McGREGOR W. SCOTT
United States Attorney
S. ROBERT TICE-RASKIN
LAURA L. FERRIS
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

MICHAEL MULLANEY
Acting Chief, Counterterrorism Section
STEVEN A. TYRRELL
Deputy Chief, Counterterrorism Section
DAVID B. DEITCH
Trial Attorney, Counterterrorism Section
Criminal Division
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C.  20005
Telephone: (202) 514-0849


IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. S-05-240 GEB |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S TRIAL MEMORANDUM |
| | ) | |
| v. | ) | |
| | ) | |
| HAMID HAYAT and, | ) | |
| UMER HAYAT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Plaintiff, United States of America, by and through its

counsel of record, hereby submits its trial memorandum in the

above-captioned case.  In this memorandum, the government sets

forth information regarding the evidence to be admitted against

each of the defendants at trial, as well as the proposed

resolution of legal and logistic issues that the government

anticipates may arise during the trial.  The government

respectfully suggests the Court resolve two of these issues –
regarding <u>Bruton</u>-related redaction of the defendants' videotaped
statements and regarding the administration of a polygraph
examination to defendant Hamid Hayat – before the government
begins its case-in-chief.

**I.**

**<u>INTRODUCTION</u>**

Trial is set for February 14, 2006, before the Honorable
Garland E. Burrell, Jr., United States District Judge.

A.   <u>Trial Estimate</u>

The government estimates that it will take approximately 15
days to present its case-in-chief.  The defense has stated
jointly that it estimates that presentation of evidence in the
defendants' cases will take approximately 12 days.  The total
estimate of 27 days excludes the time necessary for selection of
the two juries, opening statements as well as any rebuttal cases.

B.   <u>Government Witnesses</u>

The government expects to call approximately 23 witnesses in
its case-in-chief.

**II.**

**<u>SUMMARY OF SECOND SUPERSEDING INDICTMENT</u>**

A.   <u>Count One</u>

Count One of the Second Superseding Indictment charges
defendant Hamid Hayat with providing material support and
resources, to wit, personnel in the form of his person (as well
as concealing and disguising the nature of such material support

and resources, and attempting to conceal and disguise the nature of such material support and resources), knowing and intending that the material support and resources were to be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 2332b (Acts of Terrorism Transcending National Boundaries).

In support of this charge, the Second Superseding Indictment alleges:

On or about April 19 to April 21, 2003, defendant Hamid Hayat traveled from the United States to Pakistan via a commercial airline, a facility of interstate and international commerce. (Second Superseding Indictment, Count One, ¶ 5).

At some point, no earlier than approximately October, 2003, defendant Hamid Hayat provided himself as a recruit to receive jihadist training at a training camp in Pakistan. (Id. ¶ 6).

During a period of months sometime between in or about October, 2003 and in or about November, 2004, in Pakistan, defendant Hamid Hayat received jihadist training, including training in physical fitness, firearms, and means to wage violent jihad. (Id. ¶ 7).

On or about May 27, 2005, defendant Hamid Hayat departed Pakistan for the United States via a commercial airline. At this time, defendant Hamid Hayat intended to return to the United States and, upon receipt of orders from other individuals, to wage violent jihad against persons and real and personal property within the United States. (Id. ¶ 8).

On or about May 30, 2005, defendant Hamid Hayat's plane was diverted to Narita, Japan.  When questioned by an agent of the Federal Bureau of Investigation ("FBI") on that day, defendant Hamid Hayat concealed the fact that he had received jihadist training, and that he was returning to the United States for the purpose of waging violent jihad.  (<u>Id</u>. ¶ 9).  Based upon Hamid Hayat's false statements, he was permitted to depart Japan for the United States.  That same day, he returned to the United States via a commercial airline.  (<u>Id</u>. ¶ 10).

On or about June 3 and June 4, 2005, when questioned by the FBI in Lodi, California, defendant Hamid Hayat falsely stated that he had never attended a jihadist camp and falsely stated that he had never received weapons or other types of jihadist training, concealing the fact that he had attended a camp in Pakistan where he received jihadist training.  (<u>Id</u>. ¶¶ 11-12).

B.    <u>Counts Two through Four</u>

Counts Two through Four charge defendant Hamid Hayat with willfully making false, material statements, within the jurisdiction of the Federal Bureau of Investigation in an offense that involves international or domestic terrorism.  In Count Two defendant is charged with falsely stating on June 3, 2005: "that he had never attended a jihadist camp, when, in truth and in fact as he then well knew, he had attended one or more such camps in Pakistan."  Second Superseding Indictment, Count Two.

In Count Three defendant Hamid Hayat is charged with falsely stating on June 4, 2005: "that he had never received weapons or

4

other types of jihadist training, when, in truth and in fact, as he then well knew, he had received jihadist training, including weapons training." Second Superseding Indictment, Count Three.

In Count Four defendant Hamid Hayat is charged with falsely stating on June 4, 2005: "that he had never received training to fight against the United States, when, in truth and in fact, as he then well knew, he had received training in Pakistan to wage violent jihad against the United States." Second Superseding Indictment, Count Four.

C.   <u>Counts Five and Six</u>

Counts Five and Six charge defendant Umer Hayat with willfully making false, material statements, within the jurisdiction of the Federal Bureau of Investigation in an offense that involves international or domestic terrorism.

In Count Five defendant Umer Hayat is charged with falsely stating on June 4, 2005: "that he had no first-hand knowledge of training camps in Pakistan that would prepare persons to fight jihad, when, in truth and in fact, as he then well knew, he had visited such training camps in Pakistan."  Second Superseding Indictment, Count Five.

In Count Six defendant Umer Hayat is charged with falsely stating on June 4, 2005: "that he was not aware that his son, Hamid Hayat, had attended jihadist training, when, in truth and in fact, as he then well knew, he was aware that Hamid Hayat had attended such training in Pakistan."  Second Superseding Indictment, Count Six.

### III.

### STATEMENT OF FACTS

The government expects to prove the crimes set forth above through proof at trial of a variety of facts and events, including, without limitation, the following:

A.   <u>March and April, 2003: Hamid Hayat Pledges Belief In Jihad to a Cooperating Witness</u>

During a series of recorded conversations with a cooperating witness ("CW") between March, 2003 and April, 2003, defendant Hamid Hayat revealed, among other things: (1) that he understood the nature and structure of various known Pakistani terrorist groups; (2) that he had detailed knowledge regarding the mechanics of attending a jihadist training camp; and (3) that his relatives had various connections to jihadist groups and camps that would facilitate his attendance at such a camp.   Hamid Hayat also discussed the provision of financial support to such groups in Pakistan, and specifically confirmed that he was going to attend a jihadist training camp.

B.   <u>Late April, 2003:  Umer and Hamid Hayat Travel to Pakistan</u>

Through testimony of percipient witnesses and admission of documentary evidence, the government will prove that defendants Umer Hayat, Hamid Hayat, and their family traveled from the United States to Pakistan on or about April 19-21, 2003.

C.   <u>July and August 2003: Hamid Hayat Further Confirms His Interest In Attending A Camp to a Cooperating Witness</u>

During recorded conversations with the CW after he arrived in Pakistan, defendant Hamid Hayat confirmed that he was going to

attend a madrassah (religious school) and then a jihadist training camp.

**D.    August 2003: Defendant Umer Hayat Reports to the CW on Hamid Hayat's Attendance at a Jihadist Camp**

Evidence will be presented showing that Umer Hayat returned from Pakistan to the United States in June 2003 and remained there until departing to Pakistan again in October 2003.  During a recorded telephone conversation with the CW in August 2003, while Umer Hayat was in the United States, Umer Hayat confirmed that his son, Hamid Hayat, was in Pakistan, and that Hamid Hayat would be going to a madrassah and then attending a training camp after Ramadan.

**E.    February and May, 2005: Umer and Hamid Hayat Return to the United States**

According to percipient witnesses and documentary evidence, defendant Umer Hayat returned to the United States on or about February 27, 2005.  His son, Hamid Hayat, returned to the United States on or about May 30, 2005.

**F.    May 30 and June 3, 2005: Defendant Hamid Hayat Lies to the FBI About Jihadist Training**

Defendant Hamid Hayat was interviewed by FBI SA Lawrence Futa on May 30, 2005 (in the Tokyo airport in Narita, Japan), and by FBI SA Pedro T. Aguilar on June 3, 2005 (at defendants' home). During these interviews, defendant Hamid Hayat repeatedly denied that he had participated in any sort of jihadist training in Pakistan.

///

G.   June 4, 2005: Defendant Hamid Hayat Lies Again to the FBI
     About Jihadist Training and then Ultimately Admits to
     Attending Training

On June 4, 2005, after advisement and waiver of his rights, defendant Hamid Hayat was interviewed again by FBI Agent/Polygrapher Harry Sweeney.  Defendant initially denied that he had received weapons training and attended jihadist training with the intent to fight against the United States.   After administration of a polygraph examination, defendant subsequently admitted to SA Sweeney that he had attended jihadist training both in 2000 and again during a period of time in 2003-2004.[1]

On June 4 and June 5, 2005, during a videotaped interview with various agents, including SAs Gary Schaaf, Timothy Harrison, Harry Sweeney and Pedro T. Aguilar, defendant Hamid Hayat stated that:

- He attended a jihadist training camp in Pakistan for approximately 3-6 months in 2003-2004, and had also attended a jihadist training camp for a 3-day period in 2000.  He described, with some detail, the location and layout of the camp he attended in 2003-2004.

- The purpose of both camps was to train for jihad and to teach people to kill those who work against Muslims. The camp provided paramilitary training, including

---

[1]The government discusses *infra* the issues related to the admissibility or inadmissibility of the fact of the administration of a polygraph examination.

weapons training, explosives training, training in
fighting and physical fitness training.

- He had various beliefs as to whom ran the camp.  At one
  point he indicated that it was run by Harakat-ul-Ansar,
  a known Pakistani extremist group.  At another point he
  indicated that his uncle Attiq [Rehman] ran the camp
  and was 75-80% certain that his grandfather [Saaed Ur
  Rehman] also ran the camp.  He also stated that he
  believed that Al-Qaeda were supporters of the camp.

- He was being trained to and intended to commit violent
  jihad – that is, acts of violence – in the U.S.  He did
  not have any orders to fight at present, but expected
  to receive such orders.

H.  <u>June 4, 2005: Defendant Umer Hayat Initially Lies to the FBI
But Then Admits That He Knew His Son Had Gone to Jihadist
Camps and that Umer Hayat Himself Had Visited Jihadist
Camps.</u>

On June 4, 2005, Defendant Umer Hayat was interviewed by FBI
SAs Aguilar and Harrison at the FBI office in Sacramento.
Defendant Umer Hayat denied that he had any firsthand knowledge
of training camps in Pakistan, indicating that he would swear on
the Quran that this was true.  Defendant Umer Hayat also denied
any knowledge of his son's attendance in terrorist or jihadist
training.  Thereafter, during a videotaped interview, defendant
Umer Hayat stated, among other things, that:

- Hamid Hayat received jihadist training when he attended
  a militant training camp in Pakistan in 2003-04, the

purpose of which was to prepare Hamid Hayat to commit jihad – that is, acts of violence – in the United States.

- Umer Hayat knew of his son's intent to attend the camp beforehand, and that his son had described his attendance at the camp to him prior to the time when Umer Hayat was interviewed by the FBI.  Umer Hayat specifically explained that Hamid Hayat had been interested in attending a jihadist training camp since Hamid Hayat's teenage years growing up in Pakistan, during which time Hamid Hayat was influenced by a classmate at the madrassah (religious school) he attended in Rawalpindi, and by Hamid Hayat's uncle who had fought as a mujahideen (one who commits jihad) in Afghanistan.

- The madrassah Hamid Hayat attended was operated by Hamid Hayat's grandfather, Saaed Ur Rehman (Umer Hayat's father-in-law), a prominent public figure in Pakistan.  According to Umer Hayat, Rehman sends the students from this madrassah to jihadist training camps in Pakistan.

- Because of Umer Hayat's family connections, Umer Hayat was invited to observe more than four operational jihadist training camps, with a driver.  While visiting these training camps, he observed weapons and urban warfare training (including target practice utilizing

10

pictures of President Bush and Secretary of Defense Rumsfeld), physical training, and classroom education.

During the course of their interviews, as well as during conversations with the cooperating witness, both defendants Hamid Hayat and Umer Hayat expressed familiarity with and support for various well known Pakistani militant groups (including Harakat ul-Mujahedin, Jaish-e-Muhammed, and Sipah-e-Sahaba) which advocate violent jihad.  The government will present background expert testimony to explain the nature of these militant groups (as well as other pertinent political groups, militant groups, and historical events referenced by the defendants).

I.   <u>June 5, 2005: A Jihadist Note Is Found on Defendant Hamid Hayat.</u>

An agent searched defendant Hamid Hayat at the time of his arrest on June 5, 2005.  Defendant's wallet contained various identification documents, as well as a scrap of paper which included a brief statement in Arabic: "Oh Allah, we place you at their throats, and we seek refuge in you from their evils."  The government will offer expert testimony which will explain the source of the statement, as well as the significance of the statement and of the fact that it was being carried by the defendant.

J.   <u>June 7, 2005: Jihadist Publications Found At the Hayat Residence.</u>

Agents searched the Hayat residence on or about June 7, 2005 pursuant to a lawfully issued federal search warrant.  Agents recovered a series of Urdu publications including:

(a)  <u>Virtues of Jihad</u> by Masood Azhar, founder and leader of
     the known Pakistani extremist group Jaish-e-Muhammed
     (found in a converted garage used from time to time by
     defendant Hamid Hayat);

(b)  a Jaish-e-Muhammed magazine edited by Masood Azhar
     (found in the same converted garage); and

(c)  <u>Reports From the Window of Prison</u> by Masood Azhar
     (found in the laundry room of the Hayats' house).

Through expert testimony, the government will explain to the jury
that these publications extol the virtues of violent jihad and
urge every Muslim to commit violent jihad.

Agents also found (in the converted garage) a scrapbook
bearing Hamid Hayat's name and containing various Pakistani
newspaper articles.  Through expert testimony, the government
will explain to the jury that many of these articles relate to
topics of relevance to jihadists.[2]

///

_____

[2]For example, the scrapbook contains a series of articles (some
dated in September, 1999) protesting the arrest of Fazul-ur-
Rehman (the leader of a well known Pakistani religious party) by
the Pakistani government and indicating that if Rehman is not
released, there will be a series of protests and potential acts
of violence against the government of Pakistan, the United States
and their citizens.  These articles further describe various
processions/rallies related thereto including a "Death to
America" procession and "Long-live-Taliban" rally.  These
articles further criticize the United States government
(described, for example, as the biggest terrorist and an enemy of
Islam) and Pakistani government, express support for Osama Bin
Laden and the Taliban, and warn of consequences should the United
States attack Afghanistan.

K.    Expert Testimony Regarding Jihadist Camps In Pakistan

     The government also will present expert testimony related to the existence and purpose of jihadist training camps in Pakistan. Among other things, experts will explain: the nature of violent jihad and jihadists, the nature and ideology of various Pakistani militant groups who support violent jihad, the role of Pakistani militant groups in training jihadists, and the nature of jihadist training camps in Pakistan.  The government will also present expert testimony describing images obtained via satellite of a location consistent in appearance with the militant training camp that Hamid Hayat ultimately confessed that he attended.

**IV.**

**ELEMENTS OF PROOF FOR CHARGES**

A.    Material Support

     Count One of the Second Superseding Indictment charges defendant Hamid Hayat with a violation of Title 18, United States Code Section 2339A (Providing Material Support to Terrorists) on three alternative theories: (1) that he provided material support or resources; (2) that he concealed or disguised the nature of material support or resources; and (3) that he attempted to conceal or disguise the nature of material support or resources.[3]

---

     [3]The applicable statute, 18 U.S.C. § 2339A, provides in relevant part that:

     Whoever provides material support or resources or conceals or disguises the nature, location, source or ownership of material support or resources . . .  knowing or intending that they are to be used in preparation for, or in carrying out, a violation of  [18 U.S.C. § 2332b (acts of terrorism

1       1.   <u>Providing Material Support</u>

2            To prove that defendant Hamid Hayat provided material

3       support as charged in Count One, the government must establish

4       each of the following elements beyond a reasonable doubt:

5            <u>First</u>,    that the defendant provided material support or

6                          resources.

7            <u>Second</u>,   that the defendant did so knowing or intending

8                          that such support or resources would be used in

9                          preparation for or in carrying out a violation of

10                         18 U.S.C. § 2332b.

11      18 U.S.C. § 2339A.

12           2.   <u>Elements of Concealing Material Support</u>

13           To prove that defendant Hamid Hayat concealed material

14      support as charged in Count One, the government must establish

15      each of the following elements beyond a reasonable doubt:

16           <u>First</u>,    that the defendant concealed or disguised the

17                         nature, location, or source of material support or

18                         resources.

19           <u>Second</u>,   that the defendant did so knowing or intending

20                         that such  material support or resources would be

21                         used in preparation for or in carrying out a

22                         violation of 18 U.S.C. § 2332b.

23      18 U.S.C. § 2339A.

24      _____

25      transcending national boundaries)] or attempts or conspires
        to do such an act, [is guilty of a crime].

26      18 U.S.C. § 2339A.

27                              14

1     3.   <u>Elements of Attempting to Conceal Material Support</u>

2          To prove that defendant Hamid Hayat attempted to conceal

3     material support as charged in Count One, the Government must

4     establish each of the following elements beyond a reasonable

5     doubt:

6          <u>First</u>,      that the defendant intended to commit the crime of

7                      crime of concealing or disguising material support

8                      or resources; and

9          <u>Second</u>,     that the defendant did something which was a

10                     substantial step toward committing that crime,

11                     with all of the jurors agreeing as to what

12                     constituted the substantial step.

13    18 U.S.C. § 2339A (a); 9TH CIR. CRIM. JURY INST. 5.5 (2003).

14         4.   <u>Relevant Definitions</u>

15         For the purposes of Count One, the phrase "material support

16    or resources" means any property (tangible or intangible) or

17    service, including training and personnel. 18 U.S.C. § 2339A(b).

18    The term "personnel" means one or more persons, which can include

19    the defendant's own person. 18 U.S.C. § 2339A (b).  "Training"

20    means instruction or teaching designed to impart a specific

21    skill, as opposed to general knowledge. 18 U.S.C. § 2339A (b).

22         "Provide" means to furnish, supply or make available.  <u>The</u>

23    <u>American Heritage Dictionary of English, Fourth Edition</u> (2000);

24    <u>United States v. Mohrbacher</u>, 182 F.3d 1041, 1048 (9th Cir.

25    1999)("where the statutory term is not defined in the statute, it

26    is appropriate to accord the term its 'ordinary meaning.'  When

27

there is no indication that Congress intended a specific legal meaning for the term, the court may look to sources such as dictionaries for a definition."). The terms "conceal" and "disguise" mean to hide, or to keep from being seen, found, observed or discovered. <u>The American Heritage Dictionary of English, Fourth Edition</u> (2000).

5. <u>Mens Rea</u>

For the purposes of Count One, the government must prove that the defendant knew or intended that the material support and resources were to be used in preparation for or in carrying out a violation of 18 U.S.C. § 2332b, which prohibits acts of terrorism transcending national boundaries.

It is important to note that the government need *not* establish that defendant actually committed an act of terrorism transcending national boundaries, and the government need *not* establish that defendant actually violated section 2332b. The government must establish that defendant knew or intended that the material support *be used in preparation for or in carrying out* an act of terrorism transcending national boundaries. 18 U.S.C. § 2332b; <u>see</u> <u>United States v. Pomponio</u>, 511 F.2d 953, 957 (4th Cir.), <u>cert. denied</u>, 423 U.S. 874 (1975) ("The 'unlawful activity' specified in the [analogous Travel] Act may be [an offense] under state or federal law and reference to such law is necessary only to identify the type of 'unlawful' activity in which the defendants intended to engage. Proof that the unlawful objective was accomplished or that the referenced law has

actually been violated is not a necessary element of the offense defined in Section 1952."), <u>cited with approval by</u> <u>United States</u> <u>v. Loucas</u>, 629 F.2d 989, 991 (4th Cir. 1980), <u>cert. denied</u>, 450 U.S. 1030 (1981); <u>United States v. Polizzi</u>, 500 F.2d 856, 869 (9th Cir. 1974)(Under Section 1952, "[r]eference to state law is necessary only to identify the type of unlawful activity in which the defendants intended to engage."), <u>cert. denied</u>, 419 U.S. 1120 (1975).

Thus, while the Court must instruct the jury on the elements of section 2332B to facilitate their deliberations on Count One, the jury's consideration of section 2332B pertains solely to their evaluation of defendant Hamid Hayat's knowledge or intent.

An actually completed violation of 18 U.S.C. § 2332b consists of the following elements:

<u>First</u>,      that the defendant committed, threatened to commit, attempted to commit or conspired to commit any of the following acts of violence against a person within the United States: killing a person, assaulting a person resulting in serious bodily injury, assaulting a person with a dangerous weapon, or creating a substantial risk of serious bodily injury to a person by destroying any structure, conveyance, or other real or personal property within the United States.

<u>Second</u>,     that the conduct in question "transcended national boundaries."  This means that, in addition to

conduct occurring within the United States, part
of the conduct comprising the offense must have
occurred outside the United States.

Third,    that the actual act of violence described as part
of the first element violated the laws of a state
or of the United States.

Fourth,   that any one of the following special
circumstances is present so as to vest the courts
of the United States with jurisdiction over this
act, namely:

a)   The mail, or any facility of interstate or
foreign commerce, including means of
transportation, was used in furtherance of
the offense;

b)   The offense obstructs, delays or affects
interstate or foreign commerce;

c)   The victim, or intended victim, is the United
States Government, a member of the uniformed
services, or an official, employee or agent
of the legislative, executive, or judicial
branches, or of any department or agency of
the United States;

d)   The structure or conveyance, or other real or
personal property is, in whole or in part,
owned possessed or leased to the United

18

1             States or any department of agency of the

2             United States.

3 18 U.S.C. § 2332b.

4 B.   <u>False Statements In A Matter Related to Terrorism</u>

5     1.   <u>Two Separate Determinations</u>

6     Counts Two through Six charge defendant Hamid Hayat and

7 defendant Umer Hayat with knowingly and willfully making false,

8 material statements, within the jurisdiction of the Federal

9 Bureau of Investigation[4].   A jury must first determine whether

10 each defendant willfully made a false statement in a matter

11 within the jurisdiction of the Federal Bureau of Investigation.

12 If the jury so concludes, it must also determine whether the

13 offense involved domestic or international terrorism.

14     2.   <u>Elements of False Statements</u>

15     In order for a defendant to be found guilty of making a

16 false statement, the government must prove each of the following

17 elements beyond a reasonable doubt:

18 ///

19

20    [4]The applicable statute, 18 U.S.C. § 1001, provides in relevant part that:

21

22      [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes

23      any materially false, fictitious, or fraudulent statement or representation . . . shall be [guilty of a crime].

24      [I]f the offense involves international or domestic terrorism (as defined in section 2331) [this is a separate

25      crime].

26 18 U.S.C. § 1001.

27

First, the defendant made a false statement in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI").

Second, the defendant acted willfully; and

Third, the statement was material to the FBI's activities or decisions.

9TH CIR. CRIM. JURY INST. 8.66 (2003).

   3.  <u>False Statement</u>

The term "false statement" means an assertion which is untrue when made and which is known by the person making it to be untrue.   2A O'Malley, Grenig and Lee, <u>Federal Jury Practice and Instructions</u> § 40.08 (5th ed. 2000).

   4.   <u>Matter Within the Jurisdiction of the FBI</u>

The phrase "a matter within the jurisdiction of the Federal Bureau of Investigation" means a matter or situation in which the FBI has the power to exercise authority.   In other words, the government must prove that the falsity involved a matter which was within FBI's jurisdiction at the time it was made.   The government need not prove that the defendant had actual knowledge of the FBI's jurisdiction.   <u>United States v. Rogers</u>, 466 U.S. 475 (1984); <u>United States v. Yermian</u>, 468 U.S. 63 (1984); <u>United States v. Oren</u>, 893 F.2d 1057, 1064 (9th Cir. 1990); <u>United States v. Green</u>, 745 F.2d 1205, 1209-10 (9th Cir. 1984), <u>cert. denied</u>, 474 U.S. 925 (1985).

///

///

20

5.  <u>Mens Rea</u>

For the purposes of a false statement charge, a defendant acts knowingly and willfully if he acts deliberately and with knowledge that the statement was untrue. 9TH CIR. CRIM. JURY INST. 8.66 (2003) and Comment (mens rea defined).

6.  <u>Materiality</u>

A statement or fact is material if it could have influenced the FBI's decisions or activities.  The government does not have to prove that the statement or fact actually influenced the decisions or activities of the FBI.  The government also need not prove that the defendant acted with the intention of influencing the FBI.  9TH CIR. CRIM. JURY INST. 8.66 (2003) and Comment (materiality defined); <u>United States v. Facchini</u>, 874 F.2d 638, 643 (9th Cir. 1989); <u>United States v. Vaughn</u>, 797 F.2d 1485, 1490 (9th Cir. 1986); <u>United States v. Yermian</u>, 468 U.S. 63, 73 and n.13 (9th Cir. 1984).

7.  <u>Offense Involving Terrorism</u>

An offense that involves "international terrorism" is an offense that:

    (A) involves violent acts or acts dangerous to human life
    that are a violation of the criminal laws of the United
    States or of any State, or that would be a criminal
    violation if committed within the jurisdiction of the United
    States or of any State;
    (B) appears to be intended –
            (i) to intimidate or coerce a civilian population;
            (ii) to influence the policy of a government by
            intimidation or coercion; or
            (iii) to affect the conduct of a government by mass
            destruction, assassination, or kidnaping; and
    (C) occurs primarily outside the territorial jurisdiction of
    the United States, or transcend national boundaries in terms

of the means by which they are accomplished, the persons
they appear intended to intimidate, or the locale in which
their perpetrators  operate . . . .

18 U.S.C. §§ 1001, 2331(1).

An offense that involves "domestic terrorism" is

an offense that:

(A) involves acts dangerous to human life that are a
violation of the criminal laws of the United States or of
any State;
(B) appears to be intended –
        (i) to intimidate or coerce a civilian population;
        (ii) to influence the policy of a government by
            intimidation or coercion; or
        (iii) to affect the conduct of a government by mass
            destruction, assassination, or kidnaping; and
(C) occur primarily within the territorial jurisdiction of
the United States.

18 U.S.C. §§ 1001, 2331(5).

**V.**

**POTENTIAL OR ANTICIPATED LEGAL ISSUES WITH
RESPECT TO THE GOVERNMENT'S CASE**

A.   <u>Issues Related to the Use of Dual Juries</u>

The Court has previously granted the motion of the United

States to empanel dual juries in this case – one jury to hear

evidence and render a verdict solely as to defendant Hamid Hayat,

and the other jury to hear evidence and render a verdict solely

as to defendant Umer Hayat.  While the United States intends to

offer in evidence certain evidence as to only one or the other of

the two defendants, there is a substantial body of evidence –

both testimony and exhibits – that is admissible and which the

United States intends to offer into evidence against both

defendants.

In determining its expected order of proof, the United States has endeavored to minimize the number of times that one or the other of the juries will be forced to exit and return to the courtroom.  In general, to achieve this goal, the United States will attempt to group consecutive witnesses whose evidence is admissible only against a single defendant.

In addition, in some cases, part of a witness's testimony may be admissible against only one of the defendants, and the remainder may be admissible only against the other defendant. For this reason, the United States may seek leave to re-call witnesses in order to present evidence only to the jury hearing the case against the defendant against whom particular evidence is admissible.

The Government also expects to present at least one witness for whom some testimony will be admissible as to both defendants, but the remainder is admissible only as to one or the other defendant.  In those cases, the United States intends to conduct its examination so as to present the testimony admissible before both defendants first, and then to present the remainder of the testimony after one of the juries is excused.

The Government will confer with defense counsel to address to the greatest extent possible any other issues that may arise as a result of the presentation of this case to dual juries.

B.   <u>Stipulations Regarding CIPA § 8 Hearings and the Images.</u>

As the Court knows, section 8(c) of CIPA permits the government to object to questions or lines of inquiry that could

lead a witness to disclose classified information not previously
found admissible by the Court.  Once the Government has made such
an objection, the Court must determine if the witness's testimony
is admissible and take steps to "safeguard against the compromise
of any classified information."  18 U.S.C. App. III § 8(c).

On February 3, 2006, after a lengthy colloquy with counsel
and the defendants, the Court accepted a stipulation in which
defendants and their counsel waived the right to participate in
such hearings to the extent that they involve the disclosure of
classified information.  In doing so, defendants and counsel
acknowledged that defense counsel could have sought security
clearances (or had separate cleared counsel) so that the defense
could participate, and that they had chosen not to do so.  As a
result, if the government objects to a question or line of
inquiry on this basis, the government will request that the Court
conduct a hearing <u>ex parte</u> with the government to determine the
nature of the classified information forming the basis for that
objection.[5]

Defendants and their counsel have also entered into a
stipulation regarding four satellite images that the Government
intends to enter into evidence during trial (Government Exhibits
1 through 4).  The stipulation – which establishes the
authenticity and accuracy of the images – was designed to obviate

---

[5]The Government intends to request that its witnesses signal
any concern over the disclosure of classified information by
stating, if necessary, that a question would require the
disclosure of "sensitive" information.  The Government believes
that it is preferable to use this term before the jury rather
than refer to "classified" information.

the need for discussion of sensitive and/or classified
information regarding the sources and methods used to obtain the
images.  Given these stipulations, defense counsel should not be
permitted to inquire about the authenticity and accuracy of the
images, nor should they be permitted to argue to the jury that
the images are not authentic or accurate.

C.   Testimonial References to Other Related Investigations

        The evidence that the government intends to present at trial
includes consensually recorded conversations between a
cooperating witness and one or the other of the defendants, as
well as videotaped statements by the defendants as they were
voluntarily interviewed by FBI agents.  During these various
statements, defendants refer to two individuals – Mohammed Adil
Khan and Shabbir Ahmed – who were the subject of a separate but
related investigation undertaken by the FBI.

        The government believes that the references in these
statements to these individuals should be presented to the jury
in order to give the jury a full understanding of the defendants'
statements and the context in which they were made.  The
government does not, however, intend to present evidence to the
jury regarding other information obtained or investigation
undertaken regarding these two other individuals, and the
Government believes that defense counsel should be precluded from
inquiring into the same.  Such information would likely be
collateral, and would only serve to confuse the jury about the
issues being presented for its consideration.  See Fed. R.

25

Evid. 403.   In addition, as defense counsel are aware, much of

the additional information regarding this separate investigation

remains classified, and would therefore implicate the issues

discussed above regarding the need for hearings pursuant to

section 8 of CIPA.[6]

D.   Polygraph Examination

The government intends to call Special Agent Harry Sweeney

to establish that he interviewed Hamid Hayat on June 4, 2005, and

that Hamid Hayat indicated that (1) he had never received weapons

training and (2) that he had never received training to fight

against the United States.   The government does not intend to

elicit testimony from SA Sweeney that he is a polygrapher and

that the denials came in connection with the administration of a

polygraph examination.   In fact, in order to avoid any suggestion

of an inference that the defendant took and/or failed the

polygraph, the government does not intend to include in its

direct examination any mention of "polygraph."[7] This said, the

government believes that there may be circumstances during the

_____

[6]The fact that the Government investigated these two
individuals is not classified, nor is the existence or extent of
contacts that the cooperating witness had with those individuals
as part of that investigation.   Consistent with its disclosure
obligations, the United States has provided the defense tape
recordings of numerous such contacts.   Other information obtained
as a part of this investigation, as well as analysis of the
collected information by agents or other Government personnel,
remain classified.

[7]The government takes this position in this case in an effort
to narrowly tailor the admission of this evidence, recognizing
that information concerning the results of the test are no longer
per se barred and may be admissible under certain circumstances.
See United States v. Pitner, 969 F. Supp. 1246, 1250 (W.D. Wash.
1997).

testimony of Agent Sweeney under which the defendant may "open the door" to the admission of the fact of the administration of the polygraph examination.

Evidence of questions asked and the answers given during a polygraph examination is admissible if it is an operational fact or the basis for the cause of action:

> The key to its admissibility as an operative fact is the purpose for which it is being introduced. If the polygraph evidence is being introduced because it is relevant that a polygraph examination was given, regardless of the result, then it may be admissible; or if the evidence is being introduced as a basis for a cause of action, then it may be admissible as well.

United States v. Bowen, 857 F.2d 1337, 1341 (9th Cir. 1988)(quoting Brown v. Darcy, 783 F.2d 1389, 1397 (9th Cir. 1986)) (recognizing that where polygraph evidence is an operative fact it may be admissible). In this case, the questions and answers asked during SA Sweeney's administration of the polygraph are far more probative than prejudicial; indeed they are central to the heart of not only the false statement counts (Counts 3 and 4), but the concealment and attempted concealment of the defendant's material support charged in Count 1 of the Second Superseding Indictment. Testimony about questions and answers during the polygraph are admissible here – without reference to the fact that they were asked during a polygraph – because the questions and answers are operative facts of concealment and form the basis of the charges in two counts. See Bowen, 857 F.2d at 1341 (citing Brown v. Darcy, 783 F.2d 1389, 1397 (9th Cir. 1986)).

The government will make every reasonable effort to avoid reference to the fact these statements were made in the context of a polygraph examination on direct examination.  It is possible, though, that the defense will ask questions on cross-examination that call for an answer or explanation from the witness that discloses the fact that a polygraph examination was conducted.  If the defense asks such a question, the witness should be free to answer and the government should be free to inquire on re-direct about the fact of the underlying polygraph examination.  See United States v. Johnson, 816 F.2d 918, 923 (3d Cir. 1987)(finding that government would be permitted to rebut claim that confession was coerced with evidence concerning the polygraph examination where defense was warned they could open the door); United States v. Kampiles, 609 F.2d 1233 (7th Cir. 1979)(indicating that where defendant challenged the voluntariness of his confession the government can introduce evidence that defendant confessed after being told he failed a polygraph); United States v. Hall, 805 F.2d 1410 (10th Cir. 1986) (finding that evidence that defendant failed polygraph was admissible in rebuttal if defense raised issue of the quality of the investigation).[8]

For example, if the defense attempts to impeach SA Sweeney because his report of interview is more abbreviated than typical reports of interviews prepared by other agents, including those

---

[8]At that time the Court may, at the defendant's request, give a limiting instruction concerning the jury's consideration of this evidence.  See e.g., Hall, 805 F.2d 1410, 1416 (10 Cir. 1986).

in this case, the government should be entitled to explain to the jury that SA Sweeney is a polygrapher, that polygraphers serve different functions than investigating agents, and that polygraph reports are typically abbreviated given the specific purposes of the test.  Likewise, if defense counsel questions SA Sweeney's certainty that he asked the two questions at issue (whether Hamid "ever received any weapons training at a Jihadist camp" and "ever received training to fight against the U.S."), SA Sweeney should be permitted to explain in his answer that he is sure he asked those very question three or more times (and that Hamid Hayat denied it at least three times) because it is his practice to repeat the questions in a specific way in his administration of polygraph examinations.

The government requests a ruling from the Court that questions from the defense impeaching SA Sweeney based upon the nature of his reports or the manner in which he questioned Hamid Hayat will (1) entitle SA Sweeney to disclose, in response, that these questions were asked during administration of a polygraph examination; and (2) entitle the government to elicit from SA Sweeney further details concerning his administration of that polygraph examination (without revealing the results thereof). Under such circumstances, the probative value of such testimony outweighs any prejudice – particularly when the issue has specifically been created through the defendants' cross-examination.  Unless the defense invites reference to the polygraph in that manner, however, the government will not seek

to introduce reference to the fact that a polygraph was

administered or the results of that polygraph.[9]

E.   Video Recordings of Defendants' Statements

    1.   Foundation

    The government intends to offer into evidence videotaped

interviews of each of the defendants as admissions of a party

opponent.   Under the Federal Rules of Evidence, a defendant's

statement is admissible if offered against him.   Note that a

defendant may not elicit his own prior statements.

Fed. R. Evid. 801(d)(2)(A); United States v. Fernandez, 839 F.2d

639 (9th Cir.), cert. denied, 488 U.S. 832 (1988).

    There is no rigid set of foundational requirements to admit

tape recordings into evidence.   United States v. Hollingshead,

672 F.2d 751, 755 n.3 (9th Cir. 1982); United States v. Mouton,

617 F.2d 1379, 1383-84 (9th Cir.), cert. denied, 449 U.S. 860

[9]It is conceivable, thought,  that the defense could also "open
the door" to the admission of the results of the polygraph.   If,
through cross-examination of SA Sweeney or other agents, the
defense suggests impropriety in the agents' decision to continue
questioning the defendant after his initial denials (e.g., "Why
did you continue questioning Hamid Hayat after two hours of
interviewing?"), the probative value of the fact that there was
an indication of deception during the polygraph may outweigh the
prejudicial effect of disclosure of that fact.   The government
expects that it would present evidence that the administration of
a polygraph examination takes an average of two hours.   The
government would also present evidence that, if there is an
indication of deception, as there was in this case, the
polygrapher then conducts a post-test interview that can last
several hours as the polygrapher attempts to ascertain the truth.
See Tyler v. United States, 193 F.2d 24 (D.C. Cir. 1951) (finding
polygraph evidence admissible in a murder trial "as revealing
circumstances leading to the confession").   The evidence may also
become relevant if defendant Hamid Hayat chooses to testify.   See
Kampiles, 609 F.2d at 1244.   The government will seek further
leave from the court before attempting to elicit any testimony
regarding the results of the polygraph examination.

(1980).  The district court's decision to admit tape recordings, including the sufficiency of their authentication and their audibility, is left to the court's discretion.  United States v. Lane, 514 F.2d 22, 27 (9th Cir. 1975).

Even partly inaudible tapes are admissible, so long as they have some probative value, "unless the inaudible portions are so substantial as to render untrustworthy the recording as a whole." United States v. Hanif, 1 F.3d 998, 1002 (10th Cir.), cert. denied, 114 S.Ct. 573 (1993); United States v. Hurd, 642 F.2d 1179, 1183 (9th Cir. 1981).

At bar, agents who participated in the interviews will authenticate the videotapes.

2.  The Government Has Sought Leave of the Court to Redact Potential Bruton Statements From the Videotaped Interviews.

The government has filed a motion seeking leave from the Court to redact potential Bruton statements from the videotaped interviews of each of the defendants.  The government respectfully requests that the Court resolve this issue prior to the government's case-in-chief to avoid delays during the trial.

3.  Transcripts of English Tape Recordings

The government intends to provide transcripts of the videotaped interviews to the jury.

A jury may refer to transcripts as an aid in understanding tape recordings as they are being played.  United States v. Booker, 952 F.2d 247, 249 (9th Cir. 1991).  When the government lays a foundation for transcripts of taped conversations, the

transcripts are admissible to assist the court and the jury in identifying speakers and in following the conversations as they are being played.  Booker, 952 F.2d at 249-50; United States v. Tornabene, 687 F.2d 312, 317 (9th Cir. 1982); Turner, 528 F.2d at 167.

A district court is not required to listen to tapes to determine the accuracy of corresponding transcripts prior to the tapes being played to the jury.  United States v. Tisor, 96 F.3d 370, 376-77 (9th Cir. 1996).  Objections by the defendants to the accuracy of transcripts do not preclude their admission; rather, defendants may introduce their own transcripts and argue their accuracy to the jury.  Booker, 952 F.2d at 250; United States v. Chen, 754 F.2d 817, 824 (9th Cir.), cert. denied, 471 U.S. 1139 (1985).  Once admitted, transcripts may be used by the jury during the playing of the tape recordings and during deliberations after the case has been submitted.  United States v. Taghipour, 964 F.2d 908, 910 (9th Cir. 1992) (emphasis added); Turner, 528 F.2d at 167-68.

F.   Admission of Evidence Found During Search of Defendants' House, During Search of Defendant's Person and Supplied by Both Defendants

The government intends to introduce into evidence a number of documents obtained from the defendants or their residence:

(1)   Documents relating to travel, including

•   airline tickets issued to Hamid Hayat reflecting scheduled travel from Islamabad to San Francisco

on May 27-28, 2005 (seized from the kitchen of the Hayat's house)

- Umer Hayat's old passport (seized from the converted garage at the Hayat's house)

- Hamid Hayat's and Umer Hayat's current passports (given to the FBI by Umer Hayat on or about June 5, 2005)

- a travel itinerary for the Hayat family for travel from San Francisco to Islamabad between April 19, 2003 and April 21, 2003, copies of airline tickets related to the same, copies of Hamid Hayat's drivers licenses and Passport, a copy of Umer Hayat's passport (all of which were provided by the Hayat family to immigration authorities on or about April 19, 2003 at Dulles International Airport), and

- copies of an airline ticket issued to Umer Hayat for travel from Islamabad to San Francisco between February 26 and February 27, 2005 and a copy of Umer Hayat's passport (both of which were provided by Umer Hayat to immigration authorities on or about February 27, 2005 at San Francisco International Airport)

(2) <u>Hamid Hayat's marriage certificate</u>, seized from a bedroom of the Hayat's house

(3) <u>Jihadist publications</u>, including

- <u>Reports From the Window of Prison</u> by Masood Azhar, written in Urdu (seized from the laundry room of the Hayat house)

- <u>Virtues of Jihad</u> by Masood Azhar, written in Urdu (seized from the converted garage at the Hayat house)

- <u>a Jaish-e-Muhammed magazine</u> edited by Masood Azhar(seized from same), and

- <u>a scrapbook of newspaper articles</u> bearing Hamid Hayat's name (seized from same)

(4) <u>The "throat note"</u>, a scrap of paper found inside defendant Hamid Hayat's wallet, which states "Oh Allah, we place you at their throats, and we seek refuge in you from their evils."

1.  <u>Relevance</u>

All the items are clearly relevant to the charges at hand and are admissible against one or both defendants.

The documents relating to travel serve to corroborate the statements that each of the defendants made during their videotaped confessions regarding the period of time that each spent in Pakistan, and the dates on which certain events took place in Pakistan.  These events include, of course, defendant Hamid Hayat's admitted attendance at a jihadist training camp, and defendant Umer Hayat's admitted visits to several such camps.

Defendant Hamid Hayat's marriage certificate similarly serves to corroborate that defendant's statements regarding his

34

intention to be married, and the relationship between that intention and his plan to attend a jihadist training camp. Specifically, Hamid Hayat informed the confidential witness that he could only go to jihad after married, and told agents during his videotaped interview that he attended camp a certain number of months prior to his reported wedding date in March, 2005.

The jihadist publications are relevant in that they constitute probative evidence of defendants' knowledge and intent with respect to jihad.  These publications corroborate Hamid Hayat's admission that, when he attended a jihadist training camp, he intended to return to the United States to commit violence.  These publications also corroborate Umer Hayat's interest in jihad.  That interest will be evidenced at trial by Umer Hayat's own confession in which he discussed the fact that training camps exist in Pakistan for the purpose of training individuals to engage in violence jihad, and disclosed that he had visited a number of such camps himself to observe them.

The "throat note" is relevant as to both defendants on the same theory as the jihadist publications.  This evidence is probative evidence that Hamid Hayat attended a jihadist training camp, and that Hamid Hayat had the requisite jihadist intent when he attended the camp, returned to the United States, and lied to the FBI.  This is also relevant evidence that Umer Hayat's statements to the FBI were indeed knowing and false.

///

///

2.   Authentication and Identification

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Under Rule 901(a), evidence (including foreign records) should be admitted, despite any challenge, once the government makes a prima facie showing of authenticity or identification so "that a reasonable juror could find in favor of authenticity or identification . . . [because] the probative force of the evidence offered is, ultimately, an issue for the jury." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991) (citations and internal quotation marks omitted); see United States v. Black, 767 F.2d 1334, 1342 (9th Cir.), cert. denied, 474 U.S. 1022 (1985).

The government, of course, must establish a connection between the defendant and the exhibit. See United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985). See also Burgess v. Premier Corp., 727 F.2d 826, 835-36 (9th Cir. 1984) (exhibits adequately authenticated by fact that they were found in defendant's warehouse); United States v. Natale, 526 F.2d 1160, 1173 (2d Cir. 1975)(exhibits adequately authenticated when found at place where defendant was present), cert. denied, 425 U.S. 950 (1976).  Significantly, the authenticity of documents seized from or sent by a defendant may be proven by circumstantial evidence.

United States v. Scurlick, 52 F.3d 531, 538 (5th Cir. 1999);
Natale, 526 F.2d at 1173; United States v. King, 472 F.2d 1, 9-11
(9th Cir.), cert. denied, 414 U.S. 864 (1973); see also United
States v. Luschen, 614 F.2d 1164, 1174 (8th Cir.), cert. denied,
446 U.S. 939 (1980).  The documents need not have been signed by
the defendant nor examined by a handwriting expert.

　　　　Appearances, contents or other distinctive characteristics,
taken in conjunction with the circumstances, also can provide a
means of authentication.  Fed. R. Evid. 901(b)(4). See, e.g.,
United States v. Thornton, 197 F.3d 241, 250 (7th Cir.
1999)(authenticity of utility bills, merchant receipts and
business cards proven through content), cert. denied, 120 S. Ct.
1282 (2000);  United States v. McGlory, 968 F.2d 309, 330 (3d
Cir.), cert. denied, 506 U.S. 956 (1992)(notes in trash
authenticated based on contents and location of discovery);
United States v. Silker, 751 F.2d 477, 488 (2d Cir. 1984), cert.
denied, 470 U.S. 1058 (2d Cir. 1985)(contents of records and
seizure at defendant's home sufficient to prove authenticity).

　　　　Indeed, the Ninth Circuit has repeatedly held that documents
can be authenticated by the nature of their contents, the
location of their discovery, indicia of ownership, as well as
other corroborative evidence associated with the case. See United
States v. Huezo-Ibarra, 954 F.2d 546, 552-53 (9th Cir.
1992)("The notebooks in this case were circumstantially
authenticated because they were found in the Appellants' home in
safes with cocaine and documents bearing the Appellants' names.

They were further authenticated by the nature of their contents and the fact that they corroborated the testimony of government agents regarding the suspected drug-trafficking."); United States v. Walker, 993 F.2d 196, 199 (9th Cir. 1993) ("The notebook was sufficiently authenticated and relevant for a number of reasons: it was found in the apartment near drugs, firearm ammunition, cash, and drug paraphernalia; it contained numerous references to Walker and drug deals; and it corroborated the testimony of the special agent regarding the suspected drug trafficking.")

In this case, an FBI agent or other witness will testify as to the circumstances surrounding the discovery and/or receipt of each item, including where it was encountered or received.  There will clearly be a sufficient foundation to authenticate each item.

The documents relating to travel are authenticated by the fact that they were either obtained from the defendants or from their residence and, in most cases, bear their names and other identifying information.  The information contained in these documents is also corroborated by the defendants' own statements regarding their travel.  In addition, in the case of the passports, these documents are facially authenticated under Rule 901(7)of the Federal Rules of Evidence.  This is sufficient prima facie evidence to authenticate these documents.

Defendant Hamid Hayat's marriage certificate is authenticated, at least in part, by the fact that the document itself indicates, in English, that it relates to Hamid Hayat.

The certificate also was found in the Hayat household and is corroborated by defendant's admission to law enforcement that he, in fact, was wed in Pakistan on the date indicated on the certificate.  Finally, the marriage certificate is facially authenticated under Rule 901(7).  All this is sufficient prima facie evidence to authenticate the certificate.

The jihadist publications are authenticated by the fact that they were recovered from the residence of the defendants.  In addition, the scrapbook actually bears the name Hamid Hayat and was found in the converted garage as to which there will be evidence of use by Hamid Hayat.  A cooperating witness will also testify that he recognizes the scrapbook because defendant Hamid Hayat showed it to him.  The Virtues of Jihad book, as well as the Jaish-e-Muhammed magazine, were found in a bag with a series of documents and/or books principally bearing the names Hamid or Umer Hayat, in that same converted garage.  Reports From the Window of Prison was likewise found in the Hayat laundry room. The newspaper articles in the scrapbook are also self-authenticating under Federal Rule of Evidence 902(6)(newspapers and periodicals).  All this is sufficient prima facie evidence to authenticate these items.

The "throat note" is authenticated by the fact that it was found inside defendant Hamid Hayat's wallet along with his identification.  This will be sufficient prima facie evidence to authenticate this item.

///

1          3.    Chain of Custody

2          Evidence should be admitted, over any challenges, once the

3 government makes a prima facie showing of authenticity or

4 identification, so that a reasonable jury could find that the

5 items are in substantially the same condition as when they were

6 seized.  See United States v. Edwards, 235 F.3d 1173, 1179 (9th

7 Cir. 2000); United States v. Black, 767 F.2d 1334, 1342 (9th

8 Cir.), cert. denied, 474 U.S. 1022 (1985); Gallego v. United

9 States, 276 F.2d 914, 917 (9th Cir. 1960).  The government need

10 not establish all links in the chain of custody of an item or

11 call all persons who were in a position to come into contact with

12 it.  See Gallego, 276 F.2d 914, 917 (9th Cir. 1960).  When the

13 exhibits are at all times in official custody, a presumption of

14 regularity attends the discharge of official duties involving the

15 handling of exhibits by public officials.  United States v.

16 Harrington, 923 F.2d 1371, 1374 (9th Cir. 2000);  United States

17 v. Aviles, 623 F.2d 1192, 1198 (7th Cir. 1980).

18         The government will introduce evidence that the items seized

19 or received were in official custody at all relevant times.

20         4.    Hearsay

21         Under the Federal Rules of Evidence, "hearsay is a statement

22 [including a written assertion, Fed. R. Evid. 801(a)], other than

23 one made by the declarant while testifying at the trial . . . ,

24 offered to prove the truth of the matter asserted."  Fed. R.

25 Evid. 801(c).

26

27

The jihadist publications and the "throat note" pose no
issues under the hearsay rule.   They are offered to demonstrate
defendants' motive, intent and knowledge, and are not for their
truth.   See United States v. Huguez-Ibarra, 954 F.2d 546, 552-53
(9th Cir. 1992)("[T]he [drug] ledgers were not being admitted to
prove the truth of what was written in them. Instead, they were
admitted to show that the type of activities charged in the
indictment were being carried out in the residence. Thus, 'the
rule against hearsay was not implicated....'").

The documents relating to travel and the marriage
certificate also do not pose any hearsay issues because they are
non-hearsay under Federal Rule of Evidence 801(d).[10]  Rule
801(d)(2)(B) provides that a statement is not hearsay if offered
against a party, when the party "has manifested an adoption or
belief in its truth."  "In applying this doctrine, courts
frequently have construed possession of a written statement as an
adoption of what its contents reveal."  Paulino, 13 F.3d at 24.
"[S]o long as the surrounding circumstances tie the possessor and
the document together in some meaningful way, the possessor may
be found to have adopted the writing and embraced its contents."
Id.

For example, in United States v. Ospina, 739 F.2d 448, 451
(9th Cir. 1984), the Ninth Circuit held that two business cards

---

[10]To the extent that the travel documents and marriage
certificate are used to clarify or establish the accuracy of
Hamid Hayat's and Umer Hayat's statements to investigators, they
are not offered for the truth of their contents and thus are non-
hearsay.  See United States v. Alwan, 279 F.3d 431, 439 (7th Cir.
2002).

found in a defendant's hotel room after his arrest and a motel

receipt found on another defendant at the time of his arrest were

properly admitted into evidence as adopted admissions.

Similarly, in United States v. Marino, 658 F.2d 1120, 1124-25

(6th Cir. 1981), the Sixth Circuit held that airline tickets on a

defendant's person constituted adopted admissions.  See Paulino,

13 F.3d at 24 ("[A]ppellant held the only known key to the

apartment; he had frequented the premises; the saved document

bore his name; and he was, at the very least, privy to the

criminal enterprise.  Consequently, the record is sufficient to

permit a finding that appellant possessed and adopted, the

receipt."); United States v. Canieso, 470 F.2d 1224, 1232 n. 8

(2d Cir. 1972)(possession of letters an adoptive admission).

In this case, the fact that all of the travel documents and

marriage certificate bear the names of defendants, and were

either from their person or from there residence, is more than

enough to tie the documents and defendants together "in some

meaningful way." Thus, each of these documents has been adopted

by each defendant and are admissible non-hearsay documents.

In addition, the passports are admissible, even if

considered hearsay, under the public-records exception of Federal

Rule of Evidence 803(8), see United States v. Pluta, 176 F.3d 43,

49 (2d Cir. 1999); cf. United States v. Akbar, 698 F.2d 378, 378

(9th Cir. 1983), or under Rule 807, see United States v. Brown,

770 F.2d 768, 771 (9th Cir. 1985).

Likewise, the marriage certificate is admissible, even if considered hearsay, under the record of vital statistic exception of Federal Rule of Evidence 803(9), under the public-records exception of Federal Rule of Evidence 803(8), see <u>United States v. Pluta</u>, 176 F.3d 43, 49 (2d Cir. 1999); <u>cf.</u> <u>United States v. Akbar</u>, 698 F.2d 378, 378 (9th Cir. 1983), or under Rule 807, see <u>United States v. Brown</u>, 770 F.2d 768, 771 (9th Cir. 1985).[11]

G.   <u>Conversations Between the Defendants and the Cooperating Witness.</u>

1.   <u>Foundational Requirements</u>

The government intends to introduce various recorded and unrecorded conversations between defendants and a cooperating witness, most of which are in Urdu and Pashto and a limited portion of which are in English.

As discussed earlier, there is no rigid set of foundational requirements to admit tape recordings into evidence, <u>United States v. Hollingshead</u>, 672 F.2d 751, 755 n.3 (9th Cir. 1982); <u>United States v. Mouton</u>, 617 F.2d 1379, 1383-84 (9th Cir.), <u>cert. denied</u>, 449 U.S. 860 (1980), and the district court's decision to admit tape recordings, including the sufficiency of their

---

[11]In theory, the defense might assert that this evidence somehow is improper under Federal Rule of Evidence 403. Any such challenge should be rejected. "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." <u>United States v. Hankey</u>, 203 F.3d 1160, 1172 (9th Cir. 2000). The materials at issue directly relate to the charged offenses, and, in many instances, have substantial probative value as to defendants' knowledge and intent. It cannot be said that any potential prejudice associated with these items substantially outweighs their probative value. See <u>United States v. Salameh</u>, 152 F.3d 88, 111 (2d Cir. 1998).

authentication and their audibility, is left to the court's
discretion.  <u>United States v. Lane</u>, 514 F.2d 22, 27 (9th Cir.
1975).

A witness familiar with a voice on a tape may identify the
speaker from other contact enabling the witness to connect the
voice to the speaker.  Fed. R. Evid. 901(b)(5), <u>United States v.
Turner</u>, 528 F.2d 143, 163 (9th Cir.), <u>cert. denied</u>, <u>sub nom.</u>,
<u>Hackett v. United States</u>, 423 U.S. 996 (1975), <u>cert. denied</u>, 429
U.S. 837 (1976); <u>United States v. Goldstein</u>, 532 F.2d 1305, 1315
(9th Cir.), <u>cert. denied</u>, 429 U.S. 960 (1976).  Moreover,
circumstantial evidence may be introduced to identify a speaker
in an intercepted conversation.  Fed. R. Evid. 901(b)(5), (6).
Such evidence may include a speaker's self-identification, even
by nickname.  <u>Van Ripper v. United States</u>, 13 F.2d 961, 968 (2d
Cir.), <u>cert. denied sub nom.</u>, <u>Ackerson v. United States</u>, 273 U.S.
702 (1926); <u>Turner</u>, 528 F.2d at 163; <u>Palos v. United States</u>, 416
F.2d 438, 440 (5th Cir. 1969), <u>cert. denied</u>, 397 U.S. 980 (1970).

2.  <u>Transcripts of Foreign Language Tape Recordings</u>

The recorded conversations between the cooperating witness
and the defendants are primarily in a foreign language, and, for
that reason, the government has prepared translated English
transcripts of those recordings.  The government is entitled to
offer into evidence both the taped foreign-language conversations
and the translated transcripts.  See <u>United States v. Taghipour</u>,
964 F.2d 908, 909-910 (9th Cir. 1992)(recognizing that this is

appropriate where the tapes are in both a foreign language and English).[12]

Despite the government's good faith efforts, it has been unable to reach an agreement with the defendants regarding the accuracy of these translated transcripts.   The government raised this issue when counsel for the government met with defense counsel on January 31, 2006.   After the parties had agreed to talk on February 12, 2006, the defense declined to stipulate to the transcripts but did not identify any inaccuracies with or objections to the transcripts.   Because the defense has failed to identify any inaccuracies, raise any objections, or offer any competing translations, the government's translations should be admitted into evidence after it presents appropriate foundational testimony.   See United States v. Pena-Espinoza, 47 F.3d 356, 360 (9th Cir. 1995) (finding that conclusory allegations of possible inaccuracy are not sufficient to challenge a transcript); United States v. Font-Ramirez, 944 F.2d 42, 48 (1st Cir. 1991) (finding that because the defendant failed to offer an alternative transcript and made conclusory

---

[12]To the extent that the tapes are in English, the court can instruct the jury that the transcript is just an aid and the tape controls, see United States v. Turner, 528 F.2d 143, 167-68 (9th Cir. 1975), but to the extent there are in a foreign language they should be instructed that the transcripts control.   The tapes should be admitted into evidence to establish audibility, intonation and to the extent they contain English.

allegations of inaccuracy without specific references it was

within court's discretion to admit the transcript).[13]

H.   Prior Inconsistent and Consistent Statements

It is anticipated that the defense may attempt to introduce statements made by the cooperating witness on the theory that they constitute prior inconsistent statements.

Under certain limited circumstances, a prior inconsistent statement is admissible at trial and does not constitute hearsay. First, the declarant must actually testify at trial and be subject to cross-examination.  Fed. R. Evid. 801(d)(1).  Second, the prior statement must be "inconsistent with the declarant's testimony."  Id.  The current and prior statements need not be diametrically opposed, but there must be a variance that has a reasonable bearing on credibility.  See United States v. Trzaska, 111 F.3d 1019, 1024-25 (2d Cir. 1997).  Third, if the statement is offered as substantive evidence, the prior statement must have been given under oath.  United States v. Ragghianti, 560 F.2d 1376, 1379 (9th Cir. 1979).  Otherwise, the statement may only be used for impeachment value and, at the request of the parties, should be limited as such by way of an appropriate instruction. Id.  Finally, before a prior inconsistent statement may be introduced, the party making the statement must be given the opportunity to explain or deny the same.  Fed. R. Evid. 613(b).

_____

[13]One of the government's translators has expressed a reasonable basis for the withholding of his surname and certain other identifying personal information.  The government will submit a declaration from this witness to the court, and seek an order permitting the government to withhold such information.

Prior consistent statements are admissible under Rule 801(d)(1)(B) of the Federal Rules of Evidence which provides that:

> A statement is not hearsay if -- . . . the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . .

It is left to the court's discretion to admit prior consistent statements to rebut charges of recent fabrication. United States v. Smith, 893 F.2d 1573, 1581-82 (9th Cir. 1990).

I.    Inquiry Regarding the Witness's Prior Misdemeanor Conviction Should Be Prohibited.

The government's confidential witnesses pleaded guilty to second degree burglary in 1993, in violation of Cal. Penal Code § 459.  This conviction was a misdemeanor offense under Cal. Penal Code § 17(b), and ultimately was dismissed after the witness served his term of probation pursuant to Cal. Penal Code § 1203.4.  The government anticipates that the defendants may seek to introduce evidence of this conviction or inquire into its circumstances to impeach the witness, pursuant to Federal Rules of Evidence 609 or 608.  Neither rule is an appropriate basis for introducing evidence of the conviction, and this Court should preclude the defendants from doing so.

///

///

///

1.    <u>Impeachment Under Fed. R. Evid. 609 Is Not Allowed</u>

Under California law, Cal. Penal Code § 17(b), this offense was a misdemeanor.  Rule 609(a)(1) allows evidence of prior convictions to be admitted for the purposes of impeachment under certain circumscribed conditions.  Significantly, evidence of a prior conviction introduced under Rule 609(a)(1) is limited to felonies - that is, crimes punishable by more than one year in prison.  Fed. R. Evid. 609(a)(1).  Here, the witness's conviction plainly is inadmissible under Rule 609(a)(1).

Rule 609(a)(2) permits admission of all crimes that involve "dishonesty or a false statement." for the purposes of impeachment. Fed. R. Evid. 609(a)(2).  In interpreting Rule 609(a)(2) the Ninth Circuit has noted that the "dishonesty or false statement" language is limited "to those crimes that involve some element of misrepresentation or other indicium of a propensity to lie and [to exclude] those crimes which, bad though they are, do not carry with them a tinge of falsification,' . . . '[a]n absence of respect for the property of others is an undesirable character trait, but it is not an indicium of a propensity toward testimonial dishonesty.'" <u>United States v. Foster</u>, 227 F.3d 1096, 1100 (9th Cir. 2000) (quoting <u>United States v. Ortega</u>, 561 F.2d 803, 806 (9th Cir. 1977)).  The witness's crime manifests, at most, an absence of respect for property.

Indeed, the Ninth Circuit has expressly held that burglary is not a crime of dishonesty under Rule 609(a)(2), <u>see</u> <u>United</u>

1   States v. Brackeen, 969 F.2d 827, 830 (9th Cir. 1992); United
2   States v. Glenn, 667 F.2d 1269, 1973 (9th Cir. 1982), unless
3   there is some indication that the conviction actually involved
4   deceit.  In this case, there is no such indication that the
5   charge for which the witness was convicted involved any element
6   of deceit.  Thus any inquiry into the conviction at trial should
7   be barred.

8        Rule 609 also provides that "[e]vidence of a
9   conviction . . . is not admissible if a period of more than ten
10  years has elapsed from the date of conviction or of . . .
11  release . . . unless the probative value of the conviction
12  substantially outweighs its prejudicial effect."  Fed. R. Evid.
13  609(b).  The witness was convicted in 1993, served two days in
14  jail and later the charges were dismissed.  These events occurred
15  well over ten years ago, and thus the conviction may only be
16  allowed if the probative value *substantially outweighs* its
17  prejudicial effect.  This standard is rarely met, see United
18  States v. Bensimon, 172 F.3d 1121, 1126-27 (9th Cir. 1999), and
19  is not met here.  As noted above, the crime is not one of
20  dishonesty, and thus has no bearing on the witness' capacity for
21  truthfulness, nor does the burglary impact any issue in this
22  case.  The minimal probative value of this stale and dismissed
23  conviction does not even come close to outweighing the
24  prejudicial effect of this evidence.  Inquiry regarding the
25  conviction should be prohibited.

26  ///

27

1          2.    Impeachment Under Rule 608 Is Also Improper

2          "Specific instances of the conduct of a witness, for the

3     purpose of attacking ... the witnesses' credibility, other than

4     conviction of crime as provided in rule 609, may not be proved by

5     extrinsic evidence." Fed. R. Evid. 608(b).  "Specific instances

6     of the conduct of a witness" may "in the discretion of the court,

7     if probative of truthfulness or untruthfulness, be inquired into

8     on cross-examination of the witness . . . concerning the witness'

9     character for truthfulness or untruthfulness."

10    Fed. R. Evid. 608(b).

11         Although the defendants may argue that the misdemeanor

12    conviction is a proper subject of inquiry, see United States v.

13    Colbert, 116 F.3d 395, 396 (9th Cir. 1997), for reasons discussed

14    above it is not probative of the witness' truthfulness.  The

15    courts have repeatedly held that an individual's commission of a

16    property crime "is not an indicium of a propensity toward

17    testimonial dishonesty." United States v. Foster, 227 F.3d 1096,

18    1100 (9th Cir. 2000) (quoting United States v. Ortega, 561 F.2d

19    803, 806 (9th Cir. 1977)(quotation marks omitted)).   Therefore

20    the defendants should be barred from asking about it during

21    cross-examination.  See Colbert 116 F.3d at 396 (misdemeanor

22    conviction for lewd conduct inadmissible for purpose of

23    impeaching adverse witness because it involved neither dishonesty

24    nor false statement); United States v. Geston, 299 F.3d 1130,

25    1137 (9th Cir. 2002) (prior violent conduct by witness

26    inadmissible because prior conduct involved neither dishonesty

27

nor credibility); <u>see also</u> <u>United States v. Munoz</u>, 233 F.3d 1117,

1135 (9th Cir. 2000) (noting that 608(b) evidence may, in any

case, "be too remote in time to be deemed probative of the

witness's truthfulness").

J.   <u>Cooperating Witness Testimony Related to Inextricably</u>
     <u>Intertwined Potential Bad Acts of the Defendants.</u>

     The government anticipates that the cooperating witness may

testify regarding potential bad acts of the defendants which are

inextricably intertwined with the criminal acts of the defendants

at issue.  These acts include, but are not limited to, financial

support for extremist groups and Hamid Hayat's admitted presence

at and participation in riots and other gatherings in Pakistan.

Such testimony is wholly permissible.

     Fed. R. Evid. 404(b) is a rule of "inclusion which admits

evidence of other crimes or acts relevant to an issue in trial,

except where it tends to prove <u>only</u> criminal disposition." <u>Heath</u>

<u>v. Cast</u>, 813 F.2d 254, 259 (9th Cir.), <u>cert</u>. <u>denied</u>, 484 U.S. 849

(1987) (quoting <u>United States v. Rocha</u>, 553 F.2d 615, 616 (9th

Cir. 1977)) (emphasis in original); <u>see</u> <u>also</u> <u>United States v.</u>

<u>Ayers</u>, 924 F.2d 1468, 1472-73 (9th Cir. 1991) (same)

> Rule 404(b) states, in pertinent part:
> Evidence of other crimes, wrongs or acts is not
> admissible to prove the character of a person in order
> to show that he acted in conformity therewith.  It may,
> however, be admissible for other purposes, such as
> proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or
> accident . . . .

1  Fed. R. Evid. 404(b)[14].

2  Where evidence is "inextricably intertwined with the crime

3  with which defendant is charged, the evidence should <u>not</u> be

4  treated as "other crimes" evidence under Rule 404(b).  <u>United</u>

5  <u>States v. Ripinsky</u>, 109 F.3d 1436, 1442 (9th Cir.), <u>amended on</u>

6  <u>other grounds</u>, 129 F.3d 518 (9th Cir. 1997), <u>cert. denied</u>, 522

7  U.S. 1084 (1998).  Other act evidence may be considered

8  inextricably intertwined where the evidence is necessary to flesh

9  out the circumstances surrounding the crime with which the

10 defendant has been charged, thereby allowing the jury to make

11    [14]Rule 404(b) makes no distinction between subsequent and prior
   acts; both are equally admissible under the rule.  <u>United States</u>
12 <u>v. Wales</u>, 977 F.2d 1323, 1326 (9th Cir. 1992); <u>United States v.</u>
   <u>Bibo-Rodriguez</u>, 922 F.2d 1398, 1400 (9th Cir.), <u>cert. denied</u>, 501
13 U.S. 1234 (1991); <u>Ayers</u>, 924 F.2d at 1473.  Rule 404(b) also
   makes no distinction between criminal and non-criminal acts; both
14 are equally admissible under the rule.  <u>United States v.</u>
   <u>Erickson</u>, 75 F.3d 470, 478 (9th Cir. 1996).
15    The Ninth Circuit has developed a four-part test for
   determining the admissibility of Rule 404(b) evidence:
16 (1) there must be sufficient evidence to support a finding by the
   jury that the defendant committed the other act; (2) the conduct
17 must not be too remote in time from the commission of the crime
   charged; (3) the conduct must, in some cases, be similar to the
18 offense charged; and (4) the conduct must be introduced to prove
   an element of the charged offense that is a material issue in the
19 case.  <u>United States v. Arambula-Ruiz</u>, 987 F.2d 599, 603 (9th
   Cir. 1993); <u>Ayers</u>, 924 F.2d at 1473.
20    Rule 404(b) requires that the district court engage in
   balancing probative value with prejudicial effect: "The
21 determination must be made whether the danger of undue prejudice
   outweighs the probative value of the evidence in view of the
22 availability of other means of proof and other factors
   appropriate for making decisions of this kind under Rule 403."
23 Fed. R. Evid. 404(b), Advisory Committee's Note; <u>Arambula-Ruiz</u>,
   987 F.2d at 604. Evidence falling within the parameters of Rule
24 404(b) can be excluded by a trial court only in those cases where
   the potential for unfair prejudice <u>substantially</u> outweighs the
25 probative value of the evidence.  <u>United States v. Skillman</u>, 922
   F.2d 1370, 1374 (9th Cir. 1990), <u>cert</u>. <u>dismissed</u>, 502 U.S. 922
26 (1991); <u>see also</u> <u>United States v. Bowman</u>, 720 F.2d 1103, 1105
   (9th Cir. 1983).

27
                              52

1   sense of the testimony in its proper context.  Id. at 1442.  This

2   evidence is needed to permit the prosecutor to offer a coherent

3   and comprehensible story regarding the commission of the crime.

4   Id.   In addition, this case, the prior and contemporaneous acts

5   at issue will be offered as evidence of the defendants' intent,

6   knowledge and absence of mistake.

7   K.    Expert Testimony

8         As noted previously, the government intends to offer various

9   expert witnesses including: a series of translators, an expert

10  who will explain the meaning of the "throat note," an expert who

11  will opine regarding various Pakistani extremist groups and the

12  existence of jihadist training camps in Pakistan, and an expert

13  who will opine regarding certain satellite images of a camp

14  located in the vicinity of Balakot, Pakistan.

15        It should be noted that an expert's opinion may be based on

16  hearsay or facts not in evidence, where the facts or data relied

17  upon are of the type reasonably relied upon by experts in the

18  field.  Fed. R. Evid. 703.  In addition, an expert may provide

19  opinion testimony even if it embraces an ultimate issue to be

20  decided by the trier of fact.  Fed. R. Evid. 704.

21  L.    Multiplicity

22        Defendant Hamid Hayat filed an amended motion to dismiss

23  Counts Two and Three of the Second Superseding Indictment on the

24  grounds of multiplicity.  The government opposed and will

25  continue to oppose any such motion.

26

27

The Court has deferred ruling on this motion until the record is developed at trial. The government's position with respect to this issue is fully set forth in its January 23, 2006 Opposition to the Original Motion to Dismiss, as well as its February 2, 2006 Opposition to the Amended Motion to Dismiss.

In short, the government believes that the false statement charges set forth in Counts Two, Three and Four are appropriately charged because the statements given by defendant on June 3rd and June 4th were separate and non-identical falsities.  In the alternative, even were the Court to conclude that defendant was asked the same questions and gave the same answers on both June 3 (when interviewed by SA Aguilar) and June 4, 2005 (when interviewed by SA/polygrapher Sweeney), the government contends that defendant's June 4 statements to SA Sweeney caused additional impairment to the FBI's functions.

There is one important issue the Court should note.  As stated in the section above related to the polygraph issues, the government does not intend to offer into evidence the fact that a polygraph examination was administered to defendant Hamid Hayat on June 4, 2005 or the results thereof, during the direct examination of Agent Sweeney.  However, the government may seek leave of the Court to introduce evidence related to the administration of a polygraph, following defense cross-examination, if necessary to fully and fairly explain the circumstances of the polygraph interview at issue.

///

Given this, it may become necessary to introduce separate evidence related to the duties and functions of the polygrapher and the question of whether defendant's June 4 statements caused additional impairment to the FBI function's *outside the presence of the jury* before the Court can ultimately make a ruling on the factual and legal issues pertaining to defendant's claim of multiplicity.  The government thus recommends the following approach as to this issue.  The government will present evidence at trial related to the purported false statements on June 4, 2005.  If, in fact, no polygraph evidence is adduced at trial, and if, indeed, the jury returns multiple false statement guilty verdicts, the government respectfully requests leave to offer additional evidence to the court on the duties and functions of the polygrapher and the question of whether defendant's June 4 statements caused additional impairment to the FBI.

## VI.

### POTENTIAL OR ANTICIPATED LEGAL ISSUES WITH RESPECT TO THE DEFENSE CASE

A.   <u>Neither Defendant Has Disclosed Any Expert Evidence.</u>

The Federal Rules of Criminal Procedure require the defendant to provide, upon the government's request, a summary of any expert testimony that the defendant intends to use at trial. Fed. R. Crim. P. 16(b)(1)(C).  If the defendant fails to comply with this rule, the Court may prohibit him from introducing undisclosed evidence.  <u>See</u> Fed. R. Crim. P. 16(d)(2).

///

The government has received no notice or summaries whatsoever from the defendants describing anticipated expert testimony.   The defendants have had ample time to prepare their case and have repeatedly assured the Court that they are prepared for trial.   At this late date, the defendants cannot argue that they have had inadequate opportunity to anticipate the need for expert testimony, and exclusion under Rule 16 is appropriate. See Wong v. Regents of the Univ. of California, 410 F.3d 1052, 1060 (9th Cir. 2005).   If the defendants intend to use expert testimony, their failure to disclose it yet indicates a purposeful attempt to circumvent the discovery rules for tactical advantage.   In such a circumstance, exclusion is an appropriate sanction.   See United States v. Verduzco, 373 F.3d 1022, 1033 (9th Cir. 2004); United States v. Finley, 301 F.3d 1000, 1018 (9th Cir. 2002).   Indeed, disclosure of expert witnesses at this point risks causing either significant prejudice to the government or trial delay, making exclusion necessary.   Cf. Verduzco, 373 F.3d at 1033 (noting that a mere violation of Rule 16 may not warrant exclusion, but exclusion was appropriate when violation combined with potential prejudice and relevance issues).   This Court therefore should bar the defendants from introducing any expert evidence.[15]

---

[15]Should the defense disclose its intent to introduce such evidence, the government of course reserves the right to interpose substantive objections thereto.

B.    <u>Neither Defendant Has Disclosed Alibi Evidence.</u>

Federal Rule of Criminal Procedure 12.1 permits a district court to exclude the testimony of an alibi witness when the defendant has failed timely to disclose the witness.  <u>See</u> Fed. R. Crim. P. 12.1(d); <u>United States v. Henderson</u>, 241 F.3d 638, 650 (9th Cir. 2000).  Exclusion of such testimony does not require a "showing of surprise or prejudice to the government. <u>Henderson</u>, 241 F.3d at 650.  "A trial court may reject testimony of an alibi witness when it finds that the defendant has willfully failed to follow procedural rules applicable to the presentation such evidence."  <u>Id.</u>

In this case, the government requested notification of any intended alibi defense from the defendants on January 10, 2006. Neither defendant has provided any such notice to date. Therefore this Court should bar the defendants from presenting any potential alibi testimony concerning the time that Hamid Hayat was alleged to be training at a camp in Pakistan, or concerning the time that Umer Hayat was alleged to be touring camps.[16]  <u>See</u> <u>United States v. Pearson</u>, 159 F.3d 480, 484 (10th Cir. 1998) (exclusion appropriate when notice given four days before trial, even though defendant's counsel provided notice immediately upon learning of the alibi); <u>United States v. Rivera-Garcia</u>, 369 F. Supp. 2d 201, 202 (D.P.R. 2005) ("[T]he mere fact of the overlate disclosure alone is reason enough for exclusion of the testimony . . . ."); <u>United States v. Johnson</u>, 354 F.

---

[16]This does not pertain to testimony offered by either defendant himself.  <u>See</u> Fed. R. Crim. P. 12.1(e).

Supp. 2d 939, 954 (N.D. Iowa 2005) (fashioning such a remedy for noncompliance with Rule 12.1).  In short, the defendants have had ample time to comply with Rule 12.1's requirements, and, if either one intends to offer such witness, they have failed to comply with the Rule.

C.   The Court Should Strictly Enforce The Limits On Permissible Testimony As To The Defendant's Character.

The government believes that defendants Hamid Hayat and Umer Hayat may seek, during their respective cases, to call witnesses to provide character testimony.  If so, the Court should strictly enforce the limits on such testimony imposed by applicable law.

As a general rule, character witnesses called by the defendant may not testify about specific acts demonstrating a particular trait or other information acquired only by personal observation and interaction with the defendant.  Rather, the witness may only summarize the reputation of the defendant for a particular relevant character trait as known in the community. Michelson v. United States, 335 U.S. 469, 477 (1948). In addition, the court has discretion to limit the number of character witnesses.  Id. at 480.

On cross-examination of a defendant's character witnesses, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait at issue.  Fed. R. Evid. 405(a). Specifically, a defendant's character witnesses may be cross-examined about whether, in stating the defendant's reputation for a particular character

trait, the witness was aware of certain of the defendant's past crimes, wrongful acts, and arrest.  <u>Michelson</u>, 335 U.S. 469, 482-87 (1948);  <u>United States v. Watson</u>, 587 F.2d 365, 369 (7th Cir. 1978), <u>cert. denied</u>, 439 U.S. 1132 (1979).  The witness's knowledge of these specific crimes, wrongful acts and/or arrest is relevant information for the jury to consider in evaluating the witness's claim as to the defendant's reputation.

D.   <u>Proof and Inquiry Regarding Witness Misconduct</u>

It is possible that either of the defendants may call witnesses whom the government know to have engaged in misconduct that evidences the witnesses' character for untruthfulness.  If so, the government will see permission to probe these specific instances.  Fed. R. Evid. 608(b) ("Specific instances of the conduct of a witness" may "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . concerning the witness' character for truthfulness or untruthfulness.").  The government will not offer extrinsic evidence, however, with respect to such conduct.  <u>See</u> Fed. R. Evid. 608(b)("Specific instances of the conduct of a witness, for the purpose of attacking ... the witnesses' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.").

///

///

///

///

## VI.

## CONCLUSION

The government hereby requests leave to file such additional memoranda as may become appropriate during the course of the trial.

Dated: February 14, 2006          Respectfully submitted,

McGREGOR W. SCOTT
United States Attorney

By:  /s/ TICE-RASKIN
S. ROBERT TICE-RASKIN
Assistant U.S. Attorney

/s/ LAURA L. FERRIS
LAURA L. FERRIS
Assistant U.S. Attorney

By:  /s/ DAVID B. DEITCH
DAVID B. DEITCH
Trial Attorney
United States Dep't of Justice