1

LAW OFFICE OF WAZHMA MOJADDIDI
WAZHMA MOJADDIDI (SBN 226804)

2

7112 Agora Way
El Dorado Hills, CA 95762

3

Telephone: (916) 939-7357
Facsimile: (916) 939-2721

4

5

RIORDAN & HORGAN
DENNIS P. RIORDAN (SBN 69320)
DONALD M. HORGAN (SBN 121547)

6

523 Octavia Street
San Francisco, CA 94102

7

Telephone: (415) 431-3472
Facsimile: (415) 552-2703

8

9

Attorneys for Defendant
HAMID HAYAT

10

UNITED STATES DISTRICT COURT

11

EASTERN DISTRICT OF CALIFORNIA

12

13

UNITED STATES OF AMERICA,

     )
     )  No. CR S-05-0240 GEB
     )

14

          Plaintiff,

     )
     )  **DEFENDANT'S MEMORANDUM**
     )  **IN SUPPORT OF MOTION FOR A**

15

     vs.

     )  **NEW TRIAL**
     )

16

HAMID HAYAT,

     )
     )

17

          Defendant.

     )
     )

18

**INTRODUCTION**

19

20

    Every criminal trial is of great importance to the defendant whose liberty is at stake, and

21

that is certainly the case here, where Hamid Hayat could be sentenced to spend much of the rest

22

of his life in prison if the jury's verdicts in this matter are upheld. The significance of this

23

prosecution, however, extends far beyond the personal interests of Mr. Hayat. As the United

24

States Attorney for this district has declared, this prosecution was a test of a new post-9/11

25

paradigm.[1] The government made that clear when it argued in closing that this was "not a case

26

27

    [1] In an interview with the PBS show "Frontline" on July 24, 2006, United States Attorney
MacGregor Scott stated concerning this prosecution:

28

    ... There is a new paradigm, because we in federal law enforcement and our state

1  where a building has been blown up," but involved "a charge that allows the FBI to prevent acts

2  like that," a charge as to which, given the required mental state, a party is "guilty long before the

3  building is blown up, long before anyone is hurt." (RT 4336)

4        Undisputably, the charges brought against Hayat were serious ones, and if their truth had

5  been fairly proven beyond a reasonable doubt to the unanimous satisfaction of twelve impartial

6  jurors, Hayat's trial and conviction could and no doubt would serve as a prosecutorial strategy

7  to be emulated in the future. But any paradigm that seeks to convict defendants less for what

8  they have done than what they might do poses a grave danger of spawning a preventative

9  detention regime which criminalizes thought and opinion, thereby destroying liberty in order to

10  save it. From the moment of Hayat's arrest, grave questions have been raised as to the truth of

11  the accusations against him. Was Hamid Hayat really a trained jihadist bent on taking lives and

12  destroying property in the United States, as the government claimed, or was he merely a

13  garrulous young man guilty of nothing more than possessing a consuming but harmless interest

14  in the byzantine and sometimes violent politics of Islam and Pakistan?

15        The government's claim in closing argument to have fully proven Hayat's guilt of the

16  charged allegations rested on five building blocks. The first was Hayat's possession of books

17  and a scrapbook of newspaper articles concerning Islamist politics in Pakistan, which, the

18  government argued in closing argument, showed "Hamid Hayat had had a jihadi heart and mind

19  for quite some time." (RT 4223; see also 4224-4231) The second key component of the

20  government's case was tape recordings of conversations between Hayat and FBI informant

21  Naseem Khan in 2003 and 2004, some recorded when Hayat was in Pakistan, in which,

22  according to the government, "Hamid Hayat repeatedly, repeatedly professed his belief in

23  _____

24        and local partners have the task of not just investigating a crime after it has
         happened -- which is the old paradigm, which we have done for decades if not
25        centuries; we now have the duty to prevent that crime from ever happening in the
         first place.

26

27  See http://www.pbs.org/wgbh/pages/frontline/enemywithin/interviews/scott.html.

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    violent jihad during the course of his numerous conversations with Naseem Khan." (RT 4231)

2    Third, the government proffered an expert witness who translated a Muslim "supplication"

3    written in Arabic which Hamid carried in his wallet, and then opined, again according to the

4    government's closing argument, that this prayer only "would be carried by a holy warrior, a

5    violent jihadi, who felt himself to be traveling in an enemy land, and who was ready to commit

6    violent jihad." (RT 4357)  Fourth, the government introduced expert opinion testimony that there

7    had been jihadi training camps in the area of Balakot, Pakistan, and that satellite photos taken of

8    the area in 2000 and 2004 revealed structures consistent with the existence of a camp in that

9    region.

10          Had the government's case stopped there, of course, the defendant would have been

11   entitled to directed verdict of acquittal, because the aforementioned evidence could not possibly

12   establish that Hayat actually *attended* a training camp in Pakistan, a necessary element of every

13   crime with which the defendant was charged. The government's case therefore rose and fell on

14   its fifth category of evidence: statements taken from the defendant on June 4 and June 5, 2005 at

15   FBI headquarters in Sacramento in which he initially denied attending a training camp in

16   Pakistan and then stated that he had done so.   As the lead FBI agent on this case testified when

17   asked on cross-examination whether he was able to confirm that Hayat attended a training camp

18   in Pakistan, "minus the statements, no." (RT 762)

19          For its part, the defense placed before the jury evidence that fundamentally challenged

20   the reliability of the investigative techniques employed in this case and the weight and credibility

21   of the testimony against the defendant.  In the defense's competing narrative, (a) the FBI in the

22   wake of 9/11 was misled into launching a major anti-terrorism operation in Lodi by the patently

23   false claim of ex-convict Khan that he had observed Ayman Al-Zawahiri, Osama Bin Ladin's

24   second in command, and other Al Qaeda leaders attending the Lodi mosque at a time in 1999

25   when these parties were on the FBI's most wanted list[2]; (b) Khan had been paid hundreds of

26

27          [2]  United States Attorney Scott agreed in his July 24th Frontline interview that it was the
      naming of Al Zawahiri and other Al Qaeda leaders by Khan that "obviously perked the interest
28    of the FBI and is what really led directly to his recruitment as an operative for the FBI."  The

      U.S. v. Hamid Hayat,
      No. CR S-05-0240 GEB
                                          3

thousands of dollars and given the use of a sports car to hunt jihadists in Lodi, with particular

focus on two imams preaching there; (c)  Hamid Hayat, while exhibiting in his conversations

with Khan a cultural bent to endlessly discuss Pakistani politics in general and radical Islamic

politics in particular, was a feckless slacker rather than an aspiring warrior; (d) Hayat went to

Pakistan not to attend a training camp but to seek cheaper medical care for his mother and to get

married, both of which he did; (e) while in Pakistan, Hayat had resisted Khan's tax-payer funded

entreaties to attend a terrorist camp and Khan's threats when Hayat failed to do so; (f) upon his

return to this country, Hamid had truthfully told the FBI that he had not attended a terrorist

training camp in Pakistan; (g) wanting simply to be permitted to go home, Hayat ultimately

agreed, albeit rather incoherently, to his interrogators' insistent suggestions that he had so

trained; and (h) when the FBI failed to find any evidence justifying criminal prosecution of the

Lodi imams, Hamid Hayat had to be indicted to avoid the judgment that the long-running Khan

investigation, although full of sound and fury, had signified nothing.

        In the section of this motion that immediately follows, defendant Hayat will revisit the

evidence admitted at trial. He does not do so for the purpose of renewing his previously rejected

Rule 29 motions for a directed verdict of acquittal. Under the very demanding standard of

*Jackson v. Virginia,*[3] a motion for acquittal can be granted only if no reasonable jury could find

evidence sufficient to convict.  For purposes of this motion, Hayat accepts the Court's prior

rulings that the government had introduced at least some evidence worthy of consideration as to

each element of the charged crimes and thus that this was a case meriting decision by a jury.

        In contrast to a Rule 29 motion, however, a trial court deciding a Rule 33 claim for a new

trial is not "obliged to view the evidence in the light most favorable to the verdict, and it is free

to weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v.*

*Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000); *United States v. Alston*, 974 F.2d 1206, 1211 (9th

---

FBI had confirmed by late 2001, however, that Khan's claim was not true (RT 3370) and at trial
the government stipulated that it had no evidence that al Zawahiri was in Lodi in 1998 and 1999
(RT 3434)  In closing, the government admitted that "those people were not in Lodi." (RT 4339)

    [3] *Jackson v. Virginia*, 443 U.S. 307 (1979)

Cir. 1992)  If the court determines after weighing the evidence, "the evidence preponderates

sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it

may set aside the verdict, and submit the issues for determination by another jury." *Id.* (quoting

*United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980))  In his initial claim, Hayat seeks a

new trial on this basis.

Because its case rested so heavily on Hayat's statements during interrogation, the

government was obliged to meet the requirements of the "corpus delecti" rule requiring

independent proof that the charged crime actually was committed. *Smith v. United States*,  348

U.S. 147 (1954)  In this case, the key evidence offered as independent corroboration of the two

necessary elements of the charged offense–Dr. Mohammed's claim that Hayat possessed a jihadi

state of mind and Eric Benn's sixty to seventy percent probability estimation that a training camp

existed in Balakot, Pakistan–was legally inadmissible and probatively worthless.  When that

evidence is disregarded, the Court can have no confidence in the truth of Hayat's alleged

confession has been established in conformity with the law, particularly when the jury was not

instructed on, and thus could not have applied, the "corpus delecti" rule.  Because "a serious

miscarriage of justice may have occurred," a new trial is in order.. *Kellington* at 1097.

Hayat next contends that he was denied his Sixth Amendment right to pursue exculpatory

evidence from three witnesses–chief prosecution witness Naseem Khan, defense expert witness

Anita Weiss, and proffered defense expert James Wedick.  As to Khan, Hayat was erroneously

barred from pursuing several proper lines of cross-examination, all of which could have

generated critical evidence refuting the government's contention that he attended a jihadi

training camp.  Professor Weiss, a highly qualified Pakistani scholar, was prevented from

offering proof of the significance to Pakistanis of the Islamic supplication.  That testimony that

would have effectively rebutted the highly inflammatory but factually baseless claim of

prosecution witness Mohammed, who had no expertise in the culture, language, or politics of

Pakistan, that Hayat's carrying the prayer proved the defendant possessed the mental state

necessary to commit the charged crimes.  And the exclusion of Wedick's expert testimony

1  violated Hayat's constitutional right under *Crane v. Kentucky*[4] to challenge the credibility of his

2  purported admissions of guilt to the FBI.

3       Perhaps the most important claim of error raised herein is one for which the Court can

4  bear no responsibility, as it concerns the misconduct of two members of the Hamid Hayat jury.

5  There can be no doubt that the foreman of Hayat's jury committed misconduct when he called an

6  alternate juror during deliberations and revealed facts about the jury's confidential discussions

7  while seeking information from the alternate about a fellow juror, apparently to be used to

8  influence that other juror's decision-making.  The alternate juror informed the Court of the call,

9  which the foreman has admitted making.  Given the Court's past practice in this case, the

10  foreman would have been immediately discharged if his breach of the Court's order barring such

11  communications had surfaced prior to the return of a verdict.  Furthermore, additional

12  admissions of the foreman, corroborated by conduct observed by other jurors, establish that he

13  misled the Court during voir dire examination in swearing that he was, and would remain,

14  without bias as to the defendant, his ethnicity, and religion and would decide the case impartially

15  based solely on the evidence admitted at trial.   A second juror also committed misconduct when

16  she injected into a critical stage of the deliberations written material prepared outside the jury

17  room that contained factual information extrajudicially obtained.

18       Beginning with the press conference announcing the defendant's arrest, the community in

19  which this case was tried was subjected to a barrage of government-engendered media reports,

20  the most lurid detail of which–that Al Qaeda was in Lodi-- proved to be flatly untrue.[5]  Given the

21

22       [4] *Crane v. Kentucky*, 476 U.S. 683(1986)

23       [5]  In his July 24 2006 interview with Frontline, *supra,* United States Attorney Scott said

24  of his reference to Al Qaeda's presence in Lodi that

25       [W]e should not have said that at the opening press conference. .....

26       I do regret it from the perspective of the potential for too much concern by the
     public in this circumstance, because in the post-9/11 world, you say "Al Qaeda,"
27     and your average person on the street has a certain connotation in their mind's
     eye, and I regret that. ... [footnote continued on next page]

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    prejudicial impact that publicity could have had on potential jurors, there was always a grave

2    danger that one or more jurors deciding this action might prove to be unfair.  Unfortunately, that

3    is precisely what came to pass.

4           Finally, Hayat tenders declarations from two witnesses of a class that was conspicuously

5    absent from the government's case: eyewitnesses who were in Pakistan with the defendant and

6    observed his conduct for most or all of the period between October of 2003 and November 2004

7    when he allegedly attended a terrorist training camp for three to six months.  Jaber and Usama

8    Ismail offer proof that Hayat, as he stated in his initial FBI interviews, was in Pakistan between

9    April of 2003 and May of 2005 to help his mother receive medical care and to get married; that

10   he divided his time between the Hayat family home in Behboudi and his grandfather's house in

11   Ralawpindi, and that, based on their observations, Hayat could not have attended a training camp

12   as charged in the indictment.  Usama, who prior to trial had given the FBI the same information

13   contained in his declaration, could not be called by Hayat because Usama's court-appointed

14   attorney invoked his right not to testify; and Jaber was in Pakistan and could not have returned

15   for trial because of his placement on a "no-fly" list.  The testimony of these two witnesses meets

16   the Rule 33 standard for the granting of a new trial on the grounds of newly discovered evidence.

17

18          The legal claims raised below do not address technicalities.  Individually and collectively

19   they explain why the jury in this matter convicted an innocent man.  The defendant's motion for

20   a new trial should be granted.

21                              **STATEMENT OF THE CASE**

22          On June 16, 2005, the government filed an indictment against defendant Hamid Hayat

23   (hereinafter, "defendant" or "Hayat") charging with him two counts of 18 U.S.C. §1001 for

24   allegedly making false statements to FBI officials.  On September 22, 2005, the government filed

25   the first superceding indictment against defendant charging him with a one count violation of 18

26

27   _____

28           Scott further admitted that "there has not been nor is there an Al Qaeda cell in Lodi,
         Calif."

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  U.S.C. § 2339A for allegedly providing material support to terrorists (Count 1, a new charge),

2  and two counts of allegedly making false statements in violation of 18 U.S.C. §1001 (Counts 2

3  and 3, the same charges alleged in the original indictment).

4      On January 26, 2006, the government filed the second superceding indictment against

5  defendant charging him with a one count violation of 18 U.S.C. § 2339A and a three count

6  violation of 18 U.S.C. §1001.  Count One of the second superceding indictment alleged that

7  defendant Hayat, a United States citizen and resident of Lodi, California , of receiving "jihadist

8  training" at a camp in Pakistan sometime between October, 2003 and November, 2004, including

9  "training in physical fitness, firearms, and means to wage violent jihad," defined as "the use of

10  violence, including paramilitary action, against persons, property or governments deemed to be

11  enemies of a fundamentalist version of Islam."  (Second Superceding Indictment, paras. 2, 3, and

12  7)  Count One further charged that Hayat intended "to return to the United States and, upon

13  receipt of orders from other individuals, to wage violent jihad against persons and real property

14  within the United States." and that, upon his return, he lied to the FBI by repeatedly denying he

15  had been to a training camp in Pakistan.  (*Id.*, at para. 8)

16      Counts Two, Three and Four alleged that defendant willfully made false, material

17  statements, within the jurisdiction of the FBI in an offense that involves international or

18  domestic terrorism.  Count Two charged defendant with allegedly making a false statement to an

19  FBI official on June 3, 2005 when he stated that he had never attended a jihadist camp.   Count

20  Three charges defendant with allegedly making a false statement to an FBI official on June 4,

21  2005 when he stated that he had never received weapons or other types of jihadist training.

22  Count Four charged defendant with allegedly making a false statement to an FBI official on June

23  4, 2005 when he stated that he never received training to fight against the United States.

24      The joint trial of United States vs. Hamid Hayat and United States vs. Umer Hayat

25  commenced on February 14, 2006.  A separate jury was impaneled for each defendant. Hamid

26  Hayat's jury began deliberations on April 12, 2006.  On April 25, 2006, the jury returned guilty

27  verdicts on all four counts charged in the second superceding indictment.

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1

**STATEMENT OF FACTS**

2

**A.    The FBI Interviews of Hayat**

3    Most confessions are reliable.  If, however, there was a time when a suspect's admission

4  of having committed a charged offense conclusively settled the issue of guilt and innocence, that

5  day is past.  Even before John Mark Karr's highly publicized yet spurious claim to have

6  murdered Jon Benet Ramsay, a recent academic study of well established wrongful convictions

7  found that 51 of 340, or fifteen percent, involved false confessions.  Gross, et. al., Exonerations

8  In The United States, 1989 through 2003, Journal of Criminal Law and Criminology Vol. 95,

9  No. 2 (2005).

10    No claim of physical coercion of Hayat's statements to the FBI has been raised in this

11  case.  Rather, the central question here is whether those statements constituted a coherent

12  narrative clearly provided by the defendant himself so as to be credible, or whether a poorly

13  educated and weary defendant unaware of the gravity of his situation falsely assented to a series

14  of incriminating propositions suggested by his interrogators in a misguided effort to gain his

15  release through cooperation with the authorities.

16    Hayat describes below the context and procedures used in each of his FBI interviews, and

17  follows with a summary of his purported admissions and the conflicts contained therein.

18

**1.    The May 30, 2005 Interview in Narita, Japan**

19    On April 19, 2003, Hayat, a United States citizen, flew to Pakistan from San Francisco.

20  Approximately two years later, on May 30, 2005, Hayat was on board a plane flying from

21  Pakistan to San Francisco when his plane was diverted to Narita, Japan. (RT 446) The plane was

22  diverted because Hayat's name appeared on the federal government's "no-fly list." (RT 446-447)

23  Once the plane landed in Narita, Lawrence Futa, an FBI legal attaché stationed in Japan at the

24  time, interviewed Hayat. (RT 453)  Futa told Hayat that he needed to talk to him because the FBI

25  had received information that Hayat may have ties to terrorism.  (RT 449)  Hayat said he

26  understood that Mr. Futa needed to investigate and that he wanted to cooperate in the

27  investigation. (RT 455)

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

Hayat stated that he had been in Pakistan for two years. (RT 455) He went there because his mother had a bad case of hepatitis C and she was not getting better in the United States. (RT 455) Upon the advice of Hayat's aunt, the family went to Pakistan to consult with doctors about her condition. (RT 474) Hayat also told Futa that he had recently gotten married in Pakistan. (RT 455) Hayat described his day-to-day activities while he was in Pakistan. (RT 456) He told Futa that he took care of his mother, played a lot of cricket, made trips to Islamabad, attended mosque on Fridays, and did not work while he was in Pakistan. (RT 456)

Hayat denied that he was a member of any group that the U.S. would consider a terrorist organization. (RT 456) Hayat denied attending a terrorist training camp while he was in Pakistan. (RT 457) He said that upon returning to the States he wanted to become a truck driver because his uncle told him that it was a good way to make money. (RT 474) He also said that he wanted to go to school to improve his English. (RT 474)

Futa described Hayat as friendly, cooperative, calm and polite and showed no signs of resistance. (RT 474, 485)   Futa also observed that Hayat was rather thin and did not strike him "as someone who would have recently attended anything involving rigorous training." (RT 457, 474-475)  Hayat also gave him permission to look through his carry-on luggage.  Based upon his interview and observations of Hayat, and the information that he received from the Sacramento Division of the FBI, Futa concluded that Hayat did not pose an immediate threat to the airplane. (RT 479)   Based on Futa's recommendation, Hayat was removed from the "no-fly list" and allowed to fly into San Francisco International Airport. (RT 459)

## 2. The June 3, 2005 Interview at the Hayat Residence in Lodi

On June 3, 2005, two FBI agents, Agent Tenoch Aguilar and Agent Sean Wells went to Hayat's residence in Lodi, CA to interrogate Hayat.  (RT 538-539)  Aguilar and Wells were invited into the residence and conducted an interview of Hayat in the presence of family members. (RT 547)

Hayat told the agents that he had been in Pakistan for two years. (RT 559)  He said that he went to Behboodi, Pakistan, which is about two hours south of Islamabad.  (RT 560) He

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

10

1    explained that he went to Pakistan because his mother had Hepatitis C and the family took her

2    there so she could be seen by a doctor in Rawalpindi. (RT 560)

3          Hayat told the agents that he did not work in Pakistan because 12-hour work days earned

4    only the equivalent of one U.S. dollar.  (RT 561)  He played cricket, hung out with his cousins,

5    and played Sony Playstation. (RT 562) Every other weekend he would go cruising in Islamabad

6    and watch movies, hang out, and eat American food.  (RT 562)  On the weekends when he didn't

7    go to Islamabad, he would take his mother to the doctor Rawalpindi to receive medical

8    treatment. (RT 562)  He would leave for Rawalpindi on Friday, visit the doctor on Saturday and

9    be back in Behboodi by Sunday.  (RT 562)  His grandparents lived in Rawalpindi, a couple of

10   blocks from the doctor's office.  (RT 562)

11         Hayat explained that when he left for Pakistan, he didn't have a plan to get married, but

12   soon after they arrived in Pakistan, his parents began showing him pictures of potential brides

13   and he ended up getting married.. (RT 564) He  showed the agents his marriage certificate and

14   told them his wife's name, her birth date and her father's name.  (RT 694) Hayat now was

15   working as a cherry packer at Delta Packing Company and planned on getting his General

16   Education degree now that he was back in the U.S.  (RT 692)

17         In response to Aguilar's questions, Hayat denied attending a terrorist or jihadi training

18   camp or jihadi madrasa in Pakistan or anywhere else (RT 565-566).  Hayat said that he was not a

19   jihadi or terrorist and that he would never be involved with anything related to terrorism. (RT

20   567)

21         Hayat showed the agents his driver's license, his Delta Packing employee I.D. badge, his

22   U.S. passport and his Pakistani identification card.  (RT 691-692)  Hayat answered all of the

23   agents' questions.  (RT 697)  He was pleasant and fully cooperative throughout the interview.

24   (RT 697)  Hayat gave the agents his telephone number and agreed to go the Sacramento FBI

25   office the next day around 10 am for further questioning.  (RT 696)

26                **3.      The First Unrecorded Interview at the FBI
                           Office on June 4th**

27

28         On the morning of June 4th, Umer Hayat drove his son Hamid Hayat from their home in

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  Lodi to the FBI office located at 4500 Orange Grove Road in Sacramento. (RT 569)   They

2  arrived sometime between 10am and 11am to the FBI office.  (RT 570) Upon their arrival,

3  Aguilar took Hayat into an interviewing room and questioned him for either 15-20 minutes or

4  20-25 minutes.  (RT 570, 711) No other agents were present during this interview. (RT 570)

5  Umer Hayat waited in the lobby area.

6        Once they got into the interviewing room, Agent Aguilar immediately showed Hayat

7  some photographs. (RT 699)  These photographs were scanned and copied by law enforcement

8  officials at the San Francisco Airport out of Hayat's luggage from his recent travel. (RT 699)

9  The photos depicted men carrying and shooting rifles and an explosion in an open field.

10 (Defendant's Exhibits A1, A2, A3, A4) Hayat was wearing a garland of flowers around his neck

11 in the photos. (Defendant's Exhibit A4) Agent Aguilar asked Hayat why there were weapons in

12 the pictures. (RT 708) Hayat explained that the photos were taken during a celebration of his

13 upcoming wedding. (RT 708)   He explained that it is a cultural practice to shoot off blank

14 rounds to celebrate an upcoming wedding. (RT 708) He named the individuals depicted in the

15 photos. (RT 709)  He told Agent Aguilar that the weapons belonged to his uncle in Pakistan who

16 had a license to own the weapons and he used them for protection, which was a common practice

17 in Pakistan.(RT 709)

18        This interview was not audio taped and it was not videotaped. (RT 699)

19              **4.    The Second Unrecorded Interview of Hayat**

20      After being interviewed by Agent Aguilar, Hayat was taken into a different room and

21 interviewed by Agent Harry Sweeney.  This interview began at approximately 12:00 pm and

22 ended at approximately 4:15 pm. (RT 518-519)  The only two people in the room during this

23 time were Agent Sweeney and Hayat. (RT 516) At 12:07 pm, Hayat signed an advice of rights

24 form.  (RT 495-496) Hayat told Sweeney that he was born in the United States and that he was

25 educated, in part, in the United States up until the 5th or 6th grade. (RT 498)

26      Sweeney asked Hayat about the purpose of his recent trip to Pakistan.  (RT 498)  Hayat said

27 that he went to Pakistan to care for his ailing mother and to get married.  (RT 498) Hayat said

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

that most of the time he hung out with friends, he played cricket and would travel to another city with American-type restaurants. (RT 499)

Sweeney then asked Hayat if he had ever received weapons training at a jihadist training camp. (RT 499) Hayat denied it. (RT 499) Sweeney asked him if he had received any training at a jihadist camp to fight against the United States. (RT 499) Hayat denied it. (RT 499) For 3 ½ hours between 12:00 pm and 3:30 pm, Sweeney continued to ask questions about possible jihadi training and Hayat repeatedly denied any connection to jihadi training. (RT 519-520)

By 3:30 pm, Hayat had been undergoing questioned for over four hours; there was absolutely no grounds to further detain him, yet he had not been told that he was free to leave. It was at this point in time that Sweeney suggested to Hayat "Is it possible, Hamid, that you didn't know that you were going to a jihadi training camp? Is it possible that you may have thought it was something else, like a religious education camp?" (RT 521) It wasn't until Sweeney asked the question a number of times that Hayat said "yes" or provided any detail. (RT 521-522) Hayat then told him that he attended a jihadi camp sometime in the year 2000. (RT 500) Hayat said that he had taken a 7-8 hour bus ride to a place where he thought he was going to receive religious education that ended up being a jihadist camp where he overheard weapons and explosions. (RT 500-501) He escaped the camp by bus several days after arriving there. (RT 501) The camp was in Pakistan. (RT 500) Sweeney deemed this statement the first "admission." (RT 500)

Sweeney testified that approximately 30-45 minutes later, Sweeney asked Hayat "why would we have a picture of you on satellite image in 2003 in your most recent trip to Pakistan." (RT 523) The government did not, in fact, have a satellite image picture of Hayat at a camp. (RT 525) "Shortly" after this question, Hayat responded with a second "admission." (RT 526) Hayat told Sweeney that he attended a jihadist training camp that involved weapons and explosives training for approximately three months. (RT 502-503) Hayat thought he was going to a religious training camp, but it ended up to be a jihadist camp that included long gun weapons training, explosives training, calisthenics, and jogging. (RT 502-503) Hayat said he

took a 7-8 hour bus trip again and received pistol training at the camp.  (RT 503) Hayat

described the city where the camp was located and he wrote down the name in Urdu as

"Balakot."  (RT 504)  The second interview, which was not recorded, ended at approximately

4:15 pm.  (RT 519, 529)

### 5.    The Decision to Begin Videotaping Hayat's FBI Interviews

Hayat was interviewed two more times over the next 10-hour period and both of these

interviews were videotaped. (Government's Exhibit No. 19, 20, 21, 22) The third FBI interview,

and first recorded interview began at 4:47 pm and ended at approximately 7:09 pm.

(Government's Exhibit No. 19, 20)  The fourth interview, the second one to be recorded, began

at approximately 12:37 am on June 5, 2005 and ended at approximately 2:58 am that morning.

(Government's Exhibit No. 21,22)

When asked why he did not record the first interview of Hayat, Agent Aguilar responded

that "we typically do not record interviews." (RT 699)  When Agent Sweeney was asked why he

did not record his interview of Hayat that occurred between 12:00 pm and 4:15 pm, he responded

that he did not have the authority to do so; Special Agent in Charge Keith Slotter made the

decision of whether or not to record the interview.  (RT 528) After 4:15 pm, Sweeney suggested

to his supervisor that the interview should be recorded.  (RT 530)  When asked why he didn't

make the suggestion earlier, he stated, "generally speaking, we do not videotape our interviews."

(RT 530)  When asked what made the next interview of Hayat, which was to begin at 4:47 pm,

important enough to videotape, Sweeney responded, "his admissions."  (RT 531)

Agent Slotter testified that it was FBI policy that electronic recordings are authorized

primarily for confessions and not standard witness interviews.  (RT 3828)  The FBI office had

the capability to audiotape interviews.  (RT 3826)

### 6.    The Videotaped Interviews between June 4th and June 5th

At approximately 4:47 pm, the third interview of Hamid Hayat began.  (Government's

Exhibit 19)  The interview ended at 7:09 pm and was videotaped. (Id)  FBI Agent Gary Schaff

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  was present during the entire interview and asked most of the questions, although Agents

2  Sweeney and Lucero asked some.

3       Schaff initially asked Hayat about what kind of camps he attended. (Gov. Ex. 23 at 2)  Hayat

4  replied, "Uh they were like you know like uh training camps...Like you know…uh, you know if

5  you're not that good they won't like give you any good stuff like that move forward and like

6  that…the camps are like that." (Id.at 2)

7       Towards the beginning of the interview, Hayat told Schaff  "Most of the uh, you know

8  for my country I'll do anything you know sir, cause you know these guys are hurting our country

9  a lot…cause you know everything that was received sir, you know our troops are working there

10  very hard you know making peace in the whole world." (Id.at 16)  Hayat also told a story of

11  when one of his younger cousins rented a jihadi movie and Hayat told his cousin "you can get in

12  big trouble in this, you want me to call the cops on you…" (Id.at 16)

13       In the interview that followed, Schaff, Sweeney and Lucero used the following terms and

14  concepts, amongst others, before Hayat made any mention of them: (a) the North West Frontier

15  Province in discussing the location of a training camp; Gov. Ex. 23 at 6. (b) arriving at the camp

16  in the dark; Id.at 7. (c) weapons training at the camp; Id.at 7.  (d) explosives training at the camp;

17  Id.at 7.  (e) going up a pathway to the camp and taking supplies and other things up a trail; Id.at

18  8. (f) rifle training at the camp; Id.at 45. (g) Kalishnikovs and Kalishnikov training at the camp;

19  Id.at 45-46. (h) knives at the camp; Id.at 48.  (g) martyrs and suicide-bombers at the camp; Id.at

20  48. (h) existence of buildings at the camp; Id.at 9. (i) Harakut ul Mujahideen running the camp;

21  Id.at 12. (j) Harakut ul Ansar running the camp; Id.at 12. (k) Sipah i Sihaba running the camp;

22  Id. at 12. (l) JUI in discussing who runs the camp; Id. at 12. (m) Fazlur Rahman; Id. at 32. (o) the

23  language of Pashto being spoken at the camp; Id. at 14. (p) presence of mostly Pakistanis at the

24  camp; Id. at 13. (q) presence of Afghanis at the camp; Id. at 13. 18) presence of Kashmiris at the

25  camp; Id. at 62.  (r) jogging at the camp; Id. at 18. (s) being taught  to kill Americans at the

26  camp; Id. at 16. (t) being taught to kill Crusaders at the camp; Id. at 53. (u) being taught to kill

27  Jews at the camp; Id. at 53. (v) camp attendees going to Kashmir for jihad; Id. at 63. (w) camp

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  attendees going to Afghanistan for jihad; Id. at 63  24 ) (x) presence of security at the camp, and;

2  Id. at 94 25) (y) the term "jihadi" Id. at 12.

3        During the interview, Hayat yawned at least 13 times (Gov. Ex. 23) and when he

4  complained of being tired and jetlagged, Schaff responded "probably, a little bit, so that's, ok."

5  (Id. at 21), and continued to interview Hayat. (Id. at 21) Schaff at one point asked Hayat to wake

6  up to answer a question. (Id. at 30)  Hayat responded "I don't know" in response to at least 10

7  questions;  "I don't remember" at least 6 times; and at least 20 times, responded with a simple

8  "uh huh" in response to Schaff's questioning.  (Gov. Ex. 23) Schaff testified that Hayat was

9  courteous at all times during the interview.(RT 3719)

10       Schaff dId not believe certain things that Hayat told him because he knew they couldn't

11 be true.  (RT 3657, 3659)  Schaff told Hayat at least 9 times during the interview that parts of

12 Hayat's story about the camp did not make sense.  (Gov. Ex. 23)  Schaff told Hayat that he did

13 not believe him when Hayat said that he was tricked into going to the camp both in 2000 and in

14 2003.  (Id. at 99, 102)  Hayat explained that he thought both times he was going for Tabligh

15 Jamaat and not to a camp and Schaff told Hayat that his story didn't make any sense. (Id. at 99)

16 Hayat replied "That is ah, my story."(Id. at 103)

17       During the interview, Hayat offered to go to the camp and gather information about the

18 camp for the FBI agents. (Id. at 79-80)  He asked Schaff for a business card to contact him and

19 when Schaff said he didn't have one, Hayat asked for a beeper number or anything to contact

20 him by; Schaff told him he would give him everything. (Id. at 58)

21       At the end of the interview, Hayat asked to go home or to see his father:

22 Hayat:          Any chance of go home?

23 Schaff:         Ah, let me see what's going on here.

24 Hayat:          You guys have any more questions?

25 Schaff:         I'm thinking, I'm thinkin' I got this ah,

26 Hayat:          See ah, (unintelligible) can I see my Dad or
                   anything like that?

27

28 Schaff:         Yeah.  Let me check on that.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

16

1   Lucero:          Yeah.  He'll check on that.

2   Id. at 107.

3       For the next five and half hours of questioning, Hayat was not questioned, but remained

4   at the FBI office.  (Id. at 774)  Hayat ate pizza and drank soda.  When asked if Hayat slept during

5   this period, Agent Aguilar admitted that he didn't recall seeing Hayat sleeping. (Id. at 774)

6   Aguilar spoke to Hayat during this period about clothes and shoes and "nonsense." Hayat invited

7   Aguilar to come to his reception when his wife came into the country and Aguilar told him that

8   he might not be able to make it.  (Id. at 775)

9       The next interview of Hayat began at 12:37 am on June 5, 2005 and ended at 2:58 am.

10  (Gov. Ex. No. 23)  FBI Agent Timothy Harrison conducted most of the questioning.  (Id) Agent

11  Aguilar was also present during the entire interview and asked a few questions.  (Id.)  Towards

12  the beginning of this interview Harrison told Hayat, "…I'm trying to build an argument for you.

13  I'm trying to help you out here…You know, by saying that you're cooperating (Hamid Hayat

14  nodding) with us." (Gov. Ex. 23 at 118)

15      During this interview Hayat complained of being tired, of being sleepy, of having a

16  headache and at one point said, "my mind is not working right now, that's the problem"

17  Harrison successively replied: "Blame it on whatever you want to blame it on." (Id. at 204);

18  "Free your mind from that headache, and that, you know other voice in your head that's going

19  right now." (Id. at 209); and "If you tell the truth, you're mind is not working because you're

20  struggling to come up with answers.  And you're struggling and struggling.  You're fighting this.

21  You know. I, I see you fighting it.  I , I see your mind trying to work to come up with answers

22  that are gonna satisfy me somehow. (Hamid Hayat nodding)" (Id. at 209)

23      Throughout the interview, Harrison asked questions that he claimed "opened the door"

24  for Hayat to respond, e.g.:

25  Harrison:          Ok, I'll meet you, I'll meet you half way, all right.

26  Hayat:             What's that mean half way? You want me to
                       cooperate

27

28  Harrison:          Cooperate.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

| Hayat: | Cooperate, yeah I get that sir. |
| Harrison: | Yeah, you got to give me something in order for me to go help you. |
| Hayat: | OK. |
| Harrison: | You know, to tell my bosses that you're cooperating, that you're working with us.  You know you're in a bad situation, you know but it could be a lot worse, and there's a lot we can do to help you.  But you got to help us, you gotta work with us. |
| Hayat. | (HH nodding) |
| | All right. [* *who says this*?"] |

(Id. at 203)

About an hour and a half into the interview, at around 1:35am,  Hayat asked, "so any chance to go home or anything?" (Id. at 167).

Towards the end of the interview, Hayat asks if he will be returning the next day and the following exchange takes place:

| Harrison: | No, no.  You're not leaving here tonight, no. |
| Hayat: | No, I mean ah, tomorrow.  I'm going to be here tonight. Staying here? In the building? |
| Harrison: | No, no you're going to go, you're going to go to jail. |
| Aguilar: | Hamid you're going to jail. |
| Hayat: | Yeah, so am I going to get a place to sleep over there like that? |
| Aguilar: | It's jail Hamid you know that? |
| Hayat: | Yeah, I know, I know it's a jail, but can I lay down because my head (Hayat points to head) is hurting, I want to sleep.  I'm just saying when I come back here again tomorrow or anything like that? |

(Id. at 205-206). Hayat was formally placed under arrest about 15 minutes after the video ended, at around 3:00 am. (RT 772)

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

18

1

2

3

4        **7.      Content and Contradictions**

5            **a.      Method of Travel to the Camp and Camp**
                      **Location**

6

7        Hayat told Schaff that he left from Pindi on a 7-hour bus ride to the camp; some of the

8    people on the bus were going to the camp while others were going someplace else. (Gov. Ex. 23

9    at 3-5).  The bus was going in the direction of the Northwest Frontier Province. (Id. at 6). When

10   they arrived, it was dark and they had to walk 3, 4 miles on a path because the "bus can't go up

11   there." (Id. at 7-8). When  Schaff asked who was leading them up the trail, Hayat replied, "

12   Taking us up there? You know, no one's leading you up there, you know just going up

13   there…Get - - get direction and then people know that location." (Id. at 8).  Later, when asked by

14   Schaff whether someone led him to the camp, Hayat replied: "Yeah (yawning). I didn't ask, I

     didn't talk with no one or nothing like that." (Id. at 11).

15

16       Schaff asked Hayat about the location of the camp and referred Hayat to the piece of

17   paper where he wrote the name "Balakot" during the interview with Sweeney. (Id. at 14).  Hayat

18   then said that the camp was in the city of Balakot but he didn't know the name of the camp. (Id).

19       During the second videotaped interview with Agent Harrison, Hayat said the following

20   about the location of the camp:

21       (1) The camp was located in Balakot.  (Id. at 110).

22       (2) "This camp is in NWFP…" (Id. at 111).

23       (3) The camp was in Kashmir. (Id. at 196).

24       (4) The camp was in Afghanistan.  (Id. at 197).

25       (5) "I'll say Balakot, that the first thing I'll say uh in NWFP that's what I'll say." (Id. at
     197).

26       (6) " [I]t's in Mansehra.  (Id. at 198).

27       (7) "I'll say it's in what's it called uh uh the final question…what's it called uh Kashmir

28

that's what I'll say, Kashmir or like you trying to say that uh sure you got the wrong, wrong place so you guys try to say so." (Id. at 198).

(8) "[T]he camp will be in (unintelligible) Tora Bora something or Dohum (phonetic)… (Id. at 199).

(9) "The final thing I'll say was in uh Afghanistan." (Id. at 201).

(10) "I'll say you know what's it called this camp will be final question for mine is you know N-W-F-P, you know Peshawar, you know Peshawar, that's the area I'll say, that's where the camp was. I'll say sir. Cause I remember that pretty good, that's what I'll say. If you guys can give me more time to think about it, you know, I clear my mind." (Id. at 202).

(11) "Like I tell you guys, you know, my final answer would be like two places. I don't remember that good. One would be like, you know. That, ah, camp I told, Kashmir, one, would be like ah, you know near the Afghani border. The only two places I can tell you…Or maybe, maybe in our, you know, ahh the village, in our village, ahh (unintelligible), you know, like ahh near the village or something." (Id. at 204-205). After this response, Harrison told Hayat that he was under arrest. (Id. at 205).

Agent Aguilar testified that the results of the FBI's follow-up investigation did not confirm that Hayat attended a camp in any of the locations that he mentioned during his interview. (RT 764).

### b.  Dates of Travel to and Duration of Stay at the Camp

Hayat told Schaff that he went to the camp "six, seven months" after arriving in Pakistan in 2003, but he didn't remember the date or month. (Gov. Ex. 23 at 15). Schaff asked: "All right. So - - so, in 2003, you go to Paki-, in 2003 you're in back in Pakistan. And about 7-8 months after you get there you go to camp and you're in camp for - - for 3 to 4 months? (Id. at 15). Hayat replied: "Something like that." (Id. at 15). Just minutes later, Hayat told Schaff that he came back from the camp four to five months before his wedding date. (Id. at 20). Agent Aguilar acknowledged that six to seven months after Hayat's arrival in Pakistan in April of 2003 would be roughly October or November of 2003. (RT 760). Hayat got married in March 2005

1   and that four to five months prior to that would be around October or November 2004. (RT 762).

2

3   During the first videotaped interview, Hayat says that he ran away from the camp after three

4   months. (Gov. Ex. 23 at 11.) During the second videotaped interview, Harrison said to Hayat,

5   "You were there for six months," and Hayat replied, "Uh, huh.Yes." (Id. at 116). During the

6   remainder of the interview Harrison repeatedly stated that Hayat attended the camp for 6 months.

7   (Gov. Ex. 23).

8       During the first videotaped interview, Schaff asked Hayat "…was it supposed to be a

9   five-month camp?" (Id. at 11).   Hayat replied "I didn't know that…it was a five month camp or

10  one-year camp or anything like that.  I didn't ask I was just put on, and you know, what's it

11  called this uh, what's it called uh getting trained you know." (Id. at 11).  Over an hour later,

12  Agent Lucero asked Hayat regarding the camp, "How long were you supposed to be there?"

13  Hayat responded "Ah, they didn't say nothing.  That's up to you guys if you want to stay there

14  long as you want to stay." (Id. at 73).  Lucero replied, "So you go and you stay there for as long

15  as … you want to stay…" (Id. at 73). Lucero later asked:  "Do they have like you have to be here

16  so much training before you go to Jihad, or?" (Id. at 79).  Hayat responded, "I think so for ah six

17  months (yawn) seven months."  (Id. at 79).

18              **c.      The Camp's Group Affiliations**

19      When asked by Schaff who owned the camp, Hayat replied; "Uh. There was no names

20  about no groups or no nothing over there like he owns this camp, this group owns a camp, they

21  don't care which group you came from or like you know which group you're gonna go with.

22  Their job is to train.  They just train. That's it." Schaff: "Training just jihadi training basically?"

23  Hayat: "That's it." (Id. at 12).

24      During the second videotaped interview, Hayat was again asked about the camp's group

25  affiliation.  He first responded by saying "The group, I'll say, is Harakat-Ul-Ansar." (Id. at 126).

26  Later in the interview, Harrison asked him again about who runs the camp in the following

27  exchange:

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

21

| | | |
|---|---|---|
| 1 | Harrison: | The name of who is in charge of the camp. |
| 2 | Hayat: | I'll say Harakat-ul-Ansar is a bosses Maulana Asood Azar. Something like that. |
| 3 | | |
| 4 | Harrison: | Yeaah there's Maulana Asood Azar which is not what I am Talking about. Alright, we're talking about someone who You know very well. He's very close to you. |
| 5 | | |
| 6 | Hayat: | That runs the camp. |
| 7 | Harrison: | In your family, yeah. |
| 8 | Hayat: | In my family? |
| 9 | Harrison: | Yeah. |
| 10 | Hayat: | Maybe my uncle. |
| 11 | Harrison: | Now, I'm, I'm again I'm cracking that door for you a little Bit here, you know. |
| 12 | Hayat: | Yeah I know, my uncle (unintelligible), maybe it's my uncle. |
| 13 | | |
| 14 | Harrison: | Maybe, maybe it's your uncle? |
| 15 | Hayat: | Yeah |
| 16 | Harrison: | What is your uncle's name? |
| 17 | Hayat: | Attique, uh, I mean the little one what's it called Anas, maybe him. |
| 18 | Harrison: | Runs, runs the camp? |
| 19 | Hayat: | Yeah, I'll say that maybe, I'm not sure, maybe my Grandfather. |
| 20 | | |
| 21 | Harrison: | Maybe? |
| 22 | Hayat: | Yeah. |
| 23 | Harrison: | Maybe your grandfather? |
| 24 | Hayat: | Uh, my grandfather I say 75 or 80% |

(Id. at 170)

### d.    Types of Training at the Camp

During the first videotaped interview, when asked what kind of training he

received at the camp. (Id. at 18, 79). Hayat stated, "I got to do pistol that's it." (Id. at 18).  He

later states, "I didn't got trained that much or anything. They were using me for like you know for the kitchen and the cooking, but I don't know how to cook or anything like that." (Id. at 79). He goes on to say that he didn't learn how to cook so all he did was wash vegetables at the camp. (Id. at 79).

### e.   Number of Camp Attendees

During the first videotaped interview, Schaff asked Hayat how many people were at the camp that he attended. Hayat responded, "What can I say, sir, uh maybe uh 35, 40, 50 maybe." (Id. at 9). A couple of minutes later, Schaff asked if there are hundreds of people that came and went in the camp. (Id. at 10). Hayat responded, "I didn't see that much like uh over 50 people I'll say. I didn't see over 50 people over there, Sir." (Id. at 10).

During the second videotaped interview, Harrison asked Hayat how many students were training with him at the camp. (Id. at 195-196). Hayat responded, "Uh, I think so, over like uh 200 something." (Id. at 196).

### f.   Intent

A chief focus of Harrison's questioning in the second recorded interview was on Hayat's intent when he returned to the United States. Near the beginning of the interview, Harrison told Hayat that he knew "you left [Pakistan] with marching orders," a phrase Hayat did not understand. (Id. at 116). Harrison was sure that Hayat had been told "what your mission is. Here's what you do." (Id). Hayat replied: "They, they didn't tell me nothing. They say you can go right now and if we need anything you like that you know..." (Id). Harrison later asked Hayat why he was here rather than in Afghanistan or Kashmir, and he replied: "You know I got married so I just came back and you know." (Id. at 153). Harrison then stated that he knew there were plans for the United States and he wanted details. Hayat replied: "...they didn't give us no plans no nothing right now like we're coming from there. They didn't give us no plans. Like I was saying they gonna give us orders that, you get orders...." (Id. at 154).

Harrison asked Hayat about the targets in the United States that they were trained to

1   attack, suggesting  financial buildings, private buildings, and commercial buildings. (Id. at 176).

2   Hayat responded, "The big ones, I'll say, yeah, you know finance, I'll say finance and things like

3   that…hospitals maybe…they didn't tell us yet." (Id. at 175).  Later he added, "…maybe stores."

4   (Id. at 176).  When Harrison asks Hayat who would team up with him to take on the buildings,

5   Hayat said he didn't know but suggested maybe one or two guys from the Lodi gang would join

6   him.  (Id. at 177).  Hayat also says he knew nothing about guns or weapons to be used.  (Id. at

7   178).

8                    **g.      Hayat's Statements about Shabbir**
                              **Ahmed and Imam Adil**

9              During Hayat's interviews, it became clear that a focus of the FBI's Lodi investigation

10  was Shabbir Ahmed and Imam Adil**.**  During the first videotaped interview, Hayat told Schaff

11  that someone (whose name he couldn't remember) told him that Shabbir went to a camp.  (Id. at

12  23-25) .  Hayat also told Schaff that Shabbir was brought to the United States by Imam Maulana

13  Adil (hereinafter, "Adil"), but Hayat didn't know much about Adil. (Id. at 37).

14             During the second videotaped interview, Harrison asked Hayat if Shabbir went to the

15  camp and Hayat says, "Aah, actually I think so he went to the same camp, that's what I'll say."

16  (Id. at 124).  Hayat said "I have no idea if he went to Jihad or something…He didn't share

17  stories or nothing like that." (Id. at 124-125). Harrison then asked how Hayat would get his

18  orders and says, "They're not gonna, are they gonna call you from Pakistan? I don't think so."

19  (Id. at 128).  Hayat responded, "Maybe, uh, send a letter or anything like that maybe." (Id. at

20  128).  Harrison then said that he thought that someone local from Lodi who had been to the

21  camps or had ties to the camps was going to be giving the orders. (Id. at 130). Harrison then

22  specified someone like Shabbir could receive orders and pass them on to people like Hayat. (Id.

23  at 131). Hayat responded "Yeah, there uh, you're trying to say that Shabbir's going to get orders

24  and tell me. That's what you're trying to say." (Id. at 131).  Eventually, Hayat stated that Shabbir

25  didn't tell him that he would contact Hayat, but he was 100% sure that Shabbir would contact

26  him. (Id. at 131).  Harrison then asked what directions Shabbir had given and Hayat said he had

27  heard nothing yet but that they would meet later.  (Id. at 139).

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

Harrison then said, "…what I am trying to get to is, you know, the importance of Shabbir, and the importance of Shabbir's boss." (Id. at 145).  Hayat then responded, "The boss over here in Lodi is Maulana Adil." (Id. at 145).  Then the following exchange takes place:

| | |
|---|---|
| Harrison: | All right, what do you know about Adil? |
| Hayat: | Adil? |
| Harrison: | Uh-hmm. |
| Hayat: | Ah, he's making an Islamic center in Lodi.  And that's what I know about him…(unintelligible) |
| Harrison: | Ok, about orders coming from. |
| Hayat: | I'll say this guy Adil. |
| Harrison: | uh-huh. |
| Hayat: | Ah, he gives him the orders. |
| Harrison: | He gives Shabbir the orders? |
| Hayat: | I'll say. |
| Harrison: | All right. |
| Hayat: | Cause you know there you know they are close to each other. |
| Harrison: | Um-hmm. |
| Hayat: | I'll say that. |
| Harrison: | Ok, so, if someone in the camp wants to give orders to you, they would call. |
| Hayat: | They would contact him Adil. |
| Harrison: | Call Adil. |
| Hayat: | Adil will contact Shabbir like that. |
| Harrison: | And Adil will contact Shabbir? |
| Hayat: | Uh-huh. |
| Harrison: | And on to you. |
| Hayat: | They will contact me. |

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

(Id. at 146) Harrison later asked which camp Adil went to and Hayat said he didn't know.  (Id. at 192) "I don't even know stories about Jihad he done.  Like I'm saying, he did, he probably did and I'm sure about that .  I'll say he did it.  (Id. at 192)

### h.    Others Who May Have Attended a Camp

During the second videotaped interview, Harrison asked Hayat about other people that he knows that may have attended a training camp in Pakistan.  Harrison insisted that there are others who went to camp, who are around Hayat's age and that Hayat knew about them. (Id. at 132).. Hayat then mentioned his relative Sadiq Shoiab from Lodi, his cousin Usama Ismail from Lodi,  his cousin Jaber Ismail from Lodi, and Attique ur Rehman from Lodi. (Gov. Ex. 23). Harrison himself asked Hayat about individuals named Abdul Rashid, Mohammad Khan, and Khalid Khan.  (Id. at 179, 180). Harrison also showed Hayat a series of photographs of different men and asked Hayat if he knew about any of them.  (Id. at 142).  Hayat said that he thought that all these people attended a camp but that he never saw these people actually go or had conversations with these people about their possible attendance. (Gov. Ex. 23).

Hayat knew that Abdul Rashid attended a camp because of the "way his face look and everything. (Id. at 180).  Hayat knew that Khalid Khan attended a camp because of the "way he looks." (Id. at 181).  He knew Jaber Ismail and Attique ur Rehman trained at a camp because they memorized the Quran (Harrison himself told Hayat that not all people who memorize Quran go to camps).  (Id. at 187).  As to Mohammad Khan, Hayat said that he needed to look at his face again before he could answer because he hadn't seen him in two years.  (Id. at 180).

### B.    The Literature

The government introduced into evidence a scrapbook of articles from Pakistani publications that Hamid Hayat had shown to, and discussed with Naseem Khan. (RT 895).  Khan testified that Hayat was "proud and happy" with his collection of articles.  (RT 902). In addition to introducing the content of the articles themselves (RT 2218-2227) and Hayat's discussion of the publications with Khan, the government also placed in evidence opinion testimony from an expert witness, Hassan Abbas, a Pakistani pursuing a doctorate at Tufts University, as to the

ideology and often violent conduct of the political and religious groups discussed in the articles. (RT 2688-2780)  Both the government and defense experts agreed the reading materials in the possession of Hayat were readily available and commonly purchased in Pakistan (RT 2257, 2898, 4136) and that "people in Pakistan generally discuss general issues about religious extremist groups and politics and everything" (RT 2897).

Government expert Hassan Abbas conceded that reading and possessing material did not mean that the reader agreed with the contents of the article. (RT 2903). He also agreed that "[o]wning a certain book of any such subject would not in itself give you" the idea of attending a terrorist training camp, and that none of the books possessed by Hayat talked "about going to the United States and blowing up grocery stores." (RT 2827-29).

Since none of the articles or books concerned violent acts committed within the United States or by Hayat himself, their probative value in proving the charged intention on his part to wage jihad in this country was virtually nil. On the other hand, the literature and related testimony, the possession and discussion of which was plainly protected First Amendment activity,  permitted the government to shoehorn before the jury a plethora of evidence concerning political violence and assassinations in Pakistan, raising the "danger that one in sympathy with the legitimate aims of [a]n organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes [of that organization] which he does not necessarily share.' *Noto v. United States*, 367 U.S. 290, 299-300 (1961).

### C.     The Khan Conversations

The government introduced tapes and transcripts of seven conversations between defendant Hayat and its informant, Naseem Khan, as well as Khan's testimony about many of their other, untaped conversations, for the purpose of establishing, as the government argued in closing, that Hamid Hayat "repeatedly professed his belief in violent jihad during the course of his numerous conversations with Naseem Khan." (RT 4231).  The government quoted, among

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

others, statements of Hayat to the effect that:

> "Jihad is the duty of every Muslim.  It is our duty to go and help other Muslims anywhere in the world where Muslims or muslim countries are attacked."

(RT 4232, citing March 11, 2003 conversation).

> "60 people from our madrasa had volunteered for jihad in Afghanistan."

(RT 4232, citing March 6, 2003 conversation).

> That one friend who committed many sins did "one good thing in his whole life...going to jihad."  The friend was wounded by the enemy, but said: "So I'll die, so what's dying, it may be that God will forgive me."

(RT 4237, citing March 11, 2003 conversation).

 The Khan conversations had some probative value in demonstrating that Hayat was interested in jihad, in one of its forms or another.  They had, however, little or no tendency in reason to directly prove the key elements of the charges against Hayat: (a) that he attended a terrorist training camp in Pakistan between October of 2003 and November of 2004; and (b) that Hayat intended upon his return to the United States, "to wage violent jihad against persons and real property within the United States."

 As to the first element, as Khan admitted on the stand, Hamid never told him in any conversation between the two that Hayat had attended a training camp in Pakistan, despite the fact that Hayat had the opportunity to do so when he met Khan in May 31, 2005, upon Hayat's return to the United States.  (RT 1325-26).  As to the second, despite the many conversations the two had between 2002 and 2003, and despite the fact that, as the government stressed in closing argument, the defendant often expressed approval of radical and violence-prone politics in Pakistan, Hayat never expressed to Khan an intention to do violence to any person or property within the United States.

 The absence of either of these categories of incriminating evidence is particularly striking given that, as the government argued in its closing, "Hamid Hayat considered Naseem Khan to be his best friend" and spoke "openly" and "freely" with him. (RT 4231) Furthermore, had Hayat

engaged in the terroristic conduct that he is charged with in this case, he had every incentive to reveal that to Khan, because it was Khan, while on our government's payroll, who was imploring Hayat to commit the very crimes he is now charged with, and threatening Hayat with violence if he failed to do so.[6]

Although the Khan conversations had little worth in proving the specific offenses of which Hayat was accused, they had an enormous capacity to arouse the hostility of average American jurors and to produce a guilty verdict based not on what Hayat did but who he is and what he thought and said.  For example, many American jurors would be deeply disturbed that, as the government noted in closing argument (RT 4238), Hayat had told Khan that "the United States is his country in name only," although any citizen of this country has a constitutional right to say the same.  Other jurors would be appalled that, again pointed out in the government's closing (*id.*), the defendant referred to the President of the United States as "a worm," although that too is an opinion that citizens of this country have a First Amendment right to express (and some say worse).

In what may well have been tactically the most effective portion of the government's closing argument, it quoted at length from the anti-Semitic comments Hayat made approving of the murder of Daniel Pearl; the prosecutor then asked "what kind of person" would say such things. (RT 4234)  But under this country's constitutional regime, people are not tried and convicted for "what kind of person" they are or what they say, however repugnant.  The Pearl

---

[6] In their conversation of July 18, 2003, while Hayat was in Pakistan, Khan asked Hayat about his plans to go to a camp, and when Hamid replied it couldn't be done at that time, Khan accused Hayat of lying and talking "bullshit."  Khan then stated:

(1) "You don't tell the truth.  You just lie and talk nonsense.  Understand." (RT 1308); (2) "You fucking make promises and you can't even keep it." (RT 1308); (3) "You fucking lie up your ass.  So how about you tell me the truth." (RT 1308); (4) "You told me I'm going to a camp.  I'll do that.  You're sitting idle.  You're wasting time. . . You're fucking wasting time."; and (5) "You fucking sleep for half the day, all day, all night you sleep.  You wake up, you talking, light up a cigarette, you eat and you sleep again.  That's all you do, and you're just walking around like a loafer."  (6)  "God willing, when I come to Pakistan and I see you, I'm going to fucking force you to – get you from the throat and fucking throw you in the Madrasa."

1   comments, referring again to an event within Pakistan, had virtually no probative worth in

2   proving Hayat attended a terrorist training camp between October 2003 and November 2004,

3   but, like much of the Khan tapes, raised a grave danger that a jury would convict Hayat even if

4   he was not guilty of that specific charge.

5

6

7           **D.     The Supplication**

8           When Hamid was arrested on June 5, 2005, an agent searched him and found inside his

9   wallet (Govt. Ex. 26; RT 1969) a small, folded piece of paper with Arabic writing (hereinafter,

10  "the writing").  The government's expert, Dr. Khaleel Mohammed, an untenured, assistant

11  professor at San Diego State University (RT 1924, 1930, 2021), translated the writing as follows:

12  "Oh Allah, we place you at their throats and we seek refuge in you from their evils" (RT 1970).

13  Mohammed acknowledged that his translation to English differed substantially and materially

14  from those of other experts, *e.g.,* from that of Riyadh al Salikin, who translated the writing as,

15  "Oh Allah, we put you in front of them and we seek refuge in you from their evils" (RT 2056-

16  57), and from that of Professor Ahmad Hassan, who translated it as, "Oh Allah, we make thee

17  our shield against them and take refuge in thee from their evils" (RT 2065).

18          The government, nonetheless, claimed that the writing, as translated by Mohammed, was

19  "powerful evidence that [Hamid] viewed himself as a jihadi warrior in an enemy land, one who

20  was in the process of fulfilling his jihadi obligations and was prepared to carry out an act of

21  jihad." Dkt. no. 368 at 4.  Quite obviously, the writing, standing alone, could do, and did, no

22  such thing.  It only could achieve such an end through the explicit testimony of Mohammed that

23  anyone who carries the writing folded up in his wallet necessarily had a jihadi state of mind (the

24  opinion he formed though he had never known or heard of a single jihadist who had ever carried

25  this particular writing).  Throughout his testimony, over and over again, in varying permutations,

26  Mohammed proffered these opinions as to Hamid's state of mind.  *See, e.g.,* RT 1974-75 (the

27  "particular kind of person" who carries the writing "perceives [himself] as being engaged in war

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

for God against an enemy"); RT 1988 ("it means the person making . . . this supplication has to be involved in jihad"); *id.* (a person involved in jihad has to make or use this supplication); RT 2007 (if the writing was an amulet being used as protection against evil, "the particular kind of person" that would carry it is "a person who is engaged in jihad"); RT 2008 (the writing is used by "people who perceive themselves in a state of war or at enmity with some force"); RT 2009 (a person who carries the writing "would be a part of the mujaheden," "a jihadist"); RT 2018 (because Hamid carried the writing folded up in his wallet, he "perceived himself to be carrying out one of the obligations of jihad, that he was involved in what he deemed to be jihad"); RT 2019 (Hamid was "in the act of being a warrior," he was "completely ready" to do "[a]ny act that is deemed to be an act of warfare against a perceived enemy," that is, jihad).

In closing, the government noted that Mohammed "told you that the person who carried this supplication would perceive himself as being engaged in war for God against an enemy. Dr. Mohammed told you that this supplication would be carried by a warrior, by a jihadi, and he explained why...The doctor opined that the fact that this note, this supplication, was found in a person's wallet, Hamid Hayat's wallet, means that the person was completely, quote, ready to act, closed quote."  RT 4269.  The government further argued that: "Defendant's possession of this supplication is powerful evidence that he returned to the United States with a jihadi intent. Hamid was preparing himself for jihad against the enemy."  RT 4270.

The prosecution's efforts to prove criminal intent based on a party's carrying a religious prayer would be deeply troubling in any case, both because the possession of a scriptural passage, be it from the Koran, Bible, or Talmud, is a constitutionally protected activity, and because it is dangerously wrong to posit that any specific mental state can be inferred from having a religious text on one's person.  The Old Testament counsels to "kill every woman who has slept with a man" (Numbers 37), and Jesus Christ states in the New that "I did not come to bring peace, but a sword" (Matthew 10:34), but it would be silly to uniformly attribute those violent sentiments to those who read the Bible every day.

That aside, Dr. Mohammed's opinion testimony in this case was impermissible because,

as demonstrated below, experts are categorically precluded from opining on a defendant's state

of mind when, as here, it is an essential element of the offense, and Mohammed's doing so, in

any event, far exceeded the scope of his expertise and other limits on expert testimony

established to ensure its reliability and helpfulness.  Furthermore, the error did not stand alone,

and the prejudice that flowed from it was greatly enhanced when the Court precluded Hamid

from having an expert of his own, Dr. Anita Weiss, rebut Mohammed by testifying that the

Arabic verse or prayer ("*taweez*") found in Hamid's wallet was not very special at all and is

*commonly* carried by Pakistani *travelers* for their safety.

### E.   Expert Testimony Concerning A Balakot Training Camp

The government called two expert witnesses in an effort to establish that there were

training camps in the area near Balakot mentioned by Hayat in his June 4th and 5th

interrogations.  Based on information he had reviewed, Hassan Abbas, a Pakistani pursuing a

doctorate at Tufts University, testified that between 2001 and 2005, the group Jaish-e-

Muhammad operated jihadi training camps, with a principal one being the Madras Ahmed

Shaheed about five kilometers from Balakot City in an area of "hills, mountains, forests."  (RT

2690-91).  Abbas had never interviewed anyone who had attended a terrorist training camp

between 2000 and 2005, nor had he ever visited the camp in Balakot called Saeed Ahmed Shahid

or any other camp.  (RT 2830-31).  No specific information was available on the camp in Balakot

nor had Abbas ever seen a picture of the camp. (RT 2843-44).  Abbas acknowledged that the

Pakistan Army is deployed near Balakot and has many Pakistan military camps in the area as

well (RT 2852).

The government then called Eric Benn,  a photo analyst from the Department of Defense.

(RT 2998) Benn identified satellite photos of the area near Balakot, Pakistan, some taken in

2001, some in 2004, and described details of the photos, including structures they contained.

(RT 3008-3060).  Based on his analysis of the photos themselves, Benn opined that the

probability that the structures represented a militant training camp was fifty percent. (RT 3062)

Benn was then asked by the government to consider the statements made by defendant

1    Hayat during his interrogation, to restate the content of those statements, and then to offer an

2    opinion as to whether Benn found the statements consistent with the proposition that the images

3    reviewed by Benn were of a militant training camp.  (RT 3068, 3074).  On the basis of Hayat's

4    statements, Benn raised his estimation of the probability that the photos portrayed a militant

5    training camp to sixty or seventy five percent.  (RT 3074).

6         Benn's higher probability estimation was based on no information concerning the

7    Balakot site other than the photos and the defendant's statements. (RT 3082).  Benn had never

8    visited Balakot, Pakistan or talked to anyone who had visited that location. (RT 3084, 3105).

9    Benn was aware that during his interrogation, Hayat had mentioned at least six other sites as the

10   possible location for a training site he said he had attended, but the government did not ask Benn

11   to review satellite photos of any locations other than Balakot (RT 3086).  Benn formed his

12   opinion as to the greater probability that the photos disclosed a camp by discounting as untrue

13   statements that Hayat made in his interview about any locations other than Balakot, with Benn

14   commenting that he didn't understand that any of these other locations were "the camp that he

15   spent the several months at." (RT 3086-87).  As demonstrated below, the second probability

16   estimate was inadmissible and of no probative value.

17        Perhaps what was most striking about the government's evidentiary showing as to the

18   Balakot location was what it lacked.  The government's expert witness on Iraq testified that

19   Pakistan received a 3.5 billion dollar grant from the United States for the years 2003 to 2008 –

20   plus yearly military support.  Pakistan had collaborated with the United States in its anti-

21   terrorism campaign, and had captured and turned over to the United States over 700 al-Qaeda

22   operatives since 9/11, losing over 300 soldiers in the anti-terrorism battle. (RT 2859-61). Special

23   agent Gary Schaff, who between 1998 and 2005 specialized in international terrorism

24   investigations in the Sacramento office of the FBI, admitted traveling to Pakistan in his work and

25   being familiar with the location of terrorist training camps there. (RT 3616-3618).  Thus the

26   government obviously had the capacity both to send a United States official to the Balakot

27   location to determine whether a militant training camp or a Pakistani military installation was

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB
                                                    33

1  located there and to call a Pakistani official to testify on that subject, yet failed to do so.[7]  In sum,

2  the government's evidence on the existence of the Balakot training camp Hayat allegedly

3  attended was far from convincing.

4  <center>**ARGUMENT**</center>

5  **I.    BECAUSE THE KEY EVIDENCE OFFERED TO CORROBORATE
       HAYAT'S ALLEGED ADMISSIONS WAS BOTH INADMISSIBLE AND
6       FACTUALLY BASELESS, THE COURT SHOULD FIND THAT
       CORROBORATIVE EVIDENCE UNPERSUASIVE AND EXERCISE ITS
7       RULE 33 POWER TO GRANT A NEW TRIAL**

8      **A.    Standards of Review**

9          As noted in the Introduction, a trial court deciding a Rule 33 motion is not "obliged to

10  view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence

11  and evaluate for itself the credibility of the witnesses."*United States v. Kellington*, 217 F.3d

12  1084, 1097 (9th Cir. 2000); *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992).  If the

13  court determines after weighing the evidence that "the evidence preponderates sufficiently

14  heavily against the verdict that a serious miscarriage of justice may have occurred, it may set

15  aside the verdict, and submit the issues for determination by another jury." *Id.* (quoting *United*

16  *States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980).)

17          As to the requirement that Hayat's purported admissions be corroborated, the Supreme

18  Court in *Smith v. United States*, 348 U.S. 147 (1954) explained the underlying policy in terms

19  with obvious relevance to the present case.

20      The general rule that an accused may not be convicted on his own
       uncorroborated confession has previously been recognized by this
21       Court [cites omitted] and has been consistently applied in the
       lower federal courts and in the overwhelming majority of state
22       courts [cites omitted] Its purpose is to prevent 'errors in
       convictions based upon untrue confessions alone', Warszower v.
23       United States, supra, 312 U.S. at 347, 61 S.Ct. at page 606; its
       foundation lies in a long history of judicial experience with
24       confessions and in the realization that sound law enforcement

25  _____

26      [7]  Defense witness James Lazor testified that in February of 2006, he traveled to the site
    in Balakot displayed on the photos examined by prosecution witness Benn, and traveled up a
27  road to the area Benn had opined might be a camp until stopped by a man who stepped from a
    vehicle with different plates than other vehicles. (RT 3588-3895).  Lazor had seen a military
28  cadet facility and other military sites in the area. (RT 3597).

requires police investigations which extend beyond the words of the accused.

*Id.*, at 152- 53.

Under the rule, "[a]ll elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Id.*, at 157.

### B. The Charged Mental State was Not Proven Or Corroborated By Admissible or Probative Independent Evidence

#### 1. The Charged Intent Element

The second superseding indictment (dkt. no. 162) charged Hamid in Count One with a violation of 18 U.S.C. § 2339, providing material support to terrorists. In relevant part, that statute provides:

> (a) Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, *knowing or intending* that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, or 2340A of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284)...

(Emphasis added.)

Thus, the statute expresses the essential scienter element in the alternative, and the government could meet its burden of proof through demonstration of either the requisite knowledge or intent.

In this case, the grand jury indicted Hamid expressing his scienter in the conjunctive – he allegedly provided material support "knowing and intending" that such support was to be used to commit acts of terrorism. *See* second superseding indictment at 2, ¶ 3. Count One further charged that Hayat intended "to return to the United States and, upon receipt of orders from other individuals, to wage violent jihad against persons and real property within the United

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   States." (*Id.*, at  ¶ 8). Having alleged that Hayat possessed the intent to personally wage violent

2   jihad in the United States, the government had to prove that state of mind or suffer an acquittal.

3   *Stirone v. United States,* 361 U.S. 212 (1960) (holding that defendant may not be convicted on

4   theory of criminal liability different than one on which he was indicted, even if that uncharged

5   theory is supported by the evidence)

6                            **2.      The Evidence of The Charged Intent**

7            The evidence in the FBI interviews of Hayat of an intent to commit violent jihad was

8   quite weak.  Even after he began "confessing," when asked by Agent Harrison about his mission

9   upon his return to the States, Hayat stated: "They, they didn't tell me nothing.  They say you can

10  go right now and if we need anything you like that you know..." Gov. Ex. 23 at 116  Harrison

11  later asked Hayat why he was here rather than in Afghanistan or Kashmir, and he replied: "You

12  know I got married so I just came back and you know." Id., at 153.  Harrison then stated that he

13  knew there were plans for the United States and he demanded details.  Hayat replied: "...they

14  didn't give us no plans no nothing right now like we're coming from there.  They didn't give us

15  no plans.  Like I was saying they gonna give us orders that, you get orders...." Id., at 154.  It was

16  only later when Harrison pushed harder that Hayat stated that buildings were to be attacked,

17  generally parroting the suggestions contained in Harrison's questions. *Id.* ,at 166-167

18          The issue now for the court is whether the government offered credible evidence

19  *independent* of the statements sufficient to corroborate the *Smith* rule.  The government argued

20  to the jury that corroboration of the charged intent could be found in the Mohammed testimony

21  regarding the supplication.  *See, e.g.,* RT 4268 (prosecutor's noting in closing argument, "What

22  other evidence is there with respect to Hamid Hayat's intent?  Think about the supplication [*i.e.*,

23  the writing], ladies and gentlemen."; RT 4270 ("Defendant's possession of this supplication is

24  powerful evidence that he returned to the United States with a jihadi intent"). Mohammed

25  proffered extensive opinion testimony as to Hamid's jihadi state of mind.  *See, e.g.,* RT 1974-75

26  (the "particular kind of person" who carries the writing "perceives [himself] as being engaged in

27  war for God against an enemy"); RT 1988 ("it means the person making . . . this supplication has

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

to be involved in jihad"); *id.* (a person involved in jihad has to make or use this supplication); RT 2007 (if the writing was an amulet being used as protection against evil, "the particular kind of person" that would carry it is "a person who is engaged in jihad"); RT 2008 (the writing is used by "people who perceive themselves in a state of war or at enmity with some force"); RT 2009 (a person who carries the writing "would be a part of the mujaheden," "a jihadist"); RT 2018 (because Hamid carried the writing folded up in his wallet, he "perceived himself to be carrying out one of the obligations of jihad, that he was involved in what he deemed to be jihad"); RT 2019 (Hamid was "in the act of being a warrior," he was "completely ready" to do "[a]ny act that is deemed to be an act of warfare against a perceived enemy," that is, jihad). If those opinions were credited by the jury, it necessarily followed that Hamid's state of mind was that charged in this case. Mohammed's testimony, however, was patently inadmissible and of no probative value because Fed.R.Evid. 704(b) precludes any expert from offering such an opinion and because Mohammed was uniquely *unqualified* to give testimony as this particular defendant's mental state.

Admittedly, the Mohammed testimony was not objected to on the grounds raised below, and were Hayat seeking a new trial simply on the ground of evidentiary error, the proper standard of review would be the "plain error" rule.[8] It may well be the case that Hayat would prevail under that test, but the question need not be addressed. Under Rule 33, the defendant is now entitled to have this Court weigh the evidence for itself to determine whether or not, in the Court's own judgment, a miscarriage of justice may have occurred. In that process, the Court should, of course, discount any evidence that it determines was not properly admitted at trial.

**3.     Mohammed's Opinion That Hamid Had a Jihadist State of Mind Was Precluded by Fed.R.Evid. 704(b)**

The government certainly was entitled to call Dr. Khaleel Mohammed, to translate the

---

[8] "Under the plain error doctrine, a defendant must establish (1) that the proceedings below involved error, (2) that the error is plain, and (3) that the error affected the substantial rights of the aggrieved party." *United States v. Alferahin*, 433 F.3d 1148, 1154 (9th Cir. 2006) (citing *United States v. Olano*, 507 U.S. 725, 732-35 (1993)).

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

writing Hayat carried in his wallet as he did--"Oh Allah, we place you at their throats and we

seek refuge in you from their evils" (RT 1970)–even though other experts had translated the

writing differently.(RT 2056-57, 2065).  What Mohammed could not properly do was opine, as

he did, that the carrying of the writing meant that Hayat possessed the state of mind required to

commit the charged crimes.

        Fed.R.Evid. 704(b) provides:

> No expert witness testifying with respect to the mental state or
> condition of a defendant in a criminal case may state an opinion or
> inference as to whether the defendant did or did not have the
> mental state or condition constituting an element of the crime
> charged or of a defense thereto.  Such ultimate issues are matters
> for the trier of fact alone.

"A prohibited 'opinion or inference' under Rule 704(b) is testimony from which it necessarily

follows, if the testimony is credited, that the defendant did or did not possess the requisite *mens*

*rea*." *United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997) (*en banc*).  Thus, this

preclusionary rule applies regardless of whether or not Mohammed expressly testified, "I believe

that Hamid had the state of mind required by section 2339 and is guilty of that offense."  *Cf.*

*United States v. Dela Cruz*, 358 F.3d 623, 626 (9th Cir. 2004) (fact that question is phrased "in

the form of inquiring about the mental state of 'a person' and not directly about the mental state

of the defendant does not render the question proper); *United States v. Levine*, 80 F.3d 129, 134

(5th Cir. 1996) ("[U]nder Rule 704(b) hypothetical questions mirroring the fact patterns of the

evidence in the trial case are violative of the rule when the answering testimony contains a

necessary inference as to whether the defendant did nor did not have the mental state or

condition constituting an element of the crime charged or of a defense thereto."); *United States v.*

*DiDomenico*, 985 F.2d 1159, 1165 (2nd Cir. 1993) (holding trial court did not err in excluding

under Rule 704(b) testimony from defense expert that defendant suffered from a dependant

personality disorder; "While DiDomenico proclaims that she did not offer Dr. Grove to testify as

to the ultimate issue of whether she knew the computer equipment was stolen, this is semantic

camouflage.  We read Dr. Grove's proffered testimony as stating the bottom-line inference, and

leaving it to the jury merely to murmur, 'Amen.'"); *United States v. Lipscomb*, 14 F.3d 1236,

1240 (7th Cir. 1994) (focus by courts on specific language used by witnesses "is hardly a satisfying resolution of the problem" and "would seem to make little difference" under the language of Rule 704(b).)

Thus, even though the government had studiously avoided the use of the word "intent" in its questioning, Rule 704(b) demands no such formalism as a predicate to its application. Mohammed was talking about nothing other than Hamid's intent, and it was the government's manifest failure to restrict his testimony to the predicate facts from which Hamid's intent could be inferred that plainly violated the terms of the Rule.  The opinions were inadmissible for that reason alone.  *See United States v. Campos*, 217 F.3d 707, 711 (9th Cir. 2000) ("rationale for precluding ultimate opinion testimony applies . . . 'to any ultimate mental state of the defendant that is relevant to the legal conclusion sought to be proven'") (quoting S. Rep. 98-225 at 231).

In short, Hamid's state of mind was properly a matter for argument, not expert testimony. *Cf. United States v. Boyd*, 55 F.3d 667, 671 (D.C.Cir. 1995) (reversing conviction where expert testified defendant's conduct in case was consistent with intent to distribute crack cocaine).

> **4.    Mohammed's Opinion That Hamid Had a Jihadist State of Mind Was Inadmissible Because It Was (1) Beyond the Scope of His Expertise, (2) Unreliable, and (3) Not Helpful to the Jury**

The qualifications of an expert must be related to the particular subject upon which he is giving expert testimony; qualifications on related subject matter are insufficient.  The latter was the case with respect to Mohammed's opinion on the ultimate issue of Hamid's *mens rea.*

The key issue here was what, if anything, could be inferred about Hayat's state of mind from the fact that he carried a scriptural phrase written in Arabic in his wallet. For example, the evidence established that Hamid did not speak or understand Arabic; indeed, Dr. Mohammed testified that the transliteration of the writing in the defendant's wallet demonstrated that it had been transcribed by a non-arabic speaker. The government could adduce no evidence that Hayat even understood the meaning of the writing in his wallet.  The question for the jury thus was what the writing meant to a Pakistani who could not understand its literal meaning.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

39

1        *First,* Mohammed had no special knowledge, skill, experience, training, or education to

2    testify as an expert concerning the inner workings of Hamid's mind.  Thus, even if the blanket

3    exclusion of Fed.R.Evid. 704(b) did not apply, Mohammed's opinion as to Hamid's state of

4    mind was inadmissible.  Mohammed was no expert in, among other things, whether Hamid

5    perceived himself as a jihadist, whether he perceived the United States as the land of his

6    enemies, or whether he was "completely ready" to engage in jihad. At one point in his testimony,

7    Mohammed testified that he interpreted the fact Hayat carried the supplication in his wallet to

8    mean that Hayat considered himself "in a country of his enemies."  He then stated: "Solely based

9    on the document itself, and without knowing the person, that is how I would interpret it." (RT

10   2088) But it is precisely because he knew nothing about Hayat that Mohammed was utterly

11   unqualified to opine on the defendant's mental state.

12       *Second,* Mohammed had *no* knowledge, either from book research or interviews, of *any*

13   jihadi fighter *ever* carrying the writing; he also had no expert knowledge about whether *non-*

14   jihadists carried it.  His state-of-mind opinion testimony should, consequently, have been

15   excluded as unreliable.  In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the

16   Supreme Court held that Rule 702 imposes a "gatekeeping" obligation on the trial judge to

17   "ensure that any and all scientific testimony . . . is not only relevant, but reliable."  *Id*. at 589.  It

18   then suggested a number of factors that the trial court might consider in discharging its

19   gatekeeping function.  *Id*. at 593-94.  In *Kumho Tire v. Carmichael,* 526 U.S. 137 (1999), the

20   Court rejected the argument that the reliability assessment mandated by *Daubert* was confined to

21   cases involving "scientific" expert testimony, as opposed to expert testimony of other kinds.

22   "We conclude that *Daubert's* general principles apply to the expert matters described in Rule

23   702.  The Rule, in respect to all such matters, 'establishes a standard of evidentiary reliability.'

24   [*Daubert*], 509 U.S. at 592. . .   And where such testimony's factual basis, data, principles,

25   methods, or their application are called sufficiently into question . . ., the trial judge must

26   determine whether the testimony has 'a reliable basis in the knowledge and experience of (the

27   relevant) discipline.'" 526 U.S. at 149.

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   Here, as noted, not only was Mohammed unaware of a single jihadist carrying the

2   writing, but there was no demonstration at trial that Mohammed had conducted reliable research,

3   study, or inquiry into the extent that *non*-jihadists carried it.  This, alone, should have led to the

4   exclusion of his state-of-mind opinion – there was no reliable basis to support it.  The fatal

5   deficiency is manifest: in order to determine that the carrying of the writing necessarily means

6   that the carrier is a jihadist, Mohammed would have had to learn, in a reliable manner, to what

7   extent non-jihadists also carried it.  In the absence of such comparison, nothing about the

8   supplication's presence can suggest anything one way or the other about the carrier's state of

9   mind.  Yet, the record is wholly devoid of any indication that Mohammed had ever even *asked*

10  that question, let alone answered it in a reliable manner.  There was no demonstration, therefore,

11  that Mohammed's opinion testimony was based on any methodologically valid study.  It was

12  neither the product of reliable principles or methods nor of the reliable application of such

13  principles or methods to the facts of this case, and should have been precluded by Fed.R.Evid.

14  702 as a consequence.

15  There were other indicia of the unreliability of Mohammed's opinions that should also

16  have led to their exclusion.  Hamid was of Pakistani origin.  Mohammed, however, had never

17  been to Pakistan and was not fluent in Urdu.  RT 2021.  He was not familiar with the practice of

18  carrying *taweez* as it occurred in Pakistan and did not know the common *taweez* that are carried

19  by Pakistanis in Pakistan.  RT 2056.  Perhaps most fundamentally, even though he repeatedly

20  testified as to his knowledge of jihadists carrying "similar" writings, even as to these, he could

21  and did not connect that practice to Pakistan (or, at least, any part of Pakistan connected to

22  Hamid).  Thus, when asked whether he could give examples of warriors who have carried similar

23  supplications, Mohammed responded, "Warriors from the Southern Philippines, warriors from

24  Kashmir, warriors from Waziristan, some warriors from Afghanistan, and warriors from parts of

25  Africa."  RT 2012.  Pakistan is notably absent from this listing.  Mohammed simply did not have

26  the requisite specialized knowledge or experience to predicate his opinions as to the state of

27  mind of Hamid, a man of Pakistani origin.  Thus, and again, this opinion testimony should have

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   been precluded by Fed.R.Evid. 702 because as "not based upon sufficient facts or data."

2   *Third*, because Mohammed had already given the jury all the knowledge that it needed to

3   form its own conclusions regarding Hamid's state of mind, his opinion as to that state of mind

4   was inadmissible.  An expert witness may not give his opinion on an issue to be decided by the

5   jury based simply on the same information that is already before the jury, for to do so

6   impermissibly converts the witness into a thirteenth juror.  *United States v. Anderskow*, 88 F.3d

7   245, 251 (3rd Cir. 1996) (witness' subjective belief inadmissible when "a fact finder has before

8   it the very circumstantial evidence upon which the subjective opinion is based").  As the Ninth

9   Circuit affirmed in *United States v. Henke*, 222 F.3d 633, 641-2 (9th Cir. 2000), "[i]f the jury

10  already has all the information upon which the witness' opinion is based, the opinion is not

11  admissible."  *See also United States v. Skeet*, 665 F.2d 965, 985 (9th Cir. 1982) ("If the jury can

12  be put into a position of equal vantage with the witness for drawing the opinion, then the witness

13  may not give an opinion.").

14      Simply put, when a proffered expert confronts a usage outside his experience or study, he

15  is barred from offering any opinion as to its possible meaning in the very case being adjudicated.

16  The reason for that limitation is simple: *once the expert educates the jury with his expert*

17  *knowledge, he is in no better position to gauge the usage at issue than are the jurors*.

18  Mohammed's research into the origins of the writing was academically interesting and would

19  have made a good thesis for his Ph.D. dissertation.  He crafted an argument, supported by

20  citations to religious texts, that the origins of the writing lay in jihad.  *E.g.,* RT 1984, 1988.  If

21  the Court believed that this thesis met the foundational hurdles for expert testimony in this case,[9]

22  _____

23  [9]  Militating against such admission was the fact that Mohammed's thesis was
    transparently nothing more than an interesting construction of the religious authorities in which

24  all facts inconsistent with that construction were explained away on highly questionable bases.
    Thus, for example, although the writing is found in a commentary written by An-Nawawi within

25  the Book of the Etiquette of Travel (RT 1987), Mohammed interpreted that "Travel" in the title
    to mean *only* travel to wage jihad (RT 1989).  Likewise, he discounted the significance of

26  finding the supplication in the Book of Pilgrimage or Haj on the ground that, in the early days of
    Islam, the haj had to be made through enemy territory and, so, there was still fighting going on.

27  RT 1997.  Of course, if "travel" meant travel, and "pilgrimage" meant pilgrimage, then the

28  writing's presence in those books supports the excluded opinions of Dr. Weiss, not the thesis of

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  it should have admitted it, but what it should not have done was permit Mohammed to go on to

2  opine as to the meaning of the writing's presence in Hamid's wallet.  The prosecutor could have

3  argued that meaning, and the jury could have chosen to credit that argument or not.  Instead,

4  Mohammed invaded the province of the jury and provided that argument in the guise of his

5  "expert" opinion clothed, as such opinions are, in the aura of special reliability and

6  trustworthiness.

7      A plethora of cases have precluded the sort of testimony Mohammed proffered herein.

8  *See, e.g., United States. v. Ramirez-Velasquez*, 322 F.3d 868, 879 (5th Cir. 2003) (holding trial

9  court committed error in permitting DEA agent to testify that drivers of vehicles for drug

10  organizations "know" they are carrying drugs); *United States v. Rea*, 958 F.2d 1206, 1216 (2nd

11  Cir. 1992) (opinion testimony by witness that defendant "had to know" failed to meet Rule 701's

12  helpfulness requirement); *United States v. Anderskow*, 88 F.3d 245, 251 (3rd Cir. 1996)

13  (witness' subjective belief that defendant "must have known" not admissible when "a factfinder

14  has before it the very circumstantial evidence upon which the subjective opinion is based");

15  *United States v. Dicker*, 853 F.2d 1103 (3rd Cir. 1988) (opinion testimony of undercover agent

16  as to meaning of conversations between agent and the defendant improperly admitted because it

17  did not meet helpfulness requirement of Rule 701).

18      Finally, there is an independent reason why Mohammed's testimony was not helpful – he

19  was offering his "expert" opinion that Hayat was guilty.  His repeatedly asserting that the

20  writing's presence meant that Hayat was necessarily a jihadist (e.g., RT 1988, 1990) constituted

21  his expert opinion that Hayat, about whom Mohammed knew nothing, was guilty.  Testimony of

22  this ilk is of no assistance to the jury and fails to meet the helpfulness foundational requirement.

23  *Cf.*  Fed.R.Evid.704, Advisory Committee Note (federal rules of evidence "afford ample

24  assurances against the admission of opinions which would merely tell the jury what result to

25  reach, somewhat in the manner of the oath-helpers of an earlier day").  Mohammed's opinion

26  testimony should have been excluded on this basis alone – it was not up to him to tell the jurors

27  _____

28  Mohammed.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  what result to reach.

2      When all of Mohammed's testimony bearing on Hayat's mental state is effectively

3  stricken from the record, as it must be, there is simply no evidence in this record that

4  independently corroborates the government's claim that Hayat returned to the United States with

5  the specific intent to damage or destroy human life or property.

6  **C.   The Charged Actus Reus of Attending a Training Camp Was
          Not Proven or Corroborated By  Admissible or Probative**
7  **     Independent Evidence**

8      Under the *Smith* rule, the government had to offer proof independent of Hayat's

9  statements under interrogation that he had attended a terrorist training camp in Pakistan.  The

10  corroboration requirement, intended to prevent convictions based on false statements which

11  "reflect the strain and confusion attending [the defendant's] predicament, was of particular

12  importance in this case, in which Hayat's purported admissions of camp attendance were

13  inconsistent and frequently utterly nonsensical.

14      The only evidence arguably capable of corroborating Hayat's attendance at the camp

15  came from the two opinions of Eric Benn. Benn's first opinion, based solely on his expertise in

16  analyzing satellite photos, was that there was a fifty percent chance that the satellite photos

17  disclosed a militant training camp.  That opinion provided no more support for the government's

18  claim that a militant camp existed than the contrary proposition.  In other words, given the

19  government had to offer independent proof of camp attendance, Benn's testimony that there

20  either was or was not a camp in Balakot corroborated nothing more than would a coin

21  flip–heads, there's a Balakot camp, tails, there isn't.

22      The opinion testimony concerning a greater probability offered by Benn– that the photos

23  portrayed a militant training camp to sixty or seventy five percent.  (RT 3074) – was based not

24  on his expertise as a photo analyst, but upon his review of the defendant's statements and his

25  conclusions (a) that Hayat's assertions that he had not attended a camp were false and his claim

26  to have attended a camp was true; and (b) that the defendant's statements about attending a camp

27  near his home, or in Afghanistan, or in Tora Bora, or near Islamabad also were untrue and to be

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

discounted. Plainly, the second as to a greater probability is inadmissible and worthless as corroboration, because it is not independent Hayat's statements; instead, the statements are not only incorporated into the second opinion, *they are indeed the sole basis for the greater numerical estimate*.

Furthermore, in order to reach the greater percentage, Benn assumed the very fact in dispute as to every charge in the case: that Hayat attended a training camp for several months in the Balakot area.  That conclusion, which Benn was no more qualified than the jury to draw — indeed, far less qualified, given that he had not heard the rest of the evidence in the case–invaded the province of the jury and was inadmissible under Federal Rule of Evidence 403.  *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (Expert opinion of child abuse experts that abuse with which defendant was charged had in fact occurred improperly invaded province of jury).[10]  Furthermore, Benn's second opinion was based on his assessment of the credibility of some of Hayat's statements as opposed to others, and no expert is permitted to offer an opinion as to the credibility of other evidence or testimony in the record.

> [T]he credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not "assist the trier of fact" as required by Rule 702. [FN21]  *See United States v. Azure,* 801 F.2d 336, 339-40 (8th Cir.1986); *see also United States v. Shay,* 57 F.3d 126, 131 (1st Cir.1995); *Whitted,* 11 F.3d at 785-86;  [FN22]  *4 Weinstein's Federal Evidence* § 702.03[5] (1998).

*Charley*, at 1268 (Doctor's testimony that alleged victims were sexually abused inadmissible to the extent that it rested on crediting victims' statements concerning charged events).  There was no corroboration in the record independent of Hayat's interrogations he attended a jihadi training camp in Pakistan.

### D.   Given That The Jury Was Not Instructed On the *Smith* Rule, The Court Must Address The Corroboration Issue Under A De Novo Standard of Review

Normally when a district court faces a Rule 33 claim for a new trial on the ground of

---

[10] Again, because the admission of Benn's higher estimate was not objected to on this ground, Hayat does not cite the rule applied in *Charley* to support a claim of evidentiary error, but rather to demonstrate the lack of probative value of Benn's testimony.

1  insufficient evidence, while indisputably possessing the power to weigh the evidence for itself,

2  the court understandably begins by awarding deference to the jury's findings.  Here, however,

3  the issue of whether the independent evidence was sufficient to prove or corroborate the

4  defendant's admissions as to each element of the crime was not raised by the parties in closing

5  arguments or addressed in the Court's instructions, so there is no jury finding meriting such

6  deference.[11]  The alleged confession in this case was precisely the sort of frequently confused

7  and incoherent narrative which "should be carefully scrutinized in the light of the available

8  independent evidence." *Smith,* at 156.  Scrutinizing the admission for the first time through the

9  *Smith* prism, the Court should find the required corroboration lacking an order a new trial.

10  **II.    IN SEVERAL INSTANCES, DEFENDANT HAYAT WAS DENIED HIS
**
11  **SIXTH AMENDMENT RIGHT TO CONFRONT Naseem KHAN, THE
     CHIEF PROSECUTION WITNESS AGAINST HIM**

12  **A.    Statement of Facts**

13  During its examination of its principal witness, Naseem Khan, the government introduced

14  tape recordings and full transcripts of seven conversations between Khan and defendant Hayat

15  which occurred between March of 2002 and August of 2003.  It also asked questions of, and

16  received answers from, Khan on direct concerning the content of all of the conversation the two

17  men had, taped or untaped, e.g.:

18      (1)    Did you have conversations with Hamid Hayat about Mujaheden groups?

19          Yes.

20          Did you have conversations with him before this conversation [the first taped
            conversation of March 6, 2003]?

21
22          Yes. (RT 887)

23          [11]   It has been held that a *Smith* instruction must be given upon request, but none was
24  made by the defense here. *U.S. v. Marshall*, 863 F.2d 1285, 1288 (6th Cir. 1988) ("The record
    reveals some evidence which may tend to corroborate defendant's statements that he distributed
25  cocaine, but the jury was never advised that corroboration was necessary. It may have convicted
    on the basis of the uncorroborated statement alone. The District Court's refusal to give the
26  requested corroboration instruction was erroneous, and we are unable to say it was harmless.")

27
28

(2)     [W]hat reference did he make to being part of the Americans [sic]?

"He *never,* ever considered himself American" (RT 890; *see also* RT 935: In more than one conversation Hayat said he did not identify himself as an American)

(3)     Did he [Hayat] have conversations with you about martyrs a number of times [other than the March 6th taped conversation]?

Yes. (RT 906)

(4)     Was this the only conversation that you had with Hamid Hayat about kafirs?

No.  We had other conversations. (RT 911).

(5)     Did you have other conversations [than March 6, 2003] with him about individuals who went to jihad?

Yes.

And in those other conversations, were you telling a story about going to jihad or was Hamid Hayat?

He was telling the story. (RT 944).

(6)     At some time during your conversations with Hamid Hayat, do you recall talking about Islam.

Yes.  (RT 1078).[12]

A major portion of Khan's direct examination addressed discussions during both taped and untaped conversations between Hayat and him concerning camps and training.  (See, e.g. RT 936: In conversation of March 11, 2003, camps and training discussed; Khan told Hayat he "is going there to fight for jihad"; RT 937: conversation concerned camp lasting forty days; RT 938: Hayat used English term training camp in conversations other than taped conversation of March 11; RT 938: Hayat claimed to have seen a video of a training camp; and RT 940: Hayat made reference to a Jaish-e-Muhammad camp)  As noted above, in their taped conversation of July 18, 2003, Khan launched into an obscenity-laden harangue of Hayat castigating him for failing to

---

[12]   See also RT 886 (Hayat "generally" used his hands in discussion); RT 886 (Hayat and Khan discussed parental permission for jihad " a number of times);" RT 893 (Hayat did not talk about caring for his mother's health in any of their discussions); RT 1077-78 (They talked on more than one occasion about a government of religious scholars for Pakistan); RT 907 ( They talked about "being one thing on the outside and another thing on the inside" on more than one occasion").

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

go to a camp and urging him to do so.  (RT 1308).

The government also asked a substantial number of questions of Khan concerning

the specific subject of his discussions with Hayat on the topic of "Tablighi Jamaat"

> Q.     At any time in your conversation with Hamid
>        Hayat, did you talk about [Tablighi Jamaat]?
>
> A.     Yes.
>
> Q.     Do you recall what Hamid Hayat said about
>        Tablighi Jamaat?
>
> A.     One time when I talked to him over the phone when he was in
>        Pakistan, he actually was – went to Tablighi Jamaat.
>
> Q.     And did he indicate to you how long he was there?
>
> A.     I'm sorry, I can't recall right now.
>
> Q.     And to the extent that he indicated this to you, did he ever, in any
>        detail, describe a Tablighi Jamaat function, or his involvement in
>        Tablighi Jamaat?
>
> A.     Not that I remember...
>
>
> Q.     BY MS. FERRIS: To the extent that we were talking about
>        Tablighi Jamaat, do you know what Tablighi Jamaat is?
>
> A.     Yes.
>
> Q.     What is your definition?
>
> A.     Group of people that get together from different mosque in the area
>        and they go from city to city, sometimes state to state, and they go
>        around and preach.  And they pick the topic.  They can talk about
>        anything.
>
> Q.     When you say "they pick the topic," is there a certain area that
>        they typically talk about?
>
> A.     It's up to them.  Whatever they want to talk about.
>
> Q.     What, if any, relation to Islam would their topics
>        have?
>
> A.     They can talk about Mohammed.  They can talk about jihad.  They
>        can talk about all those stuff.

(RT 1081-1082)

During cross-examination, however, on at least two occasions when the defense sought to

question Khan as to matters discussed in his conversations with Hayat raised on his direct

examination, the government interposed a hearsay objection that was sustained by the Court.

The first came during cross-examination by Hayat's counsel concerning the aforementioned

Tablighi Jamaat.

> Q.  You testified on direct that one time you talked to Hamid
> over the telephone while he was in Pakistan, and he told
> you that he was actually at a Tablighi Jamaat camp.  Do
> you recall that on direct?

> MS. FERRIS: Objection.  Foundation....

(RT 1792)

    The government argued at sidebar that: "There was a conversation between CW and

Hamid wherein Hamid made statements about going to Tablighi Jamaat.  To the extent that those

are self-serving statements, they were ruled – they were deemed to be hearsay, not subject to any

exception."   The Court then suggested to defense counsel that "if the government is correct, you

are seeking to get in an out of court statement made by your client on behalf of your client.  So

it's an out of court statement to prove the truth of the matter asserted therein."  (RT 1793)

Defense counsel responded: "It was the government that introduced that statement that they are

now objection [sic] to..." (RT 1794)  The government conceded that it had asked "some

questions concerning Tablighi Jamaat, but that doesn't change the fact that defense counsel

eliciting these statements would still be hearsay."  The defense replied: "[O]nce the government

has introduced it into evidence, then it's something that I can go back on and ask questions

regarding."  (RT 1795)  The court then barred defense cross-examination on the area, ruling:

"The hearsay rule allows the government to introduce a statement against your client, but it does

not allow you to use a statement that – for the truth of the matter asserted therein in favor of your

client.  That is hearsay."  (RT 1795).  The Court also sustained a foundation objection to the

defense's question to Khan as to whether Tablighi Jamaat had anything to do with terrorism (RT

1795-96), despite the fact that Khan had already testified on direct and cross examination that he

knew what Tablighi Jamaat was and had given a definition of the organization. (RT 1081-1082,

1795)

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    Soon thereafter, after establishing that the last time that Khan spoke to Hayat when the

2    latter was in Pakistan was October of 2003, defense counsel asked Khan the following question:

3    "During that October 7th conversation, Hamid told you that he never intended to go to a camp,

4    and that he was lying to you all along, didn't he?" (RT 1802)

5    The government objected on the basis of "Foundation.  Hearsay.  Move to Strike."  The

6    Court sustained the objection and struck the question. (*Id.*)

    **B.**  **The Defendant Was Denied His Right to Cross-Examine Khan
      On Defendant's Statements Concerning the Tablighi Jamaat,
      An Issue That The Government Addressed on Direct
      Examination**

  As demonstrated above, the government asked its chief witness, Naseem Khan, questions

on direct examination that called for answers concerning what transpired in all of the

conversations Khan had had with Hayat, taped and untaped.  Because Khan gave testimony on

direct examination that concerned the contents of all of his conversations with Hayat, the defense

was entitled to cross-examine Khan concerning what was said in any and every conversation that

the two had. *United States v. Wolfson,* 573 F.2d 216, 224 (5th Cir. 1978) (Abuse of the trial

court's discretion to restrict cross examination here where proffer was within the scope of direct

and F.R.Evid. 611(b) specifically allows cross on the subject matter of direct; "Cross

examination on this issue was a right, not simply a question of the order of proof.") *See also*

*United States v. Cuozzo*,  962 F.2d 945, 948 (1992) (Witness "subjects herself to cross-

examination concerning 'any matters reasonably related to the subject matter of [her] direct

testimony.'"), quoting *United States v. Panza,* 612 F.2d 432, 436-437 (9th Cir. 1980).  See also

Federal Rule of Evidence, Rule 11 (Cross-examination is appropriate on "subject matter of the

direct examination and matters affecting the credibility of the witness.")

  There can be no question that Hayat was entitled on cross-examination to question Khan

as to what the defendant had said about Tablighi Jamaat, because the prosecution had

specifically addressed the question on Khan's direct:

    Q.  Do you recall what Hamid Hayat said about
      Tablighi Jamaat?

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1      A.     One time when I talked to him over the phone when
              he was in Pakistan, he actually was – went to
2             Tablighi Jamaat.

3          In *United States v. Alvarez-Lopez*, 559 F.2d 1155 (1977), the Ninth Circuit found

4  prejudicial error of constitutional dimension where the district court barred defense questioning

5  from examining a prosecution witness on the witness's prior arrests, a subject raised during the

6  witness's direct examination.

7          The questions were directed very specifically to the testimony that
           the prosecution had elicited from Gentile on direct. Cross-
8          examination into the truth of the statements that had thus been
           elicited by the prosecutor could not be foreclosed either by an
9          invocation of Rule 609 or Rule 402. Even if the Rules of Evidence
           were applicable in this situation, the prosecutor's effort to foreclose
10         attack on the testimony which he himself had elicited from Gentile
           could no more be successful than an attempt by a defendant, who
11         has chosen to take the stand, to prevent the prosecutor from cross-
           examining him about prior arrests or convictions when he has
12         testified on direct examination that he has had neither.

13  *Id.*, at 1158.

14         Whether or not Hayat could have asked Khan about Tablighi Jamaat had the government

15  *not* generally put all of their conversations in issue and never specifically asked about Tablighi

16  Jamaat is neither here nor there.   The government could not introduce testimony by Khan

17  concerning statements by the defendant, and then shield that testimony from the scrutiny of

18  cross-examination by claiming that it alone was legally entitled to gain admission of statements

19  of the defendant. Under the rule of curative admissibility or "opening the door" doctrine,

20  introduction of evidence by one party, even if inadmissible, allows an opponent to introduce

21  evidence on the same issue to rebut any false impression that might have resulted from the

22  earlier admission. *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir.1988); *United States*

23  *v. Wales*, 977 F.2d 1323(9th Cir. 1992) (Defense questioning on cross-examination "opened the

24  door" to otherwise inadmissible evidence on "typical early-morning passenger"); *United States*

25  *v. Beltran-Rios*, 878 F.2d 1208, 1211-1213 (9th Cir.1989) (drug courier profile testimony

26  admissible because defense counsel attempted to raise an inference that defendant was not a drug

27  courier by showing that his life-style was inconsistent with that line of business).

28

1   The subject on which the Court barred cross examination was important. On direct

2   examination by the government, Khan had been asked to define Tablighi Jamaat and had stated

3   that it involved a "group of people that get together from different mosques in the area and they

4   go from city to city, sometimes state to state, and they go around and preach.  And they pick the

5   topic.  They can talk about anything...They can talk about Mohammed.  They can talk about

6   jihad."  (RT 1081-1082).  Defense expert Professor Anita Weiss, a formidably credentialed

7   expert on Pakistan and Islam, later testified, however, that Tablighi Jamaat had no connection

8   with terrorism. (RT 4125-26).  It was extremely important that Khan be required to reveal on

9   cross examination that Hayat's statements to Khan about his experience in attending Tablighi

10  Jamaat was entirely religious in nature and had nothing to do with violence and terrorism.  The

11  Court erred in barring cross examination on a matter plainly related to a salient subject addressed

12  on Khan's direct examination.

13  **C.    Hayat Was Denied His Statutory And Constitutional Right To
             Cross-Examine Khan As To Hayat's Refusal To Attend A
14           Terrorist Camp**

15      Needless to say, the question of what Hayat said to Khan about attending a jihadi training

16  camp was not merely addressed time and time again on Khan's direct examination; it was a

17  crucial issue in the case.  During Khan's direct examination, the government introduced the tape

18  of the July 18, 2003 conversation in which Khan launched into an obscenity-laden harangue of

19  Hayat castigating him for failing to go to a camp and urging him to do so.  (RT 1308).  Khan

20  threatened Hayat that if the defendant continued to procrastinate, "God willing, when I come to

21  Pakistan and I see you, I'm going to fucking force you to – get you from the throat and fucking

22  throw you in the Madrasa."  (*Id.*)

23      On cross examination, after establishing that the last time that Khan spoke to Hayat when

24  the latter was in Pakistan was October of 2003, defense counsel asked Khan the following

25  question: "During that October 7th conversation, Hamid told you that he never intended to go to a

26  camp, and that he was lying to you all along, didn't he?" (RT 1802) This was the single most

27  important question that Hayat's counsel put to Khan on cross.  The July 18th conversation

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   established that as of that date, Hayat had not gone to a camp and that Khan had grown

2   extraordinarily frustrated that the defendant had not done so.  Had Khan been required to answer

3   the question put to him about the October conversation, and had he done so truthfully, the jury

4   would have learned that Hayat not only had failed to go to a camp, but that he had no intention

5   of doing so, and had cut off communications with Khan to avoid being pressured to do

6   something that he did not want to do.

7           For the reasons stated above, Hayat was constitutionally entitled to pursue this line of

8   cross-examination because it was directly related to the most relevant subject addressed on his

9   direct examination.  Of equal importance, Hayat was entitled to ask the question because,

10  contrary to the government's contention, the answer would not have been subject to a hearsay

11  objection.  Defense counsel's question called on Khan to answer what Hayat had said to him in

12  October of 2003 concerning whether the defendant intended or planned to attend a training

13  camp.  Rule 803(3) excepts from the reach of the

14  rule banning hearsay:

15          A statement of the declarant's then existing state of mind, emotion,
            sensation, or physical condition (such as intent, plan, motive,
16          design, mental feeling, pain, and bodily injury....

17          The exclusion on hearsay grounds of a statement made and tendered by the defendant

18  concerning his motivation for participating in a kidnaping plan was held to be reversible error in

19  *United States v. Peak*, 856 F.2d 825 (7th Cir. 1988).  See also *United States v. Veltmann*,  6 F.3d

20  1483 (11th Cir. 1993) (reversible error to exclude relevant statements of alleged victim

21  concerning her intention which came within Rule 803(3) "state of intent" exception to hearsay

22  rule).

23          The government's alternate objection on "foundation" was frivolous: Khan obviously

24  knew what Hayat had said to him in their October conversation about attending a training camp.

25  Indeed, when the government returned to Khan on redirect soon after its objection was sustained,

26  one of its first questions dealt with what Hayat had said to Khan about training camps in an

27  earlier conversation on June 11, 2003.  (RT 1805-07).  There was no legal basis on which to

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  deny Hayat his right to cross examine Khan on what was said about training camps in the

2  October 2003 conversation.

3      **D.    The Denial of Hayat's Sixth Amendment Right to Confront**
        **The Government's Principal witness Was Prejudicial And**
4       **Merits the Grant Of A New Trial**

5          The Sixth Amendment guarantees the accused the right "to present the defendant's

6  version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."

7  *Washington v. Texas*, 388 U.S. 14, 19 (1967) *See also Holmes v. South Carolina*, __ U.S. __,

8  126 S.Ct. 1727, 1731. (2006) (Alito, J) (Because "the Constitution guarantees criminal

9  defendants a meaningful opportunity to present a complete defense," state court erroneously

10  excluded defense evidence of third-party culpability, requiring reversal of murder conviction and

11  sentence of death ) In *United States v. Lopez-Alvarez*, 970 F.2d 583, 588 (9th Cir. 1992), the

12  Ninth Circuit held that the improper exclusion of defense evidence on hearsay grounds may

13  constitute a constitutional violation if defendant can "demonstrate that the excluded evidence

14  was important to his defense".

15          The evidence here was indeed critically important to Hayat's defense.  Had cross-

16  examination not been restricted, it would have (a) countered the suggestion in Hayat's direct

17  examination that his attendance at Tablighi Jamaat had been related to violent jihad; and (b), of

18  paramount significance, established that Hayat told Khan that he had no intention of attending a

19  training camp.  Because the evidence excluded here would have countered a central prosecutorial

20  contention, and thus "might [have]influence[d] the determination of guilt," Hayat had a federal

21  constitutional right to present it. *Pennsylvania v. Ritchie*, 480 U.S. 39, * (1987)

22          In *Franklin v. Henry*, 122 F.3d 1270 (9th Cir. 1997), overruled on other grounds, *Payton*

23  *v. Woodford* 299 F.3d 815 (9th Cir. 2002), a state trial court refused to permit the defendant to

24  testify that the victim had falsely stated to her brothers in the defendant's presence that her

25  mother had molested her.  *Id*. at 1270-72. The state appellate court conceded state evidentiary

26  error had occurred, but did not find the error of federal constitutional magnitude.  *Id*. at 1273.

27  The Ninth Circuit, however, overturned petitioner's conviction, finding that;

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1
2
3

Exclusion of the evidence deprived Franklin "of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful testing.'" *Crane v. Kentucky*, 476 U.S. 683, 690-91 [] (1986)(quoting *United States v. Cronic*, 466 U.S. 648, 656 [] (1984)).

4   *Franklin,* 122 F.3d at 1273.

5   Federal constitutional error, as occurred here, requires vacation of a criminal conviction

6   unless the government can prove beyond a reasonable doubt that the error did not affect the

7   verdict. *Chapman v. California* (1967) 386 U.S. 18. The government cannot carry that burden

8   here. A new trial is in order.

9   **III.   HAYAT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO CONFRONT**
10         **KHAN BY THE COURT'S CIPA ORDER OF MARCH 1, 2006**

11   This claim is filed under seal.

12   **IV.   HAYAT WAS DEPRIVED OF A FAIR TRIAL BY THE ERRONEOUS**
           **EXCLUSION OF PORTIONS OF PROFESSOR WEISS'S TESTIMONY**
13         **THAT WOULD HAVE REBUTTED PROSECUTION EXPERT**
           **MOHAMMED**

14   As established above, the Islamic supplication written in Arabic found in Hayat's wallet

15   was a central focus of the government's case, as the prosecution claimed it proved that Hayat

16   possessed the *mens rea* charged in the indictment–an intention to commit violent jihad against

17   persons and property withing the United States. That being the case, the key question posed by

18   the supplication was not what it meant in the language in which it was written but what it meant

19   to the defendant, a Pakistani-American who speaks Urdu. There was no evidence in the record

20   Hayat could understand Arabic.

21   Hayat has argued above why Dr. Mohammed's testimony as to the necessary mental state

22   of anyone who carried the supplication was inadmissible, in part because Mohammed, who was

23   qualified to translate the supplication from Arabic to English, had no qualifications to opine on

24   the significance it might have to an Urdu-speaking Pakistani. There were other indicia of the

25   unreliability of Mohammed's opinions that should also have led to their exclusion. Mohammed

26   had never been to Pakistan, was not fluent in Urdu, and had no expertise in the cultural practices

27   of Pakistanis in general, and the practice of carrying *taweez* in particular. Given Mohammed

28

was permitted to testify, however, it was error to preclude Anita Weiss from testifying about the supplication, as she was far more qualified to opine as to the significance of the supplication to an Urdu speaking Pakistani than was Mohammed.  It was also error to bar Weiss on timeliness grounds from testifying as to the sources on which she relied in forming her opinion, for the defense disclosures were no less timely than those provided by the prosecution as to Mohammed's sources.

## A.      Statement of Facts

On January 13, 2006, the government provided the defense with disclosures as to the experts it intended to call.  The disclosures detailed Dr. Mohammed''s proposed testimony regarding a piece of paper ("supplication") that was found in Hamid's wallet when he was arrested on June 5, 2006.  The disclosures did not include any mention of the names, qualifications or opinions of the individuals that Dr. Mohammed consulted in forming his opinion regarding the supplication.

On February 15, 2006, the defense faxed the government a letter formally notifying it of its intent to call Dr. Anita Weiss as an expert witness.  Weiss, a professor of International Studies at the University of Oregon, is one of the country's leading experts on Pakistan, has published numerous books and articles on Pakistani politics, culture, and religion, is fluent in Urdu, and has served as a consultant on Pakistan for the United States government.  In that letter, the defense notified the government that Dr. Weiss was preparing the report of her proposed testimony and that it would be sent to the government as soon as the defense received it.

On February 20, 2006, the defense sent the government a letter regarding Dr. Weiss' testimony and attached details of her qualifications and proposed testimony. That letter included the following:

> [Weiss] will testify that the supplication found in Hamid's wallet is clearly a taweez (or taviz). [13] Taweez are either Qur'anic verses or

---

[13] This Pakistani term is translated differently in Weiss' disclosure and in the Reporter's Transcript.  Hayat will use the transliteration found in the text to which he is

1
2
3
4
5
6
7

> prayers that Pakistanis carry around with them for various reasons, and especially for their safety when they travel. Someone who knows an individual well supplies them with a taweez. The verse or prayer is either carried (as with the paper in Hamid's wallet), tied in an amulet around the top of a person's arm, or eaten. The practice of carrying a taweez, especially when one travels, is an exceptionally common Pakistani practice, i.e., practiced by virtually everyone but the most westernized, secular Pakistanis. This was not a very special taweez and is likely common among travelers. This was a very common style taweez, and there was nothing particular about it, and there was no reason to assume that such a taweez would be carried by a warrior anymore so than by anyone else.

8    On March 12, 2006, two days before Dr. Mohammed was to testify, the government

9  provided Hayat's counsel with Jencks material for Dr. Mohammed.  The Jencks material

10 included e-mail correspondences between Dr. Mohammed and several individuals wherein Dr.

11 Mohammed consulted with these individuals about the meaning and significance of the

12 supplication and the individuals stated their opinions.  On the stand, Dr. Mohammad testified

13 regarding relevant portions of these e-mail correspondences and communications with parties

14 located around the world, including a student of English literature in Uzbekistan and an Islamic

15 professor in Egypt. (RT 2074-76)

16   On March 27, 2006, the defense gave government supplemental expert disclosures

17 regarding Dr. Weiss.  Those included the following description of Weiss's testimony.

18
19
20
21
22

> This taweez carried in Hamid's wallet is written in Arabic, not in Urdu. Without informing them as to the reason for my request, I separately asked three Pakistanis now living in Eugene, Oregon, to respond to the following: What does this taweez mean and why would someone likely carry it. The three respondents were: i) a female visiting Fulbright scholar who is a college principal in Pakistan; ii) a female graduate student who is a Pakhtun from Mianwali; and iii) a male immigrant from Pakistan who is now a U.S. citizen.

23
24
25
26

> They were uniform in their responses. This was not a very special taweez and is likely common among travelers. The visiting Fulbright scholar translated it as "Oh my Lord, I seek refuge from the mischievousness of magicians and wandering stars," meaning that the holder is seeking protection from people or things that could harm them, especially from asaib, things one cannot see (e.g., ghosts, djinns, etc).  She showed me a booklet published by

27

28  citing.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

Al-Huda International (Islamabad) that contains many similar kinds of prayers. When I asked each of them if they thought this was a particularly exceptional taweez, they each said no. At the conclusion, I then asked each of them if they thought there was something about this taweez that it would be carried by a jihadi, in particular, or by a 'warrior' of some sort – and each of them laughed! They each affirmed that this was a very common style taweez, and there was nothing particular about it, and there was no reason to assume that such a taweez would be carried by a warrior anymore so than by anyone else.

On March 30, 2006, the court ruled that the March 27th disclosures regarding Dr. Weiss were untimely and excluded the testimony described therein. (RT 3577)

On April 11th, Weiss took the stand or the defense.  She testified that she was familiar with the cultural practice of carrying a ta'wiz.  In Pakistan ta'wiz contains a phrase from the Koran, or the Hadith.  The ta'wiz is typically written in Arabic, although the language spoken in Pakistan is Urdu.  Weiss was aware that the supplication in this case was found in the wallet of the defendant.  (RT 4179-87) It is extremely common for travelers to carry ta'wiz in Pakistan (RT 4192).  Ta'wizs are given given by Imams, grandfathers, and well-wishers, among others.  (RT 4195).

Weiss was then asked: "Based on your understanding of where that piece of paper was found, do you believe it is a ta'wiz" (RT 4188).  The government's objection to this question was  sustained by the Court due to "the failure to establish the foundation that she speaks the language that is written on the piece of paper, and that she understands what is written on the piece of paper." (RT 4192)

### B.    The March 27 Disclosures of Sources Were Not Untimely

As defense counsel pointed out in arguing for the admissibility of the Weiss testimony concerning her sources (RT 3568), two days before Dr. Mohammed testified, the defense received for the first time disclosure of the sources he would cite in support of his opinion testimony concerning the supplication, which included parties located around the world.  See Exhibit *, the declaration of Wazhma Mojadadidi.  Obviously, those two days left the defense little time to contact or interview those individuals before Mohammed testified.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB
58

1    The defense provided parallel discovery of sources Weiss had relied rely in formulating

2  her opinion on March 27th, four days before Weiss was intended to testify and two full weeks

3  before she actually did so. As the Ninth Circuit said in another context, "this is one case in which

4  it is proper to apply the 'sauce for the goose is sauce for the gander' maxim." *United States v.*

5  *Bay*, 762 F.2d 1314, 1315 (9th Cir. 1985).  The defense disclosures were not untimely, and

6  Weiss's testimony concerning her sources should not have been excluded.

7

8    **C.    Weiss Should Not Have Been Barred from Testifying That The Supplication
         was A Taweez Commonly Carried By Travelers**

9

10    In her disclosure of February 20th, Weiss summarized a critical portion of her proposed

11  testimony thusly:

12         The practice of carrying a taweez, especially when one travels, is
           an exceptionally common Pakistani practice, i.e., practiced by
13         virtually everyone but the most westernized, secular Pakistanis.
           This was not a very special taweez and is likely common among
14         travelers. This was a very common style taweez, and there was
           nothing particular about it, and there was no reason to assume that
15         such a taweez would be carried by a warrior anymore so than by
           anyone else.

16    Weiss's testimony that the supplication was a "taweez [that] would [not] be carried by a

17  warrior anymore than anyone else" would have flatly contradicted the claim of prosecution

18  witness Mohammed that the "particular kind of person" who carries the writing "perceives

19  [himself] as being engaged in war for God against an enemy" ( RT 1974-75) and that a person

20  who carries the writing "would be a part of the mujaheden," and "a jihadist" (RT 2009),

21  testimony on which the government rested its argument in closing that "[d]efendant's possession

22  of this supplication is powerful evidence that he returned to the United States with a jihadi

23  intent." (RT 4270).  Because Weiss' testimony directly challenged the credibility of testimony of

24  crucial importance to the government's case, Hayat had a constitutional right to present it.

25  *Washington v. Texas*, 388 U.S. 14, 19 (1967) (Sixth Amendment guarantees right "to present the

26  defendant's version of the facts as well as the prosecution's to the jury so it may decide where

27  the truth lies.") .

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

Weiss was indisputably qualified to answer the crucial question to which the Court sustained an objection–whether the supplication was a taweez.  That question called for knowledge about Pakistani cultural and religious practices, as to which Weiss is one of the country's leading experts.  Whether Weiss spoke Arabic was irrelevant to the question posed to her, because Pakistanis generally do not speak Arabic; they speak Urdu, in which Weiss is fluent. Analagously, the term "Kwanzaa" is derived from "matunda ya kwanza" which means "first fruits" in Swahili, a Pan-African language which is the most widely spoken African language.[14]  If, however, one wished to ascertain what the term means to African-Americans, few of whom speak Swahili, the expert to consult would be one on African-American cultural practices, not a Swahili scholar who knew nothing about the celebration of holidays in the United States.  Weiss' opinion evidence should have been admitted.

### D.    The Exclusion of Weiss' Testimony Concerning The Supplication Was Prejudicial

Given that Mohammed's testimony was effectively left unrebutted once Weiss's testimony concerning the supplication was excluded, it is fair to assume that the jury took the prosecution at ist word and RT 2009), testimony on which the government rested its argument in closing that the "[d]efendant's possession of this supplication is powerful evidence that he returned to the United States with a jihadi intent." (RT 4270) That being so, it can be said Hayat was convictions rest squarely on Mohammed's opinion testimony.

The simple truth, however, is that Weiss's excluded testimony was credible and Mohammed's was not.  Doctor Bernard Haykel, a full professor at New York University, is one of this country's leading Middle Eastern and Islamic scholars, having obtained his doctorate at Oxford University.  In addition to many publications, he has consulted the United States and British governments on the issue of Islamic terrorism, is fluent in Arabic, having taught it both at Oxford and NYU.  He has been asked by the US government to assist in the prosecution of Al Qaeda members, and has agreed to do so. (See Exhibit D)

---

[14] http://www.officialkwanzaawebsite.org/origins1.shtml

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    Having reviewed the testimony of Dr. Mohammed in this case, Doctor Haykel concluded

2    as follows:

3    "14.  The supplication found in Hamid Hayat's trial is a very canonical and widely used

4    Sunni (originally Prophetic) Islamic invocation or supplication in the event a Muslim is in fear of

5    something or someone.  In it, the Muslim beseeches God to confront his enemies and to protect

6    him from their evil deeds.

7    15.  It can literally be translated as "Oh God! We ask You to be at their throats/chests and

8    we seek Your protection from their evil deeds."  The Arabic expression "to be at their throats or

9    chests" is an idiom that means to "confront them."  Therefore a literal translation would not be

10   an accurate way to translate this text.  A preferable, and more accurate, translation into English

11   would be "Oh God! We ask You to confront [those who seek to do us harm] and we seek Your

12   protection from their evil deeds."

13   16.  Dr. Mohammad's claim during his trial testimony that in Islamic studies there is a

14   rule giving preference to literal translation is incorrect.  The expression "be at their throats" is

15   idiomatic in Arabic and does not make sense if translated literally into English, unless the effort

16   is aimed at prejudicing the mind of the jury in light of the beheading videos and activities of the

17   jihadis in al-Qaeda.

18   17.  The supplication is in no way exclusive to terrorists or Jihadists and cannot be

19   considered a "warrior prayer" as, the government expert Dr. Mohammad labels it.

20   18.  I based my opinion in part on the most widely used and popular medieval

21   compilation of Prophetic traditions (hadiths) amongst the Sunni Muslim entitled *Riyad al-*

22   *Salihin*.  In its widespread use, this book is akin to the Book of Common Prayer that one might

23   find in any Anglican church.  In its chapter on the etiquette of traveling, and under the heading of

24   "Supplication if one fears harm," the tradition that is mentioned is that when the Messenger of

25   God (i.e. Muhammad) feared mischief from a people he would recite this prayer.

26   19.  In my opinion, this supplication is used widely by Muslim travelers around the

27   world.  This supplication or invocation is in *Riyad al-Salihin*, which is one of the most

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

commonly read and owned books by Muslims after the Koran.  As such, this supplication would be very widely known and widely used by Muslims.

20.  During his trial, Dr. Mohammad claims that the supplication found in Hayat's wallet is one that is used by Jihadis in all arenas of conflict across the globe.  This claim is unsubstantiated and not true.  I have rarely seen this invocation used by Jihadis and it is rarely to be found in any of their publications or internet sites."

The exclusion of Weiss's testimony was constitutional error that cannot be deemed harmless beyond a reasonable doubt.

**V.   HAYAT WAS DEPRIVED OF A FAIR TRIAL BY THE EXCLUSION OF THE EXPERT TESTIMONY OF JAMES WEDICK CONCERNING THE MANNER IN WHICH FBI AGENTS CONDUCTED THE INTERROGATIONS OF THE DEFENDANT**

**A.   Statement of Facts**

On February 20, 2006, the defense formally notified the government of its intention to call James Wedick as an expert witness.  Wedick is a retired FBI agent who served 34 years with the Bureau, received extensive training in the conducting of interrogations, and personally conducted hundred of them while an active agent. In that letter, the defense specifically stated that his proposed testimony was expected to include, *inter alia*, FBI policy and procedures for interviews and interrogations.[15]  On March 3rd, the government filed a motion to exclude Wedick's testimony on the grounds, among others, that the disclosures were untimely.

On March 13th, the defense provided the government with further expert disclosures concerning Wedick's testimony.  On March 16th, the Court ruled the March 13th disclosures were not untimely but they needed to be more detailed.  On March 21st, the defense filed additional disclosures regarding Wedick's proposed testimony concerning the interrogations of Hayat conducted on June 4th and 5th of 2005.  In relevant part, these latter disclosures stated:

Mr. Wedick will testify that the FBI Sacramento office had

---

[15]   The disclosure stated that Wedick would testify on the issues of  (1) FBI policy and procedures for the use of cooperating witnesses/informants; and (2) FBI policy and procedures for undercover operations; but Hayat will not argue here that the exclusion of Wedick's testimony on those issues merits a new trial.

the capability to videotape Hamid Hayat's interview right when it actually started including the ability to use a handheld video camera.  He will opine that it was inappropriate to begin videotaping his interview only after a "confession" had been elicited after hours of interviewing.  Mr. Wedick bases his opinion on his own experience and training relating to the videotaping of interviews.

Mr. Wedick will testify that the interviewing agents did not consider but should have considered Hamid's vulnerabilities as an interviewee.  Specifically, Mr. Wedick will opine that the agents should have considered Hamid's age, intelligent quotient, level of education, mental handicap, language barrier, health, marriage and/or family status, occupation and employment status, religion and/or belief in God, illiteracy, fatigue, social isolation, and experience with the criminal justice system.  Mr. Wedick will explain that all of these factors should be considered by FBI agents in conducting interviews to insure the validity of any elicited "confessions."

Mr. Wedick will testify that the FBI agents should have frequently reminded Hamid Hayat that the interview was non-custodial in nature and that he was free to go...

Mr. Wedick will testify that Agent Schaff, Agent Sweeney, Agent Harrison, Agent Aguilar and Agent Lucero all used leading questions during the interviews of Hamid Hayat.  Specifically, they suggested the names of locations of terrorist training camps in Pakistan; the dates when Hamid Hayat allegedly attended; the time frame that Hamid allegedly attended; the leadership of the camps that Hamid allegedly attended; the type of training camp that Hamid Hayat allegedly attended; the physical properties of the camp that Hamid allegedly attended; the names of other individuals in Lodi that allegedly attended, and the types of potential targets of terrorist attacks.  Mr. Wedick will testify that the agents did not ask sufficient open-ended questions.  Mr. Wedick will opine that the agents' use of leading questions throughout the interview contaminated the "confessions" to render them unreliable.  Mr. Wedick bases his opinion on his training and experience which dictates that agents should avoid asking too many leading questions because there is a danger of eliciting a contaminated confession in doing so.

[*Cite*]

On March 30, 2006, the Court issued a tentative ruling that that Wedick could not testify because his testimony would confuse the jury, waste time and constitute cumulative evidence.

The Court first stated:

The next opinion is the proposed expert opinion in the March 22nd disclosure about whether the FBI special agents should have reminded defendants that their interviews were non-custodial and

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

63

1      that they were free to go.  And the disclosure about whether it was
2  appropriate to begin videotaping defendants' interviews only after
   a confession had been elicited after hours of interviewing.

3      Tentative ruling:

4      Similar evidence was rejected by the Ninth Circuit in *United States v.*
5  *Miller*, 874 F.2d 1255-1266, Ninth Circuit, 1989.

6  (RT 3519-20)

7      After discussing Miller, the Court next ruled tentatively that:

8      Like the defendant in *Miller*, Umer and Hamid Hayats' respective
   counsel have already extensively explored the quality of the FBI
9  investigation and interviews, and elicited testimony on the same
   topics as the proposed expert testimony.

10     Therefore, the fact that the FBI special agents did not
   remind defendants that they were free to go, or that they did not
11 record all of the interviews, has only marginal probative value,
   which is outweighed by its potential for confusing the jury,
12 wasting time, and presentation of needless cumulative evidence.

13 (RT 3521).

14     The Court then tentatively ruled out all other testimony from Wedick on the ground that

15 "would not assist the trier of fact, that is the jury, with understanding the evidence, or with

16 determining a fact in issue, because it concerns matters within the common knowledge or

17 understanding of the average juror." (*Id.*)  Following argument, the Court then affirmed its

18 tentative rulings.

19     **B.  The Relevant Law**

20     Where, as here, the statements of a defendant during a police interrogation are not subject

21 to exclusion on the grounds of physical coercion, that defendant  is constitutionally entitled to

22 offer evidence supporting the defense claim that the purposted admissions or confession are false

23 and unreliable. In *Crane v. Kentucky*, 476 U.S. 683(1986), evidence proffered by the defense on

24 the circumstances under which he confessed to the charged crime, proffered on the ground that it

25 tended to undermine the credibility of his admissions, was excluded by the state courts on the

26 ground that the trial judge had already ruled that the confession was not coerced and was thus

27 admissible.  The Supreme Court found error of constitutional dimension

28

1    Whether rooted directly in the Due Process Clause of the
     Fourteenth Amendment, *Chambers v. Mississippi, supra,* or in the
2    Compulsory Process or Confrontation clauses of the Sixth
     Amendment, *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920,
3    1925, 18 L.Ed.2d 1019 (1967);  *Davis v. Alaska,* 415 U.S. 308, 94
     S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Constitution guarantees
4    criminal defendants "a meaningful opportunity to present a
     complete defense."  *California v. Trombetta,* 467 U.S., at 485, 104
5    S.Ct., at 2532; [cites omitted] That opportunity would be an empty
     one if the State were permitted to exclude competent, reliable
6    evidence bearing on the credibility of a confession when such
     evidence is central to the defendant's claim of innocence.   In the
7    absence of any valid state justification, exclusion of this kind of
     exculpatory evidence deprives a defendant of the basic right to
8    have the prosecutor's case encounter and "survive the crucible of
     meaningful adversarial testing." [cites omitted]
9
          Under these principles, the Kentucky courts erred in
10   foreclosing petitioner's efforts to introduce testimony about the
     environment in which the police secured his confession.   As both
11   *Lego* and *Jackson* make clear, evidence about the manner in which
     a confession was obtained is often highly relevant to its reliability
12   and credibility.

13   *Id.,* at 690-91.

14       In *Alcala v, Woodford*, 334 F.3d 862 (9th Cir. 2003), the court vacated a murder conviction

15   and death sentence on habeas corpus because the state courts had excluded expert testimony on

16   the manner in which a chief prosecution witness had been prepared to testify.

17       [T]he trial court's exclusion of Dr. London violated Alcala's due
         process rights. First, Dr. London's testimony was highly probative
18       because of its remarkable impeachment value.  It would have
         emphasized the suggestive nature of police interview tactics, the
19       evolution of Crappa's testimony and its vulnerability to and
         incorporation of investigators' suggestions, and Crappa's increased
20       certitude.  This impeachment testimony would have explained
         Crappa's bizarre and disturbing demeanor at Alcala's first trial, her
21       subsequent amnesia, and the parallel relationship between her
         testimony and both the prosecution's theory and the physical
22       evidence.

     *Id..,* at 887.
23
         In *United States v. Hall,* 93 F.3d 1337 (7th Cir.1996), the court determined that the trial
24
     court had erred in excluding expert psychological and psychiatric testimony that the defendant's
25
     "confession" to the crime was false. The entire theory of the defense was that the defendant had a
26
     personality disorder which made him pathologically eager to please and susceptible to suggestion.
27
     The court explained that since the fields of psychology and psychiatry deal with human behavior
28

1   and mental disorders it may be more difficult at times to distinguish between testimony which

2   reflects "genuine expertise" and "something that is nothing more than fancy phrases for common

3   sense." Id. at 1342. In overruling the district court, the appellate court emphasized that expert

4   testimony need not be excluded merely because it overlaps in some way with matters within the

5   jury's experience. Id. at 1344.

6

7       **C.    The Expert Opinion Testimony Concerning The Interrogation**
        **Techniques Used To Obtain Hayat's Statements Should Have**
8       **Been Admitted; *Miller* Does Not Hold to The Contrary**

9           The following facts about the interviews of Hayat appear undisputed.  One, Hayat did not

10  say anything incriminating during his interview in Japan, the home interview on June 3rd, the

11  initial interview at FBI headquarters with Agent Aguilar, or the first three and a half hours of his

12  questioning with Sweeney.  Two, Hayat said that he had been at a camp in the year 2001 only

13  when Sweeney suggested to him that such an "admission" would be perfectly understandable

14  because Hayat probably had been duped in attending a jihadi camp thinking that it was religious

15  in nature. Three, Hayat's second "admission" came when Hayat was told and untruth: that the

16  FBI had a picture of him at a camp.  Four, these "admissions" to Sweeney were unrecorded; the

17  agents only began taping when they believed they had Hayat pinned into inculpating himself, so

18  the jury was deprived of the opportunity to fully evaluate how these initial "admissions" came

19  about.

20          Five, throughout the interviews, Hayat was led to believe both that he was not free to go

21  home–his request to do so is ignored–and that he is not the real target of his interrogators, so

22  cooperation with them will greatly benefit the defendant. Six, the interrogation of Hayat was

23  uniformly characterized by the defendant's acceding to suggestions of the interrogators, generally

24  with monosyllabic or brief responses that added nothing to the interrogators suggestions.   Seven,

25  much of the interrogation was conducted when Hayat was visibly tired and suffering from a

26  headache.  Finally, and not surprisingly given the preceding factors, Hayat's admissions are

27  frequently confused, contradictory, and non-sensical.

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    That a confession taken under such circumstances may well be false or unreliable is

2    knowledge that is not generally within the experience of jurors. As the Supreme Court has said :

3            [T]hough a statement may not be 'involuntary' within the meaning
             of this exclusionary rule, still its reliability may be suspect if it is
4            extracted from one who is under the pressure of a police
             investigation – whose words may reflect the strain and confusion
5            attending his predicament.  Finally, the experience of the courts, the
             police and the medical profession recounts a number of false
6            confessions voluntarily made, Note, 28 Ind.L.J. 374.  These are the
             considerations which justify a restriction on the power of the jury to
7            convict, for this experience with confessions is not shared by the
             average juror.

8    *Smith*, at 152-153.

9    Based on his extensive experience with FBI interrogations, Mr. Wedick was ideally

10   qualified to testify to the fact that the techniques used by the interrogating agents exponentially

11   increased, rather than minimized, the risk of a false confession.

12   For example, Wedick's proposed opinion testimony that "agents should avoid asking too

13   many leading questions because there is a danger of eliciting a contaminated confession in doing

14   so" is not a fact within the general experience of jurors.  As to the fact that Hayat was induced to

15   day that he attended a jihadi camp by a falsehood used by Sweeney, the question is not whether

16   such a ruse is legally impermissible–it is not.  It is the sort of tactic, however, that could lead a

17   person with a fifth grade education, limited skills in English, and little understanding of the

18   American legal system to believe that an admission would then be required of him.  Even if jurors

19   had some knowledge of the problem of contamination such tactics raise, "a district court is not

20   compelled to exclude all expert testimony that may in some way overlap with matters within the

21   jury's experience.  The test of Rule 702 is whether the testimony will assist the jury." *Hall,* 93

22   F.3d 1337.

23   It is true, as the Court noted, that the defense explored the techniques used by the

24   interrogators with the agents themselves when they took the stand.  But Wedick's testimony

25   would have not been in any way cumulative, for the agents uniformly defended the propriety of

26   the methods they used to question. Wedick's testimony that the relentlessly suggestive nature of

27   the interrogation, when combined with the promise of benefits and the defendant's limited

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  education and physical condition, posed a grave danger of contamination was certainly not

2  cumulative of any other evidence in the record.  Nor would it have taken more than a few hours to

3  place it in the record.  Given the government's testimony of the government occupied four times

4  the court days of that devoted to the defense, the Wedick testimony cannot be deemed unduly

5  time consuming.  It should have been admitted.   *Washington v. Texas*, 388 U.S. 14, 19 (1967)

6  (Sixth Amendment guarantees right "to present the defendant's version of the facts as well as the

7  prosecution's to the jury so it may decide where the truth lies.") .

8          *Miller* does not counsel to the contrary.   As this Court noted in denying admission of

9  Wedick's testimony,

10              In *Miller*, the defendant argued the Court erred in excluding an FBI
                manual containing procedures governing FBI interrogations of its
11              employees suspected of criminal wrongdoing. The defendant
                claimed the FBI agents who interrogated him violated provisions of
12              the manual by not advising him of the charge against him, not
                recording his statements verbatim, examining him for lengthy
13              periods, and violating polygraph procedures.  The defendant argued
                the jury should have considered the violations of he manual as
14              evidence of bias.

15                  The Ninth Circuit stated that the fact that the procedures
                used may have been technical violations of the FBI manual was, at
16              best, weak evidence of bias.

17  (RT 3520).

18          Thus, there was no claim in *Miller* that as the result of suggestive questioning the

19  statements made by the defendant were false and unreliable; indeed, the defendant was a veteran

20  FBI agent himself and could hardly claim to have been induced into false statements by

21  techniques with which he was no doubt very familiar.  The excluded evidence was offered solely

22  on that issue of whether "the jury did not have sufficient information to evaluate the bias of a

23  crucial government witness, and the *Miller* Court decided only on that issue."** Bias in the

24  investigation or of a government witness was not a basis on which Wedick's testimony was

25  offered.

26          In deciding whether to admit expert testimony on the reliability of an admission or

27  confession, "each case necessarily turns on its own facts." *Hall,* at 1344.  In this case,  there was

28

1 an extraordinary risk that Hayat's statements "reflect[ed] the strain and confusion attending his

2 predicament" (*Smith*, at 152-153).  As *Crane* holds, the constitutional right to present defense is

3 meaningless if the government is "permitted to exclude competent, reliable evidence bearing on

4 the credibility of a confession when such evidence is central to the defendant's claim of

5 innocence." *Id.,* at 690-91.   The exclusion of Wedick's testimony deprived Hayat of his

6 constitutional right to present a defense, and that error  cannot be deemed harmless beyond a

7 reasonable doubt. A new trial is in order.

8
9
10
**VI.    SUBSTANTIAL EVIDENCE BEFORE THE COURT STRONGLY SUGGESTS THAT THE JURY FOREMAN HARBORED A DISQUALIFYING RACIAL AND RELIGIOUS BIAS THAT HE FAILED TO DISCLOSE ON VOIR DIRE, AN ISSUE THAT THE COURT MUST EXPLORE IN AN EVIDENTIARY HEARING**

11
**A.    Statement of Facts**

12     Among the prospective jurors ultimately selected to sit on the Hamid Hayat jury were

13 Joseph  Cote, who ultimately assumed the role of the foreman; Theresa Berkeley-Simmons;

14 Deborah Horn; and Arcelia Lopez.  All such jurors, along with alternate juror Marta Watanabe,

figure in the factual statements relating to this argument and Argument VII, below.

15
16
**1.    The Jury Voir Dire and the Court's Proscriptions Against Jury Misconduct**

17     When the prospective jurors assembled in the courtroom immediately prior to voir dire on

18 February 15, 2006, the Court cautioned them in response to one prospective juror's attempt to

19 speak with defense counsel the day before.  Noting that it was probably an "innocent occurrence,"

20 the Court nevertheless stated that they should not try to communicate with anybody involved in

21 the case.  (RT 196-97) In this connection, the court emphasized that:

22
23
24
> The parties are entitled to have a fair and impartial trial.  The only way they can be assured of realizing the kind of jury that they are entitled to is to be assured that you are not going to befriend anybody.  So it is just essential that you not do what that juror — that potential juror tried to do yesterday.

25 (RT 197)

26     Immediately before taking its initial recess during voir dire, moreover, the Court stated:

27
28
> Maybe we should adjourn now for the break.  I think I gave you an instruction yesterday, but since I'm unsure, I'm going to give you an instruction right now, and I'll be giving this to you later

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

69

1    as a preliminary jury instruction.

2           You can talk to each other about things that people normally
3    talk to each other about, but *don't talk to each other about this case,
     or about anyone having anything to do with this case, any of the
     participants involved with the case.*

4    (RT 226) (Emphasis added)

5
        **2.    The Jury Voir Dire and the Inquiries Directed at
6               Discovering Juror Bias**

7           The prospective jurors in this case were sworn on February 14, 2006. (RT 198) (Court

8    states that it has "... already had the courtroom deputy administer the oath to the potential jurors

9    yesterday.")

10          At the commencement of voir dire proceedings on February 15, 2006, the Court informed

11   the prospective jurors that

12          The purpose of voir dire is to have each potential juror disclose any
            feelings, bias and prejudice against or in favor of a party so that we
13          can ascertain whether you can sit as a *fair and impartial juror* in
            this particular case.

14   (RT 198) (Emphasis added)  This statement, along with most of the questions that the Court

15   addressed to the jurors, was set forth in a document entitled "Hayat Voir Dire," which the Court

16   provided to the parties.  *See* Exhibit A (Declaration of Wazhma Mojaddidi); Exhibit E ("Hayat

17   Voir Dire")

18          After describing the jury selection process and trial schedule and excusing certain jurors

19   for hardship (RT 198-219), the Court stated:

20          Both defendants [Hamid Hayat and Umer Hayat] are
21          charged with willfully making false material statements within the
            jurisdiction of the Federal Bureau of Investigation in a matter that
22          involves terrorism.

23          Both defendants have pleaded not guilty to the charges and
            are presumed innocent unless and until proved guilty beyond a
24          reasonable doubt.

25          Is there anything about the nature of the charges that makes
            you feel you cannot be a fair and impartial juror in this case?
26   (RT 218-19)

27          In response to this question, one prospective juror informed the Court that his connection

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    with law enforcement would likely impede his ability to be fair, after which the Court excused

2    him. (RT 219)  No other prospective juror — including the eventual foreperson, Joseph Cote —

3    responded to the question.  *Id.*  Nor did any prospective jurors respond to the Court's questions

4    whether they had "formed an opinion about either or both defendants' guilt or innocence." (RT

5    220)

6         After a recess, the Court asked whether any juror had "any beliefs that make it impossible

7    or difficult for you to decide the guilt or innocence of another person."  None of the prospective

8    jurors responded.  (RT 229) Upon the Court's subsequent inquiry, various prospective jurors

9    briefly described their experiences as juror in other cases and/or any personal connections they

10   had to the military, other government agencies, or law enforcement.  (RT 235-257) In this

11   connection, and in the presence of all other prospective jurors, the Court asked prospective juror

12   24 whether his and his relatives' previous military experience would have ". . . a bearing on [his]

13   ability to be fair and impartial to both sides," to which the juror 24 responded, "I don't think so."

14   (RT 242)  The Court pressed him on this point, stating:

15            Well, I need you to think about it.  I'm going to come back
         to you later and ask you, because *the parties are entitled, under the*
16       *Constitution, to have an impartial jury empaneled, which means*
         *just that, somebody that is not leaning one way or the other and is*
17       *going to make a determination as to guilt or innocence, if that*
         *determination can be made in this case, based solely on the*
18       *evidence that's presented in this courtroom, and on the instructions*
         *that I give the jury after the evidence is presented and the parties*
19       *have made their closing arguments.*  That's their constitutional
         entitlement.
20
             If you have *any reservation whatsoever as to whether or not*
21       *you can assure them that you are of that type of fair mind, then this*
         *is not a case for you to sit on.*  Sometimes a juror just can't sit on a
22       particular type of case, and that's understandable, and that's one
         reason why we go through this process.
23
24   *Id.* (Emphasis added)

         Juror 24 thereafter stated that he could be "fair and impartial" notwithstanding what he
25
     had disclosed to the Court.  (RT 243) Asked whether there was "any doubt in his mind" whether
26
     this was so, the juror stated, "I'm not absolutely sure."  Based on that answer, the Court later
27
     excused this juror for cause.  (RT 249)
28

1    The Court similarly dismissed two other jurors for cause on the grounds that a connection

2 to law enforcement (RT 233), or relationship to the defendants (RT 237-38) cast doubt on their

3 ability to remain absolutely fair and impartial.  Yet another was dismissed because [s]he had been

4 "hearing a lot of things, what's going on, and that scares me to death." (RT 256-57) To this juror,

5 the Court stated,

6             All right.  Well, I appreciate your candidness. That's what the
             parties expect.  That's what I expect.  And this judicial system
7             would not work as the framers designed it to work without
             individuals being as candid as you are.

8
*Id.*

9    Mr. Cote also disclosed his previous service in the military, stating, "It was so long ago I

10
don't think it would matter, but I should let you know, 40 years ago, in the Air Force."  The Court

11
then asked Cote, "Would that affect you?"  Cote responded, "No problem." (RT 247)

12
     During its subsequent voir dire, the court asked whether any prospective juror had

13
             any problem with the requirement that your decision in this case
14             must be based solely on the evidence presented at the trial, and by
             applying the law as I will give it to you in my instructions, whether
15             or not you agree with that law[.]

16 (RT 261)  None of the jurors, Mr. Cote included, answered this question in the affirmative.  *Id.*

17    The Court next asked:

18             Is there anything about yourself that you would to know if you were
             at counsel table?  Do you have any information to share?"
19
(RT 261-62)  Neither Mr. Cote nor any other prospective juror responded to this question.  (RT
20
262)

21
     Shortly thereafter, the Court asked prospective jurors,
22
             Do you have any difficulty with the rule of law that a person
23             charged with a crime is presumed innocent and need not present
             any evidence, and the government, at all times, bears the burden of
24             proving guilt beyond a reasonable doubt?

25 (RT 262)  Again, none of the prospective jurors responded affirmatively.  (RT 263)

26    Subsequently, and still during voir dire, the Court supplied prospective jurors with the list

27 of questions to which they were directed to respond.  *See*  Exh. E (Hayat Voir Dire) at 9-10, par.

28 31.  The questions sought to elicit relevant background information about the jurors.  *Id.*  In

1  addition, the list's concluding question, designated as no. 31(J), specifically inquired:

2          Do you have (or have you had) any experiences, feelings or
3          impressions about Muslims, Pakistanis, Pakistani-Americans or
           Islamic beliefs that would make it difficult for you to be a fair and
           impartial juror in this case?
4
5  Exh. E at 10, par. 31(J).

6          When the list of questions was passed to prospective juror Cote, he first supplied the Court

7  with his general background information in response to question 31, subdivisions (A) through (I).

8  Responding to the question posed in subparagraph J, Cote stated:

9          *I have no impressions, pre-conditions or feelings about being
           impartial in this case.*

10  (RT 268) (Emphasis added)

11         After questioning was taken up by counsel for the parties, the prosecutor addressed all

12  prospective jurors then "in the well" — including Mr. Cote — as follows:

13         Earlier the judge asked you all if you read the newspapers
           and listened to newscasts, and could individuals here who listened
14         to the news regularly on television, or read the newspapers
           regularly, could you just raise your hand.  Two or three times a
15         week.

16         All right.  As the Court informed you, it's very, very
           important to both parties, both the defendants as well as the
17         government, that you are able to set aside anything that you might
           hear in the news related to this case.
18
19         *Is there anybody on the panel who thinks that they've
           already heard something in the news that they're going to have
           difficulty just blocking out of their mind?  Sometimes it's not easy
20         once you've got a thought in your mind, an idea as to something
           that may or may not have happened, just to blank it out.*
21
22         Is there anybody on the panel who thinks, based on anything
           they have seen in the newspaper, seen on TV, that they'd have
           difficulty just blocking that out?  Raise of hands.  Anybody?
23
24  (RT 288) (Emphasis added) One prospective juror who regularly followed the news informed the

25  prosecutor that he had not read anything about the case and would resist the temptation to read

   about it.  (RT 288-89) The prosecutor then asked,
26
27         [PROSECUTOR:]  Who else in the well here?  The well in this
           area.  Who else in the well regularly reads the newspaper.  For
           example, the Sacramento Bee.  Okay.
28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB
                              73

1    That's Mr. Cote; is that correct?

2    PROSPECTIVE JUROR COTE: Correct.

3    [PROSECUTOR:] Do you read the Sacramento Bee every day?

4    PROSPECTIVE JUROR COTE: Yes.

5    [PROSECUTOR:] Have you read any stories about his case?

6    PROSPECTIVE JUROR COTE: Very early on.

7    [PROSECUTOR:] Very early on, okay.

8    PROSPECTIVE JUROR COTE: Right.

9    [PROSECUTOR:] *Are you going to be able to set aside whatever*
     *you read in the Bee?*

10   PROSPECTIVE JUROR COTE: *Absolutely.*

11   [PROSECUTOR:] *Absolutely*?

12   PROSPECTIVE JUROR COTE: *Absolutely.*

13   (RT 289-90) (Emphasis added)[16]

14   In response to similar questioning, another prospective juror assured the court that there

15   was nothing she had seen "on the news that was going to make it difficult for [her] to be fair and

16   impartial to both sides . . . totally fair, even-Steven to both the government as well as the

17   defense."  (RT 291)  Two other prospective jurors who regularly followed the news gave similar

18   responses.  (RT 291-93)

19   Concluding her questioning of the prospective jurors, the prosecutor asked,

20       Searching your heart, is there any reason that anybody can
21       think of why they could not be completely fair and impartial to the
         defense? Can anybody think of any reason?  If you were a
22       defendant, would you be comfortable being a juror, having you sit
         as a juror?

23   (RT 320)  Yet again, no prospective juror, including Mr. Cote, responded to this question. *Id*.

24   During her questioning, defense counsel likewise focused repeatedly on the importance of

25

---

26   [16]  As discussed further below, on July 25, 2005 and August 7, 2005, the Sacramento Bee
27   published articles (attached as Exhibits I and J) which discussed *both* (1) the July 7, 2005
     bombings of the London transportation system, purportedly by young men of Pakistani origin,
28   *and* (2) the charges against Pakistani defendant Hamid Hayat in the present case.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   juror impartiality but received no comment from Mr. Cote indicating that this was an issue for

2   him. See RT 329 - 354.  Among other things, counsel stated:

3          The next commitment that you're going to be making as a potential
           juror on this case is that to be fair.  Okay.  Now, we all think that
4          we're fair to some level.  Who thinks that being fair means doing
           what you think is right according to your personal beliefs?  Who
5          thinks that that's a close definition of fair?

6   (RT 329) Mr. Cote gave no response to the question.  (RT 329-30)

7          Defense counsel also asked the prospective jurors to indicate whether they would to sit on

8   the case knowing that it involved allegations of terrorism.  (RT 330)  One of the jurors who

9   responded to the question (no. 30) disclosed that his son had been in the World Trade Center

10  when it was hit on September 11th but managed to survive.  (RT 331-332).  At defense counsel's

11  request, and over the prosecutor's opposition, the Court dismissed juror 30 for cause.  (RT 341-

12  42, 345)

13         Defense counsel also questioned two prospective jurors (other than juror 30) who also

14  disclosed their thoughts concerning the allegation of terrorism and the destruction of the World

15  Trade Center on September 11, 2001.  Both provided assurances that such thoughts would in no

16  way influence them or lead them to be impartial in this matter.  (RT 333-34) Mr. Cote, however,

17  did not respond to counsel's terrorism inquiry.

18         Defense counsel also asked:

19         All right.  Anyone else think of 9/11 when they heard the
           word terrorism?  Okay.
20
           So, now, you're all willing to make that commitment to be
21         fair, right?  You've made the commitment to be fair.

22  (RT 334-35) Again, Mr. Cote did not respond.  *Id.*

23         Defense counsel continued:

24         The next commitment that we want you to make, it was
           touched upon a little bit earlier, is that when the evidence is brought
25         to you in this case, and the law is explained to you by Judge Burrell,
           that that's all you will consider in making your decision.  Okay.
26         And I think everybody said you're prepared to do that, right?

27         Okay.

28         Now, the trial of this case is going to be a test of evidence.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    The government made the charges against the defendant, and it is
     the government that has the burden of proof.  Does everybody
2    understand that?

3         What that means is that the defendant doesn't have to prove
     anything.  Are you guys comfortable with that?
4
          So, the reason why the defendant is going through this
5    process of trial is because he's claiming innocence.  How many of
     you think that if he says he's innocent he should have to prove he's
6    innocent?

7         Okay.  No hands.

8    (RT 335)

9    Shortly thereafter, defense counsel stated:

10        Now, Judge Burrell asked you earlier if you have any
     negative feelings or impressions about Muslims or Pakistanis.  I
11   think all of you said no.

12        And now considering that none of you hold those general
     prejudices, have any of you had any specific experiences with a
13   Muslim or a Pakistani, or even someone of Middle Eastern or South
     Asian descent, that just was a bad experience?  Say, a confrontation
14   at work, a fight, an ex-boyfriend or girlfriend?

15        Nothing.

16   (RT 337)

17        Also during voir dire, no prospective juror, Mr. Cote included, disclosed that they would

18   have any difficulty following the Court's instruction "about not watching any media coverage,

19   listening to any media coverage concerning the case."  (RT 220-21)

20        During its subsequent voir dire, the court asked whether any potential juror had

21        any problem with the requirement that your decision in this case
     must be based solely on the evidence presented at the trial, and by
22   applying the law as I will give it to you in my instructions, whether
     or not you agree with that law[.]
23
     (RT 261)  None of the jurors, including Mr. Cote, answered this question in the affirmative.  *Id.*
24
          In all, the Court, the prosecutor, and defense counsel issued some *seventy* statements or
25
     questions emphasizing primarily the importance of juror fairness and impartiality, and also of
26
     holding the government to its burden of proof and committing, as jurors, to decide the case only
27

28

     U.S. v. Hamid Hayat,
     No. CR S-05-0240 GEB
                              76

1  on the basis of the evidence presented at trial.[17]

2          Based on the sworn assurances given to the Court and the parties, Mr. Cote was selected

3  to sit on the Hamid Hayat jury, as were fellow jurors Theresa Berkeley-Simmons, Alicia Lopez,

4  Starrr Scaccia, and Deborah Horn.  (RT 359) Thus, he and the other individuals whom the Court

5  approved to sit on defendant's jury were among those who swore that, among other things, (1)

6  they would decide the case fairly and impartially; (2) they would require the government to prove

7  its case beyond a reasonable doubt; (3) and they would ignore any extra-judicial information

8  relating to the case.

9                      **3.      The Court's Pre-instructions**

10         On February 16, 2006, immediately prior to opening statements, the Court instructed

11 defendant's jurors, in relevant part, as follows:

12                 The defendants have pleaded not guilty to the charges and
                   are presumed innocent unless and until proved guilty beyond a
13                 reasonable doubt.
   (RT 401)
14
         The court further admonished the jurors, in relevant part, as follows:
15
                   The evidence which you are to consider in deciding what the
16                 facts are consists of the sworn testimony of any witnesses, the
                   exhibits which have been received into evidence, and any facts to
17                 which all lawyers stipulate.

18                 The following things are not evidence and you must not
                   consider them as evidence in deciding the facts of this case:
19
                   . . .
20
                   [A]nything you may have seen or heard when the court is
21                 not in session ...

22 (RT 403)

23         Shortly thereafter, the court continued:

24 ─────────────────

25      [17]  *The Court*: RT 197, 198, 218-19, 222, 236, 237, 238, 239, 240, 241 (two times), 242,
   244 (two times), 245, 246, 247 (two times), 248, 250 (two times), 251 (two times), 252 (three
26 times), 253 (three times), 254 (three times), 255, 256-57, 258 (four times), 259 (two times), and
   261; *the prosecutor*: RT 290, 291, 292, 296, 297, 301, 302, 303, 306, 307, 308, 310-11, 312, 314,
27 315, 316, 317, and 319-20; *defense counsel*: 329, 330, 333, 334, 335, 337, 338-39, 352, 353, and
   354.
28
   U.S. v. Hamid Hayat,
   No. CR S-05-0240 GEB

1    I will now say a few words about your conduct as jurors.

2          First, you are not to discuss this case with anyone, *including*
3    *your fellow jurors, members of your family*, people involved in the
     trial, *or anyone else, nor are you allowed to permit others to discuss*
4    *the case with you*.
     . . .

5          Second, *do not read any news stories or articles or listen to*
     *any radio or television reports* about the case or about anyone who
6    has anything to do with it.

7    (RT 405) (Emphasis added)

8    Significantly, the court directed the jurors to adhere to this admonishment at virtually

9    every subsequent recess during trial.  (**RT __ (Frecita)*)

10   Shortly after issuing the initial admonishment, the Court instructed:

11          [D]o not make up your mind about what the verdict should
     be until you have gone to the jury room to decide the case and you
12   and your fellow jurors have discussed the evidence.  Keep an open
     mind until then.

13
     (RT 405-6 )
14
                    **4.    The Court's Dismissal of a Juror During Trial for**
15                  **Violating Instruction in the Umer Hayat Case**

16   On February 27, 2006,  Elaine Wilson, a juror in the Umer Hayat case, informed the Court

17   that after her selection as a juror, she had learned from family members that her niece was a

18   personal friend of Umer Hayat's counsel, Johnny Griffin.  (RT 1010) She explained that in a

19   phone conversation with her brother, she had said she was going to be very busy because she was

20   juror in a case for two men from Lodi.  Her brother said he knew the case. (RT 1011)  About

21   thirty minutes later, Wilson received a call from her brother's daughter, i.e., Ms. Wilson's niece.

22   During that phone call, the niece informed Ms. Wilson of her relationship with Mr. Griffin.   (RT

23   1011) Ms. Wilson stated that despite learning this information, she could be impartial.  (RT 1012)

24   The defense argued that she should be retained, but the government took the position that she

25   should be dismissed "because of her apparent inability to follow directions of this Court."  (RT

26   1015-19)

27   The Court dismissed Ms. Wilson because she had communicated with others about her

28   presence on the jury, and "when that happens that automatically increases the probability that

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB
                                        78

1  people will talk to her about the case."  (RT 1027).  The "primary reason" for dismissing her, said

2  the Court, was that "*she has disobeyed the instruction*."  (RT 1028) (Emphasis added)

### 5.   The Dismissal of Juror 12 for Conduct Suggesting She Had Not Been Truthful on Voir Dire

On February 28, 2006, the Court met with juror no. 12 (Ms. Clabaugh) and counsel for the

parties in the Court's library.  The purpose of the meeting was to discuss Ms. Clabaugh's

disclosure that, contrary to her responses on voir dire, she had, in fact, had a relationship with

someone in law enforcement.  Ms. Clabaugh explained that she had briefly dated a Sacramento

County Sheriff in 1995; had had intermittent contact with him in subsequent years; and had

recently left him a voice-mail stating that she was presently on jury duty.  She further explained

that the relationship had completely slipped her mind during the voir dire process.  (RT 1047-50)

After juror 12 left the library, defense counsel moved to dismiss her for cause; the

prosecution opposed the motion.  (RT 1050-56)  After eliciting additional information from Ms.

Clabaugh (RT 1056-58), the Court stated:

> I'm not going to dismiss her.
>
> My function when questioning a juror is to probe areas that I think have a bearing on whether the juror can be fair and impartial. And part of my function is to listen to what the juror tells me, and also to look at the juror and determine how it is communicated.
>
> And when I do that, I look at the juror's demeanor, I look at the juror's facial expressions, I look for indicators of genuineness and credibility.  I find that this matter slipped her mind, and that it will not have a bearing on her ability to be a fair and impartial juror. Therefore, the motion is denied.

(RT 1059)

On March 22, 2006, while the trial was in progress, the Court initiated a bench conference

with counsel for the parties.  Some of the ensuing discussing was off the record.  Subsequently,

back on the record but still out of the presence of the jury, the Court noted that a meeting had

been held with juror 12 (Ms. Clabaugh) in the Court's library, and asked defense counsel whether

she wished to renew her motion to dismiss her.  After the Court reminded defense counsel that the

basis for the motion was the juror's relationship with a police officer that had not been disclosed

during voir dire, counsel did renew the motion.  The Court then stated:

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

The juror's demeanor reflected that she was answering the questions candidly, but there is a conflict in what she told me and what she did at voir dire that is quite troubling. I'm granting the motion. Juror number 12 is dismissed.

(RT 2611)

### 6.    The Foreman's Conduct and Statements During Trial

In a declaration initially filed with the court on or about April 27, 2006, and submitted in redacted form with this memorandum, juror Alicia Lopez stated:

On or about February 21, 2006, on the second day of trial, I observed a fellow juror, named Joseph Cote, make a gesture during a break inside the jury room. Mr. Cote, in the presence of myself and one other juror gestured as if he was tying a rope around his neck and then pulling the rope in an upward motion. He then said "Hang Him." . . . Mr. Cote continued to make this gesture many times throughout the trial inside the jury room while communicating with fellow jurors. I witnessed the action on a number of occasions myself.

*See* Exhibit F (Declaration of Alicia Lopez), par. 3.[18]

### 7.    The Court's Final Instructions

Immediately before the parties gave their closing arguments, the court instructed the jurors, in relevant part, as follows:
. . . . .

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. *That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case.*
. . . . .

(RT 4204) (Emphasis added)

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and *impartial* consideration of all the

---

[18]    Defendant has redacted from Ms. Lopez's original declaration filed on April 27, 2006, those portions that are arguably inadmissible under Fed.R,Evid. 606(b).

> evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

(RT 4205) (Emphasis added)

> Anything you may have seen or heard when the court was not in session is not evidence. *You are to decide the case solely on the evidence received at the trial.*

(RT 4206-07) (Emphasis added)

Subsequently, and following closing argument, the Court instructed:

> You are here only to determine whether the defendant is guilty or not guilty of the charges in the Second Superseding Indictment. *Your determination must be made only from the evidence in the case.* The defendant is not on trial for any other conduct or offense not charged in the indictment. You should consider evidence about the acts, statements, and intentions of others, or evidence about other acts of the defendant, only as they relate to the charges against the defendant.

(RT 4208-09) (Emphasis added)

Finally, in a series of post-argument instructions and immediately prior to deliberations, the Court instructed all the jurors and alternates, in relevant part, as follows:

> If you have a cell phone or a device with a wireless internet connection, you must give it to the United States Marshall's representative after you go into the jury deliberation room, or before you go into the jury deliberation room and at other times so that we can be assured that there are no interferences with jury deliberations. We also have to be assured – I *have to be assured that you're not contacting somebody else about the case.*

(RT 4369) (Emphasis added)

### 8.     The Foreman's Expressions of Bias During Deliberations

Notwithstanding a voir dire process aimed at exposing and removing from the panel, any juror harboring any type of religious, cultural, or racial bias against defendant, juror Lopez's declaration states as follows:

> During deliberations Mr. Cote made racial slurs. As an example, *on one occasion during deliberations he said in front of the entire group that they all look alike. If you put them in the same costume then they all look alike.* As a result of the statement Teresa Berkeley-Simmons, an African American female juror, expressed

that she thought the statement was insulting and inappropriate.  Mr.
Cote insisted that the statement was not inappropriate, commenting
that she was too sensitive.  At this point another juror, Jason Spann,
said that the remarks were inappropriate commenting that what
came out of Mr. Cote's mouth was pretty bad.  He suggested that an
apology by Mr. Cote would be appropriate.  Mr. Cote replied that
his comments were not inappropriate or insulting and he refused to
make an apology.  He said that Ms. Berkeley-Simmons was being
too sensitive.  Ms. Berkeley-Simmons did not agree with Mr.
Cote's statement.  Consequently in a loud tone of voice, Mr. Cote
turned to Ms. Berkeley-Simmons and commented that he was going
to bring the matter to the judge.  Mr. Spann stepped in to calm the
situation and upon his intercession Mr. Cote agreed to make an
apology to Ms. Berkeley-Simmons in front of everyone.  Later in
the afternoon, he apologized to me in the jury lounge. . . . [H]e got
right up my face less than a foot away and made his apology...

Exhibit F (Lopez. Decl.), at par. 6 (Emphasis added)

Juror Theresa Berkeley-Simmons recalled the foreman's comments and conduct this way:

During the deliberation process, the foreman, Joseph Cote,
made the statement they all looked the same when wearing a
costume or when put in a costume . . . I believe Mr. Cote made this
statement in connection with a discussion of witness Naseem
Khan's claim that he had seen Ayman Al-Zawahiri in Lodi. . . . I
immediately told foreman Cote that I was offended by his comment.
. . Mr. Cote responded by stating that I was being too sensitive. . . I
told Mr. Cote that his comment displayed ignorance on his part, that
it was inappropriate, and that it did not belong in the jury room. . . .
Mr. Cote continued to say that I was being too sensitive. . . .At
some point, another juror interceded and suggested that Mr. Cote
apologize. . . . Mr. Cote stated that he was not going to apologize to
me and at no time did he do so. . .Mr. Cote stated that if I wished,
he would bring the dispute to the attention of Judge Burrell; I
declined the offer.

*See* Exhibit G (Declaration of Theresa Berkeley-Simmons), par4-13, 14.

Juror Cote told investigator Wedick that dressing any one group in the same garb and/or

costume makes identification problematic, and that he had more or less so stated at one point

during deliberations. Mr. Cote stated that he made the comment while jury members had been

discussing Naseem Khan's misidentification of the Egyptian Ayman Zawahiri in Lodi, California.

Mr. Cote explained to Wedick that Khan was a Pakistani and not an Egyptian, and that Khan's

identification could have been inadvertently made.  Mr. Cote then told Wedick that,  during

deliberations, he told juror Theresa Berkeley-Simmons that, dressed in the same garb, one

Egyptian probably looks like any other Egyptian.  Ms. Berekeley-Simmons, said Cote, stated that

1 she was offended by the remark.  Mr. Cote stated he had offered to present the issue to Judge

2 Burrell, but that Ms. Berkeley-Simmons had stated it was not necessary.  Mr. Cote stated that he

3 had apologized to Ms. Berkeley-Simmons for his remark.  *See* Exhibit B (Wedick Decl.), at par.

4 5.

5       Juror Deborah Horn, meanwhile, stated that while two jurors were reviewing pictures of

6 two Muslim men during deliberations, Mr. Cote stated that when they dress alike they all look the

7 same; that Ms. Berkeley-Simmons told Mr. Cote she was insulted by the remark; that juror Jason

8 Spann commented that what he had heard was not appropriate; and that Mr. Cote later

9 apologized.  *See* Exhibit B (Wedick Decl.), at par. 6.

10       Furthermore, like juror Lopez, Ms. Berkeley-Simmons recalled that

11          [t]hroughout the deliberation process, Mr. Cote made other
         inappropriate racial comments.  Other jurors, myself included,
12          responded by reminding Mr. Cote that he had to be careful about
         what he said and to make sure he said what he means.

13 Exh. G (Berkeley-Simmons Decl.) at par. 13.

14
         **9.**    **The Foreman's Statements Concerning Media Reports During**
15               **Deliberations**

16       Juror Lopez's declaration states that one day during deliberations, foreman Cote

17          shared with jury members that he overheard something concerning
         a media report relating to the trial.  The information he shared was
18          clearly not something that was provided during testimony.  Ms.
         Berkeley-Simmons stated that type of conversation should not
19          occur in the jury room.  Mr. Cote explained that his wife had the
         TV on in the room next door and he happened to hear about the
20          story by accident.  Mr. Spann supported Ms. Berkeley-Simmons'
         comment that these types of conversations should not occur and Mr.
21          Cote should not be sharing them with other members of the jury.

22 Exh. _F (Lopez decl.), at par. 8.

23       Theresa Berkeley-Simmons' declaration similarly reports that "at one point during

24 deliberations, Mr. Cote began to discuss something he had learned from media reports about Mr.

25 Hayat's attorney, Wazhma Mojaddidi.  Other jurors and I told Mr. Cote that he should not be

26 reading or listening to media reports of the trial, and that he should not be discussing such reports

27 with fellow jurors."  *See* Exh. G (Berkeley-Simmons Decl.), par. 14.

28          **10.**    **The Foreman's Violations of The Ban On**

1

**Improper Communications**

2        On May 3, 2006, this Court issued a "NOTICE RE ALTERNATE JUROR TELEPHONE

3  CONTACT," which states:

4              Today my courtroom deputy informed me that the following
               message was left on her voice mail this week from alternate juror
5              Marta Watanabe: Mr. Cote contacted her on April 20, 2006, and
               asked her a question about Arcelia Lopez.

6

7        In this connection, foreman Cote himself stated to investigator Wedick that when he and

   other jury members were heading back into the courtroom one day prior to deliberations, alternate
8
   juror Marta Watanabe told Cote she thought he was going to have trouble with one particular
9
   juror.  Ms. Watanabe did not identify the juror at that time, and Cote did not ask her what she
10
   meant.  Mr. Cote told Wedick that later, while deliberations were in progress, he made a call to
11
   Ms. Watanabe.  She was not at home so he left her a message to call him back.  When Ms.
12
   Watanabe did so, Cote asked her to identify the juror she thought would cause trouble for Mr.
13
   Cote.  Ms. Watanabe then identified Ms. Lopez.  Mr. Cote stated that the conversation with Ms.
14
   Watanabe lasted two to three minutes at most.  *See* Exh. B (Wedick decl.), at par. 7.
15
         In a post-trial communication to investigator Wedick, meanwhile, Ms. Watanabe stated:
16
17              Joe Cote called me at 7:12 p.m on April 20, 2006 and left a
                voicemail message asking me to call him.  I returned the call a few
18              minutes later.  When Joe answered, I asked him if the trial was
                over.  He said no, he just wanted to ask me about a remark I had
19              made predicting that the jury would have a difficult time during
                deliberations.  I didn't remember making the comment until he said
20              I had indicated, with a nod of my head, someone sitting to my left
                (at the table in the jury room).  I said, "Oh, Arcelia [Lopez]."  Joe
21              said Arcelia was no problem; she was a very deep thinker.  He said
                he thought I had been referring to Theresa, and that she had been
22              causing a lot of trouble.  I expressed surprise, and Joe said he, too,
                was surprised by her actions.  He asked if I had heard anything
23              specific that prompted the remark about Arcelia.  I said no, it was
                just my perception. I told Joe the alternate jurors had been
24              instructed not to speak to the jurors until the trial was over.  At that
                point, we concluded the conversation.

25  *See* Exh. B (Wedick Decl.), at par. 8.

26         **11.    The Foreman's Statements Following the
                    Verdicts**
27
         In a post-trial interview with Amy Waldman of the Atlantic Monthly, foreman Cote
28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB
                                        84

recalled the central issue presented to the jury in the present case as follows:

> We're not being asked, "Did the defendant commit the crime?" —
> whether it's larceny, murder, whatever.  Now you're being asked,
> "Is the defendant capable of doing a crime?"  And I don't think that
> is in the . .. level of understanding of the juror.

*See* Exhibit C (Declaration of Donald Horgan); Exhibit H (true and exact copy of "*Prophetic*

*Justice*," contained in October, 2006, edition of *The Atlantic Monthly*) at 93.

Cote further told Waldman that there are "so-called new rules of engagement, and I don't

want to see the government lose its case."  Cote saw in Hamid a "nice young man," but said he

considered other nice young Pakistani men, including those who carried out the pre-trial London

subway bombings.[19]  In this connection, Cote stated: "Can we, on the basis of what we know, put

this kid on the street?" . . . "On the basis of what we know of how *people of his background* have

acted in the past?  The answer is no."  Exhibit H at 93.  (Emphasis added)

Significantly, as set forth in section I.B.2., above, juror Cote conceded during voir dire

that he had read stories about the present case in the Sacramento Bee "very early on," but assured

the prosecutor that he "absolutely" could set those stories aside in considering the charges against

defendant.  Yet two of the "very early" Bee stories[20] that addressed the allegations against

defendant expressly linked him to the Pakistani suspects in the July 7, 2005 London bombings.

Thus, on July 25, 2005 Sacramento Bee published an article by staff writer Dorothy

Korber entitled, "Pakistan a Hotbed for Terrorist Recruits."  The story begins,

> Whether the suspected terrorists' trial starts in London or Lodi,
> investigators tracking Islamic radicals say it often leads to the same
> place: Pakistan, America's ally in the war on terror — and a
> recruiting hub for the global jihad.

Exhibit C (Horgan Decl.); Exhibit I (July 25, 2005 Sacramento Bee article) at 1.  The article goes

on to discuss how both the London bombers and the defendants in this present case were

Pakistanis who might have had trained at terrorist camps in Pakistan.  Exh. I, at 1-4.

---

[19]  The London subway bombings occurred on July 7, 2005.  *See* July 8, 2005 *New York Times*, Final, Section A, Page 1 ("BOMBINGS IN LONDON: Subway and Bus Blasts in London Kill at Least 37")

[20]  Defendant was arrested on June 5, 2005 and initially indicted on June 16, 2005.

Similarly, on August 7, 2005, the Sacramento Bee published an article by staff write Stephen Magagnini, entitled "New Wave Imams." This story likewise linked defendant to the London bombers, stating, among other things, that:

> Many young men linked to or suspected of recent terrorist activities had drifted from traditional mosque culture to radical influences: the British-born London bombers; the Lackawanna Six, American Muslims convicted of training for jihad, or holy war in Afghanistan; and 22-year old Hamid Hayat, the Lodi youth charged with lying about attending a terrorist training camp in Pakistan.

Exh. C (Horgan Decl.), par. 4; Exh. J, at 1-2.

Finally — and also during his interview with the Atlantic Monthly's Waldman — Cote advocated a "preventive approach" to criminal prosecutions in terrorism cases. Such an approach, Cote explained, means that "just as there are people in prison who never committed the crime, this may also happen. Not this particular case, but future cases." He added that it was "absolutely" better to run the risk of convicting an innocent man than to let a guilty one go. "Too many lives are changed" by terrorism, he said. "So shall one man pay to save fifty? It's not a debatable question." Exhibit H, at 93.

**B.     The Law**

**1.     Juror Bias Deprives a Criminal Defendant of His or Her Right to an Impartial Verdict and to a Fair Trial**

The Sixth Amendment and the Due Process Clause guarantee a defendant the right to an unbiased jury. *Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976). *See also Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir. 1997)(en banc) ("The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors.") The bias or prejudice of even a single juror violates a defendant's right to a fair trial. *Dyer*, 151 F.3d at 973; *Tinsley v. Borg,* 895 F.2d 520, 523-24 (9th Cir. 1990)("Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."); *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977). Accordingly, Courts have repeatedly recognized the danger caused by such bias or prejudice and the need to take extra measures to protect against it. *See, e.g., Turner v. Murray,* 476 U.S. 28, 35-36 (1986); *Batson v. Kentucky,* 476 U.S. 79 (1986).

Particularly insidious is bias arising from considerations of race, religion or gender. As

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  one Supreme Court Justice put it, "A juror who allows racial or gender bias to influence

2  assessment of the case . . . renounces his or her oath." *J.E.B. Alabama v. Alabama ex rel. T.B.,*

3  511 U.S. 127, 153 (1994)(Kennedy, J., concurring); *see also Johnson v. State of Maryland,* 915

4  F.2d 892, 897 (4th Cir. 1990)("We are committed to the proposition that consideration of a

5  person's race has absolutely no valid place in jury deliberations, and we will reverse any

6  conviction that was influenced by the defendant's race.").

7       In *United States v. Heller*, 785 F.2d 1525 (11th Cir. 1986), the Court explained:

8         The obvious difficulty with prejudice in a judicial context is that it
       prevents the impartial decision-making that both the Sixth
9         Amendment and fundamental fair play require. A *racially or*
       *religiously biased* individual harbors certain negative stereotypes
10        which, despite his protestations to the contrary, may well prevent
       him or her from making decisions based solely on the facts and law
11        that our jury system requires.

12 *Id.* at 1527. (Emphasis added) The Court in *Jiminez v. Heylinger*, 792 F.Supp. 910 (D. Puerto

13 Rico 1992), applied the same principle:

14        The issue of plaintiff's national origin is totally extraneous . . . and
       the fact that the subject of *plaintiff's national origin* was even
15        introduced into the judicial mix . . . strongly suggests that [the
       juror] was unable to be objective towards a plaintiff of Dominican
16        descent.

17 Id. At , 918 (Emphasis added)

18      Finally, it is firmly established that the participation of a biased juror in a trial as so far

19 contrary to a defendant's constitutional rights that

20        The presence of a biased juror cannot be harmless; the error
       requires a new trial without a showing of actual prejudice. See
21        *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977). Like a
       judge who is biased, see *Tumey v. Ohio*, 273 U.S. 510, 535, . . .
22        (1927), the presence of a biased juror introduces a structural defect
       not subject to harmless error analysis. See generally *Arizona v.*
23        *Fulminante*, 499 U.S. 279, 307-10 . . (1991).

24 *Dyer v. Calderon,* 151 F.3d at 973 n. 2. (Parallel citations omitted)

25          **2.**      **Truthful Voir Dire is Critical for Purposes of**
                **Eliciting Evidence of Juror Bias**
26

27      In *Rosales-Lopez v. United States*, 451 U.S. 182 (1981), the Supreme Court observed:

28        Voir dire plays a critical function in assuring the criminal defendant
       that his Sixth Amendment right to an impartial jury will be honored.

> Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. *See Connors v. United States*, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895). Similarly, lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.

*Id.*, at 188.

Furthermore, if voir dire is to serve its purpose in protecting the rights of the accused, "'[t]he necessity of truthful answers by prospective jurors . . . is obvious.'" *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (plur. opn. of Rehnquist, J.).

The Ninth Circuit has expressly recognized that the concealment of material facts on voir dire implicates a defendant's federal constitutional rights. Thus, in *Dyer v. Calderon*, *supra*, 151 F.3d 970, the petitioner was convicted in state court of four murders and sentenced to death. On federal habeas corpus, Dyer claimed that a juror had lied on voir dire regarding whether she had ever been the victim of a crime and whether she or anyone close to her had been accused of any crime. *Id.* at 972. Although the district court rejected the claim, the Ninth Circuit reversed. After citing Dyer's federal constitutional rights to an impartial verdict and to a fair trial, the Court observed that:

> One important mechanism for ensuring impartiality is voir dire, which enables the parties to probe potential jurors for prejudice. For voir dire to function, jurors must answer questions truthfully.

*Id.* at 973.  Because the juror in *Dyer* concealed material circumstances that arguably triggered a finding of implied, or presumed, bias, and because the state trial court's post-trial inquiry into the bias issue had been inadequate, the Court ruled that the defendant's convictions could not stand. *Id.*, at 985.

As Justice Brennan explained in *McDonough, supra:*

> [F]or a court to determine properly whether bias exists, it must consider at least two questions:  are there any facts in the case suggesting that bias should be conclusively presumed;  and, if not, is it more probable than not that the juror was actually biased against the litigant.   Whether the juror answered a particular question on *voir dire* honestly or dishonestly, or whether an inaccurate answer was inadvertent or intentional, are simply factors to be considered in this latter determination of actual bias.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   *Id.*, 464 U.S. at 558-59 (footnote omitted) (Brennan, J., conc. in the judgment)

2        As set forth below, defendant alleges here, based on the materials now before the Court,

3   that foreman Cote may well have been actually biased against him at the time that Cote

4   deliberated in this matter.

5        **C.    Specific and Substantial Evidence Before the Court Strongly Suggests
          That the Jury Foreman Harbored And Concealed an Actual,**
6          **Disqualifying Racial and Religious Bias**

7             **1.    The Foreman's Sworn Promises to the Court and the
                      Parties**
8

9        The record contains extensive evidence of the directions given to foreman Cote and the

10  sworn  assurances he gave the Court and the parties as to the manner in which he would approach

11  deliberations in this matter.  To begin, and as set forth in section I.A., above, Mr. Cote:

12       (1) swore that he would supply truthful answers to the questions asked of him on voir dire;

13       (2) was expressly informed by the Court that the purpose of voir dire was to have each

14  potential juror disclose any feelings, bias and prejudice against or in favor of a party so that the

15  Court and parties could ascertain whether he or she could sit as a fair and impartial juror in the

16  case;

17       (3) affirmatively represented to the Court that he had no ". . . experiences, feelings or

18  impressions about Muslims, Pakistanis, Pakistani-Americans or Islamic beliefs that would make it

19  difficult for [him] to be a fair and impartial juror in [the] case;"

20       (4) disclosed nothing to the Court or the parties, when asked repeatedly, whether there

21  was anything about the nature of the charges that would make him feel he could not be a fair and

22  impartial juror;

23       (5) disclosed nothing to the Court or the parties, when asked repeatedly, whether he had

24  any problem with the requirement that his decision in this case be based solely on the evidence

25  presented at the trial, and that he apply the law as given in the instructions, whether or not he

26  agreed with that law;

27       (6) disclosed nothing to the Court or the parties, when asked repeatedly, whether he had

28  any difficulty with the rule of law that a person charged with a crime is presumed innocent and

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  need not present any evidence, and that the government, at all times, bears the burden of proving

2  guilt beyond a reasonable doubt;

3        (7) disclosed nothing to defense counsel, when asked, whether he thought, based on

4  anything they have seen in the newspaper or seen on TV, that he would have difficulty blocking

5  that out;

6        (8) affirmatively assured defense counsel that, although he regularly read the Sacramento

7  Bee and had seen stories covering this case "early on" in the Bee, he would "absolutely" be able

8  to set those stories aside in considering the issues in this case;

9        (9) disclosed nothing to defense counsel when asked whether the allegations of terrorist

10  activity involved in this case would have an influence on his obligation to remain impartial in the

11  case; and

12        (10) heard, and agreed to follow, the Court's preinstructions and concluding instructions

13  to the effect that he apply a presumption of innocence unless rebutted by the prosecution's proof

14  of the charges beyond a reasonable doubt; that he consider only the evidence adduced in the

15  courtroom in deliberating as to defendant's guilt or innocence, and that not consider anything he

16  might have seen or heard when the court was not in session; that he faithfully apply the law as

17  given him by the Court; that he not be influenced by any personal likes or dislikes, opinions,

18  prejudices, or sympathy; and that he not communicate with anyone about the case other than in

19  the jury room during deliberations.

20        **2.      Evidence of the Foreman's Bias**

21        Despite his oath, his sworn assurances, and his silence in response to these critical

22  inquiries, the evidence that Mr. Cote in fact harbored a bias that, if disclosed, would have

23  provided an actionable challenge for cause is extensive:

24        *First*, Mr. Cote arguably demonstrated a disqualifying bias when, as alleged by fellow

25  juror Lopez, he repeatedly made a "hangman gesture" in discussions with other jurors prior to the

26  commencement of deliberations.  Such conduct, if verified, quite clearly suggests a prejudgment

27  as to defendant's guilt or innocence, to say nothing of an extraordinary vindictiveness that Cote

28  had sworn to disavow during voir dire.  The conduct also suggests that the foreman had not been

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   truthful when he swore that he would keep an open mind and not permit passion or prejudice

2   sway his deliberations.

3        *Second*, Mr. Cote's alleged statement to the effect that Pakistanis or Muslims all "look

4   alike" if dressed in the same costume, as reported in sworn declarations submitted by jurors

5   Lopez and Berkeley-Simmons, reflects a virulent racial and religious bias that, if confirmed,

6   would alone supply an unassailable basis for a dismissal for cause.  *See United States v. Henley*,

7   238 F.3d 1111, 1120 (9th Cir. 2001) ("[r]acial prejudice is plainly a mental bias that is unrelated to

8   any specific issue that a juror in a criminal case may legitimately be called upon to determine.") It

9   also bears noting that Mr. Cote was sufficiently offended by Ms. Berkeley-Simmons' challenge to

10  his racial remarks that he violated the court's admonitions and, during deliberations, contacted

11  alternate juror Marta Watanabe to determine if the "trouble" she had predicted related to

12  Berkeley-Simmons.  Furthermore, the *additional* "racial slurs" reported by Ms. Lopez and Ms.

13  Berkeley-Simmons would likewise compel a finding of a disqualifying bias.  All such statements

14  suggest that the foreman had not been truthful when, in voir dire, he stated that he could remain

15  impartial and that he harbored no prejudice against Muslims, Pakistanis, Pakistani-Americans or

16  those with Islamic beliefs.

17       *Third,* Mr. Cote's post-verdict statements suggesting that, when deliberating,  he likened

18  defendant to the young Pakistani men responsible for the London subway bombings suggests that

19  Cote flatly disregarded his assurance that he harbored no prejudices against Pakistanis or

20  Muslims, as well as his promise to disregard whatever he had read in the media.  That latter is

21  particularly so given that two Sacramento Bee articles discussing defendant's case and published

22  shortly after the initial indictment expressly *linked* defendant to the Pakistani London bombers;

23  that during voir dire, Mr. Cote admitted having read stories about this case "early on," but

24  promised that he would "absolutely" disregard them; and that in his reported post-verdict

25  statements he effectively stated that he, in fact, *did* consider that people "*of that background*"

26  simply could not be put "on the street."   Of course, Cote's reference to the London bombers in

27  connection with defendant also indicates he was untruthful when he assured the Court and the

28  parties that during deliberations, he would consider only the evidence adduced in *this* case and

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

that he would "absolutely" disregard any media reports, specifically including articles that had run in the Sacramento Bee.

*Fourth*, after the verdicts, Mr. Cote spoke of new "new rules of engagement" he viewed as applying in terrorism cases; stated that he did "not want to see the government lose its case"; stated that it was "absolutely" better to run the risk of convicting an innocent man than to let a guilty one go; stated that "[t]oo many lives are changed" by terrorism; stated that it is "not debatable" whether "one man should pay to save fifty;" and stated that the issue at trial was simply whether a terrorism defendant was *capable* of committing a crime. These statements, too, suggest that, during voir dire, Cote had concealed the impact that the allegations of terrorism would have on his thinking, and that he had ignored his oaths to apply a presumption of innocence and to require the government to prove its charges beyond a reasonable doubt.

*Fifth*, Mr. Cote reportedly violated the Court's instructions and admonitions on not communicating with any outside party about the case, not prejudging the case, and not reading media reports, see Argument II, below, misconduct which likewise gives rise to a finding of disqualifying bias.

*Finally*, as summarized above, the Court dismissed juror 12 in the middle of trial upon a finding that she had not been entirely forthcoming during voir dire as to the nature of her relationship with a member of law enforcement. If *that* level of prevarication supplied sufficient evidence of bias to warrant a dismissal for cause, Mr. Cote's concealment of a more pronounced bias must surely do so.

All the foregoing fact and developments strongly suggest that Mr. Cote failed truthfully to answer material questions on voir dire, and that honest responses would have provided a valid basis for a challenge for cause. If that such conclusion is borne out at hearing, defendant is entitled to a new trial on this ground alone. *McDonough, supra*, 464 U.S. at 556.

### D.   The Proffered Evidence of Juror Bias is Admissible

The government may well seek to argue in its opposition briefing that inquiry into the

1   issue of Mr. Cote's bias is prohibited by the strictures of Federal Rule of Evidence 606(b).[21]

2   Defendant briefly sets forth the here the reasons why any such argument must fail.

3        *First,* as the Ninth Circuit held in *Henley,* supra:

4            We need not decide . . . whether or to what extent [Fed.R.Evid.
             606(b)] prohibits juror testimony concerning racist statements made
5            during deliberations or, as in this case, outside of deliberations but
             during the course of the trial.   *Where, as here, a juror has been*
6            *asked direct questions about racial bias during voir dire, and has*
             *sworn that racial bias would play no part in his deliberations,*
7            *evidence of that juror's alleged racial bias is indisputably*
             *admissible for the purpose of determining whether the juror's*
8            *responses were truthful.  Hard v. Burlington Northern R.R.,* 812
             F.2d 482, 485 (9th Cir.1987) ("Statements which tend to show
9            deceit during voir dire are not barred by [Rule 606(b) ].").

10   *Henley,* 238 F.3d at 1121.

11       *Second*, putting aside the issue of Mr. Cote's answers on voir dire, Rule 606(b) should not

12   in any event bar evidence of biased statements and conduct.  A juror's statements evidencing

13   racial or religious may properly be considered "extraneous prejudicial information" or an "outside

14   influence" within the meaning of Fed.R.Evid. 606(b), and therefore cognizable under the Rule.

15   *See* discussion in *Henley*, *supra,* 238 F.3d at 1119-21.

16       *Third,* as the Ninth Circuit further observed in *Henley,*

17            Even without characterizing  racial bias as "extraneous," a powerful
              case can be made that Rule 606(b) is wholly inapplicable to racial
18            bias because, as the Supreme Court has explained, "[a] juror may
              testify concerning any mental bias in matters *unrelated to the*

19

20   ─────────────────
     [21]  Fed.R.Evid. 606(b) states as follows:

21
22       **Inquiry into validity of verdict or indictment**. Upon an inquiry into the
     validity of a verdict or indictment, a juror may not testify as to any matter or
23   statement occurring during the course of the jury's deliberations or to the effect of
     anything upon that or any other juror's mind or emotions as influencing the juror
24   to assent to or dissent from the verdict or indictment or concerning the juror's
     mental processes in connection therewith, except that a juror may testify on the
25   question whether extraneous prejudicial information was improperly brought to
     the jury's attention or whether any outside influence was improperly brought to
26   bear upon any juror. Nor may a juror's affidavit or evidence of any statement by
     the juror concerning a matter about which the juror would be precluded from
27   testifying be received for these purposes.

28

     U.S. v. Hamid Hayat,
     No. CR S-05-0240 GEB

1
2
3

> *specific issues that the juror was called upon to decide ...."* *Rushen*
> *v. Spain,* 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 78 L.Ed.2d 267
> (1983) (per curiam) (citing Fed.R.Evid. 606(b)) (emphasis added).
> *Racial prejudice is plainly a mental bias that is unrelated to any*
> *specific issue that a juror in a criminal case may legitimately be*
> *called upon to determine.*

4
5

*Henley*, 238 F.3d at 1119-20. (Initial emphasis in original; second emphasis added)

6
7

        *Finally*, as *Henley* also observes, Rule 606(b) is arguably not implicated to the extent that

8

Mr. Cote's reported statements were made *outside* of deliberations. *Id.*, at 1120 ("In this case,

9

there would be even stronger reason to conclude that Rule 606(b) should not bar juror testimony

10

regarding O'Reilly's alleged racist statements, because the statements in question were made

11

*before* deliberations began and *outside* the jury room.  Rule 606(b)'s primary purpose — the

12

insulation of jurors' private deliberations from post-verdict scrutiny — would not be implicated

13

by permitting juror testimony about what O'Reilly allegedly said while carpooling with other

jurors.")

14

        For all of these reasons, Fed.R.Evid. 606 raises no barrier to admission of the statements

15

attributed to Mr. Cote in this memorandum.

16
17

    **E.    The Court Must Convene and Evidentiary Hearing to Explore**
    **the Issue of Juror Bias**

18

    In *Smith v. Phillips*, 455 U.S. 209 (1982), the Supreme Court held:

19
20

> This Court has long held that the remedy for allegations of juror
> partiality is a hearing in which the defendant has the opportunity to
> prove actual bias.

21

*Id.*, at 215.  The Ninth Circuit invoked the same principle and related Supreme Court precedent in

22

*Dyer*, *supra,* when it observed that, "a court confronted with a colorable claim of juror bias must

23

undertake an investigation of the relevant facts and circumstances." *Dyer*, 151 F.3d at 974 (citing

24

*Remmer v. United States,* 350 U.S. 377, 379 (1956) and *Remmer v. United States,* 347 U.S. 227,

25

230 (1954)); *see also United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993) ("[T]he Supreme

26

Court has stressed that the remedy for allegations of jury bias is a hearing, in which the trial court

27

determines the circumstances of what transpired, the impact on the jurors, and whether or not it

28

was prejudicial.")

        Of course, as *Angulo* observes, an evidentiary hearing is not mandated every time there is

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    an allegation of jury misconduct or bias. *Angulo*, 4 F.3d at 847. "[I]n determining whether a

2    hearing must be held, the court must consider the content of the allegations, the seriousness of the

3    alleged misconduct or bias, and the credibility of the source. *Id.* (quoting *Hard v. Burlington*

4    *N.R.R.*, 812 F.2d 482, 485 (9th Cir.1987)) In this case, however, the content of the allegations

5    facially indicate the presence of bias, the bias is profound, and the sources credible. Such

6    circumstances establish beyond dispute that the Court must convene a plenary evidentiary hearing

7    on the issue of the foreman's alleged racial and religious bias.

8

9

10

11    **VII.    SUBSTANTIAL EVIDENCE BEFORE THE COURT STRONGLY SUGGESTS
            THAT THE JURY FOREMAN AND ANOTHER JUROR VIOLATED THE
12          COURT'S INSTRUCTIONS AND OTHERWISE COMMITTED PREJUDICIAL
            MISCONDUCT, ISSUES WHICH THE COURT MUST LIKEWISE EXPLORE IN
13          AN EVIDENTIARY HEARING**

14        **A.    Statement of Facts[22]**

15            **1.    Juror Conduct and Statements During Trial**

16            Among the most significant instructions read by the Court prior to closing argument are

17    the following:

18                    Anything you may have seen or heard when the court was
                not in session is not evidence. You are to decide the case solely on
19              the evidence received at the trial.

20    (RT 4206-07)

21            In a declaration filed with the court on or about April 27, 2006, and submitted in redacted

22    form with this memorandum, juror Alicia Lopez stated:

23            *First*, Ms. Lopez has also reported that early in the trial, the topic came up about the juror

24    who had been dismissed. Several jurors began to ask what had happened to the dismissed juror

25    and as a result one juror made mention about the fifteen minute interview. The jurors were

26

27            [22] The statement of facts presented here incorporates by reference the factual statement

28    presented in connection with Argument I, above.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   interested about the interview with some wanting to know where it might be found.  At that point,

2   states Ms. Lopez, Juror Starr Scaccia suggested the Chronicle or the Bee.

3       Similarly, in her post-trial interview with defense investigator Wedick, juror Deborah

4   Horn stated that juror Starr Scaccia stated during trial, and shortly after juror Clabaugh had been

5   dismissed, that a written interview with Ms. Clabaugh could probably be found in the Sacramento

6   Bee and/or the San Francisco Chronicle because they represented two of the three major

7   newspapers in the area.  Exh. B (Wedick Decl.), par. 4

8       *Second,* Ms. Lopez has stated that on Monday, April 24, 2006, when the deliberations

9   began, Mr. Cote greeted everyone as he did each day.  According to Ms. Lopez, Mr. Cote then

10  immediately pointed to a fellow juror, Ms. Rebecca Harris,[23] who began to speak.  Ms. Harris

11  pulled out a type written note that was about 3-4 pages long.  She began to read a statement.  She

12  stated that she spent the entire weekend drafting the statement, that she was extremely stressed as

13  a juror in the case, and that her health was being affected.  She stated that, as a result, she had

14  been drinking and overeating.  Still reading from her note, she stated that all of the stress was the

15  fault of Ms. Lopez because she refused to change her vote. Ms. Harris also began to tell the story

16  of how her own mother-in-law has Hepatitis C and that such a condition doesn't cause someone

17  to be as medically injured or sick as was Hamid Hayat's mother, whom Hamid claimed also had

18  had Hepatitis C.  Ms. Harris indicated that because of the example of her mother-in-law,  I and

19  the rest of the jury should not be convinced by Hamid's statement that he was caring for his

20  mother in Pakistan. Ms. Harris said that she herself couldn't take it anymore and that if I didn't

21  change my vote, she would consider getting off the jury herself due to the stress.  Exh. F (Lopez

22  Decl.), at par. 11.

23      In her declaration, juror Berkeley-Simmons has stated that "[o]n Monday, April 24, 2006,

24  a fellow juror, Ms. Debbie Horn, read a statement during deliberations.  Ms. Horn stated that she

25  had prepared the statement over the weekend. The statement was addressed to the entire jury, but

26

27      [23]  As discussed below, in their post-trial statements, jurors Berkeley-Simmons and
    Deborah Horn stated that it was Horn who had read the typewritten statement during
28  deliberations.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    seemed particularly directed at juror Lopez.  In her statement, Ms. Horn also made reference to

2    Hepatitis C."  Exh. G (Berkeley-Simmons Decl.), at par. 18.

3           Finally, in her post-trial discussion with Mr. Wedick, Ms. Horn stated on Monday, April

4    24, 2006, while deliberations were still in progress, she brought into the jury room a typewritten

5    six-page statement written in 20 point font that she had prepared over the previous weekend.  Ms.

6    Horn stated that she read the typewritten statement to the other jurors.  In the typewritten

7    statement, Ms. Horn described the impact of the trial on her health and mental condition.  The

8    statement also contained information concerning Hepatitis C, which related to defendant's

9    testimony that he had cared for his mother when afflicted by the disease.  Ms. Horn told Mr.

10    Wedick she had preserved the statement on her computer, and that she would not destroy it, in

11    case the Court wished to review it.  Exh. B (Wedick Decl.), at par. 9.

12    **B.**      **The Relevant Law**

13           It is established beyond peradventure that a juror commits misconduct that may warrant

14    dismissal when he or she disobeys the trial court's instructions.  See, e.g., *United States v. Eldred*,

15    588 F.2d 746, 752 (9th Cir. 1978); *United States v. Almonte*, 594 F.2d 261, 267 (1st Cir. 1979).

16    Indeed, it was with that principle in mind that this Court dismissed juror Wilson in the Umer

17    Hayat case while the trial was still ongoing.  *See* RT 1028 (Court stated that the "primary reason"

18    for dismissing juror Wilson was that "she has disobeyed the instruction." )

19       "In conducting their deliberations, jurors have a duty to consider only the evidence which

20    is presented to them in open court. Evidence not presented at trial ... is deemed 'extrinsic.'"

21    *United States v. Navarro-Garcia*, 926 F.2d 818, 820 (9th Cir.1991) (citations, quotations and

22    brackets omitted). "Juror misconduct typically occurs when a member of the jury has introduced

23    into its deliberations matter which was not in evidence or in the instructions." *Thompson v. Borg*,

24    74 F.3d 1571, 1574 (9th Cir. 1996) "Jury exposure to facts not in evidence deprives a defendant of

25    the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth

26    Amendment." *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir.1995); *see also Sassounian v. Roe*, 230

27    F.3d 1097, 1108 (9th Cir. 2000). Whenever a jury obtains or uses evidence extrinsic to the trial

28    record, a new trial is warranted "if there existed a reasonable possibility that the extrinsic material

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1    could have affected the verdict." *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir.1987)

2        Furthermore, as the Supreme Court held in *Remmer v. United States*, 347 U.S. 227 (1954),

3            In a criminal case, any private communication, contact, or
             tampering directly or indirectly, with a juror . . .about the matter
4            pending before the jury is, for obvious reasons, deemed
             presumptively prejudicial, if not made in pursuance of known rules
5            of the court and the instructions and directions of the court made
             during the trial, with full knowledge of the parties.  The
6            presumption is not conclusive, but the burden rests heavily upon the
             Government to establish, after notice to and hearing of the
7            defendant, that such contact with the juror was harmless to the
             defendant.

8    *Id.*, at 229.

9        Finally, as to the issue of premature discussions of the case, the Third Circuit has

10   observed:

11

12           There are a number of reasons for this prohibition on
             premature deliberations in a criminal case.  *See generally* Lillian B.
             Hardwick & B. Lee Ware, *Juror Misconduct* § 7.04, at 7-27 (1988).
13            First, since the prosecution presents its evidence first, any
             premature discussions are likely to occur before the defendant has a
14           chance to present all of his or her evidence, and it is likely that any
             initial opinions formed by the jurors, which will likely influence
15           other jurors, will be unfavorable to the defendant for this reason. . .
             Second, once a juror expresses his or her views in the presence of
16           other jurors, he or she is likely to continue to adhere to that opinion
             and to pay greater attention to evidence presented that comports
17           with that opinion.   Consequently, the mere act of openly expressing
             his or her views may tend to cause the juror to approach the case
18           with less than a fully open mind and to adhere to the publicly
             expressed viewpoint. . .

19

20           Third, the jury system is meant to involve decisionmaking
             as a collective, deliberative process and premature discussions
21           among individual jurors may thwart that goal. . .  Fourth, because
             the court provides the jury with legal instructions only after all the
22           evidence has been presented, jurors who engage in premature
             deliberations do so without the benefit of the court's instructions on
23           the reasonable doubt standard. . .  Fifth, if premature deliberations
             occur before the defendant has had an opportunity to present all of
24           his or her evidence (as occurred here) and jurors form premature
             conclusions about the case, the burden of proof will have been, in
25           effect, shifted from the government to the defendant, who has "the
             burden of changing by evidence the opinion thus formed."

26           Finally, requiring the jury to refrain from prematurely
             discussing the case with fellow jurors in a criminal case helps
27           protect a defendant's Sixth Amendment right to a fair trial as well as
             his or her due process right to place the burden on the government
28           to prove its case beyond a reasonable doubt.

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   *See United States v. Resko*, 3 F.3d 684 (3rd Cir. 1993)

2       **C.      Specific and Substantial Evidence Before the Court Strongly Suggests**
        **That the Members of Defendant's Jury Committed Prejudicial**
3       **Misconduct**

4           In light of the general principles of law set forth above, there are a number of bases on

5   which to conclude that jurors may have engaged in prejudicial misconduct at defendant's trial.

6           *First*, foreman Cote's reported "hangman" simulation during pre-deliberation discussions

7   with other jurors, if verified, not only reflects condemnable juror bias, but also flatly violates the

8   court's emphatic instruction not to discuss the case with others, including other juror members,

9   until the close of evidence.  Such conduct thus implicated all of the rationales underlying the

10  prohibition against premature discussions, as set forth in *Resko, supra.*

11          *Second*, the allegation that juror Scaccia advised other jurors prior to deliberations that a

12  story describing the dismissal of juror 12 could be found in certain newspapers likewise reflects a

13  disregard of the court's repeated admonition to avoid exposure to any media reports relating to

14  the case.

15          *Third,* the allegation that, during deliberations, foreman Cote discussed a media report

16  concerning defense counsel in the present case likewise evidences a flagrant violation of the

17  court's instruction concerning media reports.  Furthermore, such discussion also injected into

18  deliberations extrinsic information relating to the case, as prohibited by *United States v.*

19  *Navarro-Garcia*, *supra*, and related precedent.  That being so, it is of no import whether the

20  foreman's initial exposure to the media report was intentional or not; in either case, the fact

21  remains that the foreman recalled the story during deliberations, and, beyond that, chose to

22  expose other jurors to what he surely should have recognized as prohibited material.

23          *Fourth,* the report that Ms. Horn read to the other deliberating jurors a typewritten

24  statement which she brought in from *outside* the jury room suggests that she injected extrinsic

25  information into deliberations.  Such conduct would be all the more troubling if it is shown that

26  Ms. Horn's conceded comments about Hepatitis C, which related to a key issue in the case, also

27  contained information Ms. Horn had located outside the jury room while deliberations were in

28  progress.

      U.S. v. Hamid Hayat,
      No. CR S-05-0240 GEB
                                                99

  
1    *Fifth*, Mr. Cote's telephone call to juror Watanabe to discuss a key aspect of the ongoing

2    deliberations, i.e, Cote's purported concern about a problem juror, unequivocally violated the

3    court's instructions not to discuss the case with anyone but the other deliberating jurors, see, e.g.,

4    RT 4369.[24]  At the same time, the call to Ms. Watanabe constitutes a prohibited private contact

5    relating to the case within the meaning of *Remmer, supra,* thereby triggering a presumption of

6    prejudice.

7         *Finally*, defendant notes again that the trial court determined that dismissal of juror

8    Wilson in the Umer Hayat case was warranted based on the simple (and correct) determination

9    that she had violated the court's instruction — invoked by the prosecution in favor of its dismissal

10   request — not to talk to others about the case.  Ms. Wilson had disclosed to others her presence

11   on the Umer Hayat jury but had apparently engaged in no additional misconduct.  Given this

12   treatment of this level of misconduct, defendant submits that a finding of actionable misconduct

13   must be returned in response to this motion if only a fraction of the allegations set forth above are

14   confirmed.

15        **D.        The Proffered Evidence of Juror Misconduct is Admissible**

16        Defendant submits that all of the instances of jury misconduct cited in this Argument are

17   admissible under the Federal Rules of Evidence, and specifically, Rule 606(b).  As previously

18   noted, that Rule expressly states that upon an inquiry into the validity of a verdict, jurors may

19   testify "on the question whether extraneous prejudicial information was improperly brought to the

20   jury's attention or whether any outside influence was improperly brought to bear upon any juror."

21   *Ibid.*  All of the reported misconduct described falls within this 606(b) exception.

22   _____

23        [24]  Again, in its final instructions to the panel, the Court stated:

24            If you have a cell phone or a device with a wireless internet
             connection, you must give it to the United States Marshal's
25            representative after you go into the jury deliberation room, or
             before you go into the jury deliberation room and at other times so
26            that we can be assured that there are no interferences with jury
             deliberations.  We also have to be assured – I *have to be assured*
27            *that you're not contacting somebody else about the case*.

28

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

E.    **The Court Must Convene an Evidentiary Hearing to Explore the Issue of Juror Misconduct**

A court confronted with a colorable claim of juror bias or misconduct must undertake an investigation of the relevant facts and circumstances. *Dyer,* 151 F.3d at 978; *see also Remmer, supra,* 350 U.S. 377 at 379; *Remmer, supra,* 347 U.S. at 230; *Angulo, supra,* 4 F.3d at 847.

Given the reports of extensive misconduct involved here, the seriousness of such misconduct, and the credibility of the sources, only a plenary hearing will suffice to resolve the present claim. *Angulo,* 4 F.3d at 847; *see also United States v. Humphrey,* 208 F.3d 1190, 1199-1200 (10th Cir. 2000)(holding trial court abused its discretion in limiting inquiry into jurors' hearing extrinsic information regarding defendant's reputation by halting inquiry after obtaining denial from jury foreman).

Finally, defendant notes that at the time of such hearing, and pursuant to the authority cited in section II.B, above, the prosecution will bear the burden of rebutting the presumption that Mr. Cote's private contact during deliberations was prejudicial. *Remmer, supra,* 347 U.S. at 229. Furthermore, as to verified incidents that jurors obtained or used evidence extrinsic to the trial record, a new trial is warranted "if there existed a reasonable possibility that the extrinsic material could have affected the verdict." *Marino, supra,* 812 F.2d at 504.

**VIII.   EVIDENCE OF HAYAT'S INNOCENCE THAT COULD NOT HAVE BEEN PREVIOUSLY TENDERED MERITS A NEW TRIAL**

A.    **Introduction**

Defendant Hayat faced a most difficult challenge in defending against the charges in this case. The central allegation that he faced was that he committed an act–attending a jihadi training camp between October of 2003 and November of 2004 -- not in the Eastern District of California, where he was being tried, but half a world away in Pakistan. The witnesses that could prove his innocence were those who observed his conduct in Pakistan during the charged time period, but they were largely beyond the defendant's power to produce.

Two of those witnesses were his cousins Usama and Jaber. At the time of trial, Jaber was in Pakistan on a no-fly list. Usama was in this country and had in fact given the FBI a statement

1  that demonstrated that Hayat had not attended a training camp, but could not be called because his

2  court-appointed lawyer had invoked his Fifth Amendment right no to testify.  In a case in which

3  the government offered no truly persuasive evidence that Hayat attended a jihadi camp in

4  Pakistan, the testimony of these two witnesses, had they been available to the defense at trial,

5  would have lead to the defendant's acquittal.

6

7  **B.      Statement of Facts**

8  The sworn declarations of Usama Ismail, Jaber Ismail, and Wazhma Mojadididi establish

9  the following:

10  Usama and Jaber are brothers and Hamid Hayat's first cousins.  While Hayat was in

11  Pakistan between April 2003 and May 2005, Jaber Ismail was also in Pakistan.  Usama Ismail left

12  Pakistan in March 2005, just two months before Hamid left.

13  While in Pakistan, both Usama and Jaber saw Hayat very frequently.  They lived in the

14  same village as Hayat in Behboodi near Islamabad in Pakistan.  Both Usama and Jaber went to

15  Pakistan in November 2001 to learn and memorize the Quran.  While in Pakistan they followed a

16  routine of attending the mosque to study the Quran several times a day.  During their breaks they

17  would visit Hayat at his home where he would be playing video games, watching movies or just

18  hanging out. When not studying, they would travel several times a week to nearby cities with

19  Hayat and shop and hang out with him.  Hayat would eat dinner at the Ismail home several times

20  a week. Usama and Jaber's family would also regularly eat dinner at Hayat's home.  After

21  Hayat's wedding in December 2004, they would eat dinner at Hayat's house every week.

22  Both Usama and Jaber knew that Hayat would travel to Rawalpindi and visit with his

23  grandfather. When Usama and Jaber themselves went to Rawalpindi they would see Hayat every

24  day. Both Usama and Jaber accompanied Hayat several times to Rawalpindi and even stayed at

25  Hayat's grandfather's house with Hayat.

26  Usama was interviewed by FBI agents in June 2005 after Hayat was arrested.  Jaber Ismail

27  was interviewed by an FBI agent in Islamabad, Pakistan in April 2006.  Both Usama and Jaber

28  were asked about Hayat.  They both told the FBI that Hayat had not been to a terrorist training

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1  camp. Jaber told the FBI agent that he himself never attended a terrorist training camp. Usama

2  also told the FBI agents that he himself never attended a terrorist training camp. Usama told the

3  FBI that he spent a lot of time with Hayat in Pakistan. He told the FBI that the longest period that

4  he didn't see Hayat was two weeks. He told the FBI that Hayat was innocent and that the

5  allegations against him were false.

6         Usama Ismail was interviewed by FBI agents at his home on June 9, 2005. He was also

7  served with a subpoena to testify before the federal grand jury. After being served with a

8  subpoena the Federal Defender's office appointed an attorney, Christopher Haydn-Meyer to

9  represent Usama. After he discovered that Hayat would be going to trial, Usama decided that he

10  wanted to testify on behalf of Hayat. Usama told Hayat's mother that he wanted to testify at the

11  trial. He asked her to contact Hayat's attorney, Wazhma Mojaddidi and to tell her that he wanted

12  to testify.

13        Wazhma Mojaddidi was working closely with attorney for Umer Hayat, Johnny L. Griffin

14  III in preparation for the joint trial of Hamid Hayat and Umer Hayat. Both Mojaddidi and Griffin

15  decided that Usama would be a good witness because he spent a lot of time with Hayat while they

16  were both in Pakistan. Mojaddidi had also been told by Hayat's mother that Usama wanted to

17  testify. Because Usama was represented by counsel, defense counsel did not contact Usama

18  directly. Johnny L. Griffin III contacted Christopher Haydn-Meyer and notified him that they

19  wanted to call Usama as a witness for the defense at trial. Mr. Haydn-Meyer told Mr. Griffin that

20  he would advise Usama not to testify and to invoke his 5th Amendment privilege not to testify if

21  the defense served him with a subpoena to testify. Mojaddidi and Griffin decided not to serve

22  Usama with a subpoena because they thought their efforts would be futile considering what Mr.

23  Haydn-Meyer told Mr. Griffin.

24        Defense counsel also thought that Jaber Ismail would serve as a good witness for Hayat

25  because he also spent a lot of time with Hayat in Pakistan. They knew that Jaber was still in

26  Pakistan during their trial preparations and that they couldn't subpoena him while he was there.

27  Jaber remained in Pakistan until April 21, 2006 when he tried to fly back into the United States.

28  On his way to the United States with his family, he and his father were told in Hong Kong that

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1   they could not proceed to the United States.  They were forced to return to Pakistan.  The reason

2   why they were denied entry was because they were on the federal government's "no-fly" list.

3   After their attorney, Julia Mass from the ACLU stepped in and filed a complaint with the

4   Department of Homeland Security, they were eventually allowed to come back into the United

5   States in September 2006.

6

7   **C.**      **The Relevant Law**

8        A defendant may move for a new trial based on newly discovered evidence under Rule 33

9   of the Federal Rules of Criminal Procedure. The motion must be made within three years of the

10  verdict.  *Id.*

11       A claim for a new trial motion on the grounds of newly discovered evidence generally

12  must meet a five part test: (1) the evidence must be newly discovered; (2) the failure to discover

13  the evidence must not be the result of a lack of diligence on the defendant's part; (3) the evidence

14  must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely

15  impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal.

16  See, e.g., *United States v. Kulczyk,* 931 F.2d 542, 548 (9th Cir. 1991), *United States v. Fulcher*,

17  250 F3d 592 (4th Cir. 2001).

18       In *United States v. Fulcher*, the Fourth Circuit affirmed the granting of a rule 33 motion

19  on the grounds of newly discovered evidence. The defendants in this case were convicted for

20  money laundering and drug charges arising out of a drug distribution operation in a Virginia

21  prison. After trial, a federal agent wrote a letter to the court in which he explained that he might

22  have led defendants to believe they were authorized to carry out their activities on behalf of the

23  government.  The court applied the above five-part test in reaching its conclusion. Because the

24  agent had previously testified that he had done nothing to suggest the defendants would be

25  authorized to carry out their activities, his contrary post- trial statements were "newly

26  discovered." There was nothing to suggest a lack of diligence on defendants' part as they

27  vigorously cross-examined the agent in pre-trial proceedings.  There had been no evidence

28  presented at trial regarding intent, so the evidence was not cumulative. The evidence was material

1  to a public authority defense. The favorable light that would be cast on defendants by having the

2  agent testify that he created an impression of consent to their activities could result in an acquittal.

3        **D.**    **Because Usama and Jaber's Testimony Could Prove Hayat's**
               **Innocence and They Were Not available to Testify At Trial, A**

4                 **New Trial Should Be Granted**

5         In this case, in which the government produced no evidence that Hayat attended a training

6  camp apart from the defendant's often incoherent, contradictory, and even bizarre statements, the

7  testimony of Usama and Jaber, if credited, would result in Hayat's acquittal.  Their proposed

8  testimony is internally consistent and jives with Hayat's initial statements to the FBI.  Both were

9  in a position to observe Hayat's conduct and their observations, unlike the statements of Hayat

10  relied on by the government, make sense.  Their testimony is affirmative proof of innocence, and

11  in no sense is cumulative or merely impeaching.  Neither could be called by the defense at trial.

12         The government will no doubt argue that the evidence of Usama is not newly discovered,

13  as he stated the same in his FBI interview, which was memorialized in a 302 provided to the

14  defense prior to trial.  Nonetheless, Hayat was no more able to produce Usama at trial than he

15  would have been had his counsel been unaware of Usama's existence or the exculpatory evidence

16  he could provide.  Hayat is simply not guilty of the charges against him.  In a case of such

17  importance to both himself and the nation, he should be given a full and fair opportunity to prove

18  his innocence.                    **CONCLUSION**

19         For all the foregoing reasons, the Court should reverse defendant's convictions and order

20  a new trial.

21  Dated: October 27, 2006               Respectfully submitted,

22

23                                     /s/
                         WAZHMA MOJADDIDI

24

25                                     /s/
                         DENNIS P. RIORDAN

26

27                                     /s/
                         DONALD M. HORGAN

28                           Attorneys for Defendant

U.S. v. Hamid Hayat,
No. CR S-05-0240 GEB

1          HAMID HAYAT