IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 2:05-cr-240-GEB |
| Plaintiff, | ) | |
| v. | ) | ORDER |
| HAMID HAYAT, | ) | |
| Defendant. | ) | |

Defendant Hamid Hayat filed a motion for a new trial under Federal Rule of Criminal Procedure 33 on October 27, 2006. The government filed an opposition on February 3, 2007, and Hayat filed a reply on March 20, 2007. Hearings were held on April 6 and April 13, 2007. For the following reasons, Hayat's motion is denied.

## I.  Background

On April 25, 2006, a jury returned guilty verdicts on all four counts charged in the second superceding indictment: three counts of violating 18 U.S.C. § 1001 (making false statements to FBI officials), and one count of violating 18 U.S.C. § 2339A (providing material support to terrorists). Hayat's trial commenced on February 14, 2006. The jury began deliberations on April 12, 2006.

1

## II.  Standard of Review

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A Rule 33 motion for a new trial can be granted "[i]f the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."  U.S. v. Alston, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (quoting U.S. v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).  In evaluating whether a Rule 33 motion should be granted, "[t]he district court . . . may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."  Alston, 974 F.2d at 1211 (quoting Lincoln, 630 F.2d at 1319).

A new trial "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'"  U.S. v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981) (quoting 2 Wright, Federal Practice and Procedure, Criminal § 553 at 487 (1969)).  "The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.  The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  U.S. v. Martinez, 763 F.2d 1297, 1312-13 (11th Cir. 1985) (internal citations omitted).

## III.  Analysis

### A.  Juror Bias/ Misconduct

Hayat argues that he is entitled to a new trial because the foreman of the jury, Joseph Cote, harbored a bias against him

and because Cote and another juror, Deborah Horn, engaged in prejudicial misconduct.  (Mot. at 69, 95.)

"The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors.  The bias or prejudice of even a single juror would violate [a defendant's] right to a fair trial."  Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998); Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990).  "[T]o obtain a new trial [based on a claim that a juror was dishonest during voir dire], a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984).

When considering a claim that juror misconduct justifies granting a new trial motion, "[t]he test is whether or not the misconduct . . . prejudiced the defendant to the extent that he [did] not receive[] a fair trial."  U.S. v. Klee, 494 F.2d 394, 396 (9th Cir. 1974).  "In conducting their deliberations, jurors have a duty to consider only the evidence which is presented to them in open court.  Evidence not presented at trial . . . is deemed extrinsic."  U.S. v. Navarro-Garcia, 926 F.2d 818, 820 (9th Cir. 1991) (internal citations, quotation marks, and brackets omitted); see also Thompson v. Borg, 74 F.3d 1571, 1574 (9th Cir. 1996) ("Juror misconduct typically occurs when a member of the jury has introduced into its deliberations matter which was not in evidence or in the instructions.").  "When information not placed in evidence reaches the jury during its deliberations, the defendant is entitled to a new trial if 'there existed a reasonable possibility that the

extrinsic material could have affected the verdict.'" <u>U.S. v.</u>
<u>Bagley</u>, 641 F.2d 1235, 1240-41 (9th Cir. 1981) (quoting <u>U.S. v.</u>
<u>Vasquez</u>, 597 F.2d 192, 193 (9th Cir. 1979)).

"In evaluating a claim of juror misconduct [or bias], we
begin with the presumption that the juror is impartial, [faithfully
performed official duties, and followed the instructions given by
the court]." <u>U.S. v. Collins</u>, 972 F.2d 1385, 1403 (5th Cir. 1992);
<u>U.S. v. Eldred</u>, 588 F.2d 746, 752 (9th Cir. 1978); <u>see also</u> <u>Alston</u>,
974 F.2d at 1210. "'[I]t is incumbent upon the defendant to prove
otherwise.'" <u>Collins</u>, 972 F.2d at 1403 (quoting <u>U.S. v. Wayman</u>, 510
F.2d 1020, 1024 (5th Cir. 1975)); <u>U.S. v. Elias</u>, 269 F.3d 1003, 1021
(9th Cir. 2001).

A defendant making a claim of juror bias or misconduct
will not be allowed "to evade the prohibition of [Federal Rule of
Evidence] 606(b) under the guise of a Rule 33 motion." <u>Ortega v.</u>
<u>U.S.</u>, 270 F.3d 540, 547 (8th Cir. 2001). Rule 606(b) prescribes: "a
juror may not testify as to any matter or statement occurring during
the course of the jury's deliberations or to the effect of anything
upon that or any other juror's mind or emotions as influencing the
juror to assent to or dissent from the verdict or indictment or
concerning the juror's mental processes in connection therewith."
Fed. R. Evid. 606(b). However, "a juror may testify about (1)
whether extraneous prejudicial information was improperly brought to
the jury's attention, (2) whether any outside influence was
improperly brought to bear upon any juror, or (3) whether there was
a mistake in entering the verdict onto the verdict form." <u>Id.</u>
Additionally, "[s]tatements which tend to show deceit during voir
dire are not barred by [Rule 606(b)]." <u>U.S. v. Henley</u>, 238 F.3d

1111, 1121 (9th Cir. 2001) (quoting <u>Hard v. Burlington N. R.R.</u>, 812

F.2d 482, 485 (9th Cir. 1987)).

> [T]he . . . purpose behind Rule 606(b) is to
> preserve one of the most basic and critical
> precepts of the American justice system: the
> integrity of the jury. Rule 606(b) allows for a
> system in which jurors may engage in
> deliberations with the utmost candor, performing
> in an uninhibited way the fact-finding duties
> with which they are charged. In this manner, the
> Rule provides jurors with an inherent right to
> be free from interrogation concerning internal
> influences on the decision-making process. Such
> internal influences have been held to include
> pressure of one juror on another; juror
> misunderstanding of court instructions; a
> verdict achieved through compromise; juror
> misgivings about the verdict; and juror
> agreement on a time limit for a decision.
> Accordingly, Rule 606(b) prevents the
> unwarranted badgering of jurors that would
> invariably arise in its absence in an alleged
> attempt to search for the "truth" as to the
> manner in which each and every jury reaches a
> verdict.
>
> Moreover, Rule 606(b) does not exist in a
> vacuum. To the contrary, the Rule exists as just
> one portion of the overall justice system, which
> is likewise designed to protect the
> constitutional rights of the defendant,
> including the defendant's Sixth and Fifth
> Amendment rights to a fair trial and an
> impartial jury under the Constitution.
>
> ***
>
> Against this backdrop, a court facing
> post-verdict allegations of jury misconduct
> shall rely on the essence of Rule 606(b), which
> provides that if the case involves an extraneous
> or external influence on the jury, then a
> post-verdict interrogation of jurors is
> permitted in order to adequately protect the
> defendant's constitutional rights. Conversely,
> if the case involves an internal influence, the
> Rule does not permit the post-verdict
> interrogation of jurors. In the latter instance,
> the preservation of the integrity of the jury
> system outweighs any potential violation of the
> defendant's constitutional rights. In this way,
> the internal influence versus external influence
> distinction in the Rule is designed to balance

                    the preservation of the integrity of the jury
                    system and the rights of the defendant.

U.S. v. Logan, 250 F.3d 350, 379-80 (6th Cir. 2001) (internal
citations omitted).

### 1.   Jury Foreman Cote

Hayat seeks a new trial, arguing that the jury foreman,
Joseph Cote, harbored a disqualifying racial and religious bias
which he failed to disclose during voir dire, and that he committed
prejudicial misconduct.  (Mot. at 69, 95.)  Specifically, Hayat
argues that Cote made hangman gestures before deliberations, made
racist remarks during deliberations, made an improper telephone call
to alternate juror Watanabe during deliberations, brought extraneous
information into the jury room during deliberations, and made
inappropriate remarks to a reporter from the Atlantic Monthly after
the trial concluded.  (Id. at 80-85.)  Hayat contends that Cote's
conduct and statements as a whole reveal his presence on the jury
denied Hayat his constitutional right to a fair and impartial jury.
(Reply at 3-4.)

The government counters that "contrary to [Hayat]'s
claim[s], there is no substantial and admissible evidence to suggest
that [Cote] harbored a disqualifying racial or religious bias or
that [he] engaged in any form of cognizable and prejudicial
misconduct."  (Opp'n at 4.)

The hangman gesture allegations are based on fellow juror
Arcelia Lopez's averments that, during trial, Cote "gestured as if
he was tying a rope around his neck and then pulling the rope in an
upward motion[, and] then said 'Hang Him.'"  (Mot. at 80; Lopez Aff.
¶ 3.)  These allegations combined with statements Cote allegedly

made to the Atlantic Monthly during a post-trial interview prompted
the trial judge to hold an evidentiary hearing on April 6, 2007,
during which Cote was asked questions concerning those allegations
and statements.  The salient magazine statements attributed to Cote
follow: there are "so-called new rules of engagement, and I don't
want to see the government lose its case"; it is "better to run the
risk of convicting an innocent man than to let a guilty one go";
and, although Hayat appears to be a "nice young man," considering
that the young Pakistani men who carried out the London bombings
also seemed like nice young men, "Can we, on the basis of what we
know, put this kid on the street?  On the basis of what we know of
how people of his background have acted in the past?  The answer is
no."  (Mot. at 84-85; Ex. H to Mot. at 93.)

At the April 6 evidentiary hearing, Cote categorically and
convincingly denied making the hangman gestures that Lopez alleged
he made, and further testified that he did not have thoughts
attributed to him in the Atlantic Monthly article before the
commencement of the Hayat jury deliberations.  Cote's testimony was
credible.[1]

Subsequently, Lopez appeared at a further evidentiary
hearing on April 13, 2007.  In a supplemental affidavit, and in the
April 13 evidentiary hearing, Lopez again accused Cote of making the
hangman gestures and "hang him" statement.  (Second Lopez Aff. ¶ 4.)

---

[1]   At the April 6 and 13, 2007 hearings, Hayat's counsel made
much ado about Cote's "misrepresentation" at the April 6 hearing
that the London subway bombings occurred after Hayat's trial
concluded. However, Cote's misrecollection of the date of the London
bombings does not adversely affect his credibility.

1

### a.   Hangman gestures

2        Hayat argues that the hangman gestures Cote allegedly
3 made "quite clearly suggest[] a prejudgment as to [Hayat]'s guilt
4 [and] extraordinary vindictiveness that Cote had sworn to disavow
5 during voir dire."  (Mot. at 90.)  Hayat further argues that the
6 gestures "suggest[] that [Cote] had not been truthful when he swore
7 that he would keep an open mind and not permit passion or prejudice
8 [to] sway his deliberations."  (Id. at 90-91.)

9        Cote's testimony that he did not make a hangman gesture or
10 "hang him" statement is diametrically opposite Lopez's testimony on
11 these issues.  Lopez testified on April 13, 2007, that Cote made a
12 hangman gesture and stated "hang him" in the jury deliberation room
13 on the second day of trial.  Lopez authored two affidavits which
14 differ concerning how many jurors were present when Cote made the
15 alleged hangman gesture on the second day of trial.  In Lopez's
16 affidavit dated April 27, 2006, she avers Cote made the gesture "in
17 the presence of [herself] and one other juror," whereas in Lopez's
18 second affidavit dated April 11, 2007, she avers that Cote made the
19 gesture "in the presence of [herself] and other jurors."[2]  (Compare
20 Lopez Aff. ¶ 3 with Second Lopez Aff. ¶ 4.)  During the April 13
21 hearing, Lopez explained this discrepancy, testifying: "when the
22 gesture was made, in the section that we were in next to the table,
23 it was just me, Mr. Cote and Mr. Monty Hall in the immediate area.
24 A few steps just behind us is where the rest of the jurors were.

25

26        [2]   A redacted version of Lopez's April 27, 2006 affidavit was
   filed on October 27, 2006, along with Hayat's motion for a new
27 trial. However, portions of the unredacted version of the affidavit
   became part of the record for purposes of this motion at the April
28 13, 2007 hearing, when it was cited by counsel for the government
   and the defense.

1   But they were not adjacent to us, or surrounding, or behind any of
2   us.  They were adjacent but they were next to the restrooms."
3   It is puzzling why Lopez was precise in her April 27, 2006
4   affidavit, that Cote made the gesture "in the presence of [herself]
5   and one other juror [(Hall)]," and yet in her April 11, 2007
6   affidavit, stated that the gesture was made in the presence of
7   several other jurors.  Moreover, although Hayat's counsel
8   interviewed other jurors post trial, no information has been
9   provided that any other juror saw Cote make a hangman gesture before
10  jury deliberations.

11          Lopez also declares in her April 11, 2007 affidavit, that
12  she "told [Cote during deliberations] that he . . . constantly made
13  the hangman gesture since the beginning of trial and expressed his
14  desire to find Hamid guilty," and that Cote responded she "was
15  crazy." (Second Lopez Aff. ¶ 6.)  Lopez further declares that Mr.
16  Varno, a fellow juror, heard this accusation against Cote and
17  responded "that it wasn't Cote who was making the gesture, but that
18  Mr. Hall[3] was making the gestures during trial."[4]  (Id.)  Varno
19  connoted that Lopez was confused since she mistakenly identified
20  Cote as having done what Hall did.  The record indicates Lopez could
21  be confused about the name of the juror who made hangman gestures
22  before jury deliberations.  Lopez had previously confused the

23

24          [3]   Since Hall was an alternate juror, he did not participate
25  in the deliberations.

26          [4]   Although these statements were made during deliberations,
27  the consideration of these statements does not violate Rule 606(b)
    because the evidence is relevant on the issue of whether Cote was
    truthful when he said he did not make the hangman gesture, and this
28  determination has probative value on whether Cote was deceitful
    during voir dire.

identity of two jurors.  In her April 27, 2006 affidavit, Lopez

misidentified juror Deborah Horn as juror Rebecca Harris, when Lopez

mistakenly said Harris was the author of a document concerning

Hepatitis C that was read during deliberations.[5]  (Lopez. Aff. ¶ 11;

see also Wedick Aff. ¶ 9, Berkeley-Simmons Aff. ¶ 18.)

          Further, Lopez's explanation as to why she failed to tell

the trial judge about Cote making a hangman gesture on the second

day of trial is unconvincing.  See Bristow v. Terhune, 2005 WL

1335240, at *12 (E.D. Cal. May 26, 2005) (indicating that the trial

court concluded that a juror's credibility is belied when the juror

"had numerous opportunities to talk to the court if there were

problems during deliberations, but she did not do so").  The

following exchange occurred on this point at the April 13 hearing:

          The Court: You state in your April 11, 2007
          affidavit that you conclude hangman gestures
          were inappropriate. Did you conclude that when
          you first observed it on the second day of
          trial?

          Ms. Lopez: Yes, I did.

          The Court: When you used the word
          "inappropriate," what does that mean to you?
          What are you connoting?

          Ms. Lopez: To me that was a very obvious way for
          Mr. Cote to show his stand, or his opinion, so
          early in the trial when it was not appropriate.
          We were not in deliberations at the time, so for
          him to show such a gesture I felt was unfair. I
          felt that it compromised the integrity of the

_____

          [5]    At the April 13 hearing, Lopez stated that she first
recalled Cote making the hangman gesture on the second day of trial,
but that he continued to make the gesture as the trial continued,
and into deliberations. It is possible that, consistent with Cote's
testimony at the April 6 hearing and consistent with Varno's
statement, only Hall made the gesture prior to deliberations. If
Cote made hangman gestures *during* deliberations, Lopez is probably
confused about which juror, Hall or Cote, made the gesture *prior* to
deliberations.

1   case.

2   The Court: Did you think it was wrong?

3   Ms. Lopez: Pardon?

4   The Court: You thought it was wrong?

5   Ms. Lopez: I know it was wrong.

6   The Court: Why didn't you tell me about it?

7   Ms. Lopez: I should have. That was a mistake on
    my part.
8
    The Court: Why didn't you?
9
    Ms. Lopez: I don't have an answer for that. I
10  just know that I was wrong in not reporting it.

11      Additionally, Lopez's version of what happened is not

12  credited because Lopez states in her April 27, 2006 affidavit that

13  she was not truthful when she was polled about the jury verdict.

14  (Lopez Aff. ¶ 13.)   Lopez declares that when she was polled on April

15  24, 2005, she "responded to the Court that [she] agreed with the

16  verdict," when, "[i]n fact, [she] did not."   (Id.)   Each juror was

17  polled individually and answered affirmatively when questioned

18  whether the guilty verdict was his or her verdict; it is astonishing

19  that Lopez said otherwise shortly after affirming that the verdict

20  was her verdict.[6]  See generally Bristow, 2005 WL 1335240, at *12

21  (stating that a state "appellate court concluded that the absence of

22

23          [6]     Further, Lopez's averment in her April 27 affidavit that
    she "deeply regret[s her] decision" indicates she may desire to get
24  the guilty verdict reversed. (Lopez Aff. ¶ 13.) See Chambers v.
    Cockrell, 2003 WL 22017036, at *25 (N.D. Tex. Aug. 26, 2003)
25  (quoting the trial court's finding that a juror "simply had a change
    of heart regarding the jury's verdict of death, and her testimony at
26  the motion for new trial hearing was merely an attempt to get the
    case reversed").
27      Although evidence of a juror's post-trial regret or remorse
    about a verdict is not admissible to impeach the verdict, Lopez's
28  regret is not being considered for that purpose; rather, it is being
    considered on whether she has a motive to get the verdict reversed.

1   details in [the affidavit of a juror who alleged she did not agree

2   with the jury's verdict but was intimidated by her fellow jurors],

3   her failure to apprise the court during deliberations of any

4   inappropriate behavior, and her failure to speak up when

5   individually polled, justified the trial court's conclusion that no

6   juror misconduct occurred.").

7          For all of the stated reasons, Lopez's version of who made

8   hangman gestures before deliberations is not believed.  Therefore,

9   Hayat has not proved that Cote made hangman gestures or stated "hang

10  him" prior to jury deliberations.[7]

11         A remaining issue is whether, if another juror made a pre-

12  deliberation hangman gesture, that gesture needs to be investigated.

13  The Seventh Circuit held otherwise in U.S. v. Kimberlin, 805 F.2d

14  210, 243 (7th Cir. 1986), where "[o]ne juror, during trial and in

15  presence of all others, said 'They ought to hang him now, so we can

16  go home,' or words to that effect."  The district court concluded

17  that the hangman statement allegation did "not require a hearing

18  because the only types of inquiry which would aid the court in

19  assessing possible effects of such alleged conduct are not permitted

20  by [Rule 606(b)]."  Id.  The Seventh Circuit agreed, stating, "Rule

21  [606(b)] would not permit a juror to testify to the effect of the

22  communication upon his [or her] mind or emotions, or concerning his

23  [or her] mental processes in connection with the verdict.  Thus, a

24  hearing would be fruitless unless these statements, if made, would

25  be presumed to be prejudicial."  Id. at 244.

26

27

28         [7]   Rule 606(b) prohibits the Court from probing into whether
    or not Cote, or any other juror, made a hangman gesture *during*
    deliberations.

1    "The important thing is . . . that each juror ke[pt] an
2  open mind until the case [was] submitted to the jury. . . .  What is
3  involved here is the premature discussion among [certain] jurors
4  themselves about the case.  Assuming that there was juror
5  misconduct, it is still true that not every incident of juror
6  misconduct requires a new trial."  Klee, 494 F.2d at 396.  A
7  question is whether the jurors made up their minds about Hayat's
8  guilt before deliberation.  The record does not so indicate.  The
9  jury deliberated for ten days, and during the course of their
10  deliberations, requested guidance from the court on various issues
11  (RT 4655, 4732), and requested a replay of Hayat's videotaped
12  confessions and the testimony of one of the FBI investigators (RT
13  4558, 4782).  See Klee, 494 F.2d at 396 (denying new trial premised
14  on premature deliberations and expressions of guilt by nine jurors
15  where, among other things, the trial judge "correctly observed that
16  'the only genuine issue in dispute was defendant's state of mind. On
17  this point the jury demonstrated its open-mindedness by requesting
18  re-reading of the instructions on willfulness before bringing in its
19  verdict.'").  Therefore, Hayat's motion for a new trial on this
20  ground is denied.

21           **b.   Statements to Atlantic Monthly**

22      Hayat alleges that in a post-trial interview, Cote made
23  several inappropriate statements to Amy Waldman, a reporter for the
24  Atlantic Monthly.  (Mot. at 84-85.)  Hayat argues these "statements
25  suggest[] that, when deliberating, [Cote] likened [Hayat] to the
26  young Pakistani men responsible for the London subway bombings [and
27  that this] suggests that Cote flatly disregarded his assurance that
28  he harbored no prejudices against Pakistanis or Muslims, as well as

13

his promise to disregard whatever he had read in the media."  (Id. at 91.)  Hayat also argues the statements indicate Cote "was untruthful when he assured the Court and the parties that during deliberations, he would consider only the evidence adduced in *this* case and that he would 'absolutely' disregard any media reports." (Id. at 91-92.)

Hayat further contends that Cote's statements regarding "new rules of engagement" and "not want[ing] to see the government lose its case," and that it was "absolutely" better to run the risk of convicting an innocent man than letting a guilty one go free, "suggest that, during voir dire, Cote had concealed the impact that the allegations of terrorism would have on his thinking, and that he had ignored his oath[] to apply a presumption of innocence and to require the government to prove its charges beyond a reasonable doubt."  (Id. at 92.)

The government counters that Cote's alleged statements related to the London bombings are "double hearsay and therefore of questionable reliability"; the statements are barred by Rule 606(b); and the meaning of the statements and what they reveal about Cote's "mindset during deliberations, or voir dire, is uncertain" since "the mere fact that [Cote] recalled the London bombings or that some of the bombers were Pakistani does not suggest he is prejudiced against Pakistanis or Muslims."  (Opp'n at 146, 147, 148).  The government further contends that the statements fall "woefully short of constituting substantial evidence that [Cote] purposefully concealed a bias against [Hayat] during voir dire or otherwise purposefully lied to the parties and the Court when he promised to base his decisions only on the evidence adduced at trial."  (Id. at

14

1   152-53.)

2           With regard to Cote's alleged statements related to new

3   rules of engagement, the government argues the statements are double

4   hearsay; that "Rule 606(b) bars consideration of the[se] statements

5   to prove whether [Cote] understood the law regarding presumption of

6   innocence and burden of proof, followed that law, or even refused to

7   do so"; and that "an examination of all the quoted foreman

8   statements, in context, makes it clear that [Cote] did not ignore

9   his oath [or] misapprehend the law."  (<u>Id.</u> at 154, 155, 156.)

10          Even assuming Cote made all of the statements in the

11  Atlantic Monthly article, when read as a whole, the article reveals

12  that the jurors, and Cote himself, thoroughly and thoughtfully

13  deliberated regarding Hayat's guilt or innocence.[8]  The statements

14

15          [8]   The article suggests that the jurors had great difficulty
    in deciding whether to convict Hayat. For example, the article
16  states:

17          Hayat's intent was the last issue the jurors discussed,
            when they had wrapped everything else up. To Cote, it
18          was just a subset of the main charges, but he called it
            "the most perplexing question in the entire indictment"
19          - the least damning, legally speaking, from his
            perspective, yet perhaps the most weighty morally.
20          After the judge denied their request for a dictionary,
            the jurors spent an entire morning wrestling with what
21          the word *intending* meant. Starr Scaccia said she was
            the only juror who was truly convinced that Hayat would
22          have carried out an act of terrorism; her fellow jurors
            "didn't feel he had the guts to do it." The truth, Cote
23          kept saying to me, was that they just didn't know.
24
25          This was their conundrum: Do you send a man to prison –
            ostensibly for training and lying - when the real
26          question is whether he is a threat, and most of you
            don't think he is?  "That's what made the verdict so
27          tough," Cote said. "Because we thought in the gut,
            'Maybe he may not do it.'" But what Cote called the
28          "literal world," defined by the boundaries of law and
            evidence, did not allow for shades of gray.

15

in the article do not reveal that Cote had a racial or religious bias against Hayat, that he was dishonest during voir dire, or that he was an unfair or impartial juror.

### c.   Statements during deliberations

Hayat supports his contention that Cote made racist remarks during deliberations with the affidavits of Lopez, juror

---

During our interview, Cote said several times that the jurors were not asked to decide whether Hayat was capable of engaging in terrorism. "Believe it or not, that's the only way I can sleep nights," he said.  And yet they did decide it, Cote said, concluding that the evidence suggesting that Hayat would act - the scrapbook, the prayer, and so on - was stronger than the evidence that he would not.

(Ex. H to Mot. at 92);

The "punch line," Cote said, was that he thought these cases were more than a jury could handle. "We're not being asked, 'Did the defendant commit the crime?' - whether it's larceny, murder, whatever. Now you're being asked, 'Is the defendant capable of doing a crime?' And I don't think that that is in the . . . level of understanding of the juror."

The doubt "works on you," added Cote, who used the phrase "the haunt." What haunted him was having to weigh, with inconclusive evidence, the risk that the man before the jurors was dangerous against the countervailing risk of depriving an innocent man of his liberty. He and his fellow jurors had no extraordinary talents to bring to bear on that task; they were Americans who had been selected for jury duty because of their very ordinariness. As Cote saw it, they were ill-equipped to handle what was being asked of them.

(Id. at 92-93);

This preventive approach, Cote said, means that "just as there are people in prison who never committed the crime, this may also happen. *Not this particular case, I'm saying, but future cases.*"

(Id. at 93) (emphasis added).

16

Theresa Berkeley-Simmons and investigator James Wedick, where they explain that during deliberations, in a discussion about government witness Naseem Khan's misidentification of Ayman al-Zawihiri, a well-known alleged terrorist, in Lodi, California, Cote stated that all Egyptians look alike when dressed in the same garb.  (Id. at 81-82; Lopez Aff. ¶ 6; Berkeley-Simmons Aff. ¶¶ 4-14; Wedick Aff. ¶ 6.) Hayat argues that this statement and Cote's "other inappropriate racial remarks" reveal that Cote harbored a racial and religious bias.  (Mot. at 83; Berkeley-Simmons Aff. ¶ 13; Lopez Aff. ¶ 6.) Hayat contends the "statements suggest that [Cote] had not been truthful when, in voir dire, he stated that he could remain impartial and that he harbored no prejudice against Muslims, Pakistanis, Pakistani-Americans or those with Islamic beliefs." (Mot. at 91.)

        The government counters, first arguing that "given the context and nature of the statement, [it] does not believe that the statement evidences an 'actual bias' on the part of [Cote] such that it is admissible as an exception to Rule 606(b)."  (Opp'n at 143-44.)  The government explains "it is far from clear whether Cote's reported statement is a 'racist statement' or what it reveals about [Cote's] views in general with respect to individuals of different races, nationalities or creeds."  (Id. at 143.)  The government contends that "the remark related to a legitimate topic of discussion by the jury: whether the cooperating witness had misidentified Al Zawihiri in Lodi.  Indeed, according to Cote, he was trying to explain that identification of individuals can be problematic."  (Id.)

17

1    The government further argues that "assuming that [Cote's]
2  statement related to individuals looking alike is admitted as some
3  evidence of potential bias, and even assuming its veracity, it is
4  clear that the statement does not constitute substantial evidence of
5  bias by [Cote] sufficient to warrant a further evidentiary hearing,
6  or come close to establishing actual bias on the part of [Cote]."
7  (Id. at 144.)

8    The only concrete example that Hayat provides to support
9  his contention that Cote made racist remarks during trial (that all
10 Egyptians wearing the same garb look alike) is not racist, in light
11 of the context in which it was made, since Cote was trying to
12 explain how Khan could have misidentified certain individuals.

13        **d.    Telephone call to alternate juror Watanabe**

14   Hayat alleges that on April 20, 2006, Cote telephoned
15 alternate juror Marta Watanabe and asked her a question about Lopez.
16 (Mot. at 84; Wedick Aff. ¶ 8.)  Hayat argues this communication
17 "violated the Court's instructions and admonitions on not
18 communicating with any outside party about the case, . . .
19 misconduct which . . . gives rise to a finding of disqualifying
20 bias."  (Mot. at 92.)

21   The government responds that "[a] review of the actual
22 allegations makes it clear that the communications between Cote and
23 Watanabe, in fact, were ex parte contacts and that there is no
24 reasonable possibility of prejudice to [Hayat]."  (Opp'n at 177.)
25 The government asserts the conversation did "not pertain to any fact
26 in controversy in the prosecution or any law applicable to the
27 case," and "Watanabe did not impart any information germane to
28 deliberations to foreman Cote or vice versa."  (Id. at 178, 180.)

18

1    Since there is no indication that Cote's telephone call to

2    Watanabe constituted *prejudicial* misconduct, Hayat's motion is

3    denied on this ground.

4                    **e.   Media reports in deliberation room**

5    Hayat alleges that one day during deliberations, Cote

6    talked with other members of the jury about a media report he had

7    heard relating to the trial.  (Mot. at 83.)  Specifically,

8    Berkeley-Simmons avers that "[a]t one point during deliberations,

9    Mr. Cote began to discuss something he had learned from media

10   reports about Hayat's attorney, Wazhma Mojaddidi."  (Berkeley-

11   Simmons Aff. ¶ 14.)  Additionally, Lopez avers in her April 27, 2006

12   affidavit, that "during deliberations Mr. Cote shared with jury

13   members that he overheard something concerning a media report

14   relating to the trial.  The information he shared was clearly not

15   something that was provided during testimony."  (Lopez Aff. ¶ 8.)

16   In Lopez's April 11, 2007 affidavit, she further avers, for the

17   first time, that:

18           Mr. Cote often discussed topics that he read
             about in the media with the other jurors. . . .
19           One day during trial and during a break in the
             jury room, Cote told the jury that he had read
20           about government attorney, David Deitch.  He
             said that Deitch was an attorney from Washington
21           D.C. who had a good record in these 'types of
             cases,' and that if the government would let him
22           lead during trial they would win the case.  When
             he made this comment, I did not want to be a
23           part of the conversation and so I walked out and
             went to the restroom.  When I returned, Mr. Cote
24           was telling the jurors that it didn't matter
             whether defense counsel, Wazhma Mojaddidi, won
25           the case because she had stated that she would
             not take any more cases like this one.

26

27   (Second Lopez Aff. ¶ 8.)

28

                                  19

1    Hayat argues this discussion violated the court's
2  instruction concerning media reports and "injected into
3  deliberations extrinsic information relating to the case."  (Mot. at
4  99.)  The government counters that even if the allegations are
5  assumed to be true, they "fail to demonstrate that [the jury] was
6  exposed to any sort of prejudicial extrinsic material."  (Opp'n at
7  170.)  The government argues "there is no reasonable possibility
8  that the extrinsic media material from . . . Cote could have
9  affected the verdict."  (Id. at 171.)

10    Even assuming the truth of the allegations regarding
11 Cote's statements and conduct, given their context and content,
12 there is no reasonable possibility that they affected the verdict.

13                    **f.   Cumulative effect**

14    Hayat argues that when viewed collectively, Cote's
15 statements and actions reveal that Cote harbored a disqualifying
16 bias against Hayat.  (Reply at 6; April 6 and 13, 2007 hearings.)
17 The government rejoins that the allegations of Cote's bias, even
18 when viewed collectively, do not substantiate Hayat's claim.  (Opp'n
19 at 158.)

20    The determination as to whether a juror is biased must be
21 founded on an examination of all relevant evidence of bias and
22 misconduct in the aggregate rather than in isolation.  Green v.
23 White, 232 F.3d 671, 678 (9th Cir. 2000).  However, considering all
24 evidence of Cote's alleged bias and misconduct, Hayat has not shown
25 that Cote was not a fair and impartial juror.  Therefore, Hayat is
26 not entitled to a new trial based on Cote's alleged bias or
27 misconduct.

28

1

## 2.   Juror Deborah Horn[9]

Hayat also contends that juror Deborah Horn "committed misconduct when she injected into a critical stage of the deliberations written material prepared outside the jury room that contained factual information extrajudicially obtained." (Mot. at 6.)  Specifically, investigator Wedick avers that Horn stated that "on Monday, April 24, 2006, while deliberations were still in progress, she brought into the jury room a typewritten 6-page statement written in 20 point font that she had prepared over the previous weekend" and that "she read the typewritten statement to the other jurors." (Wedick Aff. ¶ 9; see also Lopez Aff. ¶ 11; Berkeley-Simmons Aff. ¶ 18.)  Wedick further avers that Horn told him that the typewritten statement that "she had typed on her computer," "described the impact of the trial on her health and mental condition" and "contained information concerning Hepatitis C, which related to [Hayat]'s testimony that he had cared for his mother when afflicted by the disease." (Wedick Aff. ¶ 9.)

The government argues Horn's letter "constituted intrinsic statements related to jury deliberations, which are incompetent to challenge the verdict." (Opp'n at 175.)  The government contends that "the mere fact that a juror creates a writing outside of the jury room about a case does not mean that the writing, even if used during deliberations, constitutes improper extrinsic evidence.  If

---

[9]   Hayat also argues it was misconduct for juror Starr Scaccia to tell other jurors about a news story regarding one of the dismissed jurors.  (Mot. at 99.)  However, Hayat has not established a "'reasonable possibility' that th[is] evidence affected the jury's deliberations." U.S. v. Plunk, 153 F.3d 1011, 1025 (9th Cir. 1998), overruled on other grounds by U.S. v. Hankey, 203 F.3d 1160, 1169 n.7 (9th Cir. 2000).

1  the writing represents matters properly intrinsic to jury

2  deliberations, such as the kind of common knowledge which most

3  jurors are presumed to possess, the writing is not considered

4  extrinsic evidence at all." (Id. at 173-74.)  The government

5  contends that even assuming Horn made the alleged statements, "all

6  such statements plainly represented a permissible summation of a

7  juror's intrinsic thoughts about the case, including her personal

8  experience and general knowledge with respect to the illness of

9  hepatitis, and her application of this experience to making

10 credibility determinations related to Hamid Hayat's defense."  (Id.

11 at 175.)

12      A court examining a claim of a juror's improper use of

13 extrinsic evidence must determine whether the particular materials

14 that a juror allegedly brought into the jury room are, in fact,

15 improper extrinsic materials, or are merely "the kind of common

16 knowledge which most jurors are presumed to possess." Rodriquez v.

17 Marshall, 125 F.3d 739, 745 (9th Cir. 1997), overruled on other

18 grounds by Payton v. Woodford, 299 F.3d 815 (9th Cir. 2002); U.S. v.

19 Bagnariol, 665 F.2d 877, 888 (9th Cir. 1981) (discounting claim of

20 prejudice where extraneous information was something "any reasonable

21 juror already knew").

22      Jurors are permitted to utilize their life experiences and

23 common knowledge during deliberations.  Hard v. Burlington N. R.R.

24 Co., 870 F.2d 1454, 1462 (9th Cir. 1989); Grotemeyer v. Hickman, 393

25 F.3d 871, 878, 879 (9th Cir. 2004) ("The mere fact that the jury

26 foreman brought her outside experience [as a medical doctor] to bear

27 on the case [did not] violate Grotemeyer's constitutional right to

28 confrontation. . . . That a physician is on the jury does not

deprive a defendant of his constitutional right to an impartial jury, even though the physician will doubtless have knowledge and experience bearing on any medical questions that may arise."). "Many trials, including this one, boil down to a question of who is lying.  It is hard to know who is lying without some understanding, based on past personal experience, of the circumstances of the witnesses." Grotemeyer, 393 F.3d at 879.  Since Horn's statements comprised her non-extraneous background experiences and "related merely to [her] own internal mental processes" concerning jury deliberation issues, they constituted intrinsic statements involved with matters internal to the jury deliberation process.  Statements regarding such matters are not admissible under Rule 606(b) and are insufficient to support Hayat's motion.  U.S. v. Vig, 167 F.3d 443, 450 (8th Cir. 1999).

### B.   Lack of Evidence to Corroborate Confession

Hayat also argues he is entitled to a new trial because the government failed to meet the requirements of the "corpus delecti" rule requiring independent proof that the crime charged was actually committed.  (Mot. at 5 (citing Smith v. U.S., 348 U.S. 147 (1954)).)  Hayat contends that "the key evidence offered as independent corroboration of the two necessary elements of the charged offense – Dr. Mohammed's claim that Hayat possessed a jihadi state of mind and Eric Benn's sixty to seventy percent probability estimation that a training camp existed in Balakot, Pakistan – was legally inadmissible and probatively worthless," and that therefore, the court should exercise its Rule 33 power to grant a new trial. (Mot. at 5.)  The government disagrees, arguing there was sufficient evidence to corroborate both Hayat's jihadi state of mind, and his

23

1   attendance at a Pakistani training camp.  (Opp'n at 1-2.)

2        "All elements of [an] offense must be established by

3   independent evidence or corroborated admissions."  <u>Smith v. U.S.</u>,

4   348 U.S. 147, 157 (1954).  "[O]ne available mode of corroboration is

5   for the independent evidence to bolster the confession itself and

6   thereby prove the offense 'through' the statements of the accused."

7   <u>Id.</u>  The corroborating, independent evidence need not be

8   overwhelming to sustain a conviction.  <u>U.S. v. Taylor</u>, 802 F.2d

9   1108, 1117 (9th Cir. 1986).

10          **1.   Mens rea**

11       Hayat argues that the indictment charged him with

12   providing material support to terrorists "knowing and intending"

13   that such support was to be used to commit acts of terrorism and

14   that, therefore, "[h]aving alleged that Hayat possessed the intent

15   to personally wage violent jihad in the United States, the

16   government had to prove that state of mind or suffer an acquittal."

17   (Mot. at 35, 36.)  Hayat contends that Mohammed's testimony cannot

18   be used as corroborating evidence of Hayat's intent because it is

19   prohibited by Federal Rule of Evidence 704(b) since Mohammed opined

20   that carrying the supplication meant that Hayat had the state of

21   mind required to commit the charged crimes.  (<u>Id.</u> at 37-38.)  Hayat

22   further argues that Mohammed's testimony regarding the supplication

23   was inadmissible because it was beyond the scope of his expertise,

24   unreliable, and not helpful to the jury.  (<u>Id.</u> at 39.)  Hayat argues

25   that when Mohammed's testimony bearing on Hayat's state of mind is

26   stricken from the record, there is no evidence that independently

27   corroborates Hayat's mens rea.  (<u>Id.</u> at 44.)

28

1   The government responds that "the defense mistakenly
2   argues that the government assumed a higher burden of proof by
3   charging [Hayat]'s intent in the conjunctive, 'knowing and
4   intending'" and that it was entitled to prove one *or* both of the
5   mens rea theories set forth in § 2339A.  (Opp'n at 26.)   The
6   government further argues that Dr. Mohammed's testimony was
7   permissible under Rule 704(b) because it did not necessarily compel
8   a conclusion concerning Hayat's mens rea.  (<u>Id.</u> at 42.)   The
9   government contends that "the Court properly admitted Dr. []
10  Mohammed's expert testimony related to the jihadi supplication.  Dr.
11  Mohammed was wholly qualified to opine regarding the meaning of the
12  Arabic supplication; his opinion was reliable and obviously helpful
13  to the jury; and he did not impermissibly opine that [Hayat] himself
14  had the requisite criminal mens rea."  (<u>Id.</u> at 1-2; 53.)

15  An indictment can charge an element in the conjunctive and
16  the government's proof can be in the disjunctive.  <u>U.S. v. Booth</u>,
17  309 F.3d 566, 572 (9th Cir. 2002) ("When a statute specifies two or
18  more ways in which an offense may be committed, all may be alleged
19  in the conjunctive in one count and proof of any one of those
20  conjunctively charged acts may establish guilt.").  Additionally,
21  the Court has wide discretion in its determination to admit and
22  exclude expert testimony.  <u>Hamling v. U.S.</u>, 418 U.S. 87, 108 (1974);
23  <u>U.S. v. Chang</u>, 207 F.3d 1169, 1171 (9th Cir. 2000) ("We view '[t]he
24  admissibility of expert testimony [as] a subject peculiarly within
25  the sound discretion of the trial judge, who alone must decide the
26  qualifications of the expert on a given subject and the extent to
27  which his opinions may be required.'").

28

Mohammed's testimony was not inadmissible under Federal Rule of Evidence 704(b), which prohibits an expert witness from stating an opinion or inference as to whether a defendant did or did not have the mental state or condition constituting an element of the crime charged, because Mohammed did not testify that Hayat had a particular mens rea, and his testimony did not necessarily compel a conclusion regarding Hayat's mens rea.[10]  See U.S. v. Gonzales, 307 F.3d 906, 911 (9th Cir. 2002) ("[The expert witness] never directly and unequivocally testified to [the defendant's] mental state; he never stated directly that [the defendant] had the intent to distribute.  Rather, he indicated his firm conviction that a 'person' possessing the evidence in question would, in fact, possess the drugs for the purpose of distributing.  Even if the jury believed the expert's testimony, the jury could have concluded that [the defendant] was not a typical or representative person, who possessed the drugs and drug paraphernalia involved.").  Additionally, Mohammed's testimony was not beyond the scope of his expertise, unreliable, or unhelpful to the jury.  Therefore, Mohammed's testimony was not improperly admitted, and Hayat has not shown that the government offered insufficient independent corroborating evidence.

## 2.  Actus reus

Hayat also argues that the charged actus reus was not proven or corroborated by admissible or probative independent evidence.  (Mot. at 44.)  Hayat contends "[t]he only evidence arguably capable of corroborating Hayat's attendance at the camp came from the two opinions of Eric Benn" and that testimony was not

[10]    This issue was not raised during trial.

1  reliable and was not independent since it was based on Hayat's

2  confessions.  (<u>Id.</u>)

3         The government responds that there was sufficient evidence

4  to legally corroborate Hayat's confession that he attended a

5  jihadist camp in Balakot with the requisite intent and attempted to

6  conceal the same with the requisite intent.  (Opp'n at 70.)  The

7  government contends that Hayat's confession was corroborated by: his

8  possession of a jihadi supplication; his multiple recorded

9  conversations with Khan related to his belief in jihad and desire to

10  attend a jihadi camp; testimony regarding the existence of camps in

11  Pakistan (including the Balakot area) by Eric Benn and Hassan Abbas;

12  Hayat's self-made jihadi scrapbook; and Hayat's possession of

13  numerous well-known jihadi publications.  (<u>Id.</u> at 64-70.)

14         The government is correct that sufficient independent

15  corroborating evidence is in the record on Hayat's actus reus.

16  Therefore, Hayat is not entitled to a new trial on this ground.

17  **C.     Sixth Amendment Right to Confront Witnesses and Pursue**

18  **Exculpatory Evidence**

19         Hayat argues he is entitled to a new trial because "he was

20  denied his Sixth Amendment right to pursue exculpatory evidence from

21  three witnesses – chief prosecution witness Naseem Khan, defense

22  expert witness Anita Weiss, and proffered defense expert James

23  Wedick."  (Mot. at 5.)  The government disagrees, contending that

24  Hayat was not denied his sixth amendment right to confront Khan,

25  Weiss, or Wedick.  (Opp'n at 2-4.)

26         Under the Sixth Amendment, Hayat has a right to confront

27  the witnesses against him.  <u>Pointer v. Tex.</u>, 380 U.S. 400, 401

28  (1965).  "The confrontation clause, however, does not guarantee

1  unbounded scope in cross-examination." <u>U.S. v. Lo</u>, 231 F.3d 471,

2  482 (9th Cir. 2000).  A confrontation clause violation will only be

3  found if an exclusionary ruling "limits relevant testimony,

4  prejudices the defendant, and denies the jury sufficient information

5  to appraise the biases and motivations of the witness." <u>Id.</u>

6  (internal quotation marks and modifications omitted).  "Evidence

7  erroneously admitted in violation of the Confrontation Clause must

8  be shown harmless beyond a reasonable doubt, with courts considering

9  the importance of the evidence, whether the evidence was cumulative,

10 the presence of corroborating evidence, and the overall strength of

11 the prosecution's case." <u>U.S. v. Bowman</u>, 215 F.3d 951, 961 (9th

12 Cir. 2000).

13         The Sixth Amendment also guarantees Hayat the right to

14 present his own witnesses to establish a defense.  <u>Wash. v. Tex.</u>,

15 388 U.S. 14, 19 (1967).  "[T]he Constitution guarantees criminal

16 defendants a meaningful opportunity to present a complete defense

17 . . . . That opportunity would be an empty one if the State were

18 permitted to exclude competent, reliable evidence bearing on the

19 credibility of a confession when such evidence is central to the

20 defendant's claim of innocence." <u>Crane v. Ky.</u>, 476 U.S. 683, 690

21 (1986) (internal quotation marks omitted).

22         However, the right to present witnesses is also not

23 absolute.  <u>Alcala v. Woodford</u>, 334 F.3d 862, 877 (9th Cir. 2003).

24 "While the right to present a defense is fundamental, the state's

25 legitimate interest in reliable and efficient trials is also

26 compelling." <u>Id.</u> (internal citations, quotation marks, and brackets

27 omitted).

28              In weighing the importance of evidence offered
                by a defendant against the state's interest in

28

1  exclusion, the court should consider the
   probative value of the evidence on the central
2  issue; its reliability; whether it is capable of
   evaluation by the trier of fact; whether it is
3  the sole evidence on the issue or merely
   cumulative; and whether it constitutes a major
4  part of the attempted defense.  A court must
   also consider the purpose of the [evidentiary]
5  rule; its importance; how well the rule
   implements its purpose; and how well the purpose
6  applies to the case at hand.  The court must
   give due weight to the substantial state
7  interest in preserving orderly trials, in
   judicial efficiency, and in excluding unreliable
8  or prejudicial evidence.

9  Miller v. Stagner, 757 F.2d 988, 994-95 (9th Cir. 1985) (internal

10 citation omitted).

11        **1.   Right to Cross-Examine Naseem Khan**

12        Hayat contends that he "was erroneously barred from

13 pursuing several proper lines of cross-examination, all of which

14 could have generated critical evidence refuting the government's

15 contention that he attended a jihadi training camp."  (Mot. at 5.)

16 Hayat contends that "[b]ecause Khan gave testimony on direct

17 examination that concerned the contents of all of his conversations

18 with Hayat, the defense was entitled to cross-examine Khan

19 concerning what was said in any and every conversation that the two

20 had."  (Id. at 50.)  Hayat argues the denial of his Sixth Amendment

21 right to cross-examine Khan was prejudicial and merits the grant of

22 a new trial.  (Id. at 54.)

23        The government counters that "contrary to [Hayat]'s

24 claims, the Court did not impermissibly limit his ability to

25 cross-examine Naseem Khan."  (Opp'n at 2.)  The government further

26 argues that Hayat "is precluded from raising these issues at this

27 point because, at the time the Court sustained the government's

28 objections, [Hayat] made no effort to demonstrate why the challenged

29

evidence was admissible or what the challenged evidence would have revealed."  (Id.)

At trial, on direct examination of Khan, the government asked Khan about his discussions with Hayat regarding Tablighi Jamaat.  (RT 1081-82.)  On cross-examination, when defense counsel questioned Khan about whether Hayat told him that he was at a Tablighi Jamaat camp, the government objected to the question on foundation and hearsay grounds.  (RT 1792-93.)  After a bench conference, the court sustained the hearsay objection, ruling: "The hearsay rule allows the government to introduce a statement against your client, but it does not allow you to use a statement . . . for the truth of the matter asserted therein in favor of your client. That is hearsay."  (RT 1795.)

Defense counsel then asked Khan whether he believed that a Tablighi Jamaat camp "has anything to do with terrorism," and the government objected on foundation, relevance, and Rule 403 grounds. (RT 1795-96.)  The court sustained the foundation objection.  (RT 1796.)

Later, defense counsel asked Khan whether, during a conversation he had with Hayat on October 7, 2003 while Hayat was in Pakistan, Hayat told him "that he never intended on going to a camp, and he was lying to [Khan] all along."  (RT 1802.)  The government objected on foundation and hearsay grounds, and moved to strike. (RT 1802.)  The court sustained the objection and struck the question.  (RT 1802.)

### a.   Tablighi Jamaat

Hayat argues he "was entitled on cross-examination to question Khan as to what [Hayat] had said about Tablighi Jamaat,

1 because the prosecution had specifically addressed the question on

2 Khan's direct [examination]." (Mot. at 50.) "The government could

3 not introduce testimony by Khan concerning statements by [Hayat],

4 and then shield that testimony from the scrutiny of cross-

5 examination by claiming that it alone was legally entitled to gain

6 admission of statements of [Hayat]." (Id. at 51.) Hayat argues

7 "[i]t was extremely important that Khan be required to reveal on

8 cross examination that Hayat's statements to Khan about his

9 experience in attending Tablighi Jamaat was entirely religious in

10 nature and had nothing to do with violence and terrorism." (Id. at

11 52.)

12        Hayat contends that once the government "opened the door"

13 to the line of questioning, Hayat had a right to introduce evidence

14 on the same issue to rebut any false impression that might have

15 resulted from the earlier admission. (Id. at 51 (citing U.S. v.

16 Whitworth, 856 F.2d 1268, 1285 (9th Cir. 1988); U.S. v. Wales, 977

17 F.2d 1323 (9th Cir. 1992); U.S. v. Beltran-Rios, 878 F.2d 1208,

18 1211-13 (9th Cir. 1989)).)

19        The government responds that the court's ruling excluding

20 Hayat's cross-examination regarding Tablighi Jamaat is subject to a

21 plain error test because Hayat failed to make a proffer at trial

22 concerning what the anticipated testimony would be or what legal

23 basis there was for its admission, (opp'n at 76, 77) and that

24 "[w]here a defendant fails to preserve the issue by stating a

25 proffer and setting forth the grounds for the argument in district

26 court, the review is for plain error." (Opp'n at 73 (citing U.S. v.

27 Reese, 2 F.3d 870, 892 (9th Cir. 1993)).) The government argues

28 that here, there was no error since "[t]he foundation and hearsay

31

objections were wholly appropriate." (Opp'n at 78, 81.) The government also notes that even if the court assumes that the cross examination was properly responsive to the Tablighi Jamaat subject raised by the government on direct examination, the trial court still had discretion to limit inquiry on cross-examination, since "[o]nce the door is opened, a curative admission is allowed only if necessary 'to introduce evidence on the same issue to rebut *any false impression* that might have resulted from the earlier admission [of inadmissible evidence]," and "there is no indication that Mr. Khan's testimony was false." (<u>Id.</u> at 79 (quoting <u>Whitworth</u>, 856 F.2d at 1285).) The government additionally argues there was no plain error since "to the extent that there was any kind of misconception concerning the arguably misleading statements by Mr. Khan, there was no harmful impact on [Hayat] in light of the whole record" and because "Khan's knowledge of Tablighi Jamaat is not a matter of any relevance to the issues to be decided." (Opp'n at 80, 83.)

Although Hayat argues that the evidence was critically important and that "[h]ad cross-examination not been restricted, it would have . . . countered the suggestion . . . that [Hayat's] attendance at Tablighi Jamaat had been related to violent jihad," even Hayat acknowledges that his expert, Anita Weiss, later testified that Tablighi Jamaat had no connection with terrorism. (Mot. at 54, 52 (citing RT 4125-26).) Therefore, even assuming it was error to preclude Hayat from cross-examining Khan regarding Tablighi Jamaat, the error was harmless.

### b.   Refusal to Attend Terrorist Camp

Hayat further argues that he was entitled to ask Khan

1   whether Hayat told him "that he never intended to go to a

2   camp, and that he was lying to [Khan] all along."  (Mot. at 52.)

3   Hayat contends that question "was the single most important question

4   that Hayat's counsel put to Khan on cross."  (Id.)  Hayat argues the

5   government "opened the door" to this line of questioning and there

6   was no legal basis for sustaining the government's hearsay objection

7   since the question was subject to the state of mind hearsay

8   exception in Federal Rule of Evidence 803(3).  (Id. at 53.)

9           Hayat contends that the information was critically

10  important because it would have "established that Hayat told Khan

11  that he had no intention of attending a training camp."  (Id. at

12  54.)  Hayat argues that "had the jury learned that in October, 2003,

13  Hayat had finally stated to Khan in no uncertain terms that he was

14  not going to a camp and that his previous suggestions to the

15  contrary were untrue, it very likely would have concluded that

16  [Hayat] was a slacker and blowhard who had no desire to train for,

17  much less commit, acts of jihadi violence."  (Reply at 24.)

18          The government first notes that the objection that Hayat

19  challenges with regard to the October 7 conversation, was actually

20  the second objection that was made at trial.  (Opp'n at 84.)  When

21  defense counsel first asked Khan on cross-examination about the

22  October 7 conversation, the government objected on hearsay grounds.

23  (Id. (citing RT 1321).)  Defense counsel responded that the

24  testimony was being offered to show the effect of the statement on

25  the listener.  (Id.)  The court then sustained the objection because

26  the effect on the listener was not relevant.  (Id.)

27          The government argues that when the second objection was

28  made to defense counsel's cross-examination of Khan regarding the

33

October 7 conversation, defense counsel "did not ask for a bench conference, try to make a proffer, or seek to clarify how the testimony was admissible" and did not "state that the evidence was being offered for the state of mind of the defendant." (Opp'n at 85.)  Therefore, the government states that "the review is for plain error."  (Id.)  The government contends that "[n]o plain error transpired" since the record "contains numerous examples of [Hayat] pursuing the defense that he did not intend to go to a camp" and "that [Hayat] was just lying to Mr. Khan about attending a camp." (Id. at 85, 87.)

"A party must make known to the court at the time the ruling or order is made or sought, . . . the action which he desires the court to take or his objection to the action of the court and the grounds therefor. . . . Absent plain error, a conviction will not be reversed on evidentiary grounds not revealed to the trial court at the time of the assertedly erroneous ruling." U.S. v. Sims, 617 F.2d 1371, 1377 (9th Cir. 1980) (internal quotation marks omitted).  "If the significance of excluded evidence is not obvious, an offer of proof must be made to preserve the question on appeal." U.S. v. McCowan, 471 F.2d 361, 365 (10th Cir. 1972) (finding that it was not error to exclude testimony when "there [was] nothing to show that the inquiry in question was designed to elicit any competent evidence in support of appellants' theory [and, to] the contrary, it appear[ed] likely that hearsay was contemplated," yet no offer of proof was made).  Because Hayat did not make an offer of proof regarding the seemingly inadmissible hearsay testimony he sought to offer, Hayat must show that the ruling precluding him from inquiring about the October 7 conversation constituted plain error.

1    "Plain error is only found in exceptional circumstances

2  where the reviewing court finds that reversal 'is necessary to

3  preserve the integrity and reputation of the judicial process, or to

4  prevent a miscarriage of justice.'"   Sims, 617 F.2d at 1377.

5  Since other evidence in the record reveals Hayat's argument that he

6  did not intend to go to a training camp and that Hayat was simply

7  lying to Khan, the ruling was not plainly erroneous.   See RT 1282-83

8  (Hayat's statements that he would not be able to shoot a gun); 1308

9  (Hayat's statement that going to a camp "can't be done these days");

10  1314 (Hayat's concerns about "the intense heat" at training camps);

11  1260 (Khan calling Hayat a liar); 1303 (Khan and Hayat's father

12  calling Hayat a liar); 1307 (Khan asking Hayat if he "ever told the

13  truth"); 4298-99 ("Naseem Khan could instigate these conversations

14  with [Hayat], and [Hayat] would literally talk it up.  He would go

15  into details, and say all kinds of bizarre things.  And the beauty

16  of it for Naseem Khan was that while Naseem knew that [Hayat] was

17  making it all up and lying and exaggerating, he didn't have to tell

18  the FBI that he thought that. . . .  He knew that [Hayat] was a

19  storyteller."); 4302-03 ("[Hayat] brags.  He tells stories.  He lies

20  to Naseem Khan.  And I think that Agent Terry Rankhorn, the

21  undercover agent who met [Hayat] on a number of occasions, when he

22  testified he put it best, out of his own mouth, when he said that

23  [Hayat]'s statements were more boasting than substance."); 4303

24  ("Naseem Khan himself often didn't believe [Hayat]").  Therefore,

25  Hayat is not entitled to a new trial on this ground.

26                    **c.   CIPA Order of March 1, 2006**

27       The ruling on this issue has been filed under seal.

28

1
2

### 2.    Exclusion of Portions of Defense Expert Weiss's Testimony

3       Hayat contends that "Professor Weiss, a highly qualified
4  Pakistani scholar, was prevented from offering proof of the
5  significance to Pakistanis of the Islamic supplication" that was
6  found in Hayat's wallet and "[t]hat testimony would have effectively
7  rebutted the highly inflammatory but factually baseless claim of
8  prosecution witness Mohammed, who had no expertise in the culture,
9  language, or politics of Pakistan, that carrying the prayer proved
10 [Hayat] possessed the mental state necessary to commit the charged
11 crimes."  (Mot. at 5.)  Hayat argues this "was constitutional error
12 that cannot be deemed harmless beyond a reasonable doubt."  (<u>Id.</u> at
13 62.)

14      Specifically, Hayat is concerned with two limitations
15 imposed on Weiss's testimony: (1) barring Weiss from testifying as
16 to the sources on whom she relied in forming the opinion that the
17 verse was a taweez commonly carried by travelers (the testimony was
18 excluded as a sanction for what the court found to be Hayat's
19 willful failure to comply with Rule 16), and (2) sustaining an
20 objection to a question about whether the paper found in Hayat's
21 wallet was a taweez (the court sustained a foundation objection
22 because Weiss does not speak Arabic and the writing on the paper was
23 in Arabic).  (<u>See</u> Reply at 26.)

### a.    Sources

25      Hayat argues "[i]t was . . . error to bar Weiss on
26 timeliness grounds from testifying as to the sources on which she
27 relied in forming her opinion, for the defense disclosures were no
28 less timely than those provided by the prosecution as to Mohammed's

1  sources." (Mot. at 56.)  Hayat argues that the March 27

2  disclosures, which included the sources on whom Weiss relied in

3  forming the opinion that the verse was a taweez commonly carried by

4  travelers, were in fact timely, and therefore the testimony should

5  not have been excluded.  (Id. at 58-59.)

6        The government responds that the Court properly excluded

7  the testimony at issue as a sanction for the defense's willful

8  failure to comply with Rule 16.  (Opp'n at 90.)  The government

9  argues that "[o]n February 20, 2006, approximately a week after

10  trial began, [Hayat] notified the Government that he intended to

11  call James Wedick and Anita Weiss as expert witnesses.  Pursuant

12  to Rule 16, [Hayat] included Dr. Weiss' qualifications and proposed

13  testimony." (Id. at 91.)  "On March 14, 2006, during its

14  case-in-chief, the Government introduced the Arabic supplication

15  found in [Hayat]'s wallet and called Dr. Mohammed to explain its

16  significance." (Id. at 92.)  "On March 22 and 23, Government expert

17  Hassan Abbas testified.  His testimony, among other things, related

18  to jihadi camps in Pakistan, including typical weapons training at

19  those camps." (Id.)  "On March 27, 2006[, Hayat] provided new

20  disclosures about the testimony of Dr. Weiss. [T]hese disclosures

21  were not made until after Dr. Mohammed and Mr. Abbas had testified

22  [and] after the Government had filed various motions to preclude

23  [Wedick's] testimony . . . and the Court had ruled that his initial

24  disclosures were inadequate." (Id.)  The government argues that

25  most of the opinions in the March 27 disclosures "were plainly not

26  disclosed in the earlier February 20 Weiss disclosure." (Id. at 93,

27  94.)

28

Upon the government's motion to exclude the testimony, the court found that on March 27 Hayat "disclosed new testimony which was not included in [his] previous disclosure"; that Hayat's explanation was "disingenuous because [he had] known about the information . . . yet [he] waited six weeks into the trial" to make the disclosures; and Hayat's "failure to disclose the testimony was 'willful and motivated by a desire to obtain a tactical advantage' because [he] waited to make [his] disclosures until after the testimony of government witnesses Dr. Mohammed and Mr. Abbas and until after the government challenged the testimony of [Hayat]'s other proposed expert, James Wedick," and excluded the testimony. (RT 3577, 3578.)

The Court "has wide discretion in its determination to admit and exclude evidence, and this is particularly true in the case of expert testimony." Hamling, 418 U.S. at 108.  In excluding evidence as a sanction for violating Rule 16, the Court only abuses its discretion if the "evidence was of decisive value or if the exclusion was disproportionate to the conduct of counsel." U.S. v. Duran, 41 F.3d 540, 545 (9th Cir. 1994) (internal quotation marks omitted).  Exclusion is appropriate when "the omission was willful and motivated by a desire to obtain a tactical advantage." Taylor v. Ill., 484 U.S. 400, 415 (1988).  While a criminal defendant has a Sixth Amendment right to offer the testimony of witnesses, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410.

Because evidence regarding the sources on whom Weiss relied in forming the opinion that the verse was a taweez commonly

carried by travelers was not of decisive value, it was not an error
to exclude the testimony.

### b.   Supplication as Taweez

At trial, after Weiss testified regarding taweez in
general, defense counsel asked Weiss: "[B]ased on your understanding
of where that piece of paper was found, do you believe that it is a
ta'wiz?"  (RT 4187.)   The government objected on foundation grounds.
(Id.)   The court sustained the objection: "The objection is
sustained [for] failure to establish the foundation that she speaks
the language that is written on the piece of paper, and that she
understands what is written on the piece of paper.   And to the
extent that the piece of paper is folded in a manner that is
consistent with what she has already testified about, the evidence
is already in the record.   So therefore it would be cumulative."
(RT 4191-92.)

Hayat contends "it was error to preclude Anita Weiss from
testifying about the supplication, as she was far more qualified to
opine as to the significance of the supplication to an Urdu speaking
Pakistani than was Mohammed."  (Mot. at 56.)   Hayat argues that
"Weiss was indisputably qualified to answer the crucial question to
which the Court sustained an objection – whether the supplication
was a taweez.   That question called for knowledge about Pakistani
cultural and religious practices, as to which Weiss is one of the
country's leading experts.   Whether Weiss spoke Arabic was
irrelevant to the question posed to her, because Pakistanis
generally do not speak Arabic; they speak Urdu, in which Weiss is
fluent."  (Id. at 60.)   Hayat further argues that the exclusion of
Weiss's testimony regarding the supplication was prejudicial since,

39

without it, Mohammed's testimony was essentially left unrebutted. (<u>Id.</u>)

The government argues the court's exclusion of the testimony was proper since Weiss did not speak or read Arabic and was therefore "unqualified to form an opinion about the correct translation of th[e] Arabic supplication much less an opinion as to how 'common' th[e] Arabic supplication was or is in Pakistan." (Opp'n at 103.)   The government further argues that the excluded evidence was not "of decisive value" since Hayat "still had the ability, pursuant to [the] February 20 disclosure, to seek to introduce [Weiss's] other opinions related to the cultural practice of carrying a taweez and, in fact, actually introduced some evidence related thereto at trial."   (<u>Id.</u> at 102.)

It was not error to sustain the foundation objection because, as the government noted, the piece of paper in Hayat's wallet could have been something other than a taweez (such as an address (RT 4188)), and without knowing Arabic, Weiss could not know whether the piece of paper constituted a taweez.   Furthermore, Weiss had already testified about the practice of carrying a taweez on the body somewhere (RT 4178-80), (and could have further testified about the practice of carrying a taweez) so the jury could have inferred that the paper in Hayat's wallet was a taweez.   Moreover, in closing argument, defense counsel called into question Mohammed's qualifications to testify regarding the supplication and reminded the jury that Weiss had testified about what a taweez is and when a taweez is typically carried, such that the jury could have inferred

that the piece of paper in Hayat's wallet was a taweez.[11]

Therefore, Hayat is not entitled to a new trial on this ground.

### 3. Exclusion of Defense Expert Wedick

Hayat argues "the exclusion of Wedick's expert testimony violated [his] constitutional right . . . to challenge the credibility of his purported admissions of guilt to the FBI," and "that error cannot be deemed harmless beyond a reasonable doubt." (Mot. at 5-6, 69.)  Hayat states in his expert disclosures, in

---

[11]   Portions of Hayat's counsel's closing argument are stated below:

> Dr. Mohammed admitted on the stand that his views were controversial amongst Muslim scholars. He admitted on the stand that he dismissed the accuracy of translations of that exact prayer that were translated by published Muslim scholars. He also admitted that he, himself, has not published regarding that prayer. Dr. Mohammed has never been to Pakistan and he doesn't understand the culture.

(RT 4322);

> See, the problem with Dr. Mohammed's testimony about that prayer is that he has no idea of the cultural context of carrying such a prayer in Pakistan. He can't possibly because he just doesn't know about Pakistani culture. Dr. Anita Weiss, however, is an expert on Pakistani culture. You heard her tell you that carrying prayers in Arabic is a very common practice in Pakistan, especially by travelers for safety reasons. The government either doesn't understand the cultural significance of carrying a ta'wiz or it didn't want you to know about it. Because had they asked their other expert, Mr. Abbas, who knows about Pakistani culture, he would have told them that Dr. Mohammed's conclusions were wrong, and that prayers like those are commonly carried by travelers and not warriors. So Dr. Mohammed's testimony itself was problematic. And the existence of that prayer in [Hayat]'s wallet doesn't prove that he went to a terrorist training camp.

(RT 4323-24.)

relevant part, that Wedick was to testify as follows:

> Mr. Wedick will testify that the interviewing agents did not consider but should have considered Hamid's vulnerabilities as an interviewee. Specifically, Mr. Wedick will opine that the agents should have considered Hamid's age, intelligen[ce] quotient, level of education, mental handicap, language barrier, health, marriage and/or family status, occupation and employment status, religion and/or belief in God, illiteracy, fatigue, social isolation, and experience with the criminal justice system. Mr. Wedick will explain that all of these factors should be considered by FBI agents in conducting interviews to insure the validity of any elicited "confessions."
>
> Mr. Wedick will testify that the FBI agents should have frequently reminded Hamid Hayat that the interview was noncustodial in nature and that he was free to go . . .
>
> Mr. Wedick will testify that Agent Schaff, Agent Sweeney, Agent Harrison, Agent Aguilar and Agent Lucero all used leading questions during the interviews of Hamid Hayat. Specifically, they suggested the names of locations of terrorist training camps in Pakistan; the dates when Hamid Hayat allegedly attended; the time frame that Hamid allegedly attended; the leadership of the camps that Hamid allegedly attended; the type of training camp that Hamid Hayat allegedly attended; the physical properties of the camp that Hamid allegedly attended; the names of other individuals in Lodi that allegedly attended, and the types of potential targets of terrorist attacks. Mr. Wedick will testify that the agents did not ask sufficient open-ended questions. Mr. Wedick will opine that the agents' use of leading questions throughout the interview contaminated the "confessions" to render them unreliable. Mr. Wedick bases his opinion on his training and experience which dictates that agents should avoid asking too many leading questions because there is a danger of eliciting a contaminated confession in doing so.

(Mot. at 62-63.)[12]

_____

[12]    According to Hayat's motion, his expert disclosures also stated that Mr. Wedick would testify "that the FBI Sacramento office had the capability to videotape Hamid Hayat's interview right when

1    Hayat argues "[t]hat a confession taken under [Hayat's]
2  circumstances may well be false or unreliable is knowledge that is
3  not generally within the experience of jurors" and that "[b]ased on
4  [Mr. Wedick's] extensive experience with FBI interrogations, Mr.
5  Wedick was ideally qualified to testify to the fact that the
6  techniques used by the interrogating agents exponentially increased,
7  rather than minimized, the risk of a false confession." (Id. at
8  67.)  Hayat argues that, although "the defense explored the
9  techniques used by the interrogators with the agents themselves when
10 they took the stand[,] Wedick's testimony would not have been in any
11 way cumulative, for the agents uniformly defended the propriety of
12 the methods they used to question [and] Wedick's testimony [was
13 going to be] that the relentlessly suggestive nature of the
14 interrogation, when combined with the promise of benefits and
15 [Hayat]'s limited education and physical condition, posed a grave
16 danger of contamination." (Id. at 67-68.)

17    Hayat relies primarily upon Crane and Alcala for his
18 position. (Id. at 64-65.) Crane involved a sixteen year old
19 defendant who contended he confessed after having been "detained in
20 a windowless room for a protracted period of time, surrounded by as
21 many as six police officers during the interrogation, repeatedly
22 . . . denied permission to telephone his mother, and badgered into
23 making a false confession." 476 U.S. at 685. Crane was precluded

24

25 it actually started including the ability to use a handheld video
26 camera" and "that it was inappropriate to begin videotaping his
   interview only after a 'confession' had been elicited after hours of
27 interviewing." (Mot. at 62.) However, Hayat's motion for a new
   trial focuses on the court's exclusion of Wedick's testimony
28 regarding the unreliability of Hayat's confession, and does not
   address this issue. (Id. at 66-69, Reply at 28-30.)

from "introduc[ing] testimony about the environment in which the police secured his confession," which the Supreme Court held violated his constitutional right to present a complete defense. 476 U.S. at 691.   In <u>Alcala</u>, the Ninth Circuit found that excluding a psychologist's testimony that a chief prosecution witness had been hypnotized by investigators and that the hypnotic and suggestive interview techniques impacted the government witness's ability to remember the incident and led her to adopt the investigators' suggestions, violated the defendant's constitutional rights because the psychologist's testimony was the sole basis for impeaching the witness's testimony.   334 F.3d at 877-78.

The government counters that the Court properly excluded Wedick's proffered expert testimony under Federal Rule of Criminal Procedure 16, Federal Rule of Evidence 702, and Federal Rule of Evidence 403.   (Opp'n at 3.)   The government argues Wedick's proposed testimony regarding whether the interrogators should have advised Hayat that he was free to leave the interview was properly excluded because Hayat "had already extensively [presented] the facts related to th[is] issue[] with numerous FBI agents" and "'expert' evidence on th[is] point[] would have been needlessly confusing, cumulative and wasteful of time." (<u>Id.</u> at 116.)   The government further contends that this evidence was inadmissible because Hayat "failed to provide the Government with a timely and adequate summary of these opinions, the bases and reasons for the opinions, and the witness's qualifications related thereto"; Hayat "made no showing whatsoever regarding what specialized knowledge, if any, Mr. Wedick had regarding the area of his proposed opinions, other than to state, in a conclusory fashion, that Wedick had

experience and training with interviews"; Hayat "failed to establish
that the proffered opinions were reliable"; and "the record had
already been developed on the question of whether [Hayat] was
advised about his rights and/or freedom to leave the FBI [and the
issue] could readily be (and was) argued by counsel during closing
and understood and evaluated by the jury." (Id. at 117-19.)

The government also contends that the Court properly
excluded Wedick's testimony regarding whether the agents failed to
consider Hayat's background in order to insure the validity of any
elicited confessions and whether the agents' use of leading
questions contaminated Hayat's confessions. (Id. at 119.) The
government argues Hayat "failed to establish how the proffered
opinions would assist the trier of fact [since the jury] was fully
capable of listening to the evidence adduced regarding the
circumstances of the confession, and to the arguments of counsel
regarding the reliability of the confessions, and render a
credibility judgment regarding the confession on its own." (Id. at
119, 120.) The government further contends that Hayat "failed to
provide the Government with a timely and adequate summary of these
opinions, the bases and reasons for the opinions, and the witness's
qualifications related thereto"; Hayat made "no adequate showing
that Mr. Wedick had appropriate qualifications . . . to opine on the
issue of false confessions [since] the opinion that an individual's
statement constitutes a 'false admission' . . . necessarily involves
an evaluation of the psychological characteristics of the individual
in question"; Hayat "failed to demonstrate that Mr. Wedick's
proposed testimony would be in any way reliable"; Hayat "failed to
establish how the proffered opinion[s] would be relevant"; and "any

45

marginal probative value associated with these proffered opinions
would have been substantially outweighed by the risk of unfair
prejudice, confusion of issues, or undue consumption of time
associated therewith." (Id. at 119-24.)  Finally, the government
argues that Hayat is now trying "to recast many of the opinions
purportedly offered by Mr. Wedick" and that those "summary
statements by defense counsel were not disclosed at the time of
trial as being proposed opinions to be offered by Mr. Wedick, nor
are these statements a fair summation of what was disclosed." (Id.
at 124, 125.)

          Federal Rule of Evidence 702 provides that "scientific,
technical, or other specialized knowledge [is admissible if it] will
assist the trier of fact to understand the evidence or to determine
a fact in issue." See also U.S. v. Rahm, 993 F.2d 1405, 1413 (9th
Cir. 1993) (expert testimony not admissible on "matters within the
understanding of the average juror"); U.S. v. Morales, 108 F.3d
1031, 1038 (9th Cir. 1997) (expert testimony not admissible unless
"the subject matter at issue is beyond the common knowledge of the
average layman").  "[Rule] 702 imposes a 'gatekeeping' obligation on
the trial judge to 'ensure that any and all [expert] testimony . . .
is not only relevant, but reliable.'" U.S. v. Hankey, 203 F.3d at
1167 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579
(1993) and citing Kumho Tire Co. v. Carmichael, 526 U.S. 137
(1999)).  "[J]udges are entitled to broad discretion when
discharging their gatekeeping function." Hankey, 203 F.3d at 1168
(citing Kumho Tire Co.).

          Further, Federal Rule of Evidence 403 provides that
"[a]lthough relevant, evidence may be excluded if its probative

46

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Wedick's proposed expert testimony that "the FBI special agents should have reminded [Hayat] that [his] interviews were non-custodial and that [he was] free to go" was excluded because the matter had "already [been] extensively explored," and the testimony "ha[d] only marginal probative value, which [was] outweighed by [Rule 403 considerations]." (RT 3519, 3521.) This exclusion was not erroneous.[13] (See RT 771-73, 3719, 4319-20.)

Wedick's proposed expert testimony that the FBI agents should have considered Hayat's "vulnerabilities as an interviewee" in order "to insure the validity of any elicited 'confessions'" and that the agents' use of "leading questions during [Hayat's] interviews . . . contaminated the 'confessions' to render them unreliable" was also properly excluded at trial. (See RT 3521-22.)

This case is different from Crane and Alcala, the cases upon which Hayat primarily relies, because the circumstances of Hayat's interrogation and confessions were readily apparent to the jury through the testimony of the interviewing FBI agents and the videotapes, and therefore, Wedick's testimony was not necessary to inform the jury about the circumstances surrounding Hayat's

---

[13]   Hayat does not contend that the FBI agents were *obligated* to inform Hayat that he was free to leave the interview; rather, Hayat contends that Wedick was entitled to testify that they "should have" done so. (Mot. at 63.) Hayat argues that the FBI agents' failure to do so contributed to the "circumstances" that made the confession unreliable; however, Hayat's disclosures did not state that Wedick would testify as such. (Id. at 66-67, 63.)

1    confessions.[14]    See Ritt v. Dingle, 142 F. Supp. 2d 1142, 1145 (D.

2    Minn. 2001) ("Petitioner was allowed to present the jury a videotape

3    of her interrogation . . . which showed the circumstances of her

4    confession.  Petitioner's reliance on Crane for the admissibility of

5    the proffered expert testimony is misplaced as Crane does not

6    discuss expert testimony in a similar factual context.  Given the

7    more direct evidence of the videotape, the trial court decision to

8    exclude expert testimony on the interrogation technique was

9    reasonable.") (internal citations omitted); State of Minn. v. Ritt,

10   599 N.W.2d 802, 812 (Minn. 1999), reviewed by Ritt v. Dingle, 142 F.

11   Supp. 2d 1142 (Defendant's "interview and formal statement were

12   videotaped and the jury could observe the surrounding environment

13   and circumstances").

14            Nor was it erroneous to preclude Wedick from explaining to

15   the jury that failing to consider Hayat's vulnerabilities and using

16   leading questions may lead to unreliable confessions.  Bixler v.

17   Minn., 582 N.W.2d 252, 256 (Minn. 1998) (upholding the trial court's

18   "ruling that the jury, without [expert testimony], was fully capable

19   of observing and understanding [the defendant's] propensity to

20   please authority figures, and taking those observations and that

21   understanding into account in evaluating his confession.").  The

22   government argues that Hayat did not establish Wedick's

23

24        [14]    The initial interview of Hayat at FBI headquarters by
     Agent Aguilar and the subsequent interview by Agent Sweeney (in
25   which Hayat's first confession was obtained) were not videotaped.
     (RT 699, 529.)  The remaining interviews of Hayat were videotaped.
26   (Gov't Exs. 19-22.)
              The jury saw part of the videotapes during the
27   government's case-in-chief, and all of the videotapes during Hayat's
     case.  Moreover, during deliberations the jury had the videotapes
28   played again, which suggests that the jury thoroughly analyzed the
     interrogation and confessions.

qualification to testify regarding these issues since "the opinion
that an individual's statement constitutes a 'false admission' . . .
necessarily involves an evaluation of the psychological
characteristics of the individual in question" and Wedick "has no
training or experience in any field that would permit him to opine
on the psychological condition of [Hayat], or to opine that any
particular act or omission by the agents led [Hayat] to admit his
guilt falsely." (Opp'n at 122-23.)  Hayat argues Wedick should have
been permitted to testify, based on his extensive experience with
FBI interrogations, that the use of leading questions and the
failure to consider Hayat's vulnerabilities (specifically, age,
intelligence quotient, level of education, mental handicap, language
barrier, health, marriage and/or family status, occupation and
employment status, religion and/or belief in God, illiteracy,
fatigue, social isolation, and experience with the criminal justice
system) increased the risk of Hayat's confession being unreliable.
(Mot. at 63, 67.)

        Hayat cites to U.S. v. Hall, 93 F.3d 1337 (7th Cir. 1996),
in support of his indication that Wedick should have been permitted
to testify that Hayat's "'confession' to the crime was false."
(Mot. at 65.)  The Court in Hall held that it was error to exclude
expert psychological and psychiatric testimony that the defendant
had a personality disorder that made him pathologically eager to
please and susceptible to suggestion, calling into question the
reliability of the defendant's confession.  Hayat argues that Hall
"explained that since the fields of psychology and psychiatry deal
with human behavior and mental disorders it may be more difficult at
times to distinguish between testimony which reflects 'genuine

49

expertise' and 'something that is nothing more than fancy phrases for common sense.'"   (Id. at 65-66 (quoting Hall, 93 F.3d at 1342).)

But, Hayat has not shown Wedick is qualified as an expert in the field of psychology or psychiatry, or otherwise had the qualification to give expert testimony regarding Hayat's alleged susceptibility to suggestion and coercion.  Specifically, Hayat has not shown Wedick's qualification to testify about Hayat's intelligence quotient, alleged mental handicap, or social isolation. Nor does the record indicate that Wedick was in a better position than a juror to opine about Hayat's age, language barrier, marriage and/or family status, or any fatigue factor; and Wedick's testimony was unnecessary to inform the jury about Hayat's level of education, health, occupation and employment status, religion and/or belief in God, illiteracy, or experience with the criminal justice system. See U.S. v. Adams, 271 F.3d 1236, 1244 (10th Cir. 2001) (upholding the district court's exclusion of a psychologist's report with which the defendant wished to challenge the credibility of his prior statements to police; finding that nothing in Crane warranted the categorical admission of evidence; and noting that expert evidence relating to the credibility of a confession was problematic for a variety of reasons: it may invade the province of the jury, and, thus, not "assist" the jury as required by Rule 702; it may exceed the scope of the witness's expertise; or be overly prejudicial under Rule 403, as witnesses may tend to overvalue scientific evidence as it bears on truthfulness); U.S. v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999) ("[E]xpert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and

50

therefore does not 'assist the trier of fact' as required by Rule

702."); U.S. v. Barnard, 490 F.2d 907, 912 (9th Cir. 1973)

("Credibility . . . is for the jury - the jury is the lie detector

in the courtroom.").

It was also not erroneous to exclude Wedick's testimony as

to whether the failure to consider a defendant's vulnerabilities and

the use of leading questions generally could lead to an unreliable

confession.  Such an exclusion was proper under Federal Rules of

Evidence 702 and 403 since the testimony would have had little

probative value and would not have assisted the jury as contemplated

by Rule 702.[15]  Ritt, 142 F. Supp. 2d at 1145 (finding that

testimony regarding the interrogation techniques used in eliciting

the defendant's confession was unnecessary since the jury was able

to view a videotape of the confession); Scott v. Tex., 165 S.W.3d

27, 55-57 (Tex. App. 2005) (finding that the exclusion of expert

testimony from a social psychologist and criminologist regarding

police interrogation techniques and false confessions was not

erroneous because it was within the trial court's discretion to

determine that the testimony was unreliable and would not assist a

---

[15]    Hayat relies upon Smith v. U.S., 348 U.S. 147 (1954), in
arguing that whether a confession taken under Hayat's circumstances
is false or unreliable is knowledge that is not generally within the
experience of jurors.  In Smith, the court said that the reliability
of a confession "may be suspect if it is extracted from one who is
under the pressure of a police investigation-whose words may reflect
the strain and confusion attending his predicament rather than a
clear reflection of his past" and that "this experience with
confessions is not shared by the average juror."  Id. at 153-54.
However, not only is Smith factually distinguishable, but in Hayat's
case, the jury was able to view and hear testimony about the
confessions, and defense counsel explained to the jury during
closing argument that Hayat's confession was unreliable because of
the manner in which it was elicited.

trier of fact).  The jury was able to hear testimony from the

interviewing FBI agents regarding the circumstances of Hayat's

confessions and was able to see Hayat's videotaped confessions, and

any connection that Hayat wanted Wedick to make between the factual

circumstances of Hayat's confessions and factors that lead to

unreliable confession could have been and was ultimately made by

defense counsel during closing arguments.[16]   See U.S. v.

_____

[16]    Portions of Hayat's counsel's closing argument are stated below:

> You watched the videotape of Hamid Hayat on that screen. You
> watched his interview. And you got that feeling inside of
> you that something wasn't right when those agents
> manipulated him into answering leading questions, and
> getting him to say what they wanted him to say.

(RT 4286);

> First thing Agent Aguilar did [when Hayat arrived at the FBI
> office] was show him pictures of his wedding . . . . Agent
> Aguilar knew what these pictures were, and yet he showed
> them to [Hayat] as an intimidation factor. First he
> intimidated [Hayat] into coming to the FBI office, out of
> the comfort zone of his own home. Then he immediately showed
> him these pictures.

(RT 4311-12);

> Then the intimidation continues on that day. When Hamid Hayat
> is interviewed by Agent Harry Sweeney in an unrecorded
> interview, Agent Sweeney asks [Hayat] if he received weapons
> training at a camp, and [Hayat] adamantly denies it. Agent
> Sweeney asks [Hayat] if he received training to fight against
> the United States, and [Hayat] adamantly denies it . . . . At
> some point Agent Sweeney tells [Hayat] that the government
> has a satellite image of [Hayat] at a camp in Pakistan. While
> Agent Sweeney was on the stand, I asked him, I said, was this
> the question that was asked before Hamid Hayat said he went
> to a camp, and he said yes. And he admitted that this was a
> tactic, and he admitted that no such image exists. So [Hayat]
> is at the FBI office, outside of the comfort of his own home,
> he's shown pictures of his own wedding celebration and
> accused that those pictures reflect some sort of a camp. Then

Fuentes-Cariaga, 209 F.3d 1140, 1142, n.3 (9th Cir. 2000) (expert

testimony not admissible if the testimony is "about an issue within

the ken of the jury's knowledge"); In re Air Crash Disaster at New

> he's told by Agent Sweeney that there is an image of him at a
> camp. After -- at some point we know that [Hayat] said that
> he attended a camp when he spoke with Agent Sweeney. And this
> is not because there is a recorded interview, this is because
> this is what Agent Sweeney told us. So we don't really know
> the details of the types of questioning that was asked during
> that interview. What we do know is that the interview lasted
> for a few hours, and it's likely that the intimidation
> tactics continued during this unrecorded interview.

(RT 4313-14);

> Agent Schaaf admitted on the stand that he asked many
> leading questions of [Hayat]. He also said that open-ended
> questions are the preferred practice in conducting
> interviews in the FBI. He knew that the quality of his
> interview would be jeopardized by asking leading questions,
> but he went ahead and did it anyway. How else was he going
> to get Hamid Hayat to say what he wanted him to say?

(RT 4314);

> While he was on the stand, Agent Schaaf admitted that he
> first mentioned the word jihad during that interview; that
> the idea of traveling to the camp by bus, he made that
> mention first; that he first suggested that it took between
> three and ten hours to arrive at the camp; that he first
> suggested the idea of arriving at the camp in the dark; and
> that he first suggested the idea of killing Americans at the
> camp. He also first suggested that there was extensive
> weapons training, there was explosives and rifles training,
> and he first mentioned the names of extremist groups in
> Pakistan. The government is going to tell you that these
> questions were based on a prior interview that [Hayat] had
> with Agent Sweeney. But, remember, we have no recording of
> that interview. We don't know how many leading questions
> were asked in that interview. That interview was not
> recorded for a reason. It's likely that the government knew
> exactly what it wanted [Hayat] to say, and they intimidated
> him by asking him leading questions and using other
> intimidation tactics.

(RT 4314-15);

Orleans, 795 F.2d 1230, 1233 (5th Cir. 1986) (Expert testimony must "bring to the jury more than the lawyers can offer in argument, otherwise the expert testimony does not assist the trier of fact to understand the evidence or to determine a fact in issue."); Maine v. MacDonald, 718 A.2d 195, 198 (Me. 1998) ("[T]he court reasonably could have concluded that [the expert's] testimony would do little more than reinforce a concept already well within the jurors' grasps, namely, that people sometimes lie to protect those close to them.").

When you watch the video of Hamid Hayat, you saw [Hayat] was visibly tired. You heard [Hayat] complain of being tired, sleepy, and having a headache during the interview. He actually told the agents this. You heard him say at one point his mind wasn't working. You heard him answer questions with, I'll say, or, I'll say that, over 60 times during that interview.

(RT 4317-18);

Agent Schaaf, in fact testified that there were portions of [Hayat]'s interview that he did not believe. So, how did Agent Schaaf decide what he wanted to believe? Of course he knew what he wanted [Hayat] to say, and he chose to believe what he wanted to believe. Because, remember, he asked him leading questions, and when he couldn't lead him to the answer of the question the way that he wanted it, he chose not to believe it.

(RT 4318);

[A]ll of the information that was elicited from [Agent Schaaf's] leading questions led to a meaningless confession. . . . You have Hamid Hayat being intimidated into saying things that the FBI wanted him to say. He was never told that he could leave. You didn't hear an agent say that to him. In fact, you heard him ask the agents if he could go home or if he could see his father. The agents ignored his request. You heard him make these requests before he was even arrested when he was free to leave. But the agents ignored his request. As you watch the video, you saw [Hayat] make every effort to cooperate. And when he was being arrested, he didn't even

Moreover, even if the exclusion of Wedick's testimony was improper, it was harmless because the jury ultimately heard, through other testimony and closing arguments, all of the testimony that Wedick would have offered.  Therefore, Hayat is not entitled to a new trial based on the exclusion of Wedick's testimony.

### D.  New Evidence

Hayat contends he is entitled to a new trial under Rule 33 based on "newly discovered" evidence.  (Mot. at 7.)  Hayat contends the testimony of Usama and Jaber Ismail, two eyewitnesses who were in Pakistan with Hayat and who observed his conduct for most or all of the period between October 2003 and November 2004 when he allegedly attended a terrorist training camp, justifies a new trial.  (Id.)

Hayat argues that "[i]n this case, in which the government produced no evidence that Hayat attended a training camp apart from [Hayat]'s often incoherent, contradictory, and even bizarre statements, the testimony of Usama and Jaber, if credited, would

> know what was happening to him. He didn't realize that by telling the FBI what they wanted to hear, that he attended a camp in Pakistan, that he had just gotten himself into a whole lot of trouble. It's really quite sad to watch that video and watch [Hayat] say things that make no sense. They don't even make sense to the agents who are listening to them. And you really see him trying to cooperate and provide the answers the best that he can.

(RT 4318-19);

> The entire interview was meaningless, and it does not prove that [Hayat] went to a camp. . . . And because [Hayat]'s statements come from a meaningless confession, and they are completely unreliable, the government, ladies and gentlemen, is left with nothing.

(RT 4320).

1  result in Hayat's acquittal." (Id. at 105.) Hayat contends that

2  "[t]heir testimony is affirmative proof of innocence, and in no

3  sense is cumulative or merely impeaching." (Id.)

4  Hayat argues that Jaber could not be produced at trial

5  because he "was in Pakistan on a no-fly list," and that Usama could

6  not be called to testify "because his court-appointed lawyer had

7  invoked his Fifth Amendment right [not] to testify." (Id. at 101,

8  102.) Hayat contends that although Usama provided the testimony

9  that is in his affidavit in an FBI interview that "was memorialized

10 in a 302 provided to the defense prior to trial[,] Hayat was no more

11 able to produce Usama at trial than he would have been had his

12 counsel been unaware of Usama's existence or the exculpatory

13 evidence he could provide." (Id. at 105.)

14 The government responds that "the proffered testimony of

15 Usama Ismail and Jaber Ismail does not constitute 'newly discovered

16 evidence' justifying a new trial [since Hayat] was aware of their

17 potential testimony prior to trial, [Hayat] failed to diligently

18 seek to secure such testimony, and, the testimony would not likely

19 have resulted in an acquittal of [Hayat]." (Opp'n at 4; 181-87.)

20 The government argues that Usama ultimately did not testify at trial

21 because Hayat's counsel "decided not to serve Usama with a subpoena

22 because [she] thought [her] efforts would be futile." (Id. at 182

23 (quoting Mojaddidi Aff. ¶¶ 5-6).) Further, the government contends

24 that "[d]efense counsel offers no explanation whatsoever as to

25 whether the defense made any effort to contact Jaber Ismail to

26 interview him or attempt to secure his presence or testimony for

27 trial" and that Jaber did not discover that he was on the no-fly

28

56

1  list until after the case was submitted to the jury. (Opp'n at

2  183.)

3         The government also argues that even if the proposed

4  testimony is considered newly discovered, Hayat cannot show no lack

5  of diligence since Hayat did not try to secure the Ismails' presence

6  at trial, did not explore any alternative means of obtaining their

7  testimony, and never informed the court that he was having

8  difficulty securing their testimony. (<u>Id.</u> at 185-86.)

9  Additionally, the government contends that given the other evidence

10 presented in this case, "the proposed testimony does not indicate

11 that a new trial would likely result in acquittal." (<u>Id.</u> at 186.)

12        To prevail on a Rule 33 motion for a new trial on the

13 grounds of newly discovered evidence, "the movant must satisfy a

14 five-part test: (1) the evidence must be newly discovered; (2) the

15 failure to discover the evidence sooner must not be the result of a

16 lack of diligence on [Hayat]'s part; (3) the evidence must be

17 material to the issues at trial; (4) the evidence must be neither

18 cumulative nor merely impeaching; and (5) the evidence must indicate

19 that a new trial would probably result in acquittal." <u>U.S. v.</u>

20 <u>Kulczyk</u>, 931 F.2d 542, 548 (9th Cir. 1991).

21        "[N]ewly discovered" means, "in fact, newly discovered,

22 i.e., after trial." <u>U.S. v. McKinney</u>, 952 F.2d 333, 335 (9th Cir.

23 1991). "Evidence known or discovered before the trial is over is

24 not newly discovered." <u>Id.</u> at 336. "[W]hen a defendant who has

25 chosen not to testify comes forward to offer testimony exculpating a

26 codefendant, the evidence is not 'newly discovered.'" <u>U.S. v.</u>

27 <u>Lockett</u>, 919 F.2d 585, 591 (9th Cir. 1990); <u>see also</u> <u>U.S. v.</u>

28 <u>DiBernardo</u>, 880 F.2d 1216, 1224-25 (11th Cir. 1989) (where

defendants were "well aware" of witness' proposed testimony prior to trial, "the testimony cannot be deemed 'newly discovered evidence' within the meaning of Rule 33"); <u>U.S. v. Jacobs</u>, 475 F.2d 270, 286 n.33 (2d Cir.) ("[A] court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify"). Since the testimony of the Ismails was known to Hayat prior to trial, it cannot be deemed "newly discovered."  Therefore, Hayat is not entitled to a new trial based on the Ismails' testimony.

### E.   Cumulative Effect of All Alleged Errors

Hayat argues that "[i]f, after considering all of Hayat's claims both singly and in combination, the Court believes that 'a serious miscarriage of justice may have occurred, it may set aside the verdict, and submit the issues for determination by another jury.'"  (Reply at 3 (quoting <u>Kellington</u>, 217 F.3d at 1097).) Additionally, the cumulative effect of errors made at trial may deprive a defendant of a fair trial and require a new trial.  <u>U.S. v. Tory</u>, 52 F.3d 207, 211 (9th Cir. 1995).

Hayat's motion for a new trial is also denied under this standard.

///
///
///
///
///
///
///

58

## IV.   Conclusion

For the foregoing reasons, Hayat's motion for a new trial is denied.   The sentencing hearing is scheduled to commence at 1:00 p.m. on August 10, 2007.

Dated:  May 17, 2007

_____
GARLAND E. BURRELL, JR.
United States District Judge