McGREGOR W. SCOTT
United States Attorney
S. ROBERT TICE-RASKIN
LAURA L. FERRIS
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

MICHAEL MULLANEY
Chief, Counterterrorism Section
SHARON LEVER
Trial Attorney, Counterterrorism Section
Criminal Division
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C.  20005
Telephone: (202) 514-0849

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. S-05-240 GEB |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| v. | ) | |
| | ) | |
| | ) | Date: Sept. 10, 2007 |
| HAMID HAYAT, | ) | Time: 10:00 a.m. |
| | ) | Judge: G.E. Burrell, Jr. |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**I.**

**INTRODUCTION**

Federal statutory law and Sentencing Guidelines provide for substantial punishment of terrorists and would-be terrorists, and appropriately so.  Defendant Hamid Hayat attended a jihadi training camp, returned to the United States with the intent to wage violent jihad, and attempted to conceal his illegal conduct.  Defendant's offenses are very serious and, as the Probation Officer notes, require a significant sentence that will provide respect for the

1

law, provide just punishment for defendant's crimes, protect the
public from further crimes of defendant, and deter others from
engaging in similar terrorism-related crimes.  As such, the
Government urges the Court to sentence defendant to a term of
imprisonment of 420 months (thirty-five years), in accordance with
the advisory Sentencing Guidelines and as recommended by the
Probation Office.

## II.

### BRIEF STATEMENT OF FACTS[1]

Defendant was tried by jury between February 14, 2006 and April
25, 2006 and found guilty of all charges in the Second Superseding
Indictment, namely, Providing and Attempting to Conceal Material
Support and Resources (Count 1), and Making False Statements (Counts
2-4).

In short, the evidence adduced at trial established that
defendant believed in violent jihad, that defendant trained at a
jihadi camp in Pakistan, that defendant returned to the United
States with the intent to wage violent jihad upon receipt of orders,
and that defendant concealed and denied his training and activities
from the FBI.

The principle evidence of trial was as follows:  First, during
the course of three separate interviews (two videotaped), defendant
admitted that:  he went to a jihadi training camp in Balakot,
Pakistan, in 2003/2004; he was told to come to the United States for
jihad; he came to the United States; and he was prepared to wage

---

[1]If the Court desires to review a more extensive recitation of
the facts proven at trial, it should refer to the Government's
February 2, 2007 Opposition to Defendant's Motion for a New Trial at
pp. 5-24.

1  jihad upon receipt of orders.

2      Second, Hayat's repeated recorded conversations with Naseem
3  Khan, a cooperating witness, provided evidence that: defendant
4  believed in violent jihad; defendant had knowledge of jihadi camps
5  including Jaish-e-Muhammed ("JEM") camps in the Balakot/Mansehar
6  area; defendant aspired to attend a jihadi camp; and defendant
7  intended to attend such a camp.

8      Third, satellite images and testimony by Eric Benn evidenced
9  that militant camps existed in Pakistan during the relevant time
10 frame when defendant admitted attending a camp and, in fact,
11 appeared to exist in a location similar to that described by
12 defendant during the course of his confession.

13     Fourth, Dr. Khaleel Mohammed testified that a jihadi
14 supplication found in defendant's wallet (translated as "Oh Allah,
15 we place you at their throats and we seek refuge in you from their
16 evils") would be used by a jihadi or a warrior who perceived himself
17 to be engaged in a war for God against an enemy and who was
18 completely "ready to act."

19     Fifth, Hassan Abbas testified regarding the existence of jihadi
20 training camps in Pakistan, including a JEM camp in Balakot, as well
21 as the typical nature of such camps, substantiating precisely what
22 Hamid Hayat had said to the FBI about his attendance at a jihadi
23 camp in Balakot.

24     Sixth, the jihadi scrapbook (which was constructed, maintained
25 and discussed by defendant) served as proof of defendant's interest
26 in violent jihad, as well as known Pakistani extremist groups.

27     Seventh, three other jihadi publications (Virtues of Jihad,
28 Windows from the Prison, the JEM Magazine, all written or edited by

3

JEM leader Masood Azhar) and possessed by defendant, also served as proof of defendant's interest in violent jihad.

### III.

### PRESENTENCE INVESTIGATION REPORT

The Probation Office concluded that defendant's total offense level was 42 based on the following guideline calculations:

-a base offense level of 26 under USSG § 2M5.3(a)[2], Presentence

---

[2]The Government agrees with the Probation Office that, given the totality of the circumstances, § 2M5.3 appears to be the most analogous guideline for use in this case.  The defense has not objected to the use of this section.

The Court should be aware, however, that USSG Appendix A indicates that USSG § 2X2.1 (aiding and abetting) or §2X3.1 (accessory after the fact) should be used for violations of 18 U.S.C. § 2339A.  See USSG Appendix A.  Section 2X2.1 appears most analogous as this does not appear to be a situation where defendant acted as an accessory after the fact.

Under § 2X2.1, the offense level is "the same level as that for the underlying offense" defined for the purposes of § 2339A as "the offense the defendant is convicted of having materially supported prior to or during its commission." USSG 2X2.1, Commentary (n. 1). Here, the offense defendant materially supported was a violation of 18 U.S.C. § 2332b, Acts of Terrorism Transcending National Boundaries.

For § 2332b, Appendix A refers one to §§ 2A1.1-4 (murder, second degree murder, voluntary and involuntary manslaughter), § 2A2.1-2(attempted murder, aggravated assault), § 2A4.1 (kidnaping) or § 2B1.1 (fraud).  The First Superseding Indictment alleged, and the Government adduced evidence at trial demonstrating, that defendant Hayat intended to return to the United States and, upon receipt of orders from other individuals, to wage violent jihad against persons and real and personal property within the United States.  Given this, the most serious applicable guideline appears to be § 2A1.4, the murder guideline, which calls for an offense level of 43.  Were this offense level to be applied, defendant's offense level would then be enhanced 12-levels under § 3A1.4 (because the offense involved a federal crime of terrorism), and 2-levels under § 3C1.1 (obstruction), resulting in a total offense level of 57, a Criminal History category of VI, and an advisory range of life imprisonment.  Because the statutory maximum is 39 years, 39 years (468 months) then would become the advisory guideline range.

While the Government believes that §2M5.3 is the most appropriate guideline (ultimately yielding a 360-468 months range), the Court also would act well within its discretion were it to utilize § 2A1.4 and the calculations described above (ultimately yielding a 468 months sentence).

4

Investigation Report ("PSR") ¶ 36;

-a 2-level enhancement under §2M5.3(b)(1)(E) because the offense involved provision of material support with the intent, knowledge or reason to believe they were to be used to commit or assist in the commission of a violent act, PSR ¶ 37;

-a 12-level enhancement pursuant to § 3A1.4 because the offense involved a federal crime of terrorism, PSR ¶ 38;

-a 2-level enhancement pursuant to § 3C1.1 because defendant wilfully attempted to or actually obstructed/impeded the administration of justice.

The Probation Officer further concluded that defendant's Criminal History Category was VI pursuant to USSG § 3A1.4, again because the offense involved a federal crime of terrorism.  PSR ¶ 46.

The Probation Officer then found that the applicable advisory guideline range was 360-468 months (due to the 39 year aggregate statutory maximum).  PSR ¶ 62.  Ultimately, the Probation Officer recommended a mid-term sentence of 420 months, noting, among other things, that, "[i]t is chilling to consider the possible devastation this young man, a United States citizen, could have caused to this country, by his own hand or though the support of other terrorists." PSR ¶ 70.

**IV.**

**THE PARTIES HAVE NO FACTUAL OBJECTIONS TO THE PSR**

The Government has no factual objections to the PSR.  The defense, likewise, has made no factual objections to the PSR.  As

such, the Court should adopt the factual statements contained within the PSR.

**V.**

## DEFENDANT'S SOLE LEGAL OBJECTION SHOULD BE REJECTED

The Government has no legal objections to the PSR.

Defendant has one legal objection: he claims that the recommended USSG § 3A1.4 enhancement for an offense that involved a federal crime of terrorism constitutes impermissible double-counting.  First, defendant claims that Congress did not intend § 3A1.4 to apply to offenses such as defendant's where involvement with international terrorism is an element of the crimes. Defendant's Opposition to PSR and Sentencing Memorandum ("Defense Memo") at 3-4.   Second, defendant claims that "[a]ll of the offenses ... of which Hayat was convicted have involvement in international terrorism as an element of the crime which was charged in the indictment and found by the jury."  Defense Memo at 3.   Both arguments fail.  First, a review of the *complete* Congressional history, not just the selected history cited by defendant, indicates that Congress plainly directed the Sentencing Commission to expand the scope of the enhancement to apply to a large list of specifically defined "federal crimes of terrorism", including providing/concealing material support to terrorists.  Secondly, contrary to defendant's suggestion, the material support charge, which is the baseline charge for application of the guidelines, does *not* require proof of international terrorism as an element of the crime.   Finally, applicable case law from the Ninth Circuit, as well as other circuits, indicates that application of the USSG § 3A1.4 enhancement does not constitute impermissible double

counting vis a vis the base guideline, USSG § 2M5.3, because the guideline and enhancement are both distinct, unique and serve different purposes.

A.   <u>The Complete Congressional History of the Terrorism Enhancement Clearly Indicates That Congress Intended The Enhancement to Apply to All Federal Crimes of Terrorism Including Providing Material Support to Terrorists</u>

The terrorism enhancement in USSG § 3A1.4 originated in the Violent Crime Control and Law Enforcement Act of 1994.  Pub. L. 103-322 (1994).  In Section 12004 thereto, Congress directed the Sentencing Commission to formulate the first version of the enhancement, stating:

> The United States Sentencing Commission is directed to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.

Pub. L. 103-322 § 120004 (1994).

The Sentencing Commission promulgated § 3A1.4.  In the commentary to Amendment 526, Appendix C, the Sentencing Commission stated:

> Section 120004 of the Violent Crime Control and Law Enforcement Act of 1994 directs the commission to provide an appropriate enhancement for any felony that involves or is intended to promote international terrorism.  The amendment addresses this directive by adding a Chapter Three enhancement at § 3A1.4 (International Terrorism) in place of the upward departure provision at § 5K2.15 (Terrorism)[3].

USSG App. C, Amend. 526 (1994).

---

[3]Prior to the implementation of USSG § 3A1.4, the main sentencing provision that related to terrorism offenses was contained in USSG § 5K2.15 (November 1, 1989), a policy statement related to terrorism.  That section originally read: "If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range."

The new section 3A1.4 read:

(a) If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

USSG § 3A1.4.  The application note specifically indicated that "International Terrorism" would have the definition set forth at 18 U.S.C. § 2331[4].  Id., Commentary (n.1).

Contrary to defendant's implicit suggestion, Congressional action with respect to the terrorism enhancement did not stop in 1994.  Indeed, as part of the Antiterrorism and Effective Death Penalty Act of 1996, Congress directed the Sentencing Commission to amend § 3A1.4 so that it would apply to an expanded group of

---

[4]18 U.S.C. § 2331 reads in part:

As used in this chapter-

(1) the term "international terrorism" means activities that-

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State:

(B) appear to be intended-

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

offenses -- all Federal crimes of terrorism.   Pub. L. 104-132

(1996).   Section 730 of the same stated:

> The United States Sentencing Commission shall forthwith . . .
> amend the sentencing guidelines so that the chapter 3
> adjustment relating to international terrorism only applies to
> Federal crimes of terrorism, as defined in section 2332b(g) of
> title 18, United States Code.

Pub. L. 104-132 § 730 (1996).

A federal crime of terrorism, per 18 U.S.C. § 2332b(g)(5), is

an "offense" that: (1) "is calculated to influence or affect the

conduct of government by intimidation or coercion, or to retaliate

against government conduct;" *and* (2) is a violation of one of a

group of specified federal crimes of violence (including, *e.g.*, 18

U.S.C. § 2339A)[5].

---

[5]Section 2332b(g) reads, in part:

(5) the term "Federal crime of terrorism" means an offense that-

(A) is calculated to influence or affect the conduct of government
by intimidation or coercion, or to retaliate against government
conduct; and

(B) is a violation of-

(I) section 32 (relating to destruction of aircraft or aircraft
facilities), 37 (relating to violence at international airports), 81
(relating to arson within special maritime and territorial
jurisdiction), 175 (relating to biological weapons), 351 (relating
to congressional, cabinet, and Supreme Court assassination,
kidnaping, and assault), 831 (relating to nuclear materials), 842(m)
or (n) (relating to plastic explosives), 844(3) (relating to certain
bombings), 844(f) or (i) (relating to arson and bombing of certain
property), 930(c), 956 (relating to conspiracy to injury property of
a foreign government), 1114 (relating to protection of officers and
employees of the United States), 1116 (relating to murder or
manslaughter of foreign officials, official guests, or
internationally protected persons), 1203 (relating to injury to
buildings or property within special maritime and territorial
jurisdiction of the United States), 1366 (relating to destruction of
an energy facility), 1751 (relating to Presidential and Presidential
staff assassination, kidnaping, and assault), 1992, 2152 (relating
to injury of fortifications, harbor defenses, or defensive sea
areas), 2155 (relating to violence against maritime fixed
platforms), 2332 (relating to certain homicides and other violence

The Conference Report related to Section 730 explained the

significance of this two-part definition:

> This section gives the U.S. Sentencing Commission amendment
> authority to expand the scope of its Chapter 3 enhancement for
> "international terrorism offenses" under the U.S. Sentencing
> Guidelines, to apply only to federal crimes of terrorism as
> defined in section 2332b(g). In amendments to the Sentencing
> Guidelines that became effective November 1, 1996, a new
> provision . . . substantially increases jail time for offenses
> committed in connection with a crime of international
> terrorism. This section of the bill will make that new
> provision applicable only to those specifically listed federal
> crimes of terrorism, upon conviction of those crimes with the
> necessary motivational element to be established at the
> sentencing phase of the prosecution, without having to wait
> until November 1996 for the change to become law.

142 Cong. Rec. H. 3305-01, Section 730 (1995) (emphasis added); see

also H. Rep. No. 104-383 at 53, 109, 114 (1995)[6].

The statute, as well as the Conference Report, make it clear

that Congress wished to redefine the scope of the terrorism

enhancement so that it applied to all specified listed federal

crimes of terrorism accompanied by a proven "motivational element,"

i.e., proof that the offense was calculated to retaliate against the

---

against United States nationals occurring outside of the United
States), 2332a (relating to use of weapons of mass destruction),
2332b (relating to acts of terrorism transcending national
boundaries), 2332c, 2339A (relating to providing material support to
terrorists), 2339B (relating to providing material support to
terrorist organizations), or 2340A (relating to torture);

(ii) section 236 (relating to sabotage of nuclear facilities or
fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284); or

(iii) section 46502 (relating to aircraft piracy) or section
60123(b) (relating to destruction of interstate gas or hazardous
liquid pipeline facility) of title 49.

[6]A review of the Congressional debate reveals that legislators
were concerned about defining the terrorism offense precisely in
order to avoid federalizing state crime, to keep sentencing judges
from assigning a terrorist label to crimes that are truly not
terrorist, and to adequately punish terrorists for their offenses.
H. Rep. No. 104-383 at  p. 53, 109, 114 (1995).

government for its conduct, or to influence/affect the government by intimidation or coercion.

As such, the Sentencing Commission promulgated Amendment 539, Appendix C, amending § 3A1.4.  The commentary states:

> This amendment implements section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1303.  That section requires the Commission to amend the sentencing guidelines so that the adjustment in §3A1.4 (relating to international terrorism) applies more broadly to a "Federal crime of terrorism," as defined in 18 U.S.C. §2332b(g), and provides that the Commission shall have the authority to promulgate this amendment as an emergency amendment under procedures set forth in section 21(a) of the Sentencing Act of 1987.  The effective date of this amendment is November 1, 1996.

USSG App. C, Amend. 539.

Section 3A1.4, thus, was amended to read, in pertinent part:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

USSG §3A1.4.  Of note, the guideline specifically states that "Federal crime of terrorism" is defined at 18 U.S.C. §2332b(g). USSG 4A1.3, Commentary (n. 1)[7].

In sum, defendant is flatly wrong to suggest that Congress prohibited application of §4A1.3 to offenses involving international terrorism.  To the contrary, Congress made it patently clear in 1995, that the enhancement was to be applied to all specifically listed federal offenses, so long as it was also established that the offense was calculated to influence/affect or retaliate against

---

[7]Amendment 539 was an emergency amendment. It was re-promulgated without change in Amendment 565, Appendix C, effective November 1, 1997.

conduct of the government.

B.   Proof of "International Terrorism" Is Not An Element of the
     Material Support Charge

     As explained above, Congress intended that the current USSG
§ 3A1.4 apply to all Federal crimes of terrorism and did not exclude
those crimes that involved international terrorism as an element.
In any event, even if defendant's legal view were correct (which it
is not), it is clear that the material support charge in Count One
does *not* require proof of international terrorism.

     The Court instructed the jury that the crime of providing
material support and/or resources as charged in Count One had the
following essential elements:

          First, the defendant provided material support and/or
          resources . . . .
          Second, the defendant did so knowing or intending that
          such material support and/or resources were to be used in
          preparation for, or in carrying out, terrorism that transcends
          national boundaries.

Jury Instruction No. 18 (emphasis added).

     The Court instructed the jury, in substance, as follows with
respect to the crime of attempting to conceal material support and
resources as charged in Count One:

          First, the defendant intended to conceal and/or disguise
          the nature, location, or source of material support and/or
          resources . . . .
          Second, the defendant did so knowing or intending that
          such material support and/or resources were to be used in
          preparation for, or in carrying out, terrorism that transcends
          national boundaries.
          Finally, the defendant did something which was a
          substantial step toward committing the crime . . . .

Instructions Nos. 19 and 20 (emphasis added).

     What is important for the purpose of this analysis is the
defined terms relating to "terrorism that transcends national
boundaries."  Instruction No. 22 stated, in pertinent part:

12

> The phrase "terrorism that transcends national boundaries" means conduct occurring outside of the United States in addition to conduct occurring in the United States, which involves any one of the following prohibited offenses against another person in the United States, and any one of the following special circumstances.
>
> The prohibited offenses are committing, threatening to commit, attempting to commit, or conspiring to commit an unlawful killing, kidnaping, assault with a dangerous weapon, assault that results in serious bodily injury, or destruction of real or personal property within the United States that creates a substantial risk of serious bodily injury.
>
> The special circumstances are that the victim, or intended victim, of the prohibited offense is the United States Government or an official or employee thereof, that the offense would obstruct, delay or affect interstate commerce, that the real or personal property is owned or possessed by, or leased to, the United States, or that the mail, any facility of interstate or foreign commerce, or means of transportation are used in furtherance of the prohibited offense.

Instruction No. 22.

These instructions must now be compared with the definition of "international terrorism." As noted previously, Congress specifically defined "international terrorism" at 18 U.S.C. § 2331[8]. In short, it means activities that: (1) involve unlawful violent acts or unlawful acts dangerous to human life, (2) appear to be intended to intimidate or coerce a civilian population, or influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination or kidnaping, and (3) occur primarily outside the territorial jurisdiction of the United States or transcend national boundaries. 18 U.S.C. § 2331. Of note, the material support charge, among other things, does not require any sort of proof that the activities at issue appeared to be intended to intimidate a civilian population, or to influence the policy or conduct of the government by intimidation, coercion or otherwise. Thus, defendant is also

---

[8]See *supra* n. 4.

1 plainly wrong when he suggests that "international terrorism" was an

2 element of the material support charge[9].  It was not.

3      That being the case, even assuming defendant's view of the law

4 were correct (which it is not), it is clear that the material

5 support charge in Count One does *not* include international terrorism

6 as an element.  Thus, even under defendant's view of the law, there

7 would be no double counting with respect to Count One[10].

8 C.   Application of Both §§ 2M5.3 and 3A1.4 Is Permissible Under
     Established Ninth Circuit Precedent

9      Defendant's sentencing memorandum fails to discuss, at any

10 length, Ninth Circuit jurisprudence on this issue.  This is hardly

11 surprising as controlling case law plainly is contrary to

12 defendant's position.

13

14

15 [9]Likewise, it should be equally clear that the material support
charge, standing alone, does not constitute a "federal crime of

16 terrorism."  A "federal crime of terrorism" is an offense that "is
calculated to influence of affect the conduct of government by

17 intimidation or coercion, or to retaliate against government
conduct," *and* is a violation of a specified crime of violence.

18 Again, the jury was *not* instructed to find that the material support
charge was calculated to influence or affect the conduct of

19 government or retaliate against the same.

20 [10]The situation appears somewhat different for the false
statement charges.  As the Court will recall, the jury was

21 instructed that, if it found that defendant made a false statement
or statements in Counts Two through Four, it then had to determine

22 "whether the crime or crimes charged in these counts involved
domestic terrorism or international terrorism."  Instruction No. 26.

23 The jury, of course, found that the false statements involved
international or domestic terrorism.  See Special Verdict, Counts

24 Two-Four.
     At the end of the day, however, this is not significant. In

25 this case, as the Probation Office notes, the material support
charge and conduct (with a base offense level of 26 under §2M5.3)

26 creates the highest offense level of all the counts and, hence,
becomes the applicable offense guideline.  See PSR ¶ 26; see also

27 USSG §3D1.3.  For the reasons noted previously, it is clear that
there is no double counting when one compares §§ 2M5.3 and 3A1.4.

28 Hence, the §3A1.4 enhancement applies regardless of the situation
with respect to the false statement charges.

It is double-counting when "the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes." United States v. Herrera-Rojas, 243 F.3d 1139, 1144 (9th Cir. 2001). Double counting is impermissible "where one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines." United States v. Reese, 2 F.3d 870, 895 (9th Cir. 1993, cert. denied, 510 U.S. 1094 (1994). However, double counting is "sometimes authorized and intended by the Sentencing Guidelines when each invocation of the behavior serves a unique purpose under the Guidelines." United States v. Nagra, 147 F.3d 875, 883 (9th Cir. 1998). Different enhancements stemming from different concerns may be applied simultaneously. United States v. Kelly, 993 F.2d 702, 705 (9th Cir. 1993). Thus, double counting is considered permissible where "it is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct." Reese, 2 F.3d at 894-95 ("When more than one kind of harm is attributable to a given aspect of a defendant's conduct, failure to enhance his punishment for each harm caused thereby would defeat the Commission's goal of proportionality in sentencing.")

The test for double counting in this Circuit is as follows:

[I]mpermissible double counting is to be found where one Guidelines provision "is akin to a 'lesser included offense' of another," yet both are applied. Thus, the use of a single aspect of conduct both to determine the applicable offense guideline and to increase the base offense level mandated thereby will constitute impermissible double counting only where, absent such conduct, it is impossible to come within that guideline. If, on the other hand, it is possible to be sentenced under a particular offense guideline without having

<u>engaged in a certain sort of behavior, such behavior may be used to enhance the offense level, for in this situation, the guideline's base offense level will not necessarily have been set to capture the full extent of the wrongfulness of such behavior</u>.

<u>Id</u>. (Emphasis added).

Following this test, the Ninth Circuit has repeatedly held that an "enhancement" to a particular guideline offense predicated on certain behavior is not double counting so long as it is possible to be sentenced under the guideline without having engaged in the enhancement behavior.  See, <u>e.g.</u>, <u>United States v. Wright</u>, 891 F.2d 209, 211 (9th Cir.1989) (adjustment for having committed crime while "under sentence" (§ 4A1.1) did not result in impermissible double counting because being "under sentence" is not a necessary element of offenses covered by escape guideline (§2P1.1); <u>Reese</u>, 2 F.3d at 894, 895 (adjustment for use of a dangerous weapon or serious bodily injury not impermissible double counting because these behaviors are not a necessary element of offenses covered by aggravated assault guideline (§2A2.2); enhancement for being a public official not double counting because being a public official is not a necessary element of the offense covered by conspiracy to interfere with civil rights guideline (§ 2H1.2)); <u>United States v. Archdale</u>, 229 F.3d 861, 869 (9th Cir. 2000) (adjustment for use of force not impermissible double counting because use of force is not a necessary element of offenses covered by sexual assault guideline (2A3.1)); <u>United States v. Speelman</u>, 431 F.3d 1226, 1233 (9th Cir. 2005)(adjustment for victim under the age of 12 not impermissible double counting because victimizing someone under the age of 12 is not a necessary element of offenses covered by sexual assault guideline).

16

In this case, application of § 2M5.3 and §3 A1.4 does not constitute impermissible double counting.  First of all, the guideline and enhancement do not necessarily overlap and are not identical.  The offense which triggered application of the USSG § 2M5.3 guideline is a violation of 18 U.S.C. § 2339A.  As noted before, the elements of this offense, in brief, are: (1) providing or attempting to conceal provision of material support; (2) doing so knowing or intending that such material support and/or resources were to be used in preparation for, or in carrying out, terrorism that transcends national boundaries.  Notably, the "motivational element" of the § 3A1.4 enhancement (namely, that the offense involved or was intended to promote a federal crime of terrorism, "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct") is *not* an element of § 2339A.

Moreover, this motivational element is not an element of other offenses covered by the USSG § 2M5.3 guideline, e.g., violation of 18 U.S.C. § 2339B.  To establish a violation of § 2339B, it must be proven that: (1) the defendant provided material support or resources; (2) the defendant provided this support or resources to a foreign terrorist organization; (3) the defendant did so knowingly; and (4) one of the specified jurisdictional requirements is satisfied.  Proof that defendant's action involved or was intended to promote a federal crime of terrorism, calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, is not a necessary element of this offense under the § 2M5.3 guideline.

Thus, a defendant can be sentenced under § 2M5.3 without having

17

engaged in the § 3A1.4 enhancement behavior.  Section § 2M5.3 guideline's base offense level has not been set to capture the full extent of the wrongfulness covered by § 3A1.4.  As such, application of the § 3A1.4 enhancement would not constitute impermissible double counting.

Secondly, it is clear that the § 2M5.3 guideline and the § 3A1.4 enhancement do not serve identical purposes and are both necessary to "make the defendant's sentence reflect the full extent of the wrongfulness of his conduct." Reese, 2 F.3d at 894-95. Section 2M5.3 was added to establish a basic guideline for material support offenses.  See generally USSG Appendix C, Amendment 637. The § 3A1.4 enhancement was added to implement Congressional intent to increase penalties for numerous federal crimes of terrorism where the crime involved or was intended to promote a federal crime of terrorism, calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  See Pub. L. 104-132 § 730 (1996); 142 Cong. Rec. H. 3305-01, Section 730 (1995).  Section 3A1.4 is an appropriate victim-related adjustment for certain types of terrorism crimes which specifically target or victimize the government.  "It is not double counting to impose two increases based on the same conduct when one increase focuses solely on the defendant's conduct and the other increase focuses on the nature and degree of harm caused by the defendant's conduct." Herrera-Rojas, 243 F.3d at 1144-45; see, e.g., United States v. Kentz, 251 F.3d 835, 843 (9th Cir. 2001)("As the Sentencing Commission has explained, the increased penalty for a large number of vulnerable victims was designed to implement Congressional intent to increase penalties for

18

fraudulent schemes, including telemarketing schemes having a large number of victims over the age of 55.   In this way, 3A1.1 builds upon the specific offense characteristic for mass-marketing, and is acceptable under *Reese."),* <u>cert. denied</u>, 535 U.S. 933 (2002); <u>United States v. Skillman</u>, 922 F.2d 1370, 1377-78 (9th Cir. 1990)("We find no double punishment in applying a Guideline dealing with the means by which a crime was committed (use of fire) and a Guideline dealing with the susceptibility of the victim to the criminal conduct.   Each concerns a different policy reason for enhancing the sentence."), <u>cert. dism'd</u>, 502 U.S. 922 (1991).

Finally, it is important to note that two sister circuits have expressly found that application of § 3A1.4 does not constitute impermissible double counting.   <u>See</u> <u>United States v. Meskini</u>, 319 F.3d 88, 91-92 (2d Cir. 2003)(rejecting argument that USSG § 3A1.4 violated due process by impermissibly double counting the same criminal act, once for the offense level and once for the criminal history category), <u>cert. denied</u>, 538 U.S. 1068 (2003); <u>United States v. Hammoud</u>, 381 F.3d 316, 356 (4th Cir. 2004)(en banc)(rejecting argument that application of USSG §§ 2M5.3 and 3A1.4 would constitute double counting), <u>vacated on other grounds</u>, 543 U.S. 1097 (2005), <u>reinstated in relevant part</u>, 405 F.3d 1034 (4th Cir. 2005)(en banc).

Indeed, the Second Circuit expressly held that, given the grave danger caused by terrorism, Congress and the Sentencing Commission had a rationale basis for adopting the terrorism enhancement and for incapacitating offenders for a long time.   States the Second Circuit:

Congress and the Sentencing Commission had a rational basis for

19

concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.  Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

* * *

Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.

Meskini, 319 F.3d at 92.

In short, use of the § 2M5.3 guideline and the § 3A1.4 terrorism enhancement do not constitute impermissible double counting.  The guideline and enhancement are both distinct, unique and serve different purposes.

D.   Application of §3A1.4 Would Not Produce An Illegal Sentence Beyond the Authorized Statutory Maximum Sentence

Defendant also argues that application of the § 3A1.4 enhancement "would produce a sentence calculation for an unadorned section 2339A offense that is invariably illegal and thus incapable of being imposed" because it "always produces a *minimum* penalty for a specific offense which exceeds by years the statutory *maximum* that Congress has provided" for section 2339A offenses.  Defense Memo at 4-5.  Stated another way, defendant suggests that application of the enhancement is inappropriate because the typical guideline range for a material support conviction (*i.e.*, 225-293 months) exceeds the 15 year (*i.e.*, 180 month) statutory maximum under § 2339A.  This argument is wholly devoid of merit.

The Guidelines provide a simple and straightforward solution to defendant's fictional conundrum.  "Where the statutorily authorized

20

maximum sentence is less than the minimum of the applicable
guideline range, the statutorily authorized maximum sentence shall
be the guideline sentence." USSG § 5G1.1(a).  Thus, if a defendant
were convicted of violating §2339A only, and further found to have
committed a federal crime of violence, his guideline sentence, in
fact, would be the statutory maximum of 180 months, a wholly lawful
sentence because it is no more than that allowed by the statute at
issue.

In this case, of course, the Court must sentence on multiple
counts of conviction.  That being the case, the aggregate statutory
maximum is 39 years (or 468 months).  See PSR ¶ 61.  For that
reason, the PSR correctly indicates that the final advisory range is
not 360 months to life, as suggested by the guideline calculations
alone, but rather, 360 months to 468 months.  PSR ¶ 62.  Any
sentence below the aggregate statutory maximum, of course, would be
wholly lawful[11].

**VI.**

**A SENTENCE OF 420 MONTHS IS WARRANTED**

This Court should impose a prison sentence of 420 months, in
accordance with the advisory guideline range and following the
Probation Office's recommendation.

Defendant Hamid Hayat believed, and likely will always believe,
in violent jihad; he has a jihadi heart and mind.  True to his

[11]In the alternative, if this Court is at all inclined to
conclude that application of USSG § 3A1.4 constitutes impermissible
double counting of conduct accounted for by § 2M5.3, the Government
requests the Court to adopt the guideline calculations premised on
USSG §§ 2X2.1, 2A1.1, set forth *ante* at n. 2.  In the Government's
view, application of the guideline factors set forth in n. 2 are
warranted under the facts of this case and would not raise any
potential issues of double counting.

21

beliefs and his pledge, Hayat attended a jihadi training camp in Pakistan in 2003/2004 (as well as earlier in 2000).  There, at a minimum, Hayat received physical fitness training, firearms training and, of course, ideological training all for the purpose of waging violent jihad.  Hayat admitted that he had been trained for jihad and told to come to the United States for jihad.  Hayat further admitted that he had come back to the United States for jihad and was awaiting orders.  Fortunately, Hayat was intercepted by the FBI before he could follow through on any of his jihadi aspirations and before he could harm anyone or anything in the United States.  All the same, Hayat purposefully trained to become a terrorist and returned to the United States with the intention to wage jihad when directed to do so.  As such, defendant should be subjected to very substantial punishment.  As noted previously, "terrorists . . . are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Meskini, 319 F.3d at 92.  In light of this, Hayat should be incapacitated for much of his adult years -- to justly punish him for his serious misconduct, to reasonably protect society from his dangerous proclivities, and to deter any other would-be terrorists who might consider following in his footsteps.  A sentence of 420 months is manifestly warranted.

## VII.

### CONCLUSION

In sum, the Government urges the Court to: overrule defendant's objection to application of USSG § 3A1.4; enter findings that defendant's offense level is 42, his Criminal History Category is VI, and his advisory Guideline range is 360 to 468 months; enter

22

findings that a mid-term sentence of 420 months is warranted after consideration of the advisory Guidelines and the factors set forth at 18 U.S.C. § 3553(a); and order that defendant be placed on supervised release for a period of 10 years following his term of incarceration.

Dated: August 10, 2007          Respectfully submitted,


                                MCGREGOR W. SCOTT
                                United States Attorney


                        By:   /s/ ROBERT TICE-RASKIN
                                S. ROBERT TICE-RASKIN
                                Assistant U.S. Attorney

                                /s/ LAURA L. FERRIS
                                LAURA L. FERRIS
                                Assistant U.S. Attorney


                        By:   /s/ SHARON LEVER
                                SHARON LEVER
                                Trial Attorney
                                United States Dep't of Justice