DENNIS P. RIORDAN (SBN 69320)
dennis@riordan-horgan.com
DONALD M. HORGAN (SBN 121547)
don@riordan-horgan.com
LAYLI SHIRANI (SBN 257022)
lshirani@gmail.com
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile: (415) 552-2703

MARTHA BOERSCH (SBN 126569)
BOERSCH SHAPIRO LLP
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 217-3700
Mboersch@boerschshapiro.com

TED SAMPSELL-JONES (MN SBN 034302X)
William Mitchell College of Law
875 Summit Avenue
St. Paul, MN 55105
Telephone: (651) 290-6348
ted.sampselljones@wmitchell.edu

Attorneys for Defendant
HAMID HAYAT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HAMID HAYAT,<br><br>Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. CR S-05-0240 GEB CMK<br>CV 14- 1073 GEB CMK<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  December 17, 2014<br>Time: 10:00 a.m.<br>Dept.  Before the Hon. Craig M. Kellison |

**PLEASE TAKE NOTICE** that on December 17, 2014, at 10:00 a.m. or as soon

thereafter as the matter may be heard, Defendant Hamid Hayat, through counsel, will and hereby

does move for summary judgment in connection with his pending motion for relief under 28

US.C. section 2255 from his federal criminal convictions in this matter.

1    This motion is founded on the present notice of motion and motion; the accompanying

2    memorandum of points and authorities and exhibits thereto; the motion for relief under 28 U.S.C.

3    section 2255 and exhibits thereto; the entire case file in this matter; and upon such other evidence

4    and argument as may be presented at the time of the hearing.

5    Dated: November 13, 2014                    Respectfully submitted,

6                                                DENNIS P. RIORDAN
                                                 DONALD M. HORGAN
7                                                LAYLI SHIRANI
                                                 MARTHA BOERSCH
8                                                TED SAMPSELL-JONES

9
                                                 By  /s/ Dennis P. Riordan
10                                                       Dennis P. Riordan

11                                               Attorneys for Defendant
                                                 HAMID HAYAT

**PROOF OF SERVICE BY MAIL -- 1013(a), 2015.5 C.C.P.**

I am a citizen of the United States; my business address is 523 Octavia Street, San Francisco, California 94102. I am employed in the City and County of San Francisco, where this mailing occurs; I am over the age of eighteen years and not a party to the within cause. I served the within:

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT; EXHIBITS**

on the following person(s) on the date set forth below, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Post Office mail box at San Francisco, California, addressed as follows:

**S. Robert Tice-Raskin
Assistant U.S. Attorney**
501 I Street, Suite 10-100
Sacramento, CA 95814

[ ] **BY MAIL:** By depositing said envelope, with postage thereon fully prepaid, in the United States mail in San Francisco, California, addressed to said party(ies); I certify or declare under penalty of perjury that the foregoing is true and correct.

[ ] **BY PERSONAL SERVICE**       [ ] **BY FAX** [ ] **BY FEDEX**

[X] **BY E-MAIL:** Robert.Tice-Raskin@usdoj.gov

Executed on November 13, 2014 at San Francisco, California.


 /s/ Jocilene Yue
        Jocilene Yue

DENNIS P. RIORDAN (SBN 69320)
dennis@riordan-horgan.com
DONALD M. HORGAN (SBN 121547)
don@riordan-horgan.com
LAYLI SHIRANI (SBN 257022)
lshirani@gmail.com
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile: (415) 552-2703

MARTHA BOERSCH (SBN 126569)
BOERSCH SHAPIRO LLP
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 217-3700
Mboersch@boerschshapiro.com

TED SAMPSELL-JONES (MN SBN 034302X)
William Mitchell College of Law
875 Summit Avenue
St. Paul, MN 55105
Telephone: (651) 290-6348
ted.sampselljones@wmitchell.edu

Attorneys for Defendant
HAMID HAYAT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HAMID HAYAT,<br><br>Defendant. | No. CR S-05-0240 GEB CMK<br>CV 14- 1073 GEB CMK<br><br><br>Date: December 17, 2014<br>Time: 10:00 a.m.<br>Dept. Before the Hon. Craig M. Kellison |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL STANDARD GOVERNING SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . 4

THE FACTS ESTABLISHED BY MS. MOJADDIDI'S DEPOSITION . . . . . . . . . . . . . . . . . 5

    A.    Ms. Mojaddidi's Conflict of Interest and Lack of Qualifications. . . . . . . . . . . . . 5

    B.    The Collapse of the Speedy Trial Strategy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    The Lack of Investigation of Alibi Witnesses in Pakistan. . . . . . . . . . . . . . . . . 8

    D.    The Lack of Investigation of the Alleged Camp Site in Balakot. . . . . . . . . . . . . 10

    E.    The Failure to Move to Suppress Hamid's Statements. . . . . . . . . . . . . . . . . . . . 11

    F.    The Failure to Procure a False Confession Expert . . . . . . . . . . . . . . . . . . . . . . . 13

    G.    CIPA and The Failure to Obtain a Security Clearance. . . . . . . . . . . . . . . . . . . . 14

    H.    The Failure to Challenge Testimony Regarding the Balakot Camp . . . . . . . . . . 16

    I.    The Failure to Adequately Cross-Examine Nassem Khan. . . . . . . . . . . . . . . . . . 16

    J.    Failure to Challenge Expert Testimony Regarding The Supplication . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.    PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE AND UNCONFLICTED COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.    Ms. Mojaddidi's Conflict and Deficient Performance. . . . . . . . . . . . . . . . . . . . 18

    B.    The Failure to Investigate the Alibi Defense in Pakistan. . . . . . . . . . . . . . . . . . 21

    C.    Ms. Mojaddidi's Failure to Investigate and Present Defense Expert Testimony Concerning the Alleged Camp Site in Balakot, Her Failure to Challenge the Government's Inadmissible Expert Testimony on the Issue, and Her Failure to Object to the Government's Amendment of Its Camp Theory in Closing Argument . . . . . . . . . . . . . . . . . . . 23

        1.    The Failure to Investigate the Closing of the Militant Camps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.    The Failure To Challenge Benn's Inadmissible Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        3.    The Failure to Challenge the Government's Improper Amendment of its Theory of the Camp's Location . . . . . . . . . . . . . . 24

-i-

**Table of Contents continued**

    D.    The Failure to Move to Sever and to Suppress Hamid's Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    E.    The Failure to Procure a False Confession Expert . . . . . . . . . . . . . . . . . . . . . . . 26

    F.    Counsel's Failure to Obtain a Security Clearance. . . . . . . . . . . . . . . . . . . . . . . 27

    G.    The Failure to Adequately Cross-Examine Nassem Khan. . . . . . . . . . . . . . . . . 28

    H.    Ms. Mojaddidi's Multiple Failures to Challenge Mohammed's Testimony Regarding The Supplication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**CASES**

*Angel v. Seattle-First National Bank,*
653 F.2d 1293 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Avila v. Galaza,*
297 F.2d 911 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Brown v. Myers,*
137 F. 3d (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Bryant v. Scott,*
28 F.3d 1411 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Caro v. Woodford,*
280 F.3d 1247 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Celotex Corporation v. Catrett,*
477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 31

*Correll v. Ryan,*
538 F.3d 938 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cuyler v. Sullivan,*
446 U.S. 335 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*Duncan v. Ornoski,*
528 F.3d 1222 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hinton v. Alabama,*
134 S.Ct. 1081 (Feb. 24, 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Jones v. Wood,*
114 F.3d 1002 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Karis v. Calderon,*
283 F.3d 1117 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kimmelman v. Morrison,*
477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Kyles v. Whitley,*
514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lowry v. Lewis,*
21 F.3d 344 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lunbery v. Hornbeak,*
605 F.3d 754 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

**Table of Authorities continued**

*Matsushita Elec. Indus. Co. v. Zenith Radio,*
475 U.S. 574 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Mickens v. Taylor,*
535 U.S. 162 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Reynoso v. Giurbino,*
462 F.3d 1099 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Smith v. Mack Trucks,*
505 F.2d 1248 (9th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Strickland v. Washington,*
466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Tarin v. County of Los Angeles,*
123 F.3d 1259 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 31

*Taylor v. List,*
880 F.2d 1040 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Thomas v. Chappell,*
 678 F.3d 1086 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Tice v. Johnson,*
647 F.3d 87 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Awkard,*
597 F.2d 667 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

*United States v. Hayat,*
710 F.3d 875 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29, 30

*United States v. Wells,*
394 F.3d 725 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

**STATUTES**

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2339A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2255.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 31

# INTRODUCTION

> As a judge on the District of Columbia Superior Court – and, later, as United States Attorney for the District of Columbia – I frequently witnessed the devastating consequences of inadequate representation. I saw that wrongful convictions and unjust sentences carry a moral cost that's impossible to measure – and undermine the strength, integrity, and public trust in our legal system....[I]t's time to declare, once again, that this is unacceptable – and unworthy of a legal system that stands as an example for all the world.

> Attorney General Eric Holder, speaking on March 15, 2013 at the Justice Department's 50th Anniversary Celebration of the U.S. Supreme Court Decision in *Gideon v. Wainwright*

On April 30, 2014, petitioner Hamid Hayat moved this Court under 28 U.S.C. § 2255 to vacate his convictions on one count of violating 18 U.S.C. § 2339A (lending material support to international terrorism) and three counts of violating 18 U.S.C. § 1001 (false statements). That petition and supporting memorandum demonstrated the extraordinary significance of the claims raised therein.

In June of 2005, the government, in a press release that attracted attention across the nation, announced that it had unearthed the existence of an Al Qaeda-inspired terrorism plot in Lodi, California. Hamid Hayat was accused of attending a jihadi training camp between October of 2003 and November of 2004 in Balakot, Pakistan, within a relatively short distance of Islamabad, the capital. Hamid was alleged to have later returned to Lodi under orders to engage in violence against, and the destruction of, civilian sites in California.

These allegations, if true, raised a fundamental challenge to this country's international relations with Pakistan, to which the U.S. then was providing billions of dollars of foreign aid on the assumption that Pakistan was a key ally in the fight to exterminate Al Qaeda. Plainly, that relationship had to be reexamined if the Pakistani government was permitting anti-American terrorist training to be conducted close to the capital and in an area where the Pakistani military installations were located.

But ever since Hamid's arrest in June of 2005, there have been grave doubts raised as to whether the allegations underlying his indictment had any basis in fact. Other than a "confession" obtained under conditions that reeked of coercion and unreliability, the government,

despite its immense investigative resources, has been unable to obtain any evidence of Hamid's attendance at a jihadi training camp. The lead case agent admitted as much at trial. The weakness of the government's case at trial raised the profoundly disturbing question whether an innocent man was being prosecuted to avoid political fallout from the government's sensational but false claim that Al Qaeda had penetrated the Muslim community in Lodi.

But that question of Hamid's guilt or innocence was not meaningfully answered at Hamid's 2006 trial because he was forced to defend himself against the awesome power of this country's security apparatus and prosecutorial resources without the assistance of effective and unconflicted counsel. In his § 2255 motion, Hamid raised the conflict of interest under which his trial counsel, Wazhma Mojaddidi, operated as his first claim for relief, and her constitutionally inadequate representation as his second claim. Now Hamid moves for summary judgment on those Sixth Amendment claims. In the wake of the deposition of Ms. Mojaddidi, facts sufficient to fully establish the merits of both claims are beyond dispute.

At her deposition, Ms. Mojaddidi did not enthusiastically fall on her proverbial sword in an effort to benefit her former client. To the contrary, she readily responded with eager affirmatives to many of the government's leading questions in an effort to defend the quality of her advocacy. But ultimately the facts proved to be the facts. Although Ms. Mojaddidi certainly was qualified to perform the invaluable service of a translator of Urdu on a defense team for Hamid, she had no experience or knowledge that would have qualified her to serve as lead counsel in a federal misdemeanor case, much less in a highly complex terrorism case in which her client faced a possible sentence of life in prison. When she first entered her appearance as Hamid's counsel, Ms. Mojaddidi had recently been admitted to practice after failing the California bar twice. She had never stepped foot in a criminal court of any kind. She knew nothing about federal criminal procedure, or how to defend a case with a false confession, or how to investigate or obtain admissible evidence in a foreign country. She believed that her only hope of defending Hamid adequately was to rely on the guidance of a far more experienced lawyer, but she had no idea that such reliance on her co-defendant's attorney, Johnny Griffin, would create an impermissible conflict of interest.

Not surprisingly, Ms. Mojaddidi's representation of Hamid in this national security prosecution proved to be a travesty of justice. She made no effort to investigate and present at trial the evidence in Pakistan that would have conclusively proved her client's innocence, and she failed to seek and obtain exculpatory evidence in the government's possession. Her ignorance of the law and necessary reliance on the advice of Mr. Griffin, whose client's interests were quite different from Hamid's, resulted in the government improperly gaining admission of unreliable but highly prejudicial evidence while successfully blocking the introduction of testimony critical to the defense. Even before the trial began, Ms. Mojaddidi lost all credibility with the district court by taking a legal position so benighted that Judge Burrell labeled it "incredible." At trial, the government consciously took advantage of her inexperience to run roughshod over her amateurish efforts to mount a defense.

Defendant Hayat does not maintain that all of the factual allegations contained in his motion are undisputed. For example, he has alleged, and his counsel continue to firmly assert, that prior to and during his trial, the government was in possession of exculpatory evidence tending to prove both that no jihadi camp was functioning at Balakot between October of 2003 and November of 2004, and that Hamid himself never attended any jihadi camp in Pakistan during that period of time. But the facts underlying the *Brady* claims have not yet been litigated, and for that reason Hamid does not seek summary judgment on that basis. Nor is every factual allegation concerning Hamid's Sixth Amendment claims presently undisputed. But facts far in excess of those needed to grant relief on his deprivation of counsel claims now have been proven beyond peradventure.

Hamid incorporates herein the case law and legal argument from the memorandum submitted in support of his § 2255 motion (hereafter "2255 Memo"), as well as the exhibits which accompanied that motion. He now supplements that factual record with the transcript of Ms. Mojaddidi's August 11th deposition, the relevant portions of which are summarized below. Each of the facts on which Hamid relies in seeking summary judgment is supported by the trial record, by the averments in sworn declarations submitted in support of Hamid's motion to vacate, by Ms. Mojaddidi's sworn deposition testimony, or by a combination of these evidentiary

3

sources.  Hamid will not rely on any factual assertion as to which the evidence from these sources is in conflict.

No proceedings beyond this motion are needed to establish that Hamid's trial representation was, in the words of this country's chief law enforcement officer, "unworthy of a legal system that stands as an example for all the world."  A new trial is required under the Constitution.

**LEGAL STANDARD GOVERNING SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56 (c), a moving party is entitled to summary judgment when the evidence, viewed in the light most favorable to the opposing party, demonstrates that there is no genuine issue as to any material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997) .  A moving party's burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

A party opposing summary judgment must identify specific facts in dispute, and provide supporting evidence.  *Id.* at 324 (nonmovant must oppose summary judgment using evidence in the form of "affidavits, depositions, answers to interrogatories, and admissions on file"); *Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) (same); *Angel v. Seattle-First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir. 1981) (summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data); *Smith v. Mack Trucks*, 505 F.2d 1248, 1249 (9th Cir. 1974) (per curiam) (arguments and statements of counsel "are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment").  The failure of an opposing party to present any factual or evidentiary materials to dispute the material facts set forth by the moving party justifies a grant of summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986); *see also Caro v. Woodford*, 280 F.3d 1247, 1253–54 (9th Cir. 2002) (granting habeas relief to state prisoner under § 2254 because the "State failed to present any affirmative evidence, which either controverted the experts' conclusions or discredited their testimony.").

**THE FACTS ESTABLISHED BY MS. MOJADDIDI'S DEPOSITION**

2     A.     **Ms. Mojaddidi's Conflict of Interest and Lack of Qualifications**

3          In his sworn declaration, defense expert witness Daniel Broderick, former head of the

4     Federal Public Defender's office in this district, states that: "Ms. Mojaddidi was unqualified to

5     represent anyone in a federal criminal case (misdemeanor or felony) at the time she agreed to

6     represent Mr. Hamid Hayat. In my opinion, she was also grossly unqualified to represent Mr.

7     Hamid Hayat in pre-trial and trial proceedings..." (Ex. GGG at para. 6).  The following

8     undisputed facts fully support that assessment.

9          Ms. Mojaddidi graduated from law school in the spring of 2002, where she took only

10    those courses in criminal law that were required, and did no clinical work. (Exhibit FFF, the

11    August 8, 2014 deposition of Wazhma Mojaddidi, at 9:3-10:1-3, 17-20).  After failing the

12    California bar exam twice, she was finally admitted to practice in December of 2003.  (*Id.* at

13    10:21-11:1-2).  Prior to June of 2005, she had never represented a client in a criminal case in

14    state or federal court, nor in a civil jury trial.  (*Id.* at 12:20-14:1-21; *id.* at 22:14-18).

15         The decision that Ms. Mojaddidi would represent Hamid Hayat rather than his father and

16    co-defendant, Umer Hayat, was based on her assumption that Umer would face the heavier

17    charges.  (*Id.* at 18:14-21).  If she had known at the outset of her representation of Hamid in June

18    of 2005 that he would face more serious charges than Umer, she should not have decided to

19    represent Hamid.  (*Id.* at 29:12-25; *id.* at 30:9-22).  She needed the assistance of another attorney

20    to assist her in representing Hamid.  (*Id.* at 53:6-8).  Therefore, had Hamid been charged alone,

21    Ms. Mojaddidi would not have felt qualified to represent him.  (*Id.* at 22:19-23:1-9).  Likewise,

22    had Hamid's case been severed from that of Umer, she would not have proceeded to trial as

23    Hamid's lawyer.  (*Id.* at 52:8-24).  Ms. Mojaddidi understood that there would be a "joint

24    defense" in which she could rely on Johnny Griffin, the "very experienced" counsel for co-

25    defendant Umer Hayat, for guidance.  (*Id.* at 22:19-25).  She did not believe a potential conflict

26    of interest would be created by Mr. Griffin participating in the defense of Hamid.  (*Id.* at 24:25-

27    25:1-12, 25; *id.* at 26:1-25).

28         Every time Mr. Griffin made a decision involving a legal issue she knew nothing about,

Ms. Mojaddidi did her own independent research and tried to see if it was something that she thought made sense.  (*Id.* at 24:11-19).  She did not "blindly agree [with Mr. Griffin.] I did look into a lot of things myself, out of curiosity, and I wanted to learn."  (*Id.* at 24:16-19).  Ms. Mojaddidi had to learn "on the job" in order to do the case competently.  (*Id.* at 24:20-24).

In September of 2005, when Hamid was indicted on terrorism charges, Ms. Mojaddidi decided to continue to represent him, despite her earlier awareness that she was not qualified to defend against such charges.  (*Id.* at 64:12-18; *id.* at 65:6-21).  The fact that a more experienced counsel would participate in Hamid's defense was critical to her decision to stay on as Hamid's counsel.  (*Id.* at 66:6-23).  She was relying on Mr. Griffin's experience to make decisions regarding whether to file pretrial motions and, if so, what motions to file.  (*Id.* at 69:6-18).  It was agreed Mr. Griffin would give her advice during the trial.  (*Id.* at 249:5-10).

Under the written retainer agreement between Umer Hayat and Mr. Griffin, which addressed Ms. Mojaddidi's representation as well, monies expended on defending both defendants' cases would reduce the funds available to pay Mr. Griffin's attorney fees.  (*Id.* at 81-83:1-16).  The more money spent on Hamid's defense, the less money Mr. Griffin would receive for his representation of Umer.  (*Id.* at 83:8-16).  That was true of expenditures for experts.  (*Id.* at 83:20-84:1-14).  Ms. Mojaddidi received $6,000 to $10,000 at the time she entered the case, and did not receive any further funds until the trial was over.  (*Id.* at 80:3-6; *id.* at 86-88:1-20).  Mr. Griffin did receive funds during the course of the trial, and he possessed and controlled the disbursement of those funds.  (*Id.* at 29:8-18; *id.* at 86-88:1-20; *id.* at 139:20-141:1).

As trial neared, when Ms. Mojaddidi realized that she would be "on my own" for portions of the trial, her need for help felt greater.  (*Id.* at 94-95:1-16).  The idea of having to do it all – jury selection, opening statement, the examination of witnesses – became "overwhelming."  (*Id.* at 97:1-17).  She "really wanted" the help of Mark Reichel.  (*Id.* at 94:13-22).  Discussions with Reichel about his entering the case occurred about a week before the trial began.  (*Id.* at 98:17-21).  Money to pay Reichel would have had to come from Mr. Griffin.  (*Id.* at 98:22-99:1-23).  Mr. Griffin both boosted her confidence that she could do it on her own (*id.* at 100:5-9), and told her that if Reichel entered the case, he either (1) would no longer mentor Ms. Mojaddidi (*id.* at

100:10-16) or (2) that Ms. Mojaddidi would no longer need his advice. (*Id.* at 242:5-243:1-22). Ms. Mojaddidi did not think there were any ethical issues in having counsel for Hamid's co-defendant assist her rather than independent counsel, such as Reichel. (*Id.* at 100:17-24). At the time she believed that with Mr. Griffin's help, she could handle Hamid's defense on her own, but in hindsight "more than one attorney would have been a good idea." (*Id.* at 279:19-24).

After the case against Umer was mistried, Ms. Mojaddidi planned to help Mr. Griffin with Umer's trial, although the case was eventually settled by a plea to a charge not involving terrorism. (*Id.* at 114:2-16).

## B. The Collapse of the Speedy Trial Strategy

The primary rationale offered by Ms. Mojaddidi for the grevious omissions in her representation of Hamid was the decision to pursue a speedy trial at the cost of all other tactical options, a strategy that collapsed within two months of Hamid's initial indictment.

Hamid's case was Ms. Mojaddidi's first experience with the Speedy Trial Act. (*Id.* at 54:5-7). She and Mr. Griffin thought that with the limited evidence the government had produced, that the government would not prevail if pushed for a speedy trial. (*Id.* at 53:15-24). Counsel for both defendants filed a written request for discovery after the initial indictment in June of 2005, requesting information from the DOD, CIA, NSA and other national security agencies. (*Id.* at 55:2-19). They did so because they believed the agencies possessed exculpatory information. (*Id.* at 55:12-19). Ms. Mojaddidi was not aware that the written discovery demand might affect the speedy trial issue. (*Id.* at 56:24-57:15; *id.* at 59:22-60:1-7). The court granted continuances to the government to comply with the discovery request, and the initial trial date in August of 2005 was vacated, giving the government extra time to comply. (*Id.* at 61:11-23).

The speedy trial strategy was the likely reason for not filing pretrial motions. (*Id.* at 53:25-54:1-4). "We" –she and Mr. Griffin --discussed various motions and decided that the best strategy was not to file anything. (*Id.* at 54:14-24).

Ms. Mojaddidi did not know that to preserve a speedy trial claim for appeal, counsel had to file a motion to dismiss on that ground. (*Id.* at 62:23-63:1). None was filed. (*Id.* at 63:2-7).

## C.     The Lack of Investigation of Alibi Witnesses in Pakistan

Despite her firm belief that Hamid never attended a miltant training camp in Pakistan, Ms. Mojaddidi never attempted to investigate her client's alibi defense in Pakistan.

Prior to June 16, 2005 - the date of the indictment - Ms. Mojaddidi had spoken with Hamid and his family members, and she believed there were witnesses in Pakistan who could testify that Hamid had not attended a training camp. (*Id.* at 34:9-12).  Hamid had told Ms. Mojaddidi about his activities in Pakistan. She remembered hearing about his visits to Rawalpindi for his mother's medical care, and knew he was in Behboodi much of the time, hanging out with a shop owner and playing cricket and video games.  (*Id.* at 36:9-23; *id.* at 148:1-11; *id.* at 267:9-25).  Ms. Mojaddidi believed there were witnesses who could confirm that - people who played cricket with him, people who saw him hanging out at the local store, as well as people in Rawalpindi, who saw him when he brought his mother there.  (*Id.* at 268:1-17).

Regarding her efforts to speak with and preserve the testimony of alibi witnesses in Pakistan in the speedy trial time frame, she did speak with Hamid's uncle (Attique ur Rahmaan) in Pakistan, and with a couple of his cousins who had been in Pakistan when Hamid was there. (*Id.* at 35:6-17). She "may" have even spoke with Hamid's grandfather, Saeed ur Rahmaan. (*Id.* at 148:18-150:1).

Ms. Mojaddidi asked Hamid to identify individuals who would testify as to his activities in Pakistan. He named his uncle, his grandfather, his mother, and his cousin Usama. She did not remember whether Jaber Ismail - Usama's brother - was also named by Hamid.  (*Id.* at 150:2-14).  Ms. Mojaddidi interviewed and assessed as potential witnesses, Salma Hayat, Arslan Hayat, and Attique ur Rahman. (*Id.* at 153:2-12).  She spoke with Saeed ur Rahmaan, but not as a potential witness.  (*Id.* at 153:13-17).  Ms. Mojaddidi said that Hamid did not give her any other names of people she should contact as alibi witnesses.  (*Id.* at 154:6-12)  She did not recall taking notes during meetings with Hamid, and had no notes of meeting with witnesses because "I don't really remember doing much of that." (*Id.* at 145:17-23). When speaking with the family members she contacted, she asked them if they could identify other alibi witnesses, and does not recall them giving her any names. Had they done so she would have followed up with them. (*Id.* at 160:23-

161:1-14). Ms. Mojaddidi remembered that Jaber was in Pakistan during the trial because his name had appeared on a no-fly list. Ms. Mojaddidi admitted that she did not know that she could have obtained his testimony by deposition. (*Id.* at 275:2-10).

Ms. Mojaddidi did not send an investigator to Pakistan to interview potential witnesses, because "the only potential witnesses that we thought in Pakistan could be helpful" were the uncle and the grandfather, and the grandfather was ruled out because of the allegations concerning his madrassa and "both of them were elders with beards and they had the whole look and they were living in Pakistan. We didn't think they would be good alibi witnesses in that sense." (*Id.* at 35:18-36:1-8). Ms. Mojaddidi affirmed that she reached the general conclusion that any witness who was in Pakistan - even though they could provide testimony regarding Hamid's activities and whereabouts - would not be a good witness. (*Id.* at 38:7-14). Indeed, she did not consider tasking her investigator, James Wedick, with calling any potential witnesses in Pakistan because "I didn't think there were any others" and the two that she spoke with (Hamid's uncle and grandfather) did not speak English. (*Id.* at 176:17-177:1-11).

Ms. Mojaddidi explained her decision not to pursue an alibi defense by saying that the government could have said "just because he did those things doesn't mean that he could not have attended a camp at some point," and "just because he played cricket doesn't mean that at some point during those two years he couldn't have gone to camp." (*Id.* at 270:2-271:1-10). Furthermore, "our understanding was that anybody in Pakistan - it just wasn't going to work to have them be alibi witnesses in this case. ... I just know that the uncle and the grandfather - and particularly the uncle, for me, because he was an attorney. I thought he potentially could be a good witness. But we discussed why we didn't think it would be good. We, meaning Mr. Griffin and I." (*Id.* at 36:4-14). She admitted she made these decisions without sending an investigator there to interview the potential witnesses. (*Id.* at 38:7-14).

From the eighteen witness affidavits obtained in Pakistan and submitted by Hamid in support of his 2255 Memo, Ms. Mojaddidi only recognized one name - that of Hamid's uncle, Attique ur Rahmaan. (*Id.* at 155:20-160:1-22).

In deciding not to send an investigator to Pakistan, Ms. Mojaddidi did not consider the

possible uses of any affidavits or depositions in pretrial negotiations with the government. (*Id.* at 40:3-25).  Ms. Mojaddidi did not know what Rule 15 depositions were and does not recall Johnny Griffin telling her about them. (*Id.* at 39:5-23).  She thought that "maybe" she and Johnny discussed the possibility of bringing the uncle to the U.S., possibly obtaining visas for the witnesses but concluded it would be difficult. (*Id*. at 38:15-39:1-4; *id.* at 184:11-19).  Her decision not to pursue witnesses in Pakistan had nothing to do with the fact that she believed them to be beyond subpoena power.  She "probably didn't know the detailed rules about it" but it never even got there because she ruled the two Pakistan witnesses out for other reasons.  (*Id.* at 184:1-9).  Ms. Mojaddidi was uncertain whether or not her beliefs about her ability to obtain testimony from foreign witnesses had any bearing on her decision not to call Hamid's uncle and grandfather to testify: "the reason we decided not to use them was because they were already involved in the case." (*Id.* at 184:11-185:1-5).

Ms. Mojaddidi does not know or remember if or when she considered sending an investigator to Pakistan after the Superseding Indictment was filed.  (*Id.* at 66:24-67:1-5).

In a hypothetical situation involving a client who is accused of a crime and claims he was at a dance ten miles away but does not know the names of anyone there, Ms. Mojaddidi affirmed that she would "absolutely" hire an investigator to find alibi witnesses.  (*Id.* at 273:13-273:1-5).

**D.    The Lack of Investigation of the Alleged Camp Site in Balakot**

While Ms. Mojaddidi thought it was important to investigate the existence of training camps in Pakistan during the relevant period (*id.* at 43:14-18), she abandoned any efforts to do so prior to trial.

Ms. Mojaddidi contacted the embassy or a government official after reading an article in which the Prime Minister of Pakistan said the training camps had been closed (*Id.* at 43:19-44:1-2; *id.* at 193:9-22).   She considered it important to investigate what the Pakistan government said about the camps (*Id.* at 45:5-7).   She did not pursue that area of investigation further, possibly due to the discussion she had with Mr. Griffin (*Id.* at 44:20-45:1-13).  She does not recall his reasoning, but they "did not take it anywhere." (*Id.* at 45:10-13).  Ms. Mojaddidi did not think she was going to be able to get the kind of information she was hoping for (*Id.* at

196:21-197:1-2).  Prior to trial, Ms. Mojaddidi had never heard of Ghulam Hasnain (*id.* at 207:2-5), the expert on militant training camps who has submitted a declaration in support of Hamid's motion attesting to the fact that such camps were shut down by the Pakistani government prior to October of 2003. (Ex. NN).

### E.    The Failure to Move to Suppress Hamid's Statements

Although Ms. Mojaddidi believed that Hamid's "confession" was unreliable and the result of coercive questioning, she never made a motion to suppress it as involuntary and thus inadmissible at trial.

Ms. Mojaddidi firmly believed from the outset of the case that Hamid Hayat was innocent of the charges against him, that he had not associated with terrorists, and that he had never attended a terrorist training camp.  (*Id.* at 33:7-16.  *See also id.* at 147:5-20; *id*. at 150:18-22; *id.* at 263:18-19; *id.* at 306:12-15).

Ms. Mojaddidi learned very early on that the case involved taped statements by Hamid and his father to the FBI that the government regarded as confessions.  (*Id.* at 262:18-24).  In the government's view, Hamid in those statements had admitted he had attended a jihadist training camp in Pakistan and returned to the U.S. with the "intention to commit acts against persons or properties." (*Id.* at 262:25-263:7).  Ms. Mojaddidi believed that these taped statements, while false, constituted the most damaging evidence the government could present against Hamid.  (*Id.* at 68:12-18; *Id*. at 207:12-15.  *See also Id*. at 49:5-14 [In the 60-day post-indictment period, Ms. Mojaddidi believed the taped confession to be the most important item of evidence against Hamid]).

As Hamid's advocate, Ms. Mojaddidi's objective was to keep out any evidence that was unfavorable to him—chiefly Hamid's taped statements to the FBI.  (*Id*. at 68:19-22).  Ms. Mojaddidi, however, was unfamiliar with federal law concerning involuntary or coerced confessions. (*Id.* at 49:24-50:3).  She did no independent research on how juries view confession cases, she did not read any appellate opinions discussing how juries view confession cases, or look into any United States Supreme Court statements concerning this question.  (*Id*. at 264:5-15. *Cf. id*. at 226:1-12 [Ms. Mojaddidi stated she did a lot of reading about confessions, and while

she was "probably not" "completely well versed" on the applicable law, she "did [her] own reading and research."]).

After the return of the superseding indictment in September of 2005—i.e., when Hamid was first charged with providing material support to terrorists (*Id*. at 65)—the defense strategy of pushing the case out to trial under the Speedy Trial Act "was no longer an issue" because the government had been granted continuances by the court. (*Id*. at 67). Nonetheless, Ms. Mojaddidi did not consider making a suppression motion. (*Id*. at 67:20-25). She did not know why, but noted that the joint strategy "just kept continuing on" and "progressed." (*Id*. at 67:24-68:8). She did not "know at what point what decision was made for what purpose." (*Id*. at 6:20-68:11). She believed that she and Mr. Griffin had had discussions about the issue. (*Id*. at 49:18-19. *See also id.* at 225:23-25 ["I think we talked about it, but I don't remember why *we* ultimately decided not to do it."] In any event, Ms. Mojaddidi relied on Mr. Griffin to provide her with insight on which motions were worth making and which were not. (*Id*. at 69:15-18).

Ms. Mojaddidi learned prior to trial that Hamid had contracted meningitis while in Pakistan. (*Id*. at 46:3-19. *See also* Id. at 260:1-9 (Ms. Mojaddidi learned that Hamid had meningitis while in Pakistan [i.e., prior to his return to the United States], but did not know precisely when). Nevertheless, Ms. Mojaddidi did not believe that this aspect of Hamid's medical history should be investigated. (*Id*. at 46:23-25). She was not aware that an acute case of meningitis could cause cognitive difficulties (*id*. at 50:22-25) and did not consider Hamid's meningitis as a factor to be considered in challenging his confession (*Id.* at 51:1-4). She did not "remember ever making a decision that [Hamid's reported meningitis] was relevant." (*Id*. at 47:8-10).

Ultimately, Ms. Mojaddidi never filed such a motion to suppress. (*Id.* at 49:20-21). Ms. Mojaddidi stated that the decision not to move for suppression was the product of strategy, and that "every move we made was strategic." (*Id*. at 227:20-228:1). She was unable to articulate that strategy or recall why any such decision had been made. (*Id.* at 228:2-6). She did not think any such decision was linked to a strategy of pressing the case to trial as rapidly as possible because it "wouldn't make sense for them to be linked." (*Id***.** at 228:2-229:1). She could not

12

recall whether she ever reached a conclusion as to the chance that a suppression motion would succeed.  (*Id.* at 226:13-17).

### F.     The Failure to Procure a False Confession Expert

While certain that Hamid's confession was false and while cognizant of the need for expert testimony supporting that conclusion, Ms. Mojaddidi failed to admit such testimony.

After speaking with Hamid and watching his recorded statements to the FBI in their entirety, Ms. Mojaddidi thought the government's case against Hamid was weak.  (*Id.* at 263:18-25).  She based this conclusion on the content of what Hamid had said to her; Hamid's initial, unrecorded statements to the FBI, in which he consistently told the truth about where he had been while in Pakistan; and on the "ridiculous inconsistencies" in the later recorded statements to the FBI made by both Hamid and his father.  (*Id.* at 263:18-25).  Indeed, while Ms. Mojaddidi believed Hamid's purported recorded confession to be the most important component of the government's case (*id.* at 68:12-18;), she also believed it to be the weakest.  (*Id.* at 162:17-19).

As Hamid's advocate, Ms. Mojaddidi sought not only to prevent the admission of evidence that was harmful to him but also to ensure the admission of evidence that was favorable to him.  (*Id.* at 68:19-25.  *See also id.* at 69:1-5).  Ms. Mojaddidi knew that, apart from seeking suppression of Hamid's statements to the FBI, the defense could also challenge those statements, once admitted, by means of expert testimony addressing false confessions. (*Id.* at 69:22-70:11).  Presenting such testimony was an important part of the defense strategy.  (*Id.* at 69:12-14).

Ms. Mojaddidi was aware that there were other potential experts in the field of false confession who had previously been qualified to testify on the subject of false confessions.  (*Id.* at 70:17-20; *id.* at 286:13-18).  Indeed, certain such experts who had heard about the case contacted Ms. Mojaddidi and provided her with relevant background information.  (*Id.* at 71:2-5).  Nevertheless, Ms. Mojaddidi never contacted any of the experts who had contacted her to ask whether they would be available to testify.  (*Id.* at 71:8-11).  While she reviewed the information the other experts had sent her, she did not seriously consider retaining any of them.  (*Id.* at 208:10-17).

Mr. Griffin and Ms. Mojaddidi instead decided to rely on former FBI agent James

Wedick to provide expert testimony to the effect that the taped statements constituted a false confession.  (*Id*. at 70:9-16).  Mr. Wedick had been brought into the case early on and had reviewed the statements, discussed them with Mr. Griffin and Ms. Mojaddidi, and indicated that he could testify about them.  (*Id*. at 207:23-208:2).  The decision to rely on Wedick as an expert was "just kind of ... obvious from the beginning."  (*Id.* at 208:3-4.  *See also id*. at 284:4-9).

Both Mr. Griffin and Ms. Mojaddidi thought that Wedick would be best for purposes of offering the expert testimony.  (*Id*. at 287:4-5.  *See also id.* at 208:16-17 ("... There was an understanding that it was going to be Jim (Wedick), always.")).  Ms. Mojaddi ultimately made the decision to rely on Wedick for purposes of offering expert false confession testimony on Hamid's behalf.  (*Id*. at 208:18-209:1).

As Ms. Mojaddidi knew, Wedick had never been qualified as an expert in the field of false confessions.  (*Id*. at 70:21-23; *id.* at 286:4-6).  Nevertheless, Ms. Mojaddidi believed that Wedick "was going to get in and was going to be qualified."  (*Id*. at 71:5-7).  In all likelihood, Ms. Mojaddidi would have been the one to question Wedick before Hamid's jury.  (*Id*. at 284:24-285:1).  She had never before qualified an expert in a district court proceeding.  (*Id.* at 71:21-24).

The district court ultimately refused to permit Wedick to provide expert testimony in connection with Hamid's statements to the FBI.  Ms. Mojaddidi conceded that her belief Wedick would be permitted to testify as an expert proved to be wrong, but asserted that she and Mr. Griffith could not have predicted Judge Burrell's exclusionary ruling, which she felt was "unfair and unreasonable."  (*Id.* at 287:8-13).

### G.    CIPA and The Failure to Obtain a Security Clearance

In a case which plainly involved extensive classified information, Ms. Mojaddidi thought it unnecessary to obtain a security classification and refused to do so, a position District Court Judge Burrell labeled "incredible." (RT of 1/27/06, at 8).

In June of 2005, when she and Johnny Griffin filed their request for discovery from the national security agencies, Ms. Mojaddidi was not aware of the Classified Information Procedures Act (CIPA), but did gain awareness of it at some point in the case. (*Id.* at 55:20-24). She admits she may not have understood it, but remembers printing it out and putting it in her

"special binder." (*Id.* at 210:13-20).

As to why she did not seek a security clearance, Ms. Mojaddidi said she could not remember her rationale, but at the time the strategy seemed sound and rational. She believed she thought that if the government possessed any exculpatory evidence, they would have to disclose it, so the defense was not "really missing out" by refusing to get security clearances. (*Id.* at 217:22-218:1-6). At the time she was only aware of one item of classified information the government intended to present, and she believed that there was no classified evidence that she intended to present. (*Id.* at 218:7-20).

As a strategic matter, Ms. Mojaddidi did not want to spend time while she and Johnny sought clearances (*Id.* at 219:6-17). Ms. Mojaddidi had no memory of going through any thought process as to Judge Burrell's suggestion that the defense obtain outside counsel with a security clearance. (*Id.* at 222:5-20).

Ms. Mojaddidi believed that by refusing to get a security clearance, she merely waived the right to attend closed hearings concerning classified information. (*Id.* at 288:12-16). She did not believe that she had foregone any line of questioning that potentially implicated classified information. (*Id.* at 221:7-14). Ms. Mojaddidi did not know when she first realized that the government could object to her evidence or questions on the ground that they might involve classified information (*Id.* at 295:9-13). She did not remember joining with Johnny in an agreement to withdraw any question objected to on CIPA grounds (*Id.* at 288:17-19). When shown a copy of the trial transcript, she acknowledged that she agreed that she would withdraw or find a way to re-word important questions that drew a CIPA objection from the government (*Id.* at 289:21-290:1-14).

Ms. Mojaddidi had told Judge Burrell that while she had considered getting a security clearance, she saw no need to obtain one unless the government came to court and told her what classified information they intended to offer at trial. (*Id.* at 292:8-293:1). Ms. Mojaddidi did not know why she had told Judge Burrell that she had considered getting a security clearance because "we never intended to get clearances." (*Id.* at 293: 6-12; *id.* at 294:11-24; *see also id.* at 295:24-296:1-2 "Honestly, I said these things. I have no idea why I said these things. But if I said them, I

said them. I don't know what I was thinking when I said them.")

**H.    The Failure to Challenge Testimony Regarding the Balakot Camp**

Ms. Mojaddidi did not object to portions of Eric Benn's testimony concerning the Balakot area that were clearly inadmissible.

Ms. Mojaddidi remembered the testimony of Eric Benn, a Defense Department expert called to opine on the probability that an area near Balakot shown in aerial photographs contained a militant training camp. She thought the aerial photographs in themselves were "really weak evidence from the government's perspective." (*Id.* at 203:11-19). She remembered that Benn's probability estimate of the likelihood of the site being a militant camp went up when he relied on the content of Hamid's statements in his analysis. (*Id.* at 234:15-235:1-17; *id.* at 298:3-9).

She would have objected to any testimony she was aware was objectionable. (*Id.* at 111:9-112:1-9). It would have been better to limit Benn's testimony to his initial estimate of 50% rather than his higher estimate of 65% to 70%. (*Id.* at 299:6-21). She did not file a motion to exclude that testimony, however. (*Id.* at 298:10-13). She believed that she could cross-examine him on the higher estimate, but did not object to that testimony because she did not know what objection to make, or didn't try to think of one because she thought she could cross-examine him on it. (*Id.* at 298:21-299:1-4).

**I.    The Failure to Adequately Cross-Examine Nassem Khan**

As to an issue identified by the Ninth Circuit as a likely instance of ineffective representation, Ms. Mojaddidi had no tactical reason for not offering the district court a legal justification for a crucial area of cross-examination of Nassem Khan, a key government witness.

During her cross-examination of Khan, Ms. Mojaddidi referred to an October 7, 2003 telephone conversation between Hamid, who was in Pakistan at the time, and Khan, who was acting as a government informant and called Hamid from California to urge him to attend a militant training camp. Ms. Mojaddidi asked Khan if it wasn't true that Hamid had told him in the October 7th conversation, the last the two had while Hamid was in Pakistan, that Hamid had never intended on going to camp, and had been lying to Khan all along about his intention to do

so. (*Id.* at 250:3-25). The court sustained a hearsay objection to the question when Ms. Mojaddidi could not offer a legal basis for its admission.

Hamid had told Ms. Mojaddidi that he had made that statement to Khan. (*Id.* at 250:23-251:1-5). Ms. Mojaddidi viewed it as her job, as Hamid's advocate, to use every means and cite every relevant precedent to get helpful evidence into the trial. (*Id.* at 69:1-5).

**J.     Failure to Challenge Expert Testimony Regarding The Supplication**

Ms. Mojaddidi had no tactical reason for failing to challenge the inadmissible but highly prejudicial testimony of Khalil Mohammed concerning the Koranic supplication, or taweez, found in Hamid's wallet upon his arrest.

At the beginning of the case, Ms. Mojaddidi believed the case rested on Hamid's taped statements, but later on she learned about other evidence the government planned to present. One item was the supplication found in Hamid's wallet. Ms. Mojaddidi did not think of the supplication as "important." (*Id.* at 106:7-19). She made whatever objections she deemed appropriate to the testimony of Khalil Mohammed, who testified as an expert about the supplication. (*Id.* at 108:6-14). She was surprised to learn, later, how heavily the jury had relied on that testimony. (*Id.* at 162:17-23). She tried to find someone to help her deal with the meaning of the supplication but Muslim leaders or scholars were not willing to go up against the government in a case that purportedly involved a confession. (*Id.* at 199:12-201:1-7). She was unsuccessful until she found one individual in Texas, Shibli Zaman, who helped her just as a favor. (*Id.* at 199:20-23; *id.* at 201:12-18). He was a friend of Ms. Mojaddidi's sister who was an Arabic language expert and he helped her "break down the supplication." (*Id.* at 199:20-200:1-6). Zaman had no degrees. (*Id.* at 201:21-22). Ms. Mojaddidi spoke to him by phone and he gave her guidance on how to challenge Mohammed's view of the supplication. (*Id.* at 201:19-202:1-5).

Ms. Mojaddidi presented the declaration of Doctor Bernard Haykel in support of its motion for a new trial. Dr. Haykel said that the supplication described by Dr. Mohammed as a jihadi supplication was in fact one commonly used in the Muslim world. (*Id.* at 279:3-11). Ms. Mojaddidi did not call Dr. Haykel at trial because she did not know who Dr. Haykel was at that

time. (*Id.* at 279:12-15). Having an expert who was willing to testify would have helped her. (*Id.* at 280:6-7). Because she did not have an expert, she tried to do a solid job of cross-examining Mohammed. (*Id.* at 199:24-200:1-6).

Exhibit SS, an email from Bariza Umar to Dr. Mohammed, stated: "I would guess that most people don't know what is written in a taweez." (*Id.* at 281:24-25). The email was provided to Ms. Mojaddidi as part of the basis for Dr. Mohammed's testimony. (*Id.* at 282:6-10). She knew what was written in that email was true; most Muslims in Pakistan know it to be true; and she thought that Dr. Mohanmmed should have known it was true. (*Id.* at 282:21-283:1-6). She had intended to have her expert, Dr. Anita Weiss, testify to the facts contained in the email. (*Id.* at 283:1-2). That part of Dr. Weiss's testimony was excluded from evidence on the grounds that she had violated her discovery obligations. (*Id.* at 283:7-15). At the time, she did not believe that exclusion was due to her inexperience, but in hindsight there are many things she would have done differently. (*Id.* at 283:16-284:1-3).

## ARGUMENT

## I.  PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE AND UNCONFLICTED COUNSEL

### A.  Ms. Mojaddidi's Conflict and Deficient Performance

Defendant Hamid Hayat need not long expound on the factual cornerstone of his Sixth Amendment claims—namely, that Ms. Mojaddidi was utterly unqualified to serve as his counsel in this prosecution. As the declarations of expert witnesses Quin Denvir (Ex. P), Doron Weinberg (Ex. R), and Daniel Broderick (Ex. GGG) establish, the notion that Hamid could be competently represented by Ms. Mojaddidi is unthinkable. Indeed, no federal judge in this country would ever have deemed a recent law graduate with absolutely no criminal or jury trial experience qualified to serve as appointed counsel for a defendant in any felony case, much less this one. The Department of Justice cannot possibly claim that Ms. Mojaddidi had the knowledge and experience to competently represent Hamid, for to do so would make a mockery of Attorney General Holder's homage to the *Gideon* decision and to the importance of qualified defense counsel to this nation's criminal justice system.

Nor need the defendant tarry long on the question of whether Ms. Mojaddidi's

representation was subject to a conflict of interest. (*See, e.g.*, Ex. R, Weinberg Declaration, ¶¶ 23-26; Ex. GGG, Broderick Declaration, ¶¶ 30-35). In her deposition, she acknowledged the obvious fact that she could not possibly represent Hamid without the assistance of more experienced counsel. Completely ignorant of the conflict her decision would raise, Ms. Mojaddidi elected to rely for such critical assistance on the attorney for her client's codefendant, Johnny Griffin, declining the opportunity to bring aboard independent and unconflicted counsel in the person of Mark Reichel. She acknowledged that had a severance been granted in this case, she would have had to withdraw as Hamid's attorney, because she could not try the case without Mr. Griffin's participation in Hamid's defense. That admission established that Mr. Griffin, in fact if not in name, was effectively serving as co-counsel for Hamid as well as lead counsel for Umer.

That status was confirmed by Ms. Mojaddidi's constant mantra, repeated hundreds of times in her deposition, that "we" made the decisions as to the nature of Hamid's defense. And as the record makes clear, in that "we" relationship, Mr. Griffin took the lead in decision making and Ms. Mojadiddi followed behind. It could not have been otherwise when Ms. Mojaddidi had to "learn on the job" while representing Hamid. (Ex. FFF at 24). Mr. Griffin would make decisions and Ms. Mojaddidi would then do research on the issue involved because she "was curious" and "wanted to learn" (*Id.*) But the counsel upon whom Ms. Mojaddidi was relying for controlling guidance in deciding whether to file motions, to conduct investigation, and to retain experts with their attendant costs had a direct economic interest in minimizing the amount of time and money spent on Hamid's defense. In the end, Mr. Griffin received a fee multiple times greater than the fees and expenses expended defending Hamid.

There remains the question of whether the conflict of interest under which Ms. Mojaddidi operated was "actual," in the sense that it had an "adverse effect" on Hamid's representation. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) ( "An actual conflict of interest" is "a conflict that affected counsel's performance."). If so, no further showing of prejudice is required. *Id.*; *see also United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005). Additionally or alternatively, Hamid may obtain relief by demonstrating that Ms.

Mojaddidi's lack of knowledge and experience undermines confidence in the jury's verdict. *Kyles v. Whitley,* 514 U.S. 419, 434-35 (1995); *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

In addressing those two questions, Hamid will largely rely on the case law and argument contained in the extensive 2255 Memo filed in support of his motion to vacate his conviction, which he now incorporates by reference rather than duplicates below. One key principle contained in that memorandum bears repeating at the outset of this discussion.

Seven years ago, when Hamid filed his first section 2255 motion in this case which was denied without prejudice, he supported it with evidence that Ms. Mojaddidi admitted to Hamid's present counsel that she deferred to Mr. Griffin's decisions as to how she should represent Hamid both because of her own lack of knowledge and experience and because she could not risk the loss of Mr. Griffin's assistance by refusing his directions. (*See* Ex. A and B, the declarations of Dennis P. Riordan). In her recent deposition, however, while she acknowledged Mr. Griffin was a participant in almost every critical decision bearing on Hamid's defense, Ms. Mojaddidi claimed that all of those decisions nonetheless reflected her own independent strategic and tactical thinking.

While Hamid's counsel believe that Ms. Mojaddidi's earlier description of how decisions were made in this case is the more honest and accurate one, in seeking summary judgment they need not challenge her more recent version of her state of mind during trial. However sincere Ms. Mojaddidi may be in her subjective belief that she acted independently in determining Hamid's tactical and strategic interests, her inexperience and ignorance of the law left her incapable of making rational tactical and strategic decisions independent of Mr. Griffin's control. (See Ex. GGG, Broderick Declaration, ¶ 36: (Ms. Mojaddidi's inexperience and lack of knowledge rendered her incapable of exercising independent judgment on strategy and tactics during pretrial and trial proceedings). "[E]ven if counsel's decision could be considered one of strategy, that does not render it immune from attack—it must be a reasonable strategy." *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997). Decisions based on an ignorance of the law or inadequate investigation constitute deficient performance for *Strickland* purposes. *Hinton v.*

*Alabama*, 134 S.Ct. 1081, 1089 (Feb. 24, 2014); *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 691).

### B.     The Failure to Investigate the Alibi Defense in Pakistan[1]

Although representing an innocent client, Ms. Mojaddidi made no effort to obtain and present the alibi evidence that would have resulted in his acquittal.

It is undisputed that Ms. Mojaddidi believed that her client never attended a militant training camp in Pakistan; she believed that his description of his wholly innocent daily activities in Pakistan was accurate; and she believed that there were many witnesses in Pakistan who could truthfully testify to those activities. (Ex. FFF, at 267-271). Yet Ms. Mojaddidi never traveled to Pakistan to conduct an investigation, nor sent an investigator to locate and interview the witnesses that could have provided overwhelming evidence of her client's innocence. (*Id.*) Summary judgment can and should be granted on this "adverse effect" and deficiency in representation alone.

In prior statements, Ms. Mojaddidi admitted that she did not investigate the case in Pakistan because she was unaware that admissible evidence could be obtained by means of Rule 15 depositions. Mr. Griffin, whom she relied on for instructions as to how to defend Hamid, did not inform her of the Rule. In her own recent deposition, she again admitted that while defending Hamid she was ignorant of the availability of foreign depositions, and that Mr. Griffin failed to tutor her in that regard (*Id.* at 38-39). Ms. Mojaddidi nonetheless claimed that the decision not to investigate the alibi defense in Pakistan, taken jointly with Mr. Griffin (*id.* at 35-37), was based on her (admittedly uninformed) belief that the Pakistani witnesses could not provide a complete alibi for Hamid. (*Id.* at 270 (Ms. Mojaddidi did not think she could find alibi witnesses for all of the time period during which Hamid was accused of attending a militant training camp.))

Obviously, investigating the alibi defense in Pakistan was a *"plausible alternative defense*

---

[1] Hamid's section 2255 motion also raised Ms. Mojaddidi's failure to investigate and present evidence from alibi witnesses who had returned to the United States as a basis for his deprivation of the right to counsel claims. (2255 Memo, at pages 37-39). Because certain facts underlying that component of his claims remain in dispute, he does not now seek summary judgment on that ground.

strategy or tactic that might have been pursued but was not." *Wells*, 394 F.3d at 733. Ms. Mojaddidi knew that truthful alibi witnesses were located in Pakistan. As Hamid's expert declarations establish (see, e.g. Ex. R, Weinberg Declaration, ¶ 28; Ex. GGG, Broderick Declaration, ¶ 26; *see also* Ex. HHH (declaration of illustrious trial attorney and defense expert James Brosnahan, ¶ 4), any minimally competent counsel would have sent an investigator to Pakistan to investigate the alibi defense. The failure to investigate Hamid's alibi defense in these circumstances constitutes deficient performance as a matter of law. *See Brown v. Myers*, 137 F. 3d 1154 (9th Cir. 1998) (Defendant was prejudiced by his counsel's failure to contact or elicit trial testimony from alibi witnesses); *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994) (counsel's "complete failure to investigate alibi witnesses fell below the standard of a reasonably competent attorney practicing under prevailing professional norms"). Additionally, mounting an investigation in Pakistan would have cost time and money, and thus was "inherently in conflict" with Mr. Griffin's failed "speedy trial" tactic, as well as his financial interests (Ex. R, Weinberg Declaration ¶ 28). The absence of investigation of the alibi defense in Pakistan thus was an "adverse effect" of Hamid's conflicted representation, requiring that his conviction be set aside under *Cuyler*, *supra*.

Ms. Mojaddidi's failure to present a defense in the absence of adequate investigation cannot be excused as tactical or strategic in nature. *Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's failure to call a witness was inexcusable as a tactical decision because counsel did not have sufficient information with which to make an informed decision); *accord, Correll v. Ryan*, 538 F.3d 938, 951 (9th Cir. 2008) ("Counsel's ineffective assistance . . . cannot be excused as strategic. He failed to conduct an investigation sufficient to make an informed judgment."); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) ("[C]ounsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision) ); *Avila v. Galaza*, 297 F.2d 911, 920 (9th Cir. 2002) (counsel's belief that certain testimony might not be helpful at trial was an unreasonable basis upon which to decide not to investigate that the defendant's brother was the shooter, constituting deficient performance). The "general conclusion" of Ms. Mojaddidi, in consultation with Mr. Griffin, that

"no witness who had been in Pakistan would be a good alibi witness," was reached without interviewing any of these witnesses (*id.* at 38). That conclusion was not merely unreasonable; it was absurd.

"To determine whether counsel's errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Thomas*, 678 F.3d at 1102 (citing *Karis v. Calderon*, 283 F.3d 1117, 1133 (9th Cir. 2002)). Here, the overwhelming alibi evidence that Ms. Mojaddidi failed to gather and produce in Pakistan (2255 Memo, at 32-38) not only undermines confidence in the verdict; it clearly establishes Hamid's innocence.

Indeed, had that evidence been collected and presented to the government, this case might never have proceeded to trial. Yet Ms. Mojaddidi, lacking any experience in criminal cases, never considered the role that the alibi evidence could have played in pretrial negotiations with the government (Ex. FFF at 40), yet another manifestation of the constitutional inadequacy of her representation. Hamid's convictions must be vacated on this basis alone.

**C.**   **Ms. Mojaddidi's Failure to Investigate and Present Defense Expert Testimony Concerning the Alleged Camp Site in Balakot, Her Failure to Challenge the Government's Inadmissible Expert Testimony on the Issue, and Her Failure to Object to the Government's Amendment of Its Camp Theory in Closing Argument**

As the declaration of defense expert Ghulam Hasnain Aaser establishes (Ex. NN), there was no functioning militant training camp in the Balakot area betwen October of 2003 and November of 2004. Ms. Mojaddidi utterly failed to challenge the government's evidence on that point.

**1.**   **The Failure to Investigate the Closing of the Militant Camps**

Ms. Mojaddidi thought it was important to investigate the operation of training camps in Pakistan during the time frame at issue in this case. (*Id.* at 43). She was aware that Pakistani officials had stated that militant camps of the type which Hamid was alleged to have attended were not operative in Pakistan during the relevant period. (*Id.* at 44, 193-194). Yet, after a phone call to the Pakistani embassy and a discussion with Mr. Griffin in July of 2005, she dropped further investigation of the issue (*Id.* at 44-45).

As the Aaser Declaration makes obvious (Ex. NN), competent counsel could have presented powerful expert testimony that the camp in the Balakot area, which had been run by the ISI to train militants for the struggle with India over Kashmir, had been shut down before October of 2003 by the Pakistani government due to United States political pressure and dollars. Such evidence alone could have produced an acquittal in this matter, and there was no conceivable reason why it was not in Hamid's tactical interest to pursue it. Indeed, proof that the Balakot camp was not functioning in 2003 and 2004 also could have dissuaded the government from proceeding to trial. But a full investigation of the subject would have cost time and money, and thus was in conflict with Mr. Griffin's speedy trial strategy and economic interests.

### 2. The Failure To Challenge Benn's Inadmissible Expert Testimony

As Hamid's prior briefing establishes (2255 Memo, at 74-75), the portion of Eric Benn's expert testimony that was properly admissible was, if anything, exculpatory. That is, solely based on his examination of four aerial photographs of the Balakot area, Benn testified that it was as likely that the photos were of a Pakistani military facility as it was that they represented a militant training camp. Benn's added and highly damaging conclusion that the area was very likely a militant training camp was based on his wholly improper reliance on his assessment of the credibility of Hamid's statements during his interrogation by the FBI. *United States v. Awkard*, 597 F.2d 667, 671 (9th Cir. 1979) (under the Federal Rules of Evidence, opinion testimony on credibility is generally limited to character, and all other opinions on credibility are for the jury to decide.) Ms. Mojaddidi has admitted that she should have moved to exclude that testimony or objected to it (*Id.* at 111:9-112:1-9, 299:6-21). She did not file a motion to exclude that testimony or object to it, however, because she did not know or could not think of what objection to make, as one would expect from an attorney who had no prior trial experience. (*Id.* at 298:10-13- 299:1-4).

### 3. The Failure to Challenge the Government's Improper Amendment of its Theory of the Camp's Location

A law school classmate of Ms. Mojaddidi's told her that a friend of hers, James Lazor, was in Pakistan on a relief mission. Ms. Mojaddidi contacted Lazor and had him visit the area of

the alleged camp site in February of 2006, take videos, and testify at trial. Lazor drove up a road to the area Benn had opined might be a camp until stopped by a man who stepped from a vehicle with different plates than other vehicles. (RT 3588-3895). Lazor had seen a military cadet facility and other military sites in the area. (RT 3597).

In closing argument, the defense argued that the government had failed to prove beyond a reasonable doubt that Hamid had attended the camp near Balakot. Having tried its case solely on the theory that the camp Hamid attended was in Balakot, the government responded by radically changing and broadening that theory, arguing in rebuttal that: "The government doesn't have the burden to prove that [Hamid] attended a particular camp..." (RT 4361). Ms. Mojaddidi made no objection to this last-minute attempt to broaden the permissible basis of conviction, and has admitted that she would have done so if she knew what objection to make. (Ex. FFF, at 111:22-112:9: Ms. Mojaddidi intended to object to any improper argument in the government's closing.)

Ms. Mojaddidi's fundamental deficiencies in rebutting the government's claim that there was a functioning militant camp near Balakot in 2003 and 2004 deprived Hamid of his Sixth Amendment rights to effective and unconflicted counsel.

### D. The Failure to Move to Sever and to Suppress Hamid's Statements

Ms. Mojaddidi failed to make two critical motions that any competent attorney would have made as a direct result of the conflict of interest under which she operated in representing Hamid.

Umer Hayat had given the FBI a statement that was both incriminating as to Hamid and inadmissible against him. As to Hamid's "confession," Ms. Mojaddidi believed it to be false and the most damaging evidence the government could present against Hamid. (*Id*. at 68:12-18; *Id*. at 207:12-15. *See also Id*. at 49:5-14) It was thus in Hamid's interest to keep both Umer and Hamid's statements out of evidence (*Id*. at 68:19-22) Yet, at one of her first pretrial appearances, Ms. Mojaddidi "exactly" agreed with Mr. Griffin's intention to file no pretrial motions as part of his soon-to-be-unsuccessful speedy trial strategy; as the government put it, "no motion to suppress any of the statements of either of their clients, and no motion to sever the case." (RT of 7/15/13, at 2).

No competent and unconflicted counsel representing Hamid would have agreed to forgo all motions on his behalf.  (See Ex. GG, Broderick Declaration, ¶ 29) Ms.  Mojaddidi has admitted that she could not make a motion to sever Hamid's case from Umer's because she was incapable of representing Hamid if he were tried alone. (Ex. FFF, at 52:8-24) And she could not have made an independent or rational decision to forego a suppression motion because she was unfamiliar with federal law concerning involuntary or coerced confessions. (*Id*. at 49:24-50:3) She relied on Mr. Griffin to provide her with insight on which motions were worth making and which were not.  (*Id*. at 69:15-18)  She did not consider making a motion to suppress the statements, even after the collapse of Mr. Griffin's "speedy trial" strategy. (*Id*. at 67:20-25)  She did not know why no motion was made (*Id*. at 67:24-68:8)  Plainly, Ms. Mojaddidi's failure to file motions to sever and suppress were "adverse effects" of the conflict under which she operated.

"Few things can more greatly benefit a criminal defendant than keeping the most probative evidence against him from being seen by the jury."  *Lowry v. Lewis*, 21 F.3d 344, 346-47 (9th Cir. 1994) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)); *see also Tice v. Johnson*, 647 F.3d 87, 100 (4th Cir. 2011) (failure of counsel to move to suppress defendant's confession was constitutionally deficient because there was a reasonable probability of a different result at trial if the jury had not considered his confession).  For all the reasons stated in his prior memorandum, Hamid possessed a strong claim that his incriminating taped statements to the FBI were unreliable and involuntary.  (2255 Memo, at 50-66)  In failing to move to suppress, Ms. Mojaddidi deprived Hamid of his right to the effective assistance of counsel.

### E.     The Failure to Procure a False Confession Expert

"Among the hundreds of persons exonerated of serious crimes through DNA testing are numerous individuals who earlier confessed." *Lunbery v. Hornbeak*, 605 F.3d 754, 763 (9th Cir. 2010) (Hawkins, J., concurring) (citing studies).  Any competent counsel who believes her client is innocent but has confessed falsely must retain an expert to explain the phenomenon of false confessions to the jury.  (*See* Ex. QQ, the declaration of false confession expert Professor Richard Leo)  Ms. Mojaddidi, who had never before qualified an expert in a district court

proceeding (*id.* at 71:21-24), knew such expert testimony was necessary, and she was contacted by a number of qualified experts who could have provided it. (*Id.* at 71:2-5). But she did not seriously consider retaining any of them. (*Id*. at 208:10-17).

She and Mr. Griffin instead decided to rely on ex-FBI agent James Wedick, an unpaid volunteer investigator working for Mr. Griffin on the case (*see* Exhibit F, Wedick Declaration) to provide the critical expert testimony. As Ms. Mojaddidi knew, Wedick had never been qualified as an expert in the field of false confessions. (Exh. FFF at 70:21-23; *id.* at 286:4-6). Nevertheless, Ms. Mojaddidi believed that Wedick "was going to get in and was going to be qualified." (*Id.* at 71:5-7).

She was wrong. The district court ultimately refused to permit Wedick to provide expert testimony in connection with Hamid's statements to the FBI,[2] a ruling Ms. Mojaddidi felt was "unfair and unreasonable." (*Id.* at 287:8-13). *But see United States v. Hayat*, 710 F.3d 875, 903 (9th Cir. 2013) ("Nor was it clear that Wedick had particular expertise in the field of false confessions. The district court did not abuse its discretion in excluding Wedick's testimony.").

Obviously, Ms. Mojaddidi's failure to tender the expert testimony she knew to be of critical importance to Hamid's defense was due to her ignorance of the law concerning the necessary requirements for expert testimony, and constituted deficient performance on her part. Furthermore, because an expert who was qualified to testify would likely have required payment, his or her retention was not in Mr. Griffin's financial interests, rendering the failure to tender a qualified expert an adverse effect of the conflict that plagued Hamid's representation.

### F.    Counsel's Failure to Obtain a Security Clearance

Competent counsel in a case involving classified information under CIPA must obtain a security clearance, both to ensure that defense counsel will be able to obtain any and all classified information in the possession of the government that may assist in his or her client's defense, and to ensure that the defendant will gain admission of relevant evidence in the defense's possession

---

[2]"Hayat has not shown Wedick is qualified as an expert in the field of psychology or psychiatry, or otherwise had the qualification to give expert testimony regarding Hayat's alleged susceptibility to suggestion and coercion." *See* Dkt. 482, order denying motion for new trial, at 50.

over the government's objections under CIPA.  (See Exhibit PP, Cline Declaration).  Both Ms. Mojaddidi and Mr. Griffin refused to seek such clearances, a decision so plainly derelict of their duties that the district court labeled it "incredible" in open court. (*Id.* at 292:8-293:1).  In her deposition, Ms. Mojaddidi admitted that she had misled Judge Burrell in claiming that she and Mr. Griffin had at least "considered" applying for clearances; in truth, the two had "never intended to get clearances." (*Id.* at 293: 6-12; *id.* at 294:11-24).

It was Mr. Griffin who flatly stated on behalf *of both defendants* that "with reference to questions on cross-examination that the government believes will elicit a response that involves classified information, *the defense* will either withdraw the  question, or reword the question and will not seek classified information."  (RT of 1/27/06 at 20).  The resulting consequences of failing to obtain security clearances was thus an adverse effect of Mr. Griffin's conflict in representing both defendants, and in Ms. Mojaddidi's conflict in acquiescing in the multiple representation arrangement.  And while the arrangement did not work to Umer Hayat's ultimate detriment, it proved devastating for Hamid.  As demonstrated in defendant's prior memorandum, Ms. Mojaddidi bestowed upon the government unfettered veto power over her client's Sixth Amendment right to confrontation, and the prosecution used that power to great advantage, blocking inquiry into several subjects that would have gravely undermined the government's accusations. (2255 Memo, at 47-49).  Again, Hamid's convictions can be vacated on this single ground alone.

### G.    The Failure to Adequately Cross-Examine Nassem Khan

The Ninth Circuit has already effectively indicated that Hamid's conviction should be set aside due to Ms. Mojaddidi's failure to properly exercise his right to confrontation and to present critical defense evidence.

During her cross-examination of Nassem Khan, Ms. Mojaddidi referred to the October 7, 2003 telephone conversation between Hamid and Khan.  She asked Khan if it wasn't true that Hamid had told him in that last conversation between the two that Hamid had never intended on going to a training camp, and had been lying to Khan all along about his intention to do so. (*Id.* at 250:3-25).  Such evidence that Hamid never intended to attend a camp alone would have

defeated the government's case. The court sustained the government's objection, however, when Ms. Mojaddidi failed to provide a legal basis for admission of Hamid's statement to Khan. Ms. Mojaddidi's deposition adds a critical fact to those in the trial record: during trial preparation, Hamid had told Ms. Mojaddidi that he had made that statement to Khan. (*Id.* at 250:23-251:1-5)

On appeal, the Ninth Circuit denied Hamid's claim that his statement was so clearly admissible that the district court had committed plain error in excluding it, but specifically recognized that Ms. Mojaddidi's failing to articulate the grounds for its admission may have constituted a prejudicial deficiency in her representation of her client. *Hayat*, at 787 & n.16. The Court strongly suggested that relief would be in order in a 2255 proceeding if Ms. Mojaddidi had no tactical explanation for her omission. *See id.* ("We cannot determine from the current record why defense counsel did not attempt to justify the admission of Hayat's statements on the bases now asserted. In order to determine whether such failure constituted ineffective assistance of counsel, further factual development not possible on direct appeal is necessary.")

Ms. Mojaddidi has admitted that she viewed it as her job, as Hamid's advocate, to use every means and cite every relevant precedent to get helpful evidence into the trial. (*Id.* at 69:1-5). As a recently admitted lawyer with no trial or criminal law experience and no familiarity with the Federal Rules of Evidence, she was simply incapable of proffering the correct legal basis for the admission of Hamid's critically important statement to Khan. Consistent with the Ninth Circuit's opinion on direct appeal, habeas relief is in order on this ground alone.

### H. Ms. Mojaddidi's Multiple Failures to Challenge Mohammed's Testimony Regarding The Supplication

In his prior memorandum, Hamid exposed the multiple deficiencies in Ms. Mojaddidi's representation in regards to the purportedly expert testimony of government witness Khalil Mohammed concerning a Koranic supplication, or taweez, found in Hamid's wallet at the time of his arrest. (2255 Memo at 80-98). They included her failure to object to Mohammed's inadmissible but highly prejudicial testimony concerning the jihadist mental state of a person carrying the taweez; her failure to conduct cross-examination of Mohammed on the basis of discovery materials that exposed his testimony concerning the taweez as false; her failure to obtain and offer available expert testimony from Arabic scholars far more authoritative that

Mohammed that would have destroyed his credibility; and her failure to comply with her discovery obligation in regards to the expert testimony of Anita Weiss, which led to the partial exclusion of Weiss's testimony concerning taweezs.

In her deposition, Ms. Mojaddidi admitted that she made whatever legal objections she was aware of to the testimony of Mohammed.  (*Id.* at 108:6-14).  Having an Arabic expert who was willing to testify would have helped her (*id.* at 280:6-7).  Ms. Mojaddidi did not call Dr. Haykel at trial because she did not know who Dr. Haykel was at that time (*id.* at 279:12-15), but he provided a critical declaration when she contacted him after trial.  She had no explanation of her failure to cross-examine based on Exhibit SS, an email from Bariza Umar to Mohammed, which stated: "I would guess that most people don't know what is written in a taweez." (*Id.* at 281:24-25).  She had intended to have her expert, Dr. Anita Weiss, testify to the facts contained in the email.  (*Id.* at 283:1-2).  As to the fact that part of Dr. Weiss's testimony was excluded from evidence on the grounds that Ms. Mojaddidi had violated her discovery obligations (*Id.* at 283:7-15),  in hindsight there are many things she would have done differently.  (*Id.* at 283:16-284:1-3).

In sum, Ms. Mojaddidi's representation in challenging Mohammed's unreliable but highly prejudicial testimony was an utter fiasco, yet one more reason that Hamid's convictions must be vacated.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

**CONCLUSION**

There is no genuine issue as to the material facts relied upon by Hamid Hayat to establish that he was deprived of his Sixth Amendment right to the assistance of effective and unconflicted counsel. Even when viewing the evidence concerning that deprivation in the light most favorable to the government, summary judgment is in order. *Celotex*, 477 U.S. at 323–24; *Tarin*, 123 F.3d at 1263. Hamid's convictions must now be vacated pursuant to 28 U.S.C § 2255.

Dated: November 13, 2014

Respectfully submitted,

DENNIS P. RIORDAN
DONALD M. HORGAN
LAYLI SHIRANI
MARTHA BOERSCH

TED SAMPSELL-JONES

By  /s/ Dennis P. Riordan
       Dennis P. Riordan

Attorneys for Defendant
HAMID HAYAT

# EXHIBIT FFF

1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,

     Plaintiff,

vs.                     Case No. 05-cr-240-GEB

HAMID HAYAT,

     Defendant.
_____/




DEPOSITION OF WAZHMA MOJADDIDI




DATE:        August 11, 2014



TIME:        11:44 a.m.



LOCATION:    United States Attorney's Office
            501 I Street
            Suite 10-100
            Sacramento, California 95814


REPORTED BY: Jessica Sotelo
            Certified Shorthand Reporter
            License No. 13679

2

 1                    A P P E A R A N C E S

 2

 3  For the Plaintiff:

 4         S. ROBERT TICE-RASKIN, AUSA
           United States Attorney's Office
 5         501 I Street
           Suite 10-100
 6         Sacramento, CA 95814
           916.554.2738
 7
           Erin Creegan, Trial Attorney
 8         United States Department of Justice
           National Security Division
 9         950 Pennsylvania Avenue, NW
           Washington, DC 20530
10         202.514.0127

11  For the Defendant:

12         DENNIS P. RIORDAN, ESQ.
           DONALD M. HORGAN, ESQ.
13         Riordan & Horgan
           523 Octavia Street
14         San Francisco, CA 94102
           415.431.3472
15
           MARTHA BOERSCH, ESQ.
16         Boersch Shapiro LLP
           235 Montgomery Street
17         Suite 835
           San Francisco, CA 94104
18         415.500.6640

19  Also Present:

20         James McGrath, Videographer

21

22

23

24

25

3

1                      I N D E X

2   Examination by:                          Page:

3        MR. RIORDAN                              5

4        MR. TICE-RASKIN                        115

5

6   Further Examination by:

7        MR. RIORDAN                            261

8        MR. TICE-RASKIN                        305

9        MR. RIORDAN                            306

10

11

12

13                   E X H I B I T S

14

15        (Previously marked exhibits were referenced

16        and retained by counsel.)

17

18

19

20

21

22

23

24

25

```
1                P R O C E E D I N G S

2                    ---oOo---

3        THE VIDEOGRAPHER:  Okay.  Good morning.

4        This begins Volume I, Tape No. 1 of the

5   videotaped deposition of Wazhma Mojaddidi, taken in      11:43:23

6   the matter of the United States of America v. Hamid

7   Hayat, in the United States District Court, Eastern

8   District of California.  The case number is

9   05-CR-240-GEB.  This deposition is taking place at the

10  United States Attorney's Office, Eastern District of    11:43:45

11  California; located at 501 I Street, Suite 10-100,

12  Sacramento, California 95814.

13       Today's date is August 11, 2014, and the time

14  is approximately 11:44 a.m.  My name is James McGrath

15  with the firm of California Reporting Company, and I     11:44:04

16  am the legal video specialist.  Our court reporter

17  today is Jessica Sotelo, also in association with

18  Capital Reporting Company, located at 155 Montgomery

19  Street, San Francisco, California; and the zip code is

20  94104.                                                   11:44:20

21       For the record, would counsel please

22  introduce themselves and with whom they represent.

23       MR. RIORDAN:  Dennis Riordan, R-I-O-R-D-A-N,

24  and I represent defendant and petitioner Hamid Hayat.

25       MR. HORGAN:  Donald Horgan, H-O-R-G-A-N, also      11:44:39
```

5

1  here on behalf of petitioner Hayat.

2        MS. BOERSCH:  Martha Boersch, B-O-E-R-S-C-H,

3  Boersch Shapiro, here for Mr. Hayat.

4        MR. TICE-RASKIN:  Good morning.  Robert

5  Tice-Raskin on behalf of the United States.        11:44:55

6        MS. CREEGAN:  Erin Creegan from the

7  Department of Justice, National Security Divion, also

8  on behalf of the United States.

9        THE VIDEOGRAPHER:  Thank you.

10        Would the court reporter please swear in the    11:45:03

11  witness, and then we shall begin.

12                  WAZHMA MOJADDIDI,

13  called as a witness, who, having been duly sworn by

14  me, was examined and testified as hereinafter set

15  forth.                                               11:45:18

16                    EXAMINATION

17  BY MR. RIORDAN:

18     Q.   Good morning, Ms. Mojaddidi.

19     Ms. Mojaddidi, have you been deposed before

20  in any sort of action?                              11:45:24

21     A.   Deposition, I don't think so, no.

22     Q.   Have you taken deposition yourself?

23     A.   Oh, yes.

24     Q.   So you are familiar with the process?

25     A.   Yes.                                        11:45:35

6

1    Q.   And you are aware that you have to speak

2  audibly for the court reporter.  And if any of my

3  questions are unclear, please ask me to rephrase

4  them.

5    A.   Okay.                   11:45:50

6    Q.   Let me begin with this:  Have you discussed

7  the taking of this deposition with anyone prior to

8  this morning?

9    A.   Meaning that I'm going to be here for a

10  deposition?                 11:46:09

11    Q.   Well, let me -- let me limit it to, have you

12  discussed the content of -- of -- or the potential

13  con -- intent of this deposition with anyone before

14  today?

15    A.   I have not.              11:46:22

16    Q.   You haven't spoken to the government or the

17  U.S. Attorney's Office about it?

18    A.   No, I have not.

19    Q.   And did -- did counsel for the defense,

20  including myself, ask you to discuss the content of   11:46:31

21  the deposition recently, within the last six months or

22  so?

23    A.   With them?

24    Q.   Yes.

25    A.   No.                    11:46:44

1      Q.   You didn't get a request to discuss the case

2   with us within the last six months?

3      A.   Oh.  To discuss the case, I think I -- I

4   did.  I think I got an e-mail.  I think I got an

5   e-mail just to discuss the case.  I don't know if it      11:46:59

6   was prior to you filing the brief, but not since the

7   deposition has been noticed, I haven't been contancted

8   to discuss the contents of the deposition; if that's

9   the question.

10     Q.   Let me frame it --                               11:47:11

11     A.   Okay.

12     Q.   -- prior to filing of the 2255 action here,

13   did you get an e-mail asking you to meet and -- with

14   present defense counsel to discuss the case?

15     A.   I think I did, yes.                              11:47:24

16     Q.   And what was your response to that e-mail?

17     A.   That I was not interested in doing that.

18     Q.   Ms. Mojaddidi, can you tell us something

19   about your educational background.

20     A.   Sure.  I went to UC Davis, did my               11:47:39

21   undergraduate degree in political science, and then I

22   went to McGeorge and got my juris doctorate in 2000.

23     Q.   And when did you begin at McGeorge?

24     A.   Let's see.  Oh, 1998.

25     Q.   So basically you went through a four-year        11:47:58

1  program there?

2      A.    I started out as full-time, but then I had a

3  baby.  So my second year, I only took, like, one class

4  the whole year.  But -- so I was, essentially, on a

5  three-year program but stretched that over four years.    11:48:10

6      Q.    And do you speak languages other than

7  English?

8      A.    Yes, I do.

9      Q.    And what languages are those?

10     A.    I speak Pashto, P-A-S-H-T-O; Farsi,                  11:48:18

11  F-A-R-S-I; Urdu, U-R-D-U.  I've studied French, but I

12  think I've lost it.  And English.

13     Q.    And how is it that you became a -- a --

14  fluent in Urdu, Pashto, and Farsi?

15     A.    So pashto is my mother tongue.  I was born in    11:48:41

16  Kandahar, Afghanistan.  Spoke it at home.  Farsi is

17  also a language that is spoken in Afghanistan, and my

18  parents were bilingual so I just happened to know that

19  language from the beginning.

20         I married my husband, who is from Pakistan.       11:48:58

21  He speaks Urdu, and I learned Urdu within a year of

22  marriage.

23     Q.    And at what age did you -- I assume you

24  immigrated to United States.  At what age?

25     A.    I did.  I came to the United States when I       11:49:12

1   was five years old from Afghanistan.

2      Q.   So let's return again to law school.

3      Do you recall during law school whether you

4   took courses in criminal law?

5      A.   I did.  I took the required criminal law and   11:49:24

6   criminal procedure, I believe.  I don't think I took

7   any other courses in -- in criminal law.

8      Q.   And was criminal law a one -- one-semester

9   course?

10     A.   Oh, I -- I don't remember.  I think one of   11:49:36

11  them was half semester, and I don't remember if one of

12  them was a full year.  They may have both been just

13  semester courses.  I don't recall.

14     Q.   And during law school, did you take courses

15  in trial practice?   11:49:51

16     A.   No, I did not.

17     Q.   Did you take courses in evidence?

18     A.   Yes, I did.  I took a full year of evidence.

19     Q.   Did you take courses -- were there courses

20  denominated federal courts?   11:50:06

21     A.   I don't -- I don't -- well, actually called

22  federal courts, the case --

23     Q.   Yes.

24     A.   No.

25     Q.   Were -- did McGeorge have clinical programs   11:50:18

1  in criminal law or procedure?

2      A.   They may have, but I don't remember while I

3  was there, and I didn't take any.

4      Q.   Okay.  Did you intern or -- either unpaid or

5  paid work during law school?                          11:50:40

6      A.   During law school, I did.

7      Q.   And what kind of work or areas were you

8  working in at that time?

9      A.   It was immigration appellate work.

10     Q.   And was that a clinic or --               11:50:55

11     A.   No.  It was a friend who owned a firm and I

12  was helping him out with various projects.

13     Q.   And was that during your second or third

14  year, or third or fourth year?

15     A.   I think it was probably towards the latter,   11:51:09

16  and I honestly don't remember.

17     Q.   And you graduated from law school in the

18  spring of 2002; is that correct?

19     A.   No.  Oh, yeah, the spring.  I'm sorry.  Yes.

20  May 2002.                                          11:51:22

21     Q.   And did you then take the bar exam?

22     A.   Yes.  I was pregnant and so I took it for

23  practice in July and February, and then I actually

24  studied for the following year when my daughter was

25  already a little bit older.  And so when I took it in   11:51:39

1  July, again, of 2003, that's when I passed, and I was

2  admitted in December of 2003.

3      Q.   Now, during that -- that period between

4  graduating and your admission in December of 2003, did

5  you work as a law graduate anywhere?                    11:51:58

6      A.   You know, I think that during that period I

7  was also assisting that attorney friend with some

8  projects here and there, but I wasn't working.

9      Q.   And so then you were admitted and sworn in,

10  in December of 2003?                                   11:52:14

11      A.   Yes.

12      Q.   And what -- what did you do then in terms of

13  practicing law?

14      A.   I immediately -- I was actually, at that

15  point, again, pregnant with my -- with my third child  11:52:24

16  who was going to be born the following May.  And so I

17  just started to take cases on my own and began a

18  practice from home.  My first case, I think, was a

19  family law case.

20      Q.   And that would have been sometime in early    11:52:42

21  2004, or --

22      A.   Yes.  But I -- I think it was after I --

23  right after I got my results.  So it may have been the

24  very end of, like, December of 2003, and then early

25  2004 I just continued to take cases.                   11:52:55

1    Q.    And so let's focus on the calendar year

2    2004.  How would you describe your practice during

3    that year?

4    A.    Primarily family law and immigration.

5    Q.    And did -- in addition to consulting with          11:53:09

6    clients, what kind of forums would you have appeared

7    in on those cases at that time?

8    A.    Superior court for family law cases, and then

9    I did San Francisco immigration court, federal level.

10   Q.    And did any of those appearances in 2004           11:53:29

11   involve trials?

12   A.    In 2004, I don't recall.  There may have been

13   one, but I don't remember.

14   Q.    And are -- if a family court matter, if

15   there's a trial in it, is that before a judge?          11:53:53

16   A.    Yes.  No jury.

17   Q.    And is that true of immigration matters as

18   well?

19   A.    Yes.

20   Q.    Okay.  So -- oh.  During that year of 2004,        11:54:02

21   did you ever make a appearance in state court in a

22   criminal case?

23   A.    No, I did not.

24   Q.    Did you ever make a appearance in federal

25   court in a criminal case?                               11:54:14

1      A.    No, I did not.

2      Q.    Did you make an appearance in federal

3  district court of any kind during 2004?

4      A.    No, I did not.  And I just want to clarify,

5  there may have been, in 2004, although I don't think    11:54:27

6  so because I may have helped a family member just

7  appear at an arraignment or something in state court.

8  I just don't remember if I did it in 2004.  I don't

9  think so, but I may have.

10     Q.    And that would have been for an initial    11:54:41

11  appearance?

12     A.    Right.  Nothing that went beyond, maybe, an

13  arraignment or a pretrial conference.

14     Q.    So let's go to 2005, and now I'm -- I'm

15  looking at the period between the beginning of 2005    11:54:56

16  and June of 2005.  Let me ask you the same question.

17  What kind of -- what did your practice consist of

18  then?  What kind of appearances were you making then?

19     A.    That was also family law and immigration,

20  maybe a civil matter here and there.    11:55:16

21     Q.    But -- you had not had a jury trial in a

22  civil matter or a criminal matter during that period

23  of time?

24     A.    No.  And I think the one civil matter that I

25  think I did have prior -- well, I don't know if it was    11:55:30

1  prior to June 2005.  You know what, it wasn't.  So,

2  no, I had not had a jury trial prior to that.

3      Q.    This may be obvious, but -- but as of June of

4  2005, you had not -- I gather you had not examined or

5  cross-examined a witness in federal district court?    11:56:00

6      A.    No.

7      Q.    Had you examined or cross-examined a witness

8  in superior court, state superior court?

9      A.    Yes, I had.

10     Q.    And that would have been in a family law    11:56:09

11  matter or an im -- family law matter?

12     A.    Yes.  I -- I was in trial.  On his first

13  arraignment, I was in trial.

14     Q.    And what kind of trial was that?

15     A.    That was a family law trial.              11:56:23

16     Q.    And that would have been before a judge in

17  superior court?

18     A.    Yes.

19     Q.    And it would have been an evidentiary hearing

20  where you examined witnesses in front of a judge?    11:56:32

21     A.    Yes.  No jury.

22     Q.    Can you tell us -- give us your best

23  recollection of how you first were contacted about the

24  Hamid Hayat matter.

25     A.    Sure.  It was a Sunday afternoon, and I think  11:56:45

15

1  it was June 5th, if that was the Sunday, if that day

2  states -- stays in my mind.  Or maybe I'm thinking

3  2005.  But it was a Sunday in June, and I think I was

4  in downtown running errands between different shopping

5  I had to do.  And I got a call from Basim Elkarra.        11:57:05

6  That's B-A-S-I-M.  Last name Elkarra, E-L-K-A-R-R-A.

7  He's the executive director of an organization called

8  CAIR, Counsel of American-Islamic Relations.  I was --

9  I had volunteered with CAIR doing various types of

10  things, and he called me on that date and said that     11:57:28

11  there was family members of two gentlemen who had been

12  at the FBI and they needed representation.  So he

13  called me and said they couldn't get ahold of anybody

14  else, whether or not I could come to the CAIR office

15  and meet with the family members.  And that's when I    11:57:50

16  went to the CAIR office, and I met with --

17      Q.   Let me just --

18      A.   Sure.

19      Q.   -- stop you there.  But you are on to the

20  next topic.  So you went to the CAIR office.  What      11:58:00

21  occurred there?

22      A.   Okay.  So there were a number of -- of people

23  there who were leaders and I think some family members

24  of the Hayats from the Stockton and Lodi community who

25  were concerned.  And they said, you know, these two     11:58:18

1 gentlemen had left, I think at that point, a couple

2 days before that, and they had essentially lost

3 contact with them and they wanted to see what was

4 going on.  And I essentially just listened, and then

5 one of the -- one of the people there said that they        11:58:36

6 had also found another attorney that they had spoken

7 with, Johnny Griffin, and -- and then essentially

8 arranged for Johnny and I to meet.  And that all

9 happened, I think, within an hour of me getting there.

10      Q.   Let --                                            11:58:57

11      A.   Okay.

12      Q.   Were you familiar with the name Johnny

13 Griffin, or did you know this individual?

14      A.   No, I did not.

15      Q.   And what -- and during this meeting, were you     11:59:04

16 informed that the -- the -- the Hayats had gone to the

17 FBI office?

18      A.   Yes.  That's what I -- that's what I was told

19 by these people, right.

20      Q.   And so let's move on.  What then happened in      11:59:19

21 terms of you making contact with Johnny Griffin?

22      A.   Okay.  So I -- I think it was a phone call,

23 and Johnny was the one who had found out who the U.S.

24 attorney, I think, on the case was.  Maybe it was

25 Steve Lapham at the time.  And he made the phone        11:59:35

1  calls.  And then I -- I just don't remember if I

2  actually, physically, went to Johnny's office or if we

3  just talked on the phone and he -- and he said, Well,

4  since there's two of them, why don't you just come

5  with me and we can go down to the FBI office together;  11:59:53

6  you represent one and I'll represent the other.  And

7  so I went along.

8      Q.   And do you recall whether you met him --

9  well, where did -- where were you going at that time?

10     A.   So my -- my -- I know for sure I was at the  12:00:07

11 CAIR office.  I don't -- either I went to Johnny's

12 office -- it's all within downtown, like a few blocks

13 away.  Either I went to Johnny's office and the two of

14 us went together, or we somehow met somewhere.  I

15 just -- I just don't remember.                          12:00:23

16     Q.   And where did you go together?

17     A.   Oh, I'm sorry.  We went to the Orange --

18 Orange Grove?  I forget what it's called, but it's --

19 it's the FBI office in Sacramento.

20     Q.   And -- and -- and who did you meet at the FBI  12:00:34

21 office?

22     A.   I don't remember which agent.  I don't know

23 if it was Aguilar.  I'm -- I'm forgetting some of

24 these names.  And I'm not sure if it was Steve or if

25 there was -- I think there was another U.S. attorney   12:00:56

1   who was there.  But there was a U.S. attorney and

2   there were agents.  Johnny did most of the talking.

3        Q.   And -- and did you in fact meet with Umer or

4   Hamid Hayat while at the FBI office?

5        A.   I know I talked to them that day, and I think   12:01:19

6   I  --  I think I did speak with them there.  Well,

7   no.  They had already been -- I think they had already

8   been sent to Sac County by that point, and so maybe we

9   went down to the jail to see them, but I know I spoke

10  with them that first day.                               12:01:40

11       Q.   And can you describe that -- that meeting

12  with one or the other of the Hayats, who was there,

13  who was together, who you spoke to.

14       A.   Yeah.  I really, honestly, can't remember.  I

15  don't know if the decision of who I should -- I think   12:01:58

16  Johnny asked somebody, who, between the two, had the

17  heavier case, and -- meaning a U.S. attorney or an

18  agent -- and he was told that it was the father.

19       So I don't recall if it was at this point

20  that he spoke -- he tried to go speak with the father   12:02:18

21  and then I spoke with Hamid.  I just -- I don't

22  remember how that initial contact was made.  I just

23  know that I -- I'm -- I'm certain I talked to Hamid on

24  that first day.  Whether or not I spoke with Umer, I

25  don't remember.  Whether or not it was somehow a        12:02:34

19

1 meeting where we -- both counsel went to talk to Hamid

2 and then both counsel went to talk to Umer, I don't

3 remember.

4        Q.   But you do recall meeting with Hamid?

5        A.   Yes.                                        12:02:48

6        Q.   And at that meeting, was it discussed whether

7 you would represent him in -- in the case?

8        A.   I -- I don't remember.  I don't remember if I

9 told him that I was here for this first day just

10 because we wanted to stop whatever potential           12:03:08

11 interrogation was going on and that -- I don't think I

12 made a commitment on that day that I was going to be

13 representing him for the rest of the case because I

14 didn't know that myself at the point.

15       Q.   Okay.  And your recollection is that this     12:03:24

16 would have been on Sunday, June 5th?

17       A.   I think so, yeah.

18       Q.   And you mentioned before that you were in

19 trial at the time.

20       A.   I was in trial whatever -- whatever date his  12:03:35

21 arraignment was.  So I must have been in trial if he

22 was arraigned Monday.  Whatever day he was arraigned,

23 I know I was in trial and I couldn't be there.

24       Q.   He was arraigned -- well --

25       A.   Yeah.                                         12:03:49

1     Q.    -- let's assume --

2     A.    Yeah.

3     Q.    -- he was arraigned on June 7th.

4     A.    Okay.  Tuesday.  Yeah, so I would have been

5  in trial the day before, Monday, and it would have      12:03:55

6  continued over to Tuesday.  And I couldn't attend the

7  arraignment, so I think his arraignment was continued,

8  or Johnny made an appearance -- I don't remember -- a

9  special experience.

10    Q.    Is it your recollection that Johnny made a --   12:04:06

11  that Johnny appeared for Umer at that arraignment?

12    A.    I think Johnny was present for his -- for

13  Umer's arraignment, yes.

14    Q.    And is it your recollection that he appeared

15  specially for you as counsel for Hamid?               12:04:20

16    A.    Either -- he may have appeared specially, but

17  I do recall that there was a continuance of his

18  arraignment to when I could be present, which was

19  maybe a couple days later.  I think that's how it

20  went.                                                12:04:31

21    Q.    Let's assume there was a detention hearing on

22  June 10th.

23    A.    Okay.

24    Q.    And at that time, did you appear as counsel

25  for Hamid?                                           12:04:39

1    A.    I think I did, yes.

2    Q.    And Johnny appeared as counsel for Umer?

3    A.    Yes.

4    Q.    Do you recall anything about what happened

5    between the 5th and the 10th such that you were          12:04:51

6    formally entering appearance for Hamid?

7    A.    Oh, yes.  I think I was visiting with Hamid

8    almost on a daily basis.  We met with the family

9    members, and there was the discussion of -- between --

10   various discussions -- family members and Johnny and    12:05:13

11   I, so by the time that I formally appeared, there was

12   a decision that I was going to be representing him,

13   moving forward.

14   Q.    Now, were you aware that the U.S. attorney

15   and the FBI had held a press conference and made a      12:05:29

16   statement about the case soon after the arrest?

17   A.    Oh, yes.

18   Q.    And were you aware that they referred to this

19   as being somehow related to Al-Qaeda?

20   A.    That rings a bell, although I can't             12:05:45

21   specifically recall that.

22   Q.    What kind of -- to your recollection, what

23   kind of press attention was the case receiving at that

24   time?

25   A.    I mean, it was definitely all over the local   12:05:58

22

1   California news, and I think it had received national

2   attention by then.

3       Q.   Would have been on CNN, for example?

4       A.   Yes.

5       Q.   So did you consider this case to be a big          12:06:11

6   deal?

7       A.   I sure did.

8       Q.   And you were aware that the government had --

9   had stated in a press release that this was somehow

10  related to terrorism?                                        12:06:32

11      A.   Yes.

12      Q.   So this was a very serious case?

13      A.   Yes.

14      Q.   You -- given -- well, let me ask you this:

15  Would you say that you had no experience in criminal         12:06:51

16  law at that time?

17      A.   I -- I would say I had no experience in

18  criminal law at that time.

19      Q.   And what was your thinking on why you were

20  qualified to represent Hamid in this very serious            12:07:06

21  case?

22      A.   Well, my understanding was that it was going

23  to be, essentially, a joint defense.  I was working

24  with somebody who was very experienced, and I think I

25  did -- you know, my own independent research on Johnny       12:07:21

1 Griffin.  And then just the fact that I had all of

2 the -- the language and cultural and all of those

3 skills, I thought that it could work.  I thought

4 that -- I mean, even though I had never been in a

5 criminal courtroom, I felt comfortable in the          12:07:44

6 courtroom.  I thought it was something I could handle

7 if I had some guidance on just the procedural stuff,

8 and I was willing -- I was willing to learn it.  I was

9 willing to get in and do it.

10     Q.   Let me ask you a hypothetical question.       12:08:00

11 Obviously the government made a decision to file a --

12 a complaint on both Umer and Hamid Hayat.  Let me --

13 assume that they had not filed on Umer and Hamid was

14 the only defendant in the case, would you have felt

15 qualified to represent him by yourself in this serious  12:08:24

16 proceeding?

17     A.   No.

18     Q.   And is it the case, given the relative

19 difference in experience between you and Mr. Griffin,

20 that you were going to count on Mr. Griffin to make     12:08:40

21 critical decisions for the team?

22          MR. TICE-RASKIN:  At this point, I'm going to

23 object on the grounds of leading --

24          MR. RIORDAN:  All right.  Let me rephrase the

25 question --                                             12:08:52

24

1        MR. TICE-RASKIN:  Let's have some open-ended

2  questions, please.

3  BY MR. RIORDAN:

4        Q.   What was your belief as to who would make

5  decisions in the case for what you described as a          12:08:57

6  joint-team defense?

7        A.   I think that's a big question.  I -- I knew

8  that I would rely on Johnny for a lot of things, but I

9  didn't go in thinking that he was going to be making

10  all of the decisions, no.                                 12:09:13

11       Q.   What if there was a legal issue about what

12  you know nothing and he had experience, who would make

13  the decision then?

14       A.   Well, I -- every time Johnny made a decision,

15  I myself did my independent research and tried to see     12:09:32

16  if it was something that I thought made sense and so I

17  didn't blindly agree on everything.  I did look into a

18  lot of things myself, out of curiosity, and I wanted

19  to learn.

20       Q.   And your belief was you had to learn in order  12:09:53

21  to do this case, you had to learn on the job in order

22  to do the case competently?

23       A.   To learn on the job to do the case

24  competently.  Sure, yes.

25       Q.   What was your understanding at the time that   12:10:09

1 the decision was made to have a joint defense -- and

2 you would represent Hamid, Johnny would represent

3 Umer -- about the law of conflict of interest in a

4 criminal case?

5    A.   It's very difficult to recall what I believed    12:10:28

6 it to be then.  I really don't remember.  But I think

7 I went in with the understanding that that was not an

8 issue in this case because we spoke with both

9 defendants and we looked at the facts and we didn't

10 think that there was going to be a conflict.  So we    12:10:58

11 went in with the understanding that that wouldn't be

12 an issue.

13    Q.   Did you believe that there was a potential

14 conflict if the counsel for one defendant was making

15 decisions for a second -- for codefendant?    12:11:22

16        MR. TICE-RASKIN:  Objection.  Assumes facts

17 not in evidence.  She's not indicated that Mr. Griffin

18 was making decisions on behalf of Hamid.  She's

19 indicated that she represented Hamid, that Johnny

20 Griffin represented Umer, and that they had a joint    12:11:37

21 defense agreement.

22        MR. RIORDAN:  Let me rephrase the question as

23 a hypothetical.

24 BY MR. RIORDAN:

25    Q.   At that time, did you understand or did you    12:11:44

26

1  believe there might be a conflict if a defendant for

2  one codefendant is participating in the defense for

3  the other codefendant?

4      A.   Participating in the defense?  No, I did not

5  think that there would be a conflict.  I don't -- I          12:12:01

6  don't think there would be by just participating, no.

7      Q.   Were you aware of the practice in the federal

8  court -- were you aware there was a practice in the

9  federal court involving the representation of

10 codefendants by a single lawyer?                            12:12:31

11     A.   I want to make sure I understand your

12 question.  Was I aware that there was a practice in

13 the federal courts of a single lawyer representing

14 multiple defendants, that that was something that

15 happened?                                                   12:12:50

16     Q.   All right.  Let me rephrase that.

17          Did you believe or were you aware that an

18 issue is created in federal court if one lawyer

19 attempts to represent two codefendants, at that time?

20     A.   Well, not just in federal court.  I mean, I       12:13:14

21 knew that that was an issue just from my training in

22 law school and as an attorney, that if you are going

23 to represent more than one defendant, there's a

24 potential conflict of interest.  I'm sure I knew that

25 then.                                                       12:13:30

27

1    Q.    Did you think there was an obligation to

2  bring to the attention of the federal court that this

3  was a team defense led by Mr. Griffin?

4        MR. TICE-RASKIN:  Objection.  Misstates her

5  testimony.  She said it was a joint defense.  To the      12:13:41

6  extent you are suggesting that Mr. Griffin represented

7  Hamid Hayat, that misstates what the witness had

8  testified to.

9  BY MR. RIORDAN:

10    Q.    Did you believe that you should inform the      12:13:53

11  court that this would be a joint defense in which

12  Mr. Griffin would be participating in the defense of

13  your client?

14    A.    At the time I was not aware if that was

15  something I was required to do.  I thought it was      12:14:10

16  obvious from our appearances in court.

17    Q.    Did you inform Hamid Hayat that you had no

18  criminal -- no experience in criminal law before the

19  decision was made that you would represent him?

20    A.    Absolutely.      12:14:34

21    Q.    Did you execute an engagement letter with

22  Hamid Hayat at that time?

23    A.    I don't remember when I did.  I know we did,

24  and it must have been before.  I just -- I don't

25  know.  I gave you guys everything.      12:14:51

1    Q.   What is your recollection of the retainer

2    that you received upon your decision to represent him

3    in June of 2005?

4    A.   Are you asking about the amount?

5    Q.   The amount and where it came from.          12:15:15

6    A.   Where it came from, I think it was either

7    collected by community members or family.  I don't

8    know, because I think they put all the money together

9    for both Johnny and I and then they distributed how we

10   asked them to.                                   12:15:31

11       As I sit here today, I honestly do not

12   remember.  I did provide a response to another

13   attorney that works with you once I looked in my

14   records, but as I sit here now, I just don't

15   remember.  It was -- I think it was cash, though.    12:15:51

16   Q.   And do you recall whether -- well, let me ask

17   you this:  Does the -- could the figure have been

18   $6,000?

19   A.   It could have been.  It wasn't -- it wasn't a

20   big number, like, a huge number, no.  So it could have    12:16:10

21   been.

22   Q.   It could have been in the neighborhood of

23   6,000?

24   A.   It could have been between 6 and 10, maybe.

25   Q.   And do you remember whether that was given       12:16:19

1   directly to you, or given to Johnny and he gave you

2   some of the money that was given to him?

3       A.   At the time, I was working out of a home

4   office, and so a lot of the meetings that we had were

5   at the -- at Johnny's office.  And so it could have        12:16:36

6   been that the family members dropped off all the money

7   at Johnny's office and then I collected it from there.

8       Q.   Were you aware of what amount of money Johnny

9   was paid at that time?

10      A.   It was much more than mine, but I don't          12:16:50

11  remember the number.

12      Q.   And was it agreeable to you that he would

13  receive much more money than you did?

14      A.   It was.

15      Q.   And why was that?                                12:17:05

16      A.   I thought I was -- I thought he was more

17  experienced and that was just how he -- how he

18  charged.  I honestly, at the time, didn't realize how

19  much work I would be putting into this case.  I just

20  wanted to take that case, and I frankly would have       12:17:21

21  done it for free.

22      Q.   And when you say "how much work," you didn't

23  realize how much work that was because you hadn't been

24  involved in a case like this before?

25      A.   Well, and it ultimately ended up being more     12:17:33

1  work than I thought because they increased the charges

2  and there was a tremendous amount of evidence that I

3  personally went through myself.

4      Q.   You mentioned they increased the charges.

5      A.   Yes.                                          12:17:48

6      Q.   And we can come back to that -- that was some

7  months later, right?

8      A.   Right.

9      Q.   Would you have accepted the representation of

10  Hamid if he had been charged with terrorism at the     12:18:01

11  beginning of the case?

12          MR. TICE-RASKIN:  I'm going to object on the

13  grounds of relevance, this hypothetical.

14          MR. RIORDAN:  Well, I'm going to ask you to

15  answer the question.                                   12:18:14

16          THE WITNESS:  I think both Johnny and I, had

17  we known that Hamid was going to have the heavier

18  charges, he would have taken Hamid's case.

19  BY MR. RIORDAN:

20      Q.   And that's because he had much more            12:18:24

21  experience than you?

22      A.   Oh, yes.

23      Q.   So we talked about the detention hearing on

24  June 10th.  Do you remember the date on which both

25  Umer and Hamid Hayat were indicted?                    12:18:49

1    A.   No.

2    Q.   Assume the docket says it's June 16th.

3    A.   Okay.

4    Q.   You remember the event of them getting

5  indicted?                                        12:19:03

6    A.   The fact that it happened, yes.

7    Q.   And did you and Johnny issue a statement upon

8  Umer and Hamid being indicted?

9    A.   As -- you mean, like, a -- to the press?

10   Q.   Yes.                                       12:19:17

11   A.   You know, I don't remember if we did some

12  kind of a written statement, but I remember saying at

13  some early interviews that at this point, the only

14  thing that they're being charged with is lying and

15  there are no terrorism-related charges, that that was  12:19:37

16  something we were emphasizing early on.  That's the

17  only real statement I remember.

18   Q.   Do you remember at the time of the

19  indictment -- do you remember if you made a statement

20  that your client was innocent?                   12:19:51

21   A.   I may have.

22   Q.   Do you remember if you made a statement that

23  he did not associate with terrorists?

24   A.   I may have.

25   Q.   Do you remember if he made a statement that  12:20:06

1  he did not attend a terrorist training camp?

2      A.   I may have.

3      Q.   I'm going to ask you to -- show you a

4  document and ask you if it refreshes your

5  recollection.                                    12:20:19

6      A.   Sure.

7           MR. RIORDAN:  And I'm going to mark this

8  FFF.

9           MR. HORGAN:  I think it's FFF.

10          MR. RIORDAN:  Okay.  And I'll show it to the    12:20:25

11  government and then we are actually probably going to

12  need additional copies of this before we are done.

13          (Exhibit FFF was referenced, not produced to

14          be marked, retained by counsel.)

15          MR. TICE-RASKIN:  Thanks.               12:21:02

16          MR. RIORDAN:  Thank you.

17  BY MR. RIORDAN:

18      Q.   So I'm going to hand you a description --

19  well, a newspaper article, and I'm just -- just ask

20  that you review it first.                        12:21:15

21      A.   Okay.

22      Okay, I reviewed it.

23      Q.   Having reviewed that article, do you recall

24  whether you made a statement that your client was

25  innocent on the day of the indictment?          12:22:10

1       A.    The -- what's -- in this is a -- this is a --

2   an article from a newspaper called Dawn -- what -- the

3   quote that's attributed to me sounds like something I

4   may have said.  Whether or not I said that exactly, I

5   can't be certain, but it sounds like something I may        12:22:27

6   have said early on.

7       Q.    Well, let me ask you this:  Did you believe

8   on June 16th that your client was innocent?

9       A.    Yes.

10      Q.    Do you believe that he did not -- did you        12:22:37

11  believe on that date that he did not associate with

12  terrorists?

13      A.    Yes.

14      Q.    Did you believe that he had not attended a

15  training camp, a terrorist training camp in Pakistan?      12:22:48

16      A.    Yes.

17      Q.    Has -- have those beliefs ever changed since

18  that day?

19      A.    Never.

20      Q.    So the clients have been indicted on June        12:23:04

21  16th.  And you just stated your belief, that the

22  client was innocent and didn't attend a training camp.

23  The training camp he's alleged to have attended was in

24  Pakistan, right?

25      A.    Ultimately, that's what they said, yeah.  I      12:23:26

1  mean, because they said it was during the time he was

2  there.

3     Q.   And did you believe that -- let me ask you

4  this:  You had talked to family members prior to this

5  time, right?                          12:23:41

6     A.   Prior to the 16th, yeah.

7     Q.   And you had interviewed Hamid?

8     A.   Yes.

9     Q.   Did you believe that there were witnesses in

10  Pakistan who could testify that Hamid had not attended   12:23:52

11  a training camp?

12     A.   Yes.

13     Q.   And I'm now going to talk about a time period

14  between -- let me ask you this:  At the arraignment on

15  the indictment, was a trial date set at that time?   12:24:15

16     A.   I don't remember.

17     Q.   Do you recall whether the Court had set a

18  trial date within what we call the speedy trial

19  period?

20     A.   I remember that the Speedy Trial Act was an   12:24:34

21  issue and that we were pushing for it.  So it's

22  likely.  I just don't remember.

23     Q.   Let me ask you this:  What steps after the

24  indictment did you take to interview and preserve the

25  testimony of potential alibi witnesses in Pakistan?   12:24:57

1     A.    So you are saying after the indictment until

2  through the conclusion of trial?

3     Q.    No.  I'm asking, through -- well, why don't

4  we take a 60-day period.  Between -- between June 16th

5  and August 19th.                                    12:25:14

6     A.    The question is, what efforts did I take to

7  preserve the testimony or the potential --

8     Q.    Well, to -- to interview witnesses or

9  preserve testimony in -- of witnesses in Pakistan.

10     A.    It's very difficult for me to assess a time    12:25:31

11  frame, but I know I -- I know I did speak with, at

12  some point, I don't know when, I did speak with his

13  uncle.  I did not speak with his grandfather.  I think

14  one or two of his cousins who were there while he was

15  there, were not in Pakistan; they were here.  And so    12:25:56

16  those were the people I had spoken with.  When I did

17  it, I don't remember.

18     Q.    Do you recall if you sent an investigator to

19  Pakistan to interview potential witnesses?

20     A.    No, I did not.                               12:26:12

21     Q.    Why not?

22     A.    Well, the only potential witnesses that we

23  thought in Pakistan could be helpful would be the

24  uncle and the grandfather, and we discussed that it

25  was not a good idea to have them involved because      12:26:31

36

1  their names were all over the evidence as the people

2  who -- well, I think it was alleged that the

3  grandfather had the madrassa that was helping to train

4  these people and the had some kind of association and

5  both of them were -- were elders with beards and they      12:26:53

6  had the whole look and they were living in Pakistan.

7  We didn't think that they would be good alibi

8  witnesses in that sense.

9      Q.    Your -- had your client told you what he did

10  during the years that he was in Pakistan?              12:27:07

11      A.    Yes, he did.

12      Q.    Did he say that he traveled to Rawalpindi on

13  occasions?

14      A.    Yeah.  He probably did tell me that.  I can't

15  specifically remember him saying that, but to          12:27:22

16  Rawalpindi, he may have told me that, yeah.

17      Q.    Did he say he spent time in the village, his

18  village of Behboodi?

19      A.    Yes.

20      Q.    Did he say he played a lot of cricket?        12:27:30

21      A.    Yes.

22      Q.    Did he say he played a lot of video games?

23      A.    Yes.

24      Q.    Did you conclude that, therefore, there might

25  be a lot of people who could testify where he was at     12:27:39

1  different times during the time he was in Pakistan?

2      A.    Did I therefore conclude that?

3      Q.    Uh-huh.

4      A.    I don't -- I don't remember actually thinking

5  of it in those terms.  I think our understanding was          12:28:00

6  that anybody in Pakistan -- it just wasn't going to

7  work to have them be alibi witnesses in the case.  So

8  I don't remember sitting and thinking, Well, here are

9  all the possible people that we can bring in.  I just

10 know that the uncle and the grandfather -- and              12:28:20

11 particularly the uncle, for me, because he was an

12 attorney.  I thought he could potentially be a good

13 witness.  But we discussed why we  didn't think it

14 would be good.  We, meaning Johnny and I.

15          MR. TICE-RASKIN:  Dennis, for clarification,       12:28:30

16 can we try to identify the names of these individuals,

17 the uncle and the grandfather.

18          THE WITNESS:  Oh, sure.  Atiq Ur Rehman,

19 A-T-I-Q U-R; and then Rehman, R-E-H-M-A-N.  And then

20 is the grandfather Saeed Ur Rehman?  You guys might         12:28:44

21 know better than I.  I don't remember.  S-A-E-E-D U-R

22 R-E-H-M-A-N.  And I'm not sure about the grandfather's

23 name.  I'm pretty sure about the uncle's name.

24 BY MR. RIORDAN:

25      Q.    Let me just understand something that you          12:29:00

38

1   said before.  You concluded -- well, if there were

2   witnesses as to where Hamid was during this 10- or

3   11-month period when he is alleged to have gone to a

4   camp, it was your conclusion they would have been in

5   Pakistan?                                    12:29:23

6       A.   There would have been some, right.

7       Q.   And you made a general conclusion that no

8   witness who had been in Pakistan would be a good alibi

9   witness?

10      A.   Yes.                                12:29:34

11      Q.   And you made that decision without having

12  sent an investigator to Pakistan to locate and

13  interview these people?

14      A.   Yes.

15      Q.   Did you raise with Johnny the question of   12:29:44

16  whether alibi witnesses could be brought to the United

17  States?

18      A.   I think we -- I -- I think I remember having

19  that discussion.  Yeah.  Maybe about the -- about the

20  uncle.                                       12:30:08

21      Q.   Did you raise with him the question of

22  obtaining visas for witnesses from Pakistan?

23      A.   I think -- I think we did talk about that.

24      Q.   And what -- do you recall what Johnny said

25  about the possibility of getting visas?      12:30:21

39

1    A.    I don't recall what he said about the

2    possibility of getting visas.  I recall that there was

3    an understanding at the conclusion of that discussion

4    that it would be difficult.

5    Q.    Did Johnny -- did you and Johnny discuss Rule    12:30:39

6    15 depositions?

7    A.    No, I don't think so.

8    Q.    Did you know what a rule -- to your best

9    recollection, did you know at the time what a Rule 15

10   deposition was?                                        12:30:55

11   A.    No, I did not.

12   Q.    To the best of your co -- recollection, had

13   you ever read Rule 15 of the -- Rules of Criminal

14   Procedure?

15   A.    At the time of my discussion with Johnny,        12:31:04

16   probably not.

17   Q.    At that period during the summer, those 60

18   days, were you aware that you can take depositions --

19   under federal law you can take depositions of

20   witnesses in foreign countries?                        12:31:21

21   A.    I may have been aware that you can take the

22   depositions, but I was probably not aware of the

23   admissibility at the trial level.

24   Q.    Before you mentioned that a couple of these,

25   the uncle, the grandfather, in your opinion wouldn't   12:31:53

1  have been good witnesses at trial.

2      A.    Right.

3      Q.    Did you consider the -- the value of

4  interviewing and obtaining alibi testimony in terms of

5  your discussions with the government?                    12:32:10

6      A.    I'm confused.  Can you restate that question.

7      Q.    Well, let me distinguish between two things.

8      A.    Yeah.

9      Q.    One is an assessment of whether a particular

10  piece of evidence will be effective at trial.            12:32:22

11     A.    Okay.

12     Q.    Another, in front of the lay jurors.

13     A.    Right.

14     Q.    Another is whether evidence will be useful in

15  terms of presenting it to the government in either       12:32:32

16  plea negotiations --

17     A.    Oh, okay.

18     Q.    -- or a discussion about dropping the

19  charges.

20     A.    Okay.  So your -- so your question again.       12:32:40

21     Q.    Is -- in deciding whether to interview

22  witnesses in Pakistan, did you consider whether those

23  witnesses' depositions or affidavits would be useful

24  in terms of discussing your case with the government?

25     A.    I don't think so.                               12:32:54

41

```
1       Q.   Was it a factor -- well, I think you

2   testified that you didn't send an investigator to

3   Pakistan.

4       A.   Right.

5       Q.   Was it a factor that you believed you -- you    12:33:21

6   didn't have funds for an investigator to go to

7   Pakistan?

8       A.   No, I don't believe that was the factor.

9       Q.   Who was your in -- who was Hamid's

10  investigator in this case?                              12:33:38

11      A.   James Wedick.

12      Q.   Was James Wedick the investigator for Hamid

13  or for Umer or both -- both defendants?

14      A.   Both defendants.

15      Q.   And did you possess the authority to tell       12:33:50

16  James Wedick what to do?

17      A.   I think if there was something that I needed,

18  I could have asked him.

19      Q.   So you could have asked James Wedick to go to

20  Pakistan?                                               12:34:04

21      A.   I think so, because I ultimately did ask him

22  to do things and he did them.

23      Q.   Would you have needed Johnny's concurrence to

24  send James Wedick to Pakistan?

25      A.   There were -- I would have liked it, but I      12:34:18
```

1    don't think I would have needed it; meaning, that I

2    couldn't do it without his concurrence.  I made many

3    decisions without Johnny's stamp of approval.

4        Q.   Well, if you had asked James Wedick to go to

5    Pakistan, how would you have paid his -- for his          12:34:44

6    services?

7        A.   It would have come from the money that we

8    received from the family.

9        Q.   And who was holding that money?

10       A.   I had some; Johnny had some.  We would have       12:34:53

11   probably had to figure that out, or we would have

12   contacted the family and let them know what the cost

13   of it was, because there was an understanding that if

14   we needed additional monies, that they may need to

15   step up and provide the money.                            12:35:09

16       Q.   Did -- so I can clarify this:  Is it your

17   testimony that you and Johnny possessed equal

18   authority to direct James Wedick to do different

19   tasks?

20       A.   Yes, yes.  I don't think that if I had asked      12:35:34

21   for something that James would have said, No, because

22   Johnny doesn't approve.  I don't think that was the

23   nature of the relationship.  But it's true that Johnny

24   was the primary person who did direct James.  And so

25   if the question was the ability to do it, I don't -- I     12:35:58

43

1   don't think I thought that I couldn't do it if I

2   didn't want to.

3        Q.   And do you know what the financial arrange --

4   well, let me ask you this:  Did you ever pay James

5   Wedick any money?                                    12:36:12

6        A.   No, I did not.

7        Q.   Do you -- were you aware of what the

8   financial arrangement between Johnny and James Wedick

9   was?

10       A.   I think Johnny may have told me how much he   12:36:19

11  was paying him, but I don't -- I don't -- I don't know

12  the specifics and I never -- I don't think I ever saw

13  a contract between the two of them.

14       Q.   Again, returning to investigation.  Did you

15  consider it important to investigate the question of    12:36:45

16  whether a terrorist camp was functioning in Pakistan

17  at the time that Hamid was accused of attending it?

18       A.   Yes.

19       Q.   And what efforts did you take to investigate

20  the existence or functioning of these camps in          12:37:09

21  Pakistan during the time that Hamid was accused of

22  attending a camp?

23       A.   Well, I -- you know, I may have just done my

24  own independent research.  I think I may have

25  contacted somebody at the embassy, and then I sent      12:37:34

44

1  Mr. Lazor to go visit the site and come testify.

2  That's my recollection of what I did, I think.

3      Q.    Hamid is indicted on June 16th.  Soon

4  thereafter, did you read a newspaper article about

5  whether these camps were functioning in Pakistan?          12:38:08

6      A.    I don't remember when I read it, if I did.  I

7  just don't remember, but I -- I'm sure, like I said,

8  did research and read stuff.  I don't know when.

9      Q.    Do you -- do you recall whether you read an

10 article in which the prime minister of Pakistan said        12:38:26

11 that these camps had been closed down?

12     A.    That sounds familiar.  Now that you are

13 saying it, that sounds familiar.  I may have.  I just

14 don't specifically recall.

15     Q.    But you do recall that you made an attempt to     12:38:39

16 contact the embassy?

17     A.    I do recall either the embassy or some kind

18 of government official -- there was something I tried

19 to do there.

20     Q.    And did you inform Johnny Griffin that you        12:38:51

21 had been in touch with the embassy?

22     A.    Yes.

23     Q.    And what was his response?

24     A.    I don't remember.

25     Q.    Did Johnny Griffin tell you to abandon your       12:39:03

1  efforts to contact the Pakistani government?

2      A.   I don't remember what he told me, but I

3  remember that those efforts were abandoned, and it was

4  likely a result of a discussion I had with Johnny.

5      Q.   You had thought it was a good idea to contact    12:39:26

6  Pakistani officials?

7      A.   Yeah.  That's why I did it.

8      Q.   He didn't think it was a good idea to contact

9  Pakistani officials?

10     A.   I just don't remember what his reasoning was,    12:39:40

11 but I was the one who did it.  It was my idea.  I gave

12 him the information.  But we ultimately didn't take it

13 anywhere.

14     Q.   At that time, had you heard the expression

15 MLATs?  Does that ring a bell?                           12:39:55

16     A.   No.

17     Q.   Were you aware that there's a procedure by

18 one government to communicate with another government

19 to ask for information?

20     A.   No.                                              12:40:11

21     Q.   Had you heard the term "letters rogatory"?

22     A.   No.

23     Q.   But in your -- in your own mind, you believed

24 it would be an important area of investigation to

25 investigate what the Pakistani government said about    12:40:39

46

1    the existence of these camps?

2        A.    Yes.

3        Q.    Were you aware that Hamid Hayat had had a

4    bout of meningitis --

5        A.    Yes.                                    12:41:03

6        Q.    -- at the time of this?

7        A.    Yes.  Sorry --

8              MR. TICE-RASKIN:  And can we be precise as to

9    time?

10             THE WITNESS:  Dur -- I think during his stay    12:41:08

11   in Pakistan; is that what you're asking?  The two

12   years that he was there?

13   BY MR. RIORDAN:

14       Q.    Well, I'm asking -- I'm asking you what your

15   own knowledge about meningitis and the client was.       12:41:14

16       A.    I -- I think that it was during the time that

17   he was in Pakistan, but I know that he had had it.  I

18   don't know if it was prior to that, but it was

19   something that he had had.

20       Q.    And what -- what information did you receive    12:41:25

21   about the severity of this episode?

22       A.    I don't recall.

23       Q.    Did you believe it, that that aspect of his

24   medical history should be investigated?

25       A.    No.                                      12:41:43

47

```
1      Q.    And why not?

2      A.    I don't remember why not.  I don't remember

3  if I -- I just -- I don't remember, but I knew, I knew

4  about it at the time.

5      Q.    And you made a decision that -- at some          12:42:02

6  point -- that it wasn't worth pursuing further

7  information about it?

8      A.    Well, I would have only made that decision if

9  I thought that it was somehow relevant.  So I don't

10 remember ever making a decision that it was relevant.    12:42:18

11     Q.    When you began representing Hamid in this

12 first criminal case, were you aware that one of the

13 phases of a federal criminal trial is the making of

14 pretrial motions?

15     A.    Yes.                                             12:42:45

16     Q.    And what -- was a decision made early on in

17 the case, soon after indictment, that the defense

18 would not make any pretrial motions?

19     A.    I don't think so.  I don't remember making

20 that conscious decision.  I don't remember.             12:43:07

21     Q.    Do you recall whether, at a hearing on

22 July 15th, the defense, Mr. Griffin, announced that

23 the defense would make no pretrial motions and --

24 motions.  Do you remember him making that statement?

25     A.    I don't remember him making that statement,     12:43:27
```

1  but if it was an argument for pushing for the speedy

2  trial, that may have happened.  I don't remember him

3  saying that.

4      Q.   Do you recall whether you concurred in

5  telling the court there would be no pretrial motions?   12:43:42

6      A.   I likely did concur.

7      Q.   Okay.  And -- and -- and why -- who made the

8  decision that there would be no pretrial motions?

9           MR. TICE-RASKIN:  I --

10           THE WITNESS:  The problem is, I don't         12:43:58

11  remember making that decision, so it's -- it's

12  difficult to say how that decision was made because I

13  don't remember that being a decision.

14  BY MR. RIORDAN:

15      Q.   Do you remember whether you -- during this    12:44:10

16  speedy trial period, whether the defense, either you

17  or Mr. Griffin, made any pretrial motions?

18           MR. TICE-RASKIN:  I'm going to object on the

19  grounds of ambiguity and ask that you ask specifically

20  who made the decision on behalf of Hamid versus who    12:44:26

21  made the decision on behalf of Umer, because they had

22  separate counsel who were making decisions on behalf

23  of separate clients.

24           MR. RIORDAN:  So you think.  That's what --

25  that's what we're getting to here.                     12:44:38

49

1  BY MR. RIORDAN:

2      Q.   Do you recall whether you made any pretrial

3  motions?

4      A.   I don't recall.

5      Q.   What, in your mind, was the most important      12:44:47

6  piece of evidence that your -- the government would

7  offer against your client, Hamid?

8      A.   At what time frame?

9      Q.   Well, let's -- let's say we're in -- in this

10 period soon after indictment when -- the 60-day          12:45:12

11 period.  What was your awareness, your belief as the

12 most important piece of evidence they would offer

13 against your client?

14     A.   His confession.

15     Q.   Were you aware that -- or let me ask you         12:45:24

16 this:  Did you consider making a motion to suppress

17 his confession or statements?

18     A.   It sound -- I -- I think we had discussions

19 about it.  I just don't remember.

20     Q.   Was any such motion ever made?                   12:45:44

21     A.   No, I don't believe it was.

22     Q.   Do you recall why such a motion wasn't made?

23     A.   I don't recall.

24     Q.   Were you familiar at the time with the law of

25 involuntary -- concerning involuntary statements?        12:46:09

50

1     A.    With the federal law regarding --

2     Q.    Yes.

3     A.    Probably not.

4     Q.    Were you aware of the four or five criteria

5 for deciding whether a statement is involuntary and      12:46:20

6 therefore must be suppressed?

7     A.    Maybe if we had a discussion about it, it was

8 something that I probably learned, but I don't recall.

9     Q.    Do you recall whether you were aware that the

10 length of an interrogation is one of those factors?      12:46:40

11     A.    I don't recall.

12     Q.    Do you recall whether implicit promises are a

13 factor that go into the calculus of whether a

14 statement is involuntary?

15     A.    I -- I don't recall.                           12:46:59

16     Q.    Do you recall whether you knew that a -- a

17 suspect's mental history or medical history can be

18 relevant to a motion to suppress on the grounds of

19 involuntariness?

20     A.    I mean, that's something I -- I knew at some   12:47:21

21 point.  When, I don't know.

22     Q.    Do you recall whether you were aware that a

23 severe case of meningitis can cause cognitive

24 difficulties?

25     A.    I was not aware of that at the time.          12:47:40

51

```
 1      Q.   So you didn't consider the history of

 2 meningitis as a factor to be considered in whether to

 3 bring a motion to suppress for involuntariness?

 4      A.   I don't think I did that.

 5      Q.   This -- you mentioned your -- Hamid's          12:47:58

 6 statements as being, at that time, certainly the --

 7 your view of the bedrock of the case against your

 8 client.  And was that also true of -- to your

 9 knowledge, of the case against Umer?

10      A.   His videotaped confession?                     12:48:20

11      Q.   Yes.

12      A.   Yes.

13      Q.   Were you -- does the -- the case name United

14 States v. Bruton mean anything to you?

15      A.   Yes.                                           12:48:38

16      Q.   And what -- what does that case stand for?

17      A.   I knew then and I don't know now.

18      Q.   Did you believe that if you had a joint trial

19 there was a danger that Umer's statements would come

20 into evidence against your client?                       12:49:00

21      A.   I recall that we had those discussions and

22 that ultimately that's why parts of the trial were

23 separated.

24      Q.   Were you aware that -- that having

25 codefendants who made statements which are not          12:49:22
```

1   supposed to be admitted against each other, that

2   that's a basis for making a motion to sever the trial?

3       A.   I probably knew that then, but I don't -- I

4   don't know it right now.

5       Q.   Why wasn't there a motion to sever the two         12:49:38

6   defendants?

7       A.   I don't know.

8       Q.   Let me ask you this:  Let's say the Court or

9   the government, for some reason, severed the two

10  cases.  Are you with me?                                    12:49:59

11      A.   Yes.

12      Q.   Would you have proceeded to trial alone as

13  Hamid's lawyer in the terrorism case?

14      A.   Probably --

15           MR. TICE-RASKIN: --                                12:50:11

16           THE WITNESS:  Do you want to say your

17  objection for the record?

18           MR. TICE-RASKIN:  Yeah.

19           Objection.  Relevance.  It assumes facts that

20  are not in evidence and contrary to the actual trial       12:50:19

21  record.

22  BY MR. RIORDAN:

23      Q.   Now answer the question.

24      A.   Probably not.

25      Q.   And that would have been because you needed        12:50:27

1  Johnny to participate in the trial with you?

2       MR. TICE-RASKIN:  Objection.

3       THE WITNESS:  No.

4       MR. TICE-RASKIN:  Leading.

5       THE WITNESS:  That would not have been the       12:50:32

6  reason.  It would have been because I didn't want to

7  do it all by myself.  I would have had another

8  attorney help me.  I didn't need Johnny.

9  BY MR. RIORDAN:

10      Q.  Okay.                                         12:50:42

11      I believe you said that -- that a principal

12  tactical focus at the beginning of the case was

13  raising the speedy trial issue.

14      A.  I remember that being an issue early on, yes.

15      Q.  Why don't you tell me how -- what the         12:51:04

16  thinking was -- your thinking or the joint -- the

17  defense thinking about the speedy trial issue.

18      A.  All I can recall is that early on in the

19  case, the amount of evidence that the government had

20  produced in terms of discovery and our assessment of  12:51:27

21  the limited amount of evidence that they had was that

22  they wouldn't ultimately succeed if they were pushed

23  to trial with what they had and that it was a good

24  idea for us to push for a speedy trial.

25      Q.  Was -- wasn't that a reason that you didn't    12:51:51

1 want to make motions?

2      A.    That sounds like that was likely the reason,

3 but I don't think -- I don't know if that was the only

4 reason, but it sounds like a big part of it.

5      Q.    Had you -- were you fam -- had you ever dealt      12:52:07

6 with the Speedy Trial Act before this case?

7      A.    No.

8      Q.    Did you review the statute itself?

9      A.    Yes.

10      Q.    And the case law?                                  12:52:17

11      A.    I -- well, that's a big question.  Not all

12 the case law, but I think I -- I educated myself to

13 understand it.

14      Q.    And was it your belief that if you made

15 motions, that would halt the speedy trial claim?            12:52:29

16      A.    I think so, at the time.

17      Q.    And wasn't that a reason that you didn't want

18 to make motions?

19      A.    It's the same question.  I have to answer it

20 the same way.  I think that that sounds like it was          12:52:47

21 probably a good reason for it.  Whether or not that

22 was the only reason, I think we talked about different

23 types of motions and decided strategically, this was

24 the best way to proceed.

25      Q.    Do you recall that right after -- do you           12:53:00

55

1   recall right after the complaint that the joint

2   defense, both you and Mr. Griffin, filed a discovery

3   request by letter with the government?

4       A.   I remember doing a written discovery request,

5   yes.                                                    12:53:19

6       Q.   And do you recall that it asked for

7   information from a large number of federal agencies?

8       A.   Yes.

9       Q.   And that those agencies included the CIA and

10  the FBI and the national -- the Department of Defense?  12:53:30

11      A.   Probably did.

12      Q.   And did you -- was there a belief that

13  they -- on your part in filing that, that the

14  government might well have exculpatory evidence in the

15  files of those agencies?                                12:53:51

16      A.   We thought there could be, sure.

17      Q.   And you wanted to get that information if it

18  existed?

19      A.   Well, right.  That's why we sent the request.

20      Q.   At the time that you sent the request -- had  12:54:04

21  you ever heard the term CIPA?

22      A.   At the time I sent the request, I don't

23  remember.  CIPA.  I don't know when I first learned of

24  CIPA, but it was definitely in this case.

25      Q.   Were you aware that to obtain information     12:54:21

56

1  from the CIA or the FBI, under the provisions of CIPA,

2  would require a security clearance?

3          MR. TICE-RASKIN:  Objection.  That misstates

4  the law.  There are circumstances under which

5  classified information can be dis -- declassified and      12:54:39

6  provided to the defense to discharge Brady

7  obligations.  So it's not legally correct that you

8  have to have a clearance in order to obtain discovery

9  that is mandated under federal law.

10         MR. RIORDAN:  Let me rephrase my question.       12:54:53

11 BY MR. RIORDAN:

12     Q.  Did you believe under CIPA that you needed a

13 security clearance in order to get that information

14 from the FBI or the CIA?

15     A.  I don't -- I don't remember that, but to the      12:55:03

16 extent it helps anything with your future questions,

17 what Rob just said, I do remember knowing that and

18 that being a discussion of why we ultimately did not

19 get the clearances, that we knew we had the ability to

20 have classified information declassified.  And that --    12:55:22

21 that was primarily the reason why we did not get the

22 clearances, and the time factor.

23     Q.  Explain the time factor.

24     A.  Well, I think that it was -- we thought that

25 that was going to cause further delays in the case to     12:55:39

1  get the clearance because Johnny's understanding was

2  that -- well, I didn't personally know -- but Johnny's

3  understanding was that it's a -- it's an extensive

4  process.

5      Q.   So that if you asked for the clearances, that        12:55:50

6  would have required sacrificing your speedy trial

7  demand?

8      A.   It was going to cause delays, but I know that

9  that was a consideration, but the primary

10 consideration was that Johnny felt we didn't need it          12:56:05

11 to proceed.

12     Q.   That Johnny felt that?

13     A.   That Johnny felt that, and that in his

14 explanation to me of the rules and my attempt to read

15 them and understand them, I agreed.                           12:56:18

16     Q.   So when it came to CIPA, you relied on

17 Johnny's understanding of the law and its requirements

18 and its exceptions?

19     A.   No, not entirely.  I remember I did my own

20 reading and research as well.                                 12:56:35

21     Q.   So -- and don't let me put words in your

22 mouth.  Is it -- is it fair to say that in the initial

23 period of the case, a very important tactical

24 consideration was preserving a speedy trial claim?

25     A.   Yes.                                                 12:57:03

1      Q.   And that consideration flowed over into your

2   consideration of whether to file pretrial motions?

3      A.   You are asking me the same question several

4   different ways, and I honestly -- I know that that was

5   a big focus and I know it affected our decision to          12:57:27

6   file motions.  However, we also considered the

7   different types of motions and had the discussions and

8   weighed what was the best strategy.  So I don't think

9   it was the only reason why we didn't file motions.

10      Q.   Well, do I understand that -- that Johnny and    12:57:47

11   you participated in a discussion about whether to

12   move -- to suppress Hamid's statements on

13   involuntariness grounds?

14      A.   I don't remember, but I know we talked about

15   the different types of motions that could be filed.  I    12:58:05

16   don't remember which specific discussions we had, but

17   I know we had discussions about them.

18      Q.   Were you -- in your discussions of the Speedy

19   Trial Act, did you believe that if the case was

20   dismissed on speedy trial grounds, it would be over?      12:58:23

21      A.   At the time, you know, I -- I may have known

22   that they could come back and recharge it, but maybe

23   we talked about the likelihood of that happening, that

24   it wasn't going to happen.  I -- I don't remember that

25   discussion and whether or not I thought that that was     12:58:44

59

1   a finality.  I don't think -- I don't think I thought

2   that.

3       Q.   Well, so you -- you are not sure as you sit

4   there whether you factored into your thinking that if

5   it was dismissed for speedy trial grounds, they could        12:59:09

6   just recharge the case?

7           MR. TICE-RASKIN:  That's a little ambiguous.

8           THE WITNESS:  Yeah.

9           MR. TICE-RASKIN:  Might you rephrase that,

10  please.                                                      12:59:20

11  BY MR. RIORDAN:

12      Q.   How did -- well, you don't know as you -- as

13  you testified today, you don't know whether you

14  believed or knew that they could refile the case if

15  it's dismissed on speedy trial grounds?                      12:59:36

16      A.   I don't -- I don't remember, but I think -- I

17  think that was something we talked about, that it

18  just -- I don't think just because it was dismissed on

19  Speedy Trial Act that it was over for sure, that there

20  was nothing else the government could do about that.         12:59:53

21  I don't think I believed that.

22      Q.   You had made a demand for discovery from the

23  FBI and the CIA, right?

24      A.   Right.

25      Q.   Did you believe if -- having made that             01:00:07

1  demand, that you could -- that the speedy trial claim

2  might succeed?

3      A.   Having made that demand.  I don't know why

4  the two were necessarily -- I don't know why would the

5  two necessarily have affected each other.  We could        01:00:30

6  have -- just because we made the request doesn't mean

7  we had to wait for the responses before we proceeded.

8      Q.   Well --

9      A.   --

10     Q.   I'm sorry.                                         01:00:41

11     A.   Okay.

12     Q.   Were you aware of the complex case exception

13  to the Speedy Trial Act?

14     A.   I don't -- I don't -- I don't remember right

15  now, but like I said, I read then.  As I sit here          01:00:48

16  today, it doesn't sound familiar to me.

17     Q.   Well, but it was your belief that you could

18  request the information?

19     A.   Right.

20     Q.   And the government would have to go out to         01:00:58

21  trial even if they hadn't been able to fulfill your

22  request?

23     A.   Could the government proceed to trial without

24  having fulfilled our request?

25     Q.   No.  Could you force the government to go out      01:01:22

61

1  if you had requested this information from them?

2      A.   It's -- it's -- it's difficult for me to

3  remember what I knew then about that issue.  About

4  outstanding discovery and how it affected the trial, I

5  don't know right now --                           01:01:41

6      Q.   Did you know then?

7      A.   -- what I knew about that.

8      That's what I'm saying.  I don't know what I

9  knew about that then.  I don't know.  I honestly

10  don't.                                           01:01:49

11     Q.   Do you recall that at some point the Court

12  granted the government continuances to comply with

13  your discovery request?

14     A.   Sounds familiar.

15     Q.   And it -- it vacated the trial date in late  01:02:03

16  August?

17     A.   If you say so.  I don't remember the date.

18     Q.   But you remember that you didn't go out to

19  trial in late August?

20     A.   Oh, yeah, for sure.                      01:02:18

21     Q.   And that the government was given additional

22  time to prepare its case?

23     A.   I do remember that.

24     Q.   At that point, in your mind, was the speedy

25  trial issue dead?                                01:02:28

1      A.    I don't remember.

2      Q.    Well, was there any reason to press the

3  government forward from that point on once the speedy

4  trial -- they had been granted those continuances?

5      A.    I don't remember.  And I don't remember if I    01:02:48

6  thought or knew that the clock began to run again

7  after a superseding indictment.  I don't remember.

8      Q.    Okay.  Did you think that you should preserve

9  the speedy trial issue for appeal?

10     A.    I -- I -- I know that I knew that we had to      01:03:08

11 preserve issues for appeal on this -- I mean, I --

12 specifically on this speedy trial issue, I don't know

13 what I thought of it.

14     Q.    So jumping ahead, and we'll come back.

15     Do you recall whether it was your opinion           01:03:33

16 once the trial was over that the speedy trial issue

17 could be an effective issue on appeal?

18     A.    Did I believe that at the time?  I probably

19 did.

20     Q.    Do you think you might have communicated that   01:03:47

21 thought to appellate counsel?

22     A.    I think I may have.

23     Q.    And were you aware that in order to preserve

24 a speedy trial issue for appeal, you have to make a

25 motion to dismiss on speedy trial grounds?            01:03:59

63

1     A.    I probably was not aware of that.

2     Q.    And there was no motion to dismiss on speedy

3  trial grounds made by you or Mr. Griffin, right?

4     A.    I don't recall doing that.

5     Q.    And therefore there was no appellate issue in    01:04:13

6  that regard?

7     A.    If that's the law, then that's the law.

8     Q.    Do you know whether it states on the face of

9  the Speedy Trial Act that you need a motion to

10  preserve the issue?                                      01:04:26

11    A.    As I sit here, I don't know that and I don't

12  know if I knew that then, but --

13    Q.    You don't know now whether you actually ever

14  read the Speedy Trial Act?

15    A.    No, that's not true.  I know I read it, but     01:04:38

16  whether or not I picked up on that issue and decided

17  that this was an issue we needed to preserve and we

18  needed to take action on, I probably didn't do that.

19    Q.    I'm going to move to -- well, we talked about

20  the government being granted countinuances over your    01:05:04

21  objection?

22    A.    Okay.

23    Q.    Sorry.  At some point, was there a

24  superseding indictment in the case?

25    A.    I -- I recall there being a superseding         01:05:17

1   indictment.

2       Q.   Do you recall when it was?

3       A.   No.

4       Q.   Does September 22nd of 2005 sound reasonable?

5       A.   I don't recall, honestly.  I really don't.    01:05:27

6       Q.   If the docket says that, you would accept

7   that representation?

8       A.   I would accept that representation.

9       Q.   What was your reaction or -- what -- did --

10  did the indictment -- okay.  Given that indictment --    01:05:45

11  let me start again.

12      Did the indictment charge Hamid Hayat with a

13  terrorism offense, a superseding one?

14      A.   Yeah -- I don't know, was there a second

15  superseding indictment?  I -- at some point I know    01:06:06

16  those charges were added.  I don't know which document

17  it was, but yes, I remember it was added.  The

18  material support, yes.

19      Q.   Do you need to look at the docket to see when

20  it was added for the first time?                      01:06:18

21      A.   I mean, if you make a representation, I'll

22  believe it.  I just can't -- I don't remember dates or

23  any of that, so --

24          MR. RIORDAN:  Do we want to stipulate that

25  the first superseding indictment was on September 22,    01:06:28

65

1   2005?  It's Item No. 50 in the -- in the docket.

2           THE WITNESS:  That's fine.

3           MR. TICE-RASKIN:  It was indeed

4   September 22nd.

5   BY MR. RIORDAN:                                    01:06:40

6      Q.   How did it affect your considerations about

7   representing Hamid that he was now charged with a

8   terrorism offense?

9      A.   Well, I can't remember specifically, but my

10  feeling is that I don't think we were surprised when  01:07:03

11  it came out.  I think we thought it was eventually

12  going to happen.  So there had been a buildup to it,

13  in my mind.  So I don't think it was just like, Whoa,

14  what's this.

15     Q.   But I think you said that the decision to    01:07:18

16  have you represent Hamid was based on him having the

17  less serious charge, right?

18     A.   Right.

19     Q.   Was it your conclusion that he now faced a

20  much more serious charge?                            01:07:34

21     A.   Yes.

22     Q.   What was the maximum penalty for the

23  terrorism offense?

24     A.   I knew then.  I don't know now.

25     Q.   Was it many, many years in prison?          01:07:43

1     A.    Yes.

2     Q.    Do you remember what the maximum offense for

3  a false statement charge is?

4     A.    Was it five or eight years or something like

5  that?  Yeah, with an enhancement.                      01:07:57

6     Q.    So he was now looking at a potential sentence

7  multiples greater than originally?

8     A.    Yes.

9     Q.    Did that force you to reconsider your

10  decision about whether you should represent him?       01:08:11

11     A.    No.

12     Q.    Why not?

13     A.    I had already -- so if you say it was

14  September, by that time, I had already put in months

15  into the case.  I was intimately knowledgeable of the  01:08:25

16  evidence.  I was working very hard.  I was -- my

17  confidence was building.  And I knew that I -- that

18  Johnny was there, and I think I felt I was more

19  capable at that point to stay on.

20     Q.    But the existence of a second, more           01:08:50

21  experienced counsel was critical in your decision to

22  continue as Hamid's representative?

23     A.    Yes.

24     Q.    At that point, in September, did you

25  reconsider the decision not to have an investigator go  01:09:12

1  to Pakistan?

2      A.    I don't know.  I don't know when those

3  thoughts and the strategy, when that played in my

4  mind, if it was closer to trial or if it was in the

5  fall.  I have no idea of any of that right now.      01:09:31

6      Q.    Did it recon -- did it affect -- well, is

7  it -- was it the case that the rationale of not making

8  motions because of the Speedy Trial Act was now out of

9  the picture, it was no longer a consideration?

10     A.    You know, the -- the speedy trial issue, I    01:09:55

11  know at some point, wasn't an issue.  I just -- I just

12  can't remember the strategy and the thinking in all of

13  that right now.  But I know it was an issue and then

14  it wasn't an issue.

15     Q.    Okay.  The efforts to press the government to  01:10:17

16  trial had been denied by the -- by the district court

17  in August, right?

18     A.    Right.  When you just told me that -- that

19  their request to continue was granted, yes.

20     Q.    Did you, upon this superseding indictment,    01:10:30

21  then consider making a motion to suppress Hamid's

22  confession?

23     A.    I don't think so.

24     Q.    Why not?

25     A.    I don't -- I don't know.                      01:10:47

68

1    Q.   Where -- was it -- did -- did you believe

2  there might be grounds to do it, or did you believe

3  there were no grounds to do it?

4    A.   I don't -- I don't remember exactly how I

5  felt about that issue.  I just know that as the case          01:11:07

6  progressed and as the evidence came in and as things

7  happened in court, our strategy just kept continuing

8  on.  So it progressed.  I don't know at what point

9  what decision was made for what purpose.  I just --

10  it's very difficult to recall that.  This was nine          01:11:27

11  years ago.

12    Q.   Well, let me ask you this:  There was

13  evidence that you viewed as helpful to the government,

14  right?

15    A.   Yes.                                                 01:11:48

16    Q.   Primary among those quantums of evidence was

17  the defendant's taped statement?

18    A.   Yes.

19    Q.   Would you -- was it your objective as Hamid's

20  advocate to keep out of that evidence, any bad             01:12:06

21  evidence that you could keep out of --

22    A.   Of course.

23    Q.   And conversely, you had evidence that you

24  wanted to get in trial -- into trial?

25    A.   Sure.                                                01:12:19

69

```
 1      Q.   And it was you viewed your position as an

 2  advocate as using every means and citing every

 3  relevant precedent to try and get into evidence, that

 4  evidence that you thought would help Hamid?

 5      A.   Yes.                                        01:12:37

 6      Q.   So would it be fair that if you didn't move

 7  to suppress the confession, you didn't know of any

 8  ground on which you could have moved to suppress the

 9  confession?  Is that a fair statement?

10      A.   The only way I can answer that is that I    01:12:55

11  wouldn't have, on my own, known it and it would have

12  been something that would have been a result of a

13  discussion with Johnny.  Whether or not we had those

14  discussions and the extent of them, I don't recall.

15      Q.   You were relying on Johnny to provide you,  01:13:11

16  from his experience, with some insight as to what

17  motions were worth making and which were not?

18      A.   Yes.

19      Q.   Let me ask you this:  Let's stay on the -- on

20  the statements of Hamid.                             01:13:30

21      A.   Okay.

22      Q.   Putting aside a motion to suppress, were you

23  aware that there are methods of challenging statements

24  as being false confessions?  Were you aware of various

25  strategies and methods of doing that in a criminal    01:13:54
```

1    trial?

2       A.    In a trial, or in a pretrial motion?

3       Q.    Now we are talking about trial.

4       A.    Trial.  To challenge the statements?

5       Q.    Uh-huh.                                    01:14:05

6       A.    Yes.

7       Q.    And what was your understanding of what those

8    methods would be?

9       A.    Well, we thought we were going to put on our

10   expert to testify about why he thought it was a false    01:14:15

11   confessoin.

12      Q.    And that was an important part of your

13   strategy?

14      A.    Yes.

15      Q.    And who is that expert?                    01:14:22

16      A.    James Wedick.

17      Q.    And were you aware that there is a fairly --

18   that there are -- were you aware that there were other

19   potential experts in the field of false confessions?

20      A.    Yes.                                       01:14:39

21      Q.    Had Mr. Wedick ever been qualified as an

22   expert in the field of false confessions?

23      A.    I don't think so.

24      Q.    Did you consider calling a more experienced

25   expert in this field who had been qualified in other    01:14:57

1  cases to testify about false confessions?

2      A.   I think I did because I -- I received --

3  various people tried to contact me themselves because

4  they knew about the case.  So I'm sure I considered it

5  when I saw their information.  But I felt -- I          01:15:16

6  thought -- I thought James was going to get in and he

7  was going to be qualified.

8      Q.   So did you actually contact any of those

9  other people and ask them whether they would be

10  available to testify?                                  01:15:41

11      A.   No.

12      Q.   Had you ever -- well, this may be obvious,

13  but for the record, had you ever qualified an expert

14  in a federal court proceeding?

15      A.   Trying to remember if I had had an           01:15:53

16  immigration hearing at that time where I did that.  At

17  that time, maybe not.

18      Q.   Are immigration proceedings subject to the

19  federal rules of evidence?

20      A.   Yes.                                          01:16:04

21      Q.   But you had never called or confronted an --

22  called your own expert or confronted a hostile expert

23  in a federal district court proceeding?

24      A.   No.

25      Q.   So the superseding indictment comes down in  01:16:19

1  September 22nd.  What, to your recollection, were you

2  doing on the case between September 22nd and the

3  beginning of January?

4      A.    All I know is I was constantly working on the

5  case at some level and there was a lot of evidence.          01:16:57

6  So I -- between those times, I really don't remember.

7  I don't know if it was -- was January an original

8  trial date that was continued?  I don't remember.  So

9  if it was, maybe there was trial preparation involved,

10 specifically.  I just don't recall in that period what   01:17:17

11 I was doing, but I know I was working.  This was --

12 this was -- the majority of my practice was this case

13 at the time.  I was doing a lot of work.

14     Q.    And you mentioned before that certainly by

15 the time of trial you knew the evidence well?             01:17:31

16     A.    Yes.

17     Q.    Was it your opinion that you knew the

18 evidence -- that you had studied the evidence much,

19 much more than Mr. Griffin?

20     A.    Yes.                                             01:17:42

21     Q.    Was it your opinion that you knew the

22 evidence much, much more than Mr. Griffin?

23     A.    Yes.

24     Q.    Do you recall whether you made any -- any

25 motions between September and January?                     01:17:52

1     A.    I don't recall.

2     Q.    In -- do you recall whether in December of

3  2005 the government contacted you and said you

4  folks -- you and Mr. Griffin have to get security

5  clearances?                                           01:18:12

6          MR. TICE-RASKIN:  Objection to the extent

7  that it misstates the letter in the government's

8  request -- or advice, rather.

9          THE WITNESS:  I don't remember anyway, so.

10 BY MR. RIORDAN:                                       01:18:23

11    Q.    Do you remember whether the issue of security

12 clearances came back up in the case in December and

13 January -- December of 2005 and January of 2006?

14    A.    I don't remember.

15    Q.    Do you remember whether a hearing was held   01:18:36

16 before the -- before Judge Burrell on the issue of

17 whether you should get security clearances?

18    A.    I don't remember a hearing, but if it

19 happened, sure.  I just don't remember we had a

20 hearing on it.                                        01:18:57

21    Q.    Do you recall -- was it your belief at the

22 time that the -- the only issue involving security

23 clearances were the aerial photographs that the

24 government was going to use at trial?

25    A.    I don't remember if I thought that was the   01:19:08

1    only issue.  I don't remember.

2        Q.   Was it your belief -- let's put aside the

3    government's use of classified information.

4        A.   Uh-huh.

5        Q.   Was it your belief and understanding that the    01:19:31

6    government could block evidence that was in your

7    position that you had obtained by evoking CIPA?

8        A.   I -- well, if I had information that was

9    classified, could they block it under CIPA?  I don't

10   remember specifically thinking about that, but if it     01:20:05

11   was classified, it was classified.  I don't think it

12   mattered who had it.

13       Q.   Do you remember asking a trial -- FBI agent

14   at trial whether someone had gone up to investigate --

15   someone from the government or the FBI had gone up to    01:20:31

16   investigate the camp at Balakot?

17       A.   Oh, I may have asked that question.  I don't

18   remember asking it, but I may have, yeah.

19       Q.   Do you remember whether the government

20   objected on CIPA grounds?                                01:20:45

21       A.   I don't remember.  They made a lot of

22   objections on CIPA grounds.

23       Q.   And do you remember that you made an

24   agreement that you would not pursue any question that

25   they objected to on CIPA grounds?                        01:20:56

1          MR. TICE-RASKIN:  Objection.  Misstates the

2    record.

3          MR. RIORDAN:  I doubt it.

4          THE WITNESS:  I -- I don't remember.

5    BY MR. RIORDAN:                                    01:21:06

6      Q.   But you recall that there were CIPA

7    objections at trial?

8      A.   Yes.

9      Q.   Do you recall whether they were sustained?

10     A.   The Court -- I mean, the government's        01:21:31

11   objections?

12     Q.   Uh-huh.

13     A.   I recall a lot of them were.

14     Q.   And do you recall that as to others you

15   withdrew the questions when the government objected on   01:21:41

16   CIPA grounds?

17     A.   I may have.

18     Q.   Did you -- did you believe that you were

19   foreclosed from arguing the admissibility of those

20   questions because you didn't have the security        01:22:01

21   clearance?

22     A.   You mean after the Court sustained the

23   objection, following that, whether or not I felt I

24   could argue the -- the objection because what --

25   because I didn't have clearance; that's your        01:22:24

1  question?

2      Q.   Yes.

3      A.   Yes.  I think that I may have eventually come

4  to that point because they were all sustained.

5      Q.   But you would have come to that realization      01:22:39

6  during trial?

7      A.   Oh, yeah.

8      Q.   You didn't have that realization pretrial

9  when the decision was made not to seek a security

10  clearance?                                               01:22:51

11     A.   I don't remember if when we decided not to

12  get the clearance that that was something Johnny and I

13  talked about, that a CIPA objection would likely be

14  sustained.  I don't remember if we expected that

15  result.                                                  01:23:10

16     Q.   So your understanding may have been that CIPA

17  only applied to attempts to get the government's

18  evidence as opposed to the government's ability to

19  block your evidence?

20     A.   No.  I -- I -- I don't think I differentiated    01:23:31

21  whose evidence it was.  I thought it was just

22  classified evidence, period, there would be issues

23  with.

24     Q.   But you did or did not understand that

25  without a CIPA clearance you can't participate in an     01:23:45

1  argument about CIPA evidence?

2      A.   Oh, I understood that because I knew that the

3  government had CIPA hearings where we weren't even

4  present.  So I think I understand that.

5      Q.   Did you understand that the same thing would     01:24:00

6  be true at trial to your questions on

7  cross-examination?

8      A.   You're saying in advance of trial did I

9  understand that?

10     Q.  Yes.                                              01:24:11

11     A.   That's the question I am not sure.

12     Q.   Okay.

13     A.   Whether or not we talked about that, I don't

14  remember.

15     Q.   We've jumped forward to some issues at trial,    01:24:17

16  but let -- let's go back to the beginning of

17  January --

18     A.   Okay.

19     Q.   -- 2006, but before the trial began.

20     Did you discuss with your client at that time        01:24:36

21  the possibility of a plea agreement?

22     A.   At some time.  I don't remember when, but it

23  was in advance of trial, yes.

24     Q.   And it was going to be -- was it going to be

25  a joint agreement that covered both him and his         01:24:51

78

1  father?

2      A.   That's how it was offered.

3      Q.   And what -- what was the term of

4  imprisonment, do you recall, that he would have had to

5  agree to?                                          01:25:04

6      A.   Was it 15 years?  That sounds -- that's what

7  I remember.

8      Q.   And did he agree to that offer?

9      A.   Hamid, no.

10     Q.   Did he profess his innocence and refuse --   01:25:14

11  refusing to take the offer?

12     A.   Yes.

13     Q.   And that necessarily meant that Umer was not

14  going to receive a separate offer, was that your

15  understanding?                                     01:25:37

16     A.   No, I don't think that -- I definitely

17  thought that the government wouldn't maybe make

18  separate offers, but that particular offer was a joint

19  offer.  So if we didn't take it, it was wasn't going

20  to happen.                                         01:25:51

21     Q.   And it then -- was it your conclusion the

22  case was then going to get tried?

23     A.   Yes.

24     Q.   And was there a new retainer agreement?

25     A.   There may have been.                       01:26:08

1      MR. RIORDAN:  Can I look at Exhibit G.

2  BY MR. RIORDAN:

3      Q.   I'm going to show you what's been marked as

4  Exhibit G and ask you to review that before I ask you

5  a question about it.                              01:26:26

6      A.   Sure.

7      Okay.

8      Q.   Have you seen that document before, or

9  something like it?

10     A.   I probably did.  I mean, it's drafted by    01:27:23

11  Johnny's office, but I probably saw it.

12     Q.   And it's a -- am I correct that it's a

13  retainer agreement that would cover both Mr. Griffin

14  and you in terms of your trial representation?

15     A.   I mean, I think he -- it's -- it's signed    01:27:40

16  only between the two of them, so he -- he mentions the

17  terms of an agreement between -- for my fees, but I

18  don't think it's a retainer agreement for all four of

19  us.  I think that I probably did one too.

20     Q.   But it purports to cover both his fees and   01:27:57

21  your fees?

22     A.   Yeah.

23     Q.   And I believe it states that he had already

24  received $20,000 in an --

25     A.   Yeah --                                      01:28:09

80

1     Q.    -- from an earlier agreement?

2     A.    -- that's what it says.

3     Q.    All right.  And that appears to -- well, you

4  testified that you had received something between 5-

5  and $10,000?                                          01:28:20

6     A.    6- and 10-, I said, yeah.

7     Q.    Yeah.  And had you received -- this is dated

8  January 18th.  To your recollection, had you received

9  any additional funds between that initial $6,000

10 and -- and mid-January?                               01:28:33

11    A.    That question on its own, I don't remember,

12 but if I read this letter, if Johnny hadn't received

13 any money after $20,000, I wouldn't have received any

14 money either.

15    Q.    Why is that?                                 01:28:48

16    A.    Because there wasn't a period of time where I

17 got paid and Johnny didn't get paid.

18    Q.    Say that again.

19    A.    There wasn't a time when Johnny -- when I got

20 paid and Johnny didn't get paid.  We both got paid at  01:28:56

21 the same time.  If --

22    Q.    Well, let me --

23    A.    If I got -- okay.  If I got paid, Johnny had

24 also gotten paid at that time.  There may have been a

25 time when Johnny got paid and I didn't get paid.      01:29:09

1    Q.    Weren't there definitely times when Johnny

2  got paid and you didn't get paid?

3    A.    There probably was.

4        MR. RIORDAN:  Where are the checks?

5  BY MR. RIORDAN:                                        01:29:20

6    Q.    Well, let me ask you this:  Do you have any

7  recollection of getting any money to represent Hamid

8  between the $6,000 that you -- or 6 to 10 that you got

9  early on and the -- the end of the trial?

10    A.    Did I get -- oh, yeah.  Between -- so the     01:29:39

11  first time I got paid 6- to $10,000.  Whether or not I

12  got paid before the end of the trial, I think I did.

13  And again, when you guys asked me the specific

14  question, I gave you the information then.  I don't

15  remember right now when and how much.                  01:29:53

16    Q.    Okay.  I'm going to ask you to review -- oh,

17  well, let's say with this for a minute.

18        So this is new retainer agreement for a -- a

19  global fee for both defendants of how much money?

20    A.    Total, 200,000.                               01:30:12

21    Q.    And how much of that 200,000 are you supposed

22  to get?

23    A.    It says 65.

24    Q.    And how much is Johnny supposed to get?

25    A.    150.  That doesn't add up to 200.            01:30:26

82

```
 1      Q.    And is the amount that he is supposed to get
 2 set, or is it dependent on expenses?
 3      A.    Oh.  Are you asking me to tell you what's in
 4 this letter?  Because I don't remember independently.
 5      Q.    Well, let's look at the second page.          01:30:52
 6      A.    Yeah, in the letter itself, yeah.
 7      Okay.  So let me see.
 8      All costs and related trial expenses will be
 9 paid from the remaining 135-.  So. . . we will pay an
10 additional lump sum payment of 200-.                     01:31:15
11      So it -- it sounds like he's saying it's 200-
12 total, I get 65-, and then out of the $135,000, that
13 will cover Johnny plus costs and travel-related
14 expenses.  Yeah, that's how it's written.
15      Q.    So you get 65-.  He's --                      01:31:32
16      A.    Yeah.
17      Q.    -- supposed to get -- then there will be 135-
18 left over, right?
19      A.    Right.
20      Q.    And he gets that 135-.  He's responsible for  01:31:40
21 expenses out of that, and he gets what's left over.
22 Is that your understanding?
23      A.    That's not what it says here, but that was
24 the understanding, that whatever costs and expenses
25 would come out of the 135-.                              01:31:56
```

83

1    Q.   His side of the ledger?

2    A.   Yes.

3    Q.   So that would mean that if you needed an

4 expert for Hamid, Johnny would have to pay for it out

5 of his 135-?                      01:32:09

6    A.   That it would come from the 135-.  That's --

7 that's how -- that's what the understanding was, yes.

8    Q.   So the more money spent on Hamid's case, the

9 less money Johnny gets to keep for himself?

10    A.   You can look at it that way, yeah.      01:32:24

11    Q.   Well, is that what it says?

12    A.   I mean -- yeah.  I mean, that's what it says,

13 that he -- the balance would be his attorney's fees.

14 But it was negotiated that way understanding that

15 there were going to be costs and related --     01:32:36

16 travel-related expenses.

17    Q.   Um --

18    A.   And he did pay for some of our costs -- or

19 all of the costs and travel-related expenses.

20    Q.   And you called one expert; is that right?   01:32:47

21    A.   Anita Weiss, yes.

22    Q.   And Johnny paid for that expert?

23    A.   Yes.

24    Q.   And how much did you pay her?

25    A.   Me personally?                   01:32:58

84

1      Q.    Or how much was she paid?

2      A.    I don't recall.

3      Q.    Was it in the neighborhood of a thousand

4  dollars?

5      A.    I don't recall.  I honestly don't remember.    01:33:04

6  I don't think she was -- I don't think it was

7  expensive, but I think we covered her travel as well.

8      Q.    Uh-huh.

9      A.    So -- she wasn't expensive, so that might be

10  right.                                                  01:33:18

11      Q.    But a more expensive expert would have

12  reduced the amount of money available to Johnny,

13  right?

14      A.    Yeah.

15      Q.    Did you ever get anything like $65,000 from    01:33:25

16  your continued representation?

17      A.    No.

18      Q.    Okay.  I want you to look at Exhibit H -- or

19  is it -- H?

20      A.    Okay.                                          01:34:02

21      Q.    Who was Umer Khitab?

22      A.    Umer Hayat's brother, I think.

23      Q.    And he was the one who was apparently paying

24  the lawyers in this case?

25      A.    He had equity in his home.                     01:34:23

1    Q.    And those checks reflect five or six checks

2  to Johnny and one to you?

3    A.    That's what it looks like, yeah.

4    Q.    And the one to you was for $10,000?

5    A.    Yeah.                                     01:34:39

6    Q.    We don't have to add up the numbers, but

7  there's over a -- a hundred thousand dollars to Johnny

8  Griffin?

9    A.    (Nonverbal response.)

10   Q.    Is that correct?                          01:34:48

11   A.    Oh, you are asking me on these numbers?

12   Q.    Yeah.

13   A.    Yeah, if that's what you are saying, yeah.  I

14 mean, it's probably right, yeah.

15   Q.    Why did he get such a disproportion amount of  01:34:55

16 funds for representing the lighter client in the case?

17   A.    It wasn't about the money for me.  I was

18 happy with what I got.

19   Q.    Who made the decision as to what lawyer would

20 get what amount of money?                         01:35:20

21   A.    I think -- I think Johnny knew how much he

22 was going to charge for the case, and I probably got

23 his input on what would be reasonable for me to ask

24 for, coupled with my own compassion for the family

25 because I just knew that their living conditions and I  01:35:45

1  just -- frankly, it wasn't about the money.  And I

2  just -- I think I was willing to take whatever there'd

3  be give -- they would give me and I quoted a number

4  and I never complained about it.

5      Q.   I'm going to redirect your attention back to          01:36:04

6  Exhibit H, and we are now looking, I think, about the

7  third check.  Well, let me -- let me ask you this:

8  The first check there, what's the date of that?

9      Oh, I'm sorry.

10     A.   June 16, 2006, yeah.                                  01:36:26

11     Q.   That was after the trial, wasn't it?

12     A.   Yeah, yeah.  So that kind of refreshes my

13  recollection that we got paid after the trial.

14     Q.   Well, let's look at the second check,

15  4/12/06.                                                       01:36:39

16     A.   Oh.

17     Q.   That was during the trial, right?

18     A.   Yeah.  Looks like it.  $20,000.

19     Q.   That's made out to Johnny Griffin, right?

20     A.   Uh-huh.                                               01:36:45

21     Q.   Did you get any of that money?

22     A.   I don't recall.  Probably -- I don't think I

23  did.  I don't recall.

24     Q.   The third check to you is for June 16th as

25  well?                                                          01:36:56

1    A.    Uh-huh.

2    Q.    That's the $10,000 check?

3    A.    Uh-huh.

4    Q.    How about the fourth check?

5    A.    It says, also to me, $10,000.  Oh, so -- is     01:37:03

6    that the same check, or --

7    Q.    No, no.

8    A.    Okay.  Oh, I'm sorry.  Fourth check, next

9    page.

10    Q.    Next page.                                      01:37:13

11    A.    That's to Johnny, 15-.  Is that the one you

12    are asking -- yeah.

13    Q.    Yeah.  And when that was paid?

14    A.    March 24th.

15    Q.    That's during the trial; is that right?        01:37:19

16    A.    Looks like it, yeah.

17    Q.    Do you recall getting any money during the

18    trial?

19    A.    Nope.

20    Q.    And the next check, what's the date of that     01:37:27

21    one?

22    A.    February 8th.

23    Q.    How much is that for?

24    A.    $5,000.

25    Q.    Do you recall getting any money from that       01:37:35

1  check?

2      A.   I don't.

3      Q.   How about the next one?

4      A.   February 13th, $10,000.

5      Q.   And that's to Johnny?                          01:37:46

6      A.   Yep.

7      Q.   And do you recall getting any of that money?

8      A.   No, I don't.

9      Q.   Do you recall receiving any money for the

10  defense during the course of the trial?               01:37:53

11     A.   I don't recall, no, and I don't think I did,

12  but I don't recall.

13     Q.   You don't have a specific relection --

14  recollection, but you -- you don't recall receiving --

15  that you did receive money from Johnny based on those  01:38:11

16  checks?

17     A.   No.  Honestly, the -- the e-mail that I sent

18  to you guys, when you guys asked me, reflects my

19  research in looking into how much I got paid.  As I

20  sit here right now, I don't remember.                  01:38:27

21          MR. RIORDAN:  We're approaching the end of a

22  tape.  We've been at it for a while.  Shall we take a

23  break?

24          MR. TICE-RASKIN:  I think that sounds like

25  a -- a good idea.                                      01:38:38

89

1          THE WITNESS:  Yeah.  I have to use the

2   restroom.

3          MR. RIORDAN:  Yeah, sure.

4          What works?  I mean, I think that we are --

5   we are going to be good on this.  I don't know how          01:38:45

6   long the government is going, but I don't have a ton

7   more.  So I'm hoping we make it by 5:00, but we'll --

8   we'll see.

9          THE WITNESS:  I prefer not to take long

10  breaks and to just finish.                                  01:38:56

11         MR. RIORDAN:  Yeah.

12         THE WITNESS:  So I just want, like, a

13  five-minute break.

14         But if -- and I know that, you know, you're

15  the person who might need the break more than any of        01:39:02

16  us, so --

17         MR. TICE-RASKIN:  Well, as well as -- I don't

18  know.

19         THE WITNESS:  Well, I mean, she's typing.

20         MS. BOERSCH:  We can do ten minutes.               01:39:09

21         THE WITNESS:  Okay.

22         MR. TICE-RASKIN:  We can try for ten

23  minutes.

24         THE WITNESS:  Yeah.

25         MR. TICE-RASKIN:  Are we off the record?           01:39:09

1          MR. RIORDAN:  Let's do 15.  15 is fine.

2          THE VIDEOGRAPHER:  Okay.  The time is 1:39,

3   and this marks the end of Tape 1, and we are off

4   record.

5          (Short break was taken.)                    01:55:07

6          THE VIDEOGRAPHER:  Okay.  The time is 2:03,

7   and we are back on record with Tape 2.

8          MR. RIORDAN:  Perhaps I could ask the court

9   reporter to just read the last question and answer, if

10  you would.                                          02:03:29

11         (Record read as requested.)

12  BY MR. RIORDAN:

13     Q.   Ms. Mojaddidi, I'm just going to back up for

14  a second on a couple of areas that we talked some

15  about before.                                       02:04:26

16     Going back, really, to the -- the beginning

17  of your involvement in the case, who would you say

18  participated in the decision as to whether you would

19  represent Umer or Hamid?

20     A.   Hamid, myself, and Johnny.                  02:04:48

21     Q.   Were -- were there times when it would have

22  been helpful in your defense of Hamid to have greater

23  resources for investigation or the returning --

24  retaining of experts?

25     A.   Are you -- do you mean financial --         02:05:21

91

```
1     Q.   Yeah.

2     A.   -- resources?

3     I honestly don't recall the money being the

4  concern.  I don't recall that it being that we didn't

5  have enough money.  I -- there were other issues.        02:05:40

6     Q.   So money was not a consideration in terms of

7  hiring experts?

8     A.   No.

9     Q.   And money was not in consideration in terms

10 of investigation?                                         02:05:59

11    A.   No.

12    Q.   Um --

13    A.   Not in my mind, because I would have been

14 willing to give up what I earned if I had to.

15    Q.   Do you recognize the name Mohammad Saeed?        02:06:16

16    A.   It's a very common name.  In -- in relation

17 to this case?

18    Q.   Yes.

19    A.   I don't recall right now.

20    Q.   Do you recall whether there was a Mohammad       02:06:27

21 Saeed who was from Behboodi but had lived in Stockton

22 for about 45 years?

23    A.   I don't.  The Mohammad Saeed that I know from

24 Stockton is, after the Hayat case, I've -- he's

25 referred other clients to me.  That's the only          02:07:08
```

92

1  Mohammad Saeed I can think of from that area, even as

2  related to this case.

3      Q.   Do you recall speaking to anybody in Pakistan

4  about raising money for the defense?

5      A.   That may have happened.  I think there was a          02:07:23

6  concern of how they were going to pay their fees

7  because we weren't sure about whether or not we could

8  get money out of the equity of the home and where the

9  money was going to come from, so that may have been

10  discussed.  I don't have a specific recollection of          02:07:42

11  it.

12     Q.   Do you remember ever expressing concerns to

13  anyone about the fact that if money wasn't raised,

14  Johnny might withdraw from the case?

15     A.   No, I don't think I ever said that to anyone.        02:07:54

16     Q.   And you don't recall speaking to anybody in

17  Pakistan about raising money through the equity in the

18  home that -- that Umer owned with his brother?

19     A.   Speaking to someone in Pakistan about raising

20  money through the equity?  I don't understand the           02:08:19

21  question.

22     Q.   Well, maybe you've answered it.  You don't

23  really recall speaking to anyone in Pakistan about the

24  need to raise money for the defense?

25     A.   I said it may have happened, but I don't            02:08:32

93

1  remember right now.

2      But I don't -- no, I definitely never said

3  that Johnny will be out of the case if we don't raise

4  money.

5      Q.   Backing up to the beginning of the trial or      02:09:13

6  just before the beginning of the trial, can you

7  describe -- well, let me begin again.

8      I believe you testified before that your

9  concern was not specifically that Johnny Griffin stay

10  in the case but that you have another lawyer to assist   02:09:41

11  you with the case?

12     A.   Yes.

13     Q.   In that regard, can you tell us what efforts

14  you made to bring Mark Reichel into the case.

15     A.   Well, I remember having a discussion before      02:09:55

16  the trial that I was getting nervous, especially, I

17  think, once we realized that there were going to be

18  portions where I would be on my own, essentially, with

19  the different -- that it was going to be different

20  juries and, you know, the reality of it all, I think     02:10:18

21  it was just coming close and --

22     Q.   Let me just stop --

23     A.   Yeah.

24     Q.   -- you there, just so we put on the record

25  what you're talking about.                               02:10:26

94

1      At some point there was a decision there

2  would be a joint trial but with two separate juries.

3      A.   Right.

4      Q.   And therefore, there would be portions of the

5  trial where only Hamid was on trial and portions of      02:10:37

6  the trial where only Umer was on trial before

7  different juries.

8      A.   Correct.

9      Q.   And people would be shut -- juries would be

10  shuttling in and out of court.                           02:10:48

11     A.   Correct.

12     Q.   Okay.

13     A.   Right.  So maybe it was cold feet.  I -- I

14  talked to Johnny about, what if we could bring

15  somebody else in.  And I didn't know Mark Reichel       02:11:00

16  before this.  So Mark was a colleague of Johnny's, and

17  he was somebody that -- that had -- that Johnny had

18  recommended.  And I don't recall if maybe Mark had,

19  prior to that, offered to assist us somehow through

20  Johnny, but that was the person that he thought of and   02:11:20

21  I wanted it.  I really wanted it, and it ultimately

22  didn't happen.

23     Q.   And why didn't it happen?

24     A.   The details of why it didn't happen, I

25  honestly don't remember right now, but I know I talked   02:11:45

1  to you guys about it after the trial.  So my

2  recollection then would have been better than my

3  recollection now.

4      Q.   Well, let me -- let me follow up on -- on

5  that.                                                02:11:59

6      Do you recall that after the jury verdict, we

7  started to work together on post-trial motions?

8      A.   Yes.

9      Q.   And we worked together on the -- did we work

10 together on the motion for a new trial?              02:12:22

11     A.   Yes, we did.

12     Q.   And what -- what would be your assessment of

13 who did what on the new trial motion?

14     A.   I think I assisted with the statement of

15 facts, did a lot of that, and you guys did everything 02:12:40

16 else.

17     Q.   Okay.  And what happened with that motion?

18     A.   Denied.

19     Q.   At that point, did we raise with you bringing

20 a legal proceeding around the issue of conflict and   02:13:00

21 ineffective assistance of counsel?

22     A.   I don't remember if it was after it was

23 dismissed or even prior to us filing it, but I

24 remember you talking about that and that being

25 something that could happen, and I understood that.  I 02:13:20

96

1  don't remember when we had that discussion.  And I

2  don't actually -- I don't think we ever talked about

3  the issue of conflict.  That's something that, when

4  you filed your motion, I saw it.  We talked about

5  ineffective assistance.                          02:13:35

6      Q.   And we actually interviewed you in that

7  regard; isn't that --

8      A.   I didn't think it was an interview.  I

9  thought it was a discussion.  But, yes, you asked me

10  questions and I gave you answers.                02:13:48

11      Q.   And you just said it is probably -- your

12  recollection was prob -- of events was probably better

13  then, seven years ago, than it is now?

14      A.   Yeah.

15      Q.   And in your answers, were you attempting to   02:14:00

16  be as forthright and honest as you could?

17      A.   Always.

18          MR. RIORDAN:  Can I get DDD?

19          MR. HORGAN:  You said DDD.

20          MR. RIORDAN:  Yeah.  Actually, before I get    02:14:35

21  that --

22  BY MR. RIORDAN:

23      Q.   Let me try and finish up on the -- on the

24  Reichel question.

25          And I hope I'm characterizing this             02:14:53

1 correctly.  Your -- your opinion was that it would

2 have been very helpful to have a second lawyer

3 assisting you and you -- and you wanted to have Mark

4 Reichel do that?

5     A.    Well, I wanted to have somebody do it.  And        02:15:08

6 my recollection is that it wasn't as if Mark Reichel

7 was a hundred percent available to do it.  There were

8 some limitations there.  So if it wasn't Mark Reichel,

9 I know that I would have felt comfortable having

10 somebody else.                                               02:15:37

11     Q.    Okay.  You felt -- you mentioned that you

12 were feeling nervous about --

13     A.    Well, I think it was just more, it was

14 getting close, it was becoming real, and the idea of

15 selecting the jury on my own and doing the opening and    02:15:51

16 all of the examination, I think was becoming

17 overwhelming.

18     Q.    That's what I was going to get to.

19     A.    Yes.

20     Q.    It was more than nervous.  You felt            02:16:00

21 overwhelmed by what you were confronting, didn't you?

22     A.    I think I was -- I don't know how to de -- I

23 think I am -- I -- it's a -- it's a character flaw.  I

24 always double-guess myself.  I'm never -- I mean, even

25 today, I go into a trial and I question whether or not    02:16:26

98

1  I'm prepared.  I just -- even though I can be very

2  over-prepared, that's just my nature.

3      At that time, I was in a different place.  I

4  was doing something that had national attention that I

5  had never done before.  So I think it was a mixture of      02:16:43

6  feelings, but I also knew going into the case that I

7  knew the evidence better than any of the attorneys,

8  including the prosecutors, because I had studied it in

9  different languages, and I knew -- I felt confident in

10  that way.  But when it came to just actually doing it,     02:16:59

11  I think I was nervous.

12      Q.   Do you think it was irrational of you to be

13  nervous or overwhelmed, facing a massive criminal

14  trial with absolutely no criminal experience?

15      A.   Do I think it was irrational of me?  At that      02:17:24

16  time, no.

17      Q.   Under -- the discussions with Mark Reichel

18  happened close to the trial, didn't they?

19      A.   I think, yeah.

20      Q.   Perhaps a week before?                            02:17:49

21      A.   It was close.

22      Q.   So the retainer agreement for the trial was

23  then in place.  It had been signed a month before,

24  right?

25      A.   I don't remember.  The time difference            02:17:59

1  between the retainer and talking to Mark, I don't

2  remember that.

3      Q.   But under that retainer agreement, any monies

4  given to Mark would have come out of Johnny's pocket,

5  wouldn't they?                                    02:18:14

6      A.   Here's the deal with the retainer agreement.

7  It was drafted, but in my mind, it didn't matter.  It

8  wasn't about the money.  So if I wanted to bring Mark

9  in, I would have been happy to give him all my money.

10 I never thought that the money was a limitation on    02:18:32

11 anything, in my mind.

12     Q.   You had received 6,000 to $10,000?

13     A.   By then, I guess, yeah.

14     Q.   Johnny was receiving money prior to trial

15 that you weren't getting, right?                   02:18:50

16     A.   Yeah.

17     Q.   So the money would have -- under that

18 agreement, and the reality, Johnny would have been the

19 one who had to pay for Mark Reichel, right?

20     A.   Yes.  Unless what was in that retainer     02:19:01

21 agreement if I said I didn't -- he could have my money

22 whenever I would ultimately get paid, that could have

23 been a possibility.  I just -- I don't -- I don't

24 remember the discussion being around money.

25     The -- you know, I told you that I can't       02:19:23

100

1  remember right now and that my recollection would have

2  been better when I initially talked to you about this

3  issue, but my feeling about that whole thing was that

4  I was nervous.

5      We discussed Mark Reichel as a possibility,          02:19:34

6  we talked to him, he didn't sound like he was totally

7  available to be there for the whole time with me, and

8  that ultimately it was Johnny who boosted my

9  confidence to do it on my own.

10     Q.   Hadn't Johnny told you that if Mark came in,     02:19:48

11  he would not be available to mentor you throughout the

12  case?

13     A.   I think that that is something that he did

14  say to me, that if -- which, I guess, made sense.  If

15  Mark was coming in, then I wouldn't need Johnny.  But,  02:20:04

16  yes, I think that was something he did say to me.

17     Q.   Did you believe that there was a potential

18  ethical issue in being assisted by the trial -- the

19  counsel for codefendant as opposed to an independent

20  counsel who was not representing Umer?                  02:20:32

21     A.   Did I believe that there was an ethical issue

22  in having Johnny help me versus having Mark?

23     Q.   Yes.

24     A.   At the time, no, I did not.

25     Q.   I'm going to ask you to look at. . . DDD and     02:20:52

1  ask you if you recognize that.

2          (Off-the-record discussion.)

3          MR. TICE-RASKIN:  Is this -- this

4  government's letter of reference clearance?

5          MR. HORGAN:  No.                          02:22:05

6          THE WITNESS:  Is that the camp?

7          MR. RIORDAN:  So it would be Docket

8  No. 532.6.  Didn't know there was a docket from 532.6.

9          MR. HORGAN:  That's pretty late.  That's not

10  it, because that's -- that says September 2007.       02:22:09

11  That's in 2013.  So, no, that's how it -- because it

12  should be.

13          MR. RIORDAN:  What day did the verdict come

14  in?  Maybe this was a --

15          What day did the verdict come in?           02:22:32

16          MR. HORGAN:  I don't know.

17          MR. RIORDAN:  Well, it should say in there,

18  right?

19          MR. HORGAN:  Yeah.

20          MR. RIORDAN:  Maybe late April.  Late april   02:23:00

21  of 2006?

22          MR. HORGAN:  April 25th.

23          MR. RIORDAN:  This is it for the verdict,

24  okay.

25          THE WITNESS:  I've never seen this.          02:23:00

1          MR. RIORDAN:  I'm --

2          THE WITNESS:  If you are about to ask me.

3          MR. RIORDAN:  Yeah.  No, I'm going to

4   withdraw my question on that.

5          THE WITNESS:  Yeah, I've never seen this        02:23:06

6   stuff.  That would have been nice to know.

7          Are you keeping marked exhibits in a certain

8   place -- or referenced exhibits?

9          MR. RIORDAN:  yeah.

10          THE WITNESS:  This one was one that needed      02:23:25

11   copies.

12          MS. BOERSCH:  Dennis, it's April 25th.

13          MR. RIORDAN:  Yeah.

14          MR. HORGAN:  This is 2014.

15          MR. RIORDAN:  Oh, that's -- that's because we   02:23:40

16   put it in.

17          MR. HORGAN:  Yeah.

18          MR. RIORDAN:  All right.  Maybe I shouldn't

19   withdraw the question.

20          All right.  Let's go right to it.              02:23:47

21   BY MR. RIORDAN:

22     Q.  Why -- are you ready -- you've reviewed

23   this --

24     A.  Yeah, I looked at it, yeah.  If I -- I've

25   done it.                                             02:23:53

103

```
 1      Q.   Do you recall receiving that letter in the

 2  course of representing Hamid?

 3      A.   No, I don't.

 4           MR. TICE-RASKIN:  Now, just for the record,

 5  you are being shown a letter that doesn't bear a date    02:24:00

 6  on it, and it appears to be missing the first page.

 7           THE WITNESS:  Yeah.

 8           MR. RIORDAN:  Yeah.

 9           THE WITNESS:  I don't -- I just have a file

10  date, which was your filing your motion, I guess.        02:24:08

11  BY MR. RIORDAN:

12      Q.   Yeah.  And our -- our submission states that

13  we couldn't find the first page, but -- so that -- I

14  was asking you, essentially, to identify it and see if

15  you have any recollection.                               02:24:23

16      A.   Yeah, I don't.  I don't.

17      Q.   Okay.  You mentioned the double-jury system?

18      A.   Uh-huh.

19      Q.   Double jury -- the practice of a double

20  jury.                                                    02:24:35

21      Just take a minute.  Do you recall how that

22  was done, where all of the prospective jurors in the

23  court at the same time?

24      A.   For parts of the trial?

25      Q.   No.  I'm sorry.                                 02:24:47
```

1      A.    Yeah.

2      Q.    Were all of the prospective jurors in a

3  single courtroom during jury selection?

4      A.    No.  Their jury selection was on different

5  days, I believe.                                    02:24:57

6      Q.    And when you were selecting the jury, was

7  Johnny Griffin in court with you?

8      A.    Yes.

9      Q.    And did Johnny Griffin consult with you

10  during the selection of Hamid's jury?              02:25:08

11     A.    Yes.

12     Q.    And why was that?

13     A.    He was there.  I don't think I was ever in

14  court alone throughout the entire case, and I was

15  there every time he was in court, helping him.  So we    02:25:22

16  worked together.

17     Q.    And -- but you had never picked a jury

18  before?

19     A.    I may have by then, one civil state court,

20  but not in criminal court, no.                     02:25:34

21     Q.    And what kind of proceeding may you have

22  picked a jury in?

23     A.    That was -- that was the one civil case that

24  I think happened -- oh, never mind, I recall that it

25  was after -- no.                                   02:25:48

1      At the time that I first represented him in

2  June of '05, I hadn't picked a jury, but between that

3  time and this, I think I did do a -- a civil case.  It

4  was like a personal injury case.  I was doing it with

5  another attorney friend, and we picked a civil jury.    02:26:06

6  It was a one-day trial.

7      Q.    So that would have been between June of 2005

8  and February of 2006?

9      A.    Yes.  Is that when trial was?  Was it

10  February?                                               02:26:19

11      Q.    Yeah.

12      A.    Okay.  I don't remember, but sure.

13      Q.    And where you the lead counsel in the civil

14  case?

15      A.    Yes.  I think that that happened beforehand.  02:26:24

16  I'm not sure.  I -- I -- I remember that -- the reason

17  why I remember that is because the opposing counsel

18  joked with me later that he was thinking of stating to

19  the jurors, Would it make a difference if you knew

20  that this person was representing -- as a joke of       02:26:45

21  somebody who's charged with terrorism.

22      That's why I recall that, but I don't

23  remember if it was prior to this trial or right after,

24  but it was in that time frame, so not sure.

25      Q.    But you mentioned before that Johnny was with  02:26:59

1  you at all times when you were representing Hamid?

2      A.    Yes.

3      Q.    And you participated in all proceedings where

4  the -- the case was just being tried before -- I mean,

5  Umer's jury?                                          02:27:14

6      A.    Yes.

7      Q.    You mentioned that at the beginning of the

8  case, it was very, very clear that the case really

9  rested on Hamid's taped statement?

10      A.    Yes.                                        02:27:40

11      Q.    And later on, did you become aware that the

12  government was going to offer evidence beyond that?

13      A.    Yes.

14      Q.    And one important part of the government's --

15  well, let me ask you, was an important part of the     02:27:55

16  government's case testimony about a supplication found

17  in Hamid's wallet?

18      A.    It was part of their testimony.  In my

19  opinion, I didn't think it was important.

20      Q.    And they called someone as an expert in      02:28:06

21  Arabic to translate the supplication on a piece of

22  paper; is that correct?

23      A.    Yes.

24      Q.    Okay.  And what testimony do you recall

25  beyond the translation that -- oh, do you remember the  02:28:24

1  name of the witness?

2      A.    Khaleel Mohammed.

3      Q.    Yeah.

4      A.    Oh, yeah.

5      Q.    Do you recall what testimony beyond simply        02:28:34

6  translating the -- the supplication that Mr. Mohammed

7  offered?

8      A.    Beyond simply translating the supplication?

9  You mean simply translating in Arabic, what the

10  meaning would be?                                          02:29:02

11      Q.    Right.

12      A.    Oh, God.  I don't -- I don't remember if he

13  talked about the cultural -- you know, culturally,

14  whether or not you should carry one, I don't remember

15  if he got there, but I know he was supposed to be an      02:29:21

16  Arabic language expert.

17      Q.    Do you recall whether you offered testimony

18  about the mental state about somebody who carried that

19  supplication?

20      A.    If I offered testimony --                        02:29:33

21      Q.    No --

22      A.    -- or if they did?

23      Q.    -- if he did.

24      A.    Oh, if he did.

25      Q.    If through -- if the government, through          02:29:35

1  Mohammed, offered testimony about the mental state of

2  someone who carried that supplication?

3      A.   No.

4      Q.   You don't recall that?

5      A.   I don't recall that.                    02:29:45

6      Q.   Okay.  Well, let me ask you this:  You said

7  before that it certainly was your intention to object

8  to any of the government's testimony that you thought

9  was objectionable?

10     A.   Yes.                                     02:30:07

11     Q.   And whatever objections you were aware of to

12  Dr. Mohammed's testimony, you would have made at the

13  time?

14     A.   Yes.

15     Q.   Do you recall whether you made a motion to    02:30:16

16  exclude -- a written motion prior to his testimony to

17  exclude part or all of his testimony?

18     A.   I don't recall.

19     Q.   Do you recall whether after the verdict you

20  obtained the testimony and the expert testimony to    02:30:34

21  contradict Dr. Mohammed -- or Mr. Mohammed's

22  testimony?

23     A.   After the verdict?

24     Q.   After the verdict.

25     A.   You mean, for our new trial motion?        02:30:46

1      Q.   Yes.

2      A.   If I did myself?

3      Q.   Yes.

4      A.   I don't remember if I assisted with you guys

5   doing anything like that.  I don't think I did.  I          02:30:55

6   don't remember.

7      Q.   Do you recognize the name Bernard Haykel?

8      A.   Oh, yeah, I do.

9      Q.   And what can you tell us about Bernard

10  Haykel?                                                      02:31:05

11     A.   I can't remember, but I recognize the name.

12     Q.   Do you recall whether you contacted

13  Dr. Haykel to obtain evidence from him for the new

14  trial motion?

15     A.   If he's the person that was -- either            02:31:16

16  recommended by Dr. Weiss, that might be right.  I know

17  the name, and I probably contacted him.  I don't

18  remember doing it.

19     Q.   Do you recall reading an article in the

20  Atlantic Monthly about the case?                           02:31:34

21     A.   Yes.

22     Q.   Do you recall whether Dr. Haykel was

23  interviewed in that -- for that article?

24     A.   I don't -- I don't recall if he was.

25     Q.   So you don't have a recollection of whether       02:31:44

110

1  you got a declaration from Dr. Haykel for the new

2  trial motion?

3      A.   I -- I do not recall.  I'm sorry.

4      Q.   Okay.  Do you recall -- does the name Eric

5  Benn ring a bell?                                    02:32:06

6      A.   It rings a bell.

7      Q.   Do you recall whether the government called

8  an expert to testify about classified aerial

9  photographs of the Balakot area?

10     A.   Yeah.  That was Eric Benn.                  02:32:19

11     Q.   Okay.  And do you recall what his testimony

12 was?

13     A.   I -- I don't remember.  Generally, I think,

14 it was he looked at aerials, and he thought that the

15 area that the government thought is the camp in       02:32:41

16 Balakot that he attended, he thought that was a camp.

17 I think it was generally that, but I don't remember

18 the specifics.

19          MR. TICE-RASKIN:  Counsel, you might have

20 misspoken.  You said that the images admitted at trial 02:32:53

21 were classified.  They were not.  They were

22 declassified.

23          MR. RIORDAN:  Oh, I stand corrected.

24 BY MR. RIORDAN:

25     Q.   Do you recall whether he offered an opinion  02:33:03

1  of probability on the likelihood that this was a

2  terrorist camp, just based on his examination of the

3  photographs?

4      A.   No.

5      Q.   And you don't recall what else he might have      02:33:15

6  taken into account in offering his probabilities,

7  opinions?

8      A.   I don't recall.

9      Q.   Okay.  But, again, if there was an

10 objection -- if you were aware of an objection to his   02:33:31

11 testimony, you made it -- you would have made it?

12     A.   I would have made it.

13     Q.   All right.  And you don't recall whether you

14 made a motion to exclude any portion of his testimony?

15     A.   I don't think I did.                             02:33:44

16     Q.   You gave the closing argument in the case for

17 Hamid Hayat?

18     A.   Uh-huh, and the opening.

19     Q.   And was Johnny Griffin in court for your

20 closing?                                                 02:34:01

21     A.   Was he in court, yes.

22     Q.   And, again, to the best of your recollection,

23 did you object to any portion of the government's

24 argument that you thought was objectionable?

25     A.   You mean their closing argument?               02:34:18

112

1      Q.   Yeah.

2      A.   I don't remember if I objected to any portion

3  of their closing argument.  I may have.  If I thought

4  it was objectionable, I would have.  I don't remember

5  if I did.                                    02:34:31

6      Q.   But if -- if you thought there was a grounds

7  to object to their closing argument, you would have

8  raised that?

9      A.   Yeah.

10      Q.   Do you remember whether the court sustained    02:34:38

11  objections to portions of your cross-examination of

12  witnesses?

13      A.   I remember one.  There's only one that I

14  remember, was because we had a discussion about this

15  later, you and I.  When I think I asked Aguilar a     02:35:06

16  question about -- or no.  I'm sorry.  Naseem Khan.

17  Sorry.  I asked Naseem Khan if -- that's K-H-A-N --

18  wasn't it true that Hamid told him, in fact, he never

19  went to a camp.  I think that was sustained.

20      Q.   And, again, when you were trying to gain the   02:35:29

21  admission of evidence, you offered whatever legal

22  arguments you could in support of the admission of

23  evidence?

24      A.   Yes.

25          MR. RIORDAN:  Let me take just -- just a       02:35:45

1  minute.

2          MR. TICE-RASKIN:  Sure.

3          MR. RIORDAN:  I've done it again.

4          THE WITNESS:  It fell to the floor.  It fell

5  to the floor.                                    02:35:57

6          THE VIDEOGRAPHER:  Want to go off record?

7          MR. TICE-RASKIN:  Okay to go off the record,

8  counsel?

9          MR. RIORDAN:  Yeah.

10          THE VIDEOGRAPHER:  Time is 2:35, and we are    02:35:59

11  off record.

12          (Off the record.)

13          THE VIDEOGRAPHER:  Okay.  The time is 2:39,

14  and we are back on record.

15  BY MR. RIORDAN:                                   02:39:42

16      Q.   Ms. Mojaddidi, I only have one other area

17  that I wanted to ask you about.

18      What were the -- the jury verdicts in the

19  joint trial that was going on with Umer and Hamid?

20      A.   Guilty on all counts for Hamid, and a       02:39:57

21  mistrial for Umer.

22      Q.   And following the -- those verdicts, did the

23  government indicate that it might choose to retry

24  Umer?

25      A.   I believe so, that that was a possibility,   02:40:13

114

1  yes.

2      Q.   And were -- were you intending to serve as

3  cocounsel for Umer in -- if the case was retried?

4      A.   I don't think there was an official that I

5  would need to be cocounsel, but I think there was an        02:40:35

6  understanding that I would be involved and help out.

7      Q.   So there was an understanding that you would

8  participate in Umer's defense?

9      A.   That I would assist Johnny.  I don't know --

10  I don't -- we didn't talk about the formality of it,        02:40:51

11  but yeah, that I would be a part of it.

12      Q.   Did you indicate in an e-mail to us that you

13  would be tied up for some time because that trial --

14  to -- to the Riordan and Horgan office, that you would

15  be tied up because that case might go out to trial in       02:41:09

16  June of -- or July of 2006?

17      A.   I may have done that, sure.

18          MR. RIORDAN:  I don't think I have anything

19  further at this point.

20          MR. TICE-RASKIN:  All right.  So we then        02:41:22

21  commence with examination by the government.

22          THE WITNESS:  Okay.

23          MR. TICE-RASKIN:  And just as a matter of --

24          THE WITNESS:  Is it -- more comfortable to

25  switch, because my neck is going to --        02:41:30

1        MR. TICE-RASKIN:  You read my mind.

2        Can we just go off the record for a second

3   while we change seats.

4        THE VIDEOGRAPHER:  Okay.  The time is 2:41,

5   and we are off record.                        02:41:36

6        (Off the record.)

7        THE VIDEOGRAPHER:  The time is 2:43, and we

8   are back on record.

9                    EXAMINATION

10  BY MR. TICE-RASKIN:                            02:44:01

11       Q.   And good afternoon, Ms. Mojaddidi.

12       A.   Good afternoon.

13       Q.   What I'd like to start with is your

14  experience prior to becoming involved with the

15  representation of Mr. Hamid Hayat.  So going back to   02:44:10

16  your undergraduate degree, when did you receive your

17  undergraduate degree?

18       A.   1997.

19       Q.   Okay.  And you graduated from McGeorge in May

20  of 2000, correct?                             02:44:26

21       A.   Yes.

22       Q.   You graduated in the order of the barristers,

23  correct?

24       A.   Yes.

25       Q.   Could you explain what the order of the    02:44:32

1  barristers is?

2      A.   I think it was a number of people who were

3  recognized for their oral advocacy skills.

4      Q.   Is it considered an honor?

5      A.   Yes.                                    02:44:45

6      Q.   Okay.  And based on your website, I -- I'm

7  told that you served as an adjunct professor at the

8  International Appellate Advocacy Department at

9  McGeorge.  Is that accurate?

10     A.   Yes.                                    02:44:57

11     Q.   For how long did you do so?

12     A.   I did that for -- I think it was -- I was

13  technically an adjunct for either a year or two, and

14  then you are called a TA when you first do it.

15     I was a -- I represented our -- I represented   02:45:10

16  McGeorge in an international moot court competition

17  and excelled in the International Appellate Advocacy

18  program.  And so that's why I went back to teach the

19  workshops for, I think it was, a couple years.  It was

20  so long ago.                                    02:45:29

21     Q.   So it would be fair to say that it was two

22  years of teaching appellate advocacy and workshops?

23     A.   Yeah.  I actually led the workshops.  So

24  there was a lecture, and then the students had

25  workshops every week.  I graded all the papers and   02:45:42

117

1   their appellate -- their oral presentations.

2       Q.   Okay.  Did you also serve in connection with

3   the UC Davis King Hall immigrate -- immigrant,

4   rather -- detention program?

5       A.   Yes, I did.                               02:45:56

6       Q.   Okay.  And as the program director?

7       A.   Yes.

8       Q.   What exactly was that program and what was

9   your role?

10      A.   That was a program that was essentially    02:46:03

11  immigrants who were detained in various immigration

12  prisons around Northern California.  We had a group of

13  students and some attorneys that would go visit them,

14  too, so they understand what their rights were and

15  stuff.  And so I was just helping out with the         02:46:25

16  program.  The attorney that I mentioned earlier that I

17  was helping out, the attorney friend, he was the

18  supervising attorney of that program, so he brought me

19  in to -- to assist.

20      Q.   And just so -- so the record is clear, going  02:46:36

21  back to your services and adjunct professor --

22      A.   Uh-huh.

23      Q.   -- was that after you had graduated from

24  McGeorge?

25      A.   I'm trying to remember.  I think it was, yes.  02:46:45

1    Q.   Okay.

2    A.   Yes, two years after.

3    Q.   And then when you served as the program

4  director for the immigrant detention program, was that

5  also after you had graduated from McGeorge?          02:46:55

6    A.   I believe it was, yes.

7    Q.   And what was the duration of your tenure as

8  the program director?

9    A.   That was just a few months.

10   Q.   Okay.                                          02:47:04

11   A.   Yeah.

12   Q.   I believe you earlier indicated that you

13  began your practice of law in December 2013; is that

14  accurate?

15   A.   Or 2003, yes.                                  02:47:10

16   Q.   Oh, thank you.  2003, indeed.

17   A.   Yeah.

18   Q.   What were the specialties that you

19  concentrated in?  You mentioned family law, correct?

20   A.   Family law and immigration.                   02:47:19

21   Q.   Okay.  Did you have any other specialties

22  that you concentrated in?

23   A.   No.

24   Q.   Okay.  Now, you have some substantial

25  familiarity with Pakistan, India, and Afghanistan; is  02:47:30

119

1  that correct?

2     A.   I do.

3     Q.   Okay.  Can you just briefly explain the basis

4  for your knowledge regarding Afghanistan.

5     A.   Okay.  Well, I spent the first five years of      02:47:41

6  my life there and, you know, since I've been -- since

7  we moved here, I have not returned to Afghanistan, but

8  I've returned to Pakistan several times.  Afghanistan,

9  I mean, that's just where my parents are from.  It's

10  the language, it's the food, it's the culture.  We       02:48:02

11  still -- my parents instilled it in us, and I just, on

12  my own, have continued to educate myself in what

13  was -- what's going on there.

14     I was offered a position by the American Bar

15  Association to head up a -- a -- the legal education     02:48:19

16  program in Afghanistan, and I ended up not taking the

17  job, but that was something that I was offered to do

18  when I -- early on in my career as an attorney.

19     Q.   Okay.

20     Okay.  So, again, if I understand correctly,          02:48:39

21  you spent the first five years of your life there,

22  correct?

23     A.   Yes.

24     Q.   And then your parents, of course, are from

25  there?                                                   02:48:46

120

1      A.    Yes.

2      Q.    And would it be fair to say that throughout

3  your childhood as well as your adult years, because of

4  your heritage, you've kind of remained immersed in

5  Afghani culture and politics and the like --          02:48:58

6      A.    Absolutely.

7      Q.    -- all via the United States?

8      A.    Yes.

9      Q.    Could you explain a little bit for me how it

10  is that you are familiar with Pakistan and -- and what   02:49:02

11  aspects of -- of Pakistan you are familiar with.

12      A.    Okay.  So I -- when we -- when we immigrated

13  to the United States as refugees, we went -- we

14  escaped from Afghanistan, and we spent just a few

15  weeks in Pakistan.  And then we -- we moved to the      02:49:23

16  United States.  Then fast forward to my second year in

17  college, I met my husband, who was raised in Pakistan

18  and spoke the language and went to part of high school

19  there.  So that's when I started becoming more

20  familiar with the culture and everything.  But it       02:49:47

21  wasn't until I got married in 1998 that -- well, prior

22  to that, I guess.

23      So between the time that I met him, 1993 and

24  1998, I had begun to study the language a little bit

25  on my own.  But in 1998, after I got married, because   02:50:04

1  my mother- and father-in-law lived with us, and my

2  mother-in-law speaks only Urdu, I very quickly picked

3  up the language and became fluent within a year.  She

4  continues to live with us.

5      Q.   And have you, aside from becoming fluent in       02:50:21

6  Urdu --

7      A.   Yes.

8      Q.   -- over the course of the years that you've

9  been together with your husband, have you become

10  familiar with other aspects of Pakistan such as --       02:50:32

11     A.   Oh, sure.

12     Q.   Can you elaborate a little bit.

13     A.   Yeah.  I mean, I cook the food, we wear the

14  clothes.  Our social circle in Sacramento is primarily

15  Pakistani families, 40 to 50 families.  We regularly      02:50:44

16  socialize.

17     I went to Pakistan when I was -- I think I

18  went in 2000 and went again in 2004.  And then I went

19  again in 2004 -- '12.  So I think I've been there

20  three times total.                                        02:51:07

21     Q.   Okay.  And so while you haven't been to

22  Afghanistan ever since you left there as a child --

23     A.   Right.

24     Q.   -- I understand that you've traveled to

25  Pakistan --                                               02:51:15

1    A.    Yeah.

2    Q.    -- on three occasions?

3    A.    Yes.

4    Q.    Okay.  All right.

5    A.    And I have a lot of clients who speak all of        02:51:19

6  those languages, so I -- so I represent people in

7  those languages as well.

8    Q.    And when you rep -- when you reference those

9  languages --

10    A.    I'm sorry.                                          02:51:30

11    Q.    -- you are referring to Urdu, Farsi, and

12  Pashto?

13    A.    Yes.

14    Q.    Okay.  You've also developed some familiarity

15  in connection with India.  Is that a fair statement?      02:51:38

16    A.    Well, India only to the extent that it's very

17  similar in terms of culture and language and stuff

18  with Pakistan, the clothes and stuff, but I haven't

19  been there.

20    Q.    You haven't traveled there?                        02:51:51

21    A.    Huh-uh.

22    Q.    All right.  Have you developed some

23  familiarity with Islam?

24    A.    Oh, yeah.

25    Q.    Can you please elaborate on that.                  02:52:05

123

1    A.    Sure.  I was born Muslim, and I've always

2  practiced my religion and regularly attended Sunday

3  school throughout my adolescence and then began more

4  of a self-study in college and continued to practice

5  to this day.  My family, my kids, we all practice.    02:52:25

6    Q.    Very good.

7    A.    And I can read Quranic Arabic, which is. . .

8    Q.    So jumping ahead to what's been referred to

9  as the government's supplication, you are -- you could

10  capably read that and translate that --               02:53:00

11    A.    I could read it, yeah.  I mean, it's like

12  second grade level, so I would have to read it slowly,

13  but I could -- I could have read it.  I could not have

14  translated it, no.  I don't -- yeah.  I don't -- I

15  don't understand it, but I can read it.               02:53:08

16    Q.    Okay.  I wanted to go back to your initial

17  involvement in the case and just get a little bit of a

18  sense as to where some of the salient events took

19  place.

20    Do you have a recollection of actually            02:53:30

21  traveling out to the FBI on June 5th, I believe was

22  the date?

23    A.    Yes.  I think we actually did come here,

24  yeah.

25    Q.    Okay.  Well, when you say "here," referring  02:53:42

124

1  to the FBI office --

2      A.    Yes.

3      Q.    -- in Sacramento?

4      A.    Yes.  I think we did.

5      Q.    Okay.  And you were there with who else?          02:53:47

6      A.    With Johnny.

7      Q.    Okay.  And while you were there at the FBI --

8  what is your best recollection as to whether you had

9  any interaction with Hamid Hayat?

10     A.    I -- I think we probably -- I probably didn't    02:54:03

11  at the FBI office.  I feel like he was already taken

12  to Sac County.  I just don't remember.

13     Q.    Okay.  And any interaction with Umer Hayat at

14  the FBI?

15     A.    I don't remember.                                02:54:16

16     Q.    Okay.  When you were initially meeting with

17  family members and representatives of CAIR, where was

18  that?

19     A.    That was at the CAIR office at 717 CAIR -- K

20  Street.                                                   02:54:27

21     Q.    Do you have a recollection as to -- to who

22  was present by way of family members?

23     A.    I -- I don't think his -- I don't think his

24  wife actually came.  I know it was all men.  So it may

25  have been a brother of his and cousins and maybe his    02:54:39

1 uncle. But I think that it was maybe half family,

2 half community leaders.

3  Q. Okay. And so you -- you have this general

4 recollection of your first meeting with Hamid Hayat

5 being in the Sacramento County Jail?                    02:55:04

6  A. Yeah, probably there.

7  Q. Okay. And when you met with him at that

8 time, were you alone or were you with others?

9  A. I think I -- when I first spoke with him, I

10 think I was by myself. I don't remember if Johnny was   02:55:17

11 in the room with me, but I -- yeah. I just -- I mean,

12 I remember speaking to him in either Urdu, Pashto, or

13 both -- a combination of both languages. And so I

14 don't recall Johnny sitting there as well, but he may

15 have been there.                                        02:55:37

16  Q. Okay. And eventually, you were retained to

17 represent a party, were you not?

18  A. Yes.

19  Q. Okay. By whom were you retained?

20  A. You mean, who -- who signed the -- I mean, it  02:55:49

21 was Hamid who signed it. Yes, he was --

22  Q. Okay.

23  A. -- the who wanted me to represent him.

24  Q. And you -- you veiwed Hamid as being your

25 client, correct?                                        02:55:59

1      A.     Oh, yes.

2      Q.     Okay.  In your mind, did anyone else

3   represent Hamid Hayat besides yourself?

4      A.     No.

5      Q.     To your knowledge, who represented Umer      02:56:08

6   Hayat?

7      A.     Johnny Griffin.

8      Q.     Okay.  Now, you mentioned that at some point

9   in time, there was a discussion between you and Johnny

10  Griffin regarding who might represent whom, correct?     02:56:29

11     A.     Yes.

12     Q.     Do you remember where that discussion was?

13     A.     I think it -- it must have taken place before

14  we actually told the -- either the U.S. attorney or

15  the FBI agents, who was representing who on that first   02:56:49

16  day.  Because Johnny, I believe, had a conversation

17  with either the U.S. attorney or an agent and asked

18  the question of who the heavy was.  And based on that,

19  I think, before we went in to meet with the clients or

20  to make the representation at the FBI office, we had     02:57:08

21  said who was representing who.  So it was in between

22  that time.

23     Q.     Okay.  Let me throw a name out there and see

24  if it rings a bell.  Does the name Bob Twist ring a

25  bell?                                                    02:57:21

1     A.   Yes.

2     Q.   Was that the assistant U.S. attorney that you

3   believe Mr. Griffin spoke with?

4     A.   I think so, yeah.

5     Q.   Okay.  Did you have a conversation with Mr.        02:57:27

6   Twist?

7     A.   I don't think -- I don't remember if I did,

8   but I know that that -- the word of who the "heavy"

9   was, was spoken to him, not to me.

10    Q.   To --                                              02:57:37

11    A.   To Johnny, not to me.

12    Q.   Got it.

13    All right.  Now, you mentioned on more than

14  one occasion during your -- your previous testimony

15  that there was a joint defense agreement between you   02:57:51

16  and Mr. Griffin.  Is that correct?

17         MR. RIORDAN:  Objection.  Misstates the

18  testimony.  There was no mention of a joint defense

19  agreement.

20  BY MR. TICE-RASKIN:                                     02:58:04

21    Q.   Okay.  What was the nature of your

22  relationship with Mr. Griffin, if any?

23    A.   I think our understanding was that we each

24  had our own clients that we were representing, but we

25  were going to be working jointly in our preparations   02:58:14

128

1  and that -- I think there was an understanding that

2  there wasn't any conflict.  And my recollection is

3  that there was definitely a discussion about it with

4  the clients, and that there was a -- something in

5  writing about it that everybody signed.          02:58:41

6     Q.   Okay.  So your best recollection is that

7  there was some sort of written document indicating

8  that you were representing Hamid and that Mr. Griffin

9  was representing Umer, and that you and Mr. Griffin

10  were working jointly?                            02:59:17

11     A.   Yes, absolutely.

12     Q.   Okay.  Now, are you confident that you have

13  provided to Mr. Riordan and his colleagues all of the

14  documents that you had in connection with your

15  representation of Hamid Hayat?  And the reason I ask  02:59:48

16  is because I don't believe to this date the document

17  you referred to is a document that at least I've

18  seen.

19     A.   Sure.  Well, when we first -- when I first

20  began working with your office, I know that there was  03:00:02

21  some documents that I shared with them, and then I

22  essentially was still in my home office until just a

23  couple of years ago.  So I had retained all of my

24  files for the Hayat case in boxes, essentially in

25  storage.  And when the request was made of me to   03:00:24

1  return -- to give the file, I just pulled out those

2  boxes and gave them the documents.

3      Now, this was a case -- I think it was seven

4  boxes that I gave them.  There were a lot of documents

5  in this case.  And so, I did what I felt was a          03:00:41

6  reasonably thorough search of documents with all of my

7  files as they were organized and I gave them what I

8  had.

9      Q.   Okay.

10     A.   There was also, sometimes, maybe an overlap    03:00:58

11  of documents between mine and Johnny's office, so I

12  gave them what I had.

13     Q.   This written agreement that you referred to,

14  do you have a recollection as to whether that was

15  something that was drafted and stored on your computer  03:01:12

16  or otherwise?

17     A.   I don't remember.  And I actually tried to

18  look through my electronic files for everything as

19  well to give them, so I don't -- I don't remember

20  seeing it electronically in the items that I gave       03:01:33

21  them.  I don't have the same computer.  And so I don't

22  know if I did it or if Johnny drafted it, but I know

23  that it was something that we knew we needed to do so

24  we did it.  I don't know where it is.

25     Q.   Okay.  So let's focus on this -- what I'll      03:01:51

130

1  refered to as the joint defense agreement.

2      A.  Okay.

3      Q.  What was your understanding of your role

4  in -- in connection with the agreement?

5      A.  In connection with the agreement.  Well, it     03:02:06

6  was essentially to inform my client that I would be

7  representing him and that I would be working with

8  counsel for Umer in this case.  And it was for, you

9  know, him to sign as well with that understanding so

10  that there was consent all the way around, that this     03:02:25

11  was how things were going to happen.  And I believe we

12  did that orally, we did it in writing, and it was

13  clear and obvious throughout the case.

14      Q.  Okay.  And is it your recollection that Hamid

15  Hayat agreed to retain you understand those terms?     03:02:40

16      A.  Absolutely.

17      Q.  Okay.  Now, from time to time during your

18  examination, I'm going to share with you certain

19  allegations that had been made, and I want to get your

20  view as to whether those allegations are accurate or     03:03:03

21  inaccurate --

22      A.  Okay.

23      Q.  -- or whatever the case may be.  So I'll just

24  state what the allegations are, and then you can tell

25  us some more about their veracity.     03:03:12

1      A.   Okay.

2      Q.   It is alleged that Johnny Griffin told you

3  that under this joint defense agreement that all final

4  decision-making power over both cases would rest with

5  him.  Is that accurate?                        03:03:33

6      A.   Absolutely not.

7      Q.   Okay.  Who had the final decision-making

8  authority in connection with Hamid Hayat?

9      A.   I did.

10     Q.   It is alleged that you ceded to Johnny    03:03:43

11  Griffin the power to make strategic and tactial

12  decisions in Hamid Hayat's case.  Is that accurate?

13     A.   Not all, but, yeah, some cases I -- I

14  obviously got his input.  But, ultimately, I made the

15  decision.                                      03:03:59

16     Q.   Okay.  When you say that you got his input,

17  did you consider his input as part of your

18  decision-making authority, or did you just simply do

19  whatever Johnny Griffin told you to do?

20     A.   No.  I looked at it as him giving me        03:04:13

21  information so I can make an informed decision.

22     Q.   It is alleged that you put Hamid Hayat's

23  defense in the control of Johnny Griffin.  Is that

24  true?

25     A.   Absolutely not.                          03:04:32

132

1    Q.   It is alleged that when there were decisions

2 to be made that you blindly deferred to Johnny Griffin

3 as supposed lead counsel for Hamid Hayat.  Is that

4 accurate?

5    A.   No.                            03:04:51

6    Q.   With whom did final decision-making rest in

7 connection with the representation of Hamid Hayat?

8    A.   With me.

9    Q.   Would it be fair to say that as part of the

10 joint defense agreement that you and Mr. Griffin would   03:05:04

11 frequently discuss strategic and tactical

12 decision-making?

13   A.   Every day.

14   Q.   Okay.  Whom -- with whom did ultimate

15 authority rest to make strategic decisions on behalf   03:05:15

16 of Hamid Hayat?

17   A.   Me.

18   Q.   And with whom did ultimate authority rest to

19 make tactical decision-making on behalf of Hamid

20 Hayat?                                 03:05:26

21   A.   Yes.

22   Q.   At any point in time did you de -- cede that

23 decision-making authority to Mr. Griffin?

24   A.   No.

25   Q.   Would it be fair to say that oftentimes you   03:05:33

133

1  and Mr. Griffin would reach a consensus with respect

2  to strategic and tactical issues?

3      A.   Yes.

4      Q.   Would it be fair to say that there were

5  occasions in which you disagreed?                    03:05:53

6      A.   Absolutely.

7      Q.   And on those occasions when you disagreed,

8  did you exercise your own independent decision-making,

9  or did you simply do what Mr. Griffin suggested you

10 should do?                                           03:06:01

11     A.   I did what I thought was right.

12     Q.   It is alleged that Mr. Griffin had

13 decision-making authority himself over what motions

14 would be filed on behalf of Hamid Hayat.  Is that

15 accurate?                                            03:06:19

16     A.   No.

17     Q.   Okay.  Who had the ultimate decision-making

18 in connection with motions filed on behalf of

19 Mr. Hamid Hayat?

20     A.   I did.                                      03:06:24

21     Q.   Okay.  It's further alleged that Mr. Griffin

22 had decision-making authority as to whether a

23 continuance would be sought for purposes of

24 investigation of continuance for the purposes of Hamid

25 Hayat.  Is that accurate that Mr. Griffin had that    03:06:36

1  authority?

2      A.   No.

3      Q.   Okay.  With whom did that authority lie?

4      A.   With me.

5      Q.   Okay.  It is alleged that Mr. Griffin had     03:06:42

6  decision-making authority over whether CIPA

7  clearances -- or a CIPA clearance would be sought by

8  yourself.  Is that accurate?

9      A.   No.

10     Q.   Okay.  It is alleged that Mr. Griffin had     03:06:58

11 decision-making authority over which witnesses would

12 be called in connection with the trial of Hamid

13 Hayat.  Is that accurate?

14     A.   No.

15     Q.   Okay.  Who had authority in connection with   03:07:07

16 which witnesses would be called?

17     A.   I did.

18     Q.   And who had authority as to the decision as

19 to whether you would obtain the CIPA clearance?

20     A.   I did.                                         03:07:19

21     Q.   It is alleged that Mr. Griffin had

22 decision-making authority as to the question of

23 whether Hamid Hayat would be called to testify.  Is

24 that accurate?

25     A.   No.                                           03:07:30

135

```
1      Q.   Okay.  Who had that decision-making

2  authority?

3      A.   I did.

4      Q.   Okay.  And in connection with all of those

5  events that I've just described, whether it's motions    03:07:36

6  being filed or a continuance or the like, did you

7  actually exercise that decision-making authority on

8  behalf of Hamid Hayat?

9      A.   Absolutely.

10     Q.   Okay.  It is alleged that Mr. Griffin          03:07:47

11 functionally served as lead counsel for both Umer

12 Hayat and Hamid Hayat.  Is that accurate?

13     A.   No.

14     Q.   It is alleged that Mr. Griffin simultaneously

15 represented both Umer and Hamid Hayat.  Is that          03:08:01

16 accurate?

17     A.   No.

18     Q.   Did you simultaneously represent both of

19 those clients?

20     A.   No.                                             03:08:09

21     Q.   It is alleged that you were junior -- a

22 junior associate to Johnny Griffin in connection with

23 a rep -- a representation of Hamid Hayat.  Is that

24 accurate?

25     A.   No.                                             03:08:22
```

136

1      Q.    Let's see here.

2            (off-the-record discussion.)

3    BY MR. TICE-RASKIN:

4      Q.    I'm now going to hand you Exhibit G, which I

5    think we shared with you previously --                03:09:26

6            THE WITNESS:  Do you want this back?

7            MR. RIORDAN:  Okay.

8            MR. TICE-RASKIN:  And, Counsel, most of the

9    exhibits that I should be working with, you should be

10   able to find here.                                    03:09:35

11           Actually, I might just ask us to share and

12   we'll give that copy to the reporter.  And I've got a

13   packet of exhibits for the reporter.  If you have any

14   difficulty pulling them out and locating them, let me

15   know.  So we are working now with previously marked    03:10:15

16   Exhibit G.

17           THE REPORTER:  So -- so you want me to mark

18   them?

19           MR. TICE-RASKIN:  You know what, I'll let you

20   know if you need to mark them, but I assume that you   03:10:33

21   will in preparing the transcript.

22           THE REPORTER:  Okay.  But not on the record,

23   though; I can do that afterwards?

24           MR. TICE-RASKIN:  That's certainly fine with

25   me.  Is that okay with you all?                       03:10:33

1        MR. RIORDAN:   Sure.

2   BY MR. TICE-RASKIN:

3       Q.   Now, I understand that this agreement was not

4   an agreement that you executed -- I'm now referring to

5   the January 18, 2006 retainer agreement executed by      03:10:41

6   Johnny Griffin and Umer Hayat.  And you did not

7   execute this agreement?

8       A.   No.

9       Q.   And nor did your client?

10      A.   Right.                                            03:10:53

11      Q.   Would it be fair to say, though, that this,

12  to your recollection, ultimately represented the terms

13  of the representation of both Johnny Griffin by Umer

14  Hayat and you by Hamid Hayat?

15      A.   Yes.  And I think there's a good chance that      03:11:12

16  I would have drafted the exact same thing and had both

17  of us sign it.  I just -- if you guys don't have it, I

18  don't know where it is, but I know that this wouldn't

19  have happened and then I would have reviewed it and I

20  would have done the same thing.                           03:11:29

21      Q.   Okay.

22      A.   Yeah.

23      Q.   Is it your best recollection that you drafted

24  some sort of retainer agreement similar to this one

25  for Hamid Hayat?                                          03:11:39

1    A.   Yes.

2    Q.   And do you recall signing that yourself?

3    A.   Yes.

4    Q.   And do you recall whether Hamid Hayat did as

5  well?                                                    03:11:47

6    A.   Yes, I would have definitely obtained his

7  signature.

8    Q.   Do you have a recollection as to this actual

9  event taking place in where you were?

10    A.   I -- I know that -- I know that when we got    03:11:54

11  close to the trial, that we had discussions about our

12  representation, the cost of it, the fact that we were

13  both going to be doing it.  Then there was another --

14  there was some other letter or something about --

15  about the offer that was made to the government.  So    03:12:20

16  there was a number of times when we -- when I needed

17  to go in and get and obtain his signature on these

18  types of documents.  So I just know that it was -- it

19  was kind of for us, like, crossing our T's and dotting

20  our I's, and we did it.                                 03:12:36

21    Q.   Okay.  Now, as far as trial expenses and

22  costs, it's your understanding under this agreement

23  that there was going to be a total lump sum payment of

24  $200,000.  Is that correct?

25    A.   Yes.                                            03:13:04

139

1  Q. And is it your understanding that you were to

2 receive approximately $65,000 in attorney's fees ,

3 correct?

4  A. Yes.

5  Q. It was your understanding that costs and  03:13:12

6 related trial expenses would be deducted from the

7 remaining $135,000, correct?

8  A. Right.

9  Q. And lastly, it was your understanding that

10 the remaining balance would be for Mr. Griffin's  03:13:24

11 attorney's fees, correct?

12  A. Yes.  And -- and to clarify, I'm -- this is

13 not my recollection as I sit here today; I'm basing it

14 on believing this document to be accurate.

15  Q. Okay.  Do you have any recollection of there 03:13:39

16 being some other retainer agreement that might have

17 been drafted and executed after January 18, 2006?

18  A. No.

19  Q. Okay.  All right.

20  So focusing on the -- the question of costs  03:13:51

21 and related trial expenses, it is alleged that

22 Mr. Griffin solely controlled defense funds associated

23 with costs and related trial expenses.  Is that

24 accurate?

25  A. Controlled in the sense that the money was in 03:14:08

1  his possession, yes.  But not that if I needed any of

2  those for my defense, that I couldn't access it, no,

3  that's not true.

4      Q.   Okay.  And it -- it's your understanding, and

5  I believe you indicated previously, that access to          03:14:25

6  funds was never a pertinent decision-making factor for

7  you in connection with your choices, whether to retain

8  certain experts or the like, correct?

9      A.   Correct.

10      Q.   Okay.  You thought if you needed an expert,        03:14:43

11  you'd be able to find the funds, correct?

12      A.   Right.

13      Q.   Were there ever any instances in which you

14  requested or wanted defense funds for payment and

15  Johnny Griffin denied the same to you?                      03:15:01

16      A.   No.

17      Q.   Did Johnny Griffin ever indicate to you that

18  he was reluctant in any way to expend money in

19  connection with Hamid's defense?

20      A.   No.                                                03:15:16

21      Q.   Did Johnny Griffin ever indicate to you that

22  he was reluctant to spend money on behalf of Hamid

23  Hayat because that would somehow reduce the amount of

24  funds that would go into Johnny Griffin's pocket, so

25  to speak?                                                   03:15:32

1      A.    No.

2      Q.    Now, there were other individuals besides

3  yourself that were working as part of the overall

4  defense team; is that correct?

5      A.    You mean like Jim -- Jim Wedick and then some      03:15:45

6  counsel at Johnny's office.  Other attorneys, yes.

7      Q.    Okay.  So, for example, do you remember who

8  the attorneys were at Mr. Griffin's office who were

9  assisting as part of the joint defense?

10     A.    Yes.  Clara Leavers and Manolo -- I don't      03:16:04

11  know his last name.

12     Q.    Does the last name Olaso ring a bell?

13     A.    Yes, that's him.

14     Q.    Okay.  And were there some individuals that

15  you had on retainer as well that assisted with the      03:16:16

16  defense of Hamid and were part of this joint defense

17  as well?

18     A.    Right.  I had some assistance on my -- my

19  brother and a couple of other people reading, but they

20  were not paid.                                          03:16:33

21     Q.    Okay.  Do you recognize the name Basir Kakar,

22  K-A-K-A-R?

23     A.    Basir Kakar.  If he was one of the -- the

24  guys who read, that might be right.  Sorry.  I can't

25  remember right now.  That's so long ago.               03:16:50

142

1    Q.   How about -- and I might mispronounce this

2  name -- Iram Ansari (phonetic)?

3    A.   Oh, okay.  Iram Ansari, yes.  Okay.  So these

4  were -- these were interns who worked with me, yes,

5  yes.  Sorry.  Yeah.                 03:17:05

6    Q.   So Mr. Kakar and Mr. -- and Ms. Ansari --

7    A.   Ansari, yes.

8    Q.   -- were interns?

9    A.   Yes.  Iram Ansari was.  Basir -- gosh, I'm

10  kind of forgetting -- I'm forgetting whether or not he  03:17:14

11  worked with me.  But Iram for sure did, yes.

12    Q.   Okay.

13    A.   It might come back to me.  It's been a while.

14    Q.   Were there other individuals besides the five

15  folks that you've mentioned thus far?  You've     03:17:29

16  mentioned Leavers, Olaso, Kakar, Ansari, Wedick.

17  Other individuals?

18    A.   Like I said, I had my brother and a couple of

19  other people read during trial, read the transcripts,

20  and they just role-played.             03:17:43

21    Q.   Okay.  A little earlier in the day you

22  discussed your best recollections as to compensation

23  you ultimately received as part of the case.  Do you

24  recall that?

25    A.   Yeah, yeah.                   03:18:06

143

1    Q.   Okay.  And I believe that you said that after

2  reflecting upon it, you sent a communication to

3  Mr. Riordan and associates that best summarized your

4  recollections as to how much money you received?

5    A.   Yeah, yeah.               03:18:28

6    Q.   Okay.  And let me see here.  I'm now

7  referring to Defense Exhibit I.  Right here.  You got

8  it?

9    A.   Yeah.  I see it, yeah.

10  BY MR. TICE-RASKIN:                03:18:50

11    Q.   Okay.  Okay.  So referring you first to

12  paragraph 3, this is a declaration of Ms. Shirani

13  (phonetic) who's associated with Mr. Riordan and

14  Mr. Horgan.  So it's her recollection, and I'm

15  focusing on what yours might be, but is it fair to say  03:19:15

16  that you have a recollection of first obtaining $6,000

17  when you were retained in 2005?

18    A.   Yes.

19    Q.   Okay.  And is it your recollection that you,

20  at some point in time, received a separate payment of  03:19:30

21  $15,000 in approximately June of 2006?

22    A.   Yes.

23    Q.   Okay.  And now -- just a second.  Ah.  And

24  then looking up at the beginning of that paragraph,

25  there's a reference to you receiving an initial     03:19:59

144

1    payment of $10,000 in June of 2006.  Do you see that?

2        A.    Right.

3        Q.    Okay.  So as you sit here today, did -- does

4    this all seem to be accurate that in sum total you

5    believe that you received $31,000?                      03:20:19

6        A.    Oh, my gosh.  I wish that I had that e-mail

7    in front of me.  I just can't remember right now.

8    That might be right.  I think that sounds about right.

9        Q.    Okay.  Fair enough.  You can go ahead and put

10   that away, if you wish.                                 03:20:54

11       A.    Okay.

12       Q.    Now, I want to talk to you a little bit about

13   your -- your recordkeeping during the course of the

14   case.  Did you maintain any sort of daily log of the

15   activities that you conducted as part of the case?     03:21:10

16       A.    Um --

17       Q.    Whether that's a time sheet or anything like

18   that?

19       A.    I didn't do that until I was -- until I was

20   approved -- appointed by the federal defender so I     03:21:26

21   could track my hours.

22       Q.    Okay.

23       A.    I didn't do that before again.

24       Q.    Okay.  All right.  How about notes of

25   meetings with Hamid Hayat himself, did you take notes  03:21:36

145

1  during your meetings with him?

2      A.   I may have.  I -- I don't know.  I may have,

3  but probably not regularly.

4      Q.   Okay.  'Cause I'll -- I'll indicate to you

5  that in all the documentation that was sent to          03:21:59

6  Mr. Riordan and then ultimately reviewed by myself, I

7  could not see notes of meetings with --

8      A.   Yeah.

9      Q.   -- with Hamid Hayat.

10      A.   Yeah.  I was trying to think about when we     03:22:12

11  sat and watched the confession tape together, whether

12  or not I took notes.  But I wasn't -- I wasn't --

13  there wasn't a lot of information-gathering when I

14  talked with him.  It was -- yeah, I mean, I don't

15  think I took a lot of notes if I -- maybe none if you  03:22:29

16  never found any.

17      Q.   How about when you were meeting with other

18  potential witnesses, did you -- when you met with them

19  and discussed matters with them, did you generate

20  notes of those meetings?                               03:22:45

21      A.   Trying to think about the witnesses that I

22  met with.  Now, at the time, I don't really remember

23  doing much of that.

24      Q.   How about meetings in connection with

25  Mr. Griffin?  You obviously spoke with him a lot about 03:23:04

146

1 strategic and tactical matters. Did you make notes of

2 those interactions with Mr. Griffin?

3     A.   I mean, I must have. I just -- and there's a

4 chance that, you know, the legal pads are lost. I may

5 have not kept them. I must have taken notes with     03:23:26

6 Johnny and with, you know, with, like, my expert who

7 was going to testify, for sure I would have taken

8 notes. It's just I -- maybe there's a missing legal

9 pad.

10     Q.   What -- was that your custom, to take notes     03:23:40

11 on yellow legal pads?

12     A.   Yeah. It would have been a yellow legal --

13 legal pad, and I'm certain that I did with the people

14 who were testifying, for sure, and Johnny, I would

15 have.     03:23:51

16     Q.   Okay. Is there any chance that these notes

17 still exist anywhere at your home or your current

18 office?

19     A.   No. I looked everywhere, so they are

20 probably just gone.     03:24:05

21     Q.   All right. So if I understand you, you

22 indicate that you did take notes in connection with

23 your meetings with witnesses, with Mr. Griffin,

24 perhaps notes when you met with your client, that all

25 those notes would have been taken on legal pads?     03:24:25

1     A.    Right.  And there's -- you know, there's a

2  possibility that if I had a phone conversation with

3  Dr. Weiss, maybe I was typing notes.  I don't know.

4  Yeah, I don't know.

5     Q.    Okay.  You spoke with your client, I trust,        03:24:59

6  on a series of occasions regarding the question of

7  whether he had ever attended any sort of camp,

8  correct?

9     A.    Yes.

10    Q.    Okay.  And did you ask him whether he had         03:25:09

11 ever attended any sort of training camp in 2000?

12    A.    Ever?  Yes.

13    Q.    And what did he indicate to you?

14    A.    He had never been.

15    Q.    To camp in 2000?                                  03:25:23

16    A.    That he had never been -- well, to a camp in

17 2000, I don't -- I don't recall, ever, that

18 discussion, but I know that the question of whether or

19 not he had ever been to a camp was always answered in

20 the negative.  So --                                      03:25:39

21    Q.    Okay.  Okay.  And what's your general

22 recollection as to what your client indicated he was

23 doing in Pakistan in 2003 to 2004 at the time that the

24 government alleges that at a certain point he went to

25 a camp?                                                   03:25:58

148

```
1      A.   So, what specifically happened for that first

2  year, I don't know.  My general -- general

3  recollection was for the two years that he was in

4  Pakistan between '03 and '05, what he was doing.  He

5  got married.                                    03:26:12

6      Q.   Uh-huh.

7      A.   He played a lot of cricket.  He would -- I

8  think he had like a friend or somebody who was like a

9  shop owner, so he would just sit in front of the shop

10 and do nothing, smoke cigarettes.  And just wasted   03:26:24

11 time is really all he did.

12     Q.   Okay.  Now, prior to going to trial, did you

13 interview other members of Hamid Hayat's family,

14 asking them, for those that had been in Pakistan, what

15 Hamid was doing during this two-year period in 2003  03:26:54

16 and 2004?

17     A.   Yes.  I physically went to Lodi and did that.

18     Q.   Okay.  Can you list off for me all of the

19 various -- we are starting with family members -- with

20 whom you spoked and asked them about what Hamid was   03:27:06

21 doing in Pakistan in 2003 and 2004?

22     A.   Okay.  His mother.

23     Q.   Okay.

24     A.   His brother Arslan --

25     Q.   And just --                              03:27:19
```

149

1      A.    Oh, his mother Salma, S-A-L-M-A.

2      Q.    Okay.

3      A.    Last name Hayat.  Same last name, H-A-Y-A-T.

4      And then his brother Arslan, A-R-S-L-A-N,

5  Hayat, H-A-Y-A-T.                                    03:27:29

6      And then his cousin.  Gosh, I can't remember

7  his name.  He had a cousin who spoke English pretty

8  well.  It was a good -- good -- he was close to Hamid,

9  and he was also in Pakistan at the same time.

10     Q.    Can I throw out a name and see if it rings a   03:27:52

11 bell?

12     A.    Sure.

13     Q.    Does the name Usama Ismail ring a bell?

14     A.    Absolutely, that's him.

15     Q.    That's the individual, okay.                  03:28:00

16     A.    U-S-A-M-A.  Ismail, I-S-M-A-E-L?  Is that

17 right?  Or I-L.

18     And I spoke with his uncle a -- well, did you

19 say limit to here in the U. S.?  His cousin -- I mean

20 his uncle Attique Ur Rahman who was in Pakistan, I      03:28:14

21 spoke with him telephonically.

22     And I think I may have had maybe one

23 conversation with his grandfather.  I don't recall.

24     Q.    And identify his grandfather, if you would.

25     A.    That was Saeed Ur Rahman, S-A-E-E-D U-R        03:28:28

1  R-A-H-M-A-N.

2      Q.   Okay.  As you sit here now, can you think of

3  any other family members with whom you spoke regarding

4  the topic of what Hamid was doing in Pakistan between

5  2003 and 2004?  You've listed out Salma Hayat, Arslan      03:28:47

6  Hayat, Usama Ismail, Attique Ur Rahman, and Saeed Ur

7  Rahman.

8      A.   You know, we -- I may have spoken with his

9  uncle who wrote these checks, Umer Khitab, and maybe

10  his sister, but I don't think I spoke with them with      03:29:06

11  the intention of -- as interviewing them as a

12  potential witness.  I think that was maybe -- had some

13  kind of conversation with them.  That's all I can

14  think of right now in terms of family members.

15      Q.   And you mentioned Hamid Hayat's sister.  Her     03:29:22

16  name is?

17      A.   I don't know.  I don't remember right now.

18      Q.   Okay.  So based on your discussions, not only

19  with Hamid but with his family members, did you, as

20  counsel, believe that Hamid Hayat had attended a camp     03:29:41

21  to attend jihadi training?

22      A.   No.

23      Q.   Okay.  Now, did you ever sit down with Hamid

24  and ask him, Hey, Hamid, tell me, who are potential

25  witnesses that can come and testify about what you --     03:29:59

151

1  Hamid was doing in Pakistan?

2      A.    Sure.  We had those --

3      Q.    Did you ever ask him to identify all the

4  witnesses who could potentially serve as alibi

5  witness?                                              03:30:16

6      A.    Yes.

7      Q.    Okay.  What I'd like you to do is to tell me

8  what you recall Hamid telling you.

9      A.    Well, I think it would have been his uncle,

10  his grandfather, his mother, and his cousin.  I think   03:30:24

11  he felt, out of everybody, that his cousin would have

12  been a good person to testify.

13      Q.    You are referring to --

14      A.    Usam -- no, I'm sorry.

15      Q.    Usama Ismail?                              03:30:40

16      A.    Yes, Usama.

17      Q.    Okay.

18      So Hamid identified for you those four

19  individuals: the uncle, being Attique Ur Rahman; and

20  the grandfather, being Saeed; his mom, Salma; and then   03:30:52

21  his cousin.  Correct?

22      A.    Yeah.  That's -- that's who I can remember

23  right now.  I don't remember if he said anybody else.

24  And, you know, his wife was obviously a family member,

25  but he married her right before he came, and so she    03:31:06

152

1  wasn't really going to be much -- so she wasn't going

2  to do much in terms of an alibi for that period of

3  time.

4       Q.   Okay.  How about the name -- is it Jabar

5  Ismail?  Does that name ring a bell?                    03:31:26

6       A.   Is that Usama's brother?  I think.  Jabar.  I

7  know the name.  And that may have been another

8  person.  I just don't remember right now.

9       Q.   Is this another person who -- who potentially

10  knew what Hamid was doing in Pakistan in 2003 and      03:31:45

11  2004?

12       A.   It may have been, yes.  I do recall the name.

13       Q.   Okay.  Was this a person that had been

14  identified by Hamid Hayat as a potential witness, or

15  do you just --                                         03:31:58

16       A.   No.  I mean I -- I don't recall that.  I

17  don't recall whether or not that was somebody that he

18  specifically mentioned to me or not.

19       Q.   Okay.  Okay.  All right --

20       A.   But if it's Usama's brother, then they -- he  03:32:14

21  likely did, because they were both there together and

22  there were -- they hung out together a lot.

23       Q.   Okay.  And so now -- I just want to make sure

24  if you took the time to follow up with these

25  individuals about their recollections.  So let me just  03:32:35

153

1   go through them.

2       Did you take the time to interview Salma

3   Hayat and to assess whether or not she should serve as

4   an alibi witness?

5       A.   Yes.                                    03:32:46

6       Q.   Okay.  How about Arslan Hayat?

7       A.   Yes.

8       Q.   Okay.  How about Usama Ismail?

9       A.   Yes.

10      Q.   Attique Ur Rahman, you spoke with him by   03:32:52

11  phone?

12      A.   Yes.

13      Q.   Okay.  Saeed Ur Rahman?

14      A.   Saeed Ur Rahman, not -- not for the purpose

15  of specifically whether or not he should be a        03:33:03

16  witness.  I did talk to him, briefly I think, so him I

17  don't -- no, I didn't.  For that purpose, I did not.

18      Q.   Okay.  Umer Khitab, did you speak with him

19  for the purposes of assessing whether or not he could

20  serve as an alibi witness?                           03:33:22

21      A.   I -- I don't -- I don't think I did because I

22  I don't remember if he was there during that time, so

23  I don't think I did.

24      Q.   Okay.  How about a Jaber Ismail, do you have

25  a recollection of -- of trying to meet with him,      03:33:40

1   speaking with him?

2       A.   No.  I don't think I did.

3       Q.   Okay.  Do you know if he was in the United

4   States?

5       A.   I don't, yeah.                          03:33:46

6       Q.   Okay.  Back to the question of what Hamid

7   Hayat told you.  You -- you listed off four folks.  As

8   you sit here now, can you think of any other folks

9   that Hamid Hayat said, Hey, this person is a potential

10  alibi witness; you should track down and talk to this  03:34:03

11  person?

12      A.   No.

13      Q.   Okay.  So we are now going to be looking at

14  Defense Exhibits S through JJ, and I'm going to -- if

15  you want to just kind of pull out --            03:34:42

16      A.   Okay.

17      Q.   And I've got them right here, if it's easier

18  for you to just to grab them from there.

19      A.   All right.

20      Q.   'Cause what I'm going to do is, I'm just    03:34:49

21  going to be referring to a name --

22      A.   Okay.

23      Q.   -- and I'm going to always be asking you the

24  same question in connection with all of these --

25      A.   All right.                            03:34:57

155

1     Q.    -- which would be, did Hamid or any of his

2   family members, at the time, identify the individual

3   named as a potential alibi witness to you?

4     A.    Okay.  Did you say starting with SS or S?

5     Q.    So -- it's starting with S, as in Sam.          03:35:17

6     A.    This one goes from O to MM.

7     Q.    Oh, here, let me help you find it.

8     A.    Oh.

9     Q.    So it's just selected exhibits.  And you know

10  what I just did, I probably just gave you the binder.    03:35:29

11  Or maybe not.  Let's just do it this way.

12    A.    What about their copy now?

13    Q.    Why don't I just -- I'll give you the name --

14    A.    Okay.

15    Q.    -- and I'll show you a document --               03:35:48

16    A.    Okay.

17    Q.    -- if need be.  And we'll do it that way,

18  okay.

19    A.    S is in here too.

20    Q.    So first individual on the list.  Attique Ur    03:35:57

21  Rahman.  I believe you've already identified Attique

22  Ur Rahman as being somebody that Hamid told you about

23  and that you spoke with.  Is that correct?

24    A.    Yes.

25    Q.    Okay.  Muhammad, M-U-H-A-M-M-A-D A-N-A-S, was   03:36:09

1 that an individual identified for you by Hamid?

2     A.    I've never heard of this person.

3     Q.    Okay.  Did any member of his family say you

4 should speak with Muhammad Anas?

5     A.    That's the first time I've ever seen the          03:36:37

6 name --

7     Q.    Okay.

8     A.    -- or heard of him.

9     Q.    Okay.  Next person I wanted to ask you about

10 was a Muhammad, M-U-H-A-M-M-A-D, Daud, D-A-U-D.          03:36:44

11     Did Hamid say that this is -- that this was a

12 potential alibi witness with whom you should speak?

13     A.    Nope.

14     Q.    Okay.  Did any member of his family identify

15 Mr. Daud as being a potential alibi witness with whom     03:37:03

16 you should speak?

17     A.    No.  Never heard of him.

18     Q.    Mohammed, M-U-H-A-M-M-A-D, Usman, U-S-M-A-N.

19 Did Hamid Hayat identify this individual witness to

20 you as being a potential alibi witness?               03:37:23

21     A.    Muhammad Usman.  It's not -- it's not, like,

22 another name for -- no, that's Usama.  Muhammad Usman,

23 I don't know that name.  I don't know who that is,

24 no.  I thought sometimes you just call a person

25 Muhammad and just take their first name.  So I thought    03:37:37

157

1    that's what it was.  No, I don't know that name.

2         Q.   Okay.  So neither -- would it be fair to say

3    that no family member of Hamid Hayat identified this

4    individual as being a potential alibi witness?

5         A.   No.                                    03:37:51

6         Q.   Okay.  Did Hamid Hayat ever identify a

7    gentleman by the name of Hammad, H-A-M-M-A-D, Ishfaq,

8    I-S-H-F-A-Q as being a potential alibi witness?

9         A.   I've never heard of that person, no.

10        Q.   Okay.  And similarly, no member of Hamid   03:38:09

11   Hayat's family told you that you should track down

12   Hammad Ishfaq and speak with him?

13        A.   No.

14        Q.   Muhammad, M-U-H-A-M-M-A-D, Qasim, Q-A-S-I-M,

15   did Hamid Hayat ever identify him as being a potential  03:38:29

16   alibi witness?

17        A.   No.

18        Q.   Did any member of Hamid Hayat's family ever

19   identify him as being a potential alibi witness?

20        A.   No.                                    03:38:39

21        Q.   Sajjad, S-A-J-J-A-D, Ishfaq, I-S-H-F-A-Q, did

22   Hamid Hayat ever identify him as being a potential

23   alibi witness?

24        A.   No.

25        Q.   Did any member of Hamid Hayat's family ever  03:38:57

1  identify him as being a potential alibi witness?

2      A.   No.

3      Q.   What I'm going to do, just to speed things

4  up -- well, you know what, I'm not going to do that.

5  I take that back.  I'm just going to go through them        03:39:18

6  one by one.

7      An individual by the name of Rafaqat,

8  R-A-F-A-Q-A-T, purportly a son of Ameer Sultan,

9  S-U-L-T-A-N.  Ameer spelled A-M-E-E-R.

10     Did Hamid Hayat ever identify this as being a        03:39:34

11  potential alibi witness?

12     A.   No.

13     Q.   Okay.  Did his family ever --

14     A.   No.

15     Q.   Okay.  I'll just go to an abbreviated           03:39:42

16  question, which is did anybody ever identify --

17     A.   Okay.

18     Q.   -- this individual as being a potential alibi

19  witness, and you'll understand that to mean anyone

20  including Hamid, his family, or anybody else.          03:39:51

21     A.   That's fine.

22     Q.   Okay.  Salahuddin, S-A-L-A-H-U-D-D-I-N,

23  purportedly the son of Muhammad Younas, Y-O-U-N-A-S,

24  did anyone ever identified him as being a potential

25  alibi witness for Hamid Hayat?                         03:40:07

1      A.   No.

2      Q.   Muhammad Saeed, S-A-E-E-D, did anyone ever

3  identify him as being a potential alibi witness for

4  Hamid Hayat?

5      A.   No.  The only Muhammad Saeed that I know      03:40:23

6  involved in the case was the man from Stockton I said

7  before.  He was assisting the family, but nobody ever

8  identified him as a potential alibi witness, no.

9      Q.   Okay.  And the individual identified here as

10  Mohammad Saeed is purportedly a resident of Behboodi,    03:40:39

11  Tehsil, and the district Attock, so --

12      A.   Yeah.  And it also says he's 28 years old.

13  It's not the same guy, yeah.

14      Q.   Okay.  Did anyone ever identify an individual

15  by the name of Nisar, N-I-S-A-R, Ahmad, A-H-M-A-D, as    03:40:54

16  being a potential alibi witness for Hamid?

17      A.   No.

18      Q.   Did anyone ever identify Shakeel,

19  S-H-A-K-E-E-L, Ahmad, A-H-M-A-D, as being a potential

20  alibi witness for Hamid Hayat?                          03:41:14

21      A.   No.

22      Q.   Did anyone ever identify Fahim, F-A-H-I-M,

23  Ud, U-D, Din, D-I-N, as being a potential alibi

24  witness for Hamid Hayat?

25      A.   No.                                            03:41:30

160

1    Q.   Did anybody ever identify Pashmina,

2  P-A-S-H-M-I-N-A, purportedly the wife of Qari Abdur

3  Rahman, R-A-H-M-A-N.  Spelling of Qari, Q-A-R-I.

4  Anybody ever identify that individual as being a

5  potential alibi witness for Hamid Hayat?         03:41:57

6    A.   No.

7    Q.   Did anyone every identify Muhammad, spelled

8  M-U-H-A-M-M-A-D, Nauman, N-A-U-M-A-N, as being a

9  potential alibi witness for Hamid Hayat?

10    A.   No.                              03:42:16

11    Q.   Anybody ever identify Malik Ihtesham,

12  I-H-T-E-S-H-A-M, Mumtaz, M-U-M-T-A-Z, as being a

13  potential alibi witness on behalf of Hamid Hayat?

14    A.   No.

15    Q.   Anybody ever identify Tayyaba, T-A-Y-Y-A-B-A,  03:42:33

16  Faham, F-A-H-A-M, as being a potential alibi witness

17  on behalf of Hamid Hayat?

18    A.   No.

19    Q.   And then lastly, did anybody ever identify

20  Bibi, B-I-B-I, Asma, A-S-M-A, as being a potential  03:42:54

21  alibi witness on behalf of Hamid Hayat?

22    A.   No.

23    Q.   Okay.  Now, still on the topic of potential

24  alibi witnesses, I know that you spoke with a whole

25  host of folks that you've listed off before.  When you  03:43:12

161

1  were speaking with them, did you ask them if they

2  could identify any other potential alibi witnesses who

3  could testify on Hamid's behalf?

4       A.   Yeah, we had that discussion.

5       Q.   Okay.  Did they provide you with any                  03:43:28

6  additional names?

7       A.   None that I can recall.

8       Q.   As to those individuals, do -- you say none

9  that you can recall, as you sit here now, even if you

10  can't recall a specific name, do you remember being       03:43:53

11  given a name, a new name, by any of these

12  individuals?

13      A.   No.  I -- I specifically remember that they

14  did not refer someone to me.

15      Q.   Okay.  If -- if any of these individuals with   03:44:04

16  you -- with whom you had spoken, such as Salma or

17  Arslan or Hayat, if they had given you the name of

18  another potential alibi witness, would you have

19  followed up on that name?

20      A.   Yes.                                             03:44:19

21      Q.   Okay.  So why don't we change gears and talk

22  about defense strategies that -- that you considered.

23  You indicated that you reviewed the -- the

24  government's case and all the discovery that we

25  provided to you, all umpteen thousand pages, every        03:44:45

162

1  single one of them.

2      A.    Yes.

3      Q.    And it is your belief that you knew this case

4  better than anyone who was part of the defense team,

5  correct?                                          03:44:58

6      A.    Yes.  And I will just clarify that there were

7  certain documents that were in different language

8  scripts that I referenced the translation versus the

9  actual document, because it would have taken longer

10  for me to read the Arabic.  So I didn't, in detail,    03:45:12

11  read all of that.

12      Q.    So when you assessed the government's case,

13  what aspects of the government's case did you think

14  were the weakest?  What did you think the Achilles'

15  heel was of the government's case that you were going   03:45:26

16  to focus on?

17      A.    Wow.  Well, I think that it was --

18  essentially, it was the confession, was really what

19  their case was, and when we saw -- when we saw the

20  supplication, I personally thought that wasn't a big    03:45:49

21  deal.  I thought it was week.  But I learned later

22  that the jury relied heavily on the expert's

23  testimony.

24      Besides -- let's see, besides that, I thought

25  the aerials, I didn't think that was very compelling.   03:46:07

1  And then I thought that the books and, you know,

2  journals and writings that they found, or the

3  scrapbook, I didn't think any of that stuff was really

4  a big deal.  I thought it was really the confession.

5      Q.   Okay.  Now, ultimately, when you took the        03:46:28

6  matter to trial, you argued that there was

7  insufficient evidence and reasonable doubt; is that

8  fair to say?

9      A.   Oh, yeah.

10     Q.   Okay.  And would you say that your ultimate      03:46:41

11  strategy, chosen strategy, was an insufficient

12  evidence strategy?

13     A.   Yes.

14     Q.   Okay.  Now, setting aside what you ultimately

15  decided to pursue at trial, did you consider, as part   03:46:52

16  of your pretrial preparation, whether to pursue other

17  strategies besides the strategy that you ultimately

18  chose?

19     A.   I don't -- I don't remember what other

20  strategies we thought about, but I think I -- as the    03:47:10

21  evidence kept coming in, I just didn't think the

22  government was going to meet its burden, because even

23  the confession, I thought, had a lot of problems with

24  it.

25     Q.   Did you consider the possibility of putting      03:47:23

164

1  on some sort of an affirmative alibi defense?

2      A.   Did we think about it?  I think very briefly,

3  and then we realized it wasn't a good idea.

4      Q.   Okay.  And that's what I want to focus on for

5  a moment --                                          03:47:40

6      A.   Yeah.

7      Q.   -- is what you thought about it and why you

8  concluded that it wasn't something you wanted to

9  pursue.

10      A.   Well, because the -- the witnesses that were   03:47:47

11  identified or that we thought could possibly be alibi

12  witnesses all seemed to have different levels of

13  problems with them.

14      We thought that the grandfather and the uncle

15  in Pakistan, like I said earlier, their names were all  03:48:04

16  over all of the evidence.  The allegations were

17  related to specifically them kind of guiding Hamid to

18  do what he was doing.  We didn't think that there was

19  going to be -- that they were going to really come

20  across -- we thought that that might hurt his case if   03:48:20

21  they testify.

22      The family members, we tried -- I tried to

23  speak with Salma Hayat, and she just -- she didn't

24  look -- she did not come across as a potential good

25  witness because --                                   03:48:37

165

1    Q.   I'm sorry.  You are referring now to Salma --

2    A.   I'm sorry.  Salma -- Salma the mother --

3    Q.   Okay.  So you are saying you spoke with the

4  mother of Hamid Hayat --

5    A.   Yeah.                                    03:48:43

6    Q.   -- and why did you believe that she would not

7  present well as a witness?

8    A.   Just she -- she had a difficulty time, even

9  if she was doing it in her own language and we had to

10 translate it, responding to questions, and I just     03:48:53

11 didn't think she was going to come across as a good

12 witness.

13     Usama was the only person that I think we

14 would have seriously considered, and then I think we

15 actually -- I don't know if he came into the office or  03:49:08

16 if he was there when we went and visited the home in

17 Lodi.

18     When we spoke with him, we also ultimately

19 concluded -- because he was a person that I --

20 honestly, out of everybody, he was a person I thought   03:49:20

21 might be pretty good.  But then after we spoke with

22 him and got more details of what he -- I think we had

23 gotten a 302 because he was interviewed by the FBI.

24 We looked at the 302, interviewed him and tested it

25 out, and then just determined he wasn't going to be a   03:49:42

166

1  good witness.  I don't remember the specific reasons,

2  but it was -- it was seriously considered.

3      Q.    Okay.  Do you remember, was -- Usama Ismail,

4  was he represented by counsel?

5      A.    He was, yes.                                    03:49:56

6      Q.    Okay.

7      A.    That was another issue.

8      Q.    Do you remember whether or not there were

9  questions as to whether or not Usama Ismail would

10 agree to testify?                                         03:50:06

11     A.    You know, what had happened was, I had spoken

12 with Usama, I think, before he had gotten

13 representation or there was -- it's coming back to

14 me -- formally, whether or not I actually interviewed

15 him, or if I relied on his 302 and just conversations  03:50:19

16 that I had had with him before and not specifically

17 for that purpose.  Just ultimately there was a

18 decision that we -- we couldn't use him.  But, yeah,

19 he was represented by counsel, and I'm trying to

20 remember.  I know his attorneys didn't want him to     03:50:38

21 testify.

22     Q.    And why is that?

23     A.    Because he had been issued, I think, a grand

24 jury subpoena, and she said that she wanted -- she was

25 going -- I think it was a Fifth Amendment claim or     03:50:49

1   something she was going to -- she was going to raise

2   with him.  But that wasn't the only reason that we

3   decided not to call him.  I think his 302 just had

4   problems too.

5       Q.   Okay.  So what I hear you saying is there      03:51:04

6   were some Fifth Amendment concerns but you also, in

7   reviewing the 302, perceived some other problem in

8   connection with presenting it?

9       A.   Yeah.  That's why we didn't -- I think that's

10  maybe why we didn't push it with the attorney.  I -- I   03:51:13

11  don't remember right now.

12      Q.   Okay.  As far as who represented Usama

13  Ismail, does the name Chris Haydn-Myer ring a bell?

14      A.   It does ring a bell.

15      Q.   Was Mr. Haydn-Myer representing Usama Ismail,   03:51:30

16  or do you not know?

17      A.   I thought it was a female.  I don't

18  remember.  I thought -- was it Krista something?  I

19  don't really remember if it was a female because there

20  were a number of people who had different attorneys     03:51:43

21  representing them.  I don't remember.  I hought it was

22  a family.

23      Q.   Okay.

24      A.   Yeah.

25      Q.   So you -- we've talked a little bit about       03:51:48

1 your interactions and impressions of Salma Hayat as

2 well as your thoughts in connection with Usama Ismail,

3 the uncle and the grandfather.  How about Arslan

4 Hayat, did you consider calling him as an alibi

5 witness and if -- what were your thoughts as to him?     03:52:07

6     A.   Yeah.  I think it was -- his, also, 302s

7 weren't good.  I think -- now I remember specifically

8 looking -- reading all of the 302s of all the

9 different cousins and family members.  And after

10 reading the 302s, that was really when we decided we     03:52:21

11 just couldn't use any -- any of these people.

12     Q.   Okay.

13     A.   And Arslan may have had less problems with

14 his 302 than anybody else had, and that's why we were

15 seriously considering him, but we -- we abandoned it     03:52:34

16 for whatever reason.  I don't remember.

17     Q.   So just so that -- so I'm clear to folks that

18 you actually spoke with as well as reviewed their

19 302s, you actually spoke with Salma Hayat in assessing

20 her viability as a witness, correct?                     03:52:49

21     A.   Yeah.  And hers I -- hers I specifically

22 remember traveling to Lodi, and in her living room,

23 talking to her, and trying to assess whether or not we

24 should call her.

25     Q.   Okay.  How about Arslan Hayat, do you recall   03:53:00

169

1  specifically interacting with him?

2      A.   Oh, God.  You know, as I sit here right now,

3  I can't -- the only person I can really, truly

4  remember talking with that way is Salma.

5      I don't remember if I did with Arslan.  With      03:53:14

6  Arslan it may have been a judgment based off his 302s,

7  and probably the same with Usama.  It's just -- it's

8  difficult because I had interactions with them, you

9  know, kind of throughout, and I just don't remember

10 specifically sitting down and talking with them like I   03:53:37

11 do with Salma.

12     Q.   How about Attique Ur Rahman, do you

13 remember --

14     A.   That was a phone conversation, yeah --

15     Q.   That was a phone conversation in which you     03:53:46

16 were discussing with him his salient potential

17 recollections with --

18     A.   Oh, yes.  Yeah.

19     Q.   Okay.  And you ultimately decided because of

20 his connection with a lot of the other identified       03:53:55

21 information that --

22     A.   We wouldn't use him.

23     Q.   -- not a good witness to call?

24     A.   Right.

25     Q.   Okay.                                          03:54:03

170

1    All right.  Let's see if I've left anybody

2  out.  I don't think so.  Jaber Ismail, you don't have

3  a recollection of --

4     A.    No.  I just -- I feel like he, you know -- he

5  may have been the brother who wasn't around and then        03:54:14

6  he came back and maybe I talked to him, you know, on

7  the phone after -- I just -- I don't remember too much

8  interaction with him.  But I know at some point --

9  maybe it's that he returned later than everybody else

10  and he was contacted by the FBI and he needed an          03:54:32

11  attorney.  So maybe that's when I spoke with him.  I

12  don't remember interviewing him for the case.  I just

13  don't remember.

14     Q.    Okay.

15     A.    Yeah, probably not.                              03:54:42

16     Q.    All right.

17     You testified earlier that you wanted to push

18  the government to trial rapidly, correct?

19     A.    Uh-huh.

20     Q.    Why?                                             03:54:55

21     A.    Well, I think at the -- I think in the

22  beginning you -- the government hadn't even produced

23  the interviews with the informant.  We hadn't seen any

24  of that stuff.  And the amount of evidence that we got

25  was very limited.  And so we really just didn't think     03:55:12

1  you had enough evidence to go to trial on.

2      Q.   Okay.

3      A.   And we thought that that was a good strategy.

4      Q.   And did you continue to believe all the way

5  through the time of trial that the best strategy was      03:55:24

6  to rush the government to trial as rapidly as

7  possible?

8      A.   Yes, because we felt that the evidence was

9  just trickling in and that you guys were -- we thought

10  that you -- you charged the case and built it later.     03:55:37

11      Q.   What was your concern about giving the

12  government any more time in connection with the case?

13      A.   Because you would continue to gather evidence

14  and create the case against him.

15      Q.   Okay.  Would it be fair to say that it was     03:55:58

16  all -- at all times, your strategy to push the case to

17  trial as rapidly as you possibly could?

18      A.   Well, yeah, until -- yeah, I think that

19  that's -- that's fair to say, but I think we -- we

20  really pushed the speedy trial stuff in the begining.    03:56:18

21  And then it got to a point where I think it didn't

22  become an issue because the government ran out of ways

23  to continue it.  Maybe that's what it was.

24      Q.   When the Court indicated that it was inclined

25  to grant some of the government's requested            03:56:43

1  continuances for the purposes of gathering discovery,

2  did the defense make a request of the Court to have

3  the earliest trial date as possible?

4      A.   I think so.

5      Q.   And was that consistent with your chosen      03:56:59

6  strategy?

7      A.   Yes.

8      Q.   Okay.  Now, in -- we talked a little bit

9  about your consideration of and rejection of the alibi

10  defense strategy, correct?                            03:57:09

11     A.   Okay, yeah.

12     Q.   Okay.  Were there other defenses that you

13  considered and rejected?  We've talked about the alibi

14  defense, we've talked about the insufficient

15  evidence/reasonable doubt defense.  Were there any     03:57:21

16  other defenses that you considered before you

17  ultimately made the decision to go with the strategy

18  you did?

19     A.   I just can't think of any right now.

20     Q.   Okay.  All right.  Now, in making the         03:57:38

21  decision to go with the insufficient

22  evidence/reasonable doubt strategy, did you exercise

23  your own independent judgement?

24     A.   Yes.

25     Q.   Okay.  Now, would it be fair to say that      03:57:51

1  Mr. Griffin gave you advice in connection with this

2  issue?

3      A.   Yes.

4      Q.   And fair to say that you considered that

5  advice?                         03:57:59

6      A.   Yes.

7      Q.   Okay.  But did you make that decision solely

8  because Johnny Griffin told you to do so?

9      A.   No.

10      Q.   Okay.  It is alleged that you felt compelled  03:58:04

11  to follow Johnny Griffin's advice.  Is that true?

12      A.   No.

13      Q.   Okay.  It is alleged that you made the

14  decision to go with this strategy solely because of

15  the Johnny Griffin advice.  Is that true?  03:58:26

16      A.   No.

17      Q.   Okay.  Did you make your own independent

18  professional decision based on the totality of facts

19  then known to you?

20      A.   On the strategy?  03:58:37

21      Q.   Yes.

22      A.   Yes.

23      Q.   Okay.  And did you make that decision based

24  on your belief that that would be in the best interest

25  of Hamid?  03:58:44

1      A.    Yes.

2      Q.    Okay.  Now, talking about this -- this whole

3  issue of speedy trial, you've just indicated that one

4  of the -- the strategic objectives that you were

5  pursuing was to push the government to trial as          03:59:06

6  rapidly as possible, correct?

7      A.    Yes.

8      Q.    Okay.  Was that a separate strategy, separate

9  from potentially creating some sort of -- of Speedy

10  Trial Act claim?                                         03:59:18

11     And I'm not sure if I'm --

12     A.    No.  I -- I understand the question.  I'm

13  trying to just think about it.

14     Q.    Let me just make sure I'm being clear here.

15     A.    Yeah.                                           03:59:39

16     Q.    There's pushing the government to trial as

17  rapidly as possible as a strategic matter, and there's

18  also believing that there might have been a violation

19  of the Speedy Trial Act and wanting to pursue that

20  violation as a means to obtain dismissal of the          03:59:53

21  charges.

22     A.    Oh, I see what you are saying.

23     Q.    Okay.  And so were those separate

24  considerations, were they one and the same?  What I'm

25  trying --                                                04:00:04

1      A.    Yeah.

2      Q.    I'm trying to tease the two of them apart if

3    they are a separate consideration.

4      A.    Well, there's a focus.  The focus was to push

5    the government to trial, and if along the way there      04:00:11

6    was a violation, then there was a violation and we

7    could raise it.  But that was not -- the focus was

8    just to push the government to trial.

9      Q.    Okay.

10     A.    That was really the focus.                       04:00:23

11     Q.    Now, you mentioned that you ultimately,

12   pretrial, did not file a motion under the Speedy Trial

13   Act alleging that there had been a violation, correct?

14     A.    Right.

15     Q.    Okay.  Did you assess whether such a motion      04:00:39

16   would be viable and conclude that it would not be

17   viable, or did you simply not even consider bringing a

18   motion?

19     A.    No.  I think -- I think we -- we talked about

20   it, and we must have ultimately concluded not to do     04:00:54

21   it.  I don't remember the process of that

22   decision-making.  But I know that if -- if -- if there

23   was a question of a possible violation, then we would

24   have considered the relief available.

25     Q.    Okay.  All right.  So your best recollection     04:01:13

176

1    is you believe you would have considered it and

2    ultimately the decision was not to bring it --

3       A.   Not to do it for whatever reason, right.

4       Q.   In connection with that issue, as best you

5    can recall, was that your own independent              04:01:32

6    decision-making to abstain from filing a speedy trial

7    motion as opposed to just deferring to whatever Johnny

8    Griffin told you?

9       A.   Yes.

10      Q.   Okay.  Is this a situation where again        04:01:45

11   Mr. Griffin gave you advice and you considered that

12   adivce?

13      A.   Yes.

14      Q.   Okay.  Did you feel compelled to follow

15   Mr. Griffin's advice?                                  04:01:55

16      A.   No.

17      Q.   Aside from speaking with Saeed Ur Rahman and

18   Attique Ur Rahman in Pakistan, did you consider

19   conducting any additional investigation of possible

20   exculpatory alibi witnesses in Pakistan?              04:02:53

21      A.   Other alibi witnesses that actually were

22   physically in Pakistan at the time?

23      Q.   Yes.

24      A.   No, I didn't think there were any.

25      Q.   Okay.  And was the basis of your belief from  04:03:09

177

1   your discussions with all those other individuals

2   we've discussed previously?

3       A.   Yes.

4       Q.   Did you -- you ever consider somehow tasking

5   Jim Wedick with making calls to Pakistan to figure out      04:03:35

6   whether there were other alibi witnesses there?

7       A.   No.

8       Q.   Okay.  Why did you not consider that?

9       A.   I didn't think there was any others, and the

10  two that I spoke with, Jim couldn't communicate with        04:03:49

11  them anyway, so I spoke with them in Urdu.

12      Q.   Did you ever consider just traveling to

13  Pakistan yourself?

14      A.   You know, I did.  I thought about it, but

15  there really -- I mean, I thought about it more             04:04:14

16  because I wanted to go visit the site, but we found

17  somebody to do it.

18      Q.   Okay.  Why don't you tell me a little bit

19  about your -- who you found and what tasked him with

20  doing and why that was an important part of your            04:04:33

21  strategy.

22      A.   Okay.  Well, we got information on -- I think

23  they were specifically like a -- what do you call

24  it? -- longitude/latitude of the location in Pakistan

25  and Balakot whether the government thought that he          04:04:47

1  attended the camp.  And so I had done some research

2  and just by my on -- online, just looking at it, it

3  didn't look like a camp.  I think I looked at Google

4  Earth and then thought, Well, God, it would be great

5  to have somebody there.                              04:05:03

6       And I actually got a phone call from a friend

7  from law school who was a district attorney who said

8  that he had been following the case and he had a

9  friend who was visiting for humanitarian purposes and

10  if there's any assistance he could give.  And that's  04:05:22

11  when I -- it just clicked and I said, yes, he could.

12       Q.   And who was that person?

13       A.   La -- what was his first name?  Lazor was his

14  last name.

15       Q.   Was it James?                              04:05:32

16       A.   James.  Yeah, James Lazor.

17       Q.   Okay.

18       A.   I contacted him, and he said he would

19  travel -- because there had been, I think, an earth --

20  some kind of a disaster there prior to that, so he    04:05:43

21  went there to -- I don't know, to deliver blankets or

22  something, some humanitarian purpose.

23       Anyway, so I asked him if he could visit the

24  site and then come and testify as to what it is, and

25  he did.                                              04:05:54

1      Q.    Okay.  Let me ask you to pause there --

2      A.    Yeah.

3      Q.    -- because I think we are about to run out of

4   tape.

5      A.    Okay.  All right.                          04:05:58

6           MR. TICE-RASKIN:  And should we take a brief

7   break here for the purposes of a drink of water and

8   the like?

9           MR. RIORDAN:  Yeah.  Let me ask you this --

10  or we could go off the record.                      04:06:05

11          MR. TICE-RASKIN:  Can we go off the record.

12  Thank you.

13          THE VIDEOGRAPHER:  The time is 4:06, and we

14  are off record with Tape 2.

15          (Short break was taken.)                    04:34:24

16          THE VIDEOGRAPHER:  Okay.  The time is 4:35,

17  and we are back on record with Tape 3.

18  BY MR. TICE-RASKIN:

19     Q.    Ms. Mojaddidi, I believe you had last

20  indicated that you had considered but ultimately     04:35:31

21  decided not to travel to Pakistan yourself.  Is that

22  accurate?

23     A.    Yes.

24     Q.    Okay.  And would it be fair to say that based

25  on your interviews of folks both here in the United  04:35:44

                                                                    180

1  States and in Pakistan that one of the reasons you

2  decided not to go to Pakistan which -- was that you

3  didn't believe there were -- there was reasonable

4  investigation for you to conduct there yourself?

5      A.   Yes.  And I did find somebody else who could    04:35:59

6  go visit the site.

7      Q.   And indeed we were talking about that -- that

8  individual, whose name is Jim --

9      A.   James Lazor.

10     Q.   James Lazor.                                     04:36:12

11     A.   L-A-Z-O-R.

12     Q.   Okay.  Now, what precisely did you task

13 Mr. Lazor with doing while he was there in Pakistan in

14 connection with his humanitarian mission?

15     A.   Basically just gave him the coordinates and     04:36:27

16 said, Go see what's there, and that was it.  And he --

17 I think when he himself went up, he videotaped it.

18 Yeah.  And I think I gave him the information about

19 the specific route.  And so he followed it, went

20 there, and then came back and testified in court about  04:36:49

21 what he saw.

22     Q.   Okay.  And what was your recollection as to

23 what it was that Mr. Lazor observed in connection with

24 the facilities at that locale of the coordinates?

25     A.   I think it was his understanding that it was    04:37:06

181

1 a former Pakistani military site and not any type of a

2 terrorist training camp. And I think he tried to

3 testify about what people told him, but there were

4 hearsay objections being made, I remember.

5     Q. His understanding was based on conversations   04:37:22

6 he had with individuals and his observations of

7 individuals in their uniforms; is that fair to say?

8     A. Right. And what he saw himself, yes.

9     Q. Okay.

10     All right. Back on the topic of -- of   04:37:35

11 additional investigation in Pakistan. It is -- it's

12 alleged that Johnny Griffin told you that

13 investigation in Pakistan would take too much time,

14 and for that reason, shouldn't be pursued. Is that

15 accurate?   04:37:57

16     A. No. I don't believe that that's what he

17 said.

18     Q. Okay. Did he say anything along those lines,

19 to your knowledge?

20     A. I don't believe so.   04:38:03

21     In fact, when it came to those kinds of

22 topics and those kinds of decisions and our experts,

23 it was me who was doing a lot of the recommendation

24 and advice, and Johnny was confirming that.

25     Q. So you are saying that it was you that was   04:38:41

1  making recommendations in connection with what

2  potential investigation should be undertaken in

3  Pakistan?

4      A.    Right.  I mean, when it -- when it came to

5  things that had to do with, you know, specifically,     04:38:54

6  you know, what was going on in Pakistan or how we

7  should approach, you know, any witnesses there or an

8  investigation there, you know, I really took the lead

9  on those kinds of things and made the suggestions and

10 recommendations, and Johnny would just confirm with     04:39:13

11 me.  So it wasn't as if it was his idea that I went

12 along.  It wasn't like that.

13     Q.    Okay.  In deciding what investigation to

14 conduct, did -- did you believe at any point in time

15 that you lacked investigative resources, that is to     04:39:31

16 say money, in order to conduct that investigation?

17     A.    No.

18     Q.    And it was your belief that Jim Wedick was

19 also subject to your authority and could be dispatched

20 by you to conduct investigation?                        04:39:49

21     A.    Yes.

22     Q.    At the time, did you perceive any need to

23 seek outside funding besides the funding that was

24 being provided to you by friends and family of the

25 Hayats?                                                 04:40:12

1     A.    Did I perceive a need to do it?  I mean,

2  there were different stages of the resources that they

3  could come up with.  I mean, I think there was an

4  issue at one point of whether or not they could afford

5  the attorney's fees or any of those costs because of      04:40:28

6  the home and I think it was tied to the bail.  And so

7  there were disucssions about, you know, where --

8  where's the money going to come from, but I don't

9  think that it was ever that, you know, we couldn't

10 afford some kind of investigation or, you know, that    04:40:47

11 we couldn't make that happen.  That was never a

12 reason.  The finances was never a reason.

13    Q.    Okay.  Now, you ultimately decided not to

14 pursue an alibi defense, including the use of

15 potential alibi witnesses that were in Pakistan,        04:41:16

16 correct?

17    A.    Right.

18    Q.    Okay.  Was any part of your decision in which

19 you rejected use of an alibi defense for witnesses

20 that would be coming from Pakistan, was any part of     04:41:30

21 that decision-making process associated with a belief

22 on your part that -- that witnesses were beyond

23 subpoena power?

24    A.    No.  Because the only two in Pakistan that we

25 considered, we decided to not pursue, not because of    04:41:46

1  inability.  The uncle and the grandfather, it was just

2  because we didn't think that they would be -- there

3  would be any value to their testimony.

4      Q.  So are you saying, then, that the -- the

5  question of being able to subpoena or not subpoena,    04:42:07

6  that didn't factor into your analysis?

7      A.  No.  But I know that I, you know, probably

8  didn't know the detailed rules about it, but I just

9  don't think we got to that level.

10     Q.  Oh, I see.                    04:42:23

11    Did you ever engage in discussions with

12  Johnny Griffin about trying to obtain visas for

13  potential Pakistani defense witnesses?

14     A.  I don't remember having that discussion, but

15  even if it were a discussion, it would be, I don't    04:43:01

16  know, talk to Johnny about it.  I'd probably know more

17  about visas and immigration, the ability to do that,

18  than he does.  So having a discussion about it, I

19  don't remember.

20     Q.  Okay.  Was that at all a factor in your    04:43:16

21  decision not to pursue potential alibi witnesses from

22  Pakistan?

23     A.  You know, if -- it could have been part of

24  the discussion, but I know that ultimately the re --

25  the reason we decided not to use them was because they  04:43:30

185

1  were already involved in the case.

2      Q.    Meaning that their names were associated with

3  evidence and you were fearful that it would be

4  counterproductive?

5      A.    Yes.                                    04:43:46

6      Q.    Let's go back for a moment to Usama Ismail.

7      Okay.  I'm handing defense Exhibit G to you,

8  which is the 302 for Usama Ismail.  And take a moment

9  to peruse it; the question being, do you recall at one

10 point in time reviewing this as part of discovery?    04:44:54

11 And I -- I think I've --

12         MR. RIORDAN:  Yeah.  I have a feeling that

13 you've identified it as G when it was G to the first

14 2255 as opposed to G to the present 2255.

15         MR. TICE-RASKIN:  If I said G --           04:45:09

16         THE WITNESS:  J.

17         MR. TICE-RASKIN:  -- I misspoke.  J.

18         MR. RIORDAN:  Oh, I'm sorry

19         MR. TICE-RASKIN:  J as in Joe.

20         MR. RIORDAN:  Okay.                        04:45:17

21         THE WITNESS:  Yeah.

22         THE WITNESS:  Okay.  I need time to look at

23 this.

24         I mean, I don't know if you want me to read

25 through this whole thing --                         04:45:23

1  BY MR. TICE-RASKIN:

2      Q.   Oh, you don't need to read it in its

3  entirety.

4      A.   In the interest of time, I -- I did look at a

5  302 for Usama Ismail.                                04:45:27

6      Q.   Okay.  And as you sit here today, do you

7  remember actually sitting down and interviewing him

8  separate and apart from reviewing this 302?

9      A.   I probably did not.

10     Q.   Okay.  Was it your desire, though, based on  04:45:38

11  your review of the 302, to try to utilize him as a

12  witness?

13     A.   You know, it was -- I remember, like I said

14  before, reading all of the 302s, and after reading the

15  302s, he was the only person that I felt there was    04:45:53

16  some hope with and that I wanted to -- I considered

17  using him.

18     Q.   Okay.

19     A.   But, you know, we did run into the issue of

20  his attorney, and we just didn't push it, ultimately,  04:46:04

21  and I don't remember the exact reason.  But I -- but I

22  did not -- I don't -- I don't think -- I don't think I

23  sat down with him and talked with him about his 302.

24  It's just -- again, it's difficult, because I did

25  speak with him on a number of occasions, even after    04:46:23

1 the trial, so it's just -- I just don't remember.

2    Q.   You mentioned earlier that you thought that

3 there was some Fifth Amendment issues raised.  What

4 does the state of your recollection as to whether that

5 was an impediment to using Mr. Ismail as a witness?    04:46:39

6    A.   I mean, obviously it was.  It wasn't as if I

7 could just call him and talk to him and directly speak

8 with him about maybe questions and stuff that I had.

9 So it created -- it was definitely an impediment, but

10 I don't think that that was the reason why -- like, if   04:46:56

11 it hadn't been for that, then he would have definitely

12 testified, I don't think that's accurate.

13    Q.   If -- what were the other reasons why you

14 think that he ultimately wouldn't have testified then?

15    A.   Yeah, again, I don't remember.  But, like I     04:47:17

16 said, I think there may have been things in his 302.

17    Q.   Okay.

18    A.   I don't remember.  And I think -- he may have

19 been a person who also made some statements in the

20 media and maybe had done interviews, and so. . .        04:47:32

21    It was just those were all the types of

22 things I was looking at.

23    Q.   Okay.

24    A.   And I -- and, you know, looking at this now,

25 that's -- that was one of the other big -- big          04:47:56

188

1   reasons, because he was the person who says he was

2   with Hamid daily, almost, and so I thought that, if

3   anybody, he would have been a good alibi witness.

4       Q.   Okay.  You can go ahead and -- and set that

5   one --                                              04:48:16

6       A.   Okay.

7       Q.   -- aside or back.

8       A.   Okay.

9       Q.   Whatever your pleasure.

10      A.   All right.                                  04:48:20

11      Q.   I want to direct your attention then to

12  Exhibit K, as in kilo, which should be the 302 as to

13  Arslan Hayat.

14  BY MR. TICE-RASKIN:

15      Q.   And my general question, do you remember    04:48:59

16  receiving and reviewing this 302?

17      A.   Yes.

18      Q.   Okay.  And did -- do you recall speaking to

19  Arslan?

20      A.   You know, I don't know -- like I said, I    04:49:12

21  don't remember a specific sit-down interview.  Yeah,

22  I'm really trying to recollect what was the issue with

23  why we decided not to go with Arslan.  I just don't

24  remember.

25      Q.   Okay.  But there was -- as you sit here      04:49:33

1  today, you seem to recall that there was some reason

2  why you believed Arslan would not serve as an

3  appropriate alibi witness?

4      A.   Oh, yes.  I mean, yeah, for sure, all of his

5  immediate family members, we considered.  But I          04:49:46

6  think -- I recall that when we went to Lodi to the

7  home to interview the mother, that Arslan was there,

8  and I don't remember whether or not we spoke with him.

9      Q.   How about grab, if you would, Exhibit L.

10     A.   Okay.                                            04:50:21

11 BY MR. TICE-RASKIN:

12     Q.   This is the 302 for Sadiq Shoaib?

13     A.   Oh, God.

14     Q.   Do you recall reviewing this 302 at some

15 point in time?                                            04:50:33

16     A.   I must have.  Those are my -- that's my

17 handwriting -- handwritten on that page.  I -- as I

18 sit here today, I can't even remember who this person

19 is.

20     Q.   But that's your handwriting --                   04:50:42

21     A.   Yeah, that's --

22     Q.   -- referenced to "second cousin mom's side"?

23     A.   Yeah.

24     Q.   Got you.  Did you consider the possibility of

25 using him as an alibi witness?                            04:50:50

190

1    A.    Yeah, I -- I considered all -- everyone who

2   was in the 302s.

3    Q.    Okay.  And you ultimately concluded not to

4   call him as an alibi witness?

5    A.    Yes.                                    04:50:59

6    Q.    As you sit here today, do you recall why?

7    A.    No.

8    Q.    Hamid Hayat had some sisters, did he not?

9    A.    He did.  He had -- I think he -- gosh.  So

10  bad that I forgot this, but I think he -- I think he   04:51:28

11  had one much younger sister and then one sister who

12  also got married in Pakistan when he got married.

13  So --

14    Q.    Does the name -- do the names Najia and

15  Rohela ring a bell?                              04:51:43

16    A.    Not really, but --

17    Q.    Did you speak with -- how young was the

18  younger sister?

19    A.    I don't remember, but she was young enough to

20  where I don't think I spoke with her.            04:51:56

21    Q.    How about the older sister who was married --

22    A.    Um --

23    Q.    -- in Pakistan?

24    A.    Yeah, I mean, she was -- she was an adult, I

25  think, yeah.  So I do remember speaking with her.   04:52:07

1  Whether or not I interviewed her, I don't know.  I

2  mean, part of it is, I spoke with them all, I

3  interacted with all the family members and, you know,

4  they -- as an attorney, you assess whether or not a

5  person is going to be a good witness.  And so, you      04:52:29

6  know, I may have just dismissed that possibility

7  without even speaking to her in detail and

8  interviewing her, you know, just because of her

9  demeanor.

10     Q.   Do you have a recollection of chatting with    04:52:44

11  the elder sister of Hamid Hayat?

12     A.   Like with -- like, specifically interviewing

13  her about where she -- no, not like that.  But I -- I

14  spoke with all of them.

15     Q.   All the family members you are referring to?   04:52:58

16     A.   Uh-huh.

17     Q.   Okay.

18     All right.  It is alleged -- it is alleged

19  that you improperly failed to obtain a judicial grant

20  of immunity in connection with Usama Ismail after he    04:53:24

21  invoked his Fifth Amendment rights.  Do you -- do you

22  know whether that's an accurate allegation?

23     A.   Again, I know that it was annoying that he

24  had an attorney and that we wanted to talk with him.

25  But we ultimately dismissed, for whatever strategical   04:53:49

1  reason, we just didn't push it.  And so if we wanted

2  it, you know, did -- did -- did we -- I'm sure, you

3  know, Johnny knew.  And right now as I sit here, I

4  don't remember if I specifically thought about the

5  immunities, but I just -- I just remember that we          04:54:15

6  didn't -- that wasn't the reason that we just stopped

7  and said, Oh, okay.  That wasn't the only reason, but

8  it was a problem.

9      Q.   Let me ask you this question:  At the time

10  that you were considering whether to -- to use Usama      04:54:28

11  Ismail as a witness, were you aware of any evidence

12  whatsoever suggesting that the prosecution had

13  intentionally caused Usama Ismail to invoke the Fifth

14  Amendment right against self-incrimination for the

15  purpose of distorting the fact-finding process?          04:54:51

16      A.   No.

17      Q.   Okay.  Were you aware of any evidence

18  whatsoever suggesting that the prosecution had granted

19  immunity to a government witness in order to obtain

20  that witness's testimony but at the same time had        04:55:07

21  denied immunity to Usama Ismail, whose testimony would

22  have contradicted that of the government witness?

23      A.   I had no knowledge that the government denied

24  immunity to Usama.

25          MR. TICE-RASKIN:  And can we go off the          04:55:24

193

1   record for just one second.

2           THE VIDEOGRAPHER:  The time is 4:55, and we

3   are off record.

4           (Off the record.)

5           THE VIDEOGRAPHER:  The time is 4:57, and we      04:57:52

6   are back on record.

7   BY MR. TICE-RASKIN:

8       Q.   All right.  Locate Exhibit M, if you could.

9       All right.  So Exhibit M is a July 25, 2005

10  Sacramento Bee article.  And within it, there is a       04:59:02

11  statement attributed to a governmental official from

12  Pakistan who indicated that there were purportedly no

13  jihadi camps in Pakistan.

14      Do you recall seeing this article and

15  actually locating this article?                          04:59:31

16      A.   You know, I -- I see that statement.

17      Q.   This is referring to paragraph 5 of the

18  article?

19      A.   Yes.  Where it says that the prime minister

20  says there are no such camps.  I recall that             04:59:45

21  statement.  Whether or not it was in this article, I

22  don't remember.

23      Q.   Okay.  Now, my question to you is, the -- the

24  assertion that Pakistan had closed down training camps

25  is -- is that a fact that you utilized during the        05:00:04

194

1   course of your cross-examination of government

2   witnesses?

3       A.   Yes.

4       Q.   Okay.  And do you recall which government

5   witnesses you utilized that line of cross-examination      05:00:21

6   with?

7       A.   I may have asked the agents and the experts

8   of Hassan Abbas.

9       Q.   All right.  That's all for that article.

10      Oh, let me ask you, actually, this.  It's           05:00:47

11  alleged -- you indicated earlier that you placed a

12  call to the embassy of Pakistan, correct?

13      A.   Yeah.  I think it was maybe the one in Los

14  Angeles.

15      Q.   Okay.  And the purpose of that call to the      05:01:02

16  embassy in Pakistan was what?

17      A.   I think I was just trying to seek information

18  on what assistance they could give us to prove that

19  there were no camps.

20      Q.   Okay.  It's alledged that Johnny Griffin       05:01:26

21  directed you to cease communications with the

22  embassy.  Is that accurate?

23      A.   No.  But I think it is accurate that when I

24  talked to him about that, he may have not thought it

25  was as important as I thought it was.  But I placed     05:01:41

1  the call and I looked into it and I did that without

2  his guidance.

3     Q.   Okay.  Is that an example of an instance in

4  which you and Mr. Griffin disagreed on a tactical or

5  strategic issue?                            05:02:00

6     A.   Yes.

7     Q.   Okay.  And when you had those disagreements,

8  how would you resolve them?  Would you just cave to

9  his viewpoint?

10     A.   No.  I mean, you know, he just -- he thought    05:02:10

11  it was -- you know, I had already done it and I was

12  telling him, you know -- it wasn't as if I did it and

13  I found, you know, somebody who was going to come

14  testify with this great information, and he said, No,

15  don't do it.  I just told him, Hey, look, I've been    05:02:22

16  looking into this.  And he just didn't seem to think

17  it was that important, and it was what it was.  But I

18  didn't just walk away thinking, I can't do this now

19  because Johnny doesn't think it's a good idea.

20     Q.   Okay.  It is alleged that sometimes when you    05:02:42

21  had disagreements with Mr. Griffin that you actually

22  feared that you would lose support from Mr. Griffin

23  and act based thereon.  Is that an accurate

24  allegation?

25     A.   No.  We had a very good working           05:02:57

196

1   relationship.  When we disagreed, we moved on.

2       Q.   It's alleged that you did not attempt to

3   initiate any investigation in Pakistan concerning the

4   nature of the Balakot camp.  Is that an accurate

5   allegation?                                              05:03:24

6       A.   No.  That's -- I had Lazor go specifically to

7   go look into that.  I prepared for a cross-examination

8   of Hassan Abbas.

9       Q.   All right.  Would it be fair to say, then,

10  that as far as the camp evidence was concerned, that    05:03:51

11  you elected to utilize two separate strategies; one

12  being to use some affirmative evidence in connection

13  with that and the other being to confront government

14  witnesses and cross-exam them in connection with those

15  issues?                                                  05:04:13

16      A.   Yes.

17      Q.   All right.  Was there any other investigation

18  that --

19      (Off-the-record discussion.)

20  BY MR. TICE-RASKIN:                                      05:04:42

21      Q.   Back to the topic of the Pakistani embassy.

22      Do you recall why it was that you ceased

23  communication with the embassy or ceased trying to

24  communicate with them?

25      A.   I mean, it was -- I -- I didn't think that I    05:04:50

197

1  was actually going to be able to get the kind of

2  information I was hoping for.  I -- it didn't -- it

3  was, you know, I -- I think I saw this statement and I

4  thought, Hey, you know, let me go -- let me call them

5  and see.  And I just -- I don't think that the -- how        05:05:09

6  do I put this?

7       At the time, there were a lot of people that

8  I called for help in this case, and there were a lot

9  of people who didn't want to be involved in a federal

10  terrorism trial.  I ran into that issue a lot in        05:05:25

11  seeking experts and help.

12       Q.   Well -- and that's --

13            MR. RIORDAN:  Have you finished -- has the

14  witness finished her answer?

15            THE WITNESS:  Yes                                  05:05:36

16            MR. RIORDAN:  Okay.

17  BY MR. TICE-RASKIN:

18       Q.   Okay.  And that's a question that I -- I want

19  to pursue.  So you of course recall getting the

20  government's notice regarding Hassan Abbas and what he    05:05:46

21  was going to testify to, correct?

22       A.   Yes, I saw a report.

23       Q.   Okay.  And you also received notice regarding

24  Khaleel Mohammed and what he was going to testify

25  about, correct?                                            05:06:00

198

1      A.   Yes.

2      Q.   All right.  And in a nutshell, would it be

3  fair to say that the government placed you on notice

4  that Hassan Abbas was going to testify about Pakistani

5  political extremist groups and -- including camps?     05:06:12

6      A.   Yes.

7      Q.   And in a nutshell, would it be fair to say

8  that Khaleel Mohammed was going to testify about the

9  supplication?

10     A.   Yes.                                          05:06:20

11     Q.   Okay.  And I believe you previously indicated

12 that you thought it was important to address that

13 evidence that the government was going to present,

14 correct?

15     A.   Sure.                                         05:06:28

16     Q.   Okay.  And did you indeed attempt to obtain

17 some experts who could serve as defense experts to

18 counter the testimony of Abbas and Mohammed?

19     A.   Yes.

20     Q.   And why don't you just list out, if you       05:06:49

21 would, all the folks, to the best of your

22 recollection, that you tried to contact to serve as

23 potential experts.

24     A.   Well, I honestly can't remember everybody,

25 but I knew that I needed an expert who was going to     05:07:05

1  testify about the existence of the camps as well as

2  some of the -- the -- I wanted somebody who could talk

3  about the cultural aspects of things.  And so

4  Dr. Anita Weiss was great.  She was somebody who, you

5  know, really sounded like who was going to give us          05:07:28

6  some valuable testimony, and she was willing to.  But

7  I know that she -- it's not as if she was the first

8  person I called who agreed.  I can't remember who I

9  called in advance of her, but I know I -- I just went

10 on kind of my own search and looked for people, and          05:07:47

11 then I asked --

12     She assisted me, 'cause she looked at

13 Dr. Khaleel Mohammed's report, in trying to find the

14 Arabic language experts.  And I called -- in addition

15 to everybody she had recommended to me, I called my          05:08:03

16 own contacts across the country who could testify with

17 regards to the meaning of the -- of the supplication.

18 And I was unsuccessful.  I had nobody who -- who would

19 help.

20     I found one individual in Texas who helped me          05:08:25

21 just as a favor -- he was a friend of my sister's --

22 helped me, because he was a Arabic language expert,

23 break down the supplication.

24     So I decided I was just going to do -- try to

25 do a solid cross-examination of Khaleel Mohammed          05:08:47

200

1  because I didn't have an expert who would specifically

2  come and testify about the meaning of it.  And I would

3  use Dr. Weiss to talk about the cultural aspect of a

4  supplication was, which was something Dr. Mohammed

5  knew nothing about.  And so my strategy, I thought,      05:09:09

6  was going to work and that I was covering the bases.

7       Q.   Can you recall how many folks you -- you

8  tried to locate to testify specifically regarding the

9  supplication and delined your invitation to serve as

10 experts?                                                05:09:29

11      A.   I'd say at least ten.

12      Q.   Can you identify any of these ten individuals

13 that you tried to get in touch with?

14      A.   Gosh, I can't.  I can't, honestly, right now,

15 but, you know, I -- I tried initially California        05:09:56

16 experts and then looked all nationwide.  Came up with

17 nothing and primarily -- and I think the concern with

18 a lot of people was that this was a case that involved

19 a confession.  And in 2005 things were different, and

20 these Muslim leaders or scholars weren't as willing to  05:10:23

21 go up against the government.

22      Q.   Did the people that you contacted, which you

23 estimated to be at least ten people, did you actually

24 speak with them about the supplication and ask them

25 whether they'd be willing to lend a hand?               05:10:46

201

1    A.   You know, I think it may have been a

2    combination of e-mails and phone calls, and maybe

3    Dr. Weiss may have contacted her people for me.  So

4    it's a combination of through her and then myself.

5    I'm trying to remember whether or not my sister may        05:11:13

6    have assisted in contacting, but I know I somehow got

7    negative responses.

8        Q.   And you ultimately made the decision that you

9    were going to combat the government's testimony, if

10   you will, through cross-examination, correct?            05:11:36

11       A.   Yes.

12       Q.   And there was somebody, you said, who

13   assisted you in connection with this task, somebody

14   from Texas?

15       A.   Yes.                                            05:11:45

16       Q.   Who was that?

17       A.   His name is Shibli, S-H-I-B-L-I.  Last name

18   is Zaman, Z-A-M-A-N.

19       Q.   And who is he and what expertise did he lend

20   to your preparation of cross-exam?                       05:12:01

21       A.   I mean, he's -- he's kind of -- you know, I

22   don't know if he has any formal degrees, but he's

23   extremely knowledgeable about Islam and fluent in the

24   Arabic language.  And so my sister, who is very

25   spiritual and has a lot of connections, referred me to   05:12:26

1 him because she knew I was frustrated and couldn't

2 find somebody to help me, and as a favor to her, he --

3 he just helped me.  I spoke with him over the phone,

4 and he just guided me on how I can challenge

5 Mohammed's view of what the supplication was.          05:12:48

6      Frankly, the end of the cross-examination, I

7 thought I did a good job.

8      Q.   Let's -- let me ask you kind of some similar

9 questions in connection with the camp testimony that

10 was -- and the Pakistan -- Pakistani, rather,          05:13:09

11 political extremist group testimony that was proffered

12 by Hassan Abbas.

13      Did you specifically try to find some experts

14 who could speak to those issues?

15      A.   I -- I think I -- say again what the two      05:13:23

16 issues are.

17      Q.   Sure.  So, again, Hassan Abbas was going to

18 testify about and did testify about Pakistani

19 political extremist groups --

20      A.   Right.                                        05:13:37

21      Q.   -- including the existence of camps, training

22 camps.

23      A.   Right.

24      Q.   And my question to you is, did you

25 specifically try to locate experts to counter the      05:13:45

203

1    proposed Abbas testimony?

2        A.   I think that was also cross-examination as

3    well as Lazor's testimony putting reasonable doubt in

4    the jury's mind.

5        Q.   Got you.  Would -- did you think about        05:14:00

6    finding anybody like an academician or anything like

7    that to come in, was it your belief that

8    cross-examining Lazor was sufficient to deal with the

9    testimony of Hassan Abbas?

10       A.   Oh, right, right.  Okay.  I see what you are   05:14:14

11   saying.

12       I'm trying to remember on the existence of

13   camps if I specifically said -- I think I did some

14   research.  Gosh, I just don't remember.  Yeah, I think

15   I may have -- I think I may have done some research     05:14:35

16   and -- and maybe talked to Anita about potential

17   people, but it wasn't -- I don't know.  I think I just

18   thought that that -- I thought that was really -- I

19   thought that was really weak evidence from the

20   government's perspective, just this aerial shot.  And   05:14:52

21   so I thought that it would be sufficient to

22   cross-examine him -- because I thought that his report

23   had a lot of weaknesss in it -- to cross-examine him

24   and to use Lazor.

25       Q.   All right.  Now, you were the one who         05:15:17

1  ultimately located Anita Weiss; is that correct?

2      A.   Oh, yeah, I -- and I think I -- all of the --

3  I did all of the communications and I prepared our

4  examination.

5      Q.   Okay.  And why was it that you ultimately        05:15:36

6  chose to retain Anita Weiss?

7      A.   Well, I thought that she could testify about

8  some of the cultural aspects, which, you know, I don't

9  remember now.  But I don't know why I'm remembering a

10  picture of shooting off a gun at a wedding.  I mean,     05:15:56

11  there were little things that I thought -- or there

12  were things that I thought throughout the case that

13  she could provide some expert testimony about

14  Pakistani culture.  And she knew -- she was familiar

15  with what the supplication was, so she was going to     05:16:12

16  testify about why a person would carry a

17  supplication.  And so that was -- that was, from my --

18  what I remember now, there may have been other things,

19  I just don't remember right now.

20      Q.   Okay.  Did you discuss the retention of Anita   05:16:30

21  Weiss with Johnny Griffin?

22      A.   Well, yeah, I mean, that was something he

23  pretty much deferred to me to do.

24      Q.   Okay.  And my next question was, did he in

25  any way object to or interfere with your ability to     05:16:47

1  retain Anita Weiss?

2      A.   Oh, no.  I think he trusted my opinion there.

3      Q.   Okay.  And did the amount of -- strike that.

4      What impact, if any, did the defense --

5  retainer agreement and defense resources have on your      05:17:09

6  decision to hire Weiss?

7      A.   Oh, no, the money was not an issue.

8      Q.   All right.  Would it be fair to say that part

9  of your strategy for countering the Abbas testimony --

10         MR. RIORDAN:  Now you are leading.      05:17:47

11  BY MR. TICE-RASKIN:

12      Q.   Would -- recount for me again what additional

13  means you utilized in order to counter the Abbas

14  testimony.

15      A.   You mean besides -- you mean in my      05:17:59

16  cross-examination, or besides cross-examination and

17  Lazor?

18      Q.   If there was anything else.

19      A.   If there was anything else, oh.  I just -- I

20  just honestly can't remember all of the things he      05:18:09

21  testified about, so.

22      Q.   Okay.  But those were your two primary

23  approaches?

24      A.   I mean, that I can remember right now, yeah.

25      Q.   Okay.  And your primary approaches to counter      05:18:18

1  the Mohammed testimony would have been what?

2      A.   Cross-examination and Anita so -- Anita Weiss

3  on the supplication.

4      Q.   Okay.  At --

5      A.   So to clarify, Anita Weiss on the          05:18:32

6  supplication and the significance having one, but not

7  on the Arabic.

8      Q.   Okay.  And now, at -- prior to the time of

9  trial, were you aware of the existence of Dr. Bernard

10  Haykel?                                             05:18:49

11      A.   Prior to the time of trial?

12      Q.   Yeah.

13      A.   I don't know.  It may have been a name that

14  came up, maybe in discussions with Anita -- or because

15  I really did look for a lot of people, so I don't      05:18:59

16  know.  I don't remember.  But I think when I contacted

17  him, now that I -- my recollection was refreshed, that

18  I contacted him in our -- in our motion, post-trial

19  motion.  I had not spoken with him prior to that, and

20  I probably didn't -- I don't know whether or not I      05:19:20

21  knew about it.

22      Q.   If you had become aware of an individual like

23  Dr. Bernard Haykel and what he could testify to prior

24  to trial, would you have tried to reach out to him?

25      A.   Well, yeah.  I mean, I was desperately       05:19:36

1    looking for experts.

2       Q.    Prior to trial, had you ever heard of a

3    individual by the name of Ghulam, G-H-U-L-A-M,

4    Hasnain, H-A-S-N-A-I-N?

5       A.    No.                                    05:19:56

6       Q.    All right.  Now, you obviously reviewed all

7    of the interviews of Hamid Hayat, correct?

8       A.    Yes, I have listened to them and -- oh, you

9    are talking about the FBI interviews?

10      Q.    Yes.                                   05:20:21

11      A.    Sorry.  Yes, I did.

12      Q.    Okay.  And it was your professional belief

13   that many of the admissions made by Hamid Hayat were

14   not true admissions, that they were false admissions?

15      A.    Yes.                                   05:20:38

16      Q.    And ultimately a decision was made to try to

17   obtain the testimony of Jim Wedick as an expert; is

18   that correct?

19      A.    Right.

20      Q.    Now, who was it who was in charge of         05:20:49

21   obtaining expert testimony in connection with the

22   whole confessions issue?

23      A.    Well, I think the reason why Jim was brought

24   on to the case early -- very early on was because he

25   was a former agent.  And he reviewed the tape and he   05:21:12

208

1   discussed with Johnny and I what he felt about it, and

2   that he felt, you know, he could testify about it.

3   And so that was a -- it was just kind of an obvious

4   decision from the beginning --

5        Q.   Okay.                                      05:21:26

6        A.   -- that he was going to be the one to do it.

7        Q.   Did you -- did you or Mr. Griffin consider

8   locating other experts in connection with the question

9   of false confessions?

10       A.   I -- like I said earlier, I know that people  05:21:37

11  reached out to me.  And so at the time they reached

12  out, I think I may have reviewed whatever information

13  they gave me and so considered it at that point.

14  But -- no, I wouldn't say considered it at that

15  point.  I looked at it and reviewed it, but I think   05:21:56

16  there was an understanding that it was going to be

17  Jim, always.

18       Q.   Okay.  Who ultimately, on behalf of Hamid,

19  made the decision to utilize Jim Wedick as an expert

20  witness?                                             05:22:21

21       A.   I did.

22       Q.   Okay.  And, again, was that based on your own

23  independent judgment, or was that just because Johnny

24  Griffin told you to do so?

25       A.   Oh, no, it was -- I thought he would be good  05:22:29

209

1  for it.

2      Q.   Okay.  Did finances enter at all into the

3  calculus as to whether to use Wedick or choose

4  somebody else?

5      A.   No.                                    05:22:42

6      Q.   Okay.  Aside from potentially using the

7  testimony of Jim Wedick, did you have any other

8  strategies to try to address the question of -- of the

9  interviews and their reliability?

10      A.   Cross-examination.                     05:22:57

11      Q.   Okay.  And did you indeed attempt to

12  vigorously cross-examine government witnesses about

13  the interviews?

14      A.   I did.

15      Q.   Okay.  And was that indeed a part of the   05:23:13

16  affirmative defense case?

17      A.   Yes.

18      Q.   Okay.  Mr. Wedick was -- there was some

19  preparation apparently of Mr. Wedick to potentially

20  serve as a defense witness; is that accurate?        05:23:35

21      A.   I mean, sure.  He -- he reviewed the tapes.

22  We had a lot of meetings with him and he was

23  involved.  He was in court a lot.  I think he prepared

24  ultimately some kind of a -- I don't know, some kind

25  of a notice of what he would be testifying to.  So,    05:23:56

210

1  yeah, there was preparation.

2      Q.   Okay.  Who was it who worked on the expert

3  disclosure with him?  Did he do that -- Mr. Wedick do

4  that himself?  Was that done by you, by Mr. Griffin,

5  by whom?                                          05:24:12

6      A.   I think -- I think Jim may have been the one

7  who did this draft, and then both of us would have

8  looked at it for edits.  I don't remember who did.

9  But I know that I was definitely involved in it.

10     Q.   Okay.  And when you say "both," you are       05:24:29

11  referring to yourself and Mr. Griffin?

12     A.   Yes.

13     Q.   It's alleged that you never read any of the

14  provisions of CIPA.  Is that accurate?

15     A.   No, that's not accurate.  What's accurate is  05:24:46

16  that I may not have understood some of it, but I think

17  I did -- well, I remember printing out -- printing it

18  out and I had a special binder.  So I'm not going to

19  say I read every word, but I know I read enough to

20  familiarize myself with it.                        05:25:09

21     Q.   Okay.  At the time that you were representing

22  Mr. Hayat, were you aware that the government had an

23  obligation under the discovery laws to review

24  classified information in its possession and to

25  provide that information to the defense?           05:25:33

211

```
 1      A.   To review classified information and to

 2  provide it to the defense.

 3      Q.   To provide discoverable information to the

 4  defense.

 5      A.   Yes.  Oh, yes.                              05:25:48

 6      Q.   Okay.  At the time of your representation,

 7  were you aware that under CIPA the government could

 8  seek permission from the Court to provide an

 9  unclassified summary of discoverable information to

10  the defense?                                         05:26:02

11      A.   I may have known that then.  I don't remember

12  if I knew that.

13      Q.   Do you remember receiving discovery from the

14  government in which the government would describe

15  certain information it had obtained relevant to, for  05:26:18

16  example, militant camps operating in Pakistan?

17      A.   Sure.

18      Q.   It's alleged that you abandoned any effort to

19  obtain classified exculpatory information on behalf of

20  your client.  Is that an exact allegation, that you   05:26:44

21  abandoned efforts to obtain exculpatory information --

22  classified exculpatory information on behalf of your

23  client?

24      A.   Exculpatory, no, I don't think so.

25      Q.   Okay.  And, indeed, didn't you send out a     05:26:58
```

1  discovery letter requesting just that?

2      A.   Yes.  I -- sounds like -- if I did I -- yes.

3      Q.   Okay.  And at one point in time, didn't you

4  even file a motion to compel discovery?

5      A.   I don't recall, but if we did, yeah.          05:27:13

6      Q.   Why don't you take a look at the document

7  that's entitled CR143.

8      A.   Okay.

9      Q.   And my question to you -- and take as much

10 time as you need to review this.  But was this a joint   05:27:43

11 motion to compel discovery that was filed in

12 connection with this matter?

13     A.   What was the trial date?  February -- do you

14 remember -- 14th?

15     Q.   It was the middle of February, yes.           05:27:55

16     A.   Yeah.  It's -- it's -- I -- I honestly can't

17 remember specifically, but this looks like a motion we

18 would have filed.

19     Q.   During the course of pretrial, did you

20 receive a variety of discovery information from the     05:29:07

21 government in a declassified letter form related to

22 camps in Pakistan?

23     A.   I think -- I think we likely did, but I can't

24 specifically recall.

25     Q.   All right.  You can go ahead and put that     05:29:24

1  exhibit away, if you wish.

2      I'm now going to ask you to pull out the

3  Exhibit OO, please.

4      A.   Okay.

5      Q.   All right.  And this is a Jan -- a December,      05:30:27

6  rather, 16, 2005 letter that was sent by myself to you

7  and Mr. Griffin, related to clearance.

8      Do you recall receiving this letter?

9      A.   No, but I likely did.  I don't remember

10  seeing it.                                               05:31:03

11      Q.   Okay.  Have you had sufficient time to take a

12  look at it?

13      A.   I haven't read the whole thing.  I could look

14  at it.

15      I remember that you guys wanted to have this        05:31:26

16  hearing, and in order for us to be there, we needed

17  clearances, yeah.

18      Q.   Okay.

19      A.   I recall that issue.

20      Q.   Okay.                                           05:31:36

21      A.   So, yeah.

22      Q.   Now, in this letter, would it be fair say

23  that the government suggested to you that you should

24  obtain clearance due to the camp images that it was

25  seeking to offer at trial?                              05:31:48

214

1     A.   I don't think it says camp images.  Does it

2  say that?

3     Q.   Well, take a look at -- take a look at the

4  second paragraph.

5     A.   Okay.                                    05:32:04

6     Q.   It says there that as we indicated to you

7  previously, the government now possesses certain

8  inculpatory evidence which has been shown to you which

9  the government intends to introduce at trial.

10    Do you see that line?                          05:32:16

11    A.   Yeah.

12    Q.   Do you remember whether there was a point in

13 time in which you were invited over to the FBI to take

14 a look at certain images?

15    A.   Yes.                                      05:32:25

16    Q.   Okay.

17    A.   If that's what the letter was referencing,

18 then that makes sense, yeah.

19    Q.   Okay.  And I guess my question to you is, as

20 of December '05 and January '06, were you aware of any  05:32:37

21 other evidence that the government was seeking to

22 offer of a classified nature besides the foundational

23 evidence in connection with these images?

24    A.   No.

25    Q.   Okay.  And what was ultimately your view with  05:33:08

1  respect to the images and --

2      A.   I thought it was -- I thought it was weak

3  evidence because -- I don't remember now, but I don't

4  remember if the -- if it was the date when the images

5  were taken or just -- I just didn't think that that          05:33:28

6  was going to be very important evidence.

7      Q.   Did you ultimately stipulate to the

8  admissibility of the images?

9      A.   I don't remember.  But I know they were

10  presented and admitted, so we may have.                     05:33:48

11      Q.   Did you have a belief as to whether the

12  images would help the defense or hurt the defense?

13      A.   I just -- I just recall thinking that it was

14  very weak.  I thought it was going to be weak evidence

15  from the government's perspective and that it -- I          05:34:09

16  mean, I was convinced that it -- there were no camps

17  there.  And so I just didn't think it was going to be

18  strong evidence.  I don't remember any more than

19  that.

20      And I thought that, as having the only person          05:34:34

21  throughout the trial testify who had actually been

22  there, to say, based on his understanding, it was a

23  military site, I thought would be stronger than any --

24  any of this stuff.  But it wasn't.

25      Q.   Let's take a look at, if you would, Court          05:34:53

216

1  Record 179.  It's marked CR179.

2      And if you could please just carefully read

3  through the three numbered one, two, and three

4  paragraphs.

5      A.   This refreshes my recollection that we did      05:36:09

6  this.

7      Q.   Okay.  And this was a stipulation that was

8  ultimately executed by counsel as well as their

9  clients; is that correct?

10     A.   Yes.                                            05:36:27

11     Q.   Okay.  And was it an accurate statement that

12  as a matter of strategy that the defendants, with the

13  advice and consent of their counsel, concluded that it

14  was in their best interest to proceed to trial at that

15  present time?                                           05:36:53

16     A.   Yes.

17     Q.   And that the clients did not wish to have

18  cleared defense counsel?

19     A.   Yes.

20     Q.   And that they did not wish to participate      05:36:58

21  through their counsel in any incamera proceedings?

22     A.   Yes.

23     Q.   Okay.  Now, this stipulation only limited

24  your ability to participate in incamera proceedings;

25  is that correct?                                        05:37:14

1    A.   Yes.

2    Q.   Okay.  Under this stipulation, did you in any

3  way limit your right to argue that a particular

4  question or answer in connection with a witness should

5  be admitted into evidence?                          05:37:26

6    A.   No.

7    Q.   Okay.  And did you limit your ability to

8  argue that an item of evidence should or should not be

9  admitted into evidence?

10   A.   No.                                          05:37:36

11   Q.   Okay.  So it was solely a waiver of your

12  ability to participate in the in camera CIPA

13  proceedings, correct?

14   A.   Correct.

15   Q.   Now, back to the images for a second.  Do you  05:37:44

16  have any recollection of concluding that -- that you

17  wanted to actually use the images as part of your

18  defense case?

19   A.   I just -- I just can't remember right now

20  exactly why I felt that the images were not good      05:38:08

21  evidence for the government.  I just don't remember.

22   Q.   Why did you ultimately decide that you didn't

23  need to obtain a clearance?

24   A.   I don't honestly remember right now, but at

25  the time, the strategy seemed sound and rational, and  05:38:41

218

1    it made sense.  And I -- it's just, you know, I know

2    back then I definitely understood better, but I think

3    if -- if we felt that it was exculpatory, it needed to

4    be disclosed.  And so, really, we weren't really

5    missing out.  I don't -- I mean, that's just kind of      05:39:11

6    my --

7        Q.   At the time that you made this decision, I

8    believe you indicated that you were aware of -- of

9    only one piece of potential classified information

10   that the government intended to use at trial.            05:39:26

11   Correct?

12       A.   Yes.

13       Q.   Okay.  Did you have any reason to believe

14   that the government was going to utilize any other

15   type of classified information at trial?                 05:39:36

16       A.   No.

17       Q.   Okay.  Did you have any knowledge of any

18   classified information which the defense potentially

19   wanted to utilize at trial?

20       A.   No.                                             05:39:47

21       Q.   At this juncture, was it still a strategic

22   objective of Hamid Hayat to proceed to trial rapidly,

23   or had that strategic objective changed?

24       A.   I think -- I think -- I think we -- we

25   continued to push that issue.  I just remember it        05:40:06

219

1    was -- it seemed to be more litigated early on.  But,

2    like I said, at some point, I felt like the government

3    couldn't continue it anymore, couldn't delay it any

4    further.  So it wasn't as hard, maybe.  But, yeah, I

5    think we always wanted to do it as soon as possible.     05:40:25

6        Q.   What would have been the strategic downside

7    to you in obtaining clearances?  Did you perceive

8    there to be a strategic downside?

9        A.   I think it was more of a question of -- of we

10   knew that it was going to take time and it was -- we      05:40:46

11   thought it was just the government's attempt to buy

12   time and that they really -- there really wasn't much

13   classified stuff out there.  They were just trying to

14   buy time, and we didn't need it.

15       Q.   As a strategic matter, did you want to have      05:41:04

16   the trial delayed while you obtained clearances?

17       A.   No.

18       Q.   As a strategic matter, did you want to have

19   the trial delayed while you potentially challenged the

20   foundation, the classified foundation for the images?     05:41:19

21       A.   No.

22       Q.   In -- in making these decision -- and I'm now

23   referring the decision to stipulate to the admission

24   of the images and the decision to not seek clearance,

25   okay -- did you exercise your own independent             05:41:36

220

1   judgment?

2       A.   Yes.

3       Q.   Okay.  Did Johnny Griffin give you advice

4   with respect to those issues?

5       A.   Yes.                                    05:41:44

6       Q.   And did you consider that advice?

7       A.   Yes.

8       Q.   Did you blindly follow his advice, as is

9   alleged?

10      A.   No.                                     05:41:50

11      Q.   Did you feel compelled to follow his advice?

12      A.   No.

13      Q.   Did you make your own independent

14  professional decision based on what you believed would

15  be in the best interest -- or what you believed would  05:41:58

16  be in the best interest of Hamid Hayat?

17      A.   Yes.  And, in fact, I think I read some -- I

18  tried to get pretty detailed into reading some of the

19  CIPA provisions and educated Johnny about some of

20  them.                                           05:42:15

21      Q.   The -- it is alleged that you waived your

22  right to all CIPA evidence and that you agreed to

23  forego reliance on all classified information.  Is

24  that accurate?

25      A.   By -- no.  I think the only thing we did was  05:42:43

221

1   the stipulation regarding participation in the

2   hearings.  There was no other waiver.

3       Q.  Okay.  So it wasn't like you waived your

4   right to exculpatory information that might have been

5   a classified form?                             05:43:01

6       A.  No.

7       Q.  As part of -- and I'm again referring to this

8   stipulation 179 --

9       A.  Uh-huh.

10       Q.  -- with the Section 8 hearings.         05:43:15

11       Did you agree as part of your stipulation to

12   waive your rights to pursue any line of questioning

13   that potentially implicated classified information?

14       A.  No.

15       Q.  Okay.  In fact, didn't the stipulation     05:43:34

16   specifically reserve that right?

17       A.  Yeah, in Item 3.

18       Q.  Okay.  Were there instances in which you

19   asked questions, received CIPA objections, and then

20   pressed the Court for the right to continue with your   05:43:47

21   inquiry?

22       A.  I don't remember, but I -- probably.

23       MR. RIORDAN:  I'm sorry, I missed the last --

24       THE WITNESS:  But probably.

25   BY MR. TICE-RASKIN:                         05:43:56

222

1      Q.    Do you remember a particular point in time in

2   which you were pressing Naseem Khan to talk about

3   certain expenditures that had been made on his behalf?

4      A.    I remember that part of the examination.

5      Q.    Okay.  And do you remember when you continued    05:44:07

6   to pursue that line of questioning that that's when

7   the CIPA proceeding was actually held?

8      A.    I don't remember.

9      Q.    At some point in time, Judge Burrell alluded

10   to the possibility of obtaining outside cleared        05:44:27

11   counsel to assist.  Do you remember that?

12     A.    Rings a bell, but I don't remember.

13     Q.    Do you have any -- so you -- do you -- no

14   recollection whatsoever of that topic being placed on

15   the table?                                             05:44:55

16     A.    Yeah, I just don't.  I really don't.

17     Q.    Okay.  Do you recall going through any mental

18   processes to whether separate counsel would be

19   advisable or otherwise?

20     A.    I don't remember that issue.                   05:45:06

21     Q.    It is alleged that severance of the trials

22   may have been warranted based on potential conflicting

23   defenses and strategies between Umer Hayat and Hamid

24   Hayat.

25     Now, you've indicated that you -- you             05:45:34

1  ultimately decided to pursue a "go to trial as rapidly

2  as possible, insufficient evidence type" strategy,

3  correct?

4        A.    Uh-huh, yes.

5        Q.    And you rejected the idea of putting on an        05:45:49

6  affirmative alibi defense, right?

7        A.    Correct.

8        Q.    Now, to pursue, though, that latter option,

9  you -- that is, to go after an alibi defense, you

10  theoretically could have sought a severance and        05:46:07

11  theoretically could have obtained more time.  Is that

12  fair to say?

13        A.    Sure.

14        Q.    Okay.  But you didn't seek a severance and

15  you didn't seek that additional time to pursue that        05:46:18

16  alternative strategy.

17        A.    Right.

18        Q.    Well, why is that?

19        A.    That wouldn't have -- that would not have

20  been a good defense, under the facts.  I don't think        05:46:28

21  -- I think the -- I think insufficient evidence was

22  the way to go.

23        Q.    In making that decision, the decision to --

24  to go with the insufficient evidence defense and to

25  forego continuances to pursue an alibi defense, was        05:46:44

1   that ultimately a decision that you made based on your

2   own independent judgment?

3       A.   Oh, yes.

4       Q.   Okay.  Again, was this one of the decisions

5   where Mr. Griffin was giving you advice and counsel?    05:46:55

6       A.   No.

7       Q.   It was not?

8       A.   No.  I thought -- I thought you said that --

9   I'm sorry.  Ask the question again.

10      Q.   Sure.                                          05:47:05

11      Did Mr. Griffin give you advice on this topic

12  of whether to seek a severance?

13      A.   Yes.  Sorry.

14      Q.   Okay.  Did you consider that advice?

15      A.   Yes.                                           05:47:14

16      Q.   Did you blindly follow his advice?

17      A.   No.

18      Q.   Did you make your own independent decision?

19      A.   Yes.

20      Q.   Okay.  And I think you indicated earlier that 05:47:24

21  you had, at the relevant time, familiarity with the

22  Bruton rule?

23      A.   Yes.

24      Q.   And it's the idea that a confession of a

25  nontestifying defendant can't be introduced at trial    05:47:33

225

1    when it incriminates another defendant?

2         A.    Right.

3         Q.    Okay.  Are you aware that there are multiple

4    ways to resolve potential Bruton problems?

5         A.    I may have been then; I don't know now.        05:47:46

6         Q.    Okay.  Did the government, in fact, indicate

7    to you that it was going to suggest separate panels in

8    order to avoid any potential Bruton issue?

9         A.    Oh, yeah.

10         Q.    And did you believe that was an appropriate      05:47:58

11    way to protect your client's rights against potential

12    Bruton problems?

13         A.    Yes.

14         Q.    Okay.  Now, moving on to the question of

15    whether to challenge the -- the -- statements, it's       05:48:16

16    alleged that supression of the statements may have

17    been warranted based on involuntariness challenge, and

18    I believe you were asked some questions regarding

19    that.  Do you recall that?

20         A.    Yeah.                                           05:48:32

21         Q.    Okay.  Did you consider whether it was wise

22    to seek suppression of -- of Hamid Hayat's statements?

23         A.    I think we -- I think we talked about it, but

24    I don't remember why we ultimately decided not to do

25    it.                                                        05:48:50

1      Q.    As part of this process of -- of talking

2   about it --

3      A.    U-huh.

4      Q.    -- and considering it, did you familiar --

5   familiarize yourself with any of the applicable law      05:49:00

6   regarding confessions, including confessions based on

7   Miranda violations or on lack of voluntariness

8   grounds?

9      A.    I mean, I know I did a lot of reading about

10  confessions, and so did I think I was, you know,         05:49:16

11  completely well-versed on it, probably not, but I know

12  that I did my own reading and research.

13     Q.    Based on the research you did and based on

14  your discussions with Mr. Griffin, did you ultimately

15  believe that a motion to suppress premised on           05:49:40

16  voluntariness would have been successful?

17     A.    I don't recall.

18     Q.    But you ultimately chose not to file that

19  motion --

20     A.    Yeah.                                           05:49:54

21     Q.    -- that's a fair statement?

22     A.    Right.

23     Q.    Okay.  Did you believe that litigation of the

24  admissibility or -- strike that.

25        Did you believe that litigation of the            05:50:02

1 voluntariness issue would have been contrary to your

2 strategy to force the government --

3        MR. RIORDAN:  I'll object.  She said that she

4 doesn't remember any decision about this, and you are

5 leading the witness to provide a rationale.          05:50:16

6 BY MR. TICE-RASKIN:

7    Q.  Did --

8    A.  My answer to the question would have been, I

9 don't remember.

10    Q.  Okay.  Well, I'm not sure if the question's    05:50:26

11 on the table --

12    A.  Yeah, but I knew where you were going.

13    Q.  Just so that the record is complete, I'm

14 trying to ferret out, the question of whether or not

15 your decision to not seek to suppress the statements    05:50:34

16 was at all related to your -- the defense strategy and

17 Hamid Hayat's strategy of pushing the matter to trial

18 as rapidly as possible.

19    A.  Well, the question is a little bit different

20 now.  There was a decision not to do it, then, yeah,    05:50:54

21 it was related to our strategy, yes.

22    Q.  Can you elaborate on that --

23    A.  Specifically --

24    Q.  -- so I can understand.

25    A.  Yeah.  Specifically how, no, but it was all    05:51:02

228

1 part of strategy.  Every move we made was strategic.

2     Q.   Are you suggesting that there was a link

3 between your decision not to file a motion to suppress

4 and your overall strategy of seeking to press the

5 matter to trial as rapidly as possible --                05:51:20

6          MR. RIORDAN:  Now I think you are leading

7 again.

8          THE WITNESS:  Oh, I see what you are saying.

9          MR. RIORDAN:  You can ask her why she did

10 what she did.                                            05:51:29

11          THE WITNESS:  Okay.  I understand where I --

12 I understand.

13          MR. RIORDAN:  Where the prosecution is

14 leading you?

15          THE WITNESS:  No.                              05:51:31

16          MR. TICE-RASKIN:  No.  The question doesn't

17 call for a leading answer.  pnk]I asked, is there a

18 link.  If the answer is affirmative, I will ask her

19 what that link is.

20 BY MR. TICE-RASKIN:                                      05:51:40

21     Q.   Is there a link?

22     A.   Well, here's the problem, and I'll clarify.

23 I think I misunderstood the question.  Whether or not

24 the two were linked, I -- I don't think so, but I --

25 it wouldn't make sense for them to be linked, so I      05:51:58

229

1  doubt it.

2      Q.   So if I understand correctly, where you stand

3  today is you have no recollection as to why you

4  declined to filed a motion to suppress?

5      A.   No, I don't remember why we made that          05:52:32

6  decision.

7      Q.   All right.  Let's change gears to the

8  question of calling Hamid Hayat to testify on his

9  behalf.

10      Did you have a discussion with Mr. Hayat          05:52:54

11  about him potentially testifying on his behalf?

12      A.   Yes.

13      Q.   Okay.  And did you discuss the pros and cons

14  of his potential testimony with him?

15      A.   Yes.                                          05:53:09

16      Q.   And what did you advise him as to whether he

17  should testify or not on his behalf?

18      A.   I didn't think he -- it was a good idea.

19      Q.   Why did you advise him that it was not in

20  his -- why did you advise him that it was not a good    05:53:21

21  idea?

22      A.   Because he had videotaped statements of

23  inconsistent -- internally inconsistent statements

24  over such a long period of time, and I just thought

25  that his -- all of his prior statements were just so    05:53:38

230

1    inconsistent that I didn't think there was going to be

2    much value to his credibility if he himself

3    testified.  He had given too many statements in

4    advance.

5        Q.    Were there any other reasons that you can        05:54:07

6    recall that you advised him that it would not be in

7    his best interest to testify?

8        A.    Well, I didn't think that there was much he

9    could say that would help him, and there was a danger

10   of him maybe making the case worse.  The state -- the    05:54:25

11   story what he did in Pakistan, I think, was already

12   reflected in the evidence, so I didn't think that

13   there would be much of a value to putting him on the

14   stand to repeat the same stuff.

15       Q.    During your examination of government           05:54:48

16   witnesses who had interviewed Hamid Hayat, did you

17   make a point of highlighting the statements that he

18   had made that were reflective of his innocent conduct

19   in Pakistan?

20       A.    Yes.                                            05:55:06

21       Q.    All right.  Now, in giving this advice to

22   Mr. Hayat not to testify, did you exercise your own

23   independent professional judgment in giving him that

24   advice?

25       A.    Yes.                                            05:55:24

231

```
1      Q.   Okay.  Did you have any discussions with
2  Johnny Griffin about Hamid testifying and the
3  advisibility or not of that?
4      A.   I mean, we may have talked about it, but I --
5  it wasn't really a -- it wasn't a big topic of      05:55:38
6  conversation.  I think it was understood under the
7  facts of this case that these two would not be
8  testifying, from the beginning.
9      Q.   Did Mr. Griffin, in any way, try to influence
10 your advice regarding his question of whether Hamid  05:55:54
11 should testify?
12     A.   No.
13     Q.   Did Mr. Griffin recommend against calling
14 Hamid to testify?
15     A.   No.                                          05:56:05
16     Q.   Okay.  It's alleged that Mr. Griffin
17 recommended against Hamid testifying.  Is that
18 inaccurate?
19     A.   That's inaccurate.
20     Q.   Okay.  It's alleged that you felt compelled  05:56:23
21 to follow Mr. Griffin's advice with respect to this
22 question because you didn't want to alienate
23 Mr. Griffin.  Is that accurate?
24     A.   No.  I'm sorry.  No, that is not accurate.
25     Q.   Okay.  It's alleged that Mr. Griffin         05:56:38
```

232

1    pressured you to keep Hamid Hayat off the stand to

2    avoid the possibility that Hamid would testify in the

3    case and adversely impact Umer Hayat.  Is that

4    accurate?

5        A.   Absolutely not.                          05:56:59

6        Q.   Okay.  To your recollection, there were two

7    separate panels, were there not?

8        A.   Yes.

9        Q.   And, indeed, weren't certain defense

10   witnesses presented solely to one panel?           05:57:09

11       A.   Yes.

12       Q.   Had you elected to counsel Hamid to testify,

13   would you have requested that he testified before the

14   Umer Hayat panel, or just the Hamid Hayat panel?

15       A.   Can I make my own objection that it calls for  05:57:32

16   speculation, but it wouldn't have made sense to do

17   that.  If I -- I wouldn't have put him on the stand,

18   and if I put him on the stand, I don't know why he

19   would have testified in Umer's case.

20       Q.   It's alleged that it was somehow improper for  05:58:02

21   you not to file a motion to dismiss the indictment on

22   the grounds that no specific camp location was alleged

23   in the relevant indictment.  Did you consider whether

24   such a motion was appropriate?

25       A.   No, I did not.                            05:58:28

233

1     Q.   Okay.  At the time -- okay.  Strike that.

2     It's alleged that you likewise erred by

3   failing to file a motion for a bill of particulars

4   because no specific camp was alleged in the

5   indictment.                                          05:58:51

6     Did you consider the propriety of filing a

7   motion for a bill of particulars on that issue?

8     A.   No.

9     Q.   Do you recall going through any kind of

10  thought process as to whether a bill of particulars  05:59:06

11  was necessary or unnecessary?

12         MR. RIORDAN:  Objection.  The question is

13  asked and answered.  She said she didn't consider it.

14  BY MR. TICE-RASKIN:

15    Q.   Is that accurate, did you not consider a bill 05:59:17

16  of particulars?

17    A.   Yeah, I did not consider it.

18    Q.   Did Mr. Griffin at any point in time mention

19  to you that he thought either motion was worthy of

20  pursuit?                                             05:59:39

21    A.   He may have, but I -- I don't think so.

22    Q.   At the time that you represented Mr. Hayat,

23  were you aware of any legal authority that indicated

24  that a material support charge for receiving jihadist

25  training requires proof of the exact locale of that  06:00:12

234

1  training?

2      A.   No.

3      Q.   You indicated that you had a -- a -- somewhat

4  of a recollection of the testimony offered by

5  Mr. Benn in connection with the images.                    06:00:34

6      A.   The fact that he testified and he just --

7  right, as an expert of aerial whatever, I don't

8  remember, but yeah.

9      Q.   Do you have any recollection of Mr. Benn

10  testifying along the lines that there was a good solid   06:00:52

11  possibility that the 2004 images represented a

12  militant training camp?  Does that ring a bell?

13      A.   It's -- that he gave his own opinion, I kind

14  of remember that.

15      Q.   Do you have any recollection of Mr. Benn's      06:01:20

16  testimony that based on his review of the images and

17  Hamid Hayat's interview that he was very confident

18  that the images represented a militant training camp?

19      A.   I -- I kind of -- yeah.  It's coming back to

20  me a little bit.  That sounds familiar.                   06:01:40

21      Q.   Okay.  So my question to you is, what was

22  your strategy at the time as to the most effective

23  means to blunt, if you will, or address the testimony

24  of Mr. Benn?  How did you believe that you were going

25  to counter that testimony?                                06:02:01

235

1      A.    With Lazor testifying.

2      Q.    Okay.  And did you believe there were going

3    to be any other means that you could utilize to blunt

4    his testimony other than the testimony of Mr. Lazor?

5      A.    Well, cross-examination of him as well as          06:02:18

6    cross-examination of Hassan Abbas.

7      Q.    Did you ultimately believe that -- do you

8    have a recollection of -- of Mr. Benn's testimony that

9    just looking at the images alone he only had about a

10   50-percent confidence they represented a military          06:02:40

11   training camp?

12     A.    Yeah, that sounds -- sounds familiar.

13     Q.    And do you have a recollection of his

14   testimony that looking at the images, looking at the

15   interview, he got up to a 60- to 70-percent confidence     06:02:50

16   level?

17     A.    That sounds familiar.

18     Q.    Okay.  What was your impression as to how

19   powerful that evidence was and whether that supported

20   the government's theory or supported the defense           06:03:04

21   theory?

22     A.    I thought it was -- I didn't think it was

23   very impressive and that, you know, maybe through

24   cross-examination I think I might have highlighted, I

25   don't remember, that he wasn't certain and there was       06:03:19

236

1  the high probability beyond a reasonable doubt that it

2  wasn't true what he was saying.

3      I thought -- I just didn't think there was --

4  his testimony was powerful at all.

5      Q.   Did you indeed try to incorporate those --      06:03:32

6  his probability testimony in your defense closing

7  argument to suggest that there was reasonable doubt?

8      A.   I did.

9      Q.   All right.  I'd like you to please take a

10  look at Defense Exhibit SS, and in particular, it       06:04:20

11  starts off with a 13 January e-mail.

12      And I'd like you to very closely, if you

13  could, read that first paragraph.  And then I would

14  like you to, when you are done with that, let me know

15  and I'll direct you to another portion of the exhibit  06:04:51

16  that I'd like you to read as well.

17      A.   Okay.

18      Q.   Thanks.

19      A.   Okay.

20      Q.   Okay.  Now, going to the next page, there is  06:05:14

21  a 27 February 2006 e-mail, and I'd like you to focus

22  your attention on the second paragraph and read that

23  in its entirety, the one that starts with, As for the

24  du'a, D-U-apostrophe-A.

25      A.   Uh-huh.                                        06:05:48

1      Yeah.

2      Q.    Okay.  And if there's any other portion of

3  this e-mail that you want to read, go ahead --

4      A.    Yeah, yeah.

5      Q.    -- but just let me know.                    06:05:55

6      So it's alleged that you were deficient

7  during your cross-examination of Khaleel Mohammed

8  because you didn't cross him with some of the

9  statements of Bariza Umar, the individual who sent

10 this e-mail.                                          06:06:19

11     A.    Okay.

12     Q.    Okay.  And on that first page, of course, you

13 saw that he was talking about taweezes and the like.

14     A.    Okay.

15     Q.    Okay.  But I guess my question to you is, was  06:06:29

16 there a strategic reason why you chose not to

17 cross-examine Khaleel Mohammed with these particular

18 statements?

19     A.    I don't -- I don't know specifically about

20 those particular statements, but I thought I          06:07:06

21 cross-examined him about the fact that he was relying

22 on his students to inform him.  So. . .

23     Q.    Let me -- let me ask you this question:

24 Focusing on the statement of Bariza Umar that he

25 didn't know -- he says, quote, I don't know if it --  06:07:22

1  referring to the taweez or the supplication --

2      A.    Uh-huh.

3      Q.    -- is worn as a taweez in a time of war.

4  That would probably be the only time, close quote.

5      A.    Uh-huh.                                    06:07:36

6      Q.    I guess my question to you is, did that

7  statement on Bariza Umar's part, give you any level of

8  pause or not --

9          MR. RIORDAN:   I -- I object to that.  It's

10  leading.  Just the question can be, what were your      06:07:49

11  tactical reasons for not using the material in this --

12  in this -- in this e-mail.

13          THE WITNESS:   I'll tell you, I honestly don't

14  remember why I didn't use any of these specific

15  statements, but I thought that I was making clear in    06:08:10

16  my cross-examination that he was relying on statements

17  that were given to him by students and it reflected

18  the lack of his knowledge.  And why I didn't pick

19  particular statements, I can't remember.

20  BY MR. TICE-RASKIN:                                     06:08:37

21      Q.    Okay.  So even looking at the statement that

22  I just quoted to you --

23      A.    Yeah.

24      Q.    -- do you have any recollection as you sit

25  here today as to whether that was part of your          06:08:42

239

1    calculus or not?

2          MR. RIORDAN:  Asked and answered.  Objection.

3          THE WITNESS:  All I can say is, I know, I

4    studied all of this, and I had a reason for everything

5    I did.  Every question I asked, I had a reason for it,    06:09:16

6    because I couldn't find an expert to challenge him,

7    and I worked very hard on this cross-examination

8    preparation.  I can't recall right now.

9    BY MR. TICE-RASKIN:

10         Q.   When you saw e-mails from other experts that    06:09:29

11   Khaleel Mohammed had conversed with, and you thought

12   that they were inconsistent with Khaleel Mohammed's

13   opinions, did you attempt to utilize that as part of

14   your cross-examination?

15         A.   I think I did.                                  06:09:48

16         Q.   Okay.  And as you sit here today, you don't

17   recall why you chose not to utilize this e-mail; is

18   that correct?

19         A.   Right.  I don't recall.

20         Q.   During your closing argument, at one point      06:10:14

21   you indicated that even expert Hassan Abbas would have

22   indicated that Khaleel Mohammed's conclusions were

23   wrong.  Do you remember making that statement during

24   your closing argument?

25         A.   Is it specifically about the taweez?            06:10:44

240

```
1      Q.   Yes.

2      A.   That sounds like something I would have

3 said --

4      Q.   Okay.

5      A.   -- because he's Pakistani, yeah.          06:10:56

6      Q.   Okay.  My question to you is, had you spoken

7 with Hassan Abbas about the topic at the time that you

8 made that remark during closing, or were you just

9 assuming that someone like Hassan Abbas would have

10 reached -- would have made a statement like that?     06:11:16

11     A.   I made that assumption.

12     Q.   At some point in time -- you remember who

13 Dave Deitch was?

14     A.   Yeah.

15     Q.   And he is -- or was what at the time?       06:11:38

16     A.   He was the trial counsel from DC.

17     Q.   Okay.  Trial counsel for the government.

18     A.   For the government, sorry.

19     Q.   Okay.  And it is alleged that Mr. Deitch

20 mischaracterized the record during closing and -- and   06:11:51

21 it's alleged that he stated that there was a uniform

22 opinion among highly qualified Islamic scholars that

23 this piece of paper with a prayer on it, referring to

24 the taweez or supplication, would be carried by a holy

25 warrior.  That's the statement that is at issue.  And   06:12:14
```

241

1  I'll proffer to you that at the time that Mr. Deitch

2  made the statement, you didn't interpose an

3  objection.

4      A.   Right.

5      Q.   And my question to you is this:  As you sit      06:12:25

6  here today, do you know whether you had actually heard

7  Mr. Deitch make that statement during the closing

8  argument, if you were cognizant at the time of that

9  statment by Mr. Deitch?

10     A.   I don't recall him saying that.               06:12:45

11     Q.   Okay.

12     All right.  To the topic, then, of Mark

13  Reichel, please.  Do you have a recollection as to --

14  to whom reached out to Mark Reichel?  Was that you or

15  Johnny?                                               06:13:29

16     A.   It was probably Johnny, because I didn't know

17  him at the time.

18     Q.   Okay.  And did -- did you meet, personally,

19  with Reichel to discuss the possibilities of him

20  coming on board?                                      06:13:43

21     A.   I don't think it was an in-person meeting.  I

22  think it was a telephone conference from Johnny's

23  office or Johnny, myself, and Mark talked when I was

24  involved in the conversation.  Johnny may have reached

25  out -- likely reached out to him before that.  I don't  06:14:11

1  remember.

2      Q.    Okay.

3      A.    But I do remember a conversation in Johnny's

4  office.

5      Q.    And did Reichel express a willingness to come    06:14:21

6  on board as cocounsel?

7      A.    My -- yes.  He expressed a willingness, but

8  for some reason, I feel like there was an -- also an

9  expression of his inability to be there every day

10  consistently with his own schedule or something like    06:14:52

11  that where it wasn't as if he was going to be there

12  all the time or some kind of limitation, I feel like.

13      Q.    Can you recall any other -- well, you

14  ultimately made the decision not to bring Reichel on

15  board, correct?                                          06:15:19

16      A.    Correct.

17      Q.    Okay.  And you've indicated that -- is this

18  one of the reasons why you chose not to bring him on

19  board?

20      A.    Well, I think that that was -- that was --    06:15:28

21  yeah, that was part of the consideration, but

22  ultimately we just talked it out.  And, like I said, I

23  think my -- my fears were alleviated and I decided

24  just to do it on my own.

25      Q.    When you say you talked it out --              06:15:45

243

1      A.    With Johnny.

2      Q.    And as best you can recall, what did

3  Mr. Griffin tell you to alleviate your concerns?

4      A.    Well, he thought that we had reached a point

5  where I was so familiar with the case that I could        06:16:05

6  handle it and I could do it, and that bringing Mark in

7  wasn't necessary.

8      Q.    Okay.  It is alleged that Johnny Griffin

9  insisted that Reichel not be obtained.  Is that

10 accurate?                                                  06:16:46

11     A.    No.  He was the one that recommended him.

12     Q.    It is alleged that Johnny Griffin advised you

13 that if -- if Reichel were to join, he would no

14 longer -- he being Johnny Griffin -- would no longer

15 continue to corroborate with you.  Is that accurate?      06:17:11

16     A.    No.  I don't think that that was -- that's

17 not what he said.  It was, if Mark was going to get on

18 board, because Mark was somebody that had comparable

19 experience to him, that there wouldn't be a need for

20 Johnny, Johnny's role with me in the sense of the         06:17:29

21 advice he was giving; not that Johnny was going to

22 shut his door.  It wasn't like that at all.

23     Q.    Is it accurate that Mr. Griffin discussed

24 with you your ability to adequately represent Hamid

25 Hayat?                                                     06:17:57

1      A.    Yes.

2      Q.    Did Mr. Griffin as alleged in any way bar

3  Mr. Reichel's participation?

4      A.    No.

5      Q.    Did Mr. Griffin indicate that Mr. Reichel's        06:18:08

6  retention was unacceptable because Reichel wanted to

7  pursue some tactical options perceived to be in

8  conflict with Mr. Griffin's tactical plan?

9      A.    No.

10      Q.    As suggested or alleged, did Mr. Griffin         06:18:28

11  indicate that Reichel's retention was unacceptable

12  because it was not in Johnny Griffin's best financial

13  interest?

14      A.    No.  You know, I -- I -- there is one thing

15  that -- there may have been a discussion about the     06:18:44

16  fact that -- and I just thinking there may have been,

17  so I don't -- I don't want to give a complete "no"

18  answer.  But there may have been a discussion about

19  the fact that, you know, if Mark Reichel were to come

20  in, that -- you know, as an attorney coming into the   06:19:02

21  case, that strategies may change because he had a

22  different style.  But phrasing that as that would be

23  the reason not to bring him on didn't happen.

24      Q.    Did you of your own accord independently

25  conclude that it was not necessary to bring Reichel on  06:19:30

245

1   board?

2       A.    Yes, because, like I said, he rebuilt my

3   confidence in myself.

4       Q.    Okay.  Did you just blindly follow

5   his advice, or --                                      06:19:43

6       A.    No.

7       Q.    -- did you ultimately believe that this was

8   right for you?

9       A.    At the time I thought it was right for me.

10      Q.    Did you engage in any sort of discussions     06:19:56

11  regarding strategy or tactics with Reichel?

12      A.    You know, I just -- I don't remember doing

13  that.  I feel like he showed up at one hearing and at

14  some point he provided some kind of consulting.  I

15  know he had some kind of involvement in it.  So I       06:20:15

16  just -- I just don't remember.  But not like detailed

17  strategy, I don't recall anything like that.  I just

18  don't remember the role he played.  I feel like he

19  played some role, limited.

20      Q.    And throughout the course of trial?           06:20:31

21      A.    Or -- I don't know if it was in the

22  begining.  I just remember he appeared one day, and I

23  don't remember why.  He appeared at a hearing.

24      Q.    And this was pretrial?

25      A.    Maybe.  I don't remember.  I don't remember.   06:20:45

246

1   He came for some kind of support purpose, yeah.

2       Q.   Did he -- did he have any sort of agreed role

3   in connection with the trial to remain available as a

4   potential consultant or anything like that?

5       A.   He may have, but if I -- we ever changed our      06:20:59

6   mind -- that if we ever changed our mind, he could

7   have.  I just -- I just don't remember.  That may have

8   been an understanding.  It's so long ago.

9       Q.   Did, to your recollection, Mr. Reichel

10  indicate that he would be prepared to lend assistance      06:21:25

11  if -- if contacted?

12      A.   I mean, I know that it wasn't as if the

13  decision -- the decision not to use Mark was not in

14  any way perceived as a negative thing from his end.  I

15  think it was, we were still -- you know, I think that      06:21:48

16  makes sense that in -- it's Mark's nature to say,

17  Well, I'm here if you need me.

18      The part of the reason I'm having such a hard

19  time is, since then, Mark and I have worked on a lot

20  of things together and we're good friends, so I'm just     06:22:02

21  having a hard time remembering some of it.

22      Q.   To your recollection, did you contact

23  Mr. Reichel at any point during the course of the

24  trial to seek any of -- any assistance from him?

25      A.   I don't -- I don't think I did.              06:22:19

1     Q.    We -- you discussed a little bit earlier that

2  the plea offer that was made pretrial, and you'd

3  indicated that you discussed that with your client,

4  correct?

5     A.    Oh, yes.                                    06:22:59

6     Q.    Did you make a recommendation to your client

7  as to whether he should accept or reject that plea

8  offer?

9     A.    Yes.

10    Q.    And what was your recommendation?           06:23:07

11    A.    Reject it.

12    Q.    Did you and Mr. Griffin discuss whether Hamid

13 should accept the plea offer?

14    A.    This was one of those decisions that we were

15 initially apart on, and, my client and I didn't want  06:23:20

16 to accept it.  We wanted to go to trial, yeah.

17    Q.    What -- what did Mr. Griffin advise regarding

18 the plea?

19    A.    I think he was maybe willing to -- he may

20 have been a little bit more willing to consider it and 06:23:43

21 just to make sure that, you know, Hamid was certain

22 and that I was certain about his innocence.  I

23 think -- I think that somewhere in the back of

24 Johnny's mind was the government was holding on,

25 maybe, to a smoking gun, and I didn't believe it.     06:24:05

1    Q.   Did -- did Mr. Griffin firmly state to you

2  what he believed Hamid should do or --

3    A.   No.

4    Q.   What exactly did he convey to you?

5    A.   No, no, no.  I think -- I think it was just   06:24:18

6  a, you know, maybe you two should -- I don't know.  I

7  think Hamid and I just were more firmly like, No way,

8  we are not going to accept that deal.  And he wanted

9  to make sure that that was a well thought out informed

10  decision.   06:24:38

11    Q.   You are referring to Johnny Griffin wanted to

12  make sure?

13    A.   Johnny, right, right.  It wasn't as if he

14  pressured or did any of that.  It was just -- just

15  make sure, you know, that this is the best route.   06:24:47

16    Q.   So it's alleged that Mr. Griffin urged Hamid

17  Hayat to accept the plea offer.  Is that accurate or

18  inaccurate?

19    A.   That is inaccurate.

20    Q.   Okay.  Now, I believe you indicated that   06:25:11

21  Mr. Griffin attended all portions of the Hamid Hayat

22  trial, correct?

23    A.   He did.

24    Q.   And did you similarly attend all portions of

25  the Umer Hayat trial?   06:25:20

249

1      A.    Every day.

2      Q.    Okay.  And was that consistent with your

3   joint defense agreement?

4      A.    Yes.

5      Q.    When Mr. Griffin attended the Hamid Hayat        06:25:27

6   trial, did he give you advice in connection with

7   issues as they arose?

8      A.    At the -- at the trial?

9      Q.    Yeah.

10     A.    Yes.                                             06:25:40

11     Q.    Okay.  And did you just blindly accept the

12  advice given to you, or otherwise?

13     A.    I -- I did not.  I just took the advice and

14  made -- made the decision I thought was best.  During

15  Hamid's trial, I did all my own preparation for         06:25:55

16  examination, all my own examination, drafted the

17  opening and closing.

18     Q.    There was a point -- now switching gears to

19  your cross-examination of Naseem Khan.

20     A.    Uh-huh.                                          06:26:27

21     Q.    There was a point during the examination in

22  which you put this question to Naseem Khan:  During

23  the November 7th conversation --

24          MS. CREEGAN:  October.

25          MR. TICE-RASKIN:  Oh, did I misspeak?  Let me    06:26:41

250

1  start again.

2  BY MR. TICE-RASKIN:

3      Q.    The question was, During the October 7th

4  conversation, this will be the conversation between

5  Naseem Khan and Hamid Hayat --                          06:26:51

6      A.    That was the last telephone conversation.

7      Q.    -- Hamid told you he never intended on going

8  to a camp and he was lying to you all along, didn't

9  he?

10      That was a question you posed to Naseem            06:27:02

11  Khan.  Do you recall posing that question or a

12  question like that?

13      A.    I do.

14      Q.    okay.  So here's my question to you:  Why

15  were you asking that question of Naseem Khan?  What    06:27:13

16  was the basis for your inquiry?

17      A.    Well, I felt that -- well, my client told me

18  that during phone conversations he very clearly told

19  him that he never went and he never intended on going,

20  so I was asking Naseem about that.  And I thought I    06:27:40

21  built it up to where, during all of the phone

22  conversations, Hamid never said he actually went.

23      Q.    So the genesis, if you will, for the question

24  was based on statements made to you by Hamid Hayat?

25      A.    Right.                                       06:28:01

251

1    Q.   And his statements to you that he had never

2  gone to a camp and that he had never intended to go a

3  camp?

4    A.   Right.  And that he had expressed that to

5  Naseem Khan.                                          06:28:13

6    I mean, I could have technically asked that

7  question of every -- maybe of every single interview

8  he had.  I don't know.

9        MS. CREEGAN:  So he didn't say that in that

10  specific conversation he had told him?               06:28:24

11        THE WITNESS:  No, that -- he did tell me that

12  the last conversation he had with him -- he clearly

13  told him that.

14  BY MR. TICE-RASKIN:

15    Q.   Okay.  So could you pull Exhibit C, please.   06:29:11

16    Okay.  So this is a Bee article dated March

17  14, 2013, and I would direct your attention to page 3

18  of 5.  Have you seen this article?

19    A.   Yeah.

20    Q.   Okay.  And so there's a quote attributed to   06:30:03

21  you, and so I wanted to talk to you about that quote.

22    A.   Sure.

23    Q.   And it's, "Mojaddidi said Wednesday, quote,

24  Most of the trial was jointly with Johnny Griffin,

25  close quote, who represented Hayat's father, Umer."   06:30:19

252

```
1      And is that an accurate statement, did you

2   indicate to the press --

3      A.   Yes.

4      Q.   -- that most of the trial was jointly with

5   Johnny Griffin?                                    06:30:30

6      A.   Yeah, I mean, yeah.

7      Q.   Okay.  And then you said, "I was in the case

8   primarily because of my Muslim background, language

9   skills, and ability to analyze evidence."

10     Is that an accurate quotation?                  06:30:42

11     A.   Sounds like something I would have said,

12  yeah.

13     Q.   Okay.  You said, "I admit my inexperience may

14  have affected Hamid's case," and -- you see that

15  statement there?                                   06:30:57

16     A.   Yes.

17     Q.   And then apparently there is an omission of

18  some statement that you may have made.  And then it

19  goes on to say, "I did the best job I could under the

20  circumstances.  I believe I represented him          06:31:08

21  competently."

22     Do you see all that there?

23     A.   I do.

24     Q.   Okay.  So those -- those three statements

25  that are quoted there, are those all on -- accurate   06:31:18
```

253

1  statements that you made to the press?

2      A.   It sounds -- yeah, sounds like something I

3  would have said.

4      Q.   Okay.  Now, there you are being a little bit

5  introspective, if you will, about these matters, and      06:31:31

6  goodness knows we can all be introspective with the

7  passage of time.

8      My question to you is, when you say, "I admit

9  my inexperience may have affected Hamid's case; I did

10  the best I could; I believe I represented him           06:31:51

11  competently," what are you getting at there?

12      A.   Well, you know, in hindsight, sure, I could

13  have done things differently.  So I was -- I mean,

14  it's -- I think it's obvious that I was inexperienced

15  and it could have affected his case.  I mean, this is     06:32:12

16  what the appellate work is going to be.  If the law

17  says that the -- the decisions I made negatively

18  affected his case, then it is what it is.  And if it's

19  because of my inexperience, then it is.

20      At the time, I thought I did the best I           06:32:34

21  could, and if my inexperience affected the outcome,

22  then it is what it is.

23      Q.   All right.  Before you made these remarks,

24  had you had a chance to examine the petition that had

25  been filed in this case?                               06:33:05

254

```
1           MR. RIORDAN:  I -- I ask for clarification.

2   Of what petitions?

3           MR. TICE-RASKIN:  What I'm referring to is

4   the motion under 28 USC Section 2255, alleging

5   ineffective assistance of counsel and conflict of        06:33:16

6   interest.

7           MR. RIORDAN:  Filed when?

8           MR. TICE-RASKIN:  Filed most recently, in the

9   middle of this year.

10          THE WITNESS:  So this is the 2013 article, so     06:33:22

11  this would have been -- wasn't it just, like, a notice

12  itially?  And then the big brief just came 2014.

13          MR. TICE-RASKIN:  Yes.

14          THE WITNESS:  So this would have been just

15  a -- not this big brief.  So are you asking about the    06:33:36

16  actual filing?  I probably saw it.

17          MR. TICE-RASKIN:  Okay.

18          THE WITNESS:  Well, I am still -- you guys

19  may have noticed, I still get every filing notice

20  because of my -- my e-mail address is there.  So, yes,   06:33:47

21  if it came before this, I probably did see it.

22          MR. RIORDAN:  I'd ask for clarification on

23  dates.

24          MR. TICE-RASKIN:  Sure.  I agree.

25          THE WITNESS:  Yeah.                               06:33:59
```

255

1  BY MR. TICE-RASKIN:

2      Q.   So there was actually initially a motion

3  under 28 USC Section 2255 that was trial -- that was

4  filed shortly after trial at the same time that a new

5  trial motion was filed, correct?                    06:34:10

6      A.   Right.

7      Q.   Okay.  And you saw the allegations that were

8  set forth in that motion, correct?

9      A.   Yes.

10     Q.   And indeed you discussed some of the        06:34:20

11 allegations with -- with Mr. Riordon and Mr. Horgan,

12 correct?

13     A.   Now I'm losing track of time.  So we are

14 talking about --

15     Q.   Post-trial.                                 06:34:33

16     A.   -- right after the trial.

17     Q.   Yes.

18     A.   Oh, yes, yes, I talked to them.

19     Q.   Okay.

20     A.   Okay.                                       06:34:38

21     Q.   All right.  And then fast forward.

22     A.   Yeah.

23     Q.   Most recently, the middle of this year --

24     A.   Yeah.

25     Q.   -- a motion was again filed --             06:34:43

256

1     A.    Right.

2     Q.    -- correct?

3     A.    Right.

4     Q.    And did you review that motion?

5     A.    Yes, I did read it.                          06:34:49

6     Q.    Okay.

7     A.    Yeah.

8     Q.    And then you made these comments after you

9  had seen both the original motion as well as the --

10    A.    No, no.                                      06:34:59

11          MR. RIORDAN:  I object to the time sequence.

12          THE WITNESS:  Let me explain to him.  This --

13  this is from 2013.

14  BY MR. TICE-RASKIN:

15    Q.    Oh, this is from the -- excuse me.           06:35:04

16    A.    Yes.

17    Q.    This is the article --

18    A.    This is the Ninth Circuit result, yeah.

19    Q.    Okay.  So at the time that you made these

20  comments, it was only after the original motion had   06:35:16

21  been filed; is that correct?

22    A.    Right.  And it was the Ninth Circuit.  An

23  appeal that I read or the --

24    Q.    Okay.  Very good.

25    A.    Ruling.                                      06:35:24

257

1     Q.   Sorry for my confusion with respect to the

2  article at issue.

3     A.   That's okay.

4          MR. TICE-RASKIN:  All right.  Well, why don't

5  we take a break at this time.                    06:35:30

6          MR. RIORDAN:  And do you have a sense of

7  where we are on the 23 pages?

8          MR. TICE-RASKIN:  Oh, wow.

9          THE WITNESS:  Second to the last page.

10         MR. TICE-RASKIN:  Page 7 or something.    06:35:43

11         THE WITNESS:  Second to the last page.

12         MR. TICE-RASKIN:  I just need to confer with

13  counsel.  I thought we might be at the point where we

14  are going to call it a wrap --

15         MS. RICE:  Okay.                          06:35:50

16         MR. TICE-RASKIN:  -- and let you all go.

17         THE VIDEOGRAPHER:  So the time is 6:35, and

18  we are off record with Tape 3.

19         (Short break was taken.)

20         THE VIDEOGRAPHER:  Okay.  The time is 6:51,  06:51:01

21  and we are back on record with Tape 4.

22  BY MR. TICE-RASKIN:

23     Q.   All right.  Ms. Mojaddidi, how are you

24  feeling right now?

25     A.   I'm great.                               06:51:30

258

1    Q.    Okay.  So no problems at all continuing with

2  this deposition even though it's a little bit before

3  7:00 in the evening?

4    A.    Not at all.

5    Q.    Okay.  If at any point in time you feel like        06:51:37

6  you're getting tired such that your recollections or

7  your ability to answer questions is being impacted,

8  just go ahead and let us know and we'll all be happy

9  to take a break.

10    A.    Thank you.                                          06:51:51

11    Q.    All right.  So at some point in time

12  pretrial, did you obtain the actual coordinates

13  associated with the camp depicted on the images that

14  were ultimately admitted at trial?

15    A.    I got them at some point.  I don't know when.      06:52:16

16    Q.    Was that at a meeting between the government

17  and defense counsel when you were shown those images?

18    A.    I don't recall.  Yeah, I don't recall if they

19  were given to me or if I just remembered them and

20  wrote them down.  That could have happened.           06:52:40

21    Q.    You definitely received them pretrial,

22  correct?

23    A.    Well, I mean, Lazor didn't testify until our

24  defense present -- by the time we presented our case,

25  so I don't know.  It could have happened during       06:52:55

259

1  trial.  I don't remember.

2      Q.   Okay.

3      A.   Yeah.

4      Q.   So your best recollection is, at the very

5  least, you received it prior to the defense case?      06:53:02

6      A.   Oh, yeah.

7      Q.   Okay.

8      A.   Yeah, because we knew Lazor was going to

9  testify.

10     Q.   And you also had it with sufficient time such   06:53:08

11  that you could Google the coordinates --

12     A.   Yes.

13     Q.   -- on Google Earth and pick up some own --

14  your own satellite imagery?

15     A.   Right.  And give it to Lazor while he was      06:53:19

16  there and then he flew back.  And so decent amount of

17  time, yeah.

18     Q.   Okay.  So at the very least you would have

19  had those coordinates before Mr. Lazor went to

20  Pakistan, correct?                                      06:53:31

21     A.   No.  I sent it to him while he was there.

22     Q.   Oh, while he was there, okay.  All right.

23          MR. RIORDAN:  Does that cover the other issue

24  sufficiently?

25  BY MR. TICE-RASKIN:                                     06:53:40

1      Q.   Now, you were aware that Mr. Hayat, earlier

2  in his life, had meningitis?

3      A.   Yeah.  I was asked that earlier about --

4  about the meningitis.  I knew that he had it.  I

5  don't -- I don't remember as I sit here today whether      06:53:57

6  or not it was during the time he was in Pakistan,

7  those two years --

8      Q.   Okay.  Let me ask you this --

9      A.   -- or before.

10     Q.   I'm going to hand you what's previously been      06:54:05

11  marked as Exhibit S and refer you to a paragraph and

12  ask you just to refer it to see if it will refresh

13  your recollection as to the time period during which

14  Hamid Hayat was reportedly ill with meningitis.

15     So if you could go ahead and take a look at      06:54:27

16  the declaration of Attique Ur Rahman.  That's

17  A-T-T-I-Q-U-E, Rahman, R-A-H-M-A-N.  And I'm referring

18  to the second to the last paragraph on the first

19  page.

20     A.   It might help me to try to think about how      06:54:53

21  old he was then.  So late teens?  19?  I don't know.

22  Trying to think of how old he was because I can't --

23  by looking at this and it being the year 2000, it --

24  this does not refresh my recollection.

25     Q.   Okay.  Okay.  At any point during your      06:55:15

261

1  representation of Hamid Hayat, did -- do you have any

2  reason to question his competence to stand trial?

3      A.    His competence to stand trial?

4      Q.    And specifically his ability to understand

5  the nature of the offenses that he was accused of and        06:55:36

6  his ability to assist you in connection with his

7  defense?

8      A.    No.

9            MR. TICE-RASKIN:  Anything else?

10           MS. CREEGAN:  No.                                  06:55:53

11           MR. TICE-RASKIN:  All right.  Well, thank you

12  so much for answering my questions, Ms. Mojaddidi.

13           MR. RIORDAN:  Shall we switch again?

14           MR. TICE-RASKIN:  Yeah.  Shall we go off the

15  record?                                                     06:56:01

16           THE VIDEOGRAPHER:  Absolutely.

17           Okay.  The time is 6:56, and we are off

18  record.

19           (Short recess was taken.)

20           THE VIDEOGRAPHER:  Okay.  The time is 6:58,        06:58:45

21  and we are back on record.

22                      FURTHER EXAMINATION

23  BY MR. RIORDAN:

24      Q.    Ms. Mojaddidi, during your questioning by the

25  government, there was a lot of discussion about             06:59:00

262

1 strategic choices and strategies during the trial.

2 What -- well, let me ask you this:  Is one of the

3 factors that goes into deciding a strategy your

4 perception of the strength of the government's case?

5     A.   Sure.                                    06:59:20

6     Q.   Would you believe or agree that there are

7 cases where the government's case is sufficiently

8 strong but what you should recommend to your client is

9 pleading guilty?

10     A.   If the government's case is sufficiently   06:59:35

11 strong, would I recommend to my client to plead

12 guilty?  If there was a reasonable offer, sure.

13     Q.   Okay.  But the other factor is the strength

14 of the defense case?

15     A.   The strength of the defense case, sure.   06:59:56

16     Q.   And this was your first criminal case?

17     A.   Yes.

18     Q.   And it was a case that you learned very early

19 on, almost the day that you took it, involved a

20 tape -- well, taped statements by the defendants that   07:00:11

21 the government characterized as confessions?

22     A.   Yes.  Not the day -- I don't think it was the

23 date I took it that I learned it, but, yeah, very

24 early on.

25     Q.   And in the government's view, your client had   07:00:27

1    admitted in those taped statements going to a camp in

2    Pakistan for training?

3        A.    Yes.

4        Q.    And had admitted that he came back to the

5    United States with the intention to commit acts         07:00:40

6    against persons or properties?

7        A.    Yes.

8        Q.    So what was your assessment at that time of

9    how strong those statements made the government's

10   case?                                                    07:00:55

11       A.    So we are talking about when they first gave

12   us the videotaped confessions and I hadn't seen any

13   other evidence, any assessment at that time, is that

14   what --

15       Q.    Yes.                                           07:01:06

16       A.    -- you are asking me?

17       Q.    Yes.

18       A.    Okay.  Because I spoke with my client and I

19   was convinced of his innocence, and I watched the

20   entirety of the tape and I saw the ridiculous           07:01:20

21   inconsistencies in everything that he said and his

22   father said, I thought and I knew that all of the

23   statements he made where he consistently told the

24   truth about where he went were not recorded, I felt

25   they had a weak case.                                    07:01:43

264

```
1      Q.   And you mentioned that later on you tried to

2  get experts, and some people did not want to touch the

3  case because there was a confession in the case?

4      A.   Yes.

5      Q.   And did you do any research into -- into the    07:01:56

6  question of how juries generally viewed confession

7  cases?

8      A.   No.

9      Q.   Did you look at any of the appellate opinions

10  discussing how juries view confession cases?           07:02:11

11      A.   No.

12      Q.   Did you look at the United States Supreme

13  Court statements on how juries view confession

14  statements?

15      A.   No, I did not.  But I will say that in some    07:02:22

16  of the material that was sent to me by various people

17  who offered assistance, they included some analysis or

18  authority for things.  So I do remember seeing some of

19  that stuff, but I didn't independently research it.

20      Q.   Did you -- was it your perception that in a    07:02:43

21  confession case there is a greater need for the

22  defense to prove innocence as opposed to rely on the

23  presumption of proof beyond a reasonable doubt?

24      A.   I'm sorry.  Can you ask that question again.

25      Q.   Okay.  You mentioned at one point your         07:03:04
```

265

1  defense was, the government hadn't proved its case

2  beyond a resonable doubt?

3      A.   Sure.

4      Q.   Insufficiency of the evidence?

5      A.   Right.                                    07:03:13

6      Q.   Had you looked at the question of how

7  successful an insufficiency of the evidence defense is

8  in cases where there's a taped confession?

9      A.   I may have.  Again, I did a lot of reading

10  and research into things.                         07:03:38

11     Q.   But was it your opinion that the government

12  did not have a strong case against Hamid Hayat?

13     A.   Yes.

14     Q.   Okay.  At the beginning of the -- the --

15  defense, was it your attitude that Hamid ought to go   07:03:51

16  on the offense and prove his innocence through

17  affirmative alibi witnesses?

18     A.   No.

19     Q.   Did you ever tell anyone -- did you ever tell

20  me that at the beginning you thought you should put on  07:04:07

21  an affirmative alibi defense?

22     A.   No.  I don't think I've said that in today's

23  deposition, either.

24     Q.   I'm asking you whether in 2007 you told me

25  that was your initial thought.                    07:04:22

1    A.   I don't -- I think that -- I think that all

2  of the different thoughts that came into my mind and

3  the different ideas that I had is what I discussed

4  with you, but I don't think I ever said to you that in

5  the begining of the case I just felt that we needed to    07:04:41

6  strongly put on an affirmative alibi defense.  I do

7  not think I said that to you, because that would not

8  have been true.

9    Q.   Is it the case that your memory of what you

10  said or did in 2007 was better in 2007 than it is    07:04:55

11  today?

12    A.   Sure.

13    Q.   Is it the case that there are things that you

14  did during the trial that you've testified today you

15  have no recollection of doing?    07:05:06

16    A.   Yes.

17    Q.   For instance, did you testify that you didn't

18  know who Bernard Haykel was during my direct

19  examination?

20    A.   Yeah.  I didn't remember his name initially,    07:05:18

21  yes.

22    Q.   But you are now aware that you are the person

23  who contacted him and obtained his declaration back

24  for -- to support the new trial motion?

25    A.   After you refreshed my recollection, yes.    07:05:26

267

```
1      Q.    So you didn't remember it, but once your
2   recollection was refreshed, you recall it?
3      A.    Yeah.  And I did that a number of times.
4      Q.    Okay.  And so turning to the question of
5   alibi witnesses, you mentioned that you reviewed the    07:05:40
6   statements of Hamid Hayat and you interviewed Hamid
7   Hayat initially in the case?
8      A.    Yes.
9      Q.    And you -- he explained to you and said on
10  the initial tapes that -- or the initial interviews --  07:05:56
11  that he had gone to Pakistan.  One purpose was to
12  assist his mother getting medical care in Rawalpindi;
13  isn't that right?
14     A.    Yes.
15     Q.    And that when he was there, he did not work?  07:06:11
16     A.    Right.
17     Q.    He generally -- he played a lot of cricket?
18     A.    Right.
19     Q.    Did he tell you he played a lot of video
20  games?                                                  07:06:26
21     A.    I -- I heard you ask me that about -- about
22  that, but I don't remember him saying that.
23     Q.    But he told you that he hung out at the local
24  store a lot and smoked cigarettes?
25     A.    Yes.                                           07:06:38
```

1    Q.   And you came to the belief that all of those

2  statements were true?

3    A.   Yes.

4    Q.   And you came to the belief, therefore, that

5  there would necessarily have been people in Pakistan    07:06:50

6  that observed him doing those things?

7    A.   Sure.

8    Q.   There would be people who played cricket with

9  him?

10    A.   Sure.                                           07:06:59

11    Q.   There would be people who saw him in

12  Rawalpindi when he came with his mother to Rawalpindi?

13    A.   Yes.

14    Q.   There would be people who saw him hang out at

15  the store in Behboodi.  When he was hanging out at the  07:07:07

16  store in Behboodi?

17    A.   Yes.

18    Q.   And -- and if -- if -- did you believe that

19  if -- if people told you that they had observed those

20  things, those people would be telling the truth?       07:07:23

21         MR. TICE-RASKIN:  Uh --

22         THE WITNESS:  That's -- yeah.

23         MR. RIORDAN:  Let me withdraw the question.

24  BY MR. RIORDAN:

25    Q.   Did you believe -- you believed that there     07:07:33

269

1    were potential witnesses in Pakistan who had observed

2    those actions?

3        A.   Yes.

4        Q.   And you believed that if those potential

5    witnesses described the things that Hamid described,      07:07:43

6    they would be truthful because you believed he was

7    truthful, right?

8        A.   Yes, that it would be consistent with what he

9    told me.

10       Q.   And what did you perceive as your -- you        07:07:53

11   mentioned that a number of people who you had

12   considered as potential alibi witnesses, right?

13       A.   Uh-huh.

14       Q.   And your testimony was that you discounted

15   every potential alibi witness?                           07:08:07

16       A.   Sure.

17       Q.   And -- but what about the people in Pakistan

18   who would have observed his daily activities?

19       A.   I'll explain why I didn't even really

20   consider that.                                           07:08:20

21       Q.   Well, let me ask you this:  Did you send

22   an -- an investigator there to interview them?

23       A.   No, I didn't.

24       Q.   You yourself didn't go there to interview

25   those people?                                            07:08:29

270

1    A.   No, I didn't.

2    Q.   All right.  And I interrupted you.  Your

3 thinking about not going and interviewing those people

4 was what?

5    A.   Or -- right.  Of not even considering their        07:08:37

6 testimony as being helpful was because the argument

7 could have been that just because he did those things

8 doesn't mean that he could not have attended a camp at

9 some point when he wasn't doing those things.

10   Q.   But you did not know whether you would find        07:08:56

11 an alibi witness for every single day he was in

12 Pakistan, did you?

13   A.   No, I didn't think I could.

14   Q.   But you -- you came to that judgment without

15 making any attempt to actually investigate the case in  07:09:09

16 Pakistan?

17   A.   Well, no.  The only --

18        MR. TICE-RASKIN:  Objection to the extent it

19 misstates her previous testimony that she spoke with a

20 couple of people over there as well as witnesses here   07:09:18

21 in the states to determine whether there were alibi

22 witnesses.

23        THE WITNESS:  And -- and the reason why I

24 considered the uncle and the grandfather was for alibi

25 as well as, maybe more importantly, for countering the  07:09:33

1  allegations that he attended a madrassa for the

2  purposes of training and all of that.  That was really

3  why those two were important to me.

4            The guy he played cricket with, I didn't

5  think was going to be important because, like I said,    07:09:51

6  the -- just because he played cricket doesn't mean

7  that at some time during those two years he couldn't

8  have gone to a camp.  And I -- so that's why the

9  person that I considered could have been helpful was

10 Usama, who essentially said he was with him every day.  07:10:06

11      Q.   Let's come back to Usama.  Have you actually

12 read the -- the content of the declarations submitted

13 in support of the 2255 of witnesses from Pakistan?

14      A.   I -- I didn't read them all, no.  I -- got a

15 general idea of what they were trying to say, but I     07:10:29

16 did not read them all.

17      Q.   Did many of them talk about Hamid playing

18 cricket while he was there?

19      A.   I -- again, I did not read them all.  I don't

20 even remember reading one about cricket.                07:10:43

21      Q.   So you don't have any assessment about -- you

22 haven't formed any assessment about whether they would

23 be valuable witnesses?

24      A.   Based on what you filed?

25      Q.   Yes.                                          07:10:55

1    A.    Based on your declaration?

2    Q.    Yes.

3    A.    No, I don't have an assessment of that.

4    Q.    Okay.  We talked a minute ago about things

5  that were difficult to recollect from five years ago    07:11:02

6  or seven years ago, right?

7    A.    Sure.

8    Q.    And in addition to the Professor Haykel,

9  there were -- there's aspects of the testimony of

10 witnesses that you can't now recollect; is that         07:11:16

11 correct?

12   A.    That's correct.

13   Q.    But the -- have you spoken to Mr. Tice-Raskin

14 about your testimony today in any way before today?

15   A.    No.  The only communications I've had with    07:11:27

16 him has been in e-mails with -- to which you've been

17 copied on.

18   Q.    Okay.  He read off 18 different names, did he

19 not, of directing you to various declarations of

20 witnesses from Pakistan?                                07:11:43

21   A.    Oh, yes.  Yeah.

22   Q.    And how did you respond to those questions?

23   A.    That I did not know -- that I did not know

24 any of those names.

25   Q.    And you don't remember contacting Mr. Haykel,  07:11:51

1  but you have an expressed memory today that you had

2  never heard those names before?

3      A.   Absolutely.

4      Q.   And what is the difference?  Can you explain

5  that.                                                    07:12:03

6      A.   Well, the difference is that I know what

7  Hamid told me and what the family members told me

8  about potential people I could have talked to.  And

9  I'm certain that beyond the names that were given to

10 me, and the family members, the names that I had        07:12:24

11 listed, that there was nobody else that they ever

12 mentioned.  I'm certain of that.

13     Q.   Let me ask you about that.  You know what an

14 alibi defense is, right?

15     A.   Yes.                                            07:12:38

16     Q.   You might have a client who is accused of a

17 crime at the corner of 4th and Broadway, and he

18 informs you that he was at a dance ten miles away.

19     A.   Okay.

20     Q.   If he said that he didn't know the names of    07:12:51

21 the other people at the dance, would you, for that

22 reason, stop investigating his alibi?

23     A.   If he told me that he didn't know anybody

24 else that was at the dance, would I investigate -- no,

25 I would like to see if the dance occurred and find out  07:13:10

274

1  who was there and ask those people if they saw him

2  there.

3      Q.   And you'd put an investigator on the case to

4  locate witnesses?

5      A.   Absolutely.                                    07:13:19

6      Q.   But you made the decision not to do that in

7  this case?

8      A.   No.  For the reason I explained before.

9      Q.   Now, you mentioned Usama, and it was also a

10  discussion of Jaber?                                    07:13:30

11      A.   Yes.

12      Q.   Okay.  And you mentioned that there were

13  Fifth Amendment problems with Usama?

14      A.   Right.

15      Q.   And the Jaber was in Pakistan during much of   07:13:39

16  the case?

17      A.   I said I don't remember, but I feel like he

18  wasn't here and at some point, he came back.  And I

19  don't know why I had contact with him once he

20  returned.  I don't remember if it was because he was   07:13:53

21  contacted and he needed an attorney -- oh, I know.  I

22  think he was the one that was on the no-fly list and

23  trying to come back.  That's what the issue was with

24  Jaber.

25      So, yeah, I think he was not here during much      07:14:05

1  of the trial.  You are right, yeah.

2      Q.   But there is a -- there was a method of

3  obtaining his testimony in Pakistan; isn't that right?

4      A.   Jaber's.

5      Q.   Yes.                                    07:14:18

6      A.   Well, yeah, just like anybody else, right.

7      Q.   And what was that method?

8      A.   We could have taken a deposition.

9      Q.   Were you aware of Rule 15 at that time?

10     A.   No.                                     07:14:26

11     Q.   Okay.  But did you testify that while there

12  were Fifth Amendment problems with Usama, actually

13  there had been an independent decision not to call

14  him?

15     A.   I do remember that we made the decision not  07:14:38

16  to call him.  And, like I said, I think the Fifth

17  Amendment problem was part of it, but I think that

18  there were other reasons too.

19     Q.   Your testimony today is that even if there

20  hadn't been a Fifth Amendment problem, you had made  07:14:57

21  the decision not to call him?

22     A.   To the best of my recollection.  To the best

23  of my recollection, the Fifth Amendment was not the

24  only issue.  I think that the -- out of all of the

25  potential witnesses we could have called, he would  07:15:14

1  have been the one to -- to call.  And at some point I

2  felt that I wanted him, and at some point we abandoned

3  it.  I don't remember why.

4      Q.   Do you -- you recall the new trial motion

5  that we filed jointly, right?                    07:15:30

6      A.   Uh-huh.

7      Q.   Do you recall whether you filed a declaration

8  under penalty of perjury in support of that motion?

9      A.   I think I did.

10      Q.   Did that declaration say that you and Johnny    07:15:38

11  had decided to call him but the Fifth Amendment was

12  the only you did not?

13      A.   If that's what it says, then my recollection

14  then in that declaration would have been more accurate

15  than what my memory is today.                    07:15:54

16      Q.   So that was sworn testimony?

17      A.   Yes.

18      Q.   You stand by it?

19      A.   Yes.

20      Q.   And if that was the sworn testimony, your    07:15:59

21  testimony today is inaccurate because you can't

22  remember events that clearly?

23      A.   Yes.

24      Q.   How about Jaber?  Did -- do you recall what

25  you said in that declaration about Jaber?           07:16:10

277

1    A.    Honestly, I don't.

2    Q.    Do you recall mentioning the no-fly problem?

3    A.    I don't recall that.  I -- I just remembered

4 the no-fly issue as we talked here.  I don't remember

5 if I put that in the declaration.          07:16:26

6    Q.    Okay.  But you would not have utilized the

7 Rule 15 procedure because you were not aware of it at

8 the time?

9    A.    I was not aware of it at the time, right.

10    Q.    We mentioned Professor Haykel.        07:16:42

11    A.    Okay.

12    Q.    You obtained his declaration in support of

13 the new trial motion.

14    A.    Okay.

15    Q.    Do you remember whether you considered it a    07:16:53

16 powerful declaration?

17         MR. TICE-RASKIN:  I'm sorry.  What was the

18 question again?

19         MR. RIORDAN:  Well, why don't I show it to

20 you.          07:17:02

21         MR. HORGAN:  Where is it?

22         MR. RIORDAN:  AAA.

23         MR. HORGAN:  AAA?

24         MR. RIORDAN:  Yeah.  Exhibit -- I believe,

25 AAA.          07:17:11

278

1        MR. HORGAN:  I have a AAA.

2        MR. RIORDAN:  I have a AAA here as well.

3        MR. TICE-RASKIN:  Oh, thanks.  Should be

4   right on the top.

5        MR. RIORDAN:  I stand corrected.  It's BBB.      07:17:28

6   BY MR. RIORDAN:

7   Q.   I'm going to direct your attention to page 4,

8   paragraphs 11 and 12.

9   A.   This is it right here.

10       I can't see it.                                   07:17:52

11       I'm sorry.  Where?

12  Q.   Page 4, paragraphs 11 and 12.

13  A.   Okay.

14  Q.   Do you recall Dr. Haykel's qualifications?

15  A.   No.                                               07:18:14

16  Q.   Do you recall your sense of whether he was

17  more qualified than Khaleel Mohammed?

18  A.   At the time that I got his affidavit, I

19  probably did, because I thought Dr. Khaleel Mohammed

20  was not very qualified and I thought he wasn't very    07:18:35

21  represented in his field.

22  Q.   Dr. Mohammed spoke Arabic, but he did not

23  speak any language connected to Pakistan, right?

24  A.   Correct.

25  Q.   And he did not have any great experience with    07:18:48

279

1  Pakistani culture, did he?

2      A.   No, he didn't.

3      Q.   And Dr. Haykel gave evidence on the new trial

4  motion that what Dr. Mohammed said was a jihadi

5  supplication -- supplication was, in fact, commonly    07:19:04

6  used in the Muslim world, right?

7      A.   I haven't read the whole thing, but I recall

8  that he -- the purpose of his affidavit was to

9  challenge Khaleel Mohammed.  So if that's what he said

10  in here, yes, but that's what I cross-examined Khaleel  07:19:18

11  Mohammed on, the same thing.

12      Q.   Why didn't you call -- Professor Haykel at

13  trial?

14      A.   I didn't know who -- I don't think I knew who

15  Professor Haykel was at trial.                          07:19:34

16      Q.   You were essentially in a situation where you

17  had the -- the tapes to deal with and Mohammed to deal

18  with and the -- and the declassified aerial

19  photographs to deal with.  In your opinion, was this a

20  case that needed more than a single lawyer to deal     07:19:57

21  with Hamid's case?

22      A.   At that time?  I thought I could handle it

23  working with Johnny.  In hindsight, I think more than

24  one attorney would have been a good idea.

25      Q.   If you had more time -- did you think if you    07:20:14

280

1  had more time and more help you could have located

2  someone like Dr. Haykel?

3      A.    I don't think time was an issue.  I

4  essentially dedicated my entire practice to this

5  case.  I don't think time was an issue for me.  Help,          07:20:28

6  I -- sure, the help of an expert who was willing to

7  testify would have helped me, but I didn't need help

8  in the sense that I was overwhelmed with the work.

9      Q.    Well, you described reaching out and trying

10  to reach people around the country to assist you in          07:20:50

11  this regard, did you not?

12      A.    Right.  In seeking an expert --

13      Q.    Yes.

14      A.    -- yes, I did.

15      Q.    Do you recall that Khaleel Mohammed testified   07:20:57

16  about the mental state of someone who carried this

17  supplication?

18          MR. TICE-RASKIN:  Asked and answered.

19          MR. RIORDAN:  Well, there's things that she's

20  recalled --                                                   07:21:25

21          THE WITNESS:  Yeah, so here's the problem

22  with that.  I know that was something I read in what

23  you filed, but can I remember now when he did it and

24  how he did it, I can't.

25  BY MR. RIORDAN:                                               07:21:36

281

1    Q.   You don't have a recollection of whether he

2  said that anyone who carried the supplication would

3  have a jihadi state of mind?

4    A.   I think -- I can recollect that that was a

5  message he was trying to convey, but how he said it, I    07:21:49

6  don't remember.  But, yeah, I do recall that that was

7  the message he conveyed somehow through his testimony.

8    Q.   And how -- what was your method of dealing

9  with that testimony?

10    A.   That I asked him specifically about -- well,    07:22:03

11  I cross-examined him specifically about the sources

12  that he relied upon in drawing that conclusion, and

13  I -- I was trying to get him to prove, to show, or to

14  state that it was actually a common supplication

15  carried by travelers and not a jihadi supplication.    07:22:32

16    Q.   And Khaleel Mohammed, in any case, was not

17  familiar with Muslims in Pakistan; is that correct?

18    A.   Well, I didn't think he was.

19    Q.   You were showed Exhibit SS by the government

20  and there is a sentence on -- in the e-mail of    07:22:51

21  January 13, 2006, that's underlined.

22    A.   Uh-huh.

23    Q.   Why don't you read aloud that sentence.

24    A.   "I would guess that most people probably

25  don't know what is written in taweez."    07:23:10

282

1      Q.    Well, is that -- and this is from someone in

2    Pakistan, is it not?

3      A.    I think this may have been one of his

4    students.  I don't know where she was, but that --

5    that might be right, yeah.                          07:23:26

6      Q.    Would that opinion -- well, let me ask you

7    this:  Those e-mails were provided to you by the

8    government as being part of the basis for

9    Dr. Mohammed's opinions, right?

10     A.    Yes.                                         07:23:47

11     Q.    And does that sentence tend to undermine --

12   in your view now, does it undermine the notion that

13   anyone who has this taweez or supplication understands

14   that it's a jihadi --

15          MR. TICE-RASKIN:  Objection to the extent     07:24:03

16   that you are seeking her view now.  What's pertinent

17   is her view at the time, not Monday morning

18   quarter-backing from today's perspective.

19          MR. RIORDAN:  All right.

20   BY MR. RIORDAN:                                      07:24:12

21     Q.    Okay.  At the time, would you have viewed

22   that sentence as undermining Dr. Mohammed's opinion?

23     A.    Well, I can tell you why I probably didn't

24   think much of it, is because I -- I know this, and

25   most Muslims in Pakistan know this, and I thought     07:24:25

283

1    Dr. Mohammed should have known this.  And I was going

2    to have Anita Weiss testify to it.  And so a guess by

3    his intern in an e-mail written to him that he relied

4    upon, that's probably why I didn't think much of it,

5    because I thought it was -- that was the ultimate          07:24:49

6    point I was trying to prove.

7        Q.    Now, you mentioned Anita Weiss.  Part of her

8    testimony was excluded by the Court, wasn't it?

9        A.    Yes.

10       Q.    And that was testimony that you viewed as          07:25:01

11   important to your case, right?

12       A.    Yes.

13       Q.    And that was excluded on the grounds that you

14   had violated your discovery obligations, was it not?

15       A.    Yes.                                               07:25:12

16       Q.    And was that violation as you view it now or

17   as you viewed it then due to your inexperience?

18            MR. TICE-RASKIN:  Again.  Same objection.

19            MR. RIORDAN:  Well, let's make it --

20            MR. TICE-RASKIN:  Her --                           07:25:27

21   BY MR. RIORDAN:

22       Q.    Viewed it then.

23       A.    Viewed it then, I think it -- viewed it then,

24   was it my inexperience?  I don't -- I don't think I

25   perceived it as my inexperience at the time.                07:25:45

284

1    Q.    Should you have done things differently?

2    A.    In hindsight, there's a whole lot of stuff I

3  would have done differently.

4    Q.    In terms of the confession -- you mentioned

5  cross-examination as a strategy, but the other major      07:26:06

6  part of this was to offer affirmative testimony from

7  an expert, attacking the credibility of the -- the

8  taped confessions; is that --

9    A.    Right.  Jim Wedick, yes.

10    Q.    Okay.  And who was going to put Jim Wedick on     07:26:19

11  the stand?

12    A.    Oh, who was going to examine him in direct?

13    Q.    Yes.

14    A.    It was -- I think it was probably going to be

15  Johnny.                                                   07:26:30

16    Q.    Uh-huh.

17    A.    Because when we divided up experts, I think I

18  handled the other two.

19    Q.    And so in that sense, you were relying on

20  Johnny to -- to put in this part of the -- your joint     07:26:41

21  defense?

22    A.    Relying on Johnny?  I mean -- well, let me

23  see.  I'm trying to remember.

24    No, I don't think that would have worked.

25  Because if he was going to testify about Hamid           07:26:58

1  confession, I don't think that Johnny's jury could

2  have been in the room, and so I would have had to have

3  done the examination.  If it was -- if he was going to

4  testify jointly, then either one of us could have done

5  it.  So I think I had to do it.                    07:27:17

6      Q.   Well, there were parts of the -- of the case

7  in which both juries were in the room at the same

8  time, right?

9      A.   Yes, but that's when we didn't talk about the

10 confession.                                        07:27:30

11     Q.   And so your recollection is that Wedick would

12 have testified before both juries?

13     A.   He probably would have had to if he was

14 talking about their confessions, yes.

15     Q.   But was it Johnny who prepared his testimony?  07:27:43

16     A.   I don't think there was a preparation of

17 testimony.  I think what happened was, he was required

18 to -- I thought Jim himself gave us a draft of what he

19 was going to -- what was purposed to testify, and then

20 the Court said he couldn't testify.  So nobody         07:28:06

21 actually prepared questions for him.

22     Q.   Who drafted the memorandum in support of the

23 offer of proof?

24     A.   Oh, I don't remember.  I don't remember if it

25 was a group effort between the three of us.  I don't    07:28:22

286

1  think I did it all by myself, and I don't -- I don't

2  think anybody did it all by themselves, so it was

3  either a group effort or one of us wasn't involved.

4      Q.    But to your recollection, Jim Wedick had

5  never testified before as a false confession expert?    07:28:40

6      A.    I believe that's accurate.

7      Q.    And wasn't his testimony excluded because he

8  had no expertise or experience as a false confession

9  expert?

10     A.    No, I don't think that's that reason.  I       07:28:52

11 think the reason that it was excluded is because the

12 judge found that it was going to be a waste of time.

13     Q.    There were -- you are aware that there were

14 other expert witnesses who had been qualified to

15 testify as false confession experts?                     07:29:11

16     A.    Was I aware at the time?

17     Q.    Yes.

18     A.    Sure.

19     Q.    And you -- who made the decision that Jim

20 Wedick would be a better witness to offer than these     07:29:20

21 experts?

22     A.    I think it was a -- it was -- well, no.

23 That's assuming there was a decision made that he

24 would be the best, like we actually made that

25 decision.  I don't think it played out that way.  I      07:29:35

287

1  think he became involved early on in the case, he was

2  somebody who worked for 34 years, he had come out

3  of -- in the FBI, he had come out of that particular

4  office.  We thought he was going to be the best person

5  for it.                                            07:29:52

6     Q.   And -- but his testimony was excluded?

7     A.   Ultimately it was.

8     Q.   So the assessment that he would get to

9  testify proved to be wrong?

10    A.   That -- the assessment that he would get to   07:30:05

11 testify -- I mean, yeah, we couldn't predict that

12 judge's ruling, which I felt was unfair and

13 unreasonable.

14    Q.   You discussed with the government proceedings

15 around CIPA.                                        07:30:30

16    A.   Okay.

17    Q.   Was it -- you -- do you have -- we are

18 looking at EE5?

19         MR. HORGAN:  That's probably in that big one

20 at the very end.                                    07:30:51

21         THE WITNESS:  Yeah, it's here.  I have it.

22         MR. TICE-RASKIN:  Maybe we'll improve things

23 a little.  Why don't we try.

24         THE WITNESS:  It's at the end of this.

25         MR. TICE-RASKIN:  I think a lot of it is just   07:31:04

1  coming right through.

2          THE WITNESS:  Reporter's transcript.

3          MR. RIORDAN:  Yeah.

4          MR. TICE-RASKIN:  Yeah.  So I can -- yeah, I

5  got some copies here I can give you guys, too, if you      07:31:06

6  need them.

7          MR. HORGAN:  Well, we got it.

8          MR. TICE-RASKIN:  EE5.  We are moving on to

9  the January 27th transcript?

10          MR. RIORDAN:  Yeah.                               07:31:19

11  BY MR. RIORDAN:

12      Q.   I believe you testified that the only thing

13  that you waived in regard to CIPA was the right to

14  participate in closed hearings?

15      A.   Based on the stipulation that I was shown and   07:31:44

16  my memory, yes.

17      Q.   Didn't you in fact join with Mr. Griffin in

18  agreeing that you would withdraw any question to which

19  the government objected on CIPA grounds?

20      A.   I do not remember that.                         07:32:09

21      Q.   Okay.  I'm directing your attention to pages,

22  the bottom of the --

23      A.   It's numbered right here, 330.

24      Q.   Yeah.  On page 20.  And Mr. -- well, why

25  don't you read the first paragraph there.                07:32:36

1          MR. TICE-RASKIN:  What page are we on?

2          MR. RIORDAN:  We are on page -- it's number

3    20 at the top of the page.

4          MR. TICE-RASKIN:  Okay.

5          MR. HORGAN:  First full paragraph.          07:32:47

6          MR. RIORDAN:  Yeah, first full paragraph.

7          MR. TICE-RASKIN:  You know, honestly, I think

8    the record reflects what it reflects, and I'm not

9    really sure how this witness's recollection of this

10   transcript is germane.                            07:33:00

11         MR. RIORDAN:  Well, let me --

12         MR. TICE-RASKIN:  Especially since taking one

13   citation without reviewing the entire transcript can

14   mean that something can be totally out of context.

15         MR. RIORDAN:  I note the objection.  Let's go  07:33:15

16   to page 21.

17         THE WITNESS:  Okay.

18   BY MR. TICE-RASKIN:

19      Q.   Why don't you read the first paragraph aloud

20   for the record.  Who was speaking?               07:33:25

21      A.   It's Johnny Griffin speaking.

22      "With reference to questions on

23   cross-examination and that the government believes

24   will elicit a response that involves classified

25   information, the defense will later withdraw the   07:33:37

1  question or reword the question and not seek

2  classified information."

3      Q.   So in -- and you were in a court with that,

4  were you not?

5      A.   Yes.                                        07:33:49

6      Q.   So you agreed that if you asked a question on

7  cross-examination that you thought it was important

8  and the government objected on CIPA grounds, you would

9  withdraw the question or let the Court sustain an

10 objection to it?                                      07:34:05

11     A.   Or reword the question and not seek

12 classified information.

13     Q.   Okay.

14     A.   Yeah.

15     Q.   Do you remember asking a government witness   07:34:10

16 whether anybody from the government had driven up from

17 Rawalpindi to Balakot to look at this supposed camp?

18     A.   I'm sure I asked that question.

19     Q.   And do you recall whether you were permitted

20 to get an answer?                                     07:34:27

21     A.   No.

22     Q.   Do you recall whether the government objected

23 on CIPA grounds and you withdrew the question?

24     A.   No.

25     Q.   That was an important question, right?       07:34:37

291

1      A.    Yes.

2      Q.    If the government -- how far, in your

3   understanding, was Balakot from Rawalpindi?

4      A.    Oh, I don't remember.  I knew then.  I don't

5   remember.                                              07:34:50

6      Q.    It wasn't way -- well, okay.

7      A.    It was just mile -- just miles away.

8      Q.    And was it your understanding at the time

9   that the only thing that would be involved under CIPA

10  is whether the government would make use of classified  07:35:13

11  information?

12     A.    Was that my understanding at the time?

13         MR. TICE-RASKIN:  I'm going to object on

14  ambiguity grounds.  Are you talking about the

15  waiver --                                              07:35:28

16         MR. RIORDAN:  Let -- let me rephrase it.

17         MR. TICE-RASKIN:  -- or just Section 8

18  proceedings or --

19         MR. RIORDAN:  Let me rephrase it.

20  BY MR. RIORDAN:                                        07:35:34

21     Q.    I think in the government you -- with the

22  government you discussed the fact that to your

23  knowledge, there was only a couple of pieces of

24  classified information at issue in this case, right?

25     A.    The -- right.                                 07:35:43

292

1    Q.   And they were the aerial photographs?

2    A.   Right.

3    Q.   And was it your impression that the only

4 issue in the case was whether you would get the

5 foundational information for those photographs, which   07:36:01

6 the government said was classified?

7    A.   Oh, I don't remember that.

8    Q.   Well, was it your opinion that you shouldn't

9 get a -- you needn't get a classification -- a

10 security clearance because the government hadn't told   07:36:19

11 you what evidence they might have that was classified?

12    A.   No.

13    Q.   All right.  I'm going to direct your

14 attention to page 7 of the same transcript, the last

15 paragraph.   07:36:44

16    A.   What was it?  Line what?

17    Q.   The last paragraph --

18    A.   Oh, okay.

19    Q.   -- starting on line 18 and going down to 25.

20    A.   Uh-huh.   07:37:16

21    Q.   And going over to the next page, what did

22 Judge Burrell say about your response?  And now we are

23 looking on lines 5 and 6.

24    A.   You want me to read that?

25    "How many CIPA hearings have we had since I   07:37:44

293

1  find that response incredible."

2      Q.   He's referring to your response being

3  incredible?

4      A.   The one from the page before?

5      Q.   Right.                                    07:37:53

6      A.   Which I don't think was likely true.  I think

7  we may have just said that.

8      Q.   I'm sorry?

9      A.   I'm sorry.  I think that that may have just

10  been a -- I don't think that that was necessarily    07:38:08

11  true, that we had an intention of see -- of getting

12  clearances.

13      Q.   But -- but what about the next part where you

14  say, I don't know why we'd need clearances because the

15  government hasn't told us what they are interested in  07:38:22

16  putting in?

17      A.   To -- wait.  Where do I say that?

18          MR. TICE-RASKIN:  Are we back --

19          THE WITNESS:  Oh, are you on line 14?

20          MR. TICE-RASKIN:  Page 7 --                07:38:30

21          THE WITNESS:  No.

22          MR. TICE-RASKIN:  -- again, lines 18 through

23  25.

24          MR. RIORDAN:  Yes.

25          (Off-the-record discussion.)               07:38:55

294

1          THE WITNESS:  I'm still confused.  Which

2    lines am I reading?

3          MR. RIORDAN:  All right.  Let's look at line

4    21 to 25.

5          THE WITNESS:  Of page 8, right?                07:39:02

6          MR. TICE-RASKIN:  Page 7 --

7          MR. HORGAN:  Page 7.

8          MR. RIORDAN:  Page 7 --

9          THE WITNESS:  Page 7, okay.

10   BY MR. RIORDAN:                                       07:39:09

11       Q.   Was it your opinion at that time that unless

12   the government came to court and told you what they

13   would offer in terms of classified information, there

14   was no need to get a security clearance?

15       A.   No.  I think that I just said this to the    07:39:22

16   Court but that it wasn't necessarily true.

17       Q.   So you were giving the Court a rationale that

18   you didn't actually believe in?

19       A.   I just don't think -- I just -- the reason

20   why I questioned this statement is because it says our  07:39:37

21   intention was that we would probably get clearances.

22   I know that's not true, because we never intended to

23   get clearances.  That's why I questioned the rest of

24   the statements.

25       Q.   And when did you first realize that without a  07:39:52

1  clearance the government could object to your

2  questions and your evidence?

3      A.   I don't know.

4      MR. TICE-RASKIN:  I'm sorry.  Could you read

5  that question back, please.          07:40:04

6      MR. RIORDAN:  All right.  I'll -- let me

7  rephrase it.

8  BY MS. RICE:

9      Q.   When did you first realize that under CIPA

10 the government could object to questions that you   07:40:11

11 asked on cross-examination or evidence that you

12 affirmly offered on the ground that it was classified.

13     A.   I don't know.

14     Q.   Let's just look at page 10, lines 15 to 18.

15 You are speaking at that time, are you not?    07:40:46

16     A.   Okay.  You want me to read it -- or just read

17 it to myself?

18     Q.   You can read it to yourself.

19     A.   Yeah.

20     Q.   So your opinion at that time was that there   07:41:04

21 was no reason to get a security clearance unless the

22 government told you what classified information they

23 might be relying on?

24     A.   Honestly, I said these things.  I have no

25 idea why I said these things.  But if I said them, I   07:41:23

1  said them.  I don't know what I was thinking when I

2  said them.

3      Q.    Let's go over to the next page, page 11,

4  lines 15 to 18.  Who's Ms. Leaver?

5      A.    Leaver, Sharon.  Yes, government counsel,       07:41:46

6  right?

7      Q.    On national security issues?

8      A.    Yes.

9      Q.    Okay.  And how does she respond to your

10 statement that if the government is going to rely on      07:41:56

11 classified information, they should tell us now?

12         MR. TICE-RASKIN:  Okay.  I'm going to object

13 because there's a full context here that this witness

14 is obviously not familiar with.  So if you want to

15 give her the time to read over this so she can           07:42:12

16 understand the context of the question, that's one

17 thing.  And then the other thing is, is -- I -- I

18 failed to see why her present day recollections of

19 what she said back then is at all germane.

20         The record is what the record is.  She made      07:42:28

21 the statements.  At the time, she had a reason to make

22 the statements.  She doesn't recall that exact

23 rationale right now, is what she testified to.  So I'm

24 not really sure that the pertinence of this whole line

25 of inquiry, again.                                       07:42:40

1            MR. RIORDAN:  Well, she -- she has told us

2     something significant beyond the record, which is that

3     she didn't mean the statements that she was making to

4     the Court.

5            THE WITNESS:  Well, this is what --            07:42:50

6            MR. TICE-RASKIN:  That misstates her

7     testimony.

8            THE WITNESS:  Here -- okay.  About this whole

9     thing.  What I'm saying is, I'm looking at that

10    statement about it saying our intention, even in       07:42:59

11    October, was that we would probably get clearances.  I

12    don't -- as I sit here today, I don't remember that we

13    actually ever had an intention of getting clearances.

14    And so because I made the statement, I have no idea

15    what frame of mind I was in at this time and why I     07:43:19

16    said the things that I said on this entire day.  I

17    just don't know.

18    BY MR. RIORDAN:

19       Q.   I think in your examination with the

20    government, they mentioned that expert Benn, who has   07:43:32

21    testified about the photographs --

22       A.   Uh-huh.

23       Q.   -- gave two probablity estimates for the

24    likelihood of there being a camp?

25       A.   Yeah, right.                                  07:43:46

298

1      Q.    One of them was based on the photos alone?

2      A.    Okay.

3      Q.    And the probability estimate went up if Benn

4 factored in Hamid's statements?

5      A.    Right.  The only reason I had a recollection       07:44:02

6 of that is because I think I highlighted it in my

7 closing, but I don't remember what percentage was

8 attributed to what.  I just remember ultimately his --

9 his numbers just didn't seem to be --

10     Q.    Did you file a motion to exclude the              07:44:17

11 testimony about the higher probability?

12           MR. TICE-RASKIN:  Objection --

13           THE WITNESS:  No.

14           MR. TICE-RASKIN:  -- to the extent it assumes

15 that those actual percentage numbers were disclosed as   07:44:30

16 part of the actual expert's summary.  I don't frankly

17 know if that was the case and if this -- if that was

18 even something that Ms. Mojaddidi would have had

19 pretrial.

20           MR. RIORDAN:  But -- okay.  I'm sorry.           07:44:51

21           THE WITNESS:  Yeah.  I was actually going to

22 ask you about what -- if you meant before -- before

23 that.  Like somehow I had that information.  I

24 don't -- I don't -- I didn't when -- when -- when he

25 said it, I didn't object to it when he said it, but I    07:45:06

1  am pretty certain that I did not have that information

2  prior to his testimony, because I remember being

3  surprised by it and happy that he said that so that I

4  could cross-examine him on it.

5  BY MR. RIORDAN:                                    07:45:23

6      Q.   You were happy that he gave a higher

7  percentage?

8      A.   No.  That his numbers just seemed low.  To

9  say that I'm about 50 percent sure, it just didn't

10  seem enough, yeah.                                 07:45:32

11     Q.   But from the defense point of view --

12     A.   Yeah.

13     Q.   -- 50 percent was better than 70 -- 65 or 70

14  percent --

15     A.   Sure.                                      07:45:39

16     Q.   -- right?

17     A.   Sure.

18     Q.   So it would have been better if you had

19  limited it to 50 percent as opposed to 65 to 70,

20  correct?                                           07:45:44

21     A.   Yeah.

22     Q.   Why didn't you object to the second part of

23  the testimony at trial?

24     A.   While he was giving it on direct?

25     Q.   Uh-huh.                                    07:45:59

300

1    A.   I thought I could cross-examine him on it.

2    Q.   You -- to your recollection, you did not know

3  of any ground on which to object to the higher

4  estimate?

5         MR. TICE-RASKIN:  I'm going to object to the      07:46:12

6  extent it misstates her -- her testimony just given,

7  which is that she thought that she could effectively

8  cross-examine the witness in connection with that

9  point.

10        MR. RIORDAN:  Well, I -- I understand that.      07:46:21

11 I'm -- I'm asking whether --

12 BY MR. RIORDAN:

13   Q.   Well, did you know of an objection that you

14 decided to forego because you'd rather deal with it

15 just with cross-examination?                            07:46:34

16   A.   I don't know.  I probably did not at the

17 time -- didn't think of an objection because I thought

18 I could cross-examine him on it.

19   Q.   Now, the -- you mentioned that in addition to

20 cross-examination, your principal weapon to counter     07:46:54

21 the whole Balakot theory was the testimony of -- I

22 believe it was James Lazor, maybe -- Mr. Lazor?

23   A.   Yes.  It was Lazor and maybe some cross of

24 Hassan Abbas.

25   Q.   And Lazor was not someone who you had           07:47:09

301

1   discovered through investigation; someone who had read

2   about the case got in touch with you and mentioned

3   him?

4       A.   Right.

5       Q.   And it was -- was it during trial when you        07:47:19

6   first were told that Lazor was in Pakistan?

7       A.   It was during -- no, I don't remember when

8   that was.

9       Q.   But he was already there when you were

10  sending him the coordinates?                             07:47:38

11      A.   Yes.

12      Q.   Okay.  And isn't it true that the first

13  contact with him was, if not during trial, sometime

14  early in 2006?

15      A.   That's -- that's likely true, and I want to     07:47:51

16  clarify.  The attorney friend who contacted me didn't

17  call me to say, I have this friend.  He called me to

18  talk about the case and offered assistance, and then I

19  think I had maybe mentioned that I was looking -- I

20  don't know.  Somehow it was -- he didn't call me just   07:48:14

21  for that purpose.  It came up during the conversation

22  that he had a friend there in Pakistan, and that's

23  when I asked what he was doing there and I just

24  explored that possibility.

25      Q.   But you had not done investigation of the       07:48:30

302

1  camp in Pakistan at any time in 2005, had you?

2      A.    Investigation?

3      Q.    Of the camp issue.

4      A.    It depends on what you mean by

5  investigation.  I mean, I did do a lot of reading and        07:48:47

6  research.  That's when I talked -- called someone at

7  the embassy.  I did look into it, but beyond that, no.

8      Q.    Well, you eventually concluded that it would

9  be a good idea to send Lazor to the camp?

10     A.    Yes.                                               07:49:05

11     Q.    And so as far as you were concerned, that was

12 an important investigative task that had to be pursued

13 in Hamid's defense?

14     A.    Yes.  But we didn't -- I didn't -- I didn't

15 have the location and the coordinates in early -- in      07:49:19

16 the early part of the case.  That came late.

17     Q.    You were aware that this was a camp -- that

18 the government had settled on a Balakot theory?

19     A.    No, not necessarily.  I don't think so.

20     Q.    When did you first become aware of that?        07:49:36

21     A.    I think that as soon as I got an idea of

22 where they were looking at, I immediately tried to

23 figure out where it was and how I was going to be able

24 to counter that.

25     Q.    And would you have -- there was a central --    07:49:52

1  the government raised a central problem to Lazor's

2  testimony at cross-examination, did they not?

3      A.   I don't remember what it was, but.

4      Q.   Hadn't he gone -- wasn't there an earthquake

5  in Balakot?                                          07:50:21

6      A.   Yes.

7      Q.   Do you recall when that was?

8      A.   I don't remember now, but I think it was

9  closer to the time that -- of trial.

10     Q.   And after that, the entire area of Balakot   07:50:30

11 was virtually destroyed, was it not?

12     A.   I don't recall that -- no, I don't think the

13 entire area was destroyed, and I don't recall that as

14 being a central focus of the government's.

15     Q.   Weren't there thousands of people killed in  07:50:51

16 that earthquake?

17     A.   Yes.

18     Q.   Weren't relief agencies coming in from around

19 the world?

20     A.   To my knowledge, yes.                        07:50:59

21     Q.   So the problem with Lazor going to the camp

22 at that -- to the area at that point is that even if

23 there had been a camp, it would have been destroyed by

24 the earthquake, right?

25     A.   I don't think that was the counter, and I    07:51:10

1  believe that there were structures still there.

2      Q.    But in retrospect, wouldn't it have been

3  better -- well, let me ask you this:  Shouldn't you

4  have sent an investigator to Pakistan to look at the

5  Balakot area as soon as you could have?          07:51:25

6      A.    I'm pretty certain that the earthquake

7  happened before I knew the coordinates and the

8  location, and you can't -- I couldn't have just sent

9  somebody to the entire Balakot to go look wherever.

10     Q.    Well, didn't your research reveal that there    07:51:48

11  had been a training camp in Manresa [sic] and Balakot

12  to train militants to fight in Kashmir?

13     A.    Yes.

14     Q.    And you were aware of that fact soon after

15  the case began, right?                           07:52:01

16     A.    But not -- right.  But not during the time

17  period that they alleged.  I knew that there were

18  camps but not during 2003 and 2005.

19     Q.    And therefore if you had sent an

20  investigator, you would have been able to confirm in    07:52:17

21  your view that the camp no longer functioned?

22     A.    And that's what I did when I found out where

23  it was.

24     Q.    Okay.

25          MR. RIORDAN:  Can I have minute.          07:52:32

1        THE VIDEOGRAPHER:  Okay.  The time is 7:52,

2  and we are off record.

3        (Short break was taken.)

4        THE VIDEOGRAPHER:  Okay.  The time is 7:59,

5  and we are back on record.                    07:59:42

6                    FURTHER EXAMINATION

7  BY MR. TICE-RASKIN:

8     Q.   All right.  Ms. Mojaddidi, just a couple of

9  quick questions.  You still feeling okay and ready to

10 proceed?                                       07:59:50

11    A.   I'm fine.  Thank you.

12    Q.   Okay.  I'm still unclear and wanted to ask

13 you if you have any recollection today as to why

14 you -- whether you considered filing a severance

15 motion first at any point in time?             08:00:06

16    A.   I don't remember.

17    Q.   You don't remember whether you considered

18 it.  And do you remember any of your thought processes

19 to visibility or nonvisibility of seeking severance?

20    A.   No, I don't.                           08:00:31

21    Q.   During the course of the pretrial

22 preparations leading all the way up to the trial, did

23 you ever feel like it would have been in your interest

24 to take a separate strategic path and to change your

25 decision to move to -- for trial as rapidly as  08:00:58

306

1  possible and to advance "failure of the government to

2  prove its case beyond a reasonable doubt type"

3  defense?

4      A.   No.

5          MR. TICE-RASKIN:  All right.  I don't have      08:01:13

6  any further questions, then.

7          MR. RIORDAN:  I have one final question.

8                  FURTHER EXAMINATION

9  BY MR. RIORDAN:

10     Q.   The strategic decisions that you made --      08:01:20

11 well, scratch that.

12     Your client, in your firm belief from 2005 to

13 today, is innocent of these charges against him; is

14 that right?

15     A.   Yes.                                          08:01:35

16     Q.   The strategic decisions you made at trial

17 were wrong; isn't that true?

18     A.   No.

19         MR. RIORDAN:  I have nothing further.

20         MR. TICE-RASKIN:  Okay.  We can go off the     08:01:47

21 record, then.

22         THE VIDEOGRAPHER:  This concludes Volume 1 in

23 the deposition of Wazhma Mojaddidi.  The timing the --

24 the time is 8:01, and we are off record.

25         (Deposition concluded at 8:01 p.m.)

1                CERTIFICATION OF DEPOSITION OFFICER

2

3           I, JESSICA SOTELO, CSR, duly authorized to

4    administer oaths pursuant to Section 2093(b) of the

5    California Code of Civil Procedure, hereby certify

6    that the witness in the foregoing deposition was by me

7    sworn to testify to the truth, the whole truth, and

8    nothing but the truth in the within-entitled cause;

9    that said deposition was taken at the time and place

10   therein stated; that the testimony of the said witness

11   was thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete,

13   and true record of said testimony; and that the

14   witness was given an opportunity to read and correct

15   said deposition and to subscribe the same.

16           I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21

22

23           _____
             Jessica Sotelo
24           CSR No. 13679

25

```
 1                              August 25, 2014

 2

 3  Wazhma Mojaddidi
    3400 Cottage Way
 4  Suite E
    Sacramento, California 95825

 5

 6  IN RE:  USA v. Hayat

 7  Dear Ms. Wazhma Mojaddidi:

 8      Please be advised that, pursuant to California
    Code of Civil Procedure Section 2025.520 or Federal
 9  Rule of Civil Procedure 30, the original transcript of
    your deposition, taken August 11, 2014, in the
10  above-referenced matter, has been completed and is now
    ready for your reading, correcting, and signing, by
11  appointment at our office, Capital Reporting Company,
    155 Montgomery Street, Suite 815, San Francisco,
12  California 94104.

13      Pursuant to the applicable rules, the transcript
    will be available for 30 days.  Any errata changes
14  must be signed by the deponent within the 30-day time
    period.
15
        The official transcript for the noticing counsel,
16  with exhibits, will be mailed in accordance with said
    rules, depending on the action of the deponent.
17
        Please do not hesitate to contact us if you have
18  any questions.

19

20                              Best Regards,

21

22                              Jessica Sotelo
                                CSR No. 13679
23

24  cc: Original Transcript
        All Counsel
25
```

1   A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3   I, WAZHMA MOJADDIDI, do hereby acknowledge I have read

4   and examined the foregoing pages of testimony, and the

5   same is a true, correct, and complete transcription of

6   the testimony given by me, and any changes or

7   corrections, if any, appear in the attached errata

8   sheet signed by me.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  _____          _____
    Date                      WAZHMA MOJADDIDI

310

1   Capital Reporting Company
    155 Montgomery Street, Suite 815
2   San Francisco, California 94104
    (415) 499-DEPO (3376)
3
                E R R A T A   S H E E T
4
    Case Name:  USA v. Hayat
5
    Witness Name:  Wazhma Mojaddidi
6
    Deposition Date:  August 11, 2014
7
    Page No.  Line No.        Change/Reason for Change
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   _____        _____
25   Signature                       Date

### $

**$10,000** 80:5 81:11 85:4 87:2,5 88:4 99:12 144:1

**$135,000** 82:12 139:7

**$15,000** 143:21

**$20,000** 79:24 80:13 86:18

**$200,000** 138:24

**$31,000** 144:5

**$5,000** 87:24

**$6,000** 28:18 80:9 81:8 143:16

**$65,000** 84:15 139:2

### 0

**03** 148:4

**05** 105:2 148:4 214:20

**05-cr-240-GEB** 1:6 4:9

**06** 214:20

### 1

**1** 4:4 90:3 306:22

**1:39** 90:2

**10** 28:24 38:2 80:6 81:8 295:14

**10-100** 1:20 2:5 4:11

**10th** 20:22 21:5 30:24

**11** 1:15 4:13 278:8,12 296:3 308:9 310:6

**11:44** 1:17 4:14

**115** 3:4

**11-month** 38:3

**12** 121:19 278:8,12

**13** 236:11 281:21

**135** 82:9,17,20,25 83:5,6

**13679** 1:23 307:23 308:22

**13th** 88:4

**14** 251:17 293:19

**14th** 212:14

**15** 39:6,9,13 78:6 87:11 90:1 275:9 277:7 295:14 296:4

**150** 81:25

**155** 4:18 308:11 310:1

**15th** 47:22

**16** 86:10 213:6

**16th** 31:2 33:8,21 34:6 35:4 44:3 86:24

**179** 216:1 221:8

**18** 137:5 139:17 272:18 292:19 293:22 295:14 296:4

**18th** 80:8

**19** 260:21

**1993** 120:23

**1997** 115:18

**1998** 7:24 120:21,24,25

**19th** 35:5

### 2

**2** 90:7 179:14

**2:03** 90:6

**2:35** 113:10

**2:39** 113:13

**2:41** 115:4

**2:43** 115:7

**20** 288:24 289:3

**200** 81:25 82:10,11

**200,000** 81:20,21

**2000** 7:22 115:20 121:18 147:11,15,17 260:23

**2002** 10:18,20

**2003** 11:1,2,4,10,24 118:15,16 147:23 148:15,21 150:5 152:10 304:18

**2004** 11:21,25 12:2,10,12,20 13:3,5,8 121:18,19 147:23 148:16,21 150:5 152:11 234:11

**2005** 13:14,15,16 14:1,4 15:3 28:3 64:4 65:1 73:3,13 105:7 143:17 193:9 200:19 213:6 302:1 304:18 306:12

**2006** 73:13 77:19 86:10 101:21 105:8 114:16 137:5 139:17 143:21 144:1 236:21 281:21 301:14

**2007** 101:10 265:24 266:10

**2013** 101:11 118:13 251:17

**254:10** 256:13

**2014** 1:15 4:13 102:14 254:12 308:1,9 310:6

**202.514.0127** 2:10

**2025.520** 308:8

**20530** 2:9

**2093(b** 307:4

**21** 289:16 294:4

**22** 64:25

**2255** 7:12 185:14 254:4 255:3 271:13

**22nd** 64:4 65:4 72:1,2

**23** 257:7

**235** 2:16

**24th** 87:14

**25** 193:9 292:19 293:23 294:4 308:1

**25th** 101:22 102:12

**261** 3:7

**27** 236:21

**27th** 288:9

**28** 159:12 254:4 255:3

### 3

**3** 143:12 179:17 221:17 251:17 257:18

**30** 308:9,13

**302** 165:23,24 166:15 167:3,7 168:14 185:8 186:5,8,11,23 187:16 188:12,16

189:12,14

**302s** 168:6,8,10,19
169:6 186:14,15
190:2

**305** 3:8

**306** 3:9

**30-day** 308:14

**330** 288:23

**3376** 310:2

**34** 287:2

**3400** 308:3

---

### 4

**4** 257:21 278:7,12

**4/12/06** 86:15

**4:06** 179:13

**4:35** 179:16

**4:55** 193:2

**4:57** 193:5

**40** 121:15

**415** 310:2

**415.431.3472** 2:14

**415.500.6640** 2:18

**45** 91:22

**499-DEPO** 310:2

**4th** 273:17

---

### 5

**5** 3:3 80:4 193:17
251:18 292:23

**5:00** 89:7

**50** 65:1 121:15
299:9,13,19

**501** 1:19 2:5 4:11

**50-percent** 235:10

**523** 2:13

**532.6** 101:8

---

**5th** 15:1 19:16
21:5 123:21

---

### 6

**6** 28:24 80:6
81:8,11 292:23

**6,000** 28:23 99:12

**6:35** 257:17

**6:51** 257:20

**6:56** 261:17

**6:58** 261:20

**60** 39:17 235:15

**60-day** 35:4 49:10

**65** 81:23 82:12,15
299:13,19

---

### 7

**7** 257:10 292:14
293:20
294:6,7,8,9

**7:00** 258:3

**7:52** 305:1

**7:59** 305:4

**70** 299:13,19

**70-percent** 235:15

**717** 124:19

**7th** 20:3 249:23
250:3

---

### 8

**8** 221:10 291:17
294:5

**8:01** 306:24,25

**815** 308:11 310:1

**835** 2:17

**8th** 87:22

---

### 9

**916.554.2738** 2:6

---

**94102** 2:14

**94104** 2:17 4:20
308:12 310:2

**950** 2:9

**95814** 1:20 2:6
4:12

**95825** 308:4

---

### A

**a.m** 1:17 4:14

**AAA** 277:22,23,25
278:1,2

**abandon** 44:25

**abandoned** 45:3
168:15
211:18,21 276:2

**Abbas** 194:8 196:8
197:20 198:4,18
202:12,17
203:1,9 205:9,13
235:6 239:21
240:7,9 300:24

**abbreviated**
158:15

**Abdur** 160:2

**ability** 42:25 56:19
76:18 184:17
204:25 216:24
217:7,12 243:24
252:9 258:7
261:4,6

**able** 60:21 136:10
140:11 184:5
197:1 302:23
304:20

**above-referenced**
308:10

**absolutely** 27:20
98:14 120:6
128:11 130:16
131:6,25 133:6
135:9 149:14

---

232:5 261:16
273:3 274:5

**abstain** 176:6

**academician** 203:6

**accept** 64:6,8
247:7,13,16
248:8,17 249:11

**accepted** 30:9

**access** 140:2,5

**accord** 244:24

**accordance** 308:16

**account** 111:6

**accurate** 116:9
118:14 130:20
131:5,12 132:4
133:15,25
134:8,13,24
135:12,16,24
139:14,24 144:4
179:22 181:15
187:12 191:22
194:22,23
195:23 196:4
209:20
210:14,15
216:11 220:24
231:23,24 232:4
233:15
243:10,15,23
248:17
252:1,10,25
276:14 286:6

**accused** 43:17,21
261:5 273:16

**Achilles** 162:14

**acknowledge**
309:3

**across** 164:20,24
165:11 199:16

**act** 34:20 54:6
58:19 59:19
60:13 63:9,14

67:8 174:10,19 175:13 195:23

**action** 5:20 7:12 63:18 308:16

**actions** 269:2

**activities** 144:15 269:18

**acts** 263:5

**actual** 52:20 138:8 162:9 254:16 258:12 298:15,16

**actually** 9:21 10:23 11:14 17:2 32:11 37:4 63:13 71:8 96:2,6,20 98:10 116:23 123:20,23 124:24 126:14 129:17 135:7 136:11 165:15 166:14 168:18,19 176:21 178:6 186:7 193:15 194:10 195:21 197:1 200:23 215:21 217:17 222:7 241:6 250:22 255:2 270:15 271:11 275:12 281:14 285:21 286:24 294:18 297:13 298:21

**add** 81:25 85:6

**added** 64:16,17,20

**addition** 12:5 199:14 272:8 300:19

**additional** 32:12 42:14 61:21 80:9 82:10 161:6 176:19 181:11

205:12 223:15

**address** 198:12 209:8 234:23 254:20

**adequately** 243:24

**adivce** 176:12

**adjunct** 116:7,13 117:21

**administer** 307:4

**admissibility** 39:23 75:19 215:8 226:24

**admission** 11:4 112:21,22 219:23

**admissions** 207:13,14

**admit** 252:13 253:8

**admitted** 11:2,9 52:1 110:20 215:10 217:5,9 258:14 263:1,4

**adolescence** 123:3

**adult** 120:3 190:24

**advance** 77:8,23 199:9 230:4 306:1

**adversely** 232:3

**advice** 73:8 173:1,5,11,15 176:11,15 181:24 216:13 220:3,6,8,11 224:5,11,14,16 230:21,24 231:10,21 243:21 245:5 249:6,12,13

**advisable** 222:19

**advise**

229:16,19,20 247:17

**advised** 230:6 243:12 308:8

**advisibility** 231:3

**advocacy** 116:3,8,17,22

**advocate** 68:20 69:2

**aerial** 73:23 110:8 203:20 234:7 279:18 292:1

**aerials** 110:14 162:25

**affect** 65:6 67:6

**affected** 58:5 60:5 61:4 252:14 253:9,15,18,21

**affidavit** 278:18 279:8

**affidavits** 40:23

**affirmative** 164:1 196:12 209:16 223:6 228:18 265:17,21 266:6 284:6

**affirmly** 295:12

**afford** 183:4,10

**Afghani** 120:5

**Afghanistan** 8:16,17 9:1 118:25 119:4,7,8,16 120:14 121:22

**afternoon** 14:25 115:11,12

**afterwards** 136:23

**against** 49:7,13 51:7,9,20 52:1 171:14 192:14 200:21 225:11

231:13,17 263:6 265:12 306:13

**age** 8:23,24

**agencies** 55:7,9,15 303:18

**agent** 17:22 18:18 74:13 126:17 207:25

**agents** 18:2 126:15 194:7

**ago** 68:11 96:13 116:20 128:23 141:25 246:8 272:4,5,6

**agreeable** 29:12

**agreed** 57:15 130:15 199:8 220:22 246:2 290:6

**agreeing** 288:18

**agreement** 25:21 74:24 77:21,25 78:24 79:13,17,18 80:1 81:18 98:22 99:3,6,18,21 127:15,19 129:13 130:1,4,5 131:3 132:10 137:3,4,5,7,24 138:22 139:16 205:5 249:3

**Aguilar** 17:23 112:15

**Ah** 143:23

**ahead** 62:14 123:8 144:9 188:4 212:25 237:3 258:8 260:15

**Ahmad** 159:15,19

**A-H-M-A-D** 159:15,19

**ahold** 15:13

**alibi** 34:25 36:7
37:7 38:8,16
40:4 151:4 152:2
153:4,20 154:10
155:3
156:12,15,20
157:4,8,16,19,23
158:1,11,18,25
159:3,8,16,20,23
160:5,9,13,16,21
,24 161:2,18
164:1,11 168:4
172:9,13
176:20,21 177:6
183:14,15,19
184:21 188:3
189:3,25 190:4
223:6,9,25
265:17,21 266:6
267:5 269:12,15
270:11,21,24
273:14,22

**alienate** 231:22

**alledged** 194:20

**allegation** 191:22
195:24 196:5
211:20

**allegations**
130:19,20,24
164:16 255:7,11
271:1

**alleged** 33:23 36:2
38:3 131:2,10,22
132:1 133:12,21
134:5,10,21
135:10,14,21
139:21
173:10,13
181:12 191:18
194:11 195:20
196:2 210:13
211:18 220:9,21
222:21 225:16
231:16,20,25

232:20,22
233:2,4 237:6
240:19,21
243:8,12
244:2,10 248:16
304:17

**alleges** 147:24

**alleging** 175:13
254:4

**alleviate** 243:3

**alleviated** 242:23

**alluded** 222:9

**alone** 52:12 104:14
125:8 235:9
298:1

**aloud** 281:23
289:19

**Al-Qaeda** 21:19

**already** 10:25 18:7
66:13,14 79:23
124:11 155:21
185:1 195:11
230:11 301:9

**alternative** 223:16

**am** 4:16 77:11
79:12 97:23
254:18 294:2
299:1 307:16

**ambiguity** 48:19
291:14

**ambiguous** 59:7

**Ameer** 158:8,9

**A-M-E-E-R** 158:9

**Amendment**
166:25 167:6
187:3 191:21
192:14 274:13
275:12,17,20,23
276:11

**America** 1:4 4:6

**American** 119:14

**American-Islamic**
15:8

**among** 68:16
240:22

**amount** 28:4,5
29:8 30:2
53:19,21 82:1
84:12 85:15,20
140:23 170:24
205:3 259:16

**analysis** 184:6
264:17

**analyze** 252:9

**Anas** 156:4

**A-N-A-S** 155:25

**Angeles** 194:14

**Anita** 83:21 199:4
203:16
204:1,6,20 205:1
206:2,5,14
283:2,7

**announced** 47:22

**annoying** 191:23

**Ansari**
142:2,3,6,7,9,16

**answer** 30:15
52:23 54:19
69:10 90:9
197:14 217:4
227:8 228:17,18
244:18 258:7
290:20

**answered** 92:22
147:19 233:13
239:2 280:18

**answering** 261:12

**answers** 96:10,15

**anybody** 15:13
37:6 92:3,16
151:23
158:16,20
160:1,4,11,15,19

168:14 170:1
188:3 203:6
273:23 275:6
286:2 290:16

**anymore** 219:3

**anyone** 6:7,13
92:13,15,23
126:2 158:19,24
159:2,14,18,22
160:7 162:4
265:19 281:2
282:13

**anything** 21:4
51:14 56:16
84:15 99:11
109:5 114:18
144:17 181:18
203:6 205:18,19
245:17 246:4
261:9

**anyway** 73:9
177:11 178:23

**anywhere** 11:5
45:13 146:17

**apart** 175:2 186:8
247:15

**apparently** 84:23
209:19 252:17

**appeal**
62:9,11,17,24
256:23

**appear** 13:7 20:24
309:7

**appearance**
12:21,24 13:2,11
20:8 21:6

**appearances** 12:10
13:18 27:16

**appeared** 12:6
20:11,14,16
21:2,11
245:22,23

**appears** 80:3

103:6

**appellate** 10:9
62:21 63:5
116:8,17,22
117:1 253:16
264:9

**applicable** 226:5
308:13

**applied** 76:17

**appointed** 144:20

**appointment**
308:11

**approach** 182:7

**approaches**
205:23,25

**approaching**
88:21

**appropriate** 189:3
225:10 232:24

**approval** 42:3

**approve** 42:22

**approved** 144:20

**approximately**
4:14 139:2
143:21

**april** 101:20,22
102:12

**Arabic** 106:21
107:9,16 123:7
162:10
199:14,22
201:24 206:7
278:22

**area** 45:24 92:1
110:9,15 113:16
303:10,13,22
304:5

**areas** 10:7 90:14

**argue** 75:24
217:3,8

**argued** 163:6

**arguing** 75:19

**argument** 48:1
77:1
111:16,24,25
112:3,7 236:7
239:20,24 241:8
270:6

**arguments** 112:22

**arose** 249:7

**arraigned**
19:22,24 20:3

**arraignment**
13:7,13 14:13
19:21
20:7,11,13,18
34:14

**arrange** 43:3

**arranged** 16:8

**arrangement** 43:8

**arrest** 21:16

**Arslan** 148:24
149:4 150:5
153:6 161:17
168:3,13,25
169:5,6
188:13,19,23
189:2,7

**A-R-S-L-A-N**
149:4

**article** 32:19,23
33:2 44:4,10
109:19,23
193:10,14,15,18,
21 194:9
251:16,18
254:10 256:17
257:2

**aside** 69:22 74:2
121:5 163:14
176:17 188:7
209:6

**Asma** 160:20

**A-S-M-A** 160:20

**aspect** 46:23 200:3

**aspects** 120:11
121:10 162:13
199:3 204:8
272:9

**assertion** 193:24

**assess** 35:10 153:3
168:23 175:15
191:4

**assessed** 162:12

**assessing** 153:19
168:19

**assessment** 40:9
53:20 95:12
263:8,13
271:21,22 272:3
287:8,10

**assist** 93:10 94:19
114:9 117:19
222:11 261:6
267:12 280:10

**assistance** 95:21
96:5 141:18
178:10 194:18
246:10,24 254:5
264:17 301:18

**assistant** 127:2

**assisted** 95:14
100:18 109:4
141:15 199:12
201:6,13

**assisting** 11:7 97:3
141:9 159:7

**associate** 31:23
33:11 135:22

**associated** 139:22
143:13 183:21
185:2 258:13

**associates** 143:3

**association** 4:17
36:4 119:15

**assume** 8:23
20:1,21 23:13
31:2 136:20

**assumes** 25:16
52:19 298:14

**assuming** 240:9
286:23

**assumption**
240:11

**Atiq** 37:18

**A-T-I-Q** 37:19

**Atlantic** 109:20

**attached** 309:7

**attacking** 284:7

**attempt** 44:15
57:14 196:2
198:16 209:11
219:11 239:13
270:15

**attempting** 96:15

**attempts** 26:19
76:17

**attend** 20:6 32:1
33:22 150:21
248:24

**attended** 33:14,23
34:10 110:16
123:2 147:7,11
150:20 178:1
248:21 249:5
270:8 271:1

**attending** 43:17,22

**attention** 21:23
22:2 27:2 86:5
98:4 188:11
236:22 251:17
278:7 288:21
292:14

**Attique** 149:20

150:6 151:19 153:10 155:20,21 169:12 176:18 260:16

**A-T-T-I-Q-U-E** 260:17

**attitude** 265:15

**Attock** 159:11

**attorney** 2:7 11:7 16:6,24 17:25 18:1,17 21:14 26:22 28:13 37:12 53:8 105:5 117:16,17,18 119:18 126:14,17 127:2 167:10 170:11 178:7 186:20 191:4,24 244:20 274:21 279:24 301:16 307:17

**attorneys** 98:7 117:13 141:6,8 166:20 167:20

**attorney's** 1:19 2:4 4:10 6:17 83:13 139:2,11 183:5

**attributed** 33:3 193:11 251:20 298:8

**audibly** 6:2

**August** 1:15 4:13 35:5 61:16,19 67:17 308:1,9 310:6

**AUSA** 2:4

**authority** 41:15 42:18 131:8,18 132:15,18,23 133:13,22 134:1,3,6,11,15, 18,22 135:2,7

182:19 233:23 264:18

**authorized** 307:3

**available** 71:10 84:12 97:7 100:7,11 175:24 246:3 308:13

**Avenue** 2:9

**avoid** 225:8 232:2

**aware** 6:1 21:14,18 22:8 26:7,8,12,17 27:14 29:8 39:18,21,22 43:7 45:17 46:3 47:12 49:15 50:4,9,22,25 51:24 55:25 60:12 62:23 63:1 69:23,24 70:17,18 106:11 108:11 111:10 192:11,17 206:9,22 210:22 211:7 214:20 218:8 225:3 233:23 260:1 266:22 275:9 277:7,9 286:13,16 302:17,20 304:14

**awareness** 49:11

**away** 17:13 144:10 195:18 213:1 273:18 291:7

---

### B

**baby** 8:3

**background** 7:19 252:8

**Backing** 93:5

**bad** 68:20 190:10

**bail** 183:6

**Balakot** 74:16 110:9,16 177:25 196:4 290:17 291:3 300:21 302:18 303:5,10 304:5,9,11

**balance** 83:13 139:10

**bar** 10:21 119:14 244:2

**Bariza** 237:9,24 238:7

**barristers** 115:22 116:1

**based** 65:16 88:15 111:2 116:6 126:18 150:18 169:6 173:18,23 179:24 181:5 186:10 195:23 208:22 215:22 220:14 222:22 224:1 225:17 226:6,13 234:16 250:24 271:24 272:1 288:15 298:1

**bases** 200:6

**basically** 7:25 180:15

**Basim** 15:5

**B-A-S-I-M** 15:6

**basing** 139:13

**Basir** 141:21,23 142:9

**basis** 21:8 52:2 119:3 176:25 250:16 282:8

**BBB** 278:5

**bear** 103:5

**beards** 36:5

**became** 8:13 121:3 287:1

**become** 106:11 121:9 171:22 206:22 302:20

**becoming** 97:14,16 115:14 120:19 121:5

**bedrock** 51:7

**Bee** 193:10 251:16

**beforehand** 105:15

**begin** 5:11 6:6 7:23 93:7

**begining** 171:20 245:22 266:5

**beginning** 8:19 13:15 30:11 53:12 72:3 77:16 90:16 93:5,6 106:7 143:24 170:22 208:4 231:8 265:14,20

**begins** 4:4

**begun** 120:24

**behalf** 5:1,5,8 25:18 48:20,21,22 132:15,19 133:14,18 135:8 140:22 160:13,17,21 161:3 208:18 211:19,22 222:3 229:9,11,17

**Behboodi** 36:18 91:21 159:10 268:15,16

**belief** 24:4,20 33:21 49:11 54:14 55:12

60:17 73:21 74:2,5 162:3 173:24 176:25 182:18 183:21 203:7 207:12 215:11 268:1,4 306:12

**beliefs** 33:17

**believe** 9:6 25:13 26:1,17 27:10 33:7,10,11,14 34:3,9 41:8 46:23 49:21 51:18 53:11 56:12 58:19 59:25 62:18 64:22 68:1,2 75:18 79:23 93:8 100:17,21 104:5 113:25 118:6,12 123:21 126:16 127:3 128:16 130:11 140:5 143:1 144:5 150:20 155:21 165:6 171:4 176:1 179:19 180:3 181:16,20 182:14 198:11 218:8,13 225:10,18 226:15,23,25 234:24 235:2,7 245:7 247:25 248:20 252:20 253:10 262:6 268:18,25 277:24 286:6 288:12 294:18 300:22 304:1

**believed** 25:5 41:5 45:23 59:14,21 189:2 220:14,15 248:2 268:25 269:4,6

**believes** 289:23

**believing** 139:14 174:18

**bell** 21:20 45:15 110:5,6 126:24,25 141:12 149:11,13 152:5 167:13,14 190:15 222:12 234:12

**Benn** 110:5,10 234:9,24 297:20 298:3

**Bennn** 234:5

**Benn's** 234:15 235:8

**Bernard** 109:7,9 206:9,23 266:18

**besides** 126:3 141:2 142:14 162:24 163:17 182:23 205:15,16 214:22

**best** 14:22 39:8,12 54:24 58:8 111:22 124:8 128:6 137:23 142:22 143:3 171:5 173:24 175:25 176:4 198:21 216:14 220:15,16 230:7 243:2 244:12 248:15 249:14 252:19 253:10,20 259:4 275:22 286:24 287:4 308:20

**better** 37:21 95:2 96:12 98:7 100:2 162:4 218:2 266:10 286:20 299:13,18 304:3

**beyond** 13:12 106:12,25 107:5,8 183:22 236:1 264:23 265:2 273:9 297:2 302:7 306:2

**Bibi** 160:20

**B-I-B-I** 160:20

**bilingual** 8:18

**bill** 233:3,7,10,15

**binder** 155:10 210:18

**bit** 10:25 120:9,24 121:12 123:17 144:12 167:25 172:8 177:18 227:19 234:20 247:1,20 253:4 258:2

**blankets** 178:21

**blindly** 24:17 132:2 220:8 224:16 245:4 249:11

**block** 74:6,9 76:19

**blocks** 17:12

**blunt** 234:23 235:3

**board** 241:20 242:6,15,19 243:18 245:1

**Bob** 126:24

**Boersch** 2:15,16 5:2,3 89:20 102:12

**B-O-E-R-S-C-H** 5:2

**books** 163:1

**boosted** 100:8

**born** 8:15 11:16 123:1

**bottom** 288:22

**bout** 46:4

**boxes** 128:24 129:2,4

**Brady** 56:6

**break** 88:23 89:13,15 90:5 179:7,15 199:23 257:5,19 258:9 305:3

**breaks** 89:10

**brief** 7:6 179:6 254:12,15

**briefly** 119:3 153:16 164:2

**bring** 27:2 37:9 51:3 93:14 94:14 99:8 176:2 242:14,18 244:23,25

**bringing** 95:19 175:17 243:6

**Broadway** 273:17

**brother** 84:22 92:18 124:25 141:19 142:18 148:24 149:4 152:6,20 170:5

**brought** 38:16 117:18 207:23

**Bruton** 51:14 224:22 225:4,8,12

**building** 66:17

**buildup** 65:12

**built** 171:10 250:21

**burden** 163:22

**Burrell** 73:16 222:9 292:22

**buy** 219:11,14

---

### C

**CA** 2:6,14,17

**CAIR** 15:8,9,14,16,20 17:11 124:17,19

**calculus** 50:13 209:3 239:1

**calendar** 12:1

**California** 1:2,20 4:8,11,12,15,19 22:1 117:12 200:15 307:5 308:4,8,12 310:2

**camera** 217:12

**camp** 32:1 33:15,22,23 34:11 38:4 43:16,22 74:16 101:6 110:15,16 111:2 112:19 147:7,11,15,16,19,25 150:20 178:1,3 181:2 196:4,10 202:9 213:24 214:1 232:22 233:4 234:12,18 235:11 250:8 251:2,3 258:13 263:1 270:8 271:8 290:17 297:24 302:1,3,9,17 303:21,23 304:11,21

**camps** 43:20 44:5,11 46:1 193:13,20,24 194:19 198:5 199:1 202:21,22 203:13 211:16 212:22 215:16

304:18

**capable** 66:19

**capably** 123:10

**Capital** 4:18 308:11 310:1

**caption** 307:18,20

**care** 267:12

**career** 119:18

**carefully** 216:2

**carried** 107:18 108:2 240:24 280:16 281:2,15

**carry** 107:14 204:16

**case** 1:6 4:8 7:1,3,5,14 9:22 11:18,19 12:22,25 16:24 18:17 19:7,13 21:16,23 22:5,12,21 23:14,18 24:5,21,22,23 25:4,8 29:19,20,24 30:11,18 37:7 40:24 41:10 47:12,17 50:23 51:7,9,13,16 52:13 53:12,19 54:6,10,12 55:24 56:25 57:23 58:19 59:6,14 60:12 61:22 63:24 66:15 67:7 68:5 71:4 72:2,5,12 73:12 78:22 83:8 84:24 85:16,22 90:17 91:17,24 92:2,14 93:3,10,11,14 98:6 100:12 104:14,23 105:3,4,14

106:4,8,16 109:20 111:16 114:3,15 123:17 128:24 129:3,5 130:8,13,23 131:12 142:23 144:14,15 159:6 161:24 162:3,12,13,15,19 164:20 170:12 171:10,12,14,16 178:8 185:1 197:8 200:18 204:12 207:24 209:16 217:18 230:10 231:7 232:3,19 243:5 244:21 252:7,14 253:9,15,18,25 258:24 259:5 262:4,7,10,14,15,16,18 263:10,25 264:3,21 265:1,12 266:5,9,13 267:7 270:15 274:3,7,16 279:20,21 280:5 281:16 283:11 285:6 287:1 291:24 292:4 298:17 301:2,18 302:16 304:15 306:2 310:4

**cases** 11:17,25 12:7,8 52:10 71:1 131:4,13 262:7 264:7,10 265:8

**cash** 28:15

**cause** 50:23 56:25 57:8 145:4 154:20 199:12 307:8,19

**caused** 192:13

**cave** 195:8

**cc** 308:24

**cease** 194:21

**ceased** 196:22,23

**cede** 132:22

**ceded** 131:10

**central** 302:25 303:1,14

**certain** 18:23 33:5 102:7 130:18 140:8 146:13 147:24 162:7 211:15 214:7,14 222:3 232:9 235:25 247:21,22 273:9,12 299:1 304:6

**certainly** 51:6 72:14 108:7 136:24

**CERTIFICATION** 307:1

**Certified** 1:22

**certify** 307:5,16

**challenge** 70:4 202:4 225:15,17 239:6 279:9

**challenged** 219:19

**challenging** 69:23

**chance** 137:15 146:4,16 253:24

**change** 115:3 161:21 229:7 244:21 305:24 310:7

**Change/Reason** 310:7

**changed** 33:17 218:23 246:5,6

**changes** 308:13

309:6

character 97:23

characterized
262:21

characterizing
96:25

charge 64:12
65:17,20 66:3
85:22 207:20
233:24

charged 29:18
30:10 31:14 65:7
105:21 171:10

charges 30:1,4,18
31:15 40:19
64:16 174:21
306:13

chatting 191:10

check 86:7,8,14,24
87:2,4,6,8,20
88:1

checks 81:4 85:1
88:16 150:9

child 11:15 121:22

childhood 120:3

choices 140:7
262:1

choose 113:23
209:3

chose 163:18
204:6 226:18
237:16 239:17
242:18

chosen 163:11
172:5

Chris 167:13

CIA 55:9 56:1,14
59:23

cigarettes 148:10
267:24

CIPA 55:21,23,24

56:1,12 57:16
74:7,9,20,22,25
75:6,16
76:13,16,25
77:1,3
134:6,7,19
210:14 211:7
217:12
220:19,22
221:19 222:7
287:15
288:13,19
290:8,23 291:9
292:25 295:9

circle 121:14

Circuit 256:18,22

circumstances
56:4 252:20

citation 289:13

citing 69:2

civil 13:20,22,24
104:19,23
105:3,5,13 307:5
308:8,9

claim 54:15 57:24
60:1 166:25
174:10

Clara 141:10

clarification 37:15
254:1,22

clarify 13:4 42:16
139:12 162:6
206:5 228:22
301:16

class 8:3

classification
292:9

classified 56:5,20
74:3,9,11 76:22
110:8,21 210:24
211:1,19,22
214:22
218:9,15,18

219:13,20
220:23 221:5,13
289:24 290:2,12
291:10,24
292:6,11 294:13
295:12,22
296:11

clear 106:8 117:20
130:13 168:17
174:14 238:15

clearance
56:2,8,13 57:1
75:21,25
76:10,12,25
101:4 134:7,19
213:7,24 217:23
219:24 292:10
294:14 295:1,21

clearances
56:19,22 57:5
73:5,12,17,23
134:7 213:17
219:7,16
293:12,14
294:21,23
297:11,13

cleared 216:18
222:10

clearly 250:18
251:12 276:22

clicked 178:11

client 27:13 31:20
32:24 33:8,22
36:9 46:15
49:7,13 51:8,20
77:20 85:16
125:25 130:6
137:9 146:24
147:5,22
211:20,23
247:3,6,15
250:17
262:8,11,25
263:18 273:16
306:12

clients 12:6 33:20
48:23 91:25
122:5 126:19
127:24 128:4
135:19 216:9,17

client's 225:11

clinic 10:10

clinical 9:25

clock 62:6

close 93:21 97:14
98:18,21 138:11
149:8 238:4
251:25

closed 44:11
193:24 288:14

closely 236:12

closer 67:4 303:9

closing
111:16,20,25
112:3,7 236:6
239:20,24
240:8,20 241:7
249:17 298:7

clothes 121:14
122:18

CNN 22:3

co 39:12

cocounsel 114:3,5
242:6

code 4:19 307:5
308:8

codefendant 25:15
26:2,3 100:19

codefendants
26:10,19 51:25

cognitive 50:23

cognizant 241:8

cold 94:13

colleague 94:16

colleagues 128:13

collected 28:7 29:7

college 120:17
123:4

combat 201:9

combination
125:13 201:2,4

comes 71:25

comfortable 23:5
97:9 114:24

coming 93:21
100:15 163:21
166:13 183:20
234:19 241:20
244:20 288:1
303:18

commence 114:21

comments
256:8,20

commit 263:5

commitment
19:12

common 91:16
281:14

commonly 279:5

communicate
45:18 177:10
196:24

communicated
62:20

communication
143:2 196:23

communications
194:21 204:3
272:15

community 15:24
28:7 125:2

Company 4:15,18
308:11 310:1

comparable
243:18

compassion 85:24

compel 212:4,11

compelled 173:10
176:14 220:11
231:20

compelling 162:25

compensation
142:22

competence
261:2,3

competently
24:22,24 252:21
253:11

competition
116:16

complained 86:4

complaint 23:12
55:1

complete 227:13
244:17 307:12
309:5

completed 308:10

completely 226:11

complex 60:12

comply 61:12

computer
129:15,21

computer-aided
307:11

con 6:13

concentrated
118:19,22

concern 91:4 92:6
93:9 171:11
200:17

concerned 15:25
196:10 302:11

concerning 49:25
196:3

concerns 92:12

167:6 243:3

conclude 36:24
37:2 175:16
244:25

concluded 38:1
164:8 165:19
175:20 190:3
216:13 302:8
306:25

concludes 306:22

concluding 217:16

conclusion 35:2
38:4,7 39:3
65:19 78:21
281:12

conclusions
239:22

concur 48:6

concurred 48:4

concurrence 41:23
42:2

conditions 85:25

conduct 180:4
182:14,16,20
230:18

conducted 144:15

conducting 176:19

confer 257:12

conference 13:13
21:15 241:22

confession
49:14,17 51:10
67:22 69:7,9
145:11 162:18
163:4,23 200:19
224:24
264:3,6,10,13,21
265:8 284:4
285:1,10
286:5,8,15

confessions 69:24

70:19,22 71:1
207:22 208:9
226:6,10 262:21
263:12 284:8
285:14

confessoin 70:11

confidence 66:17
100:9 235:10,15
245:3

confident 98:9
128:12 234:17

confirm 182:10
304:20

confirming 181:24

conflict 25:3,10,14
26:1,5,24 95:20
96:3 128:2 244:8
254:5

conflicting 222:22

confront 196:13

confronted
71:21,22

confronting 97:21

confused 40:6
294:1

confusion 257:1

connected 278:23

connection 117:2
122:15 128:14
130:4,5 131:8
132:7 133:18
134:12,15
135:4,22
140:7,19 145:24
146:22 154:24
167:8 168:2
169:20 171:12
173:1 176:4
180:14,23 182:1
191:20
196:12,14
201:13 202:9

207:21 208:8
212:12 214:23
217:4 234:5
246:3 249:6
261:6 300:8

**connections**
201:25

**cons** 229:13

**conscious** 47:20

**consensus** 133:1

**consent** 130:10
216:13

**consider** 22:5
40:3,22 43:15
49:16 51:1 67:21
70:24 131:17
163:15,25 168:4
175:17 176:18
177:4,8,12
189:24 208:7
220:6 224:14
225:21 232:23
233:6,13,15,17
247:20 269:20

**consideration**
57:9,10,24
58:1,2 67:9
91:6,9 172:9
175:3 242:21

**considerations**
65:6 174:24

**considered** 51:2
58:6 71:4 116:4
161:22 165:14
166:2 172:13,16
173:4 175:24
176:1,11 179:20
183:25 186:16
189:5 190:1
208:13,14
269:12 270:24
271:9 277:15
305:14,17

**considering**

168:15 192:10
226:4 270:5

**consist** 13:17

**consistent** 172:5
249:2 269:8

**consistently**
242:10 263:23

**constantly** 72:4

**consult** 104:9

**consultant** 246:4

**consulting** 12:5
245:14

**contact** 16:3,21
18:22 44:16
45:1,5,8 71:3,8
198:22 246:22
274:19 301:13
308:17

**contacted** 14:23
42:12 43:25 73:3
109:12,17
170:10 178:18
200:22 201:3
206:16,18
246:11 266:23
274:21 301:16

**contacting** 201:6
272:25

**contacts** 199:16

**contancted** 7:7

**content** 6:12,20
271:12

**contents** 7:8

**context** 289:14
296:13,16

**continuance** 20:17
133:23,24 135:6

**continuances**
61:12 62:4 172:1
223:25

**continue** 66:22

67:19
171:4,13,23
219:3 221:20
243:15

**continued** 11:25
20:6,7 72:8
84:16 119:12
123:4 218:25
222:5

**continues** 121:4

**continuing** 68:7
258:1

**contract** 43:13

**contradict** 108:21

**contradicted**
192:22

**contrary** 52:20
227:1

**control** 131:23

**controlled**
139:22,25

**conversation**
126:16 127:5
147:2 149:23
150:13
169:14,15 231:6
241:24 242:3
249:23 250:4,6
251:10,12
301:21

**conversations**
166:15 181:5
250:18,22

**conversed** 239:11

**conversely** 68:23

**convey** 248:4
281:5

**conveyed** 281:7

**convinced** 215:16
263:19

**cook** 121:13

**coordinates**
180:15,24
258:12
259:11,19
301:10 302:15
304:7

**copied** 272:17

**copies** 32:12
102:11 288:5

**copy** 136:12
155:12

**corner** 273:17

**correct** 10:18 56:7
79:12 85:10
94:8,11 106:22
115:20,23
118:19 119:1,22
125:25 126:10
127:16 138:24
139:3,7,11
140:8,9,11 141:4
147:8 151:21
155:23 162:5
168:20 170:18
172:10 174:6
175:13 183:16
194:12
197:21,25
198:14 201:10
204:1 207:7,18
216:9,25
217:13,14
218:11 223:3,7
239:18
242:15,16 247:4
248:22
255:5,8,12
256:2,21 258:22
259:20
272:11,12
278:24 281:17
299:20 307:14
309:5

**corrected** 110:23
278:5

correcting 308:10

corrections 309:7

correctly 97:1
119:20 229:2

corroborate
243:15

cost 42:12 138:12

costs 82:8,13,24
83:15,18,19
138:22
139:5,20,23
183:5

Cottage 308:3

counsel 3:16 4:21
6:19 7:14 15:8
19:1,2 20:15,24
21:2 25:14 32:14
48:22 62:21
66:21 95:21
100:19,20
105:13,17
110:19 113:8
130:8 132:3
135:11 136:8
141:6 150:20
166:4,19
216:8,13,18,21
222:11,18 224:5
232:12
240:16,17 254:5
257:13 258:17
296:5 307:16
308:15,24

count 23:20

counter 198:18
202:25
205:13,25
234:25 300:20
302:24 303:25

countering 205:9
270:25

counterproductiv
e 185:4

countinuances
63:20

countries 39:20

country 199:16
280:10

counts 113:20

County 18:8
124:12 125:5

couple 16:1 20:19
39:24 90:14
116:19 128:23
141:19 142:18
270:20 291:23
305:8

coupled 85:24

course 9:9 68:22
88:10 103:2
119:24 121:8
144:13 194:1
197:19 212:19
237:12 245:20
246:23 305:21

courses
9:4,7,13,14,17,1
9

court 1:1 4:7,16
5:10 6:2
12:8,9,14,21,25
13:3,7 14:5,8,17
26:8,9,18,20
27:2,11,16 34:17
48:5 52:8 61:11
67:16 68:7
71:14,23
75:10,22 90:8
94:10 103:23
104:7,14,15,19,2
0 111:19,21
112:10 116:16
171:24 172:2
180:20 209:23
211:8 215:25
221:20 264:13
283:8 285:20

290:3,9
294:12,16,17
297:4

courtroom 23:5,6
104:3

courts 9:20,22
26:13

cousin 149:6,7,19
151:10,11,21
189:22

cousins 35:14
124:25 168:9

cover 79:13,20
82:13 259:23

covered 77:25
84:7

covering 200:6

CR143 212:7

CR179 216:1

create 171:14

created 26:18
187:9

creating 174:9

credibility 230:2
284:7

Creegan 2:7 5:6
249:24 251:9
261:10

cricket 36:20
148:7 267:17
268:8
271:4,6,18,20

crime 273:17

criminal
9:4,5,6,7,8 10:1
12:22,25 13:22
22:15,18 23:5
25:4 27:18 39:13
47:12,13 69:25
98:13,14 104:20
262:16

criteria 50:4

critical 23:21
66:21

cross 237:8 300:23

cross-exam 196:14
201:20

cross-examination
77:7 112:11
194:1,5 196:7
199:25 201:10
202:6 203:2
205:16 206:2
209:10
235:5,6,24 237:7
238:16 239:7,14
249:19 284:5
289:23 290:7
295:11
300:15,20 303:2

cross-examine
203:22,23
209:12 237:17
299:4 300:1,8,18

cross-examined
14:5,7 237:21
279:10 281:11

cross-examining
203:8

crossing 138:19

CSR 307:3,23
308:22

cultural 23:2
107:13 199:3
200:3 204:8

culturally 107:13

culture 119:10
120:5,20 122:17
204:14 279:1

curiosity 24:18

current 146:17

custom 146:10

**D**

**daily** 21:8 144:14
188:2 269:18

**dance**
273:18,21,24,25

**danger** 51:19
230:9

**date** 1:15 4:13
15:10 19:20
30:24 33:11
34:15,18
61:15,17 72:8
86:8 87:20
103:5,10 123:22
128:16 172:3
212:13 215:4
262:23 309:25
310:6,25

**dated** 80:7 251:16

**dates** 64:22 254:23

**Daud** 156:10,15

**D-A-U-D** 156:10

**daughter** 10:24

**Dave** 240:13

**Davis** 7:20 117:3

**Dawn** 33:2

**day** 15:1
18:5,10,24
19:9,12,22 20:5
32:25 33:18
101:13,15 123:5
126:16 132:13
142:21 242:9
245:22 249:1
262:19,22
270:11 271:10
296:18 297:16

**days** 16:2 20:19
39:18 104:5
308:13

**DC** 2:9 240:16

**DDD** 96:18,19
100:25

**de** 97:22 132:22

**dead** 61:25

**deal** 22:6 99:6
162:21 163:4
203:8 248:8
279:17,19,20
300:14

**dealing** 281:8

**dealt** 54:5

**Dear** 308:7

**December**
11:2,4,10,24
73:2,12,13
118:13 213:5
214:20

**decent** 259:16

**decide** 217:22

**decided** 54:23
63:16 76:11
163:15 167:3
168:10 169:19
179:21 180:2
183:13,25
184:25 188:23
199:24 223:1
225:24 242:23
276:11 300:14

**deciding** 40:21
50:5 182:13
262:3

**decision** 18:15
21:12 23:11
24:13,14 25:1
27:19 28:2 38:11
47:5,8,10,16,20
48:8,11,12,13,20
,21 58:5 65:15
66:10,21,25 68:9
76:9 85:19 90:18
94:1 131:15,21
134:18 166:18

172:17,21
173:7,14,18,23
176:2 183:18
184:21 201:8
205:6 207:16
208:4,19 218:7
219:22,23,24
220:14 223:23
224:1,18
227:4,15,20
228:3 229:6
242:14 246:13
248:10 249:14
274:6
275:13,15,21
286:19,23,25
305:25

**decision-making**
131:4,7,18
132:6,12,19,23
133:8,13,17,22
134:6,11,22
135:1,7 140:6
175:22 176:6
183:21

**decisions** 23:21
24:5,10 25:15,18
42:3 48:22
131:12 132:1,15
181:22 224:4
247:14 253:17
306:10,16

**declaration** 110:1
143:12 260:16
266:23 272:1
276:7,10,14,25
277:5,12,16

**declarations**
271:12 272:19

**declassified**
56:5,20 110:22
212:21 279:18

**declined** 229:4

**dedicated** 280:4

**deducted** 139:6

**defendant** 1:8 2:11
4:24 23:14 25:14
26:1,23 224:25
225:1

**defendants** 25:9
26:14 41:13,14
52:6 81:19
216:12 262:20

**defendant's** 68:17

**defender** 144:20

**defense** 6:19 7:14
22:23 24:6
25:1,21 26:2,4
27:3,5,11,12
47:17,22,23
48:16 53:17
55:2,10 56:6
88:10 90:22
92:4,24 114:8
127:15,18 130:1
131:3,23 132:10
139:22
140:2,14,19
141:4,9,16 143:7
154:14 161:22
162:4 164:1
172:2,10,14,15
183:14,19
184:13 185:7
198:17 205:4,5
209:16,20
210:25
211:2,4,10
215:12 216:18
217:18 218:18
223:6,9,20,24,25
227:16 232:9
235:20 236:6,10
249:3 258:17,24
259:5 261:7
262:14,15
264:22
265:1,7,15,21
266:6 273:14
284:21 289:25

299:11 302:13
306:3

**defenses** 172:12,16
222:23

**deferred** 132:2
204:23

**deferring** 176:7

**deficient** 237:6

**definitely** 21:25
55:24 78:16 81:1
93:2 128:3 138:6
187:9,11 210:9
218:2 258:21

**degree** 7:21
115:16,17

**degrees** 201:22

**Deitch** 240:13,19
241:1,7,9

**delay** 219:3

**delayed** 219:16,19

**delays** 56:25 57:8

**delined** 200:9

**deliver** 178:21

**demand** 57:7
59:22 60:1,3

**demeanor** 191:9

**denied** 67:16
95:18 140:15
192:21,23

**Dennis** 2:12 4:23
37:15 102:12

**denominated** 9:20

**Department** 2:8
5:7 55:10 116:8

**dependent** 82:2

**depending** 308:16

**depends** 302:4

**depicted** 258:13

**deponent**

308:14,16

**deposed** 5:19

**deposition** 1:12
4:5,9 5:21,22
6:7,10,13,21
7:7,8 39:10
258:2 265:23
275:8 306:23,25
307:1,6,9,15,18
308:9 310:6

**depositions**
39:6,18,19,22
40:23

**describe** 12:2
18:11 93:7
211:14

**described** 24:5
135:5 269:5
280:9

**description** 32:18

**desire** 186:10

**desperately**
206:25

**destroyed**
303:11,13,23

**detail** 162:10
191:7

**detailed** 184:8
220:18 245:16

**details** 94:24
165:22

**detained** 117:11

**detention** 20:21
30:23 117:4
118:4

**determine** 270:21

**determined**
165:25

**developed**
122:14,22

**difference** 23:19

98:25 105:19
273:4,6

**different** 15:4 37:1
42:18 54:22
58:4,7,15 93:19
94:7 98:3,9
104:4 162:7
164:12 167:20
168:9 183:2
200:19 227:19
244:22 266:2,3
272:18

**differentiated**
76:20

**differently** 253:13
284:1,3

**difficult** 25:5
35:10 39:4 48:12
61:2 68:10 169:8
186:24 272:5

**difficulties** 50:24

**difficulty** 136:14
165:8

**Din** 159:23

**D-I-N** 159:23

**direct** 42:18,24
188:11 236:15
251:17 266:18
278:7 284:12
292:13 299:24

**directed** 194:21

**directing** 272:19
288:21

**directly** 29:1 187:7

**director** 15:7
117:6 118:4,8

**dis** 56:5

**disagreed** 133:5,7
195:4 196:1

**disagreements**
195:7,21

**disaster** 178:20

**discharge** 56:6

**disclosed** 218:4
298:15

**disclosure** 210:3

**discounted** 269:14

**discoverable**
211:3,9

**discovered** 301:1

**discovery** 53:20
55:2,4 56:8
59:22 61:4,13
161:24 172:1
185:10 210:23
211:13
212:1,4,11,20
283:14

**discuss** 6:20
7:1,3,5,8,14 39:5
77:20 132:11
204:20 229:13
241:19 247:12

**discussed** 6:6,12
19:6 35:24 37:13
92:10 100:5
142:22 145:19
177:2 208:1
243:23 247:1,3
255:10 266:3
287:14 291:22

**discussing** 40:24
169:16 264:10

**discussion** 21:9
38:19 39:3,15
40:18 45:4 50:7
56:18 58:11,25
69:13 93:15
96:1,9 99:24
101:2 112:14
126:9,12 128:3
136:2 147:18
161:4
184:14,15,18,24

196:19 229:10
244:15,18
261:25 274:10
293:25

**discussions** 21:10
40:5 49:18 51:21
58:7,16,17,18
69:14 98:17
138:11 150:18
177:1 184:11
206:14 226:14
231:1 245:10

**dismiss** 62:25 63:2
232:21

**dismissal** 174:20

**dismissed** 58:20
59:5,15,18 95:23
191:6,25

**dispatched** 182:19

**disproportion**
85:15

**distinguish** 40:7

**distorting** 192:15

**distributed** 28:9

**district** 1:1,2
4:7,8,10 13:3
14:5 67:16 71:23
159:11 178:7

**disucssions** 183:7

**divided** 284:17

**Divion** 5:7

**Division** 2:8

**docket** 31:2
64:6,19 65:1
101:7,8

**doctorate** 7:22

**document** 32:4
64:16 79:8
128:7,16,17
139:14 155:15
162:9 212:6

**documentation**
145:5

**documents**
128:14,21
129:2,4,6,11
138:18 162:7

**dollars** 84:4 85:7

**Donald** 2:12 4:25

**done** 29:21 32:12
43:23 98:5
102:25 103:22
113:3 114:17
137:20 178:1
187:20 195:11
203:15 210:4
236:14 253:13
284:1,3 285:3,4
301:25

**door** 243:22

**dotting** 138:19

**double** 103:19

**double-guess**
97:24

**double-jury**
103:17

**doubt** 75:3 163:7
172:15,22 203:3
229:1 236:1,7
264:23 265:2
306:2

**downside** 219:6,8

**downtown** 15:4
17:12

**Dr** 108:12,21
109:13,16,22
110:1 147:3
199:4,13 200:3,4
201:3 206:9,23
278:14,19,22
279:3,4 280:2
282:9,22 283:1

**draft** 210:7 285:18

**drafted** 79:10 99:7
129:15,22
137:16,23
139:17 249:16
285:22

**drawing** 281:12

**drink** 179:7

**driven** 290:16

**dropped** 29:6

**dropping** 40:18

**du'a** 236:24

**D-U-apostrophe-
A** 236:24

**due** 213:24 283:17

**duly** 5:13 307:3

**Dur** 46:10

**duration** 118:7

**during** 9:3,14
10:5,6,13 11:3,6
12:2,20 13:3,22
16:15 34:1 36:10
37:1 38:2 39:17
43:21 46:10,16
48:15 76:6 86:17
87:15,17 88:10
104:3,10 127:14
130:17 142:19
144:13 145:1
148:15 153:22
193:25 212:19
230:15 237:7
239:20,23
240:8,20 241:7
246:23
249:14,21,22
250:3,18,21
258:25
260:6,13,25
261:24 262:1
266:14,18 271:7
274:15,25
301:5,7,13,21
304:16,18

305:21

---

E

**earlier** 80:1
117:16 118:12
142:21 164:15
170:17 187:2
194:11 208:10
224:20 247:1
260:1,3

**earliest** 172:3

**early** 11:20,24
31:13,16 33:6
47:16 53:14,18
81:9 119:18
207:24 219:1
262:18,24 287:1
301:14
302:15,16

**earned** 91:14

**earth** 178:4,19
259:13

**earthquake**
303:4,16,24
304:6

**easier** 154:17

**Eastern** 1:2 4:7,10

**edits** 210:8

**educate** 119:12

**educated** 54:12
220:19

**education** 119:15

**educational** 7:19

**EE5** 287:18 288:8

**effective** 40:10
62:17 234:22

**effectively** 300:7

**effort** 211:18
285:25 286:3

**efforts** 35:6 43:19
45:1,3 67:15

93:13 211:21

**eight** 66:4

**either** 10:4
17:11,13 20:16
28:6 40:15 44:17
48:16 80:14
109:15 116:13
125:12
126:14,17
233:19 265:23
285:4 286:3
307:17

**elaborate** 121:12
122:25 227:22

**elder** 191:11

**elders** 36:5

**elected** 196:11
232:12

**electronic** 129:18

**electronically**
129:20

**elicit** 289:24

**Elkarra** 15:5,6

**E-L-K-A-R-R-A**
15:6

**else** 15:14 59:20
94:15 95:16
97:10 111:5
124:5 126:2
151:23 158:20
168:14 170:9
180:5 205:18,19
209:4 261:9
273:11,24 275:6

**e-mail** 7:4,5,13,16
88:17 114:12
144:6 236:11,21
237:3,10 238:12
239:17 254:20
281:20 283:3

**e-mails** 201:2
239:10 272:16

282:7

**embassy** 43:25
44:16,17,21
194:12,16,22
196:21,23 302:7

**emphasizing** 31:16

**engage** 184:11
245:10

**engagement** 27:21

**English** 8:7,12
149:7

**enhancement** 66:5

**enter** 209:2

**entering** 21:6

**entire** 104:14
280:4 289:13
297:16
303:10,13 304:9

**entirely** 57:19

**entirety** 186:3
236:23 263:20

**entitled** 212:7

**episode** 46:21

**equal** 42:17

**equity** 84:25
92:8,17,20

**Eric** 110:4,10

**Erin** 2:7 5:6

**errands** 15:4

**errata** 308:13
309:7

**erred** 233:2

**escaped** 120:14

**especially** 93:16
289:12

**ESQ** 2:12,15

**essentially** 8:4
16:2,4,7 22:23
93:18 103:14

117:10
128:22,24 130:6
162:18 271:10
279:16 280:4

**estimate** 298:3
300:4

**estimated** 200:23

**estimates** 297:23

**ethical** 100:18,21

**evening** 258:3

**event** 31:4 138:9

**events** 96:12
123:18 135:5
276:22

**eventually** 65:11
76:3 125:16
302:8

**everybody** 128:5
151:11 165:20
170:9 198:24
199:15

**everyone** 190:1

**everything** 24:17
27:25 95:15
120:20 129:18
239:4 263:21

**everywhere**
146:19

**evidence** 9:17,18
25:17 30:2 36:1
40:10,14 49:6,12
51:20 52:20
53:19,21 55:14
66:16
68:6,13,16,20,21
,23 69:3,4 71:19
72:5,15,18,22
74:6
76:18,19,21,22
77:1 98:7 106:12
109:13
112:21,23
163:7,12,21

164:16 170:24
171:1,8,13 185:3
192:11,17
196:10,12
198:13 203:19
214:8,21,23
215:3,6,14,18
217:5,8,9,21
220:22
223:2,21,24
230:12 235:19
252:9 263:13
265:4,7 279:3
292:11 295:2,11

**evidence/
reasonable**
172:15,22

**evidentiary** 14:19

**evoking** 74:7

**exact** 137:16
186:21 211:20
233:25 296:22

**exactly** 33:4 68:4
117:8 217:20
248:4

**exam** 10:21

**examination** 3:2,6
5:16 97:16 111:2
114:21 115:9
130:18 204:4
222:4 230:15
249:16,21
261:22 266:19
285:3 297:19
305:6 306:8

**examine** 253:24
284:12

**examined** 5:14
14:4,7,20 309:4

**example** 22:3
141:7 195:3
211:16

**excelled** 116:17

exception 60:12

exceptions 57:18

exclude 108:16,17 111:14 298:10

excluded 283:8,13 286:7,11 287:6

exculpatory 55:14 176:20 211:19,21,22,24 218:3 221:4

excuse 256:15

execute 27:21 137:7

executed 137:4,5 139:17 216:8

executive 15:7

exercise 133:8 135:7 172:22 219:25 230:22

exhibit 32:13 79:1,4 84:18 86:6 136:4,16 143:7 185:7 188:12 189:9 193:8,9 213:1,3 236:10,15 251:15 260:11 277:24 281:19

exhibits 3:15 102:7,8 136:9,13 154:14 155:9 308:16

exist 146:17

existed 55:18

existence 43:20 46:1 66:20 199:1 202:21 203:12 206:9

expected 76:14

expend 140:18

expenditures

222:3

expenses 82:2,8,14,21,24 83:16,19 138:21 139:6,21,23

expensive 84:7,9,11

experience 20:9 22:15,17 23:19 24:12 27:18 30:21 69:16 98:14 115:14 243:19 278:25 286:8

experienced 22:24 29:17 66:21 70:24

expert 70:10,15,22,25 71:13,22 83:4,20,22 84:11 106:20 107:16 108:20 110:8 140:10 146:6 198:25 199:22 200:1 204:13 207:17,21 208:19 210:2 234:7 239:6,21 280:6,12 284:7 286:5,9,14 297:20

expertise 201:19 286:8

experts 70:19 90:24 91:7 140:8 181:22 194:7 197:11 198:17,23 199:14 200:10,16 202:13,25 207:1 208:8 239:10 264:2 284:17 286:15,21

expert's 162:22 298:16

explain 56:23 115:25 119:3 120:9 256:12 269:19 273:4

explained 267:9 274:8

explanation 57:14

explored 301:24

express 242:5

expressed 242:7 251:4 273:1

expressing 92:12

expression 45:14 242:9

extensive 57:3

extent 27:6 56:16 69:14 73:6 122:16 270:18 282:15 298:14 300:6

extremely 201:23

extremist 198:5 202:11,19

---
F
---

face 63:8

faced 65:19

facilities 180:24

facing 98:13

fact 18:3 23:1 31:6 92:13 112:18 138:12 181:21 193:25 220:17 221:15 225:6 234:6 237:21 244:16,19 279:5 288:17 291:22 304:14

fact-finding

192:15

factor 41:1,5,8 50:13 51:2 56:22,23 140:6 184:6,20 262:13

factored 59:4 298:4

factors 50:10 262:3

facts 25:9,16 52:19 95:15 173:18 223:20 231:7

Faham 160:16

F-A-H-A-M 160:16

Fahim 159:22

F-A-H-I-M 159:22

failed 191:19 296:18

failing 233:3

failure 306:1

fair 57:22 69:6,9 116:21 120:2 122:15 132:9,25 133:4 137:11 143:15 144:9 157:2 163:8 171:15,19 172:25 173:4 179:24 181:7 196:9 198:3,7 205:8 213:22 223:12 226:21

fairly 70:17

fall 67:5

false 66:3 69:24 70:10,19,22 71:1 207:14 208:9 286:5,8,15

fam 54:5

familiar 5:24

16:12 44:12,13
49:24 60:16
61:14
120:10,11,20
121:10 204:14
226:4 234:20
235:12,17 243:5
281:17 296:14

**familiarity** 118:25
122:14,23
224:21

**familiarize** 210:20
226:5

**families** 121:15

**family** 11:19
12:4,8,14
13:6,19
14:10,11,15
15:11,15,23
21:8,10 28:7
29:6 34:4
42:8,12 85:24
118:19,20 123:5
124:17,22 125:1
148:13,19
150:3,14,19
151:24 155:2
156:3,14
157:3,11,18,25
158:13,20 159:7
164:22 167:22
168:9 182:24
189:5 191:3,15
273:7,10

**Farsi** 8:10,14,16
122:11

**F-A-R-S-I** 8:11

**fast** 120:16 255:21

**father** 18:18,20
78:1 251:25
263:22

**father-in-law**
121:1

**favor** 199:21 202:2

**FBI** 15:12 16:17
17:5,19,20 18:4
21:15 55:10
56:1,14 59:23
74:13,15 123:21
124:1,7,11,14
126:15,20
165:23 170:10
207:9 214:13
287:3

**feared** 195:22

**fearful** 185:3

**fears** 242:23

**February** 10:23
87:22 88:4
105:8,10
212:13,15
236:21

**federal** 9:20,22
12:9,24 13:2
14:5
26:7,9,13,18,20
27:2 39:19 47:13
50:1 55:7 56:9
71:14,19,23
144:20 197:9
308:8

**fee** 81:19

**feel** 124:11 170:4
176:14 220:11
242:8,12
245:13,18 258:5
274:17 305:23

**feeling** 65:10
97:12 100:3
185:12 257:24
305:9

**feelings** 98:6

**fees** 79:17,20,21
83:13 92:6
139:2,11 183:5

**feet** 94:13

**fell** 113:4

**felt** 23:5,14
57:10,12,13
66:18 68:5 71:5
75:23 97:9,11,20
98:9 129:5
151:11 171:8
173:10 186:15
208:1,2 217:20
218:3 219:2
231:20 250:17
263:24 266:5
276:2 287:12

**female** 167:17,19

**ferret** 227:14

**FFF** 32:8,9,13

**field** 70:19,22,25
278:21

**Fifth** 166:25 167:6
187:3 191:21
192:13 274:13
275:12,16,20,23
276:11

**fight** 304:12

**figure** 28:17 42:11
177:5 302:23

**file** 23:11 58:2,6,9
103:9 129:1
175:12 212:4
226:18 228:3
232:21 233:3
298:10

**filed** 23:13 55:2
58:15 96:4
133:14,18 135:6
212:11,18 229:4
253:25 254:7,8
255:4,5,25
256:21 271:24
276:5,7 280:23

**files** 55:15 128:24
129:7,18

**filing** 7:6,12 55:13

95:23 103:10
176:6 233:6
254:16,19
305:14

**final** 131:3,7 132:6
306:7

**finality** 59:1

**finances** 183:12
209:2

**financial** 43:3,8
90:25 244:12

**finding** 203:6

**fine** 65:2 90:1
136:24 158:21
305:11

**finish** 89:10 96:23

**finished** 197:13,14

**firm** 4:15 10:11
306:12

**firmly** 248:1,7

**first** 11:18
14:12,23
18:10,24 19:9
32:20 47:12
55:23 64:20,25
81:11 86:8
103:6,13 105:1
116:14 119:5,21
125:4,9 126:15
128:19
143:11,16 148:1
155:20 156:5,25
178:13 185:13
199:7 236:13
237:12 260:18
262:16 263:11
288:25
289:5,6,19
294:25 295:9
301:6,12 302:20
305:15

**five** 9:1 50:4 66:4
85:1 119:5,21

142:14 272:5

**five-minute** 89:13

**flaw** 97:23

**flew** 259:16

**floor** 113:4,5

**flowed** 58:1

**fluent** 8:14 121:3,5
201:23

**focus** 12:1 53:12
58:5 129:25
162:16 164:4
175:4,7,10
236:21 303:14

**focusing** 139:20
143:15 237:24

**folks** 73:4 142:15
154:7,8 160:25
168:17 179:25
198:21 200:7

**food** 119:10
121:13

**force** 60:25 66:9
227:2

**foreclosed** 75:19

**forego** 220:23
223:25 300:14

**foregoing**
307:6,12,18
309:4

**foreign** 39:20

**forget** 17:18

**forgetting** 17:23
142:10

**forgot** 190:10

**form** 212:21 221:5

**formal** 201:22

**formality** 114:10

**formally** 21:6,11
166:14

**formed** 271:22

**former** 181:1
207:25

**forth** 5:15 255:8

**forthright** 96:16

**forums** 12:6

**forward** 21:13
62:3 77:15
120:16 255:21

**foundation** 219:20

**foundational**
214:22 292:5

**fourth** 10:14
87:4,8

**four-year** 7:25

**frame** 7:10 35:11
49:8 105:24
297:15

**Francisco** 2:14,17
4:19 12:9 308:11
310:2

**frankly** 29:20 86:1
202:6 298:16

**free** 29:21

**French** 8:11

**frequently** 132:11

**friend** 10:11 11:7
105:5 117:17
148:8 178:6,9
199:21
301:16,17,22

**friends** 182:24
246:20

**front** 14:20 40:12
144:7 148:9

**frustrated** 202:1

**fulfill** 60:21

**fulfilled** 60:24

**full** 9:12,18
289:5,6 296:13

307:12

**full-time** 8:2

**functionally**
135:11

**functioned** 304:21

**functioning**
43:16,20 44:5

**funding** 182:23

**funds** 41:6 80:9
85:16 139:22
140:6,11,14,24

**future** 56:16

_____

### G

**gain** 112:20

**games** 36:22
267:20

**gather** 14:4 171:13

**gathering** 172:1

**gears** 161:21 229:7
249:18

**general** 38:7 125:3
147:21 148:2
188:15 271:15

**generally**
110:13,17 264:6
267:17

**generate** 145:19

**genesis** 250:23

**gentleman** 157:7

**gentlemen** 15:11
16:1

**germane** 289:10
296:19

**gets** 82:20,21 83:9

**getting** 16:9 31:4
38:25 39:2 48:25
81:7 87:17,25
88:7 93:16 97:14
99:15 197:19

253:11 258:6
267:12 293:11
297:13

**Ghulam** 207:3

**G-H-U-L-A-M**
207:3

**given** 22:14 23:18
28:25 29:1,2
61:21 64:10 99:4
161:11,17 230:3
238:17 249:12
258:19 273:9
300:6 307:14
309:6

**giving** 131:20
171:11 224:5
230:21,23
243:21 294:17
299:24

**global** 81:19

**God** 107:12 169:2
178:4 189:13

**gone** 16:16 38:3
74:14,15 146:20
251:2 267:11
271:8 303:4

**goodness** 253:6

**Google** 178:3
259:11,13

**gosh** 142:9 144:6
149:6 190:9
200:14 203:14

**gotten** 80:24
165:23 166:12

**government** 6:16
22:8 23:11 32:11
40:5,15,24 44:18
45:1,18,25 49:6
52:9 53:19
55:3,14 59:20
60:20,23,25
61:12,21 62:3
63:20 67:15

68:13 73:3,24
74:6,15,19 75:15
77:3 78:17 89:6
106:12 107:25
110:7,15 113:23
114:21 138:15
147:24 163:22
170:18,22
171:6,12,22
174:5,16 175:5,8
177:25
192:19,22,23
194:1,4 196:13
198:3,13 200:21
209:12 210:22
211:7,14 212:21
213:23
214:7,9,21
217:21
218:10,14 219:2
225:6 227:2
230:15
240:17,18
247:24 258:16
261:25 262:21
265:1,11 281:19
282:8 287:14
288:19 289:23
290:8,15,16,22
291:2,10,21,22
292:6,10 293:15
294:12
295:1,10,22
296:5,10 297:20
302:18 303:1
306:1

**governmental**
193:11

**government's** 73:7
74:3 75:10
76:17,18 101:4
106:14,16 108:8
111:23 123:9
161:24
162:12,13,15
171:25 197:20
201:9 203:20

215:15 219:11
235:20
262:4,7,10,25
263:9 303:14

**grab** 154:18 189:9

**grade** 123:12

**graded** 116:25

**graduate** 11:5

**graduated** 10:17
115:19,22
117:23 118:5

**graduating** 11:4

**grand** 166:23

**grandfather**
35:13,24 36:3
37:10,17,20
39:25 149:23,24
151:10,20
164:14 168:3
184:1 270:24

**grandfather's**
37:22

**grant** 171:25
191:19

**granted** 61:12
62:4 63:20 67:19
192:18

**great** 178:4 195:14
199:4 257:25
278:25

**greater** 66:7 90:22
264:21

**Griffin** 16:7,13,21
23:1,19,20
25:17,20
27:3,6,12
44:20,25 47:22
48:17 55:2 63:3
72:19,22 73:4
79:13 85:8 86:19
93:9 104:7,9
111:19 126:7,10

127:3,16,22
128:8,9
131:2,11,19,23
132:2,10,23
133:1,9,12,21,25
134:5,10,21
135:10,14,22
137:6,13 139:22
140:15,17,21
145:25 146:2,23
173:1,8,15
176:8,11 181:12
184:12 194:20
195:4,21,22
204:21 208:7,24
210:4,11 213:7
220:3 224:5,11
226:14
231:2,9,13,16,23
,25 233:18
243:3,8,12,14,23
244:2,5,10
247:12,17
248:1,11,16,21
249:5 251:24
252:5 288:17
289:21

**Griffin's** 139:10
140:24 141:8
173:11 176:15
231:21 244:8,12

**ground** 69:8
295:12 300:3

**grounds** 23:23
30:13 48:19
50:18 58:13,20
59:5,15 62:25
63:3 68:2,3
74:20,22,25
75:16 112:6
226:8 232:22
283:13 288:19
290:8,23 291:14

**group** 117:12
202:11 285:25
286:3

**groups** 198:5
202:19

**Grove** 17:18

**guess** 99:13 100:14
103:10 120:22
214:19 237:15
238:6 281:24
283:2

**guidance** 23:7
195:2

**guided** 202:4

**guiding** 164:17

**guilty** 113:20
262:9,12

**gun** 204:10 247:25

**guy** 159:13 271:4

**guys** 27:25 37:20
81:13 88:18
95:1,15 109:4
137:17 141:24
171:9 213:15
254:18 288:5

---

### H

**half** 9:11 125:1,2

**Hall** 117:3

**halt** 54:15

**Hamid** 1:7 4:6,24
14:24 18:4,21,23
19:1,4 20:15,25
21:6,7 22:20
23:12,13
25:2,18,19
27:7,17,22
30:10,17,25 31:8
34:7,10 38:2
41:12 43:17,21
44:3 46:3 47:11
48:20 49:7 64:12
65:7,16 69:4,20
78:9 81:7 83:4
90:19,20,22 94:5
103:2 106:1

111:17 112:18
113:19,20
115:15 124:9
125:4,21,24
126:3 128:8,15
130:14
131:8,12,22
132:3,7,16,19
133:14,19,24
134:12,23
135:8,12,15,23
137:14,25 138:4
140:22 141:16
144:25 145:9
148:13,15,20
149:8
150:4,15,19,20,2
3,24 151:1,8,18
152:10,14
154:6,9 155:1,22
156:1,11,19
157:3,6,10,15,18
,22,25
158:10,20,25
159:4,16,20,24
160:5,9,13,17,21
164:17 165:4
173:25 188:2
190:8 191:11
207:7,13 208:18
218:22 220:16
222:23 225:22
227:17 229:8
230:16
231:2,10,14,17
232:1,2,12,14
234:17 243:24
247:12,21
248:2,7,16,21
249:5
250:5,7,22,24
260:14 261:1
265:12,15 267:6
269:5 271:17
273:7 284:25

**Hamid's** 30:18
41:9 51:5 52:13

58:12 66:22
67:21 68:19 83:8
104:10 106:9,17
140:19 161:3
249:15 252:14
253:9 279:21
298:4 302:13

**Hammad** 157:7,12

**H-A-M-M-A-D**
157:7

**hand** 32:18 136:4
200:25 260:10

**handing** 185:7

**handle** 23:6 243:6
279:22

**handled** 284:18

**handwriting**
189:17,20

**handwritten**
189:17

**hang** 268:14

**hanging** 268:15

**happen** 58:24
65:12 78:20
94:22,23,24
95:25 130:11
183:11 244:23

**happened** 8:18
16:9,20 21:4
26:15 31:6 48:2
68:7 73:19
92:5,25 95:17
98:18 104:24
105:15 137:19
148:1 166:11
258:20,25
285:17 304:7

**happy** 85:18 99:9
258:8 299:3,6

**hard** 66:16 219:4
239:7 246:18,21

**Hasnain** 207:4

**H-A-S-N-A-I-N**
207:4

**Hassan** 194:8
196:8 197:20
198:4 202:12,17
203:9 235:6
239:21 240:7,9
300:24

**haven't** 6:16 7:7
121:21
122:18,20
213:13 271:22
279:7

**having** 5:13 32:23
38:11,18 51:24
59:25 60:3,24
65:16 93:15 97:9
100:22
184:14,18 206:6
215:20
246:18,21

**Hayat** 1:7 4:7,24
5:1,3 14:24 18:4
23:12 27:7,17,22
30:25 46:3 64:12
91:24 111:17
115:15 124:9,13
125:4 126:3,6
128:15,24
130:15 131:8
132:3,7,16,20
133:14,19,25
134:13,23
135:8,12,15,23
137:6,14,25
138:4 140:23
144:25 145:9
149:3,5
150:5,6,20
152:14 153:3,6
154:7,9 156:19
157:3,6,15,22
158:10,25
159:4,20,24
160:5,9,13,17,21
161:17 164:23

165:4
168:1,4,19,25
188:13 190:8
191:11 207:7,13
210:22 218:22
220:16
222:23,24
229:8,10
230:16,22
232:1,3,14
233:22 243:25
248:17,21,25
249:5 250:5,24
260:1,14 261:1
265:12 267:6,7
308:6 310:4

**H-A-Y-A-T**
149:3,5

**Hayats** 15:24
16:16 18:12
182:25

**Hayat's** 84:22
131:12,22
148:13 150:15
157:11,18,25
225:22 227:17
234:17 251:25

**Haydn-Myer**
167:13,15

**Haykel**
109:7,10,13,22
110:1 206:10,23
266:18 272:8,25
277:10
279:3,12,15
280:2

**Haykel's** 278:14

**head** 119:15

**hear** 167:5

**heard** 45:14,21
55:21 156:2,8,17
157:9 207:2
241:6 267:21
273:2

**hearing** 14:19 20:21 30:23 47:21 71:16 73:15,18,20 213:16 245:13,23

**hearings** 77:3 221:2,10 288:14 292:25

**hearsay** 181:4

**heavier** 18:17 30:17

**heavily** 162:22

**heavy** 126:18 127:8

**heel** 162:15

**held** 21:15 73:15 222:7

**help** 53:8 69:4 100:22 114:6 155:7 197:8,11 199:19 202:2 215:12 230:9 260:20 280:1,5,6,7

**helped** 13:6 199:20,22 202:3 280:7

**helpful** 35:23 68:13 90:22 97:2 270:6 271:9

**helping** 10:12 36:3 104:15 117:15,17

**helps** 56:16

**hereby** 307:5 309:3

**hereinafter** 5:14

**here's** 99:6 228:22 250:14 280:21

**heritage** 120:4

**hers** 168:21

**he's** 15:7 33:23 82:11,15,20 91:24 109:15 159:12 201:21,22 240:5 293:2

**hesitate** 308:17

**Hey** 150:24 154:9 195:15 197:4

**high** 120:18 236:1

**higher** 298:11 299:6 300:3

**highlighted** 235:24 298:6

**highlighting** 230:17

**highly** 240:22

**hindsight** 253:12 279:23 284:2

**hire** 205:6

**hiring** 91:7

**history** 46:24 50:17 51:1

**holding** 42:9 247:24

**holy** 240:24

**home** 8:16 11:18 29:3 84:25 92:8,18 128:22 146:17 165:16 183:6 189:7

**honest** 96:16

**honestly** 10:16 18:14 28:11 29:18 58:4 61:9 64:5 84:5 88:17 91:3 94:25 165:20 198:24 200:14 205:20 212:16 217:24

238:13 277:1 289:7 295:24

**honor** 116:4

**hope** 96:25 186:16

**hoping** 89:7 197:2

**Horgan** 2:12,13 4:25 32:9 96:19 101:5,9,16,19,22 102:14,17 114:14 143:14 255:11 277:21,23 278:1 287:19 288:7 289:5 294:7

**H-O-R-G-A-N** 4:25

**host** 160:25

**hostile** 71:22

**hought** 167:21

**hour** 16:9

**hours** 144:21

**huge** 28:20

**Huh-uh** 122:21

**humanitarian** 178:9,22 180:14

**hundred** 85:7 97:7

**hung** 152:22 267:23

**hurt** 164:20 215:12

**husband** 8:20 120:17 121:9

**hypothetical** 23:10 25:23 30:13

---
**I**
---

**I'd** 115:13 151:7 184:16 200:11 236:9,12,16,21 254:22

**idea** 35:25 45:5,8,11 53:24 67:5 88:25 97:14 164:3 182:11 195:19 223:5 224:24 229:18,21 271:15 279:24 295:25 297:14 302:9,21

**ideas** 266:3

**identified** 151:18 152:14 155:21 156:1 157:3 158:24 159:8,9 164:11 169:20 185:13

**identify** 37:16 103:14 149:24 151:3 155:2 156:14,19 157:6,15,19,22 158:1,10,16 159:3,14,18,22 160:1,4,7,11,15, 19 161:2 200:12

**Ihtesham** 160:11

**I-H-T-E-S-H-A-M** 160:12

**I-L** 149:17

**ill** 260:14

**I'll** 17:6 32:10 64:21 129:25 130:23 136:19 145:4 155:13,15 158:15 227:3 228:22 236:15 238:13 241:1 269:19 295:6

**im** 14:11

**I'm** 6:9 10:19 13:14 15:2 17:17,23,24 18:23 23:22

26:24 30:12,14
32:3,7,18,19
34:13 35:3
37:22,23 40:6
44:7 46:14 48:18
60:10 61:8 63:19
71:4 79:3 81:16
86:5,9 87:8 89:7
90:13 96:25
97:24 98:1
100:25 102:1,3
103:25 105:16
110:3 112:16
116:6 117:25
122:10 130:18
136:4 137:4
139:12,13
142:9,10
143:6,14 146:13
151:14
154:14,20,23
158:3,4,5
165:1,2 166:19
168:17
174:11,12,14,24
175:2 185:7,18
188:22 192:2
201:5 203:12
204:9 210:18
213:2 219:22
221:7,23 224:9
227:10,13
231:24
246:17,18,20
254:3 255:13
257:25
260:10,17
264:24 265:24
273:9,12 277:17
278:7,11 284:23
288:21 289:8
290:18 291:13
292:13 293:8,9
294:1 295:4
296:12,23 297:9
298:20 299:9
300:5,11 304:6

305:11,12

**imagery** 259:14

**images** 110:20
213:24
214:1,14,23
215:1,4,8,12
217:15,17,20
219:20,24
234:5,11,16,18
235:9,14
258:13,17

**immediate** 189:5

**immediately** 11:14
302:22

**immersed** 120:4

**immigrant** 117:3
118:4

**immigrants**
117:11

**immigrate** 117:3

**immigrated** 8:24
120:12

**immigration** 10:9
12:4,9,17 13:19
71:16,18 117:11
118:20 184:17

**immunities** 192:5

**immunity** 191:20
192:19,21,24

**impact** 205:4
232:3

**impacted** 258:7

**impediment**
187:5,9

**implicated** 221:13

**implicit** 50:12

**important** 43:15
45:24 49:5,12
57:23 70:12
106:14,15,19
177:20 194:25

195:17 198:12
215:6 271:3,5
283:11 290:7,25
302:12

**importantly**
270:25

**impression** 235:18
292:3

**impressions** 168:1

**impressive** 235:23

**imprisonment**
78:4

**improper** 232:20

**improperly** 191:19

**improve** 287:22

**inability** 184:1
242:9

**inaccurate** 130:21
231:18,19
248:18,19
276:21

**incamera**
216:21,24

**inclined** 171:24

**included** 55:9
264:17

**including** 6:20
98:8 158:20
183:14 198:5
202:21 226:6

**inconsistencies**
263:21

**inconsistent**
229:23 230:1
239:12

**incorporate** 236:5

**increased** 30:1,4

**incredible** 293:1,3

**incriminates** 225:1

**inculpatory** 214:8

**indeed** 65:3
118:16 180:7
198:16
209:11,15
211:25 232:9
236:5 255:10

**independent** 22:25
24:15 43:24
100:19 133:8
172:23 173:17
176:5 208:23
219:25 220:13
224:2,18 230:23
275:13

**independently**
82:4 244:24
264:19

**India** 118:25
122:15,16

**indicate** 113:23
114:12
140:17,21 145:4
146:22 147:13
225:6 244:5,11
246:10 252:2

**indicated** 25:17,19
118:12 140:5
147:22 161:23
171:24 174:3
179:20 193:12
194:11 198:11
214:6 218:8
222:25 224:20
233:23 234:3
239:21,22
242:17 247:3
248:20

**indicating** 128:7

**indicted** 30:25
31:5,8 33:20
44:3

**indictment** 31:19
32:25 34:15,24
35:1 47:17 49:10

62:7 63:24
64:1,10,12,15,25
67:20 71:25
232:21,23 233:5

**individual** 16:13
149:15 155:2,20
156:1,19 157:4
158:7,18
159:9,14 160:4
180:8 199:20
206:22 207:3
237:9

**individuals** 37:16
141:2,14
142:14,17
151:19 152:25
161:8,12,15
177:1 181:6,7
200:12

**ineffective** 95:21
96:5 254:5

**inexperience**
252:13
253:9,19,21
283:17,24,25

**inexperienced**
253:14

**influence** 231:9

**inform** 27:10,17
44:20 130:6
237:22

**informant** 170:23

**information**
45:12,19 46:20
47:7 55:7,17,25
56:5,13,20 60:18
61:1 71:5 74:3,8
81:14 131:21
169:21 177:22
180:18 194:17
195:14 197:2
208:12
210:24,25
211:1,3,9,15,19,

21,22 212:20
218:9,15,18
220:23 221:4,13
289:25 290:2,12
291:11,24 292:5
294:13 295:22
296:11 298:23
299:1

**information-
gathering**
145:13

**informed** 16:16
131:21 248:9

**informs** 273:18

**initial** 13:10 18:22
57:22 80:9
123:16 143:25
265:25 267:10

**initially** 100:2
124:16 200:15
247:15 255:2
266:20 267:7

**initiate** 196:3

**injury** 105:4

**innocence** 78:10
247:22 263:19
264:22 265:16

**innocent** 31:20
32:25 33:8,22
230:18 306:13

**in-person** 241:21

**input** 85:23
131:14,16,17

**inquiry** 221:21
250:16 296:25

**insight** 69:16

**insisted** 243:9

**instance** 195:3
266:17

**instances** 140:13
221:18

**instilled** 119:11

**insufficiency**
265:4,7

**insufficient**
163:7,11
172:14,21
223:2,21,24

**intended** 218:10
250:7,19 251:2
294:22

**intending** 114:2

**intends** 214:9

**intent** 6:13

**intention** 108:7
150:11 263:5
293:11 294:21
297:10,13

**intentionally**
192:13

**interacted** 191:3

**interacting** 169:1

**interaction**
124:9,13 170:8

**interactions** 146:2
168:1 169:8

**interest** 25:3 26:24
173:24 186:4
216:14
220:15,16 230:7
244:13 254:6
305:23

**interested** 7:17
293:15 307:19

**interfere** 204:25

**intern** 10:4 283:3

**internally** 229:23

**international**
116:8,16,17

**interns** 142:4,8

**interpose** 241:2

**interrogation**
19:11 50:10

**interrupted** 270:2

**interview** 34:24
35:8,19 38:13
40:21 96:8
148:13 153:2
188:21 189:7
234:17 235:15
251:7 269:22,24

**interviewed** 34:7
96:6 109:23
165:23,24
166:14 191:1
230:16 267:6

**interviewing** 40:4
150:11 170:12
186:7 191:8,12
270:3

**interviews** 31:13
170:23 179:25
187:20 207:7,9
209:9,13 267:10

**intimately** 66:15

**introduce** 4:22
214:9

**introduced** 224:25

**introspective**
253:5,6

**investigate**
43:15,19 45:25
74:14,16 270:15
273:24

**investigated** 46:24

**investigating**
273:22

**investigation**
43:14 45:24
90:23 91:10
133:24 176:19
180:4 181:11,13
182:2,8,13,16,20
183:10 196:3,17

301:1,25 302:2,5

**investigative** 182:15 302:12

**investigator** 35:18 38:12 41:2,6,10,12 66:25 269:22 274:3 304:4,20

**invitation** 200:9

**invited** 214:13

**invoke** 192:13

**invoked** 191:21

**involuntariness** 50:19 51:3 58:13 225:17

**involuntary** 49:25 50:5,14

**involve** 12:11

**involved** 29:24 35:25 72:9 114:6 115:14 159:6 185:1 197:9 200:18 209:23 210:9 241:24 262:19 286:3 287:1 291:9

**involvement** 90:17 123:17 245:15

**involves** 289:24

**involving** 26:9 73:22

**Iram** 142:2,3,9,11

**irrational** 98:12,15

**I's** 138:20

**Ishfaq** 157:7,12,21

**I-S-H-F-A-Q** 157:8,21

**Islam** 122:23 201:23

**Islamic** 240:22

**I-S-M-A-E-L** 149:16

**Ismail** 149:13,16 150:6 151:15 152:5 153:8,24 166:3,9 167:13,15 168:2 170:2 185:6,8 186:5 187:5 191:20 192:11,13,21

**isn't** 96:7 267:13 275:3 301:12 306:17

**issue** 24:11 25:8,12 26:18,21 31:7 34:21 53:13,14,17 61:3,25 62:9,12,16,17,24 63:5,10,16,17 67:10,11,13,14 68:5 73:11,16,22 74:1 95:20 96:3 100:3,18,21 166:7 171:22 173:2 174:3 176:4 183:4 186:19 188:22 195:5 197:10 205:7 207:22 213:19 218:25 222:20 225:8 227:1 233:7 240:25 257:2 259:23 274:23 275:24 277:4 280:3,5 291:24 292:4 302:3

**issued** 166:23

**issues** 62:11 76:22 77:15 91:5 133:2 187:3 196:15 202:14,16 220:4

249:7 296:7

**item** 65:1 217:8 221:17

**items** 129:20

**itially** 254:12

**it's** 17:12,18,19 25:5 31:2 32:9 34:21 35:10 42:23 48:11 54:19 56:7 57:3 59:15 61:2 65:1 68:10 79:10,12,15,18 82:11,14 85:14 91:16 97:23 102:12 119:9,10 122:16 123:11 133:21 135:5 138:22 140:4 142:13 143:14 146:8 152:20 154:17 155:5,9 156:21 159:13 166:13 169:7 170:9 181:11 186:24 187:1 194:10,20 195:19 196:2 199:7 201:4 210:13 211:18 212:16 216:1 218:1 224:24 225:15 231:16,20,25 232:20 233:2 234:13,19 237:6 238:9 240:21 246:8,16 248:16 251:23 253:14,18 258:2 278:5 282:14 287:21,24 288:23 289:2,21

**I've** 8:11,12 91:24 101:25 102:5,24 113:3 119:6,8

121:19 123:1 128:17 135:5 136:12 154:17 156:2,5 157:9 170:1 185:11 195:15 265:22 272:15

_____

## J

**Jabar** 152:4,6

**Jaber** 153:24 170:2 274:10,15,24 276:24,25

**Jaber's** 275:4

**jail** 18:9 125:5

**James** 2:20 4:14 41:11,12,16,19,2 4 42:4,18,21,24 43:4,8 70:16 71:6 178:15,16 180:9,10 300:22

**Jan** 213:5

**January** 72:3,7,25 73:13 77:17 80:8 137:5 139:17 214:20 236:11 281:21 288:9

**Jessica** 1:22 4:17 307:3,23 308:22

**jihadi** 150:21 193:13 279:4 281:3,15 282:14

**jihadist** 233:24

**Jim** 141:5 177:5,10 180:8 182:18 207:17,23 208:17,19 209:7 210:6 284:9,10 285:18 286:4,19

**JJ** 154:14

**job** 24:21,23

119:17 202:7
252:19

**Joe** 185:19

**Johnny**
16:7,8,12,21,23
18:2,16
20:8,10,11,12
21:2,10 22:25
24:8,14 25:2,19
28:9 29:1,8
30:16 31:7 37:14
38:15,24 39:5,15
42:10,17,22,23
43:8,10 44:20,25
45:4 53:1,8
57:10,12,13
58:10 66:18
69:13,15 76:12
80:12,17,19,20,2
3,25 81:1,24
82:13 83:4,9,22
84:12 85:2,7,21
86:19 87:11
88:5,15 90:20
92:14 93:3,9
94:14,17,20
99:14,18
100:8,10,15,22
104:7,9 105:25
111:19 114:9
124:6 125:10,14
126:7,9,16
127:11 129:22
131:2,10,19,23
132:2 135:22
137:6,13
140:15,17,21,24
146:6,14
173:8,11,15
176:7 181:12,24
182:10
184:12,16 192:3
194:20 195:19
204:21 208:1,23
220:3,19 231:2
241:15,16,23,24
243:1,8,12,14,20

,21 244:12
248:11,13
251:24 252:5
276:10 279:23
284:15,20,22
285:15 289:21

**Johnny's**
17:2,11,13
29:5,7 41:23
42:3 57:1,2,17
79:11 94:16 99:4
129:11 141:6
241:22 242:3
243:20 247:24
285:1

**join** 243:13 288:17

**joint** 22:23 25:1,20
27:5,11 51:18
53:16 55:1 77:25
78:18 94:2
113:19
127:15,18 130:1
131:3 132:10
141:9,16 212:10
249:3 284:20

**jointly** 127:25
128:10 251:24
252:4 276:5
285:4

**joint-team** 24:6

**joke** 105:20

**joked** 105:18

**journals** 163:2

**judge** 12:15
14:16,20 73:16
222:9 286:12
292:22

**judgement** 172:23

**judge's** 287:12

**judgment** 169:6
208:23 220:1
224:2 230:23
270:14

**judicial** 191:19

**July** 10:23 11:1
47:22 114:16
193:9

**jumped** 77:15

**jumping** 62:14
123:8

**juncture** 218:21

**June** 13:16 14:1,3
15:1,3 19:16
20:3,22 28:3
30:24 31:2
33:8,20 35:4
44:3 86:10,24
105:2,7 114:16
123:21 143:21
144:1

**junior** 135:21,22

**juries** 93:20
94:2,7,9
264:6,10,13
285:7,12

**juris** 7:22

**jurors** 40:12
103:22 104:2
105:19

**jury** 12:16 13:21
14:2,21 95:6
97:15 103:19,20
104:3,4,6,10,17,
22 105:2,5 106:5
113:18 162:22
166:24 285:1

**jury's** 203:4

**Justice** 2:8 5:7

————————
K
————————
**Kakar** 141:21,23
142:6,16

**K-A-K-A-R**
141:22

**Kandahar** 8:16

**Kashmir** 304:12

**Khaleel** 107:2
197:24 198:8
199:13,25
237:7,17
239:11,12,22
278:17,19
279:9,10 280:15
281:16

**Khan** 112:16,17
222:2 249:19,22
250:5,11,15
251:5

**K-H-A-N** 112:17

**Khitab** 84:21
150:9 153:18

**kids** 123:5

**killed** 303:15

**kilo** 188:12

**kinds** 181:21,22
182:9

**King** 117:3

**knew** 24:7
26:21,24 47:3
50:16,20 51:17
52:3 56:19 59:14
61:3,7,9 62:6,10
63:12 65:24
66:17 71:4
72:15,17,21 77:2
85:21,25
98:6,7,9 105:19
129:23 152:10
162:3 192:3
198:25 200:5
202:1 204:14
206:21 211:12
219:10 227:12
259:8 260:4
263:22 279:14
291:4 304:7,17

**knowledge** 46:15
51:9 119:4 126:5

181:19 192:23
218:17 238:18
291:23 303:20

**knowledgeable**
66:15 201:23

**known** 30:17
58:21 69:11
173:19 211:11
283:1

**Krista** 167:18

_____

### L

**La** 178:13

**lack** 226:7 238:18

**lacked** 182:15

**language** 8:17,19
23:2 107:16
119:10
120:18,24 121:3
122:17 162:7
165:9 199:14,22
201:24 252:8
278:23

**languages** 8:6,9
98:9 122:6,7,9
125:13

**Lapham** 16:25

**large** 55:7

**last** 6:21 7:2 15:6
90:9 141:11,12
149:3 178:14
179:19 201:17
221:23 250:6
251:12 257:9,11
260:18
292:14,17

**lastly** 139:9 160:19

**late** 61:15,19
101:9,20 260:21
302:16

**later** 20:19 30:7
105:18 106:11

112:15 162:21
170:9 171:10
264:1 289:25

**latter** 10:15 223:8

**law**
9:2,3,4,5,7,8,14
10:1,5,6,17
11:5,13,19
12:4,8 13:19
14:10,11,15
22:16,18 25:3
26:22 27:18
39:19 49:24 50:1
54:10,12 56:4,9
57:17 63:7
118:13,19,20
178:7 226:5
253:16

**laws** 210:23

**lawyer**
26:10,13,18
52:13 85:19
93:10 97:2
279:20

**lawyers** 84:24

**lay** 40:12

**Lazor** 44:1
178:13,16
180:9,10,13,23
196:6 203:8,24
205:17 235:1,4
258:23
259:8,15,19
300:22,23,25
301:6 302:9
303:21

**L-A-Z-O-R**
180:11

**Lazor's** 203:3
303:1

**lead** 105:13 132:3
135:11 182:8

**leaders** 15:23

125:2 200:20

**leading** 23:23 53:4
205:10 227:5
228:6,14,17
238:10 305:22

**learn** 23:8
24:19,20,21,23

**learned** 8:21 50:8
55:23 162:21
262:18,23

**least** 128:17
200:11,23
259:5,18

**Leaver** 296:4,5

**Leavers** 141:10
142:16

**lecture** 116:24

**led** 27:3 116:23

**ledger** 83:1

**legal** 4:16 24:11
95:20 112:21
119:15
146:4,8,11,12,13
,25 233:23

**legally** 56:7

**lend** 200:25
201:19 246:10

**length** 50:10

**less** 65:17 83:9
168:13

**let's** 7:24 9:2 12:1
13:14 16:20
20:1,21 24:1
49:9 52:8 69:19
74:2 77:16 81:17
82:5 86:14 90:1
102:20 129:25
136:1 155:11
162:24 170:1
185:6 202:8
215:25 229:7
271:11 283:19

289:15 294:3
295:14 296:3

**letter** 27:21 55:3
73:7 80:12
82:4,6 101:4
103:1,5 138:14
212:1,21
213:6,8,22
214:17

**letters** 45:21

**level** 12:9 39:23
72:5 123:12
184:9 235:16
238:7

**levels** 164:12

**License** 1:23

**lie** 134:3

**life** 119:6,21 260:2

**lighter** 85:16

**likelihood** 58:23
111:1 297:24

**likely** 34:22 45:4
48:6 54:2 76:13
152:21 212:23
213:9 241:25
293:6 301:15

**likewise** 233:2

**limit** 6:11 149:19
217:3,7

**limitation** 99:10
242:12

**limitations** 97:8

**limited** 53:21
170:25 216:23
245:19 299:19

**line** 194:5 214:10
221:12 222:6
292:16,19
293:19 294:3
296:24 310:7

**lines** 181:18

234:10 292:23
293:22 294:2
295:14 296:4

**link**
228:2,18,19,21

**linked** 228:24,25

**list** 148:18 155:20
198:20 274:22

**listed** 150:5 154:7
160:25 273:11

**listened** 16:4 207:8

**litigated** 219:1

**litigation**
226:23,25

**little** 10:25 59:7
120:9,24 121:12
123:17 142:21
144:12 167:25
172:8 177:18
204:11 227:19
234:20 247:1,20
253:4 258:2
287:23

**live** 121:4

**lived** 91:21 121:1

**living** 36:6 85:25
168:22

**LLP** 2:16

**local** 21:25 267:23

**locale** 180:24
233:25

**locate** 38:12 193:8
200:8 202:25
274:4

**located** 4:11,18
204:1 280:1

**locating** 136:14
193:15 208:8

**location** 1:19
177:24 232:22
302:15 304:8

**Lodi** 15:24 148:17
165:17 168:22
189:6

**log** 144:14

**long** 89:6,9
116:11,20
141:25 229:24
246:8

**longer** 67:9 162:9
243:14 304:21

**longitude/latitude**
177:24

**Los** 194:13

**lose** 195:22

**losing** 255:13

**lost** 8:12 16:2
146:4

**lot** 24:8,18 29:4
36:20,22,25
72:5,13 74:21
75:13 95:15
122:5 129:4
145:13,15,25
148:7 152:22
163:23 169:20
181:23
197:7,8,10
200:18 201:25
203:23 206:15
209:22,23 226:9
246:19 261:25
265:9
267:17,19,24
284:2 287:25
302:5

**low** 299:8

**lump** 82:10 138:23

**lying** 31:14 250:8

---

**M**

**madrassa** 36:3
271:1

**mailed** 308:16

**maintain** 144:14

**major** 284:5

**majority** 72:12

**Malik** 160:11

**man** 159:6

**mandated** 56:9

**Manolo** 141:10

**Manresa** 304:11

**March** 87:14
251:16

**mark** 32:7 93:14
94:15,16,18
97:3,6,8 98:17
99:1,4,8,19
100:5,10,15,22
136:17,20
241:12,14,23
243:6,17,18
244:19
246:13,19

**marked** 3:15
32:14 79:3 102:7
136:15 216:1
260:11

**marks** 90:3

**Mark's** 246:16

**marriage** 8:22

**married** 8:20
120:21,25 148:5
151:25
190:12,21

**Martha** 2:15 5:2

**massive** 98:13

**material** 64:18
233:24 238:11
264:16

**matter** 4:6 12:14
13:20,22,24
14:11,24 99:7
114:23 163:6

174:17 212:12
216:12
219:15,18
227:17 228:5
308:10

**mattered** 74:12

**matters** 12:17
145:19 146:1
253:5

**maximum** 65:22
66:2

**may** 9:12 10:2,20
11:16,23 12:12
13:5,6,9 14:3
20:16 31:21,24
32:2 33:4,5
36:16 39:21
42:14
43:10,23,24
44:13 48:2 58:21
62:22 71:12
74:17,18 75:17
76:3,16 78:25
80:24 92:5,9,25
104:19,21 112:3
114:17 115:19
124:24 125:14
130:23 145:2
146:4 149:22
150:8 152:7,12
168:13 169:6
170:5 187:16,18
191:6 194:7,24
201:1,3,5 203:15
204:18 206:13
208:12 210:6,16
211:11 215:10
222:22 225:5,16
231:4 233:21
241:24
244:15,16,18,21
246:5,7 247:19
252:13,18 253:9
254:19 265:9
282:3 293:7,9

**maybe** 13:12,20

15:2 16:24 18:8
20:19 28:24
38:19 50:7 58:22
71:17 72:9 78:17
92:22 94:13,18
101:14,20
102:18 124:25
125:1 129:10
145:15 146:8
147:3 149:22
150:9,12 155:11
167:10
170:6,9,11
171:23 187:8,20
194:13 201:2
203:16 206:14
219:4 230:10
235:23 245:25
247:19,25 248:6
251:7 270:25
287:22
300:22,23
301:19

**McGeorge** 7:22,23
9:25 115:19
116:9,16 117:24
118:5

**McGrath** 2:20
4:14

**mean** 21:25 23:4
26:20 31:9 34:1
50:20 51:14 60:6
62:11 64:21
75:10,22
79:10,15 83:3,12
85:14 89:4,19
90:25 97:24
106:4 107:9
108:25 111:25
119:9 121:13
123:11
125:11,20 141:5
145:14 146:3
149:19 152:16
158:19 177:15
182:4 183:1,3

185:24 187:6
189:4 190:24
191:2 195:10
196:25 201:21
204:10,22
205:15,24
206:25 209:21
215:16 218:5
226:9 231:4
246:12 251:6
252:6 253:13,15
258:23 270:8
271:6 284:22
287:11 289:14
297:3 302:4,5

**meaning** 6:9 18:17
37:14 42:1
107:10 185:2
199:17 200:2

**means** 69:2 174:20
205:13 234:23
235:3 307:11

**meant** 78:13
298:22

**media** 187:20

**medical** 46:24
50:17 267:12

**meet** 7:13 15:15
16:8 17:20 18:3
126:19 153:25
163:22 241:18

**meeting** 16:15
18:11 19:1,4,6
124:16 125:4
145:17 241:21
258:16

**meetings** 29:4
144:25
145:1,7,20,24
146:23 209:22

**member** 13:6
151:24 156:3,14
157:3,10,18,25

**members**

15:11,15,23
21:9,10 28:7
29:6 34:4
124:17,22
148:13,19
150:3,14,19
155:2 164:22
168:9 189:5
191:3,15
273:7,10

**memorandum**
285:22

**memory** 266:9
273:1 276:15
288:16

**men** 124:24

**meningitis** 46:4,15
50:23 51:2
260:2,4,14

**mental** 50:17
107:18 108:1
222:17 280:16

**mention** 127:18
233:18

**mentioned** 19:18
30:4 39:24 51:5
72:14 97:11
103:17 105:25
106:7 117:16
118:19 126:8
127:13
142:15,16
150:15 152:18
175:11 187:2
264:1,25 267:5
269:11 273:12
274:9,12 277:10
283:7 284:4
297:20 300:19
301:2,19

**mentioning** 277:2

**mentions** 79:16

**mentor** 100:11

**message** 281:5,7

**met** 15:16 17:8,14
21:8 120:17,23
125:7 145:18,22
146:24

**method** 275:2,7
281:8

**methods** 69:23,25
70:8

**middle** 212:15
254:9 255:23

**mid-January**
80:10

**mile** 291:7

**miles** 273:18 291:7

**militant** 211:16
234:12,18

**militants** 304:12

**military** 181:1
215:23 235:10

**mind** 15:2 45:23
49:5 61:24 65:13
67:4 91:13
99:7,11 104:24
115:1 126:2
203:4 246:6
247:24 266:2
281:3 297:15

**mine** 29:10 129:11

**minister** 44:10
193:19

**minute** 81:17
103:21 113:1
272:4 304:25

**minutes** 89:20,23

**Miranda** 226:7

**mischaracterized**
240:20

**mispronounce**
142:1

missed 221:23

missing 103:6
146:8 218:5

mission 180:14

misspeak 249:25

misspoke 185:17

misspoken 110:20

misstates 27:4,7
56:3 73:7 75:1
127:17 270:19
297:6 300:6

mistrial 113:21

misunderstood
228:23

mixture 98:5

MLATs 45:15

MM 155:6

Mohammad
91:15,20,23 92:1
159:10

Mohammed
107:2,6 108:1,21
156:18 197:24
198:8,18 199:25
200:4 206:1
237:7,17 239:11
278:17,19,22
279:4,9,11,17
280:15 281:16
283:1

Mohammed's
108:12,21
199:13 202:5
239:12,22
282:9,22

Mojaddidi 1:12
4:5 5:12,18,19
7:18 90:13
113:16 115:11
179:19 251:23
257:23
261:12,24

298:18 305:8
306:23 308:3,7
309:3,25 310:5

mom 151:20

moment 164:5
185:6,8

mom's 189:22

Monday 19:22
20:5 282:17

money 28:8
29:2,6,8,13
42:7,9,15 43:5
80:13,14 81:7,19
83:8,9 84:12
85:17,20 86:1,21
87:17,25
88:7,9,15
91:3,5,6,9
92:4,8,9,13,17,2
0,24 93:4
99:8,9,10,14,17,
21,24 139:25
140:18,22 143:4
182:16 183:8
205:7

monies 42:14 99:3

Montgomery 2:16
4:18 308:11
310:1

month 98:23

Monthly 109:20

months 6:21 7:2
30:7 66:14 118:9

moot 116:16

morning 4:3
5:4,18 6:8
282:17

mother 8:15 121:1
148:22 149:1
151:10 165:2,4
189:7 267:12
268:12

mother-in-law
121:2

motion
49:16,20,22
50:18 51:3
52:2,5 62:25
63:2,9 67:21
69:22 70:2
95:10,13,17 96:4
103:10
108:15,16,25
109:14 110:2
111:14
175:12,15,18
176:7 206:18,19
212:4,11,17
226:15,19 228:3
229:4 232:21,24
233:3,7,19 254:4
255:2,5,8,25
256:4,9,20
266:24 276:4,8
277:13 279:4
298:10 305:15

motions
47:14,18,23,24
48:5,8,17 49:3
54:1,15,18,23
58:2,6,7,9,15
67:8 69:17 72:25
95:7 133:13,18
135:5

mouth 57:22

move 16:20 58:12
63:19 69:6 228:1
305:25

moved 69:8 119:7
120:15 196:1

moving 21:13
225:14 288:8

Muhammad
155:25
156:4,10,21,22,2
5 157:14 158:23
159:2,5 160:7

M-U-H-A-M-M-
A-D 155:25
156:10,18
157:14 160:8

multiple 26:14
225:3

multiples 66:7

Mumtaz 160:12

M-U-M-T-A-Z
160:12

Muslim 123:1
200:20 252:8
279:6

Muslims 281:17
282:25

myself 6:20 19:14
24:15,18 30:3
53:7 54:12 90:20
97:24 109:2
119:12 125:10
145:6 201:4
210:20 213:6
241:23 245:3
286:1 295:17

_____

N

Najia 190:14

Naseem 112:16,17
222:2 249:19,22
250:5,10,15,20
251:5

national 2:8 5:7
22:1 55:10 98:4
296:7

nationwide 200:16

nature 42:23 98:2
127:21 196:4
214:22 246:16
261:5

Nauman 160:8

N-A-U-M-A-N
160:8

**necessarily** 60:4,5
78:13 268:5
293:10 294:16
302:19

**necessary** 233:11
243:7 244:25

**neck** 114:25

**needn't** 292:9

**negative** 147:20
201:7 246:14

**negatively** 253:17

**negotiated** 83:14

**negotiations** 40:16

**neighborhood**
28:22 84:3

**neither** 157:2

**nervous** 93:16
97:12,20
98:11,13 100:4

**news** 22:1

**newspaper** 32:19
33:2 44:4

**nice** 102:6

**nine** 68:10

**Ninth** 256:18,22

**Nisar** 159:15

**N-I-S-A-R** 159:15

**nobody** 159:7
199:18 273:11
285:20

**no-fly** 274:22
277:2,4

**none** 145:15
161:7,8

**nontestifying**
224:25

**Nonverbal** 85:9

**nonvisibility**
305:19

**Nope** 87:19 156:13

**nor** 137:9 307:18

**Northern** 117:12

**note** 289:15

**notes** 144:24,25
145:7,12,15,20
146:1,5,8,10,16,
22,24,25 147:3

**nothing** 13:12
24:12 59:20
148:10 200:5,17
306:19 307:8

**notice** 197:20,23
198:3 209:25
254:11,19

**noticed** 7:7 254:19

**noticing** 308:15

**notion** 282:12

**November** 249:23

**nutshell** 198:2,7

**NW** 2:9

---

### O

**oaths** 307:4

**object** 23:23 30:12
48:18 108:7
111:23 112:7
204:25 227:3
238:9 256:11
291:13 295:1,10
296:12 298:25
299:22 300:3,5

**objected** 74:20,25
75:15 112:2
288:19 290:8,22

**objection** 25:16
27:4 52:17,19
53:2 56:3 63:21
73:6 75:1,23,24
76:13 111:10
127:17 232:15
233:12 239:2

241:3 270:18
282:15 283:18
289:15 290:10
298:12
300:13,17

**objectionable**
108:9 111:24
112:4

**objections** 74:22
75:7,11 108:11
112:11 181:4
221:19

**objective** 68:19
218:22,23

**objectives** 174:4

**obligation** 27:1
210:23

**obligations** 56:7
283:14

**observations**
181:6

**obtain** 55:25 56:8
109:13 134:19
138:17 174:20
184:12 191:19
192:19 198:16
207:17
211:19,21
213:24 217:23
258:12

**obtained** 74:7
108:20 138:6
211:15 219:16
223:11 243:9
266:23 277:12

**obtaining** 38:22
40:4 143:16
207:21 219:7
222:10 275:3

**obvious** 14:3 27:16
71:12 130:13
208:3 253:14

**obviously** 23:11

131:14 145:25
151:24 187:6
207:6 296:14

**occasion** 127:14

**occasions** 36:13
122:2 133:5,7
147:6 186:25

**occurred** 15:21
273:25

**Octavia** 2:13

**October** 249:24
250:3 297:11

**offense** 64:13
65:8,23 66:2
265:16

**offenses** 261:5

**offer** 49:7,12
78:8,11,14,18,19
106:12 138:15
213:25 214:22
247:2,8,13
248:17 262:12
284:6 285:23
286:20 294:13

**offered** 78:2 94:19
107:7,17,20
108:1 110:25
112:21
119:14,17 234:4
264:17 295:12
301:18

**offering** 111:6

**offers** 78:18

**office** 1:19 2:4
4:10 6:17
15:14,16,20
16:17
17:2,5,11,12,13,
19,21 18:4
29:4,5,7 79:11
114:14
124:1,11,19
126:20

128:20,22
129:11 141:6,8
146:18 165:15
241:23 242:4
287:4 308:11

**OFFICER** 307:1

**official** 44:18
114:4 193:11
308:15

**officials** 45:6,9

**off-the-record**
101:2 136:2
196:19 293:25

**oftentimes** 132:25

**oh** 5:23 7:3,24
9:10 10:19 12:20
17:17 21:7,17
30:22 37:18
40:17 61:20
74:17 76:7 77:2
81:10,16 82:3
85:11 86:9,16
87:5,8 102:15
104:24 106:25
107:4,12,24
109:8 110:23
118:16 121:11
122:24 126:1
142:3 144:6
149:1 155:7,8
163:9 169:2,18
174:22 184:10
185:18 186:2
189:4,13 192:7
194:10 203:10
204:2 205:2,7,19
207:8 208:25
211:5 224:3
225:9 228:8
247:5 249:25
255:18 256:15
257:8 259:6,22
272:21 274:21
278:3 284:12
285:24 291:4

292:7,18 293:19

**okay** 4:3 6:5 7:11
10:4 12:20 15:22
16:11,22 19:15
20:4,23 31:3
32:10,21,22
40:11,17,20 48:7
53:10 60:11 62:8
63:22 64:10
67:15 69:21
77:12,18 79:7
80:23 81:16 82:7
84:18,20 87:8
89:21 90:2,6
94:12 95:17
97:11 101:24
103:17 105:12
106:24 108:6
110:4,11 111:9
113:7,13 114:22
115:4,19 116:6
117:2,6
118:1,10,21,24
119:3,5,19,20
120:12 121:21
122:4,14
123:16,25
124:5,7,13,16
125:3,7,16,19,22
126:2,8,23
127:5,21
128:6,12
129:9,25
130:2,14,17,22
131:1,7,16
132:14
133:17,21
134:3,5,10,15
135:1,4,10
136:7,22,25
137:21 138:21
139:15,19
140:4,10
141:7,14,21
142:3,12,21
143:1,6,11,19,23
144:3,9,11,22,24

145:4 146:16
147:5,10,21
148:12,18,22,23
149:2,15
150:2,18,23
151:7,17
152:4,13,19,23
153:6,8,13,18,24
154:3,6,13,16,22
155:4,14,16,18,2
5 156:3,7,9,14
157:2,6,10
158:13,15,17,22
159:9,14 160:23
161:5,15,21
163:5,10,14
164:4 165:3
166:3,6
167:5,12,23
168:12,25
169:19,25
170:14 171:2,15
172:8,11,12,20,2
5
173:7,10,13,17,2
3 174:2,8,23
175:9,15,25
176:10,14,25
177:8,18,22
178:17
179:1,5,16,24
180:12,22
181:9,18 182:13
183:13,18
184:20
185:7,20,22
186:6,10,18
187:17,23
188:4,6,8,18,25
189:10 190:3
191:17 192:7,17
193:23
194:4,15,20
195:3,7,20
197:16,18,23
198:11,16
203:10

204:5,20,24
205:3,22,25
206:4,8 207:12
208:5,18,22
209:2,6,11,15,18
210:2,10,21
211:6,25 212:3,8
213:4,11,18,20
214:5,16,19,25
216:7,11,23
217:2,7,11
218:13,17
219:25 220:3
221:3,15,18
222:5,17 223:14
224:4,14,20
225:3,6,14,21
226:23 227:10
228:11 229:13
231:1,16,20,25
232:6 233:1
234:21 235:2,18
236:17,19,20
237:2,11,12,14,1
5 238:21 239:16
240:4,6,17,19
241:11,18
242:2,17 243:8
245:4 248:20
249:2,11 250:14
251:15,16,20
252:7,13,24
253:4 254:17
255:7,19,20
256:6,19,24
257:3,15,20
258:1,5
259:2,7,18,22
260:8,25
261:17,20
262:13 263:18
264:25 265:14
267:4 272:4,18
273:19 274:12
275:11
277:6,11,14
278:13 282:21

284:10 287:16
288:21 289:4,17
290:13 291:6
292:18 294:9
295:16 296:9,12
297:8 298:2,20
301:12 304:24
305:1,4,9,12
306:20

**Olaso** 141:12
142:16

**old** 9:1 159:12
260:21,22

**older** 10:25 190:21

**omission** 252:17

**one-day** 105:6

**one-semester** 9:8

**online** 178:2

**OO** 213:3

**oOo** 4:2

**open-ended** 24:1

**opening** 97:15
111:18 249:17

**operating** 211:16

**opinion** 39:25
62:15 72:17,21
97:1 106:19
110:25 205:2
234:13 240:22
265:11 279:19
282:6,22 292:8
294:11 295:20

**opinions** 111:7
239:13 264:9
282:9

**opportunity**
307:14

**opposed** 76:18
100:19 176:7
185:14 264:22
299:19

**opposing** 105:17

**option** 223:8

**options** 244:7

**oral** 116:3 117:1

**orally** 130:12

**Orange** 17:17,18

**order** 24:20,21
56:8,13 62:23
115:22,25
182:16 192:19
205:13 213:16
225:8

**organization** 15:7

**organized** 129:7

**original** 72:7
256:9,20
308:9,24

**originally** 66:7

**others** 75:14 125:8
177:9

**otherwise** 129:16
222:19 249:12

**ought** 265:15

**outcome** 253:21
307:19

**outside** 182:23
222:10

**outstanding** 61:4

**overall** 141:3
228:4

**overlap** 129:10

**over-prepared**
98:2

**overwhelmed**
97:21 98:13
280:8

**overwhelming**
97:17

**owned** 10:11 92:18

**owner** 148:9

─────────
**P**
─────────

**p.m** 306:25

**packet** 136:13

**pad** 146:9,13

**pads** 146:4,11,25

**page** 3:2 82:5
87:9,10 103:6,13
189:17 236:20
237:12 251:17
257:9,10,11
260:19 278:7,12
288:24
289:1,2,3,16
292:14,21
293:4,20
294:5,6,7,8,9
295:14 296:3
310:7

**pages** 161:25
257:7 288:21
309:4

**paid** 10:5 29:9
42:5
80:17,20,23,24,2
5 81:2,11,12
82:9 83:22 84:1
86:13 87:13
88:19 99:22
141:20

**Pakistan** 8:20
33:15,24
34:10,25
35:9,15,19,23
36:6,10 37:1,6
38:5,8,12,22
40:22
41:3,7,20,24
42:5 43:16,21
44:5,10 46:11,17
67:1
92:3,17,19,23
118:25 119:8
120:10,11,15,17

121:10,17,25
122:18 147:23
148:4,14,21
149:9,20 150:4
151:1 152:10
164:15
176:18,20,22
177:5,13,24
179:21
180:1,2,13
181:11,13
182:3,6
183:15,20,24
184:22
190:12,23
193:12,13,24
194:12,16 196:3
202:10 211:16
212:22
230:11,19
259:20 260:6
263:2 267:11
268:5 269:1,17
270:12,16
271:13 272:20
274:15 275:3
278:23 281:17
282:2,25
301:6,22 302:1
304:4

**Pakistani**
45:1,6,9,25
121:15 181:1
184:13 196:21
198:4 202:10,18
204:14 240:5
279:1

**panel** 232:10,14

**panels** 225:7 232:7

**paper** 106:22
240:23

**papers** 116:25

**paragraph**
143:12,24
193:17 214:4

236:13,22
260:11,18
288:25
289:5,6,19
292:15,17

**paragraphs** 216:4
278:8,12

**parents** 8:18
119:9,11,24

**participate** 53:1
76:25 114:8
216:20,24
217:12 288:14

**participated** 58:11
90:18 106:3

**participating**
26:2,4,6 27:12

**participation**
221:1 244:3

**particular** 40:9
78:18 217:3
222:1 236:10
237:17,20
238:19 287:3

**particularly** 37:11

**particulars**
233:3,7,10,16

**parties** 307:17

**party** 125:17

**Pashmina** 160:1

**P-A-S-H-M-I-N-A**
160:2

**pashto** 8:10,14,15
122:12 125:12

**P-A-S-H-T-O** 8:10

**passage** 253:7

**passed** 11:1

**path** 305:24

**pause** 179:1 238:8

**pay** 43:4 82:9

83:4,18,24 92:6
99:19

**paying** 43:11
84:23

**payment** 82:10
138:23 140:14
143:20 144:1

**penalty** 65:22
276:8

**Pennsylvania** 2:9

**people** 15:22
16:5,19 35:16
36:1,4,25 37:9
38:13 71:3,9
94:9 116:2 122:6
141:19 142:19
146:13 167:20
168:11 181:3
197:7,9 199:10
200:18,22,23
201:3 203:17
206:15 208:10
264:2,16
268:5,8,11,14,19
,20 269:11,17,25
270:3,20
273:8,21 274:1
280:10 281:24
303:15

**perceive** 182:22
183:1 219:7
269:10

**perceived** 167:7
244:7 246:14
283:25

**percent** 97:7
299:9,13,14,19

**percentage**
298:7,15 299:7

**perception** 262:4
264:20

**perhaps** 90:8
98:20 146:24

**period** 11:3,6
13:15,22
34:13,19 35:4
38:3 39:17 48:16
49:10,11 57:23
72:10 76:22
80:16 148:15
152:2 229:24
260:13 304:17
308:14

**perjury** 276:8

**permission** 211:8

**permitted** 290:19

**person** 42:24
89:15 94:20
105:20 109:15
151:12
152:8,9,13
154:9,11
156:2,9,24 157:9
165:13,19,20
169:3 178:12
186:15 187:19
188:1 189:18
191:5 199:8
204:16 215:20
266:22 271:9
287:4

**personal** 105:4

**personally** 30:3
57:2 83:25
162:20 241:18

**persons** 263:6

**perspective** 203:20
215:15 282:18

**pertinence** 296:24

**pertinent** 140:6
282:16

**peruse** 185:9

**petition** 253:24

**petitioner** 4:24 5:1

**petitions** 254:2

**phases** 47:13

**phone** 16:22,25
17:3 147:2
153:11
169:14,15 170:7
178:6 201:2
202:3 250:18,21

**phonetic** 142:2
143:13

**photographs**
73:23 110:9
111:3 279:19
292:1,5 297:21

**photos** 298:1

**phrasing** 244:22

**physically** 17:2
148:17 176:22

**pick** 238:18
259:13

**picked** 63:16
104:17,22
105:2,5 121:2

**picture** 67:9
204:10

**piece** 40:10
49:6,12 106:21
218:9 240:23

**pieces** 291:23

**placed** 194:11,25
198:3 222:14

**Plaintiff** 1:5 2:3

**plan** 244:8

**played** 36:20,22
67:3 148:7
245:18,19
267:17,19 268:8
271:4,6 286:25

**playing** 271:17

**plea** 40:16 77:21
247:2,7,13,18
248:17

**plead** 262:11

**pleading** 262:9

**please** 4:21 5:10
6:3 24:2 59:10
122:25 213:3
216:2 236:9
241:13 251:15
295:5 308:8,17

**pleasure** 188:9

**plus** 82:13

**pnk|I** 228:17

**pocket** 99:4
140:24

**point** 11:15 16:1
18:8,19 19:14
23:22 31:13
35:12 47:6 50:21
61:11,24 62:3
63:23 64:15
66:19,24 67:11
68:8 76:4 94:1
95:19 114:19
126:8 132:22
143:20 147:24
170:8 171:21
182:14 183:4
185:10 189:15
208:13,15 212:3
214:12 219:2
222:1,9 230:17
233:18 239:20
240:12 243:4
245:14 246:23
249:18,21
257:13
258:5,11,15
260:25 264:25
270:9 274:18
276:1,2 283:6
299:11 300:9
303:22 305:15

**political** 7:21
198:5 202:11,19

**politics** 120:5

**portion** 111:14,23
112:2 236:15
237:2

**portions** 93:18
94:4,5 112:11
248:21,24

**posed** 250:10

**posing** 250:11

**position** 69:1 74:7
119:14

**possess** 41:15

**possessed** 42:17

**possesses** 214:7

**possession** 140:1
210:24

**possibilities**
241:19

**possibility** 38:25
39:2 77:21 99:23
100:5 113:25
147:2 163:25
189:24 191:6
222:10 232:2
234:11 301:24

**possible** 37:9
171:7 172:3
174:6,17 175:23
176:19 219:5
223:2 227:18
228:5 306:1

**possibly** 164:11
171:17

**post-trial** 95:7
206:18 255:15

**potential** 6:12
19:10 25:13
26:24 34:25
35:7,19,22 66:6
70:19 100:17
145:18
150:12,24
152:14 154:9

155:3
156:12,15,20
157:4,8,15,19,22
158:1,11,18,24
159:3,8,16,19,23
160:5,9,13,16,20
,23 161:2,18
164:24 169:16
182:2 183:15
184:13,21
198:23 203:16
218:9 222:22
225:4,8,11
229:14 246:4
269:1,4,12,15
273:8 275:25

**potentially** 37:12
151:4 152:9
174:9 209:6,19
218:18 219:19
221:13 229:11

**power** 131:4,11
183:23

**powerful** 235:19
236:4 277:16

**practice** 9:15
10:23 11:18 12:2
13:17 26:7,8,12
72:12 103:19
118:13 123:4,5
280:4

**practiced** 123:2

**practicing** 11:13

**prayer** 240:23

**precedent** 69:3

**precise** 46:8

**precisely** 180:12

**predict** 287:11

**prefer** 89:9

**pregnant** 10:22
11:15

**premised** 226:15

**preparation** 72:9
163:16 201:20
209:19 210:1
239:8 249:15
285:16

**preparations**
127:25 305:22

**prepare** 61:22

**prepared** 98:1
196:7 204:3
209:23 246:10
285:15,21

**preparing** 136:21

**present** 2:19 7:14
20:12,18 77:4
124:22 165:7
185:14 198:13
216:15 258:24
296:18

**presentations**
117:1

**presented** 215:10
232:10 258:24

**presenting** 40:15
167:8

**preserve** 34:24
35:7,9
62:8,11,23
63:10,17

**preserving** 57:24

**press** 21:15,23
22:9 31:9 62:2
67:15 228:4
252:2 253:1

**pressed** 221:20

**pressing** 222:2

**pressured** 232:1
248:14

**presumption**
264:23

**pretrial** 13:13
47:14,18,23

48:5,8,17 49:2
58:2 70:2 76:8
163:16 175:12
212:19 245:24
247:2 258:12,21
298:19 305:21

**pretty** 37:23 101:9
149:7 165:21
204:23 220:18
299:1 304:6

**previous** 127:14
270:19

**previously** 3:15
136:5,15 140:5
177:2 198:11
214:7 260:10

**primarily** 12:4
56:21 121:14
200:17 252:8

**primary** 42:24
57:9 68:16
205:22,25

**prime** 44:10
193:19

**principal** 53:11
300:20

**printing** 210:17

**prior** 6:7 7:6,12
13:25 14:1,2
34:4,6 46:18
94:19 95:23
99:14 105:23
108:16 115:14
120:21 148:12
178:20
206:8,11,19,23
207:2 229:25
259:5 299:2

**prison** 65:25

**prisons** 117:12

**prob** 96:12

**probabilities**

111:6

**probability** 111:1
236:1,6 298:3,11

**probablity** 297:23

**probably** 10:15
32:11 36:14
39:16,22 42:11
50:3,8
52:3,14,24 54:21
55:11 62:18
63:1,18
79:10,11,19 81:3
85:14,22 86:22
96:11,12 109:17
124:10 125:6
145:3 146:20
155:10 169:7
170:15 184:7,16
186:9 206:20
221:22,24
226:11 238:4
241:16
254:16,21
278:19 281:24
282:23 283:4
284:14 285:13
287:19 294:21
297:11 300:16

**problem** 48:10
167:7 192:8
228:22
275:17,20 277:2
280:21 303:1,21

**problems** 163:23
164:13 167:4
168:13 225:4,12
258:1 274:13
275:12

**procedural** 23:7

**procedure** 9:6
10:1 39:14 45:17
277:7 307:5
308:8,9

**proceed** 54:24
57:11 60:23

216:14 218:22
305:10

**proceeded** 52:12
60:7

**proceeding** 23:16
71:14,23 95:20
104:21 222:7

**proceedings** 71:18
106:3 216:21,24
217:13 287:14
291:18

**process** 5:24 57:4
175:21 183:21
192:15 226:1
233:10

**processes** 222:18
305:18

**produced** 32:13
53:20 170:22

**profess** 78:10

**professional**
173:18 207:12
220:14 230:23

**professor** 116:7
117:21 272:8
277:10
279:12,15

**proffer** 241:1

**proffered** 202:11

**program** 8:1,5
116:18
117:4,6,8,10,16,
18 118:3,4,8
119:16

**programs** 9:25

**progressed** 68:6,8

**projects** 10:12
11:8

**promises** 50:12

**proof** 233:25
264:23 285:23

**properties** 263:6

**proposed** 203:1

**propriety** 233:6

**pros** 229:13

**prosecution**
192:12,18
228:13

**prosecutors** 98:8

**prospective**
103:22 104:2

**protect** 225:11

**prove** 194:18
264:22 265:16
281:13 283:6
306:2

**proved** 265:1
287:9

**provide** 28:12
42:15 69:15
161:5 204:13
210:25 211:2,3,8
227:5

**provided** 56:6
128:13 161:25
182:24 245:14
282:7

**provisions** 56:1
210:14 220:19

**pull** 154:15 213:2
251:15

**pulled** 129:1

**pulling** 136:14

**purportedly**
158:23 159:10
160:2 193:12

**purportly** 158:8

**purports** 79:20

**purpose** 68:9
153:14,17
166:17 178:22
192:15 194:15

246:1 267:11
279:8 301:21

**purposed** 285:19

**purposes**
133:23,24
153:19 172:1
178:9 179:7
271:2

**pursuant** 307:4
308:8,13

**pursue** 74:24
163:15,16 164:9
174:19
183:14,25
184:21 197:19
221:12 222:6
223:1,8,15,25
244:7

**pursued** 181:14
302:12

**pursuing** 47:6
174:5

**pursuit** 233:20

**push** 53:24 167:10
170:17 171:16
174:5 175:4,8
186:20 192:1
218:25

**pushed** 53:22
171:20

**pushing** 34:21
48:1 174:16
227:17

**putting** 29:19
69:22 163:25
203:3 223:5
230:13 293:16

---
### Q
---

**Qari** 160:2,3

**Q-A-R-I** 160:3

**Qasim** 157:14

**Q-A-S-I-M** 157:14

**qualifications**
278:14

**qualified** 22:20
23:15 70:21,25
71:7,13 240:22
278:17,20
286:14

**quantums** 68:16

**quarter-backing**
282:18

**question** 7:9 13:16
23:10,25 24:7
25:22 26:12
30:15 35:6
38:15,21 40:6,20
42:25 43:15
52:23 54:11,19
56:10 58:3
74:17,24 76:1
77:11 79:5 80:11
81:14 90:9 92:21
96:24 97:25
102:4,19 112:16
126:18 134:22
139:20 147:6,18
154:6,24 158:16
174:12 175:23
184:5 185:9
188:15 192:9
193:23 197:18
202:24 204:24
208:8 209:8
212:9 214:19
217:4 219:9
224:9 225:14
227:8,14,19
228:16,23 229:8
231:10,22
233:12 234:21
237:15,23
238:6,10 239:5
240:6 241:5
249:22
250:3,10,11,12,1
4,15,23 251:7

253:8 261:2
264:6,24 265:6
267:4 268:23
277:18 288:18
290:1,6,9,11,18,
23,25 295:5
296:16 306:7

**questioned**
294:20,23

**questioning**
221:12 222:6
261:24

**questions** 6:3 24:2
56:16 75:15,20
77:6 96:10
165:10 166:9
187:8 202:9
221:19 225:18
258:7 261:12
272:22 285:21
289:22 295:2,10
305:9 306:6
308:18

**question's** 227:10

**quick** 305:9

**quickly** 121:2

**quotation** 252:10

**quote** 33:3 237:25
238:4
251:20,21,23,25

**quoted** 86:3
238:22 252:25

**Quranic** 123:7

---
### R
---

**Rafaqat** 158:7

**R-A-F-A-Q-A-T**
158:8

**Rahman**
149:20,25
150:6,7 151:19
153:10,13,14
155:21,22 160:3

169:12
176:17,18
260:16,17

**R-A-H-M-A-N**
150:1 160:3
260:17

**raise** 38:15,21
92:24 93:3 95:19
167:1 175:7

**raised** 92:13 112:8
120:17 187:3
303:1

**raising** 53:13
92:4,17,19

**ran** 171:22 197:10

**rapidly** 170:18
171:6,17
174:6,17 218:22
223:1 227:18
228:5 305:25

**rather** 73:8 117:4
202:10 213:6
300:14

**rational** 217:25

**rationale** 67:7
227:5 294:17
296:23

**Rawalpindi**
36:12,16 267:12
268:12 290:17
291:3

**re** 184:24 308:6

**reach** 133:1
206:24 280:10

**reached** 208:11
240:10
241:14,24,25
243:4

**reaching** 280:9

**reaction** 64:9

**reading** 57:20
109:19 141:19

168:8,10 186:14
220:18 226:9,12
265:9 271:20
294:2 302:5
308:10

**ready** 102:22
305:9 308:10

**real** 31:17 97:14

**reality** 93:20 99:18

**realization** 76:5,8

**realize** 29:18,23
294:25 295:9

**realized** 93:17
164:3

**really** 18:14 25:6
64:5 72:6 90:16
92:23 94:21
106:8 145:22
148:11 152:1
162:18 163:3,4
164:19 167:19
168:10 169:3
170:25 171:20
175:10 177:15
182:8 188:22
190:16 199:5
203:18,19
206:15 218:4
219:12 222:16
231:5 269:19
271:2 289:9
296:24

**reason** 52:9
53:6,25
54:2,4,17,21,22
56:21 58:9 62:2
105:16 128:15
167:2 168:16
176:3 181:14
183:12 184:25
186:21 187:10
189:1 192:1,6,7
207:23 218:13
237:16 239:4,5
242:8 244:23

246:18 261:2
270:23 273:22
274:8 286:10,11
294:19 295:21
296:21 298:5

**reasonable** 64:4
85:23 163:7
180:3 203:3
236:1,7 262:12
264:23 306:2

**reasonably** 129:6

**reasoning** 45:10

**reasons** 166:1
180:1 187:13
188:1 230:5
238:11 242:18
275:18

**rebuilt** 245:2

**recall** 9:3,13 12:12
17:8 18:19 19:4
20:17 21:4,21
25:5 28:16 32:23
34:17 35:18
38:24 39:1,2
44:9,14,15,17
46:22 47:21 48:4
49:2,4,22,23
50:8,9,11,12,15,
16,22 51:21
53:18 54:25
55:1,6 61:11
62:15 63:4,25
64:2,5 68:10
69:14 72:10,24
73:1,2,21
75:6,9,13,14
78:4 84:2,5
86:22,23
87:17,25
88:7,9,11,12,14
91:3,4,19,20
92:3,16,23 94:18
95:6 103:1,21
104:24 105:22
106:24 107:5,17

108:4,5,15,18,19
109:12,19,22,24
110:3,4,7,11,25
111:5,8,13
125:14 138:2,4
142:24 147:17
149:23 151:8
152:12,16,17
161:7,9,10
168:25 176:5
185:9 188:18
189:1,6,14 190:6
193:14,20 194:4
196:22 197:19
200:7 212:5,24
213:8,19 215:13
222:17 225:19
226:17 230:6
233:9
239:8,17,19
241:10 242:13
243:2 245:17
250:11 258:18
267:2 276:4,7,24
277:2,3
278:14,16 279:7
280:15 281:6
290:19,22
296:22
303:7,12,13

**recalled** 280:20

**receive** 29:13
46:20 78:14
88:15 115:16
139:2 212:20

**received** 22:1 28:2
42:8 71:2 79:24
80:4,7,8,12,13
99:12 142:23
143:4,20 144:5
197:23 221:19
258:21 259:5

**receiving** 21:23
88:9,14 99:14
103:1 143:25
188:16 211:13

213:8 233:24

**recently** 6:21
254:8 255:23

**recess** 261:19

**recharge** 58:22
59:6

**recognize** 91:15
101:1 109:7,11
141:21

**recognized** 116:3

**recollect** 188:22
272:5,10 281:4

**recollection** 14:23
19:15 20:10,14
21:22 28:1 32:5
39:9,12 44:2
72:1 80:8 81:7
86:13 88:14
92:10 95:2,3
96:12 97:6 100:1
103:15 109:25
111:22 123:20
124:8,21 125:4
128:2,6 129:14
130:14
137:12,23 138:8
139:13,15
143:14,16,19
147:22 148:3
153:25 170:3
175:25 180:22
187:4 191:10
198:22 206:17
216:5 217:16
222:14 229:3
232:6 234:4,9,15
235:8,13 238:24
241:13 246:9,22
259:4 260:13,24
266:15,25 267:2
275:22,23
276:13 281:1
285:11 286:4
289:9 298:5
300:2 305:13

**recollections** 142:22 143:4 152:25 169:17 258:6 296:18

**recommend** 231:13 262:8,11

**recommendation** 181:23 247:6,10

**recommendations** 182:1,10

**recommended** 94:18 109:16 199:15 231:17 243:11

**recon** 67:6

**reconsider** 66:9,25

**record** 4:21 52:17,21 71:13 75:2 89:25 90:4,7,11 93:24 103:4 113:6,7,11,12,14 115:2,5,6,8 117:20 136:22 179:10,11,14,17 193:1,3,4,6 216:1 227:13 240:20 257:18,21 261:15,18,21 289:8,20 296:20 297:2 305:2,5 306:21,24 307:13

**recorded** 263:24

**recordkeeping** 144:13

**records** 28:14

**recount** 205:12

**redirect** 86:5

**reduce** 140:23

**reduced** 84:12

**refer** 161:14 260:11,12

**refered** 130:1

**reference** 101:4 122:8 143:25 289:22

**referenced** 3:15 32:13 102:8 162:8 189:22

**referencing** 214:17

**referred** 21:18 91:25 123:8 128:17 129:13 201:25

**referring** 122:11 123:25 137:4 143:7,11 151:13 154:21 165:1 191:15 193:17 210:11 219:23 221:7 238:1 240:23 248:11 254:3 260:17 293:2

**refile** 59:14

**reflect** 85:1

**reflected** 230:12 238:17

**reflecting** 143:2

**reflective** 230:18

**reflects** 88:18 289:8

**refresh** 260:12,24

**refreshed** 206:17 266:25 267:2

**refreshes** 32:4 86:12 216:5

**refugees** 120:13

**refuse** 78:10

**refusing** 78:11

**regard** 63:6 93:13 96:7 280:11 288:13

**regarding** 50:1 119:4 126:10 147:6 150:3 197:20,23 200:8 221:1 225:18 226:6 231:10 245:11 247:17

**regards** 199:17 308:20

**regularly** 121:15 123:2 145:3

**Rehman** 37:18,19,20

**R-E-H-M-A-N** 37:19,22

**Reichel** 93:14 94:15 96:24 97:4,6,8 98:17 99:19 100:5 241:13,14,19 242:5,14 243:9,13 244:6,19,25 245:11 246:9,23

**Reichel's** 244:3,5,11

**reject** 247:7,11

**rejected** 172:13 183:19 223:5

**rejection** 172:9

**related** 21:19 22:10 82:8 83:15 92:2 139:6,21,23 164:17 212:21 213:7 227:16,21

**relation** 91:16

**Relations** 15:8

**relationship** 42:23 127:22 196:1

**relative** 23:18

**release** 22:9

**relection** 88:13

**relevance** 30:13 52:19

**relevant** 47:9,10 50:18 69:3 211:15 224:21 232:23

**reliability** 209:9

**reliance** 220:23

**relied** 57:16 162:22 166:15 281:12 283:3

**relief** 175:24 303:18

**religion** 123:2

**reluctant** 140:18,22

**rely** 24:8 264:22 296:10

**relying** 69:15 237:21 238:16 284:19,22 295:23

**remain** 246:3

**remained** 120:4

**remaining** 82:9 139:7,10

**remark** 240:8

**remarks** 253:23

**remember** 9:10,11 10:2,16 12:13 13:8 17:1,15,22 18:14,22,25 19:3,8 20:8 25:6 27:23 28:12,15,25 29:11 30:24 31:4,11,12,17,18 ,19,22,25

34:16,20,22
35:17 36:15
37:4,8,21 38:18
44:6,7,24
45:2,3,10
47:2,3,10,19,20,
24,25
48:2,11,13,15
49:19 53:14
55:4,23 56:15,17
57:19
58:14,16,24
59:16 60:14
61:3,17,18,23
62:1,5,7
64:17,22 65:9
66:2 67:12 68:4
71:15 72:6,8
73:9,11,14,15,18
,19,25
74:1,10,13,18,19
,21,23 75:4
76:11,14
77:14,22 78:7
80:11 81:15 82:4
84:5 88:20 92:12
93:1,15 94:25
95:22,24 96:1
98:25 99:2,24
100:1
105:12,16,17,23
106:25
107:12,14
109:4,6,11,18
110:13,17
112:2,4,10,13,14
117:25
124:12,15
125:10,12
126:12 127:7
129:17,19
141:7,25 144:7
145:22 149:6
150:17
151:22,23 152:8
153:22
161:10,13

163:19
166:1,3,8,20
167:11,18,19,21
168:7,16,22
169:4,5,9,13
170:7,12,13
175:21 181:4
184:14,19
186:7,13,21
187:1,15,18
188:15,21,24
189:8,18
190:19,25
192:4,5 193:22
198:24 199:8
201:5 203:12,14
204:9,18,19
205:20,24
206:16 210:8,17
211:11,13
212:14,17
213:9,15 214:12
215:3,4,9,18
217:19,21,24
218:25 221:22
222:1,4,5,8,11,1
2,20 225:24
227:4,9 229:5
234:8,14 235:25
238:14,19
239:23 240:12
242:1,3
245:12,16,18,22,
23,25 246:7
259:1 260:5
264:18 266:20
267:1,22 271:20
272:25
274:17,20
275:15 276:3,22
277:4,15 280:23
281:6 284:23
285:24 288:20
290:15 291:4,5
292:7 297:12
298:7,8 299:2
301:7 303:3,8

305:16,17,18

**remembered**
258:19 277:3

**remembering**
204:9 246:21

**rep** 122:8 135:23

**repeat** 230:14

**rephrase** 6:3 23:24
25:22 26:16
56:10 59:9
291:16,19 295:7

**report** 197:22
199:13 203:22

**REPORTED** 1:22

**reportedly** 260:14

**reporter** 1:22 4:16
5:10 6:2 90:9
136:12,13,17,22

**Reporter's** 288:2

**Reporting** 4:15,18
308:11 310:1

**represent** 4:22,24
17:6 19:7 22:20
23:15 25:2
26:19,23 27:19
28:2 65:16 66:10
81:7 90:19 122:6
125:17,23
126:3,10 135:18
243:24

**representation**
15:12 26:9 30:9
64:7,8,21 79:14
84:16 115:15
126:20 128:15
132:7 135:23
137:13 138:12
166:13 211:6
261:1

**representative**
66:22

**representatives**

124:17

**represented**
25:19,20 27:6
105:1 116:15
126:5 135:15
137:12 166:4,19
167:12 233:22
234:11,18
235:10 251:25
252:20 253:10
278:21

**representing**
19:13 21:12
26:13 47:11 65:7
85:16 100:20
103:2 105:20
106:1 126:15,21
127:24 128:8,9
130:7 167:15,21
210:21

**request** 7:1
55:3,4,19,20,22
60:6,18,22,24
61:13 67:19 73:8
128:25 172:2

**requested** 61:1
90:11 140:14
171:25 232:13

**requesting** 212:1

**require** 56:2

**required** 9:5 27:15
57:6 285:17

**requirements**
57:17

**requires** 233:25

**research** 22:25
24:15 43:24 44:8
57:20 88:19
178:1 203:14,15
226:12,13
264:5,19 265:10
302:6 304:10

**reserve** 221:16

resident 159:10

resolve 195:8
225:4

resonable 265:2

resources 90:23
91:2 182:15
183:2 205:5

respect 133:1
215:1 220:4
231:21 257:1

respond 272:22
296:9

responding 165:10

response 7:16
28:12 44:23 85:9
289:24 292:22
293:1,2

responses 60:7
201:7

responsible 82:20

rest 19:13 131:4
132:6,15,18
294:23

restate 40:6

rested 106:9

restroom 89:2

result 45:4 69:12
76:15 256:18

results 11:23

retain 130:15
140:7 204:6
205:1

retained 3:16
32:14 125:16,19
128:23 143:17

retainer 28:1
78:24 79:13,18
81:18 98:22
99:1,3,6,20
137:5,24 139:16
141:15 205:5

retaining 90:24

retention 204:20
244:6,11

retried 114:3

retrospect 304:2

retry 113:23

return 9:2 129:1

returned 119:7,8
170:9 274:20

returning 43:14
90:23

reveal 304:10

review 32:20 54:8
79:4 81:16
186:11 210:23
211:1 212:10
234:16 256:4

reviewed 32:22,23
102:22 137:19
145:6 161:23
168:18 207:6,25
208:12,15
209:21 267:5

reviewing 167:7
185:10 186:8
188:16 189:14
289:13

reword 290:1,11

RICE 257:15
295:8

ridiculous 263:20

rights 117:14
191:21 221:12
225:11

ring 45:15 110:5
126:24 141:12
149:13 152:5
167:13,14
190:15 234:12

rings 21:20 110:6
126:24 149:10

222:12

Riordan 2:12,13
3:3,7,9 4:23 5:17
23:24 24:3
25:22,24 27:9
30:14,19
32:7,10,16,17
37:24 46:13
48:14,24 49:1
52:22 53:9
56:10,11 59:11
64:24 65:5 73:10
75:3,5 79:1,2
81:4,5 88:21
89:3,11
90:1,8,12
96:18,20,22
101:7,13,17,20,2
3
102:1,3,9,13,15,
18,21 103:8,11
110:23,24
112:25
113:3,9,15
114:14,18
127:17 128:13
136:7 137:1
143:3,13 145:6
179:9
185:12,18,20
197:13,16
205:10 221:23
227:3 228:6,9,13
233:12 238:9
239:2 254:1,7,22
256:11 257:6
259:23
261:13,23
268:23,24
277:19,22,24
278:2,5,6
280:19,25
282:19,20
283:19,21
288:3,10,11
289:2,6,11,15
291:16,19,20

293:24
294:3,8,10 295:6
297:1,18 298:20
299:5 300:10,12
304:25
306:7,9,19

R-I-O-R-D-A-N
4:23

Riordon 255:11

Rob 56:17

Robert 2:4 5:4

rogatory 45:21

Rohela 190:15

role 117:9 130:3
243:20
245:18,19 246:2

role-played 142:20

room 125:11
168:22 285:2,7

route 180:19
248:15

rule 39:5,8,9,13
224:22 275:9
277:7 308:9

rules 39:13 57:14
71:19 184:8
308:13,16

ruling 256:25
287:12

run 62:6 179:3
186:19

running 15:4

rush 171:6

_____
S
_____

Sac 18:8 124:12

Sacramento 1:20
2:6 4:12 17:19
121:14 124:3
125:5 193:10
308:4

sacrificing 57:6

Sadiq 189:12

Saeed 37:20 91:15,21,23 92:1 149:25 150:6 151:20 153:13,14 159:2,5,10 176:17

S-A-E-E-D 37:21 149:25 159:2

Sajjad 157:21

S-A-J-J-A-D 157:21

Salahuddin 158:22

S-A-L-A-H-U-D-D-I-N 158:22

salient 123:18 169:16

Salma 149:1 150:5 151:20 153:2 161:16 164:23 165:1,2 168:1,19 169:4,11

S-A-L-M-A 149:1

Sam 155:5

San 2:14,17 4:19 12:9 308:11 310:2

sat 145:11 186:23

satellite 259:14

saw 43:12 71:5 79:11 96:4 162:19 180:21 181:8 197:3,22 237:13 239:10 254:16 255:7 263:20 268:11,14 274:1

schedule 242:10

scholars 200:20 240:22

school 9:2,3,14 10:5,6,17 26:22 120:18 123:3 178:7

science 7:21

scrapbook 163:3

scratch 306:11

scripts 162:8

search 129:6 199:10

seats 115:3

second 8:3 10:13 25:15 64:14 66:20 82:5 86:14 90:14 97:2 115:2 120:16 123:12 143:23 189:22 193:1 214:4 217:15 236:22 257:9,11 260:18 299:22

Section 221:10 254:4 255:3 291:17 307:4 308:8

security 2:8 5:7 56:2,13 73:4,11,17,22 75:20 76:9 292:10 294:14 295:21 296:7

seeing 129:20 193:14 213:10 264:18

seek 76:9 182:23 194:17 211:8 219:24 223:14,15 224:12 225:22 227:15 246:24 290:1,11

seeking 197:11 213:25 214:21 228:4 280:12 282:16 305:19

seem 144:4 189:1 195:16 298:9 299:10

seemed 164:12 217:25 219:1 299:8

seen 79:8 101:25 102:5 128:18 156:5 170:23 251:18 256:9 263:12

selected 155:9

selecting 97:15 104:6

selection 104:3,4,10

self-incrimination 192:14

self-study 123:4

semester 9:11,13

send 41:2,24 211:25 269:21 302:9

sending 301:10

sense 24:16 36:8 100:14 123:18 139:25 214:18 218:1 228:25 232:16 243:20 246:16 257:6 278:16 280:8 284:19

sent 18:8 35:18 38:12 43:25 55:19,20,22 88:17 143:2 145:5 213:6 237:9 259:21 264:16

304:4,8,19

sentence 66:6 281:20,23 282:11,22

separate 48:22,23 78:14,18 94:2 143:20 174:8,23 175:3 186:8 196:11 222:18 225:7 232:7 305:24

separated 51:23

September 64:4,25 65:4 66:14,24 72:1,2,25 101:10

sequence 256:11

series 147:6

serious 22:12,20 23:15 65:17,20

seriously 165:14 166:2 168:15

serve 114:2 117:2 151:4 153:3,20 189:2 198:17,22 200:9 209:20

served 116:7 118:3 135:11

services 42:6 117:21

setting 163:14

settled 302:18

seven 96:13 129:3 272:6

sever 52:2,5

several 58:3 119:8

severance 222:21 223:10,14 224:12 305:14,19

severe 50:23

severed 52:9

severity 46:21

Shakeel 159:18

S-H-A-K-E-E-L 159:19

Shapiro 2:16 5:3

share 130:18 136:11

shared 128:21 136:5

Sharon 296:5

sheet 144:17 309:8

she's 25:17,18 89:19 280:19

Shibli 201:17

S-H-I-B-L-I 201:17

Shirani 143:12

Shoaib 189:12

shooting 204:10

shop 148:9

shopping 15:4

Short 90:5 179:15 257:19 261:19 305:3

Shorthand 1:22

shortly 255:4

shot 203:20

showed 245:13 281:19

shown 103:5 214:8 258:17 288:15

shut 94:9 243:22

shuttling 94:10

sic 304:11

sign 130:9 137:17

signature 138:7,17

310:25

signed 79:15 98:23 125:20,21 128:5 308:14 309:8

significance 206:6

significant 297:2

signing 138:2 308:10

similar 122:17 137:24 202:8

similarly 157:10 248:24

simply 107:5,8,9 131:18 133:9 175:17

simultaneously 135:14,18

single 26:10,13 104:3 162:1 251:7 270:11 279:20

sister 150:10,15 190:11,18,21 191:11 201:5,24

sisters 190:8

sister's 199:21

sit 28:11,14 59:3 60:15 63:11 88:20 139:13 144:3 148:9 150:2,23 154:8 161:9 169:2 186:6 188:25 189:18 190:6 192:3 238:24 239:16 241:5 260:5 297:12

sit-down 188:21

site 44:1 177:16 178:24 180:6 181:1 215:23

sitting 37:8 125:14

169:10 186:7

situation 176:10 279:16

six 6:21 7:2 85:1

skills 23:3 116:3 252:9

slowly 123:12

smoke 148:10

smoked 267:24

smoking 247:25

social 121:14

socialize 121:16

solely 139:22 173:7,14 217:11 232:10

solid 199:25 234:10

somebody 18:16 22:24 43:25 94:15,17 97:5,10 105:21 107:18 148:8 152:17 155:22 177:17 178:5 180:5 195:13 199:2,4 201:12,13 202:2 209:4 243:18 287:2 304:9

somehow 17:14 18:25 21:19 22:9 47:9 94:19 140:23 177:4 201:6 232:20 281:7 298:23 301:20

someone 74:14,15 92:19 106:20 108:2 161:14 240:9 280:2,16 282:1 300:25 301:1 302:6

sometime 11:20

301:13

somewhat 234:3

somewhere 17:14 247:23

son 158:8,23

sorry 10:19 17:17 46:7 60:10 63:23 86:9 87:8 103:25 110:3 112:16,17 122:10 141:24 142:5 151:14 165:1,2 185:18 207:11 221:23 224:9,13 231:24 240:18 257:1 264:24 277:17 278:11 293:8,9 295:4 298:20

sort 5:20 128:7 137:24 144:14 147:7,11 164:1 174:9 245:10 246:2

Sotelo 1:22 4:17 307:3,23 308:22

sought 133:23 134:7 223:10

sound 49:18 60:16 64:4 100:6 217:25

sounded 199:5

sounds 33:3,5 44:12,13 54:2,4,20 61:14 78:6 82:11 88:24 144:8 212:2 234:20 235:12,17 240:2 252:11 253:2

sources 281:11

speak 6:1 8:6,10 18:6,20 35:11,12,13

122:5 140:25
153:18
156:4,12,16
157:12 164:23
186:25 187:7
190:17 200:24
202:14 278:23

**speaking**
92:3,16,19,23
125:12 154:1
161:1 176:17
188:18 190:25
191:7 289:20,21
295:15

**speaks** 8:21 121:2

**special** 20:9
210:18

**specialist** 4:16

**specially** 20:15,16

**specialties**
118:18,21

**specific** 58:16
81:13 88:13
92:10 161:10
166:1 180:19
188:21 232:22
233:4 238:14
251:10

**specifically** 21:21
36:15 44:14
48:19 62:12 65:9
72:10 74:10 93:9
148:1 152:18
153:15 161:13
164:17 166:16
168:7,21
169:1,10 177:23
182:5 191:12
192:4 196:6
200:1,8
202:13,25
203:13
212:17,24
221:16
227:23,25

237:19 239:25
261:4 281:10,11

**specifics** 43:12
110:18

**speculation**
232:16

**speed** 158:3

**speedy** 34:18,20
48:1,16
53:13,17,24
54:6,15 57:6,24
58:18,20
59:5,15,19
60:1,13 61:24
62:3,9,12,16,24,
25 63:2,9,14
67:8,10 171:20
174:3,9,19
175:12 176:6

**spelled** 158:9
160:7

**Spelling** 160:3

**spend** 140:22

**spent** 36:17 83:8
119:5,21 120:14

**spiritual** 201:25

**spoke** 8:16
18:9,13,20,21,24
25:8 120:18
125:9 127:3
145:25 147:5
149:7,18,21
150:3,10 153:10
155:23 160:24
165:3,18,21
168:18,19
170:11
177:10,11 189:8
190:20 191:2,14
202:3 263:18
270:19 278:22

**spoked** 148:20

**spoken** 6:16 8:17

16:6 35:16 127:9
150:8 161:16
166:11 206:19
240:6 272:13

**spring** 10:18,19

**SS** 155:4 236:10
281:19

**stages** 183:2

**stamp** 42:3

**stand** 51:16
110:23 229:2
230:14
232:1,17,18
261:2,3 276:18
278:5 284:11

**start** 64:11 115:13
250:1

**started** 8:2 11:17
95:7 120:19

**starting** 148:19
155:4,5 292:19

**starts** 236:11,23

**state** 12:21 13:7
14:8 104:19
107:18 108:1
130:24 187:4
230:10 248:1
280:16 281:3,14

**stated** 22:9 33:21
240:21 307:10

**statement** 21:16
31:7,12,17,19,22
,25 32:24
47:24,25 50:5,14
66:3 68:17 69:9
95:14 106:9
122:15
193:11,16,21
197:3 216:11
226:21 237:24
238:7,21 239:23
240:10,25
241:2,7

252:1,15,18
294:20 296:10
297:10,14

**statements**
49:17,25
51:6,19,25 58:12
69:20,23 70:4
187:19
225:15,16,22
227:15
229:22,23,25
230:3,17
237:9,18,20
238:15,16,19
250:24 251:1
252:24 253:1
262:20
263:1,9,23
264:13,14 267:6
268:2 294:24
296:21,22 297:3
298:4

**states** 1:1,4,19
2:4,8 4:6,7,10
5:5,8 8:24,25
15:2 38:17 51:14
63:8 79:23
103:12
120:7,13,16
154:4 180:1
263:5 264:12
270:21

**stating** 105:18

**statment** 241:9

**statute** 54:8

**stay** 46:10 66:19
69:19 93:9

**stays** 15:2

**step** 42:15

**steps** 34:23

**Steve** 16:25 17:24

**stipulate** 64:24
215:7 219:23

**stipulation**
216:7,23 217:2
221:1,8,11,15
288:15

**Stockton** 15:24
91:21,24 159:6

**stop** 15:19 19:10
93:22 273:22

**stopped** 192:6

**storage** 128:25

**store** 267:24
268:15,16

**stored** 129:15

**story** 230:11

**strategic** 131:11
132:11,15 133:2
146:1 174:4,17
195:5 218:21,23
219:6,8,15,18
228:1 237:16
262:1 305:24
306:10,16

**strategical** 191:25

**strategically** 54:23

**strategies** 69:25
161:22
163:17,20
196:11 209:8
222:23 244:21
262:1

**strategy** 58:8
67:3,12 68:7
70:13
163:11,12,17
171:3,5,16
172:6,10,17,22
173:14,20 174:8
177:21 200:5
205:9 216:12
217:25 223:2,16
227:2,16,17,21
228:1,4 234:22
245:11,17 262:3

284:5

**Street** 1:19
2:5,13,16
4:11,19 124:20
308:11 310:1

**strength**
262:4,13,15

**stretched** 8:5

**strike** 205:3
226:24 233:1

**strong** 215:18
262:8,11 263:9
265:12

**stronger** 215:23

**strongly** 266:6

**structures** 304:1

**students** 116:24
117:13 237:22
238:17 282:4

**studied** 8:11 10:24
72:18 98:8 239:4

**stuff** 23:7 44:8
102:6 117:15
122:17,18 163:3
170:24 171:20
187:8 215:24
219:13 230:14
264:19 284:2

**style** 244:22

**subject** 71:18
182:19

**submission** 103:12

**submitted** 271:12

**subpoena** 166:24
183:23 184:5

**subscribe** 307:15

**substantial** 118:24

**succeed** 53:22 60:2

**successful** 226:16
265:7

**sufficient** 203:8,21
213:11 259:10

**sufficiently** 259:24
262:7,10

**suggest** 225:7
236:7

**suggested** 133:9
213:23 244:10

**suggesting** 27:6
192:12,18 228:2

**suggestions** 182:9

**Suite** 1:20 2:5,17
4:11 308:4,11
310:1

**Sultan** 158:8

**S-U-L-T-A-N**
158:9

**sum** 82:10 138:23
144:4

**summarized** 143:3

**summary** 211:9
298:16

**summer** 39:17

**Sunday** 14:25
15:1,3 19:16
123:2

**superior** 12:8
14:8,17

**superseding** 62:7
63:24,25
64:13,15,25
67:20 71:25

**supervising**
117:18

**supplication**
106:16,21
107:6,8,19 108:2
123:9 162:20
198:9 199:17,23
200:4,9,24 202:5
204:15,17

206:3,6 238:1
240:24 279:5
280:17
281:2,14,15
282:13

**support** 64:18
112:22 195:22
233:24 246:1
266:24 271:13
276:8 277:12
285:22

**supported**
235:19,20

**supposed** 52:1
81:21,24 82:1,17
107:15 132:3
290:17

**suppress** 49:16
50:18 51:3 58:12
67:21 69:7,8,22
226:15 227:15
228:3 229:4

**suppressed** 50:6

**suppression**
225:22

**Supreme** 264:12

**supression** 225:16

**sure** 7:20 14:25
15:18 17:10,24
22:7 24:24
26:11,24 32:6
37:18,22,23 44:7
55:16 59:3,19
61:20 68:25 71:4
73:19 77:11 79:6
89:3 92:7
105:12,16,24
113:2 114:17
121:11 123:1
128:19 137:1
142:11 146:7,14
149:12 151:2
152:23
174:11,14 189:4

192:2 198:15
202:17 209:21
211:17 223:13
224:10 227:10
247:21
248:9,12,15
251:22 253:12
254:24
262:5,12,15
265:3 266:12
268:7,10 269:16
272:7 280:6
286:18 289:9
290:18 296:24
299:9,15,17

**surprised** 65:10
299:3

**suspect's** 50:17

**sustain** 290:9

**sustained** 75:9,22
76:4,14
112:10,19

**swear** 5:10

**switch** 114:25
261:13

**switching** 249:18

**sworn** 5:13 11:9
276:16,20 307:7

**system** 103:17

————————

T

**TA** 116:14

**table** 222:15
227:11

**tactial** 131:11

**tactical** 53:12
57:23 132:11,19
133:2 146:1
195:4 238:11
244:7,8

**tactics** 245:11

**taking** 4:9 6:7

119:16 138:9
289:12

**talk** 19:1,2 34:13
38:23 114:10
144:12 153:16
154:10 161:21
184:16 187:7
191:24 199:2
200:3 222:2
251:21 271:17
285:9 301:18

**talked** 17:3
18:5,23 30:23
34:4 54:22
58:14,23 59:17
63:19 76:13
77:13 90:14
94:14,25 96:2,4
100:2,6 107:13
145:14 167:25
170:6
172:8,13,14
175:19 186:23
194:24 203:16
225:23 231:4
241:23
242:22,25
255:18 272:4
273:8 277:4
302:6

**talking** 18:2 70:3
93:25 95:24 99:1
168:23 169:4,10
174:2 180:7
207:9 226:1
237:13 255:14
263:11 285:14
291:14

**tape** 4:4 88:22
90:3,7 145:11
179:4,14,17
207:25
257:18,21
262:20 263:20

**taped** 68:17 106:9
262:20 263:1

265:8 284:8

**tapes** 209:21
267:10 279:17

**task** 180:12 201:13
302:12

**tasked** 177:19

**tasking** 177:4

**tasks** 42:19

**taweez** 238:1,3
239:25 240:24
281:25 282:13

**taweezes** 237:13

**Tayyaba** 160:15

**T-A-Y-Y-A-B-A**
160:15

**teach** 116:18

**teaching** 116:22

**team** 23:21 27:3
141:4 162:4

**tease** 175:2

**technically** 116:13
251:6

**teens** 260:21

**Tehsil** 159:11

**telephone** 241:22
250:6

**telephonically**
149:21

**ten** 89:20,22
200:11,12,23
273:18

**tend** 282:11

**tenure** 118:7

**term** 45:21 55:21
78:3

**terms** 11:12 16:21
37:5 40:4,15,24
53:20 79:14,17
91:6,9 122:17

130:15 137:12
150:14 152:2
284:4 294:13

**terrorism** 22:10
30:10 52:13
64:13 65:8,23
105:21 197:10

**terrorism-related**
31:15

**terrorist** 32:1
33:15 43:16
111:2 181:2

**terrorists** 31:23
33:12

**tested** 165:24

**testified** 5:14 27:8
41:2 59:13 80:4
93:8 170:17
180:20
187:12,14
205:21 230:3
232:13,19 234:6
266:14 280:15
285:12 286:5
288:12 296:23
297:21

**testify** 34:10 36:25
44:1 70:10
71:1,10 110:8
134:23 146:7
150:25 151:12
161:3 164:21
166:10,21
178:24 181:3
195:14
197:21,24
198:4,8 199:1,16
200:2,8 202:18
204:7,16 206:23
208:2 215:21
229:8,17
230:7,22
231:11,14
232:2,12 258:23
259:9 266:17

275:11 280:7
283:2 284:25
285:4,19,20
286:15 287:9,11
307:7

**testifying** 146:14
209:25 229:11
231:2,8,17
234:10 235:1

**testimony** 27:5
34:25 35:7,9
40:4 42:17
106:16,18,24
107:5,17,20
108:1,8,12,16,17
,20,22 110:11
111:11,14
127:14,18
162:23 184:3
192:20,21
198:18 199:6
201:9 202:9,11
203:1,3,9 204:13
205:9,14 206:1
207:17,21 209:7
229:14
234:4,16,23,25
235:4,8,14
236:4,6 269:14
270:6,19
272:9,14
275:3,19
276:16,20,21
281:7,9 283:8,10
284:6 285:15,17
286:7 287:6
297:7 298:11
299:2,23
300:6,21 303:2
307:10,13
309:4,6

**Texas** 199:20
201:14

**thank** 5:9 32:16
118:16 179:12
258:10 261:11

305:11

**thanks** 32:15
236:18 278:3

**that's** 7:8 11:1
15:6,15 16:18
20:19 24:7 30:20
31:16 33:3,25
44:2 45:7
48:24,25 50:20
51:22 52:2 54:11
55:19 59:7 61:8
63:7,15 65:2
75:25 77:11
78:2,6 80:2
82:14,23
83:6,7,12
85:3,13 86:19
87:2,11,15 88:5
91:25 96:3 97:18
98:2 101:9,10,11
102:15 105:22
112:17 116:18
119:9 120:19
136:24 140:3
141:13,25
144:17
149:14,15
150:13 151:22
156:5,22 157:1
158:21 164:4
167:9 168:14
170:11
171:19,23
178:10 181:16
187:12,25
189:16,20,21
191:22 194:9
196:6 197:12,18
210:15 212:7
214:17 218:5
222:6 226:21
231:19 240:25
243:16 257:3
260:16 268:22
271:8 272:12
274:23 276:13
279:9,10 281:21

283:4 285:9
286:6,10,23
287:19
294:22,23
296:16
301:15,22 302:6
304:22

**themselves** 4:22
71:3 286:2

**theoretically**
223:10,11

**theory** 235:20,21
300:21 302:18

**thereafter** 44:4
307:11

**there'd** 86:2

**therefore** 36:24
37:2 50:6 63:5
94:4 268:4
304:19

**therein** 307:10

**thereon** 195:23

**there's** 12:15 17:4
26:23 45:17 85:7
112:13 137:15
143:25 146:3,8
147:1 174:16,17
175:4 178:10
237:2 251:20
265:8 272:9
280:19 284:2
296:13

**they'd** 200:25

**they're** 31:14

**third** 10:13,14
11:15 86:7,24

**thorough** 129:6

**thoughts** 67:3
168:2,5 266:2

**thousand** 84:3
85:7 161:25

**thousands** 303:15

**three-year** 8:5

**throughout**
100:11 104:14
120:2 123:3
130:13 169:9
204:12 215:21
245:20

**throw** 126:23
149:10

**thus** 142:15

**Tice-Raskin** 2:4
3:4,8 5:4,5 23:22
24:1 25:16 27:4
30:12 32:15
37:15 46:8
48:9,18 52:15,18
53:2,4 56:3
59:7,9 65:3 73:6
75:1 88:24
89:17,22,25
101:3 103:4
110:19 113:2,7
114:20,23
115:1,10 127:20
136:3,8,19,24
137:2 143:10
179:6,11,18
185:15,17,19
186:1 188:14
189:11 192:25
193:7 196:20
197:17 205:11
221:25 227:6
228:16,20
233:14 238:20
239:9 249:25
250:2 251:14
254:3,8,13,17,24
255:1 256:14
257:4,8,10,12,16
,22 259:25
261:9,11,14
268:21 270:18
272:13 277:17
278:3 280:18

282:15
283:18,20
287:22,25
288:4,8
289:1,4,7,12,18
291:13,17
293:18,20,22
294:6 295:4
296:12 297:6
298:12,14 300:5
305:7 306:5,20

**tied** 114:13,15
183:6

**tired** 258:6

**today** 4:17 6:14
28:11 59:13
60:16 97:25
139:13 144:3
186:6 189:1,18
190:6 229:3
238:25 239:16
241:6 260:5
266:11,14
272:14 273:1
275:19
276:15,21
297:12 305:13
306:13

**today's** 4:13
265:22 282:18

**ton** 89:6

**tongue** 8:15

**top** 278:4 289:3

**topic** 15:20 150:4
160:23 181:10
196:21 222:14
224:11 231:5
240:7 241:12

**topics** 181:22

**total** 81:20 82:12
121:20 138:23
144:4

**totality** 173:18

**totally** 100:6
289:14

**touch** 44:21
200:13 264:2
301:2

**towards** 10:15

**track** 144:21
154:10 157:11
255:13

**train** 36:3 304:12

**training** 26:21
32:1 33:15,22,23
34:11 147:11
150:21 181:2
193:24 202:21
233:25
234:1,12,18
235:11 263:2
271:2 304:11

**transcribed**
307:11

**transcript** 136:21
288:2,9
289:10,13
292:14
308:9,13,15,24

**transcription**
307:12 309:5

**transcripts** 142:19

**translate** 106:21
123:10 165:10

**translated** 123:14

**translating**
107:6,8,9

**translation** 106:25
162:8

**travel** 84:7 178:19
179:21

**traveled** 36:12
121:24 122:20

**travelers** 281:15

**traveling** 123:21
168:22 177:12

**travel-related**
82:13 83:16,19

**tremendous** 30:2

**trial** 2:7 9:15
12:15 13:21
14:2,12,13,14,15
19:19,20,21,23
20:5 34:15,18,20
35:2 39:23
40:1,10 47:13
48:2,16 51:18,22
52:2,12,20
53:1,13,17,23,24
54:6,15 57:6,24
58:19,20
59:5,15,19
60:1,13,21,23
61:4,15,19,25
62:4,9,12,16,24,
25 63:3,9,14
67:4,8,10,16
68:24 70:1,2,3,4
72:8,9,15 73:24
74:13,14 75:7
76:6
77:6,8,15,19,23
79:14 81:9,12
82:8 86:11,13,17
87:15,18 88:10
93:5,6,16
94:2,5,6
95:1,10,13 97:25
98:14,18,22
99:14 100:18
103:24
105:6,9,23
108:25 109:14
110:2,20 113:19
114:13,15
134:12
138:11,21
139:6,21,23
142:19 148:12
163:6,15 170:18

171:1,5,6,17,20
172:3
174:3,5,10,16,19
175:5,8,12 176:6
187:1 197:10
206:9,11,24
207:2 212:13
213:25 214:9
215:21 216:14
218:10,15,19,22
219:16,19 223:1
224:25 227:17
228:5 240:16,17
245:20 246:3,24
247:16
248:22,25
249:6,8,15
251:24 252:4
255:3,4,5,16
258:14 259:1
261:2,3 262:1
266:14,24 275:1
276:4 277:13
279:3,13,15
299:23 301:5,13
303:9 305:22,25
306:16

**trials** 12:11 222:21

**trickling** 171:9

**tried** 18:20 24:15
44:18 71:3 78:22
106:4 129:17
164:22 181:2
198:22
200:8,13,15
206:24 220:18
264:1 302:22

**true** 12:17 42:23
51:8 63:15 77:6
112:18 131:24
140:3 173:11,15
207:14 236:2
266:8 268:2
293:6,11
294:16,22
301:12,15

306:17 307:13 309:5

**truly** 169:3

**trust** 147:5

**trusted** 205:2

**truth** 263:24 268:20 307:7,8

**truthful** 269:6,7

**try** 37:16 69:3 89:22 96:23 186:11 199:24 202:13,25 207:16 209:8 231:9 236:5 260:20 287:23

**trying** 71:15 112:20 117:25 145:10,21 153:25 166:19 168:23 174:13,25 175:2 184:12 188:22 194:17 196:23 199:13 201:5 203:12 219:13 227:14 260:22 271:15 274:23 280:9 281:5,13 283:6 284:23

**T's** 138:19

**Tuesday** 20:4,6

**turning** 267:4

**Twist** 126:24 127:6

**two-year** 148:15

**type** 181:1 218:15 223:2 306:2

**types** 15:9 54:23 58:7,15 138:18 187:21

**typing** 89:19 147:3

---
## U
---

**U.S** 6:17 16:23 17:25 18:1,17 21:14 126:14,17 127:2

**UC** 7:20 117:3

**Ud** 159:23

**U-D** 159:23

**Uh** 268:21

**Uh-huh** 37:3 70:5 74:4 75:12 84:8 86:20 87:1,3 103:18 111:18 117:22 148:6 170:19 191:16 221:9 223:4 236:25 238:2,5 249:20 269:13 276:6 281:22 284:16 292:20 297:22 299:25

**U-huh** 226:3

**ultimate** 132:14,18 133:17 163:10 283:5

**ultimately** 29:25 33:25 41:21 45:12 51:22 53:22 56:18 94:21 99:22 100:8 131:14 137:12 142:23 145:6 163:5,14,17 165:18 166:17 169:19 172:17 175:11,20 176:2 179:20 183:13 184:24 186:20 187:14 190:3 191:25 201:8 204:1,5 207:16 208:18 209:24 214:25 215:7

216:8 217:22 223:1 224:1 225:24 226:14,18 235:7 242:14,22 245:7 258:14 287:7 298:8

**Um** 83:17 91:12 144:16 190:22

**Umar** 237:9,24

**Umar's** 238:7

**Umer** 18:3,24 19:2 20:11 21:2 23:12,13 25:3,20 30:25 31:8 41:13 48:21 51:9 78:13 84:21,22 90:19 92:18 94:6 100:20 113:19,21,24 114:3 124:13 126:5 128:9 130:8 135:11,15 137:6,13 150:9 153:18 222:23 232:3,14 248:25 251:25

**Umer's** 20:13 51:19 106:5 114:8 232:19

**umpteen** 161:25

**unacceptable** 244:6,11

**unclassified** 211:9

**uncle** 35:13,24 37:10,11,17 38:20 39:25 125:1 149:18,20 150:9 151:9,19 164:14 168:3 184:1 270:24

**unclear** 6:3 305:12

**uncle's** 37:23

**undergraduate** 7:21 115:16,17

**underlined** 281:21

**undermine** 282:11,12

**undermining** 282:22

**understand** 25:25 26:11 37:25 54:13 57:15 58:10 76:24 77:4,5,9 92:20 117:14 119:20 121:24 123:15 130:15 137:3 146:21 158:19 174:12 227:24 228:11,12 229:2 261:4 296:16 300:10

**understanding** 22:22 24:25 25:7,11 37:5 39:3 42:13 57:1,3,17 70:7 74:5 76:16 78:15 82:22,24 83:7,14 114:6,7 127:23 128:1 130:3,9 138:22 139:1,5,9 140:4 180:25 181:5 208:16 215:22 246:8 291:3,8,12

**understands** 282:13

**understood** 77:2 95:25 210:16 218:2 231:6

**undertaken** 182:2

**unfair** 287:12

**uniform** 240:21

**uniforms** 181:7

United 1:1,4,19
2:4,8 4:6,7,10
5:5,8 8:24,25
38:16 51:13
120:7,13,16
154:3 179:25
263:5 264:12

unless 99:20
294:11 295:21

unnecessary
233:11

unpaid 10:4

unreasonable
287:13

unsuccessful
199:18

upon 28:2 31:7
67:20 143:2
281:12 283:4

Ur 37:18,20
149:20,25 150:6
151:19
153:10,13,14
155:20,22
169:12
176:17,18
260:16

U-R 37:19,21
149:25

Urdu 8:11,14,21
121:2,6 122:11
125:12 177:11

U-R-D-U 8:11

urged 248:16

USA 308:6 310:4

Usam 151:14

Usama 149:13
150:6 151:15,16
153:8 156:22
165:13
166:3,9,12
167:12,15 168:2

169:7 185:6,8
186:5 191:20
192:10,13,21,24
271:10,11
274:9,13 275:12

U-S-A-M-A
149:16

Usama's 152:6,20

USC 254:4 255:3

useful 40:14,23

Usman
156:18,21,22

U-S-M-A-N
156:18

utilize 186:11
196:11 208:19
218:14,19 235:3
239:13,17

utilized 193:25
194:5 205:13
277:6

———————
V
vacated 61:15

valuable 199:6
271:23

value 40:3 184:3
230:2,13

variety 212:20

various 10:12 15:9
21:10 69:24 71:3
117:11 148:19
264:16 272:19

veiwed 125:24

veracity 130:25

verdict 95:6
101:13,15,23
108:19,23,24

verdicts 113:18,22

versus 48:20
100:22 162:8

via 120:7

viability 168:20

viable 175:16,17

video 4:16 36:22
267:19

Videographer
2:20 4:3 5:9
90:2,6
113:6,10,13
115:4,7
179:13,16
193:2,5
257:17,20
261:16,20
305:1,4 306:22

videotaped 4:5
51:10 180:17
229:22 263:12

view 51:7 130:20
202:5 214:25
262:25
264:10,13
282:12,16,17
283:16 299:11
304:21

viewed 68:13 69:1
264:6 282:21
283:10,17,22,23

viewpoint 195:9

vigorously 209:12

village 36:17,18

violated 283:14

violation
174:18,20
175:6,13,23
283:16

violations 226:7

virtually 303:11

visas 38:22,25
39:2 184:12,17

visibility 305:19

visit 44:1 117:13
177:16 178:23
180:6

visited 165:16

visiting 21:7 178:9

Volume 4:4
306:22

voluntariness
226:7,16 227:1

volunteered 15:9

vs 1:6

———————
W
wait 60:7 293:17

waive 221:12

waived 220:21
221:3 288:13

waiver 217:11
221:2 291:15

walk 195:18

wallet 106:17

war 238:3

warranted 222:22
225:17

warrior 240:25

Washington 2:9

wasn't 11:8 14:1
28:19 37:6 47:6
49:22 52:5 53:25
54:17 58:24
67:11,14 78:19
80:16,19 84:9
85:17 86:1,11
92:13 97:6,8
99:8 112:18
120:21 128:2
145:12,13 152:1
162:20 164:3,8
165:25 167:2
170:5 182:11,12
187:6 192:6,7

195:12 203:17
215:24 219:4,12
221:3 231:5
235:25 236:2
242:11 243:7,22
246:12 248:13
254:11 270:9
274:18 278:20
283:8 286:3,7
291:6 294:16
303:4

**waste** 286:12

**wasted** 148:10

**watched** 145:11
263:19

**water** 179:7

**ways** 58:4 171:22
225:4

**Wazhma** 1:12 4:5
5:12 306:23
308:3,7 309:3,25
310:5

**weak** 203:19
215:2,14 263:25

**weakest** 162:14

**weaknesss** 203:23

**weapon** 300:20

**wear** 121:13

**website** 116:6

**we'd** 293:14

**wedding** 204:10

**Wedick**
41:11,12,16,19,2
4 42:4,18 43:5,8
70:16,21 141:5
142:16 177:5
182:18 207:17
208:19
209:3,7,18,19
210:3 284:9,10
285:11 286:4,20

**Wednesday**

**week** 98:20 116:25
162:21

**weeks** 120:15

**weighed** 58:8

**Weiss** 83:21
109:16 147:3
199:4 200:3
201:3 204:1,6,21
205:1,6 206:2,5
283:2,7

**we'll** 62:14 89:7,8
136:12 155:17
258:8 287:22

**well-versed** 226:11

**we're** 48:25 49:9
88:21 246:20

**we've** 77:15 88:22
167:25
172:13,14 177:2

**whatever**
19:10,20,22
82:24 86:2
108:11 112:21
130:23 131:19
168:16 176:3,7
188:9 191:25
208:12 234:7

**whatsoever**
192:12,18
222:14

**whenever** 99:22

**where's** 183:8

**wherever** 304:9

**whether** 9:3 15:14
17:8 18:24,25
19:6 28:16,25
32:24 33:4 34:17
38:16
40:9,14,21,22
43:16 44:5,9
47:21 48:4,15,16

49:2
50:5,9,12,13,16,
22 51:2 54:21
58:2,11,25
59:4,13 62:15
63:8,13,16 66:10
69:13 71:9 72:24
73:2,11,15,17
74:14,19 75:9,23
77:13 81:11
90:18 91:20 92:7
97:25 107:14,17
108:15,19
109:12,22,25
110:7,25 111:13
112:10 124:8
129:14 130:20
133:22
134:6,19,23
135:5 138:4
140:7 142:10
144:17 145:11
147:7,10,18
152:17
153:3,15,19
163:16
166:8,9,14
168:23 175:15
177:6,25 183:4
187:4 189:8
191:1,4,22
192:10 193:21
200:25 201:5
206:20 209:3
214:12 215:11
222:18 224:12
225:15,21
227:14 228:23
229:16 231:10
232:23 233:10
235:19 238:25
241:6 247:7,12
260:5 265:24
270:10,21
271:22 276:7
277:15 278:16
281:1

290:16,19,22
291:10 292:4
300:11
305:14,17

**Whoa** 65:13

**whole** 8:4 36:6
100:3,7 160:24
174:2 185:25
207:22 213:13
279:7 284:2
296:24 297:8
300:21 307:7

**whom** 4:22 125:19
126:10
132:6,14,18
134:3 148:20
150:3 156:12,15
161:16 210:5
241:14

**who's** 105:21
143:13 296:4

**whose** 76:21 180:8
192:21

**wife** 124:24 151:24
160:2

**willing** 23:8,9 86:2
91:14 199:6
200:20,25
247:19,20 280:6

**willingness**
242:5,7

**wise** 225:21

**wish** 144:6,10
213:1 216:17,20

**withdraw** 92:14
102:4,19 268:23
288:18 289:25
290:9

**withdrew** 75:15
290:23

**within-entitled**
307:8

**witness** 5:11,13
14:5,7 27:7
30:16 37:13,18
38:8,9 46:10
48:10 52:16
53:3,5 59:8 65:2
73:9 75:4
89:1,9,12,19,21,
24 101:6,25
102:2,5,10
103:7,9 107:1
113:4 114:22,24
136:6 150:12
151:5 152:14
153:4,16,20
154:10 155:3
156:12,15,19,20
157:4,8,16,19,23
158:1,11,19,25
159:3,8,16,20,24
160:5,9,13,16,21
161:18 164:25
165:7,12 166:1
168:5,20 169:23
185:16,21,22
186:12 187:5
188:3 189:3,25
190:4 191:5
192:11,19,22
197:14,15
208:20 209:20
217:4 221:24
227:5
228:8,11,15
238:13 239:3
251:11
254:10,14,18,25
256:12 257:9,11
268:22 269:15
270:11,23
280:21 286:20
287:21,24 288:2
289:17 290:15
293:19,21
294:1,5,9 296:13
297:5,8
298:13,21 300:8

307:6,10,14
310:5

**witnesses** 14:20
34:9,25
35:8,9,19,22
36:8 37:7
38:2,16,22 39:20
40:1,22,23
112:12
134:11,16
145:18,21
146:23 150:25
151:4 160:24
161:2 164:10,12
176:20,21 177:6
182:7
183:15,19,22
184:13,21
194:2,5 196:14
209:12 230:16
232:10 265:17
267:5 269:1,5,12
270:20,22
271:13,23
272:10,20 274:4
275:25 286:14

**witness's** 192:20
289:9

**work** 10:5,7,9 11:5
23:3 29:19,22,23
30:1 37:7 72:13
95:7,9 200:6
253:16 267:15
280:8

**worked** 95:9
104:16 142:4,11
210:2 239:7
246:19 284:24
287:2

**working** 10:8 11:8
22:23 29:3 66:16
72:4,11 127:25
128:10,20 130:7
136:9,15 141:3
195:25 279:23

**works** 28:13 89:4

**workshops**
116:19,22,23,25

**world** 279:6
303:19

**worn** 238:3

**worse** 230:10

**worth** 47:6 69:17

**worthy** 233:19

**wow** 162:17 257:8

**wrap** 257:14

**writing** 128:5
130:12

**writings** 163:2

**written** 31:12 55:4
82:14 108:16
128:7 129:13
281:25 283:3

**wrong** 239:23
287:9 306:17

**wrote** 150:9
258:20

---

**Y**

**yellow** 146:11,12

**Yep** 88:6

**you'll** 158:19

**Younas** 158:23

**Y-O-U-N-A-S**
158:23

**young** 190:17,19

**younger** 190:11,18

**yours** 143:15

**yourself** 5:22
23:15 126:3
134:8 138:2
141:3 177:13
179:21 180:4
210:11 226:5

269:24 295:18

**you've** 92:22
102:22 120:4
121:8,24 122:4
142:15 150:5
155:21 160:25
174:3 185:13
222:25 242:17
266:14 272:16

---

**Z**

**Zaman** 201:18

**Z-A-M-A-N**
201:18

**zip** 4:19

# EXHIBIT GGG

DENNIS P. RIORDAN (SBN 69320)
dennis@riordan-horgan.com
DONALD M. HORGAN (SBN 121547)
don@riordan-horgan.com
LAYLI SHIRANI (SBN 257022)
lshirani@gmail.com
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile: (415) 552-2703

MARTHA BOERSCH (SBN 126569)
BOERSCH SHAPIRO LLP
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 217-3700
Mboersch@boerschshapiro.com

TED SAMPSELL-JONES (MN SBN 034302X)
William Mitchell College of Law
875 Summit Avenue
St. Paul, MN 55105
Telephone: (651) 290-6348
ted.sampselljones@wmitchell.edu

Attorneys for Defendant
HAMID HAYAT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR S-05-0240 GEB CMK |
| | ) | CV 14- 1073 GEB CMK |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **DECLARATION OF** |
| HAMID HAYAT, | ) | **DANIEL J. BRODERICK** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

DECLARATION OF DANIEL J. BRODERICK

I, DANIEL J. BRODERICK, hereby declare under penalty of perjury as follows:

1. I served as the Federal Defender for the Eastern District of California from 2006 until 2012, when I retired. Prior to that, I served as the Chief Assistant Federal Defender, Chief of the Habeas/Appeals Unit, Chief Trial Attorney, and Assistant Federal Defender. I joined the Federal Defender's office in 1991. I am currently an inactive member of the California bar.

2. I graduated with distinction from Stanford University in 1974. Between December 1974 and June 1976, I worked as a clerk for the criminal division of the U.S. Justice Department in Washington, D.C. I attended Yale Law School from 1976 until 1979 and was a member of the Law Journal staff. Between 1979 and 1981, I was a law clerk to U.S. District Judge Malcolm M. Lucas in the Central District of California. I was an Assistant U.S. Attorney in the criminal division of the U.S. Attorney's office for the Central District from 1981 until 1985. In 1985-86, I was a Robert Bosch Foundation Fellow. Between 1986 and 1991 I was an Associate Professor of Law at Pepperdine University School of Law, where I taught criminal law, criminal procedure, evidence, trial practice, and advance trial practice among other subjects. From 1990 to 1997, I lectured applicants for the California bar exam on the subjects of professional responsibility, evidence, criminal law, and criminal procedure.

3. The Federal Defender's office recruits, supervises, and trains members of the Criminal Justice Act Panel for the Eastern District of California. During my tenure with the Federal Defender's office I attended annual CJA panel selection meetings, where new panel applications were reviewed and discussed, the actions of approximately one-third of CJA panel members were reviewed, and where decisions were made concerning the composition of various CJA panels for the upcoming year. I have read and discussed several hundred resumes of attorneys seeking admission onto a federal CJA panel. I was also able to observe personally the actions of many criminal defense attorneys, including Assistant Federal Defenders and panel attorneys, and to review written documents filed by these attorneys.

4. Between 2007 and 2011, I served as lead counsel for lead defendant Harrison Jack in U.S. v. Harrison Jack, et al., No. 07-CR-266-FCD. As lead counsel, I supervised the work of the

1

Federal Defender staff and coordinated the work of several private and panel counsel representing co-defendants. I am quite familiar with the work that is involved in defending a "terrorism" case charged by the U.S. Attorney's office for the Eastern District of California. As a result of that work, all charges against all defendants in Mr. Jack's case were ultimately dismissed by the government.

5. I have been asked by attorney Dennis P. Riordan to review the deposition of Wazhma Mojaddidi concerning her representation of Hamid Hayat in U.S. v. Hamid Hayat and Umer Hayat, No. 05-CR-240-GEB. I have reviewed that entire deposition, taken on August 11, 2014. I have not reviewed the trial transcript in the underlying case.

6. In my opinion, Ms. Mojaddidi was unqualified to represent anyone in a federal criminal case (misdemeanor or felony) at the time she agreed to represent Mr. Hamid Hayat. In my opinion, she was also grossly unqualified to represent Mr. Hamid Hayat in pre-trial and trial proceedings in the above-mentioned case.

7. In my opinion, Ms. Mojaddidi's lack of experience and qualifications, as well as her actions, prejudiced Mr. Hamid Hayat in several ways throughout the pendency of this case.

8. The bases for these opinions are outlined below.

Selection of Competent Counsel

9. The Federal Defender office for the Eastern District of California has maintained and supervised different CJA panels for several years. The primary reasons for this are: (1) to prevent conflicts by insuring that co-defendants in the same case are represented by their own counsel; and (2) to assure that appointed counsel can provide constitutionally-adequate assistance, depending upon the nature of the case and the role of each defendant in that case. The panels include a Felony A panel, a Felony B panel, a misdemeanor panel, and a mentor panel. Attorneys on the Felony A panel have considerable experience in federal court and have represented some of the most culpable defendants in the most serious cases. Felony B panel attorneys usually have federal felony experience, but either by the attorney's choice or by a decision of the CJA Panel Committee are not assigned lead defendants in the most serious felony cases. Attorneys with some criminal trial experience, but limited federal criminal experience,

may be assigned to the misdemeanor panel or they may be assigned to the mentor panel. Any attorney assigned to the mentor panel works with an experienced federal criminal attorney (not involved in that same case) and is not permitted to make substantive decisions or to file anything in federal court without the review of that attorney.

10. At the time Ms. Mojaddidi agreed to represent Mr. Hamid Hayat, she had no criminal experience whatsoever. She graduated law school in 2002, but did not pass the bar until 2003. She did not take trial practice in law school, nor did she participate in any criminal law clinics. She made no appearances in state or federal criminal courts in 2004. She had not participated in any criminal jury trials. In her deposition, she does not express any familiarity with federal criminal procedure or with the federal rules of evidence, prior to her agreeing to represent Mr. Hamid Hayat.

11. Had Mr. Mojaddidi applied for a position on the Eastern District CJA panel in 2005, her application would have been rejected. She had shown no prior interest in criminal law. She had no criminal jury trial experience. She was unqualified to represent anyone charged with a federal criminal offense. Sometimes applicants with similar lack of experience have been advised in their rejection letter to gain some experience (usually in a county court indigent panel) before applying again. Ms. Mojaddidi had not served on a county indigent criminal panel.

12. Had the Federal Defender's office been approached by the Hayat family, either co-defendant, or the U.S. Attorney's office about appointed counsel, the Federal Defender's office would have taken one defendant and assigned a Felony A panel attorney to the other defendant. The reasons are several: the seriousness of the charges, the potential penalty, the need to deal with publicity necessarily associated with a "terrorist" offense, the difficulty of dealing with prosecutors from the Justice Department in Washington, D.C., the complicated process of obtaining and reviewing classified information, the potential for a lengthy and expensive investigation, and the necessity of knowing what types of errors (legal and factual) that the U.S. Attorney's office and the FBI can make in such a case. Within the Federal Defender's office, the assignment would have been given to one of the more experienced attorneys, who would likely be assisted by a more junior Assistant Federal Defender.

<u>Staffing the Case</u>

2      13.  At the outset of a case of this nature, it is essential to staff the case with a trained

3  investigator, a qualified interpreter, and a paralegal to organize the discovery.

4      14.  From the outset, Ms. Mojaddidi was aware that investigation was needed in the

5  United States and in Pakistan.  She attempted to conduct much of this investigation herself.  This

6  action was contrary to usual criminal defense practice.  If a witness says something to the

7  attorney and later changes that statement in any material way, counsel cannot be a witness in her

8  own case. Trained investigators are also trained to ask the right questions and to follow up clues

9  or ambiguities suggested by witnesses. Investigators are also available to meet with witnesses at

10  any hour of the day and during weekends, as well as during trial.  Witnesses are also frequently

11  reticent to talk to attorneys, but investigators are trained to break down such barriers.  Ms

12  Mojaddidi should have had retired FBI agent Wedick or another person accompany her whenever

13  she met with a potential witness.  At the very least that other person would have taken and

14  retained notes of each conversation, which Ms. Mojaddidi did not appear to do.  Witness notes

15  are essential to subsequent cross-examination of that witness and other individuals mentioned by

16  that witness.

17      15.  Mr. Hamid Hayat informed Ms. Mojaddidi at their first meeting that he had not

18  attended a terrorist training camp while he was in Pakistan.  A competent criminal defense

19  attorney would have known, therefore, that some investigation in Pakistan was essential; either to

20  confirm or dispute the government's allegations.  The necessity of such an investigation was not

21  impacted by an decision to insist upon a speedy trial; only the timing of such an investigation

22  would be affected.  Experienced criminal defense attorneys understand that if the defendant

23  insists upon not waiving time for trial, then the investigation must be pursued immediately,

24  because most federal judges will not permit delays during trial.  However, when faced with the

25  allegations in this case, an experienced criminal defense attorney would have attempted very

26  strongly to convince Mr. Hamid Hayat to waive the provisions of the speedy trial in order to

27  permit a full and complete investigation.

28

16. Ms. Mojaddidi states that she didn't ask retired FBI agent Wedick to make any calls to Pakistan because he did not speak Urdu. An appropriately experienced federal criminal defense attorney would know that there were still several other options that could be pursued. First, the Federal Defender's office has a national e-mail network connected to all other Federal Defender offices in the country. CJA attorneys are made aware of this service and often use it to send e-mails to all the other offices to determine if any other office (or panel attorney in that district) had investigated a case in Pakistan and if they knew of experienced investigators with the capability of conducting such an investigation. Second, there are public and private criminal investigators in Pakistan. Mr. Wedick could arrange to contract or hire such a person to conduct a local investigation. This practice is often used to reduce travel costs and investigator fees in a case. Third, Mr. Wedick could have travelled to Pakistan in the company of an interpreter to conduct an investigation himself.

17. It is not clear from Ms. Mojaddidi's deposition what is Mr. Hamid Hayat's native language. If it is Urdu, Ms. Mojaddidi is not a native Urdu speaker. She did not learn it until she married her husband. Regardless of her fluency in Mr. Hamid Hayat's native language, Ms Mojaddidi is not a trained interpreter. Experienced criminal defense lawyers understand that, no matter what their personal fluency is in a foreign language, there are words, nuances, and meanings that trained interpreters understand, but non-native speakers do not. Ms. Mojaddidi states that the Hamid Hayat case involved a joint defense agreement, a pre-trial plea offer from the United States Attorney's office, and various trial stipulations. At the very least, all of these written documents should have been reviewed and explained to Hamid Hayat by a trained interpreter. In addition, some of Mr. Hamid Hayat's statement to the FBI appears to have been recorded. An experienced criminal defense attorney would have had a trained interpreter review this statement with Mr. Hamid Hayat, as many non-native English speakers say and use English words in ways that are unintended.

18. It is unclear from the deposition how many documents were given to the defense by the U.S. Attorney's office. Nonetheless, Mr. Umer Hayat's attorney was assisted by junior lawyers in his law firm; Ms. Mojaddidi had no such assistants. Competent criminal defense

attorneys would have sought and obtained assistance in obtaining, organizing, and reviewing discovery. In a case such as this, where Mr. Hamid Hayat's statement to the FBI was critical to the government's case, a paralegal would have been able to visit Mr. Hamid Hayat in custody and, accompanied by a trained interpreter, review each and every statement made by or to Mr. Hamid Hayat.

Pre-trial Proceedings

19. The government accused Mr. Hamid Hayat of attending a terrorist training camp in Pakistan. Any competent criminal defense attorney would know that you cannot possibly provide a defense to that charge without knowing when this allegedly occurred and where it occurred. The way to obtain such information is to file a bill of particulars. Ms. Mojaddidi did not do that. By not limiting the government's case to a specific time frame, Ms. Mojaddidi made an alibi defense extraordinarily difficult, if not impossible; thus, depriving Mr. Hamid Hayat of a viable defense.

20. Ms. Mojaddidi states that one of her strategic decisions was to seek a speedy trial. In reactive crime cases, where the police and prosecution charge an offense after little investigation, such a defense may make sense. In federal felony cases, this strategy rarely makes any sense, because the government can only proceed by indictment, which means that the government has amassed a good deal of evidence and presented that evidence to a grand jury. In Mr. Hamid Hayat's case, the decision to seek a speedy trial at the expense of a full and complete investigation constituted ineffective assistance. The government stated Mr. Hamid Hayat attended a "terrorist" training camp in Pakistan. He stated he had never done so. Only one side could be correct, so an experienced criminal defense attorney would proceed with the strategy of showing who was correct. Despite logistical difficulties, this would not be an insurmountable burden, but it would take time. The defense would begin by having the government identify with specificity where and when his alleged visit occurred. Authorities within the governments of the United States and Pakistan would be contacted to confirm or deny this information. If this required clearance to review classified information, then the attorney would obtain it. A constitutional right to a fair trial trumps any statutory right to secrecy. If the government

6

precluded the defense from obtaining information in its possession that would determine this issue, then the case would have to be dismissed. In the event the defense investigation revealed that Mr. Hamid Hayat had in fact attended a camp as alleged, then an experienced criminal defense attorney would consult with the defendant and decide to try and reach a plea agreement, or decide how to proceed at trial. Ms. Mojaddidi did none of this.

21. After Ms. Mojaddidi opted to pursue a speedy trial defense, the government blunted this strategy by obtaining a continuance in the trial. A competent criminal defense attorney would have immediately filed a motion for bill of particulars and proceeded to fully investigate this case. At no time did Ms. Mojaddidi consider filing a motion for bill of particulars.

22. During Ms. Mojaddidi's deposition, government counsel opines that the prosecutor did not have an obligation to locate exculpatory evidence from other government agencies. Although this statement is an incorrect statement of the law, such a position would have alerted a competent criminal defense counsel that government discovery would not reveal all (if any) exculpatory evidence. In addition, Ms. Mojaddidi had sources of information suggesting such exculpatory evidence existed. She received information that at least one representative of the Pakistan government stated that there were no terrorist training camps in existence during the alleged time period. After making a formal request for such information to the Pakistan government and a discovery request to the federal prosecutors, a competent criminal defense attorney would have made a request to agencies of the U.S. Government that would have this information. To the extent CIPA clearance was required, it was malpractice not to obtain such a clearance. Regardless of the extent of such exculpatory evidence, Mr. Hamid Hayat was deprived of his right to seek exculpatory evidence by his retained counsel.

23. Ms. Mojaddidi states that the decision to push for a speedy trial was based in part on the limited amount of evidence produced by the government as discovery. An experienced criminal defense attorney would have known that, at the time of this pending case, the U.S. Attorney's office for the Eastern District of California was notorious for delays or outright non-disclosure of relevant and exculpatory evidence. Several U.S. District Court judges have made comments on the record to this effect. Ms. Mojaddidi was in fact informed of this possibility by

attorney Mark Reichel, who suggested to her that the government may been holding onto important evidence that was not disclosed. She stated she did not believe it. It is unclear from the deposition when she received a key piece of evidence, the coordinates of the alleged camp that Mr. Hamid Hayat allegedly attended. Her only responses to this critical piece of evidence were to cross examine government witnesses and to ask a friend of a friend to visit the site in Pakistan (which he did not do until after an earthquake had devastated the area). At the very least, Ms. Mojaddidi should have sought a continuance in the trial the moment she received the coordinates of the alleged camp, in order to conduct a proper investigation. Had a trained investigator been assigned to visit the coordinates, he or she would have talked to residents of the area to determine if any camp actually existed there prior to the earthquake.

24. After the government made its required expert disclosure under Rule 16 of the Federal Rules of Criminal Procedure, Ms. Mojaddidi would have been aware that they intended to call two "expert" witnesses. An effective criminal defense attorney would have known to ask the Federal Defender's office to circulate these names to other offices to see if these witnesses had ever appeared in any other federal criminal cases. This was not done. One of the government's witnesses also testified to the state of mind of people carrying a "supplication." Such state-of-mind testimony is not permitted post Hinckley. Ms. Mojaddidi did not object at trial. Ms. Mojaddidi could have precluded this testimony prior to trial either by seeking a more definitive statement of that "expert" witness's planned testimony under Rule 16 or by a Motion in Limine prior to trial. Neither option would have delayed the trial.

25. Ms. Mojaddidi's efforts to obtain evidence rebutting the government's two "expert"witnesses were woefully inadequate. She received assistance about the supplication from a man with no formal degrees and her "spiritual" sister. She relied primarily upon her cross examination, even though she had never cross-examined a witness in a criminal case prior to the trial. Cross examination of expert witnesses is particularly difficult, even for experienced criminal defense counsel. A competent criminal defense attorney would have consulted a qualified expert, not only to provide evidence rebutting the government expert, but to educate the defense lawyer what questions to ask on cross-examination.

26. An alibi defense is a very powerful defense in a criminal case, when properly presented. To present such a defense, however, several steps must be taken prior to trial. First, the defense must obtain a definitive statement from the government when and where the alleged crime occurred; otherwise, the defendant has not been provided constitutionally-required notice of the charges against him. Ms. Mojaddidi did not obtain such information. Second, the defendant must be thoroughly interviewed to obtain a detailed account of where the defendant was at all relevant times and to obtain the names of all *potential* alibi witnesses. It is unclear from the deposition, how thoroughly Ms. Mojaddidi pursued this step. Third, all potential alibi witnesses must be interviewed, preferably by a trained investigator and by the attorney. If the government's action causes a potential alibi witness to obtain legal advice and that advice is to remain silent, a competent defense attorney would seek to have the court hold a hearing as to the legitimacy of the witness's Fifth Amendment claim. Any improper actions by the prosecutor's office would be a reason to file a motion to dismiss the indictment. Fourth, alibi witnesses being considered as trial witnesses, would be vetted by mock cross examination. Ms. Mojaddidi states in her deposition that she believed there were people in Pakistan who could confirm Mr. Hamid Hayat's activities, but she did not investigate these witnesses because she did not think that they could corroborate every single day he was in Pakistan. An experienced criminal defense attorney would know that such precision was not necessary. The defense must create a reasonable doubt, not prove innocence. The prosecution alleged that Mr. Hamid Hayat was trained as a terrorist. If there were days or even weeks that could not be accounted for, the defense could still nonetheless show that there were no other days to suggest he had adopted such an attitude. Mr. Mojaddidi's failure to narrow the government's charges, combined with the failure to investigate, directly prejudiced Mr. Hamid Hayat.

27. Ms. Mojaddidi states that the two strategies she considered were to push for a speedy trial and rely upon cross examination to show the weaknesses of the government's case. She does not state that she ever considered introducing character evidence. Mr. Hamid Hayat was accused of being a terrorist. Ms. Mojaddidi had access to many people inside and outside the United States who could have informed her (and the jury) about Mr. Hamid Hayat's character for

violence, both before or after his visit to Pakistan. Experienced criminal defense attorneys know that character evidence about defendants can be compelling to a jury, particularly if the defendant will not take the stand to present himself to the jury. Such evidence would be particularly important to a jury, because of constant media exposure to the behavior of actual terrorists. The investigation and presentation of character evidence would not delay the trial in any way and it would go directly to weakening the government's case against Mr. Hamid Hayat. Failure to investigate such a defense was ineffective assistance and failure to present such a defense at trial could have been ineffective.

28. A defense based upon insufficiency of evidence can be a viable defense. It is particularly effective if there is an insufficiency as to some legal element of the charge. That does not appear to have applied in the case against Mr. Hamid Hayat. Factual insufficiency is very difficult to show, particularly in federal court where every criminal charge has survived review by a grand jury. A competent criminal defense attorney, before relying upon the defense of factual insufficiency, would either brainstorm the case before others (preferably non-lawyers) unconnected to the case, or before a mock jury. Ms. Mojaddidi appears to have based her decision to pursue factual insufficiency entirely upon her personal belief. Yet, she had no prior jury experience, nor any criminal jury experience in the Eastern District of California.

29. The government had no direct evidence placing Mr. Hamid Hayat at any alleged terrorist training camp, other than his statement to the FBI. In light of this, it was incompetent for Ms. Mojaddidi not to challenge the admissibility of this statement. She knew in advance he suffered from an illness that could have affected his mental capacity. She knew in advance that he was subjected to intense questioning by the FBI. Significantly, the decision not to call Mr. Hamid Hayat as a witness was based in large part upon her personal assessment that the inconsistencies in his prior statements would cause the jury to devalue his credibility. However, a competent criminal defense attorney would know that filing a motion to suppress his statement would have allowed her to see and hear him testify under cross examination outside a jury's presence. Had she retained a false confession expert, Ms. Mojaddidi could have had the expert see Mr. Hamid Hayat testify about the circumstances of his statement and this would have greatly

enhanced the value of such an expert's testimony at trial. Ms. Mojaddidi opted to use retired FBI agent James Wedick to be her "expert" with regard to Mr. Hamid Hayat's statement to the FBI. Filing a pre-trial motion to suppress this statement would have provided an opportunity to present Mr. Wedick in this capacity to the court. Then, if the court precluded his testimony, there was still sufficient time to obtain a properly qualified expert. During her deposition, Ms. Mojaddidi states she did not recall why she did not file a motion to suppress Mr. Hamid Hayat's statement.

Conflict

30. Ms. Mojaddidi states that she had a joint defense agreement with counsel for the co-defendant. The deposition does not state the terms of such an agreement. However, the existence of a joint defense agreement raises serious questions regarding confidentiality and conflict. This is particularly true in cases where the government's only plea offer involved a package deal.

32. At the outset of her representation in this case, Ms. Mojaddidi states that her co-counsel was retained to defend the co-defendant because the prosecution stated he was the more culpable. At the time final charges were filed, however, it was clear that Mr. Hamid Hayat was the one facing more serious charges. At this time, an attorney with so little experience should have withdrawn from the case or offered to assist new counsel for Mr. Hamid Hayat. Instead of doing that, Ms. Mojaddidi agreed to a retainer agreement that limited her compensation dramatically in relation to the compensation under the control of her co-counsel. That was malpractice. Regardless of whether her co-counsel would or would not have approved giving her money for investigation or experts or assistance by other attorneys, it was incompetent to relinquish control of such funds to counsel for another defendant, and to a counsel who stood to retain personally whatever funds were not used for these purposes.

32. It is impossible for me to outline all the ways in which conflicts would have arisen during trial without reviewing the full trial transcript. However, one of the most significant areas of conflict in this case occurred in the decision to seek a speedy trial. It appears that the evidence against the co-defendant was quite limited; thus, it may have made initial sense for his attorney to press for a speedy trial, particularly if that evidence could be addressed without the need for

11

much additional investigation. Pressing for a speedy trial for Mr. Hamid Hayat, however, was malpractice. He was alleged to have attended a terrorist training camp in Pakistan and returned to the U.S. with intentions to harm this country and/or its populace. Ms. Mojaddidi knew nothing about Mr. Hamid Hayat at the time she met him. He was in custody and could provide very little assistance in defending himself. He had been in Pakistan for two years. He had several relatives and acquaintances familiar with his activities and his expressed beliefs in the United States and in Pakistan. Ms. Mojaddidi had no idea what evidence the government actually had, only what they chose to share with her. She had no idea what other evidence was available to her. And, once the government obtained a continuance in the case, over the defense objection, to continue to pursue a speedy trial defense at all costs was simply nonsensical.

33. Joint defense agreements concern access to and sharing of information among jointly charged defendants. They do not concern trial strategy. A criminal defense attorney has a duty to his or her own client, not other family members and not to other individuals who may have paid the attorney's fees. At trial, an experienced criminal defense attorney would be aware that counsel for any co-defendant was obligated to defend his client zealously, even if it hurt the case of other co-defendants. With absolutely no criminal defense experience or criminal jury trial experience, Ms. Mojaddidi needed the assistance and advice of someone other than her co-defendant's counsel in deciding and executing a trial strategy. The fact that the prosecutors and not the defense suggested having two juries is clear evidence of this. I cannot determine how many ways this failure negatively affected Mr. Hamid Hayat without reviewing the trial transcript; however, the potential for conflict between the two counsel was significant.

34. The most obvious areas where conflict presented itself at trial were in regard to CIPA and stipulations. The co-defendant may not have needed CIPA clearance at all, as the charges against him did not allege that he attended a terrorist training camp in Pakistan. Ms. Mojaddidi, however, could not properly defend the case against Mr. Hamid Hayat without having access to CIPA-related information. The prosecution suggested the defense obtain clearances in order to look at the camp images it planned to introduce at trial. The trial court offered the possibility of obtaining outside cleared counsel to assist the defense. Yet, rather than obtain this necessary

clearance, Ms. Mojaddidi admitted falsely telling the court she intended to obtain a CIPA clearance. This was ineffective assistance that directly prejudiced Mr. Hamid Hayat's defense.

35. The CIPA-related stipulation was also a conflict that directly prejudiced Mr. Hamid Hayat. The stipulation restricted the defense attorney's ability to conduct cross-examination. This may have been an adequate strategic move by co-defendant's counsel, as such evidence did not directly affect his client. But it was malpractice for Ms. Mojaddidi to sign such a stipulation. First, she states she did not understand some of CIPA; yet, she and her client signed the stipulation. It is not possible for her to have explained something she did not understand to her client. Second, she stipulated she could not participate in in camera hearings regarding the CIPA evidence. In so doing, she deprived Mr. Hamid Hayat of the assistant of counsel at this critical stage of the case. Third, she stipulated to the admissibility of the satellite images. In so doing, she deprived Mr. Hamid Hayat of an opportunity to cross examine foundation witnesses who could have been questioned about the timing, accuracy, and content of critical evidence. Fourth, she believed the stipulation preserved the defense right to pursue lines of questioning that potentially implicated classified information. Yet, at trial, the government successfully objected to such questioning. This either violated the terms of the stipulation or it demonstrated her lack of understanding of what she'd agreed to in signing it. By agreeing to this stipulation, Ms. Mojaddidi deprived Mr. Hamid Hayat of his constitution right to confront and cross examine evidence against him.

Conclusion

36. Ms. Mojaddidi states that she had decision-making authority whether to seek a continuance for the purpose of investigation; whether CIPA clearances would be sought; in connection with what witnesses to call; whether Mr. Hamid Hayat should testify; over what strategic decisions to make before and at trial; over what tactical decisions to make before and at trial; over pre-trial motions; and other issues. She was not competent to exercise such authority in a serious federal felony case. She was not competent to exercise such authority having no experience with any pre-trial procedures, motions, or issues. She was not competent to exercise such authority at trial, having no experience with the Federal Rules of Evidence in a criminal trial

and federal criminal trial procedure.  It appears that she was offered the assistance of Mark

Reichel, an experienced federal criminal attorney and she indicated she wanted such assistance,

but she ultimately declined to do so.  She was unfamiliar with CIPA and admitted she did not

understand some of it.  She believed the government had no obligation to review classified

information and provide it to the defense, even though the least competent criminal defense

attorney would know that Brady obligations are constitutional requirements, whereas CIPA is

merely a statute.

37.  Ms. Mojaddidi was not competent at the time she decided to represent Mr. Hamid

Hayat and performed incompetently prior to and during the trial in this case.  Mr. Hamid Hayat

was severely prejudiced by her incompetence.

I, DANIEL J BRODERICK, hereby declare that the foregoing is true and correct under

penalty of perjury.

<u>Daniel J. Broderick</u>                                        November 10, 2014

# EXHIBIT HHH

DENNIS P. RIORDAN (SBN 69320)
dennis@riordan-horgan.com
DONALD M. HORGAN (SBN 121547)
don@riordan-horgan.com
LAYLI SHIRANI (SBN 257022)
lshirani@gmail.com
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile: (415) 552-2703

MARTHA BOERSCH (SBN 126569)
BOERSCH SHAPIRO LLP
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 217-3700
Mboersch@boerschshapiro.com

TED SAMPSELL-JONES (MN SBN 034302X)
William Mitchell College of Law
875 Summit Avenue
St. Paul, MN 55105
Telephone: (651) 290-6348
ted.sampselljones@wmitchell.edu

Attorneys for Defendant
HAMID HAYAT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR S-05-0240 GEB CMK |
| Plaintiff, | ) | CV 14- 1073 GEB CMK |
| | ) | |
| vs. | ) | |
| | ) | **DECLARATION OF** |
| HAMID HAYAT, | ) | **JAMES BROSNAHAN** |
| Defendant. | ) | |
| _____ | ) | |

# DECLARATION OF JAMES J. BROSNAHAN

1. My name is Jim Brosnahan. I'm an attorney with the firm of Morrison & Foerster LLP located in San Francisco. I am Senior trial counsel with that firm. I've practiced law 55 years trying both civil and criminal cases over that time. I have been asked to express to the court my thoughts with regards to handling cases that have top secret information and whose facts are located, at least in part, in foreign countries. Briefly, I can say that I've handled three cases, at least, involving top secret evidence and have handled and tried cases where facts were at least partly located in Japan or the Filipines or Mexico or Northern Ireland or Germany or France.

2. I have worked with a number of other lawyers who have handled similar cases, some of them as co-counsel or opposing counsel in the cases referred to above.

3. The legal standard for investigation of a criminal case where some of the evidence is classified as top secret involves obtaining a clearance which I've done in each of the cases that had such evidence in my own matters. There are regular procedures for such things. The top secret material is then handled in special ways dictated by the Government but the lawyers are allowed to work with the material and as long as it's kept in certain secure areas. On one occasion, we were allowed to keep the secure material under lock and key in our law firm. In another one, the case of John Walker Lindh, the so-called American Taliban, we were required to examine the evidence in the basement of the federal courthouse in Virginia. In the course of those cases, I worked closely with a government person who was in charge of the security. At no time did that person interfere with our preparation or lay down requirements that I thought unreasonable.

4. It's certainly true that cases that have important facts in foreign countries present difficulties to any lawyer. But they must be investigated. They can be investigated by one of two ways. First, an experienced investigator can be retained to go to the country and gather the evidence. Second, the lawyer can go to the country to participate in the gathering of evidence. During the troubles in Northern Ireland I represented a man named Kevin Barry Artt, who had escaped from the Maze prison after having been convicted of murder which he did not commit. I spent eleven days in Northern Ireland under circumstances involving some personal safety issues.

5.      It is not my purpose by this declaration to second guess the work of others with which I am not really familiar.  But the things I have said I believe to be the proper legal standard and consistent with the U.S. Supreme court authorities under the Sixth Amendment Right to Adequate Counsel which requires investigation in criminal cases.

6.      I hope this is of assistance to the court.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ___7th___ day of ___November___, 2014, in San Francisco, CA.

_____
JAMES J. BROSNAHAN

**DECLARATION OF JAMES J. BROSNAHAN**