PHILLIP A. TALBERT
Acting United States Attorney
ANDRÉ M. ESPINOSA
ROGER YANG
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

ERIN CREEGAN
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-0127

Attorneys for Respondent/Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:05-CR-240-GEB |
| Respondent/Plaintiff, | UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS TO THE COURT'S FINDINGS AND RECOMMENDATIONS |
| v. | |
| HAMID HAYAT, | DATE: May 30, 2016 |
| Petitioner/Defendant. | |

UNITED STATES' REPLY TO PETITIONER'S OBJECTION TO THE COURT'S FINDINGS AND
RECOMMENDATIONS

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     RELEVANT PROCEDURAL HISTORY ...........................................................3
        A.      District Court Proceedings ......................................................................3

        B.      Direct and Collateral Review ..................................................................4

III.    STATEMENT OF RELEVANT FACTS ..............................................................5
        A.      The Government's Case At Trial .............................................................5

                1.      Hayat Told Cooperating Witness Nasseem Khan of His Intentions to
                        Attend a Jihadi Training Camp in Pakistan .................................5

                2.      Hayat Confessed to the FBI That He Attended Jihadi Training and
                        Intended to Wage Violent Jihad in the United States ..............7

                3.      Extremist Publications From 1999-2003 Discovered in Hayat's Living
                        Space Further Evidenced Hayat's Intent ....................................8

                4.      Expert Testimony Regarding the Existence of Militant Camps in the
                        Balakot Region Corroborated Aspects of Hayat's Confession ............9

                5.      Expert Testimony and Satellite Evidence Corroborated Hayat's
                        Confession that He Attended a Jihadi Camp in the Balakot Region ..................10

                6.      The Jihadi Supplication Hayat Carried Provided Further Evidence That
                        Hayat Returned to the United States Intending to Engage in Violent
                        Jihad .......................................................................................10

        B.      The Defense Case At Trial ......................................................................11

IV.     CONTROLLING LEGAL PRINCIPLES ...........................................................12
        Summary Judgment Standard ...........................................................................12

V.      GOVERNMENT'S RESPOSE TO HAYAT'S OBJECTIONS ..............................13
        A.      The Court Correctly Concluded that Hayat Failed to Establish a Conflict of
                Interest ..................................................................................................13

                1.      Mojaddidi Exercised Her Independent Judgment and There Was no
                        Conflict ....................................................................................13

                2.      There Was No Financial Conflict of Interest ............................16

        B.      Mojaddidi Provided Effective Assistance and the Court Correctly Concluded
                that Hayat Failed to Demonstrate a Lack of Material Dispute on that Question ..............20

        Ineffectiveness Assistance of Counsel Standard.................................................20

1. Mojaddidi's Decision to Forego Further Investigation of an Alibi Defense and Pursue an Alternative Defense Was Reasonable and Hayat Failed To Demonstrate the Absence of a Material Dispute to the Contrary ..............................................................................................22

    a. Mojaddidi's Strategic Decision to Pursue a Speedy Trial and Sufficiency of the Evidence Defense Instead of an Alibi Defense Was Well Within the Wide-Range of Competent Representation.......................................................................................24

2. Mojaddidi's Representation Concerning Evidence of the Balakot Terrorist Training Camp Was Reasonable and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary .........................27

    a. Mojaddidi's Strategic Decision to Challenge the Government's Camp Evidence Through Cross-Examination of Abbas Was Well Within The Wide Range of Competent Representation...................27

3. Mojaddidi's Cross-Examination of Benn Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary..................................31

4. Mojaddidi's Decision to Forego an Objection to a Non-Existent Amendment Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary ...........................................................35

5. Mojaddidi's Decision to Forego a Motion to Suppress Hayat's Confession Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary ...........................................................37

6. Mojaddidi's Decision to Rely on Cross-Examination to Challenge the Reliability of Hayat's Confession Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary ......................................38

    a. Mojaddidi Did Not Act Based on Ignorance of the Law and Any Competent Counsel Would Have Reasonably Decided Not to Pursue an Alternative False Confessions Expert ...............................41

7. Mojaddidi's Decision to Forego a Security Clearance was Reasonable As Such a Clearance Would Not Have Enhanced Hayat's Defense and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary ............................................................................................42

8. Mojaddidi's Cross-Examination of Government Witness Nasseem Khan Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary ............................................................................................46

    b. The Question of Mojaddidi's Representation Was Not Before the Ninth Circuit on Direct Appeal and Nothing in the Circuit's Opinion Endorses His Arguments ...........................................................49

9.   Mojaddidi's Cross-Examination of Government Witness Khalil Mohammed Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary ................................................................ 50

a.   Mojaddidi Was Not Ineffective for Not Raising a Futile Objection to Mohammed's Expert Testimony Concerning Hayat's Ta'wiz ................................................................ 50

b.   Mojaddidi's Cross-Examination of Mohammed was Vigorous, Robust, Fruitful, and Well Within the Wide Range of Competent Representation ................................................................ 52

C.   Mojaddidi's Resume as of 2005-2006 Does Not Alter the Correctness of the Court's Findings and Recommendations ................................................................ 55

VI.   CONCLUSION ................................................................................................................ 57

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) .................................................................................... 13

Bonin v. Calderon,
  59 F.3d 815 (9th Cir. 1995) .................................................................. 14, 16

Campbell v. Wood,
  18 F.3d 662 (9th Cir. 1994) ........................................................................ 22

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) .................................................................................... 12

Colorado v. Connelly,
  479 U.S. 157 (1986) .................................................................................... 37

Cooper v. Fitzharris,
  586 F.2d 1325 (9th Cir. 1978) .................................................................... 20

Cuen v. Evans,
  390 Fed.Appx. 721 (9th Cir. 2010) ............................................................ 33

Cuyler v. Sullivan,
  446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) ................. 13, 14, 18

Darden v. Wainwright,
  477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) ......................... 21

Dark v. Curry County,
  451 F.3d 1078 (9th Cir. 2006) .................................................................... 12

Derrick v. Peterson,
  924 F.2d 813 (9th Cir. 1991) ...................................................................... 37

Fitzpatrick v. McCormick,
  869 F.2d 1247 (9th Cir. 1989) .................................................................... 19

Frazier v. Cupp,
  394 U.S. 731, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) ........................... 38

Grayson v. Thompson,
  257 F.3d 1194 (11th Cir. 2001) .................................................................. 21

Guam v. Santos,
  741 F.2d 1167 (9th Cir. 1984) .................................................................... 22

Harrington v. Richter,
  562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ..................... passim

Hart v. Massanari,
  266 F.3d 1155 (9th Cir. 2001) .................................................................... 51

Hunt v. Cromartie,
    526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) ................................ 13

In Re Grand Jury Subpoena,
    739 F.2d 1354 (8th Cir. 1984) .......................................................................... 56

In re Terrorist Bombings,
    552 F.3d 93 (2d Cir. 2008) ............................................................................... 43

James v. Borg,
    24 F.3d 20 (9th Cir. 1994) ...................................................................... 21, 38, 40

Johnson v. Lockhart,
    921 F.2d 796 (8th Cir. 1990) ............................................................................ 24

Kimmelman v. Morrison,
    477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) ........................... 21, 22

LaGrand v. Stewart,
    133 F.3d 1253 (9th Cir. 1998) .......................................................................... 56

Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.,
    189 F.3d 473 (9th Cir. 1999) ............................................................................ 34

LoCascio v. United States,
    395 F.3d 51 (2d Cir. 2005) ......................................................................... 14, 40

Long v. County of Los Angeles,
    442 F.3d 1178 (9th Cir. 2006) .......................................................................... 12

Lowry v. Lewis,
    21 F.3d 344 (9th Cir. 1994) ......................................................................... 33, 37

McMann v. Richardson,
    97 U.S. 759, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970) ..................................... 20

Miranda v. Arizona,
    384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ................................... 37

Murray v. Schriro,
    746 F.3d 418 (9th Cir. 2014) ...................................................................... 52, 54

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.,
    210 F.3d 1099 (9th Cir. 2000) .......................................................................... 12

Noe v. United States,
    601 F.3d 784, (8th Cir. 2010) ........................................................................... 14

North Carolina v. Butler,
    441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) ................................... 37

Odom v. United States,
    455 F.2d 159 (9th Cir. 1972) ............................................................................ 51

People v. Barboza,
    129 Cal. 3d 375 (1981) ........................................................................ 17

People v. Doolin,
    45 Cal.4th 390 (Cal. 2009) ................................................................. 17

People v. Kowalski,
    821 N.W.2d 14 (Mich. 2012) .............................................................. 42

Richardson v. Marsh,
    481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987) ................... 37

Rogers v. Zant,
    13 F.3d 384 (11th Cir. 1994) ......................................................... 21, 26

Sanders v. Ratelle,
    21 F.3d 1446 (9th Cir. 1994) ............................................................... 19

Sawyer v. Smith,
    497 U.S. 227, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990) ................. 55

Sec. & Exch. Comm'n v. Todd,
    642 F.3d 1207 (9th Cir. 2011) ............................................................ 13

Seymour v. Walker,
    224 F.3d 542 (6th Cir. 2000) .............................................................. 27

Soremekun v. Thrifty Payless, Inc.,
    509 F.3d 978 (9th Cir. 2007) ........................................... 12, 13, 19, 23

State v. Cobb,
    43 P.3d 855 (Kan. Ct. App. 2002) ...................................................... 41

State v. Davis,
    32 S.W.3d 603 (Mo. App. 2000) ........................................................ 41

Strickland v. Washington,
    466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ............. passim

T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,
    809 F.2d 626 (9th Cir. 1987) ..................................................... 12, 13, 14

Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,
    322 F.3d 1039 (9th Cir. 2003) ............................................................ 12

Turner v. Calderon,
    281 F.3d 851 (9th Cir. 2002) .............................................................. 22

United States v. Adams,
    271 F.3d 1236 (10th Cir. 2001) .......................................................... 41

United States v. Adamson,
    291 F.3d 606 (9th Cir. 2002) .............................................................. 36

United States v. Baptista-Rodriguez,
    17 F.3d 1354 (11th Cir. 1994) .......................................................... 43, 44, 46

United States v. Cazares,
    121 F.3d 1241 (9th Cir. 1997) ................................................................ 37

United States v. Cronic,
    466 U.S. 648 (1984) ................................................................... 55, 56, 57

United States v. Duncan,
    42 F.3d 97 (2d Cir. 1994) ....................................................................... 34

United States  v. Griffin,
    324 F.3d 330 (5th Cir. 2003) ................................................................. 14

United States v. Hartz,
    458 F.3d 1011 (9th Cir. 2006) ............................................................... 36

United States v. Hayat,
    710 F.3d 875 (9th Cir. 2013) .......................................................... passim

United States v. Hirokawa,
    342 Fed.Appx. 242 (9th Cir. 2009) ....................................................... 33

United States v. Kindle,
    925 F.2d 272 (8th Cir. 1991) ................................................................. 14

United States v. Kirsh,
    54 F.3d 1062 (2d Cir. 1995) .................................................................. 14

United States v. Lewis,
    786 F.2d. 1278 (5th Cir. 1986) .............................................................. 55

United States v. Marchini,
    797 F.2d 759 (9th Cir. 1986) ................................................................. 33

United States v. Merritt,
    528 F.2d 650 (7th Cir. 1976) ................................................................. 56

United States v. Miller,
    874 F.2d 1255 (9th Cir. 1989) ............................................................... 41

United States v. Milstein,
    401 F.3d 53 (2d Cir. 2005) .................................................................... 36

United States v. Moore,
    159 F.3d 1154 (9th Cir. 1998) ............................................................... 14

United States v. Schwartz,
    924 F.2d 410 (2d Cir. 1991) .................................................................. 34

United States v. Scop,
    846 F.2d 135 (2d Cir. 1988) .................................................................. 34

United States v. Scrivner,
    189 F.3d 825 (9th Cir. 1999) ................................................................... 51

United States v. Strem,
    959 F.2d 243 (9th Cir. 1992) ................................................................... 33

United States v. Von Stoll,
    726 F.2d 584 (9th Cir. 1984) ................................................................... 36

United States v. Ward,
    747 F.3d 1184 (9th Cir. 2014) ................................................................. 36

United States v. Yunis,
    867 F.2d 617 (D.C. Cir. 1989) ................................................................. 43

Vent v. State,
    67 P.3d 661 (Alaska Ct. App. 2003) ........................................................ 41

Waters v. Thomas,
    46 F.3d 1506 (11th Cir. 1995) ........................................................... 21, 48

Watts v. United States,
    841 F.2d 275 (9th Cir. 1988) ................................................................... 26

Williams v. Calderon,
    52 F.3d 1465 (9th Cir. 1995) ............................................................. 17, 18

Woods v. Sinclair,
    655 F.3d 886 (9th Cir. 2011) ................................................................... 55

Woratzeck v. Ricketts,
    820 F.2d 1450 (9th Cir. 1987) ................................................................. 22

## STATUTES

18 U.S.C. § 2339A ..................................................................................... 35

28 U.S.C. § 2255 ......................................................................................... 4

## RULES

Fed. R. Civ. P. 56(c) ................................................................................. 11

FRE 106 ............................................................................................... 47, 48

FRE 401 ..................................................................................................... 46

FRE 403 ..................................................................................................... 46

FRE 607 ............................................................................................... 48, 50

FRE 702 ....................................................................................... 31, 54, 55

FRE 704(a) ................................................................................................ 35

FRE 704(b)............................................................................................................ 51

FRE 803(3)............................................................................................................ 47

**OTHER AUTHORITIES**

Margaret A. Berger, <u>United States v. Scop: The Common–Law Approach to an Expert's Opinion about a Witness's Credibility Still Does Not Work</u>, 55 Brooklyn L.Rev. 559 (1989)................................. 34

PHILLIP A. TALBERT
Acting United States Attorney
ANDRÉ M. ESPINOSA
ROGER YANG
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700

ERIN CREEGAN
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-0127

Attorneys for Respondent/Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Respondent/Plaintiff,<br><br>          v.<br><br>HAMID HAYAT,<br><br>                    Petitioner/Defendant. | CASE NO.  2:05-CR-240-GEB<br><br>UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS TO THE COURT'S FINDINGS AND RECOMMENDATIONS<br><br>DATE: May 30, 2016 |

## I.    INTRODUCTION

When Hamid Hayat learned he was being charged with a crime relating to international terrorism, he called his family to help him obtain a lawyer.  His family contacted the Council on American-Islamic Relations ("CAIR"), a Muslim civil liberties organization.  CAIR contacted Wazhma Mojaddidi ("Mojaddidi"), a young, local lawyer who had done *pro bono* work for the organization, and who possessed unique cultural knowledge and specialized language skills that she had used to represent Muslim clients in immigration and other cases.  Hayat and his father, Umer, who was also charged, met with Mojaddidi and another lawyer, Johnny Griffin ("Griffin").  Hayat chose Mojaddidi as his lawyer.

1   Umer chose Griffin.  In the proceedings that followed, which lasted over a year and monopolized her

2   professional attention, Mojaddidi worked to exonerate Hayat.  She was ultimately unsuccessful because

3   the jury was persuaded by the compelling evidence of Hayat's guilt the government presented at trial.

4         After the Ninth Circuit affirmed his conviction on direct appeal, Hayat brought this collateral

5   attack.  In March 2016, the Honorable Craig M. Kellison ("Judge Kellison") issued Findings and

6   Recommendations to the District Court, recommending denial of Hayat's motion for summary judgment,

7   which asserted conflict of interest and ineffective assistance claims.  Hayat now objects to those Findings

8   and Recommendations, characterizing the Court's disposition of his various arguments as "wafer-thin"

9   and accusing the Court of failing to employ the "higher order of judicial attention and decision-making"

10  Hayat believes his motion for summary judgment required.  Essentially, Hayat argues that if the Court had

11  only written *more* it might have reached a different conclusion.

12        Contrary to Hayat's objections, the Court's Findings and Recommendations succinctly disposed of

13  the ultimate issue before it, correctly concluding that Hayat failed to meet his burdens of production and

14  persuasion to prevail on summary judgment.  Hayat's objections simply ignore that conclusion.  Instead,

15  Hayat re-asserts the multitude of underlying legal arguments he offered in his summary judgment briefing,

16  ignores the controlling standard, and complains the Court should have reached a different conclusion.  His

17  objections lack any merit.

18        Under the summary judgment standard, Hayat was required to affirmatively demonstrate a lack of

19  any genuine factual dispute concerning his claims and that no reasonable trier of fact could disagree he

20  was entitled to relief.  Hayat cannot meet that high burden.  The record in this case is comprised of nearly

21  7,000 pages and, contrary to Hayat's unfounded conjecture, it is devoid of even a scintilla of evidence of

22  any actual financial or other conflict between Mojaddidi and Griffin.  In her 300-page deposition,

23  Mojaddidi, under oath, repeatedly affirmed that she exercised independent professional judgment when

24  making decisions on every issue about which Hayat complains.  Mojaddidi's deposition testimony is

25  supported by the trial record, which demonstrates her efforts were well within the broad range of effective

26  representation under the Sixth Amendment.

27        Viewing the facts in the light most favorable to the government and drawing all reasonable

28  inferences in favor of the government – as required under the summary judgment standard – Hayat failed

to meet his burden on each of his claims.  First, Hayat failed to demonstrate the existence of any conflict of interest.  Even if he identified some evidence of an actual conflict, which he did not, Hayat failed to prove a conflict beyond any material dispute.  Second, Hayat failed to demonstrate Mojaddidi was ineffective.  Even if he identified some evidence in the record of potential ineffectiveness, which he did not, he failed to prove such purported ineffectiveness beyond any material dispute.  Finally, concerning his claims that Mojaddidi was ineffective, Hayat failed to demonstrate or prove prejudice beyond any material dispute.

Judge Kellison's Findings and Recommendations explain clearly and succinctly that Hayat failed to meet his burden on summary judgment.  Nothing more was required.  Hayat has spilled much ink in the course of this litigation over his § 2255 claims.  However, saying a lot does not always mean one has much to say.  Judge Kellison's Findings and Recommendations say all that is necessary.  Hayat failed to meet the high burden applicable to the procedural vehicle he chose to advance his claims.  His objections offer no basis to second-guess that conclusion.  Accordingly, the District Court should adopt the Finding and Recommendations and deny Hayat's motion for summary judgment.

## II.      RELEVANT PROCEDURAL HISTORY

### A.      District Court Proceedings

On June 7, 2005, Hamid Hayat ("Hayat") and Umer Hayat ("Umer"), son and father, were each charged in a Complaint with one count of Making a False Statement.  (CR 1).  Johnny Griffin appeared as retained counsel for Umer and stood in for Mojaddidi, who Hayat later retained as counsel.  (CR 1; CR 5).[1]  On June 16, 2005, Hayat was charged in an Indictment with Making False Statements (Counts One and Two) and Umer was charged with Making a False Statement (Count Three).  (CR 8).  On July 1, 2005, the Court set trial for August 24, 2005, at the request of the defense.  (CR 17; Defense Exhibit in Support of Motion for Summary Judgment ("Def. Ex.") EEE.2 at 1:20-2:4).  On July 6, 2005, the government moved for an exclusion of time under the Speedy Trial Act, which the defense opposed.  The Court denied the motion on July 15, 2005.  (CR 18, 20, 22, 25, 26).  On August 4, 2005, the government moved to vacate the August 24, 2005 trial date, and for an exclusion of time under the Speedy Trial Act.

---

[1] Both defendants were ordered detained and remained in custody throughout the proceedings.  (CR 3, 5).

Over the defendants' objections, on August 5, 2005, the Court granted the motion and set the matter for further status on October 7, 2005.  (CR 29, 30, 31; Def. Ex. EEE.4 at 10:1-14:24).

On September 22, 2005, Hayat was charged in a Superseding Indictment with Providing, Concealing, and Attempting to Conceal Material Support and Resources (Count One), and Making False Statements (Counts Two and Three).  Umer was charged with Making a False Statement (Count Four).  (CR 50).  On October 6, 2005, the government moved for an exclusion of time under the Speedy Trial Act.  On October 7, 2005, the Court granted the motion.  (CR 74).  On January 6, 2006, the Court set the case for trial on February 14, 2006.[2]  (CR 136).  On January 26, 2006, Hayat was charged in a Second Superseding Indictment with Providing, Concealing, and Attempting to Conceal Material Support and Resources (Count One), and Making False Statements (Counts Two through Four), and Umer was charged with Making False Statements (Counts Five and Six).  (CR 162).[3]

Hayat and his father were tried by separate juries from February 14, 2006 to April 25, 2006.  On April 25, 2006, Hayat was found guilty of all charges by his jury; Umer's jury could not reach a verdict and the Court declared a mistrial as to the charges against him.  (CR 328, 331, 325).  On May 17, 2007, the Court denied Hayat's motion for a new trial.  (CR 329, 339, 441, 482).  On September 10 and 11, 2007, the Court conducted a sentencing hearing after which it sentenced Hayat to 288 months in custody.  (CR 500, 501).  On November 7, 2007, the Court dismissed without prejudice Hayat's premature Section 2255 motion.  (CR 496, 516).

## B.   Direct and Collateral Review

On March 13, 2013, a divided panel of the Ninth Circuit affirmed Hayat's conviction.  See United States v. Hayat, 710 F.3d 875 (9th Cir. 2013).  On April 30, 2014, Hayat filed a new petition for relief under 28 U.S.C. § 2255 alleging, among other claims, that Mojaddidi worked under an actual conflict of interest that adversely affected her performance and that her representation was ineffective.  (CR 531).

---

[2] On January 13, 2006, the defendants filed nine motions in limine, a motion to dismiss, a motion to compel, a motion for disclosure of Brady/Jencks material, and a motion to dismiss Count Two of the Superseding Indictment.  (CR 143-147).  The Court denied the motions in limine and to dismiss on January 19, 2006.  (CR 149, 152).

[3] On January 30, 2006, Mojaddidi filed a revised motion to dismiss Counts Two and Three of the Second Superseding Indictment.  (CR 168).  On February 2, 2006, the Court deferred ruling on that motion until post-trial (CR 178) and, on February 3, and April 3, 2006, the Court denied the motion to compel.  (CR 185, 280, 281).

On August 11, 2014, the parties conducted a deposition of Mojaddidi.[4]  (CR 540; see also Def. Ex. FFF: August 11, 2014 Deposition of Wazhma Mojaddidi ("W.M. Dep.")).

On November 13, 2014, Hayat filed a motion for summary judgment on his claims of conflict and ineffective assistance.  (CR 548).  With leave of the Court, the government filed its opposition on February 27, 2015. (CR 555, 557).  Hayat filed a reply on March 20, 2015. (CR 558).  On April 22, 2015, the parties argued Hayat's summary judgment motion.[5]  (CR 569).

On or about March 10, 2016, Judge Kellison issued Findings and Recommendations to the District Court, recommending denial of Hayat's motion for summary judgment and ordering the parties to file objections by March 24, 2016.  (CR 588).  Hayat filed two requests for extensions of time to file his objections, which the Court granted.  (CR 589-592).  On April 29, 2016, Hayat filed objections to the Court's Findings and Recommendations.  (CR 593).  On May 11, 2016, the Court granted the government's request for leave to file this response to Hayat's objections.  (CR 596).

## III.    STATEMENT OF RELEVANT FACTS

### A.    The Government's Case At Trial

At trial, the government presented abundant evidence that Hayat attended a jihadist training camp in Pakistan between 2003 and 2004, returned to the United States with the intent to wage violent jihad, and lied to the FBI about his training and intentions.  In its case in chief, the government called eleven percipient witnesses and three expert witnesses.  A summary of the relevant testimony follows.

#### 1.    Hayat Told Cooperating Witness Nasseem Khan of His Intentions to Attend a Jihadi Training Camp in Pakistan

Nasseem Khan ("Khan"), a cooperating government witness, met Hayat in 2002.  (RT 847:4-22).[6]  Thereafter, Khan, whom Hayat described as his "best friend" (Government's Exhibit[7] ("Govt. Ex.") 67.1

---

[4] The parties scheduled Griffin's deposition.  (CR 540).  He refused to answer questions, claiming Umer declined to waive the attorney-client privilege, and his deposition was postponed by the Court.  (See CR 542).

[5] While his summary judgment motion was pending, Hayat filed motions seeking leave to: (i) take foreign depositions, (CR 571); and (ii) to conduct discovery by interrogatories and requests for admissions, (CR 574), which the government opposed.  (CR 581).  The Court denied both discovery motions as premature.  (CR 584).

[6] "RT" refers to the record transcript of the trial, a complete copy of which the government filed with the Court as an exhibit to its opposition to Hayat's motion for summary judgment.

[7] Citations to Government Exhibits are to the exhibits filed with the government's opposition to Hayat's summary judgment motion. (CR 557).  The government's prior arguments and exhibits are incorporated herein.

at 37), participated in a series of recorded and unrecorded conversations with Hayat. Hayat spoke often with Khan about the existence of jihadi training camps in Pakistan, and his intent to attend such a camp. Hayat described jihadi camps to Khan and told Khan several times that jihadi training was going on in Mansehra, Pakistan.[8] (Govt. Ex. 2 at 5-6). Hayat explained that the camp in Mansehra was run by Jaish-e-Muhammed ("JEM") and its leader Masood Azhar ("Azhar"), and he discussed the nature of training at the camp. (Govt. Ex. 2 at 7-8, 10, 26-27). Hayat told Khan that people came to the camp from all over the world, including America, and that there were many people, including Hayat's grandfather and uncle, who could help someone get into a camp. (Govt. Ex. 2 at 25-26).

Hayat told Khan about his intent to attend a jihadi training camp and engage in violent jihad. Starting in March 2003, Hayat pledged to Khan that Hayat was ready for jihad, stating: "I'm ready, I swear, friend." (Govt. Ex. 3 at 18). In April 2003, Hayat told Khan that he had "one objective now" – "I'm going for training." (Govt. Ex. 4 at 65). In July 2003, Hayat, from Pakistan, told Khan the camps had been closed and Hayat's grandfather told Hayat he should go to camp but the conditions were not right at that time. Hayat stated that if the camp had been open, he would have "been there." (Govt. Ex. 5 at 10). In August 2003, Hayat told Khan that he was going to attend a training camp after Ramadan, which was to occur at the end of November 2003. (Govt. Ex. 6 at 14-15; RT 2599:1-13).

Hayat's conversations with Khan demonstrated Hayat's clear interest in violent jihad and served as further evidence of his knowledge and intent at trial. Hayat asserted that jihad was the duty of all Muslims, and that it was "our duty" to help Muslims anywhere in the world where Muslims or Muslim countries were attacked. (Govt. Ex. 2 at 31). Hayat spoke with pride to Khan about young men, many from his grandfather's madrassa in Pakistan, who had gone to jihadi training or for jihad in Afghanistan. (Govt. Ex. 1 at 10-13; Govt. Ex. 2 at 28-30). Hayat also spoke approvingly of the concept of martyrdom for those who wage jihad.[9] Hayat expressed disdain for perceived infidels, including Shia Muslims and

---

[8] Hayat's lived with his grandparents in Rawalpindi, Pakistan, between the ages of approximately 7 and 18, from 1990 until 2000. (See Govt. Ex. 8 at 49-50). From approximately mid-2000 through early 2003, he resided in the U.S., in Lodi, California. Id. On or about April 23, 2003, Hayat re-entered Pakistan. He returned to the U.S. approximately two years later, on or about May 27, 2005. (See RT 550:6-555:17, 559:18-25, 2187:17-2194:7).

[9] See Govt. Ex. 1 at 40 (knowing martyrs of extremist group Sipah-e-Sahaba ("SSP") and supporting their families); Govt. Ex. 2 at 29 (relating story of "fortunate" Afghan martyrs); Govt. Ex. 2 at 29-30 (relating story of friend going to jihad and inspired to "die in God's path" for forgiveness of his sins).

UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS
TO THE COURT'S FINDINGS AND RECOMMENDATIONS

Jews.  Hayat stated that he was "so pleased" that a jihadi group had cut Wall Street Journal reporter Daniel Pearl "into pieces."  Hayat noted that Pearl "was Jewish" and that as a result of this "good job," now "they can't send one Jewish person to Pakistan."[10]  (Govt. Ex. 4 at 49; see also Govt. Ex. 1 at 21).

### 2. Hayat Confessed to the FBI That He Attended Jihadi Training and Intended to Wage Violent Jihad in the United States

On May 30, 2005, while Hayat was at the airport in Tokyo, returning from Pakistan, FBI Special Agent ("SA") Larry Futa questioned him about his time in Pakistan.  Hayat denied that he attended any kind of terrorist camp in Pakistan or elsewhere.  (RT 457:7-12).  A few days later, on June 3, 2005, FBI SAs Tenoch Aguilar and Sean Wells questioned Hayat at his home in Lodi, California.  Hayat again denied that he attended a jihadi camp, attended a jihadi madrasa, or was a jihadi.  (RT 566:2-23).

The next day, June 4, 2005, FBI SA Harry Sweeney ("SA Sweeney") questioned Hayat at the Sacramento FBI office.  After being advised of and waiving his rights, Hayat initially denied that he had received any weapons training at a jihadi terrorist training camp and denied that he had received any training at a jihadi camp to fight against the U.S. (RT 493:11-497:12, 499:9-500:5).  Later, during interviews with SA Sweeney and other FBI special agents, Hayat confessed that he attended a jihadi camp both in 2000 and 2003-2004, that he received training, and that he returned to the U.S. with the intent to commit jihad.

During the interviews, Hayat repeatedly admitted that he attended a jihadi camp in 2003-2004 (Govt. Ex. 8 at 15, 18, 21, 90-92), and in 2000 (Govt. Ex. 8 at 48-49, 51, 91).[11]  Hayat admitted at least six separate times that the camp he attended was in the Balakot area, in the Northwest Frontier Province. (Govt. Ex. 8 at 14, 21-22, 110, 113, 197).  Hayat explained, in detail, how he traveled from Rawalpindi to the camp.  (Govt. Ex. 8 at 4, 7-8, 82-83).  Hayat stated that he was at the camp for months, once stating three and one-half months, (Govt. Ex. 8 at 18, 114), and later, six months.  (Govt. Ex. 8 at 114-15).  He

---

[10] Hayat spoke to Khan unflinchingly about his hatred for the U.S.  He told Khan the U.S. was his country "in name only" and that his "heart is in Pakistan."  (Govt. Ex. 1 at 35; Govt. Ex. 1 at 38-40 (speaking approvingly of extremist attacks in Islamabad)).  Hayat also demonstrated his familiarity with numerous Pakistani extremist groups and their leadership.  (Govt. Ex. 2 at 19-20; see also Govt. Ex. 7 at 3-9 (expressing familiarity with extremist group SSP and describing audio tapes Hayat gave to Khan that featured a speech by an SSP leader)).

[11] Hayat was interviewed between 4:45 p.m. and 7:00 p.m., on June 4, 2005, and between 12:37 a.m. and 3:00 a.m., on June 5, 2005.  (RT 582:19-584:1).  Excluding breaks, each interview lasted two hours.  (Id.)

UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS
TO THE COURT'S FINDINGS AND RECOMMENDATIONS

identified various dates during which he attended the camp, all in the period from approximately October 2003, through November 2004.  (Govt. Ex. 8 at 15, 19-21, 90-91).

Hayat described the lay-out of the camp including buildings, designated living and teaching facilities, and an explosives and firearms training area.  (Govt. Ex. 8 at 83-87, 89, 194-196).  He stated there were numerous attendees, once suggesting as many as seventy, and later suggesting 200.  (Govt. Ex. 8 at 9-10, 196).  He described the trainees as being between ages 18 to 30, (Govt. Ex. 8 at 61), mostly Pakistani, (Govt. Ex. 8 at 13), and speaking mostly Urdu with some Pashto (Govt. Ex. 8 at 13-14).  He stated the camp included training in physical fitness, (Govt. Ex. 8 at 18, 44), fighting, (Govt. Ex. 8 at 69), firearms, (Govt. Ex. 8 at 18, 42-43, 45-46, 115), as well as what he believed was explosives (Govt. Ex. 8 at 39, 46-48).  He admitted he received pistol training, (Govt. Ex. 8 at 18) and training with a rifle or shotgun, (Govt. Ex. 8 at 45), and he stated first that he shot at a bull's-eye and, later, at targets with pictures of U.S. leaders on them.  (Govt. Ex. 8 at 43-44, 96, 115, 174-75).  He first stated he did not know the duration of the training, (Govt. Ex. 8 at 11), but later said it lasted approximately five to six months.  (Govt. Ex. 8 at 79).  He stated repeatedly that the purpose of the camp was to train individuals for jihad.  (Govt. Ex. 8 at 12, 53, 67-68).

Hayat made statements regarding his intentions after training.  At one point, he stated attendees at these camps were allowed to go wherever they wanted to go after training, (Govt. Ex. 8 at 53), and were not given specific assignments.  (Govt. Ex. 8 at 48).  He later stated he was prepared to fight upon receipt of orders, (Govt. Ex. 8 at 127-28), that he had not yet been told what targets to attack, and that the target would come with the orders.  (Govt. Ex. 8 at 157-58).  He admitted he trained for jihad, that he came to the U.S. for jihad, and he was awaiting orders.  (Govt. Ex. 8 at 160-61).  He reiterated that he had been trained for jihad and was told to come to the United States for jihad.  (Govt. Ex. 8 at 161-64).

### 3.   Extremist Publications From 1999-2003 Discovered in Hayat's Living Space Further Evidenced Hayat's Intent

At trial, the government introduced a series of publications Hayat possessed, many before he met Khan, which evidenced Hayat's belief in violent jihad and his intent in this case.  First, the government introduced Hayat's "jihadi scrapbook," (Govt. Ex. 9; RT 2216:11-2226:17), a scrapbook of Urdu newspaper and magazine articles – most from 1999, when Hayat previously was in Pakistan – bearing

Hayat's name and found by FBI investigators in a converted garage Hayat used at his parent's house.  (RT 857:21-858:6, 2159:3-2168:18, 2172:-2173:4; Govt. Ex. 1 at 5; Govt. Ex. 3 at 19).  Articles in the scrapbook portrayed Islamic extremism favorably by: describing a "death to America" procession and a "long live Taliban" rally; criticizing the U.S. government as the "biggest terrorist" and "an enemy of Islam;" expressing support for Osama Bin Laden and the Taliban; speaking approvingly about Pakistani / Egyptian terrorists or extremist clerics; and threatening harm against Americans if Afghanistan was attacked.  (See RT 2216:11-2226:17, 2780:20-2806:15).[12]

The government also introduced at trial an Urdu magazine (Govt. Ex. 10; Govt. Ex. 11 at 1-2) recovered by FBI investigators during a search of the converted garage Hayat occupied.  (RT 2116:25-2119:5).  The magazine was a weekly JEM publication, issued in Pakistan in June 2000, at a time when Hayat previously was in Pakistan.  (RT 2735:1-22, 2737:1-2738:7).  The magazine, edited by Azhar, the JEM leader: extols a focus on jihad; details a JEM attack in the Kashmir; profiles jihadi "martyrs"; details efforts of Filipino mujahedin; and explains Muslims' obligations to help mujahedin everywhere.  (Govt. Ex. 11 at 1-2; RT 2735:23-25, 2744:7-2751:21).

Agents also recovered two other Urdu books authored by Azhar: The Virtues of Jihad (Govt. Ex. 12; Govt. Ex. 13 at 1-3), published in 2000 in Karachi, Pakistan, and located in Hayat's converted garage, (RT 2116:25-2119:5, 2127:5-11; 2719:15-2720:6); and Reports from the Window of Prison (Govt. Ex. 14; Govt. Ex. 15 at 1-2), published in 2003 in Karachi, Pakistan, and located in the laundry room of Hayat's parents' home.  (RT 1859:25-1864:6, 2753:18-2754:6).[13]

### 4.   Expert Testimony Regarding the Existence of Militant Camps in the Balakot Region Corroborated Aspects of Hayat's Confession

Hassan Abbas ("Abbas"), a government expert on Pakistani political and extremist groups, testified jihadi training camps existed in Pakistan in 2000-2005.  (RT 2622:4-2623:13).  He described: the

---

[12] Many the articles came from publications associated with Pakistani extremist groups like JEM and Harakut-ul-Mujahedin ("HUM").  (See RT 2216:11-2226:17, 2803:16-23; 2788:9-22, 2792:6-18).  Hayat highlighted for Khan extremist articles of interest.  (See, e.g., RT 895:8-915:11, 917:19-928:11).  While showing Khan articles Hayat expressed sympathy for the Taliban and boasted that his grandfather had a close relationship with Taliban leader, Mullah Omar.  (Govt. Ex. 1 at 19, 28-34; RT 907:16-908:11, 912:10-913:2, 926:17-928:11.

[13] In these texts, Azhar: extols the concept of violent jihad; argues that violent jihad was compulsory; argues that violent jihad should be waged all over the world, including the U.S.; expresses hatred toward Christians, Indians, Hindus, Jews, Muslim minority groups, and Americans; and argues the ideal government would be an Islamic state, such as the government of the Taliban. (RT 2720:12-2722:6, 2754:18-2756:22).

extremist groups known to run the camps, (RT 2623:14-2624:15); the purpose of the camps, (RT 2624:23-2625:5); typical camp attendee backgrounds, (RT 2625:19-2630:6); typical camp size and facilities, including security and training, (RT 2631:20-2634:4, 2637:12-2638:9); typical religious, political, and paramilitary training at the camps, (RT 2638:10-2640:12); typical length of training at the camps, (RT 2640:20-2641:10); what attendees did after attending camp, (RT 2641:11-20); and the regions where camps were known to be located, (RT 2634:14-2636:9).  Abbas testified about a particular JEM camp in Balakot, known as the madrassa Ahmed Shaheed.  (RT 2691:1-2692:4).

**5.      Expert Testimony and Satellite Evidence Corroborated Hayat's Confession that He Attended a Jihadi Camp in the Balakot Region**

Government expert Eric Benn ("Benn"), a senior imagery analyst from the Department of Defense, (RT 3004:11-19), confirmed that militant training camps existed in Pakistan including camps in the Balakot area.  (RT 3082:7-3083:1).  Viewing certain 2001 and 2004 satellite-derived images in the Balakot area, Benn opined it was a "good solid possible" – that is, a 50% confidence or thereabouts – that the buildings and location depicted on the images constituted a militant training camp.  (RT 3062:2-12).  Based on his review of the images as well as Hayat's corroborating interview statements, Benn opined he was "very confident" the buildings and location depicted in the images were a militant training camp – that is, a "ballpark" of 60% to 70% confidence level; "much more likely than not."  (RT 3073:5-3075:1, 3114:24-3115:3).

**6.      The Jihadi Supplication Hayat Carried Provided Further Evidence That Hayat Returned to the United States Intending to Engage in Violent Jihad**

The government introduced at trial an Arabic supplication, or ta'wiz, Hayat possessed in his wallet.  (Govt. Ex. 16, RT 1968:19-1970:20).  Government expert Dr. Khaleel Mohammed testified this ta'wiz was an uncommon and non-peaceful supplication which translated as: "Oh Allah, we place you at their throats and we seek refuge in you from their evils."  (RT 1970:1-23, 1973:18-22, 1974:7-19, 2007:22-2008:12).  He opined that the ta'wiz would be used by a jihadi or a warrior who perceived himself to be engaged in a war for God against an enemy and who was completely ready to act.  (RT1974:15-1975:1; 2008:24-2009:13; 2018:13-2019:17).

### B.    The Defense Case At Trial

At trial, Mojaddidi thoroughly cross-examined all fourteen government witnesses.  The defense called percipient witnesses and its own expert.  Mojaddidi challenged the government's evidence, presented substantial defense evidence, and forcefully argued that the government failed to prove its case.  (See RT 4285:6-4330:21).  Mojaddidi could not, however, overcome the compelling evidence of Hayat's guilt.  In sum, Mojaddidi argued:

- The government's cooperating witness, Khan, who was known as "wildcat," was a wildly out of control, unsupervised, highly paid, liar and manipulator who encouraged Hayat to go to a camp and induced him to say that he would go to a camp.  (RT 4292:3-4307:20).

- Hayat visited Pakistan with his family for innocent and lawful purposes during the time in question.  He cooperated during initial FBI interviews, truthfully recounted his innocent experiences, and truthfully denied attending a camp.  (RT 4307:21-4311:9).

- Hayat's so-called confession during later FBI interviews was unreliable, and through coercion and leading questions, the FBI intimidated him to say the things it wanted him to say.  Hayat could not accurately describe a camp in Pakistan was because he never went to a camp.  (RT 4311:10-4320:17).

- The jihadi publications found in Hayat's home were regularly circulated in Pakistan, where anti-American sentiment is common, and it is not shocking that the articles and books espoused those views.  None of the items indicated Hayat attended a camp.  Merely reading about jihad doesn't make one a jihadi, any more than reading a murder novel makes one a murderer.  (RT 4321:7-25).

- Hayat's ta'wiz did not prove he visited a camp.  Government expert Mohammed had no basis to testify it was a prayer carried by a jihadi warrior, and had no understanding of the cultural context for carrying such a prayer in Pakistan.  By contrast, Defense expert Dr. Anita Weiss testified that travelers in Pakistan commonly carry prayers in Arabic, such as Hayat's, for safety reasons.  (RT 4323:15-18).

- The government's expert, Abbas, was biased against Pakistan and his highly-paid expert testimony was not trustworthy.  (RT 4324:3-4325:24).

- Government satellite images that purportedly depicted a militant training camp did not prove Hayat attended a camp, and suggested there was a reasonable doubt on the question.  Government expert Benn testified that, after watching Hayat's purported confession, he was 60% to 70% sure the camp was a militant training camp.  By his own expert estimation, there was a 30% to 40% chance that the satellite images did not depict a camp which, constituted ample reasonable doubt.  (RT 4327:20-24).

- It was implausible that Pakistan and the U.S. would allow a camp to persist after 2001.  Both government expert Benn and defense witness James Lazor testified there was a Pakistani military site just two miles away from the camp depicted in the satellite imagery.  Pakistan and the U.S. would have shut this camp down if it really was a terrorist training camp.  (RT 4328:1-4329:7).

## IV.   CONTROLLING LEGAL PRINCIPLES

### Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact," and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case."   Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003).  "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party."  Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

When, as in this case, the moving party bears the burden of proof on an issue at trial, "the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, California Practice Guide: Federal Civil Procedure Before Trial, § 14:124 (when moving party bears the burden of persuasion at trial, that party's showing "*must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.*") (emphasis in original).  By contrast, when a moving party does not bear the ultimate burden of persuasion at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."[14]  See Soremekun, 509 F.3d at 984.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102-03 (9th Cir.

---

[14] Hayat again incorrectly asserts his burden "may be met by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support" the government's opposition to his claims.  Obj. at 6; Def. Mot. at 4.  His misstatement of the controlling standard ignores that he alone bears the ultimate burden on his § 2255 claims.  Thus, his burden on summary judgment is much higher than he suggests.  To prevail, Hayat must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  Soremekun, 509 F.3d at 984.  If Hayat's misstatement of the standard were correct, he could simply replace the extraordinary burden he must satisfy under § 2255 with a far lesser standard on summary judgment.  Although he may prefer to do so, the law does not permit Hayat to discharge his heavy burden by shifting it onto the government.  The Court applied the correct standard and concluded Hayat failed to meet his burden.

2000).  If the movant satisfies his initial burden, the nonmoving party must set forth, specific facts

showing that there is a genuine issue for trial.  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809

F.2d 626, 630 (9th Cir. 1987).  "The burden on the nonmoving party is not a heavy one" and the

nonmoving party is only required to show specific facts that present a genuine dispute.  Dark v. Curry

County, 451 F.3d 1078, 1082 n. 2 (9th Cir. 2006).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed,

and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541,

552 (1999) (citation omitted); Sec. & Exch. Comm'n v. Todd, 642 F.3d 1207, 1215 (9th Cir. 2011) ("[On

summary judgment,] evidence must be viewed in the light most favorable to the nonmoving party, and all

reasonable inferences must be drawn in favor of that party.").  Inferences may be drawn from underlying

facts that are not in dispute, such as background or contextual facts, and from facts on which there is

conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the

nonmoving party.  See T.W. Elec. Serv., Inc., 809 F.2d at 631.  Summary judgment may not be granted if

the evidence, viewed in the light most favorable to the nonmoving party, permits a rational trier of fact to

find in that party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## V.     GOVERNMENT'S RESPOSE TO HAYAT'S OBJECTIONS

The Court organized its Findings and Recommendations into categories: (i) Conflict of Interest;

(ii) Alibi Defense; (iii) Terrorist Camp; and (iv) Trial Errors.  This memorandum responds first to Hayat's

conflict claims, and then to his ineffective assistance claims in the order addressed by the Court.

### A.     The Court Correctly Concluded that Hayat Failed to Establish a Conflict of Interest

### 1.     Mojaddidi Exercised Her Independent Judgment and There Was no Conflict

Hayat argues the Court failed to properly apply the controlling legal test, in Cuyler v. Sullivan, 446

U.S. 335, 348 (1980), to determine whether Mojaddidi's representation was subject to an actual conflict of

interest.  See Obj. at 11-15.  Hayat's argument ignores that the controlling legal standard on summary

judgment required the Court to: first, determine whether Hayat met his initial burden to demonstrate the

existence of a conflict of interest; and second, determine whether Hayat met his burden of persuasion to

demonstrate the absence of material dispute as to the existence of such a conflict and that "no reasonable

trier of fact could find other than for [him]."  See Soremekun, 509 F.3d at 984.

As the Court correctly concluded, Hayat's conflict claim is refuted by the record, which is replete with facts that demonstrate Mojaddidi maintained and exercised her independent professional judgment throughout her representation of Hayat.  Findings at 6.  Those facts make clear that, even on the merits of his claim, Hayat cannot demonstrate an actual conflict and thus cannot reach the <u>Cuyler</u> test.  <u>See</u> <u>Cuyler</u>, 446 U.S. at 350 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.").  On summary judgment, where the Court must view the facts in the light most favorable to the government and accept all inferences in favor of the government – especially where there is conflicting evidence – Hayat's failure is even more clear.  <u>See</u> <u>T.W. Elec. Serv., Inc.</u>, 809 F.2d at 631.

"[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  <u>Cuyler</u>, 446 U.S. at 348.  A "conflict of interest is the existence of competing interests potentially affecting counsel's capacity to give undivided loyalty to his client's interests."  <u>United States v. Moore</u>, 159 F.3d 1154, 1158 (9th Cir. 1998).  In the absence of an actual conflict that squarely places the interests of the client in opposition to those of the attorney and is likely to compromise a reasonable attorney's ability to comply with his legal and ethical obligation to represent his client with undivided loyalty, the <u>Cuyler</u> standard cannot be met.  <u>Bonin v. Calderon</u>, 59 F.3d 815, 827 (9th Cir. 1995).

A defendant's decision to undertake a joint defense strategy with a co-defendant, "does not create a conflict of interest tainting a trial."  <u>LoCascio v. United States</u>, 395 F.3d 51, 58 (2d Cir. 2005); <u>accord</u> <u>United States v. Kindle</u>, 925 F.2d 272, 275-76 (8th Cir. 1991) (a joint defense agreement "does not mean there was 'constructive' joint representation or a conflict of interest.").  A decision to pursue a joint defense "is one of trial strategy, and not a basis for an ineffective assistance claim."  <u>United States  v. Griffin</u>, 324 F.3d 330, 364 (5th Cir. 2003).  One attorney serving as lead counsel in a joint defense strategy does not thereby represent both defendants and does not create a conflict of interest.  <u>See</u> <u>United States v. Kirsh</u>, 54 F.3d 1062, 1072 (2d Cir. 1995); <u>Noe v. United States</u>, 601 F.3d 784, (8th Cir. 2010) ("[W]e reject Noe's argument that the fee arrangement and designation of Garcia as lead counsel resulted in constructive joint representation.").

Here, Hayat retained Mojaddidi, and Umer retained Griffin.[15]  (W.M. Dep. at 21:4-13, 125:16-25, 126:3-7).  Mojaddidi understood she had no experience in criminal law and she testified she advised Hayat of this before he retained her.  (Id. at 22:14-18, 27:17-20).  Hayat wanted Mojaddidi to represent him and signed a retainer agreement.  (Id. at 27:21-25, 125:19-21).  Mojaddidi determined that she could handle Hayat's representation and felt comfortable in the courtroom, but knew she would need some guidance, particularly as to procedural issues.  (Id. at 22:22-23:9; 23:5-7).

Mojaddidi and Griffin had an oral and written joint defense agreement: each represented her/his client and agreed to work jointly to prepare their cases.  She testified the arrangement was discussed with the clients and was memorialized in a document that everybody signed.  (Id. at 128:2-11, 130:5-16).  Mojaddidi testified both she and Griffin looked into whether there was a potential conflict of interest.  They determined that they did not "think there was going to be a conflict," and they discussed their conclusions with both clients, who agreed.  (Id. at 24:25-25:12).

Mojaddidi repeatedly confirmed that she maintained and exercised complete independent decision-making authority with respect to Hayat.  Mojaddidi had final decision-making authority with respect to Hayat for both tactical and strategic issues.  (Id. at 131:2-21).  She emphatically denied that Griffin ever told her that all final decision-making power over both cases would rest with him.  (Id. at 131:22-25).  To the contrary, she and Griffin discussed strategy and tactics daily, and she looked to him to give her information on issues so she could make informed decisions.  (Id. at 131:10-15, 132:1-24).  "Ultimately," Mojaddidi testified, "I made the decision[s]" affecting Hayat's representation.  (Id. at 131:14-15).  Mojaddidi denied that she placed Hayat's defense in the control of Griffin, that she "blindly deferred" to Griffin as lead counsel for Hayat, and that she ceded decision-making authority to Griffin.  (Id. at 24:15-17, 131:10-13, 132:1-24).  Sometimes she and Griffin agreed about strategy and tactics; other times they disagreed.  (Id. at 132:25-133:6).  When they disagreed, Mojaddidi did as she believed was right for Hayat.  (Id. at 133:7-11; 195:3-196:1).

---

[15] Hayat erroneously asserts that Mojaddidi and Griffin decided on who would represent who before meeting their clients.  Obj. at 8.  To the contrary, Mojaddidi testified when she visited the FBI offices on June 7, 2005, at the request of Hayat's family, her objective was to stop any interrogation and she had not yet committed to represent Hayat throughout the case against him. (W.M. Dep. at 19:6-17).  After speaking with Hayat *daily* between June 5 and 10, 2005, Mojaddidi agreed to represent him.  (Id. 21:4-13; 90:16-20).

15   <span style="font-variant:small-caps">United States' Response to Petitioner's Objections to the Court's Findings and Recommendations</span>

As for litigation decisions, Mojaddidi affirmed that she, not Griffin, had the ultimate decision-making authority over all pretrial and trial matters affecting Hayat, including: what motions were filed on behalf of Hayat, (id. at 58:1-17; 69:15-18; 176:4-16); whether to seek a continuance for purposes of investigation, (id. at 53:15-54:4; 54:3-4; 58:1-17); whether to obtain a CIPA clearance or stipulate to the admission of the satellite imagery evidence, (id. at 134:18-20; 219:22-220:21); advice about whether Hayat should accept a plea offer from the government,(id. at 77:20-23; 78:3-7; 247:10-11; 247:19-248:10; 248:13-19; 78:8-9); which witnesses would be called on behalf of Hayat, (id. at 134:10-17); and advice about whether Hayat should testify, (id. at. 134:21-25; 229:8-18; 230:8-14; 231:9-232:5).

Consistent with the joint defense agreement, Mojaddidi and Griffin worked together during the trial.  (Id. at 104:13-16, 248:21-249:4).  Mojaddidi considered Griffin's advice but ultimately made the decisions she thought were best for Hayat.  (Id. at 135:21-25).  Mojaddidi prepared and conducted her own examinations and prepared and delivered her opening and closing.  (Id. at 249:15-17).  She denied Griffin served as lead counsel for both clients, that he functionally represented both clients, and that she served as Griffin's junior associate in representing Hayat.  (Id. at 135:21-25).

As the Court correctly concluded, the record demonstrates no conflict.  Findings at 5.  Mojaddidi and Griffin engaged in a joint defense.  Mojaddidi looked to the more experienced Griffin for advice but maintained professional independence and undivided loyalty to Hayat.  No further analysis is required.  See Bonin, 59 F.3d at 827 (absent an actual conflict that "squarely places the interests of the client in opposition to those of the attorney, and is likely to compromise a reasonable attorney's ability to comply with his legal and ethical obligation to represent his client with undivided loyalty, the Cuyler standard cannot be met.").  Even if the question was a closer call, and it is not, Hayat's conclusory allegations merely create a material dispute as to whether a conflict existed.  Summary judgment was not appropriate.

## 2.    There Was No Financial Conflict of Interest

The Court correctly concluded that Hayat failed to establish any financial conflict.  Findings at 5. The record is devoid of evidence that Griffin influenced Mojaddidi, directly or indirectly, to cede her independent judgment to Griffin so he could maximize his pay at the expense of Hayat's rights.[16]

---

[16] Hayat's accusation that Griffin violated his ethical obligations as a member of the Bar and an officer of the Court to enrich himself is completely unfounded.  Such a serious allegation should be based on more than mere conjecture, especially in light of Mojaddidi's sworn testimony that Griffin *never* indicated any reluctance to spend

The use of a fixed fee contract for both costs of representation and investigative fees does not create a Sixth Amendment conflict.  See Williams v. Calderon, 52 F.3d 1465, 1473 (9th Cir. 1995).  In Williams, the defendant argued that "the fact that payment for any investigation or psychiatric services could have come from counsel's pocket forced counsel to choose between [defendant's] interests and his own."  Id.  The Ninth Circuit "discern[ed] in this situation no conflict of constitutional dimension."  Id.  "All [defendant] alleges is the same theoretical conflict that exists between an attorney's personal fisc and his client's interests in any pro bono or underfunded appointment case.  Such arrangements, without more, do not require Sixth Amendment scrutiny."  Id.  A defendant claiming a financial conflict must establish that his attorney's purported professional failure was motivated by his asserted desire to keep for himself funds budgeted for the investigation.  People v. Doolin, 45 Cal.4th 390, 423 (Cal. 2009).

Here, Mojaddidi testified she and Hayat executed an engagement letter.  (W.M. Dep. at 27:21-24).  She testified she may have received a retainer between $6,000 and $10,000, but did not remember.  (Id. at 28:1-24; 80:3-10; 81:6-12).  She could not remember what amount Griffin received but knew it was a larger amount and acknowledged that was "agreeable."  (Id. at 29:8-14).  Mojaddidi testified she "wanted to take the case," "would have done it for free," and knew that Griffin was more experienced than she and would charge accordingly.  (Id. at 29:16-21).

Mojaddidi testified she and Hayat executed a retainer agreement setting the terms of her representation, and, pursuant to that agreement she was to receive $65,000 and Griffin was to receive $135,000, less any costs and travel-related expenses.  (Id. at 137:23-138:20; 82:8-25; 138:21-139:14).  She testified the contract was negotiated with the understanding there were going to be costs and expenses, and that if Mojaddidi and Griffin needed additional funds, the Hayat family would need to provide it.[17]  (Id. at

---

funds on Hayat's defense or worried that doing so would reduce his pay.  (W.M. Dep. at 140:4-141:1).

[17] Hayat argues a financial conflict arises when one defendant pays for legal representation of a co-defendant.  Obj. at 13-14.  But that is not what happened here.  The Hayat family, including possibly relatives in Pakistan, pooled $200,000 to pay for the joint defense.  (W.M. Dep. 138:21-25, 42:7-15, 81:18-20, 92:3-11).  That scenario is distinct from the cases Hayat cites, in which representation of unrelated co-defendants is funded by a relative of one defendant and results in improper influence by the funding source over the representation of the co-defendant.  Obj. at 13-14.  The Hayat family had every interest in ensuring adequate representation of both Hayat and Umer.  Any argument to the contrary rests on an implausible assumption that Umer (and the entire Hayat family) would elect to doom the young (and purportedly sick and vulnerable) Hayat to advantage Umer.  To the contrary, there is no evidence that the family pushed Griffin to deprive Hayat of resources to maximize Umer's defense.

Hayat also argues that People v. Barboza, 129 Cal. 3d 375, 378-79 (1981), renders the funding arrangement in this case improper.  He is wrong.  Barboza dealt with a public defender office's institutional unwillingness to

42:13-15).  She testified if money were needed to send an investigator to Pakistan, they would have contacted the family or otherwise figured out how to fund it.  (Id. at 42:4-13).

Both Mojaddidi and Griffin had the right to control defense funds.  (Id. at 139:21-140:3).  Griffin retained custody of the defense funds, but Mojaddidi testified she could have had access to any defense funds she needed.  (Id.)  Mojaddidi consistently testified she was never concerned about a lack of defense resources.  She stated: "I honestly don't recall the money being the concern."  (Id. at 91:3-14).  She testified money was not a consideration when she made decisions about what investigative steps to take, and financial considerations played no role in the decision-making regarding what investigative steps to take in Pakistan.  (Id. at 91:6-11, 140:4-20, 183:8-12).  Money also was not a factor in connection with hiring experts.  (Id. at 91:6-8, 140:10-12).  In particular, finances were not part of the determination of whether to use a defense investigator as a false confession expert or someone else.  (Id. at 209:2-5).  Mojaddidi emphasized that point by noting that the defense paid the costs and travel-related expenses for defense expert witness Weiss.  (Id. at 83:18-84:7).

There was never any instance in which Griffin denied Mojaddidi's request for defense funds.  Similarly, Griffin never indicated to her that he was reluctant in any way to expend money in connection with Hayat's defense or that he worried that doing so would reduce his pay. [18]  (Id. at 140:4-141:1).  Griffin received over $100,000 for representing Umer, and Mojaddidi received approximately $31,000.  (Def. Exs. H and I; W.M. Dep. at 143:11-144:8).  Regarding the pay disparity, Mojaddidi confirmed there were at least two other attorneys in the Griffin law firm who assisted as part of the joint defense team.  (Id. at 141:7-20).  Mojaddidi added that the representation "wasn't about the money" for her.  (Id. at 85:17-18).  She felt compassion for Hayat's family because she knew their living conditions.  (Id. at 85:24-25).

declare conflicts to avoid draining a reserve pool to fund outside counsel that impacted its overall budget.  Id.  The Supreme Court of California has specifically "declined to extend" Barboza to situations like this case.  People v. Doolin, 45 Cal.4th 390, 423 (Cal. 2009) (finding common funding source for representation and investigation permissible when agreement permits infusion of additional funds).  Hayat's flawed reliance on Barboza also requires the Court to ignore later Ninth Circuit precedent.  See Williams, 52 F.3d at 1473 (holding use of a fixed fee contract for both costs of representation and investigative fees does not create a Sixth Amendment conflict.).

[18] Mojaddidi initially wanted co-counsel.  (Id. at 94:14-22, 97:5-10, 241:12-17).  She and Griffin spoke to Mark Reichel, who interested but was not available for every day of trial.  (Id. at 242:3-12, 100:5-9).  Griffin later advised Mojaddidi she was well familiar with the case, could handle it alone, and Reichel was unnecessary.  With her confidence boosted, Mojaddidi decided to do it on her own.  (Id. at 100:8-9, 242:22-24, 244:2-245:9).  She testified that money played no role.  (Id. at 244:2-14).

She was willing to take whatever they could pay, she "quoted a number" to the family concerning her fee, and she "never complained about it." (Id. at 85:21-86:4).

The Court correctly concluded that "the evidence provides no significant support for [Hayat's] contentions." Findings at 5. As with his general conflict claim, because Hayat cannot demonstrate the existence of any financial conflict, he cannot reach the Cuyler test. See Cuyler, 446 U.S. at 350 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."). There is no evidence that the fee agreement impacted Mojaddidi's representation of Hayat. Rather, the record establishes the contrary is true. At most, the record demonstrates the possibility of a mere theoretical conflict such as that discussed in Williams and Bonin, which does not constitute a conflict of constitutional dimensions. On a motion for summary judgment, the record is far from sufficient to demonstrate the absence of material dispute and that "no reasonable trier of fact could find other than for [Hayat]." See Soremekun, 509 F.3d at 984.

Finally, Hayat argues the Court improperly considered only Mojaddidi's deposition testimony in reaching the conclusions in its Findings. Obj. at 14. Hayat (again) ignores facts that do not advance his cause and distorts legal principles to suit his desired argument. Hayat relies on Sanders v. Ratelle, 21 F.3d 1446, 1452 (9th Cir. 1994) for the proposition that the existence of an actual conflict "cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict." In Sanders, the attorney suffered a conflict of interest that arose out of his successive representation of two brothers, one who admitted committing a murder for which the second was later convicted. 21 F.3d at 1448-50. In two trials, the lawyer at issue did not assert certain defenses on behalf of the second brother to protect the first. In the absence of a deposition or other testimony, the court examined the entire record and found a conflict. Id. at 1452. The opinion in Sanders cited Fitzpatrick v. McCormick, 869 F.2d 1247, 1252-53 (9th Cir. 1989), in which the Ninth Circuit found a conflict after relying solely on the testimony of a lawyer who admitted having engaged in successive representation of two clients, the second of whom blamed the first for the crime with which the second was convicted. See Sanders, 21 F.3d at 1452.

Sanders and Fitzpatrick are distinguishable because both dealt with successive representations by the same lawyers of clients with adverse interests. Moreover, the conflicted lawyers in those cases each

failed to take action for his second client to protect his first.  More broadly, the cases stand for the reasonable principles that when a record of the relevant conduct exists, a court may (and should) freely rely upon it, see Fitzpatrick, 869 F.2d at 1252-53, and when no transcript exists, a court may (and should) consider the entire record to reach a conclusion, see Sanders, 21 F.3d at 1448-50.  Somehow, Hayat reads Sanders and Fitzpatrick together to *prohibit* this Court from relying on the extensive, detailed, and consistent testimony in Mojaddidi's deposition.  See Obj. at 14.  Neither case requires anything of the sort.

Here, the Court properly considered Mojaddidi's deposition testimony alongside the entire record.[19]  Hayat's argument to the contrary fails even modest scrutiny.

## B.   Mojaddidi Provided Effective Assistance and the Court Correctly Concluded that Hayat Failed to Demonstrate a Lack of Material Dispute on that Question

### Ineffectiveness Assistance of Counsel Standard

The Constitution does not guarantee infallible representation.  Cooper v. Fitzharris, 586 F.2d 1325, 1330 (9th Cir. 1978).  The key inquiry is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  Strickland v. Washington, 466 U.S. 668, 686 (1984); Harrington v. Richter, 562 U.S. 86 (2011) ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial.").  The Supreme Court has established a two-pronged test to determine if counsel was ineffective.  Under this test, a defendant must establish by a preponderance of the evidence: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced his defense.  Id. at 687.  In applying this standard, a court need not follow any particular order.  If an ineffectiveness claim fails on the performance prong, the court need not even address the prejudice prong.  Strickland, 466 U.S. at 697.

---

[19] The Court repeatedly referred to its broad review of the record.  See Findings at 5 ("the evidence provides no significant support for Hayat's contentions"; "the evidence [Hayat] provides in support of his motion … is simply insufficient…."); at 8 ("there is insufficient evidence before the court…."); at 11 (Again, on the evidence before the court, [Hayat] has not met his burden…."; "based on the evidence currently before the court…."); at 12 ("Based on the evidence before the court…").  In other instances the Court cited particular evidence, including Mojaddidi's sworn deposition testimony (id. at 5-9), and her trial performance (id. at 9-10).  The Court also identified the evidence Hayat submitted in support of his arguments.  Id. at 7 ("In support of this contention, [Hayat] submits [Mojaddidi's] deposition, declarations from several potential witnesses, and purported expert declarations."); at 9 ("In support of this claim, [Hayat] provides a declaration from a journalist who states he is familiar with Pakistani camps and knew there was no terrorist camp at the location the government claimed.").

UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS
TO THE COURT'S FINDINGS AND RECOMMENDATIONS

### Incompetence

To establish incompetence, a defendant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment, id. at 689-690, and prove serious derelictions on the part of counsel.  McMann v. Richardson, 397 U.S. 759, 774 (1970).  The focus is whether the representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.  Strickland, 466 U.S. at 690.  A defendant must show that counsel made errors so serious that she was not functioning as the counsel guaranteed by the Sixth Amendment.[20]  Strickland, 466 U.S. at 685.

There is a strong presumption that counsel's conduct fell within the wide range of reasonable representation.  Strickland, 466 U.S. at 689.  Judicial scrutiny of counsel's performance must be highly deferential because it is "all too tempting for a convicted defendant to second-guess counsel's assistance after conviction or adverse sentence."  Strickland, 466 U.S. at 689.  Counsel's strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.  Id. at 690-91.  Thus, counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy."  Darden v. Wainwright, 477 U.S. 168, 186 (1986); see also Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994) (even if many reasonable lawyers would not have done as defense counsel did, relief cannot be granted unless, in the circumstances, no reasonable lawyer would have done so); Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) ("The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.").

Generally, counsel's actions are properly based on information supplied by her client.  Id.  "[W]hat investigation decisions are reasonable depends critically on such information."  Id.  Therefore, "the

---

[20] "The object of an ineffectiveness claim is not to grade counsel's performance."  Id. at 697.  Rather, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.  The Court must determine whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  Id. at 718.  To be unreasonable, the performance must be such that "*no competent counsel would have taken the action that [the petitioner's] counsel did take*."  Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis in original).

UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS
to the COURT'S FINDINGS AND RECOMMENDATIONS

1  defendant 'must overcome the presumption that under the circumstances the challenged action might be

2  considered sound trial strategy.'"[21]  Turner v. Calderon, 281 F.3d 851 (9th Cir. 2002) (quotation omitted).

3  An objectively reasonable tactical decision by counsel, with which a defendant disagrees, does not

4  constitute ineffective assistance of counsel.  Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984).  The

5  Ninth Circuit has warned it will "neither second-guess counsel's decisions, nor apply the fabled twenty-

6  twenty vision of hindsight.  Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1994).

7  **Prejudice**

8  It is not enough to show that errors or omissions had a conceivable effect on the outcome of a

9  proceeding, as virtually every act or omission of counsel would meet that test.  Strickland, 466 U.S. at

10  693.  Instead, a defendant must show there is some reasonable probability that, but for an unprofessional

11  error, "the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "A

12  reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.  The

13  standard is "highly demanding."  Kimmelman, 477 U.S. at 381-82.  In assessing prejudice, the Court must

14  also consider the applicable legal standard.  Strickland, 466 U.S. at 695 (e.g., when conviction challenged,

15  would fact finder have had a reasonable doubt, absent counsel's errors).

16  **1.  Mojaddidi's Decision to Forego Further Investigation of an Alibi Defense and
   Pursue an Alternative Defense Was Reasonable and Hayat Failed To**
17  **Demonstrate the Absence of a Material Dispute to the Contrary**

18  Hayat claims the Court failed to discuss his ineffectiveness arguments in sufficient detail, and

19  ignored cases he cited in support of his claim.  Obj. at 4.  However, it is Hayat who (again) ignores the

20  controlling legal standard on summary judgment and his burden to demonstrate an absence of material

21  dispute that Mojaddidi was ineffective and that any purported ineffectiveness prejudiced him.  The Court

---

22  [21] Given the strong presumption of competence, the petitioner's burden of persuasion is a heavy one.
23  Kimmelman v. Morrison, 477 U.S. 365, 384, (1986).  Trial counsel's inability to remember reasons for conducting
   the trial in the manner that she did will not overcome the Strickland presumption of effective performance.
24  Harrington, 562 U.S. at 109 ("There is a 'strong presumption' that counsel's attention to certain issues to the
   exclusion of others reflects trial tactics rather than 'sheer neglect.'").  A standard of objective reasonableness applies
25  to tactical choices.  See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994).  Counsel need not recognize and assert every
   possible defense and argument.  Woratzeck v. Ricketts, 820 F.2d 1450, 1453 (9th Cir. 1987), vacated on other
26  grounds, 859 F.2d 1559 (9th Cir. 1988).  Rather, counsel "has a duty to make reasonable investigations or to make a
   reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  "[S]trategic
27  choices made after less than complete investigation are reasonable precisely to the extent that reasonable
   professional judgments support the limitations on investigation."  Id.  A particular decision not to investigate must
28  be assessed for "reasonableness in all the circumstances, applying a heavy measure of deference…."  Id.

reviewed the entire record, including the exhibits Hayat submitted, and found Mojaddidi properly

considered an alibi defense "but after evaluating the potential witnesses [Hayat] … provided information

on, she determined it was not a viable defense."  Findings at 8.  The Court's Findings make clear Hayat

failed to demonstrate "no reasonable trier of fact could find other than for [him]" on this issue.  See

Soremekun, 509 F.3d at 984.  Accordingly, the Court correctly concluded that, because Hayat failed to

satisfy his burden with sufficient evidence, summary judgment is inappropriate.

Mojaddidi took on her role as counsel with zeal and conducted an exhaustive review of the 7,000

pages of discovery (much of which was in foreign languages).  (W.M. Dep. at 161:23-162:2).  In

Mojaddidi's opinion, she knew and studied the evidence much more than Griffin.  (Id. at 72:4-23, 162:3-

11).  Working with Griffin, Mojaddidi considered and ultimately determined that the best defense strategy

for Hayat was to push the government to trial as fast as possible and argue there was insufficient evidence

to establish guilt.  (Id. at 163:5-13, 170:17-171:10, 223:21-22).  Mojaddidi testified the defense assessed

"the amount of evidence that the government had produced in terms of discovery" and, based on that

"limited amount of evidence," the defense believed that "[the government] wouldn't ultimately succeed if

they were pushed to trial with what they had and that it was a good idea for [the defense team] to push for

a speedy trial."  (Id. at 53:18-24).  In Mojaddidi's words: "As the evidence kept coming in, I just didn't

think the government was going to meet its burden."  (Id. at 163:19-24; 170:24-171:1).

The defense felt that the government had simply "charged the case" and was "build[ing] it later"

with the "evidence . . . just trickling in," (id. at 171:8-10), therefore "it was a good idea . . . to push for a

speedy trial."  (Id. at 53:23-24).  The defense was concerned that, if given more time to prepare, "[the

government] would continue to gather evidence and create the case [it needed] against [Hayat]."  (Id. at

171:13-14).  Mojaddidi testified she never believed it would have been in her interest to take a separate

strategic path or to change her decision to seek a trial as fast as possible and advance a failure of proof

defense.  (Id. at 305:21-306:4).  Thus, even when the Court granted the government's requests for a

continuance, Mojaddidi and Griffin requested the earliest trial date possible.  (Id. at 171:24-172:7).[22]

---

[22] Hayat implies that the *only* strategic goal was to force a trial within the first 70 days or to seek dismissal
under the Speedy Trial Act.  Mojaddidi confirmed the defense had two objectives: (a) push the government to trial
as fast as possible; and (b) make sure Hayat received a speedy trial under the Act.  (W.M. Dep. at 175:2-8).  She

a.   Mojaddidi's Strategic Decision to Pursue a Speedy Trial and Sufficiency of the Evidence Defense Instead of an Alibi Defense Was Well Within the <u>Wide-Range of Competent Representation</u>

In deciding to press for an immediate trial on what she considered insufficient evidence, Mojaddidi pursued a common strategy.  As the Supreme Court has observed: "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."  <u>Harrington</u>, 562 U.S. at 109.  Indeed, a defense decision to challenge the sufficiency of the government's evidence is more than enough to meet the constitutional requirement of effective representation.  <u>See, e.g.</u>, <u>Johnson v. Lockhart</u>, 921 F.2d 796, 800 (8th Cir. 1990) (given tenuous nature of case against defendant, counsel's interview of alibi witnesses was sufficient investigation of alibi defense; it was reasonable to pursue alternative strategy.).

Mojaddidi considered an alibi defense but concluded it would not be a sound strategy.  (W.M. Dep. at 172:8-24).  She asked Hayat and his family to identify potentially alibi witness.  (<u>Id.</u> at 34:3-12, 150:23-152:18).  Hayat identified five family members.[23]  Mojaddidi testified she was certain neither Hayat nor his family mentioned any other witnesses.  (Id. at 273:6-12).  Mojaddidi testified she spoke with or reviewed interview reports about every individual to assess whether they would be good alibi witnesses.  (<u>Id.</u> at 35:6-17, 148:18-154:5, 168:3-170:13, 186:4-17, 189:12-190:7).

In support of his § 2255 petition, Hayat proffers declarations from eighteen purported alibi witnesses in Pakistan, only one of whom was identified by Hayat in 2005.  (<u>See</u> Def. Ex. S through JJ).  Neither Hayat nor his immediate family members – who were undoubtedly in the best position to identify *all* helpful witnesses – ever identified the new purported "alibi" witnesses.  (<u>Id.</u> at 154:13-161:14).  Mojaddidi testified if anyone she contacted before the trial had given her the name of another alibi witness, she would have followed up.  (<u>Id.</u> at 161:15-20).

Mojaddidi testified the witnesses Hayat identified, or who the defense thought might offer alibi testimony, "all seemed to have different levels of problems."  (<u>Id.</u> at 164:10-13).  Mojaddidi initially

also confirmed that the objective, even after the District Court granted continuances of the trial date, was to seek a trial as fast as possible.  (<u>Id.</u> at 171:24-172:7).

[23] Specifically: his mother, Salma Hayat; his cousin, Usama Ismail; his uncle, Attique Ur Rehman; and his grandfather, Saeed Ur. Rehman.  (<u>Id.</u> at 148:18-151:12).  Mojaddidi also identified Hayat's brother, Araslan Hayat, as a potential witness.  (<u>Id.</u> at 148:18-149:5).

thought Hayat's uncle and grandfather might offer helpful testimony.  (Id. at 35:22-37:14).  But she concluded they would not be good witnesses because their names were "all over all the evidence," referring to Hayat's statements and other evidence.  (Id. at 36:7-8, 164:14-21).[24]  In short, she concluded it "might hurt [Hayat's] case if they testif[ied]."  (Id. at 164:18-21).  Mojaddidi also determined that Hayat's mother, Salma Hayat, would be a poor witness because she had difficulty answering questions even in her native language.  (Id. at 165:8-12).  Mojaddidi testified she also determined Usama Ismail and Arsalan Hayat would not be good witnesses.  (Id. at 165:13-166:2, 168:25-169:11).

Mojaddidi acknowledged there were likely people in Pakistan who observed Hayat doing some of the innocent activities Hayat claimed he did while in Pakistan.[25]  (Id. at 268:4-17).  However, she concluded it would not "work" for those individuals to serve as alibi witnesses because the government could argue Hayat engaged in innocent activities only when he was not at a militant camp.  (Id. at 37:4-14, 269:1-16; 270:5-9).  Mojaddidi determined she would likely not be able to find an alibi witness for every single day Hayat was in Pakistan.  (Id. at 270:10-13).  Informed by these factors, she made strategic decisions not to send an investigator to Pakistan to rove about in an unfocused, wasteful, and likely fruitless effort to locate unidentified alibi witnesses.  (Id. at 35:18-20).  Mojaddidi exercised her own independent judgment in making that decision, based on the totality of facts known to her and her belief that it would be in the best interests of Hayat.  (Id. at 172:5-174:1).

Viewing the facts in the light most favorable to the government, Mojaddidi's strategic decision to push the government to trial on what she assessed as weak evidence, and not sacrifice that strategy to pursue unidentified alibi witnesses in Pakistan, was more than reasonable.[26]  It was reasonable for

---

[24] Mojaddidi noted that it was alleged these two relatives "guid[ed] [Hayat] to do what he was doing" in connection with the camps.  (Id. at 164:16-18).  As for the grandfather, Ms. Mojaddidi knew that it was alleged that the grandfather "had the [jihadi] madrassa [in Pakistan] that was helping to train … people."  (Id. at 36:2-4).  Hayat made statements implicating his uncle and grandfather in recorded calls to Khan.  Govt. Ex. 2 at 25-26.

[25] Hayat asserts Mojaddidi "independently knew" of witnesses in Pakistan, and claims such knowledge was "based on her discussions with Hayat and his family members."  Obj. at 24, 19.  The claim is belied by the record.  Mojaddidi was asked if she "came to a belief" that people in Pakistan observed Hayat doing innocent acts while he was in Pakistan.  She answered: "Sure."  (W.M. Dep. at 268:4-17).  She said nothing about learning of other alibi witnesses.  Id.  To the contrary, she stated: she asked for all potential alibi witnesses and received only the 5 listed above, who she interviewed and excluded.  Discussions of "other witnesses" are pure speculation.

[26] Hayat admitted attending a jihadi training camp for months between October 2003 and November 2004.  To rebut those admissions with an alibi defense, Mojaddidi would have required credible witnesses – not just relatives or friends, whose credibility could be readily disputed – from across the world, who, individually or collectively,

1  Mojaddidi to conclude that such an investigation would be wasteful, fruitless, and would conflict with

2  what she believed was a winning and achievable defense strategy.  Harrington, 562 U.S. at 107 (counsel

3  "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord

4  with effective trial tactics and strategies.").

5          Finally, it is irrelevant that Hayat has proffered declarations from relatives and friends – well after

6  he was publicly convicted and sentenced – who purportedly would now offer alibi testimony.  The only

7  relevant legal question is whether Mojaddidi's decision was reasonable at the time she made it: "[o]nce we

8  conclude that declining to investigate further was a reasonable act, we do not look to see what a further

9  investigation would have produced. … [T]here can be no question about the reasonableness of having

10  failed to present evidence of which the lawyer was unaware as a result of a reasonable decision to

11  investigate no further."  Rogers, 13 F.3d at 388.  Moreover, it is perplexing that Hayat waited nine years to

12  proffer a list of purported "alibi" witnesses that includes *eleven* people who claim to have spent time with

13  him *every single day, every other day, or every week* while Hayat was in Pakistan between April 2003 and

14  May 2005.  In 2005, Hayat was in the best position to know who he spent time with while he was in

15  Pakistan.  The list he and his family gave Mojaddidi included only the five people, who Mojaddidi

16  assessed and excluded as viable alibi witnesses.

17          It strains credulity that Hayat, Umer, or their family would not have identified every potential alibi

18  witness when asked by his defense counsel after Umer and Hayat were arrested, especially when fourteen

19  of the new "alibi" witnesses are related to Hayat.  That earlier silence refutes his present claims.[27]  While

20  the government harbors strong doubts about the credibility of the alleged "alibi" witnesses, the Court

21  properly disposed of Hayat's claim without making credibility determinations, and correctly found Hayat

22  failed to demonstrate a lack of material dispute that Mojaddidi was ineffective on this point. No further

23  analysis was required.[28]  See Strickland, 466 U.S. at 697.

24  _____

    could testify they were with Hayat outside of a militant training camp for fourteen months.

25      [27] See Watts v. United States, 841 F.2d 275, 278 (9th Cir. 1988) (affirming credibility findings on affidavits,

26  without hearing, and finding defendant's prior silence about allegedly exonerating facts refuted later claims.).

27      [28] Even if Mojaddidi's strategic decisions concerning the appropriate defense were defective, Hayat cannot
    demonstrate prejudice.  *None* of the witnesses proffered by Hayat is disinterested.  All are either blood relatives or
    friends, and most were teens at the relevant time who now claim to have socialized with Hayat years ago.  None was
28  subject to cross-examination.  Four fail to describe the dates, frequency, or duration of their purported encounters

2.     **Mojaddidi's Representation Concerning Evidence of the Balakot Terrorist Training Camp Was Reasonable and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary**

Hayat begins his objections on this point by relying on a 2007 editorial published in a San Francisco newspaper that questioned the likelihood that the militant camp Hayat was convicted of attending could have been located sixty miles from the Pakistani capital of Islamabad.  Obj. at 35.  The author's flimsy reasoning is laid bare when considered against the fact that American forces located and killed Osama Bin Laden in a fortified compound only two miles from the principal Pakistani military training center (the equivalent West Point, the U.S. Military Academy), and seventy-five miles from Islamabad.[29]  Hayat's remaining argument is familiar.  He ignores the Court's conclusion that he failed to meet his burden on summary judgment and re-states his prior arguments.  His claims are not supported by the record or controlling law.

a.     Mojaddidi's Strategic Decision to Challenge the Government's Camp Evidence Through Cross-Examination of Abbas Was Well Within The Wide Range of Competent Representation

Mojaddidi believed it was important to investigate whether a terrorist camp was functioning in Pakistan at the time Hayat admitted attending such a camp.  (W.M. Dep. at 43:14-18).  In 2005, she did "a lot" of research regarding the Pakistani camp issue.[30]  (Id. at 43:19-44:1, 302:4-7).  On January 13, 2006, the government sent Mojaddidi an expert disclosure for the proposed testimony of Hassan Abbas ("Abbas"), providing notice that Abbas would testify: that jihadi training camps existed in Pakistan in 2000-2005; about characteristics of those camps and attendees; and about the regions where these camps are located, including in the Mansehra/Balakot "belt."  The letter was Mojaddidi's first indication the government would offer expert evidence about Pakistani militant camps.  (See Govt. Ex. 17 at 4-5).

Mojaddidi did not recall what research she did to find an expert to counter Abbas.  (W.M. Dep. at

with Hayat.  See Def. Ex. GG, HH, II, JJ.  Three others offer only vague memories of seeing Hayat occasionally, with few precise recollections.  See Def. Ex. T, U, FF.  The jury would have given little weight to the testimony of these biased witnesses.  See Seymour v. Walker, 224 F.3d 542, 556 (6th Cir. 2000) (counsel not defective for failing to call witness/sister who "would likely be considered by the jury to be biased").

[29] Ahmed and Toihid, "Osama bin Laden killed Near Pakistan's West Point. Was he really hidden," Christian Science Monitor (online edition), May 2, 2011 (http://www.csmonitor.com/World/Asia-South-Central/2011/0502/Osama-bin-Laden-killed-near-Pakistan-s-West-Point.-Was-he-really-hidden) (last visited May 22, 2016).

[30] Mojaddidi used the information she heard about Pakistani governmental camp closures as part of her cross-examination of Abbas.  (Id. at 193:23-194:8).

UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS TO THE COURT'S FINDINGS AND RECOMMENDATIONS

198:20-202:7).  She recalled that she reviewed Abbas' testimony, believed that it had many "weaknesses," and concluded she could "sufficient[ly]" counter that evidence through cross-examination.  (Id. at 203:18-24).  Tactics, thus, motivated her decision to address the camp evidence through cross-examination, rather than calling an expert.  Mojaddidi specifically denied that Griffin told her that investigation in Pakistan would take too much time and should not be pursued for that reason.  (Id. at 181:10-24).  Moreover, Mojaddidi did not believe she lacked resources to conduct investigation regarding the camp issue and confirmed that finances were not a reason or factor for her decision-making.  (Id. at 182:4-183:12).

Abbas testified for the government on the topics of Pakistani political and extremist groups, as well as the interrelated topics of Pakistani history, government, religion, politics and extremist groups outside of Pakistan.  (See generally RT 2560:12-2806:15).  Abbas testified jihadi training camps existed in Pakistan from 2000-2005, (RT 2622:4-2623:13), and offered other evidence.[31]  On cross-examination Mojaddidi challenged Abbas's reliability.  Abbas admitted he never met or interviewed an attendee at a camp, (RT 2829:10-2830:22), and never visited a camp when he conducted field research.  (RT 2830:7-10).  Mojaddidi emphasized Abbas's lack of data regarding Ahmed Shaheed camp in Balakot.  Abbas admitted he never saw a picture of the camp, (RT 2848:10-11), never visited the camp, (RT 2830:23-25), and he had no specific data regarding the training offered or weapons used at the camp, (RT 2842:16-2844:2).  A major defense theme was that Pakistan was allied with the U.S. in the fight against terrorists and had taken measures after the September 11, 2001 terrorist attacks on the U.S. to shut down jihadi madrassas and camps.  In response to defense questioning, Abbas made admissions that Mojaddidi used to advance that theme in her closing argument.[32]

---

[31] He described: the extremist groups known to run the camps, (RT 2623:14-2624:15); the purpose of the camps, (RT 2624:23-2625:5); typical camp attendee backgrounds, (RT 2625:19-2630:6); the typical camp size and facilities, including security and training, (RT 2631:20-2634:4; 2637:12-2638:9); typical religious, political, and paramilitary training at the camps, (RT 2638:10-2640:12); typical length of training at the camps, (RT 2640:20-2641:10); what attendees do after they attend these camps (RT 2641:11-20); the regions where these camps are known to be located, (RT 2634:14-2636:9); and the existence of a particular JEM camp in Balakot known as the madrassa Ahmed Shaheed, (RT 2691:1-2692:4).

[32] Including: the U.S has given support to and considers Pakistan an ally in the fight against terrorists, (RT 2858:5-2859:19; 2863:5-22; 2915:17-2916:1; 2925:10-2927:4); the U.S gave $3.5 billion to Pakistan, half of which was to fight terrorists, (RT 2858:9-12; 2915:12-16; 2927:11-14); the government of Pakistan has worked with the U.S. to apprehend Osama Bin Laden and members of al-Qaeda, (RT 2916:7-13); Pakistan utilized 70,000 troops in the Waziristan area since the September 11, 2001 attacks on the U.S. to assist the fight against terrorists, (RT 2860:10-16); Pakistan turned over 700 Al-Qaeda operatives to the U.S. and lost over 300 soldiers in the fight against terrorists, (RT 2861:1-10); Pakistan announced clamp-downs on militant groups and terrorist training camps

1    Mojaddidi cross-examined Abbas about his bias, suggesting he was motivated to testify favorably

2 for the government.  Abbas confirmed he was paid $250 per hour by the government for testimony, (RT

3 2875:11-13), and admitted that he had earned $34,000 between December 2005 and March 6, 2006, (RT

4 2877:22-2878:4).  Abbas also admitted the government reimbursed his travel costs, (RT 2877:20-21), and

5 he expected to receive more compensation for his services through the date of his testimony.  (RT

6 2878:22-2878:7).  Mojaddidi questioned Abbas' high hourly rate, including why he received $250 per

7 hour when he told the government he received lesser rates of $100-$200 in the past.  (RT 2875:11-

8 2877:31).  During closing, Mojaddidi argued Abbas was biased and untrustworthy, in part, based on his

9 compensation.  (RT 4324:11-12; 4325:22-23).[33]

10    Mojaddidi questioned Abbas regarding his Shia background and suggested he had skewed his

11 opinions because he was a member of a minority sect of Islam which is frequently perceived as the

12 "enemy" by proponents of violent jihad.  (RT 2873:14-18; 2920:19- 2921:10).  She asked questions

13 suggesting Abbas harbored ill-will against Pakistan, including why he had left government service in

14 Pakistan in 1998 and whether he was asked to return, implying there was something untoward about his

15 departure.  (RT 2809:2-24).  Mojaddidi also asked Abbas about the unpopularity of his book in Pakistan.

16 (RT 2873:21-2874:14).  During closing, the defense argued that Abbas was "clearly biased against

17 Pakistan" and biased as a result of his membership in the Shia sect.[34]  (RT 4324:3-10, 23-24).

18    The Court correctly found that Hayat failed to meet his burden on summary judgment.  Findings at

19 9.  It was reasonable for Mojaddidi to make a tactical decision to counter Abbas' testimony primarily

20 through cross-examination.[35]  She skillfully elicited concessions from Abbas and drew attention to

21 _____

22 after the September 11, 2001 attacks on the U.S., (RT 2860:1-9; 2916:2-5; 2922:11-22); and Pakistan ordered
   madrassas to register with the government, which some did (RT 2867:21-2868:4; 2869:23-2870:6).

23    [33] Mojaddidi contrasted defense expert Weiss, who was paid $1,000, and Abbas, stating that "[a]n expert who is
   asked to testify about their expertise shouldn't be paid for hundreds of hours of research, he should know what he's
   going to testify to."  (RT 4324:12-18).

24    [34] Mojaddidi attacked Abbas' credibility and asserted he was "coached" or "cued" by a government attorney.
25 (RT 2878:11-2887:8).  She challenged Abbas for speaking with the government before trial but not the defense.
   (RT 2891:25-2895:20).  During closing, the defense argued Abbas "altered his testimony to what the prosecution
26 wanted to say."  (RT 4324:3-4325).  On cross, Abbas admitted he was only a Ph.D. candidate.  (RT 2807:7-10).
   During closing, the defense reminded the jury its expert, Weiss, held a Ph.D. for 23 years, and argued she was more
27 knowledgeable than Abbas.  (RT 4324:19-22).

   [35] Before trial, the government disclosed the location it suspected Hayat had attended camp.  (W.M. Dep. at
28 177:22-178:5, 302:11-24).  Mojaddidi thought it would be great to send someone to inspect the location, (id. at
   178:4-5), and contacted James Lazor, who was visiting Pakistan and who agreed to go to the site and testify about

UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS
   TO THE COURT'S FINDINGS AND RECOMMENDATIONS

weaknesses in his opinions.  That Hayat's current attorneys might have chosen other means to address this evidence is irrelevant.  "<u>Strickland</u> does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."  <u>Harrington</u>, 562 U.S. at 111.  "Even the best criminal defense attorneys would not defend a particular client in the same way."  <u>Id.</u> at 106.  "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach."  <u>Id.</u>

1)   *Aaser's Testimony Would Not Have Undermined Abbas's Expert Testimony and was Subject to Exclusion*

Before trial, Mojaddidi was unaware of Ghulman Hasnian Aaser ("Aaser"), or his potential testimony.  (Def. Ex. NN).  Even if Mojaddidi had known of Aaser, it would have been reasonable for her not to call him, especially in light of his many vulnerabilities.  <u>See</u> <u>Harrington</u>, 562 U.S. at 108 ("Even if it had been apparent that expert blood testimony could support [the defendant's] defense, it would be reasonable to conclude that a competent attorney might elect not to use it.").  According to his declaration, Aaser is a Pakistani journalist who conducted unspecified "investigative work on militant groups in Pakistan" from 2001 to 2008.  (Def. Ex. NN, ¶ 1).  Aaser claims he "cultivated relationships with many of the militants" and visited Pakistan's "largest training camp."  (<u>Id.</u> ¶ 2).  Yet he offers no citation to *any* basis to support his opinions.[36]  Two other omissions from Aaser's proposed testimony are remarkable.

First, Aaser states he visited the camp in Muzzafarabad in 1999 but did not declare that he visited the pertinent Balakot camp at any time or explain how he knew of its status.  He vaguely states that he visited the region of Muzzafarabad every few weeks and observed unspecified "camps" continue to

---

what he saw.  (<u>Id.</u> at 43:23-44:1, 178:6-16, 180:5-11, 301:5-24).  On February 17, 2006, Lazor visited the site and, based on his observations, believed it was a former Pakistani military base and not a terrorist training camp.  (<u>Id.</u> at 180:12-181:9).  Mojaddidi used Lazor's testimony to counter Abbas', (<u>id.</u> at 203:2-24).  Lazor testified he saw what he believed were Pakistani military facilities near the site, but admitted that an earthquake had caused major damage to the Balakot area in October 2005, and that he did not know what the area looked like before the earthquake.  (RT 3592:4-3598:20, 3603:12-3606:12).

[36] He claims among other things: there were four major militant camps in Pakistan including one south of Balakot, and one near Muzaffarabad, later run by the group Jaish-eMohammed; the camps were run by Pakistan's Directorate of Inter-Services Intelligence; there was no anti-American training in the Balakot/Muzaffarabad area; after September 11, 2001, the U.S. pressured Pakistan to close these camps; the Pakistani government took "at least two years" to suppress training at these camps; he confirmed this because he visited the Muzzafarabad area "every few weeks" and "observed" the camps "operate as residential facilities" after they "ceased to function as training facilities;" he saw a map with coordinates about which a government expert testified; when he saw the camp location, he identified it as a camp in Mansehra and closed.  (Id. ¶¶ 3-7).

30   <span style="font-variant:small-caps">United States' Response to Petitioner's Objections to the Court's Findings and Recommendations</span>

operate as residential facilities.  (Id. ¶¶ 7-8).  On those facts, it is unclear whether Aaser has any reliable basis to opine regarding the relevant Balakot camp.  Aaser's ambiguous statements do not establish the nature or the non-existence of the Balakot camp at the relevant period, and certainly do not satisfy Hayat's burden to demonstrate beyond dispute that Mojaddidi's decision not to call an expert to rebut Abass's testimony was unreasonable.

Second, Aaser does not indicate when, in his opinion, these camps closed or when he personally observed the camps cease to operate.  He merely states that it took *at least* two years, until September 2003, to suppress training at these camps – suggesting that, based on his recollection, the camps might have persisted for three years, until September 2004, or even longer.  Hayat admitted visiting a camp between October 2003 and November 2004.  Thus, Aaser's testimony would not refute the possibility that the camp closed *after* Hayat attended.  As such, Aaser's purported expert opinion would not have undercut Abbas's testimony and would not have caused the jury to reach a different verdict.

Mojaddidi's strategic decision to counter Abbas' testimony primarily with cross-examination and argument was well within the wide range of competent representation.[37]  Accordingly, because the Court correctly found that Hayat failed to demonstrate a lack of material dispute that Mojaddidi was ineffective on this point, it properly ended its analysis.[38]  See Strickland, 466 U.S. at 697.

### 3. Mojaddidi's Cross-Examination of Benn Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary

Hayat faults the Court's for "not in any way or manner" addressing Mojaddidi's purported failure to challenge certain testimony from expert Eric Benn ("Benn") concerning the Balakot camp.  Obj. at 41.  Contrary to Hayat's claim, the Court considered and rejected this argument.  Findings at 8-9 (acknowledging that "movant argues counsel was ineffective … for her failure to challenge expert testimony" but finding "she relied on the lack of evidence supporting the government's claim, including

---

[37] Any competent counsel might have also rejected this testimony for its vulnerability to challenge and exclusion under Daubert and Rule 702 of the Federal Rules of Evidence.

[38] Even if Mojaddidi's strategic decisions concerning the appropriate tactic were defective, Hayat cannot demonstrate prejudice.  Aaser's proffered testimony would likely have been excluded under FRE 702.  Even if his testimony was permitted, it would not have contradicted Abbas' testimony regarding the existence of the Balakot camp.  Abbas's credibility was substantially challenged on cross-examination and Aaser's additional testimony would not have tipped the scales toward a different verdict.  The jury also heard Lazor's testimony that he visited the area and believed he found a military camp; not a militant camp.

1  her cross-examination for the government's expert."). Mojaddidi was not required to make a frivolous

2  objection and, instead, correctly disputed Benn's conclusions through cross-examination. Even if there

3  were some basis to do more, it was within Mojaddidi's professional judgment not to object and use the

4  testimony to assist the defense's case of reasonable doubt.

5  At the time Benn testified, he had worked as an analyst at the Department of Defense for over

6  twenty years, after military service. (RT 2988:2-9, 2988:10-14). He was "personally responsible for

7  overseeing the substantive content of the work [the agency's] analysts do"—including reviewing for

8  accuracy. (RT 2988:18-2989:10). Benn had reviewed "many thousands" of mapping images in his

9  career, (RT 3001:9-12), including making distinctions between militant training camps and foreign

10 military run camps (RT 3003:20-3004:19, 3030:11-16).

11 Benn testified about the particular identifiers, called "signatures," that help him distinguish a

12 militant camp from a military camp. (RT 3030:17-23-3031:3-8). Benn testified about the signatures

13 present in the images he reviewed in Hayat's case. (RT 3032:4-3033:12). Benn also testified about the

14 physical features associated with the location of the camp in the images he examined.[39] (RT 3011:5-21-

15 3029:22). Benn concluded that an official military camp would have different signatures than those he

16 identified in the images he examined. (RT 3036:10-25-3042:25). On balance, Benn stated he would

17 confirm the "possible" presence of a militant training camp based on his review of the images. (RT

18 3064:24-3065:25). He clarified that "possible" meant 50% likelihood. (RT 3061:2-3062:19).

19 Benn explained he could increase his estimate of whether a particular camp was a militant camp

20 with outside reporting. (RT 3063:2-3064:25). He testified he reviewed Hayat's statement, (RT 3067:8-

21 3073:25), and that an outside account so similar to the image he showed the jury raised his confidence that

22 the location was a militant training camp. (RT 3069:5-12-3072:11-23, 3073:9-19) ("And it's not just [that

23 Hayat's account is] consistent with a single thing of what I saw, but essentially multiple parameters or

24 attributes of the place. And so it very much influences the confidence of my judgment…"). He testified

25 his confidence increased to 60%-70% that the image was that of a militant camp. (RT 3074:12-15).

---

28 [39] See also Gov. Opp. Br. at 46-48 (discussing Benn's testimony concerning the images he examined).

Hayat claims Mojaddidi should have objected to Benn's quantification of the likelihood that the structure was a training camp.  As a legal matter, there is nothing objectionable about Benn quantifying his expert opinion in percentage terms.  See, e.g., Cuen v. Evans, 390 Fed.Appx. 721, 723 (9th Cir. 2010) (government witness testifying that he was "95% sure" of his judgment that subject was competent).  Nor was Benn improperly commenting on the credibility of a witness.  This argument, carried to its natural end, would render any evidence tending to show Hayat's guilt something which improperly comments on his credibility.  Mojaddidi was not ineffective for failing to suppress this testimony, given that such a motion should fail.[40]  See Lowry v. Lewis, 21 F.3d 344, 346-47 (9th Cir. 1994) (not ineffective to fail to assert motion to suppress that counsel knew would not succeed).

Moreover, it was a reasonable strategic decision for Mojaddidi to allow the government to admit relatively low confidence estimates of the value of the evidence.  The strategic advantage of declining to object is obvious, 50% or even as high as 70%, may not be sufficient in the evaluation of some jurors to overcome reasonable doubt.  Mojaddidi rendered this point in stark relief when she argued in closing: "When Eric Benn told you that after watching Hamid Hayat's video that he was now 60 to 70 percent sure it was a militant training camp, he left a 30 to 40 percent chance that it wasn't. And that, in itself, is enough for reasonable doubt."  (RT 4327:20-24).

Mojaddidi thoroughly cross-examined Benn, which is the proper way to examine and undermine an expert's conclusions.  See United States v. Hirokawa, 342 Fed.Appx. 242, 246 (9th Cir. 2009) (holding an expert's methods go to the probative weight, rather than the admissibility, of evidence and are properly the subjects of "cross-examination, presentation of contrary evidence, and … instruction on the burden of proof.").  Benn admitted he based his opinion on only his experience, the images of the camp presented at trial, and Hayat's statements.  (RT 3081:17-3082:5).  Mojaddidi questions him about prejudice he might have from learning the nature of the case before reviewing the images.  (RT 3085:2-3086:5).  She asked

---

[40] In United States v. Strem, 959 F.2d 243, 243 (9th Cir. 1992) (unpublished), an expert identified the portions of other government witness's testimony, on which he had based the figures in summary charts he prepared for trial. The court found the expert's testimony did not deprive the jury of the right to determine the credibility of the witnesses or prevent the jury from weighing the evidence presented by the defendants.  The expert's testimony was not offered merely to assess the credibility of other witnesses, nor did his testimony improperly buttress their credibility.  Id.  See also United States v. Marchini, 797 F.2d 759, 765-66 (9th Cir. 1986) (finding an expert may testify based on his having heard testimony of other witnesses and after reviewing the government's exhibits.).

1    Benn about the conflicting descriptions Hayat gave of the camp in his interview, and Benn's low

2    probability estimates.  (RT 3086:6-3103:6).  She also elicited other concessions, including: in many

3    countries official military camps appear informal, (RT 3103:10-19), it is "possible" such informal camps

4    exist in the Balakot region, (RT 3104:3-13), official military camps may be disguised for secrecy, (RT

5    3104:21-3105:3), and that Benn had never personally visited the Balakot camp location.  (RT 3105:4-6).

6           Hayat relies heavily on an inapposite and often misapplied case from the Second Circuit, United

7    States v. Scop, 846 F.2d 135 (2d Cir. 1988), to support his erroneous claim that Benn improperly

8    buttressed the credibility of Hayat's statement by recounting objective facts from it to corroborate his

9    expert opinion.  In Scop, the government called an SEC investigator as an expert.  Id. at 138.  The expert

10   conceded on cross-examination that his opinion was largely based not on his expertise in securities

11   trading, but on his "positive assessment of the trustworthiness and accuracy of the testimony of the

12   government's witnesses."  Id. at 142.  Because the witness "drew directly upon the language of [a] statute

13   and [its] accompanying regulations" and testified as to whether the defendant had violated that statute, the

14   court concluded his testimony had "invade[d] the province of the court to determine the applicable law

15   and to instruct the jury as to that law," and constituted an improper "legal conclusions."  Id. at 140.

16          Courts and commentators have criticized Scop and the frequent, erroneous reliance on it by

17   defendants seeking reversal whenever a witness comments on or refers to testimony of another witness.

18   See Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc., 189 F.3d 473 (9th Cir. 1999) (unpublished)

19   (concluding experts did not directly or indirectly comment on credibility of witnesses but "merely chose to

20   rely on certain evidence they deemed to be consistent with other evidence," and cross-examination was

21   proper method to challenge expert opinions); United States v. Duncan, 42 F.3d 97, 101-02 (2d Cir. 1994)

22   ("Here … the witnesses at issue did not testify that the defendants violated a statute, but merely explained

23   why, in their opinion," certain commission payments were referred to as "bonuses."); United States v.

24   Schwartz, 924 F.2d 410, 426 (2d Cir. 1991) ("[expert's] testimony—that he continued his investigation in

25   this case because he concluded that the defendants' manner of transshipment, as they described it to him,

26   was illegal—did not run afoul of [Scop]").  See also Margaret A. Berger, United States v. Scop: The

27   Common–Law Approach to an Expert's Opinion about a Witness's Credibility Still Does Not Work, 55

28   Brooklyn L.Rev. 559 (1989) (criticizing Scop and citing authority).

Unlike in <u>Scop</u>, here Benn did not explicitly or implicitly rely on a "positive assessment of the trustworthiness and accuracy" of Hayat's statement. Rather, Benn merely acknowledged objective facts described by Hayat and applied those facts to his expert training and knowledge to form, in part, one of the expert opinions he offered. (RT 3066:8-3074:15). Benn did not endorse Hayat's statements as true or otherwise, he merely acknowledged they were consistent with other evidence. <u>Id.</u> The jury was left to form its own conclusion about the credibility of Hayat's confession. Benn merely stating an opinion about disputed issues of fact, which is precisely what an expert does. <u>See</u> FRE 704(a) (an opinion is not objectionable just because it embraces an ultimate issue of fact.). Mojaddidi appropriately challenged the basis for Benn's opinions on cross-examination and featured that criticism in her closing. No more was required.[41] Accordingly, because the Court correctly found that Hayat failed to demonstrate a lack of material dispute that Mojaddidi was ineffective on this point, it properly ended its analysis.[42] <u>See</u> <u>Strickland</u>, 466 U.S. at 697.

### 4.   Mojaddidi's Decision to Forego an Objection to a Non-Existent Amendment Was Within the Wide Range of Competent Representation and Hayat Failed to <u>Demonstrate the Absence of a Material Dispute to the Contrary</u>

Contrary to Hayat's argument, the Court considered and rejected his claim that Mojaddidi was ineffective for not objecting to the government's assertion, in rebuttal argument, that it had no burden to prove Hayat attended a particular camp. Findings at 8-9. The allegations against Hayat contained no specific location, as Hayat has conceded. 2255 Mot. at 69. Nor does the charged statute, 18 U.S.C. § 2339A, require, as an element, proof of the location where a defendant provides material support. If the jury found beyond a reasonable doubt that, as alleged, Hayat attended a militant training camp (despite its precise location), they were permitted to convict him if all elements were proved. Government counsel's statement of law in rebuttal was accurate. Mojaddidi was not ineffective for failing to make a frivolous objection to an accurate statement of law.

---

[41] Hayat claims Mojaddidi "admitted" she should have moved to exclude Benn's testimony. Obj. at 41. The citations he offers shows no such admission. Rather, she stated she would have made any viable objection, did not recall objecting, and would have liked to limit Benn's opinion to 50% but did not object because her strategy was to cross Benn and call Lazor. (W.M. Dep. at 111:9-112:1-9; 299-301:15).

[42] Even if Mojaddidi's strategic decision to challenge Benn's opinion with cross-examination and other evidence was defective, Hayat cannot demonstrate prejudice. Benn's estimates fell below what jurors might have considered the threshold of reasonable doubt. Thus, they were more exculpatory than inculpatory, as Mojaddidi emphasized in her closing argument. No prejudice can result from failing to exclude such evidence.

A constructive amendment "occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." United States v. Ward, 747 F.3d 1184, 1189 (9th Cir. 2014). The Ninth Circuit has "found constructive amendment of an indictment where (1) there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument, or (2) the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." United States v. Adamson, 291 F.3d 606, 615 (9th Cir. 2002). However, "where a generally framed indictment encompasses the specific legal theory or evidence used at trial," there is no constructive amendment.[43] United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005).

Here, location was not an element of the charged crime, nor was it alleged. Thus, the prosecutor did not substantially alter the charge in his rebuttal by correctly stating that the government was not required to prove Hayat attended a particular camp. The indictment in this case provided Hayat with notice of the core of criminality to be proved at trial – that Hayat provided material support for terrorism by attending a militant training camp – and its general framing encompassed the specific legal theory and evidence presented at trial. In sum, there is no support in the law for Hayat's constructive amendment claim. Therefore, Mojaddidi cannot have been deficient for failing to object to the non-existent amendment. Accordingly, because the Court correctly found that Hayat failed to demonstrate a lack of material dispute that Mojaddidi was ineffective on this point, it properly ended its analysis.[44] See Strickland, 466 U.S. at 697.

---

[43] In United States v. Von Stoll, the indictment charged the defendant with transporting in interstate commerce $10,000 taken from a particular victim. 726 F.2d 584, 585 (9th Cir. 1984). The evidence showed the defendant met with the victim and the victim's partner, and took the $10,000 from the victim's partner. Id. at 585-86. The jury charge allowed jurors to find the defendant guilty if they found the $10,000 was taken from "the owner." Id. at 586. The court found no prejudice, reasoning the identity of the victim was irrelevant to the defendant's culpability. Id. at 586-87.

[44] The Court considered all of the "camp issues" together, summarized Hayat's claims, discussed the relevant facts, and dispatched the related arguments with the same conclusion: Hayat failed to demonstrate ineffectiveness beyond any material dispute. Findings at 9. The Court was not required to say more. Even if Mojaddidi's strategic decision concerning the purported amendment was defective, Hayat cannot demonstrate prejudice. The only evidence at trial related to the Balakot camp, jurors were instructed to decide the case only on the evidence presented, and they are presumed to follow instructions. See Richardson v. Marsh, 481 U.S. 200, 210 (1987).

5. **Mojaddidi's Decision to Forego a Motion to Suppress Hayat's Confession Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary[45]**

The Court correctly found that Mojaddidi's decision to forego a frivolous motion to suppress Hayat's confession was reasonable. Findings at 9-10. Hayat asserts that, although Mojaddidi knew his confession was likely the most damaging evidence against him, she was ineffective for not moving to suppress it. Obj. at 47. Hayat's argument finds no support in the law. See Lowry, 21 F.3d 344 at 346-47 (not ineffective to fail to assert motion to suppress that counsel knew would not succeed).

To be valid, a waiver of Miranda rights must be voluntarily, knowingly, and intelligently made. Miranda v. Arizona, 384 U.S. 436, 479 (1966). Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant. North Carolina v. Butler, 441 U.S. 369, 374–75 (1979). The government bears the burden of proving by a preponderance of the evidence that a defendant's Miranda waiver was voluntary. Colorado v. Connelly, 479 U.S. 157, 168 (1986). Post-Miranda statements are not suppressed where a defendant's actions sufficiently indicated his desire to waive his rights. United States v. Cazares, 121 F.3d 1241, 1244 (9th Cir. 1997). However, "[o]nly if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Derrick v. Peterson, 924 F.2d 813, 820 (9th Cir. 1991), overruled on other grounds, 751 F.3d 1008. Police coercion is required for a Miranda waiver to be found involuntary. See Connelly, 479 U.S. at 167-170 (holding coercive police activity is a necessary predicate to the finding a confession is not voluntary.).

Hayat was advised of his Miranda rights more than once before he agreed to answer questions. (RT 493:11-494:10, 782:1-783:8). The circumstances of the interviews were captured on videotape, which depicts the absence of coercion by investigators and demonstrates the voluntariness of Hayat's statements. (See Govt. Ex. 19; RT 782:1-783:8). Any motion to suppress would have been futile.[46]

---

[45]  In rejecting the broad category of trial errors alleged by Hayat, the Court also rejected his argument that Mojaddidi was ineffective by foregoing a motion to sever his trial from Umer's. Hayat did not object to the Court's conclusion and has abandoned that argument.

[46]  Without irony, Hayat claims his confession was involuntary because he: (i) yawned thirteen times during the interview; (ii) answered "I don't know" ten times; (iii) answered "I don't remember" six times; and (iv) answered "uh huh," instead of "yes," twenty times. 2255 Mot. at 56:23-28. Even if accurate, those facts offer no support for

1    Investigators interviewed Hayat between 4:45 p.m. and 7:00 p.m., on June 4, 2005, and between

2    approximately 12:37 a.m. and 3:00 a.m., on June 5, 2005.  (RT 582:19-584:1).  Excluding breaks, each

3    interview lasted approximately two hours.  (Id.)  During breaks, Hayat spent time "hang[ing] out" at the

4    FBI office, eating pizza and drinking soda, and "rest[ing] in the lounge area."  (RT 584:12-16).  When

5    Hayat complained that he was cold, SA Sweeney found a blanket for him.  (RT 584:14-15).  During the

6    interviews, Hayat complained of being tired, sleepy, and having a headache.  (RT 768:9-17).  By the end

7    of the interview, he was fatigued.  (RT 769:1-5).  At points in the interview, agents grew frustrated with

8    Hayat and, at least five times, told Hayat his statements did not make sense.  (RT 770:18-771:3).  Hayat

9    contradicted himself several times, likely to deflect responsibility or protect his cohorts (as the

10   government argued at trial).  None of those facts supports a colorable motion to suppress Hayat's

11   confession.  Accordingly, because the Court correctly found that Hayat failed to demonstrate a lack of

12   material dispute that Mojaddidi was ineffective on this point, it properly ended its analysis.[47]  See

13   Strickland, 466 U.S. at 697.

14           **6.    Mojaddidi's Decision to Rely on Cross-Examination to Challenge the
                     Reliability of Hayat's Confession Was Well Within the Wide Range of
15                   Competent Representation and Hayat Failed to Demonstrate the Absence of a
                     Material Dispute to the Contrary**

16           The Court correctly found that Mojaddidi was not ineffective for not presenting an alternative

17   "false confession expert" to replace her original choice, James Wedick ("Wedick"), to challenge the

18   reliability of Hayat's confession.  Findings at 9-10.  Given the state of the law and the basis for the District

19   Court's exclusion of Wedick's proposed testimony, it was reasonable for Mojaddidi to conclude, as a

20   matter of strategy, that it was not worthwhile to spend time to seek and present an alternative false

21   confession expert.   Instead, Mojaddidi reasonably relied on her challenges to the reliability of Hayat's

22

23   ───────────────────────────────

24   a motion to suppress.  That Hayat did not know certain answers or could not recall other answers, or answered using
     slang rather than more formal responses is not evidence investigators coerced his confession.  Nor do the use of ruse
     questions by interrogators render his confession involuntary.  See Frazier v. Cupp, 394 U.S. 731, 739 (1969)
25   (interrogators may make false claims about the crime or investigation during questioning without rendering a
     confession coerced).

26   [47] Even if Mojaddidi's strategic decision to forego a futile motion was somehow defective, Hayat cannot
     demonstrate prejudice.  Hayat claims Mojaddidi had nothing to lose by moving to suppress his confession.  That is
27   not the standard for constitutionally effective performance.  As a matter of law, it is simply not ineffective to forego
     filing a futile motion.  See James v. Borg, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not
28   constitute ineffective assistance….").  A motion to suppress would have failed.  There was no prejudice.

confession through direct and cross-examination, and argument at closing.  Her fruitful effort shows why any competent counsel would have reasonably elected not to pursue an alternative expert after the Court excluded Wedick's testimony.[48]

Mojaddidi was familiar with methods to challenge a purported false confession.  (Id. at 70:4-16).  Mojaddidi originally intended to challenge the confession testimony by presenting a defense expert on false confessions and through cross-examination of government witnesses about the interviews.   (Id. at 207:12-209:17).  The defense intended to call Wedick, a former FBI agent, as an expert to explain why Hayat's confession was unreliable.  (Id. at 70:9-16, 207:16-208:4).  Mojaddidi was aware that Wedick had not previously qualified as an expert in the field of false confessions, but she believed that Wedick would be deemed qualified to testify.   (Id. at 70:21-23, 71:5-7, 208:16-17, 286:4-6).  Mojaddidi was aware of other potential false confession experts, considered information sent to her by other experts, but did not contact them.   (Id. at 70:24-71:7, 208:7-17).  Ultimately, she made the decision to utilize Wedick as an expert on behalf of Hayat.[49]   (Id. at 208:18-209:1).

The government challenged the admission of Wedick's testimony (CR 261), which the defense opposed (CR 271).  In an oral decision during trial, the Court excluded Wedick's testimony, finding his opinions would not assist the jury.  (RT 3521:17-3552:21).[50]  After that ruling, and in light of the state of

---

[48] In the government's opposition memorandum, counsel for the government misstated the procedural context for the relevant facts concerning Mojaddidi's response to the Court's exclusion of Wedick's testimony.  Despite the error, the record nevertheless demonstrates Mojaddidi intended to rely on vigorous cross-examination of Hayat's FBI interrogators *and* Wedick's testimony to demonstrate the unreliability of Hayat's confession.  Government counsel's error does not alter than fact.

[49] The defense thought Wedick was the best witness because of his 34-years as an FBI agent in Sacramento.  (W.M. Dep. at 286:19-287:5).  Wedick intended to opine that agents: (i) did not but should have considered Hayat's vulnerabilities as an interviewee; (ii) should have considered Hayat's age, intelligence, education, mental handicap, language barrier, health, marriage or family status, occupation and employment status, religion and/or belief in God, illiteracy, fatigue, social isolation, and inexperience with the criminal justice system; (iii) used leading questions during the interviews; and (iv) did not ask sufficient open-ended questions.  (Govt. Ex. 18 at 8).

[50] Long after trial, the Court confirmed its exclusion in a written opinion, (CR 482), and held Hayat had "not shown Wedick [was] qualified as an expert in the field of psychology or psychiatry, or otherwise [was qualified] to give expert testimony regarding Hayat's alleged susceptibility to suggestion and coercion."  (Id. at 50).  The Court also held that "the testimony would have had little probative value and would not have assisted the jury as contemplated by Rule 702," (id. at 51-55), and noted that "the circumstances of Hayat's interrogation and confession were readily apparent to the jury through the testimony of the interviewing FBI agents and the videotapes, and therefore, Wedick's testimony was not necessary to inform the jury about the circumstances surrounding Hayat's confessions."  (Id. at 47-48).  The Court also held that "any connection that Hayat wanted Wedick to make between the factual circumstances of Hayat's confession and factors that may lead to unreliable confessions could have been and was ultimately made by defense counsel during closing arguments."  (Id. at 52).

law at the time, it was reasonable for Mojaddidi to conclude that it was strategically unwise to spend time attempting to procure testimony from an alternative expert and, instead, focus on assailing the reliability of Hayat's confession by maximizing remaining opportunities in direct examination of FBI interrogators to reveal flaws in their techniques and emphasizing those flaws (as also highlighted on earlier cross-examination of other interrogators) in closing argument.

Mojaddidi vigorously cross-examined FBI special agents called by the government as part of its case, including SA Lawrence Futa, SA Harry Sweeney, SA Tenoch Aguilar.  Mojaddidi also called SA Gary Schaaf and SA Keith Slotter as part of the defense case.  Mojaddidi questioned each of those witnesses in a fruitful effort to elicit testimony in support of Hayat's contentions that Hayat: (i) had not attended a camp; (ii) truthfully denied that he attended a camp in initial interviews with the FBI; and (iii) was induced to offer false admissions by the FBI in later interviews.[51]  Mojaddidi's thorough direct and cross-examinations produced strong evidence to support the defense theory that Hayat's confession was unreliable.  She powerfully argued the same in closing.  (RT 4308:5-4320:17).

Hayat now proffers an affidavit from Dr. Richard A. Leo ("Leo") who opines that "an expert in the psychology of police interrogation practices and false confessions would have helped Hayat before and during trial.  (Def. Ex. QQ at ¶ 36).  Notwithstanding Leo's opinion or Hayat's arguments, it would have been wholly reasonable for a competent attorney to elect not to present Wedick or any alternative expert concerning the phenomenon of false confessions in this case.  See Harrington, 562 U.S. at 108 ("Even if it had been apparent that expert blood testimony could support [the defendant's] defense, it would be reasonable to conclude that a competent attorney might elect not to use it.").

By playing the videotapes of Hayat's confession for jurors and through direct and cross-examination of interrogators, Mojaddidi knew she would be able to – and ultimately did – present a full record of the circumstances of Hayat's interviews, including a trove of helpful testimony to advance her theory that Hayat's confession was unreliable.  That evidence included: (i) Hayat's initial, persistent denials; (ii) agents' use of leading questions; (iii) Hayat's conflicting answers about camp location, his manner of travel, when he attended camp, how long he attended camp, how many others attended camp,

---

[51] A summary of Mojaddidi's extensive efforts on cross-examination and the many concessions she elicited, can be found in the government's opposition to Hayat's motion for summary judgment.  Gov. Opp. Br. at 63-68.

1    the duration and composition of training; (iv) answers from Hayat agents found unbelievable; (v) that

2    Hayat complained of being tired, jet-lagged, having a headache, and that his mind "was not working"; (vi)

3    that interrogators grew frustrated with Hayat and told him several times that his answers did not make

4    sense; and (vii) that interrogators never told Hayat he was free to go home during the interview.  See Gov.

5    Opp. Br. at 63-68 (discussing questioning of interrogators).  Moreover, by the time of Hayat's trial, many

6    courts had held that when the circumstances of a confession are recorded for examination by the jury,

7    expert testimony about false confessions, even from qualified specialists, may properly be excluded

8    because it would usurp the jury's function to make credibility findings and because of its minimal

9    probative value and prejudicial value.[52]

10        Thus, it was reasonable for Mojaddidi to conclude, as a matter of strategy, that it was not

11   worthwhile to spend additional time to seek and present the false confession testimony now proffered by

12   Leo, especially given the likelihood that it would have been have been excluded.[53]  Instead, Mojaddidi

13   took advantage of ample opportunities to challenge the reliability of Hayat's confession through direct and

14   cross-examination, and vigorously highlighted the fruits of her efforts in closing argument.  Her effort

15   demonstrates why, on the facts of this case, any competent counsel might have reasonably elected not to

16   utilize the testimony of an alternative expert witness.

17            a.    Mojaddidi Did Not Act Based on Ignorance of the Law and Any Competent
                    Counsel Would Have Reasonably Decided Not to Pursue an Alternative
18                  False Confessions Expert

19        Hayat argues Mojaddidi failed to secure an alternative false confession expert due to her ignorance

20   of the law concerning the necessary requirements for expert testimony.  Obj. at 50.  To the contrary,

21   _____

22       [52] See United States v. Miller, 874 F.2d 1255, 1266 (9th Cir. 1989) (affirming exclusion of psychology
     professor's purported false admissions testimony as unhelpful); United States v. Adams, 271 F.3d 1236, 1245-46
23   (10th Cir. 2001) (affirming exclusion of psychologist's false confession testimony as it "necessarily touches upon
     witness credibility, invades the province of the jury and exceeds the scope of the witness's expertise"); Vent v.
     State, 67 P.3d 661, 670 (Alaska Ct. App. 2003) (affirming exclusion of Leo's false confessions testimony as
24   unreliable and an invasion of the province of the jury); State v. Cobb, 43 P.3d 855, 869 (Kan. Ct. App. 2002)
     (affirming exclusion of Leo's false confessions testimony because it "invades the province of the jury"); State v.
25   Davis, 32 S.W.3d 603 (Mo. App. 2000) (affirming exclusion of Leo's false confession testimony, finding his
     testimony was "specific credibility testimony that encroaches upon the jury's duty to determine the reliability of
26   defendant's statement," noting counsel's cross-examination, and concluding defendant's credibility was within
     jury's common knowledge).  See also Gov. Opp. Br. at 69-70, 73-74 (citing cases).

27       [53] In the examples cited above, the purported experts were not former law enforcement agents, like Wedick, but
     trained psychologists, like Leo – and, in certain cases Leo himself – who possessed expertise in the field of false
28   confessions.  Nevertheless, their testimony was excluded.

Mojaddidi believed Wedick would be qualified to offer an expert opinion concerning Hayat's confession. (W.M. Dep. at 70:21-23, 71:5-7, 208:16-17, 286:4-6). The defense opposed a government challenge to Wedick's testimony and clearly understood the relevant law.  (See CR 271). That the District Court disagreed and excluded Wedick's testimony does not prove Mojaddidi was ignorant or deficient. At the time of trial, a number of courts had excluded false confession expert testimony – especially when, as here, the confession was videotaped – because such testimony did not aid a trier of fact. See Gov. Opp. Br. at 69-70, 73-74. Nevertheless, defense counsel attempted to persuade the District Court to exercise its discretion to admit Wedick's testimony. The failure of that effort cannot be fairly branded a product of ignorance or incompetence.

While ignoring the facts, Hayat's argument also ignores the law. See Harrington, 562 U.S. at 106 ("[e]ven the best criminal defense attorneys would not defend a particular client in the same way."). The record establishes that Mojaddidi chose a reasonable technique to challenge the reliability of Hayat's confession. After the District Court excluded Wedick's testimony, Mojaddidi relied on her (completed) cross-examination and remaining direct examination of his interrogators. She highlighted the results of those challenges in a powerful closing argument. It was reasonable to avoid the distraction and delay of seeking an alternative expert, whose opinion was subject to exclusion for the same reasons the Court excluded Wedick's testimony. Accordingly, because the Court correctly found that Hayat failed to demonstrate a lack of material dispute that Mojaddidi was ineffective on this point, it properly ended its analysis.[54] See Strickland, 466 U.S. at 697.

**7.     Mojaddidi's Decision to Forego a Security Clearance was Reasonable As Such a Clearance Would Not Have Enhanced Hayat's Defense and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary**

Hayat disagrees with the Court's conclusion that he failed to prove a conflict of interest and, thus,

---

[54] Even if Mojaddidi's decision to forego an alternative expert was defective, Hayat cannot demonstrate prejudice. Mojaddidi elicited substantial evidence to support her argument that Hayat's confession was unreliable and zealously argues it in closing. Expert testimony would not have enhanced the jurors' evaluation of the videotaped circumstances of Hayat's confession. Moreover, Leo's testimony would likely have been excluded. See People v. Kowalski, 821 N.W.2d 14, 31-32 (Mich. 2012) (affirming exclusion of Leo's testimony after lower court found methodology "unreliable at every stage[,]" the underlying data "were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review," and that Leo's unreliable methodology "resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process."); See also Gov. Opp. Br. at 69-70, 73-74 (citing cases).

his arguments based on a purported conflict all must fail, including his argument concerning the defense decision not to obtain security clearances.  Obj. at 45-46.  However, the Court is correct and the record demonstrates no conflict.  Moreover, Mojaddidi's decision was reasonable based on her knowledge of the case at the time, her overall defense strategy, and the government's disclosure that only a single item of classified information subject to classified proceedings (a satellite image of a camp in the Balakot area) would be introduced at trial.  Rather than submit to delay associated with obtaining a clearance and surrender a strategic advantage, Mojaddidi stipulated to the admission of the image, waived her presence at CIPA proceedings, and pressed the government for a speedy trial on evidence she considered weak. Her decision was within the wide range of competent representation.

Limits on the use of classified material at trial raise questions about whether it is sensible for defense counsel to obtain a security clearance in every case that might implicate such material.  See In re Terrorist Bombings, 552 F.3d 93 (2d Cir. 2008) (classified information passed to cleared counsel could not be shared with the defendant or used directly in open court without further proceedings).  It has become relatively common to use CIPA to substitute or summarize classified information in an unclassified form and pass that information to defense counsel to be shared with the client, used to impeach a witness, and for other litigation purposes.  See United States v. Baptista-Rodriguez, 17 F.3d 1354, 1363-64 (11th Cir. 1994).  CIPA does not alter the government's discovery obligations.  See United States v. Yunis, 867 F.2d 617, 623 (D.C. Cir. 1989).  CIPA permits the government to delete from discovery information which is not relevant and helpful to the defense.  18 U.S.C. App. III § 4 (1980). CIPA also allows information to be disclosed in substituted form, or summarized.  18 U.S.C. App. III § 6(c)(1).  Deletion, substitution, and summarization occur commonly in national security cases, and facilitate disclosure of discoverable information in an unclassified form that can be shared with a client, used to impeach a witness at trial, and so on.  Baptista-Rodriguez, 17 F.3d at 1363-64.  CIPA does not permit the government to refuse to provide exculpatory information to a defendant because the information is classified.  Id. at 1364.  Any deletion, substitution, or summary that occurred here would have been submitted to the trial court for review and approval.  See 18 U.S.C. App. III § 4 and § (6)(c)(1).

Mojaddidi testified she read the Classified Information Procedures Act ("CIPA") and understood the government's obligation to provide exculpatory information would not be reduced because CIPA

1    motions were being filed.  (W.M. Dep. at 210:13-20).  She correctly understood that there was only one

2    item of classified information the government intended to present at trial, and that she had no classified

3    information to present.  (Def. Ex. EEE.5 at 9-11, 16; W.M. Dep. at 214:12-24, 218:7-20). She recalled

4    visiting FBI offices to examine satellite images depicting militant camps in the Balakot area.  (W.M. Dep.

5    at 214:12-15).  In a December 16, 2005 letter, the government reminded Mojaddidi it possessed and had

6    shown that evidence to Mojaddidi, intended to offer it at trial, and would establish a foundation for it in a

7    Section 6 CIPA hearing for classified information.  (See Def. Ex. 00).  Mojaddidi considered the images

8    weak evidence.  (W.M. Dep. at 214:25-215:6).  The government gave her the coordinates of the camp in

9    the satellite image, (id. at 258:11-259:6), and she used Google Earth to verify the structure in the image

10   existed.  (Id. at 177:22-178:5, 259:10-21).

11        Mojaddidi and her client stipulated to the foundation for the satellite images, (CR 180-183), and

12   stipulated that Mojaddidi would not participate in *ex parte* and *in camera* CIPA hearings at trial. (CR 179;

13   W.M. Dep. at 216:1-221:2).[55]  Mojaddidi knew there were circumstances under which classified Brady

14   information could be declassified and produced to her in discovery.  (W.M. Dep. at 55:2-56:22).  She

15   testified that was one of the primary reasons she and Griffin did not obtain security clearances.  (Id. at

16   56:18-22, 218:2-5).  Griffin believed, and Mojaddidi agreed, that they did not need clearances.  (Id. at

17   57:9-20).  Mojaddidi believed that clearances "was an extensive process" that "was going to cause further

18   delays in the case," and that by raising CIPA, the government was attempting to "buy time" when there

19   really "wasn't much classified stuff out there."  (Id. at 56:22-57:4, 218:21-219:21).

20        Mojaddidi did not waive her right to all CIPA evidence, did not agree to forego reliance on all

21   classified information, and did not waive her right to potentially exculpatory classified evidence.  (Id. at

22   220:21-221:17).  Mojaddidi also did not agree to waive her right to pursue questioning that implicated

23   classified information.  (Id. at 221:11-14).  The stipulation was a waiver of her right to participate in any

24   *in camera* CIPA proceedings and did not limit her right to object to particular questions or answers.  (Id. at

25   76:24-77:4, 217:2-14, 220:21-221:17).

26        The record establishes that Mojaddidi's decision not to obtain a clearance in this case was

27

28   _____
     [55] See also Gov. Opp. Br. at 77 (setting forth full text of stipulation).

considered, strategic, and well within the wide range of competent representation.  Hayat failed to meet his burden to demonstrate how Mojaddidi was ineffective for choosing to stipulate to the admission of a single piece of clearly admissible evidence, while simultaneously pursuing a joint defense effort to pressure the government to trial on weak evidence.  Mojaddidi was under no professional obligation to submit to lengthy and intrusive screening to obtain a security clearance solely to become aware of the sources and methods by which the government acquired a satellite image that she could, and did, independently verify was accurate using Google Earth.[56]  Nor were Mojaddidi and Griffin required to agree to the intrusion of cleared counsel to participate in CIPA proceedings they believed were a delay tactic, that could not be used to withhold <u>Brady</u> material[57], and that resulted in nothing of consequence.

Hayat also claims Mojaddidi failed to pursue important questions because she did not obtain a security clearance.  Obj. 45-46.  The record does not support his claim.  Mojaddidi posed two questions during her cross-examination of Benn to which the government proffered objections, in part, based on the possibility the question might call for classified information.  The first objectionable question was too confusing for Benn to answer and was withdrawn.  (RT 3083:2-9).  The second objectionable question was outside of Benn's personal knowledge but he answered it on the record and in the jury's hearing, nonetheless.  (RT 3105:10-15).  Mojaddidi's lack of a security clearance was irrelevant.

Hayat also points to two other questions Mojaddidi asked and to which the government objected, in part, on the basis of CIPA.  <u>See</u> 2255 Mot. at 48-49.  While conducting her direct examination of SA Schaaf, Mojaddidi asked whether he knew of "any other secretly recorded conversations besides those that Nasseem Khan recorded of Hamid Hayat."  (RT 3628:9-12).  The prosecutor objected "on 401, 403 grounds, and also CIPA."  (<u>Id.</u>)  The Court observed that, as phrased, the question potentially implicated "all of the investigations that the FBI may be engaged in," and "sustained [the objection] on 403 grounds because of the way it's worded."  (RT 3628:13-3629:5).  That ruling was proper because of the vastly overbroad nature of the question.  Mojaddidi's lack of a security clearance was irrelevant.

Mojaddidi also asked SA Schaaf whether Hayat had been the "target of any other FBI investigation

---

[56] Instead, she focused on showing the image did not advance the government's case and likely undermined it. (<u>See</u> RT 3062:2-3063:10, 3073:20-3074:15, 4326:1-4327:24).  Although unsuccessful, the strategy was reasonable.
[57]

1    besides the investigation that led to the interviews on June 4th," to which the prosecutor made the "same

2    objection." (RT 3629:6-13). Mojaddidi withdrew the question. (Id.) Had she not, this question also

3    would have been properly excluded under FRE 401 and FRE 403, as irrelevant and confusing to the jury

4    or wasteful of the jury's time. Information about any other investigations targeting Hayat, assuming their

5    existence, was not relevant, would have prejudiced Hayat, and would have wasted the jury's time and

6    confused them with unrelated information. Mojaddidi's lack of a security clearance was completely

7    irrelevant to the withdrawal of this question.

8         In sum, Hayat argues Mojaddidi's decision to forego a security clearance prevented her from

9    asking questions that would have helped Hayat's defense and offers in support four questions presented to

10   two witnesses from among countless questions asked of twenty-three witnesses. The Court sustained

11   objections that included CIPA as a possible basis in only two instances, and in one of those instances the

12   Court sustained the objection on a *non*-CIPA basis. What remains is one question to Benn, concerning

13   whether he knew if any other government officials had visited a location depicted in a map about which he

14   testified. The Court sustained a government objection that included CIPA as a possible basis but only

15   *after* Benn answered that question by stating he was "not aware" of any such visit. On that meager basis,

16   Hayat argues this Court should have found Mojaddidi ineffective and vacated his conviction. The Court

17   correctly rejected that argument, found Hayat failed to demonstrate a lack of material dispute that

18   Mojaddidi was ineffective on this point, and ended its analysis.[58] See Strickland, 466 U.S. at 697.

19
              **8.    Mojaddidi's Cross-Examination of Government Witness Nasseem Khan Was
20                    Well Within the Wide Range of Competent Representation and Hayat Failed
                      to Demonstrate the Absence of a Material Dispute to the Contrary**

21        The Court properly concluded that Hayat failed to meet his burden on summary judgment

22   concerning his complaints about Mojaddidi's cross-examination of a Nasseem Khan. Findings at 9-11

23   (addressing, among other alleged trial errors, Hayat's claim that Mojaddidi did not adequately "cross-

24   examine government witnesses."). Hayat's claim focuses on Mojaddidi's alleged failure concerning an

25   answer to a single question posed to Khan. Obj. at 56. The court properly rejected his argument.

26   _____

27   [58] Even if Mojaddidi's decision to forego a security clearance was defective, Hayat cannot demonstrate
     prejudice. Hayat has made no showing that any line of questioning was not advanced because of CIPA concerns or
     that he was denied information known by Benn or anyone else that could have assisted his defense – in the absence
28   of such a showing, there can be no prejudice.

1    Many conversations between Khan and Hayat were recorded.  (RT 847:20-851:4, 1799:1-22).

2    Some, including the one on October 7, 2003, were not.  (RT 850:11-16, 1201:4-13).  Khan created a report

3    on the substance of nearly all his conversation, whether recorded or not.  (RT 849:22-850:10).  When

4    Hayat reviewed discovery with his attorney, he would have seen that there was no tape-recording of the

5    October 7, 2003 conversation.  Mojaddidi testified that Hayat told her he made a self-serving and

6    exculpatory statement to Khan during the October 7, 2003 phone call and that, at trial, she duly followed

7    up on by questioning Khan about the statement.  (W.M. Dep. at 250:3-25).

8    Mojaddidi asked Khan about that October 7, 2003 telephone conversation with Hayat, who was in

9    Pakistan at the time.  (RT 1321:4-6, 1802:2-13).  She asked if Hayat had told Khan that Hayat never

10   intended to go to a training camp, and had been lying all along to Khan about his intention to go do so.

11   (Id.)  The District Court correctly sustained the government's objection that any response would be

12   hearsay.  (1321:4-24, 1802:2-13).  In any event, Mojaddidi was able to plant in the minds of jurors the

13   idea that, had Khan responded, the answer would have been "yes," despite no support in the record that

14   Khan would have agreed.  In fact, the evidence runs to the contrary.  During cross-examination, Mojaddidi

15   asked Khan: "When [Hayat] told you that he was going to a training camp, did you believe he was lying?"

16   (RT 1807:9-15).  Khan answered: "No, I believed the opposite, that he was telling the truth."  (Id.)

17   On direct appeal, Hayat argued that his purported statement that "he never intended on going to a

18   camp" should have been admitted to show his then-existing intent under FRE 803(3) or under the rule of

19   completeness, FRE 106.  See Hayat, 710 F.3d at 896.  As Mojaddidi offered different grounds to admit the

20   statement at trial, the Ninth Circuit reviewed for plain error.  Id.  Concerning Hayat's FRE 803(3)

21   argument, the majority noted that the phrase "never intended" is "backward-looking" "[o]n its face," and

22   found Hayat's contention "far from obvious, as it is inconsistent with ordinary grammar."  Id. at 895-96.

23   Concerning Hayat's FRE 106 argument the majority found Hayat misinterpreted Ninth Circuit precedent

24   because the rule of completeness only applied to written and recorded statements.  Id. at 896.  The

25   dissenting opinion suggested Mojaddidi might have argued Hayat's purported "intent" hearsay statement

26   was admissible to impeach Khan under FRE 607.  Id. at 907-08.  The majority refused to address the

27   argument because Hayat did not raise it at trial or on appeal.  Id. at 896.

28

Hayat now argues that because Khan called Hayat a liar in conversations – but expressly denied he thought Hayat was lying about going to a camp – an alleged instance in which *Hayat* purportedly confessed to lying should have been admitted to impeach *Khan*.  Hayat's learned appellate counsel did not raise this novel argument on direct appeal.  It scarcely seems logical to conclude that Mojaddidi (who offered other reasons to admit the hearsay statement at trial) was constitutionally ineffective because she did not, in the heat of trial, offer an innovative and nuanced justification to admit the "intent" hearsay statement that was not identified and advanced by appellate counsel, and that, when raised *sua sponte* by Judge Tashima on appeal, was rejected by the Ninth Circuit majority.  See Waters, 46 F.3d at 1512 ("The test [of effective counsel] has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.").

Obviously, impeachment was not the true purpose of the "intent" hearsay statement.  Rather, it "primarily served the purpose of furthering the theory of the defense and not of impeaching the prosecution's witness."  Hayat, 710 F.3d at 898.  Hayat could point to no "evidence corroborating the excluded statement."  Id. at 898-99 ("the contested statement lacked the requisite 'persuasive assurances of trustworthiness.'").  The majority also noted that Hayat could likely have made a conscious decision to mislead Khan during the October 7, 2003 conversation that purportedly included the "intent" hearsay statement because "Hayat had grown suspicious of Khan … and so cut off the relationship."  Id.  "In that case, Hayat could have lied when he said he never intended to go to a camp, hoping to throw Khan off his trail before he stopped speaking with him entirely."  Id.  As the majority's reasoning makes clear, the "intent" hearsay statement would have been used by the jury for an improper purpose, and the trial court likely would not have admitted it— even if Mojaddidi had offered FRE 607 as a basis.

Notwithstanding her failure to admit the "intent" hearsay statement, Mojaddidi did a highly competent job questioning Khan's credibility on cross-examination.  See Gov. Opp. Br. at 87-94 (discussing Khan's cross-examination in detail).  Her cross-examination of Khan was robust, vigorous, and fruitful.  Id.  She assailed Khan's credibility and bolstered Hayat's claims of innocence with the numerous admissions and concessions she elicited.  Id.  Mojaddidi's put to good use the substantial admissions and concessions she elicited from Khan in a powerful closing argument.  (See RT 4286:21-25,

48   United States' Response to Petitioner's Objections
to the Court's Findings and Recommendations

4291:1-9, 4291:19-4294:22, 4295:1-9, 4295:23-4296:12, 4296:13-18, 4297:12-20, 4298:6-14, 4305:14-25, 4306:13-20).  Moreover, even though the Court sustained the government's objections to her questions concerning Hayat's purported "intent" hearsay statement, Mojaddidi referred to the statement in her closing argument to advance her attack on Khan's credibility.  (RT 4301:10-21).

As the Court concluded, Hayat's argument that Mojaddidi was ineffective in her cross-examination of Khan is without merit.  Accordingly, because the Court correctly found that Hayat failed to demonstrate a lack of material dispute that Mojaddidi was ineffective on this point, it properly ended its analysis.[59]  See Strickland, 466 U.S. at 697.

> b.    The Question of Mojaddidi's Representation Was Not Before the Ninth Circuit on Direct Appeal and Nothing in the Circuit's Opinion Endorses His Arguments

As he has done at every opportunity, Hayat erroneously asserts that the Ninth Circuit's opinion denying all of his claims on direct appeal somehow supports his ineffectiveness claim on this issue.  Obj. at 57.  The passages on which Hayat relies appear in two footnotes and one line of text in the portion of the majority opinion that dealt with Hayat's argument concerning  Khan's testimony about the purported "intent" hearsay statement.  Those passages are considerably more equivocal than Hayat represents and the Court correctly concluded they are irrelevant to the outcome of his claims.

The cited passages scarcely amount to more than an acknowledgment that certain legal issues are inappropriate for disposition on direct appeal and may require development in post-conviction relief proceedings.[60]  Such observations are unsurprising in light of Hayat's post-trial attempt to prematurely assert his § 2255 claims before his direct appeal.  See Hayat, 710 F.3d at 903.  Hayat's efforts to paint the majority's observations of legal truisms as endorsements of his § 2255 claims lack any merit.

---

[59] Even if Mojaddidi's cross of Khan was defective, Hayat cannot demonstrate prejudice.  No support exists in the record to for his claim that admission of the self-serving, hearsay statement, which the jury heard and that Mojaddidi pressed in her closing argument, would have tipped the scale in favor of acquittal.

[60] In a footnote the majority noted: "Nor, of course, do we preclude a demonstration on collateral review that counsel rendered ineffective assistance in enunciating the basis for the admission as she did. Hayat's attorney may well have been deficient by failing to offer a plausible justification for admission of the "never intended" statement." Hayat, 710 F.3d at 895 n. 15.  In another footnote the majority observed: "We cannot determine from the current record why defense counsel did not attempt to justify the admission of Hayat's statements on the bases [of FRE 607].  In order to determine whether such failure constituted ineffective assistance of counsel, further factual development not possible on direct appeal is necessary."  Hayat, 710 F.3d at 897 n. 16.  The panel added: "Under these circumstances, the failure of Hayat's attorney to explain the connection between the proffered statement and Khan's prior testimony may be relevant to a later claim for ineffective assistance of counsel.  But the district court's failure to recognize such a basis on its own was not plain error."  Hayat, 710 F.3d at 897.

**9.     Mojaddidi's Cross-Examination of Government Witness Khalil Mohammed Was Well Within the Wide Range of Competent Representation and Hayat Failed to Demonstrate the Absence of a Material Dispute to the Contrary**

The Court properly concluded Hayat failed to meet his burden concerning his complaints about Mojaddidi's cross-examination of Dr. Khalil Mohammed ("Mohammed").  Findings at 9-11 (addressing, among other alleged trial errors, Hayat's claim that Mojaddidi did not adequately "cross-examine government witnesses.").  Hayat asserts several arguments.  First, he claims Mojaddidi failed to object to Mohammed's qualifications and testimony, including testimony about the "jihadist mental state" of a person carrying the ta'wiz FBI agents found in Hayat's wallet.  Obj. at 54.  The Ninth Circuit squarely rejected the legal theory supporting this argument.  See Hayat, 710 F.3d at 900-02.  Second, Hayat alleges Mojaddidi failed to properly cross-examine Mohammed.  Obj. at 55.  To the contrary, Mojaddidi conducted a thorough cross-examination and was not ineffective for not asking a single question concerning a speculative "guess" from a student with whom Mohammed conferred about Hayat's ta'wiz.  Third, Hayat faults Mojaddidi for not obtaining a more authoritative expert to counter Mohammed's testimony, despite her diligent efforts to do so.[61]  Id.  The arguments all lack merit.

a.     Mojaddidi Was Not Ineffective for Not Raising a Futile Objection to Mohammed's Expert Testimony Concerning Hayat's Ta'wiz

The Ninth Circuit found Mohammed was a properly qualified expert.  See Hayat, 710 F.3d at 900 ("Mohammed's analysis of the meaning of the supplication was well within the scope of his expertise."); see also Gov. Opp. Br. at 96-99.  Mohammed described the process of interpreting a ta'wiz (or supplication) and stated one would look for precedent either in the Koran or the oral traditions of Islam, check certain important texts for sources of meaning in the words used, and research the commentaries on the verses.  (RT 1934:4-1936:25).  Mohammed translated the supplication in Hayat's wallet as: "Oh Allah we place you at their throats and we seek refuge in you from their evils."  (RT 1970:1-3).  He concluded the meaning of Hayat's ta'wiz was "not peaceful" because "just about every commentary I checked puts it in a case where someone who is in jihad makes this supplication, someone who is at war with a perceived enemy. … [I]t is to be used when in activity against an enemy."  (RT 1974:4-14).  Mohammed testified

---

[61] Hayat elected not to object concerning his fourth argument faulting Mojaddidi for purportedly failing to uphold her discovery obligations.  Def. Mot. at 30.  He has abandoned the argument.

United States' Response to Petitioner's Objections to the Court's Findings and Recommendations

that the kind of person who would carry the ta'wiz Hayat carried would be: "A person who perceives him or herself as being engaged in war for God against an enemy."  (RT 1974:15-1975:1).

Hayat argues Mohammed impermissibly commented on his mental state, in violation of FRE 704(b), when he testified about the type of person who would carry the ta'wiz Hayat carried.  Obj. at 54. The Ninth Circuit rejected that argument on direct appeal.  See Hayat, 710 F.3d at 902.  The majority held that an expert could offer testimony "supporting an inference or conclusion that a defendant does or does not have the requisite mental state, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony."  Id. at 901.  Id.

Hayat has not and cannot explained how Mojaddidi's failure to object to testimony that was permitted under controlling substantive law, could be ineffective.  Instead, Hayat invited the Court to adopt the position advanced in the dissent and overrule settled Ninth Circuit precedent.[62]  The majority noted its disagreement with the law on this issue but applied it, as required.  Hayat, 710 F.3d at 902.  Cf Hart v. Massanari, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting *en banc*, or by the Supreme Court.").  Hayat argues the Ninth Circuit found only that the District Court did not commit plain error by not *sua sponte* excluding Mohammed's alleged "mental state" testimony.  He insists if Mojaddidi had objected, the Ninth Circuit might have reached a different decision reviewing for preserved claims of error.  Obj. 52-53.  The argument is spurious.  Even if Mojaddidi had made a futile objection to preserve this argument, the same outcome would follow.  See Hayat, 710 F.3d at 902 ("our precedents [have limted] Rule 704(b) essentially to a semantic preclusion … while we might like to agree with Judge Tashima that the expert evidence in this case crossed the Rule 704(b) line, we are prevented from doing so by this court's caselaw.").  Judge Kellison properly declined Hayat's invitation to ignore settled law.

---

[62] When an issue is decided on direct appeal, the "law of the case" bars courts from reconsidering those issues in further post-conviction proceedings.  See United States v. Scrivner, 189 F.3d 825, 827 (9th Cir. 1999) (applying law of the case doctrine in § 2255 action to preclude petitioner's claim after it was rejected on direct appeal.).  Courts may depart from the doctrine only under circumstances not present in this case.  See Scrivner, 189 F.3d at 827.

b.   Mojaddidi's Cross-Examination of Mohammed was Vigorous, Robust, Fruitful, and Well Within the Wide Range of Competent Representation

Even if there were mistakes, overreaches, or omissions in Mohammed's testimony, such errors should be pointed out by cross-examination, rather than excluded by objection, as errors go to the weight, rather than the admissibility of expert testimony.  See Murray v. Schriro, 746 F.3d 418, 428 (9th Cir. 2014).  Mojaddidi properly focused on cross-examining Mohammed and offering a rival expert.  She countered Mohammed's testimony first through "solid cross-examination," (W.M. Dep. at 199:24-200:6), that was vigorous, robust, and fruitful.  See Gov. Opp. Br. at 101-02 (detailing Mojaddidi's cross examination of Mohammed).  Mojaddidi deftly attacked Mohammed's expert testimony in her closing argument.  (RT 4322:1-4324:2); Gov. Opp. Br. at 103 (detailing Mojaddidi's closing argument concerning Mohammed).  Her efforts were well within the broad range of competent representation.

1)   *Mojaddidi Was Not Ineffective by Not Cross-Examining Mohammed About a Speculative "Guess" by a Student with Whom Mohammed Conferred Concerning Hayat's Ta'wiz*

Hayat claims that Mojaddidi was ineffective for failing to cross-examine Mohammed with a single question regarding an email from Bariza Umar ("Umar") to Mohammed, in which Umar stated: "I would guess that most people don't know what is written in a ta'wiz."  Def. Mot. at 30.  In the full context of Mojaddidi's cross-examination of Mohammed, adding a single question about Umar's very weak statement, which was speculative and unreliable on its face, would have, at best, been cumulative of other damaging testimony Mojaddidi elicited during cross-examination.  Hearing testimony about Umar's "guess" about what "most people" might know about a ta'wiz would not have impacted jurors' evaluation of Mohammed's testimony.  There is no basis to conclude that Umar's speculative opinion would have been the missing needle in the haystack of defense evidence that would have caused a different verdict.

2)   *Mojaddidi Was Not Ineffective by Not Obtaining an Alternative Expert to Counter Mohammed's Testimony*

Mojaddidi went beyond offering a thorough cross-examination and closing argument concerning Mohammed's testimony.  She also offered the testimony of Dr. Anita Weiss ("Weiss"), an expert on Pakistani culture.  (Id. at 205:12-206:7, 198:25-199:14).  Mojaddidi, or Weiss acting on her behalf, contacted a series of other experts who they thought might potentially testify about the meaning of Hayat's ta'wiz.  (Id. at 199:14-201:7).  Mojaddidi testified in her deposition that, even though she

"desperately" look[ed] for "a lot" of experts, she was not successful.  (<u>Id.</u> at 199:14-201:7, 206:9-25).  Of the "at least ten" people contacted, she found "nobody . . . who would help."  (<u>Id.</u> at 199:14-201:7, 239:6). She explained that there were a lot of people who did not want to be involved in a federal terrorism trial and that she ran into that issue a lot in seeking experts and help.  (<u>Id.</u> at 197:7-11).  Hayat cannot assert that such diligent efforts were ineffective simply because they were not successful.

Mojaddidi could not obtain an Arabic-speaking expert to opine on the accuracy of Mohammed's translation and focused instead on effectively cross-examining him.  Even if Mojaddidi had retained the experts Hayat now proffers, the result would have been no different.  Dr. Bernard Haykel ("Haykel") could not have rebutted Mohammed's testimony.  <u>See</u> Def. Ex. BBB.  Haykel admits that a supplication like the one Hayat possessed could have, in fact, been carried by a jihadist.  <u>Id.</u>  Thus, even if Haykel had testified, his testimony would have left the jury in the same position: with substantial basis to credit Mohammed's testimony and some evidence to refute it.

Similarly, the affidavit of Tahir Anwar ("Anwar") does not support Hayat's ineffectiveness claim. (<u>See</u> Def. Ex. CCC.)  Anwar's affidavit cannot even establish his qualification to render an expert opinion. At the time of Hayat's trial, Anwar had been an imam at the South Bay Islamic Association in San Jose for approximately five years. (<u>Id.</u>)  Anwar currently teaches Islamic Law but it is unclear from his affidavit whether he held that position at the time of Hayat's trial.  His affidavit does not describe his educational accomplishments, significant research, or other specialized knowledge that might qualify him as an expert concerning the significance of Hayat's ta'wiz.  His only nominal "expert" qualification seems to be that he speaks Arabic, comfortably, but not fluently.  (<u>Id.</u>)

Nor can Anwar satisfy the methodological requirements of FRE 702.  He admits the foundation for his purported expert opinion about Hayat's ta'wiz is subjectively based on his personal experiences and his "family and educational background," and anecdotally based on the unknown "substantial portion of [his] congregants … of Indio-Pakistani origin."  (<u>Id.</u>)  Such bases are simply not sufficiently reliable to support his opinions and assist the jury.  Thus, Anwar would likely not have been permitted to testify and could not have refuted Mohammed's testimony or affected the jury's verdict.

3)   *Mojaddidi Was Not Ineffective Because the Court Excluded Part of Weiss' Opinion as Beyond the Scope of Her Qualifications*

Weiss testified about her qualifications and offered an expert opinion about certain facts concerning Pakistani culture.[63]  Weiss also testified favorably for the defense on the subject of Hayat's ta'wiz.  (RT 4178:3-4180:3, 4192:8-21, 4194:4-7).  Hayat claims that part of Weiss's opinion was stricken because Mojaddidi violated her discovery obligations.  2255 Mot. at 86.  The claim is not supported by the record.  The District Court struck part of Weiss' answer to Mojaddidi's question: "And can you explain to the jury what a ta'wiz is?"  After an explanation of the definition of a ta'wiz, Weiss opined that carriers of a ta'wiz "really don't know what's written in them."  The Court struck that portion of the answer after a government objection that the answer was non-responsive and speculative.  (RT 4183:7-4184:15).

Hayat has not demonstrated how such a statement was admissible, or could have affected his defense.  The jury had heard from Mohammed that Hayat's ta'wiz was written in Koranic Arabic and could not be accurately translated by an ordinary Muslim, and that Arabic is not the language spoken in Pakistan.  Thus, jurors would have been aware that Hayat could likely not read the supplication.  Weiss' additional, inadmissible, and speculative testimony would have added nothing.  Even if it would have, despite the Court's striking the testimony, the jury had already heard Weiss's testimony to that effect.  The Court correctly rejected this argument.  Findings at 9-11.

Hayat also argues Weiss would have offered an expanded opinion about his ta'wiz if the Court had not excluded part of her testimony because of Mojaddidi's late, supplemental expert disclosure.  2255 Mot. at 86.  Yet, he offers no description of any additional opinion Weiss would have offered, or how exclusion of that unknown opinion prejudiced him.  In any event, despite the Court's order under Rule 16, at trial Mojaddidi attempted to elicit Weiss's opinion about translations of the ta'wiz Weiss learned from others.  (RT 4187:7-13).  The District Court sustained the government's FRE 702 objection on the basis that Weiss did not speak or read Arabic.  (RT 4187:14-4192:6).  The Court properly rejected this and Hayat's other claims concerning alleged trial errors related to Mohammed's testimony.

---

[63] See Gov. Opp. Br. at 106-07 (discussing Weiss's qualifications and testimony).

**C.**    **Mojaddidi's Resume as of 2005-2006 Does Not Alter the Correctness of the Court's Findings and Recommendations**

Throughout his objections, Hayat dwells on Mojaddidi's general qualifications in 2005-2006.  Yet, the questions Judge Kellison decided concerned Mojaddidi's actions and not the state of her résumé when she represented Hayat.[64]  Mojaddidi's general qualifications are only minimally relevant and, to be sure, are not dispositive.  Indeed, "[every experienced criminal defense attorney once tried his first criminal case."  United States v. Cronic, 466 U.S. 648, 665 (1984) (rejecting ineffective assistance claim in mail fraud case based on allegations that the appointed trial attorney was young, that his principal practice was in real estate, and that this was his first jury trial), overruled on other grounds by Sawyer v. Smith, 497 U.S. 227 (1990).  "An attorney can render effective assistance of counsel even if [s]he has had no prior experience in criminal advocacy."  United States v. Lewis, 786 F.2d 1278, 1281 (5th Cir. 1986); see also United States v. Merritt, 528 F.2d 650, 651 (7th Cir. 1976) ("[a]dmission to the bar allows [a court] to assume that counsel has the training, knowledge, and ability to represent a client.").

"The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation." See Cronic, 466 U.S. at 665.  To the contrary, "in considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, [her] performance."  LaGrand v. Stewart, 133 F.3d 1253, 1275 (9th Cir. 1998).  Mere lack of criminal experience and lack of trial experience do not automatically render an attorney ineffective to represent criminal clients.  Id.  See also In Re Grand Jury Subpoena, 739 F.2d 1354, 1358 (8th Cir. 1984) ("Unfamiliarity with an area of the law does not justify a presumption of ineffectiveness.").  As with all ineffectiveness claims, Hayat must show that Mojaddidi engaged in specific acts or omissions that were ineffective.  Woods v. Sinclair, 655 F.3d 886, 907 (9th Cir. 2011), judgment vacated on other grounds, 132 S. Ct. 1819 (2012).

---

[64] Mojaddidi was a new litigator when Hayat retained her.  She earned bachelor's degree from U.C. Davis in 1997, and a J.D. from Pacific McGeorge Law School in 2000.  (W.M. Dep. at 7:20-22, 10:6-20, 115:13-123:15). She completed courses in substantive and procedural criminal law, and evidence.  (Id. at 9:2-10:3).  She served as an adjunct professor at the International Appellate Advocacy Department at McGeorge for 2 years after law school. (Id. at 116:6-117:25). She was admitted to practice in California in December 2003.  (Id. at 10:21-11:2).  In 2004, she practiced family law in state court and immigration law in federal court, and added civil matters in 2005.  (Id. at 11:3-14:21, 118:3-23,13:2-25).  Before June 2005, she had no experience in criminal law, federal district court, and no jury trial experience.  (Id. at 12:1-14:21, 22:15-18, 71:12-24, 104:17-105:24).

UNITED STATES' RESPONSE TO PETITIONER'S OBJECTIONS
TO THE COURT'S FINDINGS AND RECOMMENDATIONS

Though she was just beginning her criminal practice, Mojaddidi's background uniquely qualified her to assist Hayat. Mojaddidi has substantial familiarity with Pakistan and Afghanistan. (Id. at 119:3-123:15). She was born in Afghanistan and immigrated to the U.S. at the age of five. Her husband was raised in Pakistan and she travelled there several times. (Id. at 8:6-22, 119:3-123:15). She speaks Pashto, Urdu, and Farsi and has been immersed in Afghani and Pakistani culture and politics for years. (Id.). She also had been a practicing Muslim all her life. (Id. at 122:22-123:5). Given that much of the evidence in the case related to Pakistan, Afghanistan, and Islam, and given that much of the evidence, in fact, was written in Pashto and Urdu, Mojaddidi had a unique personal background which made her unusually well-suited to critically analyze the evidence in this prosecution.[65]

In the word of the Supreme Court: "[t]he character of [Mojaddidi's] experience may shed light in an evaluation of [her] actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation." See Cronic, 466 U.S. at 665. In certain cases, like this one, an attorney's subject matter experience can be even more valuable than general criminal litigation experience. See id. ("[A] lawyer's experience with real estate transactions might be more useful in preparing to try a criminal case involving financial transactions than would prior experience in handling, for example, armed robbery prosecutions."). Even though Mojaddidi lacked practical criminal experience,[66] she had a wealth of specialized knowledge relevant to the charges. The fundamental question, thus, remains the same: whether Mojaddidi used her skills to competently represent Hayat. As the forgoing makes clear and as the Court properly concluded, the answer is: yes. Mojaddidi did not labor under a debilitating conflict of interest Hayat and her representation was well within the broad range of competent representation. Hayat failed to demonstrate the absence of a material dispute to the contrary.

---

[65] Hayat now argues that Mojaddidi was "utterly unqualified to serve as his counsel." Def. Mot. at 18. Hayat's charge represents a curious demotion of Mojaddidi from his earlier assessment of her as a potentially "valuable junior member" of his defense team, particularly "given her mastery of South Asian languages and her understanding of the Muslim religion and Pakistani culture." 2255 Mot. at 3. Notably, Hayat's revised sentiment follows Mojaddidi's deposition, in which her sworn testimony refuted his § 2255 claims.

[66] Mojaddidi testified she was "inexperienced" at the time she represented Hayat and suggested that may have affected his case. (W.M. Dep. at 253). Such introspection and "Monday morning quarterbacking," while typical, is irrelevant as a matter of law. "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." Harrington, 562 U.S. at 109. But Strickland calls for inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind. Id.

# VI.    CONCLUSION

In its Findings and Recommendations the Court succinctly disposed of the ultimate issue before it, correctly concluding Hayat failed to meet his burden to demonstrate the absence of material factual disputes concerning his conflict of interest and ineffective assistance claims.  Hayat's objections ignore that simple conclusion.  As the foregoing demonstrates, Hayat's objections offer no basis to second-guess the Court's conclusions.  Accordingly, the District Court should adopt the Finding and Recommendations and deny Hayat's motion for summary judgment.


Dated:  May 30, 2016                                    PHILLIP A. TALBERT
                                                        Acting United States Attorney


                                                By:    /s/ ANDRÉ M. ESPINOSA
                                                        ANDRÉ M. ESPINOSA
                                                        Assistant United States Attorney

                                                        /s/ ROGER YANG
                                                        ROGER YANG
                                                        Assistant United States Attorney

                                                        /s/ ERIN CREEGAN
                                                        ERIN CREEGAN
                                                        Trial Attorney