UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Respondent,<br><br>    v.<br><br>HAMID HAYAT,<br><br>            Movant. | No.  2:05-cr-0240-GEB-CMK<br>      2:14-cv-1073-GEB-CMK<br><br>**ORDER DENYING HAMID HAYAT'S SUMMARY JUDGMENT MOTION** |

  Hamid Hayat ("Hamid," "Hayat," or "Movant") moves for summary judgment, ECF No. 548, on his claims alleged under 28 U.S.C. § 2255, in which he seeks an order vacating, setting aside, or correcting his criminal judgment. Hayat challenges his 2006 convictions for violation of 18 U.S.C. § 2339A (providing material support to terrorists) and 18 U.S.C. § 1001 (making false statements). His convictions were affirmed by a divided Ninth Circuit panel.

  Hayat incorporates into his summary judgment motion his April 30, 2014 § 2255 motion for the same relief. Hayat states in his summary judgment motion:

> In his [April 30, 2014] § 2255 motion, Hamid raised the conflict of interest under which his trial counsel, Wazhma Mojaddidi, operated

1

> as his first claim for relief, and her constitutionally inadequate representation as his second claim. Now Hamid moves for summary judgment on those Sixth Amendment claims. In the wake of the deposition of Ms. Mojaddidi, facts sufficient to fully establish the merits of both claims are beyond dispute.

Mot. for Summ. J. 2:9-13, ECF No. 548.

Hayat's summary judgment motion was referred to a United States Magistrate Judge under an Eastern District of California local rule for proposed findings and recommendations. The Magistrate Judge filed findings and recommendations, recommending that the summary judgment motion be denied. ECF No. 588. Hayat filed timely objections to the proposed findings and recommendations. In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 304, the undersigned judge has conducted a de novo review of the motion, and for the reasons stated below, the Magistrate Judge's recommendations will be adopted except for the portion that is rejected or modified below.

**DISCUSSION**

**A. Conflict of Interest**

The Magistrate Judge summarized Movant's conflict of interest claim and recommends denying it as follows:

> Movant contends that due to counsel's lack of knowledge and experience, [Ms. Mojaddidi] relied on codefendant's counsel [Mr. Johnny Griffin], essentially giving him control over movant's defense as well as [Hamid's codefendant Umer Hayat's defense]. [Hamid] also contends that codefendant's counsel controlled the purse strings for the joint defense of both defendants, which was a conflict with counsel's performance of an adequate defense. In support of this

2

>contention, he supplies codefendant counsel's retainer agreement and [Ms. Mojaddidi]'s deposition.
>
>Contrary to movant's compelling arguments, the evidence provides no significant support for [Hamid's] contentions. There was no joint representation of the codefendant; each defendant had separate representation. Counsel in this case was independent of each other, not two attorneys employed by the same firm. Trial counsel specifically testified at her deposition that money was never an issue for the defense she put on for movant.

Findings & Recommendations ("F & R") 5:2-12, ECF No. 588.

Hayat objects to this finding, arguing the Magistrate Judge failed to evaluate his conflict of interest claim under the applicable standard and "the instances in which [Ms. Mojaddidi's] representation was deficient." Objs. to F & R 3:14, ECF No. 593. Hayat presents evidence, including portions of Ms. Mojaddidi's deposition testimony, in support of his arguments.

This deposition testimony includes Ms. Mojaddidi testifying that she did not feel "qualified to represent [Hamid] by [herself]." Dep. of Wazhma Mojaddidi ("Dep. of WM") 23:10-17, ECF No. 548, Ex. FFF. Ms. Mojaddidi explained:

>Well, my understanding was that it was going to be, essentially, a joint defense. I was working with somebody who was very experienced, and I think I did -- you know, my own independent research on Johnny Griffin. . . . I thought it was something I could handle if I had some guidance on just the procedural stuff, and I was willing -- I was willing to learn it.

Id. at 22:22-23:8.

Hayat's objections include the statement that an experienced defense counsel named Mark Reichel "appeared in court during jury selection and was introduced to the court in his

3

'advisory consultation capacity.'"  Objs. to F & R 10:1-2, ECF No. 593.  Hayat argues:

> Money to pay Reichel would have had to come from [co-defendant's attorney] Mr. Griffin.  Mr. Griffin indicated that if Mr. Reichel came in, Mr. Griffin would not be needed to assist or advise [Ms. Mojaddidi]. Mr. Griffin advised Ms. Mojaddidi that she was well familiar with the case, could handle it on her own, and adding Mr. Reichel was unnecessary.  With her confidence boosted by counsel for the codefendant, Ms. Mojaddidi decided to represent Hamid without Mr. Reichel's assistance.

Id. at 10:3-9 (citations omitted).  Hayat further argues:

> [T]he counsel upon whom Ms. Mojaddidi was relying for controlling guidance in deciding whether to file motions, to conduct investigation, and to retain experts with their attendant costs had a direct economic interest in minimizing the amount of time and money spent on Hamid's defense.  In the end, Mr. Griffin received a fee multiple times greater than the fees and expenses expended in defending Hamid.

Id. at 13:15-19.

However, as the Magistrate Judge found:

> [Ms. Mojaddidi] testified . . . that while codefendant's counsel held the money available for paying expenses, she was equally able to access it, never ran into the situation where she asked and was told no, she could not use the defense money, and even if she had been told no, she would have used the money she was paid in attorney fees for expenses if she felt the expense was worthy.

F & R 5:12-16, ECF 588.  The Magistrate Judge also found:

> [Ms. Mojaddidi] clearly testified at her deposition that while she utilized codefendant's counsel and his experience, she did her own research, independently reviewed possibilities, and made decisions on her own based on her own judgement.  Most of the decisions made were in agreement, but trial counsel did disagree with codefendant's counsel on several issues which they then

4

> discussed and she made her own independent decision. At no time did trial counsel simply blindly follow codefendant's counsel's decisions.

Id. at 6:11-17.

Movant objects to the Magistrate Judge's analysis, arguing: "[T]he magistrate ruled that there was no conflict of interest simply because Ms. Mojaddidi testified at her deposition that, in her subjective and self-serving opinion, there was none." Objs. to F & R 14:11-13. Movant contends Ms. Mojaddidi labored under an actual conflict of interest because of her

> elect[ion] to rely [on the] assistance [of] the attorney for her client's codefendant, Johnny Griffin [for Hamid's defense decisions]; [and] at Griffin's urging, she declined the opportunity to bring aboard independent and unconflicted counsel in the person of Mark Reichel. She acknowledged that . . . she could not try the case without Mr. Griffin's participation in Hamid's defense. That admission established that Mr. Griffin, in fact if not in name, was effectively serving as co-counsel for Hamid as well as lead counsel for Umer [Hayat].

Objs. to F & R 13:2-8, ECF 593. Movant also contends that when "[f]inding no potential conflict solely based on Ms. Mojaddidi's testimony, the magistrate never considered whether any adverse effects resulted from Mr. Griffin's role in Hamid's representation," nor the following holding in Sanders v. Ratelle, 21 F.3d 1446, 1452 (9th Cir. 1994): "The existence of an actual conflict cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict." Objs. to F & R 14:18-26.

Movant argues a "potential conflict" should have been

5

found to exist and then the "adverse effects result[ing] from Mr. Griffin's role in Hamid's representation" should have been examined, including "Mojaddidi's failure to obtain and present the overwhelming alibi evidence from Pakistani witnesses [and her] failure to investigate the closing of the Balakot camp." Objs. to F & R 14:25-15:1.

The government counters:

> Here, Hayat retained Mojaddidi, and Umer retained Griffin. Mojaddidi understood she had no experience in criminal law and she testified she advised Hayat of this before he retained her. Hayat wanted Mojaddidi to represent him and signed a retainer agreement. Mojaddidi determined that she could handle Hayat's representation and felt comfortable in the courtroom, but knew she would need some guidance, particularly as to procedural issues.
>
> Mojaddidi and Griffin had an oral and written joint defense agreement: each represented her/his client and agreed to work jointly to prepare their cases. She testified the arrangement was discussed with the clients and was memorialized in a document that everybody signed. Mojaddidi testified both she and Griffin looked into whether there was a potential conflict of interest. They determined that they did not "think there was going to be a conflict," and they discussed their conclusions with both clients, who agreed.
>
> . . .
>
> Consistent with the joint defense agreement, Mojaddidi and Griffin worked together during the trial. Mojaddidi considered Griffin's advice but ultimately made the decisions she thought were best for Hayat. Mojaddidi prepared and conducted her own examinations and prepared and delivered her opening and closing. She denied Griffin served as lead counsel for both clients, that he functionally represented both clients, and that she served as Griffin's junior associate in representing Hayat.

6

Resp. to Objs. to F & R 15:1-16:14 (citations and footnote omitted).

Hayat has not satisfied his burden under the summary judgment standard of showing that Ms. Mojaddidi's representation of him was ineffective due to a conflict of interest. A criminal defendant's Sixth Amendment "right to effective assistance of counsel at trial . . . includes the entitlement to representation that is free from conflicts of interest." United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005) (citing Strickland v. Washington, 466 U.S. 668, 688 (1984)).  The Supreme Court states in Cuyler v. Sullivan, 446 U.S. 335, 348 (1980):  "In order to establish a violation of the Sixth Amendment [based on a conflict of interest], a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  "If this standard is met, prejudice is presumed."  Wells, 394 F.3d at 733.  "A requirement of the showing of prejudice would not be susceptible of intelligent, even-handed application, as it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." Sanders v. Ratelle, 21 F.3d 1446, 1452 (9th Cir. 1994) (citations omitted).

The Supreme Court also states in Sullivan "a possible conflict inheres in almost every instance of multiple representation," and that a defendant challenging that "representation must . . . show that potential conflicts impermissibly imperil his right to a fair trial."  446 U.S. at 348.  "But until a defendant shows that his counsel actively represented conflicting interests, he has not established the

7

constitutional predicate for his claim of ineffective assistance" based on conflict of interest. Id. at 350 (emphasis added). As the Magistrate Judge ultimately found, Hayat has not satisfied this predicate in his summary judgment motion.

**B. Deficient Performance**

Hayat also seeks summary judgment on his claim that Ms. Mojaddidi made unreasonable errors in her representation of him, thereby depriving him of the effective legal representation he is guaranteed by the Sixth Amendment. Hayat argues his counsel's assistance at trial was ineffective based on: counsel's overall trial strategy, counsel's failure to adequately investigate an alibi defense on his behalf, counsel's failure to adequately investigate whether the terrorist training camp where the government asserts Hamid received terrorist training was operational when he is asserted to have been trained, counsel's failure to locate experts sufficient to counter the government's experts, and counsel's other errors such as failure to adequately question witnesses.

The Supreme Court explains in Strickland that to prevail on this Sixth Amendment claim the following standard must be satisfied:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from

8

> a breakdown in the adversary process that renders the result unreliable.
>
> . . .
>
> [Further, t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, 466 U.S. at 687, 695.

The Supreme Court also explains in Strickland:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id. at 688.

"The first prong of the Strickland test—deficient performance—requires a showing that counsel's performance fell below an objective standard of reasonableness, or was outside the wide range of professionally competent assistance." Miles v. Ryan, 713 F.3d 477, 486 (9th Cir. 2013) (citation omitted). When evaluating counsel's errors under this prong of analysis, the inquiry of whether a movant satisfies this standard "has nothing to do with what the best lawyers would have done" or "even what most good lawyers would have done." White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992); accord Coleman v.

9

Calderon, 150 F.3d 1105, 1113 (9th Cir. 1998), judgment rev'd on other grounds, 525 U.S. 141 (1998). Instead, an attorney's actions are adjudged deficient only if "no competent attorney" would have taken said action. Premo v. Moore, 562 U.S. 115, 124 (2011).

Hayat "bears the burden of proving that [counsel]'s trial strategy was deficient." Matylinsky v. Budge, 577 F.3d 1083, 1091 (9th Cir.2009).

> [He] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy. In determining whether the defendant received effective assistance of counsel, we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight, but rather, will defer to counsel's sound trial strategy. Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment.

Id. (alteration in original) (citations omitted).

With regard to the use of expert witnesses, "Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." Harrington v. Richter, 562 U.S. 86, 111 (2011). "Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach." Id. at 106 (citation omitted). "Even the best criminal defense attorneys would not defend a particular client in the same way." Id. (citation omitted).

Although there are two prongs of analysis of the

Strickland ineffectiveness of counsel standard, the Supreme Court states in Strickland:

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

466 U.S. at 697.

> In determining prejudice,
>
> a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

Id. at 695-96 (emphasis added). Because of this "totality of the evidence" approach, "[t]he length of jury deliberations has been cited as a factor of some importance in [the decision whether prejudice exists]." Gibson v. Clanon, 633 F.2d 851, 855 n.8 (9th Cir. 1980).

11

**1. Handling of Government's Expert Witness Testimony**

Hayat argues that Ms. Mojaddidi should have found expert witnesses on the closure of the terrorist camp in Pakistan where the government asserts he received terrorist training, and on the meaning of an Arabic supplication of which he had possession.

Hayat argues counsel was ineffective in assisting him defend against the government's expert, Khaleel Mohammed, who testified about the meaning and implications of the Arabic note found in Hayat's wallet. The Ninth Circuit summarized the evidence presented at trial on this issue as follows:

> Khaleel Mohammed, an expert in Islamic studies who testified as an expert witness for the government, testified that the note was an Islamic supplication. He provided the following translation of the Arabic phrase: "Oh Allah we place you at their throats and we seek refuge in you from their evils." Mohammed opined that the supplication was both uncommon and "not peaceful," and that the type of person who would carry such a supplication was "[a] person who perceives him or herself as being engaged in war for God against an enemy."
>
> . . .
>
> [Hayat] presented an expert, Anita Weiss, who testified that it is common for Pakistanis to carry a talismanic prayer, known as a ta'wiz, for protection while traveling.

United States v. Hayat, 710 F.3d 875, 884 (9th Cir. 2013) (first alteration in original).

Counsel also countered Mohammed's opinion in her closing argument to the jury arguing, in part:

> [T]he problem with Dr. Mohammed's testimony about that prayer is that he has no idea of the cultural context of carrying such a prayer in Pakistan. He can't possibly

12

>because he just doesn't know about Pakistani culture. Dr. Anita Weiss, however, is an expert on Pakistani culture . . . Mohammed's conclusions were wrong, and that prayers like those are commonly carried by travelers and not warriors.
>
>So Dr. Mohammed's testimony itself was problematic. And the existence of that prayer in Hamid's wallet doesn't prove that he went to a terrorist training camp.

R. Tr. 4323:11-43244:2.

Hayat also argues in his objection that counsel failed to adequately counter the government's evidence on "[t]he core allegation against [him] at trial . . . that he attended a militant camp in the Balakot/Mansehra area of Pakistan where he received training to be employed in attacking institutions in the United States upon his return to this country." Objs. to F & R 35:20-22. Hayat further argues, and cites to deposition testimony of trial counsel:

>While Ms. Mojaddidi thought it was important to investigate the existence of training camps in Pakistan during the relevant period, she abandoned any efforts to do so prior to trial.
>
>Ms. Mojaddidi contacted the embassy or a government official after reading an article in which the Prime Minister of Pakistan said the training camps had been closed. She considered it important to investigate what the Pakistan government said about the camps. She did not pursue that area of investigation further, possibly due to the discussion she had with Mr. Griffin. She did not recall his reasoning, but they "did not take it anywhere." Ms. Mojaddidi did not think she was going to be able to get the kind of information she was hoping for.

Objs. to F & R 36:13-22 (citations omitted).

Hayat contends that had counsel adequately investigated the camp closure issue, she could have found an expert on this

13

issue, such as Ghulam Hasnain Aaser,[1] from whom Hayat's new counsel obtained a declaration after the jury in this case found Hayat guilty of the charges, to counter the government's expert's opinions on the issue. Hayat argues Hasnain avers "such camps were shut down by the Pakistani government prior to October of 2003," Id. at 37:1-4, which is after Hayat is asserted to have attended a camp. Hayat further argues:

> Hasnain affirmed that the camps in the Balakot area in the early 2000s were funded by the Pakastani ISI, and were effectively shuttered by the end of 2002 due to pressure from the United States government. That pressure resulted in the ISI terminating the monthly stipend that the militants were paid, thereby cutting off the funds needed to continue training at the camps. Thereafter the camp locations functioned at most as mere residences. Those interested in continuing militancy tended to migrate to Waziristan, thereby escaping control by the ISI and becoming more amenable to Al Qaeda influence. Hasnain specifically affirms that the JEM camp in the Balakot area at the coordinates testified to by Benn was closed before October of 2003.

Id. at 37:5-13.

> The government disagrees with the weight Hayat places on Hasnain's averments, arguing:

> According to his declaration, [Hasnain] is a Pakistani journalist who conducted unspecified "investigative work on militant groups in Pakistan" from 2001 to 2008. [Hasnain] claims he "cultivated relationships with many of the militants" and visited Pakistan's "largest training camp." Yet he offers no citation to any basis to support his opinions. . . .
>
> First, [Hasnain] states he visited the camp in Muzzafarabad in 1999 but did not declare that he visited the pertinent Balakot

---

[1] Hayat refers to Ghulam Hasnain Aaser as "Hasnain," while the government refers to him as "Aaser."  The Court here uses Hayat's convention.

14

> camp at any time or explain how he knew of its status. He vaguely states that he visited the region of Muzzafarabad every few weeks and observed unspecified "camps" continue to operate as residential facilities. On those facts, it is unclear whether [Hasnain] has any reliable basis to opine regarding the relevant Balakot camp. [Hasnain]'s ambiguous statements do not establish the nature or the non-existence of the Balakot camp at the relevant period, and certainly do not satisfy Hayat's burden to demonstrate beyond dispute that Mojaddidi's decision not to call an expert to rebut Abass's testimony was unreasonable.
>
> Second, [Hasnain] does not indicate when, in his opinion, these camps closed or when he personally observed the camps cease to operate. He merely states that it took <u>at least</u> two years, until September 2003, to suppress training at these camps––suggesting that, based on his recollection, the camps might have persisted for three years, until September 2004, or even longer. Hayat admitted visiting a camp between October 2003 and November 2004. Thus, [Hasnain]'s testimony would not refute the possibility that the camp closed <u>after</u> Hayat attended. As such, [Hasnain]'s purported expert opinion would not have undercut Abbas's testimony and would not have caused the jury to reach a different verdict.
>
> Mojaddidi's strategic decision to counter Abbas'[s] testimony primarily with cross-examination and argument was well within the wide range of competent representation. Accordingly, because the Court correctly found that Hayat failed to demonstrate a lack of material dispute that Mojaddidi was ineffective on this point, it properly ended its analysis.

Resp. to Objs. to F & R 30:13-31:16 (footnotes and citations omitted).

The Magistrate Judge ultimately concluded on the camp existence issue:

> [T]he use of an expert [such as Hasnain] was not specifically necessary for the jury to understand that the government witnesses

> opinion that he was fifty to seventy percent sure that the a[e]r[i]al photograph represented a training camp was not the strongest evidence. Trial counsel's failure to produce such evidence at trial does not necessarily render her performance inadequate such that it provides a basis for granting summary judgment.

F & R 9:15-19.

### 2. Potential Alibi Defense

Hayat also argues that Ms. Mojaddidi failed to adequately investigate an alibi defense on his behalf, and that this failure is prejudicial. Ms. Mojaddidi testified that she and Mr. Griffin decided to pursue the defense strategy of rushing the government to trial as rapidly as possible because they felt that the evidence was insufficient to establish guilt. See Dep. of WM 163:5-13, 170:17-171:10, 223:21-22.

Hayat contends this decision was unreasonable and resulted in counsel failing to investigate all potential alibi witnesses. Concerning additional potential alibi witnesses that Hayat argues should have been investigated, the Magistrate Judge found:

> [Ms. Mojaddidi] acknowledged, as movant argues in his motion, that she did not send an investigator to Pakistan to determine if there were other alibi witnesses to be found. However, movant did not give her reason to believe such people could be found to cover his entire two-year stay in Pakistan. She specifically testified at her deposition that one of the reasons she decided not to pursue an alibi defense was "because the argument could have been that just because he did those things [he told her he did, playing cricket, smoking cigarettes, playing video games, hanging out at the store] does[n't] mean that he could not have attended a camp at some point when he wasn't doing those things." None of these witnesses, at best could have provided a conclusive alibi, and

16

>       certainly such testimony would have
>       conflicted with movant's confession which
>       would have to be first discounted.

F & R 7:21-8:4 (second alteration in original). This proposed finding essentially concludes that the decision not to investigate the referenced potential alibi witnesses is within "the wide latitude counsel must have in making tactical decisions." Harrington, 562 U.S. at 106.

Hayat is correct in his assertion that he gave his counsel enough information for her to have conducted a more thorough investigation of a potential alibi defense on his behalf.  Hayat supports his motion with declarations from the individuals who could have been investigated, including the owner of a store that Hayat frequented and his friends and relatives. Those individuals aver they saw Hamid regularly, doing what he told Ms. Mojaddidi he did in Pakistan, including playing cricket, frequenting the store, and/or taking a few short trips out of the village.  See ECF No. 532, Exs. S to EE.  None of these declarations, however, squarely contradict Hayat's confession.

Hayat's confession was the central piece of evidence proffered against him at trial.  The Ninth Circuit in its direct review of Hayat's conviction discussed the trial evidence concerning this confession as follows:

>       Hayat arrived at the FBI office in
>       Sacramento around 11 a.m. . . . and was
>       interviewed in four waves.  Hayat at first
>       denied having attended a terrorist training
>       camp, but during the second session admitted
>       that he had attended a camp <u>for a few days
>       during an earlier stay in Pakistan in 2000</u>,
>       where he "observed and heard weapons
>       training," and also in 2003, when he himself
>       received "pistol training" at a camp in
>       "Balakot."

17

> The third and fourth sessions, which were videotaped, took place during the afternoon and evening of June 4, 2005, and the early morning hours of June 5. During the third interview, Hayat confirmed that he had attended a camp to train for jihad and said he was trained to use a pistol and rifle and taught how to kill American troops.

Hayat, 710 F.3d at 882-83 (emphasis added).

### 3. Prejudice

"To determine whether counsel's errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." Cannedy v. Adams, 706 F.3d 1148, 1163 (9th Cir. 2013).

The evidence Hayat's new counsel provides in support of Hayat's motion does not alter the "evidentiary picture" involved with his conviction, which includes Hayat confession that he trained at the Balakot camp for "a few days." See Strickland, 466 U.S. at 696. Hasnain's proffered testimony is not clear on the closure status of the Balakot camp at the time Hayat confessed he trained there. Further, the individuals declaring they spent time with Hayat while he was in Pakistan fail to provide specifics such as actual dates on when they saw Hayat, and personal knowledge about Hayat's activities when they were not with him. The potential alibi witnesses' testimony is insufficient to satisfy Hayat's "burden of showing that the decision [the factfinder] reached would reasonably likely have been different absent the [counsel's failure to adequately investigate alibi witnesses] error[]." Strickland, 466 U.S. at 696.

18

Nor has Hayat shown in his motion that the asserted errors before and during trial—including counsel's failure to object to testimony regarding existence of the terrorist camp, failure to obtain a security clearance, failure to retain and call a false confessions expert, failure to properly challenge testimony regarding the Arabic writing found in Hayat's wallet, and failure to adequately cross-examine the government's informant—constitute prejudice under Strickland.

Prejudice is found if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome" of a proceeding. Id. "Thus, a petitioner need not prove 'counsel's actions more likely than not altered the outcome,' but rather he must demonstrate that '[t]he likelihood of a different result [is] substantial, not just conceivable.'" Clark v. Arnold, 769 F.3d 711, 725 (9th Cir. 2014) (alterations in original) (quoting Harrington, 562 U.S. 86, 112 (2011)). "In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different." Walker v. Martel, 709 F.3d 925, 942 (9th Cir. 2013) (citation and quotes omitted).

Here, the summary judgment record does not justify finding prejudice under Strickland.

19

Accordingly, IT IS HEREBY ORDERED that:

1. The findings and recommendations filed March 10, 2016, are adopted in part and rejected in part; and

2. Movant's motion for summary judgment (Doc. 548 in the criminal docket) is denied.

Dated: November 10, 2016

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge