# EXHIBIT 1

DENNIS P. RIORDAN (SBN 69320)
dennis@riordan-horgan.com
DONALD M. HORGAN (SBN 121547)
don@riordan-horgan.com
LAYLI SHIRANI (SBN 257022)
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile: (415) 552-2703

Attorneys for Defendant
HAMID HAYAT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR S-05-0240 GEB |
| Plaintiff, | **DECLARATION OF JAMES WEDICK IN SUPPORT OF DEFENDANT'S MOTION FOR RELIEF UNDER 28 U.S.C. §2255** |
| vs. | |
| HAMID HAYAT, | Date: TBA |
| Defendant. | Time: TBA |
| | Dept.: Before the Hon. *** |

I, James Wedick, hereby declare under penalty of perjury as follows:

1. I am now an investigator in private practice.

2. Prior to entering private practice in 2004, I was employed by the Federal Bureau of Investigation [FBI] for more than 34 years, having been a Special Agent and Supervising Special Agent for almost 31 years.

3. While in the FBI, I was a recipient of the Director's Award for conducting a very successful investigation regarding the California State Legislature often referred to by the news media as "shrimpscam," with my accomplishments cited in the U.S. Congressional Record. Retiring from the FBI on April 30, 2004, U.S. Attorney General John Aschcroft said my investigations were in the "highest traditions" of the Justice Department – calling my cases "models" for other agents to "emulate." As the head of the FBI's corruption squad in Sacramento, I handled some of this judicial district's most complicated and sensitive

Declaration of James Wedick in Support of
Defendant's Motion Under 28 U.S.C. §2255       1

Case 2:05-cr-00240-GEB-DB   Document 637-1   Filed 09/18/17   Page 3 of 5

investigations – many relying on Confidential Informants, Cooperating Witnesses, and FBI Undercover Agents to collect evidence, analyze intelligence, and conduct electronics surveillance.

4. Following the attacks of September 11, 2001, in accordance with my managerial duties, I assisted the executive management team supervising the Sacramento Command Post and attended daily teleconference briefings held by FBI Headquarters concerning the ongoing 9/11 investigation. While in the Command Post, my duties included supervising personnel assigned to handle terrorism related investigations, assigning terrorist-related leads generated by either members of the general public and/or FBI Headquarters to Sacramento area investigators, monitoring investigations initiated at the Command Post level, reporting to FBI Headquarters regarding the status of ongoing investigations, and coordinating personnel and investigations at Sacramento's International Airport.

5. Additionally, in the absence of the Special Agent in Charge (SAC) and/or the Assistant Special Agent in Charge (ASAC), periodically I acted as SAC/ASAC in Sacramento and occasionally my duties included supervising and making decisions on terrorist-related investigations.

6. Shortly after the arrest of Hamid and Umer Hayat in June of 2005, I was asked by Johnny Griffin, who had been retained as counsel for Umer Hayat to assist him with defending his client as a defense investigator. Previously, I had worked with Mr. Griffin when he was a member of the United States Attorney's Office and before that when he clerked for the FBI while attending law school – so we were also friends.

7. Agreeing to work with Mr. Griffin, one of the first tasks he asked me to perform was drafting a letter requesting discovery information from dozens of government agencies, including the FBI, the CIA, the Defense Department, and the National Security Agency [NSA]. I believe the letter was served on the government in much the same form as I drafted it.

8. In my opinion from the time defendants' Hamid and Umer Hayat were arrested, until the end of their trial, Mr. Griffin appeared to serve as chief counsel for both defendants. As an investigator working for Mr. Griffin on the Hayat case, Mr. Griffin was responsible for assigning

tasks to perform. On several occasions I was telephonically contacted by Wazhma Mojaddidi requesting assistance, but on each occasion she usually began the conversation saying Mr. Griffin said it was okay for me to do whatever she wanted done. Throughout the case, however, the majority of my contacts concerning the case were with Mr. Griffin and not Ms. Mojaddidi. The limited funds paid to me for work were disbursed by Mr. Griffin and not Ms. Mojaddidi.

9. Agreeing to assist Mr. Griffin concerning the case in 2005, I assumed some investigation might be required in Pakistan before the Hayats' trial commenced. I think the initial trial date for the Hayats was in late August 2005. At some point, I learned Mr. Griffin decided the best strategy for both defendants was to press the government for an early trial date, since he was convinced prosecutors were not prepared to move forward with a trial. I don't think I was asked to conduct any in-depth investigation concerning the case, but did do some work related to the FBI's Confidential Informant [CI] known as Nassem Khan.

10. Following the district court's order granting a continuance of the trial date because of the complexity, I was "not" assigned any significant investigative tasks by Mr. Griffin in the fall of 2005. Because I was convinced Hamid Hayat did not attend a jihadi camp in Pakistan, I was prepared to assist Mr. Griffin and Ms. Mojaddidi with conducting an investigation in Pakistan either in person and/or via telephone in an effort to locate witnesses who might provide exculpatory information regarding the Hayats, but no request came. Also neither Mr. Griffin and/or Ms. Mojaddidi asked me to conduct any additional investigation in the United States looking for individuals who might have exculpatory information concerning Hamid Hayat's whereabouts and/or his activities during his stay in Pakistan between 2003 and 2005.

11. Also at no time did Mr. Griffin and/or Ms. Mojaddidi ask me to locate witnesses in Pakistan who might testify to the presence or absence of militant training camps in or around Balakot, Pakistan or anywhere else in Pakistan or Afghanistan before or during the time period that Hamid had allegedly attended a jihadi camp.

12. In approximately January of 2006, Mr. Griffin told me the Hayats' case was scheduled to go to trial shortly and requested I attend court proceedings each day and join him and Ms. Mojaddidi at counsel table and I agreed to do so.

**Declaration of James Wedick in Support of**
**Defendant's Motion Under 28 U.S.C. §2255**          3

13. While I was paid approximately $4,000 for my early work on the case in approximately June through October 2005, afterwards I only served in a pro bono capacity refusing compensation, since I was convinced the Hayats were not guilty of the crimes for which they were charged.

14. Attending trial, both in court and during defense conferences between Ms. Mojaddidi and Mr. Griffin, I observed while both counsel reached a consensus on tactical decisions made during the day, the ultimate power to make a decision concerning either Hamid Hayat or Umer Hayat always resided with Mr. Griffin. For example, while the Hayats were tried before separate juries, the decisions concerning which prospective jurors should be challenged and/or used were made by Mr. Griffin, as Ms. Mojaddidi had little or no criminal trial experience.

15. Prior to the Hayats' trial, I was told Mark Reichel, an experienced practitioner, had been retained to assist Ms. Mojaddidi representing Hamid Hayat. At the beginning of the trial, while I observed Mr. Reichel in the audience on one maybe two days, he did not attend the trial thereafter and I was provided with no explanation concerning the reason for his later absence.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

Executed this 17th day of April 4/17/2014 at San Francisco, California.

_____
JAMES WEDICK

Declaration of James Wedick in Support of
Defendant's Motion Under 28 U.S.C. §2255        4