1              IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF CALIFORNIA
2

    United States of America,
3        Plaintiff/Respondent,        Sacramento, California
                                       No. 2:05-cr-00240
4    vs.                              Thu., Feb. 1, 2018
                                       9:03 a.m.
5    Hamid Hayat,
         Defendant/Petitioner.
6    _____/

7              TRANSCRIPT OF EVIDENTIARY HEARING
                          VOLUME 4
8        BEFORE THE HONORABLE DEBORAH BARNES, MAGISTRATE JUDGE
                         ---oOo---
9

    APPEARANCES:
10

    For the Plaintiff/Respondent:   United States Attorney
11                                   501 I Street, Suite 10-100
                                     Sacramento, California  95814
12                                   By:  Andre M. Espinosa
                                     Roger Yang
13                                   Assistants U.S. Attorney

14   For the Defendant/Petitioner:  Riordan and Horgan
                                     523 Octavia Street
15                                   San Francisco, CA  94102
                                     By:  Dennis P. Riordan
16                                   Donald Horgan
                                     Layli Shirani
17                                   Attorneys at Law

18                                   Boersch Shapiro, LLP
                                     1611 Telegraph Avenue
19                                   Suite 806
                                     Oakland, CA  94612
20                                   By:  Martha Boersch
                                     Attorneys at Law
21
    Official Court Reporter:        Kimberly M. Bennett,
22                                   CSR, RPR, RMR, CRR
                                     501 I Street
23                                   Sacramento, CA 95814

24   Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription
25

620

1                                INDEX

2
     PETITIONER WITNESSES:                                    PAGE:
3
     BERNARD HAYKEL
4    DIRECT EXAMINATION BY MR. RIORDAN................... 626
     CROSS-EXAMINATION BY MR. YANG....................... 645
5    REDIRECT EXAMINATION BY MR. RIORDAN................. 674

6    WAZHMA MOJADDIDI
     DIRECT EXAMINATION BY MS. BOERSCH................... 678
7    CROSS-EXAMINATION BY MR. YANG....................... 773
     REDIRECT EXAMINATION BY MS. BOERSCH................. 780
8    RECROSS EXAMINATION BY MR. YANG..................... 783

9    DENNIS RIORDAN
     DIRECT EXAMINATION BY MR. HORGAN.................... 786
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

```
 1          (Call to order of the court, 9:03 a.m.)

 2              THE CLERK:  Calling Criminal Case 05-240 GEB/DB;

 3   United States versus Hamid Hayat.

 4       Your Honor, this matter is on calendar for evidentiary

 5   hearing.

 6              THE COURT:  Good morning, everyone.

 7       We seem to be missing -- hold on just a moment.

 8       All right.  Could counsel please state your appearances for

 9   the record.

10              MR. ESPINOSA:  Good morning, Your Honor.  Andre

11   Espinosa and Roger Yang for the United States.

12              THE COURT:  Good morning.

13              MR. RIORDAN:  Good morning, Your Honor.  Dennis

14   Riordan, Donald Horgan, Martha Boersch, Layli Shirani for

15   petitioner Hayat.

16              THE COURT:  Good morning, all.  I hope you all had a

17   good evening.

18       A couple of housekeeping issues before we get started.  I

19   notice up here on the bench is -- I believe it's an addition to

20   Petitioner's Exhibit U; is that correct, Mr. Riordan?  Or who

21   is handling this for the petitioner?

22              MS. BOERSCH:  Yes, Your Honor, that's correct.

23              THE COURT:  Could you just state your name for the

24   court reporter before you speak since we have so many folks

25   here.
```

1          MS. BOERSCH:  Sorry.  Martha Boersch for petitioner

2     Hayat.  Thank you.

3          THE COURT:  So, this is an addition to --

4          MS. BOERSCH:  Yes.  That was the Urdu original for

5     Muhammad Daud's declaration, and we have provided a copy to the

6     government and to the Court.

7          THE COURT:  All right.  Thank you.

8       And then the next housekeeping issue is dependent,

9     whether we deal with it now or later in the proceedings.

10      Mr. Riordan, who is your first witness this morning?

11         MR. RIORDAN:  Professor Bernard Haykel, Your Honor.

12         THE COURT:  So, we can either address the examination

13    of Ms. Mojaddidi now or before she hits the stand.  Do you have

14    a preference?

15         MR. RIORDAN:  Whatever the Court prefers, Your Honor.

16    Ms. Boersch will handle any discussion of Ms. Mojaddidi.

17         THE COURT:  Then why don't we -- you know what, let's

18    go ahead and get it taken care of now, make things go a little

19    bit smoother later on.

20      Mr. Espinosa, do you have any difficulty with that?

21         MR. ESPINOSA:  Not at all, Your Honor.  We're

22    prepared to submit on our statements yesterday.

23         THE COURT:  I only had one additional question for

24    the government.

25      Can you identify any prejudice should Ms. Mojaddidi be

1    deemed an adverse witness and the petitioners are allowed to

2    ask leading questions on direct?

3              MR. ESPINOSA:  Only that it gives the petitioner a

4    shortcut to answers that she might not otherwise give

5    intuitively based on open-ended questions.  That prejudice is,

6    obviously, quite light.  We defer to the Court's judgment.

7              THE COURT:  You can't identify any other prejudice?

8              MR. ESPINOSA:  No.

9              THE COURT:  I'm going to go ahead and grant the

10   request to allow the petitioner to cross-examine Ms. Mojaddidi

11   on direct based on her status as an adverse witness.  It's

12   based on factors that have been identified in the record in

13   terms of -- one of the primary factors is the expediency of the

14   process here in court.  Also, it is certainly not based on any

15   preconception the Court has as to whether or not Ms. Mojaddidi

16   would be evasive or intentionally not recall answers, but

17   basically primarily on expediency and on the unique position

18   that Ms. Mojaddidi has as a potential of giving testimony that

19   would be adverse to herself.

20       So, in an abundance of caution, I'm going to allow that.

21   And I know the petitioner will -- counsel will treat all

22   witnesses with respect and courtesy.

23       With that said, I'm going to grant that request.

24       Let's go ahead, Mr. Riordan, and call your next witness.

25              MR. RIORDAN:  One very brief other housekeeping

1    matter.

2        Subsequent to the testimony of John Cline, our expert

3    witness on CIPA, he called us and stated that he had testified

4    on the stand that when asked about payment for his services

5    that he --

6            THE COURT:  Let me stop you.  In this case?

7            MR. RIORDAN:  Yes.  While he was testifying before

8    this Court, he was asked about payment for his services, and he

9    said that he had billed but not been paid, which refers to his

10   status since he was appointed by the Court as an expert.

11       He then recalled that when he filed a declaration, back in

12   2014, he had been paid a thousand dollars as an expert witness.

13   We discussed this with the government.  Mr. Cline just wanted

14   to make sure that that was placed on the record because his

15   testimony might have been ambiguous or misleading if it had not

16   been placed on the record.

17           THE COURT:  Thank you.  Mr. Espinosa, any additional

18   thoughts on that matter?

19           MR. YANG:  This is Roger Yang.  I handled Mr. Cline.

20   Sorry.

21           THE COURT:  Sorry.

22           MR. YANG:  If we could just do a brief stipulation, I

23   think that would handle this completely.

24           THE COURT:  Why don't you, just to make sure the

25   record is clear, just prepare a brief written stipulation for

1   the Court.  That would be preferable, that way we don't -- I

2   don't see a need on this matter, unless someone -- Mr. Yang,

3   you have a strong objection, to pull Mr. Cline back --

4             MR. YANG:  No.

5             THE COURT:  -- just for this matter.

6             MR. YANG:  No, Your Honor.  I think a brief

7   stipulation should handle it.

8             THE COURT:  I'm going to ask the parties to prepare

9   one.

10            MR. RIORDAN:  Thank you, Your Honor.

11            THE COURT:  Anything else before we get started with

12  today's business?

13            MR. RIORDAN:  Your Honor, our intention is to call,

14  as our next witness, Bernard Haykel.

15            MR. ESPINOSA:  Nothing from the government.

16            THE COURT:  Pardon me?

17            MR. ESPINOSA:  Nothing from the government.

18            THE COURT:  Thank you, Mr. Espinosa.

19       Is Mr. Haykel in the courtroom?

20       Mr. Haykel, if you could come up here to the witness stand

21  so you can be sworn in, please.

22            THE CLERK:  Please raise your right hand.

23       (The Witness, BERNARD HAYKEL, is sworn.)

24            THE WITNESS:  I do.

25            THE CLERK:  You may be seated.

1          Please say and spell your full name for the record.

2               THE WITNESS:  My name is Bernard Haykel.  That's

3     B-E-R-N-A-R-D, last name, H-A-Y-K-E-L.

4                           DIRECT EXAMINATION

5     BY MR. RIORDAN:

6     Q.  I'll begin with calling you Mr. Haykel, but what is your

7     current occupation and position?

8     A.  I'm a professor of Near Eastern studies at Princeton

9     University.

10    Q.  I'll refer to you as Professor Haykel from this point

11    forward.

12         And do you hold any other titles at Princeton University?

13    A.  Yes.  I'm the director of the Institute for the

14    Transregional Study of the Contemporary Middle East, Central

15    Asia and North Africa, as well as the program -- the director

16    of the program Near Eastern Studies.

17    Q.  And prior to -- when did you start at Princeton University?

18    A.  In July of 2007.

19    Q.  And prior to that, did you hold an academic position?

20    A.  I did.  I held an academic position at New York University

21    from January 1998 'til June 2007.

22    Q.  What were your areas of study or teaching at New York

23    University?

24    A.  I worked on the history of the Middle East, Islamic law,

25    Islamic political movements, with a specific interest in

1    Arabia; that is, the history and politics of the countries of

2    Yemen, Saudi Arabia, and the other Gulf Cooperation Council

3    countries.

4    Q.  Do you speak any languages other than English?

5    A.  Yes.  I'm a native speaker of both Arabic and French.  And

6    I have working knowledge of several other languages, German,

7    Urdu, Persian.

8    Q.  And can you -- in addition to being a native speaker of

9    Arabic, have you been educated in it, taken courses of it,

10   taught it?

11   A.  Yes.  I -- I mean, it is the language that I use for my

12   work.  Given that I work on the history and politics of the

13   Middle East, all the primary sources I use are in Arabic.  And

14   I have been educated in it at university at all levels, from

15   undergraduate to the PhD level.

16   Q.  And could you tell us what your academic -- what your

17   educational background in terms of academics is?

18   A.  So, I have a bachelor's degree from Georgetown University

19   in international politics, where I did work, also, on the

20   Middle East.  I then received three degrees from the University

21   of Oxford in the United Kingdom, including a master's in Middle

22   Eastern studies and a DPhil, or PhD, from Oxford in Islamic

23   studies.

24   Q.  And have you received fellowships to pursue your studies?

25   A.  Yes.  I was a Fulbright fellow where I did -- lived and did

1     research in Yemen under the Fulbright fellowship.

2         I was a prize fellow at Magdalen College, Oxford.

3     M-A-G-D-A-L-E-N, although pronounced Magdalen.

4         Then I received additional fellowships, including the

5     Carnegie Corporation fellowship, the Guggenheim fellowship, and

6     several others.

7     Q.  Have you received other honors and awards?

8     A.  I mean, the fellowships are honors and awards.

9     Q.  In addition to those.

10    A.  Yeah.  I've had several others, including at Princeton

11    University, and a teaching award, as well, from NYU.

12    Q.  What was the subject of your doctoral dissertation?

13    A.  So, my doctoral dissertation was on an Islamic legal and

14    theological reformer from Yemen who is a -- the founder of a

15    major reformist movement called Salafism.  That's

16    S-A-L-A-F-I-S-M.  And it was an intellectual political

17    biography of this man and the state in which he served.

18    Q.  And you touched on this, but what would you say are your

19    areas of focus in your academic and professional research?

20    A.  So, Islamic legal thought, Islamic political thought, the

21    politics of the countries of Saudi Arabia and Yemen, Islamic

22    political movements, including al-Qaeda, the Islamic state, and

23    several other Islamic fundamentalist movements.

24    Q.  Have you published in your fields?

25    A.  Yes, I have.

1    Q.   Do you have any broad estimate of the number of academic

2    articles or -- of articles, generally, on these subjects?

3    A.   I mean, tens of articles.   Three books.

4    Q.   Have you had any contact with the State Department in terms

5    of your fields of expertise?

6    A.   Yes.

7    Q.   What is that?

8    A.   So, I've been approached repeatedly since 2001, since the

9    tragic events of 9/11, by various agents of the U.S.

10   Government, including the State Department, to consult and

11   advise on Islamic political movements, on the politics of the

12   Middle East, including Saudi Arabia and Yemen.

13   Q.   Have you consulted with the Central Intelligence Agency?

14   A.   I have.

15   Q.   Have you lectured at the Central Intelligence Agency?

16   A.   Yes, I have.   At Langley, yes.

17   Q.   Have you lectured at various law schools?

18   A.   Yes, I have.

19   Q.   Could you just give us some instances in which you did

20   that, what the subjects of your lectures were?

21   A.   So, I was the inaugural lecturer for a new program at Yale

22   Law School on Islamic law and civilization, where I gave a

23   lecture -- I think the title was, The Failure of Political

24   Islam.   So, it was about how Islamic political thought has

25   failed.

1    Q.   Have you lectured on al-Qaeda?

2    A.   I have.

3    Q.   And do you recall where that was, or what the subject of

4    the lecture was?

5    A.   I've lectured on al-Qaeda dozens of times, frankly.  I

6    don't recall, you know, specific instances, but many, many

7    times, in many different settings, academic as well as

8    nonacademic.

9    Q.   Have you been called upon to testify before legislative

10   bodies?

11   A.   Yes.  I testified before the Senate twice, different

12   committees of the Senate, once on the Islamic state and once on

13   Iraq and the constitution of Iraq.

14   Q.   Have you advised, in any capacity, the government of

15   Brittain?

16   A.   Yes, I have.

17   Q.   And what function did you play in terms of consultant?

18   A.   So, after 9/11, the Office of the Prime Minister of Great

19   Brittain contacted me to explain al-Qaeda, and why the attacks

20   happened.

21        And I have since continued to have a relationship with

22   British intelligence on questions of terror and Islamic

23   fundamentalism.

24             MR. RIORDAN:  Your Honor, I'm going to proffer

25   Dr. Haykel on a number of topics, one being the Arabic

1    language, and the second being Islamic culture, and the third

2    being Islamic political movements.

3                THE COURT:  Who is handling this witness for the

4    government?

5                MR. YANG:  I am, Your Honor.

6                THE COURT:  Mr. Yang, do you have any voir dire for

7    this witness?

8                MR. YANG:  No, Your Honor.

9                THE COURT:  And have you already -- was that your

10   proffer, or your motion, to have him deemed --

11               MR. RIORDAN:  Yes.  Based on his discussion of his

12   qualifications, to have him deemed an expert in those fields.

13               THE COURT:  Mr. Yang, any objection to that?

14               MR. YANG:  No, Your Honor.

15               THE COURT:  All right.  The Court will then deem

16   Professor Haykel as an expert witness in those areas identified

17   by Mr. Riordan.

18               MR. RIORDAN:  Thank you, Your Honor.

19   Q.  BY MR. RIORDAN:  Professor Haykel, when did you first learn

20   of the Hamid Hayat prosecution?

21   A.  I believe it was when a journalist called Amy Waldman

22   contacted me about an article that she was writing for, I

23   think, The Atlantic magazine, maybe, on Islam and US courts,

24   and how Islam was discussed in US court cases.

25   Q.  And did you eventually meet with Ms. Waldman?

1   A.   Yes.

2   Q.   And did you -- was there some specific subject related to

3   the Hayat case that she was interested in talking to you about?

4   A.   My -- this is from, I believe, 2006.  My recollection was

5   that she mentioned a supplication that had been -- that had

6   been adduced as evidence in that case, and she asked me what I

7   thought of the supplication.

8   Q.   And, to your knowledge, was there eventually an article

9   published about this subject, which included comments from you?

10   A.   Yes.

11   Q.   I'd ask to call up ZZ.

12        Professor Haykel, it will appear on your screen.  Exhibit

13   ZZ is also in the book of exhibits in front of you.

14   A.   Okay.  Yes.

15   Q.   Does that appear to be the cover of the magazine that

16   contained your article?

17   A.   I don't remember the cover.  I remember the article.

18   Q.   Go a page in.

19   A.   Yes.

20   Q.   Does this appear to be the article that you provided

21   commentary for?

22   A.   Yes.

23   Q.   And at the time that you -- and does this article contain

24   comments from you about a supplication that was -- to your

25   knowledge, was part of the Hamid Hayat prosecution?

1   A.   Yes.

2   Q.   And at the time that you provided those comments, did you

3   have any expectation that you might play any role in the Hamid

4   Hayat case?

5   A.   No.

6   Q.   What was your purpose in speaking with Ms. Waldman?

7   A.   Well, I speak to the -- to members of the press, and to the

8   media, and to other people to educate them.  I see my role as a

9   professor to be an educator, especially for the public, and

10  especially after the events of 9/11, when I think, you know,

11  people needed to know more about the nature of both Islam as a

12  religion, but also Islamic fundamentalists and political

13  movements, especially those that are terror movements since

14  we'd been attacked.

15  Q.   Subsequent to the publication of that article, were you

16  contacted by a lawyer who was involved in the Hamid Hayat

17  prosecution?

18  A.   Yes.

19  Q.   Do you remember who that was?

20  A.   I believe her name was Wazhma Mojaddidi, I think.

21  Q.   And do you remember, roughly, when she contacted you?

22  A.   It was several months later in 2006, after the appearance

23  of the article.

24  Q.   And what was her purpose, or expressed purpose, in getting

25  in touch with you?

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1    A.   She, again, asked me about the supplication, and wondered

2    whether I would be willing to write about it -- an affidavit

3    about it, which I did do.

4    Q.   Can we call up Exhibit B as in boy, B as in boy, B as in

5    boy.

6         Does this appear to be the affidavit that you provided?

7    A.   Yes.

8    Q.   And between her call to you and the drafting of this

9    affidavit, did you review any materials?

10   A.   Yes.

11   Q.   And what were those materials?

12   A.   So, I -- I saw the supplication in Arabic.  I did some

13   research on the supplication and its use amongst Muslims.  And

14   then I believe I was shown the testimony of one of the expert

15   witnesses in the case.

16   Q.   Do you happen to remember the name of that --

17   A.   Professor from somewhere here in California.

18   Q.   Okay.

19   A.   Mohammed, I think?

20   Q.   That's correct.

21        Now, when you read this -- well, you were able to read

22   this -- strike that.

23        What language was the supplication in?

24   A.   In Arabic.

25   Q.   And this was a -- you were given a written document with

1    Arabic on the document?

2    A.   Yes, the image of the supplication.

3    Q.   Were you able to translate that into English?

4    A.   Yes.

5    Q.   And was the supplication that you examined familiar to you

6    at the time that you first saw it?

7    A.   Yes.  I had heard it used, but I also needed to do

8    additional research in order to fully acquaint myself with all

9    its uses.

10   Q.   And is the supplication, essentially, a prayer?

11   A.   Yes.  It's an invocation.  An invocation, a prayer, to God,

12   yes.

13   Q.   Is there an Arabic word that refers to these kinds of

14   supplications?

15   A.   Yeah.  It's -- in Arabic it's called a du'a.  I'll spell

16   that for you; D-U-A, A, if you like.  And it's -- it's an

17   invocation or supplication that -- among many other hundreds of

18   thousands of supplications that Muslims have.

19   Q.   And what is the -- based on your knowledge and research,

20   what is the source of this particular prayer or supplication?

21   A.   It's a tradition, or what is called, in Arabic, a Hadith --

22   I'll spell that, H-A-D-I-T-H.  It's a tradition of the Prophet

23   Muhammad.  He is meant to have said it and used it on

24   particular occasions.

25   Q.   And --

1            THE COURT:  Mr. Riordan, before you ask your next

2    question, I just want to ensure -- and if you've already

3    covered this, great -- but I just want to ensure we're

4    talking -- that we identify which prayer/supplication that

5    we're questioning the witness about.

6        Is this -- does the Court assume correctly this is the

7    supplication that's in the Government's 22, that was produced

8    to the imam during yesterday's hearing?

9            MR. RIORDAN:  Yes, Your Honor.

10           THE COURT:  All right.

11           MR. RIORDAN:  And I'll elaborate on that.

12           THE COURT:  You'll be getting there?

13           MR. RIORDAN:  Yes.

14           THE COURT:  Thank you.

15   Q.  BY MR. RIORDAN:  And where is -- is this supplication

16   located in books of any kind?

17   A.  Yes.  It's found in two of the principal collections of

18   prophetic traditions.

19       The first is a book called the Sunan, I'll spell that,

20   S-U-N-A-N, by a name called Abu Dawud, A-B-U, separate word,

21   D-A-W-U-D, which is a major collection of prophetic traditions,

22   one of the six canonical collections of the Sunni tradition.

23   Sunni is S-U-N-N-I.

24       And the other place where it's located is another

25   collection of prophetic traditions called the Musnad,

1   M-U-S-N-A-D, of a man called Ibn Hanbal, I-B-N H-A-N-B-A-L.

2      And then it is also found in many other smaller

3   abridgements or collections of fewer traditions of the Prophet,

4   one of which is a book by a medieval scholar called Nawawi,

5   N-A-W-A-W-I.  And so it's found in many, many books in the

6   Islamic tradition.

7   Q.  Let me just back up for a minute.

8      Is it your testimony that Ms. Mojaddidi provided you with a

9   copy of this supplication?

10  A.  Yes.

11  Q.  That was in Arabic?

12  A.  Correct.

13  Q.  And you reviewed the testimony of Dr. Mohammed, correct?

14  A.  Correct.

15  Q.  And you reviewed his testimony about a supplication?

16  A.  That is correct.

17  Q.  And was the supplication that Dr. Mohammed discussed in his

18  testimony the same supplication that Ms. Mojaddidi provided you

19  with?

20  A.  Yes.

21  Q.  Can you opine on -- well, let me put it this way:  In your

22  knowledge in your fields, are there rules that govern the

23  translation of the Koran or some sayings attributed to the

24  Prophet Muhammad?

25  A.  I don't believe there are fixed rules for translation.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1    Basically, you can translate, literally, what the words say,

2    but because the expressions often contain idiomatic language

3    that is specific to, let's say, Arabic, a literal translation

4    doesn't convey the meaning, or cannot be fully understood by a

5    speaker of another language.  So, a literal translation is

6    often not appropriate, although accurate.

7        I often prefer to start with a literal translation, and

8    then turn that into an idiomatically correct translation so

9    that an English speaker, or French speaker, for instance, can

10   understand it.

11   Q.  And what would be the literal translation of the

12   supplication that you reviewed?

13   A.  So, the literal translation would be -- can I see the

14   supplication on the screen?  Even the Arabic, and then I

15   will --

16           MR. RIORDAN:  Thank you, Mr. Yang.

17   Q.  BY MR. RIORDAN:  Professor Haykel, I'm providing you with

18   what's been marked as -- Government's Exhibit 22?

19           MR. YANG:  That's correct.

20   Q.  BY MR. RIORDAN:  22.

21           THE WITNESS:  So, it's -- this supplication literally

22   translated would be:  Oh, God, we ask you to be at the throats

23   -- and here it's not mentioned, our enemies, that's the

24   implication.  And we seek your help and assistance from their

25   evils or their misdeeds.

1    Q.   BY MR. RIORDAN:  And how would you translate this

2    supplication into idiomatic English?

3    A.   Idiomatic translation would be:  Oh, God, we ask, or

4    beseech, you to be -- to confront our enemies.  And we ask you

5    for help from their evil deeds, or from their -- yeah, from

6    their evil deeds.

7    Q.   In your field and research, what is -- well, are you

8    familiar with the uses of this supplication in the Islamic

9    religious and community?

10   A.   Yes.

11   Q.   How would you describe those?

12   A.   So, to fully understand the supplication, one has to see

13   when and how the Prophet himself used it.

14        So, the tradition tells us that he used it at a time when

15   he was about to begin travel.  He was traveling from one place

16   to another.  And travel at the time in Arabia, which is where

17   he lived, was fraught with danger because you had highway

18   robbers, and so he would -- he would say this supplication

19   before embarking on travel.

20        And because the Prophet, in Islam, is considered the model

21   that all Muslims should follow, Muslims are therefore

22   encouraged to say the same thing whenever they are about to

23   embark on something that is fraught with difficulty, or if they

24   find themselves in a situation where they might be -- where

25   they might face enemies or they might face difficulties.  And

1    the enemies and the difficulties could come from non-Muslims,

2    but they could also be fellow Muslims who are threatening them.

3    So the invocation is not religious specific as far as who the

4    enemy is concerned.

5    Q.  You mentioned that the Prophet would, in the tradition, say

6    this before he traveled.  What time period are we talking about

7    when we're talking about the Prophet?

8    A.  So, the Prophet lived -- was born in the year 570, five

9    seven zero, of the common era, or A.D. 570, and he died in the

10   year 632 of the common era.  So we're talking about in the

11   seventh century of the common era.

12   Q.  So, when you talk about the dangers of travel, you're

13   talking about the dangers in that time period?

14   A.  Correct.

15   Q.  In your opinion, is this supplication exclusive to any

16   particular group or movement within the Islamic culture and

17   religion?

18   A.  No.  All Muslims use it.

19   Q.  On what do you base that opinion?

20   A.  Well, if you -- if you do a search, for instance, of how

21   and when it's used, if you do a search on Google, for instance,

22   just for the first three words in that supplication, you get

23   over 84,000 hits.

24        And then if you look at who and how it's being used, and in

25   what context, and if you look at the -- the explanations by

1    scholars for when it is to be used, it's clear that it is not

2    confined to any one group, that all Muslims use it.

3    Q.  And you mentioned a search on Google using three words.

4    Have you ever done such a search?

5    A.  Yes.

6    Q.  When is the last time you did a search like that?

7    A.  This morning.

8    Q.  And among the entries or sites that will come up if you do

9    such a search, does that include YouTube?

10   A.  Yes.  If you do a search for the three words and specify

11   videos on Google, then you will get about 4,000 hits on YouTube

12   that -- in which you see videos of scholars and Muslims using

13   this term -- using this supplication.

14   Q.  And are those scholars who lecture on YouTube identified

15   with any particular jihadist movement?

16   A.  Not necessarily.  I mean, most of the ones that I saw were

17   not jihadists.  That said, I mean, jihadists can also use this

18   supplication.  It is not specific to any one group of Muslims.

19   All Muslims will use this supplication if they are afraid of an

20   enemy.

21   Q.  Would you describe this supplication as a warrior prayer?

22   A.  No, not necessarily.  No.

23   Q.  In the Islamic tradition, are there invocations which are

24   defensive in nature as opposed to offensive in nature?

25   A.  Yes.

1   Q.  Why don't you explain what you mean by that.

2   A.  So, if Muslims are engaged in war, in an offensive war,

3   they will use invocations that call on God to help them in

4   their war to defeat the enemy.  So you will see invocations --

5   and these, by the way, are used by jihadists, but not just

6   jihadists.  Invocations such as, Oh, God, make our aim true,

7   defeat our enemies, destroy our enemies, divide our enemies,

8   those are offensive invocations, if you like, that Muslims will

9   use, and certainly jihadists use all the time.

10      This one is not an offensive invocation.  It's an

11  invocation that Muslims will use if they're afraid of -- of

12  someone who might harm them.  And typically, as I said, it's to

13  do with travel.  It's associated with travel in the lifetime of

14  the Prophet, but it can be used against fellow Muslims.

15      So, an offensive invocation would never be used against

16  other Muslims, because you're not supposed to fight Muslims,

17  whereas this can be used against Muslims, or to ward off the

18  harm that Muslims can inflict on you, but also the harm

19  non-Muslims can inflict on you.

20  Q.  Is this supplication one that might be said during daily

21  prayers?

22  A.  Yes.  Absolutely, it can be used.  It can be used also, and

23  I have heard it being used, in the Friday congregational

24  prayer, which is the equivalent to the Catholic Mass.

25      So, Muslims are supposed to come together for the midday

1   prayer on Fridays, and religious leaders who lead the prayer at

2   one point have to say a number of invocations, one of which

3   is -- is often this one.

4   Q.  Dr. Haykel, based on your research, knowledge, expertise,

5   do you have an estimate of how many Muslims there are in the

6   world?

7   A.  We don't have exact numbers, but it's -- it is estimated

8   that there are between 1.2 and 1.5 billion Muslims in the

9   world.

10  Q.  And do you have an estimate of how many of that 1.2 to

11  1.5 billion Muslims are Arab speakers -- speakers of the Arabic

12  language?

13  A.  About 300 million are native speakers of Arabic.

14  Q.  So, the very, very considerable majority of Muslims in the

15  world do not speak Arabic?

16  A.  That's correct.

17  Q.  Again, based on your research -- well, let me --

18  preliminary question.

19      You've discussed the division between Arabic speakers

20  and -- or the percentage of Muslims who are Arabic speakers.

21  Would you say that all, or virtually all, Muslims, however,

22  whether they understand Arabic, repeat supplications that are

23  in Arabic?

24  A.  Yes.  I mean, all Muslims have to pray in Arabic.  Their

25  prayers involve reciting verses from the Koran, which is the

1  Holy Book of Muslims, that is a book that is entirely in

2  Arabic.  So they would have to memorize some of that and use

3  some of that in their five daily prayers, but they wouldn't

4  necessarily understand what they're saying.

5      So it's -- the liturgical language of Islam is Arabic.  It

6  would be, like, for example, by analogy, Catholics before

7  Vatican II using Latin in their prayers, or Jews who don't know

8  Hebrew still having to use Hebrew in their prayers.

9  Q.  So, in your opinion, there would be a large number of

10  Muslims who would not know the literal or idiomatic translation

11  of this supplication?

12  A.  Yes.

13  Q.  But they would, nevertheless, recite it?

14  A.  Yes.  They would recite it, and it would have a certain

15  spiritual quality to it, because it is -- it represents the

16  words of the Prophet, it was said by the Prophet.  So, it has

17  a -- it has a spiritual power and sanctity because of that.

18  Q.  Based on your expertise and familiarity with this

19  supplication and its use, do you have an opinion as to whether

20  the assertion that only -- that anyone who recited or carried

21  this supplication would necessarily be engaged, or intending to

22  engage, in jihadi -- violent jihadi behavior?

23  A.  I don't agree with that assertion.

24  Q.  Would you consider it a false assertion?

25  A.  Yes.

1    Q.  And if called upon to do so, were you available to testify

2    in the Hayat case in February or March of 2006?

3    A.  Yes.

4           MR. RIORDAN:  I don't have any further questions,

5    Your Honor.

6           THE COURT:  Mr. Yang, cross-examination?

7       Do you have any idea, Mr. Yang, about how long you'll be?

8           MR. YANG:  I think it will be fairly extensive

9    cross-examination.

10          THE COURT:  Let's go ahead and get started.

11          MR. YANG:  Okay.

12                        CROSS-EXAMINATION

13   BY MR. YANG:

14   Q.  Good morning, Dr. Haykel.

15   A.  Good morning.

16   Q.  We've talked, basically, about a translation versus an

17   interpretation, correct?

18   A.  Well, all translations are interpretations.

19   Q.  Okay.  But in terms of the literal translation, you did not

20   disagree with the expert called at trial, correct?

21   A.  I didn't disagree with his literal translation.

22   Q.  Okay.  And you acknowledge that Hadiths are notoriously

23   difficult to interpret, correct?

24   A.  Well, some are and some are not.

25   Q.  Right.  But that Hadiths are -- there is a tendency for

1   groups with idealogical agendas to interpret Hadiths

2   differently, correct?

3   A.  Yes.  I -- I believe that all scripture can be differently

4   interpreted by different people over time.

5   Q.  And, in fact, last year the Saudi Arabian government

6   created a special institute, the King Salman Institute, I

7   believe, to try to -- try to standardize the interpretation of

8   Hadiths to prevent their use in terrorist -- for terrorist

9   purposes, correct?

10  A.  Yes.  The Saudi government is trying to standardize the

11  interpretation of Islam.

12  Q.  And the Saudi government specifically created it to try to

13  prevent the use of these Hadiths for terrorism?  That's one of

14  the bases for this creation, right?

15  A.  Yes.  The Saudi government believes that scripture has been

16  misinterpreted and abused by terrorist movements.

17  Q.  And your interpretation was based, in part, on the Riyadh

18  al-Salihin?

19  A.  This Hadith is in the Riyadh al-Salihin, but it's also in

20  the earlier text that I mentioned.

21  Q.  And in -- you would agree with the expert in the trial that

22  this Hadith is found, actually, in two places in the Riyadh

23  al-Salihin, correct?

24  A.  That is correct.

25  Q.  And the first place is the Book of Etiquette of Travel, as

1    you already mentioned, correct?

2    A.   Yes.

3    Q.   The second place is in the Book of Jihad?

4    A.   That is correct.

5    Q.   And you acknowledge that this du'a was reported by Abu Musa

6    Al-Ashari?

7    A.   This du'a is in Abi Dawud Sunan, in Ahmad Ibn Hanbal's

8    Musnad, and the Riyadh al-Salihin of --

9              THE COURT:  Professor, I'm going to ask you if you

10   could slow down a tiny bit and assist with some spelling of the

11   terms you're using.

12             THE WITNESS:  Of course.  Yes.  Should I repeat that,

13   then?

14             THE COURT:  Let's ask the court reporter.

15             THE COURT REPORTER:  I'm going to need those spelled.

16             THE COURT:  Could we go back to the last question

17   pending?  Can you read that for us?  Why don't we let the court

18   reporter read it.

19     (Record read aloud.)

20             THE COURT REPORTER:  I'm not going to try to

21   pronounce that.

22             THE COURT:  Mr. Yang, pick up.

23             MR. YANG:  Abu Musa Al-Ashari.

24             THE WITNESS:  He is the companion of the Prophet who

25   narrated this particular tradition of the Prophet.

1    Q.  BY MR. YANG:  And you know who he is?

2    A.  Yes.

3    Q.  Can you explain to the Court who he is?

4    A.  He is one of the companions of the Prophet who has narrated

5    a great number of traditions, this being one of them.

6    Q.  And, historically, he was a fairly early convert to Islam,

7    correct?

8    A.  Yes.

9    Q.  And early on, after his conversion, he went on a mission

10   trip to Ethiopia, or Africa, essentially, correct?

11   A.  Yes.  He was sent by the Prophet on missions.  He was a

12   very close companion of the Prophet.

13   Q.  So, he was missing for many years, essentially, on this

14   mission trip, correct?

15   A.  So, the early history of Islam in the seventh century was

16   written 200 years after the fact, so I think one has to be

17   cautious not to be too literal about exactly what happened

18   since we don't actually know, with any precision, the life of

19   either the Prophet or his companion.

20   Q.  But at some point he did -- Mr. Abu Musa Al-Ashari did

21   return?

22   A.  Yes.

23   Q.  To become another companion of the Prophet?

24   A.  Yes.  He was always a companion, yes.

25   Q.  And this was in the history of the Prophet around the time

1    of the expedition of Dhat al-Riqa?

2    A.   Okay.  Yes.

3              THE COURT:  One of you spell that, please.

4              MR. YANG:  D-H-A-T, next word, A-L dash R-I-Q-A.

5    Q.   BY MR. YANG:  And it was approximately at this time that

6    Mohammed instituted rules allowing the shortening of prayers in

7    times of war, correct?

8    A.   Yes.  He did allow such rules.  He led wars.

9    Q.   This was a time period which was, essentially, almost

10   continuous warfare because the Prophet was being attacked from

11   all sides, essentially, correct?

12   A.   So, the Prophet did engage in military campaigns.  Those

13   military campaigns were not continuous, but he did, and

14   ultimately was able to concur Mecca and a number of other

15   tribes in tribal regions around the town he lived in, Medina.

16   M-E-D-I-N-A.

17   Q.   And that's actually a later campaign known as the Battle of

18   the Trench?

19   A.   The Battle of the Trench was a battle in Medina.  There

20   were also two other famous battles.  One was the battle of

21   Badr, that's B-A-D-R, in which the Muslims one.  And the second

22   battle called Uhud, U-H-U-D, again in Medina, which the Muslims

23   lost.

24   Q.   And there was another battle regarding the oasis at

25   Khaibar, K-H-A-I, or Y, depending on how you spell it, B-A-R?

1    A.  Correct.

2    Q.  It's after the battle at this oasis that Abu Musa Al-Ashari

3    was sent to Yemen?

4    A.  I'm not -- I'm not exactly sure exactly when he was sent.

5    I would have to look that up.

6    Q.  But at some point he left the companionship to go to Yemen,

7    essentially?

8    A.  So, once you're a companion of the Prophet, you're always a

9    companion of the Prophet.  You never leave the companionship.

10   But that's a status that he had.  But he was sent on missions

11   by the Prophet to different places, yes, he did, and one of

12   those places was Yemen.

13   Q.  The military campaigns that are described as expeditions,

14   those were generally excursions into enemy territory, correct?

15   A.  Yes.

16   Q.  There are Hadiths that say terrible things about

17   polytheists and Jewish people, correct?

18   A.  Yes.

19   Q.  That's because, in historical context, those were the

20   tribes that surrounded the new Muslim people, correct?

21   A.  Yes.  And also because it is alleged that the Jews who had

22   allied themselves with the Prophet then broke that alliance and

23   helped his enemies against him, so the Prophet then turned

24   against them.

25   Q.  And you acknowledge that the expert who testified at trial

1   acknowledged other interpretations of this particular du'a,

2   correct?

3   A.  I don't remember whether he did acknowledge such

4   interpretation.

5   Q.  If I could bring your attention to Exhibit 21.  It should

6   be in the government's binder.  I think maybe -- that's maybe

7   the defense's binder --

8               MR. YANG:  One moment, if I could --

9               THE COURT:  Yes, please.  If you could provide him

10  with that exhibit.

11  Q.  BY MR. YANG:  Why don't we start with Exhibit 20.  I'm

12  sorry.

13  A.  Okay.

14  Q.  And I'll just do a little bit of explanation.

15      These are transcripts from Dr. Mohammed's testimony, and

16  therefore I'm going to direct you to transcript page by

17  transcript page.  Does that make sense?

18  A.  Okay.

19  Q.  So I'll direct your attention to page 2034.

20              THE COURT:  In which exhibit?

21              MR. YANG:  In Exhibit 20.

22              THE COURT:  2034?

23              MR. YANG:  Yes.  Starting with line 3, and then if

24  you could read to 2035 at line 6.

25              THE WITNESS:  Should I read out loud?

1              MR. YANG:  No.  Just read it to yourself.

2              THE WITNESS:  Okay.

3    Q.  BY MR. YANG:  So, you will agree that an interpretation

4    more in line with your translation was before the jury?

5    A.  Yes.  It was presented here, yes.

6    Q.  And if you -- I could bring your attention in the same

7    exhibit to page 2043, if you could read from line 21 to the

8    next page, line 22.

9    A.  Yes.

10   Q.  That's another example of a translation by

11   Z-A-F-R-U-L-L-A-L, last name K-H-A-N, that was presented to the

12   jury?

13   A.  Yes.

14   Q.  And do you know who that person is?

15   A.  No.

16   Q.  Okay.  Do you know -- well, okay.

17        Bring your attention to Exhibit 21.  If you could go to

18   page 2060, please, line 22, and then read to the next page at

19   line 18.

20   A.  Yes.

21   Q.  You agree that the witness did acknowledge other

22   interpretations of this particular du'a?

23   A.  Yes.  He read that, yes.

24   Q.  All right.  One moment.

25        Now, did you write your declaration yourself?

1    A.   Yes.

2    Q.   Bringing your attention to your declaration at -- it's, I

3    believe, Exhibit BBB, paragraph 16, the statement, Unless the

4    effort is aimed at prejudicing the mind of the jury in light of

5    the beheading videos and activities of the jihadis and

6    al-Qaeda.

7         Did Dr. Mohammed testify regarding any beheading videos?

8    A.   I don't recall.

9    Q.   And he didn't mention al-Qaeda in his testimony either,

10   right?

11   A.   I also don't recall.

12   Q.   Bring your attention to paragraph 21.

13              THE COURT:  Same exhibit, counsel?

14              MR. YANG:  Same exhibit.

15   Q.   BY MR. YANG:  Lines 13 to 17.  Do you see those?

16   A.   Yes.

17   Q.   Who are you referring to?

18   A.   I believe he must have referred to someone called Subhi in

19   his testimony.

20   Q.   Now, who were you referring to in this declaration?

21   A.   To the man that he was referring to.

22   Q.   Okay.  But you basically compared a man named Subhi to the

23   KKK, correct?

24   A.   If I may, you can't refer to an enemy of a group as a

25   witness to that group.  Right?  You wouldn't ask for -- and

1   this was the point I was trying to make by analogy, so that an

2   American would understand, that you wouldn't ask a KKK person

3   to -- for an opinion that would be considered authoritative on

4   African American politics or culture.

5      That is what I found in his testimony, that he was invoking

6   the name of a well-known opponent of the Salafis as a

7   legitimate authority on the Salafis, and he is not.

8   Q.  What are the actual views of Mr. Subhi?

9   A.  Can I see the testimony of Mr. Mohammed?

10  Q.  Certainly.  It was -- but, as you sit here today, you do

11  not know who you were referring to in paragraph 21?

12  A.  With any specificity, no.  But I know that Mr. Subhi is an

13  anti-Salafi, and therefore is not someone that I would consider

14  an authority on that group.

15  Q.  But you -- what is his specific viewpoint that is

16  anti-Salafi?

17  A.  Well, he's an opponent of -- within Islam there are

18  different groups, and there are polemics between these groups,

19  and I wouldn't choose the opinion of a polemicist as a valid

20  opinion on what that group that he's attacking, and is known to

21  attack, to be.  You know, I wouldn't consider it a valid

22  viewpoint.

23  Q.  You would view him as an extremist?

24  A.  I would view him as a polemicist, someone who is an

25  opponent of that group, and therefore not a legitimate

1    authority on that group.

2        You know, again, by way of analogy, you know, you wouldn't,

3    for instance -- I use the example of the KKK, which is a very

4    striking example, but, you know, I wouldn't take the opinion of

5    an anti-abortionist on the views of people who are in favor of

6    abortion.  An anti-abortionist does not have standing on the

7    matter.  Mr. Subhi does not have standing when it comes to

8    Salafis.

9    Q.  But you agree that this is somewhat inflammatory language?

10   A.  No, it's not inflammatory, it's just a very clear analogy

11   to make it obvious to an American exactly how you are not

12   supposed to take polemicists as legitimate people who have

13   standing when they're talking about their opponents.  It's

14   fairly straightforward, really.

15   Q.  If I could bring your attention to Exhibit 21.  Exhibit 21,

16   page 2076.

17             THE COURT:  What was that again, counsel?

18             MR. YANG:  Exhibit 21, page 2076.  Starting at

19   page -- at line 8.

20             THE WITNESS:  Yes, sir.

21   Q.  BY MR. YANG:  Does that refresh your recollection?

22   A.  Yes.  Absolutely, yes.

23   Q.  Who are you referring to?

24   A.  I'm referring to Ahmed Subhi.  At the time I did research

25   on him, tried to find out exactly where he stands in the

1  polemical word of Islamic sects and groups, and he is an

2  Egyptian, and he is clearly anti-Salafi and anti-Muslim

3  brotherhood; therefore, I wouldn't take his views as

4  authoritative.

5  Q.  One of Mr. Subhi's big, I guess, academic interests is he's

6  a Koranist, right?

7  A.  Yeah.  He's in Islamic studies.

8  Q.  Right.  And he believes in not interbreeding the Hadiths,

9  and relying on the Hadiths, but only on interpreting the Koran,

10  correct?

11  A.  Correct.

12  Q.  I'm going to bring your attention to Exhibit 20 at page

13  2031.

14  A.  I'm sorry, repeat the page, please.

15  Q.  2031.  Starting at line 6.

16  A.  Yes.

17  Q.  And this testimony refers to a translation that was relied

18  upon by the expert witness, correct?

19  A.  Yes.  The reference is to a text in Abu Daud, A-B-U

20  D-A-U-D.

21  Q.  And he refers to a translation by someone named Subhi,

22  correct?

23  A.  Yes.

24  Q.  And that's spelled S-U-B-H-I, correct?

25  A.  Yes.

1   Q.  Whereas Mr. Ahmed Subhy spells his name S-U-B-H-Y, correct?

2   If you want to refer to --

3   A.  I looked at his name is Arabic, I didn't look at his name

4   in English.

5   Q.  You agree that this reference to Subhi could refer to Subhi

6   al-Shalih?

7   A.  The translator of this text?

8   Q.  Yes.

9   A.  In my -- are you asking me whether in my affidavit I was

10  referring to this translator as opposed to the Koranist?

11  Q.  Please listen to my question.

12  A.  Yes.

13  Q.  You agree that this portion of the transcript, the witness

14  may be referring to Subhi al-Salih?

15  A.  I don't see Salih here.

16  Q.  Certainly.  But he could be referring to one of two

17  renowned Hadith scholars who also have the same Subhi, correct?

18  A.  He could be, yes.

19  Q.  And you stated in your direct testimony that jihadis would

20  be familiar with this du'a, and no doubt use it, correct?

21  A.  Yes.

22  Q.  How would they use it?

23  A.  They would use it whenever they were threatened and they

24  felt an enemy was to harm them.  They would use it just like

25  other Muslims use it.

1    Q.  But their interpretation overall would be a little more

2    offensive, correct?

3    A.  Well, they're involved in war.  They're engaged in war.

4    So, they're engaged in an offensive war.  When they use du'a

5    offensively, it's fairly clear.  They don't hide what du'a they

6    use.

7    Q.  And you agree that this could also apply to the situation

8    where someone is venturing into enemy territory, correct?

9    A.  Where you would use this du'a, yes, absolutely.

10   Q.  And you testified on direct that you have done a lot of

11   analysis of the ideology behind the Islamic state --

12   A.  Yes.

13   Q.  -- correct?

14        And a lot of the interviews that you've given, you've

15   talked about how the Islamic state interprets, specifically,

16   the Hadiths in a very aggressive manner, correct?

17   A.  They cherry-pick the Hadiths and in the Koran to justify

18   their behavior and their actions.

19   Q.  This is precisely what Saudi Arabia is trying to avoid or

20   prevent, right?

21   A.  Saudi Arabia is trying to establish a standard,

22   authoritative interpretation of the text of revelation, which

23   include the Koran and the Hadith.

24   Q.  Okay.  Thank you.

25        In a supplemental expert disclosure, you stated that proof

1    of jihadi idealogical thought and belief would include -- would

2    require proof of a considerable repertoire of ideas, books,

3    authorities that they invoke and cite openly, correct?

4    A.  Yes.

5    Q.  And are you familiar with some of the militant movements in

6    Pakistan, for example?

7    A.  I'm not an expert on them but, yes, I do follow and read

8    about them.

9    Q.  Okay.  So you're familiar with J-A-M-I-A-T U-L-E-M-A dash E

10   dash I-S-L-A-M?

11   A.  Sorry, I have to write that out.

12   Q.  Right.

13   A.  I can't --

14   Q.  It's abbreviated as J-U-I.

15   A.  Yes.  Can you tell me the name -- can you read it out?

16   Q.  I'll try.  I'm going to butcher this.  Jamiat

17   Ulema-e-Islam?

18   A.  Yes.

19   Q.  That is a political party?

20   A.  Yes.

21   Q.  But it, essentially, supports militant movements,

22   especially in Kashmir?

23   A.  Yes.

24   Q.  And it openly supports a militant group called

25   Jaish-e-Muhammad, correct?

1    A.   Jaish-e-Muhammad, yes.

2    Q.   Okay.  And you acknowledge that someone who has certain

3    jihadist materials would be more likely to interpret this

4    Hadith in a more aggressive manner, correct?

5    A.   No, not necessarily.  I mean, jihadists have offensive du'a

6    that they can use.  This is a -- this is a du'a that Muslims

7    use, whether they're jihadist or not, when they're afraid of an

8    enemy.

9    Q.   Okay.  What about if someone possessed articles about the

10   arrest of Fazlur, F-A-Z-L-U-R, Rehman, R-E-H-M-A-N, the leader

11   of JUI, would that person be more likely to have jihadist

12   leanings?

13   A.   Just because he or she has those articles?

14   Q.   I'm just saying, would they be more likely or less likely?

15   A.   I can't make a determination based on that.

16   Q.   Okay.  What if they also had articles praising

17   Sipah-e-Sahaba, S-I-P-A-H dash E dash S-A-H-A-B-A?

18   A.   Sipah-e-Sahaba.  Yes.  That's another movement in Pakistan.

19       Just having articles about these groups, to my mind, does

20   not necessarily mean that you are a supporter or a member of

21   these groups.  Normally, people who are jihadists in their

22   inclinations, in my experience, when you look at their

23   computers, they have files of some of the core manuals and

24   books and fatwas, F-A-T-W-A-S, that the jihadists produce.

25   Q.   Okay.  But these -- these specific articles are about a

1   death to America procession for JUI, or a long-lived Taliban

2   rally, or expressing support for Osama bin Laden and the

3   Taliban, would that make it more likely or less likely that

4   this person has a jihadi mindset, I guess?

5   A.   So, I mean, could be just curious about this subject.  One

6   could even, perhaps, be supportive but not actually a member or

7   a believer in the movement.

8       I don't think that establishing a mindset is something that

9   is easy to do.

10  Q.   But you would agree it shows an interest, specifically --

11  A.   Yes.

12  Q.   -- in --

13  A.   Yes.  But if you were to look at my computer, you would

14  think that I'm also a member of these movements, because I

15  follow them and I have all these documents on my computer.

16  Q.   Believe me, if you saw my Google searches over the last

17  couple weeks you'd agree.

18      What about an article about Sheikh Abdul Rahman threatening

19  harm to the United States if something were to happen to him?

20  A.   Yes.  That is -- that is an opinion that jihadist circles

21  were circulating.  This is the blind Sheikh who is in

22  maximum -- actually, he died, he passed away --

23  Q.   That's correct.

24  A.   -- not too long ago.  And who was implicated in the plot to

25  bomb several sites in New York City.

1        Again, I mean, one could be curious and interested in

2    jihadism, because it's the latest thing out there, without

3    necessarily being a member or supporter.

4    Q.  What about the magazine of H-A-R-A-K-A-T U-L dash

5    M-U-J-A-H-E-D-E-N?

6    A.  Harakat ul-Mujaheden.

7    Q.  Their magazine.

8    A.  Yes.  To read it or to have it on your computer?

9    Q.  To have a physical copy, would it make it more likely or

10   less likely that someone may have jihadist leanings?

11   A.  What I would be able to say is that clearly a person who is

12   reading that kind of material is interested in these movements

13   and is curious about -- about what's happening in Islamic

14   politics.  Membership and belonging is a whole other level of

15   commitment.

16   Q.  I'm just trying to determine whether, in your opinion,

17   would it make it more likely or less likely that someone has

18   jihadist ideology or leanings?

19   A.  I can't -- I can't make that determination, I'm afraid.  I

20   would say that that person is interested in jihadism,

21   certainly.

22   Q.  What about Jaish magazine, J-A-I-S-H, which is the magazine

23   of the Jaish-e-Muhammad?

24   A.  Yes.

25   Q.  Same question.

1    A.   Yes.  You would be interested in Islamist politics.

2         By the way, in both these cases, in the Jaish-e-Muhammad

3    and the Sipah-e-Sahaba -- going too fast, perhaps.

4              THE COURT:  Let's ask our court reporter.

5              THE COURT REPORTER:  It's okay.  Thank you.

6              THE COURT:  We're doing good.  Thank you for being

7    sensitive to that.

8              THE WITNESS:  The Pakistani states support these

9    movements, or has supported the movements.  So, if you're in

10   Pakistan and you know that your state is, you know, backing

11   these movements, I imagine a lot of Pakistanis are interested

12   in them.

13   Q.   BY MR. YANG:  But the fundamental ideology of these

14   movements is to wage jihad against non-Muslim areas,

15   specifically Kashmir, but also the United States and elsewhere,

16   correct?

17   A.   In the case of -- in the case of the movement -- the

18   Pakistani movements in question, they're mainly aimed -- their

19   target, or their aim, is Indian state, is India, because they

20   claim that Muslim territory in Kashmir is occupied by the

21   Indians.  They have less interest in the United States.

22        If you're interested in attacking the United States, then

23   al-Qaeda would be your group of choice to follow.

24   Q.   But in the rhetoric, they specifically do target the United

25   States, correct?

1    A.   They curse the United States, definitely.   And they

2    consider the United States to be an enemy.

3    Q.   Okay.   What about if the person is on an audiotape

4    discussing having read The 40 Maladies of Jews?

5    A.   So, in the case of the Islamic world, anti-Semitism is

6    rife.   And you have, for example, the book by Hitler known as

7    Mein Kampf, My Struggle, that book is widely sold throughout

8    the Islamic world.

9        There are also books like the Protocols of the Learned

10   Elders of Zion, which is a czarist Russian fabrication against

11   Jews.

12       So, conspiracy theories that are anti-Semitic, and that

13   target Jews, are widespread, and are believed, unfortunately,

14   by -- and pedaled by large numbers of Muslims and Arabs, not

15   just jihadists.

16   Q.   I'm asking whether this person is more likely or less

17   likely to hold jihadist views.

18   A.   Again, it's impossible to say, because anti-Semitism is so

19   widespread amongst non-jihadists.

20   Q.   And this person specifically is extolling this work, The 40

21   Maladies of Jews.

22   A.   Yes.   Again, unfortunately, that is a widespread phenomenon

23   in the Arab and Islamic world.

24   Q.   What about his possession of a translation of the Virtues

25   of Jihad?

1  A.  Can you be more specific about the book?

2  Q.  It's a book by Masood A-Z-H-A-R, who was the founder of --

3  as you know.

4  A.  Yes.

5          THE COURT:  Could we, for the record, state what this

6  individual is the founder of?

7          MR. YANG:  Sure.  He was the founder of

8  Jaish-e-Muhammad.

9          THE WITNESS:  That he had this book?

10  Q.  BY MR. YANG:  That he had a copy of the book.

11  A.  Yes.  He's definitely, again, interested in this movement.

12  Q.  If this individual is on an audiotape from March 11, 2003,

13  saying, Jihad is the duty of every Muslim, it is our duty to go

14  and help other Muslims anywhere in the world where Muslim or

15  Muslim countries are attacked --

16  A.  Um-hum.

17  Q.  -- does it make it more likely or less likely?

18  A.  That's a widespread belief amongst Muslims, that they

19  should go and help fellow Muslims who are under attack.  That's

20  not necessarily exclusive to jihadism.

21  Q.  And what about a March 6, 2003 audiotape where he talks

22  about -- with admiration, about a friend of his grandfather's

23  madrasa who showed him two bullets in his leg from Afghanistan,

24  does that make it more likely or less likely that he holds

25  jihadi ideology?

1    A.   Well, if the bullets were the result of fighting the

2    Soviets in Afghanistan in the 1980s, then that would be a badge

3    of honor for any Muslim.   It depends when the bullets and who

4    shot the bullets.

5    Q.   Sure.   What about bragging that 60 people from the madrasa

6    -- his grandfather's madrasa volunteered for jihad in

7    Afghanistan?

8    A.   Again, it depends on when that jihad in Afghanistan took

9    place.   If you were fighting against the Soviets, the Soviets

10   invaded Afghanistan in 1979 and left in 1988.   In that period,

11   it was considered virtuous to go and help the Afghans against

12   the Soviet invasion.

13   Q.   What if this person is on audiotape on March 6, 2003?

14   A.   When did these people go and fight?   If they fought against

15   Americans or they fought against Soviets makes a fairly big

16   difference.

17   Q.   The discussion is that 60 people have just volunteered for

18   jihad in Afghanistan.

19   A.   Then they went to fight Americans.

20   Q.   That's a fair inference?

21   A.   If they just went in 2003?

22   Q.   Yes.

23   A.   Yes, it is a fair inference.

24            THE COURT:   Mr. Yang, about how much longer do you

25   have?

1              MR. YANG:  It's going to be a little bit longer, yes.

2              THE COURT:  Is now a convenient breaking time for our

3    morning break?

4              MR. YANG:  Certainly, Your Honor.

5              THE COURT:  Why don't we take 15 minutes now, and

6    we'll be back in court at 10:40.

7         (Recess taken, 10:25 a.m. - 10:42 a.m.)

8              THE CLERK:  May I remind you, professor, you're still

9    under oath.

10        Please continue.

11             MR. YANG:  Thank you.

12   Q.  BY MR. YANG:  We were going through some of the

13   hypotheticals relating to whether it would become more likely

14   or less likely that someone has a militant or jihadi mindset,

15   correct?

16   A.  Yes.

17   Q.  All right.  What about a March 6, 2003 recording where a

18   person is expressing contempt for the Shia, saying how they are

19   not even Muslims, would that make it more likely or less likely

20   that they had a militant mindset?

21             THE COURT:  Mr. Riordan?

22             MR. RIORDAN:  Your Honor, I have an objection, and a

23   motion to strike all questions -- all testimony in response to

24   questions about the potential mental state of a hypothetical

25   individual, which is based on evidence concerning Hamid Hayat.

 1          If I could, I would elaborate on that.

 2               THE COURT:  Please, do.

 3               MR. RIORDAN:  This expert is an expert and offered an

 4    opinion on the uses of this particular du'a in Islamic culture,

 5    and who generally is likely to possess it or use it.  He has

 6    not offered any opinion about the mental state of any

 7    particular individual, and certainly not of the defendant in

 8    this case.  He has no expertise on offering or formulating

 9    opinion as to any given individual, and hasn't offered any

10    opinion on it.

11          So, all questions trying to figure out what a specific

12    individual who might have this supplication would have in mind

13    are simply outside the scope of his opinion and the scope of

14    his expertise.

15               THE COURT:  And does that include -- does your

16    objection include reference to articles or other materials an

17    individual may obtain or have?

18               MR. RIORDAN:  Yes.  Because the question is, if an

19    individual has these materials, what are they likely thinking,

20    or what does this say about their mental state, and that's a

21    question about the mental state of a given individual.  And

22    Dr. Haykel, while extremely qualified on the subjects on which

23    he has offered his opinion, has no expertise in determining the

24    mental state of any given individual, depending on the

25    materials they possess.

1                    THE COURT:  Mr. Yang?

2                    MR. YANG:  Two points.

3         The first point is, part of his expert declaration and

4    testimony has been that jihadis do use these particular

5    supplications.  And that if, in combination with other

6    materials, it is possible to determine or have an opinion about

7    whether or not someone had this particular du'a or

8    supplication, with an interpretation that is more in line with

9    why the jihadis would use it versus the standard, kind of, more

10   mainstream use of this supplication.

11        The second point is, there are advantages and disadvantages

12   to calling experts at trial.  I am simply demonstrating the

13   disadvantages of calling such an expert who would provide this

14   specific testimony.

15                   THE COURT:  That's an interesting argument.

16        As to your first point, are you suggesting that Professor

17   Haykel, in his affidavit, has opined on the state of mind of

18   some unnamed individual who has the supplication, or some other

19   of these materials, and that's why you're cross-examining and

20   you feel like you're not beyond the scope?

21                   MR. YANG:  He has testified that people who are --

22   who have a jihadi ideology would use --

23                   THE COURT:  Where is that located -- the specific

24   words, that individuals who have a jihadi ideology, where is

25   that in his affidavit?

1          MR. YANG:  This is in the document 694, Your Honor.

2          THE COURT:  What document 694?

3          MR. YANG:  On our docket.

4          THE COURT:  Okay.  Is it an exhibit in the case?

5          MR. YANG:  No, it's a filing.

6          THE COURT:  I don't have the docket up right here.

7          MS. BOERSCH:  Your Honor, I think it's BBB.  Boy,

8    boy, boy.  Is that right?

9          MR. RIORDAN:  Yes, that's the -- I don't think that's

10   what he's referring -- no, it is not BBB --

11         THE COURT:  Let's let Mr. Yang inform the Court

12   specifically where the language is that Professor Haykel has

13   opined as to the state of mind of an unnamed individual who is

14   in possession of this supplication, the supplication that's in

15   Government's Exhibit 22.

16         MR. YANG:  I'm reading the first sentence from

17   paragraph 5 on page 2 of this document that's been filed.

18         THE COURT:  Is that in Exhibit -- what exhibit is

19   that?  Is that Exhibit BBB?  Is that the affidavit of Bernard

20   Haykel that was --

21         MR. YANG:  No, Your Honor.  It is a defendant's

22   supplementary disclosure regarding testimony of Bernard Haykel.

23         THE COURT:  Just a moment.  All right.

24     You're on paragraph 2, page 2?

25         MR. YANG:  No.  Paragraph 5 of page 2.

1            THE COURT:  Okay.  Now I have document 694 in front

2      of me.

3            MR. YANG:  So, first, Jihadis would be familiar with

4      this invocation and no doubt use it to...

5         Then flipping the page to paragraph 8.

6            THE COURT:  Um-hum.

7            MR. YANG:  And Dr. Haykel did reinforce both parts of

8      this notice in his direct testimony.  But he opined that as for

9      proof to establish that someone is partaking in jihadi

10     idealogical thought and belief, one would need to obtain

11     considerably more than this invocation to assert that a person

12     is a jihadi.

13        And then he explains, Jihadis have a considerable

14     repertoire of ideas, books, authorities that they invoke and

15     cite openly, and which mark them off from the rest of the

16     Muslim community as jihadis.

17        And it is -- we are going through ideas, books and

18     authorities that were invoked as hypotheticals.

19            THE COURT:  Mr. Riordan?

20            MR. RIORDAN:  Yes.  May I respond?

21        The government, at the close of this, is perfectly entitled

22     to bring to your attention evidence in the case which it says

23     would reflect on the mental state of this particular defendant.

24        My objection here is that Dr. Haykel has never offered an

25     opinion on whether any given individual has a jihadi mindset,

1  you know, based on this -- the possession of this supplication,

2  and that he has no qualifications to assess, as has been

3  evident from his answers, whether the possession of particular

4  materials say anything or don't say anything about their mental

5  state.

6      So, again, it's outside the scope of an opinion he's

7  offered, and it's outside the scope of his expertise.

8          THE COURT:  All right.  Anything else before I rule,

9  Mr. Yang?

10         MR. YANG:  Again, I'm simply highlighting what -- and

11 Dr. Haykel has stated that there are things that he can

12 consider when rendering these opinions with regard to whether

13 or not someone is and possesses a jihadi ideology.

14         THE COURT:  Mr. Yang, I understand where you're

15 trying to go with this.  I, at this time, am going to take

16 Mr. Riordan's objection under submission.

17     I will state, however, though, prior to the break you've

18 asked a series of questions where Professor Haykel has

19 indicated he is unable to render an opinion as to whether a

20 specific individual has jihadi mindset, jihadi leanings.

21 You're basically asking this individual to speculate as to what

22 an unnamed individual may be thinking due to the possession of

23 various articles.

24     And I think even in a moment of jest here, both Professor

25 Haykel and yourself indicated that one might even infer the two

1   of you might even have jihad leanings given the Google searches

2   and information on your computers that you've had in preparing

3   for this case.  I'm not suggesting that's true for either one

4   of you, but what it does illustrate is the difficult territory

5   that you're in with this particular expert, who was not offered

6   for this purpose, and I don't read the language you've read to

7   me as evidence that he's here to opine on any specific

8   individual's leaning or not leaning towards jihadi mindset,

9   however one might define that.

10      So, with that said, I am going to sustain the objection.  I

11  will not be striking any of the answers or previous questions

12  from the record.  I think the Court will -- I actually said I

13  was going to initially take it under submission, but I think I

14  am going to sustain the objection.

15      Obviously, both sides can argue -- I'm not going to strike

16  the answers or questions from the record, and both sides can

17  certainly argue to what extent, if any, the Court should

18  utilize those answers in the Court's final findings and

19  recommendations.

20      Mr. Yang, do you have further cross?

21  Q.  BY MR. YANG:  You would agree, would you not, that the

22  evidence I have just summarized would represent ideas, books,

23  authorities that are invoked and cited openly and would mark

24  someone off from the rest of the Muslim community, correct?

25          MR. RIORDAN:  Same objection, Your Honor.

1               THE COURT:  Sustained.

2               MR. YANG:  One moment.

3          (Pause in proceedings.)

4          Thank you, Your Honor.  No further questions.

5               THE COURT:  Any redirect, Mr. Riordan?

6               MR. RIORDAN:  Yes, Your Honor.

7               THE COURT:  All right.

8                          REDIRECT EXAMINATION

9     BY MR. RIORDAN:

10    Q.  Dr. Haykel, this isn't a memory test, so I'm going to put

11    two questions in the form of a hypothetical.

12         So, assume that witness Mohammed had stated in his

13    testimony that just about every commentary that he checked puts

14    this supplication in a case where someone who is in jihad makes

15    this supplication, someone who is at war with a perceived

16    enemy.

17         Would you agree that every commentary on this puts a person

18    possessing this in that category?

19               MR. YANG:  Objection, Your Honor.

20               THE COURT:  Basis?

21               MR. YANG:  He is essentially arguing weight in front

22    of a jury rather than an expert opinion.

23               THE COURT:  I'm sorry, what was that?

24               MR. YANG:  He's essentially arguing weight to a jury

25    rather than trying to elicit an expert opinion.

1          THE COURT:  I'm going to overrule the objection.

2   But, again, as throughout these proceedings, parties are able

3   to argue these points in your final briefing before the Court.

4       Please proceed, Mr. Riordan.

5   Q.  BY MR. RIORDAN:  Do you remember the question, Dr. Haykel?

6   A.  No.  Can you repeat, please.

7   Q.  I'm asking you to assume that witness Mohammed stated that

8   just about every commentary check puts this supplication in a

9   case where someone who is in jihad makes this supplication,

10  someone who is at war with a perceived enemy.

11      In your opinion, do the commentaries on this supplication

12  uniformly put persons in that category of being at war with a

13  perceived enemy?

14          MR. YANG:  Objection.  Asked and answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  No.  As I stated earlier, all Muslims

17  use this supplication, not just jihadis.  And they will use it

18  whenever they are fearful of someone or something harming them.

19  So, it is not specific to the jihadis; although, as I also

20  stated, jihadis who are Muslims will also use it.

21  Q.  BY MR. RIORDAN:  And assume -- I'm sorry, did I -- assume

22  that witness Mohammed said that a person carrying this

23  supplication would be a person engaged in jihad, and there is

24  no other way it could be used.

25      Would you agree with that opinion?

1            MR. YANG:  Objection.  Asked and answered.

2            THE COURT:  Overruled.

3            THE WITNESS:  No, I wouldn't agree with that opinion.

4    I believe that this supplication is used by, as I said, many,

5    many Muslims who are not jihadis.

6    Q.  BY MR. RIORDAN:  And you were asked to review certain

7    testimony of Dr. Mohammed on cross-examination?

8    A.  Yes.

9    Q.  Were you shown any instance where Dr. Mohammed retracted

10   his opinion that there is no other way that this supplication

11   could be used, other than to engage in jihad?

12   A.  I did not.

13           MR. RIORDAN:  Nothing further, Your Honor.

14           THE COURT:  Any recross, Mr. Yang?

15           MR. YANG:  No, Your Honor.

16           THE COURT:  Is this witness excused?

17           MR. RIORDAN:  Yes, Your Honor.

18           THE COURT:  All right.  Sir, thank you for joining

19   us.

20           THE WITNESS:  Thank you.

21           THE COURT:  Petitioner ready to call your next

22   witness?

23           MS. BOERSCH:  Yes, Your Honor.  Petitioner calls

24   Wazhma Mojaddidi.

25           THE COURT:  Good morning.

1              THE WITNESS:  Good morning.

2              THE COURT:  Step up here so you can be sworn in.

3              THE CLERK:  Please raise your right hand.

4         (The Witness, WAZHMA MOJADDIDI, is sworn.)

5              THE WITNESS:  I do.

6              THE CLERK:  You may be seated.

7         Please say and spell your full name for the record.

8              THE WITNESS:  Wazhma Mojaddidi.  First name spelled

9    W-A-Z-H-M-A, last name, M-O-J-A-D-D-I-D-I.

10             THE COURT:  Before you begin, counsel, since we've

11   had the exclusion order throughout this hearing, and I know --

12   Ms. Mojaddidi?

13             THE WITNESS:  Yes.

14             THE COURT:  If I mispronounce that, just be aware

15   that this magistrate judge at times will mispronounce names.

16   So, I hope I do not mangle yours too badly.

17        But before -- because you've been excluded as a witness,

18   prior to this there was a motion made by the petitioner, and a

19   slight objection by the government, to have you deemed to be an

20   adverse witness in these proceedings and I granted that motion.

21   So that you're aware of the type of examination, and are not

22   taken by surprise, I wanted to make sure you're aware of that

23   ruling.

24             THE WITNESS:  I anticipated it, Your Honor.  Thank

25   you.

1           THE COURT:  Please continue, counsel.

2           MS. BOERSCH:  Thank you, Your Honor.

3                       DIRECT EXAMINATION

4  BY MS. BOERSCH:

5  Q.  Ms. Mojaddidi, if I mispronounce your name as well, please

6  correct me, but I will try to get it right.

7       First of all, before I start, I put two binders there on

8  the witness stand, which you may want to refer to at some point

9  during your examination.  I will direct you to a particular

10 exhibit.  One includes the transcript of your deposition, and

11 the other includes exhibits for petitioner.

12      Ms. Mojaddidi, as I understand it, you were trial counsel

13 for Hamid Hayat in 2005, correct?

14 A.  Yes, Your Honor -- I'm sorry.  Yes.

15 Q.  Thank you.

16          THE COURT:  There are times I wouldn't mind

17 switching.

18          THE WITNESS:  It's awkward being on this side.

19          THE COURT:  I'm sure it is.

20 Q.  BY MS. BOERSCH:  But you have not, however, represented

21 Hamid since his conviction and sentencing; is that correct?

22 A.  Yes.

23 Q.  And you understand, I assume, that since then Mr. Hayat has

24 filed a petition for a writ of habeas corpus, correct?

25 A.  Yes.

1    Q.  Have you had a chance to review that petition?

2    A.  You know, I -- I don't think -- and this would probably

3    respond to most of the documents that have been filed since I'm

4    no longer in the case, I wouldn't say that I read them in

5    detail, but I have seen many of the documents.  I can't recall,

6    specifically, if I saw the whole thing.

7    Q.  And do you recall whether you reviewed a declaration filed

8    by Hamid's now counsel, Dennis Riordan?

9    A.  With the petition?

10   Q.  Yes.

11   A.  I have reviewed that declaration.

12   Q.  Thank you.

13        And you were deposed in this case -- your deposition was

14   taken in this case on August 11th of 2014; is that right?

15   A.  Sounds right.

16   Q.  And you were deposed here at the United States Attorney's

17   Office, correct?

18   A.  Correct.

19   Q.  There was a court reporter there?

20   A.  Yes.  I think it was videotaped as well.

21   Q.  And you were put under oath?

22   A.  Yes.

23   Q.  And you were sworn to tell the truth?

24   A.  Yes.

25   Q.  And you did tell the truth during that deposition to the --

```
 1    A.  I did.

 2    Q.  -- best of your recollection?

 3    A.  I did.

 4    Q.  Have you had an opportunity to review that deposition?

 5    A.  I have.

 6    Q.  And did you make any corrections to that deposition?

 7    A.  No.  At the time that I reviewed it, I think it was way

 8    past that timeframe to make corrections.

 9    Q.  And is it fair to say that your memory about your

10    representation of Mr. Hayat would have been better in 2014 than

11    it may be today?

12    A.  Generally, that is correct.

13    Q.  And would it also be fair to say that your memory about

14    that representation would have been even fresher in 2007, say,

15    than it was in 2014?

16    A.  Yes.

17    Q.  Okay.  Ms. Mojaddidi, you believed strongly that Hamid

18    Hayat was innocent; is that right?

19    A.  Yes.

20    Q.  And you still believe that today?

21    A.  Yes.

22    Q.  And you've always believed in his innocence?

23    A.  Yes.

24    Q.  You believed that he never attended a terrorist training

25    camp?
```

1    A.   Yes.

2    Q.   And you had met with him dozens of times while representing

3    him?

4    A.   Probably more than dozens of times, but, yes.

5    Q.   And he told you that he had never attended a terrorist

6    training camp?

7    A.   Correct.

8    Q.   And do you agree that it would -- if he is, in fact,

9    innocent, it would be an injustice to keep him in jail?

10   A.   Yes.

11   Q.   You were subpoenaed to be here today, correct?

12   A.   Correct.

13   Q.   Prior to your appearance here today, did you -- have you

14   met at all with the government prosecutors in this case?

15   A.   No.

16   Q.   Have you met with any of Mr. Hayat's legal team?

17   A.   No.  I've only exchanged e-mail communications with regards

18   to scheduling.

19   Q.   Have you reviewed any documents prior to your testimony

20   today?

21   A.   My deposition.

22   Q.   Okay.  Let me talk a little bit about your background

23   generally.

24        You went to McGeorge Law School here in Sacramento?

25   A.   I did.

1  Q.  You graduated in May of 2002?

2  A.  Correct.

3  Q.  How many years did you attend McGeorge?

4  A.  I was there for four years.  One of the years was when I

5  had my baby, and I just took one class the entire year.  So I

6  kind of did an accelerated, I guess, evening program to finish.

7  Q.  Okay.  So, you were in McGeorge the evening -- well, does

8  McGeorge have both a daytime program and an evening program?

9  A.  It does.  I started out as a daytime, and then my second

10  year is when I had my baby and I took -- I only took one class.

11  And then my third and forth year I was an evening student.  So,

12  I graduated as an evening student.

13  Q.  Okay.  While you were attending McGeorge, other than the

14  two required criminal law courses, did you take any classes in

15  criminal law or criminal procedure?

16  A.  I don't believe I did.

17  Q.  Did you ever take any clinical courses in criminal law?

18  A.  No.

19  Q.  And during law school, did you have the opportunity to do

20  any work in the area of criminal law, criminal defense?

21  A.  No.

22  Q.  You took the bar exam, I think, the first time in July

23  of 2002; is that correct?

24  A.  I did.  I took it in -- I was pregnant at the time, so in

25  '02 -- July 2002 and February of '03 I took them for practice.

1    I didn't really study.  And then I took it in July of '03, and

2    was admitted in December of '03.

3    Q.  So, the first two times you took the bar exam, you did not

4    pass it?

5    A.  I did not.

6    Q.  So, you passed in July of 2003, and then at that point you

7    began practicing law from your home?

8    A.  I did.

9    Q.  And in 2004, when you began practicing, it consisted

10   primarily of family law and immigration law?

11   A.  Correct.

12   Q.  Is that still primarily your practice today?

13   A.  No.

14   Q.  And what does your practice today consist of?

15   A.  Family law only.

16   Q.  Family law only.  Okay.

17        Taking you back to 2004, when you first began to practice,

18   did you have an opportunity to appear in court at all?

19   A.  Oh, yes.

20   Q.  And were those court appearances limited primarily to state

21   court, superior court?

22   A.  Yes, with the exception of appearances in the immigration

23   court in San Francisco.

24   Q.  The Federal immigration court?

25   A.  Yes.

1    Q.   In 2004, had you ever had a jury trial?

2    A.   I don't believe I had.

3    Q.   And in 2004, when you began practice, had you ever

4    represented anyone in a criminal case?

5    A.   No.

6    Q.   No criminal cases in state court?

7    A.   No criminal cases at all.  I mean, if you want to fast

8    forward to the Hayat trial, that was my first criminal case.

9    Q.   Okay.  So when you first were engaged to represent

10   Mr. Hayat, as you just said, that was your first criminal case.

11   Up until that time had you, in any other case, prepared

12   witnesses to testify?

13   A.   Yes.

14   Q.   And were those in family law proceedings?

15   A.   Family law proceedings and maybe immigration proceedings.

16   Although, I don't -- I don't specifically recall the

17   immigration, but certainly family law.

18   Q.   And how many times do you think you had done that prior to

19   your representation of Mr. Hayat?

20   A.   I'm now in my 15th year of practice.  I cannot -- I have no

21   idea.

22   Q.   You can't remember at this point?

23   A.   I cannot.

24   Q.   Had you ever prepared an expert witness to testify --

25   A.   Prior to --

685

1    Q.   -- at the time you were engaged to represent Mr. Hayat?

2    A.   I don't think so.  And, if any, it may have been in an

3    immigration proceeding, but I don't think so.

4    Q.   And at that point in time, in 2004-2005, how active was

5    your practice?

6    A.   Well, which year?

7    Q.   2004-2005, just before representing Mr. Hayat.

8    A.   So, I -- I did work out of my home office, and I was

9    certainly not as active as I am now.  I would say that I had a

10   part-time practice because I -- I had very young children, and

11   I chose to stay home because of my young children.

12   Q.   So, you were first contacted about Hamid Hayat in June

13   of 2005; is that right?

14   A.   I think so, yes.

15   Q.   And you were contacted by, I think it's, Baseim Elkarra, of

16   CAIR?

17   A.   Correct.

18   Q.   And CAIR is the Council for American-Islamic Relations?

19   A.   Correct.  Do you need the spelling of his last name or do

20   you have that?

21   Q.   I have it.  The court reporter may need it.  I think it's

22   E-L-K-A-R-R-A?

23   A.   That's correct.

24   Q.   Baseim is B-A-S-E-E-M?

25   A.   I-M.

1   Q.  I-M.  Thank you.

2       And you were contacted by them because you were active in

3   CAIR?

4   A.  Yes, I was.

5   Q.  And at that point were you told that they were contacting

6   you because they couldn't get ahold of anyone else?

7   A.  Yes.  I mean, I -- that sounds -- that sounds correct.  It

8   was a -- it was a Sunday afternoon --

9   Q.  Right.

10  A.  -- so not many attorneys were answering their phones, and

11  he had my private cell number.

12  Q.  And so at that point, to some extent, to reiterate, you did

13  not have any experience defending a criminal case?

14  A.  No, I did not.

15  Q.  And no experience in federal court, other than the

16  immigration court?

17  A.  Yes.

18  Q.  And you'd been practicing for about 18 months?

19  A.  At that time, that's right.

20  Q.  You learned, when you were contacted, that Mr. Hayat's

21  family had also contacted a man by the name of Johnny Griffin?

22  A.  I don't think I learned it at the first contact, but I

23  learned it sometime soon after.

24  Q.  Okay.  And when you say "sometime soon after," do you mean

25  that Sunday or --

1    A.   I apologize.  Yes.  The same day.

2    Q.   The same day?

3    A.   Maybe within an hour or two.

4    Q.   And did you speak to Mr. Griffin on that day?

5    A.   I did.

6    Q.   And as a result of that conversation -- well, did

7    Mr. Griffin suggest to you that you represent -- let me back

8    up.

9         When you first were contacted by CAIR, you were told that

10   two individuals had been questioned by the FBI and had not

11   returned from the FBI; is that correct?

12   A.   Correct.

13   Q.   And one of those individuals was Umer Hayat?

14   A.   Yes.

15   Q.   And one of them was Hamid Hayat?

16   A.   Yes.

17   Q.   And Umer is Hamid's father?

18   A.   Yes.

19   Q.   So when you spoke to Mr. Griffin, he suggested to you that

20   you would represent one of the Hayats and he would represent

21   the other?

22   A.   Are you -- well, it didn't play out exactly that way.

23   Q.   What happened?  What did he tell you?

24   A.   Okay.  Do you want me to just start from my contact with

25   him, or just with regards to that topic?

1  Q.  Well, what was -- what did Mr. Griffin tell you when you

2  first discussed the case with him?

3  A.  Well, when I -- when he first -- when I first spoke with

4  him, there was an intention to stop the questioning.  And

5  because there were two defendants, and I happened to be a

6  licensed attorney, he suggested that I -- the both of us go

7  down to the FBI office to stop the questioning.

8      And so we went down there and he spoke with -- he must have

9  spoke with the -- with the AUSA, I think it was the AUSA, or an

10  agent, and asked about -- between the two defendants, who was

11  the heavy.  And I specifically remember those words.  And he

12  was told by whomever he spoke with that it was Umer Hayat.  So,

13  based on that conversation, he explained to me that it would be

14  better if he were to speak with Umer and I would speak with

15  Hamid.  And for the purposes of that visit to the FBI, we would

16  represent -- respectively, I would represent Hamid and he would

17  represent Umer.  And that's how -- that's how he told it to me.

18  Q.  At that point in time, was Mr. Griffin aware that you did

19  not have any experience in defending a criminal case?

20  A.  He did.

21  Q.  And he was aware, was he, that you had never appeared in

22  federal court before, other than the immigration court?

23  A.  He was.

24  Q.  And when you went to the FBI and met with the AUSA and the

25  FBI agents, that was the first time you had ever met with or

1    dealt with the FBI in a criminal case?

2    A.  I -- I don't -- I don't recall specifically if -- post-9/11

3    if I had any interactions with the FBI prior to 2005, but as it

4    related to an active criminal case, that's accurate.

5    Q.  And you, at that point in time, had never met with or dealt

6    with an Assistant United States Attorney before?

7    A.  As it related to an active criminal case, no.

8    Q.  So, when you met with the AUSA and the FBI at that time,

9    Mr. Griffin did most of the talking with them?

10   A.  I think he may have had a phone conversation with -- with

11   either of them before we went down there, so he certainly was

12   involved in most of the talking before we went down there,

13   because I didn't speak with anyone on the phone.  But when we

14   got down there, we were together the whole time, and I think we

15   probably equally engaged in conversation.

16   Q.  Did you meet with Mr. -- with Hamid Hayat on that day?

17   A.  Yes.

18   Q.  You explained to Hamid Hayat that you did not have any

19   experience defending a criminal case?

20   A.  Yes.

21   Q.  Did you meet on that day jointly, with both Hamid and Umer?

22   A.  I -- I don't think we would have met jointly with them,

23   because by the time that we spoke with them, it may have been

24   at the jail, and they certainly wouldn't have been together.

25        Whether or not any of those meetings were jointly with

1    Johnny, I don't recall.

2    Q.  On that first day?

3    A.  On that first day.

4    Q.  In the course of your representation of Mr. Hayat -- I'll

5    call him Hamid so as not to confuse him with his father -- you

6    met dozens of times with Hamid, correct?

7    A.  I did.

8    Q.  But you do not have any notes of your meetings with Hamid?

9    A.  Nope.

10   Q.  Did you take notes of your meetings with Hamid?

11   A.  I -- I'm sure that I did, because some of the meetings were

12   specifically to discuss, maybe, documents that we had received,

13   or issues in the case, and I wanted to take notes.  So, I

14   certainly did take notes.  And at that time I used legal pads

15   more than I did a computer, and so I certainly took notes, I

16   just don't have any of them.

17   Q.  During those meetings with Hamid, though, you did little

18   information gathering; is that correct?

19   A.  No, that's not true.

20   Q.  I'm going to ask you if you could take a look at the top

21   binder there, and that is a copy of your deposition.

22   A.  Okay.

23   Q.  I would ask if you could turn to page 145 of that

24   deposition.

25        So, do you recall testifying during your deposition that

1    when you sat with Hamid there was not a lot of information

2    gathering when you talked with him?

3    A.   So, I'm -- I think you're referencing line 10, where I say

4    I was trying to think about when we sat and watched the

5    confession tape together, whether or not I took notes, but I

6    wasn't -- there wasn't a lot of information gathering when I

7    talked with him.

8         I think that in the sense of the question being asked about

9    did I take notes, and was I writing notes of information that

10   he was giving to me, probably not a lot of notes based on

11   information that he was giving to me because he -- the -- first

12   of all, we spoke in a foreign language.  And, I did not get

13   from Hamid as much information as I get from typical other

14   witnesses because of his education level and background.

15        But when asked whether or not there was information

16   gathering, I certainly asked him details about what he did, and

17   what happened with the confession.  I mean, I didn't just --

18   just go to the jailhouse to just visit with him.  We talked

19   about a lot of this.

20   Q.   And during that conversation -- we'll come back to this.

21   But during that conversation, he told you that he had never

22   attended a terrorist training camp?

23   A.   Yes.

24   Q.   And he told you that he had been in Pakistan during -- from

25   2003 to 2005 visiting his family?

1    A.   Right.  That he was there for the two years.  It wasn't

2    just to visit family, but, yeah, he told me he was there for

3    the past two years before coming back.

4    Q.   Okay.  We will get -- we'll get back to that.

5         So, as a result of this initial meeting, you and

6    Mr. Griffin agreed that you would represent Hamid, correct?

7    A.   No.  No.  It was -- what I was explaining was simply to

8    stop the interrogation.  For that purpose, that's how we

9    divided it up.  But the decision to continue with the

10   representation was not made the first day.

11   Q.   Okay.  And when was that decision made?

12   A.   It -- all I know is that it was made after speaking with

13   Hamid individually, myself, as well as speaking with Johnny and

14   Umer, various family members, community members.  It was a

15   decision that was not made in haste.

16   Q.   You agreed that you would represent Hamid despite your lack

17   of experience because you believed you'd be a member of a team

18   with Johnny Griffin; is that right?

19   A.   I believed that -- that we would -- that the type of -- the

20   type of representation would be such that there was no conflict

21   between the father and the son, and that I could rely on

22   Johnny's experience with -- as being a criminal law

23   practitioner, and that I could be invaluable in other ways.

24   Q.   Okay.  So, your understanding was that you and Griffin

25   would be a team, essentially, representing Hamid and Umer in

693

1    the case?

2    A.   That we -- that I would rely on him in my representation of

3    Hamid, was my understanding, but that we would have -- parts of

4    the trial would be together, or that at the hearings, when

5    there were appearances made, I would join in his arguments, and

6    that we could work together to develop strategies.  But I

7    always distinguished between the fact that I was not Umer

8    Hayat's attorney, and he was not Hamid Hayat's attorney.

9    Q.   But Griffin's role in the defense was to provide the

10   criminal and legal experience that you lacked with respect to

11   the representation of Umer and Hamid Hayat?

12   A.   His role was to provide the information to me, and advice

13   to me, and then I would represent my client.

14   Q.   And you relied on Mr. Griffin's advice to you in order to

15   make decisions in the case?

16   A.   Yes, I did.

17   Q.   And, in fact, isn't it correct that Mr. Griffin insisted

18   that he would have the final decision making power for strategy

19   and tactical decisions?

20   A.   That is not true at all.

21   Q.   Do you remember -- at the end of Mr. Hayat's trial, after

22   his conviction, do you recall that Mr. Riordan was brought in

23   to assist you with sentencing, correct?

24   A.   I recall that Mr. Riordan -- yes.

25   Q.   And you then had a number of meetings with Mr. Riordan and

1   his partner, Don Horgan, right?

2   A.  Of course, yes.

3   Q.  And during those meetings, Mr. Riordan would ask you

4   questions about your representation of Mr. Hayat -- of Hamid

5   Hayat?

6   A.  I -- I don't -- I'm not going to characterize the

7   discussions as him asking me questions.  We were working on a

8   new trial motion based on jury misconduct and other issues, and

9   I assisted in that regard.  And so in discussing what had

10  happened in trial, and just throughout my representation, sure,

11  I provided a lot of information to Dennis.

12  Q.  And you had conversations with him about your

13  representation of Hamid Hayat; is that right?

14  A.  Yes.

15  Q.  And during those conversations, isn't it correct that you

16  told Mr. Riordan that Griffin had, in fact, insisted to you

17  that he would have the final decision making power for strategy

18  and tactical issues?

19  A.  I would never say that because it wasn't true.

20  Q.  So, you did not say that to Mr. Riordan?

21  A.  I did not say that to him.

22  Q.  And at that point in time, you had no criminal experience,

23  correct?

24  A.  Well, I had just finished a trial.  Which time are you

25  talking about?

1   Q.   When you first came in to represent Hamid Hayat.

2   A.   Oh, no.  I thought I answered that.  No, I didn't.

3   Q.   Isn't it true that you also told Mr. Riordan that the

4   decisions that Mr. Griffin would have the power to make

5   included things like what motions to file?

6   A.   No.

7   Q.   Or whether to ask for continuances?

8   A.   No.

9   Q.   Or what witnesses to call?

10  A.   No.

11  Q.   Whether either defendant would testify?

12  A.   No.

13  Q.   But, in fact, given your lack of experience, those sorts of

14  decisions were something that you had never done before,

15  correct?

16  A.   Correct.

17  Q.   And so you did not know at that point in time what to take

18  into account when making those decisions?

19  A.   Well, that's -- I didn't know before the decision presented

20  itself, but based on the information I received and my own

21  research, I made the decision.

22  Q.   And the information you received, you're speaking of

23  information you received from Mr. Griffin, discussions with

24  Mr. Griffin?

25  A.   Discussions with Mr. Griffin, there may have been -- I

1    don't recall if we had had -- well, at some point we had had

2    discussions with Mark Reichel, feedback from our investigator,

3    and, again, my own research.

4    Q.  And with respect to Mr. Reichel, you didn't have any

5    conversations with Mr. Reichel until the eve of trial; isn't

6    that right?

7    A.  My first conversation with Mark, I do believe, was before

8    trial.

9    Q.  At the time when you began representing Hamid Hayat, you

10   were not familiar with the law regarding conflict of interest

11   between co-defendants in a case, correct?

12   A.  I don't think that's accurate.  I mean, I -- I went through

13   law school, so I certainly had exposure to it.  But had I ever

14   dealt with the issue in a criminal case?  No, I had not.

15   Q.  Well, with respect to law school, again, you didn't have

16   any criminal law courses in law school other than the two

17   required courses, correct?

18   A.  Correct.  But -- but conflict of interest was certainly

19   raised, and probably in the professional responsibility course

20   and other courses in law school.

21   Q.  Do you recall, in your discussions with Mr. Riordan,

22   telling him that you -- that you, at the time you began

23   representing Hamid Hayat, were not familiar with the law

24   regarding conflict of interest between co-defendants?

25   A.  I don't -- I don't recall saying that to him.

1  Q.  Did you say that -- you don't recall at all?

2  A.  No, I don't -- I don't -- I don't think I would have said

3  that because I don't know how -- I don't think we had a

4  conversation about a conflict of interest.  We were talking

5  about jury misconduct --

6  Q.  Well --

7  A.  -- primarily.

8  Q.  Mr. Riordan continued to represent -- to assist you in the

9  representation of Hamid Hayat in other matters other than just

10 the jury misconduct --

11 A.  I mean -- I'm talking about the motion for new trial.

12 Q.  Right.

13 A.  Right.

14 Q.  When you met with Hamid Hayat, when you first began

15 representing him, did you explain to Hamid that Griffin would

16 be making tactical and strategic decisions in the case, that

17 you would rely on him for that?

18 A.  Those are two different questions.

19     Did I explain to him that I would be relying on Johnny's

20 advice?  I think -- I think I didn't even need to -- I mean, he

21 knew it, he saw it.  I definitely would have told him about it,

22 but he watched it in court, that I did rely on his advice.  But

23 I never told him that Johnny was making the decisions in his

24 case.

25 Q.  Did you ever attempt to get Hamid's written consent to you

1   relying on Johnny Griffin for criminal legal experience and

2   advice?

3   A.   The -- I think we -- we went over this in the deposition,

4   but I know that I had him sign more than one document that

5   reflected the representation, and I -- and I'm pretty sure that

6   at least one of them included mention of how Johnny and I were

7   working together.  Specifically what the agreement stated, I --

8   I don't know.  And I don't recall.

9   Q.   At the time that you began representing Mr. Hayat, did you

10  understand or did you believe that it might be a conflict of

11  interest if a defendant [sic] for one defendant participated in

12  the defense of another co-defendant?

13  A.   My understanding -- I -- I think my understanding at the

14  time was that if there was a conflict of interest between the

15  defendants.

16  Q.   So your understanding was that it was not a conflict if one

17  lawyer participated in the defense of another unless there was

18  a formal conflict?

19  A.   Yes.  I think.  It's hard to remember what I thought then,

20  but that sounds about right.

21  Q.   You just talked about having Hamid Hayat sign certain

22  documents.  So, when you came in to represent Mr. Hayat, did

23  you prepare and have him sign an engagement letter?

24  A.   I did.

25  Q.   And did you draft that engagement letter?

1   A.  I did.

2   Q.  Did you draft that engagement letter based on language you

3   got from Mr. Griffin?

4   A.  I may have gotten some language from him, but I -- and I

5   just -- I just honestly don't recall.  But I probably did get

6   advice from him, or use some of his language, yeah.

7   Q.  If we could bring up Exhibit, I think it's, JJJ.2, page 2.

8   A.  Do I need to reference it -- I thought you were going --

9   Q.  It will be on your screen.

10  A.  Oh, that's what we're doing.  All right.

11  Q.  If we could go to page 2.  Just scroll one more page.  Go

12  back to page 2.

13      Is that -- do you recognize that document?

14  A.  I recognize that this is my letterhead and -- do you want

15  me to read the whole document?

16  Q.  No.  No.

17  A.  Okay.  I mean, it sounds -- I mean, it looks like something

18  I would have drafted.

19  Q.  Well, do you recognize whether or not that's the engagement

20  agreement that you --

21  A.  Oh, that was actually -- that was actually executed by the

22  parties?  I -- I don't know.  I don't recall, honestly.

23  Q.  Okay.  Your recollection is that you had Hamid Hayat

24  sign -- sign an engagement letter?

25  A.  Yes.

1   Q.  And who -- at that time, were you paid any money to

2   represent Hamid Hayat?

3   A.  At the time of signing the engagement letter?  Is that the

4   question?

5   Q.  Yes.

6   A.  On June 16th?

7       I have no recollection of when I was paid.  I really don't.

8   Q.  How much were you paid?

9   A.  I don't remember.  And even though I read my deposition, I

10  still don't remember.

11  Q.  At that point in time, or around this point in time, there

12  was an indictment returned against Hamid Hayat, correct?

13  A.  Yeah.  I mean, June 2005.

14  Q.  He was charged with making a false statement to the FBI?

15  A.  Yes.

16  Q.  And at that point in time, were you familiar at all with

17  the false statement statute?

18  A.  No.  No, I was not.

19  Q.  At that point in time, had you ever made an initial

20  appearance on a criminal case?

21  A.  No.

22  Q.  And did you make an initial appearance in this case for

23  Mr. Hamid Hayat?

24  A.  The initial appearance, I was in trial that week, and so I

25  may have missed the initial appearance and may -- Johnny

1    Griffin may have specially appeared at the first hearing

2    because I was in a family law trial.

3         And I just -- I just want to modify.  You asked generally

4    about criminal cases.  I may have -- prior to this time, I may

5    have in state court maybe done an arraignment or something for

6    a family member.  So I don't -- but in federal court, certainly

7    this was the first time.

8    Q.  So, Mr. Umer Hayat was also charged at the same time,

9    correct?

10   A.  I -- I -- I'm assuming he was, yes, at the same time.

11   Q.  And at that point in time, you believed that if Hamid alone

12   had been charged, without Umer, and therefore without Griffin,

13   that you would not have been qualified or capable of

14   representing Hamid Hayat in a criminal proceeding?

15   A.  I'm trying to understand your question.

16   Q.  If --

17   A.  If the question is would I have represented him on my own,

18   with no assistance from -- or mentorship with any other

19   attorney, no, I would not have.

20   Q.  Okay.  And, certainly, if by the time Hamid is charged with

21   a material support of terrorism charge, you, alone, would not

22   have been qualified or felt competent to represent him on that

23   charge either?

24   A.  Same answer.  With -- without mentorship or the involvement

25   of someone who was more experienced, no.

1  Q.  Or, by the same token, had Hamid's case been severed from

2  Umer's, and you did not have the assistance of Mr. Griffin, or

3  someone like him, you would not have felt competent to

4  represent Hamid in a severed separate case?

5  A.  At what point?

6  Q.  Well, at any point, if it had happened.

7  A.  Prior to the start of trial, I think I'd probably felt that

8  I could do it.

9  Q.  Well, prior to the start of trial is when you actually felt

10  so overwhelmed that you -- that you wanted to bring in Mark

11  Reichel to help you, correct?

12  A.  I did.  I had a bit of a -- some anxiety about doing it on

13  my own, but I ultimately decided I would do it without him.

14  Q.  Part of the reason you ultimately decided to do it without

15  Mr. Reichel was based on discussions you had with Mr. Griffin,

16  correct?

17  A.  Part of it, yes, it was.

18  Q.  And Mr. Griffin informed you that -- at that time that if

19  Mr. Reichel came into the case, Mr. Griffin would no longer be

20  able to mentor you or give you any advice, correct?

21  A.  I don't know if he said it that way, but what he did

22  explain -- I'm sorry.  What he did explain was that I -- the

23  fact that I was relying on him prior to that, that would --

24  that would certainly change because now we would have the

25  involvement of another experienced attorney, and so it wouldn't

1    be at the same level, which made sense.

2    Q.  When you were speaking to Mr. Reichel at that point in

3    time, you knew that there were going to be two juries, right,

4    one for Hamid and one for Umer?

5    A.  I probably did because I -- I -- I'm just trying to

6    remember when it was.  But I know it was close to trial, so I'm

7    sure we did know that, yeah.

8    Q.  So, one of the reasons you wanted to bring in Mr. Reichel

9    was to help you select Hamid's jury, correct?

10   A.  Right.  I had never -- I had never done a federal jury

11   selection, and so that was one of the reasons.  But I think

12   maybe just overall the idea that I was going to be totally on

13   my own at a trial, I think that was a bit overwhelming for me.

14   Yeah.

15   Q.  You were going to be totally on your own because Hamid's

16   jury was separate from Umer's, and Johnny could not assist you

17   with the selection of Hamid's jury -- Mr. Griffin could not?

18   A.  No, that's not what I mean.

19        I mean in the sense that prior to the trial, the hearing --

20   the pretrial hearings, we -- Johnny took the lead on a lot of

21   those pretrial hearings, in making arguments on law and motion

22   type stuff, and I would join in many of those decisions and

23   agreements.  But the trial was going to be, you know, hundred

24   percent me, kind of, on my own, examining my own witnesses,

25   doing my own jury selection, and so I think the thought of that

1    I did get nervous about.

2    Q.  At the end you decided not to bring Mr. Reichel in,

3    correct?

4    A.  Yes.  He -- he wanted us to continue it out, and he wasn't

5    going to be as available as we thought he would be.  And so

6    I -- I built up the confidence and decided I can do it.

7    Q.  And so part of the reason you decided you could do it was

8    because you had Mr. Griffin still available to help you?

9    A.  Oh, yeah.  Yeah.

10   Q.  So, I want to go back to the retainer agreement --

11   actually, let me move on.  Let me move on from that.

12       After you were retained by Hamid Hayat to represent him,

13   you appeared for him at a detention hearing, correct?

14   A.  I think so.

15   Q.  You had never been in -- appeared in a detention hearing

16   before?

17   A.  No.

18   Q.  Did Mr. Griffin assist you in that proceeding as well?

19   A.  Yes.

20   Q.  Mr. Griffin provided you with advice?

21   A.  Yes.

22   Q.  Did he formally appear at that detention hearing?

23   A.  Formally appear?  Like, was he physically present?  Yes.

24   But I think when we put our appearances -- formal appearances,

25   my understanding is I say, I am the attorney for Hamid Hayat.

1   I don't think he said he was the attorney for Hamid Hayat.

2   Q.  But he was there with you in the courtroom?

3   A.  Yeah.  He was there, I think, every time I was in the

4   courtroom.

5   Q.  And to explain the bail statute to you?

6   A.  I don't recall.  I -- I don't recall that conversation, no.

7   Q.  Because of your lack of experience at the time, you were

8   basically having to learn on-the-job, right?

9   A.  I was.

10  Q.  And you were -- for all of these things, you were doing

11  something you had never done before?

12  A.  For a lot of it, I was.

13  Q.  And you were -- as you testified, you viewed Mr. Griffin as

14  your mentor, essentially?

15  A.  I mean, I -- I used that word, but I think it was more

16  somebody who was in the courtroom and saw everything, and our

17  clients were, essentially, going through a lot of the same

18  hearings, and I relied on his background and knowledge in

19  reaching the decisions that I did for my client.

20  Q.  But apart from Mr. Griffin's advice and consultation, the

21  only basis you had to make a decision on your own would be

22  whatever you might have read?  Maybe you read a statute, or

23  maybe you read a --

24  A.  I don't think it was that basic.  I -- I pretty much

25  breathed and lived this case.

1    Q.  I understand that, in terms of the facts, but what I'm

2    talking about here is your -- with respect to legal decisions

3    or strategic decisions that had to be made, apart from

4    Mr. Griffin's advice, and the consultation with Mr. Griffin,

5    your decisions were based on -- not on experience but on

6    whatever you might have learned on-the-job, reading a statute,

7    for instance?

8    A.  Correct.  Everything but experience.

9    Q.  Okay.  Now, at some point, as we discussed, Mr. Hamid Hayat

10   is now charged in a superseding indictment with material

11   support of terrorism, correct?

12   A.  Yes.

13   Q.  And at that point in time -- that was in November of -- I'm

14   sorry, in September of 2006; do you recall that?

15          MR. YANG:  Objection.  I don't think it was September

16   of --

17          THE WITNESS:  '5.

18          MS. BOERSCH:  2005.  Sorry.  Typo.  It was

19   September 2005.

20          MR. YANG:  I'm withdrawing it based on the

21   clarification, Your Honor.

22          THE COURT:  Let the record reflect Mr. Yang is

23   withdrawing his objection.

24          MS. BOERSCH:  And I have corrected the date.

25   Q.  BY MS. BOERSCH:  It was September 22nd, 2005, correct?

1   A.   Sure.  I remember sometime in September '05, I don't

2   remember the day.

3   Q.   And those were extremely serious charges, right?

4   A.   Well, yeah, I thought it was.

5   Q.   And as a result of those new charges, Mr. -- Hamid Hayat

6   was now facing decades in prison, right?

7   A.   Yes.

8   Q.   And prior to that, with the false statement charges, the

9   maximum was -- well, what was the maximum prior to that?

10  A.   I don't remember, but I think he had more than one charge

11  of false statements, so adding those together -- I don't

12  remember the numbers right now, but yes, the material support

13  certainly added.

14  Q.   And do you recall what was the maximum penalty for the

15  material support charges?

16  A.   I don't remember.

17  Q.   In the superseding indictment, Umer Hayat was not charged

18  with material support of terrorism, correct?

19  A.   Correct.

20  Q.   And Umer Hayat had only, I think, a single false statement

21  charged against him?

22  A.   I know that the nature of his charges were only false

23  statements.  Whether or not it was only one, I don't remember.

24  Q.   But Hamid clearly had the more serious charges?

25  A.   Clearly.

1   Q.  And yet you continued to represent Hamid by yourself with

2   Mr. Griffin, correct?

3   A.  Yep.

4   Q.  Do you recall before trial -- well, this -- in the

5   superseding indictment, the allegation, as I understand it, was

6   that Hamid Hayat had attended a terrorist training camp in

7   Balakot, Pakistan; is that right?

8   A.  I don't recall right now if all those specifics were in --

9   I don't remember if there was an amended indictment but, yeah,

10  I mean, that was the nature of the charge.  Yeah.

11  Q.  And Mr. Hayat had told you he had never attended any

12  training camp, correct?

13  A.  Correct.

14  Q.  Do you recall, shortly -- sometime before trial finding an

15  article from the Pakistan Press in which a government official

16  indicated that there were no longer any jihadi camps in

17  Pakistan of the sort that Mr. -- that Hamid Hayat was alleged

18  to have attended?

19  A.  Yes.

20  Q.  And when you found that article, you contacted the

21  Pakistani embassy to find out if you could obtain information

22  about that from the Pakistani government, correct?

23  A.  I mean, I think I was -- right.  I was just doing my

24  research and trying to see.  This was in my search for experts

25  and information, and I was trying to see what I could gather.

1    If that statement was made, if I could get cooperation from

2    someone in the Pakistani government with our case.

3    Q.  So you did contact someone in the Pakistani government?

4    A.  I did.

5    Q.  And you informed Mr. Griffin that you had done so, correct?

6    A.  Yes.

7    Q.  But he indicated to you that you should not do that

8    anymore; is that right?

9    A.  No.

10   Q.  Didn't he tell you that the Pakistani authorities were

11   working in coordination with the federal government and would

12   not be of assistance to you?

13   A.  I mean, he may have made a comment that that was his

14   belief, but he didn't instruct me to cease my efforts.  A lot

15   of -- actually, all of the work that I did in looking for

16   experts, and that type of research, was without consultation

17   with him.

18   Q.  Let me go back a little bit.

19       After Mr. Hayat's conviction and sentencing, when you met

20   with Mr. Riordan and Mr. Horgan --

21   A.  Yes.

22   Q.  -- one of the issues that you discussed with them was their

23   efforts to look for a basis for a petition for writ of habeas

24   corpus for Mr. Hamid Hayat, correct?

25   A.  If it was framed that way, I don't recall, but -- but,

1    yeah, I mean, I knew that they were experienced appellate

2    attorneys who were trying to figure out any way to overturn

3    that conviction.

4    Q.  And you believe, again, that Hamid Hayat was innocent, and

5    so you voluntarily and forthrightly answered their questions,

6    right?

7    A.  Again, I don't -- I don't think that it was -- it was an

8    interview type session.  But, yes, I -- I believed us to have a

9    good working relationship, and I provided information, I voiced

10   frustrations, I made comments about things -- how things could

11   have been done differently, because, you know, hindsight is

12   always 20/20.  But, yeah, it was -- it was a difficult and

13   emotional time, I think, for me.

14   Q.  Clearly.  I've been there.  I understand.

15   A.  Yeah.

16   Q.  But as a result of your commitment to Hamid Hayat, when you

17   spoke to Mr. Riordan and Mr. Horgan, you wanted to give them as

18   much information as you could about Hamid's case to help him,

19   right?

20   A.  Absolutely.

21   Q.  And you were as honest as you could be with Mr. Riordan and

22   Mr. Horgan?

23   A.  Absolutely.

24   Q.  During those discussions, isn't it correct that you told

25   Mr. Riordan that during your representation of Hamid Hayat you

1    felt like you had to take Mr. Griffin's advice about how to

2    defend Hamid's case, given your lack of experience?

3    A.  No.

4    Q.  Isn't it correct that you told Mr. Riordan that you were

5    fearful, given your lack of experience, that Mr. Griffin would

6    stop assisting you if you didn't follow his advice?

7    A.  No.

8    Q.  When you and Mr. Griffin were retained to represent Hamid

9    Hayat and Umer Hayat, you don't recall how much money you

10   received?

11   A.  I mean, I -- I think I -- maybe you showed me some things

12   to refresh my recollection at the deposition -- I don't know

13   why the number 6,000, or somewhere less than 10,000, for an

14   initial payment, something like that.  I don't remember right

15   now.

16   Q.  And was that -- assume it was 6 to 10,000 that you

17   received, that was all of the money that you ever received for

18   representing Hamid Hayat?

19   A.  No, I don't think that's accurate.

20   Q.  You think you received some later?

21   A.  I did.

22   Q.  Okay.  But over the course of the representation,

23   Mr. Griffin received much more money than you did?

24   A.  Yes, he did.

25   Q.  At some point shortly before trial, you and Mr. Griffin had

1    a conversation with the family in which you informed the family

2    that you and Mr. Griffin were going to need more money for the

3    trial, correct?

4    A.  I don't -- I don't recall if it was the family, or who,

5    exactly, we spoke with, but certainly before trial we explained

6    that we needed more money.

7    Q.  And as a result of that conversation, Mr. Griffin and Umer

8    Hayat entered a new retainer agreement, correct?

9    A.  I -- I think, based on what you showed me at the

10   deposition, they may have, but my understanding is that -- is

11   that they probably did, and that Hamid and I also entered a new

12   agreement.

13   Q.  You believe you executed a new, second agreement with Hamid

14   Hayat?

15   A.  Yes.

16   Q.  And you had him sign it?

17   A.  Yes.

18   Q.  If I could -- if you could see Exhibit, I think it's, G.

19   If you could scroll just to the second page and then back to

20   the first.

21       Ms. Mojaddidi, do you recognize that document?

22   A.  If this is the same -- was this -- if this is the same one

23   that was shown to me at the deposition, I mean, I -- as I sit

24   here today, I don't know if I've seen it before.  But if it's

25   the same one at the deposition, then I surely saw it then.

1    Q.  Well, you know that at some point Mr. Griffin and Umer

2    Hayat entered a new engagement letter -- a new engagement

3    agreement?

4    A.  Right.  I just -- I answered that question.  My

5    recollection is that they likely did, because I -- Hamid and I

6    did at the same time.

7    Q.  Well, in -- isn't it correct that, in fact, you did not

8    ever actually enter a new engagement letter with Hamid Hayat?

9    A.  No, that's not true.

10   Q.  Well, let me -- if we could look at -- it's Exhibit JJJ.2,

11   I believe, the e-mail.

12       Do you recognize that?

13   A.  Do you want me to read it?  Looks like an e-mail I sent to

14   Dennis.

15   Q.  Just read it to yourself.

16   A.  Okay.

17   Q.  So, in fact, you did not actually enter a new retainer

18   agreement with Hamid Hayat, correct?

19   A.  Let me -- I wasn't done reading when you asked the

20   question.  So, give me a second.

21            THE COURT:  Counsel, while the witness is reviewing

22   the exhibit, do I assume correctly that you have a fair amount

23   left?

24            MS. BOERSCH:  I do.  Is it time for the --

25            THE COURT:  I was hoping to break still around noon.

1    Would that be convenient for you?

2              MS. BOERSCH:  That's fine.

3              THE COURT:  So we'll go until 12:00, and take an

4    hour.

5              THE WITNESS:  So, yeah, it just -- what it says is, I

6    don't know -- yeah, I don't know why I never got the second one

7    signed.

8         So, yeah, at this time it appeared as though I -- I

9    couldn't understand why I didn't have a copy of it or -- or if

10   I got it signed.

11   Q.  BY MS. BOERSCH:  So you --

12   A.  So I would agree that what I said here is probably more

13   accurate than what I'm saying today.

14   Q.  Okay.

15   A.  Yes.

16   Q.  The agreement that -- if we could go back to Exhibit, I

17   think it was, G, the agreement between Mr. Griffin and Umer

18   Hayat.

19        That agreement purported to divide the funds that the

20   family was required to provide to pay for both you and

21   Mr. Griffin's representation, correct?

22   A.  I'd have to read it.  But I see my name in there, so...

23   Q.  Do you have any independent recollection of whether the

24   agreement --

25   A.  Well, because this was discussed at the deposition -- an

1    independent recollection, I don't right now.  I am relying on

2    reading this agreement and discussions we had at the

3    deposition.

4    Q.  So, if you want to take some time to read that.

5    A.  Okay.

6    Q.  Does that -- and I'll ask the question, but take some time

7    to read that, but does that refresh your recollection that the

8    agreement between Umer Hayat and Mr. Griffin was to provide

9    funds for both you and Mr. Griffin's representation?

10        (Pause in proceedings.)

11   A.  So, I'm sorry, ask that question again, to provide funds?

12   Q.  Yes.  That the funds that are referred to in this letter

13   between Mr. Griffin and Umer Hayat were to pay for both your

14   and Mr. Griffin's representation.

15   A.  Right.  The numbers that were explained in this agreement

16   would be for both of us, yes.

17   Q.  And the total fee was about $200,000?

18   A.  Yes.

19   Q.  And of that, Mr. Griffin was to get $135,000?

20   A.  Does it say 150,000?

21   Q.  You were to get $65,000, right?

22   A.  Right.  And then he would get 150, is what I see, not 135.

23   Q.  Okay.  And, in fact, as you now recall, Mr. Hamid Hayat

24   never signed this agreement --

25   A.  Based --

1   Q.  -- or an equivalent agreement?

2   A.  Based on the e-mail I sent to Dennis, I said that I didn't

3   know, didn't look like I was able to locate it.  So, as I sit

4   here right now, I don't -- I don't know.

5   Q.  Other than the initial payment of 6 to $10,000, the only

6   other payment you received for your representation of Hamid

7   Hayat was about $10,000, right?

8   A.  I don't recall.

9   Q.  Did you ever receive $65,000?

10  A.  No.

11  Q.  Based -- was it your understanding that of the new funds

12  that were to be provided, that all expenses for the trial of

13  both Hamid Hayat and Umer Hayat were to come from that

14  $200,000?

15  A.  What was the first part of that question?  I'm sorry.

16  Q.  Sorry.

17      Was it your understanding at the time that any expenses for

18  the trial were to come from the $200,000 that's referred to in

19  this engagement letter?

20  A.  Sure.  And I think this letter is saying what the total

21  moneys would be, so it was also adding any moneys that were

22  received prior to January of 2006.  So, if the question is the

23  moneys that came from the family throughout that time period,

24  yes, the expenses were going to come from that money.

25              MR. YANG:  Your Honor, I'm going to object at this

1   time based on the rule of completeness, and ask that counsel

2   show her the second page of this letter.

3              THE COURT:  Overruled.  I believe she's already been

4   shown the second page.  But, overruled.

5              MS. BOERSCH:  Yes.

6   Q.  BY MS. BOERSCH:  And then once expenses were deducted, and

7   your $65,000, the remainder of the funds would be for

8   Mr. Griffin's representation of Umer Hayat, correct?

9   A.  I -- I honestly don't have an independent recollection of

10  how that was -- how that was determined.

11       I think at the time that we did this letter there was a --

12  there was an expectation that there was a certain amount of

13  money that might come from the home that the family had.  I

14  don't know how the numbers ultimately added up.

15       And, frankly, for me, it had nothing to do with the money.

16  My entire representation I wasn't really interested in much of

17  it.

18              THE COURT:  Counsel, why don't we -- it's about a

19  minute to noon.  Why don't we take our noon break now.

20              MS. BOERSCH:  Okay.

21              THE COURT:  Court will reconvene in one hour.

22       (Recess taken, 11:59 a.m. - 1:02 p.m.)

23              THE COURT:  All right.  I see the same players that

24  were here this morning are here now.

25       Ms. Mojaddidi, I'm sure I don't need to, but I'm going to

1    gently remind you that you're still under oath.

2        Are we ready to proceed with further examination?

3            MS. BOERSCH:  Yes, Your Honor.

4            THE COURT:  All right.

5    Q.  BY MS. BOERSCH:  Ms. Mojaddidi, could you -- in that binder

6    in front of you there is a series of exhibits, we've already

7    looked at one, but JJJ, and I'd like you to look at JJJ.1,

8    JJJ.2 and JJJ.3.

9    A.  So, they're not actually marked with the points, that just

10   reflects the page number?

11   Q.  It should be --

12           MS. BOERSCH:  If I could approach the witness?

13           THE COURT:  Yes.

14           THE WITNESS:  I see now.  We've got another set of

15   them.

16           MS. BOERSCH:  Yes, we have a whole bunch.

17           THE WITNESS:  JJJ1?

18           MS. BOERSCH:  JJJ.1, .2 and .3.

19           THE WITNESS:  Okay.

20   Q.  BY MS. BOERSCH:  JJJ.1, is that what you're looking at?

21   A.  Yes.

22   Q.  Is that, in fact, an e-mail that you sent to or received

23   from Mr. Riordan?

24   A.  Looks like --

25           THE COURT:  Hold on just a moment.  Are we going to

```
1     pull this up on the screen or not?

2              MS. BOERSCH:  We can.

3              THE COURT:  Just creates less paper rustling from the

4     bench.

5     Q.  BY MS. BOERSCH:  Is that an e-mail that you, in fact, sent

6     to Mr. Riordan?

7     A.  Can I have a minute to read it?

8     Q.  Sure.

9     A.  Thank you.

10         I really don't remember this e-mail at all.

11    Q.  Okay.  Was that -- I guess there is no e-mail address on

12    there.

13         If you could turn -- and the only questions I'm going to

14    ask you on these e-mails is whether or not you recognize that

15    as an e-mail that you sent.

16    A.  Yeah.  This one, I -- I honestly don't.

17    Q.  Okay.  If you could turn to JJJ.2.

18             THE COURT:  Ms. Mojaddidi --

19             THE WITNESS:  Mojaddidi.

20             THE COURT:  Thank you.  I'm so sorry.

21             THE WITNESS:  Don't worry about it.

22             THE COURT:  I butcher all kinds of names.

23         If you could just make sure you speak into the microphone,

24    please.

25             THE WITNESS:  I will.
```

1      So, you showed it to me earlier.  I recognize my e-mail

2   address.  And I don't at all remember sending this e-mail, so

3   I -- if the question is whether or not I recognize it, as I sit

4   here, I don't.

5   Q.  BY MS. BOERSCH:  But you do recognize your e-mail address?

6   A.  I do recognize my e-mail address.  And I think I even

7   recognize Dennis' e-mail address.

8   Q.  That was your e-mail address at that time, in 2005?

9   A.  Yeah.  It continues to be, actually.

10  Q.  If we could look now at JJJ.3.

11  A.  I'm sorry, so you don't want me to look at the next page of

12  JJJ.2, you want me to go to the next exhibit?

13  Q.  Correct.

14  A.  Got it.

15  Q.  JJJ.3.

16  A.  Okay.

17  Q.  Do you recall getting that e-mail from Mr. Horgan?

18  A.  No, but I imagine we had such exchanges.  I don't, right

19  now, remember receiving this, no.

20  Q.  Okay.  If you could further forward in that binder, look at

21  Exhibit H.  Go back one page.  Is that page 3?  If you could

22  look at page 3 of that exhibit.

23      Do you recognize that document?

24  A.  I do not.  As I sit here right now, I don't recognize it.

25  But --

1   Q.  Do you recall whether, in fact, you received a $10,000

2   payment from Umer Hayat around that time, which was June

3   of '06?

4   A.  I probably did.  I think I remember getting something after

5   the trial, so that -- the timeframe makes sense, but this -- I

6   don't recall this specific document, but I do recall receiving

7   money after the trial.

8   Q.  And you don't recall getting any other checks during the

9   trial?

10  A.  I don't.  And I think someone from Mr. Riordan's office had

11  asked me to look, and I sent some kind of an e-mail

12  communication where I went back and looked in my records of all

13  the moneys that I received.  And I just, right now, don't

14  remember what my response to that was.

15      But I think that that would have been the most accurate

16  reflection of the moneys that I received, was that

17  communication to Mr. Riordan's office --

18  Q.  Okay.

19  A.  -- a few years ago.

20  Q.  With respect to moneys for the defense of Hamid Hayat,

21  isn't it correct that Mr. Griffin controlled the bank account

22  in which the funds for expenses would have to be paid?

23  A.  Well, the check they -- if I -- if there was a cashier's

24  check written to me, it wasn't as if it -- that he deposited it

25  and then sent it to me, I would have directly cashed it myself.

1    So, any other moneys that were not addressed to me, I believe

2    it was Johnny who was in possession of all the moneys.

3    Q.   And that -- it was a bank account that he controlled,

4    correct?

5    A.   As far as I know.  I'm assuming it was related to his firm.

6    Q.   Okay.  Now, with regard to the defense of Hamid Hayat, you

7    personally never hired an investigator to investigate the case

8    for Mr. -- for Hamid Hayat; is that correct?

9    A.   Well, Jim Wedick was our investigator throughout the entire

10   case.

11   Q.   But you did not hire Mr. Wedick?

12   A.   Well, it -- the way that he became involved was because he

13   was Johnny's, I guess, longtime friend and colleague.  And he

14   worked with us from, I think, almost day one.  So there was an

15   absolute understanding that he would serve as the investigator

16   for both.

17        But did I interview him and formally hire him and formally

18   sign an agreement with him and pay him?  I did none of those

19   things.

20   Q.   Okay.  And during the course of the pretrial proceedings,

21   isn't it correct that Mr. Griffin was primarily the person who

22   directed Mr. Wedick's activities?

23   A.   That's not true.

24   Q.   Who else did?

25   A.   I did.

1    Q.  What did you ask him to do?

2    A.  Well, directing activities, specifically what did I ask him

3    to do?  I don't -- I don't remember the specifics of what I

4    asked him to do, but what I recall in terms of our relationship

5    was he sat through trial, we would have either lunch or dinner

6    meetings, or other strategy meetings, and I would always be

7    involved.

8        And so whatever decisions were made with regard to anything

9    he needed to do were certainly with the input and direction of

10   both of us.  I had many conversations with Jim on the phone

11   where Johnny wasn't involved.

12       And so I -- I can't, right now, specific -- the only -- and

13   it's probably because it's the most recent, the specific thing

14   that I directed him to do was to interview the one juror that

15   we believed was pressured to vote the way she did on the day

16   that the verdict came out.  That was a hundred percent at my

17   direction.  Johnny wasn't involved in that at all.

18   Q.  Other than that post-trial direction, you don't have any

19   specific recollection of directing Mr. Wedick to do anything

20   specific for Hamid Hayat?

21   A.  Well, I mean, I'd have to, kind of, think about it.  Sure,

22   we asked him to watch the videotape.  Of course he's going to

23   watch my client's videotape, at my direction and my request.

24   So, he watched the interviews.  He reviewed the evidence.

25       I just can't -- I was thinking more of beyond reviewing the

1   evidence and having conversations with us, what else he did in

2   terms of interviewing people.  I just, right now, don't have

3   any specific recollection.  But it -- it was certainly not a

4   situation where I did not have the ability to ask him to do

5   something for me.

6   Q.  Whether or not you had the ability -- that was not my

7   question, whether or not you had the ability.

8   A.  Yeah.

9   Q.  The question is whether or not you recalled any specific

10  direction to Mr. Wedick on behalf of Hamid Hayat.

11  A.  Yes, I do.  And I -- now I'm thinking about the -- the

12  video was a big thing, because that was a major role that he

13  was going to play, was to give his opinion with regards to the

14  confession.  And so having him review the video, and talking to

15  him about it, that was -- certainly, Jim and I had those

16  conversations.

17  Q.  That's the only one -- the only other one you recall at

18  this point?

19  A.  At this point, and that as well as, like I said, reviewing

20  some of the other evidence that we got, you know, maybe the

21  search warrant.  I just -- I can't think, right now,

22  specifically about asking him to do anything beyond helping us

23  review the evidence so we can gather what his opinion was going

24  to be that he was going to offer to the court when he

25  testified.

725

1   Q.   And when you say "we," you're referring to yourself and

2   Mr. Griffin?

3   A.   Yes.

4   Q.   But you -- you never paid Mr. Wedick any money for his

5   investigative services, correct?

6   A.   Did I pay him directly, out of the money that I received?

7   No, because that wasn't the -- that wasn't the arrangement.

8       The arrangement was that Johnny was holding those moneys

9   that were going to go for experts.  And when I needed it, if I

10  needed it, I would ask him for it.  I think the moneys that Jim

11  received came from Johnny.

12  Q.   You don't know how much Johnny Griffin paid Mr. Wedick?

13  A.   You know, I -- I don't.  But I do know that Jim was --

14  he -- him and I had a similar mentality of, it wasn't about the

15  money, we were willing to do it for free.

16  Q.   One of the things that you believed was important in

17  defending Hamid Hayat was to investigate whether there was a

18  terrorist training camp that actually existed in the Balakot

19  area where he was accused of going to a camp, correct?

20  A.   Correct.

21  Q.   But you never asked Mr. Wedick to go to Pakistan to

22  investigate whether or not there was, in fact, a camp there?

23  A.   No.  I didn't -- I don't think I thought that that -- no.

24  I never -- I never did that.  I don't -- I don't know if I

25  think he would have survived out there.

1    Q.   Let me go back to Mr. Hamid Hayat for a second.

2         You knew, did you not, that Hamid Hayat had suffered from

3    meningitis at some point prior to --

4    A.   Yes.

5    Q.   But you never did any further investigation of his

6    meningitis?

7    A.   Well, it was in the past, so I -- I received no information

8    from him that he continued to suffer from it.

9         And, as I sit here today, do I recall what timeframe it was

10   that he had the meningitis?  I thought it was before he went to

11   Pakistan, but I could be wrong.

12        But, no.  The answer is, no, I did not.

13   Q.   And you just did not believe it was relevant to anything,

14   his past meningitis?

15   A.   I -- I -- I don't think I did.  I don't recall that I did,

16   actually.

17   Q.   Now, you were -- you stated before you were convinced that

18   Hamid Hayat had never attended a terrorist training camp,

19   correct?

20   A.   I'm sorry, can you repeat the question.

21   Q.   You were convinced that Hamid Hayat had never attended a

22   terrorist training camp in Pakistan, right?

23   A.   I was.

24   Q.   And you learned from him that, in fact, during the time he

25   was in Pakistan, he spent most of his time in his native

727

1   village, Behboodi?

2   A.  Yes.  And I think he said that he went to Rawalpindi as

3   well.

4   Q.  And he went to Rawalpindi to take his mother to Rawalpindi

5   for medical care, correct?

6   A.  I don't think he told me that.  I think I just -- as I sit

7   here right now, I just remember that he went to Rawalpindi.

8   So, he spent his time between the two places.

9   Q.  And did you learn that he spent a lot of time in Behboodi

10  playing cricket?

11  A.  He told me that was one of the things he did.

12  Q.  And watching video games?

13  A.  Yes.

14  Q.  And he spent a lot of time at the local store?

15  A.  Yeah, just hanging out in front of the store.

16  Q.  And so as a result of that, you believed that there may be

17  witnesses in Pakistan who could testify as to his whereabouts

18  while he was there, correct?

19  A.  Sure, I explored that possibility.

20  Q.  Okay.  And Hamid, in fact, gave you the names of a number

21  of people in Pakistan who might be able to testify about his

22  whereabouts?

23  A.  No.  It wasn't -- it wasn't -- it wasn't that way.  It was

24  more him telling me who was there, which of his family members

25  were there around that time, and who he had interactions with.

1    He didn't tell me that there were specific people that I should

2    talk to.

3    Q.  But you -- his family members did tell you the names of

4    people there?

5    A.  I mean, the only -- and I don't -- I don't think that that

6    even happened, that his family members told me.  I think once

7    we were -- reviewed the evidence, and were looking at 302s and

8    documents, we were able to assess who some of the players were,

9    like his uncle and his grandfather, his cousin, his mother.

10   Q.  So, you never interviewed Hamid Hayat and asked him

11   specifically to give you names of people who he spent time with

12   in Pakistan?

13   A.  I mean, no, I -- I guess I'm just -- the question was did

14   he -- did he give me a list of all of the people that he spent

15   all the time with.  I don't think it was -- it was presented

16   that way because he, himself, didn't seem to have a perfect

17   recollection of the whole time that he was there.  And so I

18   just generally asked him, and I assessed that those were the

19   players.

20   Q.  With respect to his family members, you never interviewed

21   his family members to get from them a list of people with whom

22   he'd spent time?

23   A.  Oh, I did.  I did.  I interviewed -- I mean, I -- the one

24   person that I specifically recall speaking to was his mother

25   about that topic.

1       Other family members were, at the time, I think, a really

2   young sister, who I didn't speak with, and another sister, and

3   then his uncle, who was here.  And so I didn't really have a

4   lot of resources in that sense.

5       If you have interactions with his mother, she's a very

6   timid, quiet person.  So, she wasn't really the type who sat

7   and volunteered a lot of information.  But I did interview her,

8   and I did speak with her.

9       And, again, based on the information I received, I was able

10  to assess who the possible people were that could help with an

11  alibi.

12  Q.  But you never sent anybody to Pakistan to interview those

13  people, correct?

14  A.  Well, no.  I spoke with -- I spoke, myself, with his uncle.

15  And I don't remember if I spoke with the grandfather.  But

16  those were the only two that were in Pakistan at the time that

17  were mentioned to me, that I recall.

18  Q.  And you never spoke to Hamid Hayat's younger sister,

19  Raheela?

20  A.  No.  She was -- she was a little girl.

21  Q.  How old was she at the time?

22  A.  Gosh, I don't know, maybe nine or ten or eight.  I mean,

23  I -- I don't even recall.

24  Q.  But you knew she had spent time with him in Pakistan, with

25  Hamid?

1    A.   For the whole time?

2    Q.   For some portion of the time in Pakistan.

3    A.   Well, I think that that was one of the issues, was that the

4    only person that was maybe consistently there while he was

5    there was his mother, I think.  I don't -- I don't -- as far as

6    I remember.  But I don't recall his sister being a person that

7    he told me, or anybody told me, was with him every day.  I

8    don't -- I don't recall that at all.

9    Q.   And was it your view that unless someone was with him every

10   day they would not be relevant as an alibi witness?

11   A.   Well, the problem was, was that it was a two-year period of

12   time.  And it was an allegation that he attended a camp.  And

13   maybe the allegation was he attended a camp for one day.  And

14   so I thought that we needed somebody who had spent -- had had

15   daily contact with him to assess where his whereabouts were.

16   Q.   Well, with regard to the allegations, what were the

17   allegations about how long he had attended a camp?

18   A.   I don't remember right now, as I sit here.

19   Q.   But --

20   A.   I didn't think that it -- because of the -- the length of

21   time, that it was two years, I felt that that was a -- that

22   that was a difficult argument to make.

23   Q.   Other than speaking to Hamid's uncle on the telephone, you

24   didn't speak to any other witnesses in Pakistan, correct?

25   A.   Not -- not that I recall.  I know that there was one family

1    member who was on the no-fly list, and at some point he had

2    contacted me.  And I don't remember if that was while he was

3    still there, or if he was here.  I don't remember.

4    Q.  At the end of the day, you decided not to pursue an alibi

5    defense, correct?

6    A.  Yes.

7    Q.  And you decided that there would not be any good witnesses

8    in Pakistan who could testify as to an alibi, right?

9    A.  Yes.  The grandfather and the -- and the uncle were -- from

10   everything that we saw, I think they were also, from the

11   government's perspective, terrorists.

12   Q.  But you never interviewed the grandfather?

13   A.  Right now, I don't remember that I did.  I may have had a

14   conversation with him.  But the uncle was the main person of

15   contact, because he was an attorney in Pakistan, and so he was

16   a good -- good contact.  So, I don't know if I maybe spoke

17   through him to the grandfather.  But I assessed it for both of

18   them that it wouldn't be a good idea.  I think the position was

19   that the grandfather owned a madrasa that my client allegedly

20   attended before he went to the camp.

21   Q.  But you never interviewed the uncle in person?

22   A.  No.  No.

23   Q.  And you had discussions with Mr. Griffin about whether to

24   call alibi witnesses?

25   A.  Yes, we definitely talked about it.

1   Q.   What was Mr. Griffin's view?

2   A.   Of whether to call alibi witnesses?  You know, whether --

3   the problem is, is that throughout 2005, prior to the trial,

4   there were so many updates and changes.  We were -- we were

5   still receiving new evidence from the government, and so

6   whatever strategy or ideas we had, you know, may have morphed

7   over that time.

8        And so all I can recall is that the conclusion was that

9   there weren't going to be any sound alibi witnesses, and we

10  decided that that would not be a strategy.

11  Q.   You and Mr. Griffin?

12  A.   Well, I mean -- yeah, I mean, he, obviously, wanted to

13  pursue -- thought about the same thing for his client.  But,

14  yeah, we both discussed it, and we concluded that that was

15  appropriate for each of our clients.

16  Q.   Well, Umer Hayat did not need any alibi witnesses for his

17  defense, correct?

18  A.   I don't know if that's true.

19  Q.   Well, he was only charged with falsely denying that he went

20  to a camp, right?

21  A.   Right.  That he -- but there were statements within his --

22  Q.   I'm sorry.

23  A.   Yeah.

24  Q.   Let me rephrase it.  Falsely denying that --

25  A.   That Hamid --

1    Q.   -- Hamid went to a camp.

2    A.   Right.  But I think that within his -- within his

3    videotaped confession there were statements that were made

4    about where he was himself, and allegedly taking him, I think.

5    So, sure, I think an alibi witness would have -- would have

6    helped his case as well.

7    Q.   Isn't it true that Mr. Griffin believed that there were not

8    any good alibi witnesses in part because the grandfather owned

9    a madrasa, ran a madrasa?

10   A.   You're asking about what Mr. Griffin believed?

11   Q.   Yeah.

12   A.   I -- I think that I -- I, myself, agreed with that.  So

13   I -- I'm sure that's what he believed because I think we both

14   reached the same conclusion, that their names were all over it,

15   and they appeared to be the targets at some point.

16   Q.   Was one of the other reasons why you rejected them as alibi

17   witnesses was because they were elders with beards and lived in

18   Pakistan?

19   A.   No.  I mean -- let me -- let me think about that.

20       I think it wasn't just that they were elders with beards

21   that lived in Pakistan, I think they were elders with beards

22   that lived in Pakistan whose grandfather -- grandfather had a

23   madrasa.  And, again, their names were all over the evidence

24   that we saw.  So, it was a combination of those things.

25       But, sure, I probably thought about that during that

1    timeframe.  It was very different than now.  2005, things were

2    different.

3    Q.  So, at the end of this, even though you had not sent anyone

4    to Pakistan to interview any alibi witnesses, you and

5    Mr. Griffin decided not to call any alibi witnesses?

6    A.  Yes.  I -- I made that ultimate determination.

7    Q.  And isn't it true that, in fact, when you got into the case

8    you believed that, for Hamid, you ought to go on the offensive

9    and pursue an alibi defense?

10   A.  Well, yeah.  I mean, that's why initially we considered it,

11   is if the allegation is he was there, then how can I prove he

12   wasn't there.

13       But the problem, again, was that as we received more and

14   more information from the government, things changed.

15   Q.  And what is it that you received from the government that

16   caused you to change your initial view?

17   A.  Well, my initial feeling of whether or not I could do that,

18   I think that maybe some of the alibi witnesses that I thought

19   about had made -- had been interviewed by the FBI, had made

20   statements to the -- to the media, were, themselves, kind of

21   being looked upon.  And so that certainly affected my decision.

22   Q.  Well, the potential witnesses in Pakistan had not been

23   interviewed by the FBI?

24   A.  Oh, no.  No.  No.  No.  In terms of the -- for the Pakistan

25   witnesses, it was -- I'm pretty sure that the conversations

1    with Naseem Khan, the informant, actually mentioned the names

2    of the grandfather and the uncle.  And I just -- I -- right now

3    I can't think of where else their names came up, but I've --

4    but I know that they were -- they were not cast in a good light

5    by the evidence the government gave us.

6    Q.  Isn't it correct that part of the reason why you didn't

7    pursue an alibi defense was Mr. Griffin thought that pursuing,

8    essentially, a reasonable doubt defense was a better strategy?

9    A.  I think, again, our strategy morphed.  So, we -- what we

10   were noticing was that the evidence that the government had was

11   lacking, and that pursuing a different strategy made sense by

12   the time that we had received a lot of the documents.  And

13   then, of course, we were trying to push for a speedy trial.

14   Q.  So, part of the reason was the speedy trial issue?

15   A.  That was a big issue, yeah.

16   Q.  Prior to this case, you were not familiar with the Speedy

17   Trial Act?

18   A.  The federal Speedy Trial -- no, I wasn't, prior to this

19   case.

20   Q.  And so you were relying on Mr. Griffin's experience and

21   advice about the Speedy Trial Act in order to make that a

22   fulcrum of your defense?

23   A.  Partially.

24   Q.  Did you discuss, at all, with Mr. Griffin whether or not

25   you could get witnesses from Pakistan to come and testify at

1   Hamid's trial?

2   A.  We probably did have those discussions, yes.

3   Q.  And isn't it right that Mr. Griffin discouraged you --

4   basically told you that you couldn't do that because the

5   Executive Branch would not give visas to the witnesses?

6   A.  Oh, you mean the visas.  I -- that conversation -- I

7   honestly don't remember how that played out, but Johnny doesn't

8   have -- didn't have the background in immigration that I did,

9   so I don't think I would have relied on him for immigration

10  type issues.

11      But the ultimate determination not to bring those two from

12  Pakistan didn't have to do with the visas.

13  Q.  Did you ever discuss with Mr. Griffin whether or not you

14  could go to Pakistan and take depositions --

15  A.  No.

16  Q.  -- from these witnesses?

17  A.  No.  We didn't have those discussions.

18  Q.  Partly that was because you were not at all familiar with

19  Rule 15 depositions in a criminal case?

20  A.  I think the reason why we didn't have those discussions is

21  because we decided we didn't -- we weren't going to use them.

22  I mean, if we wanted to use them, we probably would have had

23  the discussions of how it was going to happen.  But when the

24  decision was made that we weren't going to use them, then there

25  was no need to have that discussion.

1   Q.   Let me ask a slightly different question.

2        At the time of Mr. -- of Hamid Hayat's trial, did you know

3   that under Rule 15 of the Federal Rules of Criminal Procedure

4   you could go to Pakistan and take a deposition of someone who

5   could otherwise not come to the United States?

6   A.   I probably did not know that rule at that time.

7   Q.   Had you, at that time, ever heard of mutual legal

8   assistance treaties?

9   A.   No.

10  Q.   So, you never made any effort to ask the government to get

11  evidence under a mutual legal assistance treaty?

12  A.   No.

13  Q.   Other than speaking to the uncle in Pakistan, you didn't

14  make any other effort to investigate an alibi defense for Hamid

15  Hayat, correct?

16  A.   No, that's not true.

17  Q.   What else did you do?

18  A.   I spoke with his mother.

19  Q.   Okay.  So, you spoke to his mother and his uncle and

20  decided not to pursue an alibi defense?

21  A.   I spoke with his mother, his uncle, I reviewed 302s, and

22  one of his cousins was a person that I did consider, and

23  ultimately decided not to use him.

24  Q.   Which --

25  A.   As I recall, those were the -- those were the three that

1    were considered and pursued.

2    Q.  Which cousin?  What was the name?

3    A.  I think he was -- I think he's Jaber's, J-A-B-E-R, brother.

4    I don't remember his name.  Is it Usama?

5    Q.  Um --

6    A.  Is that Jaber's brother?  Okay.  If Jaber has -- if Hamid

7    has a brother -- I'm sorry, has a cousin named Usama, who has a

8    brother named Jaber, then it's Usama.

9         Sorry, I just can't remember the names.

10   Q.  But you never interviewed Jaber?

11   A.  Jaber?  Okay.  So, Jaber was the one that, during the

12   trial, was in Pakistan.  I did not interview him for purposes

13   of having him testify as an alibi witness, correct.

14   Q.  Before the trial began -- until just before the trial

15   began, did you file any -- well, you didn't file any pretrial

16   motions on behalf of Hamid Hayat, correct?

17   A.  I do not recall any of the -- I don't recall what motions,

18   if any, were filed.  I don't.

19   Q.  Well, you testified a little bit ago that one of the issues

20   for Mr. Griffin was a speedy trial issue, correct?

21   A.  For both of us.

22   Q.  It was an issue for you as well?

23   A.  It was.

24   Q.  And -- but you didn't have any prior experience with the

25   Speedy Trial Act, right?

1   A.  No.  But I learned.

2   Q.  But you did not know that in order to pursue a speedy trial

3   claim, ultimately, you have to move to dismiss?

4   A.  At that time I don't -- I don't think -- I don't remember

5   that I knew that, and I don't think that I did.  But I think

6   the whole strategy was we were just going to push for a speedy

7   trial because the government was just buying more time to

8   obtain more evidence.

9   Q.  At any rate, you never made a motion to dismiss based on

10  speedy trial grounds?

11  A.  If that's what the record reflects, it's accurate.  I don't

12  recall.  I don't think we did.

13  Q.  Well, do you recall that, in fact, the judge in this case,

14  on the government's motion, made a finding of excludable time

15  under the Speedy Trial Act?

16  A.  I do recall that Burrell made a number of -- Judge Burrell,

17  I'm sorry, made a number of rulings that affected our strategy

18  on the speedy trial.  I do recall that.

19      But at some point I think the -- once the trial was set,

20  the government, kind of, ran out of ways to get continuances,

21  so we -- we believed we were successful in getting a trial set

22  pretty -- as quickly as we could have, under the circumstances.

23  Q.  Well, do you recall that the reason why Judge Burrell

24  excluded time under the Speedy Trial Act was, essentially, two;

25  he found the case complex, correct?

1  A.  I don't recall, but that sounds right.

2  Q.  And once a case is complex, it doesn't become un-complex,

3  correct?

4  A.  I don't know that.  I don't -- yeah, I -- it sounds

5  logical.

6  Q.  So, it was your view that even though Judge Burrell had

7  declared the case complex under the Speedy Trial Act, that it

8  might -- the government might not be able to get another

9  continuance based on the complexity of the case?

10 A.  The -- I don't know if -- if that was the basis for what I

11 believed.  All I know is that once the trial was set, because

12 we had objected to any further continuances, for some reason we

13 knew that trial was going to go forward.  I can't remember what

14 it was right now, but I -- I think it was a -- seemed to be a

15 hard set.

16 Q.  But you don't know whether or not you, in fact, still had,

17 at that point, a viable claim under the Speedy Trial Act?

18 A.  I don't know that right now, no.  I don't recall that.

19 Q.  You never moved to sever Hamid Hayat's case from Umer

20 Hayat's case, correct?

21 A.  Correct.

22 Q.  And part of the reason for that was that you knew that if

23 Hamid Hayat's case was severed from Umer's, you could not

24 represent Hamid Hayat by yourself?

25 A.  No.  That's not the reason.

1    Q.  Well, could you have?

2    A.  Well, I testified earlier that I -- if I -- I couldn't have

3    done it without some kind of assistance or mentorship from

4    somebody.  But your question was, was that the reason why I

5    didn't move to sever.  It wasn't.

6    Q.  Why didn't you move to sever?

7    A.  I just don't think we considered it.  We didn't think that

8    it was something that -- that needed to be done.  There were

9    going to be separate juries, which I think resolved the -- I

10   think it's a Bruton issue, and that -- and that it made sense

11   to proceed that way, and we didn't need to sever.

12   Q.  So, you never considered that a severance might be in Hamid

13   Hayat's interest because his charges were so much more serious

14   than Umer Hayat's?

15   A.  No.

16   Q.  And you never considered that Mr. Griffin's interest in

17   pursuing a speedy trial claim might not be in Hamid Hayat's

18   best interest?

19   A.  Well, I'm sure I considered what was in Hamid Hayat's best

20   interest when we pursued the speedy trial claim, and I thought

21   it was in his best interest to do it that way, considering the

22   way that the government was gathering evidence, and the lack of

23   evidence they had when they initially charged him.

24   Q.  Well, part of the evidence that the government discussed

25   with the court, at any rate, was evidence that was classified,

1   correct?

2   A.  I think that the only documents were the aerial

3   photographs, which we eventually were able to -- that -- I'm

4   sorry.

5       The only classified information that the court -- I'm

6   sorry, that the government somehow maybe declassified so they

7   could present it to the jury were the aerial photographs.  And

8   the foundation for those aerial photographs was something that

9   they had discussions of that we weren't privy to.

10  Q.  You do not recall now what the superseding indictment

11  identified as the period of time in which Hamid Hayat was

12  supposedly at this terrorist training camp?

13  A.  I think that it may have given a more definitive timeframe

14  instead of just the full two years.  I think it did narrow it

15  down a little bit, but I don't remember, right now, what it

16  was.

17  Q.  Do you recall whether you ever moved for a bill of

18  particulars?

19  A.  I know we did not.

20  Q.  And you never considered making any other motion to try to

21  determine, with more specificity, the camp that Hamid Hayat

22  supposedly attended?

23  A.  Outside of discovery requests that we made, I don't -- I

24  don't recall filing any other motions.  I don't remember if we

25  ever did a motion to compel.  I don't remember.  But it would

1    have been discovery related.

2    Q.  Probably the most important piece of evidence against Hamid

3    Hayat was his supposed confession to the FBI, correct?

4    A.  I agree.

5    Q.  And you knew at the time that that confession had been made

6    after a number of interviews in which he denied that he had

7    been to a terrorist training camp, correct?

8    A.  Correct.

9    Q.  And you were convinced that he had not ever attended a

10   terrorist training camp?

11   A.  Right.

12   Q.  So, you thought that any confession he made was likely

13   false, correct?

14   A.  Correct.

15   Q.  But you never moved to suppress the statement that he made

16   to the FBI?

17   A.  You mean the -- the videotaped portion?

18   Q.  The confession.

19   A.  The confession.  No, I did not.

20   Q.  And even after Hamid was charged with material support of

21   terrorism, you did not move to suppress that statement,

22   correct?

23   A.  No, I did not.

24   Q.  And at that time, you personally were not familiar with the

25   law governing the voluntariness or involuntariness of

1    confessions, correct?

2    A.   Prior to that, no, I was not.  But I think I learned about

3    it, and must have -- must have done some reading about it.  I

4    just don't recall right now.  I think the way we looked at the

5    confession was that there were so many problems with it itself,

6    the internal inconsistencies and all of it, that we decided

7    that suppressing it wasn't -- wasn't the way to go.

8    Q.   And when you say "we," you mean yourself and Mr. Griffin?

9    A.   Yeah.  And Wedick.  With our expert.

10   Q.   Isn't it correct that, really, the only way you would have

11   known a legal basis to suppress Hamid Hayat's confession was if

12   Johnny had advised you what that would be, given your lack of

13   experience?

14   A.   No, that's not the only way.  I -- I had enough basic

15   knowledge to know you can move to suppress evidence.

16   Q.   But you didn't know on what legal grounds you could move to

17   suppress?

18   A.   No, I think I -- I think I would have known.  Voluntariness

19   of that statement was certainly something that I knew was a

20   legal basis.  But the exact rules and the details, again,

21   because we decided that we're going to keep the video -- not

22   try to get rid of it, that it -- I never pursued it in detail

23   to research the issue.

24   Q.   And you decided, with Mr. Griffin, that you were not going

25   to try to suppress the statement, even though you knew, and

1    believed, it was the most powerful piece of evidence against

2    Hamid Hayat?

3    A.   Yes.

4    Q.   Is one of the reasons why you didn't move to suppress

5    Hamid's statement because of the concern about pursuing a

6    speedy trial claim?

7    A.   No.

8    Q.   Wasn't one of the reasons why you didn't file any pretrial

9    motions is because Mr. Griffin was concerned that any motion

10   might destroy his speedy trial claim?

11   A.   I think that -- I think that we did have discussions about

12   if we're going to try to push for a speedy trial, that filing

13   motions would slow down that process for both -- for both

14   clients.  I do recall that.

15   Q.   At the time, you were not aware of the -- you were not

16   aware that a person's medical history, such as suffering from

17   meningitis, could be a factor in determining whether or not a

18   confession was voluntary or involuntary?

19   A.   No.  I don't think I -- I don't think I knew that or

20   considered it.

21   Q.   And, again, you just did not consider his history of

22   meningitis to be relevant to anything in the case?

23   A.   Well, relevant to -- to whether or not he went to a

24   terrorist training camp, no.

25   Q.   So you didn't believe it was anything that should be

1    further investigated?

2    A.   No.  Based on what I knew about it at the time, I did not

3    think it was something to investigate.

4    Q.   We just mentioned previously -- I mentioned previously the

5    Classified Information Procedures Act.  Prior to your

6    involvement in this case, you had never heard of that act,

7    correct?

8    A.   Correct.

9    Q.   And you had no experience with -- I'll call it -- CIPA?

10   A.   No.  No experience with CIPA.

11   Q.   Okay.  But shortly after the indictment, the original

12   indictment, you and Mr. Griffin sent a discovery request to the

13   government, correct?

14   A.   I -- I know we sent it, I don't know when.

15   Q.   Who drafted that discovery letter?

16   A.   I don't recall.  I don't recall.  I mean, he probably did.

17   And if I drafted something and put it on my letterhead, it was

18   probably from -- with his guidance.  But right now I don't have

19   any memory.

20   Q.   Do you recall whether you ever sent a separate discovery

21   request to the government on behalf of Hamid Hayat, apart from

22   a joint discovery request?

23   A.   I don't recall.  I think some documents were sent jointly

24   and some things were maybe separately, but I don't recall on

25   the discovery.

1   Q.  And the discovery request that you sent to the government,

2   do you recall that it listed a number of federal agencies?

3   Correct?

4   A.  I don't recall.  But if that's what we sent, then it's

5   right.

6   Q.  Who decided which agencies to list in that letter?  Do you

7   recall?

8   A.  No.  I don't recall.

9   Q.  Did some of those agencies include US intelligence

10  agencies?

11  A.  They probably did.

12  Q.  And you believed at the time that the government might have

13  evidence that would be exculpatory as to Hamid Hayat, correct?

14  A.  I mean, we thought that there may be some, but it was

15  difficult to imagine what kind of evidence they would have that

16  would be exculpatory, considering the nature of the charges.

17  Q.  Well, would the fact that there was, in fact, no terrorist

18  training camp in the area where Hamid Hayat supposedly went,

19  would that have been exculpatory?

20  A.  If the government had that information?

21  Q.  Right.

22  A.  Well, it would have -- I guess it would have been

23  exculpatory if they had the information that there was, in

24  fact, no camp.  But I think the information as to where, when

25  we actually got the coordinates, that came so much later in the

1   case that -- I'm sorry, I think I went beyond answering your

2   question.

3   Q.  That's all right.

4       So, prior -- prior to getting the coordinates, then, am I

5   correct that you had not done any investigation to try to

6   determine the exact location of the camp that Hamid allegedly

7   attended?

8   A.  Prior to getting the coordinates, I mean, I -- no, I

9   probably did, on my own, read and do a lot of research, but it

10  wasn't until I got the coordinates that I thought -- that I

11  think I really focused, because otherwise it would have been a

12  very -- it would have been a very big area to consider.

13      And, I'm sorry, I think -- here is part of the problem:  In

14  his confession he had named a number of different possible

15  places where the camp could be, so it was just -- it would have

16  been, really, kind of a big task.

17  Q.  Well, maybe I'm incorrect, but isn't it correct that in his

18  alleged confession, Hamid Hayat, in fact, said the camp was at

19  Balakot?

20  A.  That was one of the places.  He named a bunch of different

21  possible places.

22  Q.  Okay.

23  A.  And so it wasn't as if he said it's for sure Balakot.  That

24  was part of the inconsistencies, I think, that I raised as an

25  issue with his confession.

1   Q.  But at least one of the locations was Balakot?

2   A.  Right.  At least one of them were, but he -- he named a

3   bunch of different places, I think.

4   Q.  And prior to getting the coordinates, then, you didn't do

5   any investigation to determine whether or not there was

6   actually a terrorist training camp in Balakot?

7            MR. YANG:  Objection.  Misstates testimony.

8            THE COURT:  Overruled.

9            THE WITNESS:  I think -- if you're asking me did I,

10  prior to getting the coordinates, look specifically at Balakot,

11  I -- I don't think I did.  I think I just was generally

12  looking, at that timeframe, what type of -- if there were any

13  training camps in the area, but it wasn't -- the focus on

14  Balakot came after the coordinates came.

15  Q.  BY MS. BOERSCH:  With respect to CIPA, isn't it correct

16  that you knew, very, very early on in the case, that the

17  criminal case was going to involve issues under CIPA?

18  A.  I think it was early in the case, yes, that we knew that

19  there would be CIPA issues.

20  Q.  And, in fact, isn't it correct that the government filed

21  notices saying that the case was going to involve CIPA issues?

22  A.  I think so, yes.

23  Q.  But you never got a security clearance, correct?

24  A.  No, we did not.

25  Q.  And you never made any effort to get a security clearance?

1    A.   No, we did not.

2    Q.   You, personally, at the time didn't know anything about the

3    security clearance process, correct?

4    A.   Prior to the case?  No.  But I learned about it.

5    Q.   You learned about it from Mr. Griffin?

6    A.   I learned about it from Mr. Griffin, and I think I did my

7    own reading, research.

8    Q.   And you didn't get a security clearance because -- again,

9    because Mr. Griffin wanted to preserve a speedy trial claim,

10   and told you that the process of getting a security clearance

11   was several months, right?

12   A.   He told me that the process of getting a security clearance

13   would take time, and it seemed counter to the strategy that we

14   had -- we had decided was best, which was to push for the

15   speedy trial.

16        And then we also, of course, had a discussion about --

17   about whether or not the clearance, in our minds, was necessary

18   to pursue the case.

19   Q.   And one of the reasons why you thought a clearance was not

20   necessary is that you thought that you had the ability to have

21   classified information declassified; is that right?

22   A.   I think the -- if I can recall this correctly, the way that

23   I remembered it is that if the government was going to present

24   anything to the jury, it would clearly need to be declassified.

25        And if the government had anything that was potentially

1    exculpatory, it would have the in-chambers hearings with the

2    judge, and the judge can determine whether or not it was

3    exculpatory.  And if it was, then they would need to give it to

4    us in, I think, a summary fashion, or some type of declassified

5    fashion, so that anything exculpatory we would get somehow.

6         I think that was my understanding of -- of why we didn't

7    pursue the clearance.

8    Q.  Was that understanding based on your conversations with

9    Mr. Griffin?

10   A.  I think it was.  It was based on -- yeah, conversations

11   with Johnny, and whatever other information I had assessed in

12   reading.

13   Q.  With respect to exculpatory evidence for Hamid Hayat, you

14   never submitted any ex-parte submission to Judge Burrell

15   explaining your theory of the defense, correct?

16   A.  I don't recall doing that, no.

17   Q.  So, in fact, Judge Burrell would have very little

18   information to go on to determine what would or wouldn't be

19   exculpatory as to your defense, correct?

20   A.  Well, I thought that the allegation was pretty

21   straightforward.  He attended a camp, that was the allegation.

22   If there was any evidence that would show that he didn't attend

23   the camp, then that would be exculpatory.  So, I think Judge

24   Burrell should have been able to make that assessment pretty

25   easily with the nature of the charges.

1   Q.  And so other than that broad, sort of, view of exculpatory

2   evidence, you didn't think that there might be any other kind

3   of evidence that might be exculpatory for Hamid Hayat --

4   A.  Well --

5   Q.  -- other than evidence that he didn't go to a camp?

6   A.  Well, or maybe things that would counter some of the other

7   evidence that was found in his house.

8   Q.  And let me pause you for a second there.

9       Did you ever make a motion to suppress any of the evidence

10  that was taken from the house?

11  A.  No.

12  Q.  And, again, was that because you were trying to pursue a

13  speedy trial claim?

14  A.  No.  I don't -- I don't -- I think we -- I recall that

15  we -- we looked to see if there would have been a good legal

16  basis for trying to suppress any of it, because some of it

17  was -- was not helpful to his case.  So we -- I'm sure we

18  looked at that.  And whether or not we abandoned those efforts

19  because of the speedy trial, I don't -- I don't think we would

20  have.

21  Q.  With respect to the strategy of pursuing a speedy trial

22  claim, by August of 2005, Judge Burrell had found the case

23  complex and had excluded time, correct?  He excluded, I think,

24  60 days.

25  A.  I don't specifically recall that, but I accept your

1    representation if that was his ruling at that time.

2    Q.  So, at that point why didn't you get a security clearance?

3    A.  So, if you don't mind asking me that question again, the

4    question before?

5    Q.  After Judge Burrell had excluded time under the Speedy

6    Trial Act for at least 60 days, why didn't you get a security

7    clearance at that point?

8    A.  Because -- I can't recall specifically right now, but I

9    think that we were still able to get a trial set -- for

10   whatever reason that I don't remember right now, but we were

11   still able to get a trial set quickly, and so we wanted to have

12   that trial as soon as possible.

13   Q.  At that point, since he had excluded time, you didn't make

14   any effort, at that point, to go investigate alibi witnesses or

15   an alibi defense, right?

16   A.  I -- I don't remember when I -- when I decided that that

17   was no longer going to be something to pursue in terms of the

18   timeframe, because I don't remember how -- what timeframes we

19   received evidence from the government.

20   Q.  Well, at that point, certainly in August, you knew that the

21   government had some evidence relevant to the case that was

22   classified under CIPA, right?

23   A.  I don't remember if I knew that at that time.  I don't

24   remember.

25   Q.  Well, the government had filed notices with the court

1   indicating that the case and the discovery may involve

2   classified information, correct?

3   A.  Well, right.  But your question was did I know that they

4   actually had, and I don't know if I knew that at that time.  I

5   think notices had come out, but I don't know if, in August, I

6   knew that they actually had classified documents that were

7   relevant.

8   Q.  Well, at some point the government, in fact, sent you a

9   letter saying they did have relevant evidence that was

10  classified under CIPA, right?

11  A.  We probably did get that letter.  If that -- is that the

12  letter related to the aerial photographs?

13  Q.  That's one.

14  A.  Okay.

15  Q.  Yeah.

16  A.  So, we may have, sure.  I just don't remember at this time.

17  Q.  And at some point the government also informed you that

18  after doing their CIPA review, they had, I don't know, several

19  thousands pages of documents that might be potentially relevant

20  but classified?

21  A.  I don't recall that.

22  Q.  As a result of you not getting a security clearance, you

23  were not able to represent Hamid during any of the Section 6

24  hearings under CIPA, right?

25  A.  Correct.

1   Q.  So, when the government went in chambers with Judge Burrell

2   and presented the evidence that was classified, you had no

3   ability to review that evidence?

4   A.  No, I did not.

5   Q.  And you had no ability to advocate for Hamid as to whether

6   or not that evidence ought to be disclosed somehow to the

7   defense?

8   A.  No, I did not.

9   Q.  Since you had never submitted an ex-parte submission to

10  Judge Burrell, he didn't know any of the specific details of

11  your defense, other than that you contended Hamid didn't attend

12  a camp at all?

13  A.  I mean, I don't -- I don't agree with that.  I think Judge

14  Burrell knew what our defense was.

15  Q.  What was your defense?

16  A.  That he didn't attend a camp.

17  Q.  But other than that, I'm saying.

18  A.  Well -- yeah, I don't know what other -- what else there

19  would have been.  Disprove the allegation made by the

20  government.

21  Q.  One of the other issues under CIPA is what happens during

22  trial when a question from the defense might elicit classified

23  information, right?

24  A.  Sorry, I just want to follow you.  A question from the

25  defense might elicit classified information.  Correct.

1  Q.  And that, in fact, happened in Hamid Hayat's trial,

2  correct?

3  A.  I -- I think -- I only recall because I was -- I was asked

4  about it at the deposition.  So, it -- it sounds like it

5  happened.

6  Q.  Okay.  And do you recall that, in fact, before trial

7  Mr. Griffin agreed and told the court that either one of you

8  would withdraw any question that might elicit classified

9  information?

10  A.  Yeah.

11  Q.  And that was Mr. Griffin's statement to the court, right?

12  A.  Well, we had talked about it.  We had talked about the

13  strategy.  So, if he made the statement to the court, I think

14  it would have been consistent with what we both believed was

15  appropriate with our strategy.

16  Q.  You think you discussed, prior to that hearing, with

17  Mr. Griffin, whether or not you would withdraw any question on

18  cross that might elicit classified information?

19  A.  I don't know if we would have had that specific

20  conversation, but I -- I know we had discussions about security

21  clearance, and CIPA hearings, and just everything that could

22  result from that.  So, I don't know about the specific question

23  about objections being made.  I don't recall.

24  Q.  You also agreed, along with Mr. Griffin, to waive Hamid

25  Hayat's right, under CIPA, to participate in Section 8

1    proceedings during trial, right?

2    A.   Yes.

3    Q.   And you did that -- you made that agreement in consultation

4    with Mr. Griffin, right?

5    A.   Sure.  Yeah.

6    Q.   And what did you tell Hamid Hayat about that agreement?

7    A.   I don't remember what I told him about specific agreements,

8    but I -- I'm sure I talked to Hamid about the fact that there

9    were these hearings happening, and what our strategy was.  But

10   I don't recall what I told him about a specific agreement.

11   Q.   The stipulation that was executed is a stipulation in

12   English, correct?

13   A.   I think -- I think all documents were in English that we

14   signed and submitted to the court.

15   Q.   Do you recall having that document translated for Hamid?

16   A.   Oh, I honestly don't remember if I did.

17   Q.   And at trial, you, in fact, withdrew a number of questions

18   when the government objected to those questions at least partly

19   on CIPA grounds, right?

20   A.   Yeah, I probably did.

21   Q.   And when the government objected to your question, you

22   would just withdraw the question?

23        I might have just asked that, right?

24   A.   Right.

25   Q.   Okay.  You did not, instead, ask the court for a Section 8

1    hearing during trial to determine whether or not the question

2    would, in fact, elicit classified information?

3    A.  No.

4    Q.  By the same token, to the extent the government raised some

5    other objection as well, you did not proffer any basis to the

6    court for overruling that objection, correct?

7    A.  I -- I -- I don't know.  The record would speak for itself,

8    whether or not I never proffered anything.  I don't remember.

9    Q.  One of the issues, in fact, that came up during trial, to

10   which there was an objection, was during the cross-examination

11   of Mr. Khan, right?

12   A.  Naseem Khan?

13   Q.  Yes.

14   A.  Okay.  Yes.

15   Q.  And he was, in fact, a principal witness for the

16   government?

17   A.  I think he was.

18   Q.  And so it was very important to effectively cross-examine

19   him as best as you could?

20   A.  I agree.

21   Q.  And he testified about conversations that he had had with

22   Hamid Hayat before Hamid left for Pakistan in 2003, right?

23   A.  Yes.  Conversations before he left, and while he was there.

24   Q.  And he also testified -- yes, also testified about

25   conversations while he was there?

1    A.   Right.

2    Q.   And sometime in July of 2003 there was a recorded

3    conversation in which Khan told Hamid, I'm going to -- pardon

4    the language here -- I'm going to fucking force you to get from

5    the throat -- get you from the throat and fucking throw you in

6    the madrasa.  Do you recall that?

7    A.   I recall something to that effect, yes.

8    Q.   And you questioned Mr. Khan at trial about the last phone

9    conversation that he had had with Hamid while Hamid was in

10   Pakistan, right?

11   A.   I'm sure I did.  I think I questioned him about most of the

12   conversations, if not all.

13   Q.   And as to that conversation, the government maintained that

14   there was no recording of it, right?

15   A.   Yeah.  I -- you're -- you're refreshing my recollection as

16   to that.  I -- I think that that's accurate.

17   Q.   And on cross-examination, you asked Mr. Khan whether or not

18   during that conversation Hamid told him that he, Hamid, never

19   intended to go to a camp, and that he was lying to Mr. Khan all

20   along.  Do you recall asking Mr. Khan that question?

21   A.   Yes.

22   Q.   And the government objected, right?

23   A.   I -- I don't recall that the government objected, but I

24   think they -- I think they did.

25   Q.   That statement of Hamid's was -- was a key part of your

1    defense at trial, right?

2    A.  Well, it was -- sure.  It was a -- I mean, it was a part of

3    the defense.  I don't know if it was key.

4    Q.  And you -- when the government objected, you didn't proffer

5    any basis -- any legal basis to the court for admitting the

6    statement, right?

7    A.  I don't think I did.

8    Q.  You -- if you had thought of a legal basis to admit the

9    statement, you would have made that argument, right?

10   A.  I probably would have.

11   Q.  I want to talk a little bit about the government witness

12   Mohammed.  He was qualified as an expert in Arabic language and

13   in the Islamic religion, right?

14   A.  Right.  Dr. Mohammed?

15   Q.  Right.

16       And one of the things he testified about was a translation

17   of the supplication that had been found in Hamid Hayat's

18   wallet?

19   A.  Yes.

20   Q.  And he testified that anybody who carried such a

21   supplication would have been intending to or engaged in violent

22   jihad, right?

23   A.  I mean, something to that effect.  I don't remember the

24   exact words he used, but, yeah, I think he drew that type of

25   conclusion.

1   Q.   But you never made any motion in limine to exclude

2   Mr. Mohammed's testimony?

3   A.   No, I did not.

4   Q.   You didn't object to it specifically at trial?

5   A.   To the fact that he was testifying?

6   Q.   Right.

7   A.   No.

8   Q.   And that was because you couldn't think of any legal basis

9   to object to it?

10   A.   Oh, I think if there -- if I -- if I did know a legal basis

11   to object to it, I would have done it.

12   Q.   I want to talk a little bit about these four photographs.

13        So, you recall that there were four photographs that the

14   government believed were critical corroborative evidence of

15   their case, right?

16   A.   So, I honestly don't remember the number of photographs,

17   but if you're saying -- if you're talking about the aerial

18   photographs, I do recall that the government presented those

19   with an expert at the trial.

20   Q.   Okay.  And that evidence was, in your view, something that

21   the government thought was important to its case?

22   A.   Well, I can only suspect that everything they present to

23   the jury they thought was important to their case.  So, I

24   don't -- I don't know what the government thought.

25   Q.   Do you recall that the government notified you and

1    Mr. Griffin, prior to trial, that they were in possession of

2    important foundational evidence regarding those aerial

3    photographs but it was classified?

4    A.  I don't know if it was -- I know that the foundational

5    evidence with regards to the photographs was classified, yes.

6    Q.  And do you recall that the government, in their letter to

7    you, urged you and Mr. Griffin to get a security clearance so

8    you could see that foundational evidence?

9    A.  They probably did.

10   Q.  But you did not take them up on that urging and get the

11   security clearance?

12   A.  No, we did not.

13   Q.  And you never considered that it might be important to

14   Hamid Hayat's defense to know the foundational evidence for

15   those photographs?

16   A.  No, I -- no, I don't think it would have mattered how they

17   obtained the photographs.  It was the fact that the photographs

18   existed that we needed to deal with.

19   Q.  Do you understand what foundational evidence is?

20   A.  Absolutely.

21   Q.  During the trial, the government called an official from

22   the defense department to testify about those photographs,

23   right?

24   A.  Yes.  Mr. Benn.

25   Q.  And he displayed those four photographs to the jury, right?

1   A.  The number I don't remember, but yes.

2   Q.  There were a couple that were from 2001, do you remember

3   that, the photographs?

4   A.  It's -- it's coming back to me that, yeah, maybe the

5   photographs were from different time periods.  I don't remember

6   the dates.

7   Q.  Do you recall that a couple of them were from 2004?

8   A.  I really don't.  I don't recall the dates at all.

9   Q.  Do you recall his testimony that based on the photographs

10  alone there was only a 50/50 probability that there was a

11  terrorist training camp at that location?

12  A.  I -- I do recall that he gave percentages.  50 percent

13  might be right.  I think -- I do recall that he did that.

14  Q.  And you considered that to be pretty weak evidence from the

15  government, right, if it's just a 50/50 probability?

16  A.  I did.

17  Q.  But Mr. Benn then testified that if he took into account

18  Hamid Hayat's statement, the probability went much higher that

19  it was a terrorist training camp?

20  A.  Right.  I think he did say that.

21  Q.  You never moved to exclude that testimony or objected to

22  it?

23  A.  No, because I think that even the number he gave then was

24  still, in my mind, pretty low.  It wasn't -- he had no

25  certainty of it.  So, I don't remember, it was -- it just

1    increased the percentage a little bit, but it didn't make it

2    certain.

3    Q.   Did you know at the time whether or not there was a legal

4    basis to exclude that testimony?

5    A.   Oh, wow.   I don't know.

6    Q.   One of the witnesses that testified at trial was a

7    Mr. Lazor, right?

8    A.   Yes.

9             THE COURT:   Counsel, before we go further, I assume

10   you have more?

11            MS. BOERSCH:   I have more -- not a ton more, but I do

12   have more, yeah.

13            THE COURT:   All right.   Would now be a convenient

14   time to take our afternoon break?

15            MS. BOERSCH:   Sure.

16            THE COURT:   Why don't we reconvene at 2:30.

17      (Recess taken, 2:12 p.m. - 2:31 p.m.)

18            THE COURT:   All right.   Are we ready to proceed?

19            MS. BOERSCH:   Yes.

20            MR. ESPINOSA:   Yes.

21            THE COURT:   Please do.

22   Q.   BY MS. BOERSCH:   Good afternoon, again, Ms. Mojaddidi.

23      So, at some point very -- I guess shortly before trial, you

24   did conclude that someone ought to go to investigate the site

25   at Balakot, correct?

1   A.   Well, an opportunity arose and I took advantage of it.

2   Q.   Okay.

3   A.   Yeah.

4   Q.   That's probably a fair way to put it.

5        And the person who went was a person by the name of Lazor;

6   is that correct?

7   A.   Lazor.

8   Q.   Lazor.  Okay.

9        And other than Mr. Lazor, you never sent any professional

10  investigators over to Pakistan to investigate?

11  A.   No, I did not.

12  Q.   And this opportunity that arose with Mr. Lazor was just

13  through happenstance, right?

14  A.   Yeah.

15  Q.   And you learned that Mr. Lazor was about to go to Pakistan?

16  A.   No.  I believe he was there when I learned -- well, do you

17  want me to just tell you what happened?

18  Q.   Yeah.  What happened with Mr. Lazor?

19  A.   So, I had an attorney friend who was a Deputy DA, he had

20  heard about the case, and he called and was just talking to me

21  about the case, and happened to mention that he had a friend

22  who was there in that area, doing some humanitarian efforts.

23  And he generally was reaching out to me, if I wanted to talk

24  about the case, if I needed assistance.

25        And once he told me that there was somebody there, in that

1    location, then I asked for his contact information, and

2    contacted him, and he was -- at the time that he told me about

3    it, he was there.  Actually, maybe he was about to go.  I'm

4    sorry.  Either he was about to go to Pakistan or he was already

5    there.  I apologize.  I'm thinking maybe he was about to go.

6    Q.  Did you ever meet Mr. Lazor?

7    A.  Well, certainly when he came to testify.  You mean prior

8    to?

9    Q.  Prior to.

10   A.  No.

11   Q.  This -- when you learned about Mr. Lazor, that was sometime

12   in February of 2006; is that right?

13   A.  I have no idea.

14   Q.  It was shortly before trial?

15   A.  It was before trial and after receiving the coordinates.

16   Q.  And the reason why Mr. Lazor was going to Pakistan was

17   because there had been a pretty significant earthquake there,

18   right?

19   A.  I think he was there for -- he was -- yeah, he was doing

20   something with some kind of humanitarian effort

21   post-earthquake.  I don't remember the timeframe of when the

22   earthquake happened.  At this time, I don't remember.

23   Q.  But the earthquake was in Balakot?

24   A.  It was in that area, yes.

25   Q.  And, in fact, Balakot had basically been devastated by that

1    earthquake, right?

2    A.  I don't know the extent of what happened, but I know there

3    was a significant earthquake in the area, and I don't remember

4    when it was.

5    Q.  And prior to this time, you had not made any effort to

6    either send an investigator or determine what, if anything, was

7    actually in Balakot?

8    A.  No, I did.  I -- I think the day I got the coordinates I

9    was excited because I knew Google Earth existed, and I thought

10   I could look into it myself.

11        And I did.  I looked at it.  Put in the coordinates and

12   tried to see if it would match the description that Hamid gave

13   of a camp that he -- that he may have attended, that I think

14   the government was -- was thinking was the one in Balakot.  So

15   I specifically was looking to see if there was the path that

16   they described, and the buildings, and I did all of that.

17   Q.  Other than your own Google or internet research, you didn't

18   get -- you didn't do any other investigation regarding the

19   location at Balakot?

20   A.  Other than my own research, meaning hiring someone to do

21   it?  I guess -- other than that, no, I did nothing else

22   besides --

23   Q.  Or consulting an expert?

24   A.  Consulting an expert.  Gosh, I don't -- I -- I don't

25   recall.  I don't recall if I spoke with anybody about it.  I

768

1    don't recall.  Probably -- I probably did not, but I -- I just

2    don't remember right now if I had conversations about -- with

3    an expert.  But it was certainly on my mind.

4    Q.  Mr. Lazor, who you did speak to, had he ever been to

5    Pakistan before?

6    A.  I don't know.

7    Q.  He didn't speak Urdu or Pashto?

8    A.  No.  I thought -- frankly, I thought that that made it all

9    the better.  He was just a white American, just a person who

10   happened to be there, and I thought that gave him -- made him

11   an unbiased person, and he could just go and tell me what was

12   there.

13   Q.  And he went to Balakot?

14   A.  Well, he was there, but he went to -- he went to the -- the

15   coordinates that I gave him.  He went to the location and he

16   testified about it.

17   Q.  But when he testified about it, the government made a

18   number of objections to his testimony, right?

19   A.  I think they did because he -- he was stopped, and people

20   were talking to him, so it was -- there were hearsay objections

21   that were made.

22   Q.  And as a result of the objections, was his testimony

23   stricken?

24   A.  His entire testimony, I don't think so.  I think there were

25   portions of his testimony -- the objections were sustained, so.

1  Q.  Many of his answers were stricken?

2  A.  If that's what the record reflects.  If he answered the

3  question before the judge ruled, and it was stricken, then

4  sure.  But his entire testimony I don't think was stricken.

5  Q.  One of the issues pretrial was whether or not Hamid would

6  testify at his trial, right?

7  A.  One of the issues was whether or not -- well, I think

8  that's always an issue with -- in a case, a criminal defendant,

9  whether or not they would testify.

10 Q.  Right.  So, prior to this trial, you had never been in a

11 position where you had to advise someone whether or not they

12 should testify at their own trial?

13 A.  No, I had.

14 Q.  Criminal trial?

15 A.  Criminal.  No, I don't -- I don't think I had.

16 Q.  Whether or not Hamid would testify was an issue that you

17 discussed with Mr. Griffin, right?

18 A.  I think -- yeah, we had the discussion.

19 Q.  And part of the reason you discussed it with Mr. Griffin is

20 he had a lot more experience in criminal cases than you did,

21 right?

22 A.  Well, that was the basis for a lot of my discussions with

23 him, was his experience, yeah.

24 Q.  So, you -- you asked him what his view was as to whether or

25 not Mr. Hayat -- Hamid Hayat should testify?

1   A.  I don't think I asked that question.  Once we saw --

2   actually, maybe after the first couple of meetings that I had

3   with my own client, and watching the video, I was certain he

4   wasn't going to be a good witness.

5   Q.  Mr. Griffin also advised that Hamid Hayat should not

6   testify, right?

7   A.  No.  It wasn't -- he didn't advise me.  I think we both

8   agreed that both of our clients would not make good witnesses.

9   But he -- if what you're getting at is was he the person who

10  made that decision, no.

11  Q.  He agreed with the decision?

12  A.  He agreed with the decision, sure.

13  Q.  And you advised Hamid Hayat not to testify?

14  A.  I mean, Hamid and I, I'm sure, had the conversation, and I

15  think I believed that it was not a good idea.

16  Q.  At the time you were making these decisions, did you

17  understand that if Hamid did testify that his statement might

18  be admissible against Mr. -- against Umer Hayat?

19  A.  If he did testify -- is that the Bruton issue or -- I

20  don't -- I don't remember right now those kinds of

21  implications.  I just don't remember right now.

22  Q.  You don't --

23  A.  But I probably -- but I know I knew it then.

24  Q.  You think you knew it then, even though you don't know it

25  now?

1    A.   Yeah.   Yeah.

2    Q.   Sitting here now, in hindsight, looking back on the trial,

3    you believe that you could have done things differently, right?

4    A.   I think that of every trial that I've ever had.

5    Q.   And looking back on it, you believe that you were very

6    inexperienced in criminal trials at the time, right?

7    A.   Well, it's a fact, because it was my first trial.   So it

8    doesn't matter what I believed, it's just the fact that's true.

9    Q.   And your inexperience might have affected the outcome of

10   the trial, right?

11          MR. YANG:   Objection.   Calls for speculation.

12   Q.  BY MS. BOERSCH:   Do you believe that?

13          THE COURT:   Overruled.

14   Q.  BY MS. BOERSCH:   Do you believe that?

15   A.   Do I believe that my inexperience affected --

16   Q.   Might have.

17   A.   Might have --

18          MR. YANG:   Objection.   Relevance.

19          THE WITNESS:   I don't.

20          THE COURT:   Overruled.

21          THE WITNESS:   No, I don't, considering we almost got

22   a hung jury.

23          MS. BOERSCH:   If I could consult for just a minute?

24          THE COURT:   Certainly.

25       (Pause in proceedings.)

1    Q.  BY MS. BOERSCH:  Now, Ms. Mojaddidi, you -- we looked -- we

2    discussed previously that you were previously deposed in this

3    case, right?

4    A.  Yeah.

5    Q.  And in that prior deposition, you, in fact, testified that

6    your inexperience could have affected the outcome of this case.

7        Do you remember that?

8    A.  I mean, thinking about possibilities of could it have, if

9    there is a legal basis for it, and the court makes that

10   finding, sure.  But what do I -- what do I personally believe

11   when I reflect on the case?  I -- I think I did a good job

12   considering there was a confession and we almost got a hung

13   jury.

14   Q.  Did you say in your deposition, I think it's obvious that I

15   was inexperienced and it could have affected the case?

16   A.  Yeah.  And I think I pretty much am saying the same thing

17   now.  If it -- if the court finds that something I did could

18   have affected the case, then, legally, I accept it.

19            MS. BOERSCH:  All right.  I have no further

20   questions.

21            THE COURT:  Does the government have

22   cross-examination?  And who is going to be doing that?

23            MR. YANG:  I am, Your Honor.  Thank you.

24            THE COURT:  All right.  Mr. Yang, are you ready?

25            MR. YANG:  Yes.

1                             CROSS-EXAMINATION

2    BY MR. YANG:

3    Q.  Ms. Mojaddidi, you took losing the trial hard, correct?

4    A.  Oh, sure.

5    Q.  And you kind of beat yourself up, either in statements

6    or -- in statements after the trial you kind of orally beat

7    yourself up a little bit?

8    A.  I think I went through a range of emotions, yes.

9    Q.  And there are potentially times that you were kind of

10   beating yourself up in front of Mr. Riordan?

11   A.  I -- I think that in -- with Mr. Riordan, I just candidly

12   spoke about a lot of feelings that I had.  So -- so, yeah, I

13   could imagine that I beat myself up, sure.  And I probably

14   blamed Johnny for things.  And blamed -- you know, got

15   frustrated with Hamid about things.  And, just -- I probably

16   did a lot of that, yeah.

17   Q.  And at the time that this happened, whatever you said would

18   be colored by the emotions of the moment?

19   A.  Sure.

20   Q.  You testified about a potential alibi witness, Usama.  Do

21   you remember that testimony?

22   A.  Right.  If that's the cousin, yes.

23   Q.  And do you remember filing an affidavit where you stated

24   that you could not contact a represented party under the ethics

25   rules?

1   A.  Oh, that I couldn't contact him directly because he was

2   represented?  I believe that he was the person who had

3   representation.  And, yes, I couldn't represent -- I could not

4   contact him directly once he had an attorney.  That's true.

5   Q.  And in your affidavit, you specifically mention that

6   Mr. Haydn-Myer was his -- was Usama's attorney?

7   A.  I don't recall right now, but if I wrote that in the

8   affidavit, it's probably accurate.

9   Q.  And that Mr. Haydn-Myer told you and Johnny Griffin that he

10  would advise his client not to testify and Usama would invoke

11  his Fifth Amendment rights?

12  A.  Yes.

13  Q.  If you were aware of a viable pretrial motion that would

14  have helped Hamid, you would have filed it, correct?

15  A.  I think we would have.

16  Q.  And based on your testimony on direct, it's a little

17  unclear, but when you were entering into these stipulations

18  regarding the security clearance issue, you specifically

19  informed your client what you were doing, correct?

20  A.  I mean, my -- I -- I met with Hamid regularly, and I would

21  speak to him about everything that was going on.  And certainly

22  if there was a stipulation that was reached on his behalf, I

23  would explain it to him.

24  Q.  And you would specifically obtain his consent to any

25  stipulation that you entered into?

1    A.   Absolutely.

2    Q.   I'm going to show you what has been previously marked as

3    Government's Exhibit 8.

4              THE COURT:   Counsel, what volume is that in?

5              MR. YANG:   This is in volume one, Your Honor.

6              THE WITNESS:   Did he say H or 8?

7              MR. YANG:   8.   The number 8.

8              MS. BOERSCH:   I think she only has --

9              MR. YANG:   I'm going to bring it up.

10             THE WITNESS:   I have volume one, but there are no

11   numbers in this.

12             MR. YANG:   Sorry.   I was showing it to defense

13   counsel.   I will bring it up in a second.

14             THE WITNESS:   Okay.

15   Q.   BY MR. YANG:   If you could just briefly identify what

16   Exhibit 8 is.   Take your time to read some of the pages, if you

17   need to.

18   A.   Are you sure we're looking at the same thing?   This is a

19   64-page transcript from a hearing that was held on

20   February 3rd.

21   Q.   Yes.

22   A.   Okay.   I am going to accept that this is a transcript from

23   that date, but I don't know if you want me to read the whole

24   thing.

25   Q.   I will be directing you to certain pages.

1   A.   Okay.

2   Q.   Why don't you start on page 11, and read to page 32, just

3   to yourself.

4   A.   All right.

5           THE COURT:   I'm sorry, counsel, you want her to read

6   starting at page 11 to where?

7           MR. YANG:   32.

8           MS. BOERSCH:   Your Honor, I might suggest we could

9   have Ms. Mojaddidi read the 32 pages perhaps on a break?

10          THE COURT:   Yes.   Is that something that would work

11  for you?

12          MR. YANG:   That's perfectly fine, Your Honor.

13          THE COURT:   As you know, we're now at ten to 3:00,

14  and we've had our afternoon break.   Is there another area of

15  questioning that you can pursue?

16          MR. YANG:   Well, once I'm finished with this

17  question, the follow-up question to this testimony, I'm only

18  going to have a few more questions.   So, we will be done by

19  4:00.

20          THE COURT:   So, in other words, you're putting the

21  Court in a position where we have to take another break ten

22  minutes after we just came back from one?

23          MR. YANG:   My apologies, Your Honor, but I believe

24  it's not going to take that long for the witness to get through

25  these pages.

1          THE COURT:  You can't be any more specific with your

2     questions and the pages in the transcript?

3          MS. BOERSCH:  And, Your Honor, maybe I could

4     interpose a formal objection, which is he has not asked the

5     witness a question to which she has answered I don't recall,

6     and so there is no question pending which would require her to

7     read.

8          THE COURT:  Sustained.

9     Q.  BY MR. YANG:  Ms. Mojaddidi, if you will stop reading.

10    A.  Yes.  Okay.

11    Q.  With regard to the stipulations that were entered regarding

12    the aerial photographs, do you have a specific recollection as

13    to how those stipulations were entered?

14    A.  I do not.

15    Q.  Is there anything that would refresh your memory?

16    A.  Yes.  And I only say that because it looks like this

17    hearing may have discussed that.  So, if I were to read the

18    transcript from the hearing, it may refresh my recollection.

19          THE COURT:  Again, before I -- if I see where this is

20    going, Mr. Yang, I apologize for interrupting you, that's just

21    one of my privileges, is that if you can be more specific,

22    direct the witness to specific areas that may -- she can

23    utilize as opposed to basically the bulk of the hearing.  I

24    assume that you prepared questions that are more specific in

25    nature.

1          MR. YANG:  Certainly, Your Honor.

2     Q.  BY MR. YANG:  Your clients were present during this hearing

3     where the stipulations were entered, correct?

4     A.  If the -- if that's what the -- if that's what it reflects,

5     then, yes, they would have been.  I just don't have a specific

6     recollection right now that they were present, but I think in

7     the transcript it would state that they were, if they were.

8     Q.  And they actually entered the waivers relating to the

9     stipulations in open court, correct?

10    A.  If that's what happened at this hearing.

11         And I did look at the first few pages, it does state that

12    he was present, and it looks like the interpreter was present.

13    So we would have only needed an interpreter for that purpose,

14    or for the purpose of explaining the proceedings.  And so if

15    there were -- if there were stipulations and waivers reached

16    during this hearing then, yes, my client was present, and it

17    was interpreted to him.

18    Q.  And, in fact, Judge Burrell specifically went through a

19    colloquy with both Hamid and Umer relating to these waivers,

20    correct?

21    A.  If this exhibit reflects that then, yes, that would have

22    happened.

23         And, I'm sorry, as I flip through these pages, I do see

24    that each of them is responding in the affirmative to questions

25    asked by the court.

1    Q.  You've testified today that you researched issues on your

2    own before deciding what to do, correct?

3    A.  Generally -- yes.

4    Q.  And you essentially quit your practice and were working on

5    this case 24/7 throughout this time period, correct?

6    A.  I mean, I -- I wouldn't say I quit it.  I still had other

7    ongoing cases, but I would say that this case was -- took over

8    probably at least 75-80 percent of the time.  Certainly, during

9    the trial it was the only case I did.  But throughout the year

10   or so that I represented him, I think it was probably 75 to 80

11   percent of my time.

12   Q.  And if Johnny Griffin gave you advice that you believed was

13   against the interest of Hamid Hayat, what would you have done?

14   A.  I would have -- if I believed it was against the interest

15   of Hamid Hayat, I would not have taken the advice.

16            MR. YANG:  One moment.

17       (Pause in proceedings.)

18   Q.  BY MR. YANG:  And why would you have not taken the advice?

19   A.  Because I have an ethical duty to represent my client's

20   best interests.  That's it.

21            MR. YANG:  Thank you.  No further questions, Your

22   Honor.

23            THE COURT:  Any redirect, counsel?

24            MS. BOERSCH:  Just a couple.

25       ///

1                          REDIRECT EXAMINATION

2     BY MS. BOERSCH:

3     Q.   When you met with Mr. Riordan and spoke with him, you

4     candidly spoke to him about your representation of Hamid Hayat,

5     right?

6     A.   I mean, I -- I have -- my recollection is I just talked to

7     him about whatever was appropriate in that conversation.  And

8     I -- I'm sure I was truthful.  I have no reason to lie to him.

9     Q.   And you were interested in helping your client, Hamid

10    Hayat, right, and you thought Mr. Riordan could help?

11    A.   In every way possible.

12    Q.   With regard to the witnesses, in particular the witness

13    Usama, there were -- Mr. Usama Hayat was not the only person

14    who could have testified as an alibi witness, right?

15    A.   So, I'm pretty certain that's not his last name.  Ismail,

16    maybe.  Sorry.

17         So -- so the question again was?  I got distracted.

18    Q.   Usama -- and I think you're right on the last name.

19    A.   Yeah.

20    Q.   Usama was not the only person who could have testified as

21    an alibi witness for Hamid Hayat?

22    A.   Well, I think that -- well, I -- I talked to -- I talked

23    about the different people that I considered.  And the reason

24    why Usama was a person I thought about is because I think his

25    302s reflected that he saw Hamid daily, I think.  And that was

1   why I thought it was -- he was important.  But other than that,

2   I explored potential other alibi witnesses and dismissed them

3   for the reasons I stated earlier.

4   Q.  For instance, Hamid told you that he played cricket in

5   Pakistan very frequently, right?

6   A.  Yeah.  He told me he played cricket, yes.

7   Q.  So, there would have been people there who played cricket

8   with him, for instance, on a regular basis?

9   A.  Sure.

10  Q.  But you didn't interview any of those people?

11  A.  No, I didn't think that they were viable alibi witnesses.

12  Q.  Despite the fact that you didn't actually speak to them?

13  A.  Well, no, because I considered the fact that Hamid did not

14  tell me that every day he was in Pakistan he played cricket

15  with people.

16  Q.  Do you recall that the indictment in this case actually

17  specified that the period of time during which Hamid attended,

18  allegedly, a terrorist training camp was three to six months?

19  A.  I don't think that that's accurate.  I don't -- it's not

20  three to six months.

21  Q.  You might be right.

22  A.  I think it may have been more like ten months to a year.

23  Q.  That was what Mr. Hayat said in his alleged confession,

24  right?

25  A.  Well, one of many things -- inconsistent things he said in

1    his confession.

2    Q.  So, that was the period of time during which alibi

3    witnesses would have been relevant, given that his statement

4    was one of the most important pieces of evidence against him?

5    A.  His -- when you're saying that time, I'm assuming you're

6    talking about the three to six months that he mentioned in his

7    statements -- in his confession.  I took almost everything that

8    he said in his confession, because he told me, wasn't true.

9    Q.  Okay.  But you knew the confession was coming into

10   evidence, right?

11   A.  I did.

12   Q.  So, the period of three to six months that he said he was

13   allegedly at this terrorist training camp would have been a

14   period during which it would have been helpful to have alibi

15   witnesses, right?

16   A.  Again, because he told me it wasn't true, I don't know why

17   I would pursue something that I knew my client told me wasn't

18   true.

19   Q.  Okay.  With respect to Usama, and his attorney's

20   representation that he would invoke his Fifth Amendment

21   privilege, at that time you were not aware, or you did not

22   know, that you could have petitioned the court or asked the

23   court for a grant of immunity to immunize Usama so he could

24   testify on Hamid Hayat's behalf?

25   A.  As I sit here right now, I don't know if I knew that at

1  that time.  But that was not the reason we decided not to call

2  him.

3         MS. BOERSCH:  No further questions.

4         THE COURT:  Anything else, Mr. Yang?

5     Apparently, yes.

6                    RECROSS EXAMINATION

7  BY MR. YANG:

8  Q.  Hamid never gave you a list of names with whom -- of the

9  people he played cricket with?

10 A.  No.  He never, I think, even gave me one name.

11 Q.  And his family never gave you a list of names of the people

12 he played cricket with, correct?

13 A.  No.

14        MR. YANG:  Thank you.  No further questions.

15        THE COURT:  All right.  Counsel, is this -- anything

16 else, or is this witness excused?

17        MS. BOERSCH:  No, Your Honor, nothing.

18        THE COURT:  You're excused.  Thank you for being here

19 today.

20        THE WITNESS:  Thank you, Your Honor.

21        THE COURT:  Counsel, do we have another witness for

22 today?

23        MR. RIORDAN:  Your Honor, here is our situation.  As

24 discussed earlier, I think we informed the Court that we were

25 going to go through exhibits, consult with the government, and

1     close our case on Monday morning.

2               THE COURT:  Correct.

3               MR. RIORDAN:  The only witness remaining is myself.

4     And, for a variety of reasons which I could explain, I imagine

5     my testimony would be at most an hour, half an hour on direct,

6     and then a half an hour thereafter, we'd ask the Court's

7     indulgence to put my testimony over to Monday morning, since we

8     weren't going -- we were going to go over there to close.

9               THE COURT:  All right.  Who wants to address this

10    issue from the government, Mr. Espinosa or Mr. Yang?

11              MR. ESPINOSA:  Your Honor, we'll accept Mr. Riordan's

12    representations that there may be reasons outside of the

13    established record that he can't proceed to testimony today.

14    He may want to elaborate on those reasons so the Court can make

15    a finding, but we don't oppose the request, even in the absence

16    of that elaboration, if the Court is intending to grant the

17    request.

18              THE COURT:  I would like, given the representations

19    made by both parties earlier in the week -- you can sit down or

20    back at the podium, Mr. Riordan, whatever you're comfortable

21    with.  But it would be nice if we could wrap this up -- this

22    part of the hearing up on Monday.  And I understand that that

23    was a representation that was made, that the government may

24    have, what, one to two witnesses at most?  Is that still

25    accurate?

1          MR. ESPINOSA:  Yes, Your Honor.

2          THE COURT:  We still have exhibits to go through for

3     petitioner, not necessarily in this order, and we have an hour

4     left today.

5        I have to tell you that it would be preferable -- I'm not

6     going to -- you know, unless the government can articulate some

7     sort of prejudice if we move the entire proceeding over to

8     Monday, I have to tell you, I would really like to knock some

9     of that out this afternoon if it's at all possible.  Could you

10    even work in a half an hour if you have a break?

11        (Pause in proceedings.)

12          MR. RIORDAN:  We'll proceed, Your Honor.

13          THE COURT:  All right.  So who is your next witness?

14    Would that be you, Mr. Riordan?

15          MR. RIORDAN:  Dennis Riordan, Your Honor.  And

16    Mr. Horgan will conduct the examination.

17          THE COURT:  All right.  Mr. Espinosa, I assume you

18    have no objection to this?

19          MR. ESPINOSA:  Your Honor, the government only states

20    its objection to his testimony because Mr. Riordan is a

21    percipient witness who was here throughout the proceedings,

22    during the testimony of other fact witnesses.

23          THE COURT:  He was also counsel here.  He also

24    participated.  And the government knew that this was -- the

25    situation was going to occur given the motions in limine, the

1    objections that were made, and at no time during this

2    proceeding did the government object to Mr. Riordan's presence

3    throughout, nor did the government make any motion with this

4    Court to remove Mr. Riordan from these proceedings or as

5    counsel for Mr. Hayat.

6         So, with that said, your objection is noted for the record,

7    and I'm going to have -- I'm going to overrule it at this time.

8         Mr. Horgan, could you -- actually, first, I believe,

9    Mr. Riordan, if you could step up to the witness stand and if

10   you could be sworn in, please.

11             THE CLERK:  Raise your right hand.

12        (The Witness, DENNIS RIORDAN, is sworn.)

13             THE WITNESS:  I do.

14             THE CLERK:  You may be seated.

15        Please say and spell your full name for the record.

16             THE WITNESS:  Dennis Riordan; D-E-N-N-I-S,

17   R-I-O-R-D-A-N.

18                      DIRECT EXAMINATION

19   BY MR. HORGAN:

20   Q.  Good afternoon, Mr. Riordan.

21        Could you briefly describe your experience as an attorney,

22   please.

23   A.  I was admitted to practice in California in 1976.  I worked

24   for several years as a state public defender in San Francisco.

25   I went into private practice in 1981, and have been in practice

1    ever since, initially on my own, subsequently in a partnership

2    Riordan and Rosenthal, and for the last dozen years or so, I

3    believe, a partnership of Riordan and Horgan.

4    Q.  Okay.  And have you handled a number of federal appeals

5    during your tenure as a lawyer, or your experience as a lawyer?

6    A.  I think it's fair to say that the vast majority of my

7    practice has been as an appellate lawyer.  And within that

8    specialty, or subspecialty, as a criminal appellate lawyer.  I

9    have handled some civil appeals, but my principal practice has

10   been an appellate lawyer and a -- what we'd call a writ lawyer,

11   collateral attacks, habeas corpus matters, in both state and

12   federal court.

13          THE COURT:  Mr. Horgan, I'm going to ask you,

14   sometimes you drop your voice while you're at the podium, could

15   you just -- it's late in the afternoon, could you just make

16   sure you speak up so we can -- we, specifically me, can hear

17   everything you're saying.

18          MR. HORGAN:  Sorry, Your Honor.

19          THE COURT:  Thank you.

20          MR. HORGAN:  Yes.

21   Q.  BY MR. HORGAN:  Can you -- and in the course of your

22   experience, have you gained familiarity with the concepts of

23   ineffective assistance of counsel and conflict of interest?

24   A.  Yes.  It's -- well, let me say this:  As an appellate

25   lawyer, it's an issue that an appellate lawyer has to look at

788

1   in virtually every case.  Although, it's narrowly defined, and

2   the number of cases in which there is a colorable claim is

3   much, much smaller.  But I'm familiar with it, and I've

4   litigated many writs of habeas corpus or criminal appeals that

5   involve issues of ineffective assistance of counsel and

6   conflicts of interest.

7   Q.  Do you remember your first contact with this particular

8   case?

9   A.  Yes.  Like many people, I was aware of the publicity when

10  the Hayats were arrested in June of 2005.  There was a great

11  deal of publicity, and national publicity.  And over the course

12  of the next year I would read articles on the proceedings, and

13  subsequently the trial.  But my familiarity was, really, solely

14  through the media.

15  Q.  Okay.  What about your first contact with Ms. Mojaddidi?

16  A.  Well, what occurred was that just after -- in the wake of

17  the verdict, within a day or two, there was a series of

18  articles in both the San Francisco Chronicle, I believe, and

19  the Sacramento Bee, saying that an issue of potential juror

20  misconduct had arisen in the case and been brought to the

21  attention to the Court.  And there was going to be post-trial

22  proceedings involving the issue of jury misconduct.

23           THE COURT:  I think I -- if we could stop just a

24  moment, Mr. Horgan.  I believe our last witness left a scarf on

25  the witness stand, and it would be great if we can get it back

1    to her.

2              MS. MOJADDIDI:  Thank you so much.  I apologize, Your

3    Honor.

4              THE COURT:  No problem.  If that's our biggest issue

5    today, we're having a good day.

6         All right.  Thank you for that, gentlemen.

7         Please continue.

8    Q.  BY MR. HORGAN:  I'm sorry, do you want to pick up where you

9    left off, Mr. Riordan?

10   A.  Yeah.  Where I had left off at was the fact that through

11   the media I learned that there was -- appeared to be a

12   significant issue of juror misconduct that had arisen in the

13   case.  And I had litigated several of the major juror

14   misconduct cases in the Ninth Circuit Court of Appeal, so I

15   actually called Ms. Mojaddidi and offered the assistance of our

16   office on a new trial motion.

17   Q.  Do you recall how soon after the verdicts came in, in late

18   April 2006, you made contact with Ms. Mojaddidi?

19   A.  It would have been in the week afterwards.  I seem to

20   remember that around May 5th I sent her an e-mail with a -- a

21   number of briefs attached from juror misconduct issues that our

22   office had handled in state and federal court.

23   Q.  And did you accompany the briefs with a message to her of

24   some kind?

25   A.  Yeah.  I -- my recollection is that I received an e-mail

1    back saying -- thanking me and saying that we should talk

2    within the next day or two.

3    Q.  Okay.  And did you talk?

4    A.  We did.  And -- I'm sorry.

5    Q.  When did that happen?

6    A.  It was certainly within the next day or two, because within

7    a relatively short period of time Ms. Mojaddidi had a motion

8    pending -- a request pending to be appointed as counsel for

9    Hamid Hayat in post-trial proceedings.

10   Q.  And where did -- what did you discuss after that?

11   A.  Well, I believe I supplied information to Ms. Mojaddidi, or

12   directly to Dan Broderick, who was then the federal public

13   defender, indicating my willingness, and the willingness of our

14   office, to come in and assist Ms. Mojaddidi in post-trial

15   proceedings, because it was clear that she would not be

16   appointed to serve as counsel for Mr. Hayat -- for Hamid Hayat

17   in post-trial proceedings unless an experienced lawyer agreed

18   to serve as, essentially, her mentor in post-trial proceedings.

19   Q.  So, did you reach some kind of an agreement about what

20   presentation would be made to the court with respect to

21   appointment?

22   A.  Well, what I -- what I know occurred is that -- I believe

23   around May 19th I appeared with her in federal court, here in

24   the Eastern District, because Judge Burrell scheduled an

25   appointment to set a schedule for post-trial proceedings.  And

1   soon thereafter he issued an order appointing Ms. Mojaddidi as

2   counsel for Mr. Hayat in post-trial proceedings, subject to

3   several conditions.

4   Q.  And what were the conditions?

5   A.  The conditions were that I would serve as her mentor in

6   post-trial proceedings, and that she would not be permitted to

7   be appointed as appellate counsel, should there be an appeal to

8   the Ninth Circuit, because she lacked the qualifications to be

9   so appointed.  And that there would be an expectation on the

10  part of the court that if there were an appeal, that I would be

11  handling the appeal.

12  Q.  So, what did the likely appointment mean beyond that?  Or

13  is that pretty much the extent of it?

14  A.  Well, the fact that -- I don't know if I anticipated this,

15  but the fact that Judge Burrell indicated that I was to serve

16  as appellate counsel, if there was an appeal, had an impact on

17  how I would handle the post-trial proceedings prior to

18  sentencing.

19  Q.  And did you thereafter learn anything about the fact that

20  the government was contemplating a retrial of Umer Hayat?

21  A.  Yes.  Around -- in that period of time, and it would have

22  been in May, Ms. Mojaddidi sent me an e-mail, this was

23  subsequent to her appointment, saying that she wanted me to be

24  aware that there was a potential retrial of Umer Hayat coming

25  up, and that she'd be unavailable to work on anything on

1  Hamid's case because she was going to participate in the trial

2  of -- retrial of Umer Hayat along with Johnny Griffin.

3  Q.  And did that -- was that significant -- that statement from

4  Ms. Mojaddidi significant to you, or raise any concerns with

5  you?

6  A.  It was significant because it raised the specter that this

7  was a situation in which Ms. Mojaddidi and Mr. Griffin may

8  have, essentially, engaged in the representation of both

9  Hayats.

10  Q.  Okay.  And, in other words, that she might be devoting some

11  of her time to the Umer Hayat case while still involved in the

12  Hamid Hayat case on the new trial motion; is that right?

13  A.  My concern was less that she would be unavailable to work

14  on the new trial motion, because I expected that -- that our

15  office would draft it, but that this raised the possibility

16  that there was, or had been, a multiple -- a representation

17  of -- multiple representation of defendants.  And from an

18  appellate lawyer's point of view, that's a potential conflict

19  issue.  And since I was going to serve as appellate counsel,

20  from that point on I had an obligation to look at all the

21  possible issues that might be raised in an appellate court.

22  Q.  Okay.  Now, did you meet with Ms. Mojaddidi at that first

23  appearance in May?  Is that the first time you met?

24  A.  That was, I'm quite confident, the first time that we met

25  in person, at that court appearance.

1    Q.   Okay.  Was there much discussion of representation at that

2    point?

3    A.   No.  There was an agreement that she would come to

4    San Francisco and we would start -- sit down and start

5    discussing the case.

6    Q.   And did she, in fact, come to San Francisco and meet at the

7    office of Riordan and Horgan?

8    A.   She did.  And I would -- believed it was towards the end of

9    that month of May.

10   Q.   And what happened at the meeting that happened at that time

11   in San Francisco?

12   A.   May I add just one fact on the Umer Hayat retrial question?

13   Q.   Sure.

14   A.   I believe by that time Umer Hayat's case had been resolved.

15   The charge that he faced was dismissed, and he had pled to an

16   offense unrelated to terrorism or a false statement.

17   Q.   So, the potential conflict as to dual representation of

18   Umer and Hamid was moot at that point?

19   A.   Well, it was moot going forward.  But what the -- the

20   message had said to me was that there was the possibility that

21   there had been a joint defense arrangement during the trial

22   that had concluded.

23   Q.   Okay.  And during the meeting in San Francisco, you

24   discussed the history of the case, I assume?

25   A.   We -- well, we got to know one another in terms of her

1  background, and -- and we started in on what was then, in that

2  initial session, an extended discussion of the case, and how it

3  had been conducted, and if she thought there were issues in the

4  case.

5  Q.  Do you remember a particular room where this discussion

6  occurred?

7  A.  Yeah.  It was in our conference room at 523 Octavia Street.

8  I believe, in addition to Ms. Mojaddidi, you were present.

9  Q.  Okay.  And what was your impression of Ms. Mojaddidi and

10 what did you learn from her?

11 A.  Well, in the case related sense, she was extremely

12 passionate about the case.  It was obvious that she had

13 dedicated herself to it, as she testified today, for the

14 preceding year.  Very, very convinced of her client's

15 innocence.

16     And, on a personal level, she had a very, very impressive

17 personal story, an immigrant coming here, learning English, and

18 going on to graduate from law school.

19 Q.  And what about the -- did you discuss the substance of the

20 new trial motion and the approach that would be taken there?

21 A.  Well, we -- we -- it was clear the motivating factor

22 initially had been that there was a juror misconduct issue that

23 had been raised.  And that, actually, was a significant issue

24 in the new trial motion, and actually resulted in an

25 evidentiary hearing.

1    But what we made clear to Ms. Mojaddidi was that one of the

2    functions of a new trial motion is to -- can be to canvas all

3    of the potential issues that could have arisen, claims of error

4    and so forth, and particularly to ensure that to the extent

5    that those issues may not have been adequately addressed

6    previously, that they're addressed in the new trial motion.

7    Q.  Did you learn anything about Ms. Mojaddidi's experience

8    coming into the case in the course of that first discussion?

9    A.  I -- as I sit here, I can't remember whether I was aware of

10   it before then, but certainly by the time of that discussion.

11   And I'm sure we talked about it in that meeting.  She informed

12   me that she had had no criminal trial -- no criminal law

13   experience and no trial experience prior to taking on the

14   representation of Hamid Hayat.

15   Q.  Did that raise any -- did that raise your interest in any

16   way, or raise any concerns with you?

17   A.  Well, I suppose I could say there was a personal reaction,

18   but also a reaction from the point of view of the work that we

19   were supposed to be doing on a new trial motion.  I was

20   flabbergasted.

21   Q.  Why were you flabbergasted?

22   A.  From what I could tell, from what I had read, this was one

23   of the most complex prosecutions in terms of the issues that it

24   raised; international witnesses, allegations of terrorism.

25   There had been a press release by the United States Attorney in

1    this district at the time of the arrest that this was a sleeper

2    cell in al-Qaeda -- of al-Qaeda located in Lodi.  I was aware

3    that the National Security Division of the Justice Department

4    would be involved.  And that the trial had gone on for any

5    number of months.  And I was certain that any number of issues

6    involving requiring the testimony of expert witnesses on both

7    sides, the government and the defense, would -- were and --

8    would have been and were involved in the case.

9    Q.  Okay.  Did you, in this initial conversation, discuss the

10   extent and quality of any pretrial investigation?

11   A.  I am -- let me preface this by saying that there were

12   discussions and meetings with Ms. Mojaddidi that extended over

13   the period of time from when I entered the case, in May

14   of 2006, until the sentencing, which was, I believe, in

15   September of 2007.  And so there are portions of discussions

16   that I would have a hard time pinning down to one meeting or

17   the other.

18       But I am certain in that first meeting that we discussed

19   the issues of a defense and pretrial investigation.

20   Q.  Okay.  Did --

21           MR. HORGAN:  Excuse me, Your Honor.  I wonder if I

22   can just grab a declaration that I left, just for my

23   consultation --

24           THE COURT:  Certainly.

25           MR. HORGAN:  -- in questioning the witness?

1      Thanks, Your Honor.

2          (Pause in proceedings.)

3              MR. HORGAN:   Thank you, Your Honor.

4   Q.  BY MR. HORGAN:   In that initial -- in the course of

5   discussing the pretrial investigation done in the case, did

6   Ms. Mojaddidi say anything concerning potential witnesses in

7   Pakistan who might have addressed Hamid Hayat's activities

8   during the charged period?

9   A.  Yes.  What she said was that when she became aware of the

10  charge, and the allegation of Hamid Hayat attending a terrorist

11  camp in Pakistan, that she believed the allegation was false,

12  and that she was certain that there were witnesses in Pakistan

13  who could testify and provide evidence that he had not attended

14  a camp.

15  Q.  And did she say anything about what her first instinct was

16  with respect to the charges against Mr. Hayat with respect to a

17  trial strategy?

18  A.  She -- the -- I remember very clearly the expression she

19  used in that discussion.  It was her belief and intention to,

20  quote, go on the offensive, in terms of providing evidence of

21  an alibi and his innocence.

22  Q.  And did she indicate how she would go about doing that?

23  A.  The -- the specific thing that she thought of was to make

24  an effort to obtain visas from the United States Government to

25  bring alibi witnesses to the United States to testify here in

1    this courthouse at a trial of Hamid Hayat.

2    Q.  And did she say what -- whether she pursued that tact, or

3    what developed in that regard?

4    A.  She said that she had consulted with Johnny Griffin, and he

5    deprecated, discouraged her from doing so, because he said that

6    the issuance of visas is in the exclusive province of the

7    Executive Branch of the United States Government, and the

8    government was never going to issue visas to any witnesses to

9    come and testify for the defense in Sacramento.

10   Q.  Did Ms. Mojaddidi think that that ended the matter, or did

11   she think that there was some further action she might take?

12   A.  She -- the phrase that I remember her using was that there

13   are, you know, witnesses who can prove his innocence, but

14   they're in Pakistan and you can't -- you know, there was no way

15   to get evidence from these witnesses in Pakistan.

16   Q.  Did you make -- in the course of this particular

17   conversation, did you make any reference to the Federal Rule --

18   to Federal Rule 15, which relates to foreign depositions?

19   A.  Yes.  This was in 2006, and in -- from 2002 to 2004 I had

20   been involved in the defense of the ex-prime minister of

21   Ukraine.  And in that case, when the trial came about, some

22   overwhelming percentage of the trial consisted of nothing but

23   playing before the jury depositions taken all around the world,

24   I think in ten different countries, under Rule 15.

25        So I brought up the subject of Rule 15, and essentially

1    said, well, you know, you can take depositions all around the

2    world from witnesses.  And her response was, I didn't know

3    that, and Johnny didn't tell me.

4    Q.  Okay.  Did she say anything about the availability of

5    securing funding for investigation in Pakistan?

6    A.  Well, it was during the course of that discussion that we

7    had a discussion of getting an investigator, funding an

8    investigator to go to Pakistan.  And I asked her whether she

9    was aware that an indigent defendant, even with retained

10   counsel, can apply to the court for the appointment of an

11   investigator.  And she said that she had not been aware of

12   that.

13   Q.  Did she make any reference to her understanding or -- well,

14   let me say it again.

15       Did she refer to information she had received concerning

16   the closure of militant camps in Pakistan?

17   A.  Yes.  She said that early on in the case she had read an

18   article that -- from -- quoting a Pakistani official, in the

19   wake of these arrests, because there was concerns raised, and

20   questions raised to Pakistani officials about the existence of

21   camps, and that in this article a Pakistan -- a Pakistani

22   official had denied the existence of a camp such as Mr. Hamid

23   Hayat was accused of attending.

24   Q.  Did she express any interest in doing anything further

25   after reading that article?

1    A.   Yes.  She said that she went to Johnny Griffin, brought the

2    article to Johnny Griffin, and raised with him the topic of

3    pursuing this line of investigation with Pakistani officials.

4    Q.   And what was the response, or what was -- what happened

5    next in that conversation?

6    A.   She said that Johnny essentially instructed her to drop the

7    idea because Pakistani officials were going to be hostile to

8    their clients and would not assist them in any way.

9    Q.   Did she say anything about continuing the effort or

10   abandoning the effort?

11   A.   That was, I believe, the first time that she said that when

12   Johnny strongly discouraged her from further pursuing it, she

13   was just afraid that if she disagreed with Johnny over a

14   question like that, that he would cut off his mentoring role

15   and assistance to her.

16   Q.   Okay.  In this -- in these discussions -- and, again, I

17   guess we've established that there were several over a -- more

18   than a year period, but during the course of the

19   conversations -- by the way, I mean, do you remember about how

20   many in-person meetings there may have been?

21   A.   My recollection is that there were at least three or four

22   meetings in San Francisco.  And then there were subsequent

23   court appearances.  And we met in Sacramento.  It was during

24   one of those that I visited Hamid Hayat for the first time, in

25   the holding cell, I believe, in this building.

1  Q.  Okay.  So during the course of the conversations, did

2  Ms. Mojaddidi ever make reference to an attempt to bring Mark

3  Reichel in as counsel for Hamid Hayat, either as cocounsel or

4  some other capacity?

5  A.  Yeah.  I mean, we started out talking about the beginnings

6  of the case, and her representation of Hamid Hayat, and the

7  Reichel incident was six or seven months later.

8      But her words were that she was in her office, it was a

9  week or two before the trial was to begin, and she was

10  overwhelmed.  I think she used -- my recollection is she used

11  the phrase that she was having a nervous breakdown when she

12  thought of, you know, the overwhelming nature of trying a case

13  of this complexity without any criminal law experience.

14  Q.  And so what did she say she did in response to that feeling

15  she was having?

16  A.  I don't think that she went into a great amount of detail

17  as to the contacts that went on between herself and Johnny,

18  when they occurred and where they occurred, but she said that

19  they -- she had gotten in touch -- or they had gotten in touch

20  with Mark Reichel, and that -- and met with him, and that he

21  was very interested in coming into the case as her cocounsel.

22  Q.  And did she say what Mark -- Mr. Reichel's response to that

23  was?

24  A.  He -- that he was very eager to come in.  And I believe she

25  mentioned the figure that they offered.  They said that $10,000

1  would be available for him to come in as cocounsel.

2  Q.  Did she say whether or not Mr. Reichel, in fact, became

3  involved in the case as counsel?

4  A.  She said that she had a discussion with Johnny Griffin in

5  which Johnny said that if Mark Reichel came into the case he

6  would not be able to mentor her, and would not be able to

7  assist her in her representation of Hamid Hayat.

8  Q.  Did she say anything about how she reacted to that comment?

9  A.  She said that the prospect of losing Johnny as her mentor

10  and assistant was such that it was just not tenable to bring in

11  a lawyer who Johnny did not want to have enter the case.

12  Q.  Did she say anything about her willingness or reluctance to

13  disagree with decisions that Johnny would make?

14  A.  It was -- as with the embassy incident, it was an instance

15  in which she repeated that she just felt that she could not

16  disagree with Johnny on a major decision for fear of losing his

17  assistance.

18  Q.  Did she report that Mr. Reichel had or had not come into

19  the case?

20  A.  What she said is they had told Mark Reichel that they would

21  not need to bring him on.

22  Q.  Did she make any -- did she raise the topic of the Speedy

23  Trial Act, and how that played into the defense approach to the

24  case?

25  A.  Yeah.  I mean, we've leapt ahead to the Reichel incident.

1    I think the discussions were sort of chronological.

2        So, around the time we were talking about pretrial

3    investigation, she said that the initial strategy in the case

4    was to make a demand for a speedy trial the central and initial

5    strategic objective on the belief that the government was not

6    prepared to try the case within the -- you know, the short time

7    period allowed under the Speedy Trial Act.

8    Q.  Did she say anything about whether or not that was her

9    thinking about the case, or whether it was Mr. Griffin's, or a

10   joint decision or approach?

11   A.  I think it's fair to say that she said -- she said that

12   that was Johnny's strategy, and how he intended to proceed in

13   the initial phase of the case.

14   Q.  Did she say whether she knew anything about the impact a

15   dismissal could have with respect to a second charge in the

16   case?

17   A.  Well, my reaction was that in a complex case such as this,

18   it was virtually unthinkable that you'd be able to get a speedy

19   trial, within 75 days.

20       But I expressly -- and then -- which led to the second

21   part.  I expressly asked her, Are you aware that even if you

22   get a speedy trial dismissal, the government is then free to

23   reindict the case and gets a second bite at the apple?  And she

24   said that she had not been aware of that fact.

25   Q.  Okay.  Did you discuss whether it wouldn't have made sense,

1   at that point, to conduct further investigations, or under

2   those circumstances?

3   A.  Yes.  And what she said was that even though -- that a

4   continuance had been granted by the judge initially, and that

5   occurred in August of 2005.  And I raised the question of then,

6   you know, pursuing investigation.  And she said that Johnny's

7   position was that they -- even though their motion -- their

8   attempt to get a speedy trial had been foiled by the granting

9   of a continuance, that they needed to preserve the speedy trial

10  issue, and for them to ask for a continuance or delay of the

11  trial would -- would waive the speedy trial issue that would

12  exist, potentially, on appeal.

13  Q.  Did she say anything else about the speedy trial strategy

14  that was significant with respect to how the statute would

15  operate?

16  A.  Well, I then asked her whether the -- she had moved to

17  dismiss the case on speedy trial grounds.  And I remember,

18  quite clearly, she said, No, but we objected to every

19  continuance or request for continuance.

20      And I said, Are you aware that you can't preserve a speedy

21  trial issue for appeal unless you move to dismiss on speedy

22  trial grounds?  And she said no, she had not been aware of

23  that, and Johnny Griffin had not told her that.

24  Q.  During the course of these discussions and meetings, did

25  you discuss the potential issue of conflict of interest?

1    A.   Let me say that for the most part that did not really come

2    up as a central concern.  And one reason for that was that we

3    did not have her files at that point.  We did not obtain them

4    until we filed the 2255 in 2014.  So, one thing that we did not

5    have, and did not obtain until 2014, was the retainer agreement

6    under which this joint defense arrangement proceeded.

7         So, I don't remember extended discussions, but I do recall

8    this, because of the concerns about representation of multiple

9    defendants, I asked her, just generally, about the concept of

10   conflict of interest in a criminal case.  And she said that she

11   would -- was completely unfamiliar with how conflict of

12   interest law would operate in a criminal case.

13   Q.   Did she say anything more specifically about the concept or

14   the prohibition against representation of multiple defendants

15   and/or divided loyalties?

16   A.   I specifically asked about, you know, representation of

17   multiple defendants.  And she said she had no awareness of that

18   concept, or that a -- representing the interest of more than

19   one defendant in a criminal case can present a potential

20   conflict of interest.

21   Q.   With respect to the question of available resources, did

22   you discuss with her her ability to apply to the court for

23   funding for resources such as experts and investigators?

24   A.   Well, we had previously discussed the fact that a retained

25   lawyer can apply for funds on behalf of an indigent defendant

1   for investigators.  And, certainly, subsequently we raised --

2   we had a discussion of the fact that that is also true where

3   expert witnesses are concerned.

4   Q.  Was she aware of that?

5   A.  She said that she was not aware that a private counsel,

6   retained counsel, could apply to a court for any sort of

7   support for ancillary services.

8   Q.  Did she give you an idea of her understanding of how her --

9   what her available resources were with respect to getting

10  experts or investigation done?

11  A.  She said that Jim Wedick was the team investigator in the

12  case.  And, actually, when I attended the first court

13  appearance, in May of 2005, I met Jim Wedick at the Starbucks

14  here before coming over to court.

15  Q.  Did she say whether or not Mr. Griffin was a source of

16  funding for experts?

17      In other words, was that -- would she -- did she say

18  anything about looking to his agreement for purposes of doing

19  investigation or for securing experts?

20  A.  As I said, I was not aware at the time of the specific

21  retainer agreement in the case, but she did say that

22  Mr. Griffin possessed whatever funds there were in the case,

23  and if she needed anything in the case that involved money that

24  she needed to go to Mr. Griffin to ask for funds.

25  Q.  Let me ask you this, just about the timing of these

1  discussions and, sort of, the phases of the representation:

2      Was there a certain focus in your discussions prior to the

3  time the new trial motion was filed in 2006?

4  A.  Yes.  We were -- we were brought in, essentially, to take

5  over the post-trial proceedings in May of 2006.  And my

6  recollection is that we were -- the case was extremely large,

7  and I believe that there were issues about getting ahold of

8  transcripts in order to use them for the purpose of briefing

9  the new trial motion, and that we were given until sometime in

10 September -- I think it actually was in October -- to file the

11 new trial motion.  Then there were -- the government was given

12 time to reply to that -- there was a reply by us, opposition by

13 the government, reply by us.  That led to an evidentiary

14 hearing, and eventually the new trial motion was finally

15 decided, I believe, in May or June of 2007.

16     So that briefing period went on -- that -- that period of

17 post-trial motion went on for that amount of time.  At that

18 time a sentencing was set, I believe, in September of 2007, and

19 there was a shift in our discussions once the new trial motion

20 was denied.

21 Q.  Who drafted the new trial motion?

22 A.  It was drafted by myself, yourself and Ted Sampsell-Jones,

23 a law professor in Minnesota with whom we had worked on

24 previous cases.

25 Q.  Do you remember what sorts of issues the new trial motion

1  raised?

2  A.  Very much so, because one of the things that we discovered

3  as we went through the transcripts was that there were a large

4  number of what we viewed as significant issues for appeal that

5  had not been addressed by Ms. Mojaddidi at trial; objections to

6  testimony that could have been raised that were not raised,

7  issues around certain rulings by the court.

8      So the new trial motion, as I said, one central focus was

9  the juror misconduct issue, which led to a hearing where a

10  juror -- one or two jurors came in to testify, but I think that

11  there were, perhaps, a dozen issues raised in the new trial

12  motion on evidentiary questions, some of them dealing with

13  experts.

14  Q.  And did Ms. Mojaddidi play any role in the drafting of the

15  new trial -- in preparation of the new trial motion?

16  A.  Ms. Mojaddidi was very helpful in the fact that she --

17  the -- she prepared -- based on her own experience with

18  reviewing the tape recording of Mr. Hayat, she prepared the

19  summary -- a very detailed summary of what was in that

20  recording.

21      In addition to that, she -- she was the one who got in

22  touch with Dr. Bernard Haykel, who testified here today, in the

23  wake following the conviction after she had read the prophetic

24  justice article, and she was the person who got in touch with

25  and obtained the affidavit that we submitted in support of the

1  new trial motion.

2  Q.  What was the argument in the new trial motion with respect

3  to Professor Haykel; do you remember?

4  A.  Well, we chose to -- well, that was one of the problems, it

5  was clearly a very helpful declaration, but what legal category

6  can you put it in in a new trial motion.  And so we attempted

7  to raise it as new evidence, but the new evidence rule really

8  requires that the evidence couldn't have been available during

9  the trial, and I believe that was the basis on which Dr. --

10 Judge Burrell rejected that particular claim in the new trial

11 motion.

12 Q.  So was -- did the new trial motion -- or could the new

13 trial motion raise an allegation of a Sixth Amendment violation

14 based on conflict of interest or ineffective assistance?

15 A.  That's actually a complicated question we've dealt with in

16 several cases recently in our office, because there are some

17 authority that says, sure, you can raise it on a new trial

18 motion, and there are others that says it's really only

19 properly raised on a 2255 motion, and a 2255 motion cannot be

20 filed until after there is a judgment in place.  So, it was

21 unclear.

22     Let me say that we had discussions about whether -- whether

23 there was a possibility of raising this in the new trial

24 motion, which was due four months after we came into the case,

25 and for a number of reasons we concluded that we could not

1   raise an ineffective assistance of counsel claim, as a

2   practical matter, in the new trial motion.

3   Q.  So, can you remind me again, when did you say -- when is

4   your best estimate of when the new trial motion was denied?

5   A.  I think that it was filed in October of 2007 and denied in

6   May or June -- I'm sorry -- in October of 2006, and then denied

7   in May or June of 2007.

8   Q.  So, was there a different -- so, after the new trial motion

9   has been denied, the sentence has not yet occurred -- it did

10  not occur on the date of the new trial denial, I assume?

11  A.  Right.

12  Q.  Was that set -- I believe you said that the sentencing was

13  set for several months after the denial of the new trial

14  motion?

15  A.  Yes.

16  Q.  After the new trial motion was denied, was there -- were

17  there further discussions with Ms. Mojaddidi and you concerning

18  what else might be done prior to sentencing, other than

19  preparing a sentencing memorandum with respect to trying to

20  vacate or overturn the conviction?

21  A.  Yes.  At that point, after the new trial motion was denied,

22  I made the determination that we had to make an effort to raise

23  the ineffective assistance of counsel claim in the district

24  court on the possibility that we would then be able to raise it

25  on appeal.

1        And so after the denial of the new trial motion, I remember

2    meeting in our office in San Francisco, and I told

3    Ms. Mojaddidi that we were going now to use a particular

4    strategy to file a 2255 motion, raising a claim of her

5    ineffective assistance, and that that would occur immediately

6    after the sentencing, and that would require her to withdraw

7    from the case and representation of Hamid Hayat.

8    Q.  And do you remember telling her that at a meeting in

9    San Francisco or somewhere else?

10   A.  I have a very clear memory of that meeting in

11   San Francisco, because it was a very emotional meeting.

12   Q.  What happened when you told Ms. Mojaddidi that that would

13   be the new approach?

14   A.  She -- she became very emotional, and she teared up, and it

15   was, obviously, a very difficult moment for her given all of

16   her involvement and work on Hamid Hayat's case.

17   Q.  Did she understand the -- the approach?

18   A.  Actually, I don't know how she felt when she left the room,

19   but thereafter I had a communication with her in which she said

20   that she had talked to Johnny Griffin, and Johnny said, look,

21   this is the nature of the beast, you know.  That if you are

22   going to be a criminal lawyer, you know, this is something that

23   can occur.  And, you know, it's part of the job.

24       And thereafter we had a series of conversations -- we had

25   many conversations about the case that were particularly

1   directed at the issue of ineffective assistance of counsel that

2   we would be raising in this first 2255 petition which was filed

3   immediately after sentencing in September 2007.

4   Q.  Ineffective assistance of counsel as well as conflict of

5   interest, or was that not, at that point, a focus of the

6   discussion?

7   A.  The -- the -- I'm trying now to remember.

8       There was a description in the declaration that I filed in

9   support of that motion of the nature of the relationship

10  between Johnny and Wazhma during the trial, and, essentially,

11  an assertion that he had control over the decision making for

12  her client.  I don't -- and that was relevant to a lot of the

13  things that we raised as IAC claims, to talk about the

14  division, and Sixth Amendment, between conflict of interest

15  claims and ineffective assistance claims.  But I don't know, in

16  that original petition, whether we expressly raised what's

17  called a Cuyler conflict of interest claim as opposed to

18  raising things in the context of a Strickland ineffective

19  assistance of counsel.

20  Q.  Did you come --

21              THE COURT:  Mr. Horgan, I'm going to stop you for

22  just a moment.  It's about five to 4:00.  How much further do

23  you have?

24              MR. HORGAN:  Not very much, Your Honor.

25              THE COURT:  Close to 4:00 o'clock?

1          MR. HORGAN:  I --

2          THE COURT:  I don't want to cut you off, but I just

3   want to deal with the scheduling issue.

4          MR. HORGAN:  I think -- I think that would be enough

5   time, Your Honor.

6          THE COURT:  All right.  Let's go ahead, then.

7   Q.  BY MR. HORGAN:  Did you come to learn more about, or

8   develop more -- more of an understanding about, the conflict of

9   interest issue in the present 2255 proceedings?

10  A.  Very much so, because once we got the -- Ms. Mojaddidi's

11  files, which we did -- which we had not requested back in 2007,

12  but got the directive from our client to have those turned

13  over, the -- the retainer agreement, you know, surfaced, and

14  that was a real -- one of the cornerstones of raising a

15  separate conflict of interest claim distinct from simply an

16  ineffective assistance of counsel claim.

17  Q.  Did she -- did Ms. Mojaddidi participate in the preparation

18  of a -- and so I -- there was then a preparation of an initial

19  2255 motion prior -- that would be filed around the time of

20  sentencing; is that right?

21  A.  Um --

22  Q.  Or after the time of sentencing?

23  A.  Yes.

24      And I've just realized something, and I have to correct my

25  testimony.  I just realized, because I saw an exhibit today,

1   that we had received from her in that period -- I saw an e-mail

2   on it -- so, in-between the denial of the new trial motion and

3   the sentencing, an e-mail that contained an unsigned copy of

4   the retainer agreement between Umer Hayat and Johnny Griffin.

5   So I had seen it then, but I think, again, that was not a focus

6   of any claim that we raised in the initial 2255.

7   Q.  And the -- and the preparation of the initial 2255, who was

8   involved in that?

9   A.  Well, our office was.  And it was based on a declaration

10  from me, I believe it was also based on a declaration from you,

11  concerning the Mark Reichel incident.  So our office prepared

12  it.

13      And there was quite a, sort of, strategic design to it

14  because it could not be filed before the sentencing, but had to

15  be filed before the notice of appeal was filed if there was

16  going to be any hope that the district court would entertain

17  that motion, because once the notice of appeal is filed, then

18  the court loses jurisdiction until the appeal is over.  So,

19  that was our intention.

20  Q.  And do you remember whether or not you ever presented or

21  transmitted a draft of the declaration that you submitted in

22  support of that 2255, did you ever transmit that to

23  Ms. Mojaddidi prior to its filing?

24  A.  Yes.  I -- when the declaration was complete, I sent it to

25  both Johnny Griffin and to Ms. Mojaddidi, because there were

1   statements, allegations dealing with the conduct of the case

2   that concerned both Johnny Griffin and Ms. Mojaddidi.  So, I

3   made sure I sent it to both of them.

4   Q.  Is that the declaration that is presently Exhibit B to the

5   2255 petition filed in April of 2014?

6   A.  Yes.  I wanted to make sure they reviewed this before it

7   was -- it was filed.  So, it was a draft, or a final draft at

8   the time, it contained a fairly significant description of my

9   conversation with Johnny Griffin about those allegations, other

10  allegations about conversations with Jim Wedick, and that was

11  the -- the draft that was filed in support of the 2007, 2255.

12  Q.  Did that declaration contain many of the conversations

13  you've testified about here today that you had with

14  Ms. Mojaddidi?

15  A.  It did; about the speedy trial, about the investigation.

16      And then let me say this:  In the discussion of the

17  investigation, at no time did Ms. Mojaddidi say that there was

18  a tactical decision not to use or contact or interview alibi

19  witnesses in Pakistan.  Her comment was that there was simply

20  no way that she knew of to obtain that testimony.

21      And the Mark Reichel incident, I believe, is discussed in

22  there, along with a few other things.

23  Q.  And after you sent the declaration to Mr. Griffin and

24  Ms. Mojaddidi, did Johnny -- did Mr. Griffin reply in any way?

25  A.  He did.  He -- because the -- his -- my description of

1    Johnny Griffin -- and I think there was the description of the

2    relative -- the disparity between his experience as a criminal

3    lawyer and Ms. Mojaddidi's, who had none, I had put in that

4    description that he had been -- among other things, he was on

5    the CJA panel, Criminal Justice Act, where you take appointed

6    cases.  And he wrote back and said, no, I was never on the CJA

7    panel.  But I did not get any response from Ms. Mojaddidi.

8              MR. HORGAN:  That was going to be my last question.

9    So, I think we're done, Your Honor, on the direct.

10             MS. BOERSCH:  May I have one moment with counsel?

11             THE COURT:  All right.

12        (Pause in proceedings.)

13             MR. HORGAN:  Your Honor, I actually -- maybe we could

14   start with this on Monday, because this is actually going to

15   take maybe another five minutes, but I --

16             THE COURT:  If it's five minutes.

17        Mr. Espinosa, I'm sure you'd have no objection to that?

18             MR. ESPINOSA:  No, Your Honor, I defer to the Court.

19             THE COURT:  Courtroom staff, five more minutes?  Do

20   we have it in us?  Let's see if we can wrap it up today.

21             MR. HORGAN:  Thank you, Your Honor.

22   Q.  BY MR. HORGAN:  Did Ms. Mojaddidi tell us during -- tell

23   you during the early conversations you had with her that -- did

24   she say anything about her capability of competently --

25   competently providing a defense to Mr. Hayat alone if she were

1    to act alone?

2    A.  Her repeated statement was that she could not represent

3    Hamid Hayat without the assistance and mentoring of Johnny

4    Griffin.

5    Q.  Did she say how she understood -- how she -- how she viewed

6    her relationship with Mr. Griffin, whether it was a team

7    effort, whether it was a divided defense or a joint defense?

8    How did she characterize it?

9    A.  Well, she described it as a -- as a team or joint defense.

10       There are terms such as joint defense agreement, which is

11   very different from a joint defense team arrangement.  She

12   wasn't really aware of those distinctions.  A joint defense

13   agreement, lawyers simply have a promise of mutual

14   confidentiality, there is no representing of each other's

15   clients.  And so she described it as that.

16       And she did say that the -- well, in certain ways she

17   expressed her greater competence than Mr. Griffin in terms of

18   translation of documents, and review of the evidence.  She said

19   that the understanding was that certainly they would discuss

20   things, but he'd be the -- the team leader and the ultimate

21   decision maker on what strategy to pursue.

22   Q.  And did she describe any conditions that may have been

23   imposed by Mr. Griffin in connection with their -- his working

24   with Ms. Mojaddidi in the joint effort?

25   A.  Well, let me say that, you know, my sense was that they

1   worked well together, and they liked one another, and this was

2   not a -- I don't know, a -- an employer/employee, low employee,

3   relationship.  But she made clear that if push came to shove on

4   a decision, it was understood that he would make the decision.

5   That would be a necessary part of the team arrangement.

6   Understandably so.

7   Q.  And did she say whether or not she agreed to that

8   condition?

9   A.  Yeah.  In multiple instances, such as the discussion of the

10  visas, pursuing visas or pursuing the contacts with Pakistani

11  officials, she made clear that when he made a decision she was

12  at least extremely reluctant to disagree for fear of creating a

13  breach between the two of them since she needed his assistance.

14  Q.  And did she report whether or not the -- whether

15  Mr. Griffin wanted ultimate decision making power as to other

16  matters, such as CIPA, or even witnesses that might be called

17  on Hamid Hayat's behalf?  Did she say anything about that?

18  A.  We had a -- only a peripheral exchange about CIPA.  And

19  there were two reasons for that.

20      One is, at the time when I entered this, despite having a

21  lot of experience in other matters, I didn't know anything

22  about CIPA.  I hadn't handled a CIPA case.

23      And the other reason for it was that it became clear that

24  Ms. Mojaddidi didn't know anything about CIPA either.

25      So there was one exchange of e-mails on that, but that was

1    never pursued in the new trial motion -- well, I -- it was

2    certainly never pursued in our discussions of any ineffective

3    assistance of counsel claim.

4    Q.  And what about the decision whether or not Hamid would

5    testify?

6    A.  She described that as a decision in which she felt that he

7    should not testify, and that she consulted with Johnny on, and

8    Johnny had a strong position that Hamid should not testify.

9              MR. HORGAN:  Okay.  I think that's all I have, Your

10   Honor.

11             THE WITNESS:  I left out one subject.

12       There was one other thing that she -- that there was

13   friction about, and it was clearly an item of tension between

14   them, and that was on money.  She was seeking the appointment

15   because she had not been paid in a long time, and wanted CJA

16   funding, and was upset that Johnny, her expression, had taken

17   almost all the money.

18             THE COURT:  All right.

19             MR. HORGAN:  Thank you, Your Honor.

20             THE COURT:  All right.  I assume the government will

21   have cross-examination?

22             MR. ESPINOSA:  Yes, Your Honor.

23             THE COURT:  All right.  Why don't we start first

24   thing Monday morning, at 9:00 a.m., with cross-examination of

25   Mr. Riordan.  Be prepared -- Mr. Riordan, if you want to take a

1    step down.

2        Be prepared to address the -- any exhibit issues for the

3    petitioner.  And then I'm, hopefully, cautiously optimistic

4    that we can get to, and maybe, perhaps, finish, I don't know,

5    your witnesses, Mr. Espinosa, on Monday.

6            MR. ESPINOSA:  I think it may be possible, Your

7    Honor.

8            THE COURT:  Okay.

9            MR. ESPINOSA:  I don't want to overpromise, but I

10   think it might be possible.

11           THE COURT:  Obviously, if necessary, we will go over

12   to Tuesday, but we'll aim for that.  So have your ducks lined

13   up in a row.

14           MR. ESPINOSA:  We will, Your Honor.

15           THE COURT:  Are there any other housekeeping issues

16   we need to address before we adjourn for today?

17           MR. HORGAN:  Your Honor, I -- I've been asked by some

18   of the people who have been in attendance whether or not --

19   when we do the videotaped proceedings, whether the public --

20   there will be arrangements so that the members of the public

21   can view the proceedings.

22           THE COURT:  Why don't you gentleman have a seat and

23   I'll give you an update as to where we are with that since you

24   brought it up.

25       At this point we're aiming to have the courtroom open

1    around 7:00 on the 14th and 15th.  The proceedings will be open

2    to the public, but the courthouse, in general, will not be,

3    obviously, after business hours.  The doors automatically lock

4    to the courthouse at 5:00 p.m.  There will be security officers

5    at the front who will let folks in who want to attend the

6    hearing here in this courtroom.  They'll need to identify that

7    this is where they want to go, because the other portions of

8    the courthouse will be closed to the public after 5 p.m. on the

9    14th and 15th, as they are on any other business day.

10        So what they'll need to do is just knock on the door, the

11   court security officer will be right there, anticipating folks

12   who will either be participating in the process as

13   representation -- as representatives for parties, and then

14   they'll be also anticipating folks who will want to be

15   observing the proceedings.

16        I trust that answers your question, Mr. Horgan?

17            MR. HORGAN:  Yes, Your Honor.

18            THE COURT:  All right.  Anything else we need to

19   address today?

20            MR. ESPINOSA:  Nothing.

21            THE COURT:  Mr. Espinosa?

22            MR. ESPINOSA:  Not from the government, Your Honor.

23            THE COURT:  Everyone, have a good weekend.  Good work

24   this week.  And we'll see everyone bright and early at 9:00

25   a.m. on Monday.

1          MS. BOERSCH:  Thank you, Your Honor.

2          MR. ESPINOSA:  Thank you, Your Honor.

3              (Proceedings adjourned, 4:09 p.m.)

4                      ---oOo---

5     I certify that the foregoing is a correct transcript from the

6     record of proceedings in the above-entitled matter.

7

8                          /s/ Kimberly M. Bennett
                           KIMBERLY M. BENNETT
9                          CSR No. 8953, RPR, CRR, RMR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25