1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11   UNITED STATES,                         No. 2:05-cr-0240 GEB DB

12              Plaintiff/Respondent,

13        v.                                FINDINGS AND RECOMMENDATIONS

14   HAMID HAYAT,

15              Defendant/Movant.

16
17        Movant Hamid Hayat ("Hayat") is a federal prisoner proceeding with a motion to vacate

18   his sentence pursuant to 28 U.S.C. § 2255.  Hayat challenges a judgment of conviction entered

19   against him on one count of providing material support for terrorism and three counts of making

20   false statements to government officials.  Hayat seeks relief under § 2255 alleging that he was

21   denied his Sixth Amendment right to the effective assistance of counsel.  The bases for his

22   allegations are the unreasonable conduct of counsel and conflict of interest.  Hayat further alleges

23   that he was denied due process when the government withheld exculpatory evidence.  Upon

24   careful consideration of the record and the applicable law, the undersigned will recommend

25   Hayat's motion be granted on the ground that his trial attorney was ineffective in violation of his

26   Sixth Amendment rights.

27   ////

28   ////

                                          1

BACKGROUND[1]

Hayat is a United States citizen of Pakistani descent.  He lived in the United States until he was seven and then, between the ages of seven and eighteen, with his grandparents in Pakistan. Hayat returned to the United States in 2000 to live with his parents in Lodi, California.  Three years later, in April 2003, he traveled to Pakistan with his family.  He spent just over two years in Pakistan on this second stay, returning to the United States in late May 2005.  Days after his return, Hayat was arrested by FBI agents and charged with making false statements to government officials.  An additional charge of providing material support to terrorists was added several months later.  A summary of the facts presented at trial follows.

## I.     Prosecution Case

### A.  Events Leading to Hayat's Arrest

In October 2001, an FBI agent in Oregon interviewed Naseem Khan, a 28-year-old Pakistani immigrant, in connection with a money laundering investigation.[2]  Khan informed the agents that he had regularly observed Ayman al Zawahiri, Osama bin Laden's second-in-command and one of the FBI's 22 most-wanted terrorists, at a mosque in Lodi, California, in 1999.  Khan later told the agents that he had also seen two other individuals on the FBI's 22 most-wanted list in Lodi during the same period.[3]

The FBI then hired Khan as a confidential informant and asked him to return to Lodi to gather additional information on a suspected terrorist cell.  Khan agreed.  He began his work as an informant in Lodi in December 2001.[4]  Approximately eight months later, in August 2002, Khan met Hayat, who was nineteen years old at the time and living in his parents' garage.  As explained

---

[1] The following summary is largely identical to the overview provided in the Ninth Circuit Court of Appeals' decision on Hayat's appeal.  United States v. Hayat, 710 F.3d 875, 880-84 (9th Cir. 2013).  This court supplemented that overview in several places based on its review of the record.

[2] Khan apparently had no information about the money laundering investigation.  It was later determined that the government had mistaken Naseem Khan for another person of the same name.

[3] At Hayat's trial, government witnesses conceded that it was highly unlikely that the individuals identified by Khan had been in Lodi in the late 1990s.

[4] The FBI paid Khan between $3,000 and $4,500 per month plus expenses.

1  in greater detail below, recorded conversations between Khan and Hayat indicated that Hayat's

2  father was linked to a terrorist organization in Pakistan and that Hayat's uncle and grandfather

3  were recruiters for "jihad."[5]

4        Between August 2002 and October 2003, Khan and Hayat spoke regularly.  Khan

5  recorded seven of those conversations, took notes on others, and testified that he reported to the

6  FBI soon after his conversations with Hayat, summarizing for the agents the conversations that

7  were not recorded.[6]  The recorded conversations were introduced at trial, as was testimony by

8  Khan regarding unrecorded conversations.  Because Khan and Hayat frequently spoke to each

9  other in Pashto and Urdu, the jurors were provided with English translations of pertinent parts of

10  the recorded conversations.

11        In the recorded conversations, Hayat made several anti-American and anti-Semitic

12  remarks.  At one point, for example, he expressed pleasure over the murder of Wall Street Journal

13  reporter Daniel Pearl because his death meant that "[n]ow they can't send one Jewish person to

14  Pakistan."  In addition, Hayat at times spoke approvingly of Islamic fundamentalist groups such

15  as Jaish-e-Mohammed ("JEM") and indicated his respect for their leaders.  He also professed to

16  know and to admire Pakistanis who had engaged in "jihad."  Some of these people Hayat knew

17  because he had studied with them in a madrassa, or religious school, in Pakistan run by his

18  grandfather.  Hayat told Khan that his grandfather was a prominent cleric and that after 9/11,

19  Pakistani President Musharraf had sent him and others to Afghanistan to persuade the Taliban to

20  hand over Osama bin Laden.  Hayat also described to Khan a terrorist training camp in Pakistan -

21  ////

22                                             

23  [5] Hayat's father, Umer Hayat, was indicted on two counts of making false statements to the FBI -
24  namely denying that he had firsthand knowledge of terrorist training camps in Pakistan and
    denying that he knew that Hamid had attended a camp - in violation of 18 U.S.C. § 1001.  After a
    jury failed to reach a verdict on those counts, Umer Hayat pled guilty to making a single false
25  statement to the FBI and U.S. Customs and Border Protection - falsely denying that he was
    carrying more than $10,000 while on a flight from the United States to Pakistan.  Umer Hayat
26  was sentenced to time served, approximately 11 months.

27  [6] During the defense case at trial, Khan discovered he had an eighth recording of a conversation
    with Hayat in October 2002.  The defense questioned Khan about his failure to turn over the
28  recording to the FBI sooner; this recording was not provided to the jury.

1  he said he had seen a video of it - and, on a few occasions, expressed interest in attending such a

2  camp.

3  Five of the recorded conversations took place while Hayat and Khan were both in Lodi.

4  At one point, when the two were discussing travel to Pakistan and a possible meeting with

5  Hayat's uncle, Hayat said "I have one objective now.  If I went to Pakistan, now, see, <u>straight</u>

6  <u>away</u>, I'll stay at home for one or two <u>weeks</u>, then I'm going for <u>training</u>, friend."[7]

7  Hayat traveled with his family to Pakistan in April 2003.  Two of the recorded

8  conversations took place when he was there.  Like the earlier conversations, they covered a wide

9  range of topics.  On one occasion, Khan scolded Hayat for being lazy and not going to a training

10  camp.  In response, Hayat protested that the camp was closed during hot weather and that had the

11  camp been open, he "would have been there."  Khan even threatened Hayat, telling him that when

12  he came to Pakistan he was "<u>gonna fuckin' force you to – get you from your throat and fuckin'</u>

13  <u>throw you in the</u> Madrassah – <u>in your grandfather's</u> Madrassah."  On another occasion, Khan

14  relayed to Hayat a conversation in which Hayat's father explained that "[Hayat wi]ll enter the

15  Madrassah, and, God Willing, he [will] go for training!"  Hayat responded to Khan: "Um-hmm. .

16  . . <u>No problem</u>, absolutely."

17  In another of the recorded conversations, Hayat explained to Khan how to send money to

18  Sipah-e-Sahaba ("SSP"), a Pakistani organization that Pakistan declared a terrorist organization in

19  2002.  Hayat expressed admiration for members of SSP who die as "martyrs."  Hayat boasted that

20  he gave more money to SSP than any other member of his Pakistani madrassa, and stated that he

21  gave money to SSP because his money was more likely to be used to acquire "<u>weapons, books</u>

22  <u>and everything</u>" than if he gave to other groups, which wasted money.  Hayat also reported that

23  when someone told him that he could go to jail for giving SSP money, he replied, "<u>Fuck you.</u>

24  <u>Who cares, man, who goes to jail, man?</u> . . . .  <u>Fuck, look what's America doing</u>. . . ."

25  Hayat made several statements to Khan indicating Hayat's knowledge of his family's

26  involvement in terrorist activities.  For example, Hayat explained that his father in Lodi had sent

27

28  [7] The underlined portions of each quoted statement were spoken in English.

money to SSP.  Hayat also told Khan that his grandfather, who was the leader of the madrassa Hayat attended in Pakistan, had called a special meeting in 1999 in which he recommended that his students leave the madrassa to go participate in jihad.  In addition, Hayat explained that if someone were interested in attending a training camp, that person could contact Hayat's maternal uncle, who would either accompany that person "to the Jehad people's office," or make a phone call to that office on the interested person's behalf.

Hayat's direct interactions with American law enforcement began when he attempted to re-enter the United States in May 2005.  On May 30, 2005, Hayat's return flight to San Francisco was diverted to Japan because Hayat's name appeared on the federal government's "No Fly" list.[8]  Hayat was interviewed in Japan by FBI agent Lawrence Futa.  Futa questioned Hayat about his two-year stay in Pakistan, including whether Hayat had joined a terrorist organization or attended a terrorist training camp.  Hayat denied joining a terrorist group or attending a training camp while in Pakistan.  Futa concluded that Hayat "posed [no] immediate threat" and could be permitted to return to the United States.  Hayat left Japan and flew to San Francisco that evening.

Four days later, on June 3, 2005, FBI agents Tenoch Aguilar and Sean Wells interviewed Hayat at his parents' home in Lodi.  After again explaining the reason for his family's trip to Pakistan - because of his mother's health - and his activities while in Pakistan, Hayat again denied attending a terrorist training camp and stated that "he would never be involved with anything related to terrorism, and didn't know why anybody would say otherwise."  After eliciting this response, Aguilar and Wells asked Hayat to come to the FBI office in Sacramento for further questioning.

Hayat arrived at the FBI office in Sacramento around 11:00 a.m. the following morning and was interviewed in four waves.  Hayat at first denied having attended a terrorist training camp, but during the second session admitted that he had attended a camp for a few days during an earlier stay in Pakistan in 2000, where he "observed and heard weapons training," and also in 2003, when he himself received "pistol training" at a camp in "Balakot."

---

[8] Hayat's name appeared on the "No Fly" list as a result of the information provided by Khan.

1    The third and fourth sessions, which were videotaped, took place during the afternoon and

2    evening of June 4, 2005, and the early morning hours of June 5.  During the third interview,

3    Hayat confirmed that he had attended a camp to train for jihad and said he was trained to use a

4    pistol and rifle and taught how to kill American troops.

5    Before the final session, Hayat was given <u>Miranda</u> warnings (for the second time that day)

6    and signed an Advice of Rights form (also for the second time).  Hayat reported that at the

7    training camp, he was told to expect to receive orders in the United States.  When someone

8    wanted to transmit orders to him, the person would first contact Adil Khan (a prominent Islamic

9    figure in the Lodi area); Khan would contact Shabbir Ahmed (the Imam at Hayat's Lodi mosque);

10   and Shabbir would contact Hayat.  By the end of the interview Hayat also suggested that his

11   grandfather was involved in jihadist activities, indicating that his grandfather may have held a

12   leadership position in the terrorist camp Hayat attended.

13   Hayat's statements regarding the amount of time he spent at the jihadi camp and its

14   location varied.  He told some agents that he spent three months at a camp; he told others he spent

15   four or six months.  In addition, while he initially identified the camp as being in Balakot, he later

16   identified several other locations.

17   The FBI arrested Hayat at the end of the fourth set of interviews.

18   **B.  The Charges**

19   On June 16, 2005, the government filed the original indictment.  (ECF No. 8.)  It charged

20   Hayat with two counts of making false statements on June 3 and June 4, 2005, that he never

21   attended a terrorist training camp.  Three months later, on September 22, 2005, the government

22   filed the first superseding indictment which added a count against Hayat for providing material

23   support to terrorists in violation of 18 U.S.C. § 2339A.  (ECF No. 50.)

24   On January 26, 2006, the government filed its second and final superseding indictment

25   against Hayat, charging him with one count of violating 18 U.S.C. § 2339A (providing material

26   support to terrorists) and three counts of violating 18 U.S.C. § 1001 (making false statements to

27   the FBI).  (ECF No. 162.)  Section 2339A reads, in relevant part,

28   ////

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various provisions prescribing penalties for terrorist acts] . . . shall be . . . imprisoned not more than 15 years. . . .

18 U.S.C. § 2339A(a).  The statute defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

Id. § 2339A(b)(1).  The indictment explained that Hayat had provided his personal services to a terrorist organization by attending the training camp in Pakistan for a period of months between October 2003 and November 2004, and returning with the intent to carry out acts of terrorism when directed to do so.  The three counts of making false statements to the FBI were related to Hayat's initial statements to various FBI agents in California, in which he denied attending a terrorist training camp while in Pakistan.

### C.  The Trial

Hayat's trial began on February 14, 2006.  Khan testified about his seven recorded and other unrecorded conversations with Hayat.  The jury viewed the videotaped confessions, and several agents, including Futa, Aguilar, and Sweeney, testified about their interviews with Hayat.  The government also introduced a "scrapbook" that agents seized from Hayat's parents' garage.  The scrapbook bore Hayat's name on the cover and contained clippings from Pakistani newspapers.  Several of the articles in the scrapbook discussed Islamic fundamentalist groups, including the Taliban, and their leaders, including Osama bin Laden.  Khan testified that Hayat had shown him the scrapbook while expressing support for the fundamentalist groups described in the articles.

The government's evidence also included a note written in Arabic that government agents found in Hayat's wallet after his return from Pakistan.  Khaleel Mohammed, an expert in Islamic studies, testified that the note was an Islamic supplication.  He provided the following translation

1    of the Arabic phrase: "Oh Allah we place you at their throats and we seek refuge in you from

2    their evils."  Mohammed opined that the supplication was both uncommon and "not peaceful,"

3    and that the type of person who would carry such a supplication was "[a] person who perceives

4    him or herself as being engaged in war for God against an enemy."

5         Finally, the government presented testimony from two additional experts, Hassan Abbas

6    and Eric Benn.  Abbas, an expert on extremist groups, testified to the location and nature of

7    typical terrorist training camps in Pakistan.  Benn, a defense department analyst and satellite

8    imagery expert, analyzed satellite images to determine the likelihood that there was a militant

9    training camp near Balakot between 2003 and 2005.  He characterized the likelihood as "a good

10   strong possible."  He further testified that when an analysis of the satellite imagery was combined

11   with the description Hayat provided in his confession, his assessment of the likelihood that a

12   military training camp existed outside Balakot increased to "probable."

13   **II.     Defense Case**

14        Hayat did not testify.  He presented an expert, Anita Weiss, who testified that it is

15   common for Pakistanis to carry a talismanic prayer, known as a ta'wiz, for protection while

16   traveling.  The district court did not permit Weiss to express her opinion on whether the note

17   found in Hayat's wallet was a ta'wiz because Weiss does not speak or read Arabic.

18        Hayat also presented testimony from eleven other witnesses - mostly FBI agents - and

19   from Naseem Khan, who had also testified for the prosecution.  One aspect of Hayat's defense

20   was that Khan was an unreliable informant who had given the FBI implausible information -

21   namely, a report that three Al Qaeda members on the FBI's most wanted list had visited a mosque

22   in Lodi - the accuracy of which the FBI was unable to confirm, and which was belied by

23   testimony from a regular attendee of the Lodi mosque who never saw the men.  Hayat's counsel

24   also elicited testimony from Gary Schaaf, one of the agents who interviewed Hayat, that Schaaf

25   and other agents used leading questions and that Hayat seemed tired during the interview.  In

26   addition, agent Terry Rankhorn testified that he had posed undercover as a convert to Islam and

27   met with Hayat four times in 2002; Hayat never mentioned training camps to Rankhorn.

28   Rankhorn also testified that he felt Hayat's talk was often "more boasting than actual substance."

1      The defense was unsuccessful in its attempt to put on some other evidence.  First, the

2   defense attempted to show that the Balakot location identified by the government as the location

3   of the jihadi camp Hayat attended was not, in fact, a jihadi camp.  James Lazor, a U.S. citizen

4   who had been in Pakistan on a humanitarian mission, testified that he traveled to that location at

5   the behest of defense counsel.  On the way there, he encountered someone who appeared to be a

6   Pakistani military officer.  Much of Lazor's testimony regarding what that officer told him was

7   stricken as hearsay.

8      The defense was also unsuccessful in presenting evidence regarding the FBI's standard

9   procedures for conducting interrogations.  The court granted the government's motion to exclude

10  the testimony of former FBI agent James Wedick.

11     Jury deliberations began on April 12, 2006.  In a proceeding on April 24, the district judge

12  stated that he had received a note from the jury.  The note was not made part of the public record.

13  The district judge responded by directing the jury to continue deliberations.  Hayat characterizes

14  the note as indicating a jury deadlock.  The government does not appear to dispute that

15  characterization.  The next day, on April 25, 2005, after nine days of deliberation, the jury

16  returned a verdict of guilty on all four counts charged in the indictment.

17      **III.      Post-trial Procedural History**

18     Hayat filed a motion for a new trial based on juror misconduct and, later, supplemented it

19  with thirteen additional grounds.  (ECF Nos. 329, 441.)  After conducting an evidentiary hearing

20  related to the juror misconduct charge, the district court denied Hayat's motion for a new trial.

21  (ECF No. 482.)  Hayat was sentenced to 288 months, 24 years, in federal prison.  (ECF No. 500.)

22  That sentence included the maximum, 15-year penalty for violation of 18 U.S.C. § 2339A.  The

23  same day he was sentenced, Hayat filed a motion to vacate his convictions under 28 U.S.C. §

24  2255.  (ECF No. 496.)  The district court dismissed the motion without prejudice as premature.

25  (ECF No. 516.)

26     Hayat filed an appeal in which he raised three claims:  (1) denial of a fair trial based on

27  juror bias; (2) denial of his right to cross-examine Khan; and (3) error in admitting expert

28  testimony offered by the government and excluding expert testimony offered by Hayat.  In

1    addition, Hayat asked the Court of Appeals to consider his challenge to the district court's denial

2    of his original § 2255 motion.  United States v. Hayat, 710 F.3d 875, 880 (9th Cir. 2013).  On

3    March 13, 2013, the Ninth Circuit held:  (1) the district court's determination that Hayat failed to

4    show the jury foreperson was not fair and impartial was not clearly erroneous, id. at 885-92; (2)

5    the district court did not err in sustaining objections to Khan's testimony, id. at 891-900; and (3)

6    the district court did not err in its rulings regarding the testimony of prosecution expert

7    Mohammed, defense expert Weiss, and proposed defense expert Wedick, id. at 900-03.  The

8    Ninth Circuit further found that Hayat failed to file a timely notice of appeal from the district

9    court's order dismissing his § 2255 motion.  Id. at 903.

10           On April 30, 2014, Hayat filed the present motion to vacate, set aside, or correct his

11   sentence under 28 U.S.C. § 2255 ("motion to vacate").  (ECF No. 531.)  The motion sets out two

12   types of claims – ineffective assistance of counsel in violation of the Sixth Amendment and

13   violation of the due process standards set out in Brady v. Maryland.   On August 5, 2014, the

14   government filed an answer  (ECF No. 539), and on September 4, 2014, Hayat filed a reply (ECF

15   No. 541).  On November 13, 2014, Hayat moved for summary judgment on his claims of

16   ineffective assistance of counsel.  (ECF No. 548.)  On March 10, 2016, the previously-assigned

17   magistrate judge recommended denial of summary judgment.  (ECF No. 588.)  The district judge

18   adopted in part and rejected in part the magistrate judge's findings.  He denied summary

19   judgment.  (ECF No. 600.)

20           In August 2016, this case was reassigned to the undersigned magistrate judge.  On January

21   11, 2017, Hayat filed a motion for an evidentiary hearing.  (ECF No. 603.)  In March 2017, this

22   court ordered the government to file a substantive, supplemental answer.  It did so.  (ECF No.

23   612.)  Hayat filed a supplemental traverse.  (ECF No. 615.)  On June 7, 2017, the undersigned

24   granted Hayat an evidentiary hearing on his claims of ineffective assistance of counsel.  (ECF No.

25   616.)  After litigation regarding, among other things, defense access to classified information,

26   taking the testimony of witnesses residing in Pakistan, and numerous motions in limine, the

27   evidentiary hearing commenced on January 29, 2018.  The parties then completed post-hearing

28   ////

1   briefing.  (ECF Nos. 721, 722, 725, 730, 731.)  The motion to vacate is now submitted for

2   decision.

3                           **LEGAL STANDARDS UNDER § 2255**

4          A federal prisoner making a collateral attack against the validity of their conviction or

5   sentence must do so by way of a motion to vacate, set aside, or correct the sentence pursuant to 28

6   U.S.C. § 2255, filed in the court which imposed sentence.  United States v. Monreal, 301 F.3d

7   1127, 1130 (9th Cir. 2002).  Under § 2255, the sentencing court may grant relief if it concludes

8   that a prisoner in custody was sentenced in violation of the Constitution or laws of the United

9   States.  Davis v. United States, 417 U.S. 333, 344-45 (1974); United States v. Barron, 172 F.3d

10  1153, 1157 (9th Cir. 1999).  To warrant relief, the prisoner must demonstrate the existence of an

11  error of constitutional magnitude that had a substantial and injurious effect or influence on the

12  guilty plea or the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also

13  United States v. Montalvo, 331 F.3d 1052, 1058 (9th Cir. 2003) ("We hold now that Brecht's

14  harmless error standard applies to habeas cases under section 2255, just as it does to those under

15  section 2254.").  Relief is warranted only when a petitioner has shown "a fundamental defect

16  which inherently results in a complete miscarriage of justice."  Davis, 417 U.S. at 346; see also

17  United States v. Gianelli, 543 F.3d 1178, 1184 (9th Cir. 2008).

18                      **INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS**

19         This court first addresses petitioner's ineffective assistance of counsel claims, which were

20  the subject of the evidentiary hearing.  In the first set of claims discussed below, Hayat argues his

21  trial attorney Wahzma Mojaddidi's representation was unreasonable and resulted in prejudice to

22  him.  In the second set of claims, Hayat argues he was denied effective assistance of counsel

23  because Mojaddidi labored under a conflict of interest and, therefore, the court should presume

24  prejudice.

25  **I.      Testimony of Witnesses at the Evidentiary Hearing**

26         Hayat presented the testimony of sixteen witnesses.  They included percipient witnesses:

27  Attorney Wahzma Mojaddidi, Investigator James Wedick, Attorney Mark Reichel, Attorney

28  Dennis Riordan, Maryam Mohiuddin Ahmed, and six alibi witnesses; experts on the standard of

1   care for criminal defense counsel:  Attorney Daniel Broderick; Attorney Doron Weinberg, and

2   Attorney James Cline; an expert on false confessions, Dr. Richard Leo; and an expert on Arabic

3   language and Islamic political movements, Dr. Bernard Haykel.  The government put on attorney

4   Johnny Griffin, III.  In lieu of his testimony, the parties stipulated to the admission, subject to

5   objections, of Umer Hayat's video-recorded statement to the FBI.

6       Below, the court summarizes the testimony of each evidentiary hearing witness.  Their

7   testimony is more closely examined in the discussions of Hayat's claims for relief.

8       **A. Testimony of Percipient Witnesses**

9           **1.  Attorney Wahzma Mojaddidi**

10      Mojaddidi was deposed by Hayat's counsel in 2014 and testified at the 2018 evidentiary

11  hearing.[9]  Mojaddidi testified that she had been practicing law for less than two years when

12  Hayat's family hired her to represent him at trial.  Mojaddidi had never represented anyone in a

13  criminal case, had never been involved in a jury trial, and had never prepared an expert to testify.

14  The family also hired experienced criminal defense attorney Johnny Griffin to represent Hayat's

15  father, Umer.

16      Mojaddidi testified that she and Griffin felt the evidence against both defendants was

17  weak and that the best strategy was to rush to trial to prevent the government from obtaining

18  additional evidence.  After Hayat's indictment was amended in September 2005 to include the

19  much more serious charge of providing material support for terrorism, Mojaddidi still felt rushing

20  to trial was the best strategy.  Mojaddidi testified that she and Griffin felt that making pretrial

21  motions or seeking security clearance would be time-consuming and therefore should be avoided.

22  ////

23

24  _____

   [9] The transcript of Mojaddidi's deposition was not moved into evidence during the evidentiary
   hearing.  However, both parties cite to her deposition testimony.  And, Hayat's counsel

25  specifically notes that consideration of that testimony is appropriate.  (See ECF No. 722 at 2 n.1.)
   The court finds that the parties have waived any objection to the court's consideration of

26  Mojaddidi's deposition testimony.  Because her deposition testimony was taken under oath and
   subject to cross-examination, the court finds that it may be considered, as necessary.  The

27  transcript of her deposition was submitted as Exhibit FFF by Hayat and can also be found in the
   court's docket as an exhibit to Hayat's summary judgment motion.  (See ECF No. 548 at 41-347.)

28

1    She also testified that she initially considered an alibi defense, but later felt that no alibi witnesses

2    were viable.  (IV TR 677-783.[10])

3                 **2.  Investigator James Wedick**

4         Wedick is a former FBI agent who Griffin hired to work as an investigator for Umer and

5    Hamid Hayat.  Wedick testified that he was present for a majority of Griffin and Mojaddidi's

6    discussions about strategy and that he was present during the entire trial of both defendants.  He

7    described the work he did for both defendants and the relationship between the two attorneys.  He

8    also testified that prior to trial, he understood he would testify at trial as an expert on the FBI's

9    standard practices for interrogations.  (III TR 574-610.)

10                **3.  Attorney Mark Reichel**

11        Reichel is an experienced criminal defense attorney practicing in the Sacramento area.

12   About two weeks before Hayat's trial was set to start, Griffin and Mojaddidi called Reichel to ask

13   if he would come into the case to represent Hayat as lead counsel.  Reichel told them he would

14   want a continuance of the trial date and questioned their failure to file pretrial motions.  Later that

15   day, they called Reichel again to tell him that Mojaddidi had decided she could conduct the trial

16   on her own with Griffin's help.  About a week after that, Griffin called Reichel to ask if he would

17   be willing to act as a consultant during trial for both defendants.  Reichel agreed and conducted

18   research and provided advice.  (III TR 488-547.)

19                **4.  Attorney Dennis Riordan**

20        Riordan, Hayat's current lead counsel, is an experienced criminal defense attorney.  He

21   was appointed to represent Hayat, along with Mojaddidi, for Hayat's motion for a new trial.  The

22   expectation was that Riordan would also represent Hayat in his appeal.  Riordan testified about

23   statements Mojaddidi made to him about her representation of Hayat before and during trial and

24   about her relationship with Griffin.  (IV TR 786 - V TR 891.)  The government also questioned

25   _____

26   [10] As the parties have done, the court uses the "TR" abbreviation to refer to the evidentiary
     hearing transcript, the seven volumes of which are available electronically at ECF Nos. 712-718,

27   and "RT" to refer to the trial transcript, available in paper only (see ECF Nos. 399-430).  In
     addition, "EH Ex." refers to exhibits admitted at the evidentiary hearing.  A list of the admitted

28   exhibits appears in the evidentiary hearing transcript at V TR 907-09.

1   Riordan about his conversations with Umer Hayat's attorney.  Umer Hayat's attorney objected to

2   those questions.  The government seeks to re-open the evidentiary hearing to pursue this line of

3   questioning.  That issue is addressed in a separate section below.

### 5. Attorney Johnny Griffin, III

5   The government called Griffin as a witness.  The prosecutor informed Griffin that he had

6   just three questions for him.  Griffin invoked the attorney-client privilege and refused to answer

7   any of the three questions.  The government objected to the invocation of the privilege.  The court

8   did not rule on the objection and invited the government to argue the issue in its post-hearing

9   briefing.  (V TR 892-894.)  In that briefing, the government seeks to re-open the evidentiary

10  hearing to compel Griffin to answer these three questions.  The government's request is addressed

11  below in a separate section.

### 6. Umer Hayat

13  The government identified Umer Hayat as one of its witnesses for the evidentiary hearing.

14  In place of his testimony, the parties stipulated, on foundational grounds, to the admission of the

15  video-recorded statements of Umer Hayat to FBI investigators on June 3 and June 4, 2005.  Those

16  statements are evidentiary hearing exhibits 41A, 41B, and 41C.  The parties further stipulated that

17  this stipulation did not limit either party's right to object, on the grounds of hearsay or relevance,

18  to Umer Hayat's statement or to any other exhibits admitted in this proceeding.  (V RT 898-901.)

### 7. Alibi Witnesses

20  Six witnesses testified that they saw Hayat frequently in Behboodi or Rawalpindi between

21  2003 and 2005.  In addition, some witnesses also testified about Hayat's bout with meningitis in

22  2000 and its apparent effects on him.

23  Raheela Hayat and Jaber Ismail testified in court.  Raheela is Hayat's younger sister.  She

24  testified about Hayat's illness and about her time with him in Pakistan between 2003 and 2005.

25  They both lived in Behboodi with their mother, and for part of that time also with their father.

26  Raheela testified that the longest period of time she did not see Hayat in Pakistan between 2003

27  and 2005 was one week.  (I TR 122-189.)

28  ////

1   Jaber is Hayat's cousin.  He testified that he was also residing in Behboodi when Hayat

2   was in Pakistan from 2003 to 2005.  He recalled that he usually saw Hayat daily; the longest

3   period of time he did not see Hayat was about six days.  (II TR at 300-364.)

4   The remaining four witnesses testified by videoconference from Pakistan.  Muhammad

5   Anas is Hayat's uncle.  He resides in Rawalpindi and also has a home in a village near Behboodi.

6   He recalled Hayat's 2000 illness.  Anas testified that the longest period of time he did not see

7   Hayat in Pakistan between 2003 and 2005 was about ten days.  (VI TR 926-957.)

8   Rafaqat is a friend of Hayat's who resides in Behboodi.  He testified that he saw Hayat

9   almost every day when Hayat was there from 2003 to 2005.  The longest period of time Rafaqat

10   recalled not seeing Hayat was a week.  (VI TR 959-981.)

11   The next witness, Dr. Fahim ud Din, is Hayat's uncle and a pediatrician.  He examined

12   Hayat when he was ill in 2000 and referred him to the emergency ward at the hospital.  Dr. Fahim

13   testified that he saw Hayat almost weekly from 2003 to 2005 and the longest he recalled Hayat

14   possibly being away from Behboodi was two weeks.  (VII TR 994-1016.)

15   The final Pakistani witness was Tayyaba Fahim, Hayat's aunt and Dr. Fahim's wife.  She

16   testified that there was no period of time as long as three months that she did not see Hayat

17   between 2003 and 2005 when he was in Pakistan.  (VII TR 1018-1045.)

18   **8.  Maryam Mohiuddin Ahmed**

19   Ahmed is an entrepreneur who attended law school in the United States.  She now resides

20   in Pakistan.  She and a friend traveled to Rawalpindi and Behboodi in 2014 to take statements

21   from potential witnesses.  She testified about the procedures used to take the statements and the

22   nature of sworn statements in Pakistan.  (I TR 190 - II TR 243.)

23   **B.  Evidentiary Hearing Testimony of Attorney Experts**

24   **1.  Attorney Daniel Broderick**

25   Broderick is an experienced criminal defense attorney and former Federal Defender who

26   testified as an expert on the standard of care for a criminal defense attorney representing a client

27   charged with material support for terrorism.  The Federal Defender's Office is responsible for

28   managing a panel of attorneys to recommend for appointment in criminal cases.  Broderick

15

testified about the qualifications for counsel to take complex felony cases in 2005, when he was the Federal Defender.  In addition, Broderick testified in detail about the sort of pretrial preparation a reasonable attorney would undertake when the government charged the defendant with terrorist activity in both the United States and in a foreign country and the defendant had confessed.  (II TR 365-427.)

### 2.  Attorney Doron Weinberg

Weinberg has practiced criminal defense for over forty years.  He testified as an expert on criminal trial practice and ethics in criminal cases.  Weinberg opined that several factors in this case presented the possibility of a conflict of interest:  (a) the financial arrangement in which Griffin controlled all funds to be spent on either defendant; (b) the fact Hayat's confession could be used against his father if Hayat testified; and (c) the fact Mojaddidi was inexperienced and relied upon Griffin's advice.  Weinberg further testified about some of Mojaddidi's conduct before and during trial.  (III TR 442-487.)

### 3.  Attorney John Cline

Cline is an attorney with over thirty years' experience who has primarily worked in criminal defense.  He has represented several clients charged with providing material support for terrorism and is familiar with the Classified Information Procedures Act, which governs the handling of classified information prior to and during a criminal trial.[11]  Cline testified as an expert on the standard of care for handling classified information in a criminal case.  He opined that in a case involving serious terrorism charges, he could think of no reason an attorney would not obtain a security clearance or associate counsel who already had such a clearance.  (II TR 244-298.)

### C.  Evidentiary Hearing Testimony of Other Experts

#### 1.  Dr. Richard Leo

Leo is a law and psychology professor who has qualified as an expert hundreds of times on the subjects of police interrogation, psychological coercion, and false confessions.  He testified

---

[11]  The Classified Information Procedures Act ("CIPA") is codified at 18 U.S.C. App. 3.

1   here about the risk of false confessions, the techniques used by interrogators that make a

2   confession less reliable, and the interrogation techniques used in this case.  (I TR 12-73.)

3            **2.   Dr. Bernard Haykel**

4            Haykel is a professor of Near Eastern Studies who specializes in the history and politics of

5   the Middle East and in Islamic political thought and movements.  He also speaks Arabic.  Haykel

6   testified about the meaning of the supplication found in Hayat's wallet when he was arrested.  (IV

7   TR 626-676.)

8     **II.      Ineffective Assistance of Counsel Claims under <u>Strickland</u>**

9            Hayat alleges Mojaddidi was constitutionally ineffective for failing to do the following:

10   (1) investigate and present alibi witnesses; (2) investigate the site of the alleged training camp in

11   Balakot; (3) file pretrial motions; (4) procure and present testimony of an expert on false

12   confessions; (5) obtain a security clearance; (6) challenge Mohammed's testimony regarding the

13   supplication; (7) challenge testimony regarding the alleged training camp near Balakot; and (8)

14   adequately cross-examine Naseem Khan.

15           **A.   Legal Standards for Ineffective Assistance of Counsel**

16           To succeed on a claim of ineffective assistance of counsel, a petitioner must show (1) that

17   his counsel's performance was deficient and (2) that the "deficient performance prejudiced the

18   defense."  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).

19               **1.   Deficient Performance**

20           Counsel is constitutionally deficient if their representation "fell below an objective

21   standard of reasonableness" such that it was outside "the range of competence demanded of

22   attorneys in criminal cases."  <u>Strickland</u>, 466 U.S. at 687–88 (internal quotation marks omitted).

23   "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose

24   result is reliable.'"  <u>Harrington v. Richter</u>, 562 U.S. 86, 104 (2011) (quoting <u>Strickland</u>, 466 U.S.

25   at 687).

26           A reviewing court is required to make every effort "to eliminate the distorting effects of

27   hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

28   conduct from counsel's perspective at the time."  <u>Strickland</u>, 466 U.S. at 669; <u>see also</u> <u>Richter</u>,

1    562 U.S. at 107.  Reviewing courts must also "indulge a strong presumption that counsel's

2    conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S.

3    at 689.  This presumption of reasonableness means that the court must "give the attorneys the

4    benefit of the doubt," and must also "affirmatively entertain the range of possible reasons

5    [defense] counsel may have had for proceeding as they did."  Cullen v. Pinholster, 563 U.S. 170,

6    195 (2011) (internal quotation marks and alterations omitted).

7          A defense attorney has a general duty to make reasonable investigations or to make a

8    reasonable decision that makes particular investigations unnecessary.  See Strickland, 466 U.S. at

9    691.  A claim of negligence in conducting pretrial investigation can form the basis for a claim of

10   ineffective assistance.  See United States v. Tucker, 716 F.2d 576, 581 (9th Cir. 1983); Hines v.

11   Enomoto, 658 F.2d 667, 676 (9th Cir. 1981).  Counsel must, at a minimum, conduct a reasonable

12   investigation enabling them to make informed decisions about how best to represent their client.

13   See Sanders v. Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994).  Where the decision not to investigate

14   further is taken because of reasonable tactical evaluations, the attorney's performance is not

15   constitutionally deficient.  See Siripongs v. Calderon, 133 F.3d 732, 734 (9th Cir. 1998).  If

16   counsel reviews the preliminary facts of the case and reasonably decides to pursue only one of

17   two conflicting defense theories, for example, they need not investigate the abandoned defense

18   theory further.  See Turk v. White, 116 F.3d 1264, 1267 (9th Cir. 1997); Bean v. Calderon, 163

19   F.3d 1073, 1082 (9th Cir. 1998).

20         Thus, strategic choices made after thorough investigation of law and facts relevant to

21   plausible options are virtually unchallengeable.  See Cacoperdo v. Demosthenes, 37 F.3d 504,

22   508 (9th Cir. 1994) (decision whether to introduce medical evidence largely question of

23   professional judgment).  That said, the label of "trial strategy" does not automatically immunize

24   an attorney's performance from Sixth Amendment challenges.  See United States v. Span, 75

25   F.3d 1383, 1389-90 (9th Cir. 1996).

26                    **2.  Prejudice**

27         The second part of the Strickland test requires a movant to show that counsel's conduct

28   prejudiced him.  Strickland, 466 U.S. at 691-92.  Prejudice is found when "there is a reasonable

1   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

2   been different." Id. at 694.  A reasonable probability is one "'sufficient to undermine confidence

3   in the outcome.'" Summerlin v. Schriro, 427 F.3d 623, 640 (9th Cir. 2005) (quoting Strickland,

4   466 U.S. at 693). "This does not require a showing that counsel's actions 'more likely than not

5   altered the outcome,' but the difference between Strickland's prejudice standard and a more-

6   probable-than-not standard is slight and matters 'only in the rarest case.'" Richter, 562 U.S. at

7   112 (quoting Strickland, 466 U.S. at 693).  "The likelihood of a different result must be

8   substantial, not just conceivable." Id.

9         In evaluating prejudice, the court must "compare the evidence that actually was presented

10   to the jury with the evidence that might have been presented had counsel acted differently,"

11   Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir. 1995), and evaluate whether the difference between

12   what was presented and what could have been presented is sufficient to "undermine confidence in

13   the outcome" of the proceeding, Strickland, 466 U.S. at 694.  Prejudice is established if "there is a

14   reasonable probability that at least one juror would have struck a different balance" between

15   guilty and not guilty.  Wiggins v. Smith, 539 U.S. 510, 537 (2003).

16         When determining whether a movant has been prejudiced, the court considers the

17   cumulative effect of counsel's errors.  See Harris v. Wood, 64 F.3d 1432, 1438–39 (9th Cir.

18   1995) (finding cumulative prejudice from counsel's performance that was "deficient in eleven

19   ways, eight of them undisputed" which "obviates the need to analyze the individual prejudicial

20   effect of each deficiency," but noting that "some of the deficiencies [may be] individually

21   prejudicial"); see also Montana v. Egelhoff, 518 U.S. 37, 53 (1996) (The combined effect of

22   multiple errors at trial violates due process where it renders the trial fundamentally unfair. (Citing

23   Chambers v. Mississippi, 410 U.S. 284 (1973).); Taylor v. Kentucky, 436 U.S. 478, 487 n.15

24   (1978).  The Ninth Circuit has described the standard for evaluating cumulative error on habeas

25   as "determining whether the combined effect of multiple errors rendered a criminal defense 'far

26   less persuasive' and had a 'substantial and injurious effect of influence' on the jury's verdict."

27   Parle v. Runnels, 505 F.3d 922, 928 (9th Cir. 2007).

28   ////

**B. Failure to Investigate and Present Testimony of Alibi Witnesses**

Hayat first contends Mojaddidi was constitutionally ineffective when she failed to investigate and present the testimony of alibi witnesses.  The government counters that Mojaddidi exercised reasonable judgment in rejecting an alibi defense and deciding to challenge the sufficiency of the government's evidence.

**1. Standards for Determining the Reasonableness of a Decision to Forego an Alibi Defense**

**a. Would a Reasonable Attorney Find an Alibi Defense Worth Investigating in this Case?**

The second superseding indictment charged Hayat with providing material support to terrorists by going to a jihadi training camp and providing his person in support of terrorist activity.  It described Hayat's "Jihadist Training" as follows:

> At some point, no earlier than approximately October 2003, defendant Hamid Hayat provided himself as a recruit to receive jihadist training at a training camp in Pakistan.

> During a period of months sometime between in or about October, 2003, and in or about November, 2004, in Pakistan, defendant Hamid Hayat received jihadist training, including training in physical fitness, firearms, and means to wage violent jihad.

(ECF No. 162 at 4 (paragraph numbers omitted).)  The first superseding indictment filed in September 2005 had essentially the same language.  (ECF No. 50.)

The government's primary evidence that Hayat had, in fact, attended a terrorist training camp in 2003/2004 was Hayat's confession.  During that confession, Hayat provided different time periods that he attended the camp.  Agent Sweeney testified that Hayat told him he attended a camp for three months.  (III TR 502.)  Agent Aguilar testified that Hayat told him it was four months.  (IV TR 653-54.)  In his opening brief, Hayat points to twenty-six different exchanges in his videotaped interrogation in which time periods were estimated for Hayat's attendance at a camp.  (See ECF No. 721 at 22-23 n.10.)  Three months was the minimum amount of time discussed.

////

The government argues in its current briefing, apparently for the first time, that there was evidence in the record to support a jury finding that Hayat attended a camp for forty days.  (ECF No. 725 at 100.)  That argument is based on a recorded telephone call with Naseem Khan in which Hayat told Khan that a jihadi training camp would take forty days.  (RT 940; see Trans. of Hayat 's Mar. 11, 2003 conv. with Khan, Ex. 2 to Answer, at pp. 7-8 (ECF No. 612-1 at 59-60).)

In the face of Hayat's many statements that he attended a camp for at least three months, this court cannot imagine how a reasonable attorney should have assumed a jury might credit this one general statement when it considered the length of time Hayat attended a training camp.  Reasonable counsel would have known that there was no evidence to support a jury finding that Hayat's attendance at a jihadi camp during the 2003/2004 period alleged in the indictment was anything less than three months.  Moreover, the indictment itself stated that Hayat attended a camp for a "period of months."

Thus, to establish an alibi, the defense would have had to show that Hayat was seen in places that were not a terrorist training camp for every consecutive three-month period between October 2003 and November 2004.[12]  As attorney expert Broderick testified, it would be very possible to construct an alibi showing that a defendant could not have "vacated themselves for three months where nobody saw them."  (II TR 399.)  Broderick opined that "[t]here would be no circumstances" in which a reasonable attorney would deem it unnecessary to locate and interview potential alibi witnesses where the attorney felt their client was innocent.  (Id. at 398.)  The government presented no contrary expert testimony.  Courts have held, and it stands to reason, that an "alibi defense is clearly among the most compelling defenses."  McGahee v. United States, 570 F. Supp. 2d 723, 733 (E.D. Penn. 2008).  A reasonable attorney would have pursued such a defense in this case.

////

_____

[12] The court notes that even if there is some basis for an attorney to have thought that the jury could have found Hayat's attendance at the camp was as short as 40 days, that fact would not excuse Mojaddidi's failure to investigate Pakistani alibi witnesses.  Further, it would not affect the court's analysis of prejudice because, as discussed below, almost every alibi witness who testified at the evidentiary hearing stated that they saw Hayat in Behboodi or Rawalpindi at least once every two weeks.

**b.  What Sort of Alibi Investigation was Reasonable?**

In <u>Strickland</u>, the Supreme Court explained that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  466 U.S. at 691.  Counsel has "considerable discretion to make strategic decisions about what to investigate, but only *after* those lawyers '*have gathered sufficient evidence upon which to base their tactical choices*.'"  <u>Duncan v. Ornoski</u>, 528 F.3d 1222, 1235 (9th Cir. 2008) (quoting <u>Jennings v. Woodford</u>, 290 F.3d 1006, 1014 (9th Cir. 2002) (emphasis in original)).

Broderick testified that a reasonably competent attorney representing a client charged with conduct in a foreign country who believed their client innocent would have sought to conduct investigations in that country to locate potential alibi witnesses early on.  (II TR 396-99.)  A reasonable attorney would either send an investigator to that country or hire an in-country investigator to determine whether the defendant was at the scene of the crime and whether there are any alibi witnesses for the period of time alleged in the indictment or in the bill of particulars.  (<u>Id.</u> at 398-99.)  Broderick noted that an experienced investigator in the foreign country can locate witnesses, follow up new leads, and obtain documents with dates showing when the defendant was at certain locations.  (<u>Id.</u> at 399.)  Broderick testified that if the attorney felt they were unable to secure the presence of those alibi witnesses at trial, they could seek to conduct Rule 15 depositions in lieu of in-court testimony.  (<u>Id.</u> at 403-04.)

Rule 15(c)(3) of the Rules of Criminal Procedure provides:

> **Taking Depositions Outside the United States Without the Defendant's Presence**. The deposition of a witness who is outside the United States may be taken without the defendant's presence if the court makes case-specific findings of all the following:
>
> (A) the witness's testimony could provide substantial proof of a material fact in a felony prosecution;
>
> (B) there is a substantial likelihood that the witness's attendance at trial cannot be obtained;
>
> (C) the witness's presence for a deposition in the United States cannot be obtained;

(D) the defendant cannot be present because:

(i) the country where the witness is located will not permit the defendant to attend the deposition;

(ii) for an in-custody defendant, secure transportation and continuing custody cannot be assured at the witness's location; or

(iii) for an out-of-custody defendant, no reasonable conditions will assure an appearance at the deposition or at trial or sentencing; and

(E) the defendant can meaningfully participate in the deposition through reasonable means.

Broderick further explained that the testimony of these foreign witnesses can be videotaped and the video shown to the jury.  (II TR 403.)  Even if the witness refuses to testify, the investigator may be able to testify to what they were told under Evidence Rule 804.  (Id. at 404.)

A reasonable investigation, then, would include obtaining sufficient information to determine if an alibi defense was plausible.  The fact that potential alibi witnesses resided in a foreign country, while certainly making investigations more complicated, was not an insurmountable problem, as demonstrated by the work of Hayat's post-conviction counsel.  They found people willing to conduct investigations in Pakistan.  Those investigations found witnesses willing and, through Rule 15, able to testify to Hayat's whereabouts during the time period in question.

### c.   When Would a Reasonable Attorney Abandon a Potential Alibi Defense?

The Supreme Court has been clear – counsel may abandon a potential defense only after having made a reasonable investigation to determine the relative merits of that defense to others.

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

Strickland, 466 U.S. at 690-91; see also Reynoso v. Giurbino, 462 F.3d 1099, 1112 (9th Cir. 2006) ("Although trial counsel is typically afforded leeway in making tactical decisions regarding

1  trial strategy, counsel cannot be said to have made a tactical decision without first procuring the

2  information necessary to make such a decision."); Jennings, 290 F.3d at 1014 ("Although defense

3  counsel is empowered to make such strategic decisions, Strickland demands that such decisions

4  be reasonable and informed.").  Labeling a decision "strategic" does not save it from scrutiny.  In

5  determining the deference due an attorney's strategic decisions, courts look to the attorney's level

6  of experience, among other things.  See Strickland, 466 U.S. at 681 (One factor "relevant to

7  deciding whether particular strategic choices are reasonable" is the "experience of the attorney.")

8  The failure to "conduct even the minimal investigation that would have enabled [counsel] to

9  come to an informed decision about what defense to offer" can hardly be called strategic without

10  "strip[ping] the term of all substance."  Sanders, 21 F.3d at 1456.

11      Courts have found a failure to investigate particularly egregious when it relates to the

12  client's factual innocence.  See Duncan, 528 F.3d at 1234-35 ("This court has repeatedly held that

13  '[a] lawyer who fails adequately to investigate and introduce . . . [evidence] that demonstrate[s]

14  his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine

15  confidence in the verdict, renders deficient performance.'"  (Quoting Hart v. Gomez, 174 F.3d

16  1067, 1070 (9th Cir. 1999) and collecting cases.).)

17  ### 2.  Did Mojaddidi Act Reasonably in Failing to Investigate Potential
18  ### Witnesses in Pakistan and Abandoning an Alibi Defense?

19  #### a.  What Mojaddidi Did

20      The evidence adduced at the evidentiary hearing showed that Mojaddidi initially

21  considered an alibi defense.  (IV TR 732.)  She testified that in her discussions with Hayat, she

22  learned that he spent his time in Pakistan in either Behboodi or Rawalpindi.  (Id. at 726-27.)  He

23  told her he spent time playing cricket, playing video games, and hanging out in front of the local

24  store in Behboodi.  (Id. at 727.)  She knew that he spent time with family members and that there

25  were others in Pakistan who could testify to his whereabouts.  (Id.)

26      Mojaddidi found she was unable to get much information from Hayat due to his

27  "education level and background" and because "he did not seem to have perfect recollection of

28

24

1    the whole time that he was there." (IV TR 691, 727-28.)  She turned to his mother, but found that

2    his mother also did not "volunteer[] a lot of information." (Id. at 728-29.)  Mojaddidi did not

3    think Hayat's mother would be a good witness because she had difficulty responding to questions,

4    even in her own language, and was "quiet" and "timid." (Mojaddidi Depo. at 165 (ECF No. 548

5    at 205); IV TR 729.)  However, Mojaddidi also testified that the only person she recalled was

6    "consistently" with Hayat in Pakistan was his mother. (IV TR 730.)

7         Mojaddidi also mentioned Hayat's older sister and uncle in the United States. (IV TR

8    729.)  However, she did not specifically recall talking with them. (Id.; Mojaddidi. Depo. at 150

9    (ECF No. 548 at 190).)  At her deposition, Mojaddidi testified that she considered Hayat's

10   brother, Arslan, and Hayat's wife in Pakistan as alibi witnesses.  She rejected the wife as a

11   witness because she and Hayat had married shortly before he returned to the United States.  With

12   respect to Arslan, Mojaddidi testified at her deposition that she talked with him but she did not

13   recall why she rejected putting him on as an alibi witness. (Mojaddidi Depo. at 153, 168 (ECF

14   No. 548 at 193, 208).)

15        Mojaddidi was unaware that Hayat spent a good deal of time in Pakistan with his sister

16   Raheela.  Mojaddidi never spoke with Raheela because she was so young. (IV TR 729.)  Raheela

17   was ten years old when Hayat was indicted in 2005. (See I TR 122 (Raheela testified that she

18   was born in February 1995).)  Mojaddidi also testified that she did not recall that Raheela had

19   been with Hayat "consistently." (IV TR 730.)  Because Raheela was not with Hayat "every day,"

20   Mojaddidi did not consider Raheela a possible alibi witness. (Id.)

21        Based on information Mojaddidi received, she narrowed the list of possible alibi witnesses

22   to only Hayat's uncle, Attique ur Rehman, and grandfather, Saeed ur Rehman, in Pakistan, and

23   his cousin Usama, who was then in the United States. (IV TR 729, 780.)  She testified that the

24   uncle and grandfather were "the only two that were in Pakistan at the time that were mentioned to

25   me, that I recall." (Id. at 792.)  She recalled speaking with Usama. (Mojaddidi Depo. at 153

26   (ECF No. 548 at 193).)  Mojaddidi thought Usama was important because he saw Hayat "daily."

27   (IV TR 780.)  However, she could not contact him directly because he was represented by

28   counsel. (Id. at 774.)  In addition, his attorney told Mojaddidi and Griffin that if called to testify,

25

1  Usama would invoke the Fifth Amendment.  (Id. at 773-74.)  Mojaddidi testified that she was not

2  aware she could petition the court to grant immunity to Usama to testify.  (Id. at 782.)

3         She also recalled talking with Hayat's uncle in Pakistan by telephone.  (IV TR 729, 780.)

4  She may have also spoken with Hayat's grandfather; however, she testified at her deposition that

5  she did not speak with him about the possibility of being a witness.  (Mojaddidi Depo. at 153

6  (ECF No. 548 at 193).)  She felt that the uncle and grandfather would not be good witnesses

7  because the government considered them terrorists.  (IV TR 731.)  Despite knowing that there

8  were others in Pakistan who could provide information on Hayat's whereabouts, Mojaddidi

9  testified that she did not conduct, or have an investigator conduct, interviews of witnesses in

10 Pakistan.[13]  (Id. at 781.)

11        In her declaration in support of Hayat's motion for a new trial, Mojaddidi stated that she

12 was also aware that Usama's brother, Jaber Ismail, "had spent a substantial amount of time with

13 Hamid in Pakistan."  (ECF No. 441-2 at 2.)  However, because Jaber was in Pakistan at the time

14 of trial, Mojaddidi stated that she "knew [she] would be unable to serve him with a subpoena to

15 testify at Hamid's trial."  (Id.)  At the evidentiary hearing, Mojaddidi testified that she did not

16 interview Jaber.  (IV TR 738.)

17        Mojaddidi summarized her investigation into a possible alibi defense as follows:  "I spoke

18 with his mother, his uncle, I reviewed 302s,[14] and one of his cousins was a person that I did

19 consider, and ultimately decided not to use him."  (IV TR 737.)

20 ////

21

---

22 [13] Hayat also argues that Mojaddidi was unaware that she could seek funds for an investigation by
   making an application under the Criminal Justice Act.  However, that factor does not appear to be
23 relevant.  While Hayat attempts to show that Griffin controlled all expenditures on behalf of both
   clients and implies that Griffin was motivated to limit expenses because those monies would
24 reduce his total fee, there is no evidence in the record that Mojaddidi felt she had to limit
   expenditures on behalf of her client.  In fact, she testified during her deposition that Griffin
25 expressed no reluctance about spending money on Hayat's behalf.  (Mojaddidi Depo. at 139-40
   (ECF No. 548 at 179-80).)  It is also worth noting that Mojaddidi's testimony that she did not feel
26 she had to limit expenditures renders irrelevant the government's argument that it can be
   reasonable for counsel to decide not to conduct an investigation in the face of limited resources.
27

28 [14] A "302 Report" is an FBI summary of a witness interview.

### b.  What Mojaddidi Decided

Mojaddidi testified that she did not consider many potential alibi witnesses as viable because they did not see Hayat every day.  For example, she did not believe the Pakistanis that Hayat played cricket with on a regular basis were viable witnesses because Hayat did not tell her that he played cricket every day.  (IV TR 781.)  She did not talk with Raheela in part because she did not have information that Raheela had been with Hayat "every day" in Pakistan.  (Id. at 730.) She believed that an alibi witness must have had "daily contact" with Hayat because the government could allege he had attended a training camp for only "one day."  (Id. at 730.)

When asked whether only someone who was with Hayat every day could have been an alibi witness, Mojaddidi responded:

> Well, the problem was, was that it was a two-year period of time. And it was an allegation that he attended a camp. And maybe the allegation was he attended a camp for one day. And so I thought that we needed somebody who had spent -- had had daily contact with him to assess where his whereabouts were.

(IV TR 730.)  When asked whether she considered Hayat's statement that he had attended a camp for three to six months, Mojaddidi testified that she did not "know why I would pursue something that I knew my client told me wasn't true."  (Id. at 782.)  However, Mojaddidi was aware that Hayat's confession, which referred to attending a camp for "months," provided the basis for the government's case.  (Id. at 743.)

Mojaddidi testified that she was unaware that Rule 15 permitted her to seek to take the depositions of foreign witnesses in lieu of in-court testimony.  (IV TR 737.)  She and Griffin never discussed the possibility of deposing witnesses in Pakistan.  (Id. at 736.)  Mojaddidi also testified that Rule 15 was not relevant because she had rejected an alibi defense on the basis of a lack of "viable" witnesses.  However, that testimony is belied by other evidence.

First, Mojaddidi told Riordan shortly after trial that she felt then that an alibi defense would not work because there was "simply no way she knew of to obtain that testimony."[15]  (Id.

---

[15] The government argues that Riordan's testimony repeating what Mojaddidi told him is hearsay. As such, it may only be used to impeach Mojaddidi.  (See ECF No. 725 at 69.)  This court agrees. See Fed. R. Evid. 801; United States v. Crouch, 731 F.2d 621, 622 (9th Cir. 1984) ("Hearsay statements may be admissible to impeach a declarant who subsequently testifies at trial. . . .")

1   at 798, 815.).  Second, in a declaration in support of Hayat's new trial motion, Mojaddidi stated

2   that she could not use Jaber Ismail as a witness because he could not be served with a subpoena.

3   (ECF No. 441-2 at 2.)  Finally, at her deposition, Mojaddidi testified that "our understanding was

4   that anybody in Pakistan – it just wasn't going to work to have them be alibi witnesses in the

5   case."  (Mojaddidi Depo. at 37 (ECF No. 548 at 77).)

6        Mojaddidi explained that as discovery came in from the government, the defense approach

7   "morphed" and a different strategy made sense.  (IV TR 732, 735.)  However, she also testified

8   that she and Griffin concluded that an alibi defense was not the best strategy because there were

9   no "sound alibi witnesses."  (Id. at 732.)  She testified that she felt the strategy of pushing for a

10  trial as quickly as possible made the most sense because the government had so little evidence

11  when they initially charged Hayat.  (Id. at 738-39.)  The defense's primary theory would be that

12  the government's evidence was insufficient.  (Id. at 755.)  When the district court declared the

13  case complex, a basis for exclusions of time under the Speedy Trial Act, Mojaddidi still felt

14  pushing for a trial as quickly as possible was appropriate.  (Id. at 740.)

15                    **c.  Were Mojaddidi's Actions and Decisions Reasonable?**

16       Mojaddidi's decisions to reject an alibi defense, base her strategy on a rush to trial, and

17  limit the defense to a challenge to the government's evidence were based on three

18  misconceptions.

19       First, Mojaddidi believed that the only legitimate alibi witnesses were witnesses who saw

20  Hayat every day.  Yet, the indictment charged Hayat with attending a terrorist training camp for a

21  "period of months," and the only evidence adduced at trial regarding Hayat's attendance at a

22  training camp was that he had done so for somewhere between three and six months.  Thus,

23

24  This court considers Riordan's testimony about Mojaddidi's statements only where it contradicts
    Mojaddidi's testimony.

25  The court also notes that Riordan's testimony largely tracked his declaration prepared in 2007,
    shortly after his interactions with Mojaddidi.  He testified that reviewing that declaration

26  refreshed his memory of many of their conversations.  (V TR 849-50.)  This court finds that fact

27  supports the credibility of Riordan's testimony.  Mojaddidi, on the other hand, did not testify
    about the issues herein until August 2014, over eight years after trial, when she was deposed.

28  (See Mojaddidi Depo. (ECF No. 548 at 41).)

1    Mojaddidi was not required to account for Hayat's whereabouts every day in Pakistan over the

2    two years he was there.  Rather, an alibi defense needed to show that Hayat was seen during

3    every continuous three-month period between October 2003 and November 2004, the dates

4    identified in the indictment.  Further, Mojaddidi's uncertainty about the frequency with which

5    witnesses in Pakistan saw Hayat provided "no reasonable basis" to decide not to investigate.  See

6    Duncan, 528 F.3d at 1235 (defense counsel's "mere" belief that certain testimony "might not be

7    helpful" provided no basis to decide not to investigate it further); Ramonez v. Berghuis, 490 F.3d

8    482, 489 (6th Cir. 2007) (a decision to forego investigation into witnesses based on a "guess"

9    about what those witnesses might say is not reasonable); Rios v. Rocha, 299 F.3d 796, 806 (9th

10   Cir. 2002) (an unreasonable assumption is not a basis for a reasonable strategic decision); Lord v.

11   Wood, 184 F.3d 1083, 1095 (9th Cir. 1999) (counsel's "vague impression" that witnesses were

12   not credible insufficient to excuse his failure to interview them).

13        Second, Mojaddidi was unaware of Rule 15 of the Rules of Criminal Procedure.  "An

14   attorney's ignorance of a point of law that is fundamental to his case combined with his failure to

15   perform basic research on that point is a quintessential example of unreasonable performance

16   under Strickland."  Hinton v. Alabama, 571 U.S. 263, 274 (2014).  While Mojaddidi may have

17   had good reason to reject Attique ur Rehman and Saeed ur Rehman as potential witnesses, she did

18   not have any such basis to reject others in Pakistan.  Because she felt she had no way to obtain

19   their testimony, Mojaddidi failed to conduct an investigation into the possible testimony of other

20   Pakistani witnesses.  As a result, Mojaddidi failed to make informed decisions about an alibi

21   defense.

22        Mojaddidi's third misconception was that a strategy of rushing the case to trial was valid

23   under the circumstances and required, among other things, foregoing filing pretrial motions and

24   obtaining security clearance.  The legitimacy of the rush-to-trial strategy falls flat when this court

25   considers the "broad" discovery requests submitted by the defendants, which resulted in the

26   district court's determination on August 8, 2005, that this case was "unusual."[16]  (See ECF No.

27   _____

28   [16] The Speedy Trial Act requires that an individual be charged within thirty to sixty days of arrest
     and tried within seventy days from the filing of an indictment or from the date of the defendant's

30.)  On that basis, he twice granted the government's motions for exceptions to the speedy trial clock.  (ECF Nos. 30, 74.)  In fact, when the first superseding indictment was issued in September 2005, and it was clear Hayat was facing the very serious charge of providing material support for terrorists by having attended a jihadi training camp for a period of "months," no trial date was then pending.  At the October 7, 2005 status conference, the district court set a next status conference for three months out, on January 6, 2006.  (See ECF No. 74.)  At the January 6 status conference, the district court set the February 14, 2006 trial date.  (See ECF No. 136.)  Mojaddidi recognized that the district court's rulings upended the rush-to-trial strategy.  (IV TR 739.)  What she did not explain was why that strategy did not change as a result.

Mojaddidi's lack of awareness of the criminal rules and unreasonable strategic decisions are not surprising.  She came into the case in the Spring of 2005 with less than two years' experience as an attorney and no experience in criminal law.[17]  She testified that she graduated from law school in May 2002.  (IV TR 628.)  She took no criminal law courses in law school besides the two required to graduate.  (Id.)  Mojaddidi was admitted to the California bar in

_____

appearance in court, whichever is later.  18 U.S.C. § 3161(a)-(c).  A judge may grant a party's request for a continuance of the trial date based on a finding that, among other things, the case is "so unusual or so complex . . . that is it unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section."  Id. § 3161(h)(7)(B)(ii).  That continuance "excludes" time for filing an indictment or going to trial.

[17] Mojaddidi testified that she first became involved in this case when a representative of the Council for American-Islamic Relations contacted her in June 2005 and told her that Umer and Hamid Hayat were being questioned by the FBI and had not returned home.  (IV TR 686-87.)  Hayat's family had also contacted attorney Johnny Griffin.  (Id. at 687.)  Mojaddidi and Griffin went to the FBI office with the intention of stopping the interrogations of the Hayats.  (Id. at 688.)  Griffin spoke with an Assistant United States Attorney there and was told that Umer Hayat was the "heavy."  (Id.)  Therefore, Griffin determined that it would be best if he represented Umer and Mojaddidi represented Hamid.  (Id.)  Later, after consultation with Hayat, his family, Griffin, and community members, she agreed to represent Hayat.  (Id. at 692.)  She and Griffin were hired by the defendants and their family and paid a set fee by family members.  (Id. at 714.)  Attorney expert Broderick testified that an attorney with no criminal law experience would "[a]bsolutely not" be qualified to represent a defendant facing the charge of material support for terrorism.  (II TR 378-79.)  As Federal Defender, he would have recommended that the court appoint only an attorney with a "considerable amount of experience" in "complex cases" and "major felony cases."  (Id. at 372-73; 377-78.)  In fact, when Mojaddidi sought appointment to represent Hayat in his new trial motion, the court appointed her only with the help of a mentor attorney.  (Riordan Test. (IV TR 791).)

1    December 2003.  (Id. at 682-83.)  In 2004 and 2005, she practiced primarily family law and

2    immigration law part-time from a home office.  (Id. at 683, 685.)  Before she took on

3    representation of Hayat, she had never represented anyone in a criminal case except, perhaps, an

4    arraignment for a family member; had never been involved in a jury trial; and had never prepared

5    an expert witness to testify.  (Id. at 684-85, 701.)

6          The critical misconceptions Mojaddidi made caused her to unreasonably limit her

7    investigations.  Even if those misconceptions were not the cause, the investigations were

8    objectively unreasonable on their face.  Knowing that Hayat risked a lengthy sentence, and

9    knowing that there were potential alibi witnesses in Pakistan, a reasonable attorney, aware of the

10   Criminal Rules, would have made every effort during the months between the first superseding

11   indictment and the February 2006 trial, to, at the very least, interview as many potential alibi

12   witnesses as possible in Pakistan.  See Raygoza v. Hulick, 474 F.3d 958, 964 (7th Cir. 2007) (in a

13   case in which the defendant faced a lengthy sentence (here, a first-degree murder trial), "it is

14   almost impossible to see why a lawyer would not at least have investigated alibi witnesses more

15   thoroughly"); (Broderick Test. (II TR 398-99 (a reasonable attorney would investigate alibi

16   witnesses in foreign country).)  This is not a case like Johnson v. Lockhart, 921 F.2d 796, 800

17   (8th Cir. 1990), cited by the government.  There, the court determined that a strategy of solely

18   challenging the government's evidence was reasonable because the case against the defendant

19   was "tenuous" and defense counsel had interviewed the defendant's alibi witnesses and

20   determined they would not be credible witnesses.  921 F.2d at 799.

21         In the present case, Mojaddidi's investigation fell far short of a reasonable investigation

22   into an alibi defense.  She knew there were people in Pakistan – residents of Behboodi, Hayat's

23   friends, Hayat's cricket teammates, Hayat's other Pakistani relatives – who would likely know his

24   whereabouts on a regular basis.  This is also not a case, like those cited by the government, in

25   which alibi witnesses could not have been reasonably known by counsel at the time of trial or

26   counsel had other legitimate reasons not to seek them out.  See Bieghler v. McBride, 389 F.3d

27   701, 708 (7th Cir. 2004) (court found counsel conducted a sufficient investigation into potential

28   alibi witnesses and the fact that an alibi witness was later uncovered "by chance" did not change

31

1  the reasonableness of counsel's conduct); Williams v. Armontrout, 912 F.2d 924, 933 (8th Cir.

2  1990) (where defendant gave his attorney "five possible alibis" and then settled on one, attorney

3  not unreasonable in failing to interview the witnesses to confirm the other possible alibis).

4       The government argues that Hayat provided insufficient evidence to allow Mojaddidi to

5  determine the identification of potential alibi witnesses.  While counsel should certainly discuss

6  potential alibi witnesses with the client, a reasonable investigation does not begin and end there.

7  The government cites no authority or expert opinion to support its assertion that questioning only

8  a client who seemed to have a difficult time remembering and communicating with a few family

9  members, some of whom were not forthcoming, satisfied counsel's burden to conduct a

10  reasonable investigation.[18]

11       Further, this court rejects the government's contention that the Pakistani witnesses had

12  some sort of obligation to reach out to Hayat's family or Mojaddidi to offer up their testimony.

13  See Butler v. McEwen, No. CV 11-3543-DDP(RNB), 2014 WL 2566069, at *33 (C.D. Cal. Feb.

14  20, 2014) (onus is on counsel, not on witnesses, to assure investigation moves forward); Adams

15  v. Quarterman, 324 F. App'x 340, 348 (5th Cir. 2009) ("[I]t is troubling that [counsel], without

16  accepting responsibility for his own investigation, seems to have expected [petitioner]'s family

17  members to come forward independently, irrespective of [counsel]'s investigative efforts.").

18       This court also notes that the evidence in the record is sparse about just what sort of

19  investigation Mojaddidi conducted.  She appeared to recall only talking with Hayat and his

20  mother for a "list" of potential alibi witnesses.  She did not recall talking with his other family

21  members but stated that she believed she did so.  She did not testify about just what she asked

22  Hayat's family members regarding possible alibi witnesses.  Did she ask Hayat and his family

23  members appropriately probing questions to identify friends and family members in Pakistan?

24  Or, as the evidence before this court indicates, did she make little attempt to investigate witnesses

25  in Pakistan because she did not feel she could obtain their testimony?

26  _____

27  [18] In ruling on Hayat's summary judgment motion, the district court similarly concluded that
    Hayat gave Mojaddidi "enough information for her to have conducted a more thorough
28  investigation of a potential alibi defense."  (ECF No. 600 at 17.)

1    Mojaddidi's misconceptions caused her to make "strategic" decisions that were wholly

2    uninformed.  Mojaddidi's determination that witnesses were not viable was based on an error in

3    logic.  She did not understand that an alibi witness did not have to have been with Hayat every

4    day.  Her determination was further based on an unreasonable lack of knowledge of criminal law

5    because she was unaware of Rule 15.  For these reasons, Mojaddidi's decision that the witnesses

6    were not viable was not a reasonable basis for her tactical decision to forego further investigation

7    into alibi witnesses and to give up on an alibi defense.  See Thomas v. Chappell, 678 F.3d 1086,

8    1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he

9    had "sufficient information with which to make an informed decision"); Avery v. Prelesnik, 548

10   F.3d 434, 437 (6th Cir. 2008) (Counsel cannot make a strategic decision not to have alibi

11   witnesses testify when "he had no idea what they would have said.")  Moreover, Mojaddidi's

12   conduct, without considering her "strategy," was objectively unreasonable.  A reasonably

13   competent attorney would have done more to investigate Hayat's alibi.

14       Finally, it is worth noting that an alibi defense was not at odds with challenges to the

15   government's evidence.  Mojaddidi could very well have initiated investigations in Pakistan early

16   on and then determined whether the witnesses would be able to appear in the United States or

17   whether she would need to move for Rule 15 depositions.  She had months to do so.  Showing

18   that Hayat could not have been at a jihadi training camp for the "period of months" specified in

19   the indictment would have been completely consistent with the defense that Hayat's confession

20   should not be credited and the government lacked other supporting evidence.

21       This court finds Mojaddidi acted unreasonably when she rejected an alibi defense.

22       **3.  Prejudice from Decision to Forego an Alibi Defense**

23       Because this court has determined that Mojaddidi unreasonably decided to forego an alibi

24   defense, the next question is whether that decision prejudiced Hayat.  At the evidentiary hearing,

25   Hayat presented the testimony of six witnesses regarding his whereabouts during the time he was

26   in Pakistan.  Two of those witnesses, Raheela Hayat and Jaber Ismail, testified in court.  The

27   remaining four witnesses testified by video-conference from Pakistan.  Hayat also presents

28   ////

1  declarations from a number of other Pakistanis regarding their interactions with Hayat during the

2  relevant time period.

3       This court first examines each witness's testimony and then determines whether "there is a

4  reasonable probability" that had that testimony been presented to the jury, the result of Hayat's

5  trial would have been different.  See Strickland, 466 U.S. at 694.

6                    **a.  Testimony of Alibi Witnesses**

7                         **i.      Raheela Hayat**

8       Raheela is Hayat's younger sister.[19]  (I TR 122.)  She testified that she traveled to Pakistan

9  with her family in 1997 and returned in 2000.  (Id. at 124.)  She recalled that during that time,

10  Hayat became sick.  (Id. at 127.)  She testified that he had meningitis and stayed at a hospital in

11  Islamabad.  (Id. at 129.)  After his illness, Raheela noticed that Hayat acted more like a kid, and

12  had more "tantrums."  (Id.)  Her family returned to the United States for treatment for him.  (Id.)

13       In April 2003, the family returned to Pakistan.  (I TR 130-31.)  Raheela was eight years

14  old at that time.  (Id.)  They returned to the United States in May 2005.  (Id.)  They went to

15  Pakistan to get treatment for Hayat's mother, who had Hepatitis C, and to "get Najia and Hamid

16  married over there."  (Id. at 131.)  When they first arrived, they stayed in Rawalpindi with

17  Hayat's grandparents for about a month.  (Id. at 131-32.)  They then moved to Behboodi and

18  stayed first in Umer's house and then, while it was being remodeled, in Hayat's grandparents'

19  second house, in Behboodi.  (Id. at 132.)  While there, the family all slept together in one room.

20  (Id. at 133.)

21       Once or twice a month, the family, including Hayat, travelled to Rawalpindi for his

22  mother to have treatment.  (I TR 136-37.)  They would stay for two or three days at Hayat's

23  grandparents' house.  (Id. at 138.)  Once in a while, Hayat traveled to Islamabad.  (Id.)  He also

24  traveled to Multan twice.  (Id.)  He went in the summer of 2004 to meet a possible bride.  (Id. at

25  139.)  Raheela and the rest of the family went with him.  (Id.)  In October 2004, Hayat traveled to

26  Multan with friends to attend a wedding of a friend named Nawaz.  (Id. at 139-40.)  He was gone

27  _____

28  [19] Because of the numerous people with the surname "Hayat" in this case, the court frequently refers to Raheela Hayat and other family members by their first names.

1    for about a week.  (Id. at 140.)  In December 2004, Hayat was married in Pakistan.  (Id. at 143.)

2    In February 2005, Umer and Arslan returned to the United States.  (Id. at 148.)

3         While in Pakistan, Raheela saw Hayat daily, except for the few trips he took to Islamabad

4    and the one trip to Multan for a wedding.  (I TR 148-49.)  Hayat picked Raheela up from school

5    each day.[20]  (Id. at 148.)  Raheela testified that the longest period of time that she did not see

6    Hayat when they were in Pakistan was the one-week trip in October 2004 that he took to Multan

7    for Nawaz's wedding.  (Id. at 149.)  She testified that it was not possible that Hayat was gone for

8    three months.  (Id.)

9         Raheela recalled that their plane stopped in Tokyo when she, her sister, her mother, and

10   Hayat were flying back to the United States.  (I TR 150-51.)  She recalled that they were told

11   Hayat could not travel to the United States because "his record is not clear."  (Id. at 151.)  FBI

12   agents then came to their home in Lodi when they had all returned to the United States.  (Id. at

13   152.)  They questioned Hayat and asked him to come to Sacramento "to talk about what happened

14   in Tokyo."  (Id.)  She testified that the family encouraged Hayat to go to "clear your record."

15   (Id.)

16        Raheela testified that Mojaddidi never interviewed her or asked her any questions about

17   Hayat's activities when he was in Pakistan.  (I TR 153.)

18        Raheela testified that she saw the following people with Hayat in Pakistan between 2003

19   and 2005:  Attique ur Rahman, Muhammed Anas, Muhammad Daud, Muhammad Usman,

20   Hammad Ishfaq, Muhammad Qasim, Sajjad Ishfaq, Rafaqat, Salahuddin, Nisar Ahmad, Shakeel

21   Ahmad, Fahim ud Din, Pashmina, Muhammad Nauman, Malik Ihtesham Mumtaz, Tayyaba

22   Fahim, and Bibi Asma.  (I TR 154-64.)

23        Raheela identified Hayat in a number of photographs.  She testified that several were

24   photographs from Nawaz's wedding which, she testified, occurred in October 2004.  (See EH

25   _____

26   [20] Raheela also testified about some of Hayat's daily activities, such as going to the baithak, a
     central place where men from the village met in the evening.  (See VI TR 973 (testimony of
27   Rafaqat re the baithak in Behboodi).)  Because Raheela, as a woman, did not have personal
     knowledge that Hayat was, in fact, at the all-male baithak, the court does not consider that
28   testimony.

1     Exs. KKK.1-1 to KKK.1-4; I TR 141-42.)  She also identified Hayat and others in photographs

2     from Hayat's wedding in December 2004.  (EH Exs. KKK.2-1 to KKK.2-5; I TR 143-45.)

3                                        **ii.      Jaber Ismail**

4           Jaber is Hayat's cousin.  (II TR 300-01.)  He was born in California and resides there now.

5     (Id. at 301.)  Growing up, he and Hayat lived on the same street in Lodi.  (Id. at 302.)  In 2001,

6     Jaber traveled to Pakistan to attend school to learn the Koran.  (Id. at 304-06.)  He was living in

7     Behboodi during this time.  (Id. at 304-05.)  During his lessons, he had several breaks during the

8     day to go home for meals and for prayer.  (Id. at 305-06.)

9           Hayat arrived in Pakistan in April 2003.  (II TR 308.)  Jaber and his family traveled to

10    Rawalpindi to see the Hayat family when they arrived.  (Id.)  After being in Rawalpindi for "a

11    few days," Hayat and his family, including his brother Arslan, and his sisters Raheela and Najia,

12    moved to Behboodi.  (Id.)  Jaber recalled Hayat getting married in December 2004.  (Id. at 309.)

13    He identified several photographs from that wedding.  (Id. at 316-17.)

14          Jaber testified that when they were living in Behboodi, he "probably" saw Hayat during

15    his mid-day breaks from school.  He would go to Hayat's house and hang out, talk, watch movies,

16    or play Playstation.  (II TR 310.)  During his evening breaks, "we would just walk around . . . to

17    the fields" and Hayat would play cricket.  (Id.)  Jaber would stay and watch the game.  (Id.)  At

18    night, "after we got done with dinner on Thursday, we would go to his brother-in-law's baithak."

19    (Id. at 311.)  Jaber explained that a "baithak" was an area where "the guys just hang out after

20    dinner."  (Id.)

21          Jaber testified that he saw Hayat every day when they were both in Behboodi.  (II TR

22    312.)  The only times he did not see him were when Hayat went to Rawalpindi with his mother

23    and family for his mother's medical treatment.  They went about once a month and would be

24    gone for two or three days.  (Id.)  Hayat also traveled to Rawalpindi right before his wedding to

25    purchase things for the wedding.  (Id. at 312-13.)  He was usually gone only a couple days on

26    those trips and would show Jaber his purchases when he returned.  (Id.)  Raheela would go with

27    him.  (Id. at 313.)

28    ////

1    Sometimes, on Jaber's day off from school when Hayat was in Rawalpindi, Jaber would

2    meet him there and they would walk around Rawalpindi or Islamabad.  (II TR 313.)  Islamabad is

3    very close to Rawalpindi.  (Id. at 316.)

4    Jaber also recalled Hayat going to Multan twice.  The first time he went to attend Nawaz's

5    wedding for about three or four days and the second time to "look for a bride for him" for about

6    five or six days.  (II TR 314-15.)

7    Jaber testified that the longest he went without seeing Hayat during the time he was in

8    Pakistan from 2003 to 2005 was when Hayat went to Multan.  (II TR 319.)  He said it was not

9    possible that he had gone as long as three months without seeing Hayat during that time.  (Id.)

10   When Jaber attempted to return from Pakistan in April 2006 with his family, he and his

11   father were denied boarding passes during a layover in Korea.  (II TR 320.)  His mother and

12   siblings went on to the United States.  He and his dad were "thrown on a plane and sent back to

13   Pakistan."  (Id. at 320-21.)  Eventually, they discovered that they were on the no fly list, were

14   interviewed by FBI agents, and, many months later, were able to return to the United States.  (Id.

15   at 321-25.)

16   While in Pakistan, Jaber spoke to Mojaddidi on the telephone a few times because she was

17   trying to help Jaber and his father get home.  (II TR 325.)  Mojaddidi never asked Jaber any

18   questions about the time he had spent with Hayat in Pakistan.  (Id. at 325-26.)   Jaber identified

19   the following people as having contact with Hayat when he was in Pakistan:  Attique ur Rahman,

20   Muhammad Anas, Muhammad Usman, Hammad Ishfaq, Muhammad Qasim, Sajjad Ishfaq,

21   Rafaqat, Muhammad Saeed, Nisar Ahmad, Shakeel Ahmad, Fahim ud Din, Pashmina,

22   Muhammad Nauman, Tayyaba Fahim, and Bibi Asma.  (Id. at 311, 326-34.)

23   He testified that he saw Hayat every day with Asma, Tayyaba, Hammad, Sajjad, Dr.

24   Fahim, Rafaqat, and Saeed.  (Id. at 349.)  However, when asked whether Dr. Fahim was in

25   Behboodi every day, he testified that he saw Dr. Fahim with Hayat whenever Fahim was in

26   Behboodi with his wife.  (Id. at 351.)  Jaber's testimony was somewhat unclear about whether he

27   intended to testify that he saw most of those people "every day" with Hayat.  (Id. at 350-51.)  He

28   insisted that he himself saw Hayat every day.  (Id. at 351.)

Jaber testified that Hayat is the "type of person that would bullshit a lot;" "he liked to make up stories."  (II TR 345-46.)  Jaber recalled Hayat boasting to a doctor in Pakistan that his father owned a K-Mart.  (Id. at 346.)

Hayat never told Jaber that he had been to a terrorist training camp.  (II TR 357.)  After Hayat was charged, Jaber spoke to Hayat's mother on the phone a few times but they did not discuss the case.  (Id. at 361.)

### iii.     Muhammad Anas

Anas was the first witness to testify by videoconference from Pakistan.  He took the following oath: "I solemnly swear that whatever I'm going to testify today is going to be the truth, the whole truth, nothing but the truth."  (VI TR 926.)  Anas is Hayat's uncle.  (Id. at 927.) He resides in Rawalpindi, Pakistan.  (Id.)  He teaches Islamic studies and Urdu language at Jamia Islamia, an Islamic institute.  (Id. at 927, 942.)  He teaches five or six days a week for two 45-minute periods per day.  (Id. at 941.)

When Hayat was in Pakistan in 2000, he lived with Anas and would occasionally visit Behboodi.  (VI TR 928.)  Anas recalled that in 2000, Hayat became sick with meningitis.  Anas took him to Shifa Hospital in Islamabad.  (Id. at 929.)   He was there for about a week.  (Id.) When his parents returned from the Haj, the family stayed in Pakistan "for some time," and then left for the United States so that Hayat could get treatment there.  (Id. at 933.)  After the meningitis, Hayat became "more slow and lazy."  (Id. at 935.)

In 2003, Hayat and his family returned to Pakistan so that Najia and Hamid could be married and for Hayat's mother's treatment for Hepatitis C.  (VI TR 933.)  The Hayat family lived in Behboodi during that time, and would "visit us in 'Pindi."[21]  (Id. at 934.)  When they visited, they stayed with Anas.  (Id. at 934-35.)  Hayat came with his mother to Rawalpindi.  (Id. at 934.)  A driver would bring them during the middle of the week to meet the doctor.  (Id. at 946.)  They would contact Anas when they got back to Behboodi to let him know they had arrived safely.  (Id. at 948.)

---

[21] Many witnesses referred to Rawalpindi as "Pindi."

38

1   Once a week, Anas would go to his village near Behboodi.  (VI TR 935.)  His wife and

2   children went with him some of the time.  (Id. at 943-45.)  Each month, he saw Hayat three or

3   four times.  (Id. at 935.)  He estimated that he saw Hayat approximately once a week.  (Id. at

4   955.)  Hayat kept himself busy playing video games, playing cricket, and sitting with his friends.

5   (Id. at 935.)

6   Anas recalled that Hayat traveled to Multan once or twice when he was in Pakistan during

7   this time.  (VI TR 935-36.)  Once he went with a friend to attend a friend's wedding.  The second

8   time he went with his mother.  (Id. at 936.)

9   The longest period of time that Anas recalled not seeing Hayat was one week,

10  "maximum."  (VI TR 936.)   Later, he testified that it could have been as long as ten days, but

11  "not more than that."  (Id. at 955.)  Anas testified that he would have noticed if Hayat had been

12  absent for three months or more.  (Id. at 936.)  Anas conceded that his memory of those years has

13  declined with age.  (Id. at 954.)

14  Anas recalled Amna Hassan and Maryam Ahmed coming to Rawalpindi in 2014 to "write

15  our statement."  (VI TR 936.)   He denied telling anyone what to say in their statement.  (Id. at

16  937.)  He also denied that anyone attempted to influence what he said in his statement.  (Id.)  He

17  testified that his statement is accurate.  (Id.)  He said they wrote down his statement, he read it,

18  and signed it.  (Id. at 951.)

19  Anas testified that he does not believe he ever spoke to Mojaddidi.  (VI TR 956.)

20  Anas stated that he spoke with one of Hamid's attorneys a few days before testifying at

21  the evidentiary hearing.  The attorney told him that whatever he was going to say, he needed to

22  tell the truth.  (VI TR 952-53.)  They did not practice questions and answers.  (Id. at 953.)

23                              **iv.      Rafaqat**

24  Rafaqat is Hayat's friend.  He resides in the village of Behboodi, Pakistan, and lived there

25  during the years from 2003 to 2005.  (VI TR 959-60, 965.)  Rafaqat testified that when Hayat was

26  in Behboodi, Rafaqat would see him every day.  (Id. at 960.)  They played cricket most evenings

27  and would sit together in the baithak.  (Id. at 962-63, 974.)  Jaber Ismail may have come to watch

28  sometimes but he did not play cricket with the others.  (Id. at 976.)  In addition, Hayat came to

1    Rafaqat's tailoring shop two or three times a week to visit at around 10:00 or 11:00 in the

2    morning.[22]  (Id. at 963, 978.)  He would stay for a few hours before they both went to their

3    respective homes for the mid-day meal.  (Id. at 963, 978.)

4         In 2003, Rafaqat traveled with Hayat to Multan to attend Ahmed Nawaz's wedding.  (Id.

5    at 960.)  He recalled that they were in Multan five or six days.  (Id. at 961.)  Rafaqat testified that

6    he gave photographs from that wedding to Hassan and Ahmed when they were in Behboodi.  (Id.)

7         Rafaqat stated that he spoke with Hassan and Ahmed when they were in Behboodi.  He

8    read the statement they wrote for him and signed it.  He testified that everything in his statement

9    is true.  (VI TR 961-62.)

10        Rafaqat recalled that Hayat would go with his family to Rawalpindi about once or twice a

11   month.  (VI TR 962.)   They were usually there one or two days.  (Id. at 964.)

12        He testified that Hayat never left Behboodi for more than a week.  (VI TR 964.)

                         **v.    Fahim ud Din**

14        Fahim is a doctor specializing in pediatrics and is Hayat's maternal uncle by marriage.

15   (VII TR 994-95.)  He resides in Rawalpindi and also has a house in the Attock district.  (Id. at

16   995, 1002.)  He recalled Hayat falling ill around March 2000.  (Id. at 997.)  Fahim examined him

17   and determined he may have meningitis.  (Id. at 998.)  He referred Hayat to the emergency ward

18   at Shifa International Hospital in Islamabad.  (Id.)  They determined that Hayat had bacterial

19   meningitis.  (Id. at 999.)  Hayat was in the hospital for about a week.  (Id.)  Fahim testified that

20   the lasting effects of bacterial meningitis can include effects on the person's mental condition,

21   sight, memory, and capability of tolerating things.  (Id. at 1000.)

22        Fahim testified that during the years 2003 to 2005 he worked three to four days a week in

23   Rawalpindi and the rest of the time he spent in Daman, a village about three or four kilometers

24   from Behboodi.  (VII TR 1001-02, 1007.)  Fahim testified that it has been "such a long time" that

25   he did not "remember exactly" but recalled that he saw Hayat at least "every two weeks."  (Id. at

26   _____

27   [22] The government contends this testimony conflicts with Jaber Ismail's testimony that he saw
     Hayat "every day for an hour at 11 o'clock."  (ECF No. 725 at 122.)  However, Jaber did not
28   testify that he saw Hayat every day at that time.  Rather, he testified that he "probably" saw Hayat
     when he was on his mid-day school break from 11:00 a.m. to 1:00 p.m.  (II TR 310.)

1   1002.)  Fahim testified that it was not possible that Hayat could have been gone for a period of

2   three months during that time.  (Id. at 1003.)  He also recalled that Hayat did not like to travel

3   alone and he had never seen Hayat use public transportation.  (Id. at 1003-04.)

4            Fahim recalled meeting with Hassan and Ahmed in 2014.  (VII TR 1004.)  They told him

5   that they wanted to inquire about Hayat's childhood and illness.  (Id.)  In his declaration, he states

6   that he saw Hayat "almost weekly" for the entire duration of his stay and it is not possible he left

7   "the village (Balakot)" for more than two weeks.  (Id. at 1004-05.)  Fahim testified that the word

8   "Balakot" should have been Behboodi.  (Id. at 1005.)  Everything else in his declaration is true.

9   (Id. at 1005-06.)  He would have given testimony on Hayat's behalf in 2006 if he had been asked.

10  (Id. at 1006.)

11                        **vi.    Tayyaba Fahim**

12           Ms. Fahim is married to Dr. Fahim.  (VII TR 1018.)  Her sister is Hayat's mother.  (Id. at

13  1019.)  She is from Behboodi.  (Id.)  Ms. Fahim recalled Hayat's illness in 2000.  (Id. at 1019-

14  20.)  He was very sick when they brought him to Rawalpindi.  (Id. at 1020-21.)  Then, her

15  husband went with Hayat to the hospital.  (Id. at 1021.)  Hayat was in the hospital about a week.

16  (Id.)

17           In 2003, Ms. Fahim would see Hayat when he came to Rawalpindi with his mother.  (VII

18  TR 1022.)  She did not recall Hayat going anywhere besides Rawalpindi and Behboodi when he

19  was in Pakistan during this time.  (Id. at 1023.)  There was no period of time as long as three

20  months that she did not see Hayat when he was in Pakistan.  (Id. at 1024.)   Ms. Fahim did not

21  recall seeing Jaber and Usama Ismail between 2003 and 2005.[23]  (Id. at 1042.)  Ms. Fahim

22  testified that she has read her declaration prepared by Hassan and Ahmed and everything in it is

23  true.  (Id. at 1024.)

24  ////

25  ////

26  ////

27  

28  ─────────────────
[23] This statement conflicted with Jaber's testimony that he saw Hayat with Ms. Fahim frequently.

41

**b.  Declarations of Pakistani Witnesses**

**i.      Foundational Testimony for Declarations**

Maryam Mohiuddin Ahmed testified about the procedures used to take statements from the witnesses in Pakistan.  Ahmed attended the University of California, Berkeley, law school in the United States and now works as an entrepreneur in Lahore, Pakistan.  (I TR 190.)  In January 2014, she was asked by a friend, Amna Hassan, to work on investigating Hayat's whereabouts between 2003 and 2005.  (Id. at 192.)   Ahmed and Hassan were put in touch with Muhammad Anas, Hayat's uncle.  (Id. at 194.)  In February 2014, they traveled to Rawalpindi to meet with him.  (Id. at 195.)  While in Rawalpindi, they also met with Hayat's grandmother, Pashmina, and with Dr. Fahim.  (Id.)  The next day they traveled to Behboodi and met with a number of Hayat's family and friends there.

At Muhammad Anas's house, Ahmed, Hassan, and Mrs. Shah, Hassan's aunt, sat in the drawing room and "one-by-one we had folks come in, who we met, who we spoke to, asked them questions."  (I TR 196.)  They had previously decided on a list of questions.  (II TR 227.)  The questions included ones about what kind of person Hayat is, whether they had interaction with Hayat between 2003 and 2005, whether they could testify to that, and whether they had any documentary evidence to support that.  (I TR 196-97.)  All three of them took notes during these interviews.  Afterwards, they compiled and condensed the notes into a single statement for each witness.  (Id. at 197.)  Ahmed testified that the three of them had no disagreements about what each witness had said.  (II TR 228.)  They read the statement to each witness and asked whether they had missed anything or anything was incorrect.  (I TR 197.)  Once the witness approved the statement, Shah handwrote the declaration on "stamp paper" and had the witness sign it.  (Id. 197, 199.)  Ahmed testified that stamp paper "is used in Pakistan to ensure the document is credible." (Id. at 199.)  A document on stamp paper is notarized and is admissible in a court of law.  (Id.)

Ahmed testified that they told the witnesses that their statements could be evidence in Hayat's case and therefore they might have to come and testify.  (I TR 199.)  She told them that if they lied, "then they are actually breaking the law."  (Id. at 197-98.)

////

42

1    Ahmed testified that they asked each witness whether anyone had talked with the witness

2    about the subjects they were asking about or had tried to take a statement from them; all said no.

3    (II TR 236, 240.)

4    They followed this procedure in both Rawalpindi and in Behboodi.  (I TR 198-99.)  In

5    both places, Muhammad Anas set up the interviews.  (Id.)

6    After they had all the statements, Hassan took them and each witness's national ID card to

7    an "oath commissioner."  (I TR 200.)  According to Ahmed, the oath commissioner would have

8    verified that the signature or thumbprint used on the statement was the same as that on the

9    witness's national ID card.  (Id.)  When that was confirmed, the oath commissioner notarized the

10   statement.  Ahmed testified that she did not go with Hassan to the oath commissioner.  (II TR

11   223.)  Ahmed stated that the "whole point of the oath commissioner" was that "the witnesses had

12   to promise or state that, yes, they are telling the truth and, yes, they can be held liable if they lie."

13   (Id. at 230.)  Even though the declarations state that the witness is making the declaration "under

14   penalty of perjury, under the laws of the United States of America," Ahmed testified that to "get

15   notarized by a notary in Pakistan, they also necessarily need to follow Pakistani law."  (Id. at

16   231.)

17   With the exception of Dr. Fahim's, all of the statements were written in Urdu.  (I TR 201.)

18   Hassan translated the statements into English.  Ahmed reviewed each translation.[24]  (Id.)

19   The documents they collected from witnesses were photographs and the marriage

20   certificates of Ahmed Nawaz and of Najia Hayat.  (II TR 234-35.)

21   Ahmed then confirmed that the following declarations were those she took in Pakistan:

22   Attique (EH Ex. S), Hayat's aunt (EH Ex. JJ), Muhammad Nauman (EH Ex. GG), Muhammad

23

24   [24] The government implies that Hassan and Ahmed may not be qualified to translate the
     declarations.  However, Ahmed testified that she is fluent in both English and Urdu, and the

25   government put on no evidence that the declarations were incorrectly translated.  In addition, the
     fact that Ahmed, Hassan, and Shah worked together to prepare the declarations would only

26   implicate their truthfulness if the witnesses had not read and signed them, and there was

27   uncontested testimony that each had.  Accordingly, for purposes of this § 2255 proceeding, this
     court accepts the English translations provided as being a correct statement of the potential

28   testimony of these witnesses.

43

1   Anas (EH Ex. T), Muhammad Daud (EH Ex. HH), Hayat's grandmother (EH Ex. FF), Dr. Fahim

2   (EH Ex. EE), Muhammad Usman (EH Ex. V), Hammad Ishfaq (EH Ex. W), Muhammad Qasim

3   (EH Ex. X), Sajjad Ishfaq (EH Ex. Y), Rafaqat (EH Ex. Z), Salahuddin (EH Ex. AA),

4   Muhammad Saeed (EH Ex. BB), Nisar Ahmad (EH Ex. CC), Shakeel Ahmad (EH Ex. DD);

5   Tayyaba Fahim (EH Ex. II).  (I TR 202-12; II TR 219-20.)

6                       **ii.       Summary of Declarations**

7         Hayat presented declarations from fourteen non-testifying witnesses regarding his

8   whereabouts during the 2003/2005 time period in Pakistan.  Each of the witnesses who testified

9   from Pakistan had also prepared a declaration.  Their testimony is summarized in the prior

10  section.  The declarations discussed here are from the following non-testifying witnesses:  (1)

11  Attique ur Rahman (uncle from Behboodi and Rawalpindi);  (2) Muhammad Daud (friend from

12  Rawalpindi); (3)  Muhammad Usman (brother-in-law from Behboodi); (4) Hammad Ishfaq

13  (cousin from Behboodi); (5) Muhammad Qasim (shopkeeper in Behboodi); (6) Sajjad Ishfaq

14  (cousin from Behboodi); (7) Salahuddin (cousin from Behboodi); (8) Muhammad Saeed (friend

15  from Behboodi); (9) Nisar Ahmad (cousin from Behboodi); (10) Shakeel Ahmad (friend from

16  Behboodi); (11) Pashmina (grandmother from Rawalpindi); (12) Muhammad Nauman (cousin in

17  Behboodi); (13) Malik Ihtesham Mumtaz (friend from Rawalpindi); and (14) Bibi Asma (aunt in

18  Behboodi).

19        Many declarants stated that they saw Hayat frequently when he was in Pakistan between

20  2003 and 2005.  Some saw Hayat at least once a week in Behboodi or Rawalpindi.  (See EH Ex.

21  V (Muhammad Usman); EH Ex. W (Muhammad Ishfaq); EH Ex. X (Muhammad Qasim); EH Ex.

22  Y[25] (Sajjad Ishfaq); EH Ex. AA (Salahuddin); and EH Ex. DD (Shakeel Ahmad – for time period

23  from April 2003 to winter of 2004).)  Muhammad Daud stated that he saw Hayat once or twice a

24  month.  (EH Ex. U.)

25  _____

26  [25] In arguing that the declarations were not appropriately submitted, the government states that its
    copy of defense exhibit Y is identical to defense exhibit W, the declaration of Hammad Ishfaq.

27  However, the court's copies are not identical.  Exhibit Y is a declaration of Sajjad Ishfaq that is
    distinct from Exhibit W.  The fact that there was a mix-up in the government's copy of the

28  exhibits does not give the court pause.

1    A few declarants state that they saw Hayat frequently but do not specify a time period.

2    (See EH Ex. BB (Muhammad Saeed); EH Ex. CC (Nisar Ahmad); EH Ex. FF (Pashmina).)

3    Muhammad Nauman does not appear to have resided in Behboodi during the 2003/2005 time-

4    period and stated only that he visited there "frequently."  (EH Ex. GG.)  Because the declarations

5    of Muhammad Saeed, Nisar Ahmad, Pashmina, and Muhammad Nauman are vague as to time,

6    this court does not consider these declarants potential alibi witnesses regarding Hayat's activities

7    from 2003 to 2005 in Pakistan.  In addition, Malik Ihtesham Mumtaz describes spending time

8    with Hayat before 2000 in Rawalpindi (EH Ex. HH), and Bibi Asma only describes Hayat's

9    illness in 2000 (EH Ex. JJ).  Those declarations are not relevant to the time period at issue here

10   for alibi purposes.  Further, this court does not consider the declaration of Hayat's uncle Attique

11   ur Rahman (EH Ex. S) as a factor in the prejudice analysis because, as discussed above,

12   Mojaddidi had good reason to decide that he would not be helpful to the defense at trial.

13                  **c.   Was Hayat Prejudiced by the Decision to Forego an Alibi Defense?**

14   To establish prejudice under Strickland, Hayat must show that there is a "reasonable

15   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

16   been different."  466 U.S. at 694.  To make that determination in this case, this court compares

17   "'the evidence that was actually presented to the jury with that which could have been presented

18   had counsel acted appropriately.'"  Thomas v. Chappell, 678 F.3d 1086, 1102 (9th Cir. 2012)

19   (quoting Karis v. Calderon, 283 F.3d 1117, 1133 (9th Cir. 2002)).

20   Hayat was charged with a violation of 28 U.S.C. § 2332A which describes the crime as

21   follows:

22               Whoever provides material support or resources or conceals or
              disguises the nature, location, source, or ownership of material
23            support or resources, knowing or intending that they are to be used
              in preparation for, or in carrying out, a violation of [various
24            provisions prescribing penalties for terrorist acts] . . . shall be . . .
              imprisoned not more than 15 years. . .
25

26   The basis for the charge of providing material support for terrorism was explained in the

27   indictment as follows:

28   ////

                                                   45

1
2
3
4
5

> [C]ommencing in or about March, 2003 . . . and continuing on or about June 4, 2005, defendant Hamid Hayat provided material support and resources, to wit, personnel in the form of his person; attempted to conceal and disguise the nature of such material support and resources; and concealed and disguised the nature of such material support and resources; knowing and intending that the material support and resources were to be used in preparation for, and carrying out, a violation of [18 U.S.C. § 2332b] (Acts of Terrorism Transcending National Boundaries).

6   (ECF No. 165 at 2.)

7   In a section entitled "Defendant Hamid Hayat's Jihadist Training," the indictment stated

8   that Hayat traveled to Pakistan in April 2003 and,

9
10
11
12

> At some point, no earlier than approximately October 2003, defendant Hamid Hayat provided himself as a recruit to receive jihadist training at a training camp in Pakistan. [¶] During a period of months sometime between in or about October, 2003 and in or about November, 2004, in Pakistan, defendant Hamid Hayat received jihadist training, including training in physical fitness, firearms, and means to wage violent jihad.

13   (Id. at 2-3.)

14   To show Hayat's intent to wage jihad in the United States, the indictment stated that when

15   Hayat returned to the United States in 2005, he intended "upon receipt of orders from other

16   individuals, to wage violent jihad against persons and real and personal property within the

17   United States." (Id. at 3.)

18   The government, then, needed to prove both an act – that Hayat attended a jihadist

19   training camp in Pakistan – and intent – that Hayat did so with the intention of returning to the

20   United States to wage violent jihad.  At trial, the government's evidence primarily focused on

21   Hayat's intent.  It included:  (1) the telephone conversations in which Hayat told Khan that his

22   family was involved with terrorist organizations, told Khan that he approved of some jihadis and

23   jihadist groups, and expressed anti-American and anti-Semitic views;  (2) Mohammed's

24   testimony that the supplication found in Hayat's wallet would only have been carried by a jihadi;

25   (3) the jihadi literature found in Hayat's bedroom; (4) Hayat's scrapbook containing articles about

26   jihadis; and, most importantly, (5) Hayat's confession that he attended a jihadi training camp.

27   To show the act of attending a training camp, the government's evidence rested almost

28   exclusively on Hayat's confession.  The testimony of Abbas and Benn regarding the existence of

46

1    a training camp near Balakot was only relevant in the context of Hayat's confession.  The

2    testimony of Naseem Khan that Hayat told him he intended to go to a training camp when he was

3    in Pakistan was also introduced as evidence that Hayat did so.

4          In his confession, Hayat stated that he attended a training camp for three to six months in

5    a place he most frequently identified as Balakot.  The testimony of the alibi witnesses at the

6    evidentiary hearing directly contradicted that testimony.  Hayat presented six witnesses whose

7    testimony was consistent - Hayat spent almost all of his time in Behboodi with regular, brief trips

8    to Rawalpindi for almost his entire stay in Pakistan from April 2003 to May 2005.  After the

9    family's initial stay in Rawalpindi upon their arrival in Pakistan in April 2003, the longest period

10   of time Hayat was absent from his family's village of Behboodi was one week.

11         This court finds the declarations provided have significantly less value than the live

12   testimony because the government was not able to cross-examine the declarants and this court

13   was unable to determine their credibility.  Cf. Blackledge v. Allison, 431 U.S. 63, 82 n.25 (1977)

14   ("When the issue is one of credibility, resolution on the basis of affidavits can rarely be

15   conclusive . . . .").  That said, the relevant declarations do show that at least some other witnesses

16   could have, and likely would have, provided testimony similar to that provided by the witnesses

17   who testified at the evidentiary hearing.

18         The government challenges the alibi witnesses' credibility on a number of grounds.  First,

19   the government argues each witness lacks credibility based on his or her affection for Hayat as a

20   family member or friend.[26]  However, "alibi witnesses often have close relationships with the

21   defendant."  Poindexter v. Booker, 301 F. App'x 522, 529 (6th Cir. 2008).  The fact that an alibi

22   witness is a family member or close friend does not necessarily mean a jury would not find them

23   credible.  See Lopez v. Miller, 915 F. Supp. 2d 373, 428 (E.D. N.Y. 2013) (alibi witnesses' close

24   relationship to the defendant "alone does not reasonably justify a decision not  to call witnesses

25   with potentially exculpatory evidence"); Brownridge v. Miller, No. 06 CV 6777(RID)(SMG),

26

27   [26] The government also notes that a number of the witnesses were teenagers in 2004.  The court is
     unsure why that point is raised.  Certainly, a fourteen-year-old is capable of testifying in court.  In
     addition, the government provides the court with no basis to doubt the recollection of someone
28   about their teen years any more than the recollection of someone regarding their adult years.

1   2010 WL 2834829, at *6 (E.D. N.Y. July 15, 2010) ("an alibi is not disingenuous merely because

2   it involves family members"); but see Romero v. Tansy, 46 F.3d 1024, 1030 (10th Cir. 1995)

3   ("alibi testimony by a defendant's family members is of significantly less exculpatory value than

4   the testimony of an objective witness").

5       The Ninth Circuit has held that the failure to call alibi witnesses who are family members

6   can be prejudicial.  The fact that those witnesses may have a bias in favor of the defendant does

7   not render their alibi testimony irrelevant.  See Luna v. Cambra, 306 F.3d 954, 962 (9th Cir.),

8   amended on other grounds, 311 F.3d 928 (9th Cir. 2002); Brown v. Myers, 137 F.3d 1154, 1157

9   (9th Cir. 1998) (court finds failure to call family members who would corroborate defendant's

10  alibi prejudicial under Strickland).  See also Madrigal v. Yates, 662 F. Supp. 2d 1162, 1190 (C.D.

11  Cal. 2009) ("[T]he mere fact that [the witness] was a family member does not render [counsel's]

12  failure to present his corroboration of Petitioner's alibi harmless.").

13      In this case, it makes sense that only people with a close relationship to Hayat would

14  recall his whereabouts years earlier.  Further, the fact that the witnesses' statements were largely

15  consistent regarding the facts at issue lends credibility to their testimony.  See McGahee v. United

16  States, 570 F. Supp. 2d 723, 736 (E.D. Penn. 2008) (long-time friends of petitioner not inherently

17  unreliable alibi witnesses particularly where their testimony was "basically consistent").

18      The government also argues that the court should assume the witnesses colluded to give

19  false testimony in Hayat's favor.[27]  (See ECF No. 725 at 107-08.)  There is simply no basis to

20  draw that conclusion and reject these witnesses' testimony.  The witnesses who testified during

21  the evidentiary hearing stated that they had not discussed their testimony in any detail with other

22  witnesses.  With respect to the Pakistani declarants, the government argues that the process by

23

---

24  [27] In a related argument, the government contends that since the declarations were gathered to
    support Hayat's motion to vacate, they are unreliable.  This court finds that argument nonsensical
25  – every investigation made on behalf of a criminal defendant, or, for that matter, on behalf of any
    party to a legal proceeding, is made with the intention of gathering evidence to support
26  defendant or party's case.  In addition, the fact that Ahmed and Hassan used scripted questions
    for each witness does not, as the government implies, show that the interviews were skewed in
27  Hayat's favor.  Rather, a jury could also find that the use of the same questions with each
    declarant was an attempt to make the process as objective as possible.
28

1   which the declarations were taken shows that the witnesses likely coordinated their statements.

2   However, Ahmed testified that she asked each declarant if anyone talked with them about the

3   subject of their declarations, and all responded that no one had.  (I TR 195.)  That testimony is

4   corroborated by the testimony of Muhammad Anas, Hayat's uncle who arranged for the

5   declarants to meet with Ahmed and Hassan.  Anas testified that he did not tell anyone how to

6   answer Ahmed's questions and no one influenced his own statement.  (VI TR 936-51.)

7       The government makes a better point when arguing that the declarations lack reliability

8   because Hayat did not provide sufficient information about the use of an "oath commissioner" to

9   verify just what sort of oath, and the penalties for perjury, the declarants understood.  However,

10  the declarations have limited value in this court's consideration of the prejudice Hayat suffered.

11  As discussed above, the declarations do not weigh significantly in Hayat's favor.  The court finds

12  the declarations relevant to show that it is likely at least some other witnesses besides those who

13  testified during the evidentiary hearing could have been deposed in Pakistan at the time of trial to

14  provide alibi testimony.

15      With respect to the live witnesses, the government argues that the fact they did not come

16  forward until now is also relevant to their credibility.  As the court discussed above in considering

17  the reasonableness of Mojaddidi's conduct, the burden is not on witnesses to come forward.

18  Rather, the burden is on counsel to conduct a reasonable investigation.  Moreover, Mojaddidi was

19  aware of, but did not speak with, Raheela and was aware of Jaber Ismail but rejected him because

20  at the time of trial he resided in Pakistan.  The other live witnesses all resided in Pakistan.

21      The cases cited by the government for the proposition that newly discovered alibi

22  witnesses should be treated as suspect are simply not applicable.  In Cuevas v. Henderson, 801

23  F.2d 586, 591 (2nd Cir. 1986), the court considered impeachment of alibi witnesses with the fact

24  that they failed to come forward earlier to provide law enforcement with their statements.

25  However, that impeachment can only be effective where the witness "was familiar with the means

26  to make such information available to law enforcement authorities."  801 F.2d at 591.  Witnesses

27  in Pakistan can hardly be charged with knowledge of how to provide statements to American law

28  enforcement or with knowledge of the American legal system generally.  In the second case cited

1    by the government, <u>Thomas v. Scully</u>, 854 F. Supp. 944, 959-60 (E.D. N.Y. 1994), the court

2    noted that a prosecutor may attack an alibi witness's credibility with the fact he or she did not

3    come forward earlier, but that it was also appropriate for a court to instruct the jury that witnesses

4    have no obligation to do so.  This court rejects the government's repeated argument that these

5    witnesses should be disbelieved because they did not come forward sooner.

6           The government also mentions, briefly, that the court should discount the live Pakistani

7    witnesses' testimony because they are effectively immune from perjury charges.  The government

8    previously opposed Hayat's motion to take Rule 15 depositions.  One issue it raised then was the

9    fact that testimony in Pakistan raised the "specter" of sanction-free perjury.  (<u>See</u> ECF No. 678 at

10   19.)  The court held that it would permit the testimony to be taken by videoconference and that

11   the oath issue should be resolved before that testimony was taken.  At the evidentiary hearing, the

12   Pakistani witnesses were sworn with the oath used on domestic witnesses – "I solemnly swear

13   that whatever I'm going to testify today is going to be the truth, the whole truth, nothing but the

14   truth."  (VI TR 926 (testimony of Muhammad Anas).)

15          The government did not challenge this oath at the evidentiary hearing, did not move to

16   strike the testimony of the Pakistani witnesses, and does not now argue that any motion for Rule

17   15 depositions or motion for introduction of that deposition testimony at trial would have been

18   unsuccessful.  Therefore, any arguments that this evidence is, or would have been, inadmissible

19   have been waived.

20          The court considers that the testimony was given while the witnesses were in Pakistan,

21   with no showing by Hayat that there is any penalty for their perjury, in weighing their credibility.

22   Most courts that have considered the issue of what sort of oath is required for those testifying in a

23   foreign country have held that the question is one of weight not necessarily admissibility.  <u>See</u>

24   <u>United States v. Salim</u>, 855 F.2d 944, 953 (2nd Cir. 1988) (deposition taken in accordance with

25   French law was subject to standards for accuracy and acceptable under Rule 15; court does not

26   find the deposition "to be so lacking in probative value or so inherently unreliable as to require its

27   exclusion"); <u>United States v. Moalin</u>, No. 10CR4246-JM, 2012 WL 3637370, at *6 (S.D. Cal.

28   Aug. 22, 2012) (fact that there was no showing that an oath in Somalia is subject to penalties for

1   perjury was a factor, among others, that "strongly disfavors Rule 15 depositions in Somalia");

2   United States v. Alvarez, 837 F.2d 1024, 1029 (11th Cir. 1988) ("Foreign deposition testimony,

3   because of the absence of a sanction for perjury, is suspect.").

4        In fact, in Salim, the deponent in France did not take any oath and the court did not

5   mention any potential sanction for perjury.  855 F.2d at 952.  The court found the deponent's

6   testimony met the standards for an "oath or affirmation" under Federal Rule of Evidence 603

7   because the French judge "took pains to impress upon [the deponent] the need to answer

8   truthfully, and the witness promised that she would do so."  Id.  In the present case, the Pakistani

9   witnesses did take an oath promising to testify truthfully and each re-affirmed during their

10   testimony that they understood the obligation to testify truthfully.  (VI TR 956-57 (Muhammad

11   Anas); VI TR 981 (Rafaqat); VII TR 1005, 1015, 1016 (Dr. Fahim); VII TR 1045 (Ms. Fahim).)

12        Finally, the government attempts to pick apart the live alibi witnesses' credibility by

13   showing some inconsistencies in their testimony, showing that some admitted their memories of

14   that time were not perfect, and arguing that it is simply not reasonable to think that they

15   remembered events about fourteen years ago with any clarity.  The government's argument

16   ignores an essential aspect of these witnesses' testimony.  They did not need to account for every

17   day of Hayat's time in Pakistan, nor did they have to account for every week or every month.

18   Rather, their accumulated testimony needed to show that Hayat was not absent from Behboodi or

19   Rawalpindi for any consecutive three-month period.  The court has no problem accepting the fact

20   that family members and good friends, who typically saw Hayat on a daily or weekly basis when

21   he was in Pakistan at that time, would have remembered such an extended absence.  Their

22   memories did not need to be perfect about the events of those two years to have that recollection.

23        Further, the witnesses corroborated each other on some important points during the

24   relevant time period of Fall 2003 to Fall 2004.  Raheela and Jaber recalled that when Hayat's

25   family first arrived in Pakistan, they spent a short period of time in Rawalpindi before moving to

26   Behboodi where they resided during their stay.  (I TR 131-32; II TR 308.)  Raheela and Rafaqat

27   recalled that Hayat's trips to Rawalpindi with his family for his mother's medical treatments

28   occurred once or twice a month.  (I TR 136-37; VI TR 962.)  Several witnesses recalled that

1   besides the trips to Rawalpindi, which sometimes included Islamabad, Hayat only took two trips,

2   both to Multan and neither of which exceeded a week.[28]  (I TR 138-40 (Raheela); II TR 314-15

3   (Jaber); VI TR 935-36 (Anas); VI TR 960 (Rafaqat).)

4        The lynchpin of the government's case against Hayat was Hayat's confession.  Without it,

5   the government could not have proven Hayat took any act in material support of terrorism.  The

6   alibi witness testimony would have undermined jurors' reliance on Hayat's confession.

7        The government presented no witnesses who testified that they saw Hayat attend a

8   terrorist training camp.  And, the few bits of corroborating evidence were weak.[29]  Defense

9   department analyst Benn testified that, without considering Hayat's confession, he was only 50%

10  sure the Balakot location he testified about was a jihadi training camp.  The taped conversations

11  Hayat had with Naseem Khan showed a young man somewhat enamored of Pakistani terrorist

12  leaders, hoping to impress the older Khan, and easily lead into a promise that he would attend

13  such a camp when he reached Pakistan.

14        At least one juror at Hayat's trial also appears to have found the evidence weak.  The jury

15  initially deadlocked and took nine days to agree upon a verdict.  (See ECF Nos. 311-328 (jury

16  deliberates April 12, 13, 14, 17, 19, 20, 21, 24, and 25, 2006; verdict returned on April 25, 2006).)

17  The length of deliberations is relevant to determining prejudice.  Thomas v. Chappell, 678 F.3d

18  1086, 1104 (9th Cir. 2012); Gibson v. Clanon, 633 F.2d 851, 855 n.8 (9th Cir. 1980) (length of

19  jury deliberations is a factor "of some importance" in determining prejudice).

20  _____

21  [28] Raheela and Rafaqat differed, however, about the date of Nawaz's wedding that Hayat and
    Rafaqat attended.  Raheela testified that it occurred in October 2004 (I TR 139-40, 149) while

22  Rafaqat testified that it occurred in 2003 (VI TR 960).

23  [29] The government's recitation of the facts in this case includes a discussion of Umer Hayat's
    statements to the FBI. (See ECF No. 725 at 41.)  The government also argues that Umer's

24  statements have relevance to the court's consideration of prejudice resulting from Hamid's claim
    that his trial attorney Mojaddidi was ineffective.  (See id. at 138.)  However, analysis of an

25  ineffective assistance of counsel claim requires the court to consider whether "there is a
    reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

26  would have been different."  Strickland v. Washington, 466 U.S. 668, 691-92 (1984).  Because
    Umer's statements were not admissible against Hamid at trial, they could not have affected the

27  Hamid jury's consideration of the evidence before it and cannot now affect this court's
    consideration of the possible prejudice resulting from Mojaddidi's actions.

28

1   While Hayat told interrogators he attended a jihadi camp for, at a minimum, three months,

2   each alibi witness testified that Hayat was never absent from Behboodi for an amount of time

3   even close to that.  In an already weak government case, testimony that Hayat's statements could

4   not have been true would, at the least, have given jurors reasonable cause to doubt Hayat's

5   confession.  This court finds that had Mojaddidi investigated and presented alibi witness

6   testimony, there is a reasonable probability the result of Hayat's trial would have been different.

7   Hayat's claim for relief on this basis should be granted.

8   **C. Failure to Investigate Training Camp**

9   Hayat argues that Mojaddidi failed to investigate whether the location in Balakot

10  identified by the government was, in fact, a jihadi training camp.  He contends Mojaddidi should

11  have done two things:  (1) move the government for a bill of particulars early on in the case to

12  obtain the location of the camp; and (2) once she had received the government's coordinates for

13  the camp's location, investigate that location more thoroughly.  The parties argue extensively

14  about the reasonableness of Mojaddidi's conduct.  She testified that she did not recall considering

15  sending an investigator to the camp location after she received the coordinates of the camp from

16  the government.  (IV TR 767-68.)  Rather, when she learned that James Lazor, who had no

17  experience as an investigator, would be in the area on a humanitarian mission, she asked him to

18  visit the location.  (Id. at 768.)  While the court finds it likely Mojaddidi did not act reasonably in

19  both respects identified by Hayat, the court need not reach the question of reasonableness because

20  Hayat has failed to establish prejudice.  See Strickland, 466 U.S. at 697 ("If it is easier to dispose

21  of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be

22  followed.")

23  To show he was prejudiced by Mojaddidi's conduct, Hayat must provide evidence

24  showing what Mojaddidi would have uncovered had she conducted an adequate investigation.

25  Hayat has failed to do so.  In his opening brief, Hayat argues that documents produced by the

26  National Geospatial-Intelligence Agency through a 2016 Freedom of Information Act ("FOIA")

27  request demonstrate that the United States conducted wide-ranging surveillance operations of

28  Pakistan, including the area around Balakot, between April 2003 and early February 2004.  He

1    contends these documents include detailed aerial photographs of Pakistani militant camps.  Hayat

2    argues that if the government had such detailed aerial photographs of the alleged Balakot camp, it

3    would have produced them at trial.  The government's reliance on the significantly less-detailed

4    photographs during defense department analyst Benn's testimony is evidence, Hayat contends,

5    that no jihadi camp existed at that site.  However, Hayat does not show that had Mojaddidi

6    conducted a more thorough investigation, she would have had access to this FOIA information at

7    the time of trial.[30]  Nor does Hayat show what other evidence Mojaddidi could have uncovered.

8         Further, the government counters Hayat's argument by showing that documents produced

9    pursuant to that FOIA request support the government's case at trial.  They "establish that

10   militant camps, including the Balakot camp specifically, were operational and producing militants

11   between 2003 and 2005."  The court has examined the copies of the FOIA documents submitted

12   by Hayat as exhibit B to his Reply to Motion for Evidentiary Hearing.[31]  (ECF No. 608-2.)  They

13   support the government's contentions.  A record dated January 28, 2004, describes militants

14   leaving the JEM training camp in Balakot, Pakistan at the end of 2003.  (Id. at 4.)  A record dated

15   January 19, 2005 describes the trials of Pakistani airmen, which apparently occurred between

16   October and December 2004, for giving donations "to the banned Sunni extremist group Jaish-I-

17   Mohammad, and of receiving small-arms training at the group's camp in Balakot."  (Id. at 39; see

18   also id. at 42.)  Finally, the government points to a February 2004 report describing a federal

19   government crackdown on a terrorist group.  The group's leader "frequently visited a training

20   camp at Shawal in Balakot."  (Id. at 41.)  In his reply brief, Hayat does not address these points.

21        Hayat also asks the court to consider the declaration of Ghulam Hasnain Aaser.  (Hayat's

22   proposed EH Ex. NN.)  Mr. Aaser is a former Pakistani journalist who stated that unnamed

23   members of militant groups informed him that the JEM camp in the Balakot area at the

---

25   [30] The essence of Hayat's argument appears to be that the government should have provided the

26   defense with this information at the time of trial.  That claim alleging the government violated its
     obligations under Brady v. Maryland is addressed below.

27   [31] This court notes that neither party attempted to introduce these FOIA documents at the

28   evidentiary hearing.  Because neither party objects to their use, this court has no reason to doubt
     their authenticity and will consider them herein.

1    coordinates specified by defense department analyst Benn was closed in October 2003.  Hayat

2    listed Aaser as an expert witness for the evidentiary hearing.  The court granted the government's

3    motion to exclude Aaser's testimony because Hayat failed to show Aaser qualified as an expert.

4    (ECF No. 685 at 4-5.)

5         The court finds no basis to consider Aaser's testimony now.  Hayat's argument that

6    Aaser's testimony shows that at the time of trial, Mojaddidi would have been able to unearth an

7    expert to testify that any Balakot camp had been closed is simply baseless.  Hayat has presented

8    no competent evidence that the Balakot camp was closed or that it never existed at the site

9    identified by the government at trial.  The government's motion to strike Aaser's declaration is

10   granted on the grounds previously set out in the court's December 27, 2017 order (ECF No. 685).

11        Because he fails to show any potential for prejudice had Mojaddidi conducted more

12   thorough investigations of the Balakot site, Hayat's claim that Mojaddidi was constitutionally

13   ineffective in this respect should be denied.

14        **D.  Failure to File Pretrial Motions and Instructing Hayat not to Testify**

15        While Hayat devotes a separate section of his brief to Mojaddidi's failure to file pretrial

16   motions to suppress and to sever the Hayats' trials, he does not argue those failures amount to

17   ineffective assistance of counsel under <u>Strickland</u>.  Rather, he argues them solely as adverse

18   effects from Hayat's counsel's conflict of interest.  (<u>See</u> ECF No. 721 at 81-84.)  Hayat does

19   throw in a sentence in his motion to vacate that "virtually all of the failings of counsel discussed

20   in the [prior conflict of interest argument] . . . also constitute deficient performance within the

21   meaning of *Strickland*."  (ECF No. 531-1 at 82-83; <u>see also</u> Traverse at 26 (ECF No. 615 at 32).)

22   The court does not regard that conclusory statement as asserting separate claims for relief,

23   particularly where Hayat makes no attempt to argue he was prejudiced by the failures to file

24   motions to suppress or to sever.  (<u>See</u> Mot. to Vacate at 49-51, 65-66 (ECF No. 531-1 at 59-61,

25   75-76).)  In his traverse, he simply states that the failure to bring these motions was prejudicial.

26   ////

27   ////

28   ////

1  (ECF No. 615 at 31-32.)  He does not argue how or why those motions may have been

2  successful.[32]

3          The court notes that in his motion to vacate, Hayat also raised the issues of: (1)

4  Mojaddidi's failure to object to the government's variance from the indictment, and (2)

5  Mojaddidi's instruction to Hayat not to testify.  (Mot. to Vacate at 68-70 (ECF No. 531-1 at 78-

6  80).)  Hayat argued these issues only to show an adverse effect from the conflict.  Accordingly,

7  like the issues involving Mojaddidi's failure to make motions to suppress or sever, these issues

8  are not discussed here in the section on ineffective assistance of counsel under Strickland but only

9  below in the section on conflict of interest.

10          **E.  Failure to Procure False Confessions Expert**

11          Hayat argues that Mojaddidi acted unreasonably when she failed to procure a false

12  confessions expert.  The government counters that Mojaddidi reasonably felt James Wedick

13  would be qualified as an expert on interrogation techniques and that she otherwise effectively

14  cross-examined the interrogating FBI agents at trial.

15                  **1.  Background**

16          Mojaddidi understood that the most important evidence that would be offered against

17  Hayat was his confession.  (IV TR 743.)  She also testified that she did not believe the confession

18  was true.  (Id. at 680-81, 726.)  Mojaddidi believes she considered the possibility of presenting

19  the testimony of an expert on false confessions.  (Mojaddidi Depo. at 71, 207-09 (ECF No. 548 at

20  211, 247-49).)  However, it does not appear that she sought out any such experts.  Rather, she

21  testified at her deposition that "various people tried to contact me themselves because they knew

22  about the case." (Id. at 71.)  So, she felt "sure" she had considered the possibility of using a false

23  confession expert "when I saw their information."  (Id.)  However, later in her deposition, she

24  _____

25  [32] Hayat also elicited a good deal of testimony at the evidentiary hearing that Hayat suffered
   lasting effects from his bout with meningitis in 2000.  Hayat does not appear to be making a

26  separate ineffective assistance of counsel claim that Mojaddidi erred when she failed to
   investigate and present evidence at trial about the lasting effects of Hayat's illness.  Rather, Hayat

27  only appears to raise the effects of meningitis when arguing that a motion to suppress was a
   viable option that Mojaddidi rejected based on the conflict of interest.  (See Hayat's Op. Brief at

28  58 (ECF No. 721 at 68); Mot. to Vacate at 65-66 (ECF No. 531-1 at 75-76).)

1   corrected that statement to testify that she did not really consider it because "there was an

2   understanding that it was going to be Jim [Wedick], always." (Id. at 208.)  Using Wedick as an

3   expert was "just kind of an obvious decision from the beginning." (Id.)  She never contacted any

4   of the potential experts who reached out to her. (Id. at 71.)

5         Mojaddidi was aware that Wedick, a former FBI agent and the defense investigator for

6   both Hayats, had never qualified as an expert. (Mojaddidi Depo. at 70 (ECF No. 548 at 110).)

7   However, despite her lack of experience in criminal law and the fact she had never attempted to

8   qualify an expert for trial, she felt he "would get in and would be qualified." (Id. at 71.)

9   Mojaddidi testified that the decision to use Wedick as the expert was not based on financial

10  considerations.[33] (Id. at 209.)

11        On March 26, 2006, the government moved to preclude Wedick from testifying as an

12  expert witness. (ECF No. 261.)  It outlined Wedick's proposed testimony, which consisted of his

13  opinions regarding FBI agents' conduct during the interviews and interrogations of Hayat.

14  Wedick's testimony would have included his opinion that the agents' questioning increased the

15  risk of a false confession.  The government challenged Wedick's qualifications to testify as an

16  expert, argued the jury could evaluate the agents' conduct on their own, contended that

17  defendants failed to provide an adequate summary of Wedick's opinions, and argued that the

18  summaries were untimely.

19        In a March 31, 2006 proceeding, the district judge issued tentative rulings on the

20  government's motion.  He ruled that Wedick's proposed testimony that agents should have

21  reminded Hayat the interviews were non-custodial and should have videotaped the interviews

22  from the beginning would be excluded.  He stated that those were issues sufficiently covered by

23  defense counsel in their cross-examination of the agents. (Mar. 31, 2006 RT 3519-21.)

24        With respect to the remaining proposed testimony, the district judge tentatively held that it

25  would not assist the jury in understanding the evidence "because it concerns matters within the

26

27  [33] Wedick testified that he was paid very little for his work on the Hayats' cases.  He estimated
    that he received about $4,000. (III TR 594-95.)  His work "during the entire period of the trial"
28  was "as a volunteer" because the "family couldn't afford . . . to pay a fee." (Id. at 595.)

1   common knowledge or understanding of the average juror" and "does not bring to the jury more

2   than the lawyers can offer in argument."  (Mar. 31, 2006 RT 3521-22.)  During argument on the

3   tentative rulings, government counsel argued that the "real problem" with having Wedick testify

4   that agents' actions rendered the confession unreliable was that Wedick is not a psychologist or

5   psychiatrist."  (Id. at 3551.)  The district judge dismissed this argument, noting that his tentative

6   ruling did not deal with Wedick's qualifications.  (Id. at 3552.)  He then confirmed the tentative

7   ruling.  (Id.)

8          In Hayat's motion for a new trial, he argued, among other things, that the exclusion of

9   Wedick's testimony violated due process.  (ECF No. 441 at 62-69.)  The district court ruled that

10  Wedick was properly excluded at trial.  "[T]he circumstances of Hayat's interrogation and

11  confessions were readily apparent to the jury through the testimony of the interviewing FBI

12  agents and the videotapes, and therefore, Wedick's testimony was not necessary to inform the

13  jury about the circumstances surrounding Hayat's confessions."  (ECF No. 482 at 48-49.)  In

14  rejecting Hayat's argument that Wedick should have been permitted to testify that the FBI

15  interrogators use of leading questions and failure to consider Hayat's vulnerabilities increased the

16  risk of an unreliable confession, the district court held:

17          Hayat has not shown Wedick is qualified as an expert in the field of
            psychology or psychiatry, or otherwise had the qualification to give
18          expert testimony regarding Hayat's alleged susceptibility to
            suggestion and coercion.  Specifically, Hayat has not shown
19          Wedick's qualification to testify about Hayat's intelligence quotient,
            alleged mental handicap, or social isolation.  Nor does the record
20          indicate that Wedick was in a better position than a juror to opine
            about Hayat's age, language barrier, marriage and/or family status,
21          or any fatigue factor; and Wedick's testimony was unnecessary to
            inform the jury about Hayat's level of education, health, occupation
22          and employment status, religion and/or belief in God, illiteracy, or
            experience with the criminal justice system.
23
            . . .
24
            It was also not erroneous to exclude Wedick's testimony as to
25          whether the failure to consider a defendant's vulnerabilities and the
            use of leading questions generally could lead to an unreliable
26          confession. Such an exclusion was proper under Federal Rules of
            Evidence 702 and 403 since the testimony would have had little
27          probative value and would not have assisted the jury as contemplated
            by Rule 702. . . .   The jury was able to hear testimony from the
28          interviewing FBI agents regarding the circumstances of Hayat's

                                            58

1    confessions and was able to see Hayat's videotaped confessions, and
2    any connection that Hayat wanted Wedick to make between the
    factual circumstances of Hayat's confessions and factors that lead to

3    unreliable confession could have been and was ultimately made by
    defense counsel during closing arguments.

4

5    . . .

6    Moreover, even if the exclusion of Wedick's testimony was
    improper, it was harmless because the jury ultimately heard, through
7    other testimony and closing arguments, all of the testimony that
    Wedick would have offered.

8    (Id. at 50-55 (footnotes and internal citations omitted).)

### 2. Was Mojaddidi's Conduct Reasonable?

Attorney expert Weinberg testified that an attorney who plans to challenge their client's confession as false, "must secure contrary expert evidence regarding the circumstances under which false confession can and are made, and whether those circumstances apply in the situation involving that defendant." (III TR 475.) He explained that there are "well-known experts, many of them on the west coast, who specialize" in the study of false confessions. (Id.) "[M]ost, if not all, of those experts are academics who study psychology and related disciplines." (Id. at 475-76.) It would also be important to find an expert who has qualified to testify previously on the issue. (Id. at 476.)

Attorney expert Broderick similarly testified that if an attorney questions the voluntariness of their client's confession, then they should have "an expert on voluntariness, someone who knows the way the procedures would normally happen, how they should happen, how they don't, what effect they have on someone." (II TR 389.) In the same vein, Broderick testified that if an attorney questions the trustworthiness of the client's confession, then they should find an expert to "explain to the jury [] how someone could make a false confession." (Id.)

The government presented no testimony to counter these expert opinions. Rather, the government argues the following: (1) the choice of Wedick as an expert was a reasonable one; (2) Mojaddidi was reasonable in relying on cross-examination of the FBI agents regarding the interrogation techniques used; and (3) after Wedick was precluded from testifying, Mojaddidi did not have sufficient time to obtain a new false confessions expert.

1    The evidence before the court makes clear that Mojaddidi did not seriously consider using

2    a false confessions expert.  Rather, she and Griffin, from the beginning, decided that Wedick

3    would testify about: (1) the interrogation techniques used and, (2) why those techniques can

4    render a confession unreliable.  The problem is that Wedick did not have the expertise to testify to

5    that second, and most important, point.  As noted by the district court, Wedick had no background

6    in psychology or other expertise to talk about the effect of the interrogation techniques on a

7    suspect.  A false confession expert, with expertise in the psychological effect of interrogations,

8    would have been able to provide a very different sort of testimony.  Further, understanding the

9    psychological effects of interrogation techniques is not a subject that would necessarily have been

10   known by the average juror.  Where expert testimony would help jurors make an informed

11   judgment, a reasonable attorney would seek it out.  See Caro v. Calderon, 165 F.3d 1223, 1227

12   (9th Cir.1999).  Based on both Weinberg and Broderick's testimony, this court finds that a

13   reasonable attorney would have procured a false confession expert to explain to the jury why

14   Hayat may have confessed.

15   The record shows that the decision to use Wedick as the expert regarding Hayat's

16   confession was not based on reasonable investigation.  Mojaddidi did not weigh the benefits of a

17   false confession expert against the benefits of an interrogation expert like Wedick.  There is no

18   showing that the choice to use Wedick was a well-informed choice of one option over another.

19   Mojaddidi testified that it "was going to be Jim [Wedick], always."  (Mojaddidi Depo. at 208

20   (ECF No. 548 at 248).)  Moreover, it need not have been a choice.  Using a false confession

21   expert could have complemented, rather than replaced, Wedick.  Mojaddidi could have had

22   Wedick testify about the interrogation techniques used and FBI standard practice and a false

23   confession expert testify about the effects of those interrogation techniques on the suspect.

24   This court finds Mojaddidi acted unreasonably in failing to procure an expert on false

25   confessions.

26   ////

27   ////

28   ////

60

**3.   Did the Failure to Procure a False Confessions Expert Prejudice Hayat?**

**a.   Would a False Confessions Expert have been Permitted at Trial?**

The first issue in determining whether Mojaddidi's failure to procure a false confession expert resulted in prejudice to Hayat is whether a false confession expert would have been permitted at trial.  The government argues that any such expert would have been rejected for the same reasons Wedick was rejected and was otherwise unnecessary.

This court does not find the comparison to Wedick apt.  In fact, this court considered this very question when it ruled on the government's motion to exclude the testimony of Hayat's false confession expert Dr. Leo.  As this court held previously, "there is no question that Dr. Leo has specialized knowledge that is not within an average juror's bank of knowledge or expertise." (ECF No. 685 at 16.)  "[H]e is a professor of psychology and criminology; his specializations include research on the psychology of interrogations and confessions. He has been qualified as an expert 270 times in state and federal courts, including 119 times in disputed confession cases prior to the end of 2005, around the time he could have been retained by Mojaddidi."  (Id.)

The government makes no new arguments that this court did not consider previously when it ruled on the motion in limine.  Accordingly, this court has no grounds to find that the district court would have excluded testimony of a false confessions expert like Leo.

**b.   Did Mojaddidi's Failure to Procure a False Confession Expert Affect the Verdict?**

The second question in the prejudice analysis is whether there is a reasonable probability the testimony of a false confession expert like Leo would have made a difference in the verdict.

**i.   Dr. Leo's Evidentiary Hearing Testimony**

Leo is a professor of law and psychology at the University of San Francisco.  (I TR 12.) He has testified as an expert on the subjects of police interrogation, psychological coercion, and false confessions well over three hundred times.  (Id. at 16.)   His testimony was admitted as expert testimony on those subjects in this case.  (Id. at 50.)   On cross-examination, Leo agreed

////

1    that in a few cases his testimony was not permitted by the court.  (Id. at 78, 98-99.)  In 2008 a

2    Michigan court found his methodology unreliable.  (Id. at 95-96.)

3        Leo distinguished interviews, which involve open-ended questions, from interrogations,

4    which are typically accusatory.  (I TR 21-22.)  Interrogations are "guilt presumptive" because

5    they are "typically preceded by an investigation in which the police or agents conclude that a

6    person committed the crime."  (Id. at 22.)  Police then interrogate that person with the goal of

7    obtaining a confession.  (Id. at 22-23.)  A typical method of doing so involves isolating the

8    suspect, building rapport with the suspect, and then accusing and confronting the suspect.  (Id. at

9    26.)

10       Leo testified that an interrogation becomes psychologically coercive when the suspect

11   perceives that he has "no meaningful choice but to do what they are being pressured and

12   persuaded or demanded to do."  (I TR 35-36.)  Interrogators employ various psychological

13   techniques.  They include:

14       •  Falsely informing a suspect that the interrogators have evidence linking them to

15          the crime, to encourage admissions.  (Id. at 28.)  Leo testified that false evidence

16          ploys are often a "real problem in false confession cases."  (Id. at 29.)

17       •  Providing inducements to persuade a suspect that it is in their best interest to stop

18          denying.  (Id. at 30.)  Inducements can also appeal to morality or conscience.  (Id.

19          at 31.)

20       •  Minimizing the suspect's involvement to make the suspect think that if they

21          confess, the consequences will be minimal.  (Id. at 112.)

22       •  Maximizing the potential consequences as a threat for continuing to deny

23          involvement and not cooperating.  (Id. at 113.)

24   A suspect's cognitive and intellectual deficits and personality traits can make them more

25   vulnerable to psychological coercion.  (Id. at 37-38.)

26       Leo testified that interrogations can also be problematic when the interrogator discloses

27   non-public details about the crime, which are later repeated back by the suspect demonstrating

28   guilt.  (I TR 46-47.)

Leo stated that research has revealed that confessions are highly prejudicial.  (I TR 45.)
Most people assume someone would not confess unless they are guilty.  (Id. at 42-43, 45.)

With respect to Hayat's confession, Leo testified that he reviewed the videotaped portion
of the interrogation, the transcript of that recorded interrogation, and the testimony of agents
regarding what Hayat said during the unrecorded portions of the interrogations.  (I TR 52-53.)
Leo identified several risk factors for a false confession in this case.

First, he noted that interrogators falsely told Hayat that they had satellite imagery linking
him to a terrorist training camp in Pakistan in 2003.  (I TR 54.)   Second, he found that
interrogators "contaminated" the confession by disclosing non-public facts to Hayat which he
then repeated back.  (Id. at 55.)  Leo testified that he had reviewed the motion to vacate in this
case and recalled the factual summary of the interrogation at pages 54 to 64 of the motion.  (Id. at
62.)  Leo confirmed that the summary in Hayat's motion correctly listed the facts which were
propounded first by the interrogator before being spoken by Hayat.  (Id. at 62-63.)  He then
testified regarding a few specific examples where Hayat was "contaminated:"

- Shaaf stated that at the camp "there's clearly weapons training, there's explosives
  training that goes on."  Hayat responded "Yeah."  (EH Ex. OOO at 8.)
- After Hayat states that he would "do anything" "for my country" and "these guys
  are hurting our country a lot," Schaaf states:  "what they do at these camps that,
  what they're doing is teaching people how to kill American troops."  Hayat
  responds, "Of course."  (Id. at 16.)
- Shaaf is also the first one to bring up "crusaders" and "Jews" as being a focus of
  the violence being taught at training camps.  (Id. at 53.)
- Later, when Agent Harrison had taken over the interrogation, he tells Hayat, "you
  left with marching orders."  (Id. at 116.)  Leo testified that Harrison is stating his
  own theory of what occurred and telling Hayat.  (I TR 65.)

(See I TR 63-65.)

Leo testified regarding inducements by the interrogator in the initial part of the recorded
interview.  (I TR at 60-62.)  Agent Schaaf stated that he "understand[s] you have some

63

1    information that you've been providing about some things of uh importance to us. . . .  And so I

2    want to thank you initially for that." (EH Ex. OOO at 1.)  Hayat responded, "Oh that's my job for

3    my country you know."  (Id.)

4        Leo also testified that the videotaped confession shows Hayat was fatigued and sleep-

5    deprived.  (I TR 64, 72.)  Near the beginning of the recorded conversation, a little after 5:00 p.m.,

6    Hayat yawns and states he does not remember when he left for the camp.  He says he is tired and

7    jetlagged.  (EH Ex. OOO at 21.)  Near the end of the interrogation, Hayat is confused that he is

8    going to jail; he states that he just wants to lay down because his head "is hurting."  (Id. at 205.)

9    He tells interrogators his "mind is not working right now."  (Id. at 209.)

10       Leo testified that Hayat's requests to see his father and go home, which were effectively

11   denied, demonstrate a problem in false confessions that the suspect "understands that the only

12   way to put an end to the interrogation or to go home is to say what the interrogator is looking

13   for."  (I TR 66-67; EH Ex. OOO at 107.)

14       Leo next considered frequent statements made to Hayat that if he cooperated, interrogators

15   should be able to help him and "things are going to be a lot better for you."  (See EH Ex. OOO at

16   172.)  An interrogator also told Hayat, "If I'm gonna make an argument for you, who I, I think is

17   not an important part in this. . . .  I need you to tell me details about targets. . . . And, this is where

18   I need your memory to come back."  (Id. at 176.)  Leo testified that these statements show an

19   attempt by interrogators to suggest that there is a quid pro quo in exchange for confession.  (I TR

20   71-72.)

21       Asking Hayat whether he may have gone to a jihadist training camp thinking that he was

22   actually going to a religious education camp is an example of the minimization risk factor.  (I TR

23   113.)  Interrogators attempted to have Hayat admit he attended a camp by suggesting that Hayat's

24   intentions in going to a camp might be considered.[34]

---

25   [34] During the first several interviews/interrogations, Hayat denied attending a terrorist training
26   camp in Pakistan.  He first admitted attending a camp in response to the question identified by Dr.
     Leo as "minimization."  In the early, unrecorded portions of the June 4 interview, Agent Sweeney
27   asked Hayat whether it was "possible. . . that you didn't know that you were going to a jihadi
     training camp?  Is it possible that you may have thought it was something else, like a religious
28   education camp?"  (Feb. 16, 2006 RT 520-21.)  In response, Hayat told Sweeney that in 2000 he

In summary, Leo testified that the following risk factors for false confessions were present in the recorded portion of Hayat's interrogation: a false evidence ploy, inducements with the suggestion of benefits for cooperation, sleep deprivation, and the lengthy interrogation.   (I TR 72-73.)

### ii.   Is there a Reasonable Probability that Testimony like Dr. Leo's would have Affected the Verdict?

The court need not find that, standing on its own, there is a reasonable probability that Leo's testimony would have affected the verdict. Rather, the prejudice analysis requires the court to look at the cumulative effect of counsel's errors. Harris v. Wood, 64 F.3d 1432, 1438–39 (9th Cir. 1995). Above, the court finds Mojaddidi also erred in failing to procure alibi witness testimony. Both alibi witnesses and a false confession expert like Leo would have provided testimony attacking the reliability of Hayat's confession. Hayat's confession was the singularly most important piece of evidence the government put on. Without it, there is no question that the government would have been unable to obtain a conviction on the charge of material support for terrorism. As described above, the facts that the jury deadlocked at one point and that it took nine days to render a verdict favor a finding of prejudice.

This court finds it reasonably probable that the combined effect of Mojaddidi's errors affected the jury's verdict in Hayat's case.

### F.   Failure to Obtain Security Clearance

Hayat argues here that Mojaddidi unreasonably failed to obtain a security clearance or associate with counsel who already had security clearance. As a result, Mojaddidi was unable to obtain classified information or participate in proceedings in which the district court considered classified information.

Hayat argues at length that Mojaddidi's decision to neither apply for a security clearance nor seek the appointment of cleared counsel was not reasonable. The court finds those arguments persuasive. However, the court need not reach that issue because Hayat fails to establish that he

---

had intended on going to a religious education camp but on arrival discovered it was a jihadi training camp. (Id. at 500-501.) After several days there, he "escaped." (Id. at 501.)

1    suffered prejudice as a result of Mojaddidi's actions.  Hayat does not show what information

2    Mojaddidi would have been privy to if she had had a security clearance.

3            **1.  No Prejudice Shown from Lack of Foundational Documents for Balakot**
                **Photographs**

4

5            The Classified Information Procedures Act ("CIPA") establishes procedures for handling

6    classified information in a criminal case.  See 18 U.S.C. App. 3.  Attorney expert Cline testified

7    about the typical course in a criminal case involving classified information.  First, the government

8    will inform the court and defense counsel that CIPA will be implicated.  Under CIPA § 2, the

9    court may hold a status conference to "take a preliminary look at the classified information issues

10   that are going to come up in the case, and how those ought to be handled."  (II TR 253-54.)

11   Second, the court will enter a protective order under CIPA § 3 setting out the "ground rules for

12   the handling of classified information in the case."  (Id. at 254-55.)  Third, the government may

13   seek an ex parte, closed hearing under CIPA § 4 for a determination about whether certain

14   classified information is subject to disclosure to the defense.  (Id. at 262.)  As a result of the § 4

15   hearing, the court may determine that the information need not be provided to the defense, that

16   the information must be provided but an unclassified substitute is appropriate, or that the

17   classified information must be provided.  (Id. at 264.)  Fourth, if either party intends to use

18   classified information at trial, it informs the court by issuing a notice under CIPA § 5.  (Id. 256-

19   57.)  The court would then hold an in camera hearing under CIPA § 6 if the issue arose pretrial or

20   under CIPA § 8 if it arose during trial to determine the "use, relevance, or admissibility" of

21   classified information.  (Id. at 257-60.)  Only attorneys with a security clearance may participate

22   in §§ 6 and 8 hearings.  (Id.)  Finally, where the defense seeks to introduce classified evidence

23   and the court determines an unclassified substitution is not adequate, the government will be

24   forced to choose between revealing the classified information in court or refusing to disclose it.  If

25   it refuses, the court "can impose a range of sanctions on the government proportionate to the

26   importance of the [undisclosed] information."  (Id. at 259.)  Sanctions range from "deeming a

27   particular fact admitted, all the way up to dismissal of the indictment."  (Id. at 260.)

28

1        The government in the present case sought to have a hearing under § 6 of CIPA just once.

2    In December 2005, the government advised the defense by letter that it possessed inculpatory

3    materials which it would offer at trial, and that documents foundational to those materials would

4    be presented to the court in a hearing under CIPA § 6.  (EH Ex. OO.)  The government warned

5    that "defense counsel must obtain security clearances at once as it is clear that the parties must

6    engage in litigation that entails information protected under CIPA."  (Id.)  However, even though

7    they knew CIPA issues would arise in this case, Mojaddidi testified that she and Griffin made no

8    effort to obtain a security clearance.  (IV TR 749-50.)  They felt the process would be too time-

9    consuming and would interfere with their rush-to-trial strategy.  (Id. at 750.)

10        In January 2006, the government requested the court hold the § 6 hearing to consider the

11    admissibility of classified documents that were foundational to four aerial photographs of the

12    Balakot area that would be discussed by defense department analyst Benn.  (ECF No. 139; see

13    also Mot. to Vacate at 44 n. 37 (ECF No. 531-1 at 54 n. 37).)  At a hearing on the government's

14    motion, the government expressed concern, as did the district judge, that despite knowing the case

15    involved CIPA materials, the defense attorneys had not sought security clearances.  Therefore, the

16    defense attorneys could not be involved in any § 6 proceeding.  (See Trans. of Jan. 27, 2006 Hrg.

17    (ECF No. 398).)  In addition, as the government pointed out, it could seek to limit cross-

18    examination that might venture into classified information territory under CIPA § 8.  (Id.)  The

19    issue was resolved when defendants and their counsel stipulated to admission of the four Balakot

20    photographs and relinquished their right to participate in any in camera discussions held during

21    trial about classified materials.  (See Trans. of Feb. 3, 2006 Hrg. (ECF No. 519).)

22        Hayat argues that had Mojaddidi had access to these foundational documents, she could

23    have challenged the foundation for the Balakot photographs.  Yet, Hayat does not explain what

24    those documents would have revealed.[35]  Therefore the court has no way to determine whether a

25    challenge to the Balakot photographs might have been successful.  Hayat does not establish

26    prejudice.

---

[35] This court recognizes that Hayat attempted to obtain this information through discovery.  His
discovery motion was ultimately denied.  (See Jan. 9, 2018 Order (ECF No. 686).)

**2.  No Prejudice Shown from Foregoing the Right to Ask Questions at Trial**

As described above, on February 3, 2006, shortly before trial, both Umer and Hamid Hayat signed a stipulation that their attorneys could be excluded from all hearings on classified information.  (ECF No. 179.)  Hayat now points to three occasions during trial where a CIPA objection was made and Mojaddidi did not pursue a line of questioning.  He argues that he was prejudiced by her inability to ask further questions.

First, Mojaddidi asked FBI agent Schaaf whether he knew of "any secretly recorded conversations besides those that Naseem Khan recorded of Hamid Hayat."  (Apr. 4, 2006 RT 3628.)  The prosecutor objected "on 401, 403 grounds, and also CIPA."  The district judge sustained the objection "on 403 grounds because of the way its worded.[36]"  (Id. at 3629.)  Mojaddidi then followed up by asking Schaaf whether Hayat was the target of any other FBI investigations.  The prosecutor informed the judge that he had the "same objection.  401.  403 insofar as  --."  Mojaddidi then withdrew the question.  (Id.)  Because the district judge did not rule on CIPA grounds, the sustained objection to the first question did not implicate Mojaddidi's failure to obtain a security clearance.  Whether she withdrew the second question based on CIPA concerns is not known.  Hayat fails to make any connection between this line of questioning and Mojaddidi's failure to obtain a security clearance.  Moreover, even if he did, he makes no showing where the line of questioning would have lead.  The court cannot conduct a prejudice analysis without knowing that information.

In the second instance identified by Hayat, Mojaddidi asked defense department analyst Benn whether in reviewing the images of the Balakot area he confirmed the existence of militant training camps in that area.  The prosecutor interposed an objection:  "Under Rules 401 and 403.  And it also may call for the disclosure of classified information."  Mojaddidi responded, "That's fine.  I'll move on."  (Mar. 28, 2006 RT 3083.)  Hayat fails to show, again, what information

////

---

[36] Federal Rule of Evidence 403 permits the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

1    would have been gained had Mojaddidi not given up this line of questioning.  Hayat presents no

2    basis to analyze any prejudice resulting from Mojaddidi's decision here.

3              Finally, Mojaddidi asked Benn whether anyone from the United States government had

4    visited the location depicted in the satellite photographs introduced during his testimony.  The

5    prosecutor objected based on "Relevance. 403.  And may call for the disclosure of classified

6    information."  The district judge sustained the objection.  Mojaddidi did not attempt a follow-up

7    question.  (Mar. 28, 2006 RT 3105.).  Again, Hayat argues that Mojaddidi abandoned this line of

8    questioning based on the possible CIPA issues.  Because the question was focused on the Balakot

9    area at issue, this court finds it fair to infer that Mojaddidi made the decision based on CIPA

10   concerns.

11             The next question, then, is what Mojaddidi would have discovered had she been permitted

12   to obtain an answer.  Hayat presents the government's responses to interrogatories propounded in

13   this § 2255 action.  In response to Hayat's question about what steps the government took to

14   determine whether the Balakot location was "functioning as a jihadi training camp in 2003 and

15   2004," the government responded as follows:

16             The United States construes this interrogatory as seeking information
             regarding what the team that investigated and prosecuted the
17             petitioner, as defined by the Court, did to determine whether the
             BALAKOT camp was functioning as a militant or jihadi camp in
18             2003 and 2004. Neither the prosecutors, the investigating agents, nor
             the expert witness traveled to Pakistan to attempt to inspect the
19             BALAKOT camp. During the Hayat criminal case, the United States
             fully complied with its obligations under Brady v. Maryland, 373
20             U.S. 83 (1963), to produce exculpatory information.

21   (ECF No. 645-2 at 5.)  Hayat argues that the fact no prosecutors, investigating agents, or expert

22   witnesses inspected the Balakot camp "would have been powerfully exculpatory."  This court

23   disagrees.

24             The government's showing about the existence of a jihadi camp near Balakot was based

25   solely on satellite images.  And, the testimony was not strong.  Benn was 50% certain the images

26   showed a camp.  (Mar. 28, 2006 RT 3062, 3102.)  His opinion increased to 60 or 70% when he

27   considered Hayat's confession.  Further, Mojaddidi asked Benn whether he had gone to the

28   ////

1   Balakot location.  He testified that he had not gone there and, further, that he had not spoken to

2   anyone who had personally visited the Balakot location.  (Mar. 28, 2006 RT 3083-84; 3105.)

3   Thus, the information Hayat now contends would have been provided if Mojaddidi had

4   further questioned Benn was, in fact, provided to the jury at trial.  The jury was aware that Benn's

5   testimony did not rely on any on-site investigation of the Balakot location.  Mojaddidi stressed

6   that fact in her closing argument.[37]

7   Hayat fails to show prejudice based on Mojaddidi's abandonment of lines of questions

8   potentially implicating CIPA issues.

9   **G.   Failure to Challenge Dr. Mohammed's Testimony re the Supplication**

10   Mohammed testified for the prosecution at trial that the supplication found in Hayat's

11   wallet would only have been carried by a jihadi.  Hayat makes numerous arguments about

12   Mojaddidi's handling of Mohammed's testimony: (1) she failed to move to preclude

13   Mohammed's testimony prior to trial; (2) she failed to adequately cross-examine Mohammed; (3)

14   she failed to procure an appropriate expert to rebut Mohammed's testimony; and (4) she failed to

15   object to the prosecutor's misstatement of Mohammed's testimony in his closing argument.

16   At trial, Mohammed testified that he is an Islamic Studies professor at San Diego State

17   University.  (Mar. 14, 2006 RT 1925.)  He also served as an imam on several occasions.  (Id. at

18   1933.)  He testified that he has training in reading classical Arabic.  (Id. at 1927.)  Mohammed

19   testified that he has experience interpreting supplications.  He defined a "supplication" as a

20   Muslim's plea or petition to God asking for something.  (Id. at 1933.)  In Arabic, a supplication is

21   called a "du'a."  (Id. at 1973-74.)

22   Mohammed described his process for interpreting a supplication.  First, he would check

23   significant words from the supplication in a "concordance," which would tell him in which

24   Hadith the word is found or whether it is found in the Koran.  (Mar. 14, 2006 RT 1935.)  He

25   defined the Hadith as the words of Mohammed as reported by his companions.  It contains the

26

---

27   [37] Mojaddidi argued, "The U.S. Government has a legal attaché office of FBI agents in Pakistan.
Why didn't they produce a witness who could visit that location and come tell you what it is?"

28   (Apr. 12, 2006 RT 4329.)

1    "oral traditions" of Islam.  (Id. at 1934.)  He described the Koran as the word of God as told to

2    Mohammed.  (Id.)

3         Mohammed testified that his next step would be to go to the sources of the textual

4    references.  (Mar. 14, 2006 RT 1936.)  Following that, he would look to commentaries which

5    explain these references in the Koran or Hadith.  (Id.)  Then, after forming an opinion about the

6    meaning of the supplication, he would consult scholars "to see if they have any objections, if they

7    have any points to add, or question, in my interpretation."  (Id.)  These are the steps he took to

8    interpret the supplication at issue here.  (Id.)

9         Mohammed translated the supplication as "Oh Allah we place you at their throats and we

10   seek refuge in you from their evils."  (Mar. 14, 2006 RT 1970.)  He opined that the supplication

11   was probably written for a non-Arabic speaker because "there are several diacritics, almost in

12   every single letter, to guide someone in pronunciation of the words."  (Id. at 1971.)  He defined

13   "diacritic marks" as "letters that are placed above or below, or part on the script, to help non-

14   Arabs pronounce the words properly."  (Id. at 1972.)

15        Mohammed then testified that his research showed that the supplication is "not peaceful."

16   (Mar. 14, 2006 RT 1974.)  "[J]ust about every commentary I checked puts it in a case where

17   someone who is in jihad makes this supplication, someone who is at war with a perceived

18   enemy."  (Id.)  When asked what kind of person would carry this supplication, Mohammed

19   responded, "A person who perceives him or herself as being engaged in war for God against an

20   enemy."  (Id. at 1974-75.)

21        Mohammed described the two sources and the five commentaries he found for the

22   supplication.  (Mar. 14, 2006 RT 1975-87.)  He testified repeatedly that they showed that only a

23   jihadi would carry this supplication.  (Id. at 1988 ("the person making . . . this supplication has to

24   be involved in jihad"); 1989 (references to the supplication with respect to travel mean "travel is

25   only when you are going forth to wage jihad"); 2007 (if the supplication is a "ta'wiz," an "amulet

26   used as protection against evil," then only a jihadi would use it); 2008 (the supplication would

27   only be used during Friday prayers if the person delivering the sermon "perceives himself to be in

28   jihad against someone or some people"); 2018 (a person carrying this supplication would

71

"perceive[] himself to be carrying out one of the obligations of jihad, that he was involved in what he deemed to be jihad"); 2019 (a person carrying this supplication in his wallet "was in the act of being a warrior, which means the readiness [to commit an "act of warfare"] is at all times").

On cross-examination, Mojaddidi questioned Mohammed about the colleagues he contacted about the supplication. He identified seven. She then asked him about the e-mails he received from six of these colleagues.[38] Mojaddidi described the following statements from each e-mail and asked whether Mohammed felt that the statement supported his opinion that only a jihadi would carry the supplication:

- Dr. Farouk stated that he was unaware of the supplication. (Mar. 15, 2006 RT 2070.)

- Professor Huda was also unaware of it. (Id. at 2071.)

- Mr. Saaleh stated that he had "not noticed any special importance given to the du'a in any of the regions of Pakistan." (Id. at 2072.)

- Dr. Chattha responded that he tried to get some "reasonable answer but failed because, one, there is no Pakistani imam in Perth. Two, yes, it is a du'a, but no group can be identified in Pakistan using this du'a for any purpose including ta'wiz." (Id. at 2073.)

- Professor Ansari told Mohammed that he had "[o]ccasionally" "heard of it in the post Friday prayer du'a." (Id. at 2074.)

- Ms. Gulfiya contacted a person who was "second in command to a mufti" in Uzbekistan. That person told her that "this du'a is commonly used by our people, and when a person is saying it he is asking for help from Allah from alien atrocity or asking for an aid from Allah from attack of enemies." (Id. at 2075-76.)

Mohammed conceded that each of these statements did not directly support his conclusion. (Mar. 15, 2006 RT 2070-76.)

---

[38] Mojaddidi did not directly question Mohammed about his contacts with another colleague, Professor Subhy. She attempted to demonstrate that Subhy, who identified the du'a as being associated with terrorist organizations, was fired from his university job. The district court sustained objections based on the relevance of those questions. (Mar. 15, 2006 RT 2076-78.)

On redirect examination, Mohammed testified that Mojaddidi had questioned him about only "parts" of the e-mails. (Mar. 15, 2006 RT 2085.) The prosecutor then asked whether some of the individuals he consulted provided context for the supplication. Mohammed responded that they had. (Id.) The prosecutor specifically referenced the e-mail from Gulfiya, which included the imam's opinion that the supplication is "used when one is dealing with a perceived enemy." (Id. at 2087.) The prosecutor also pointed to Professor Subhy's opinion that the supplication is used by "fanatics and extremists." (Id. at 2089-90.)

On re-direct, Mohammed identified just three of the people he contacted as "scholars." They were Subhy, Ansari, and Saaleh. (Mar. 15, 2006 RT 2092.) He testified that those scholars "supported [his] opinion." (Id.) The other people he contacted were lay people and community members who would know "what is common and what is not common." (Id. at 2093.) He testified that the lay opinions he received were also "consistent with [his] opinion" because they all told him it was not common. Rather, "[i]t is something almost secretive." (Id.) Therefore, Mohammed felt the supplication must be used by a "specific group of people." (Id. at 2095.)

On re-cross, Mojaddidi asked Mohammed whether all three scholars in fact supported his interpretation of the supplication. Mohammed agreed that Saaleh said he did not recognize any special significance with the supplication. (Mar 15, 2006 RT 2109.) And he agreed that Ansari only said he had "occasionally heard of the prayer." (Id. at 2110.)

### 1. Failure to Move to Preclude Mohammed's Testimony

Hayat argues that Mojaddidi should have sought to preclude admission of Mohammed's testimony on two grounds: (1) that Mohammed did not qualify as an expert under Federal Rule of Evidence 702 because his testimony exceeded the scope of his experience and because it was unreliable; and (2) that Mohammed's testimony ran afoul of Rule 704(b), which prohibits expert testimony on the mental state of the defendant.

The government argues that the Ninth Circuit found no error on either of these grounds on appeal. Therefore, the argument continues, under the law of the case doctrine, Hayat cannot show he was prejudiced by Mojaddidi's failures. In reply, Hayat argues that because Mojaddidi did not object at trial, the Ninth Circuit reviewed these issues only for plain error, a very different

1    standard than the Sixth Amendment standards relevant here, and therefore the law of the case

2    doctrine is inapplicable.

3                                    **a.  Background**

4          On appeal, Hayat argued that the district court erred when it permitted Mohammed to

5    testify about the meaning and implications of the supplication.  Hayat raised the Rules 702 and

6    704 arguments that he now contends Mojaddidi should have made at trial.  The Ninth Circuit first

7    noted that because Mojaddidi did not object at trial, the court was limited to reviewing admission

8    of the testimony for plain error.  Hayat, 710 F.3d at 900 (citing United States v. Reese, 2 F.3d

9    870, 892 (9th Cir. 1993).)  The Ninth Circuit has defined plain error as a "'highly prejudicial error

10   affecting substantial rights.'"  United States v. Lopez-Cavasos, 915 F.2d 474, 476 (9th Cir. 1990)

11   (quoting United States v. Morris, 827 F.2d 1348, 1350 (9th Cir. 1987)).

12         With respect to the Rule 702 argument, the Ninth Circuit held as follows:

13             In 2006, Rule 702 provided:

14                     If scientific, technical, or other specialized knowledge will
                       assist the trier of fact to understand the evidence or to
15                     determine a fact in issue, a witness qualified as an expert by
                       knowledge, skill, experience, training, or education, may
16                     testify thereto in the form of an opinion or otherwise, if (1)
                       the testimony is based upon sufficient facts or data, (2) the
17                     testimony is the product of reliable principles and methods,
                       and (3) the witness has applied the principles and methods
18                     reliably to the facts of the case.

19             Mohammed's analysis of the meaning of the supplication was well
               within the scope of his expertise. Mohammed is a professor of
20             Islamic studies at San Diego State University and has earned several
               advanced degrees in the field. He is fluent in both modern and
21             classical Arabic and has served as an imam at a mosque in the United
               States. Mohammed testified that he had interpreted between 50 and
22             500 supplications and that he had interpreted Islamic texts "from a
               faith-based perspective, as well as from an academic perspective."
23
               Mohammed also used reliable methods. To interpret the supplication,
24             he relied on (1) his own extensive knowledge of Arabic and Islamic
               law, (2) a thorough review of relevant Islamic source materials, and
25             (3) the opinions of other academics and religious scholars. At trial,
               Mohammed testified in detail about his methods.
26
               We reject Hayat's arguments that because Mohammed was not an
27             expert on Pakistani culture and did not speak Urdu (the national
               language of Pakistan), he was unqualified to offer his opinions about
28             the note found in Hayat's wallet. Mohammed did not testify about

                                               74

1
2
3

Pakistani culture or anything written in Urdu. He testified about the meaning of an Islamic supplication written in Arabic, a topic squarely within his expertise. The district court did not err in admitting Mohammed's testimony under Rule 702.

4 710 F.3d at 900-01.

5       In considering Hayat's second argument regarding Rule 704, the Ninth Circuit first set out

6 the language of the rule and a summary of Mohammed's relevant testimony:

7
8
9
10
11
12

In 2006, that Rule provided: "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Mohammed testified that the "kind of person" who would carry the note found in Hayat's wallet was "[a] person who is engaged in jihad"; that such a note would be used "[b]y people who perceive themselves in a state of war"; and that a person who carried such a note "was in the act of being a warrior."

13 Id. at 901.  The majority noted that it "might well agree with the dissent . . . that these and similar

14 statements made by Mohammed could be held to have violated Rule 704(b) were we considering

15 the scope of that rule ab initio."  Id.  However, the Ninth Circuit went on to hold that because its

16 precedent "has interpreted that rule much more narrowly than its text might indicate," it was

17 compelled, particularly in light of the plain error standard, to hold that the district court did not err

18 in admitting the testimony.

19
20
21
22
23
24
25
26
27

Under our precedent, Rule 704(b) "does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, 'so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.'" United States v. Younger, 398 F.3d 1179, 1189 (9th Cir.2005) (quoting United States v. Morales, 108 F.3d 1031, 1038 (9th Cir.1997)). In Younger, for example, the jury was required to decide whether the defendant possessed cocaine base with the intent to distribute it. An expert witness for the prosecution testified that "[t]he person, individual, whoever possessed this, possessed it for the purposes of selling." Id. (emphasis removed). We upheld the admission of the testimony because "the expert never directly commented on defendant's mental state, and the jury could have accepted his testimony and still infer that defendant was atypical." Id. at 1190.

28

Similarly, in United States v. Gonzales, we held that expert testimony that a "person [who] was carrying those items [was carrying them]

75

for the purpose of distributing the drugs" did not violate Rule 704(b) because "[e]ven if the jury believed the expert's testimony, the jury could have concluded that [the defendant] was not a typical or representative person, who possessed the drugs and drug paraphernalia involved." 307 F.3d 906, 911 (9th Cir. 2002); *see also United States v. Anchrum*, 590 F.3d 795, 804–05 (9th Cir. 2009) (affirming, in a case where the defendant was charged with the possession of firearms in furtherance of drug trafficking, the district court's admission of expert testimony that "if you're driving around with a loaded weapon and you have narcotics in your car, ... [y]ou're either going to use [the weapon]" to get away from law enforcement, as protection against getting "rip[ped] ... off" in a drug deal gone bad, or to protect money earned through drug deals); *United States v. Gomez–Norena*, 908 F.2d 497, 501–02 (9th Cir. 1990) (holding that it was not plain error for the district court to admit an expert's testimony that it was his "opinion" that "approximately $200,000 worth of cocaine" was "possess[ed] with intent to distribute" and not for "personal use").

Here, Mohammed testified about the kind of person who would carry a note such as the one found in Hayat's wallet, but he never commented directly on Hayat's mental state. Mohammed's testimony about the typical "person" carrying the supplication is indistinguishable in its degree of precision from the expert testimony found admissible in *Younger* and *Gonzales*. Therefore, if the district court erred at all in admitting the testimony, such error certainly was not plain, given our precedents limiting Rule 704(b) essentially to a semantic preclusion. Thus, while we might like to agree with Judge Tashima that the expert evidence in this case crossed the Rule 704(b) line, we are prevented from doing so by this court's caselaw.

Id. at 901-02.

### b.  Legal Standards

### i.      Federal Rule of Evidence 702

The version of Rule 702 applicable at the time of trial is set out above in the Ninth Circuit's opinion.  Briefly, an expert must be "qualified" based on "knowledge, skill, experience, training, or education."  That expert may testify in the form of an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

The trial court serves a special "gatekeeping" function with respect to Rule 702.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).  The trial court must make an initial assessment of the proposed expert testimony to ensure that it "rests on a reliable foundation and is

76

1  relevant to the task at hand." <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993).

2  In other words, the trial court must consider (1) whether the reasoning or methodology underlying

3  the expert testimony is valid (the reliability prong); and (2) whether the reasoning or methodology

4  can be applied to the facts in issue (the relevancy prong).  <u>See id.</u> at 592-93.

5         To determine the reliability of expert testimony, the Supreme Court identified four factors

6  that a trial court may consider: "(1) whether the 'scientific knowledge...can be (and has been)

7  tested'; (2) whether 'the theory or technique has been subjected to peer review and publication';

8  (3) 'the known or potential rate of error'; and (4) 'general acceptance.'"  <u>Obrey v. Johnson</u>, 400

9  F.3d 691, 696 (9th Cir. 2005) (quoting <u>Daubert</u>, 509 U.S. at 593–94).  These factors, however, are

10  not exclusive.  <u>See</u> <u>Kumho Tire</u>, 526 U.S. at 150 ("<i>Daubert</i> makes clear that the factors it

11  mentions do not constitute a definitive checklist or test." (Citation and internal quotation marks

12  omitted.)).  Rather, the trial court enjoys "broad latitude" in deciding how to determine the

13  reliability of proposed expert testimony.  <u>Id.</u> at 141–42.  As to relevancy, the Supreme Court has

14  explained that expert testimony is relevant if it assists the trier of fact in understanding evidence

15  or determining a fact in issue in the case.  <u>Daubert</u>, 509 U.S. at 591.

16              **ii.    Federal Rule of Evidence 704(b)**

17         Rule 704(b) "'limits [an] expert's testimony by prohibiting him from testifying as to

18  whether the defendant had the mental state or condition that constitutes an element of the crime

19  charged.'"  <u>United States v. Finley</u>, 301 F.3d 1000, 1015 (9th Cir. 2002) (quoting <u>United States v.</u>

20  <u>Morales</u>, 108 F.3d 1031, 1035 (9th Cir. 1997)).  The "rationale for precluding ultimate opinion

21  testimony applies . . . 'to any ultimate mental state of the defendant that is relevant to the legal

22  conclusion sought to be proven.'"  <u>United States v. Campos</u>, 217 F.3d 707, 711 (9th Cir. 2000).

23  "However, Rule 704(b) allows expert testimony on a defendant's mental state so long as the

24  expert does not draw the ultimate inference or conclusion for the jury."  <u>Finley</u>, 319 F.3d at 1015

25  (citing <u>Morales</u>, 108 F.3d at 1037-38); <u>see also</u> <u>United States v. Freeman</u>, 498 F.3d 893, 906-07

26  (9th Cir. 2007) (expert opinion on common practices of drug traffickers admissible so long as

27  expert does not opine that this defendant had the requisite criminal intent).

28  <i>////</i>

1

### iii.  Law of the Case

2
The law of the case doctrine generally precludes a court from reconsidering an issue that

3
has been previously decided by the same court, or a higher court in the same case.  United States

4
v. Alexander, 106 F.3d 874, 877 (9th Cir. 1997).  For law of the case to apply, "the issue in

5
question must have been decided either expressly or by necessary implication in the previous

6
disposition."  Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993) (internal quotations and

7
punctuation omitted) (quoting Milgard Tempering, Inc. v. Selas Corp. of America, 902 F.2d 703,

8
715 (9th Cir. 1990)).  While courts have some discretion not to apply the doctrine of law of the

9
case, that discretion is limited.  Thomas, 983 F.2d at 155 (citing Merritt v. Mackey, 932 F.2d

10
1317, 1320 (9th Cir. 1991)).  The Ninth Circuit has identified five circumstances in which a court

11
may reopen a previously resolved question: "(1) the first decision was clearly erroneous; (2) an

12
intervening change in the law has occurred; (3) the evidence on remand is substantially different;

13
(4) other changed circumstances exist; [or] (5) a manifest injustice would otherwise result."  Id.

14
(citing Milgard, 902 F.2d at 715).

15

16

### iv.  Does a Plain Error Determination have Preclusive Effect on Collateral Review?

17
Hayat argues the law-of-the-case doctrine is inapplicable because the Ninth Circuit

18
reviewed these issues only for plain error.  However, neither Hayat, nor the government, provided

19
this court with much legal authority to determine whether a plain error determination has

20
preclusive effect on collateral review.  The government simply argues that issues raised on appeal

21
may not be raised again in a motion to vacate.  Hayat simply argues, without citation to authority,

22
that the plain error standard used by the Ninth Circuit is not the same as the ineffective assistance

23
of counsel standard used on collateral review.  Therefore, Hayat continues, the Ninth Circuit's

24
decisions on these issues do not preclude this court from considering them here.

25
This court found several cases in which courts have considered the question presented

26
here – whether a determination that there was no plain error on appeal precludes a subsequent

27
ineffective assistance of counsel claim on collateral review.  In the first case, the Fourth Circuit

28

1    analyzed this question with regard to the district court's designation of the defendant as a career

2    offender. United States v. Carthorne, 878 F.3d 458 (4th Cir. 2017). On direct appeal, the Fourth

3    Circuit had held that the district court's decision was incorrect. "Nevertheless, [the court] held

4    that the district court did not plainly err in applying the career offender enhancements because

5    existing precedent did not require the conclusion" made by the Court of Appeals. Id. at 463. The

6    Fourth Circuit noted that at the time of trial, there was a circuit split on the issue. Id.

7         In his motion to vacate, defendant Carthorne argued his counsel was ineffective for failing

8    to object to the career offender designation at trial. The court then considered "whether

9    application of the plain error standard and the ineffective assistance of counsel standard ordinarily

10   requires equivalent outcomes." Id. at 464. After reviewing the bases and purposes of both legal

11   standards, the court held that it did not. Id. at 466. The court then went on to find that

12   defendant's trial attorney should have known that the precedent on the career offender issue

13   "raised serious questions" about whether it was applicable to his client's crime. Id. at 469.

14   Further, the court found a "reasonable probability" that had counsel objected, the district court

15   would not have applied the career offender enhancement. Id. at 469-70. On that ground, the

16   court granted the defendant's § 2255 motion.

17        While it did not grapple with the issue like the Fourth Circuit did in Carthorne, the Ninth

18   Circuit in United States v. Span, did not apply a plain error finding made on appeal to an

19   ineffective assistance of counsel claim on collateral review. 75 F.3d 1383 (9th Cir. 1996). On

20   appeal, the defendant had raised the issue of instructional error. The Ninth Circuit held there that

21   the instruction was erroneous but that the district court did not plainly err. United States v. Span,

22   970 F.2d 573, 577-78 (9th Cir. 1992). On collateral review, the Ninth Circuit found defense

23   counsel unreasonably failed to object to the instruction at trial and that that failure prejudiced the

24   defendant. 75 F.3d at 1389-90.

25        In 2015, a judge of this court considered the issue, but used a somewhat different analysis.

26   In Ioane v. United States, the government argued that many of the defendant's ineffective

27   assistance of counsel claims in his motion to vacate were procedurally barred because their

28   underlying grounds had been raised and rejected on appeal. No. 1:09-cr-142-LJO, 2015 WL

79

1    2238669, at *1 (E.D. Cal. May 12, 2015).  Judge O'Neill considered the government's argument

2    under the law of the case doctrine.  He found some of the defendant's claims were not identical,

3    and therefore, not procedurally barred.  Id. at *4 n.6 ("The Ninth Circuit's previous decision in

4    this case concerned some, but not all of the periods of time that Petitioner claims were improperly

5    excluded.  As such, the law of the case does not bar Petitioner's pending arguments entirely

6    because the Ninth Circuit did not address them explicitly or by necessary implication.")

7    However, Judge O'Neill did examine the Ninth Circuit's reasoning on other claims.

8         Specifically, Judge O'Neill considered the petitioner's argument that counsel was

9    ineffective for failing to object to an instruction.  He first looked to the Ninth Circuit's decision

10   on appeal.  There, the Court of Appeals held, reviewing for plain error, that the instruction was

11   erroneous but not prejudicial - "'[e]ven assuming that the instructional error affected

12   [Petitioner's] substantial rights, the overwhelming and convincing evidence, including detailed

13   testimony from [Petitioner's] alleged co-conspirator, demonstrates that a different decision by the

14   jury would be 'extremely unlikely.'"  Id. at *5 (quoting United States v. Ioane, 524 F. App'x 383,

15   385 (9th Cir. 2013)).  Judge O'Neill stated that he "agree[d] with the Government that

16   Petitioner's '[c]ounsel's failure to object to the instruction did not prejudice [Petitioner] in light of

17   the overwhelming evidence presented at trial as noted by the Ninth Circuit.'"  Id. at *6.  He found

18   the petitioner's argument was "barred under the law of the case."  Id.

### c.  Analysis

#### i.      Rule 702 Issues

21        Hayat first goes through the bases for a challenge to Mohammed's qualifications to testify

22   about a supplication carried by a Pakistani American.  He argues that Mohammed does not have

23   experience or expertise in Pakistani religious culture, including the practice of carrying ta'wiz.  In

24   addition, Mohammed had no personal knowledge of the supplication.  Instead, he based his

25   opinion about its meaning and context on e-mail consultations with colleagues.

26        Hayat then argues that Mohammed's testimony was insufficiently reliable because his

27   opinion that only a jihadi would carry this supplication was not based on his independent research

28   about the religious and cultural practices of Pakistani Muslims, but was based solely on research

1     conducted to testify at trial.  In addition, Hayat argues that the research Mohammed conducted

2     did not support his conclusion.  The government argues the Ninth Circuit's decision on Hayat's

3     Rule 702 claim on appeal is dispositive of this claim.

4            Hayat contends the law of the case doctrine is inapplicable because the Ninth Circuit

5     reviewed for plain error.  He further argues that because Mojaddidi did not raise these issues at

6     trial, there is no record on appeal.  However, it appears that most, if not all, of Hayat's arguments

7     on the Rule 702 issue are available in the record.  In her cross-examination of Mohammed,

8     Mojaddidi pointed out conflicts between statements made by the colleagues Mohammed

9     questioned and Mohammed's testimony.  These are many of the same conflicts that Hayat now

10    argues would have provided a basis for a challenge to Mohammed's qualifications and the

11    reliability of his testimony.  Hayat does not explain how any additional argument he makes now

12    on collateral review changes the essential nature of the Rule 702 issue he raised on appeal.

13           The Ninth Circuit's conclusion about whether or not the district judge erred in qualifying

14    Mohammed as an expert was made under the "plain error" standard.  However, the Ninth

15    Circuit's predicate findings make no mention of that standard and are stated without any

16    reservation – Mohammed's testimony about the meaning of the supplication was "squarely within

17    his expertise" and he "used reliable methods."[39]  710 F.3d at 900, 901.  This court finds nothing

18    in Hayat's current argument to cause this court to reject those findings.

19           Whether or not the law of the case doctrine is technically applicable, this court's

20    determination is consistent with the Courts of Appeals' analyses in <u>Carthorne</u> and <u>Span</u>.  In both

21    of those appellate cases, the courts made a predicate finding of error, but held that those errors did

22    not rise to the level of plain error.  When considering the ineffective assistance of counsel claims

23    on collateral review, the courts looked to the predicate finding of error on appeal to hold that

24    defense counsel was unreasonable in failing to raise the issue at trial and that the defendant was

25    prejudiced by that failure.  This analysis works here as well.  The Ninth Circuit found

26

27    [39] The Ninth Circuit's finding does not mean, however, as discussed below, that all of
      Mohammed's testimony was appropriate.  It means only that Mohammed was qualified to testify
28    about the meaning of the supplication.

1    Mohammed satisfied the requirements of Rule 702.  Whether or not Mojaddidi acted

2    unreasonably in failing to challenge Mohammed's qualifications, Hayat fails to show a reasonable

3    probability the district court would have granted any motion challenging Mohammed's

4    qualifications or methods.

5         The district court should deny Hayat's ineffective assistance of counsel claim based on

6    Rule 702 because Hayat fails to show prejudice.

7                    **ii.      Rule 704 Issues**

8         Hayat's argument that Mojaddidi should have challenged Mohammed's testimony on

9    Rule 704 grounds is on very different footing.  The Ninth Circuit indicated that the question was a

10   close one, discussed the fact that it tended to find the dissent's analysis correct, and concluded

11   that the plain error doctrine required it to reject Hayat's 704 claim.  In fact, the majority declined

12   to specifically hold that there was no error at trial.  It stated, "if the district court erred at all in

13   admitting the testimony, such error certainly was not plain."  710 F.3d at 902.

14        The fact that the majority drew one conclusion and the dissent another highlights the lack

15   of clear authority regarding violations of Rule 704.  The majority examined four prior Ninth

16   Circuit opinions in which panels concluded that testimony similar to Mohammed's was

17   permissible under Rule 704.  For example, in a prosecution for possession of cocaine with intent

18   to distribute, the majority approved the testimony of an expert that the person who possessed

19   those drugs "possessed it for the purposes of selling," Younger, 398 F.3d at 1189; and in a similar

20   prosecution, it approved testimony that the person carrying the drugs did so "for the purpose of

21   distributing the drugs," Gonzalez, 307 F.3d at 911.

22        In dissent, Judge Tashima set out important distinctions between Younger and Gonzales

23   and the present case.  In both prior cases, the experts' conclusions allowed a juror to accept the

24   expert testimony and still infer that the defendant was outside that norm.  The court in Younger

25   recognized that the expert's testimony that the person possessing the drug "possessed it for the

26   purpose of selling it" was close to "Rule 704(b)'s line of prohibition."  398 F.3d at 1189.

27   However, the court felt that a jury could believe that testimony and still find the defendant was

28   "atypical."  Id.  In Gonzales, the expert testified that his opinion that the quantity of drugs

1    possessed indicated intent to distribute was "extremely firm."  307 F.3d at 911.  Again, the court

2    concluded that a jury could have believed that testimony and still found the defendant "was not a

3    typical or representative person."  Id.

4         The difference in the present case is that Mohammed's testimony left no room for dispute.

5    He testified without qualification that "the person making . . . this supplication has to be involved

6    in jihad."  Judge Tashima pointed out that there was "no wiggle room" in that statement.  710

7    F.3d at 913.  Mohammed's testimony was thus the "'functional equivalent' of an opinion that

8    Hayat had the requisite intent to provide material support for terrorism – because he could not be

9    anything other than a 'jihadist.'"  Id.

10        Judge Tashima described a second difference between the Younger line of cases and the

11   present case.  In those cases, the experts were "law enforcement officers experienced in

12   investigating the drug trade and related crimes.  These officers testified about the signature

13   accouterments of the drug trade and the modus operandi of drug dealers."  710 F.3d at 913.  In the

14   present case, by contrast, Mohammed did not have the qualifications to testify about the "modus

15   operandi of Islamic terrorists.  Notwithstanding his lack of expertise in that field, he opined on

16   what was in the heart and mind of a person who would carry a written prayer in his wallet."  Id.

17   Judge Tashima concluded that this inflammatory expert testimony usurped the jury's role as the

18   finder of fact and its admission at trial was plain error.  Id. at 915.

19        Again, relying on the analyses in Carthorne and Span, this court finds the split of opinion

20   in Hayat's appeal demonstrates two things.  First, it shows that Mojaddidi should have challenged

21   Mohammed's testimony on the grounds that it was an impermissible opinion on the state of mind

22   of Hayat under Rule 704(b).  The legal precedent "raised serious questions" about this issue.  See

23   Carthorne, 878 F.3d at 469.  Second, Judge Tashima's argument in dissent demonstrates that

24   there was a reasonable probability that had Mojaddidi challenged this aspect of Mohammed's

25   testimony, it would have been excluded or stricken.

26        As discussed above, the government's case was thin.  The only inference jurors could

27   draw if they believed Mohammed's testimony was that Hayat had the intention to wage jihad.

28   The testimony of experts "can be both powerful and quite misleading."  Daubert, 509 U.S. at 595

1   (internal quotation omitted).  Mohammed's testimony about the supplication, while challenged on

2   cross-examination by Mojaddidi, was unrebutted by contrary expert testimony.  And, his

3   testimony involved cultural practices that jurors very likely had no experience with.  As such, it

4   likely took on particularly great importance.  While the literature found in Hayat's bedroom could

5   have been considered a reflection of his curiosity, rather than his intent, Mohammed's testimony

6   amounted to evidence that Hayat was a card-carrying member of a jihadi group.

7   　　　As set out above, this court finds that had Mojaddidi procured alibi witnesses and an

8   expert on false confessions, the jury would have had substantial reasons to discount Hayat's

9   confession.  That confession was the key to the government's showing that Hayat both committed

10  an act in support of waging jihad and had the intent to do so.

11  　　　The district court should hold that there is a reasonable probability that, combined with

12  counsel's other errors identified herein, had Mohammed's testimony equating the supplication

13  with jihadis been excluded, at least one juror would have doubted Hayat's intent and would have

14  reached a different result.

15  　　　　　　　　　　**2.  Inadequate Cross-examination of Dr. Mohammed**

16  　　　In his next challenge to Mojaddidi's conduct with respect to Dr. Mohammed, Hayat

17  alleges Mojaddidi's cross-examination of Mohammed was inadequate.  However, Hayat points to

18  just one aspect of her cross-examination.[40]  Mohammed received an e-mail from Bariza Umar, a

19  Pakistani student and Ph.D. candidate in Islamic Studies.  Contrary to Hayat's statement that

20  Umar identified this specific supplication, she told Mohammed about the purpose of amulets or

21  "ta'wiz" generally and told him that she would "guess that most people probably don't know

22  what is written in the Taweez."  (EH Ex. SS.).  She then stated that "this Du'a sounds so familiar .

23  . ."  But, she provided no further information about that specific supplication.

24  ////

---

25  [40] Hayat also argues briefly that Mojaddidi should have cross-examined government witness

26  Abbas about the supplication.  However, Hayat does not explain how Mojaddidi could have
    elicited that testimony from Abbas on cross-examination.  While Abbas was an expert on

27  Pakistani culture, his testimony on direct did not address the practice of carrying ta'wiz.  Rather,
    he testified about Pakistani political extremist groups.

28

1   Umar's general information about Pakistanis' use of a ta'wiz was redundant of Professor

2   Weiss's testimony on the subject at trial.  Weiss testified about the Pakistani practice of carrying a

3   ta'wiz as protection, particularly during travel.  (Apr. 11, 2006 RT 4178-92.)  Further, Umar's

4   "guess" that most Pakistanis do not know what is written on the ones they carry was just that, a

5   guess.  It had extremely little, or no, relevance to whether Hayat was aware of what was written

6   on the supplication he carried in his wallet.[41]  Mojaddidi reasonably declined to cross-examine

7   Mohammed about Umar's e-mail.

### 3.   Failure to Procure an Appropriate Contrary Expert

9   Hayat contends that Mojaddidi's use of Dr. Anita Weiss to counter Mohammed's

10  testimony was unreasonable.  He argues Mojaddidi should have procured an appropriate expert or

11  an additional expert to testify that the supplication he carried was a ta'wiz that is carried by many

12  Pakistanis, particularly when they are traveling.

#### a.  Background

#### i.     Testimony of Dr. Anita Weiss

15  Weiss is a professor specializing in South Asia in the International Studies Program at the

16  University of Oregon.  (Apr. 11, 2006 RT 4045-49.)  She testified for the defense about a number

17  of aspects of Pakistani culture, including its educational system, education in madrassas,

18  meanings of the term "jihad," Pakistani political thought, and terrorist training camps.  In

19  addition, Mojaddidi asked Weiss about the Pakistani practice of carrying a ta'wiz.  Weiss

20  explained that "Ta'wiz are things that somebody gives to you . . . for good luck."  (Id. at 4179.)

21  Pakistanis commonly carry ta'wiz when they are traveling.  (Id. at 4192, 4195.)  A warrior would

22  not carry a ta'wiz for reasons different than the general population's.  (Id. at 4194.)

23  However, Weiss was not permitted to testify that the supplication in Hayat's wallet was a

24  ta'wiz.  (Apr. 11, 2006 RT 4187-92.)  The district court held that because Weiss did not speak

---

26  [41] In fact, Weiss also testified that Pakistanis do not "really know what's written in" the ta'wiz.
27  (Apr. 11, 2006 RT 4179-80.)  The government objected to that testimony as speculative, among
    other things.  The district court ended up striking Weiss's statement as nonresponsive.  (Id. at
    4184.)  The district court also noted that the statement was speculative.  (Id. at 4813.)  Mojaddidi
28  did not attempt to elicit that testimony again.

1    Arabic and could therefore not understand what was written on the piece of paper, there was no

2    foundation upon which she could identify the supplication as a ta'wiz or otherwise testify to its

3    meaning.  (Id. at 4191-92.)

### ii.    What Mojaddidi Did

5        Mojaddidi testified at her deposition that she attempted to find an Arabic language expert

6    who could testify about the meaning of the supplication.  (Mojaddidi Depo. at 199 (ECF No. 548

7    at 239).)  Mojaddidi testified that Weiss provided some names and Mojaddidi contacted people

8    she knew who might be able to provide that testimony.  (Id.)  However, she was "unsuccessful."

9    She could find no one who "would help."  (Id.)  Mojaddidi estimated that she contacted "at least

10   ten" people to testify regarding the supplication.  (Id. at 200.)  She was unable to identify any of

11   the people she contacted.  She noted that "in 2005 things were different, and these Muslim leaders

12   or scholars weren't as willing to go up against the government."  (Id.)

### b.    Did Mojaddidi Act Reasonably?

14       The record is sparse about Mojaddidi's conduct in attempting to locate an Arabic language

15   expert to testify about the supplication.  While she testified that she contacted "at least ten

16   people," without knowing who those people were it is not possible to determine whether any

17   would have qualified as an expert or what their testimony could have been.  Mojaddidi testified

18   that she looked for experts "without consultation with" Griffin.  (IV TR 709.)  Because she had

19   no experience with experts at trial, there is an even greater chance that the "experts" she contacted

20   would not have been qualified to testify about both the translation of the supplication and its

21   meaning and use among Pakistani Muslims.

22       Hayat provides an article from the Atlantic Monthly, published in October 2006, shortly

23   after trial.  The author contacted Professor Bernard Haykel, who had testified for the defense in a

24   2003 terrorism trial in Detroit; Ingrid Mattson, a professor of Islamic Studies at Hartford

25   Seminary; and Salman Masood, a Pakistani journalist in Islamabad.  (EH Ex. ZZ at 90-91.)  Each

26   of these people was familiar with the supplication and told the author it is "common."  The fact

27   that the article's author found three people who knew the supplication, two of whom who were

28   scholars and potential experts, shows that there were experts available.  Haykel testified in the

86

1   present case that he was available in March 2006 and, if asked, would have testified at Hayat's

2   trial.  (IV TR 645.)

3          Further, attorney expert Broderick testified that a reasonable attorney taking on the

4   defense in a terrorism case should have reached out to the Federal Defender's Office for help in

5   contacting attorneys who had provided representation in similar cases.  (II TR 393-94.)  Such

6   contacts could very well have been fruitful, particularly with respect to procuring experienced

7   experts.  There is no indication Mojaddidi took any of those reasonable steps to attempt to find an

8   Arabic language expert.  Rather, it appears she asked Weiss for contacts and Mojaddidi contacted

9   people she already knew.  As discussed above, Mojaddidi did not have any experience in criminal

10   law.  There is no indication that her contacts were people who had experience as experts at a trial.

11          Attorney expert Weinberg specifically testified that when confronted with evidence about

12   a piece of paper with Arabic writing carried by her client, a reasonable attorney would have

13   introduced "contrary expert testimony about the circumstances under which people carry such

14   scriptures, and whether the scripture, in fact, has the connotation that the prosecution expert

15   places on it."  (III TR 468.)  This court finds Mojaddidi acted unreasonably when she failed to

16   procure an appropriate expert to counter Mohammed's testimony.

17              **c.  Did Mojaddidi's Failure to Procure an Expert re the Supplication
                     Prejudice Hayat?**
18

19          As discussed previously, the government's case against Hayat was insubstantial.  While

20   Mojaddidi's cross-examination of Mohammed was effective, his testimony was essentially

21   unrebutted.  Jurors had just one expert's opinion that only a jihadi would carry the supplication

22   found in Hayat's wallet.[42]  And, the government stressed this in its closing.  After reviewing

23   Mohammed's testimony, the prosecutor argued in closing that Hayat's "possession of this

24

_____

25   [42] Hayat makes arguments about the effect of Mohammed's testimony on jurors.  Some jurors
     were interviewed for the Atlantic Monthly article and told the author they felt the evidence about
26   the supplication was particularly damning.  (EH Ex. ZZ.)  However, the court may not consider
     this evidence.  It is limited to considering the effect of counsel's errors on a "reasonable juror."
27   Hernandez v. Chappell, 878 F.3d 843, 852 (9th Cir. 2017).  Moreover, jurors' testimony about
     their deliberative process is inadmissible under Federal Rule of Evidence 606(b)(1).
28

1    supplication is powerful evidence that he returned to the United States with a jihadi intent."

2    (Apr.. 12, 2006 RT 4270.)  He asserted that Mohammed was the "only expert witness who

3    testified in this trial who can read and write Arabic."  (Id. at 4356.)  He continued, "While Dr.

4    Weiss can tell you about the general cultural practices of carrying a ta'wiz, and that travelers do

5    so, she couldn't tell you what that supplication meant because she couldn't read it.  Dr.

6    Mohammed could and did."  (Id.)

7         Hayat presented the testimony of Professor Bernard Haykel during the evidentiary hearing

8    to demonstrate the impact a defense expert's testimony could have had.  He also presented the

9    testimony of a bay area Imam about this supplication.  Both witness's testimony is summarized

10   below.

11                          **i.   Testimony of Dr. Bernard Haykel**

12        Haykel is a professor of Near Eastern Studies at Princeton University.  (IV TR 626.)  He

13   specializes in the history and politics of the Middle East and in Islamic political thought and

14   movements, including al-Qaeda.  (Id. at 627-28.)  Haykel testified that he speaks Arabic.  (Id. at

15   626.)  This court accepted Haykel as an expert on the Arabic language, Islamic culture, and

16   Islamic political movements.  (Id. at 630-31.)

17        Haykel had examined the supplication found in Hayat's wallet and "did some research on

18   the supplication and its use amongst Muslims."  (IV TR 634.)  He also reviewed the testimony at

19   trial given by prosecution witness Mohammed.  Haykel defined a "supplication" as an invocation

20   or prayer to God.  (Id.)  In Arabic, such a supplication is called a "du'a."  (Id.)  The source of this

21   du'a is the Hadith, a tradition of the Prophet Muhammad.  (Id.)  This du'a is found in a number of

22   different collections of prophetic traditions.  (Id. at 636.)  Haykel testified that he was familiar

23   with the supplication.  (Id. at 635)  He had heard it used.  (Id.)

24        Haykel testified that the literal translation of the du'a is "Oh, God, we ask you to be at the

25   throats [of our enemies].  And we seek your help and assistance from their evils or their

26   misdeeds."  (IV TR 638.)  The idiomatic translation provided by Haykel is "Oh, God, we ask, or

27   beseech, you to . . . confront out enemies.  And we ask you for help from their evil deeds."  (Id. at

28   639.)  Haykel explained that "tradition tells us that [the Prophet] used [this du'a] at a time when

1   he was about to begin travel. . . . And travel at the time in Arabia . . . was fraught with danger."

2   (Id.)

3       Haykel testified that this du'a is not exclusive to any particular group.  "All Muslims use

4   it."  (IV TR 640.)  He testified that some invocations may call on God to help defeat an enemy.

5   (Id. at 642.)  However, the supplication Hayat carried was not an "offensive invocation" like that.

6   Rather, it would be used when a Muslim is afraid that someone might harm him.  (Id.)  Haykel

7   has heard the prayer used by religious leaders leading midday Friday prayers.  (Id. at 642-43.)

8       Haykel testified that an opinion that anyone who carried or recited this supplication would

9   necessarily be involved in violent jihadi behavior was unfounded.  (IV TR 644-45.)  "[A]ll

10  Muslims use this supplication, not just jihadis." [43]  (Id. at 675.)

11                          **ii. Testimony of Imam Tahir**

12      Tahir Anwar is a Muslim whose parents were raised in India.  (III TR 550.)  He was raised

13  in the Muslim traditions of the "subcontinent," which he defined as India, Pakistan, Bangladesh,

14  and Afghanistan.  (Id.)  Tahir can read, write, and understand classical Arabic and spent eight

15  years at a madrassa in India studying the Koran and Hadith, among other things.  (Id. at 550-51.)

16  Tahir is the imam of the South Bay Islamic Association in San Jose and teaches Islamic law at a

17  college in Berkeley.  (Id. at 551.)  The "vast majority" of the people in his congregation are from

18  the subcontinent.  (Id. at 552.)

19      Tahir affirmed that everything in his declaration, signed in 2014, is true.  (III TR at 554-

20  55.)

21      Tahir was asked about the supplication found in Hayat's wallet.  He has had personal

22  experience with it.  (III TR 555.)  He testified that it is common in Muslim households to grow up

23  learning prayers and supplications at a young age.  (Id.)  He had memorized this prayer as a child

24  and testified that he probably started reciting it before he really knew what it meant.  (Id.)  His

25  _____

26  [43] On cross-examination, Haykel testified about whether a person possessing certain types of
    literature would have a "jihadi mindset."  (III TR 660-68.)  Hayat's counsel objected based on

27  Haykel's lack of expertise in determining the mindset of an individual based on the literature in
    his possession.  (Id. at 668.)  The court sustained the objection.  The court finds that the testimony

28  is entitled to no weight because it was outside Haykel's expertise.

1   parents told him that this prayer should be recited when he wanted to be safe, and protected –

2   "from bullies, . . . from evil or harm that would be out on the streets, lurking, car accidents." (Id.

3   at 557.) Tahir continues to recite this prayer daily for "divine protection," for example to return

4   home safely in the evening. (Id. at 559.) Tahir testified that he has taught this prayer to his two

5   sons. (Id. )

6          Tahir testified that he has heard others recite the prayer as well. (III TR 560.) They have

7   used it in a similar context – as a prayer for "protection," for "ease," and for "divine protection."

8   (Id.) Tahir has never heard this prayer used in the context of someone intending to harm someone

9   else. (Id.) Muslims of the subcontinent carry this prayer with them as a ta'wiz or amulet. (Id. at

10  560-61.) He explained that a ta'wiz is a verse from the Koran, or Hadith, or other prayers that

11  Muslims write themselves or have an imam write for them. (Id. at 561.) An imam often includes

12  diacritical marks so that the carrier of the ta'wiz can pronounce the words. (Id. at 563.)

13  However, most of them do not understand what the Arabic words mean. (Id. at 562.) Muslims

14  carry this ta'wiz for protection. (Id.) He concluded that if he had been asked to testify at Hayat's

15  trial, he could have done so. (Id. at 563.)

16              iii.     Is there a Reasonable Probability that Testimony like Dr.
                        Haykel's would have Affected the Verdict?
17

18         Haykel's testimony was clear and unequivocal – the supplication Hayat carried was

19  commonly used by many Muslims, not just by jihadis. As explained above, Weiss's testimony

20  was not particularly supportive of the defense because it described ta'wiz generally. She could

21  not identify the supplication Hayat carried as a ta'wiz so her testimony did not rebut

22  Mohammed's. Whether or not Mojaddidi's failure to procure an expert like Haykel could have,

23  standing alone, lead the jury to a different result, it certainly contributed to the result reached.

24         The government argues that Tahir's testimony would not have been admitted at trial. This

25  court is not so convinced. As Judge Tashima pointed out in his dissent, Mohammed's opinion

26  left no room for dissent – a person carrying that supplication had to be a jihadi. Tahir's

27  testimony, although anecdotal, would have challenged that opinion by showing that at least some

28

90

Muslims living in Northern California commonly used this supplication.  Nonetheless, the error
Hayat argues, and that this court finds Mojaddidi made, was not procuring an expert on the
supplication.  This court considers Tahir's testimony only as supplemental to Haykel's, but does
not rely on it in finding that Mojaddidi's failure to secure an expert regarding the supplication,
when considered with her other errors set out above, prejudiced Hayat.

### 4. Failure to Object to Government Closing re Mohammed's Testimony

In his closing argument, the prosecutor characterized the people consulted by Mohammed
as "highly qualified colleagues . . . highly qualified Islamic scholars" whose "uniform opinion
was that this was a piece of paper with a prayer on it that would be carried by a holy warrior, a
violent, jihadi, who felt himself to be traveling in an enemy land, and who was ready to commit
violent jihad."  (Apr. 12, 2006 RT 4356-57.)  Hayat argues that this characterization was "quite
simply" a "lie."  A review of the e-mails Mohammed received from these people shows that the
statement inflated both the qualifications of those contacted and the content of their responses.

Professor Ansari stated only that he had heard this supplication in the "post-Friday Prayer
*dua*, especially when people [] feel that they [are] facing the hostility of non-Muslims."  (EH Ex.
RR.)  As described above, Ms. Umar, a student, did not appear to recognize the supplication and
discussed the practice of carrying ta'wiz generally.  (EH Ex. SS.)  Dr. Chattha told Mohammed
that he was unable to get any information about the supplication.  He recognized it as a du'a "but
no group can be identified in Pakistan[] using this dua for any purpose including ta'wiz."  (EH
Ex. TT.)  Professor Huda told Mohammed that he did "not know this dua."  (EH Ex. VV.)  He
sent a copy of Mohammed's e-mail to Dr. Farooq, who Huda identified as the "founder and
moderator of North American Bangladeshi Islamic Community."  Farooq responded to Huda and
Mohammed that he was "not aware of this dua."  (EH Ex. WW.)  Mr. Saaleh appeared to
recognize the du'a but told Mohammed, "I have not noticed any special importance given to [this]
du'a . . . in any of the regions of Pakistan, these days."  (EH Ex. XX.)  Saaleh said he had spoken
to students from various regions of Pakistan, "as well as the imams from different regions
belonging to different schools of thought, they also confirm the same."  (Id.)

////

Ms. Gulfiya, a student in Uzbekistan, told Mohammed she had spoken with an imam who was the second in command after the mufti.  (EH Ex. YY.)  What the imam told her indicated the supplication may have some use by "warriors" but that it was also used by non-warriors.  The imam told her that the dua is commonly used by Hanafis; [44] that it "can be pronounced by war[r]iors too" to ask Allah for "help in their war;" and that it would not be said by a person who considers the citizens of that country his friends.  The imam also told her that the person saying the supplication "is trying to remind people not to be or go against [M]uslim, or his native coutnry (sic)."  And, "this dua can't [be] pronounced by people who are interested in the war against government.  But at the same time he considers that person pronouncing the dua may simply mean[] that he is trying to prevent from attacking that country where lie his co-brothers." (Id.)

The only person Mohammed contacted who identified the supplication as being used by "extremists" was Professor Subhy.  (EH Ex. UU.)  This was the only e-mail Mohammed received that could be characterized as directly supporting Mohammed's testimony that only a jihadi would carry this supplication.

While Mojaddidi did not object to the prosecutor's characterization of the information Mohammed received from colleagues, she could have remedied that problem during her closing argument.  She did not.  She just stated that Mohammed based his opinion on "a person he's never met in Uzbekistan, and on a man who no longer works for an Egyptian university because of his radical views."  (Apr. 12, 2006 RT 4322.)  She did not directly challenge the government's characterization of these people as all scholars and as "uniformly" finding the supplication associated with terrorists.

A reasonable attorney would have made a better effort to demonstrate to the jury how and why the prosecutor's statement was wrong.  While this court does not find that this error alone would have caused Hayat prejudice, when considered with the other errors described herein, it

////

---

[44] Hanafi is an orthodox school of Sunni Muslim jurisprudence followed especially in southern and central Asia.  See https://www.merriam-webster.com/dictionary/Hanafi.

1  certainly contributed to the prejudice Hayat suffered as a result of Mojaddidi's unreasonable

2  conduct.

3  **H.  Failure to Challenge Eric Benn's Testimony**

4  Benn testified for the prosecution at trial about the aerial surveillance photographs of the

5  area near Balakot that the government contended was a terrorist training camp.  It is not clear

6  whether Hayat is making one or two arguments here.  Hayat argued in his motion to vacate, and

7  briefly argues in his post-evidentiary hearing opening brief, that Mojaddidi should have

8  challenged Benn's qualifications to testify as an expert.

9  In their opposition brief, the government notes that Hayat appears to have dropped that

10  argument.  Hayat does not address that statement in his reply brief but focuses solely on his

11  second argument, that Mojaddidi erred when she failed to challenge Benn's reliance on Hayat's

12  confession to increase his confidence that the Balakot site was a jihadi camp.

13  To the extent Hayat is still making the first argument, this court finds Mojaddidi did not

14  act unreasonably in failing to challenge Benn's qualifications as an expert under the standards set

15  out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Hayat cites no

16  authority in support of his argument that Benn's use of a numerical estimate of his confidence

17  that the Balakot site was a jihadi training camp was so unscientific that it violated Daubert's

18  requirement that an expert's methodology be sound.  Nor does Hayat make any real argument that

19  Benn's methods or data were generally unreliable.

20  Hayat's second argument has more support.  Hayat argues that when Benn testified that

21  his confidence about the Balakot site increased based on Hayat's confession, Benn essentially

22  provided testimony that Hayat's confession was credible.  This court addresses this second

23  argument below.

24  **1.  Background**

25  At trial, the government put on the testimony of Eric Benn, a senior imagery analyst with

26  the Department of Defense.  Benn identified four satellite photographs, two from 2004 and two

27  from 2001, of an area near Balakot.  Benn described buildings and roads shown in the

28  photographs and testified about the reasons those structures indicated the area was used as a

1   militant camp.  (Mar. 28, 2006 RT 3023-37.)  Benn testified that the probability the area was a

2   camp was 50% or a "good solid possible."  (Id. at 3062-65.)

3          Benn further testified that he had reviewed the videotaped interrogation of Hayat.  He

4   stated that information Hayat provided in that interrogation had been "relevant" to his analysis.

5   (Mar. 28, 2006 RT 3066.)  The prosecution then played video excerpts from the interrogation.

6   Mojaddidi stated that she had no objection to the videos.  (Id. at 3066-67.)  Benn testified that

7   some of Hayat's descriptions of the camp he confessed to attending were "consistent with the

8   physical things I saw and observed" in the photographs.  (Id. at 3073.)  When he considered

9   Hayat's statements, Benn testified that his confidence that the area was a militant training camp

10  moved from the "good strong possible" based solely on the surveillance photographs "into the

11  realm of probable."  (Id.)  He testified that Hayat's statements increased his confidence to 60 or

12  70%.  (Id. at 3074.)  He further described that probability as "much more likely than not."  (Id.)

13         On cross-examination, Mojaddidi pointed out many statements made by Hayat that

14  conflicted with Benn's description of what appeared in the satellite photographs.  (Mar. 28, 2006

15  RT 3089-91 (Hayat stated path to camp was impassable by car; Benn testified that a car could

16  have driven up the path); 3092 (Hayat stated camp was in Balakot; Benn testified that camp was

17  ten kilometers from Balakot, as the crow flies, and that to get there a person would have to travel

18  further than that); 3094 (Hayat described the area as in a jungle; Benn's surveillance photos

19  showed clearly the path going up to an open area); 3096 (Hayat described a black gate at the

20  beginning of the trail; Benn saw no gate on the trail); 3097 (Hayat described the buildings at the

21  camp as small and made of mud; Benn described permanent structures, some of which were

22  large.).  She also asked Benn about his reliance on Hayat's statement that the bus ride to the trail

23  leading to the camp was seven hours long even though the distance from Rawalpindi to the

24  location identified by Benn was less than 100 miles.  (Id. at 3088.)

25         Mojaddidi also questioned Benn's focus on the Balakot area when Hayat had described

26  the camp as being in a number of other locations as well.  (Mar. 28, 2006 RT 3086-87.)  Benn

27  testified that the government had not asked him to review images of possible camps in any of

28  those other locations.  (Id. at 3087.)  On re-cross, Mojaddidi specifically asked Benn whether he

1    dismissed some parts of Hayat's confession as untrue and accepted others as true.  (Id. at 3118.)

2    In her closing argument, Mojaddidi told the jury that Benn "ultimately decided what he wanted to

3    believe about the description Hamid gave." (Apr. 12, 2006 RT 4326.)  She then described the

4    various inconsistencies between Hayat's statements and Benn's descriptions of what was pictured

5    in the surveillance photographs.  She further argued that if the government really wanted to

6    determine if this location was a militant training camp, it could have sent someone there to

7    investigate but they did not do so.  (Id. at 4328.)

8                        **2.  Legal Standards**

9           Hayat relies on the general rule that an expert may not testify in a manner that buttresses

10   the credibility of a witness.  United States v. Rivera, 43 F.3d 1291, 1295 (9th Cir. 1995) (quoting

11   United States v. Brodie, 858 F.2d 492, 496 (9th Cir. 1988), overruled on other grounds in United

12   States v. Morales, 108 F.3d 1031 (9th Cir. 1997)).  The Ninth Circuit has more particularly

13   explained the rule as follows:  "'[an] expert witness is not permitted to testify specifically to a

14   witness's credibility or to testify in such a manner as to improperly buttress a witness's

15   credibility.'"  Id. (quoting United States v. Candoli, 870 F.2d 496, 506 (9th Cir.1989)).

16          Hayat also focuses on a 1988 case from the 2nd Circuit, United States v. Scop, 846 F.2d

17   135.  In Scop, an SEC investigator testified as an expert at trial on securities trading practices.

18   His testimony did not rely on the SEC investigation; rather it relied solely on the testimony and

19   documentary evidence produced at trial.  846 F.2d at 138.  The expert testified that the defendants

20   had been engaged in a fraudulent scheme.  On cross-examination, he testified that his opinion was

21   based on his "positive assessment of the testimony of the government's witness."  Id. at 142.

22   Among other things, the court found the expert's testimony inadmissible because he opined on

23   the credibility of other witnesses before the jury.  Id.  The government attempts to limit Scop by

24   pointing to the court's other holdings – that the expert's testimony was also inadmissible because

25   he drew a legal conclusion and because he must have also relied upon evidence obtained during

26   the SEC's four-year investigation.  However, the Court of Appeals appears to have made three

27   distinct findings of error in admission of the expert's testimony.  Accordingly, this court

28   ////

95

1  recognizes that one holding is that the expert in <u>Scop</u> improperly opined on the credibility of

2  other witnesses.

3        One distinction between the present case and <u>Scop</u> is that Hayat was not a witness at trial.

4  While the jury considered the truthfulness of his confession, it was not considering his credibility

5  in court.  At least one court distinguished <u>Scop</u> on this basis.  An Iowa district court held that an

6  expert may base his opinion on the facts in the record, even where those facts are disputed.  <u>BVS,</u>

7  <u>Inc. v. CDW Direct, LLC</u>, No. 11-CV-79-LRR, 2015 WL 728411, at *8 (N.D. Iowa Feb. 19,

8  2015).  As the court pointed out, if the opposing party disagrees with the basis for the expert's

9  opinion, they may raise those issues on cross-examination.

10       **3.  Did Mojaddidi's Failure to Challenge Benn's Testimony Violate the Sixth**
11           **Amendment?**

12       Whether Benn's conclusion that took into account Hayat's confession was objectionable is

13  not entirely clear from the standards set out above.  On the one hand, <u>Scop</u> and its progeny focus

14  on a witness's interference with jurors' determination of another witness's credibility.  That is not

15  the case here.  Hayat did not testify at trial and the jury was not charged with directly determining

16  his credibility.  On the other hand, Benn did state that he considered Hayat to have been truthful

17  when he identified Balakot as the location of the camp and untruthful later in the interrogation

18  when he identified other locations.  In addition, the inference from Benn's testimony was also that

19  he believed Hayat's statement that he did, in fact, attend a camp.

20       In any event, even if Mojaddidi acted unreasonably when she failed to object to Benn's

21  testimony, Hayat fails to show prejudice.  On cross-examination, Mojaddidi thoroughly

22  questioned Benn about the fact that his testimony was based on a selective review of Hayat's

23  statements and stressed that fact in her closing argument.  She also questioned Benn about the

24  conflicts between Hayat's statements and Benn's descriptions of the surveillance photographs.

25  She reiterated those conflicts in her closing argument.  Hayat fails to establish he suffered any

26  prejudice as a result of the admission of Benn's testimony that he relied on Hayat's confession.

27  ////

28

1    This court will recommend Hayat's claim that his Sixth Amendment rights were violated

2    when Mojaddidi did not object to Benn's testimony be denied.

3        **I.   Failure to Adequately Cross-examine Naseem Khan**

4        During her cross-examination of Khan, Mojaddidi asked about an October 7, 2003

5    telephone conversation Khan had with Hayat:

6            Q. BY MS. MOJADDIDI: I asked you earlier about a conversation
             that took place on October 7, 2003, when you called Hamid while he
7            was at Pakistan. That was the last time that you contacted him
             between that date and then May 31st of 2005, correct?
8
             A. [KHAN]: It was in October. I don't remember the exact date.
9
             Q. During that October 7th conversation, Hamid told you that he
10           never intended on going to a camp, and he was lying to you all along,
             didn't he?
11
             MS. FERRIS: Objection. Foundation. Hearsay. Move to strike.
12
             THE COURT: Sustained. It's stricken.
13

14   (Mar. 10, 2006 RT 1802.)

15       Hayat challenged the district court's ruling on this issue on appeal.  Hayat argued on

16   appeal that the statement that he "never intended on going to a camp" was admissible as an

17   exception to the hearsay rule under Federal Rule of Evidence 803(3).  710 F.3d at 895.  Rule

18   803(3) permits out-of-court declarations of then-existing states of mind.  The Ninth Circuit held:

19   "We cannot say that refusing to admit the excluded statement as a declaration of current state of

20   mind was plain error."  Id.  The Ninth Circuit considered that the statement may have been

21   admissible when considered as a statement of present intent, even though it was literally a

22   backward-looking statement that would not reflect present intent.  Id. at 895-96.  If it was

23   admitted, it would have required a limiting instruction that it could not be used to prove Hayat's

24   earlier states of mind.  Id. at 896.

25       The government argues that Hayat fails to show prejudice because he presents no

26   evidence to show how Khan would have testified had Mojaddidi been permitted to ask the

27   question.  It is true that Hayat makes no argument regarding prejudice in his opening brief.  He

28   simply argues that Mojaddidi acted unreasonably.  In his reply brief, Hayat cites one case to

97

1    support his argument that this court "must assume that Khan would have confirmed Hayat's

2    statement that he never intended to attend a camp." (ECF No. 730 at 81.)  That one case is not

3    apt.

4         Hayat cites the Court's statement in <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986)

5    that "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-

6    examination were fully realized, a reviewing court might nonetheless say that the error was

7    harmless beyond a reasonable doubt."  The issue in <u>Van Arsdall</u>, a case on direct review from a

8    decision of the Delaware Supreme Court, was a court's denial of a defendant's opportunity to

9    impeach a witness for bias in violation of the Confrontation Clause.  In examining whether that

10   Confrontation Clause error was harmless, the Court considered what evidence may have been

11   admitted had the defense been permitted to cross-examine the witness.  However, unlike the

12   present case, in <u>Van Arsdall</u>, the trial court had conducted in camera proceedings to determine

13   how the witness would have testified.  <u>See id.</u> at 676.  Therefore, the information the Court

14   needed to consider the issue of harmlessness was in the record.  The Court did not, as Hayat

15   implies, hold that courts should simply assume what evidence would have been elicited if cross-

16   examination had been permitted.

17        This court should not assume how Khan would have responded to Mojaddidi's question

18   regarding the October 7, 2003 telephone conversation.  And, absent any evidence about what his

19   response would have been, Hayat fails to show any prejudice as a result of Mojaddidi's failure to

20   challenge the government's objections to her question to Khan.  This claim should be denied.

21   **III.     Ineffective Assistance Of Counsel Due to Conflict of Interest**

22        Hayat alleges his counsel acted under a conflict of interest that affected her representation

23   in numerous ways.  Hayat argues that the financial agreement for the representation of both

24   defendants, the joint defense arrangement, and Mojaddidi's ceding decision-making to Griffin

25   created a conflict.  As a result, Hayat's defense did not pursue a number of viable strategies in

26   violation of his Sixth Amendment rights.  The government argues that the interests of Hamid and

27   Umer Hayat did not conflict and that Mojaddidi acted independently.

28   ////

1          **A.  Legal Standards for Conflict of Interest Claims**

2          It is well established that the Sixth Amendment right to effective assistance of counsel

3   carries with it "a correlative right to representation that is free from conflicts of interest."  Wood

4   v. Georgia, 450 U.S. 261, 271 (1981).  Conflicts of interest broadly embrace all situations in

5   which an attorney's loyalty to, or efforts on behalf of, a client are threatened by their

6   responsibilities to another client, a third person, or their own interests.  See generally ABA,

7   Model Rules Prof. Conduct, Rule 1.7 and Commentary (1983).

8          Conflicts may occur in various factual settings.  For example, conflicts may arise in

9   circumstances in which one attorney represents more than one defendant in the same proceeding.

10  See, e.g., Holloway v. Arkansas, 435 U.S. 475, 481-91 (1978).  Conflicts may also arise in

11  situations in which an attorney has represented a person who is a witness, has a financial interest

12  in the outcome of the case, or has a personal relationship with the prosecutor.  See, e.g., Houston

13  v. Schomig, 533 F.3d 1076, 1081 (9th Cir. 2008); United States v. Hearst, 638 F.2d 1190, 1193

14  (9th Cir. 1980).

15         The rule prohibiting counsel from representing conflicting interests serves to protect

16  confidential information obtained during the course of an earlier representation, ensure undivided

17  attorney loyalty, and/or guard against infringement of the right to cross-examination.  See Sanders

18  v. Ratelle, 21 F.3d 1446, 1452-53 (9th Cir. 1994); Fitzpatrick v. McCormick, 869 F.2d 1247,

19  1251 (9th Cir. 1989); United States v. Allen, 831 F.2d 1487, 1497 (9th Cir. 1987); Trone v.

20  Smith, 621 F.2d 994, 999 (9th Cir. 1980).  Courts "generally presume that the lawyer is fully

21  conscious of the overarching duty of complete loyalty to his or her client."  Burger v. Kemp, 483

22  U.S. 776, 784 (1987).

23         Generally, courts apply the Strickland standard to ineffective assistance of counsel claims:

24  a petitioner must prove that his attorney acted unreasonably and that those actions or inactions

25  prejudiced him.  Strickland v. Washington, 466 U.S. 668, 694 (1984).  However, the Supreme

26  Court carved out an exception to the requirement that a petitioner prove prejudice.  When a

27  petitioner's attorney "actively represented conflicting interests," the petitioner must show "an

28  actual conflict of interest" existed and it "adversely affected his lawyer's performance."  Cuyler

1   v. Sullivan, 446 U.S. 335, 348 (1980).  In Sullivan, the Court examined multiple concurrent

2   representations and stressed the "high probability of prejudice arising" from this conflict situation

3   and the difficulty of proving prejudice.  Mickens v. Taylor, 535 U.S. 162, 175 (2002) (citing

4   Sullivan, 446 U.S. at 348–49).  A petitioner who shows an "adverse effect" as a result of this

5   conflict need not also show he was prejudiced under Strickland.  Sullivan, 446 U.S. at 349–50.

6          Many courts of appeals have applied the Sullivan prejudice standard to a variety of

7   conflicts of interest.  See Mickens, 535 U.S. at 174–75 (collecting cases).  In Mickens, the

8   Supreme Court noted that this "expansive application" of the Sullivan prejudice standard was not

9   supported by the language of Sullivan.  535 U.S. at 175.  The Court explained that whether the

10  Sullivan prejudice standard should apply to conflict situations other than those involving multiple

11  concurrent representation was an "open question."  Id. at 176; see also United States v. Walter-

12  Eze, 869 F.3d 891, 905 (9th Cir. 2017) (Presuming prejudice is necessary in a conflict involving a

13  joint representation because this conflict often results in an attorney finding "himself compelled

14  to *refrain* from doing" something and determining prejudice would involve "unguided

15  speculation."  (Emphasis in original.)); Schomig, 533 F.3d at 1081 ("Supreme Court ... has left

16  open the question whether conflicts in successive representation that affect an attorney's

17  performance require a showing of prejudice for reversal."); Alberni v. McDaniel, 458 F.3d 860,

18  873 (9th Cir. 2006) (same); Earp v. Ornoski, 431 F.3d 1158, 1184 (9th Cir. 2005) (same); but see

19  Lewis v. Mayle, 391 F.3d 989 (9th Cir. 2004) (court applies Sullivan prejudice standard to

20  conflict based on successive representation; no discussion of, or citation to, Mickens).  The Court

21  stated that Sullivan does not "clearly establish, or indeed even support" application of this

22  exception to the Strickland prejudice standard to these other situations.  Mickens, 535 U.S. at 176.

23  If Sullivan does not apply, a petitioner must meet the Strickland standard by establishing a

24  reasonable probability that, but for the conflict, the result of the proceedings would have been

25  different.  Mickens, 535 U.S. at 176; Strickland, 466 U.S. at 694.

26         A defendant may "waive his right to the assistance of an attorney unhindered by a conflict

27  of interests."  Holloway, 435 U.S. at 483 n.5.  "A valid waiver of conflict of interest must be

28  voluntary, knowing, and intelligent, such that the defendant is sufficiently informed of the

100

1   consequences of his choice." Lewis, 391 F.3d at 996; see also Garcia v. Bunnell, 33 F.3d 1193,

2   1195 (9th Cir. 1994) ("Even if counsel is subject to an actual conflict of interest, however, the

3   trial court may generally allow the attorney to proceed if the defendant makes a voluntary,

4   knowing, and intelligent waiver."); Allen, 831 F.2d at 1494 ("Of course, a defendant may waive

5   his right to the assistance of an attorney who is unhindered by conflicts ... provided the waiver is

6   given knowingly and intelligently.").  Whether there is a proper waiver is to be determined by the

7   trial court and any such waiver should appear on the record.  Johnson v. Zerbst, 304 U.S. 458,

8   464–65 (1938).  Resolution of the issue of waiver depends "upon the particular facts and

9   circumstances surrounding that case, including the background, experience, and conduct of the

10  accused." Id.; see also Edwards v. Arizona, 451 U.S. 477, 482 (1981).  Moreover, a court must

11  "indulge every reasonable presumption against the waiver of fundamental rights." Lewis, 391

12  F.3d at 997 (citations omitted).

      **B.  Analysis of Conflict of Interest Claims**

14         Under Sullivan, a successful conflict of interest claim requires proof of two things:  (1) the

15  attorney "actively represented conflicting interests;" and (2) that conflict "adversely affected [the]

16  lawyer's performance."  446 U.S. 335 at 348.  This court addresses each issue below.

      **1.  Active Representation of Conflicting Interests**

18         There are two aspects to determining whether Hayat's counsel actively represented

19  conflicting interests:  whether a conflict existed and whether Hayat's counsel was actively

20  engaged in representing the conflicting interests.

      **a.  Did the Interests of Umer and Hamid Hayat Conflict?**

22         Hayat argues numerous bases to find a conflict, including the financial arrangement for

23  payment of Griffin and Mojaddidi.  While there is evidence that the financial arrangement was

24  unusual (Weinberg Test. (III TR 457-59)), there is no evidence that it, in fact, created a conflict.

25         Mojaddidi testified that she did not feel financially constrained in the decisions she

26  made.[45]  She testified that if she wanted to conduct an investigation or hire an expert, she felt that

27  _____

28  [45] There is some evidence in the record that indicates finances were a concern to the defense.  The
    initial retainer agreement paid Griffin $20,000.  (Weinberg Test. (III TR 457-58).)  Under the

1    she could do so.  (IV TR 725:6-11; Mojaddidi Depo. at 91, 140, 183 (ECF No. 548 at 131, 180,

2    223).)  Further, a financial arrangement that deducted investigator and expert costs from an

3    attorney's total fee is not, in itself, a conflict of interest.  Walter-Eze, 869 F.3d at 902 ("[T]he fact

4    that in a pro bono case a lawyer may have to pay expert witness fees does not without more raise

5    a conflict of constitutional dimensions when such witnesses are not retained.") (Citing Williams

6    v. Calderon, 52 F.3d 1465, 1473 (9th Cir. 1995).).

7          This court finds that the financial arrangement alone did not create a conflict.  However,

8    this court further finds a stark conflict when it comes to the best strategies for representation of

9    each defendant.

10         This court may consider the reasonableness of counsel's choice of strategy as a factor in

11   determining whether the choice demonstrates a conflict.  See McFarland v. Yukins, 356 F.3d 688,

12   706 (6th Cir. 2004); see also Taylor v. Grounds, 721 F.3d 809, 819 (7th Cir. 2013) (court looks to

13   the strength of the defense for one defendant that was abandoned; if it was sufficiently plausible,

14   then the defendants' interests conflicted).  The unreasonable choice of strategy for the

15   representation of Hamid Hayat demonstrates the conflict between the defendants here.  Mojaddidi

16   testified that the defense strategy was to push for a trial as quickly as possible to limit the

17   government's ability to obtain additional evidence.  (IV TR 738-39.)  While this strategy may

18   have made sense for defending Umer, it made no sense for defending Hamid after the indictment

19   was amended to include the material support for terrorism charge.

20   ////

21   second retainer agreement, $65,000 was to go to Mojaddidi and the remaining money, $135,000,
     was under the control of Griffin for expenses for both defendants, with the balance left to go to

22   him as his fee.  (Id. at 458; Mojaddidi Test. (IV TR 715).)  Investigator Wedick testified that he

23   was paid about $4,000 early on for his work on this case.  (III TR 594-95.)  Because the "family
     couldn't afford . . . to pay a fee," he told Griffin he would continue to work without pay.  He was

24   not paid for any of the time period during trial.  (Id. at 595.)  Mojaddidi testified that she received
     far less than the $65,000 set out in the retainer agreement as her fee.  (IV TR 716.)  In addition, it

25   may be possible to infer that Mojaddidi, in fact, made decisions based on finances from her
     decision not to hire an investigator to look for alibi witnesses or investigate the Balakot site in

26   Pakistan.  In addition, the attempt to use Wedick as the expert on false confessions certainly
     saved the defense the cost of hiring an appropriate expert.  However, this court does not find this

27   evidence sufficient to cause it to disbelieve Mojaddidi's consistent testimony that financial
     considerations did not come into play when she made decisions on Hayat's behalf.

28

102

1    It is apparent that Griffin, an experienced criminal defense attorney, felt that a strategy of

2    pushing for trial as quickly as possible was the best strategy for Umer.[46]  This court has no basis

3    to question the reasonableness of that strategy.  However, this court also has no basis to conclude

4    that this strategy was a reasonable one to defend Hamid against the charge of providing material

5    support for terrorism.  The only person to indicate that it was a reasonable strategy is Mojaddidi,

6    an attorney with no criminal law experience and no jury trial experience.  Hayat presented the

7    testimony of three expert witnesses on the standard of care for an attorney representing a client

8    charged with material support for terrorism.  Not one opined that rushing to trial, and foregoing

9    significant pretrial preparation and motions, would have been a reasonable strategy in a case like

10   Hamid Hayat's.

11   Attorney expert Broderick testified that defending against a charge of material support for

12   terrorism required extensive preparation.  He testified that when the government has conducted an

13   investigation, taken that evidence to a grand jury, and received an indictment, the government has

14   significant evidence against a defendant.  (II TR 409-10.)  An experienced attorney would then

15   conduct an investigation to understand what evidence the government had and would look into

16   possible defenses.  (Id.)  Those investigations could include:  (1) investigating alibi witnesses; (2)

17   investigating any informant; (3) determining whether any search was appropriate and whether the

18   items seized fell within its scope; and (4) fully examining any confession for voluntariness and, if

19   appropriate, getting expert assistance in doing so.  (Id. at 388.)  That attorney would then evaluate

20   the possibility of making a number of motions.  According to Broderick, a reasonable attorney

21   would not forego making pretrial motions to simply rush to trial in a case like this.  (Id. at 409.)

22   Broderick testified that if the indictment was vague about the location of the terrorist

23   training camp the defendant attended, and that information was not provided through discovery, a

24   _____

25   [46] Attorney expert Weinberg distinguished the cases against Umer and Hamid based on the fact
     Hamid had confessed.  He explained that the case against Umer was so weak, the defense could

26   reasonably let the case go to the jury as quickly as possible on the government's evidence.  (III
     TR 462, 463.)  As the government points out, Weinberg did not appear to recognize that Umer

27   had also confessed.  Therefore, Weinberg's testimony stressing this distinction between the two
     defendants does not necessarily support his conclusion that defending Hamid would be "far more

28   complicated, complex and lengthy" than defending Umer.  (Id. at 463.)

1    reasonable attorney would move for a bill of particulars.  (Id. at 383-84.)  Broderick explained

2    that the purpose of a bill of particulars is to "avoid surprise to the defense." (Id. at 384.)  In a bill

3    of particulars, the defendant asks the government to provide information to flesh out just what

4    crime it is charging.  (Id. at 385.)  Then, the government is bound by the bill of particulars in

5    proving its case.  If the government seeks to present evidence outside the scope of the charged

6    crime described in the bill of particulars, the defense may move for dismissal based on an

7    "unconstitutional variance" from the indictment.  (Id. at 385-86.)  Broderick opined that if the

8    defense attorney does not know the time, manner, and place of the crime being charged, it would

9    be "crazy" to pursue a speedy trial defense because the government's evidence is unknown.  (Id.

10   at 412.)  In this case, once that information was known, a reasonable attorney would conduct

11   investigations to determine whether the location identified by the government was a jihadi

12   training camp.  (Id. at 413-14.)

13          Where a defendant has confessed, Broderick testified that a reasonable attorney would

14   consider whether the confession was voluntary or coerced and seek expert assistance in making

15   that determination.  (II TR 388-89.)  Under the federal rules, an attorney who seeks to challenge a

16   confession's admissibility must do so in a pretrial motion or any issues regarding admissibility

17   are waived.  (Id. at 390.)  Broderick opined about the benefits of moving to suppress a confession.

18   He explained that one advantage is that defense counsel will have the opportunity to cross-

19   examine the government witnesses about the confession prior to trial.  In addition, defense

20   counsel will obtain early information about what the court feels about the confession, about

21   whether a defense expert on the confession will be admitted, and, if not, why.  (Id. at 391.)  The

22   defense may still challenge the reliability of the confession before the jury – the pretrial motion

23   simply allows the defense more information to prepare to do so.  (Id.)

24          Broderick testified that reasonable counsel would have understood that a confession

25   essentially "eliminates" the presumption of innocence.  (II TR 411.)  The attorney has two paths

26   to rebutting it.  First, they can put the client on the stand.  However, in Broderick's opinion, a

27   client who did not hold up under government interrogation is not likely to do well during cross-

28   examination.  (Id. at 412.)  Second, they can have an expert testify about the reasons the

1   confession is false.  (Id.)  Attorney expert Weinberg agreed that reasonable counsel would have

2   challenged details about the confession, including the circumstances of the confession itself, and

3   the statements in the confession that could not be true.  (III TR 463.)

4          Hayat's third attorney expert, Cline, considered the case against Hamid Hayat to require

5   substantial preparation to address the CIPA issues.  He testified that once the case was deemed

6   "complex" by the court, there was no reason not to take the time to seek a security clearance or

7   associate cleared counsel.  (II TR 271-73, 281.)

8          The government presented no evidence contrary to the expert opinions presented by

9   Hayat.  The government simply repeats its position that Mojaddidi's strategic decisions are

10  entitled to deference.  It is true that the Supreme Court established a general rule that the strategic

11  decisions of counsel are entitled to deference.  Cullen v. Pinholster, 563 U.S. 170, 197 (2011)

12  (citing Strickland, 466 U.S. at 691).  However, courts also look to counsel's experience, among

13  other things, to determine the amount of deference due.  See Strickland, 466 U.S. at 681 (One

14  factor "relevant to deciding whether particular strategic choices are reasonable" is the "experience

15  of the attorney."); United States v. Saltzer, No. 1:14-cv-0451 BLW, 2015 WL 8215744, at *3 (D.

16  Idaho Dec. 8, 2015) (court relied on attorney's "significant experience in criminal law" to

17  conclude that attorney's strategic decisions entitled to great deference).

18         Because Mojaddidi lacked any criminal law experience, little or no deference is due her

19  "strategic" decisions.  This court finds no basis to conclude that the rush-to-trial strategy was a

20  reasonable one for Hamid Hayat.[47]  Accordingly, when the first superseding indictment charged

21  Hamid with material support for terrorism, the basic defense strategy for the representation of

22  Hamid came into conflict with Griffin's strategy for the representation of Umer.  See Walter-Eze,

23  869 F.3d at 901 (An actual conflict exists "'if during the course of the representation, the

24  defendants' interests do diverge with respect to a . . . course of action.'" (Quoting Sullivan, 446

25  U.S. at 356 n.3.)).

26

27  _____

[47] This court recognizes that the strategy pursued was not simply rushing to trial but was focusing
28  on challenging the sufficiency of the government's evidence.  Again, no expert opined that such a
    strategy made sense in Hamid Hayat's case.

### b. Did Counsel Actively Represent Both Defendants?

Mojaddidi's inexperience leads to the second question here - did counsel actively represent the conflicting interests of both defendants?  This court finds that by ceding responsibility to Griffin, who had a client with conflicting interests, Mojaddidi was effectively in a joint representation arrangement with Griffin.  Both attorneys effectively represented Hamid Hayat.  The best evidence of this joint representation is the decision that a rush-to-trial strategy was in the best interests of both defendants.  Mojaddidi simply followed Griffin's decisions that were in the best interests of his client, not hers.

Mojaddidi contended repeatedly that she did not cede ultimate decision-making to Griffin.  (See IV TR 693 (Griffin's role was to "provide the information to me, and advice to me, and then I would represent my client"), 695 (Mojaddidi denied that Griffin had the ultimate power to decide what motions to make or witnesses to call), 695 ("based on the information I received and my own research, I made the decision"), 705 ("I relied on [Griffin's] background and knowledge in reaching the decisions that I did for my client."); see also Mojaddidi Depo. at 24 (ECF No. 548 at 64) ("every time [Griffin] made a decision, I myself did my independent research and tried to see if it was something that I thought made sense and so I didn't blindly agree on everything"), 131 ("I obviously got [Griffin's] input.  But, ultimately, I made the decision."), 135 (Mojaddidi testified she "absolutely" exercised decision-making authority on behalf of Hamid.).  This court finds the evidence to the contrary significant and compelling.

First, Mojaddidi failed to make, and it appears failed to seriously consider making, the motions that experts testified she should have made.  There is no indication in the record that Mojaddidi understood the value of moving to suppress the confession.  She testified that she had "enough basic knowledge to know [how to] move to suppress evidence."  (IV TR 744.)  Yet, understanding the legal grounds for a motion to suppress is only part of the calculation.  There is no indication Mojaddidi understood the strategic reasons an attorney might move to suppress a confession, even if that motion might be unsuccessful.  Attorney expert Broderick testified that a motion to suppress would be useful to flesh out the government's evidence in support of the confession and to test how the court feels about a chosen expert on false confessions.  (II TR

106

391.)  Had Mojaddidi brought a motion to suppress, she would have known that the court would not permit James Wedick to testify as an expert.  That would have given her another opportunity to find an appropriate expert on false confessions.

Mojaddidi also testified that she "did not consider" moving for a bill of particulars. (Mojaddidi Depo. at 233 (ECF No. 548 at 273).)  Finally, Mojaddidi testified that neither she nor Griffin made any effort to obtain a security clearance because they felt it would take too much time and conflict with the rush-to-trial strategy.  (Id. at 749-50.)  It is apparent that Mojaddidi rejected that option without grappling with the various advantages having security clearance, or associating cleared counsel, would have had.  Attorney expert Cline explained that an attorney with a security clearance could:  (1) be provided any classified documents that the court, in an ex parte § 4 CIPA hearing, determined that the government must provide to the defense; (2) participate in CIPA § 6 hearings, pretrial hearings regarding the admissibility of classified evidence; and (3) participate in CIPA § 8 hearings, similar hearings held during trial.  (II TR 257-59; 265-67; 276-77.)

Second, Mojaddidi's own testimony showed that she relied on Griffin to such an extent that they were jointly representing Hamid.  She understood that she was not competent to represent Hayat without mentorship from another attorney.  (IV TR 701-02.)  She testified that she undertook representation of Hamid because she understood that she "would rely on [Griffin] in [her] representation of Hamid" and she did rely on his advice.  (Id. at 693.)  She testified that Griffin "took the lead on a lot of those pretrial hearings, in making arguments on law and motions type stuff, and I would join in many of those decisions and agreements."  (Id. at 703.)  She further testified that she relied on Griffin to provide insight into which motions were worth making and which were not.  (Mojaddidi Depo. at 69 (ECF No. 548 at 109).)  And, she relied on his advice and her own research.  (IV TR 706.)  Mojaddidi did not explain how her research would have been sufficient to challenge Griffin's recommendations made based on his significant experience.[48]

---

[48] The parties do not dispute that Griffin is an "experienced criminal defense attorney."  (See Gov't Oppo. Brief (ECF No. 725) at 27.)

Third, the evidence showed that the defendants pursued the same strategic course before and during trial. Mojaddidi testified that she and Griffin planned a joint defense. (IV TR 704-05.) They agreed that there was no conflict between the interests of the defendants.[49] (Id. at 692; Mojaddidi Depo. at 25 (ECF No. 548 at 65).) She testified that they agreed on the rush-to-trial strategy. (IV TR 739.) And, they agreed that making pretrial motions or seeking a security clearance would lead to delay and, therefore, should not be pursued. (Id. at 745, 750; see also July 15, 2005 RT 2 (in argument on government's motion to exclude time, Griffin stated that "we do not intend at this point to file pretrial motions" and Mojaddidi stated, "[t]hat's my position as well").) Mojaddidi was never in court alone during Hayat's trial. Griffin was always there as well.[50] (IV TR 705.) The only example Mojaddidi could provide showing she veered from Griffin's course was the decision she and Hayat made to reject a joint plea deal, which Griffin was "more willing to consider." (Mojaddidi Depo. at 77-78, 247-48 (ECF No. 548 at 117-118, 287-88).) In every other important respect, Mojaddidi appeared to be following Griffin's lead.

Finally, the testimony of other witnesses contradicts Mojaddidi's assertions of independence. Riordan testified that she told him that Griffin made all final decisions for both defendants.[51] (IV TR 817.) She also told Riordan that she did not feel that she could disagree with Griffin because she feared losing his assistance if she did.[52] (IV TR 800, 802.) This fear was echoed in the testimony of attorney Mark Reichel, the attorney Griffin and Mojaddidi

---

[49] It is apparent from these statements that Mojaddidi did not advise Hayat about even the possibility that there might be conflicting strategies for each defendant. Therefore, there can be no argument that Hayat waived this conflict.

[50] The government points to Griffin's description of the defense arrangement to the district judge and the judge's apparent lack of concern about the joint defense of the defendants. Griffin told the district judge that each attorney would be in court while the other was there and that the clients "in certain areas [had] a common, joint defense." (Feb. 3, 2006 RT 60-61.) Those statements did not explain the facts that defendants had conflicting interests and that Mojaddidi lacked any criminal law experience and would rely on Griffin's judgment. Therefore, the fact that the district judge may not have expressed concern is of no relevance.

[51] As noted above, this court considers Riordan's testimony herein only as impeachment of Mojaddidi's testimony.

[52] Mojaddidi denied making that statement. (Mojaddidi Depo. at 195-96 (ECF No. 548 at 235-36).)

1   contacted shortly before trial about coming into the case to help Mojaddidi.  Reichel testified that

2   in a telephone conversation with Griffin and Mojaddidi, Griffin told him that they were not going

3   to bring him into the case because Mojaddidi "is just not comfortable with losing me, because I

4   told her the only way we're going to do this deal, okay, is if you come in then I can't help her,

5   she's not going to get any help from me."[53]  (III TR 520.)  In addition, Wedick, the investigator

6   for both defendants, testified that Griffin and Mojaddidi had a joint defense agreement in which

7   both lawyers represented both Hayats.  (III TR 583.)  Wedick testified that all decisions made for

8   either defendant "went through" Griffin.  (Id. at 589.)

9       The court recognizes that a joint defense agreement in which one defendant's attorney

10  takes a lead role can be perfectly acceptable.  See Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th

11  Cir. 2001) (joint defense strategy does not, in itself, create a conflict of interest); see also

12  LoCascio v. United States, 395 F.3d 51, 58 (2nd Cir. 2005) (same); United States v. Kindle, 925

13  F.2d 272, 275-76 (8th Cir. 1991) ("A common or unified defense is sometimes the best trial

14  strategy and nothing prevents one attorney from taking a more dominant role in that defense.")

15  But, in this case, a joint defense was effectively a joint representation.

16      The defendants' interests diverged in an essential way – the basic defense strategy before

17  trial.  See United States v. Gambino, 864 F.2d 1064, 1070 (3rd Cir. 1988) ("An actual conflict of

18  interest 'is evidenced if, during the course of the representation, the defendants' interests diverge

19  with respect to a material factual or legal issue or to a course of action.'" (Quoting Sullivan, 723

20  F.2d at 1086.)).  The fact that counsel jointly represented Hamid, as illustrated by Griffin's

21  control of basic decisions about Hamid's defense, shows that there was an "active representation"

22  of those conflicting interests.  The next question, then, is whether the result of this conflict

23  "adversely affected counsel's performance."  Sullivan, 446 U.S. at 348.

24  ////

25  ////

26  ───────────────
    [53] The government also objected to Reichel's testimony as hearsay.  (See III TR 440.)  Again, this
27  court looks to Reichel's testimony only as impeaching Mojaddidi's testimony.  She testified that
    she decided not to have Reichel help her based on his desire to seek a continuance and his lack of
28  availability.  (IV TR 704.)

### 2. Adverse Effect on Counsel's Performance

To show a conflict affected counsel's performance adversely, Hayat must establish that the source of the conflict (1) "influenced the attorney not to pursue a particular litigation strategy," and (2) the "foregone litigation strategy would have been a viable alternative." United States v. Rodrigues, 347 F.3d 818, 824 (9th Cir. 2003). The first step in this analysis is answered in the section above. The rush-to-trial strategy for Umer Hayat was not a reasonable strategy for Hamid Hayat. To the extent Mojaddidi can be considered to have had a choice of strategies given her inexperience, her choice was obviously affected by Griffin's determination that the rush-to-trial strategy was best.

The second step in the adverse effect analysis is easily answered as well. Among other things, as a result of the conflict and the rush-to-trial strategy, Hayat's counsel failed to investigate and move to suppress Hayat's confession, failed to move for a bill of particulars, and failed to seek a security clearance or associate counsel with clearance. Hayat need not show that any of these potential avenues would have resulted in a different verdict. Walter-Eze, 869 F.3d at 904 (A showing of 'adverse effect' does not require showing "that these shortcomings affected the outcome of trial.") Rather, he need only show they were "'plausible'" options. Id. at 901 (quoting United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005)). A "plausible" option is one that "'possessed sufficient substance to be a viable alternative.'" Rodrigues, 347 F.3d at 823 (quoting United States v. Feyrer, 333 F.3d 110, 116 (2nd Cir. 2003)). Based on the attorney expert testimony described above, these options were certainly plausible.

With regard to suppressing the confession, Hayat presented evidence at the evidentiary hearing to show he suffered lasting effects from a bout with meningitis in 2000. As a result, Hayat could have argued, he was more susceptible to the coercive aspects of the interrogation. In addition, as discussed in more detail above, Hayat could have hired an expert on false confessions to explain why the interrogation was coercive. Finally, as Broderick testified, moving to suppress was a reasonable trial strategy even if it might not be successful. Moving to suppress the confession was certainly a viable pretrial option.

////

1    Broderick also described the benefits of moving for a bill of particulars, especially in a

2    case like this one with an indictment that was vague as to the location of the jihadist training

3    camp Hayat attended.  Finally, as Cline explained, there was no reason for counsel not to seek a

4    security clearance or associate counsel who already had such a clearance.  Mojaddidi pursued

5    none of these alternatives and instead appeared to accept without question the strategy that her

6    experienced co-counsel chose.

7    In sum, Griffin and Mojaddidi's joint defense agreement amounted to joint representation

8    of Hamid Hayat and was a conflict of interest that, given Griffin's representation of Umer Hayat,

9    caused Hamid's defense to forego many viable litigation strategies.  Hayat has demonstrated that

10   "his attorney made a choice between possible alternative courses of action that impermissibly

11   favored an interest in competition with those of the client."  McClure v. Thompson, 323 F.3d

12   1233, 1248 (9th Cir. 2003).

13   Based on the joint representation of Umer and Hamid Hayat, this adverse effect should

14   result in a presumption of prejudice under Sullivan.

15   **IV.    Motion to Re-open Evidentiary Hearing**

16   In its briefing, the government seeks to re-open the evidentiary hearing for two reasons.

17   First, it seeks to compel responses by attorney Griffin to the three questions it asked him during

18   the evidentiary hearing.  Second, it seeks to question attorney Riordan about any conversations he

19   had with Umer Hayat's attorney about asserting the attorney/client privilege to prevent Griffin

20   from testifying.

21   **A.  Motion to Compel Responses from Griffin**

22   As described above, the government called Griffin as a witness and informed him that it

23   had just three questions for him.  (V TR 892-93.)  Griffin invoked the attorney-client privilege

24   and refused to respond to any of the three questions.  (Id. at 892-95.)  The government objected to

25   invocation of the privilege.  When it asked the court to compel Griffin to respond, the court

26   declined and informed the prosecutor that the government could argue the issue in its post-

27   hearing briefing.  (Id. at 894.)

28   ////

The government now argues this court should have compelled Griffin to answer the three questions it posed. They were:

> Q. [] You're an attorney admitted in this district who practices criminal law; is that correct?"
>
> . . .
>
> Q. [] Mr. Griffin, in the period between 2005 and 2006, were you aware of the ethical obligations governing attorneys practicing in the Eastern District of California?"
>
> . . .
>
> Q. And, finally, Mr. Griffin, at any time in your legal career have you intentionally violated the rules of professional conduct that govern lawyers in this district?"

(V TR 893.) In response to each question, Griffin responded that "in light of Mr. Umer Hayat's decision not to waive the attorney-client privilege, I am ethically required to refuse to answer any questions and invoke that privilege." (Id. at 893-94.) The government argues that the attorney/client privilege was inapplicable to these questions because the questions did not seek privileged information. The government asks the court to so find and to re-open the evidentiary hearing to compel Griffin to answer these three questions.

This court finds no reason to re-open the evidentiary hearing. Irrespective of the validity of the government's objection, it fails to show how any of the information it sought from the three questions asked is material to the issues in this case. This court cannot fathom how any answer Griffin would have given would change any of the findings or conclusions made herein. This court finds no basis to re-open the evidentiary hearing to compel Griffin to respond to the government's three questions.

To the extent the government now objects to Umer Hayat's assertion of the privilege generally, this court notes that the government's objections come far too late. The government states that it was aware in September 2014 that Umer Hayat would assert the attorney/client privilege to prevent Griffin from testifying about his case. (See ECF No. 725 at 102.) At the evidentiary hearing, Umer Hayat's attorney was present and explained that he had notified the government previously that Umer would assert the privilege if anyone sought to question Griffin.

1   (VI TR 868.)  The government was also obviously aware of Griffin's likely refusal to testify in

2   September 2017 when it filed its list of witnesses for the evidentiary hearing.  (ECF No. 638 at 2

3   (government states it expected Griffin to either testify or to refuse to do so based on Umer

4   Hayat's assertion of the attorney/client privilege.)  However, despite this forewarning, the

5   government did not file a motion in limine to resolve the issue.  Moreover, the only issue

6   preserved by the government at the evidentiary hearing was Griffin's refusal to respond to the

7   three questions asked.  Any broader objection to Umer Hayat's assertion of the privilege has been

8   waived.

9   **B.   Motion to Re-open Hearing for Riordan's Testimony**

10          The government attempted to create an opening to challenge Umer Hayat's assertion of

11   the privilege during its cross-examination of Riordan.  The government asked Riordan about

12   Umer Hayat's current counsel.  Riordan identified that attorney as Dylan Schaffer, one of his

13   former law partners.  (VI TR 862.)  When asked if he had discussed Umer Hayat's invocation of

14   the privilege with Schaffer, Riordan responded that he had "met with Umer Hayat on a couple of

15   occasions between the filing of this 2014 motion and today.  The issue of privilege as far as Mr.

16   Griffin was concerned definitely came up in one of those conversations.  And I was the person

17   who gave . . . Mr. Schaffer Umer Hayat's name in terms of getting counsel on this issue."  (Id.)

18   When the prosecutor asked again whether Riordan had conversations about invoking the privilege

19   with Schaffer, Schaffer stood up in the courtroom and objected to the revelation of any

20   communications he had with Riordan about his representation of Umer Hayat.  Schaffer

21   contended those revelations were protected by the attorney/client privilege.  (Id. at 862-63.)  The

22   government explained that it sought to question Riordan about these conversations to establish

23   whether Riordan had a role in "frustrating the fact finding in this proceeding."  (Id. at 864.)

24   However, the government later stated that it "did not intend to ask any questions of Mr. Riordan

25   about his conversations with Mr. Schaffer."  (Id. at 869.)

26          The prosecutor stated he would limit his questions to any conversations Riordan had with

27   Umer Hayat when his attorney was not present.  (VI TR 869.)  When this court questioned the

28   relevance of these questions, the prosecutor stated that he sought to explore whether Riordan was

113

1    biased.  (Id. at 871.)  The prosecutor then asked Riordan about any conversations he had with

2    Umer Hayat prior to Schaffer's representation of Umer.  (Id. at 875.)  Riordan responded:

3             The conversation that I had with Mr. Hayat was in the context of
              possible testimony in this proceeding, and it was in the context of
4             one of those that I referred him to Mr. Schaffer. And I most assuredly
              never, ever suggested to him that he should assert the Fifth
5             Amendment privilege, because I would never advise anyone that
              wasn't my client to assert the Fifth Amendment privilege. It could
6             possibly lead to a charge of obstruction of justice when an attorney
              does that.
7

8    (Id. at 875-76.)  When asked whether Riordan had advised Umer Hayat to assert the

9    attorney/client privilege, Riordan testified that he "would never advised anyone who was not my

10   client on anything that they should do in terms of a legal proceeding, other than . . . to get legal

11   counsel."  (Id. at 876.)

12        In its current briefing, the government asks this court to re-open the evidentiary hearing to

13   compel Riordan to answer questions about his conversations with Schaffer regarding whether

14   Umer Hayat should invoke the attorney/client privilege.  However, as recounted above, the

15   prosecutor did not pursue questions about conversations between Riordan and Schaffer and

16   specifically told this court it would not ask about those conversations.  The government thus

17   waived any objection to those questions.  Moreover, this court finds no basis to infer, as the

18   government suggests, that Riordan and Schaffer colluded to keep Griffin from testifying.  The

19   government's requests to re-open the evidentiary hearing should be denied.

20                                    **BRADY CLAIMS**

21        Hayat makes two claims that the government failed to disclose evidence in violation of the

22   rule set out in Brady v. Maryland.  However, each is based on speculation about evidence in the

23   government's possession.  Without a showing of what the government, in fact, failed to produce,

24   Hayat's Brady claims should fail.

25   **I.     Legal Standards**

26        The due process clauses of the Fifth and Fourteenth Amendments to the Constitution, as

27   interpreted by the United States Supreme Court in Brady v. Maryland, require the prosecution to

28   learn of and disclose to the defense any exculpatory or impeachment evidence favorable to the

                                            114

1    accused that is in the prosecution's possession.  Brady v. Maryland, 373 U.S. 83, 87 (1963).

2    Brady places an affirmative duty on the prosecutor to seek out information in the government's

3    possession that is favorable to the defendant.  Kyles v. Whitley, 514 U.S. 419, 437 (1995); United

4    States v. Price, 566 F.3d 900, 908-09 (9th Cir. 2009).  However, the government has no

5    obligation to "single out" particular pieces of exculpatory evidence that are beneficial to the

6    defendant.  Rhoades v. Henry, 638 F.3d 1027, 1039 (9th Cir. 2011).

7         "[S]trictly speaking, there is never a real 'Brady violation' unless the nondisclosure was

8    so serious that there is a reasonable probability that the suppressed evidence would have produced

9    a different verdict."  Strickler v. Greene, 527 U.S. 263, 281 (1999).  When making a claim under

10   Brady, the burden of proving the need for disclosure is on the defendant.  United States v. Sai

11   Keung Wong, 886 F.2d 252, 256 (9th Cir. 1989).  "The mere suspicion that information will

12   prove helpful is insufficient to require disclosure."  Id.

13        **II**.  **Analysis**

14        In claim III in his motion to vacate, Hayat contended the government violated Brady by

15   failing to disclose exculpatory information that the camp near Balakot had closed.  (ECF No. 531-

16   1 at 112-17.)  Hayat argued the government must have been in possession of "hundreds, if not

17   thousands" of images of the Balakot area that were not introduced at trial.  However, Hayat

18   presents no evidence to support any of these contentions.  His argument is based purely on

19   speculation about what the government possessed and about whether or not the Balakot site was,

20   in fact, closed prior to 2003.  The district court recognized that this claim was based on

21   speculation in denying Hayat's request for discovery regarding the Balakot location.  (See ECF

22   No. 686.)  Claim III should be denied.

23        In his second Brady claim, claim IV, Hayat alleges that the government suppressed

24   exculpatory evidence it obtained through warrantless electronic surveillance.  (ECF No. 531-1 at

25   118-26.)  However, this claim is based solely on Hayat's speculation that he must have been

26   subject to the government's warrantless surveillance program while he was in Pakistan.  On that

27   basis, this court denied Hayat's request for discovery related to this claim.  (See ECF No. 630 at

28   15.)  Hayat has no evidence to back up his claim that he was subjected to illegal surveillance and

1  therefore no evidence to support his claim that evidence was withheld.  Claim IV should be

2  denied.

3                                          **CONCLUSION**

4          This court finds Hayat was prejudiced by his trial attorney's failure to investigate and

5  present the testimony of alibi witnesses.  That failure violated Hayat's Sixth Amendment right to

6  the effective assistance of counsel.  Counsel also acted unreasonably when she failed to procure a

7  false confessions expert and failed to challenge expert testimony regarding the supplication Hayat

8  carried.  These two errors contributed to the prejudice Hayat suffered from the failure to mount an

9  alibi defense.  Further, counsel represented Hayat under a conflict of interest caused by the joint

10  representation of Umer and Hamid Hayat.  Because that conflict had adverse effects on the

11  representation of Hayat at trial, prejudice should be presumed.  On these Sixth Amendment

12  claims, this court HEREBY RECOMMENDS that Hayat's April 30, 2014 Motion to Vacate, Set

13  Aside, or Correct his Sentence under 28 U.S.C. § 2255 (ECF No. 531) be GRANTED.  The court

14  FURTHER RECOMMENDS that the remaining claims in the Motion to Vacate be DENIED and

15  the government's request to re-open the evidentiary hearing be DENIED.

16          These findings and recommendations will be submitted to the United States District Judge

17  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30)

18  days after being served with the findings and recommendations, the parties may file written

19  objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

20  Findings and Recommendations."  The parties are advised that failure to file objections within the

21  specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834,

22  839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

23  Dated:  January 10, 2019

24

25

26                                    DEBORAH BARNES
                                     UNITED STATES MAGISTRATE JUDGE
27

28