DENNIS P. RIORDAN (SBN 69320)
dennis@riordan-horgan.com
DONALD M. HORGAN (SBN 121547)
don@riordan-horgan.com
LAYLI SHIRANI (SBN 257022)
lshirani@gmail.com
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile: (415) 552-2703

TED SAMPSELL-JONES (MN SBN 03402X)
ted.sampselljones@mitchellhamline.edu
Mitchell Hamline School of Law
875 Summit Avenue
St. Paul, MN 55105
Telephone: (651) 290-6348

MARTHA BOERSCH (SBN 126569)
mboersch@boerschshapiro.com
BOERSCH SHAPIRO LLP
1611 Telegraph Avenue, Suite 806
Oakland, CA 94612
Telephone: (415) 500-6640
Facsimile: (415) 967-3062

Attorneys for Petitioner
HAMID HAYAT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Respondent/Plaintiff,<br><br>  v.<br><br>HAMID HAYAT,<br><br>           Petitioner/Defendant. | Case No. 05-cr-0240-GEB<br><br>**DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS**<br><br>Judge:  Hon. Garland E. Burrell |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

PROCEDURAL HISTORY.................................................................................................2

STANDARD OF REVIEW .................................................................................................3

ARGUMENT ........................................................................................................................6

I.      THE MAGISTRATE ANALYZED PETITIONER'S INEFFECTIVE ASSISTANCE
        AND CONFLICT CLAIMS UNDER THE PROPER LEGAL STANDARDS .................6

II.     THE MAGISTRATE'S FINDING THAT PETITIONER'S TRIAL COUNSEL
        UNREASONABLY AND PREJUDICIALLY FAILED TO INVESTIGATE HIS ALIBI
        DEFENSE RESTS ON CREDIBILITY DETERMINATIONS AND IS SUPPORTED BY
        OVERWHELMING EVIDENCE ...................................................................................12

        A.      Introduction..........................................................................................................12

        B.      The Magistrate's Findings ...............................................................................13

        C.      There Is No Basis on Which to Reject the Magistrate's Finding of Deficient
                Performance Regarding Attorney Mojaddidi's Failure to Investigate and Present an
                Alibi Defense ........................................................................................................20

        D.      There Is No Basis on Which to Reject the Magistrate's Finding of Prejudice ............23

III.    THE MAGISTRATE JUDGE'S FINDINGS AND CONCLUSIONS CONCERNING
        THE FALSE CONFESSION EXPERT ISSUE ARE FULLY SUPPORTED BY
        CONVINCING EVIDENCE BASED ON CREDIBILITY DETERMINATIONS................24

        A.      The Magistrate Judge's Findings on Deficient Performance........................................25

        B.      The Magistrate Judge's Findings on Prejudice.........................................................26

        C.      The Magistrate's Credibility-Based Findings Merit Full Acceptance by this Court ....28

IV.     ATTORNEY MOJADDIDI'S MULTIPLE FAILURES TO CHALLENGE
        MOHAMMED'S TESTIMONY REGARDING THE SUPPLICATION DEPRIVED
        PETITIONER OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL ........................29

        A.      Introduction..........................................................................................................29

        B.      The Failure to Move to Exclude Mohammed's Mental State Opinion.........................32

        C.      The Failure to Locate and Present an Arabic-Speaking Defense Expert.....................35

i       DEFENDANT-PETITIONER'S RESPONSE TO
        OBJECTIONS TO MAGISTRATE JUDGE'S
        FINDINGS AND RECOMMENDATIONS
        Case No.: 05-cr-0240-GEB

V.     THE MAGISTRATE'S FINDINGS OF FACT CONCERNING ATTORNEY MOJADDIDI'S CONFLICT OF INTEREST ARE SUPPORTED BY OVERWHELMING EVIDENCE, MOST IMPORTANTLY HER ASSESSMENT OF MOJADDIDI'S CREDIBIBILITY ..................................................................40

    A.     Introduction ...........................................................................................40

    B.     Mojaddidi's Deposition Testimony .......................................................41

    C.     Mojaddidi's Hearing Testimony Before The Magistrate ........................43

    D.     The Magistrate's Findings on The Conflict Issue ..................................45

    E.     The Magistrate's Finding that Mojaddidi Operated Under A Conflict of Interest Rested on Her Assessment of the Relative Credibility of Multiple Witnesses .......................46

    F.     The Magistrate Judge's Findings as to the Adverse Effects Generated by Mojaddidi's Conflict of Interest Are Beyond Challenge ................................................49

VI.     THE MAGISTRATE PROPERLY CONSIDERED THE RIORDAN TESTIMONY SOLELY AS EVIDENCE OF IMPEACHMENT ...........................................50

CONCLUSION ..............................................................................................................53

# TABLE OF AUTHORITIES

**Cases**

*Bonin v. Calderon*,
  59 F.3d 815 (9th Cir. 1995) ..................................................................40

*Bruton v. United States*,
  391 U.S. 123 (1968) ............................................................................24

*Burger v. Kemp*,
  483 U.S. 776 (1987) ............................................................................48

*Cuyler v. Sullivan*,
  446 U.S. 335 (1980) ..............................................................................1

*Dillon v. Duckworth*,
  751 F.2d 895 (7th Cir. 1984) ...............................................................11

*Duncan v. Ornoski*,
  528 F.3d 1222 (9th Cir. 2008) .............................................................20

*Gonzalez v. Pliler*,
  395 F. App'x 453 (9th Cir. 2010) ...........................................................5

*Hamilton v. Ayers*,
  583 F.3d 1100 (9th Cir. 2009) ...............................................................9

*Hart v. Gomez*,
  174 F.3d 1067 (9th Cir. 1999) .............................................................20

*Hill v. Beyer*,
  62 F.3d 474 (3d Cir. 1995) .....................................................................5

*Hinton v. Alabama*,
  571 U.S. 263 (2014) ...................................................................6, 7, 20

*Jennings v. Woodford*,
  290 F.3d 1006 (9th Cir. 2002) ...............................................................6

*Johnson v. Finn*,
  665 F.3d 1063 (9th Cir. 2011) .....................................................5, 6, 50

*Lunbery v. Hornbeak*,
  605 F.3d 754 (9th Cir. 2010) ...............................................................24

*McClure v. Thompson*,
  323 F.3d 1233 (9th Cir. 2003) .............................................................50

iii     DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

*Pavel v. Hollins*,
   261 F.3d 210 (2d Cir. 2001)...........................................................................11, 28

*Sanders v. Ratelle*,
   21 F.3d 1446 (9th Cir. 1994) ...................................................................................12

*Silva v. Woodford*,
   279 F.3d 825 (9th Cir. 2002) .....................................................................................9

*Spaziano v. Singletary*,
   36 F.3d 1028 (11th Cir. 1994) ...........................................................................11, 12

*Strickland v. Washington*,
   466 U.S. 668 (1984)......................................................................................... passim

*United States v. Bergera*,
   512 F.2d 391 (9th Cir. 1975) .....................................................................................5

*United States v. Campos*,
   217 F.3d 707 (9th. Cir. 2000) ............................................................................32, 34

*United States v. Carthorne*,
   878 F.3d 458 (4th Cir. 2017) ...................................................................................33

*United States v. Cronic*,
   466 U.S. 648 (1984)..................................................................................................11

*United States v. Hayat*,
   710 F.3d 875 (9th Cir. 2013) .......................................................................25, 32, 34

*United States v. Mejia*,
   69 F.3d 309 (9th Cir. 1995) .......................................................................................5

*United States v. Moore*,
   159 F.3d 1154 (9th Cir. 1998) .................................................................................40

*United States v. Morales,*
   108 F.3d 1031 (9th Cir. 1997) ............................................................................32, 34

*United States v. Raddatz*,
   447 U.S. 667 (1980)................................................................................................4, 5

*United States v. Saltzer*,
   No. 1:14-cv-0451 BLW, 2015 WL 8215744 (D. Idaho Dec. 8, 2015).......................8, 12

*United States v. Span*,
   75 F.3d 1383 (9th Cir. 1996) ...................................................................................33

*United States v. Thomas*,
    684 F.3d 893 (9th Cir. 2012) ............................................................................5

*United States v. Walter-Eze*,
    869 F.3d 891 (9th Cir. 2017) ...............................................................41, 47, 49

*United States v. Wells*,
    394 F.3d 725 (9th Cir. 2005) ...........................................................................50

**Statutes**

28 U.S.C. § 636 .................................................................................................4

Fed. R. Evid. 704(b) ...............................................................................31, 32, 34

**Other Authorities**

Model Rules  of Professional Conduct (2002 ed.), Rule 1.1 .............................10

DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

**INTRODUCTION**

The government's memorandum of objections (hereafter "Obj.") relegates to an obscure footnote the most important legal principle applicable to this Court's review of Magistrate Judge Barnes' findings: that the Court must accept credibility findings of the magistrate unless it convenes a new evidentiary hearing.[1] There is absolutely no reason to do so here. The magistrate's report is fair and balanced, in that it rejected a number of the defendant's claims of deficient performance and found that others had not been proven prejudicial.

The Sixth Amendment principles that guided the factual findings and recommendation of the magistrate are not in dispute. *See Strickland v. Washington*, 466 U.S. 668 (1984), *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and related precedent. The outcome of the proceedings below thus turned on the facts, which Magistrate Barnes determined based largely on her assessment of the testimony from multiple witnesses at the 2018 evidentiary hearing over which she presided. Chief among those witnesses was Wazhma Mojaddidi, Hamid Hayat's trial counsel.[2]

At the hearing below, the magistrate heard and carefully weighed attorney Mojaddidi's explanation of her trial representation of Hamid, as well as the testimony of other witnesses who were privy to the preparation of Hamid's defense.  Based on all of the evidence before her, including testimony from key experts, the magistrate found as fact that Mojaddidi's ignorance of the law and errors in fact and in logic led her to make "strategic" decisions that were uninformed and unreasonable, constituting deficient performance. This court previously reached the same conclusion in one respect in ruling on petitioner's summary judgment motion.

The lower court's finding of prejudice arising from Mojaddidi's deficient performance likewise rests on credibility findings. As to Mojaddidi's egregious failure to investigate and present an alibi defense, the magistrate heard and carefully weighed testimony from six eyewitnesses who

---

[1] For convenience, Magistrate Judge Deborah Barnes will be referred to either as "Magistrate Barnes" or "the magistrate" throughout this memorandum.

[2] Because there are references in this memorandum to petitioner's co-defendant, Umer Hayat, Hamid Hayat generally will be referred to herein as "Hamid" to avoid confusion.

1      DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS

could have and would have been called at trial by a competent attorney. The magistrate considered each and every challenge to the credibility of those six witnesses advanced by the government counsel, who enjoyed a full opportunity to subject all six to cross-examination, and found their testimony to be consistent and credible, such that a different outcome would have resulted at trial had they been called to testify.

Fully supported by the evidence, the magistrate's finding of prejudice resulting from Mojaddidi's failure to investigate an alibi defense is entitled to this Court's acceptance. The same is true of the magistrate's credibility-based conclusions that such prejudice was compounded by Mojaddidi's failure to present expert testimony on false confessions and regarding the Islamic supplication on which the government heavily relied at trial as proof of petitioner's allegedly jihadist state of mind.

The magistrate further found that "Mojaddidi simply followed Griffin's decisions that were in the best interests of his client, not hers," and thus was subject to an active conflict of interest in representing Hamid. (ECF 734 at 106.) Based on credibility determinations supported by overwhelming evidence, that ruling merits approval under the legal standard governing this Court's review. The adverse effects that flowed from Mojaddidi's conflicted representation – the failure to file motions to suppress and for a bill of particulars, to investigate an alibi defense, to seek a security clearance, and to call qualified experts, among others – are firmly established by the trial record and Mojaddidi's own testimony at her deposition and before the magistrate.

Had Hamid been represented by a reasonably competent defense attorney at his 2006 trial, his jury would not have found him guilty of the charges against him. The magistrate's report and recommendation fully merits acceptance by this Court.

## PROCEDURAL HISTORY

Petitioner Hamid Hayat's direct appeal pended in the Ninth Circuit until March 13, 2013, nearly six years after his sentencing in this Court in 2007. On April 30, 2014, Hamid filed a timely notice and motion to vacate his convictions under 28 U.S.C. § 2255. (ECF 531.) On November 13,

2   DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

2014, Hamid filed a motion for summary judgment on a number of issues raised by his habeas petition. (ECF 548.) Almost a year and a half later, on March 10, 2016, Magistrate Judge Kellison issued findings and recommendations to deny the motion. (ECF 588.) On November 10, 2016, this Court issued an order adopting in part those findings and recommendations. (ECF 600.)

On July 5, 2017, Magistrate Barnes, to whom the matter had been reassigned, ordered an evidentiary hearing, which, after substantial briefing on legal and evidentiary issues, commenced on January 29, 2018.  Between January 29 and February 15, 2018, the magistrate heard seven days of testimony from 18 witnesses – 17 who testified on behalf of Hamid, four by video conferencing from Islamabad, and one called by the government.  Magistrate Barnes heard approximately 27 hours of testimony during regular court hours, and 6.5 hours of testimony from Pakistani witnesses during the evening. The witnesses' testimony and other in-court proceedings resulted in over a thousand pages of transcript. The defense proffered 78 exhibits totaling approximately 1,400 pages, and the government introduced 40 exhibits, two of which were added to the record during post-hearing briefing.

Given the volume of evidence and complexity of the legal issues raised, the post-hearing briefing was lengthy, totaling 481 pages.  All post-hearing briefing was completed by June 18, 2018, and the matter submitted to the magistrate for decision.  On January 11, 2019, the magistrate issued her 116-page Findings and Recommendation (hereafter "F&R").

Hamid Hayat has been incarcerated for nearly fourteen years following his arrest in this matter in June of 2005.

## STANDARD OF REVIEW

This Court previously recognized that this case could not be resolved without factual findings and credibility determinations.  It therefore denied summary judgment, and thereby remanded the case to the magistrate for factual findings.  The magistrate conducted an evidentiary hearing – and, as demonstrated above, that hearing was extensive, with witnesses testifying either in Sacramento or by videoconference from Islamabad.  Both parties submitted extensive briefing before and after the

hearing.  The magistrate's core factual findings rested in critical respects on credibility

determinations that were based on her viewing of live witness testimony.

The government maintains that this Court's review is *de novo* – as if no decision below had

been rendered. (Obj. at 19-20.)  In a footnote, the government maintains that this Court can and

should "undertake its own analysis of the witnesses' claims and reach its own conclusions." (*Id*. at

86 n.69.)  It argues that this Court may find the alibi witnesses incredible "as a matter of law" – as if

witness credibility is ever a matter of law.  Over and over again, the government argues that the

defense witnesses are not credible and unreliable.  Dozens of times, the government expressly asks

this Court to reject a finding by the magistrate that a witness was "credible" and instead find that

witness "incredible". (*See, e.g*., Obj. at 25, 59, 62, 63, 65, 68, 75, 78, 83, 84, 86, 87, 90, 95, 118,

147, and 167.) The word "unreliable" appears *over 50 times* in the government's brief – most of

those used in arguments attacking the credibility of Hayat's witnesses.  In a patronizing assault on a

judicial officer of this District Court, the government essentially asks this Court to reject every single

one of the magistrate's credibility determinations and find all of Hayat's witnesses incredible based

on the cold record. In one instance, the government accuses Magistrate Barnes of misrepresenting

the legal basis on which she considered specific evidence.

The government incorrectly describes the standard of review, and this Court may not do what

the government asks it to do.

While the text of 28 U.S.C. § 636(b)(1) allows for de novo review of a magistrate judge's

recommendation, it does not address credibility determinations.  Long ago, the Supreme Court noted

that it would be highly unusual for a district court to "*reject* a magistrate's proposed findings on

credibility when those findings are dispositive and substitute the judge's own appraisal." *United

States v. Raddatz*, 447 U.S. 667, 681 n.7 (1980).  The Court suggested that doing so could violate

principles of due process.  Making a credibility determination "without seeing and hearing the

witness or witnesses whose credibility is in question could well give rise to serious questions which

we do not reach." *Id*.

That suggestion by the Supreme Court in *Raddatz* eventually became binding law in the Ninth Circuit.  As the government reluctantly concedes in a footnote buried deep in its objections (Obj. at 86 n.69), in *Johnson v. Finn*, 665 F.3d 1063, 1075 (9th Cir. 2011), the Ninth Circuit held that a district court violates a defendant's Due Process rights when it rejects a magistrate's proposed findings on witness credibility without observing the testimony in person.

The holding in *Finn* was based on the fundamental importance of viewing live testimony.  "Live testimony enables the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice – matters that cannot be gleaned from a written transcript."  *Id*. at 1073 (quoting *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995)); *see Gonzalez v. Pliler*, 395 F. App'x 453, 456 (9th Cir. 2010); *United States v. Bergera*, 512 F.2d 391, 393 (9th Cir. 1975).  A magistrate's findings are ordinarily informed by her in-court observations, whether or not the findings expressly discuss them. *Finn*, 665 F.3d at 1075. Thus, the *Finn* rule applies even where a magistrate appears to base her credibility findings on a record-based analysis of the witness testimony rather than on her observations of the witnesses while their testimony was given. *Id.*

The government half-heartedly suggests that *Finn*'s holding may not apply here.  It offers no authority for that point.  Nor does it offer any authority for its suggestion that this Court may make credibility determinations "as a matter of law."  It can offer no authority in support of those arguments because the arguments are flatly wrong.

*Finn* itself is quite clear.  A district court may not reject a magistrate's credibility finding without viewing the witness testimony.  That principle applies in any situation where "the finding is dispositive of an application for post-conviction relief involving the constitutional rights of a criminal defendant."  665 F.3d at 1074 (quoting *Hill v. Beyer*, 62 F.3d 474, 482 (3d Cir. 1995)).  The rule is categorical and it is "absolute."  *United States v. Thomas*, 684 F.3d 893, 905 (9th Cir. 2012); *see also Finn*, 665 F.3d at 1074-75 (observing that, under relevant Ninth Circuit precedent, the rule contains no exceptions).  It is of course true that this Court has the authority to start from scratch and

conduct a full evidentiary hearing of its own.  But in the absence of another full hearing, this Court is obligated to accept the magistrate's credibility determinations.

The entire approach of the government's filing violates *Finn*.  Just as the magistrate's findings rested centrally on credibility determinations, the government's objections to those findings rest centrally on credibility attacks. That is not the sort of "de novo review" contemplated by the statute, and it would not comport with the Due Process Clause.

## ARGUMENT

While rejecting several of petitioner's claims for habeas relief, the lower court sustained several others and consequently recommended that his convictions be vacated. Before turning to the magistrate's favorable resolution of those specific claims, petitioner will address the government's repeated arguments that this Court should reject the magistrate's findings and related rulings based on a purported error of law affecting all of them: a failure to award sufficient deference to Mojaddidi's decision-making.

## I.   THE MAGISTRATE ANALYZED PETITIONER'S INEFFECTIVE ASSISTANCE AND CONFLICT CLAIMS UNDER THE PROPER LEGAL STANDARDS

Before discussing any of petitioner's Sixth Amendment claims, the magistrate stated the key principles that she would apply in deciding those claims, among them:

> Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011)

(Findings and Recommendation [hereafter "F&R"] at 18.)

While attorneys have considerable leeway in making tactical decisions, however, "*Strickland* demands that such decisions be reasonable and informed." (*Id*. at 24 [quoting *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002)]; *see also Hinton v. Alabama*, 571 U.S. 263, 273 (2014) ("In

any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances" quoting *Strickland*.)

Obviously, the "strong presumption" of the reasonableness of attorney decision-making was rebutted in the hundreds of federal court opinions finding deficient performance by a defendant's trial counsel. In *Hinton*, for example, the Supreme Court found deficient performance based on the attorney's lack of investigation due to mistakes of law; in doing so, it did not even mention the presumption of reasonableness. *Hinton*, 571 U.S. at 274. It also cited numerous decisions to the same effect. *Hinton* demonstrates what has always been true in *Strickland* doctrine – that the presumption of reasonableness is just that, a presumption. It is not irrebuttable, and it must fall in the face of demonstrated incompetence.

The government argues repeatedly that because the magistrate erroneously took note of Ms. Mojaddidi's utter lack of experience as a trial lawyer and criminal practitioner in both state and federal courts, the lower court thereby relied on an impermissible analytical factor to turn the presumption of reasonableness on its head. (Obj. at 1, 4, 25-29, 56-59, 130-31, 143-47.) According to the government, the magistrate "reverse[d] the presumption of adequate performance." (Obj. at 25.) The government plainly misstates the law on the role of inexperience in assessing the reasonableness of a trial lawyer's decision-making, and misstates and distorts the nature of the magistrate's findings of unreasonable performance.

The government seizes on the F&R's statement that in assessing the reasonableness of an attorney's "strategic" decisions and the deference due them, courts may consider the attorney's level of experience. (Obj. at 26, citing F&R at 24, 105.) The government argues that in relying on *Strickland,* 466 U.S. at 681, for this proposition, the F&R erred because the cited principle appears in a portion of *Strickland* that summarizes the Court of Appeal's faulty analysis of an ineffective assistance claim.

The government further notes that the only additional authority cited by the F&R to support the "inexperience" proposition is *United States v. Saltzer*, No. 1:14-cv-0451 BLW, 2015 WL

7   DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

8215744 (D. Idaho Dec. 8, 2015).  Obj. at 27-28.  The government contends that *Saltzer* likewise has "no precedential or persuasive value," and, in any event, does not state or suggest that an attorney's experience may affect a reviewing court's degree of deference to her decisions.  (*Id*. at 28-29.)  The government also chides the magistrate for failing "to cite to any other legal authority for this re-writing" of *Strickland*.  (*Id*. at 27.)[3]

*First*, the gist of the government's argument is that due to her supposed legal error, the magistrate declined from the outset to defer to Mojaddidi's claims of reasonable trial strategy.  But this ignores the essence of the F&R's analysis. The F&R consistently measured counsel's performance by an objective standard of reasonableness in connection with all of petitioner's claims. *See* F&R at 20-33 (failure to investigate alibi); 59-60 (false confession expert); 86-87 (supplication); 91-93 (rebuttal argument); 101-109 (conflict of interest).  Applying that measure, the F&R ultimately concluded that counsel's performance was unreasonable because she was fundamentally ignorant of basic facts and relevant legal principles at issue in the case.

Rather than assuming that Ms. Mojaddidi's performance was deficient simply *because* she was inexperienced, the magistrate found that complete lack of experience *explained* why her decision-making was so profoundly and patently unreasonable. (F&R at 30-32 [observing that "Mojaddidi's lack of awareness of the criminal rules and unreasonable strategic decisions are not surprising" given that "[b]efore she took on representation of Hayat, she had never represented anyone in a criminal case except, perhaps, an arraignment for a family member; had never been involved in a jury trial; and had never prepared an expert witness to testify."].)

Significantly, the government's claim of an insufficient deference to Mojaddidi's decision-making rests entirely on a single statement by the Magistrate made at page 105 of her order *after* she had conducted her analysis and issued her findings on petitioner's IAC claims. As described above, based on controlling case law and Mojaddidi's hearing testimony, the magistrate had found

---

[3]  The government initially makes these arguments in connection with petitioner's ineffective assistance claims. The government essentially restates the same arguments in its discussion of petitioner's conflict of interest claim. (Obj. at 143-47.)

unreasonable Mojaddidi's "rush to trial" justification for the glaring omissions in her representation of petitioner. In considering Hayat's conflict of interest claim, the magistrate concluded: "Because Mojaddidi lacked any criminal law experience, little or no deference is due her "strategic" decisions. This court finds no basis to conclude that the rush-to-trial strategy was a reasonable one for Hamid Hayat." (*Id*.) The magistrate here simply referenced and relied upon her earlier findings of unreasonable decision-making on Mojaddidi's part. She deferred to counsel's decisions as reasonable ones *until* Mojaddidi's demonstrated ignorance barred her from further doing so.

The F&R's analysis on this point is fully supported by the law. As the Ninth Circuit explained in *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002),

> [A]n attorney's performance is not immunized from Sixth Amendment challenges simply by attaching to it the label of "trial strategy." Rather, "[c]ertain defense strategies may be so ill chosen that they may render counsel's overall representation constitutionally defective." *United States v. Tucker,* 716 F.2d 576, 586 (9th Cir.1983).

*Id.* at 846; *see also Hamilton v. Ayers*, 583 F.3d 1100, 1113 (9th Cir. 2009) (observing that, under *Strickland*, "Although we must avoid the temptation to second-guess counsel's performance or to indulge the distorting effects of hindsight, ... *we need not defer to counsel's choices at trial unless "those choices were made after counsel ... conducted reasonable investigations or made a reasonable decision that makes particular investigations unnecessary*." [Emphasis added; internal quotations, citations, and brackets omitted].); ECF 721 (petitioner's opening post-hearing brief) at 10 (citing the foregoing principles).

*Second*, contrary to the government's claim, the Supreme Court in *Strickland* in no way disapproved the Court of Appeal's statement that "one factor relevant to deciding whether particular strategic choices are reasonable" is the "experience of the attorney." To the contrary, the Supreme Court endorsed the appellate court's entire analysis of the legal standard governing the deficient performance issue. *Strickland*, 466 U.S. at 687 ("As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance."). Indeed, the Supreme Court's only significant departure from the Court of Appeals' statement of the

legal standards governing an IAC claim involved the *prejudice* issue, with the Supreme Court establishing a more demanding test than that applied by the appellate court. *Id*. at 682, 694.

The Supreme Court's implicit recognition that an attorney's experience is relevant in assessing attorney performance further appears in the Court's key ruling that "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances.*" 466 U.S. at 686 (emphasis added). In this matter, the "circumstances" plainly include the fact that a novice trial attorney with no experience in, or specialized knowledge of, criminal law undertook and proceeded with the representation of a criminal defendant in the most publicized and consequential international terrorism case ever brought in the Eastern District.

Furthermore, the relevant circumstances include trial counsel's related admission (IV TR 701; 741) that she was so inexperienced that she could not have represented Hamid alone with no assistance from Mr. Griffin.  *See Strickland*, 466 U.S. at 688 (ruling that "prevailing norms of practice as reflected in American Bar Association standards and the like" are legitimate guides to determining whether performance is reasonable); Model Rules  of Professional Conduct (2002 ed.), Rule 1.1: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.")[4]  It is absurd to claim that a court assessing the reasonableness of counsel's performance in such a case must turn a blind eye to counsel's utter lack of experience and confessed absence of legal skills as circumstances bearing on the adequacy of that performance. Indeed, during her deposition, Mojaddidi herself conceded that it was "obvious that [she] was inexperienced and it could have affected [petitioner's] case." (Exh. FFF. at 253.)

---

[4]  *See also* Rule 1.1., Comment 5 ("Thoroughness and Preparation"): "Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence."

DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

*Third*, contrary to the government's suggestion (Obj. at 20 [n.18], 23, 36, 147), nothing in *United States v. Cronic*, 466 U.S. 648 (1984) disapproves consideration of trial counsel's experience in assessing the reasonableness of her performance; in fact, the opposite is true. The Court in *Cronic* ruled that the "character of a lawyer's experience does not justify a *presumption* of ineffectiveness" in the absence of an actual evaluation of her performance. *Id.* at 665 (emphasis added). Yet in the same sentence, the Court stated that such experience "may shed light in an evaluation" of the lawyer's performance.  In this matter, the magistrate in no way stated or suggested that she was relying on a "presumption" that counsel's performance had been unreasonable.  To the contrary, she made clear at the outset of her findings that she was applying the contrary and correct presumption. She then cited counsel's gross inexperience as shedding light on counsel's performance and the credibility of Mojaddidi's protestations that she acted strategically and reasonably at all times.

*Finally*, any doubt on the foregoing points is set to rest by consideration of relevant Court of Appeals decisions issued after *Strickland* –  some of which petitioner cited in briefing presented to the magistrate and the government. *See*, *e.g.*, ECF 721 (petitioner's opening post-hearing brief) at 10. Thus, in *Dillon v. Duckworth*, 751 F.2d 895, 901 (7th Cir. 1984), the Seventh Circuit expressly recognized inexperience as a relevant circumstance, within the meaning of *Strickland*, for purposes of assessing whether trial counsel's performance had been reasonable.[5] Similarly, in *Spaziano v. Singletary*, 36 F.3d 1028 (11th Cir. 1994), the Court ruled that, "In judging the reasonableness of an attorney's investigation and of the strategic decisions that followed from that investigation, one factor to be considered is the experience of the attorney." *Id.* at 1040; *see also Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir. 2001) (finding trial counsel's failure to retain psychiatric expert unreasonable in sex abuse case where there was no indication that counsel "had the education or experience necessary" to assess relevant psychiatric evidence, or "to make for himself a reasonable, informed

---

[5] "If [trial counsel's] omissions and mistakes were 'within the wide range of reasonable professional assistance,' *Strickland v. Washington*, 466 U.S. at [689], given the heavy measure of deference due to counsel's judgment, then we could excuse them. But 'all the circumstances,' *id.*, indicate otherwise. [The defendant's] youth and lack of a prior criminal record, the irrevocability of the penalty invoked, [counsel's] inexperience, and the heavy stress under which counsel, by his own admission, was unable to prepare adequately must all be considered."

11   DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

determination as to whether an expert should be consulted or called to the stand"); *Sanders v. Ratelle*, 21 F.3d 1446, 1460 (9th Cir. 1994) (considering trial counsel's pattern of indifference to other clients' interests, and eventual disbarment on that basis, as refuting argument that counsel's failures in present case were "strategic"; stating that "the failure to 'conduct even the minimal investigation that would have enabled [counsel] to come to an informed decision about what defense to offer' can hardly be called strategic without 'strip[ping] the term of all substance' "; and cited by the F&R on related points at 18, 24).

In light of the foregoing authority, the government's claim that the magistrate's consideration of trial counsel's inexperience "re-wrote" the governing law is flatly wrong. Its claim that the magistrate relied on nothing other than *United States v. Saltzer, supra*, to support her approach is disingenuous, particularly since, as noted, petitioner notified the government of *Spaziano, supra*, and related authority in his opening post-hearing brief.

For all these reasons, this Court should reject the government's attack on the Magistrate's legal analysis.

## II.   THE MAGISTRATE'S FINDING THAT PETITIONER'S TRIAL COUNSEL UNREASONABLY AND PREJUDICIALLY FAILED TO INVESTIGATE HIS ALIBI DEFENSE RESTS ON CREDIBILITY DETERMINATIONS AND IS SUPPORTED BY OVERWHELMING EVIDENCE

### A.   Introduction

At the hearing before the magistrate, Dan Broderick, the Federal Public Defender for this district court at the time of petitioner Hayat's trial in 2006, offered expert testimony that any reasonably competent attorney who believed his or her client to be innocent and knew of the existence of alibi witnesses would be obligated to locate and interview those potential witnesses. Ninth Circuit case law is to the same effect, and the government presented no contrary expert testimony on the issue.

After observing and considering Mojaddidi's testimony concerning her justifications for failing to conduct such investigation, the magistrate deemed all of them unreasonable, resting as they

did on errors of fact, law, and/or logic. Consequently, the Magistrate found Mojaddidi's lack of investigation to constitute constitutionally deficient performance. Any judge would have reached the same conclusion. Indeed, this District Court has already done so.

The remaining question of prejudice under *Strickland* entirely turns on the credibility of the alibi witnesses who testified at the evidentiary hearing. Based on its observation of these six witnesses, the Magistrate deemed them sufficiently credible to undermine the jury's reliance on petitioner's purported confession, raising a reasonable probability of a different result at trial had Mojaddidi adequately represented her client.  The government's claim that this Court should reject those credibility findings "as a matter of law" is unavailing.

### B.     The Magistrate's Findings

#### 1.     Deficient Performance

The government's primary evidence that Hamid had attended a terrorist training camp in 2003-2004 consisted of his statements under interrogation. During his purported confession, Hamid provided different time periods during which he attended the camp, none less than three months and all ranging up to six months. Three months was the minimum amount of time discussed in his interrogation. (F&R at 20.) From the outset of her representation of Hamid, Ms. Mojaddidi believed that he had not attended a terrorist camp (IV TR 680-81, 726, 743) and that the inculpatory statements in the purported confession were false (*id*. at 743; *see also* F&R at 56).

Mojaddidi testified at the evidentiary hearing that she initially considered an alibi defense.[6] In her discussions with Hamid, she learned that he spent his time in Pakistan in either Behboodi or Rawalpindi. He told her he spent time playing cricket, playing video games, and hanging out in front of the local store in Behboodi. She knew that he spent time with family members. (*Id*. at 24.) Despite knowing that there were also friends, neighbors, and associates in Pakistan who could provide

---

[6] Petitioner set forth a detailed summary of Ms. Mojaddidi's testimony at the hearing in his opening post-hearing brief below. (*See* ECF 721 at 27-31, 33-34.)  He summarized and discussed Mojaddidi's hearing testimony and deposition testimony together in his post-hearing reply (ECF 730 at 19-21, et seq.) and the deposition testimony alone in his summary judgment reply (ECF 564 at 20-24.)

DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

information on Hamid's whereabouts, Mojaddidi did not conduct, or have an investigator conduct, any interviews in Pakistan of these other witnesses. (*Id*. at 26.)

The magistrate deemed credible and persuasive the testimony of Broderick that it would be very possible to construct an alibi showing that a defendant could not have "vacated themselves for three months where nobody saw them," and that "[t]here would be no circumstances" in which a reasonable attorney would deem it unnecessary to locate and interview potential alibi witnesses where the attorney felt her client was innocent. (*Id.* at 21.)

Broderick further testified that a reasonably competent attorney representing a client charged with an offense in a foreign country who believed their client innocent would have sought to conduct investigations early on in that country to locate potential alibi witnesses. That reasonable attorney would either send an investigator to the foreign country or hire an in-country investigator to determine whether the defendant was at the scene of the crime, and whether there were any alibi witnesses for the period of time alleged in the indictment or in the bill of particulars. An experienced investigator in the foreign country could locate witnesses, follow up new leads, and obtain documents with dates showing when the defendant was at certain locations. If the attorney felt they were unable to secure the presence of those alibi witnesses at trial, he or she could seek to conduct Rule 15 depositions in lieu of in-court testimony. (F&R at 22.) The testimony of these foreign witnesses can be videotaped and the video shown to the jury. (*Id*. at 23.)

The government presented no expert testimony on alibi investigations to counter that proffered by Hamid.  Based on the testimony before her, the magistrate concluded that a reasonable pretrial investigation of an alibi defense in this case would have included obtaining sufficient information to determine if an alibi defense was plausible. The fact that potential alibi witnesses resided in a foreign country, while certainly making investigations more complicated, was not an insurmountable problem, as demonstrated by the work of Hamid's post-conviction counsel. They found people willing to conduct investigations in Pakistan. Those investigations found witnesses willing and, through Rule 15, able to testify concerning Hamid's whereabouts during the time period

14   DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

in question. (*Id* at 23.) The magistrate concluded that any reasonable attorney would have pursued such an alibi defense in this case. (*Id*. at 21.)

Despite never attempting to locate any alibi witnesses in Pakistan, Mojaddidi testified that she and Griffin concluded that an alibi defense was not the best strategy because there were no "sound alibi witnesses." But the law is clear that a defense counsel cannot fail to investigate and interview potential alibi witnesses based on guesses and assumptions about what they might say. (*See* F&R at 29, citing supporting case law.)  Based on Mojaddidi's own testimony and the other evidence before her, the magistrate found that her "decisions to reject an alibi defense, base her strategy on a rush to trial, and limit the defense to a challenge to the government's evidence were based on three misconceptions." (*Id*. at 28.)

First, Mojaddidi mistakenly believed that the only legitimate alibi witnesses would be witnesses who saw Hamid every day, but the indictment charged Hamid with attending a terrorist training camp for a "period of months," and the evidence adduced at trial regarding Hamid's attendance at a training camp was that he had done so for somewhere between three and six months. Therefore, an effective alibi defense needed to show no more than that Hamid was seen during every continuous three-month period between October 2003 and November 2004, the dates identified in the indictment.  (*Id*. at 28-29.)

Second, Mojaddidi was unaware that under Rule 15 of the Rules of Criminal Procedure, she could take the deposition testimony of alibi witnesses in Pakistan. Because of her ignorance of the law, Mojaddidi felt she had no way to obtain their testimony, and therefore failed to conduct an investigation into those witnesses and thus to make informed decisions about an alibi defense. (*Id*. at 29.)

Mojaddidi's third misconception was that a strategy of rushing the case to trial was valid under the circumstances and required, among other things, foregoing filing pretrial motions and obtaining security clearance. The rush-to-trial strategy was defeated by defense counsels' own pre-trial discovery requests, which resulted in multiple trial date extensions that permitted the

15   DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

government to fully prepare its case. As the magistrate found: "Mojaddidi recognized that the district court's rulings upended the rush-to-trial strategy. (IV TR 739.) What she did not explain was why that strategy did not change as a result." (F&R at 29-30.)

The Magistrate found that these "critical misconceptions" caused Mojaddidi "to unreasonably limit her investigations" (*id*. at 31), and to make "'strategic' decisions that were wholly uninformed" (*id*. at 33). Furthermore, "[s]howing that Hayat could not have been at a jihadi training camp for the 'period of months' specified in the indictment would have been completely consistent with the defense that Hayat's confession should not be credited and the government lacked other supporting evidence." (*Id*. at 32.) Based on her evaluation of all of the evidence before her, especially her observation of Mojaddidi's testimony, the magistrate found that Mojaddidi "acted unreasonably when she rejected an alibi defense." (*Id*. at 33.)

### 2. Prejudice

Whether attorney Mojaddidi's deficient performance in failing to investigate a potential alibi defense for her client depended, of course, on whether such investigation would have located credible witnesses who would have testified that, during his stay in Pakistan between 2003 and 2005, Hamid never departed for three or more months from his village in Behboodi and relatives' residence in Rawalpindi in order to attend a jihadi training camp near Balakot (or anywhere else). At the evidentiary hearing, Hamid presented the testimony of six witnesses regarding his whereabouts during the time he was in Pakistan. Two of those witnesses testified in court, while four others testified by video-conference from Pakistan. (F&R at 33-34.)

The report of the magistrate summarized the testimony of the six alibi witnesses – Raheela Hayat, Jaber Ismail, Muhammed Anas, Rafaqat, Fahim ud Din, and Tayyaba Fahim – all of whom were cross-examined by government counsel. (F&R at 34-41.) The testimony of the alibi witnesses at the hearing directly contradicted the government's contention that Hamid had attended a jihadi camp for at least three months during his time in Pakistan. Based on her observation of these witnesses, the magistrate found their detailed testimony consistent in affirming that Hamid spent

almost all of his time in Behboodi with regular, brief trips to Rawalpindi for almost his entire stay in Pakistan from April 2003 to May 2005. After the family's initial stay in Rawalpindi upon their arrival in Pakistan in April 2003, the longest period of time Hamid was absent from his family's village of Behboodi was one week.

The magistrate carefully considered each governmental challenge to the credibility of the six alibi witnesses, first among them that the alibi witnesses were relatives or acquaintances of Hamid. The magistrate noted while that issue is to be considered in weighing credibility, it is by no means a disqualifying factor as to credibility, and that the failure to call family members as alibi witnesses has been found in multiple instances to establish prejudice from a deficient performance. (F&R at 47-48, citing apposite Ninth Circuit precedent.)  The magistrate further found it unsurprising that people with a close relationship with Hamid would recall his whereabouts years earlier, and that the consistency of the witnesses' statements lent credibility to their testimony. (*Id.*)

Second, having observed the testimony of these witnesses, the magistrate found "simply no basis" to conclude that they gave false testimony in Hamid's favor.  (*Id.* at 48.)

Third, the magistrate specifically rejected the government's claim that the witnesses should be discredited on the ground that they did not come forward sooner. The court found that it had been the responsibility of Ms. Mojaddidi to locate and produce these alibi witnesses she knew existed, rather than the obligation of the witnesses to come forward of their own volition. (*Id.* at 49-50.)[7]

The magistrate also considered the fact that four of the alibi witnesses testified from Pakistan, where the existence or likelihood of a penalty for perjury was unclear. Finding that factor

---

[7] Furthermore, in 2007, present counsel for Hamid filed an initial 2255 motion on his behalf, alleging that Mojaddidi's ill-fated "rush to trial" strategy had resulted in her failure to interview and preserve testimony of the many exculpatory witnesses that she knew were located in Pakistan, as well as to preserve their testimony through Rule 15 depositions. (ECF 496 at 13-14.)  The government successfully moved to dismiss the initial 2255 motion on the ground that the district court could not entertain it until Hamid had exhausted his appellate review (ECF 506 at 4; ECF 516), an event that did not occur until 2013. The fact that the alibi witnesses who could have testified persuasively in 2006 were unable to present their testimony at court until 2018 was wholly due to Ms. Mojaddidi's deficient performance and subsequent procedural obstacles.

DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

went to weight rather than admissibility, the magistrate noted that the Pakistani witnesses did take an oath to testify truthfully and reaffirmed their obligation to do so during their testimony. (F&R at 51.)

Finally, the magistrate considered that there were some inconsistencies in the testimony of the alibi witnesses and that some admitted that their memories of the time were not perfect. Again relying on its observation of the alibi witnesses' testimony, the magistrate had "no problem accepting the fact that family members and good friends, who typically saw Hamid on a daily or weekly basis when he was in Pakistan at that time, would have remembered such an extended absence. Their memories did not need to be perfect about the events of those two years to have that recollection." (*Id*. at 51.) The magistrate also noted that the alibi witnesses corroborated each other on important factual points during the relevant time period, which she listed in her report.  (*Id*. at 51-52)

The magistrate also noted that Hamid "present[ed] declarations from a number of other Pakistanis regarding their interactions with Hayat during the relevant time period." (*Id*. at 33-34.) The magistrate made no determination as to the credibility of these declarants, unlike the alibi witnesses, because the government was not able to cross-examine the declarants and Judge Barnes could not observe their testimony. Thus, she found that "the declarations [did] not weigh significantly in Hayat's favor." (*Id*. at 49.) However, the magistrate did find, as the declarations made obvious, "that at least some other witnesses could have, and likely would have, provided testimony similar to that provided by the witnesses who testified at the evidentiary hearing." (F&R at 47.)

The magistrate correctly noted that "the government presented no witnesses who testified that they saw Hayat attend a terrorist training camp. (*Id*. at 52.) Consequently, as the magistrate found, "[t]he lynchpin of the government's case against Hayat was Hayat's confession. Without it, the government could not have proven Hayat took any act in material support of terrorism." (*Id*.)

1    The government's unequivocal theory at trial was that Hamid attended a jihadi training camp

2    for no less than three to six months.[8]  Magistrate Barnes found that while "Hayat told interrogators

3    he attended a jihadi camp for, at a minimum, three months, each alibi witness testified that Hayat

4    was never absent from Behboodi for an amount of time even close to that." (*Id*. at 53.)  "[T]estimony

5    that Hayat's statements could not have been true would, at the least, have given jurors reasonable

6    cause to doubt Hayat's confession." (*Id*.) The alibi witness testimony therefore "would have

7    undermined jurors' reliance on Hayat's confession." (*Id*. at 52.)

8    Based on the trial record, the magistrate found that petitioner's "jury initially deadlocked and

9    took nine days to agree upon a verdict, a factor that under Ninth Circuit law "is relevant to

10    determining prejudice." (*Id*. at 52.) Given that fact and the other indications of weakness in the

11    government's case, Magistrate Barnes found that "had Mojaddidi investigated and presented alibi

12    witness testimony, there is a reasonable probability the result of Hayat's trial would have been

13    different." (*Id*. at 53.)

14    //

15    //

16    //

17    //

18    //

---

19    [8] The government's claim in its objections that Hamid's interrogation "left open the
20    possibility that he attended a camp for *less than three months*" (Obj. at 48; italics in text) is
      disingenuous, as its closing arguments at trial make clear. (*See* 4-12-06 RT 4253:19-20 [Hamid
21    "indicated he stayed at (the jihadist training camp) for three months."]; *id*. at 4253:25-4254:2
      ["Of great significance, Hamid Hayat indicated that the camp was located in the proximity of
22    Balakot."]; *id*. at 4255:2-5 ["When asked how long he'd been at the camp, he initially stated it
      was maybe three and half months, or something like that. And then he later indicated it was six
23    months."]; *id*. at 4259 ["As for the length of the camp, he said at first he didn't know, but later in
      his interview indicated that one has to train for six or seven months before he can get sent out.")
24    Furthermore, petitioner's confession described a three to six month period without exception; the
      indictment itself alleged petitioner's attendance at a camp for "a period of months;" and the
25    government' pre-hearing briefing repeatedly acknowledged three to six months as the relevant
26    time period. Petitioner's post-hearing briefing thoroughly refutes the government's present
      argument on this entire point. (*See* ECF 730 [post-hearing reply] at 22-25.)

27                                     19      DEFENDANT-PETITIONER'S RESPONSE TO
                                               OBJECTIONS TO MAGISTRATE JUDGE'S
28                                             FINDINGS AND RECOMMENDATIONS
                                               Case No.: 05-cr-0240-GEB

### C.     There Is No Basis on Which to Reject the Magistrate's Finding of Deficient Performance Regarding Attorney Mojaddidi's Failure to Investigate and Present an Alibi Defense

No reasonably competent lawyer who believed her client to be innocent would fail to locate and interview alibi witnesses that attorney knew existed. On that point, the magistrate found persuasive the expert testimony of Broderick, who, as the head of the Federal Public Defender's Office at the time of petitioner's trial, was eminently qualified to define the obligations of trial counsel in this matter. Furthermore, as the magistrate noted, Broderick's testimony tracked Ninth Circuit law. (F&R at 24, quoting *Duncan v. Ornoski*, 528 F.3d 1222, 1234-35 (9th Cir. 2008) and *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999) for the principle that "[a] lawyer who fails adequately to investigate and introduce . . . [evidence] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." [citations and internal quotation marks omitted]).

The magistrate weighed the justifications proffered by attorney Mojaddidi for her failure to investigate petitioner's alibi defense, and found each to be marred by ignorance of the law or mistakes of fact. Mojaddidi could not have made a reasonable decision as to whether to interview alibi witnesses in Pakistan when she did not know that their testimony could be taken and presented at trial through Rule 15 depositions. Mojaddidi should have known, but did not, that a "rush to trial" was doomed to fail due to the extensions of time to which the government was entitled under the Speedy Trial statute due to the extent of the defense's discovery requests. As the Supreme Court has made clear, defense counsel's ignorance of relevant legal principles is sufficient to support a finding of deficient performance. (F&R at 29, quoting *Hinton v. Alabama*, supra, 571 U.S. at 274 (stating that, "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").)

Furthermore, as the magistrate found, Mojaddidi's belief that Pakistani witnesses needed to, but could not, provide an alibi for every day Hamid spent in Pakistan was based on an egregious

factual misconception. An effective alibi defense could and would have been established by testimony that "Hayat was seen during every continuous three-month period between October 2003 and November 2004, the dates identified in the indictment." (F&R at 29.)

As the government reluctantly recognizes (Obj. at 60), this court previously ruled, in its order addressing petitioner's summary judgment motion, that Mojaddidi's performance with respect to the alibi defense was deficient. (*See* Order on Summary Judgment, ECF 600 at 17 ["Hayat is correct in his assertion that he gave his counsel enough information for her to have conducted a more thorough investigation of a potential alibi defense on his behalf."].) For that reason, this court's Order stated that the previously-assigned magistrate's proposed findings and recommendations were "rejected in part." (*Id.* at 20; *see also* Magistrate Barnes' December 27, 2017 order denying the government's motion to exclude evidentiary hearing testimony from alibi witnesses, ECF 695 at 9 n.3 [noting that in its opening motion to exclude, the government argued that Magistrate Barnes should consider the previously-assigned magistrate judge's ruling that Mojaddidi did not act unreasonably, but that the government did not pursue this argument in its reply "after petitioner pointed out in his opposition that the district judge explicitly rejected the [previously-assigned] magistrate judge's findings on unreasonableness."].)

This court's previous ruling in favor of petitioner on the issue of deficient performance was founded on undisputed facts in the record, including the deposition testimony of Ms. Mojaddidi. The government now asks this court to abandon its prior ruling on deficient performance because its "analysis was based on facts developed during the summary judgment phase, more than a year before the 2018 evidentiary hearing. That record included a less developed analysis by the parties of each factor affecting Ms. Mojaddidi's evaluation of an alibi defense…" (Obj. at 60.) "On the expanded record, this court should conclude that Ms. Mojaddidi's investigation of the alibi defense was reasonable.") *Id.* at 60-61.) Thus the government's position is clear. In order to now reject its prior ruling that Mojaddidi's representation was deficient, this court would have to find her

1   testimony at the evidentiary hearing to have been credible and persuasive, thereby expressly

2   disapproving the contrary credibility determination of the magistrate.

3          The government's position has no merit. First, under *Finn* and the legal standard governing

4   review of the magistrate's credibility determinations, this court cannot reject her negative assessment

5   of Mojaddidi's credibility without ordering a new evidentiary hearing.

6          Furthermore, Mojaddidi's testimony at the hearing concerning her alibi investigation was no

7   more favorable to her credibility than her deposition testimony. Indeed, if anything, Mojaddidi's

8   testimony at the hearing exposed her incompetence on the alibi issue to an even greater degree. At

9   her deposition, Mojaddidi responded that, without interviewing any witnesses on the ground in

10  Pakistan, she made the judgment that she would not be able to build an alibi for every day that

11  Hamid had been in Pakistan, and for that reason it would have been futile to pursue an alibi defense.

12  (IV TR 270-71.) That rationale was indefensible, but at the hearing, Mojaddidi added a new, even

13  more stunning explanation of her failure to investigate an alibi defense: she saw no need to pay

14  attention to the time periods that Hamid claimed to have attended a camp during his interrogation

15  because she believed the whole "confession" was false. (IV TR 782: "I don't know why I would

16  pursue something that I knew my client told me wasn't true").[9]

17         Attorney Mojaddidi's task at trial was not to ignore details of the confession she did not

18  believe, but to convince jurors that those details were false, as was the entire confession. Ms.

19

_____

20         [9] Ms. Mojaddidi's hearing testimony was considerably more damning than her deposition
    testimony in other respects, as discussed in petitioner's post-hearing reply. (*See* ECF 730 at 19-
21  21.) For instance, at her deposition, Mojaddidi testified that petitioner, in response to
    Mojaddidi's express inquiry, identified certain people who could testify concerning his innocent
22  activities in Pakistan. (Exh. FFF at 150-152.) At the hearing, by contrast, Mojaddidi testified
    that she never sought or received from Hamid a list of people who would serve as useful alibi
23  witnesses, but rather had general discussions that allowed her to "assess" who the "players"
    were. (IV TR 727-28.) She further conceded that she did not get as much information from
24  petitioner as she "gets from typical other witnesses because of his educational level and
    background." (*Id.* at 690-91.) And while she did seek a list of witnesses from a single family
25  member, *i.e.*, Hamid's mother, Salma (Oma) Hayat (IV TR at 728), Mojaddidi conceded that
    Salma was "a very quiet, timid person" who "did not volunteer a lot of information." (*Id.* at 729).
26  *See also* F&R at 24-25 (recounting relevant hearing testimony on this point).

27                                          22   DEFENDANT-PETITIONER'S RESPONSE TO

28                                               OBJECTIONS TO MAGISTRATE JUDGE'S
                                                 FINDINGS AND RECOMMENDATIONS
                                                 Case No.: 05-cr-0240-GEB

Mojaddidi's newly minted explanation at the hearing for her failure to pursue an alibi defense was nonsensical. Furthermore, the magistrate was able to observe the odd demeanor with which Mojaddidi tendered that testimony, a critical factor in assessing credibility.

The magistrate's finding of deficient performance was based on overwhelming evidence and is consistent with Ninth Circuit law. The same is equally true of this court's prior finding to the same effect on summary judgment.  Those determinations should now be reaffirmed.

> ### D.  There Is No Basis on Which to Reject the Magistrate's Finding of Prejudice

Again, resolution of the prejudice issue depends on the credibility of the six alibi witnesses who testified at the evidentiary hearing. Both the deficiency of Ms. Mojaddidi's representation and the prejudice suffered by petitioner are dispositively established because, as the magistrate found, those witnesses would have tendered believable testimony that, while in Pakistan between 2003 and 2005, Hamid never left his family, friends, and neighbors for any time period remotely approaching three to six months.

This was not a strong case at trial for the government. While the government introduced statements of Hamid prior to his visit to Pakistan that he intended to go to a training camp, it had no convincing evidence that he actually did so. FBI agent Tenoch Aguilar, who headed the government's investigation in this case, conceded at trial that without Hamid's statements under interrogation he could not determine that Hamid attended a camp. (2/22/06 RT 762.) As the magistrate found, once in Pakistan, Hamid exhibited such disinclination to go to a camp that Khan, the government's undercover operative, "even threatened Hayat, telling him that when he came to Pakistan he was "gonna fuckin' force you to – get you from your throat and fuckin' throw you in the Madrassah…" (F&R at 4.)

Relying on case law and common sense, the magistrate found that an "alibi defense is clearly among the most compelling defenses." (F&R at 21.)  Magistrate Barnes heard the testimony of the alibi witnesses and carefully weighed the factors bearing on their credibility. She found that such

testimony, had it been offered at petitioner's trial, as it could have and should have been, would have

undermined the jury's reliance on the only evidence the government tendered as direct evidence that

petitioner attended a jihadi training camp  –  his purported confession that he attended a camp for no

less than three months. The alibi evidence attorney Mojaddidi failed to present therefore would have

rendered probable a more favorable result for Hamid at trial.

This court would have reached the same conclusion as to the credibility of the alibi

witnesses, had it had the opportunity to observe their testimony. There is simply no reason to reject

the magistrate's credibility determinations and recommendation in this matter on the issue of

petitioner's alibi defense. Rather than undertake the daunting and unnecessary task of convening an

entirely new hearing in this matter under *Finn*, this court should accept the magistrate's findings and

recommendation on the alibi claim. Petitioner's convictions can be vacated on that basis alone.

## III.   THE MAGISTRATE'S FINDINGS AND CONCLUSIONS CONCERNING THE FALSE CONFESSION EXPERT ISSUE ARE FULLY SUPPORTED BY CONVINCING EVIDENCE BASED ON CREDIBILITY DETERMINATIONS

Juries consider a defendant's confession to be the most damaging evidence that can be

offered against him. *Bruton v. United States*, 391 U.S. 123, 139-40 (1968).  Jurors generally believe

that no one accused of a serious crime would testify falsely, but false confessions do occur; they

have common characteristics; and they have been the cause of wrongful convictions.  *See Lunbery v.*

*Hornbeak*, 605 F.3d 754, 763 (9th Cir. 2010) (Hawkins, J., concurring) ("Among the hundreds of

persons exonerated of serious crimes through DNA testing are numerous individuals who earlier

confessed." (citing studies)).

The best way to combat the myths that jurors hold on the issue is to call an expert on the

science of false confessions, and a failure to do so can constitute constitutionally deficient

performance. *Id.* at 764. For those reasons, a defense counsel who truly believes that her client has

falsely admitted a crime must prepare and proffer the testimony of a false confession expert.

In this case, Mojaddidi correctly concluded that an adequate defense required the

presentation of expert testimony concerning the incriminating statements Hayat made during his

marathon interrogation. Having never prepared an expert witness to testify, and ignorant of the

nature of false confession testimony and the standards it must meet to gain admissibility, Mojaddidi

never attempted to retain a qualified expert in the field. Rather, from the initiation of her client's

prosecution, she deferred to attorney Griffin's decision to call James Wedick, his friend and

investigator, as their joint expert on interrogations.

The defense did not even seek to offer Wedick, an ex-FBI agent, as an expert on the science

of false confessions, no doubt because as both this court and the Ninth Circuit have noted, Wedick

did not have "particular expertise in the field of false confessions." *United States v. Hayat*, 710 F.3d

875, 903 (9th Cir. 2013). As a result, Wedick was barred from testifying at Hayat's trial.

The magistrate's finding that Mojaddidi's failure to present a false confession expert

constituted deficient performance was based on her assessment of the credibility of the testimony of

attorney Mojaddidi and the legal experts who addressed the issue. As such, it merits full acceptance

by this court.

### A.    The Magistrate's Findings on Deficient Performance

Attorney Mojaddidi understood that the most important evidence that would be offered

against Hayat was his confession, and believed that the confession was false. (F&R at 56.) It was her

intention to challenge the reliability of the confession through expert testimony. She was contacted

by experts in false confessions, but never really considered using them and did not contact any of

them "because 'there was an understanding [with Umer's counsel] that it was going to be Jim

[Wedick] always.'" (*Id.* at 57.)

Mojaddidi was aware that Wedick, a former FBI agent and the defense investigator for both

Hayats, had never qualified as an expert. However, despite the fact she had never attempted to

qualify an expert for trial, Mojaddidi felt Wedick "would get in and would be qualified." (*Id.*)  This

court, however, entirely excluded Wedick's testimony because, *inter alia*, Mojaddidi had "not shown

Wedick is qualified as an expert in the field of psychology or psychiatry, or otherwise and the

qualifications to give expert testimony regarding Hayat's alleged susceptibility to suggestion and coercion." (*Id*. at 58.)

The magistrate accepted the testimony of two legal experts on criminal defense, Doron Weinberg and former chief Federal Defender Daniel Broderick, that an attorney who believed her client's confession was false and planned to challenge it as such must find, prepare, and call to the stand an expert who has been previously found qualified to testify on the issue. There were qualified experts available on the West Coast at the time of Hayat's trial. The government presented no testimony to counter these expert opinions. (*Id*. at 59.) "Based on both Weinberg and Broderick's testimony, [the magistrate] found that a reasonable attorney would have procured a false confession expert to explain to the jury why Hayat may have confessed." (*Id*. at 60.)

The magistrate further found that Mojaddidi's decision to rely solely on Wedick was not based on reasonable investigation and or any consideration of the relative benefits of using a false confession expert in place of, or along with, attempting to call Wedick. She concluded "Mojaddidi acted unreasonably in failing to procure an expert on false confessions." (*Id*.)

## B.     The Magistrate's Findings on Prejudice

In response to a pre-hearing motion by the government to exclude the testimony of Doctor Richard Leo, a professor of law and psychology at the University of San Francisco and the country's leading expert on false confessions, the magistrate had concluded "there is no question that Dr. Leo has specialized knowledge that is not within an average juror's bank of knowledge or expertise." (ECF No. 685 at 16.) "[H]e is a professor of psychology and criminology; his specializations include research on the psychology of interrogations and confessions. He has been qualified as an expert 270 times in state and federal courts, including 119 times in disputed confession cases prior to the end of 2005, around the time he could have been retained by Mojaddidi." (*Id; see also* F&R at 61.)

At the hearing, the magistrate then personally heard the testimony and weighed the credibility of Leo, who had testified as an expert on the subjects of police interrogation, psychological coercion, and false confessions well over three hundred times. (*Id*. at 61.) As an expert

DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

testifying about the nature of false confessions, Leo did not offer an opinion on whether Hayat's purported confession was true or false. Rather, he described the professional studies of confessions that have been proven to be demonstrably false, and the factors common to such confessions. Leo testified that research has revealed that confessions are highly prejudicial, and that most people assume someone would not confess unless they are guilty. (*Id.* at 63.)

As the magistrate found, in his testimony Leo distinguished interviews, which involve open-ended questions, from interrogations, which are typically accusatory. (F&R at 62) Interrogations are "guilt presumptive" because they are "typically preceded by an investigation in which the police or agents conclude that a person committed the crime." (*Id.*) Police then interrogate that person with the goal of obtaining a confession. (*Id.*) A typical method of doing so involves isolating the suspect, building rapport with the suspect, and then accusing and confronting the suspect. (*Id.*)  Leo testified that an interrogation becomes psychologically coercive when the suspect perceives that he has "no meaningful choice but to do what they are being pressured and persuaded or demanded to do." (*Id.*, citing I TR 35-36.)

Interrogators employ various psychological techniques. They include falsely informing a suspect that the interrogators have evidence linking them to the crime, to encourage admissions. Leo testified that false evidence ploys are often a "real problem in false confession cases." (F&R at 62.) Other psychological techniques include (1) providing inducements to persuade a suspect that it is in their best interest to stop denying; (2) appeals to morality or conscience; (3) minimizing the suspect's involvement to make the suspect think that if they confess, the consequences will be minimal; and maximizing the potential consequences as a threat for continuing to deny involvement and not cooperating. (*Id.*)

After describing in detail Leo's testimony on the presence in Hayat's interrogation of numerous factors common to false confessions (*id.* at 63-65), the magistrate found "that the following risk factors for false confessions were present in the recorded portion of Hayat's interrogation: a false evidence ploy, inducements with the suggestion of benefits for cooperation,

27   DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

sleep deprivation, and the lengthy interrogation. (*Id.* at 65.) She then concluded that the prejudice resulting from Mojaddidi's failure to obtain alibi witness testimony was aggravated by her deficient performance in failing to procure and present the testimony of a false confession expert, as "alibi witnesses and a false confession expert like Leo [both] would have provided testimony attacking the reliability of Hayat's confession." (*Id.* at 65.)

The magistrate took note of the indisputable facts that "Hayat's confession was the singularly most important piece of evidence the government put on," and that "without it, there is no question that the government would have been unable to obtain a conviction on the charge of material support for terrorism." (*Id*. at 65.) After again observing that the facts that "the jury deadlocked at one point and that it took nine days to render a verdict favor a finding of prejudice," the magistrate found it "it reasonably probable that the combined effect of Mojaddidi's errors affected the jury's verdict in Hayat's case." (*Id*.)

## C.   The Magistrate's Credibility-Based Findings Merit Full Acceptance by this Court

It was essential that Ms. Mojaddidi locate and retain a qualified false confession expert. And yet she failed to do so due her ignorance of the nature of false confession expert testimony and the qualifications required to present it. *See Pavel,* 261 F.3d at 224 (finding trial counsel's failure to retain psychiatric expert unreasonable where there was no indication that counsel "had the *education or experience* necessary" to assess relevant psychiatric evidence, or "to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand") (emphasis added).

False confession expert testimony from an expert such as Leo would not have affirmatively proved Hamid's innocence, but it would have substantially weakened the prosecution's most, indeed only, powerful piece of evidence. The jury heard no testimony about the empirical findings regarding the frequency of false confessions and the factors common to those confessions.  Dr. Leo's opinions, which were credited by the magistrate, were based on an extensive body of peer reviewed

research (including his own). They were founded on reliable empirical methods and they were reliably applied to the facts of this case.

As Dr. Leo explained, lay jurors who have not experienced interrogation do not understand why anyone would confess to a crime he did not commit. It is precisely for that reason that confessions are so powerful, and also for that reason that confessions are such a common source of false convictions. Dr. Leo or another similar expert could have explained to the jurors why their own prior assumptions about confessions were in fact misconceptions, and he could have pointed out the risk factors that were present in this case.

The magistrate found "it reasonably probable that the combined effect of Mojaddidi's errors [such as her failure to present alibi witnesses] affected the jury's verdict in Hayat's case." (*Id.* at 65.) That conclusion rests on ample evidence found credible by the court below, and is supported by law and logic as well. Again, there is no reason whatsoever to reject the magistrate's findings and recommendation and convene a new hearing on the false confession expert issue.

**IV.   ATTORNEY MOJADDIDI'S MULTIPLE FAILURES TO CHALLENGE MOHAMMED'S TESTIMONY REGARDING THE SUPPLICATION DEPRIVED PETITIONER OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL**

**A.   Introduction**

Khaleel Mohammed, called by the government as an expert witness, was qualified to translate from Arabic to English the supplication in the possession of petitioner Hayat at the time of his arrest. But Mohammed's testimony ranged far beyond providing a literal translation of the supplication.

As Magistrate Barnes found, Mohammed "testified that his research showed that the supplication 'is not peaceful' and would be carried by '[a] person who perceives him or herself as being engaged in war for God against an enemy.'" (F&R at 71.) According to witness Mohammed, only a jihadi would carry this supplication. (*Id.*) The magistrate concluded that "Mohammed's testimony amounted to evidence that Hayat was a card-carrying member of a jihadi group." (*Id.* at

DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

83-84.) Consequently, '[t]he only inference jurors could draw if they believed Mohammed's testimony was that Hayat had the intention to wage jihad." (*Id*. at 83.)

As the government stated in its closing argument, Mohammed was "the only expert witness who testified in this trial who can read and write Arabic" (F&R at 87); thus, only Mohammed had been permitted at trial to offer an opinion as to what the supplication meant. As Magistrate Barnes noted, Mohammed's testimony was "unrebutted by contrary expert testimony," and "involved cultural practices that jurors very likely had no experience with. As such, it likely took on particularly great importance. …." to the jury. (*Id*. at 83, 84.)

It is now clear, however, that Mohammed's opinion testimony that any and every Muslim who carried the supplication was intent on committing violent jihad was demonstrably untrue. The supplication in question is commonly used by Muslims around the world, especially travelers, as a prayer to Allah for protection against harm. That fact was firmly established by the unchallenged expert and lay testimony of witnesses at the evidentiary hearing below, which the magistrate credited after observing those witnesses testify. Mohammed's opinion testimony at trial was not only unfounded but constituted a calumny on the millions of Muslims around the world who invoke this specific supplication for entirely peaceful purposes.

When initially retained by the government, Mohammed had no familiarity with the supplication and had to conduct research on the internet in order to formulate an opinion as to its usage and meaning. Mohammed had no expertise whatsoever in the religious practices of non-Arabic speaking Muslims in Southeast Asia in general and Pakistan in particular; he had to email a handful of scholars and students in that region to ascertain whether any were familiar with the supplication. The answers Mohammed received from those scholars and students provided little or no support for the predetermined opinion that Mohammed offered – to damning effect – in support of the government's case at trial.

Nonetheless, the government improperly argued in closing that the individuals from whom Mohammed sought research information on the supplication were "highly qualified colleagues …

highly qualified Islamic scholars" whose "uniform opinion was that this was a piece of paper with a prayer on it that would be carried by a holy warrior, a violent jihadi, who felt himself to be traveling in an enemy land, and who was ready to commit violent jihad." (F&R at 91; *see also id*.: magistrate finds "[a] review of the e-mails Mohammed received from these people shows that the statement [in government's closing argument] inflated both the qualifications of those contacted and the content of their responses.")

Furthermore, evidence law forbids expert opinions on a mental state of a defendant. Fed. R. Evid. 704(b). By testifying that anyone in possession of the supplication, as Hayat indisputably was, intended to commit jihadi violence, Mohammed's testimony violated that rule. Based on the relevant case law, Magistrate Barnes found a competent attorney would have moved under Rule 704(b) to exclude Mohammed's mental state testimony regarding the supplication. Mojaddidi, however, was ignorant of the bases for challenging the admission of expert testimony. Mojaddidi did know that, given the supplication's admission, she needed the testimony of an Arabic speaking expert to counter it, but having no experience in locating experts and preparing their testimony, she failed to locate one, even though highly qualified experts were available to support the defense. Based on the testimony of experts on the defense function and on the meaning and use of the supplication itself, the magistrate found that Mojaddidi's failure in that regard also constituted deficient performance.

Crediting the testimony of Professor Bernard Haykel, one of our nation's leading Arabic-speaking experts on Islam, the magistrate found Mojaddidi's failure deprived petitioner of critical and effective impeachment of Mohammed's highly prejudicial opinion testimony. Magistrate Barnes further found the prejudice resulting from that deficient performance was compounded by Mojaddidi's failure both (a) to object to the government's clear mischaracterization in its closing argument of the evidentiary basis for Mohammed's opinion on mental state and (b) to counter that distortion during the defense closing argument. Those credibility-based determinations merit this court's acceptance.

//

DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

**B.**     **The Failure to Move to Exclude Mohammed's Mental State Opinion**

**1.**     **Deficient Performance**

At the time of petitioner's trial in 2006, Rule 704(b) read: "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." *United States v. Hayat*, 710 F.3d 875, 901 (9th Cir. 2013). "A prohibited 'opinion or inference' under Rule 704(b) is testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." *United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997) (en banc); *accord United States v. Campos*, 217 F.3d 707, 711 (9th. Cir. 2000).

Mojaddidi, who had no knowledge of the procedures for qualifying or challenging expert testimony, nor any experience in doing so, made no challenge prior to or during trial to any aspect of Mohammed's testimony. Asked at the evidentiary hearing why she had not objected to Mohammed's qualifications via a motion *in limine*, or to his mental state opinions at trial, Mojaddidi admitted her ignorance of the relevant law, replying: "[I]f I did know a legal basis to object to it, I would have done it." (IV TR 760-61.)

In his opinion on petitioner's direct appeal, Judge Tashima laid out the bases on which Mohammed's opinion on the mental state of Muslims in possession of the supplication could have, and thus should have, been challenged as being in violation of FRE 704(b).  *Hayat*, 741 F.3d at 914. It would be "laughable" to conclude that a party carrying the words from: "Onward, Christian soldiers, marching as to war" was proven by that fact to be a militant bent on religious violence. (*Id*.) No expert could honestly "opine definitively and categorically on the 'kind of person' who would carry 'Onward, Christian Soldiers' in his wallet because the conceivable variations in understanding and motivation are too great. Yet this is exactly what the government expert in this case was permitted to do with respect to the prayer found in Hayat's wallet." (*Id.*)

Judge Tashima's opinion further demonstrated that Mohammed's testimony was to the effect that any and every person in possession of the supplication *necessarily* intended to commit violent jihad. "Mohammed's testimony is the 'functional equivalent' of an opinion that Hayat had the requisite intent to provide material support for terrorism – because he could not be anything other than a 'jihadist.' *Id*. at 913. "Once an expert labels someone a 'jihadist,' what is left for the jury to determine? The jury could not but reach the conclusion that a 'jihadist' is guilty of 'providing material support for terrorism.' There was no wiggle room for the jury to determine that Hayat was 'typical' and thus reach another conclusion."

Judge Tashima therefore concluded that the admission of Mohammed's testimony on mental state, even absent objection, constituted plain error. While observing that "we might like to agree with Judge Tashima that the expert evidence in this case crossed the Rule 704(b) line," however, the majority ruled the error, if any, did not meet the daunting standard for plain error. *Id*. at 901-02.

Magistrate Barnes addressed the issue of whether the majority's plain error ruling barred raising Mojaddidi's failure to object to that testimony as deficient performance under the doctrine of ineffective assistance of counsel. Relying on relevant precedent, the magistrate concluded that the holding on direct appeal regarding plain error did not bar petitioner's Sixth Amendment claim of ineffective assistance of counsel on collateral review. (F&R at 79, citing *United States v. Carthorne*, 878 F.3d 458 (4th Cir. 2017) and *United States v. Span*, 75 F.3d 1383 (9th Cir. 1996)).

As to the substance of that IAC claim, the magistrate found deficient performance, in that "Mojaddidi should have challenged Mohammed's testimony on the grounds that it was an impermissible opinion on the state of mind of Hayat under Rule 704(b), because the "legal precedent 'raised serious questions' about this issue." (F&R at 83, citing *Carthorn*e, 878 F.3d at 469.)

## 2. Prejudice

Magistrate Barnes further found that "Judge Tashima's argument in dissent demonstrates that there was a reasonable probability that had Mojaddidi challenged this aspect of Mohammed's testimony, it would have been excluded or stricken." (F&R at 83.) The government argues to the

1   contrary, contending that that even if Mojaddidi had moved to exclude Mohammed's mental state

2   testimony, the Ninth Circuit's plain error ruling established that such a motion would have been

3   denied. (Obj. at 128: "The Ninth Circuit found the testimony to be admissible…As a result, Hayat

4   cannot show prejudice.")

5   　　　　The government is wrong for several reasons. To begin, a ruling that the admission of

6   evidence did not constitute plain error does not mean that evidence should have and would have

7   been admitted over a proper objection. *See, e.g.*, *Campos*, 217 F.3d at 713 (Admission of drug

8   courier testimony did not constitute plain error, but court left open the issue of whether its admission

9   would have been deemed error if it had been properly objected to.) The comment of the panel

10  majority that "we might like to agree with Judge Tashima that the expert evidence in this case

11  crossed the Rule 704(b) line" certainly suggests that they may well have found a violation of FRE

12  704(b) if Mojaddidi's failure to object had not triggered the severe limitations of the plain error

13  doctrine. *Hayat*, 710 F.3d at 901-02.

14  　　　　Secondly, the admission of expert testimony is in the discretion of the district court. *Campos*,

15  217 F.3d at 710, citing *Morales*, 108 F.3d at 1035. Nothing in the *Hayat* opinion suggested this court

16  would have lacked the discretionary power to exclude Mohammed's mental state testimony under

17  FRE 704(b) had Mojaddidi objected to it.

18  　　　　At petitioner's trial, this court carefully scrutinized the defense's proffers of expert

19  testimony.  As a result, the court excluded the testimony of James Wedick in its entirety and

20  substantially limited the testimony of Anita Weiss on the ground that portions of that testimony

21  ranged beyond her expertise.[10] Had attorney Mojaddidi raised proper objections to the mental state

22  opinions of Mohammed, this court surely would been consistent in its application of those stringent

23  exclusionary standards.

24

25

26  　　　　[10] Dr. Weiss testified that Pakistanis carry ta'wiz as amulets, for good luck when traveling.
    (F&R at 85.) This court did not permit Weiss to testify that the supplication found in Hamid's

27  wallet was a ta'wiz, because she did not speak Arabic. (*Id*. at 85-86.)

28  　　　　　　　　　　　　　　34　　DEFENDANT-PETITIONER'S RESPONSE TO
    　　　　　　　　　　　　　　　　OBJECTIONS TO MAGISTRATE JUDGE'S
    　　　　　　　　　　　　　　　　FINDINGS AND RECOMMENDATIONS
    　　　　　　　　　　　　　　　　Case No.: 05-cr-0240-GEB

Finally, as discussed below, Mojaddidi unreasonably failed to procure the services of a qualified, Arabic-speaking expert witness such as Bernard Haykel. In support of a defense *in limine* motion seeking to exclude Mohammed's mental state testimony, such an expert could have provided truthful and persuasive information about the peaceful usage of the supplication by countless Muslims, thereby dooming the admission of Mohammed's wholly unsupportable opinion testimony.

As demonstrated above, the government forcefully argued that Mohammed's mental state testimony in itself proved that petitioner Hayat had the intent to commit the crime of lending material support to terrorism. That testimony was a cornerstone of the government's case against Hayat. The magistrate, however, did not need to reach the question of whether the admission of Mohammed's mental state testimony *alone* was so prejudicial as to require vacation of Hamid's convictions.

Rather, the magistrate noted "had Mojaddidi procured alibi witnesses and an expert on false confessions, the jury would have had substantial reasons to discount Hayat's confession. That confession was the key to the government's showing that Hayat both committed an act in support of waging jihad and had the intent to do so." (F&R at 84.) Taking those other factors into account, the magistrate found that "[c]ombined with counsel's other errors identified herein, had Mohammed's testimony equating the supplication with jihadis been excluded, at least one juror would have doubted Hayat's intent and would have reached a different result."(*Id.*) Given the emphasis the government placed on Mohammed's testimony in its closing argument, that recommendation merits this court's full acceptance.

### C.      The Failure to Locate and Present an Arabic-Speaking Defense Expert

#### 1.      Deficient Performance

Magistrate Barnes found credible attorney Broderick's testimony that "a reasonable attorney taking on the defense in a terrorism case should have reached out to the Federal Defender's Office for help in contacting attorneys who had provided representation in similar cases" and that such contacts would have been "fruitful, particularly with respect to procuring experienced experts."

(F&R at 87.)  The magistrate found credible attorney expert Weinberg's testimony that a reasonable attorney "confronted with evidence about a piece of paper with Arabic writing" would have introduced "contrary expert testimony about the circumstances under which people carry such scriptures, and whether the scripture, in fact, has the connotation that the prosecution expert places on it." (*Id*.)

Noting the sparseness of the record regarding Mojaddidi's efforts at locating an Arabic language expert – Mojaddidi provided no details in her testimony nor supporting documentation as to those efforts – the magistrate stated that "without knowing who those people were it is not possible to determine whether any would have qualified as an expert or what their testimony could have been." (F&R at 86.) Attorney Griffin had no reason to involve himself in that search for a defense expert on the supplication, as the supplication itself and Mohammed's testimony concerning it were inadmissible against his client and were not placed before Umer's jury. Indeed, because Mojaddidi testified that she undertook this effort "without consultation" with Griffin, the magistrate logically inferred that, given Mojaddidi's lack of experience with identifying and vetting experts for trial, there was "an even greater chance that the 'experts' she contacted would not have been qualified to testify about both the translation of the supplication and its meaning and use among Pakistani Muslims." (*Id*. at 86.)

Magistrate Barnes cited the *Atlantic Monthly* article published in October 2006 as providing persuasive evidence of the availability of highly respected and qualified experts that could have been available to the defense at the time of trial. (*Id*. at 86.) In that article, the author extensively interviewed Professor Bernard Haykel (then at NYU, presently at Princeton University), "who had testified for the defense in a 2003 terrorism trial in Detroit; Ingrid Mattson, a professor of Islamic Studies at Hartford Seminary; and Salman Masood, a Pakistani journalist in Islamabad. Each of these people was familiar with the supplication and told the author it is 'common.' The fact that the article's author found three people who knew the supplication, two of whom were scholars and potential experts, show that there were experts available." (*Id*. at 86.)

DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

Furthermore, Professor Haykel, contacted by attorney Mojaddidi *after* petitioner's conviction, submitted an affidavit in support of petitioner's motion for a new trial, and testified at the evidentiary hearing that he was available and could have provided expert testimony regarding the supplication had he been contacted during the trial. (F&R at 86-87.)

Magistrate Barnes found "no indication Mojaddidi took reasonable steps to attempt to find an Arabic language expert," opting instead to rely on "people she already knew." (*Id*. at 87.) Moreover, the magistrate found "no indication" that the individuals contacted by Mojaddidi were individuals who had previously qualified and served as expert witnesses. (*Id*. at 87.) Accordingly, the court below found that Mojaddidi "acted unreasonably when she failed to procure an appropriate expert to counter Mohammed's testimony." (*Id*.)

### 2.     Prejudice

Magistrate Barnes found that Professor Haykel was familiar with the supplication and had heard it used; he had studied the supplication and performed research on its use amongst Muslims; he defined a supplication as a prayer to God, and the source of this particular prayer ("du'a" in Arabic) was Hadith, which is the tradition of the Prophet Mohammed; this particular prayer is found "in a number of different collections of prophetic traditions;" he had reviewed the testimony of Mohammed. (F&R at 88.)

Haykel agreed with Mohammed that the literal translation was "Oh, God, we ask you to be at the throats [of our enemies]. And we seek your help and assistance from their evils or their misdeeds." However, he explained that the idiomatic translation was more appropriate for reaching an understanding of the meaning and intent of the carrier of this supplication: "Oh, God, we ask, or beseech, you to … confront our enemies. And we ask you for help from their evil deeds." (*Id*. at 88.) Further, Haykel explained that "tradition tells us that [the Prophet] used [this du'a] at a time when he was about to begin travel. … And travel at the time in Arabia … was fraught with danger." (*Id*.)

Haykel testified without contradiction that the supplication was not particular or exclusive to any group." (*F&R* at 89.) A Google search of the first three words of the

37   DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

supplication resulted in "over 84,000 hits." A video search of the same three words yielded "about 4,000 hits on YouTube … in which you see videos of scholars and Muslims using this term –using this supplication." (IV TR at 641) An examination of the context in which it is being used makes clear that "it is not confined to any one group, that all Muslims use it." (*Id*. at 640-641) The magistrate credited Haykel's testimony that: "[T]he supplication in question was not an 'offensive invocation.' Rather, it would be used when a Muslim is afraid that someone might harm him. Haykel had heard the prayer used by religious leaders leading midday Friday prayers. Haykel testified that an opinion that anyone who carried or recited this supplication would necessarily be involved in violent jihadi behavior was unfounded." (F&R at 89.)

Imam Tahir Anwar is a Muslim raised in the Islamic traditions of the "subcontinent," a region including Pakistan, India, Bangladesh and Afghanistan. Magistrate Barnes found that: "Tahir can read, write, and understand classical Arabic and spent eight years at a madrassa in India studying the Koran and Hadith, among other things." (*Id*. at 89.) He serves as the Imam of the South Bay Islamic Association in San Jose, Ca., and teaches Islamic law at a college in Berkeley, CA. (*Id*.)

Magistrate Barnes credited Tahir's testimony that he has had personal experience with this particular supplication, having memorized it as a child and reciting it before he even knew what it meant; it is common in Muslim households to grow up learning prayers and supplications at a young age. (*Id*. at 89.) When this supplication was given to him as a boy, his parents told him that "this prayer should be recited when he wanted to be safe, and protected – 'from bullies, … from evil or harm that would be out on the streets, lurking, car accidents.' Tahir continues to recite this prayer daily for 'divine protection;' for example, to return home safely in the evening. Tahir testified that he has taught this prayer to his two sons" and that – in a similar context – he has heard others recite the prayer. (*Id*. at 90.)

The magistrate also found credible Tahir's testimony that "Muslims of the subcontinent carry this prayer with them as a ta'wiz or amulet," and that when Imams write the prayers they often include diacritical marks so the carrier can pronounce the words. (*Id*. at 90.) While many Muslims

carry this ta'wiz for protection, "most of them do not understand what the Arabic words mean." (*Id*.) "Tahir has never heard this prayer used in the context of someone intending to harm someone else." (*Id*.) If asked to testify at Hamid's trial, he could have done so. (*Id*.)

In its objections, as was true of its cross-examination of Professor Haykel at the evidentiary hearing, the government offers no evidence whatsoever contradicting Haykel's description of the meaning of the supplication and its widespread and peaceful use in the modern Islamic world. Rather, the government argues that Mojaddidi's failure to locate and call an expert such as Haykel was harmless because his testimony was "not completely contrary to Mohammed's testimony," in that "Dr. Mohammed testified on cross-examination there were other interpretations of the ta'wiz or du'a, including the interpretation championed by Professor Haykel." (Obj. at 132.) In other words, Haykel was not needed because Mohammed conceded the truthfulness of much of what Haykel would have testified to at trial.

This argument by the government of a lack of prejudice is disingenuous at best. In closing, the government argued that it was the uniform opinion not only of Mohammed but of "highly qualified colleagues … highly qualified Islamic scholars" that "this was a piece of paper with a prayer on it that would be carried by a holy warrior, a violent, jihadi, who felt himself to be traveling in an enemy land, and who was ready to commit violent jihad." (*Id*. at 91.)

On the other hand, as the Magistrate Barnes found, "Haykel's testimony was clear and unequivocal – the supplication Hayat carried was commonly used by many Muslims." (*Id*. at 90.) The absence of that exculpatory testimony was compounded by the fact that Mojaddidi did not object to the government's false assertion that all of the sources consulted by Mohammed supported his opinion, when in fact almost none of those sources did so. Furthermore, as noted by Magistrate Barnes, even though Mojaddidi "did not object to the prosecutor's characterization of the information Mohammed received from colleagues, she could have remedied that problem during her closing argument. She did not." (*Id*. at 92.)

DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

Mojaddidi left Mohammed's mental state testimony unrebutted, and allowed that error to be compounded by the prosecutor's unchallenged and misleading summation of that testimony. The magistrate found that "when considered with the other errors described herein," those failings as to the supplication "certainly contributed to the prejudice Hayat suffered as a result of Mojaddidi's unreasonable conduct." (*Id*.)  That finding is eminently reasonable and firmly rooted in credibility assessments.  The government's objection to that finding should be overruled.

## V.   THE MAGISTRATE'S FINDINGS OF FACT CONCERNING ATTORNEY MOJADDIDI'S CONFLICT OF INTEREST ARE SUPPORTED BY OVERWHELMING EVIDENCE, MOST IMPORTANTLY HER ASSESSMENT OF MOJADDIDI'S CREDIBILITY

### A.   Introduction

The legal principles governing conflict are not in dispute.  The government agrees that a "conflict of interest is the existence of competing interests potentially affecting counsel's capacity to give undivided loyalty to his client's interests." (Obj. at 142-43 [quoting *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998), and *Bonin v. Calderon*, 59 F.3d 815, 827 (9th Cir. 1995)].)

The undisputed evidence provided by attorney Mojaddidi at her 2014 deposition firmly supported the conclusion that her inability to represent Hamid Hayat on her own required that she place decision-making over Hamid's case in the hands of Johnny Griffin, the experienced counsel for the codefendant. Because Mr. Griffin's loyalty was to Umer Hayat, the strategic decisions that he made affecting both defendants served his client's interests well, but gutted Hamid's defense.

The government's arguments against that obvious reality rest entirely on Mojaddidi's subsequent testimony at the 2018 hearing before the magistrate. The government argues that the magistrate was required as a matter of law to credit Mojaddidi's testimony that while she uniformly joined in Griffin's decisions, she acted independently in doing so. But because the hearing evidence to the contrary was "significant and compelling," the court below deemed Mojaddidi's testimony in this respect to be unworthy of belief. The magistrate expressly found that Mojaddidi followed

decisions of Griffin that were in the best interests of his client, not hers. Those credibility-based findings are supported by the evidence – and they are correct.

The adverse effects that plagued Mojaddidi's representation were legion, among them: the failure to investigate Hamid's alibi defense, to file pretrial motions, including a motion for a bill of particulars, to apply for a security clearance, and to prepare and present testimony from false confession and Islamic experts. Because the conflict of interest under which Ms. Mojaddidi operated was "actual," no further showing of prejudice is required.  As the magistrate correctly held, it is necessary to presume prejudice where a conflict results in an attorney finding "himself compelled to *refrain* from doing" something – in that situation, determining prejudice would involve "unguided speculation." *United States v. Walter-Eze*, 869 F.3d 891, 905 (9th Cir. 2017) (emphasis in original). The deprivation of Hayat's Sixth Amendment right to conflict-free counsel requires that his convictions be vacated.

### B.    Mojaddidi's Deposition Testimony

Well before she testified before the magistrate, Mojaddidi provided extensive, undisputed testimony bearing on the conflict issue in her 2014 deposition.

Mojaddidi graduated from law school in the spring of 2002, where she took only those courses in criminal law that were required, and did no clinical work. (Exhibit FFF, the August 8, 2014 deposition at 9-10, 17-20.)  After failing the California bar exam twice, she was finally admitted to practice in December of 2003.  (*Id.* at 10-11.)  Prior to June of 2005, she had never represented a client in a criminal case in state or federal court, nor in a civil jury trial.  (*Id.* at 12-14; 22.)

The decision that Mojaddidi would represent Hamid rather than his father was based on her assumption that Umer would face the heavier charges.  (*Id.* at 18.)  If she had known at the outset of her representation of Hamid in June of 2005 that he would face more serious charges than Umer, she should not have decided to represent Hamid.  (*Id.* at 29-30.)  She needed the assistance of another attorney to assist her in representing Hamid.  (*Id.* at 53.)  Therefore, had Hamid been charged alone,

Ms. Mojaddidi would not have felt qualified to represent him.  (*Id.* at 22-23.)  Likewise, had Hamid's case been severed from that of Umer, she would not have proceeded to trial as Hamid's lawyer.  (*Id.* at 52.)

She understood that there would be a "joint defense" in which she could rely on Griffin, Umer's "very experienced" counsel, for guidance.  (*Id.* at 22.)  Every time Mr. Griffin made a decision involving a legal issue she knew nothing about, Ms. Mojaddidi did her own independent research and tried to see if it was something that she thought made sense.  (*Id.* at 24.)  She did "look into a lot of things myself, out of curiosity, and I wanted to learn."  (*Id.* at 24.)  Ms. Mojaddidi had to learn "on the job" in order to do the case competently.  (*Id.* at 24.)

In September of 2005, when Hamid was indicted on terrorism charges, Ms. Mojaddidi decided to continue to represent him, despite her earlier awareness that she was not qualified to defend against such charges.  (*Id.* at 64-65.)  The fact that a more experienced counsel would participate in Hamid's defense was critical to her decision to stay on as Hamid's counsel.  (*Id.* at 66.)  She was relying on Mr. Griffin's experience to make decisions regarding whether to file pretrial motions and, if so, what motions to file.  (*Id.* at 69.)  It was agreed Mr. Griffin would give her advice during the trial. (*Id.* at 249.)

As trial neared, when Ms. Mojaddidi realized that she would be "on my own" for portions of the trial, her need for help felt greater.  (*Id.* at 94-95.)  The idea of having to do it all – jury selection, opening statement, the examination of witnesses – became "overwhelming."  (*Id.* at 97.)  She "really wanted" the help of Mark Reichel.  (*Id.* at 94.)  Discussions with Reichel about his entering the case occurred about a week before the trial began.  (*Id.* at 98.)  Money to pay Reichel would have had to come from attorney Griffin.  (*Id.* at 98-99.)  Griffin told her that if Reichel entered the case, he either (1) would no longer mentor Ms. Mojaddidi (*id.* at 100) or (2) that Ms. Mojaddidi would no longer need his advice.  (*Id.* at 242-43.)  At the time she believed that with attorney Griffin's help, she could handle Hamid's defense on her own, but in hindsight "more than one attorney would have been a good idea." (*Id.* at 279.)

DEFENDANT-PETITIONER'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

After the case against Umer was mistried, despite having to prepare Hamid's post-trial motions, Mojaddidi planned to help Griffin with Umer's trial, although the case was eventually settled by a plea to a charge not involving terrorism. (*Id.* at 114.)

### C.    Mojaddidi's Hearing Testimony Before The Magistrate

The testimony at the evidentiary hearing demonstrating Ms. Mojaddidi's incompetence to represent Hamid at trial often tracked that of her deposition. At the hearing, however, the magistrate had the critical advantage of assessing Mojaddidi's credibility by observing in person Mojaddidi's testimony concerning her claims of independent decision-making.

Before June 2005, Ms. Mojaddidi had no experience in state or federal criminal law, no experience in federal district court, and no jury trial experience, including, for example, jury selection or fact/expert witness examination. (IV TR 682-84.) At that time, she had never made a decision in a criminal case about what motions to file, whether to ask for continuances, what witnesses to call, or whether a defendant would testify.  (IV TR 695.) In representing Hamid, attorney Mojaddidi was doing things that she had never done before, and basically had to learn on the job. (IV TR 705.)

Under the legal standards of this district, Ms. Mojaddidi was unqualified for appointment to represent anyone in a federal criminal case (misdemeanor or felony) at the time she agreed to represent Hamid Hayat.  She at most could have applied for the mentorship program in which an attorney is supervised by experienced counsel who has the ultimate power over all decision-making in the case. (II TR at 373-74.)

Ms. Mojaddidi's inexperience deeply troubled one member of the joint defense team, ex-FBI agent James Wedick, who was surprised "the government didn't try to remove her from the trial." (III TR 590-91.) "She was totally unable to do this trial, and I think it became obvious to everybody. I think the judge was frustrated at different times because of her inexperience. And I was surprised that the government didn't try to remove her because she had never – she – she had never done a trial

before." (*Id.* at 591.) Wedick had believed at the time that Mojaddidi's incompetence might lead to a resulting conviction being overturned. (*Id.*)

When both Griffin and Mojaddidi were first contacted about the Hayat case in June of 2005, Griffin, an experienced defense counsel, suggested to her that because she "happened to be a licensed attorney," the two of them should go to the FBI, where Hamid and Umer, were being held and questioned, to try to stop the questioning. (IV TR 688.) When they got to the FBI, Griffin asked the FBI who was the "heavy" and was told it was Umer. (IV TR 688.) Griffin then told Ms. Mojaddidi that she "would represent Hamid and he would represent Umer." *Id.* Wedick, the third member of the defense team, testified that under the joint defense arrangement, the understanding was that both lawyers would represent both defendants. (III TR 583.)

Griffin knew at the time that Ms. Mojaddidi had no experience defending a federal criminal case. She was so inexperienced that she would not have represented Hamid alone, without assistance from Griffin or someone else. (IV TR 701; 741.) Ms. Mojaddidi agreed to represent Hamid despite her lack of experience because she could "rely on [Griffin's] experience with – as being a criminal practitioner, and that I could be valuable in other ways." (IV TR 692.) She believed that:

> I would rely on him in my representation of Hamid . . . but that we would have – parts of the trial we would be together, or that at the hearings, when there were appearances made, I would join in his arguments, and that we could work together to develop strategies.
> . . . .
> [Griffin's] role was to provide the information to me, and advice to me, and then I would represent [Hamid].

(IV TR 693.)

Mojaddidi relied on Griffin's background, knowledge, and advice to make decisions in Hamid's case. (IV TR 693; IV TR 705.) Griffin assisted and advised her and was with her "every time [she] was in the courtroom." (IV TR 704-05.) Given her lack of experience, all of the legal or strategic decisions she made were based on Griffin's advice or whatever she might have learned on the job, such as reading a statute. (IV TR 706.) At the pretrial hearings Griffin "took the lead on a

1  lot of those pretrial hearings, in making arguments on law and motion type stuff, and I would join in
2  many of those decisions and agreements."  (IV TR 703.)

3  **D.      The Magistrate's Findings on The Conflict Issue**

4  The magistrate found that Griffin decided "that a strategy of pushing for trial as quickly as
5  possible was the best strategy for Umer."  (F&R at 103.) "Mojaddidi's defense strategy also was to
6  push for a trial as soon as possible to limit the government's ability to obtain additional evidence."
7  (*Id*. at 102; *see also* 108; defendants pursued the same strategic course before and during trial.)

8  The magistrate heard and found credible the testimony of three legal experts – Daniel
9  Broderick, Doron Weinberg, and John Cline – that no reasonable attorney would forgo investigation
10 or the making of pretrial motions to rush to trial in a case like this.  (*Id*. at 103-05.) In addition,
11 attorney Reichel testified that attorney Griffin opposed his entry into the case to assist Mojaddidi
12 because Reichel insisted on a continuance in order to file critical pretrial motions on Hamid's behalf.
13 The government presented no evidence contrary to the expert opinions presented by petitioner or the
14 testimony concerning Reichel.

15 Having heard and considered the testimony of Mojaddidi, the magistrate made a factual
16 finding that "by ceding responsibility to Griffin, who had a client with conflicting interests,
17 Mojaddidi was effectively in joint representation arrangement with Griffin."  Both attorneys
18 effectively represented Hamid Hayat.  Of great importance, the magistrate found that Mojaddidi's
19 repeated testimony that she did not cede "ultimate decisions making to Griffin" was not credible, as
20 the "evidence to the contrary [was] significant and compelling." (*Id*.) The magistrate further found
21 that "Mojaddidi's own testimony showed that she relied on Griffin to such an extent that they were
22 jointly representing Hamid."  (*Id*. at 107.) The magistrate found credible the testimony of defense
23 investigator Wedick that "Griffin and Mojaddidi had a joint defense agreement in which both
24 lawyers represented both Hayats," and that "all decisions made for either defendant 'went through'
25 Griffin."  (*Id*. at 109.)

26

27

28
                                    45    DEFENDANT-PETITIONER'S RESPONSE TO
                                          OBJECTIONS TO MAGISTRATE JUDGE'S
                                          FINDINGS AND RECOMMENDATIONS
                                          Case No.: 05-cr-0240-GEB

The magistrate further found that: "Mojaddidi simply followed Griffin's decisions that were in the best interests of his client, not hers," including the "rush-to-trial" strategy.  (*Id*. at 106.) Based on Mojaddidi's hearing testimony, the magistrate found unreasonable Mojaddidi's "rush to trial" justification for the glaring omissions in her representation of petitioner. (*Id.* at 105: "This court finds no basis to conclude that the rush-to-trial strategy was a reasonable one for Hamid Hayat".)

The magistrate further found that the fact that Griffin had "control of basic decisions about Hamid's defense shows that there was an "active representation" of conflicting interests. (*Id*.)  As to adverse effects, the lower court found Mojaddidi failed to make, or even consider making, critical motions such as to suppress, or for a bill of particulars, or even understand the benefits of making such motions.  (*Id*. at 106-07.)  Nor did Mojaddidi understand the advantages of obtaining the security clearance that she failed to apply for.  (*Id*. at 107.)

### E.    The Magistrate's Finding that Mojaddidi Operated Under A Conflict of Interest Rested on Her Assessment of the Relative Credibility of Multiple Witnesses

Mojaddidi established by her own testimony that she was incompetent to provide adequate and independent representation to Hamid Hayat. She admitted that she could not and would not have represented Hamid at a trial had he been tried separately from Umer, because she needed Griffin's decision-making guidance. She entered the case on the assumption that attorney Griffin would jointly represent the Hayats with Griffin taking the defendant with the most serious charges, and that she would not have taken on Hamid's representation if she had known Hamid, not Umer, would be facing the far more serious charge of lending material support to terrorism.

With the added charge against Hamid of attending a jihadi training camp in Pakistan, Griffin's strategy of rushing to trial no longer made sense for Hamid.  Mojaddidi was sure that her client was innocent of that charge, and that there were witnesses on the ground in Pakistan who, in her opinion, could testify truthfully that her client never engaged in that terrorism-related conduct. Yet she accepted and followed Griffin's decision to refrain from taking any action, such as conducting investigation in Pakistan, or making pretrial motions, or seeking a security clearance, that

might interfere with the "rush to trial" strategy that Griffin had determined was in Umer's best interest.

Thus, as the magistrate found, "when the first superseding indictment charged Hamid with material support for terrorism, the basic defense strategy for the representation of Hamid came into conflict with Griffin's strategy for the representation of Umer." (F&R at 105, citing *Walter-Eze*, 869 F.3d at 901 [An actual conflict exists "'if during the course of the representation, the defendants' interests do diverge with respect to a . . . course of action.'" (quoting *Sullivan*, 446 U.S. at 356 n.3.)].) The magistrate further found that: "Mojaddidi simply followed Griffin's decisions that were in the best interests of his client, not hers," including the "rush-to-trial" strategy. (*Id.* at 106.)

The only counter to the overwhelming evidence that Mojaddidi operated under a conflict of interest was her oft-repeated claim that, while Griffin announced to this court every major defense decision on behalf of both Hayats, her joinder in those decisions was based on her independent judgment of the best interests of her client. But after observing Mojaddidi on the stand, the magistrate found that Mojaddidi's repeated testimony that she did not cede "ultimate decisions making to Griffin" was not credible, as the "evidence to the contrary [was] significant and compelling." (*Id.*)

That evidence included the hearing testimony of Wedick, Mr. Griffin's investigator, to the effect that "Griffin and Mojaddidi had a joint defense agreement in which both lawyers represented both Hayats," and that "all decisions made for either defendant 'went through' Griffin." (*Id.* at 109) Moreover, on more than two hundred occasions during her deposition and hearing testimony, Mojaddidi asserted a loss of memory to important questions about her representation of Hamid.

Furthermore, this court questioned Mojaddidi's truthfulness during pretrial hearings, when it found her response to the court's query concerning her failure to seek a security clearance "incredible." (RT of 1/27/05 at 8) Her credibility was also undermined by her admission during her deposition that she had misled this court in pretrial proceedings by

claiming that she and Mr. Griffin had at least "considered" applying for security clearances; in truth, the two had "never intended to get clearances." (EX. FFF. at 293; *id.* at 294.) Additionally, Mojaddidi testified under oath that she had Hamid sign a copy of the amended retainer agreement entered into by attorney Griffin and Umer Hayat, but under further questioning and after reviewing a 2007 email, she conceded that testimony was false and the retainer agreement had never been signed by Hamid. (IV 712-714.)

The magistrate found as fact that: "Mojaddidi simply followed Griffin's decisions that were in the best interests of his client, not hers," including the "rush-to-trial" strategy. (*Id.* at 106.) The government claims that the magistrate's factual findings and credibility determinations should be rejected because her refusal to give strong deference to the strategic decisions of counsel, and explicit statement that, "Because Mojaddidi lacked any criminal law experience, little or no deference is due her 'strategic' decisions" is contrary to law. That fundamental error infects all of the Magistrate Judge's findings of ineffectiveness and the finding of actual conflict." (Obj. at 143.)

To the contrary, at the beginning of her discussion of the conflict claim, the magistrate properly stated the legal standard she would apply in deciding it – namely, that courts "generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client." (F&R at 99, quoting *Burger v. Kemp*, 483 U.S. 776, 784 (1987).) But that presumption, of course, is subject to being trumped by evidence to the contrary. The magistrate found undisputed and fully credible evidence, much of it from Mojaddidi herself, that her lack of experience and ignorance of criminal law and procedure led her to permit Griffin to control decision-making for her client. (*See*, *e.g.*, IV TR 692: Mojadiddi agreed to represent Hamid despite her lack of experience because she could "rely on [Griffin's] experience with – as being a criminal practitioner, and that I could be valuable in other ways."). As previously noted, during her deposition, Mojaddidi herself conceded that it was "obvious that [she] was inexperienced and it could have affected [petitioner's] case." (Exh. FFF. at 253.)

DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

In essence, the government asserts that if an attorney testifies that he or she did not suffer from a conflict of interest, a court is bound as a matter of law to accept that testimony as valid – no matter how incredible it appears to be, and irrespective of any and all evidence to the contrary. That position is a specific application of its broader position that courts are bound as a matter of law to accept an attorney's testimony that all her decisions were tactical and reasonable.  It was the overwhelming evidence that Griffin was the decision-maker for Hamid that led the lower court to conclude that Mojaddidi's asserted claims of independent decision making merited "little or no deference." (F&R at 105.) The government's position would turn the Sixth Amendment right to counsel into a chimera.  Its assault on a fundamental constitutional right must be rejected.

### F.     The Magistrate's Findings as to the Adverse Effects Generated by Mojaddidi's Conflict of Interest Are Beyond Challenge

The magistrate concluded: "In sum, Griffin and Mojaddidi's joint defense agreement amounted to joint representation of Hamid Hayat and was a conflict of interest that, given Griffin's representation of Umer Hayat, caused Hamid's defense to forego many viable litigation strategies." (F&R at 111.) The multiple strategies that Mojaddidi refrained from pursuing included her failure to investigate Hamid's alibi defense; to file critical pretrial motions, and to obtain a security clearance for herself or other defense counsel. The magistrate relied on the law and the testimony of the expert witnesses who testified before her in finding that these measures would have been undertaken by a reasonably competent and unconflicted counsel. (F&R at 110: "Based on the attorney expert testimony described above, these options were certainly plausible.")  The government produced no expert testimony to the contrary, surely because the opinion of any qualified and honest expert on the defense function also would have supported the petitioner's position.

As the magistrate noted: "Hayat need not show that any of these potential avenues would have resulted in a different verdict. *Walter-Eze*, 869 F.3d at 904 (A showing of 'adverse effect' does not require showing "that these shortcomings affected the outcome of trial.") Rather, he need only

show they were "plausible" options. *Id.* at 901 (quoting *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005))." (F&R at 110.)

Ultimately, the magistrate concluded that: "Hayat has demonstrated that his attorney made a choice between possible alternative courses of action that impermissibly favored an interest in competition with those of the client." *Id.* (citing *McClure v. Thompson,* 323 F.3d 1233, 1248 (9th Cir. 2003)).  That finding was the product of careful factfinding after an extensive hearing.  That finding rests fundamentally on the magistrate's assessment of Mojaddidi's credibility.  That finding is also the only reasonable interpretation of the evidence.  In light of the magistrate's careful consideration of the evidence, to convene a new hearing under *Finn* would make no sense.  The government's objections to the magistrate's finding of an actual conflict of interest should therefore be overruled.

## VI.   THE MAGISTRATE PROPERLY CONSIDERED THE RIORDAN TESTIMONY SOLELY AS EVIDENCE OF IMPEACHMENT

The government claims that Magistrate Barnes relied on attorney Riordan's testimony concerning statements made to him by Wahzma Mojaddidi not as impeachment evidence but as substantive evidence, and thereby committed legal error. (Obj. at 57 n. 47: "The Magistrate Judge's reliance on impeachment evidence as substantive evidence is legal error.") The magistrate repeatedly and emphatically stated that she would only consider the testimony of both attorney Riordan and attorney Mark Reichel if it contradicted the testimony of Mojaddidi and then only as impeachment evidence.  The government is in essence accusing Magistrate Barnes of including a deliberate falsehood in her order. But it is the government that seeks to mislead the court on this issue.

In its post-hearing briefing before the magistrate, the government asserted that:

> Mr. Riordan's testimony regarding the statements made to him by Ms. Mojaddidi are not substantive evidence of an actual conflict under the Federal Rules of Evidence. Pursuant to Rule 801, those alleged statements are hearsay if offered for the truth of the matter asserted [citations omitted]. As a result, the Court should consider them only for impeachment purposes…

50   DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

(ECF 725, United States' Post-Hearing Opposition, at 42.)

Thereafter, in her Findings and Recommendation, Magistrate Barnes agreed with the government's position:

> The government argues that Riordan's testimony repeating what Mojaddidi told him is hearsay. As such, it may only be used to impeach Mojaddidi. (See ECF No. 725 at 69.) This court agrees. *See* Fed. R. Evid. 801; *United States v. Crouch*, 731 F.2d 621, 622 (9th Cir. 1984) ("Hearsay statements may be admissible to impeach a declarant who subsequently testifies at trial. . ..") This court considers Riordan's testimony about Mojaddidi's statements only where it contradicts Mojaddidi's testimony.

(F&R at 27-28 at fn. 15.; *see also id.* at 108 fn. 51: "As noted above, this court considers Riordan's testimony herein only as impeachment of Mojaddidi's testimony.")

For their part, petitioner's counsel agreed that the lower court should consider Riordan's statements only for the purpose of impeaching Mojaddidi, and further asserted that the court need not rely on Riordan's testimony at all in order to sustain petitioner's claims. (ECF 731, Hayat's Reply Brief concerning the Testimony of Dennis Riordan, at 1.) [11]

Despite dozens of citations to attorney Riordan's testimony in the government's objections, the magistrate took account of that testimony concerning Mojaddidi's statements to him *only twice*. In the first instance, Magistrate Barnes noted that Mojaddidi had testified that her admitted ignorance of her ability to take Rule 15 depositions of alibi witnesses in Pakistan "was not relevant because she had rejected an alibi defense on the basis of a lack of 'viable' witnesses.'" (F&R at 27.) The magistrate found, however, that assertion was "belied by other witnesses" (*id.*), including Mojaddidi's own prior sworn statements at her deposition and in a declaration in support of petitioner's new trial motion. (*Id.* at 27-28.) The magistrate also noted that Mojaddidi told attorney Riordan shortly after trial that she felt then that an alibi defense would not work because there was "simply no way she knew of to obtain that testimony." (*Id.*)

---

[11] "Indeed, as petitioner has previously argued, Mr. Riordan's testimony as to what Ms. Mojaddidi stated to him while they served as co-counsel for petitioner in 2006 and 2007 could be entirely excised from the hearing record, and the Court still would have more than enough evidence to support every factual finding that the petitioner has urged upon it."

DEFENDANT-PETITIONER'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS
Case No.: 05-cr-0240-GEB

Again, the magistrate was unequivocal in stating that she considered Riordan's testimony solely

as impeachment evidence. (F&R at 27-28 at fn. 15.)

The magistrate deemed this snippet of Riordan's testimony more credible than

Mojaddidi's testimony on the same subject, and for a very good reason. The magistrate noted

that

> Riordan's testimony largely tracked his declaration prepared in 2007, shortly after
> his interactions with Mojaddidi. He testified that reviewing that declaration
> refreshed his memory of many of their conversations. (V TR 849-50.) This court
> finds that fact supports the credibility of Riordan's testimony. Mojaddidi, on the
> other hand, did not testify about the issues herein until August 2014, over eight
> years after trial, when she was deposed. (See Mojaddidi Depo. (ECF No. 548 at
> 41).)

(F&R at 27-28 at fn. 15.)

The government argues in essence that a finding by a fact finder that impeachment

evidence is credible establishes by that fact alone that the fact finder considered it as substantive

evidence. That is nonsense. In order to decide whether a prior inconsistent statement is effective

impeachment of a declarant's in court testimony, a fact finder must necessarily decide whether

that out of court statement was indeed made and, if so, whether it has been accurately testified to

in court.  Judge Barnes did that, but nowhere in making her findings and recommendation did

she ever rely on testimony concerning Mojaddidi's prior inconsistent statement as substantive

evidence as to any issue she addresses.

In the second instance, the magistrate found that Mojaddidi's claim of independence from

attorney Griffin in her decision making was contradicted (1) by her prior statements to Riordan

"that Griffin made all final decisions for both defendants," and "that she did not feel that she

could disagree with Griffin because she feared losing his assistance if she did;" and (2) by the

hearing testimony of Mark Reichel and James Wedick, the latter of whom served as the

investigator for Griffin and testified that all decisions "went through" him. (*Id*. at 108-109.) Once

more, the magistrate made clear that it considered "Riordan's testimony herein only as

impeachment of Mojaddidi's testimony." (*Id*. at 108 fn. 51.)  Indeed, the magistrate expressly

imposed the same limitation on Reichel's testimony regarding Mojaddidi's prior inconsistent statements to him. (F&R at 109 fn. 53.)

The Ninth Circuit opinion that the government principally relies on to support its claim that the magistrate considered the Riordan testimony for an improper purpose (Obj. at 57, fn. 47) holds, to the contrary, that it is entirely proper to permit impeachment of a witness by means of his prior inconsistent statements. See *United States v. Beltran-Gutierrez*, 19 F.3d 1287, 1289 (9th Cir. 1994) (Prosecution did not use defendant's testimony at suppression hearing for "the purpose of proving his guilt, [but rather] in order to impeach his credibility as a witness by means of a prior inconsistent statement.") The government's specious attack on the integrity of the magistrate's decision making must be rejected.

## CONCLUSION

For the reasons stated above, the government's objections to the findings and recommendation of Magistrate Judge Barnes should be overruled and the magistrate's report should be adopted by this court.

Dated: May 4, 2019                              Respectfully submitted,

MARTHA BOERSCH
DENNIS P. RIORDAN
DONALD M. HORGAN
LAYLI SHIRANI
TED SAMPSELL-JONES


  /s/ Martha Boersch
Martha Boersch

Attorneys for Defendant
HAMID HAYAT