SHAFFY MOEEL (California SBN 238732)
Moeel Law Office
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Tel.: (415) 735-5021
*Counsel for Proposed Amicus Curiae*
*Center on Wrongful Convictions*

LAURA NIRIDER (IL Bar No. 6297299)
STEVEN A. DRIZIN (IL Bar No. 6193320)
Center on Wrongful Convictions
Northwestern University School of Law
375 East Chicago Ave., 8th Floor
Chicago, Illinois 60611
Telephone: (312) 503-8576
Facsimile: (312) 503-8977

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Respondent/Plaintiff,<br><br>  v.<br><br>HAMID HAYAT,<br><br>              Petitioner/Defendant. | No.CR S-05-0240 GEB<br><br>**BRIEF OF *AMICUS CURIAE* CENTER ON WRONGFUL CONVICTIONS**<br><br>***IN SUPPORT OF THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION***<br><br>Judge: Hon. Garland E. Burrell |

## TABLE OF CONTENTS

STATEMENT OF INTEREST BY *AMICUS CURIAE* ......................................................................1

    I.   COMMON PSYCHOLOGICAL INTERROGATION TECHNIQUES CAN INDUCE FALSE CONFESSIONS AND LEAD TO WRONGFUL CONVICTIONS MORE FREQUENTLY THAN THOUGHT. ..................................3

    II.  IN ORDER TO BE EFFECTIVE, DEFENSE ATTORNEYS MUST EDUCATE FACTFINDERS ABOUT THE COUNTERINTUITIVE PHENOMENON OF FALSE CONFESSIONS AND RELY ON OBJECTIVELY KNOWABLE FACTS AND EVIDENCE, INCLUDING ALIBIS, TO DISPROVE THE CONFESSION. ...........................................8

        A.  To be effective, Mr. Hayat's defense counsel should have educated the fact-finder as to the risk factors for false confession and highlighted those risk factors present in Mr. Hayat's case. .........................................8

        B.  To be effective, Mr. Hayat's defense counsel should have introduced evidence that many facts in Mr. Hayat's confession were not true, *i.e.* were disprovable by the objectively known evidence in the case, including alibi testimony.........................................................................9

        C.  To be effective, Mr. Hayat's defense counsel should have shown that many facts were fed to him during his interrogation, resulting in confession contamination....................................................................11

CONCLUSION..........................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Colorado v. Connelly*
  479 U.S. 157 (1986)..................................................................................................3

*Corley v. United States*
  556 U.S. 303 (2009)................................................................................................2, 4

*Crowe v. County of San Diego*
  608 F.3d 406 (9th Cir. 2010) .................................................................................6, 7

*Hopt v. Utah*
  110 U.S. 574, 584-85 (1884) ....................................................................................3

*In re Elias V.*
  (2015) 237 Cal.App.4th 568 .....................................................................................1

*J.D.B. v. North Carolina*
  131 S. Ct. 2394 (2011).............................................................................................2

*Mapp v. Ohio*
  367 U.S. 643 (1961)..................................................................................................3

*Miranda v. Arizona*
  384 U.S. 436 (1966)..................................................................................................3

*Smith v. Duckworth*
  910 F.2d 1492 (7th Cir. 1990) .................................................................................7

*Stein v. New York*
  346 U.S. 156 (1953)..................................................................................................7

*U.S. v. Preston*
  751 F.3d 1008 (9th Cir. 2014) .............................................................................5, 14

**STATUTES**

28 U.S.C. §2255..........................................................................................................14

**OTHER AUTHORITIES**

ABA Criminal Justice Mental Health Standards, Standard 7-5.8(b) .............................7

Brief of *Amici Curiae* Independent Law Enforcement Instructors and Consultants, *Dassey v. Dittmann,* No. 17-1172, U.S. Supreme Court (2017) ................................................13

Drizin, Steven A. & Leo, Richard, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891 (2004) .........................................4, 6, 10

Elbein, Saul, *Kim Possible*, National Public Radio, <u>This American Life</u> (Oct. 11, 2013) ............12

Elinson, Zusha, *False Confessions Dog Teens*, The Wall Street Journal (Sept. 8, 2013) .............10

Frenda, Steven J., Berkowitz, Shari R., Loftus, Elizabeth F., & Fenn, Kimberly M., *Sleep Deprivation and False Confessions*, Proceedings of the National Academy of Sciences of the United States of America, 113 (8) 2047-2050 (2016)....................................7

Garrett, Brandon L., *Contaminated Confessions Revisited*, 101 Virginia L Rev. 395 (2015)...................................................................................................12

Garrett, Brandon L., Convicting the Innocent (Harvard Univ. Press 2011) ..................................12

Inbau, Fred E., Reid, John E., Buckley, Joseph P., & Jayne, Brian C., *Criminal Interrogation and Confessions* (5th ed. 2013) .............................................................4, 10, 13

Int'l Ass'n of Chiefs of Police, *Reducing Risks: An Executive's Guide to Effective Juvenile Interview and Interrogation* (2012) ..........................................................................4

Kassin, Saul M. *et al.*, *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & Hum. Behav. 3 (2010)..........................................................................................5, 6

Kassin, Saul M. *et al.*, *Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs*, 31 L. & Hum. Behav. 381-400 (2007) .....................................4

LaVigne, Michele & Van Rybroek, Gregory J., *Breakdown in the Language Zone: The Prevalence of Language Impairments Among Juvenile and Adult Offenders and Why It Matters*, 15 U.C. Davis J. Juv. L. & Pol'y 37 (2011) ........................................................7

Leo, Richard A., *False Confessions: Causes, Consequences, and Implications*, 37 J. Am. Acad. Psychiatry & L. 332 (2009) ................................................................15

Leo, Richard A. *et al.*, *Promoting Accuracy in the Use of Confession Evidence: An Argument for Pretrial Reliability Assessments to Prevent Wrongful Convictions*, 85 Temp. L. Rev. 759 (2013).......................................................................................12

Meyer, Jessica R. & Reppucci, N. Dickon, *Police Practices and Perceptions Regarding Juvenile Interrogation and Interrogative Suggestibility*, 25 Behav. Sci. & L. 757 (2007).......................................................................................................................4

Nirider, Laura H. *et al.*, *Combating Contamination in Confession Cases*, 79 U. Chicago L. Rev. 837 (2012)..........................................................................1, 12, 15

National Registry of Exonerations, Browse the Cases, Filtered by False Confession, *available online at* https://www.law.umich.edu/special/exoneration/Pages/ .............................3

Ofshe Richard J. & Leo, Richard A., *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv. U. L. Rev. 979, 990 (1997)................................5, 6, 9

Shipler, David K., *Why Do Innocent People Confess*, New York Times (Feb. 23, 2012) ............11

Tepfer, Joshua A., Nirider, Laura H., & Drizin, Steven A., *Scrutinizing Confessions in a New Era of Juvenile Jurisprudence*, Court Review: The Journal of the American Judges Association, 50:1..........................................................................................1, 9

Tepfer, Joshua A., Nirider, Laura H., & Tricarico, Lynda, *Arresting Development: Convictions of Innocent Youth*, 62 RUTGERS L. REV. 887 (2010) .............................................1

Warden, Rob & Drizin, Steven A., eds., True Stories of False Confessions (2009) ......................1

Zulawski, David & Wicklander, Douglas E., Practical Aspects of Interview and Interrogation (2nd ed. 2002)..................................................................................13

**STATEMENT OF INTEREST BY *AMICUS CURIAE***

The Center on Wrongful Convictions ("CWC") operates under the auspices of the Bluhm Legal Clinic at Northwestern University School of Law. One of the oldest so-called "innocence projects" in the country, the Center on Wrongful Convictions was founded in 1999 in order to uncover and remedy wrongful convictions nationwide, as well as to promote public awareness and support for nationwide initiatives aimed at preventing future wrongful convictions. To date, the CWC has helped exonerate nearly fifty individuals in twenty-two states and four federal circuits. It also regularly files *amicus* briefs in fora ranging from state trial courts to the federal courts of appeal to the United States Supreme Court.[1]

Much of the CWC's work focuses on how individuals react to police interrogations. Indeed, CWC faculty, including the authors of this brief, have been recognized as some of the nation's leading legal experts in confessions and interrogations. No fewer than twenty of the CWC's nearly fifty exonerations involve individuals who falsely confessed to the crimes for which they were wrongly convicted. Drawing from this experience, CWC faculty have published numerous pieces highlighting risk factors for, and developing solutions to prevent, involuntary and false confessions, as well as offering guidance on how to defend false confession cases.[2] The CWC's scholarly research around interrogations has been cited repeatedly by the U.S. Supreme Court to establish that the pressures of custodial interrogation "can induce a frighteningly high percentage of people to

---

[1] Most recently in California, the CWC filed an amicus brief in the 2015 case of a thirteen-year-old boy who had confessed to committing a lewd and lascivious act upon a child. On appeal, the California Court of Appeals reversed the boy's adjudication, finding that the confession was coerced and unreliable and writing a nationally influential opinion exploring the problem of false confessions. *In re Elias V.*, (2015) 237 Cal.App.4th 568.

[2] *See, e.g.*, True Stories of False Confessions (Rob Warden & Steven A. Drizin eds., 2009); Joshua A. Tepfer, Laura H. Nirider & Lynda Tricarico, *Arresting Development: Convictions of Innocent Youth*, 62 RUTGERS L. REV. 887 (2010); Joshua A. Tepfer, Laura H. Nirider, & Steven A. Drizin, *Scrutinizing Confessions in a New Era of Juvenile Jurisprudence*, Court Review: The Journal of the American Judges Association, 50:1, at 4-11; Laura H. Nirider *et al.*, *Combating Contamination in Confession Cases*, 79 U. Chicago L. Rev. 837, 847 (2012).

confess to crimes that they never committed,"[3] and that the risk of false confession is "all the more troubling – and recent studies suggest, all the more acute – when the subject of custodial interrogation is a juvenile."[4]

CWC faculty regularly collaborate with law enforcement, prosecutors, psychologists, the defense bar, law professors, and exonerees to generate commonsense reforms around interrogations that will reduce the risk of false confessions. Among other things, the CWC has partnered with the International Association of Chiefs of Police (IACP), leading global police training firm Wicklander Zulawski LLP, and the Office of Juvenile Justice and Delinquency Prevention to establish data-driven best practices for questioning young adults.[5] To implement these recommendations, the CWC trains law enforcement around the country on interrogations and confessions, including in California. CWC faculty are also regularly featured at conferences held by the National Association of Criminal Defense Lawyers, American Bar Association, National Forensic College, and state public defender associations to train defense attorneys how to litigate false confession cases.

As proposed *amicus curiae* in this case, the CWC submits this brief in order to set forth the studies and research surrounding the phenomenon of false confessions, as well as to educate the factfinder concerning the necessary standards of practice required of defense attorneys in false confession cases. In the opinion of *Amicus*, the confession of Mr. Hayat was involuntary and unreliable, but Mr. Hayat's trial attorney failed to use available psychological expertise, as well as important alibi evidence, to challenge that confession at trial, thereby rendering ineffective

---

[3] *Corley v. United States*, 556 U.S. 303, 320 (2009) (citing Steven A. Drizin & Richard Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 906-07 (2004)).

[4] *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011) (citing Brief of Center on Wrongful Convictions of Youth *et al.* as *Amici Curiae* (collecting empirical studies that "illustrate the heightened risk of false confessions from youth")).

[5] Int'l Ass'n of Chiefs of Police, *Reducing Risks: An Executive's Guide to Effective Juvenile Interview and Interrogation* (2012), *available online at* http://www.theiacp.org/portals/0/pdfs/ReducingRisksAnExecutiveGuidetoEffectiveJuvenileInterviewandInterrogation.pdf.

assistance of counsel. On these grounds, *Amicus* urges this Court to adopt the Magistrate Judge's findings and recommendation and grant Mr. Hayat's motion for relief under 28 U.S.C. 2255.

## I.    COMMON PSYCHOLOGICAL INTERROGATION TECHNIQUES CAN INDUCE FALSE CONFESSIONS AND LEAD TO WRONGFUL CONVICTIONS MORE FREQUENTLY THAN THOUGHT.

For many, it is counterintuitive to think that an innocent person might confess to a crime he did not commit.  As the United States Supreme Court has long understood, confessions wield an enormous degree of persuasive power over the minds of factfinders precisely because it is difficult for many to understand how or why someone might falsely confess.[6]

The once-mysterious phenomenon of false confessions, however, has become better researched, quantified, and understood over the course of the past twenty-five years than ever before, as the emergence of DNA evidence has enabled confessions to be proven false at a rate previously unimagined.  Indeed, of the 354 DNA exonerations tracked by the Innocence Project, one in four cases involved a false confession.  False confessions similarly were involved in twelve percent of the exonerations tracked by the National Registry of Exonerations (whether those exonerations were driven by DNA or some other form of evidence).[7]  Importantly, the vast majority of those false confessions were detailed and, at first blush, credible-sounding – in other words, not obviously ascertainable as false on their faces.

The reality of the problem of false confessions is not embraced only by the defense bar. In a 2007 survey, police officers themselves estimated that ten percent of all interrogations result in false

[6] *See Hopt v. Utah*, 110 U.S. 574, 584-85 (1884) (recognizing that a "voluntary confession of guilt is among the most effectual proofs in the law"); *Miranda v. Arizona*, 384 U.S. 436, 466 (1966) (explaining that a confession is "the most compelling possible evidence of guilt") (citing *Mapp v. Ohio*, 367 U.S. 643, 685 (1961) (Harlan, J., dissenting)); *Colorado v. Connelly*, 479 U.S. 157, 182 (1986) (citing E. Cleary, *McCormick on Evidence* 316 (2d ed. 1972)) (observing that "[t]riers of fact accord confessions such heavy weight in their determinations that the introduction of a confession makes the other aspects of a trial in court superfluous").

[7] National Registry of Exonerations, Browse the Cases, Filtered by False Confession, *available online at* https://www.law.umich.edu/special/exoneration/Pages/browse.aspx?View={B8342AE7-6520-4A32-8A06- 4B326208BAF8}&FilterField1=Contributing%5Fx0020%5FFactors%5Fx0020&FilterValue1=False%20Confession (last visited May 6, 2019).

confessions.[8]  The leading global police training firm, John E. Reid & Associates, accordingly devotes an entire chapter of the latest edition of its interrogation training manual – the same influential manual whose earlier edition was the focal point of the 1966 *Miranda* decision -- to distinguishing between true and false confessions.[9]  The second-ranked global police training firm, Wicklander Zulawski & Associates, has developed new police training courses around false confessions. And the International Association of Chiefs of Police has published an entire police training manual dedicated to understanding and mitigating the risk of false confessions during police interrogation of young people.[10]

This growing awareness of the problem of false confessions has been acknowledged in recent years by the U.S. Supreme Court.  In 2009, the Court found that "there is mounting empirical evidence that these pressures [associated with custodial police interrogation] can induce a frighteningly high percentage of people to confess to crimes they never committed."[11]  It reiterated this point in 2011's *J.D.B. v. North Carolina*, noting that young people are at particular risk for false confession.  The U.S. Court of Appeals for the Ninth Circuit, too, has issued a number of opinions underlining the connection between false and coerced confessions and the mentally vulnerable, including its important 2014 *en banc* opinion in *Preston v. United States*, which overturned a federal conviction after an FBI interrogation resulted in an involuntary and false confession from a mentally impaired 18-year-old young adult.[12]

---

[8] Jessica R. Meyer & N. Dickon Reppucci, *Police Practices and Perceptions Regarding Juvenile Interrogation and Interrogative Suggestibility*, 25 Behav. Sci. & L. 757, 770 (2007). *See also* Saul M. Kassin, *et al.*, *Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs*, 31 L. & Hum. Behav. 381-400 (2007) (finding that 4.78% of officers surveyed reported eliciting false confessions from suspects they had interviewed).

[9] *See* Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, *Criminal Interrogations and Confessions* (5th ed. 2013) at 339-77.

[10] Int'l Ass'n of Chiefs of Police, *Reducing Risks: An Executive's Guide to Effective Juvenile Interview and Interrogation* (2012), *available online at* http://www.theiacp.org/portals/0/pdfs/ReducingRisksAnExecutiveGuidetoEffectiveJuvenileInterviewandInterrogation.pdf.

[11] *Corley*, 556 U.S. at 320 (citing Drizin & Leo, 82 N.C. L. Rev. at 907).

[12] *U.S. v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (*en banc*).

Based on an explosion of empirical evidence and research, the psychological and legal communities have generally accepted that false confessions can arise, even inadvertently, due to the use of hitherto-accepted – but psychologically potent –interrogation techniques on defendants during custodial interrogation.  Most state and federal police and investigative agencies, including the Federal Bureau of Investigation, follow a standardized set of interrogation procedures typified by the Reid Technique, which was developed and is still widely marketed by the Chicago firm John E. Reid & Associates, Inc.  Under these procedures, police interrogators generally begin by separating the suspect from his family and friends, often isolating the individual in a small interrogation room specially designed to increase his anxiety.[13] After a brief period of rapport-building, the interrogator deploys a series of tactics intended to shake the suspect's adherence to his claim of innocence. *Id.* at 11-12. It is at this time that the interrogation shifts into confrontation mode, as the questioner directly and repeatedly accuses the suspect of lying, refuses to listen to his claims of innocence, and exudes unwavering confidence in his guilt.[14] In order to convey the message that the suspect is guilty and that nothing the suspect says will change the interrogator's mind about this "fact," the interrogator may inform a suspect that the police possess evidence implicating him—fingerprints on a murder weapon, for example, or the statement of an eyewitness—even if such evidence does not actually exist. The use of such false evidence ploys is designed to make the suspect feel thoroughly hopeless and trapped.[15]

After this is accomplished, police interrogators then switch to the next stage of interrogation by offering the suspect a way out of his predicament: confession. To communicate this message, they indicate that the benefits of confessing will outweigh the costs of continued resistance and

[13] *See* Saul M. Kassin *et al.*, *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & Hum. Behav. 3, 12 (2010).
[14] *See* Richard J. Ofshe and Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv. U. L. Rev. 979, 990 (1997).
[15] Kassin *et al*, 34 L. & Hum. Behav. at 27-28.

denial.[16] Interrogators frequently minimize or rationalize the suspect's involvement in the crime, for instance, telling the suspect that he must have been merely a witness or that the criminal act must have been unintentional, a mere accident, or an act of justifiable self-defense, all in an effort to make confessing seem less damaging.[17] Interrogators also assure the suspect that confessing is in his best interest and often imply that he will receive leniency or "help" if he confesses. By deploying these tactics at the right psychological pressure points, experienced interrogators can be extraordinarily effective in causing a suspect to produce self-incriminating information.

Unfortunately, it is also beyond dispute that these mentally taxing tactics – which turn the interrogation room into the psychological equivalent of a pressure cooker – can cause not only the guilty, but also the innocent, to confess.[18]  In particular, false evidence ploys and false promises of "help" have become increasingly associated with the risk of false confession. According to the American Psychological Association's standard-setting position paper on false confessions, false evidence ploys "put innocents at risk to the extent that a suspect is vulnerable (e.g. by virtue of his or her youth, naiveté, intellectual deficiency, or acute emotional state) and to the extent that the alleged evidence is presented as incontrovertible, sufficient as a basis for prosecution, and impossible to overcome."[19]  In other words, this tactic can create an overwhelming sensation of being trapped, which then causes the suspect to try to cut his or her losses by confessing.  False assertions that confessing will "help" a suspect only compound the risk of false confessions, in turn, by "leading [innocents] to perceive that the only way to lessen or escape punishment is by complying with the

---

[16] Ofshe & Leo, 74 Denv. U. L. Rev. at 990.

[17] Drizin & Leo, 82 N.C. L. Rev. at 916.

[18] *See, e.g.*, *Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010) (explaining, in notorious false confession case, that Michael Crowe and Joshua Treadway "falsely confessed" after officers used inappropriate questioning techniques such as lying about evidence and promising "help" in exchange for an admission).

[19] *See* Kassin *et al*, 34 L. & Hum. Behav. at 29.

6

interrogator's demand for confession."[20]  Indeed, false offers of "help" in exchange for admissions have been linked to proven false confessions here in California.[21]

The psychological literature also reveals that the risk of false confession also increases when these tactics are used on individuals who exhibit particular psychological vulnerabilities.  Mental impairment, of course, is well documented as a significant risk factor for false confession, as it can make a defendant more likely to yield to suggestion and far less resistant to pressure.[22]  Similarly, sleep deprivation has been shown to markedly increase suggestibility and reduce the cognitive skills that play a role in resisting pressure.[23] And language impediments – whether related to diagnosable speech-language pathologies or everyday linguistic challenges like language barriers – are also a clear risk factor for false confession, as such impediments can make it harder to navigate interrogations that, of course, traffic in language and communication skills.[24]

---

[20] *Id.* at 29.

[21] *Crowe*, 608 F.3d at 422 (explaining that the detectives' promise to get Michael Crowe "help" was the most effective tactic in eliciting the fourteen-year-old boy's false confession).

[22] *Stein v. New York,* 346 U.S. 156, 185, 73 S.Ct. 1077 (1953) ("what would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal"); ABA Criminal Justice Mental Health Standards, Standard 7-5.8(b) ("Official conduct that does not constitute impermissible coercion when employed with nondisabled persons may impair the voluntariness of the statements of persons who are mentally ill or mentally retarded"); *Smith v. Duckworth,* 910 F.2d 1492, 1497 (7th Cir. 1990) ("a finding of involuntariness cannot be predicated solely upon" the defendant's mental state, but "his mental state is relevant to the extent it made him more susceptible to mentally coercive police tactics").

[23] *See, e.g.*, Steven J. Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, & Kimberly M. Fenn, *Sleep Deprivation and False Confessions*, Proceedings of the National Academy of Sciences of the United States of America, 113 (8) 2047-2050 (2016), *available online at* https://www.pnas.org/content/113/8/2047.

[24] *See generally* Michele LaVigne & Gregory J. Van Rybroek, *Breakdown in the Language Zone: The Prevalence of Language Impairments Among Juvenile and Adult Offenders and Why It Matters*, 15 U.C. Davis J. Juv. L. & Pol'y 37 (2011).

7

II.     **IN ORDER TO BE EFFECTIVE, DEFENSE ATTORNEYS MUST EDUCATE FACTFINDERS ABOUT THE COUNTERINTUITIVE PHENOMENON OF FALSE CONFESSIONS AND RELY ON OBJECTIVELY KNOWABLE FACTS AND EVIDENCE, INCLUDING ALIBIS, TO DISPROVE THE CONFESSION.**

  **A. To be effective, Mr. Hayat's defense counsel should have educated the fact-finder as to the risk factors for false confession and highlighted those risk factors present in Mr. Hayat's case.**

An expert witness like Dr. Richard Leo, with extensive and well-accepted expertise in the psychological dimensions of interrogation and confession, could have educated the fact-finder about the many known risk factors for false confession at play in Mr. Hayat's case.  As Dr. Leo testified at the 2255 hearing, such risk factors are plentiful.  The videotaped confession shows that Mr. Hayat was sleep-deprived during his hours-long interrogations, repeatedly yawning and telling his questioners that he was tired and jetlagged.  (I TR 64, 72; EH Ex. OOO at 21.)  When told, after confessing, that he was going to prison, Mr. Hayat stated that he just wanted to lie down because his head "is hurting" and explained that his "mind is not working right now."  (EH Ex. OOO at 205, 209.)  These latter two remarks also evoke the apparent effects of an earlier battle with meningitis, which anecdotal and medical testimony at the 2255 hearing suggested had left lasting damage on Mr. Hayat's mental functioning.  (I TR 129; IV TR 935; VII TR 1000.)

The interrogation tactics used also constitute risk factors for false confession. In particular, interrogators used both false evidence ploys and false promises of leniency in order to generate Mr. Hayat's confession.  With respect to false evidence ploys, Dr. Leo testified that interrogators falsely told Mr. Hayat that they had satellite imagery linking him to a terrorist training camp in Pakistan in 2003.  (I TR 54.)  With respect to false promises of leniency, Dr. Leo testified that there were frequent false statements during the interrogation indicating that if Mr. Hayat cooperated, he would receive help, the interrogators would "make an argument for you," and "things are going to be a lot better for you." (EH Ex. OOO at 172, 176.)  Such statements, as previously described, are clear risk factors for false confession.

**B. To be effective, Mr. Hayat's defense counsel should have introduced evidence that many facts in Mr. Hayat's confession were not true, *i.e.* were disprovable by the objectively known evidence in the case, including alibi testimony.**

There are several time-tested ways of evaluating the reliability of confession evidence that involve weighing the confession against other known evidence in the case. First, psychologists and interrogation experts Richard J. Ofshe and Richard A. Leo recommend examining the "fit" between the objectively knowable facts of the crime and the suspect's narrative.[25] If facts relayed in the confession contradict the objective facts of the crime, or otherwise don't make sense in the context of the case or suspect, the confession may be unreliable.[26]

Separate from the question of "fit" is a second important issue: corroboration. The Reid interrogation manual describes two crucial types of corroboration: dependent corroboration, which consists of known information about the crime that police purposely withheld from the media and suspect, and independent corroboration, which consists of independent corroboration, which is provably true information about the crime that the police did not know before the suspect included it in his or her confession. While both forms of corroboration are useful and important, independent corroboration is the gold standard for a confession's reliability.[27]

Finally, in addition to the search for corroboration and the performance of a "fit" analysis, scholars have identified four ways in which a disputed confession can be actually proven false: 1) proof surfaces that the crime to which the suspect confessed did not occur – e.g., a murder victim turns up alive; 2) evidence establishes that it was a physical impossibility for the defendant to have committed the crime – e.g., records show that he was incarcerated at the time of a crime that occurred outside prison; 3) the true perpetrator of the crime is identified through a corroborated confession or other means and the defendant has no known connection to him or her; and 4)

---

[25] *See* Ofshe & Leo, 74 Denv. U. L. Rev. at 1119.
[26] *See* Tepfer *et al.*, *Scrutinizing Confessions in a New Era of Juvenile Jurisprudence*, at 9.
[27] Inbau et al., *Criminal Interrogation and Confessions*, at 354-55.

scientific evidence proves that the defendant who confessed did not commit the crime – e.g., DNA evidence excludes the defendant and links another person to the crime.  Although there is some overlap among these categories, these types of newly discovered, independent evidence are generally considered the best ways to prove that a confession is false.[28]

Alibi evidence can be powerful evidence to undermine the reliability of a confession or even to prove that a confession is false.  For example, the *Wall Street Journal* has profiled the case of a 16-year-old Los Angeles boy who confessed to a shooting. Convenience-store surveillance video, however, later showed the teen was four miles from the site of the murder one minute before the shooting, causing prosecutors to drop the murder charges.[29] Similarly, the *New York Times* also profiled the case of an Oakland 16-year-old named Felix who confessed to murder during a partially recorded confession. That confession was proven false when evidence proved that Felix was actually locked in a juvenile detention center at the exact time of the crime.[30]

In Mr. Hayat's case, there was significant alibi evidence that had the potential to prove that it was physically impossible for Mr. Hayat to have committed the crimes to which he confessed as alleged by the Government; at the very least, the alibi evidence undermined the reliability of Mr. Hayat's confession by demonstrating a lack of fit between the confession and the objectively knowable evidence surrounding the crime. In its indictment, the Government alleged that Mr. Hayat provided material support for terrorism by attended a jihadist training camp in Pakistan "for a period of months" between October 2003 and November 2004 and by intending to carry out acts of terrorism when directed to do so after his months at the camp were over.  (Op. at 7.)  But as established below, there were numerous witnesses who – if they had been investigated and called to

---

[28] Drizin & Leo, 82 N.C. L. Rev. at 925-27.

[29] Zusha Elinson, *False Confessions Dog Teens*, The Wall Street Journal (Sept. 8, 2013), *available online at* https://www.wsj.com/articles/false-confessions-dog-teens-1378683912 (last visited May 7, 2019).

[30] *See* David K. Shipler, *Why Do Innocent People Confess*, New York Times (Feb. 23, 2012), *available online at* https://www.nytimes.com/2012/02/26/opinion/sunday/why-do-innocent-people-confess.html (last visited May 7, 2019).

testify – were able to account for Mr. Hayat's whereabouts while in Pakistan; indeed, a total of fourteen individuals came forward and either testified or gave sworn declarations that Mr. Hayat was never out of sight for a period of months while in Pakistan.  By failing to investigate and call these witnesses, trial counsel not only deprived her client of an affirmative defense that could have led to his acquittal, but she omitted to produce an alibi that would have fatally undermined the reliability of Hayat's confession and defeated the Government's case.

### C.  To be effective, Mr. Hayat's defense counsel should have shown that many facts were fed to him during his interrogation, resulting in confession contamination.

Confession contamination occurs when facts about the crime are disclosed to a suspect before or during an interrogation.[31] While sources of contamination can include the media, neighborhood gossip, or even the suspect's independent familiarity with the crime scene, the most common source is the interrogation itself, where police may knowingly or inadvertently disclose information to suspects during the course of questioning.[32] Such contamination is seen in nearly every false confession case, resulting in confessions that – while false – contain a startling amount of accurate detail.[33]  Indeed, Duke University law professor Brandon Garrett, the leading researcher of DNA exonerations, has found that of sixty-three modern-era confessions proven false by DNA, fifty-nine included descriptive facts that seemingly only the true perpetrator would know.[34] In Professor

---

[31] Nirider *et al.*, 79 U. Chicago L. Rev. at 847; *see also* Richard A. Leo, *et al.*, *Promoting Accuracy in the Use of Confession Evidence: An Argument for Pretrial Reliability Assessments to Prevent Wrongful Convictions*, 85 Temp. L. Rev. 759 (2013).

[32] *See also* Brandon Garrett, *Contaminated Confessions Revisited*, 101 Virginia L. Rev. 395 (2015) (explaining "the most likely scenario [for the correct facts in a false confession] is that the innocent convict had details disclosed during a lengthy interrogation"); Saul Elbein, *Kim Possible*, National Public Radio, This American Life (Oct. 11, 2013), *available online at* http://www.thisamericanlife.org/radio-archives/episode/507/confessions (last visited May 7, 2019) (interviewing former Washington, D.C., police detective Jim Trainum, who tells how he came to realize that he induced a woman to falsely confess after he reviewed the videotaped confession and saw how he had inadvertently supplied all of the details to the suspect).

[33] Garrett, 101 Virginia L. Rev. at 395.

[34] Brandon L. Garrett, Convicting the Innocent 20 (Harvard Univ. Press 2011); Garrett, 101 Virginia L. Rev. 395.

Garrett's words, 'the most likely scenario [for the appearance of correct facts in a false confession] is that the innocent convict had details disclosed during a lengthy interrogation."[35]

This pernicious situation is clearly the result of confession contamination. For precisely this reason, accordingly, the Reid interrogation manual emphatically warns officers against intentionally or inadvertently providing suspects key facts of the crime during interrogation. Officers are instructed that when eliciting a narrative confession and seeking corroborative facts that could only be known by the guilty person, "the investigator should be certain that the details were not somehow revealed to the suspect through the questioning process, news media, or the viewing of crime scene photographs. …It is highly important . . . that the investigator let the confessor supply the details of the occurrence, and to this end, the investigator should avoid or at least minimize the use of leading questions."[36] The manual further advises officers that "the lead investigator should decide and document on the case folder what information will be kept secret."[37]

Wicklander Zulawski LLP, Reid's competitor and the second-largest police training firm in the world, also condemns the practice of divulging crime-related information to suspects through the use of leading questions.[38] Linking this practice to the risk of false confession, the firm teaches officers that when interrogators divulge such information, they are giving an innocent suspect enough information to make a plausible false confession: "The use of a factual interrogation may hamper the interrogator's ability to test the confession against case facts because facts were revealed to the suspect and when repeated by the suspect make a plausible-sounding confession to the crime."[39] Indeed, Wicklander Zulawski has identified contamination

[35] *Id.*
[36] Inbau et al., *Criminal Interrogation and Confessions*, at 306, 315.
[37] *Id.* at 355.
[38] David Zulawski & Douglas E. Wicklander, <u>Practical Aspects of Interview and Interrogation</u> 73-103 (2nd ed. 2002) at 73-103.
[39] *Id.* at 80.

in a number of high-profile false confessions, including that of Brendan Dassey, the Wisconsin teen profiled in the global hit Netflix docuseries *Making a Murderer*.  In an *amicus* brief submitted to the United States Supreme Court in that case, Wicklander Zulawski explained that "fact-feeding and leading questions that divulged key investigative information" are "classic examples of common missteps that lead to false or unreliable confessions."[40]

As the phenomenon of confession contamination shows, the mere fact that a suspect's confession contains some accurate details is not enough to prove that the confession is reliable. Rather, determining the source of those details, and whether they were contaminated as described above, is crucial to any false confession defense.[41]

In Mr. Hayat's case, virtually every detail of his confession was disclosed or fed to him by his interrogators.  For three and one-half hours during the second of two unrecorded interviews on June 3, 2005 at Mr. Hayat's home, Mr. Hayat denied that he had ever attended any jihadi training camps.  Only after agent Harry Sweeney suggested to him that he might have attended a jihadi training camp by accident, thinking it was a religious education camp, did Hamid agree with Sweeney's suggestion.  This so-called "first admission" (RT 500) was followed by a "second admission" that he attended a training camp that contained weapons and explosives" for approximately three months in 2003. (RT 526)  This "second admission" was prompted by a false evidence ploy, a lie by agent Sweeney that the FBI had a picture of him by satellite image in 2003

---

[40] *Dassey v. Dittmann*, No. 17-1172, U.S. Supreme Court (2017), Brief of *Amici Curiae* Independent Law Enforcement Instructors and Consultants, available online at https://jenner.com//system/assets/assets/10537/original/Dassey%20amicus%20brief%20March%202018.pdf.

[41] *See also Preston*, 751 F.3d at 1023-28.  In *Preston*, the Ninth Circuit Court of Appeals suppressed an intellectually disabled eighteen-year-old's confession under similar circumstances. The police therein put "repeated pressure [on the suspect] to change answers inconsistent with guilt and adopt answers evidencing guilt instead." *Id.* at 1024. The officers "asked [the defendant] the same questions over and over until he finally assented and adopted the details that the officers posited." *Id.* Their questions often had "the desired response [] embedded in the question." *Id.* When coupled with the vulnerability of the suspect, and implied promises of leniency, *id.* at 1026, the *Preston* court found that the officers' tactics overbore the suspect's will and suppressed the confession as involuntary, despite a short interrogation time. *Id.* at 1023.

on his trip to Pakistan. (RT 523).  These admissions formed the basis of Mr. Hamid's indictment for providing material assistance to terrorists.  Additional extensive fact-feeding, as outlined in Dr. Leo's testimony and presented in  Mr. Hayat's Memorandum Supporting Motion for Relief under 28 U.S.C. §2255 at 54-64, was also captured on videotape.

None of it, however, was effectively highlighted by Mr. Hayat's trial counsel for the jury. Where a confession is contaminated by police disclosure of details to a suspect, it is imperative that defense counsel painstakingly point out all the instances of contamination to factfinders; "[i]ndeed, proving contamination …. must be the heart of any false confession defense."[42] Where the entire interrogation of a suspect is electronically recorded, it is possible – indeed, essential – to "trace, step by step, how and when the interrogator implied or suggested the correct answers for the suspect to incorporate into his post-admission narrative."[43]  Counsel can demonstrate contamination by "stopping and starting [the video] as appropriate to draw the jury's attention to each instance of fact-feeding and police prompting," preferably through the direct examination of a confessions and interrogations expert.[44]

Counsel for Mr. Hayat, however, did none of these things.  Had trial counsel used the videotapes effectively, she could have attacked and attacked well the reliability of Mr. Hayat's confession, the "singularly most important piece of evidence" in the government's case. She could have demonstrated to the jury that the confession was unreliable, little more than a story constructed – however inadvertently – by Mr. Hayat's investigators to fit their pre-conceived belief that he had attended a jihadist training camp.  Had defense counsel done her job, the jury would have known what is now quite apparent – that Mr. Hayat's final confession was a largely uncorroborated story that was pasted together with contaminated facts and disproven by

---

[42] Nirider, 79 U. Chicago L. Rev. at 855.
[43] Richard A. Leo, *False Confessions: Causes, Consequences, and Implications*, 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009).
[44] Nirider, 79 U. Chicago L. Rev. at 861.

persuasive alibi evidence.  It is a story that has kept him wrongly in prison for nearly fourteen years – but that should keep him there no longer.

## CONCLUSION

For all these reasons, *Amicus* asks this Court to grant the relief requested by Defendant Hamid Hayat and adopt the Findings and Recommendation of the Magistrate Judge.

Respectfully submitted,
/s/ SHAFFY MOEEL, Esq. (Cal. SBN 238732)
Moeel Law Office
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Tel.: (415) 735-5021
*Counsel for Proposed Amicus Curiae*

LAURA NIRIDER (IL Bar No. 6297299)
STEVEN A. DRIZIN (IL Bar No. 6193320)
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern University School of Law
375 East Chicago Ave., 8th Floor
Chicago, Illinois 60611
Telephone: (312) 503-8576
Facsimile: (312) 503-8977

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of May, 2019, I filed the foregoing Brief with the Clerk of the Court using the CM-ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: May 10, 2019.

Respectfully submitted,
/s/ SHAFFY MOEEL, Esq. (Cal. SBN 238732)
Moeel Law Office
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Tel.: (415) 735-5021
*Counsel for Proposed Amicus Curiae*

LAURA NIRIDER (IL Bar No. 6297299)
STEVEN A. DRIZIN (IL Bar No. 6193320)
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern University School of Law
375 East Chicago Ave., 8th Floor
Chicago, Illinois 60611
Telephone: (312) 503-8576
Facsimile: (312) 503-8977