UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

     Respondent/Plaintiff,

   v.

HAMID HAYAT,

     Petitioner/Defendant.

No. 2:05-cr-240-GEB

**ORDER**

Petitioner and movant Hamid Hayat ("Hayat") moves for habeas corpus relief under 28 U.S.C. § 2255, arguing his convictions and sentence should be vacated because his attorney, Wazhma Mojaddidi, provided him with deficient representation in violation of his federal Sixth Amendment constitutional right to effective assistance of counsel. ECF No. 531 (Hayat's Motion). Specifically, Hayat contends in his motion that Mojaddidi failed to adequately investigate and present certain defenses on his behalf and to effectively represent him on certain issues during the trial.

The motion was referred to a United States Magistrate Judge for proposed findings and recommendations under a federal statute and a local rule.  The federal statute under which the referral was made "makes it clear that the district judge must review the magistrate judge's findings and recommendations . . . *if objection is made*, but not otherwise."  United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).

1

The magistrate judge held habeas evidentiary hearings on the motion. Habeas evidentiary hearings are usually required because "[w]ithout [those] hearing[s], it is often difficult to 'reliably determine whether [defense] counsel's investigation [of certain defenses] was deficient [because] what was investigated, and the scope of the investigation can rarely be discerned from the trial record.'" Williams v. Trammell, 782 F.3d 1184, 1218 (10th Cir. 2015) (quoting Fairchild v. Workman, 579 F.3d 1134, 1142 (10th Cir. 2009)). Further, typically it cannot be "determine[d] from the bare trial record whether [defense] counsel's choice of [trial strategy] was the result of [an] [objectively reasonable] strategic decision." Fairchild, 579 F.3d at 1142.

The magistrate judge filed proposed Findings and Recommendations ("F&Rs"), finding that Mojaddidi failed to adequately investigate certain defenses on Hayat's behalf and to effectively represent him on certain issues during trial. ECF No. 734 ("F&Rs"). The United States ("United States" or "government") filed objections to certain findings on April 6, 2019, ECF No. 744 ("Objs."), and Hayat filed a reply to those objections on May 4, 2019. ECF No. 747 ("Reply").

The F&Rs include credibility determinations of fact witnesses who testified before the magistrate judge during habeas evidentiary hearings. "A district [judge] may not . . . reject a magistrate judge's proposed credibility determination [concerning fact witnesses the magistrate judge observed testify] without hearing and seeing the testimony of the relevant witnesses." Johnson v. Finn, 665 F.3d 1063, 1074 (9th Cir. 2011).

The F&Rs also include legal conclusions premised on legal

opinions of attorney expert witnesses who testified during the habeas evidentiary hearings and opined on certain ineffective assistance of counsel claims. Legal conclusions are reviewed under the de novo review standard. "De novo review means that the reviewing court 'does not defer to the lower court's ruling but freely considers the matter anew, as if no decision had been rendered below.'" Dawson v. Marshall, 561 F.3d 930, 933 (9th Cir. 2009) (brackets omitted) (quoting United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988)). A district judge has discretionary authority to rely on attorney expert testimony on the ineffective assistance of counsel legal standards, and may exercise that discretion by rejecting a magistrate judge's findings which are premised on attorney expert legal opinions, since "the district judge is himself . . . qualified to understand the legal analysis required" when determining whether counsel's representation of Hayat was ineffective representation. Bonin v. Calderon, 59 F.3d 815, 838 (9th Cir. 1995). cf. LaGrand v. Stewart, 133 F.3d 1253, 1270 (9th Cir. 1998)(stating no authority was found supporting petitioner's "contention that only outside expert testimony can provide a basis on which to measure counsel's performance.") Findings based on attorney expert legal testimony are rejected.

The overview of facts and issues concerning the motion are stated in the direct appeal decision issued in United States v. Hayat, 710 F.3d 875, 880-84 (9th Cir. 2013), as follows:

> Hamid Hayat is a U.S. citizen of Pakistani descent. He lived in the United States until he was seven and then, between the ages of seven and eighteen, with his grandparents in Pakistan. Hayat returned to the United

States in 2000 to live with his parents in Lodi, California.   Three years later, in April 2003, he traveled to Pakistan with his family.   He spent just over two years in Pakistan on this second stay, returning to the United States in late May 2005.   Days after his return, Hayat was arrested by FBI agents and charged with providing material support to terrorists and making false statements to government officials.   The events giving rise to Hayat's arrest are as follows:

In October 2001, FBI agents in Oregon interviewed Naseem Khan, a 28-year-old Pakistani immigrant, in connection with a money laundering investigation.   Khan informed the agents that he had regularly observed Ayman al Zawahiri, Osama bin Laden's second-in-command and one of the FBI's 22 most-wanted terrorists, at a mosque in Lodi, California, in 1999.   Khan later told the agents that he had also seen two other individuals on the FBI's 22 most-wanted list in Lodi during the same period.

The FBI then hired Khan as a confidential informant and asked him to return to Lodi to gather additional information on a suspected terrorist cell. Khan agreed.   He began his work as an informant in Lodi in December 2001. Approximately eight months later, in August 2002, Khan met Hayat, who was nineteen years old at the time and living in his parents' garage.   As explained in greater detail below, recorded conversations between Khan and Hayat indicated that Hayat's father was linked to a terrorist organization in Pakistan and that Hayat's uncle and grandfather were recruiters for "jihad."

Between August 2002 and October 2003 Khan and Hayat spoke regularly.   Khan recorded seven of these conversations, took notes on others, and reported to the FBI soon after every conversation with Hayat, summarizing for the agents those conversations that were not recorded.   The recorded conversations were introduced at trial, as was testimony by Khan regarding unrecorded conversations.   Because Khan and Hayat frequently spoke to each other in Pashto and Urdu, the jurors were provided with English translations of the pertinent

4

parts of the recorded conversations.

In the recorded conversations, Hayat made several anti-American and anti-Semitic remarks. At one point, for example, he expressed pleasure over the murder of *Wall Street Journal* reporter Daniel Pearl because his death meant that "[n]ow they can't send one Jewish person to Pakistan." In addition, Hayat at times spoke approvingly of Islamic fundamentalist groups such as Jaish-e-Mohammed and indicated his respect for their leaders. He also professed to know and to admire Pakistanis who had engaged in "jihad." Some of these people Hayat knew because they had studied in a madrassah, or religious school, in Pakistan run by his grandfather, which Hayat had also attended. Hayat told Khan that his grandfather was a prominent cleric and that after 9/11, Pakistani President Musharraf had sent him and others to Afghanistan to persuade the Taliban to hand over Osama bin Laden. Hayat also described to Khan a terrorist training camp in Pakistan—he said he had seen a video of it—and, on a few occasions, expressed interest in attending such a camp.

Five of the recorded conversations took place while Hayat and Khan were both in Lodi. At one point, when the two were discussing travel to Pakistan and a possible meeting with Hayat's uncle, Hayat said "I have one objective now. If I went to Pakistan, now, see, straight away, I'll stay at home for one or two weeks, then I'm going for training, friend." (Underlined portion spoken in English).

Hayat traveled with his family to Pakistan in April 2003. Two of the recorded conversations took place when he was there. Like the earlier conversations, they covered a wide range of topics. On one occasion, Khan scolded Hayat for being lazy and not going to a training camp. In response, Hayat protested that the camp was closed during hot weather and that had the camp been open, he "would have been there." On another occasion, Khan relayed to Hayat a conversation in which Hayat's father explained that "[Hayat wi]ll enter the Madrassah, and, God Willing, he [will] go for training!" Hayat responded to Khan: "Um-hmm. . . . No problem, absolutely."

(Underlined portion spoken in English).

In another of the recorded conversations, Hayat explained to Khan how to send money to Sipah-e-Sahaba ("SSP"), a Pakistani organization that Pakistan declared a terrorist organization in 2002. During a conversation with Khan, Hayat expressed admiration for members of SSP who die as "martyrs." Hayat boasted that he gave more money to SSP than any other member of his Pakistani madrassah, and stated that he gave money to SSP because his money was more likely to be used to acquire "<u>weapons, books and everything</u>" than if he gave to other groups, which wasted money. (Underlined portion spoken in English). Hayat also reported that when someone told him that he could go to jail for giving SSP money, he replied, "<u>Fuck you. Who cares, man, who goes to jail, man?</u> . . . . <u>Fuck, look what's America doing.</u> . . ." (Underlined portion spoken in English).

Hayat made several statements to Khan indicating Hayat's knowledge of his family's involvement in terrorist activities. For example, Hayat explained that his father in Lodi had sent money to SSP. Hayat also told Khan that his grandfather, who was the leader of the madrassah Hayat attended in Pakistan, had called a special meeting in 1999 where he recommended that his students leave the madrassah to go participate in jihad. In addition, Hayat explained that if someone were interested in attending a training camp, that person could contact Hayat's maternal uncle, who would either accompany that person "to the Jehad people's office," or make a phone call to that office on the interested person's behalf.

Hayat's direct interactions with American law enforcement began when he attempted to reenter the United States in May 2005. On May 30, 2005, Hayat's return flight to San Francisco was diverted to Japan because Hayat's name appeared on the federal government's "No Fly" list. Hayat was interviewed in Japan by FBI agent Lawrence Futa. Futa questioned Hayat about his two-year stay in Pakistan, including whether Hayat had joined a terrorist organization or attended a terrorist training camp. Hayat denied joining a terrorist group or attending

a training camp while in Pakistan. Futa concluded that Hayat "posed [no] immediate threat" and could be permitted to return to the United States. Hayat left Japan and flew to San Francisco that same evening.

Four days later, on June 3, 2005, FBI agents Tenoch Aguilar and Sean Wells interviewed Hayat at his parents' home in Lodi. After again explaining the reason for his family's trip to Pakistan—because of his mother's health—and his activities while in Pakistan, Hayat again denied having attended a terrorist training camp and stated that "he would never be involved with anything related to terrorism, and didn't know why anybody would say otherwise." After eliciting this response, Aguilar and Wells asked Hayat to come to the FBI office in Sacramento for further questioning.

Hayat arrived at the FBI office in Sacramento around 11 a.m. the following morning and was interviewed in four waves. Hayat at first denied having attended a terrorist training camp, but during the second session admitted that he had attended a camp for a few days during an earlier stay in Pakistan in 2000, where he "observed and heard weapons training," and also in 2003, when he himself received "pistol training" at a camp in "Balakot."

The third and fourth sessions, which were videotaped, took place during the afternoon and evening of June 4, 2005, and the early morning hours of June 5. During the third interview, Hayat confirmed that he had attended a camp to train for jihad and said he was trained to use a pistol and rifle and taught how to kill American troops.

Before the final session, Hayat was given *Miranda* warnings (for the second time that day) and signed an Advice of Rights form (also for the second time). Hayat reported that at the training camp, he was told to expect to receive orders in the United States. When someone wanted to transmit orders to him, the person would first contact Adil Khan (a prominent Islamic figure in the Lodi, California area); Khan would contact Shabbir Ahmed (the Imam at Hayat's Lodi mosque); and Shabbir would contact Hayat. Also, by the end of the interview Hayat had

suggested that his grandfather was involved in jihadist activities, indicating that his grandfather may have held a leadership position in the terrorist camp Hayat attended.

The FBI arrested Hayat at the end of this set of interviews.

On January 26, 2006, the government filed a second superseding indictment against Hayat, charging him with one count of violating 18 U.S.C. § 2339A (providing material support to terrorists) and three counts of violating 18 U.S.C. § 1001 (making false statements to the FBI). Section 2339A reads, in relevant part,

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various provisions prescribing penalties for terrorist acts] . . . shall be . . . imprisoned not more than 15 years. . . .

18 U.S.C. § 2339A(a). The statute defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." *Id.* § 2339A(b)(1). The prosecution's case was that Hayat had provided his personal services to a terrorist organization by attending the training camps in Pakistan and returning with the intent to carry out acts of terrorism when directed to do so. The three counts of making false statements to the FBI were related to Hayat's initial statements to various FBI agents in California, in which he denied attending a terrorist training camp while in Pakistan.

Hayat's trial began on February 14, 2006.  In addition to the seven recorded conversations between Hayat and Khan, the government presented Khan's testimony about those conversations and Hayat's confessions to the FBI.  The jury viewed the videotaped confessions, and several agents, including Futa, Aguilar, and Sweeney, testified about their interviews with Hayat.  The government also introduced a "scrapbook" that agents had seized from Hayat's parents' garage, where Hayat was living.  The scrapbook bore Hayat's name on the cover and contained clippings from Pakistani newspapers.  Several of the articles in the scrapbook discussed Islamic fundamentalist groups, including the Taliban, and their leaders, including Osama bin Laden. Khan testified that Hayat had shown him the scrapbook while expressing support for the fundamentalist groups described in the articles.

The government's evidence also included a note written in Arabic that government agents had found in Hayat's wallet after his return from Pakistan.  Khaleel Mohammed, an expert in Islamic studies who testified as an expert witness for the government, testified that the note was an Islamic supplication. He provided the following translation of the Arabic phrase: "Oh Allah we place you at their throats and we seek refuge in you from their evils."  Mohammed opined that the supplication was both uncommon and "not peaceful," and that the type of person who would carry such a supplication was "[a] person who perceives him or herself as being engaged in war for God against an enemy."

Finally, the government presented testimony from two additional experts, Hassan Abbas and Eric Benn.  Abbas, an expert on extremist groups, testified to the location and nature of typical terrorist training camps in Pakistan.  Benn, a satellite imagery expert who had analyzed satellite images to determine the likelihood that there was a militant training camp near Balakot between 2003 and 2005, characterized the likelihood as "a good strong possible."  He further testified that when an analysis of the satellite imagery was combined with the description Hayat had provided in his confession about his travel to the camp, his assessment of the likelihood that a military

training camp existed outside Balakot increased to "probable."

Hayat did not testify. He presented an expert, Anita Weiss, who testified that it is common for Pakistanis to carry a talismanic prayer, known as a *ta'wiz*, for protection while traveling. The district court did not permit Ms. Weiss to express her opinion on whether the note found in Hayat's wallet was a *ta'wiz* because Weiss does not speak or read Arabic.

Hayat also presented testimony from eleven other witnesses—mostly FBI agents—and from Naseem Khan, who had also testified for the prosecution. One aspect of Hayat's defense was that Khan was an unreliable informant who had given the FBI implausible information—namely a report that three Al Qaeda members on the FBI's most wanted list had visited a mosque in Lodi—the accuracy of which the FBI was unable to confirm, and which was belied by testimony from a regular attendee of the Lodi mosque who never saw the men. Hayat's counsel also elicited testimony from Gary Schaaf, one of the agents who interviewed Hayat, that Schaaf and other agents used leading questions and that Hayat seemed tired during the interview. In addition, agent Terry Rankhorn testified that he had posed undercover as a convert to Islam and met with Hayat four times in 2002; Hayat never mentioned training camps to Rankhorn.[1]

---

[1] The magistrate judge supplemented the facts, finding: "Rankhorn also testified that he felt Hayat's talk was often 'more boasting than actual substance.'" F&Rs at 8:28. The referenced "boasting" phrase was in Rankhorn's response to Mojaddidi's examination question concerning Hayat's uncle in Pakistan. March 30, 2006 RT ("RT" refers to the trial transcript) at 3423:17-25;3424:1-12. The trial testimony concerning this boasting phrase follows:

Q. Do you recall Hamid telling you that his – I'm sorry-- his uncle was the King of Pakistan and that he could get cigars for you?

A. I don't recall him saying he was the King. I recall him saying he was a politician, an influential politician. And the conversation involved around he was getting some particularly hard to get cigarettes for Mr. Naseem Khan, and he had mentioned something to the effect of, oh, I can get lots of things.

Q. Did you believe him when he said that?

A. At the time I didn't personally believe he could. It seemed to me to be more boasting than actual fact.

10

1               Jury deliberations began on April 12,
2005.  On April 25, 2005, after nine days of
2 deliberation, the jury returned a verdict of
guilty on all four counts charged in the
3 indictment.

4 (alterations in original)(footnotes omitted).

5 **The government's objections to the Magistrate Judge's findings**

6 **and recommendations**

7     The government objects to the following findings: that

8 Mojaddidi failed to adequately investigate whether Hayat had a

9 viable alibi defense and to present that defense during trial;

10 that Mojaddidi failed to adequately search for a false

11 confessions expert; that Mojaddidi failed to adequately search

12 for an Arabic language expert witness to counter the government's

13 expert witness's testimony on the meaning of the supplication

14 Hayat had in his wallet, failed to object to a portion of that

15 expert's testimony as prohibited opinion testimony barred by

16 Federal Evidence Rule 704(b), and failed to adequately counter

17 the government's rebuttal closing argument on the probative value

18 of that expert's testimony; that Mojaddidi and co-defendant's

19 attorney Johnny Griffin jointly represented Hayat under a

20 conflict of interest which adversely affected Hayat's defense;

21 and "any finding" that Mojaddidi was ineffective because she

22

23     Q. Did Hamid seem to boast about other things in your conversations with
him?

24

25     A. His air was such that -- of course, this was only my opinion at the
time, that it was more -- yes, more boasting than actual substance.

26 RT 3423:17-25, 3424:1-8.
    The magistrate judge also opines in a finding: "The taped conversations
27 Hayat had with Naseem Khan showed a young man somewhat enamored of Pakistani
terrorist leaders, hoping to impress the older Khan, and easily lead [sic]
28 into a promise that he would attend such a camp when he reached Pakistan."
F&Rs at 52:10-13.  This conclusory finding is rejected.

1  failed to obtain a security clearance or to find counsel with a

2  security clearance.   Objs. at 19 n.17, 24:20-25, 25:1, 98:11,

3  114:2-12,   119:8,   125:25-28,   127:20-22,   130:9-12,   140:9-11,

4  143:16-18, 176:24-25.

5       The government argues these findings should be rejected

6  because the magistrate judge misapplied the "legal standard

7  governing *habeas* review, including that court's erroneous refusal

8  to give deference to trial counsel's decisions because of her

9  inexperience." Id. at 1:21-23.  Hayat rejoins:

10          The outcome of the proceedings below . . .
            turned on the facts, which [the magistrate
11          judge] determined based largely on her
            assessment of the testimony from multiple
12          witnesses at the 2018 [habeas] evidentiary
            hearing over which [the magistrate judge]
13          presided.  Chief among those witnesses was
            Wazhma Mojaddidi, Hamid Hayat's trial
14          counsel.

15              At the [habeas] hearing . . ., the
            magistrate heard and carefully weighed
16          attorney Mojaddidi's explanation of her trial
            representation of Hamid . . . .  Based on all
17          of the evidence before [the magistrate
            judge], including testimony from key experts,
18          the magistrate found as fact that Mojaddidi's
            ignorance of the law and errors in fact and
19          in logic led her to make "strategic"
            decisions that were uninformed and
20          unreasonable, constituting deficient
            performance.
21

22  Reply at 1:10-19 (footnote omitted).

23       The magistrate judge finds Mojaddidi's testimony at the

24  habeas evidentiary hearing "showed that she relied on Griffin,

25  [counsel for Hamid Hayat's father and co-defendant Umer Hayat,]

26  to such an extent that they were jointly representing Hamid

27  [Hayat]."  F&Rs at 107:15-16.  The magistrate judge also finds

28  Mojaddidi "understood that she was not competent to represent

1   Hayat without mentorship from another attorney. [Mojaddidi]

2   testified that she undertook representation of Hamid because she

3   understood that she 'would rely on [Griffin] in [her]

4   representation of Hamid' . . . . And, she relied on his advice

5   and her own research." Id. at 107:16-24 (some alterations in

6   original) (internal citation omitted).

7       The magistrate judge finds the "best evidence" of the joint

8   representation was "the decision that a rush-to-trial strategy

9   was in the best interests of both defendants. Mojaddidi simply

10  followed Griffin's decisions that were in the best interests of

11  his client, not hers." Id. at 106:6-8. The magistrate judge

12  "recognize[d] a joint defense agreement in which one defendant's

13  attorney takes a lead role can be perfectly acceptable," id. at

14  109:9-10, but finds in this case it became unacceptable "when the

15  first superseding indictment charged Hayat with material support

16  for terrorism, [because at that time] the basic defense strategy

17  [of rushing to trial caused] the representation of Hamid to come

18  into conflict with Griffin's strategy for the representation of

19  Umer [Hayat]," id. at 105:20-22. The magistrate judge finds this

20  conflict of interest "caused Hamid [Hayat]'s defense to forego

21  many viable litigation strategies," and that "this adverse effect

22  should result in a presumption [that Hamid Hayat's defense was]

23  prejudice[d]" under the United States Supreme Court's presumed

24  prejudice rule. Id. at 111:9, 13-14.

25      What the magistrate judge observed during the habeas

26  evidentiary proceeding concerning Mojaddidi's deficiencies in her

27  representation of Hayat differs from what the district judge

28  observed about Mojaddidi's representation of Hayat during the

1  trial proceedings.  <u>Cf.</u> <u>Bean v. Calderon</u>, 163 F.3d 1073, 1081

2  (9th Cir. 1998) (indicating that the evidence developed at a

3  habeas evidentiary hearing concerning counsel's performance may

4  differ from evidence of how counsel represented defendant during

5  the jury trial proceedings; stating the evidence presented "at

6  the federal habeas hearing was far different from [what was

7  observed about counsel's representation of defendant during the]

8  jury [trial proceedings]").  During trial proceedings, Mojaddidi

9  appeared to independently and ably represent Hayat, and that

10 representation did not appear tainted by a conflict of interest.

11      Neither defense counsel informed the trial judge that

12 conflicts existed in this case.  Defense counsel did inform the

13 trial judge that "in certain areas [they had] a common, joint

14 defense."[2]  "[W]e generally presume that the lawyer is fully

15

16 [2] During a hearing on February 3, 2006, Mr. Griffin informed the district
   judge:

17          [R]ecognizing there are going to be two juries, and basically two
            cases being done in one, Ms. Mojaddidi will represent Mr. Hamid
            Hayat and I'll be representing Mr. Umer Hayat, we — in certain

18          areas we have a common, joint defense. . . . [I]t's our
            intention, with the Court's permission of course, to continue to
            assist each other even though, for example, say, my jury is not

19          in the courtroom.
                 That assist does not mean that I'm going to examine

20          witnesses on behalf of Mr. Hamid Hayat, but that I would be able
            to sit at counsel table, be present in the courtroom during that

21          portion where, frankly, it doesn't involve Umer Hayat, and vice
            versa, when my jury, as I'm referring to it, is in the courtroom,

22          that Ms. Mojaddidi will be able to sit at counsel table and
            provide me assistance in terms of various matters, but she will

23          not, for example, object, examine any witnesses, but that she
            would be in the courtroom at counsel table providing me

24          assistance.
   RT 60:17-25, 61:1-9.

25          Further, during the proceeding on February 14, 2006, Mr. Griffin stated:
                 The defense jointly has retained Mark Reichel, private

26          attorney from Sacramento, to provide consultation to the defense
            jointly.  It is not anticipated at this point that he would

27          examine any witnesses.  He may very well assist in the preparing
            briefs and motions if various issues come up during the course of
            the trial.

28               If, however, we determine that we want him to play a role

14

1    conscious of the overarching duty of complete loyalty to his or

2    her client. Trial courts appropriately and 'necessarily rely in

3    large measure upon the good faith and good judgment of defense

4    counsel.'"   <u>Burger v. Kemp</u>, 483 U.S. 776, 784 (1987) (quoting

5    <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 347 (1980)).

> [T]he rule applied when the trial judge [was]
> not aware of [an asserted] conflict (and thus
> not obligated to inquire) is that prejudice
> [resulting from counsel's representation of a
> defendant] will be presumed only if [a shown]
> conflict has significantly affected counsel's
> performance—thereby rendering the verdict
> unreliable, even though . . . prejudice [from
> counsel's representation under the <u>Strickland</u>
> standard)] cannot be shown.

12   <u>Mickens v. Taylor</u>, 535 U.S. 162, 172–73 (2002).

13       However, the Ninth Circuit states in <u>United States v.</u>

14   <u>Walter-Eze</u>, 869 F.3d 891, 906 (9th Cir. 2017), <u>cert.</u> <u>denied</u>,

15   139 S.Ct. 1196 (2019), that the United States Supreme Court's

16   "reasoning regarding when prejudice should be presumed does not

17   control," when vindication of a petitioner's Sixth Amendment

18   right to counsel can be resolved under <u>Strickland</u>'s familiar

19   performance-and-prejudice framework, explaining:

> As the Supreme Court clarified in
> <u>Mickens</u>, the presumed prejudice rule was not
> intended "to enforce the Canons of Legal
> Ethics, but to apply needed prophylaxis in
> situations where <u>Strickland</u> itself is
> evidently inadequate to assure vindication of
> the defendant's Sixth Amendment right to
> counsel."  It follows that where a case is
> sufficiently straightforward such that it can

---

on the record in the case, he would, with request and permission
of the Court, request to substitute in as either co-counsel or
association of counsel either for me or Ms. Mojaddidi.  He will
not step in as attorney of record for both of us because each
defendant has separate counsel.
RT 18:22-25, 19:1-8.  Mr. Reichel is an experienced federal criminal
law practitioner.

1
2
3

> be resolved under _Strickland_'s familiar performance-and-prejudice framework, [the _Cuyler v. Sullivan_] rule of presumed prejudice does not apply.

4  _Id._ (internal citation omitted). Therefore, Hayat's motion is

5  analyzed under _Strickland_'s performance-and-prejudice framework.

6  **Ineffective Assistance of Counsel Claims**

7
8
9
10
11
12
13
14

> Under _Strickland_ . . . an ineffective assistance of counsel claim has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel's representation fell below an objective standard of reasonableness. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

15  _Stanley v. Cullen_, 633 F.3d 852, 862 (9th Cir. 2011) (internal

16  quotations and citations omitted).

17     The magistrate judge finds Mojaddidi committed several

18  errors, and that Mojaddidi's failure to adequately investigate

19  whether alibi witnesses existed who knew of Hayat's whereabouts

20  during the time he was charged with attending a terrorist

21  training camp and to present that defense during the trial is

22  singularly prejudicial.

23  **Failure to investigate potential alibi witnesses and to present**

24  **an alibi defense**

25     The government objects to the alibi defense findings,

26  arguing Mojaddidi "exercised her own independent judgment . . .

27  to pursue an alternative defense strategy over an alibi defense,

28  based on the totality of facts known to her and based on her

1    belief that it would be in the best interests of Hayat." Objs.

2    at 54:24-26. Hayat rejoins that the magistrate judge considered

3    "Mojaddidi's testimony concerning her justifications for failing

4    to conduct [an adequate investigation of the viability of an

5    alibi defense and] deemed all of them unreasonable, resting as

6    they did on errors of fact, law, and/or logic." Reply at 12:25-

7    26, 13:1.

8        The magistrate judge finds Mojaddidi's failure to adequately

9    investigate the viability of an alibi defense was objectively

10   unreasonable, explaining:

11           The evidence adduced at the evidentiary
         hearing showed that Mojaddidi initially
12       considered an alibi defense. (IV TR 732.)
         She testified that in her discussions with
13       Hayat, she learned that he spent his time in
         Pakistan in either Behboodi or Rawalpindi.
14       (Id. at 726-27.) He told her he spent time
         playing cricket, playing video games, and
15       hanging out in front of the local store in
         Behboodi. (Id. at 727.) She knew that he
16       spent time with family members and that there
         were others in Pakistan who could testify to
17       his whereabouts. (Id.)

18           . . . .

19           . . . Despite knowing that there were
         others in Pakistan who could provide
20       information on Hayat's whereabouts, Mojaddidi
         testified that she did not conduct, or have
21       an investigator conduct, interviews of
         witnesses in Pakistan. (Id. at 781.)
22

23           In her declaration in support of Hayat's
         motion for a new trial, Mojaddidi stated that
24       she was also aware that [Hayat's cousin],
         Jaber Ismail, "had spent a substantial amount
25       of time with Hamid in Pakistan." (ECF No.
         441-2 at 2.) However, because Jaber was in
26       Pakistan at the time of trial, Mojaddidi
         stated that she "knew [she] would be unable
27       to serve him with a subpoena to testify at
         Hamid's trial." (Id.) At the evidentiary
         hearing, Mojaddidi testified that she did not
28       interview Jaber. (IV TR 738.)

Mojaddidi summarized her investigation into a possible alibi defense as follows: "I spoke with his mother, his uncle, I reviewed the [FBI interview reports in the] 302s, and one of his cousins was a person that I did consider, and ultimately decided not to use him."  (IV TR 737.)

. . . .

Mojaddidi testified that she did not consider many potential alibi witnesses as viable because they did not see Hayat every day.  For example, she did not believe the Pakistanis that Hayat played cricket with on a regular basis were viable witnesses because Hayat did not tell her that he played cricket every day. . . .

. . . .

. . . When asked whether she considered Hayat's statement that he had attended a [terrorist training] camp for three to six months, Mojaddidi testified that she did not "know why I would pursue something that I knew my client told me wasn't true." (Id. at 782.)  However, Mojaddidi was aware that Hayat's confession, which referred to attending a camp for "months," provided the basis for the government's case.  (Id. at 743.)

Mojaddidi testified that she was unaware that Rule 15 [of the Rules of Criminal Procedure] permitted her to seek to take the depositions of foreign witnesses in lieu of in-court testimony.  (IV TR 737.) . . . Mojaddidi also testified that Rule 15 was not relevant because she had rejected an alibi defense on the basis of a lack of "viable" witnesses.  However, that testimony is belied by other evidence.

. . . .

First, Mojaddidi believed that the only legitimate alibi witnesses were witnesses who saw Hayat every day.  Yet, the indictment charged Hayat with attending a terrorist training camp for a "period of months," and the only evidence adduced at trial regarding Hayat's attendance at a training camp was that he had done so for somewhere between three and six months.  Thus, Mojaddidi was

18

not required to account for Hayat's whereabouts every day in Pakistan over the two years he was there. Rather, an alibi defense needed to show that Hayat was seen during every continuous three-month period between October 2003 and November 2004, the dates identified in the indictment. Further, Mojaddidi's uncertainty about the frequency with which witnesses in Pakistan saw Hayat provided "no reasonable basis" to decide not to investigate. See Duncan [v. Ornoski], 528 F.3d [1222,] 1235 [(9th Cir. 2008)] (defense counsel's "mere" belief that certain testimony "might not be helpful" provided no basis to decide not to investigate it further); Ramonez v. Berghuis, 490 F.3d 482, 489 (6th Cir. 2007) (a decision to forego investigation into witnesses based on a "guess" about what those witnesses might say is not reasonable); Rios v. Rocha, 299 F.3d 796, 806 (9th Cir. 2002) (an unreasonable assumption is not a basis for a reasonable strategic decision); Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999) (counsel's "vague impression" that witnesses were not credible insufficient to excuse his failure to interview them).

Second, Mojaddidi was unaware of Rule 15 of the Rules of Criminal Procedure. "An attorney's ignorance of a point of law that is fundamental to [her client's] case combined with [her client's] failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." Hinton v. Alabama, 571 U.S. 263, 274 (2014). While Mojaddidi may have had good reason to reject [certain individuals that the government considered to have been involved with terrorism] as potential witnesses, she did not have any such basis to reject others in Pakistan. Because she felt she had no way to obtain their testimony, Mojaddidi failed to conduct an investigation into the possible testimony of other Pakistani witnesses. As a result, Mojaddidi failed to make informed decisions about an alibi defense.

. . . .

This court also notes that the evidence in the record is sparse about just what sort of investigation Mojaddidi conducted. She appeared to recall only talking with Hayat

19

and his mother for a "list" of potential alibi witnesses. She did not recall talking with his other family members but stated that she believed she did so. She did not testify about just what she asked Hayat's family members regarding possible alibi witnesses. Did she ask Hayat and his family members appropriately probing questions to identify friends and family members in Pakistan? Or, as the evidence before this court indicates, did she make little attempt to investigate witnesses in Pakistan because she did not feel she could obtain their testimony?

Mojaddidi's misconceptions caused her to make "strategic" decisions that were wholly uninformed. Mojaddidi's determination that witnesses were not viable was based on an error in logic. She did not understand that an alibi witness did not have to have been with Hayat every day. Her determination was further based on an unreasonable lack of knowledge of criminal law because she was unaware of Rule 15. For these reasons, Mojaddidi's decision that the witnesses were not viable was not a reasonable basis for her tactical decision to forego further investigation into alibi witnesses and to give up on an alibi defense. See Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); Avery v. Prelesnik, 548 F.3d 434, 437 (6th Cir. 2008) (Counsel cannot make a strategic decision not to have alibi witnesses testify when "he had no idea what they would have said.") Moreover, Mojaddidi's conduct, without considering her "strategy," was objectively unreasonable. A reasonably competent attorney would have done more to investigate Hayat's alibi.

Finally, it is worth noting that an alibi defense was not at odds with challenges to the government's evidence. Mojaddidi could very well have initiated investigations in Pakistan early on and then determined whether the witnesses would be able to appear in the United States or whether she would need to move for Rule 15 depositions. She had months to do so. Showing that Hayat could not have been at a jihadi training camp for the "period of months" specified in the indictment would have been completely

1

2

> consistent with the defense that Hayat's
> confession should not be credited and the
> government lacked other supporting evidence.

3   F&Rs at 24:20-25, 26:7-19, 27:2-5, 14-23, 28:19-22, 29:1-21,

4   32:18-25, 33:1-20 (some alterations in original) (footnote

5   omitted).

6       These factual findings are adopted. "A lawyer has a duty to

7   investigate what information . . . potential [alibi]-witnesses

8   possess, even if [she] later decides not to put them on the

9   stand." Sanders v. Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994)

10  (internal quotations and original alterations omitted). "While

11  it is strongly presumed that [defense] counsel made all

12  significant decisions in the exercise of reasonable professional

13  judgment, . . . counsel cannot be said to have [exercised

14  reasonable professional judgment] without first procuring the

15  information necessary to make such a decision." Williams v.

16  Filson, 908 F.3d 546, 567 (9th Cir. 2018) (internal quotations

17  and citation omitted).

18       **Failure to procure and present a false confession expert**

19      The United States also objects to the magistrate judge's

20  following findings that Mojaddidi was ineffective because she did

21  not procure a false confession expert:

22              The evidence before the [magistrate judge]
               makes clear that Mojaddidi did not seriously
23              consider using a false confessions expert.
               Rather, she and Griffin, from the beginning,
24              decided that [former FBI special agent James]
               Wedick would testify about: (1) the
25              interrogation techniques used and, (2) why
               those techniques can render a confession
26              unreliable. The problem is that Wedick did
               not have the expertise to testify to that
27              second, and most important, point. As noted
               by the district [judge in a ruling on the
28              government's motion to exclude Wedick's

proposed testimony], Wedick had no background
in psychology or other expertise to talk
about the effect of the interrogation
techniques on a suspect.

F&Rs at 60:1-7.

The United States argues:

Mojaddidi reviewed all of Hayat's FBI
interviews and believed that the most
important evidence against him was his
confession. (W.M. Depo. 49:5-14, 68:16-18,
162:18-19, 207:6-11; Tr. 743:2-4). Ms.
Mojaddidi was familiar with methods to
challenge purported false confessions, had
"learned about" the law governing
voluntariness of a confession, and had
discussed it with Mr. Griffin and James
Wedick, a former FBI special agent with 35
years of experience, who was an investigator
for [Hamid] Hayat and Umer [Hayat] before and
through their 2006 trials. (W.M. Depo. 41:9-
14, 70:4-16; Tr. 574:14-610:22, 583:6-11,
744:2-15). Ms. Mojaddidi originally intended
to challenge Hayat's confession with a
defense expert on false confessions and
cross-examination of his government
interrogators. (W.M. Depo. 207:12-209:17). .
. . Ms. Mojaddidi "certainly" knew a
challenge to the "voluntariness" of a
confession was a legal basis for a motion to
suppress. (Tr. 744:18-20).

The defense intended to call Wedick as
an expert to explain why Hayat's confession
was unreliable. (W.M. Depo. 70:9-16; Tr.
594:6-9). As an FBI agent, Wedick had
conducted hundreds of interviews and
interrogations, and agreed to serve as an
expert to offer an opinion on the techniques
used to elicit Hayat's confession, among
other things. (W.M. Depo. 207:16-208:4; Tr.
575:12, 604:6-21, 724:9-25; Gov. Sup. Ans.
Ex. 18). Ms. Mojaddidi was aware Wedick had
never previously qualified as an expert in
the field of false confessions but she
believed he would be "good" and would be
deemed qualified to testify. (W.M. Depo.
70:21-23, 71:5-7, 208:16-17, 286:4-6). Ms.
Mojaddidi was aware there were other
potential false confession experts, and
considered information sent to her by other
experts in the field but did not contact

1  them.    (<u>Id.</u> at 70:24-71:7, 208:7-17).
   Ultimately, she decided to utilize Wedick as
2  an expert on behalf of Hayat. (W.M. Depo.
   208:18-209:1; Tr. 594:6-9).

3

4  Objs. at 98:16-28, 99:1-8 (footnote omitted).

5      The United States further argues: "Mojaddidi reasonably

6  believed that Wedick's experience in conducting FBI

7  interrogations would be sufficient to establish his

8  qualifications to offer an expert opinion concerning the defense

9  theory of Hayat's purportedly unreliable confession."   <u>Id.</u> at

10  113:1-3.  Mojaddidi disclosed Wedick in her Rule 16 of the

11  Federal Rules of Criminal Procedure disclosure statement,

12  explaining:

13         Wedick would testify, among other things,
           that "the FBI Sacramento office had the
14         capability to videotape Hamid Hayat's
           interview right when it actually started";
15         that "the interviewing agents did not
           consider but should have considered [Hayat's]
16         vulnerabilities as an interviewee"; and that
           the agents "all used leading questions during
17         the interviews of Hamid Hayat."

18  <u>Hayat</u>, 710 F.3d at 903 (alteration in original).

19      The United States moved for an order excluding Wedick's

20  proposed testimony, and the motion was granted.  F&Rs at 57:11-

21  25, 58:1-7.

22         The district [judge] excluded Wedick's
           testimony in its entirety, finding that much
23         of the testimony was of "marginal probative
           value" and that its value was outweighed by
24         the risk of confusing the jury, wasting time,
           and presenting needless cumulative evidence.
25         The [district judge] also concluded that
           Wedick's testimony "would not assist the
26         trier of fact."

27  <u>Hayat</u>, 710 F.3d at 903.

28      Hayat has not shown that Mojaddidi was objectively

                              23

1   unreasonable in her belief that Wedick could be qualified to

2   testify as a false confession expert.   Further, during trial,

3   Mojaddidi "thoroughly explored the conduct of the [FBI] agents

4   who participated in Hayat's interview, including the improper use

5   of leading questions, during her cross-examination of those

6   agents."   Id.   Therefore, the magistrate judge's finding that

7   Mojaddidi's failure to procure a different false confession

8   expert constituted deficient representation is rejected.

9   **Failure to procure and present an Arabic language defense expert**

10  **on the meaning of the supplication**

11      The United States objects to the finding that Mojaddidi

12  failed to adequately search for an Arabic language expert to

13  counter the government's Arabic language expert's testimony on

14  the supplication Hayat carried in his wallet.   Objs. at 132:18-

15  23, 133:1-21.   The United States argues: "Mojaddidi could not

16  obtain an Arabic-speaking expert to opine on the correctness of

17  Dr. Mohammed's translation and focused instead on effectively

18  cross-examining him."   Id. at 128:24-25.

19      Hayat replies:

20          [the magistrate judge noted] the sparseness
            of the record regarding Mojaddidi's efforts
21          at locating an Arabic language expert –
            Mojaddidi provided no details in her
22          testimony nor supporting documentation as to
            those efforts – the magistrate stated that
23          "without knowing who those people were it is
            not possible to determine whether any would
24          have qualified as an expert or what their
            testimony could have been."   (F&R at 86.)
25

26  Reply at 36:6-10.

27      The magistrate judge finds:

28          Mojaddidi testified at her deposition

24

1
2
3
4
5
6
7

> that she attempted to find an Arabic language
> expert who could testify about the meaning of
> the supplication. (Mojaddidi Depo. at 199
> (ECF No. 548 at 239).)   Mojaddidi further
> testified that [defense expert Anita Weiss]
> provided some names and Mojaddidi contacted
> people . . . who might be able to provide
> that testimony. (Id.)  However, [Mojaddidi]
> was "unsuccessful."    (Id.)    Mojaddidi
> estimated that she contacted "at least ten"
> people to testify regarding the supplication.
> (Id. at 200.)  She was unable to identify any
> of the people she contacted.

8  F&Rs at 86:5-11.

9      The magistrate judge also finds:

10
11
12
13
14

> The   record  is   sparse  about   Mojaddidi's
> conduct  in  attempting  to  locate  an  Arabic
> language   expert   to   testify   about   the
> supplication.   While  she  testified  that  she
> contacted  "at   least  ten  people,"  without
> knowing  who  those  people  were  it  is  not
> possible  to  determine  whether  any  would  have
> qualified   as   an   expert   or   what   their
> testimony could have been. . . .

15
16
17
18
19
20
21
22
23
24

> Hayat  provides  an  article  from  the
> Atlantic Monthly, published in October 2006,
> shortly  after  trial.  The  author  contacted
> Professor Bernard Haykel, who had testified
> for the defense in a 2003 terrorism trial in
> Detroit;  Ingrid  Mattson,  a  professor  of
> Islamic  Studies  at  Hartford  Seminary;  and
> Salman  Masood,  a  Pakistani  journalist  in
> Islamabad.  (EH Ex. ZZ at 90-91.)  Each of
> these   people   was   familiar   with   the
> supplication  and  told  the  author  it  is
> "common."  The fact that the article's author
> found three people who knew the supplication,
> two of whom who were scholars and potential
> experts,   shows   that   there   were   experts
> available.  Haykel testified in the present
> case that he was available in March 2006 and,
> if  asked,  would  have  testified  at  Hayat's
> trial.

25  F&Rs at 86:14-28, 87:1-2.

26  The   information  Mojaddidi  provided  during  the  habeas

27  proceeding  on  her  efforts  to  find  an  Arabic  language

28  supplication  expert  fails  to  evince  that  when  she  discontinued

1   her   search,   that   information   "would   [have   led]   a   reasonable

2   attorney   to   [conclude   there   was   no   need   to   search]   further."

3   Wiggins v. Smith, 539 U.S. 510, 527 (2003).   "Strickland demands

4   that   such   decisions   be   reasonable   and   informed."   Jennings v.

5   Woodford, 290 F.3d 1006, 1014 (9th Cir. 2002) (citing Strickland,

6   466 U.S. at 691).   Therefore, the magistrate judge's findings on

7   this issue are adopted.

8   **Failure to object to Dr. Mohammed's testimony under Rule 704(b)**

9   The   United   States   objects   to   the   finding   that   Mojaddidi

10  should have challenged Dr. Mohammed's testimony as impermissible

11  opinion on Hayat's state of mind under Rule 704(b), because the

12  "legal   precedent   'raised   serious   questions'   about   this   issue."

13  F&Rs at 83:20-22.   The United States argues this conclusion

14  "conflicts with the Ninth Circuit's holding in Hayat, 710 F.3d at

15  901-02   that,   under   established   precedent,   Dr.   Mohammed's

16  testimony was proper under Rule 704(b)."   Objs. at 124:14-15.

17  Hayat rejoins the government is wrong because "a ruling that the

18  admission   of   evidence   did   not   constitute   plain   error   does   not

19  mean that evidence should have and would have been admitted over

20  a proper objection."   Reply at 34:5-7.

21  Hayat   has   not   shown   that   Mojaddidi's   failure   to   object   to

22  this testimony was constitutionally deficient representation:

23          Under [Ninth Circuit] precedent, Rule 704(b)
        does    not    bar    testimony    supporting    an
24      inference or conclusion that a defendant does
        or does not have the requisite mental state,
25      so  long  as  the  expert  does  not  draw  the
        ultimate inference or conclusion for the jury
26      and the ultimate inference or conclusion does
        not    necessarily    follow    from    the
27      testimony. . . .

28              . . . .

26

> . . . Mohammed testified about the kind of person who would carry a note such as the one found in Hayat's wallet, but he never commented directly on Hayat's mental state.

*Hayat*, 710 F.3d at 901–02 (internal quotations and citations omitted).

The magistrate judge's finding is rejected because Hayat has not shown Mojaddidi's failure to object fell below the objective standard of reasonableness.

### **Other Objections**

The government objects to "any finding that Ms. Mojaddidi's failure to seek a security clearance was deficient." Objs. at 19 n.17. The United States argues this finding should be reversed "because it is unnecessary to dispose of Hayat's claim and, more importantly, establishes a rule, contrary to law, that defense counsel in a case possibly involving classified information is *per se* ineffective for failing to seek and obtain an unnecessary security clearance." Id. This conclusory legal finding is rejected.

The government also objects to the admission of Tahir Anwar's affidavit and testimony during the habeas proceeding, arguing this evidence "was inadmissible because he was not a percipient witness and therefore could not offer a lay opinion on facts he did not perceive." Objs. at 131 n.92. The magistrate judge finds Anwar's testimony was admissible as percipient witness evidence under Evidence Rule 701, and has probative value on the deficiency representation finding that Mojaddidi should not have aborted her search for an Arabic language expert on the meaning of the supplication Hayat possessed when she did. F&Rs

1   at 90:24-27, 91:1-5.   The admissible portion of the challenged

2   lay witness evidence has minimal probative value on the

3   deficiency finding that Mojaddidi should have procured an Arabic

4   speaking expert witness on the meaning of the supplication to

5   more effectively counter the prosecution's expert witness's

6   testimony on this issue.

7       The government also objects to the magistrate judge's

8   findings that Mojaddidi was ineffective when she failed to object

9   to the government's rebuttal closing argument on the probative

10  value of Dr. Mohammed's testimony and by her failure to respond

11  to the government's characterization of Dr. Mohammed's testimony

12  in her closing argument.   Objs. at 140:9-11.

13      Mojaddidi gave her closing argument before the government

14  gave a rebuttal closing argument, so she was not authorized to

15  make additional closing argument.   Standard procedure in criminal

16  cases in which the government must prove each element of a crime

17  beyond a reasonable doubt prescribes that the government gives

18  its opening closing argument, followed by the defense closing

19  argument, and then the government gives a rebuttal closing

20  argument.   Further, abstaining from objecting during closing

21  argument is a common choice: "Because many lawyers refrain from

22  objecting during . . . closing argument, absent egregious

23  misstatements, the failure to object during closing argument is

24  within the 'wide range' of permissible professional legal

25  conduct."   United States v. Necoechea, 986 F.2d 1273, 1281 (9th

26  Cir. 1993) (citing Strickland, 466 U.S. at 689), as amended on

27  denial of reh'g (Apr. 15, 1993).

28      In addition, Mojaddidi appears to have anticipated and

1   adequately addressed the subject portion of the government's

2   rebuttal closing argument when she gave her closing argument, and

3   her closing argument has not been shown to be an objectively

4   unreasonable argument.   See RT 4322:2-25, 4323:1-25, 4324:1-2

5   (April 12, 2006).[3]   Further, the trial judge explained to the

6   jury in the jury instructions that closing arguments are not

7   evidence, and if the facts as jurors remember them differ from

8   the way the lawyers state them, each juror's memory of them

9   controls.

---

[3] The relevant portion of Mojaddidi's closing argument follows:

   The government's expert, Dr. Mohammed, testified that it was a
   prayer carried by a warrior.  Dr. Mohammed admitted on the stand
   that his views were controversial amongst Muslim scholars. . . .
      Dr. Mohammed has never been to Pakistan and he doesn't
   understand the culture.  In fact, he had to send e-mail asking
   former students of his, who are not scholars, what the
   significance of carrying such a prayer was in Pakistan.  He
   didn't know himself.  And he ultimately based his opinion about
   that prayer on a person he's never met in Uzbekistan, and on a
   man who no longer works for an Egyptian university because of his
   radical views.
      . . . He essentially called random people who he knew would
   agree with him.
      And he catered his testimony to draw one conclusion.  Even
   when I asked him about the two major sources that he relied upon,
   and I pointed out that one of those sources had this prayer in
   the Book of Traveling, he attempted to put that in the context of
   jihad.  He had one goal.  That was the conclusion he wanted to
   draw, and he was going to draw it however he had to.
      He also gave a literal translation, and admitted that
   literal translations can often change the meaning of the words.
      See, the problem with Dr. Mohammed's testimony about that
   prayer is that he has no idea of the cultural context of carrying
   such a prayer in Pakistan.  He can't possibly because he just
   doesn't know about Pakistani culture.
      Dr. Anita Weiss, however, is an expert on Pakistani
   culture.  You heard her tell you that carrying prayers in Arabic
   is a very common practice in Pakistan, especially by travelers
   for safety reasons.  The government either doesn't understand the
   cultural significance of carrying a ta'wiz or it didn't want you
   to know about it.  Because had they asked their other expert, Mr.
   Abbas, who knows about Pakistani culture, he would have told them
   that Dr. Mohammed's conclusions were wrong, and that prayers like
   those are commonly carried by travelers and not warriors.  So Dr.
   Mohammed's testimony itself was problematic.  And the existence
   of that prayer in Hamid's wallet doesn't prove that he went to a
   terrorist training camp.

29

1    Therefore, these findings are rejected.

2    **Prejudice**

3    Since Hayat has shown his counsel's representation was

4    deficient on two issues, the remaining question is whether

5    Hayat's defense was prejudiced by counsel's errors.  Hayat "is

6    deemed to have suffered 'prejudice' as the result of [counsel's]

7    performance if he succeeds in demonstrating that 'there is a

8    reasonable probability that, but for counsel's errors, the result

9    of the proceeding would have been different.'"  Bonin, 59 F.3d at

10   833 (quoting Wade v. Calderon, 29 F.3d 1312, 1323 (9th Cir.

11   1994), overruled on other grounds by Rohan ex rel. Gates v.

12   Woodford, 334 F.3d 803, 815 (9th Cir. 2003)).

13   To determine prejudice, the court "must compare the evidence

14   that actually was presented to the jury with that which could

15   have been presented had counsel acted appropriately." Cannedy v.

16   Adams, 706 F.3d 1148, 1163 (9th Cir. 2013) (quoting Thomas,

17   678 F.3d at 1102), as amended on denial of reh'g, 733 F.3d 794

18   (9th Cir. 2013).  The court then decides whether "a reasonable

19   probability" exists that a juror "hearing the additional evidence

20   developed in the postconviction [habeas] proceedings," would have

21   made a different decision.  Williams v. Taylor , 529 U.S. 362,

22   396-97 (2000).  "Some errors will have had a pervasive effect on

23   the inferences to be drawn from the evidence, altering the entire

24   evidentiary picture, and some will have had an isolated, trivial

25   effect." Strickland, 466 U.S. at 695-96.

26   **Prejudice from failure to investigate potential alibi witnesses**

27   Hayat's habeas counsel presented six alibi witnesses at the

28   habeas evidentiary hearing.  F&Rs at 11:28.  These witnesses

1  could have testified at trial if Mojaddidi had adequately

2  investigated a potential alibi defense and presented that defense

3  during trial. The magistrate judge finds all six alibi witnesses

4  sufficiently credible, explaining that notwithstanding Hayat's

5  confession that he attended a training camp for three to six

6  months, the witnesses' testimony "directly contradicted" the

7  confession, their "testimony was consistent," and demonstrated

8  that "the longest period of time Hayat was absent from his

9  family's village in Behboodi was one week." F&Rs at 47:5-10.

10  The magistrate judge explains:

11          [the six witnesses] accumulated
        testimony . . . show[s] that Hayat was not
12      absent from Behboodi or Rawalpindi for any
        consecutive three-month period. The court
13      has no problem accepting the fact that family
        members and good friends, who typically saw
14      Hayat on a daily or weekly basis when he was
        in Pakistan at that time, would have
15      remembered such an extended absence. Their
        memories did not need to be perfect about the
16      events of those two years to have that
        recollection.
17

18          Further, the witnesses corroborated each
        other on some important points during the
19      relevant time period of Fall 2003 to Fall
        2004. Raheela[, Hayat's sister,] and Jaber[,
20      Hayat's cousin,] recalled that when Hayat's
        family first arrived in Pakistan, they spent
21      a short period of time in Rawalpindi before
        moving to Behboodi where they resided during
22      their stay. (I TR 131-32; II TR 308.)
        Raheela and Rafaqat[, Hayat's friend,]
23      recalled that Hayat's trips to Rawalpindi
        with his family for his mother's medical
24      treatments occurred once or twice a month.
        (I TR 136-37; VI TR 962.) Several witnesses
25      recalled that besides the trips to
        Rawalpindi, which sometimes included
26      Islamabad, Hayat only took two trips, both to
        Multan and neither of which exceeded a week.
27      (I TR 138-40 (Raheela); II TR 314-15 (Jaber);
        VI TR 935-36 (Anas); VI TR 960 (Rafaqat).)

28          The lynchpin of the government's case

1
2
3
4

> against Hayat was Hayat's confession.
> Without it, the government could not have
> proven Hayat took any act in material support
> of terrorism.  The alibi witness testimony
> would have undermined jurors' reliance on
> Hayat's confession.

5   F&Rs at 51:18-28, 52:1-6 (footnote omitted).

6   The magistrate judge's factual determinations concerning the

7   testifying alibi witnesses are adopted.

8   **Prejudice from failure to call a defense Arabic language expert**

9   **witness on the supplication**

10   Hayat's habeas counsel also presented Dr. Bernard Haykel, a

11   professor of Near Eastern Studies at Princeton University, who

12   testified as an expert on the Arabic language, Islamic culture,

13   and Islamic political movements, and gave his expert opinion on

14   the supplication found in Hayat's wallet.  F&Rs at 88:12-28,

15   89:1-10.  The magistrate judge finds Haykel's testimony "clear

16   and unequivocal – the supplication Hayat carried was commonly

17   used by many Muslims, not just by jihadis."  F&Rs at 90:18-19.

18
19
20
21
22
23

> Haykel defined a "supplication" as an
> invocation or prayer to God.  [(IV TR 634.)]
> In Arabic, such a supplication is called a
> "du'a."  (Id.)  The source of this du'a  is
> the Hadith, a tradition of the Prophet
> Muhammad.  (Id.)  This du'a is found in a
> number of different collections of prophetic
> traditions.  (Id. at 636.)  Haykel testified
> that he was familiar with the supplication.
> (Id. at 635)  He had heard it used.  (Id.)

24
25
26
27
28

> Haykel testified that the literal
> translation of the du'a is "Oh, God, we ask
> you to be at the  throats [of our enemies].
> And we seek your help and assistance from
> their evils or their misdeeds."  (IV TR 638.)
> The idiomatic translation provided by Haykel
> is "Oh, God, we ask, or beseech, you to . . .
> confront out enemies.  And we ask you for
> help from their evil deeds."  (Id.  at 639.)
> Haykel explained that "tradition tells us

32

1
2
3

> that [the Prophet] used [this du'a] at a time
> when he was about to begin travel. . . . And
> travel at the time in Arabia . . . was
> fraught with danger." (Id.)

4
5
6
7
8
9

> Haykel testified that this du'a is not
> exclusive to any particular group. "All
> Muslims use it." (IV TR 640.)  He testified
> that some invocations may call on God to help
> defeat an enemy. (Id. at 642.)  However, the
> supplication Hayat carried was not an
> "offensive invocation" like that.  Rather, it
> would be used when a Muslim is afraid that
> someone might harm him. (Id.)  Haykel has
> heard the prayer used by religious leaders
> leading midday Friday prayers. (Id. at 642-
> 43.)

10
11
12
13

> Haykel testified that an opinion that
> anyone who carried or recited this
> supplication would necessarily be involved in
> violent jihadi behavior was unfounded.  (IV
> TR 644-45.)  "[A]ll Muslims use this
> supplication, not just jihadis." (Id. at
> 675.)

14
15

F&Rs at 88:19-28, 89:1-10 (some alterations in original)
(footnote omitted).

16
17
18
19
20

Haykel's expert opinion that the supplication is used by many Muslims, "not just jihadis," supports Hayat's argument that Mojaddidi's failure to present an Arabic language expert on the meaning of the supplication during trial contributed to the prejudice Hayat suffered.

21

**Prejudice Analysis**

22
23
24
25
26
27
28

The remaining issue is whether there is a "reasonable probability" that Hayat's jury, or a juror, would have reached a different decision had evidence been presented to the jury that was not presented because of counsel's errors.  Thomas, 678 F.3d at 1105.  "Prejudice is established if there is a reasonable probability that at least one juror would have struck a different balance . . . ."  Hamilton v. Ayers, 583 F.3d 1100, 1131 (9th

1   Cir. 2009) (quoting <u>Belmontes v. Ayers</u>, 529 F.3d 834, 863 (9th

2   Cir. 2008), <u>rev'd on other grounds sub nom.</u> <u>Wong v. Belmontes</u>,

3   558 U.S. 15 (2009)). When considering this reasonable

4   probability issue, the court examines whether "objective clues"

5   exist "as to [a juror's] assessment of the case strongly

6   suggest[ing] that the case was close." <u>Thomas</u>, 678 F.3d at 1103.

7   Objective clues could include the length of jury deliberations, a

8   jury request for a readback of testimony, and a jury

9   communication evincing that the jury reached an impasse in its

10  deliberations.

11       "Longer jury deliberations weigh against a finding of

12  harmless error because lengthy deliberations suggest a difficult

13  case." <u>United States v. Velarde-Gomez</u>, 269 F.3d 1023, 1036 (9th

14  Cir. 2001) (en banc)(internal quotations omitted)(indicating

15  complexity of trial issues are considered when deciding this

16  factor by concluding "the four-day jury deliberations were

17  relatively lengthy for this two-count drug importation and

18  possession case."). "Further, [when] the jury asked for

19  readbacks of . . . testimony while it was deliberating," that

20  could evince "it evidently did not regard the case as an easy

21  one." <u>United States v. Blueford</u>, 312 F.3d 962, 976 (9th Cir.

22  2002).

23       Hayat's jury took nine days to render a verdict. ECF Nos.

24  311-28. The jury deliberated on April 12, 13, 14, 17, 19, 20,

25  21, 24, and 25, 2006. The trial transcript shows that on

26  Thursday April 13, 2006, there was discussion of the jury's

27  request for readback of the videotaped interviews of Hayat. RT

28  4558:16-4559:1-15. An order issued on Monday, April 17, 2006,

stating in pertinent part: "Last week, . . . the Hamid jury . . .
requested . . . the replay of certain videotapes.   The replay
before the Hamid jury is scheduled to begin at 9:00 a.m. on
[Monday] April 17, 2006."   Order, ECF No. 314.   The docket
minutes show that on Tuesday, April 18, 2006, the video replay
was completed and the jury resumed deliberations and eventually
recessed until Wednesday, April 19, 2006, at 9:00 a.m.   On
Wednesday, April 19, 2006, the docket minutes show another note
was received from the jury, dated April 19, 2006.   The trial
transcript shows that the April 19, 2006 note concerned the
phrase material and/or resources in a jury instruction.   RT
4656:5-25, 4675, 4693:8-25, 4694-4697:1-4.   Further discussion
was held on this jury instruction issue on Thursday, April 20,
2006, and a supplemental jury instruction was given later that
day.   RT 4706-4708:1-8.   On Friday, April 21, 2006, the judge
received a jury note signed by the foreperson at 4:05 p.m.,
stating: "There is impass [sic] with a juror who does not seem to
fully comprehend the deliberation process.   I'm available to
discuss this with you and counsel at anytime [sic]."   The note is
attached to an order filed April 26, 2006.   ECF No. 326.   The
judge responded with the following written communication: "Jury,
Please continue your deliberations."   Id.

The trial transcript reveals that on Monday, April 24, 2006,
at 1:55 p.m., the jury requested in a note: "Testimony of Agent
Harry Sweeney of 6/4/05 interview with Hamid Hayat."   RT 4782:4-
4787:25 (April 24, 2006).   This testimony covered Hayat's
confession.   The judge responded to the jury in writing on April
24, 2006, at 2:40 p.m., stating: "I am considering your request

1   and estimate it could take until 4:30 p.m. or approximately 9:00

2   o'clock a.m. on Tuesday, [April 25, 2006,] before the court

3   reporter prepares that testimony."  RT 4794:25, 4795:2-4 (April

4   24, 2006).  The readback of agent Harry Sweeney's testimony of

5   the interview with Hamid Hayat occurred on Tuesday, April 25,

6   2006.  After the readback on April 25, 2006, the jury returned a

7   guilty verdict on all four charged counts.  ECF No. 328.

8       Even though the jury returned guilty verdicts after the

9   agent Sweeney interview with Hayat was read back to the jury, the

10  April 21, 2006 jury note evinces that one juror was clearly

11  struggling to reach a verdict on which other jurors agreed.

12  Therefore, "additional exculpatory evidence, [on Hayat's] alibi

13  defense [and testimony from an Arabic language expert on the

14  meaning of the supplication Hayat carried], had a strong

15  likelihood of tipping the scales [for that juror] in the other

16  direction."  Foster v. Wolfenbarger, 687 F.3d 702, 710 (6th Cir.

17  2012).  "And, because the jury was required to reach a unanimous

18  verdict on each count, the outcome could have differed if only

19  'one juror would have struck a different balance.'"  Weeden v.

20  Johnson, 854 F.3d 1063, 1071 (9th Cir. 2017) (quoting Wiggins,

21  539 U.S. at 537).

22      Therefore, the F&Rs filed January 11, 2019, ECF No. 734, are

23  adopted in part and the movant's convictions and sentence are

24  vacated.  Further, the Clerk of Court shall close the companion

25  case No. 14-cv-1073 and enter judgment for the movant.

26      Dated:  July 29, 2019

27

28

                                GARLAND E. BURRELL, JR.
                                Senior United States District Judge